1   Chris Beatty, SBN 250040
    LAW OFFICES OF ANDREW WOLFF, PC
2   1970 Broadway Ste. 210
    Oakland, California 94612
3   Tel: (510) 834-3300, Fax: (510) 834-3377
    chris@awolfflaw.com
4
    Jesse Newmark, SBN 247488
5   CENTRO LEGAL DE LA RAZA
    3022 International Blvd., Ste. 410
6   Oakland, California 94601
    Tel: (510) 437-1554 x115, Fax: (510) 437-9164
7   jessenewmark@centrolegal.org

8
    Attorneys for Relators Denika Terry and Roy Huskey III
9

**FILED**

APR 14 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

**SEALED**

10          UNITED STATES DISTRICT COURT

11              EASTERN DISTRICT OF CALIFORNIA

12                  SACRAMENTO DIVISION

13

14   UNITED STATES OF AMERICA, *ex*        Case No. 2:15 - CV - 0799 KJM DAD
     *rel.* DENIKA TERRY and ROY
15   HUSKEY III, and each of them for
     themselves individually, and for all   **CLASS ACTION COMPLAINT FOR**
16   other persons similarly situated and   **DAMAGES AND INJUNCTIVE**
     on behalf of the UNITED STATES         **RELIEF PURSUANT TO FALSE**
17   OF AMERICA,                            **CLAIMS ACT 31 U.S.C. § 3729, ET**
                                            **SEQ.**
                Plaintiffs/Relators,
18
                                            **FILED UNDER SEAL**
19   vs.                                    **31 U.S.C. §§ 3729-32**

20   WASATCH ADVANTAGE GROUP,
     LLC, WASATCH PROPERTY                  **JURY TRIAL DEMANDED**
21   MANAGEMENT, INC., WASATCH
     POOL HOLDINGS, LLC,
22   CHESAPEAKE COMMONS
     HOLDINGS, LLC, LOGAN PARK
23   APARTMENTS, LLC, LOGAN
     PARK APARTMENTS, LP, and
24   DOES 1-30,

25                Defendants.

26

27

28

U.S., *ex rel.* Terry, et al. v. Wasatch Advantage Group, et al.
Plaintiffs' Class Action Complaint for Damages and Injunctive Relief; Jury Trial Demanded          -1-

**CLASS ACTION COMPLAINT**

Qui tam plaintiffs DENIKA TERRY and ROY HUSKEY III ("Plaintiffs") demand a trial by jury. Qui tam plaintiffs DENIKA TERRY and ROY HUSKEY III on behalf of themselves and those similarly situated, allege as follows:

**INTRODUCTION**

1.     Plaintiffs seek to represent a class of past, present, and prospective tenants of Defendants Wasatch Advantage Group LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake Commons Holding, LLC, Logan Park Apartments, LLC, Logan Park Apartments, LP, and Does 1-30 ("Defendants").

2.     Defendants own, rent, and/or manage residential apartment units throughout the United States.

3.     Defendants' properties include four apartment communities located at: 4141 Palm Avenue, Sacramento, CA 95842 ("Palm Avenue Property"); 3600 Data Drive, Rancho Cordova, CA 95670 ("Data Drive Property"); 6633 Valley Hi Drive, Sacramento, CA 95823 ("Valley Hi Property"); and 4719 50th Avenue, Sacramento, CA 95823 ("50th Avenue Property") (collectively, "Subject Properties").

4.     At all times relevant to this Complaint, Denika Terry was Defendants' tenant at Apartment No. 391 of the Data Drive Property.

5.     At all times relevant to this Complaint, Roy Huskey III was Defendants' tenant at Apartment No. 191 of the Palm Avenue Property.

6.     Defendants rent numerous apartments at their properties to tenants who receive rental assistance through the federally subsidized Housing Choice Voucher Program, commonly known as "Section 8." The Section 8 program provides that a participating tenant, renting privately-owned housing, pays generally between 30 and 40 percent of their adjusted monthly income toward the rent and utility costs, while the federal government and local housing agencies pay the balance of the rent directly to the property owner.

7.     At the Subject Properties specifically, it is Plaintiffs' understanding there are more than one-hundred Section 8 tenants at the Data Drive Property, approximately fifty Section 8

1 tenants at the Valley Hi Property, and fifteen to twenty Section 8 tenants at the 50th Avenue
2 Property. There are more than two Section 8 tenants at the Palm Avenue Property.

3    8.    At all times relevant to this Complaint, Defendants were parties to Housing
4 Assistance Payments Contracts ("HAP Contracts") both with Plaintiffs and the Sacramento
5 County Housing and Redevelopment Agency, pursuant to the Section 8 program.

6    9.    As part of their usual course of business, Defendants violated and continue to
7 violate federal and state laws by demanding additional monthly rental payments from Plaintiffs
8 and Defendants' other Section 8 tenants, in excess of the tenants' portion of the rent due under
9 their HAP Contracts. These additional payment demands include rental charges for washers and
10 dryers, renter's insurance, and covered parking. Defendants threatened to evict Plaintiffs if they
11 did not make these additional payments. Defendants' actions caused Plaintiffs to suffer
12 economic harm and emotional distress.

13    10.    Through these unlawful actions, Defendants knowingly presented false and
14 fraudulent claims for payment of approval to the United States and local public housing agencies,
15 including the Sacramento County Housing and Redevelopment Agency. These actions by the
16 Defendants have caused the United States and local public housing agencies to suffer economic
17 damages.

18    11.    This action is brought under the United States False Claim Acts, 31 U.S.C. §§
19 3729 et seq. Plaintiffs seek all and any statutory share of any award made to the United States.
20 The United States seeks all remedies available under the False Claims Act.

21                                          **PARTIES**

22    12.    Defendants currently own and manage 69 apartment communities with 16,344
23 units across five western states: California, Utah, Arizona, Colorado, and Washington. These
24 properties range in size from 40 units to 661 units.

25    13.    Defendants were the owners and property managers, or the agents or employees of
26 the owners and property managers, of the Subject Properties, during all time periods relevant
27 herein.

28    14.    Defendants owned, controlled, and managed the Subject Properties, including

U.S., *ex rel.* Terry, et al. v. Wasatch Advantage Group, et al.
Plaintiffs' Class Action Complaint for Damages and Injunctive Relief; Jury Trial Demanded          -3-

1    renting the apartment units at the Properties.

2       15.    Defendant Wasatch Advantage Group, LLC, is a limited liability corporation,

3 registered with the Secretary of State to do business in the State of California. Defendant

4 Wasatch Advantage Group, LLC, is an entity used by Defendants to own and/or manage

5 properties including the Palm Avenue Property.

6       16.    Defendant Chesapeake Commons Holdings, LLC, is a limited liability

7 corporation, registered with the Secretary of State to do business in the State of California.

8 Defendant Chesapeake Commons Holdings is a signatory party to the September 20, 2010 HAP

9 Contract for Plaintiff Denika Terry. A true and accurate copy of this HAP Contract is attached to

10 the Complaint as Exhibit A.

11       17.    Defendant Wasatch Property Management, Inc., is a corporation, registered with

12 the Secretary of State to do business in the State of California. Defendant Wasatch Property

13 Management is a party to the June 30, 2011 Residential Rental Agreement with Plaintiff Roy

14 Huskey III. A true and correct copy of this lease agreement is an attachment to the HAP Contract

15 attached to the Complaint as Exhibit E. Defendant Wasatch Property Management also provided

16 the Resident Ledgers for Plaintiffs Denika Terry and Roy Huskey III, setting forth rents received,

17 as well as the additional, unlawful rental charges for "Washer/Dryer Rental," "Rental Insurance,"

18 and "Covered Parking." True and accurate copies of the Resident Ledgers are attached to the

19 Complaint as Exhibits B and F. In addition, the HAP Contracts for Plaintiffs Denika Terry and

20 Roy Huskey III direct that payments be mailed "cared of" Defendant Wasatch Property

21 Management. (Exh's. A & E.)

22       18.    Both Defendants Chesapeake Commons Holdings and Wasatch Property

23 Management, Inc., received August 18, 2011 and/or August 10, 2012 Subsidy Adjustment

24 Notices from the Sacramento Housing and Redevelopment Agency for Plaintiff Denika Terry.

25 True and accurate copies of these notices are attached to the Complaint as Exhibits C and D.

26       19.    Defendant Logan Park Apartments, LLC, is a limited liability corporation,

27 registered with the Secretary of State to do business in the State of California. Defendant Logan

28 Apartments, LP, is a limited partnership, registered with the Secretary of State to do business in

1 | the State of California.  Defendant Logan Park Apartments is party to both the July 8, 2011 HAP
2 | Contract and July 30, 2011 Residential Rental Agreement for Plaintiff Roy Huskey III. (Exh. E.)

3 | 20. Defendant Wasatch Pool Holdings, LLC, is a limited liability corporation,
4 | registered with the Secretary of State to do business in the State of California.  Defendant
5 | Wasatch Pool Holdings is an entity used by Defendants to own and/or manage properties
6 | including the Data Drive Property.

7 | 21. Qui tam plaintiff Denika Terry resides in Sacramento, CA, and is a 38-year-old
8 | single mother of two minor children.  Denika Terry suffers from a disability as defined by state
9 | and federal law in that she suffers from bipolar disorder.  At all times relevant to this Complaint,
10 | Denika Terry's sole sources of income were public assistance totaling approximately $4,408 per
11 | year for her and her two minor children.  Because of her extremely limited income, Denika Terra
12 | received Section 8 rental assistance.

13 | 22. Qui tam plaintiff Roy Huskey III resides in Sacramento, CA, and is a 44-year-old
14 | single father of one minor child.  At all times relevant to this Complaint, Roy Huskey III's sole
15 | sources of income was public assistance totaling approximately $15,624 per year for him and his
16 | child.  Because of his extremely limited income, Roy Huskey III received Section 8 rental
17 | assistance.

18 | 23. Plaintiff the United States of America is *ex rel.* Denika Terry and Roy Huskey III.

19 | **JURISDICTION**

20 | 24. This court has federal subject matter jurisdiction because Plaintiffs bring this
21 | Complaint pursuant to the United States False Claim Acts, 31 U.S.C. §§ 3729 et seq.

22 | 25. Venue is proper in this court because Defendants do business in its jurisdictional
23 | area, and the alleged unlawful conduct and damage to Plaintiffs, as well as the making of the
24 | contracts which are the subject of this action, occurred within its jurisdictional area.  Specifically,
25 | the Subject Properties are located at 4141 Palm Avenue, Sacramento, CA 95842; 3600 Data
26 | Drive, Rancho Cordova, CA 95670 ; 6633 Valley Hi Drive, Sacramento, CA 95823; and 4719
27 | 50th Avenue, Sacramento, CA 95823.

28 |

1

## HOUSING CHOICE VOUCHER PROGRAM ("SECTION 8")

2      26.      The Housing Choice Voucher Program is a federal program intended to assist
3 low-income families in obtaining decent, safe, sanitary, and affordable housing.  The Program is
4 authorized by Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437f.  Regulations
5 governing the Section 8 program are contained in 24 C.F.R. Part 982.

6      27.      The United States Department of Housing and Urban Development ("HUD")
7 administers the Section 8 program.  HUD enters into annual contribution contracts with local
8 public housing agencies such as the Sacramento Housing and Redevelopment Agency.

9      28.      Pursuant to the annual contribution contract, the local public housing agency may
10 enter into a HUD form contract, or Housing Assistance Payments Contract ("HAP Contract"),
11 with the landlord of a dwelling unit to make monthly housing assistance payments on behalf of
12 an eligible tenant family.  Generally, participating tenant families pay 30 to 40 percent of their
13 adjusted monthly income toward the rent and utilities, while the public housing agency pays the
14 balance.

15      29.      The participant tenant family for a dwelling unit is also a party to the HAP
16 Contract, and the landlord therefore simultaneously enters the HAP Contract with the tenant
17 family.  The HAP Contract contains federally-mandated terms and is on a HUD form.  The HAP
18 Contract continues until its expiration or termination by the owners, the participant family, or the
19 public housing agency.

20      30.      The HAP Contract includes a Tenancy Addendum and Lease Supplemental
21 Agreement that constitute the residential lease agreement between the landlord and tenant.  If the
22 landlord also provides a separate lease form to the tenant, that form must be approved by the
23 public housing agency.  The terms of the Tenancy Addendum and Lease Supplement Agreement
24 expressly supersede those of any separate lease form in the event of conflicting provisions.  (Exh.
25 E at 1.)

26      31.      The HAP Contract for a particular dwelling unit establishes the initial lease term
27 and total amount of monthly rent due from the tenant.  The landlord may not increase the total
28 rent payable to the landlord during the initial lease term.

32.     The HAP Contract also sets out the amount of the housing assistance payment by the public housing agency to the landlord, calculated in accordance with the regulations.

33.     The HAP Contract provides that the tenant is responsible for paying the landlord the balance of the total rent not covered by the housing assistance payment.

34.     The sum of the housing assistance payment by the public housing agency and the tenant's share of the rent payable to the landlord under the HAP Contract is known as the contract rent.

35.     The sum of the housing assistance payment and the tenant's share of the rent payable to the landlord may be adjusted due to market factors in the rental market and changes to a tenant's income.  These adjustments are made in accordance with HUD requirements.  Notice of these adjustments to the contract rent are provided to the landlord and tenant by the public housing agency, through a subsidy adjustment notice.

36.     The regulations that govern payment of rent under a HAP Contract are contained in 24 C.F.R. § 982.451.  Subsection (b)(4)(ii) states: "The owner may not demand or accept any rent payment from the tenant in excess of the maximum and must immediately return any excess rent to the tenant."

37.     Section 5(e) of Part C of the Tenancy Addendum to the standard form HAP Contracts further provides:  "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner.  Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."  (Exh. E at 2.)

## CLASS DEFINITION AND GENERAL ALLEGATIONS

38.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23, seeking damages, injunctive, and other equitable relief on behalf of themselves, the United States, and all class members as defined below.

39.     The class that Plaintiffs seek to represent ("Class") is defined as follows:

All persons who: 1) in the time period starting six years prior to the date of filing this Complaint up to the final resolution of this matter; 2) are, have been, or during the pendency of this action become tenants of Defendants at one or more of the four

1    Subject Properties, located in Northern California; 3) have participated or will
2    participate in the "Section 8" Housing Choice Voucher Program in connection with
     their tenancies at the Subject Properties; and 4) are charged additional rent payments
3    in excess of their individual portions of the contract rent, as set forth in their HAP
     Contracts.

4        40.    As used herein, the term "Class members" shall mean and refer to the members of

5    the Class described above.

6        41.    The "Class period" is designated as the time period starting six years prior to the

7    date of filing of this Complaint.

8        42.    Plaintiffs reserve the right to amend the Class, and to add subclasses, if discovery

9    and further investigation reveals such action is warranted.

10       43.    As discussed in more detail above, Defendants owned, controlled, and managed

11   the units that Class members resided in during the Class Period.

12       44.    Throughout the Class period, Defendants have had a consistent policy of

13   unlawfully demanding additional rent payments, or "side payments," from their tenants whose

14   rent is subsidized through the Section 8 program at the Subject Premises.

15       45.    Upon information and belief, the HAP Contracts for the dwelling units in the

16   Subject Premises are substantially identical with respect to all material terms, including the

17   provisions described above that preclude the landlord from collecting payments from Class

18   members that exceed their individual portion of the contract rent amount.

19       46.    Upon information and belief, Defendants colluded to devise and engage in this

20   course of business conduct designed and intended to violate 42 U.S.C. § 1437f, 24 C.F.R. Part

21   982, and Defendants' HAP Contracts with their Section 8 tenants.

22       47.    During the course of the Class members' tenancies, Defendants made unlawful

23   demands to the Class members for additional rent payments, or "side payments," in excess of the

24   Class members' individual shares of the contract rent pursuant to their HAP Contracts.

25       48.    Defendants' demands for "side payments" included demands that Class members

26   pay additional rent for: 1) washer and dryer rentals, 2) renter's insurance and, 3) covered parking.

27       49.    During the course of their tenancies, all Class members paid, or are in jeopardy of

28   paying, Defendants these additional rent payments, or "side payments," in excess of their

1   individual shares of the contract rent pursuant to their HAP Contracts.

2      50.   Each of Defendants' demands for additional rent and receipt of these side

3   payments from Class members violated 42 U.S.C. § 1437f, 24 C.F.R. Part 982, and the Class

4   members' HAP Contracts.

5      51.   The additional rent payments that Defendants have unlawfully collected are

6   individually so small that it is economically unfeasible for the Class members to pursue their

7   remedies through individual actions.

8      52.   Each and every Defendant was at all relevant times the agent or employee of other

9   Defendants and acted within the scope of said agency or employment.

10     53.   Class members do not know the true names of Defendants identified as Does 1-

11   30, but will seek leave to amend this Complaint if and when Class members discovers the

12   identity of any of the Defendants now sued under these fictitious names.

13     54.   In committing the acts complained of herein, each Defendant acted as the

14   authorized agent, employee, or representative of each other Defendant. Each act of each

15   Defendant complained of herein was committed within the scope of said agency, employment, or

16   other representation, and each act was ratified by each other Defendant. Each Defendant is

17   liable, in whole or in part, for the damages and injuries suffered by Class members.

18     55.   Upon information and belief, during the Class period, Defendants were Qui tam

19   plaintiffs' and Class members' landlords, and Qui tam plaintiffs and Class members were

20   Defendants' tenants, as those terms, "landlord" and "tenant," are defined under 24 C.F.R. Part

21   982 and the relevant HAP Contracts.

22                                **CLASS REPRESENTATIVES**

23                                **Plaintiff Denika Terry**

24     56.   During the Class Period, Plaintiff Denika Terry received housing assistance from

25   the Sacramento Housing and Redevelopment Agency ("Sacramento Housing Agency") under the

26   Section 8 program.

27     57.   Denika Terry is informed and believes, and thereon alleges, that at all relevant

28   times, Defendants were her landlords, and she was Defendants' tenant, as those terms,

U.S., *ex rel.* Terry, et al. v. Wasatch Advantage Group, et al.
Plaintiffs' Class Action Complaint for Damages and Injunctive Relief; Jury Trial Demanded                    -9-

1 "landlord" and "tenant," are defined under 24 C.F.R. Part 982 and the relevant HAP Contract.

2     58.    On or about September 20, 2010, Denika Terry and Defendants reached an

3 agreement for the rental of Apartment No. 391 of the Data Drive Property ("Terry Residence"),

4 subject to the approval of the Sacramento Housing Agency.

5     59.    On or about September 20, 2010, the Sacramento Housing Agency, Denika Terry,

6 and Defendants approved the rental agreement and entered into a HAP Contract for the Terry

7 Residence. A true and accurate copy of this HAP Contract is attached to the Complaint as

8 Exhibit A. Pursuant to the HAP Contract, rent for the Terry Residence was $860 per month, with

9 the Sacramento Housing Agency responsible for $860 of the contract rent, and Denika Terry

10 responsible for none of the contract rent. Section 5(e) of Part C of the Tenancy Addendum to the

11 Terry HAP Contract further provides: "The owner may not charge or accept, from the family or

12 from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to

13 owner includes all housing services, maintenance, utilities and appliances to be provided and

14 paid by the owner in accordance with the lease."

15     60.    Denika Terry occupied the Terry Residence pursuant to the HAP Contract, from

16 approximately September 20, 2010, to March 20, 2013.

17     61.    During the course of the tenancy, the Sacramento Housing Agency sent

18 Defendants and Denika Terry annual subsidy adjustment notices. True and accurate copies of the

19 relevant notices are attached to the Complaint as Exhibits C and D.

20     62.    The first subsidy adjustment notice, effective October 1, 2011, increased the rent

21 amount to $939 per month, with the Sacramento Housing Agency continuing to pay all of the

22 contract rent. The second subsidy adjustment notice, effective October 1, 2012, did not change

23 the rent amount, but decreased the Sacramento Housing Agency's assistance payment to $729

24 per month, and increased Denika Terry's portion to $210 per month.

25     63.    In accordance with the HAP Contract and subsidy adjustment notices, the

26 Sacramento Housing Agency paid Defendants housing assistance payments in the amounts of: 1)

27 $315, prorated, for the month of September 2010; 2) $860 per month from October 2010 through

28 September 2011; 3) $939 per month from October 2011 through September 2012; and 4) $729

1   per month from October 2012 through March 2013.

2       64.   In sum, HUD and the Sacramento Housing Agency made a total of at least 31

3   rental payments to Defendants totaling $26,277 for Denika Terry.

4       65.   Upon information and belief, at all times during Denika Terry's tenancy, the

5   Sacramento Housing Agency paid the housing assistance payments directly to Defendants.

6       66.   Beginning on or around September 20, 2010, and continuing throughout Denika

7   Terry's tenancy, Defendants demanded that she pay them additional rent payments, or "side

8   payments," not set forth in her HAP Contract or subsidy adjustment notices. Defendants made

9   these "side payment" demands to Denika Terry on a monthly basis, including demands that she

10   pay extra rent for: 1) washer and dryer rentals, 2) renter's insurance, and 3) covered parking

11   charges.

12       67.   These demands for "side payments" are reflected in the Defendants' Resident

13   Ledger for the Terry Residence. A true and accurate copy of the Resident Ledger is attached to

14   the Complaint as Exhibit B.

15       68.   A comparison of the relevant HAP Contract and subsidy adjustment notices with

16   the Residential Ledger demonstrates that Defendants made demands for "side payments" from

17   Denika Terry for each month that she lived at the Terry Residence.

18       69.   Defendants demanded that Denika Terry make "side payments" in violation of the

19   HAP Contract on at least 72 occasions.

20       70.   As a result, Defendants demanded and Denika Terry paid $1,953.89 in additional

21   rent payments from September 2010 through March 2013. In contrast, the amount of contract

22   rent that Denika Terry was responsible for the entirety of this time period, as set forth in the HAP

23   Contract and subsidy adjustment notices, was only $1,260. Thus, Defendants charged Denika

24   Terry more in total unlawful rent payments than the total amount of rent for which she was

25   responsible under the HAP Contract.

26       71.   Defendants threatened to evict Denika Terry and her family if she did not pay

27   these additional rental amounts.

28       72.   Defendants ultimately filed an eviction action against Denika Terry for not

1    making the unlawfully demanded "side payments."

2        73.    Neither the Sacramento Housing Agency nor HUD authorized Defendants to

3    charge or collect these additional rent payments. To the contrary, these demands for additional

4    rent payments were barred by the HAP Contract and applicable Section 8 rules and related

5    regulations, as described above.

6        74.    Defendants never informed Denika Terry that the Section 8 rules and the HAP

7    Contract prohibited them from demanding these additional rent payments.

8        75.    Due to Defendants' demands and threats of eviction, Denika Terry agreed to their

9    demands for additional rent payments so that she would not lose her home and Section 8

10   voucher.

11       **Plaintiff Roy Huskey III**

12       76.    During the Class Period, Plaintiff Roy Huskey III received housing assistance

13   from the Sacramento Housing Agency under the Section 8 program.

14       77.    Roy Huskey III is informed and believes, and thereon alleges, that at all relevant

15   times, Defendants were his landlords, and he was Defendants' tenant, as those terms, "landlord"

16   and "tenant," are defined under 24 C.F.R. Part 982 and the relevant HAP Contract.

17       78.    On or about June 30, 2011, Roy Huskey III and Defendants reached an agreement

18   for the rental of Apartment No. 191 of the Palm Avenue Property ("Huskey III Residence"),

19   subject to the approval of the Sacramento Housing Agency.

20       79.    On or about July 8, 2011, the Sacramento Housing Agency, Roy Huskey III, and

21   Defendants approved the rental agreement and entered into a HAP Contract for the Huskey III

22   Residence. A true and accurate copy of this HAP Contract is attached to the Complaint as

23   Exhibit E. Pursuant to the HAP Contract, rent for the Huskey III Property was $840 per month,

24   with the Sacramento Housing Agency responsible for $554 of the contract rent, and Roy Huskey

25   III responsible for $286 of the contract rent. Section 5(e) of Part C of the Tenancy Addendum to

26   the Huskey III HAP Contract further provides: "The owner may not charge or accept, from the

27   family or from any other source, any payment for rent of the unit in addition to the rent to owner.

28   Rent to owner includes all housing services, maintenance, utilities and appliances to be provided

1  and paid by the owner in accordance with the lease."

2      80.    Roy Huskey III continues to lease and occupy the Huskey III Residence pursuant
3  to the HAP Contract.

4      81.    During the course of the tenancy, the Sacramento Housing Agency sent
5  Defendants and Roy Huskey III annual subsidy adjustment notices.

6      82.    In accordance with the HAP Contract and subsidy adjustment notices, the
7  Sacramento Housing Agency paid the Defendants housing assistance payments in the amounts
8  of: 1) $16.67, prorated, for the month of June 2011; 2) $500 for the month of July 2011; 3) $554
9  per month from August 2011 through August 2012; 4) $536 per month from September 2012
10 through June 2013; and 5) $524 per month from July 2013 through the present.

11     83.    In sum, HUD and the Sacramento Housing Agency made a total of at least 34
12 rental payments to Defendants totaling $17,848.67, as of March 3, 2014.

13     84.    Upon information and belief, at all times during Roy Huskey III's tenancy, the
14 Sacramento Housing Agency paid the housing assistance payments directly to Defendants.

15     85.    Beginning on or around July 8, 2011, and continuing throughout Roy Huskey III's
16 tenancy, Defendants demanded that he pay them additional rent payments, or "side payments,"
17 not set forth in his HAP Contract or subsidy adjustment notices.  Defendants made these"side
18 payment" demands to Roy Huskey III on a monthly basis, including demands that he pay extra
19 rent for: 1)  washer and dryer rentals; and 2) renter's insurance.

20     86.    These demands for "side payments" are reflected in the Defendants' Resident
21 Ledger for the Huskey III Residence.  A true and accurate copy of the Resident Ledger through
22 March 3, 2014, is attached to the Complaint as Exhibit F.

23     87.    A comparison of the HAP Contract with the Resident Ledger demonstrates that
24 Defendants made demands for "side payments" from Roy Huskey III for each month that he lived
25 at the Huskey III Property, through March 3, 2014.

26     88.    Defendants demanded that Roy Huskey III make "side payments" in violation of
27 the HAP Contract on at least 70 occasions, as of March 3, 2014

28     89.    As a result, Defendants demanded and Roy Huskey III paid at least $2,239.98 in

1   additional rent payments from June 1, 2011, through March 3, 2014. In contrast, the amount of

2   contract rent that Roy Huskey III was responsible for the entirety of this time period, as set forth

3   in the HAP Contract and subsidy adjustment notices, was only $9,363.30.

4       90.     Defendants threatened to evict Roy Huskey III and his family if he did not pay

5   these additional rental amounts.

6       91.     Neither the Sacramento Housing Agency nor HUD authorized Defendants to

7   charge or collect these additional rent payments. To the contrary, these demands for additional

8   rent payments were barred by the HAP Contract and applicable Section 8 rules and related

9   regulations, as described above.

10      92.     Defendants never informed Roy Huskey III that the Section 8 rules and HAP

11  Contract prohibit them from demanding these additional rent payments.

12      93.     Due to Defendants' demands and threats of eviction, Roy Huskey III agreed to

13  their demands for additional rent payments so that he would not lose his home and Section 8

14  voucher.

15      94.     Because Roy Huskey III continues to lease and occupy the Huskey III Residence,

16  Defendants' continuing demands and collection of "side payments" from him, in excess of his

17  share of the rent set forth in the HAP Contract, is an ongoing violation of the Section 8 rules and

18  HAP Contract. Upon information and belief, Defendants are demanding, and will continue to

19  demand, that Roy Huskey III make "side payments" in excess of his share of the rent as set forth

20  in the HAP Contract.

21      95.     Plaintiffs suffered emotional distress, physical injury, overpayment of rent, and

22  out-of-pocket expenses as a result of the acts and omissions committed by Defendants.

23                          **CLASS ALLEGATIONS**

24      96.     Named Plaintiffs bring this action on behalf of themselves and as representatives

25  of all Class members, as defined above.

26      97.     This action has been brought and may be properly maintained as a class action

27  because the proposed Class meets all applicable requirements of Federal Rule of Civil Procedure

28  23.

1        98.    **Commonality:** The named Plaintiffs and Class members are all former, current,

2  or future tenants of Defendants at one or more of the four Subject Properties in Northern

3  California, who in the relevant time period, have participated or will participate in the Section 8

4  program and receive rent subsidies from HUD subject to the protections of the Section 8 rules

5  and related regulations described above. Class members therefore have been or are at risk of

6  being unlawfully charged additional rent payments, or "side payments," by Defendants, as

7  described in more detail above, in excess of their individual portions of the contract rent, set forth

8  in their HAP Contracts. Accordingly, the named Plaintiffs and Class members have suffered or

9  will suffer a common injury. The named Plaintiffs and Class members all share common

10  questions of law and fact which predominate over any question or issue solely affecting

11  individual members. These common questions of law and fact include but are not limited to:

12            i.    Whether Defendants entered into HAP Contracts with Class members and

13               the Sacramento Housing and Redevelopment Agency;

14            ii.    Whether by entering into HAP Contracts, Defendants entered into

15               residential lease agreements with Class members;

16            iii.    Whether HUD and the Sacramento Housing and Redevelopment Agency

17               made payments to Defendants for the Class members' subsidized portions

18               of the rent;

19            iv.    Whether Defendants are bound by the relevant Section 8 program statutes

20               and regulations, 42 U.S.C. § 1437f and 24 C.F.R. Part 982;

21            v.    Whether the relevant Section 8 program statutes and regulations, 42

22               U.S.C. § 1437f and 24 C.F.R. Part 982, prohibit Defendants from

23               demanding any additional rent payments, in excess of the Class members'

24               portions of the rent under the relevant HAP Contracts;

25            vi.    Whether the relevant HAP Contracts prohibit Defendants from demanding

26               any additional rent payments, in excess of the Class members' portions of

27               the rent under those HAP Contracts;

28

vii.   Whether Defendants demanded and collected additional rent payments, or "side payments"—for washer and dryer rentals, renter's insurance, and covered parking charges—from the Class members, in excess of the Class members' portions of the rent under the relevant HAP Contracts;

viii.  Whether Defendants' demands for and collection of these additional rent payments from the Class members violate the relevant Section 8 program statutes and regulations, 42 U.S.C. § 1437f and 24 C.F.R. Part 982;

ix.    Whether Defendants' demands for and collection of these additional rent payments from the Class members breach the relevant HAP Contracts;

x.     Whether Defendants' demands for and collection of these additional rent payments from the Class members breach Defendants' residential lease agreements with Class members;

xi.    Whether Defendants' demands for and collection of these additional rent payments from the Class members violate the False Claims Act, 31 U.S.C. §§ 3729 et seq.

xii.   Whether Defendants' demands for and collection of these additional rent payments from the Class members violate California Business and Professions Code section 17200 et seq.

xiii.  The method of calculation and extent of damages for members of the Class.

99.     **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class members. The named Plaintiffs and all Class members are sustaining, have sustained, or are at risk of sustaining, injuries and damages arising out of and caused by the Defendants' conduct as alleged in this Complaint.

100.    **Numerosity:** A class action is the only available method for the fair and efficient adjudication of this controversy. Plaintiffs are informed and believe that Defendants currently own and manage 69 apartment communities with 16,344 units across five western states:

California, Utah, Arizona, Colorado, and Washington. Properties range in size from 40 units to 661 units. Upon information and belief, in the four Subject Properties alone, Defendants currently own and manage more than 150 units which are subsidized by HUD through the Section 8 program. As a result, there are likely to be more than 150 Class members. Membership will be determined through analysis of the HAP Contracts for the Section 8 tenants at the Subject Properties, Defendants' Resident Ledgers for these tenants, subsidy adjustment notices sent to Defendants by the Sacramento Housing and Redevelopment Agency for these tenants, and other written communications to the named Plaintiffs and Class members.

101. **Adequacy of Representation:** The named Plaintiffs in this action are adequate representatives of the Class in that their claims are typical of those in the Class. They have been damaged as alleged herein and they are willing to go forward as representative in this class action litigation. Plaintiffs have no interests that are adverse to or conflict with those of the Class members. Plaintiffs are committed to the vigorous prosecution of this action. To that end, Plaintiffs have retained competent and experience counsel.

102. This action is certifiable under Federal Rule of Civil Procedure 23(b)(3), because questions of law or fact common to the Class members, as described above, predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

103. In addition, a class action is superior to the other available methods for fairly and efficiently adjudicating the case because the damages suffered by individual named Plaintiffs and Class members, while not inconsequential, are relatively small, and would be outweighed by the expense and burden of separate litigation by each individual. This fact is known by Defendants, and makes it impractical for Class members to seek redress individually for the wrongful conduct alleged herein. A class action is therefore the superior method of resolving this dispute and securing justice. In addition, judicial economy would be enhanced as a class action would avoid a multiplicity of lawsuits, undue hardship, and expense for both the Court and litigants. The prosecution of separate actions would also create a risk of inconsistent rulings, which might be

1  dispositive of the interests of the other Class members who are not parties to the adjudications
2  and may substantially impede their ability to adequate protect their interests.

3      104.    Moreover, the class definition is ascertainable and lends itself to class
4  certification because Defendants, as well as HUD and the Sacramento Housing and
5  Redevelopment Agency, keep records of their Section 8 tenants and rental payments.  Defendants
6  can therefore easily produce the records that would identify all Class members.

7      105.    In the alternative, this action is certifiable under the provisions of Federal Rule of
8  Civil Procedure 23(b)(2), because Defendant has acted or refused to act on grounds generally
9  applicable to the Class, thereby making appropriate final injunctive relief or corresponding
10  declaratory relief with respect to the Class and necessitating that any such relief be extended to
11  Class members on a mandatory, class-wide basis.

12      106.    In addition, the court may certify the Class with respect to particular issues, as set
13  forth in detail above, under Federal Rule of Civil Procedure 23(c)(4).

14      107.    Plaintiffs are not aware of any difficulty which will be encountered in the
15  management of this litigation which should preclude its maintenance as a class action.

16  **RELIEF AND CLAIMS**

17      108.    As a direct and proximate result of the Defendants unlawful conduct, as set forth
18  in this Complaint, named Plaintiffs and Class members have sustained damages and are entitled
19  to relief, including but not limited to: 1) a return of all rents which were unlawfully obtained by
20  the Defendants; 2) statutory interest on such amounts according to proof; 3) additional statutory
21  damages for each Plaintiff and Class member due to the acts and omission of the Defendants
22  according to proof; 4) attorneys' fees pursuant to contract and statute; 5) injunctive relief
23  according to proof, including restoration of money wrongfully retained by Defendants, and
24  interest thereon, and an injunction to prevent Defendants from continuing their illegal practices.

25      109.    In addition, this action will result in the enforcement of important rights affecting
26  the public interest, including the right of the tenants of residential units to have their rent
27  amounts determined in a lawful manner and free of harassment and intimidation.  The successful
28

1 conclusion of this litigation will confer a significant benefit on the general public and a large
2 class of persons. Plaintiffs and Class members are therefore entitled to an award of attorneys'
3 fees pursuant to California Code of Civil Procedure section 1021.5. The necessity and financial
4 burden of private enforcement are such as to make an award of fees under this statute
5 appropriate. Such fees should not, in the interest of justice, be paid out of the recovery.

6     110.   Wherefore named Plaintiffs and Class members pray for the damages stated
7 below.

8

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)
### (All Plaintiffs v. All Defendants)

11     111.   Plaintiffs re-allege and incorporate into this cause of action the allegations of
12 paragraphs 1 through 110, as if the same were set out at length herein.

13     112.   The False Claims Act provides that any person who "knowingly presents a false
14 or fraudulent claim for payment or approval" to the United States is liable on each such claim for
15 a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of
16 damages sustained by the United States. In addition, any person who violates the Act is liable for
17 the costs of the civil action brought to recover such penalty or damages. 31 U.S.C. § 3729(a).

18     113.   The False Claims Act defines the terms "knowing" and "knowingly" as meaning,
19 with respect to information, that a person: "(i) has actual knowledge of the information; (ii) acts
20 in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard
21 of the truth or falsity of the information." "[N]o proof of specific intent to defraud" is required.
22 31 U.S.C. §3729(b)(1).

23     114.   The False Claims Act defines a "claim" as "any request or demand . . . for money
24 or property . . . that . . . is made to a contractor, grantee, or other recipient, if the money or
25 property is to be spent or used on the Government's behalf or to advance a Government program
26 or interest, and if the United Statements Government" either "provides or has provided any
27 portion of the money or property requested or demanded" or "will reimburse such contractor,
28 grantee or other recipient for any portion of the money or property which is requested or

1    demanded." 31 U.S.C. § 3729(b)(2).

2        115.    For each month that Defendants accepted "additional rent payments" from
3    Plaintiffs, Defendants endorsed and presented for payment the housing assistance checks
4    received from the Sacramento Housing and Redevelopment Agency.

5        116.    In their HAP Contracts with the U.S. Department of Housing and Urban
6    Development, Defendants agreed that "During the HAP contract term, the rent to owner may at
7    no time exceed the reasonable rent for the contract unit as most recently determined or
8    redetermined by the PHA [local public housing agency] in accordance with HUD requirements."
9    (Exh. E at 9, para. 6(a).)

10       117.    Defendants also certified to the U.S. Department of Housing and Urban
11   Development that "During the term of this contract . . . d. Except for the rent to owner, the owner
12   has not received and will not receive any payment or other consideration (from the family, the
13   PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP
14   contract term." (Exh. A at 9-10, para. 8(d).)

15       118.    Defendants further agreed that "e. The owner may not may not charge or accept,
16   from the family or from any other source, any payment for rent of the unit in addition to the rent
17   to owner.  Rent to owner includes all housing services, maintenance, utilities and appliances to
18   be provided and paid by the owner in accordance with the lease.  f. The owner must immediately
19   return any excess rent payment to the tenant."  (Exh. A at 2, para. 5(e)-(f).)

20       119.    As of March 3, 2014, Defendants knowingly endorsed and presented for payment
21   65 separate housing assistance checks in relationship to the named Plaintiffs' tenancies, totaling
22   $44,125.67, while demanding and collecting from Plaintiffs additional payments in violation of
23   the relevant HAP Contracts, totaling $4,193.87.

24       120.    Upon information and belief, Defendants' unlawful demands for and collection of
25   additional rent payments are ongoing.

26       121.    Upon information and belief, Defendants commit these violations as to all of
27   their tenants who live at the Subject Properties and who receive rental subsidies from HUD and
28   the Section 8 program.

1    122.    The representations and agreements that Defendants provided in their HAP

2 Contracts (and all amendments or renewals thereof) each constitute a separate false claim or

3 representation to the United States that Defendants would not demand or receive consideration

4 for the rented premises beyond the total contract rent amount, as set forth in the HAP Contracts.

5    123.    In addition, Defendants' endorsement and presentation for payment of each

6 assistance check for each month, while knowingly receiving additional rent payments from

7 Plaintiffs, constitutes a separate false claim or representation to the United States that Defendants

8 did not receive any other consideration for the rented premises for that month, as set forth in the

9 HAP Contracts.

10    124.    The United States of America suffered damages as a result of violations of the

11 False Claims Act, because the money which HUD disbursed to local public housing agencies,

12 such as the Sacramento Housing and Redevelopment Agency, for the payment of Section 8

13 housing assistance would not have been paid to the Defendants absent these false claims and

14 fraudulent conduct.

15    125.    The United States of America sustained damages equal to all payments made to

16 the Defendants pursuant to Plaintiffs' Section 8 assistance program, for which Defendants also

17 unlawfully demanded and collected additional rent payments from Plaintiffs, totaling $44,125.67

18 as of March 3, 2014.

19

20
<div align="center">

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**CALIFORNIA CIVIL CODE §§ 3300 ET SEQ.**
**(All Plaintiffs v. All Defendants)**

</div>

21

22    126.    Plaintiffs re-allege and incorporate into this cause of action the allegations of

23 paragraphs 1 through 125, as if the same were set out at length herein.

24    127.    By signing the relevant HAP Contracts, Plaintiffs and Defendants entered into

25 written residential rental agreements, through the use of standard form leases with the same

26 material terms.

27    128.    These lease agreements were adhesion contracts not subject to any negotiations or

28 input by Plaintiffs.

129.   Defendants were obligated to comply with the material terms of these agreements. Due to Defendants' breach, Plaintiffs performed or were excused from performing their obligations under the contracts.

130.   Defendants breached the terms of said agreements on multiple occasions by charging Plaintiffs additional rental payments in violation of their HAP Contracts, including Section 5(e) of Part C of the Tenancy Addendum to the HAP Contracts which provides:  "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner.  Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."

131.   As a result of Defendants' conduct, Plaintiffs suffered damages including overpayment of rent, out of pocket expenses, physical and mental discomfort, and other damages to be ascertained at trial.

132.   Wherefore Plaintiffs pray for the damages stated below.

**THIRD CAUSE OF ACTION**
**CONSUMERS LEGAL REMEDIES ACT**
**CALIFORNIA CIVIL CODE § 1750**
**(All Plaintiffs v. All Defendants)**

133.   Plaintiffs re-allege and incorporate into this cause of action the allegations of paragraphs 1 through 132, as if the same were set out at length herein.

134.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code section 1750 ("CLRA").

135.   The CLRA has adopted a comprehensive statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property or services to consumers primarily for personal, family, or household purposes.

136.   Each of the Defendants is a "person" as defined by Civil Code section 1761(c) because each is a corporation.

137.   Plaintiffs and Class members are "consumers" within the meaning of Civil Code section 1761(d) because they are individuals who leased rental property from Defendants for

personal or household use.

138.    Defendants' leasing of rental property is a "service" within the meaning of California Civil Code section 1761(b).

139.    Plaintiffs' and Class members' payments for the services of Defendants are "transactions" as defined by Civil Code section 1761(e), because Defendants entered into agreements to provide those services in exchange for Plaintiffs' and Class members' monetary compensation.

140.    Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost money as a result of Defendants' actions as set forth herein.

141.    Plaintiffs and Class members reviewed, believed, and relied upon the statements made by Defendants, including omissions of fact, that Defendants were lawfully entitled to demand and collect additional rental amounts, or "side payments," in excess of the tenants' portions of the rent provided in the relevant HAP Contracts. These statements and omissions include (1) Defendants' affirmative misrepresentations that they would not collect amounts beyond the contract rent permitted for Plaintiffs' and Class members' respective Section 8 apartments, as set forth in the HAP Contracts including Section 5(e) of Part C of the Tenancy Addendums to the Terry and Huskey III HAP Contracts, (2) Defendants' omission to explain in the course of collecting "side payments" from Plaintiffs and Class members that such payments constitute a violation of the Section 8 program.

142.    Defendants' misrepresentations and concealment were made with knowledge of their likely effect on tenants, as members of the general public, and were done to induce Plaintiffs and Class members to enter into their Section 8 HAP Contracts and to pay additional rental amounts, or "side payments," in excess of the tenants' portion of the rent as provided in the relevant HAP Contracts. Plaintiffs reviewed the provisions identified above and justifiably relied on Defendants' misrepresentations when entering into their Section 8 HAP Contracts and paying these excess rental amounts. Further, when Plaintiffs paid the "side payments" requested by Defendants, they relied on Defendants' omission to explain that such "side payments" are prohibited by applicable Section 8 rules and regulations, and their HAP Contracts.

143.    As set forth above, Defendants violated and continue to violate the CLRA by

U.S., *ex rel.* Terry, et al. v. Wasatch Advantage Group, et al.
Plaintiffs' Class Action Complaint for Damages and Injunctive Relief; Jury Trial Demanded          -23-

engaging in practices proscribed by California Civil Code section 1770(a)(2) in transactions with Plaintiffs and Class members, by misrepresenting their approval to demand and collect additional rental amounts, or "side payments," by HUD and the Sacramento Housing and Redevelopment Agency.

144.   Plaintiffs seek an order enjoining the act and practices described above, restitution of property, and any other injunctive or equitable relief that the Court deems proper.

### FOURTH CAUSE OF ACTION
### UNFAIR BUSINESS PRACTICES
### CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 ET SEQ.
### (All Plaintiffs v. All Defendants)

145.   Plaintiffs re-allege and incorporate into this cause of action the allegations of paragraphs 1 through 144, as if the same were set out at length herein.

146.   California Business and Professions Code section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice."

147.   Defendants have engaged in unfair, unlawful, and fraudulent business acts or practices as described in this Complaint, including, but not limited to, unlawfully demanding and collecting additional rental amounts, or "side payments," in excess of Plaintiffs' portions of the rent under the relevant HAP Contracts.

148.   As discussed in more detail above, Defendants' policy of demanding and collecting these additional side payments is unlawful, unfair, and/or fraudulent in that it violates the relevant HAP Contracts and at least the following laws:

i.    Section 8 program statutes and regulations, 42 U.S.C. § 1437f and 24 C.F.R. Part 982;

ii.   False Claims Act, 31 U.S.C. §§ 3729 et seq.;

iii.  California Civil Code section 1750;

iv.   California Civil Code Section 3300.

149.   Defendants' practices, as set forth herein, also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code section 17200, because (1) their conduct offended public policy, including the public polices furthered by the Section 8 program for the benefit of low-income tenants, (2) was unethical and unscrupulous,

and (3) any alleged benefits from Defendants' conduct are outweighed by the injuries caused to Plaintiffs, Class members, and the general public.

150.    There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

151.    California Business and Professions Code section 17200 also prohibits any "fraudulent business act or practice."

152.    Defendants' material misrepresentations, and concealment and omission of material facts, as set forth above, were false, misleading, and/or likely to deceive the public within the meaning of California Business and Professions Code section 17200. These "fraudulent" acts include (1) Defendants' affirmative misrepresentations that they would not collect amounts beyond the contract rent permitted for Plaintiffs' and Class members' respective Section 8 apartments, as set forth in the HAP Contracts including Section 5(e) of Part C of the Tenancy Addendums to the Terry and Huskey III HAP Contracts, (2) Defendants' omission to explain in the course of collecting "side payments" from Plaintiffs and Class members that such payments constitute a violation of the Section 8 program.

153.    Defendants' misrepresentations and concealment were made with knowledge of their likely effect on tenants, as members of the general public, and were done to induce Plaintiffs and Class members to enter into their Section 8 HAP Contracts and to pay additional rental amounts, or "side payments," in excess of the tenants' portion of the rent as provided in the relevant HAP Contracts. Plaintiffs reviewed the provisions identified above and justifiably relied on Defendants' misrepresentations when entering into their Section 8 HAP Contracts and paying these excess rental amounts. Further, when Plaintiffs paid the "side payments" requested by Defendants, they relied on Defendants' omission to explain that such "side payments" are prohibited by applicable Section 8 rules and regulations, and their HAP Contracts.

154.    To this day, Defendants continue to violate the Unfair Business Practices Act by continuing to demand and collect additional rental amounts, or "side payments," in excess of the tenants' portion of the rent as provided in the relevant HAP Contracts.

155.    As a direct and proximate cause of Defendants' violation of the Unfair Business Practices Act, Plaintiffs and Class members have suffered injury in fact and actual damages.

U.S., *ex rel.* Terry, et al. v. Wasatch Advantage Group, et al.
Plaintiffs' Class Action Complaint for Damages and Injunctive Relief; Jury Trial Demanded          -25-

156.     As a proximate result of Defendants' violation of the California Business and Professions Code section 17200, Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and Class members or disgorge their ill-gotten profits pursuant to Business and Professions Code section 17203.

157.     Defendants' conduct, as described above, violates California Business and Professions Code section 17200 and entitles Plaintiffs and Class members to restitution and injunctive relief.

158.     In addition, pursuant to California Business and Professions Code section 17203, Plaintiffs, both individually and on behalf of the Class, seek an order of this Court requiring Defendants to immediately cease such acts of unfair competition and enjoining Defendants from continuing to conduct business via the unlawful, fraudulent or unfair business acts and practices complained of herein and from failing to fully disclose the true nature of their misrepresentations.

159.     Plaintiffs, on behalf of themselves and all others similarly situated, further request injunctive relief in the form of restitution and disgorgement and all other relief allowed under section 17200, plus interest, attorneys' fees, and costs pursuant to, inter alia, California Code of Civil Procedure section 1021.5.

## REQUEST FOR JURY TRIAL

160.     Plaintiffs request a trial by jury of all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

161.     Plaintiffs, on behalf of themselves and the Class, and the United States of America respectfully request that the Court order the following relief:

    i.    Certify the Class and appoint Plaintiffs as representatives of the Class.

    ii.    Certify the undersigned counsel as Class Counsel.

    iii.    Declare that Defendants' policy of demanding and/or collecting from their Section 8 tenants additional rent payments, in excess of the tenants' portion of the contract rent in the relevant HAP Contracts, is unlawful.

    iv.    Require Defendants, at their own cost, to notify all Class members of the alleged violations discussed herein.

v.      Enjoin Defendants from continuing to demand or collect from their Section 8 tenants any rent payments in excess of the tenants' portion of the contract rent in the relevant HAP Contracts.

vi.     Enjoin Defendants also from any attempts to evict their Section 8 tenants based on any alleged failure to pay any of these unlawful demands for additional rent.

vii.    Find that Defendants violated the False Claims Act and are liable to the United States of America.

viii.   Assess a civil penalty against Defendants for each separate violation of the False Claims Act, in an amount of not less than $5,000 or more than $10,000.

ix.     Award the United States three times the amount of damages that it sustained as a result of the Defendants' acts.

x.      Award Plaintiffs the qui tam Plaintiffs' share of the proceeds.

xi.     Award Plaintiff United States of America and qui tam Plaintiffs costs and reasonable attorneys' fees pursuant to contract and the False Claims Act.

xii.    Order Defendants to cease and desist from violating the False Claims Act.

xiii.   Find that Defendants, by breaching the relevant HAP Contracts, breached their residential lease agreements with Plaintiffs and Class members.

xiv.    Find that Defendants violated the California Consumers Legal Remedies Act.

xv.     Find that Defendants violated the California Unfair Business Practices Act.

xvi.    Award treble damages according to proof for each cause of action.

xvii.   Award general damages according to proof for each cause of action.

xviii.  Award compensatory damages for losses resulting from humiliation, mental anguish, and emotional distress according to proof.

xix.    Award incidental expenses, past, present and future.

xx.     Award interest on the amount of losses incurred at the prevailing legal

rate.

     xxi.   Award statutory penalties.

    xxii.   Award such other and further relief which this Court deems just and proper.

Dated: April 9, 2015

                                      LAW OFFICES OF ANDREW WOLFF, PC

                                      CHRIS BEATTY, ESQ
                                      Attorney for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

## SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
## HOUSING CHOICE VOUCHER PROGRAM
### Lease Supplemental Agreement

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

**1. PARTIES TO THE AGREEMENT DEFINED:**

**OWNR SPEC 1**

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

| | | | |
|---|---|---|---|
| a. | Tenant | **DENIKA TERRY** | Tenant #  t0006472 |
| b. | Owner | | Vendor # |

**2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:**

**DENIKA G. TERRY**          **MIKIYAN C. LAMBERT**

**MIKOLE SERIYAH. JENKINS**

**3. UNIT ADDRESS: 3600 DATA DR 391**
**RANCHO CORDOVA, CA 95670**

*(stamp: RECIEVED IN OWNER SERVICES  OCT 21 2010  HCV PROGRAM)*

**4. INITIAL LEASE TERM:** Begins 9/20/2010 and ends 8/31/2011

**5. INITIAL CONTRACT RENT:** $860.00     **INITIAL TENANT RENT:**     $0.00

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by "Owner". The tenant shall provide or pay for the utilities or appliances indicated below by "Tenant". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|---|---|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Sewer | Tenant |
| Trash Collection | Tenant |
| Water | Tenant |
| Water Heat - Natural Gas | Tenant |

| | | |
|---|---|---|
| *Denika H. Terry* | (916) 904.4534 | 10-18-2010. |
| **DENIKA TERRY** | Telephone Number | Date |
| | | 10/18/2010 |
| **Owner / Agent** | Telephone Number | Date |

## Housing Assistance Payments Contract (HAP Contract)
### Section 8 Tenant-Based Assistance
### Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

### Part A of the HAP Contract: Contract Information
(To prepare the contract, fill out all contract information in Part A.)

1.  **Contents of Contract**
    This HAP contract has three parts:
    Part A: Contract Information
    Part B: Body of Contract
    Part C: Tenancy Addendum



OCT 1 9 REC'D

2.  **Tenant**

    DENIKA TERRY

3.  **Contract Unit**

    3600 DATA DR 391
    RANCHO CORDOVA, CA 95670

4.  **Household**
    The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

    DENIKA G TERRY
    MUKIYAN C LAMBERT
    MIKOLE SERIYAH JENKINS

5.  **Initial Lease Term**
    The initial lease term begins on (mm/dd/yyyy): 09/20/2010
    The initial lease term ends on (mm/dd/yyyy): 08/31/2011

6.  **Initial Rent to Owner**
    The initial rent to owner is: $860
    During the initial lease term, the owner may not raise the rent to owner.

7.  **Initial Housing Assistance Payment**
    The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $860 per month.

    The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

## 8. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
|---|---|---|
| | Owner | Tenant |
| Heating - Oil/Electric | | T |
| Cooking Oil/Electric | | T |
| Other Electric | | T |
| Air Conditioning | | T |
| Water Heat - Natural Gas | | T |
| Water | | T |
| Sewer | | T |
| Trash Collection | | T |
| Flat Fee Electric | | T |

### Signatures
**Public Housing Agency: Sacramento Housing Authority**

*Sacramento Housing*
Print or Type Name of PHA

*Signature*

Print or Type Name and Title of Signatory

10 / 26 / 2010
Date (mm/dd/yyyy)

**Owner:**

Print or Type Name of Owner

Signature

Print or Type Name and Title of Signatory

10 / 14 / 10
Date (mm/dd/yyyy)

**Mail Payments to:**

Name

3600 DATA DR - OFFICE

RANCHO CORDOVA, CA 95670

Address (Street, City, State, Zip)

form HUD-52641 (8/2009)
ref Handbook 7420.8

**Housing Assistance Payment Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

**Part B of HAP Contract: Body of Contract**

1. **Purpose**

   a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

   d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

   c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

   d. The owner certifies that:

   (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
   (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
   (3) The lease is consistent with State and local law.

   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

   b. The owner must provide all utilities needed to comply with the HQS.

   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

   f. The PHA must notify the owner of any HQS defects shown by the inspection.

   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

   a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

   b. **When HAP contract terminates.**

   (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
   (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
   (3) If the family moves from the contract unit, the HAP contract terminates automatically.
   (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
   (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
   (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

---

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

## 5. Provision and Payment for Utilities and Appliances

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

## 6. Rent to Owner: Reasonable Rent

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

## 7. PHA Payment to Owner

### a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

## 8. Owner Certification

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**Prohibition of Discrimination. In accordance with** applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

## 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

## 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

     (a) Threatens the right to peaceful enjoyment of the premises by other residents;

     (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

     (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

     (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

## 15. Foreclosure.
In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

    a.   The HAP contract contains the entire agreement between the owner and the PHA.

    b.   The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

# Housing Assistance Payment Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a. **Maintenance**

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
       (a) Pay for any utilities that are to be paid by the tenant.
       (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. **Criminal activity or alcohol abuse.**
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
         (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
         (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
         (c) Any violent criminal activity on or near the premises; or
         (d) Any drug-related criminal activity on or near the premises.

      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
         (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
         (b) Violating a condition of probation or parole under Federal or State law.

      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. **Other good cause for termination of tenancy**
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause may include:
         (a) Disturbance of neighbors,
         (b) Destruction of property, or
         (c) Living or housekeeping habits that cause damage to the unit or premises.

      (3) After the initial lease term, such good cause may include:
         (a) The tenant's failure to accept the owner's offer of a new lease or revision;
         (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
         (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

      (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

      (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

   e. **Protections for Victims of Abuse.**
      (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
      (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

form HUD-52641 (8/2009)
ref Handbook 7420.8

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f.  Eviction by court action. The owner may only evict the tenant by a court action.

g.  Owner notice of grounds

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9.  Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a.  The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.  When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.  The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.  If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

**14. Conflict with Other Provisions of Lease**

   a.  The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

   b.  In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

**15. Changes in Lease or Rent**

   a.  The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

   b.  In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

     (1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

     (2)  If there are any changes in lease provisions governing the term of the lease;

     (3)  If the family moves to a new unit, even if the unit is in the same building or complex.

   c.  PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

   d.  The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

**16. Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

**17. Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B



**Wasatch Property Management**

**Date : 3/22/2013**

# Resident Ledger

| Code | t0030362 | Property | CD | Lease From | 9/21/2012 |
|------|----------|----------|-----|------------|-----------|
| Name | Denika Terry | Unit | 391 | Lease To | 4/20/2013 |
| Address | 3600 Data Dr #391 | Status | Past | Move In | 9/20/2010 |
| | | Rent | 939 | Move Out | 3/20/2013 |
| City St. Zip | Rancho Cordova, CA 95670 | Phone(O)- | | Phone(H)- | (916) 307-2374 |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|------|-------------|--------|---------|---------|---------|
| 8/2/2010 | Total Deposit Amount | 250.00 | | 250.00 | 8086253 |
| 8/2/2010 | Application Fee | 35.00 | | 285.00 | 8086254 |
| 8/27/2010 | Additional deposit due to credit*yz | 75.00 | | 360.00 | 8117093 |
| 9/20/2010 | Rent for 11 days | 315.33 | | 675.33 | 8176902 |
| 9/20/2010 | Renter's Insurance for 11 days | 5.71 | | 681.04 | 8176903 |
| 9/20/2010 | Covered Parking for 11 days | 3.67 | | 684.71 | 8176904 |
| 9/20/2010 | Washer/ Dryer charge for 11 days *yz | 14.67 | | 699.38 | 8176907 |
| 9/22/2010 | chk# 202476542840 MO- IA | | 349.05 | 350.33 | 4637836 |
| 9/22/2010 | chk# 14-169012824 MO- IA | | 35.00 | 315.33 | 4637837 |
| 9/22/2010 | chk# 14-169012823 MO- IA | | 100.00 | 215.33 | 4637838 |
| 10/1/2010 | Washer/Dryer Rental (10/2010) | 40.00 | | 255.33 | 8292089 |
| 10/1/2010 | Renter's Insurance (10/2010) | 15.58 | | 270.91 | 8292235 |
| 10/1/2010 | Covered Parking Charges (10/2010) | 10.00 | | 280.91 | 8292535 |
| 10/1/2010 | Monthly Rent Charges (10/2010) | 860.00 | | 1,140.91 | 8292536 |
| 10/2/2010 | chk# 202232505497 MO- IA | | 140.58 | 1,000.33 | 4677673 |
| 10/4/2010 | Late Charges Oct 2010 Late Fee | 50.00 | | 1,050.33 | 8304525 |
| 11/1/2010 | Covered Parking Charges (11/2010) | 10.00 | | 1,060.33 | 8383549 |
| 11/1/2010 | Washer/Dryer Rental (11/2010) | 40.00 | | 1,100.33 | 8383550 |
| 11/1/2010 | Monthly Rent Charges (11/2010) | 860.00 | | 1,960.33 | 8383551 |
| 11/1/2010 | Renter's Insurance (11/2010) | 15.58 | | 1,975.91 | 8383552 |
| 11/1/2010 | chk# 1134354 SHRA CK- IA | | 860.00 | 1,115.91 | 4718998 |
| 11/1/2010 | chk# 1134354 SHRA CK- IA | | 860.00 | 255.91 | 4719004 |
| 11/2/2010 | Resident not late in October. waiting for sec 8 ck- IA | (50.00) | | 205.91 | 8413378 |
| 11/3/2010 | SMUD Service Fee 09/20 - 10/710 | 25.00 | | 230.91 | 8414737 |
| 11/3/2010 | SMUD Electric 09/20 - 10/710 | 23.98 | | 254.89 | 8414738 |
| 11/4/2010 | Late Charges NOV 2010 LATE FEES | 50.00 | | 304.89 | 8415963 |
| 11/4/2010 | chk# 14-186750397 MO- IA | | 65.58 | 239.31 | 4749810 |
| 12/1/2010 | Covered Parking Charges (12/2010) | 10.00 | | 249.31 | 8447801 |
| 12/1/2010 | Renter's Insurance (12/2010) | 15.58 | | 264.89 | 8448219 |
| 12/1/2010 | Monthly Rent Charges (12/2010) | 860.00 | | 1,124.89 | 8449249 |
| 12/1/2010 | Washer/Dryer Rental (12/2010) | 40.00 | | 1,164.89 | 8449563 |
| 12/3/2010 | chk# 1140677 SHRA CK- IA | | 860.00 | 304.89 | 4791294 |
| 12/4/2010 | Late Charges DEC 2010 | 50.00 | | 354.89 | 8481519 |

| 12/6/2010 | SHRA Ck Late- IA | (50.00) | | 304.89 | 8483824 |
|---|---|---|---|---|---|
| 12/6/2010 | chk# 14-227566236 MO- IA | | 65.58 | 239.31 | 4798400 |
| 12/18/2010 | chk# 1146195 SHRA check/ yz | | 315.00 | (75.69) | 4807810 |
| 1/1/2011 | Covered Parking Charges (01/2011) | 10.00 | | (65.69) | 8513176 |
| 1/1/2011 | Monthly Rent Charges (01/2011) | 860.00 | | 794.31 | 8513320 |
| 1/1/2011 | Washer/Dryer Rental (01/2011) | 40.00 | | 834.31 | 8514039 |
| 1/1/2011 | Renter's Insurance (01/2011) | 15.58 | | 849.89 | 8514333 |
| 1/3/2011 | chk# 14-253723630 MO- IA | | 65.58 | 784.31 | 4838810 |
| 1/4/2011 | Late Charges Jan 2011 | 50.00 | | 834.31 | 8545897 |
| 1/4/2011 | SHRA CK LATE- IA | (50.00) | | 784.31 | 8547779 |
| 1/4/2011 | chk# 1147035 SHRA CK - IA | | 860.00 | (75.69) | 4843951 |
| 2/1/2011 | Covered Parking Charges (02/2011) | 10.00 | | (65.69) | 8661697 |
| 2/1/2011 | Washer/Dryer Rental (02/2011) | 40.00 | | (25.69) | 8661698 |
| 2/1/2011 | Monthly Rent Charges (02/2011) | 860.00 | | 834.31 | 8661699 |
| 2/1/2011 | Renter's Insurance (02/2011) | 15.58 | | 849.89 | 8661700 |
| 2/3/2011 | chk# 14-235723867 MO- IA | | 65.58 | 784.31 | 4905798 |
| 2/3/2011 | chk# 1153526 SHRA CK- IA | | 860.00 | (75.69) | 4908164 |
| 3/1/2011 | Covered Parking Charges (03/2011) | 10.00 | | (65.69) | 8717980 |
| 3/1/2011 | Washer/Dryer Rental (03/2011) | 40.00 | | (25.69) | 8717981 |
| 3/1/2011 | Monthly Rent Charges (03/2011) | 860.00 | | 834.31 | 8717982 |
| 3/1/2011 | Renter's Insurance (03/2011) | 15.58 | | 849.89 | 8717983 |
| 3/1/2011 | chk# 14-235600166 MO- IA | | 65.58 | 784.31 | 4940965 |
| 3/2/2011 | chk# 1160131 SHRA CK- IA | | 860.00 | (75.69) | 4949025 |
| 4/1/2011 | Covered Parking Charges (04/2011) | 10.00 | | (65.69) | 8784214 |
| 4/1/2011 | Washer/Dryer Rental (04/2011) | 40.00 | | (25.69) | 8784215 |
| 4/1/2011 | Monthly Rent Charges (04/2011) | 860.00 | | 834.31 | 8784216 |
| 4/1/2011 | Renter's Insurance (04/2011) | 15.58 | | 849.89 | 8784217 |
| 4/3/2011 | chk# 1166778 SHRA Ck- IA | | 860.00 | (10.11) | 5002399 |
| 4/4/2011 | chk# 14-247384337 MO- IA | | 65.58 | (75.69) | 5007308 |
| 5/1/2011 | Covered Parking Charges (05/2011) | 10.00 | | (65.69) | 8854204 |
| 5/1/2011 | Washer/Dryer Rental (05/2011) | 40.00 | | (25.69) | 8854205 |
| 5/1/2011 | Monthly Rent Charges (05/2011) | 860.00 | | 834.31 | 8854206 |
| 5/1/2011 | Renter's Insurance (05/2011) | 15.58 | | 849.89 | 8854207 |
| 5/3/2011 | chk# 1173481 SHRA CK- IA | | 860.00 | (10.11) | 5052087 |
| 5/3/2011 | chk# 68824168259 MO- IA | | 65.58 | (75.69) | 5056492 |
| 6/1/2011 | Covered Parking Charges (06/2011) | 10.00 | | (65.69) | 8927198 |
| 6/1/2011 | Washer/Dryer Rental (06/2011) | 40.00 | | (25.69) | 8927199 |
| 6/1/2011 | Monthly Rent Charges (06/2011) | 860.00 | | 834.31 | 8927200 |
| 6/1/2011 | Renter's Insurance (06/2011) | 15.58 | | 849.89 | 8927201 |
| 6/2/2011 | chk# 14-296551086 MO/ yz | | 65.58 | 784.31 | 5101701 |
| 6/3/2011 | chk# 1180089 SHRA CK- IA | | 860.00 | (75.69) | 5111303 |
| 7/1/2011 | Covered Parking Charges (07/2011) | 10.00 | | (65.69) | 9000894 |
| 7/1/2011 | Washer/Dryer Rental (07/2011) | 40.00 | | (25.69) | 9000895 |
| 7/1/2011 | Monthly Rent Charges (07/2011) | 860.00 | | 834.31 | 9000896 |
| 7/1/2011 | Renter's Insurance (07/2011) | 15.58 | | 849.89 | 9000897 |
| 7/4/2011 | Late Charges July 2011 | 50.00 | | 899.89 | 9035978 |
| 7/4/2011 | resident not late-SD | (50.00) | | 849.89 | 9036987 |
| 7/4/2011 | chk# 1186793 SHRA CK- IA | | 860.00 | (10.11) | 5162348 |

| Date | Description | | | | |
|---|---|---|---|---|---|
| | Referred E. Jones #51 MI 03-19-2011- IA | (250.00) | | (260.11) | 9049013 |
| 7/31/2011 | chk# 1193533 SHRA CK- IA | | 860.00 | (1,120.11) | 5189028 |
| 8/1/2011 | Covered Parking Charges (08/2011) | 10.00 | | (1,110.11) | 9077122 |
| 8/1/2011 | Washer/Dryer Rental (08/2011) | 40.00 | | (1,070.11) | 9077123 |
| 8/1/2011 | Monthly Rent Charges (08/2011) | 860.00 | | (210.11) | 9077124 |
| 8/1/2011 | Renter's Insurance (08/2011) | 15.58 | | (194.53) | 9077125 |
| 8/2/2011 | Conservice- IA | 64.48 | | (130.05) | 9110793 |
| 9/1/2011 | Covered Parking Charges (09/2011) 19 days | 6.33 | | (123.72) | 9155996 |
| 9/1/2011 | Covered Parking Charges (09/2011) 11 days | 3.67 | | (120.05) | 9155997 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) 19 days | 25.33 | | (94.72) | 9155998 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) 11 days | 14.67 | | (80.05) | 9155999 |
| 9/1/2011 | Monthly Rent Charges (09/2011) | 860.00 | | 779.95 | 9156000 |
| 9/1/2011 | Renter's Insurance (09/2011) 19 days | 9.87 | | 789.82 | 9156001 |
| 9/1/2011 | Renter's Insurance (09/2011) 11 days | 5.71 | | 795.53 | 9156002 |
| 9/2/2011 | chk# 1200273 SHRA CK- IA | | 860.00 | (64.47) | 5264936 |
| 9/30/2011 | Conservice- IA | 64.47 | | 0.00 | 9220684 |
| 10/1/2011 | Covered Parking Charges (10/2011) | 10.00 | | 10.00 | 9231431 |
| 10/1/2011 | Washer/Dryer Rental (10/2011) | 40.00 | | 50.00 | 9231432 |
| 10/1/2011 | Renter's Insurance (10/2011) | 17.91 | | 67.91 | 9231433 |
| 10/1/2011 | Housing Assistance Charge (10/2011) | 939.00 | | 1,006.91 | 9231434 |
| 10/3/2011 | chk# 1207023 SHRA CK- IA | | 939.00 | 67.91 | 5326803 |
| 10/11/2011 | chk# 154 CK- IA Reversed by ctrl#5346001 | | 67.91 | 0.00 | 5338704 |
| 10/20/2011 | Returned check charge | 50.00 | | 50.00 | 9287174 |
| 10/20/2011 | chk# 154 NSF receipt Ctrl# 5338704 | | (67.91) | 117.91 | 5346001 |
| 11/1/2011 | Covered Parking Charges (11/2011) | 10.00 | | 127.91 | 9307889 |
| 11/1/2011 | Washer/Dryer Rental (11/2011) | 40.00 | | 167.91 | 9307890 |
| 11/1/2011 | Renter's Insurance (11/2011) | 17.91 | | 185.82 | 9307891 |
| 11/1/2011 | Housing Assistance Charge (11/2011) | 939.00 | | 1,124.82 | 9307892 |
| 11/1/2011 | chk# 1213799 SHRA CK- IA | | 939.00 | 185.82 | 5372087 |
| 11/3/2011 | chk# 203563099190 MO- IA | | 167.91 | 17.91 | 5381598 |
| 11/8/2011 | chk# 14-384003067 Mo- IA | | 17.95 | (0.04) | 5392087 |
| 12/1/2011 | Covered Parking Charges (12/2011) | 10.00 | | 9.96 | 9379982 |
| 12/1/2011 | Washer/Dryer Rental (12/2011) | 40.00 | | 49.96 | 9379983 |
| 12/1/2011 | Renter's Insurance (12/2011) | 17.91 | | 67.87 | 9379984 |
| 12/1/2011 | Housing Assistance Charge (12/2011) | 939.00 | | 1,006.87 | 9379985 |
| 12/2/2011 | chk# 1220535 SHRA CK- IA | | 939.00 | 67.87 | 5427993 |
| 12/3/2011 | chk# 14-384003188 MO- IA | | 67.91 | (0.04) | 5431495 |
| 1/1/2012 | Covered Parking Charges (01/2012) | 10.00 | | 9.96 | 9451113 |
| 1/1/2012 | Washer/Dryer Rental (01/2012) | 40.00 | | 49.96 | 9451114 |
| 1/1/2012 | Renter's Insurance (01/2012) | 17.91 | | 67.87 | 9451115 |
| 1/1/2012 | Housing Assistance Charge (01/2012) | 939.00 | | 1,006.87 | 9451116 |
| 1/3/2012 | chk# 1227187 SHRA CK- IA | | 939.00 | 67.87 | 5484751 |
| 1/4/2012 | chk# 14-416081488 MO- IA | | 67.91 | (0.04) | 5488021 |
| 2/1/2012 | Covered Parking Charges (02/2012) | 10.00 | | 9.96 | 9525843 |
| 2/1/2012 | Washer/Dryer Rental (02/2012) | 40.00 | | 49.96 | 9525844 |
| 2/1/2012 | Renter's Insurance (02/2012) | 17.91 | | 67.87 | 9525845 |
| 2/1/2012 | Housing Assistance Charge (02/2012) | 939.00 | | 1,006.87 | 9525846 |
| 2/1/2012 | chk# 14-442266070 MO- IA | | 65.98 | 940.89 | 5524087 |

| | | | | | |
|---|---|---|---|---|---|
| | chk# 1233969 SHRA CK- IA | | 939.00 | 1.89 | 5529942 |
| 2/15/2012 | chk# 14-442266217 MO- IA | | 1.89 | 0.00 | 5549711 |
| 3/1/2012 | Covered Parking Charges (03/2012) | 10.00 | | 10.00 | 9596712 |
| 3/1/2012 | Washer/Dryer Rental (03/2012) | 40.00 | | 50.00 | 9596713 |
| 3/1/2012 | Renter's Insurance (03/2012) | 17.91 | | 67.91 | 9596714 |
| 3/1/2012 | Housing Assistance Charge (03/2012) | 939.00 | | 1,006.91 | 9596715 |
| 3/2/2012 | chk# 14-442266328 MO -IA | | 65.58 | 941.33 | 5581673 |
| 3/3/2012 | chk# 1240704 SHRA CK- IA | | 939.00 | 2.33 | 5589221 |
| 3/16/2012 | chk# 14-474485659 MO -IA | | 2.33 | 0.00 | 5603286 |
| 4/1/2012 | Covered Parking Charges (04/2012) | 10.00 | | 10.00 | 9669608 |
| 4/1/2012 | Washer/Dryer Rental (04/2012) | 40.00 | | 50.00 | 9669609 |
| 4/1/2012 | Renter's Insurance (04/2012) | 17.91 | | 67.91 | 9669610 |
| 4/1/2012 | Housing Assistance Charge (04/2012) | 939.00 | | 1,006.91 | 9669611 |
| 4/3/2012 | Credit due to SHRA Ck- IA | (905.00) | | 101.91 | 9703594 |
| 4/3/2012 | Credit due to SHRA CK- IA | (21.00) | | 80.91 | 9703606 |
| 4/3/2012 | chk# 104826866353 MO- IA | | 67.91 | 13.00 | 5638839 |
| 4/3/2012 | chk# 1247403 SHRA CK- IA | | 13.00 | 0.00 | 5642492 |
| 5/1/2012 | Covered Parking Charges (05/2012) | 10.00 | | 10.00 | 9742885 |
| 5/1/2012 | Washer/Dryer Rental (05/2012) | 40.00 | | 50.00 | 9742886 |
| 5/1/2012 | Renter's Insurance (05/2012) | 17.91 | | 67.91 | 9742887 |
| 5/1/2012 | Housing Assistance Charge (05/2012) | 939.00 | | 1,006.91 | 9742888 |
| 5/1/2012 | chk# 14-474485948 MO- IA | | 67.91 | 939.00 | 5685416 |
| 5/2/2012 | chk# 1254051 SHRA CK- IA | | 939.00 | 0.00 | 5690103 |
| 6/1/2012 | Covered Parking Charges (06/2012) | 10.00 | | 10.00 | 9819278 |
| 6/1/2012 | Washer/Dryer Rental (06/2012) | 40.00 | | 50.00 | 9819279 |
| 6/1/2012 | Renter's Insurance (06/2012) | 17.91 | | 67.91 | 9819280 |
| 6/1/2012 | Housing Assistance Charge (06/2012) | 939.00 | | 1,006.91 | 9819281 |
| 6/2/2012 | chk# 14-514548555 MO- IA | | 67.91 | 939.00 | 5743670 |
| 6/3/2012 | chk# 1260737 SHRA CK- IA | | 939.00 | 0.00 | 5749026 |
| 7/1/2012 | Covered Parking Charges (07/2012) | 10.00 | | 10.00 | 9897113 |
| 7/1/2012 | Washer/Dryer Rental (07/2012) | 40.00 | | 50.00 | 9897114 |
| 7/1/2012 | Renter's Insurance (07/2012) | 17.91 | | 67.91 | 9897115 |
| 7/1/2012 | Housing Assistance Charge (07/2012) | 939.00 | | 1,006.91 | 9897116 |
| 7/2/2012 | chk# 1267479 SHRA CK- IA | | 939.00 | 67.91 | 5802152 |
| 7/3/2012 | chk# PSID16254516 Terminal PSID 16254516 - CHECK21 | | 67.97 | (0.06) | 5806574 |
| 8/1/2012 | Washer/Dryer Rental (08/2012) | 40.00 | | 39.94 | 9975128 |
| 8/1/2012 | Renter's Insurance (08/2012) | 17.91 | | 57.85 | 9975129 |
| 8/1/2012 | Housing Assistance Charge (08/2012) | 939.00 | | 996.85 | 9975130 |
| 8/3/2012 | chk# 1274490 SHRA CK- IA | | 939.00 | 57.85 | 5860449 |
| 8/3/2012 | chk# PSID17344899 Terminal PSID 17344899 - CHECK21 | | 50.97 | 6.88 | 5861897 |
| 8/15/2012 | chk# PSID17700193-90 Terminal PSID 17700193 - CHECK21 | | 6.88 | 0.00 | 5876788 |
| 9/1/2012 | Washer/Dryer Rental (09/2012) | 40.00 | | 40.00 | 10053703 |
| 9/1/2012 | Renter's Insurance (09/2012) | 17.91 | | 57.91 | 10053704 |
| 9/1/2012 | Housing Assistance Charge (09/2012) | 939.00 | | 996.91 | 10053705 |
| 9/3/2012 | chk# PSID18155648 Terminal PSID 18155648 - CHECK21 | | 267.91 | 729.00 | 5917492 |
| 9/4/2012 | Late Charges Sept 2012 | 50.00 | | 779.00 | 10087604 |
| 9/5/2012 | SHRA PMT Late- IA | (50.00) | | 729.00 | 10094344 |
| 9/5/2012 | chk# 3000222 SHRA PMT- IA | | 939.00 | (210.00) | 5926375 |

| | | | | | |
|---|---|---|---|---|---|
| | Washer/Dryer Rental (10/2012) | 40.00 | | (170.00) | 10130375 |
| 10/1/2012 | Monthly Rent Charges (10/2012) | 210.00 | | 40.00 | 10130376 |
| 10/1/2012 | Renter's Insurance (10/2012) | 17.91 | | 57.91 | 10130377 |
| 10/1/2012 | Housing Assistance Charge (10/2012) | 729.00 | | 786.91 | 10130378 |
| 10/3/2012 | chk# PSID19426973 Terminal PSID 19426973 - CHECK21 | | 267.91 | 519.00 | 5975463 |
| 10/4/2012 | Late Charges Oct 2012 | 50.00 | | 569.00 | 10165598 |
| 10/5/2012 | SHRA PMT late- IA | (50.00) | | 519.00 | 10171379 |
| 10/5/2012 | chk# 3000432 SHRA PMT - IA | | 729.00 | (210.00) | 5981667 |
| 11/1/2012 | Washer/Dryer Rental (11/2012) | 40.00 | | (170.00) | 10205552 |
| 11/1/2012 | Monthly Rent Charges (11/2012) | 210.00 | | 40.00 | 10205553 |
| 11/1/2012 | Renter's Insurance (11/2012) | 17.91 | | 57.91 | 10205554 |
| 11/1/2012 | Housing Assistance Charge (11/2012) | 729.00 | | 786.91 | 10205555 |
| 11/2/2012 | chk# 3000730 SHRA Direct Deposit- IA | | 729.00 | 57.91 | 6023968 |
| 11/3/2012 | chk# PSID20297721 Terminal PSID 20297721 - CHECK21 | | 267.91 | (210.00) | 6029211 |
| 12/1/2012 | Washer/Dryer Rental (12/2012) | 40.00 | | (170.00) | 10277510 |
| 12/1/2012 | Monthly Rent Charges (12/2012) | 210.00 | | 40.00 | 10277511 |
| 12/1/2012 | Renter's Insurance (12/2012) | 17.91 | | 57.91 | 10277512 |
| 12/1/2012 | Housing Assistance Charge (12/2012) | 729.00 | | 786.91 | 10277513 |
| 12/3/2012 | chk# 3001311 SHRA Direct Deposit #3001311- IA | | 729.00 | 57.91 | 6077164 |
| 1/1/2013 | Washer/Dryer Rental (01/2013) | 40.00 | | 97.91 | 10348648 |
| 1/1/2013 | Monthly Rent Charges (01/2013) | 210.00 | | 307.91 | 10348649 |
| 1/1/2013 | Renter's Insurance (01/2013) | 17.91 | | 325.82 | 10348650 |
| 1/1/2013 | Housing Assistance Charge (01/2013) | 729.00 | | 1,054.82 | 10348651 |
| 1/2/2013 | chk# 3002983 SHRA Direct Deposit ACH#3002983- IA | | 729.00 | 325.82 | 6121243 |
| 1/3/2013 | chk# PSID22088680-90 Terminal PSID 22088680 - CHECK21 | | 115.82 | 210.00 | 6131688 |
| 1/4/2013 | Late Charges Jan 2013 | 50.00 | | 260.00 | 10383243 |
| 2/1/2013 | Washer/Dryer Rental (02/2013) | 40.00 | | 300.00 | 10421423 |
| 2/1/2013 | Monthly Rent Charges (02/2013) | 210.00 | | 510.00 | 10421424 |
| 2/1/2013 | Renter's Insurance (02/2013) | 18.16 | | 528.16 | 10421425 |
| 2/1/2013 | Housing Assistance Charge (02/2013) | 729.00 | | 1,257.16 | 10421426 |
| 2/2/2013 | chk# 3004755 SHRA Direct Deposit 3004755- IA | | 729.00 | 528.16 | 6178922 |
| 2/3/2013 | chk# PSID23063698 Terminal PSID 23063698 - CHECK21 | | 267.91 | 260.25 | 6186387 |
| 2/4/2013 | Late Charges Feb 2013 | 50.00 | | 310.25 | 10458078 |
| 3/1/2013 | Washer/Dryer Rental (03/2013) | 40.00 | | 350.25 | 10495956 |
| 3/1/2013 | Monthly Rent Charges (03/2013) | 210.00 | | 560.25 | 10495957 |
| 3/1/2013 | Renter's Insurance (03/2013) | 18.16 | | 578.41 | 10495958 |
| 3/1/2013 | Housing Assistance Charge (03/2013) | 729.00 | | 1,307.41 | 10495959 |
| 3/3/2013 | chk# 3006596 SHRA Direct Deposit- IA | | 729.00 | 578.41 | 6236131 |
| 3/4/2013 | Late Charges Mar 2013 | 50.00 | | 628.41 | 10531262 |
| 3/20/2013 | :Deposit credit | (325.00) | | 303.41 | 10551413 |
| 3/20/2013 | Monthly Rent Charges (03/2013) Credit 11 days | (74.52) | | 228.89 | 10551414 |
| 3/20/2013 | Housing Assistance Charge (03/2013) Credit 11 days | (258.68) | | (29.79) | 10551415 |
| 3/20/2013 | Renter's Insurance (03/2013) Credit 11 days | (6.44) | | (36.23) | 10551416 |
| 3/20/2013 | Washer/Dryer Rental (03/2013) Credit 11 days | (14.19) | | (50.42) | 10551417 |
| 3/20/2013 | Carpet Cleaning/Damage | 706.32 | | 655.90 | 10551418 |
| 3/20/2013 | Parts & Materials | 939.00 | | 1,594.90 | 10551419 |
| 3/20/2013 | Maint/Paint Labor | 510.55 | | 2,105.45 | 10551420 |
| 3/20/2013 | Legal Fees | 918.00 | | 3,023.45 | 10551421 |

|  | Cleaning Charges | 240.00 |  | 3,263.45 | 10551422 |
|---|---|---|---|---|---|
| 3/20/2013 | Final ConService Charge | 102.59 |  | 3,366.04 | 10551423 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10495959 bad debt write off | (578.41) |  | 2,787.63 | 10552533 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551418 bad debt write off | (410.69) |  | 2,376.94 | 10552534 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551419 bad debt write off | (939.00) |  | 1,437.94 | 10552535 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551420 bad debt write off | (510.55) |  | 927.39 | 10552536 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551421 bad debt write off | (918.00) |  | 9.39 | 10552537 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551422 bad debt write off | (9.39) |  | 0.00 | 10552538 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT C

25
26
27
28



Sacramento
Housing &
Redevelopment
Agency

701 – 12th Street
Sacramento, CA 95814
(916) 440-1390
TTY (916) 277-1309
www.shra.org

August 18, 2011

CHESAPEAKE COMMONS
3600 DATA DR - OFFICE
RANCHO CORDOVA, CA 95670

Tenant Number:    t0006472
Vendor Number:   005076p
Unit Number:      00487489

## SUBSIDY ADJUSTMENT NOTICE

The housing assistance subsidy currently paid to the owner as rent for the tenant family's address, shown below, shall be adjusted as follows, effective October 01, 2011

CURRENT HOUSING ASSISTANCE PAYMENT:    $860.00
                            TENANT RENT:    $0.00
                       CONTRACT RENT:    $860.00

NEW  HOUSING ASSISTANCE PAYMENT:    $939.00
                       TENANT RENT:    $0.00
                    CONTRACT RENT:    $939.00

The reason for this adjustment is:
☐ Family income changed
☐ Family composition changed
☐ Annual recertification
☑ Other:  Contract rent  increase; disregard letter dated 8/16/11

If the family has Zero Housing Assistance Payment, they will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Sylvia DeLeon
Staff Line
(916) 440-1390

---

FOR THE TENANT FAMILY

You have the right to request an informal hearing of the agency's determination provided you submit a written request within fifteen (15) days from the date of this notice.

Cc:    DENIKA TERRY
       3600 DATA DR 391
       RANCHO CORDOVA, CA 95670

SHRA_SubsidyAdjustment.doc

00048

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D



# SUBSIDY ADJUSTMENT NOTICE
# HOUSING CHOICE VOUCHERS (HCV)

**INVESTING IN COMMUNITIES**
August 10, 2012

**OPS**
CHESAPEAKE COMMONS
3600 DATA DR - OFFICE C/O WASATCH PROPERTY MGMT
RANCHO CORDOVA, CA 95670

Vendor code: 005076p

RE: DENIKA TERRY   Tenant Code: t0006472

The Housing Assistance Payment (HAP) currently paid to the owner on behalf of the above-mentioned tenant has been adjusted effective **10/01/2012** as follows:

| | |
|---|---|
| CURRENT HOUSING ASSISTANCE PAYMENT: | $939.00 |
| TENANT RENT: | $0.00 |
| UTILITY REIMBURSEMENT PAYMENT (URP): | $35.00 |
| CONTRACT RENT: | $939.00 |
| | |
| NEW HOUSING ASSISTANCE PAYMENT: | $729.00 |
| TENANT RENT: | $210.00 |
| UTILITY REIMBURSEMENT PAYMENT (URP): | $0.00 |
| CONTRACT RENT: | $939.00 |

The reason for this adjustment is: Annual Recertification
Comments:

If the Housing Assistance Payment being paid to the landlord is Zero, the family will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Kassie Slater
(916) 440-1390

---

### FOR THE TENANT FAMILY
You have the right to request an Informal Hearing of the Housing Authority's rent determination provided you submit a written request within fifteen (15) days from the date of this notice.

cc: DENIKA TERRY
3600 DATA DR 391
RANCHO CORDOVA, CA 95670



Sacramento Housing & Redevelopment Agency  630 I Street, Sacramento, CA 95814
Phone (916) 440-1390 | fax (916) 449-1285 | www.shra.org



Draft 4/12/12 tt

00033

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT E

25

26

27

28

## SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
## HOUSING CHOICE VOUCHER PROGRAM
### Lease Supplemental Agreement

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

---

**1. PARTIES TO THE AGREEMENT DEFINED:**

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

| | | | | |
|---|---|---|---|---|
| a. | Tenant | **ROY HUSKEY III** | Tenant # | **t0018323** |
| b. | Owner | **LOGAN PARK APARTMENTS** | Vendor # | **004359p** |

**OWNR SPEC 2**

**2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:**

**ROY L. HUSKEY III**          **MELISSA HUSKEY**

*JUL 15 2011*

**3. UNIT ADDRESS: 4141 PALM AVE 191**
**SACRAMENTO, CA 95842**

**4. INITIAL LEASE TERM:** Begins    **7/8/2011** and ends  **6/30/2012**

**5. INITIAL CONTRACT RENT:**     **$840.00**    INITIAL TENANT RENT:       **$286.00**

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by "Owner". The tenant shall provide or pay for the utilities or appliances indicated below by "Tenant". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|---|---|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Refrigerator | Owner |
| Sewer | Owner |
| Trash Collection | Owner |
| Water | Owner |

| | | |
|---|---|---|
| *(signature)* | *916 - 740 - 8488* | *7-9-11* |
| ROY HUSKEY III | Telephone Number | Date |
| *(signature)* | *916 344-4494* | *7/9/11* |
| Owner / Agent | Telephone Number | Date |

## TENANCY ADDENDUM

Section 8 Tenant-Based Assistance
Housing Choice Voucher Program (To
be attached to Tenant Lease)

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169
Exp. 04/30/2014

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.
or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a  Maintenance

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including

form HUD-52641-A (8/2009)
ref Handbook 7420.8

From:SHRA Exec     1 916 443 8872     07/29/201  8:55    #554 P.017/085

standard practice for the building concerned as established by the owner.

**b**   Utilities and appliances

   (1)   The owner must provide all utilities needed to comply with the HQS.

   (2)   The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

     (a)   Pay for any utilities that are to be paid by the tenant.

     (b)   Provide and maintain any appliances that are to be provided by the tenant.

**c**   Family damage. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

**d**   Housing services. The owner must provide all housing services as agreed to in the lease.

## 8. Termination of Tenancy by Owner

**a**   Requirements. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

**b**   Grounds. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

   (1)   Serious or repeated violation of the lease;

   (2)   Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

   (3)   Criminal activity or alcohol abuse (as provided in paragraph c); or

   (4)   Other good cause (as provided in paragraph d).

**c**   Criminal activity or alcohol abuse.

   (1)   The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

     (a)   Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

     (b)   Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

     (c)   Any violent criminal activity on or near the premises; or

     (d)   Any drug-related criminal activity on or near the premises.

   (2)   The owner may terminate the tenancy during the term of the lease if any member of the household is:

     (a)   Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that

is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

     (b)   Violating a condition of probation or parole under Federal or State law.

   (3)   The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

   (4)   The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

**d**   Other good cause for termination of tenancy

   (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

   (2) During the initial lease term or during any extension term, other good cause may include:

     (a)   Disturbance of neighbors.

     (b)   Destruction of property, or

     (c)   Living or housekeeping habits that cause damage to the unit or premises.

   (3) After the initial lease term, such good cause may include:

     (a)   The tenant's failure to accept the owner's offer of a new lease or revision;

     (b)   The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

     (c)   A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

   (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

   (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

e. Protections for Victims of Abuse.

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public

housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. Eviction by court action. The owner may only evict the tenant by a court action.

g. Owner notice of grounds

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9. Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

12. Security Deposit
   a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

   b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

   c. The owner must give the tenant a list of all items charged against the security deposit and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.  If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a.  The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b.  In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a.  The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b.  In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2)  If there are any changes in lease provisions governing the term of the lease;

(3)  If the family moves to a new unit, even if the unit is in the same building or complex.

c.  PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d.  The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations. Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

(Page 6 of 61)

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

**Part A of the HAP Contract: Contract Information**
(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
       Part A: Contract Information
       Part B: Body of Contract
       Part C: Tenancy Addendum

2. **Tenant**

   ROY HUSKEY III

3. **Contract Unit**

   4141 PALM AVE 191
   SACRAMENTO, CA 95842

4. **Household**
   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

       ROY L HUSKEY III
       MELISSA HUSKEY

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): 07/08/2011
   The initial lease term ends on (mm/dd/yyyy): 06/30/2012

6. **Initial Rent to Owner**
   The initial rent to owner is: $840
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $554 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

## 8. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
| --- | Owner | Tenant |
| Air Conditioning | | T |
| Cooking Oil/Electric | | T |
| Flat Fee Electric | | T |
| Heating - Oil/Electric | | T |
| Other Electric | | T |
| Refrigerator | O | |
| Sewer | O | |
| Trash Collection | O | |
| Water | O | |

JUL 15 2011

## Signatures

**Public Housing Agency: SHRA County of Sacramento Housing Authority**

Print or Type Name of PHA

_Signature_

BILVERIO RAMOS

Print or Type Name and Title of Signatory

07·18·11

Date (mm/dd/yyyy)

**Owner: LOGAN PARK APARTMENTS**

Print or Type Name of Owner

_Signature_

Raylene Jeffery  Asst Manager

Print or Type Name and Title of Signatory

7/9/11

Date (mm/dd/yyyy)

**Mail Payments to:**

**LOGAN PARK APARTMENTS**

Name

4215 PALM AVE - OFFICE
C/O WASATCH PROPERTY MGMT
SACRAMENTO, CA 95842

Address (Street, City, State, Zip)

## Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

### Part B of HAP Contract: Body of Contract

**1. Purpose**

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments *to the owner in accordance with the* HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

**2. Lease of Contract Unit**

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
(3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

**3. Maintenance, Utilities, and Other Services**

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

**4. Term of HAP Contract**

a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. **When HAP contract terminates.**

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
(3) If the family moves from the contract unit, the HAP contract terminates automatically.
(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

## 5. Provision and Payment for Utilities and Appliances

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

## 6. Rent to Owner: Reasonable Rent

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

## 7. PHA Payment to Owner

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. Owner compliance with HAP contract. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. Amount of PHA payment to owner

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. Application of payment. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. Limit of PHA responsibility.

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. Overpayment to owner. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

## 8. Owner Certification

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

## 9. Prohibition of Discrimination. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

## 10. Owner's Breach of HAP Contract

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

## 11. PHA and HUD Access to Premises and Owner's Records

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

## 12. Exclusion of Third Party Rights

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

### 13. Conflict of Interest
a. "Covered individual" means a person or entity who is a member of any of the following classes:
   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);
   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;
   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

### 14. Assignment of the HAP Contract
a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:
   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or
   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):
   (1) Has violated obligations under a housing assistance payments contract under Section 8;
   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;
   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;
   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;
   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
      (a) Threatens the right to peaceful enjoyment of the premises by other residents;
      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;
      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or
      (d) Is drug-related criminal activity or violent criminal activity;
   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or
   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

### 15. Foreclosure.
In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

    a.   The HAP contract contains the entire agreement between the owner and the PHA.

    b.   The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

## Housing Assistance Payments Contract (HAP Contract)
### Section 8 Tenant-Based Assistance
Housing Choice Voucher Program

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
_. (exp. 09/30/2012)

### Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.
   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**
      (1) The owner must maintain the unit and premises in accordance with the HQS.
      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.


b. **Utilities and appliances**
(1) The owner must provide all utilities needed to comply with the HQS.
(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

  (a) Pay for any utilities that are to be paid by the tenant.
  (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;
(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
(3) Criminal activity or alcohol abuse (as provided in paragraph c); or
(4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

  (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
  (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
  (c) Any violent criminal activity on or near the premises; or
  (d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

  (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
  (b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

  (a) Disturbance of neighbors,
  (b) Destruction of property, or
  (c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

  (a) The tenant's failure to accept the owner's offer of a new lease or revision;
  (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
  (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

e. **Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f.  Eviction by court action. The owner may only evict the tenant by a court action.

g.  Owner notice of grounds

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9.  Lease: Relation to HAP Contract

If the HAP contract terminates for any reason, the lease terminates automatically.

## 10.  PHA Termination of Assistance

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11.  Family Move Out

The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12.  Security Deposit

a.  The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.  When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.  The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.  If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13.  Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

**14. Conflict with Other Provisions of Lease**

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

**15. Changes in Lease or Rent**

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

    (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

    (2) If there are any changes in lease provisions governing the term of the lease;

    (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

**16. Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

**17. Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

From:SHRA Exec                1 916 443 8872           07/29/201▉ ▉9:00    #554 P.031/085
Case 2:15-cv-00799-K▉M-DB   Document 1   Filed 04/14/15   Page 70 of 82

(Page 17 of 61)

## RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. | Owners Agent
A Utah Corporation - registered in
595 E Riverwoods Pkwy, Suite 400 Logan, Utah 84321

This agreement is made in Sacramento, CA between, Logan Park hereinafter called Owner, by Wasatch Management Management, its authorized agent, and
**Lease Holder(s):**

**Roy Huskey**

**Authorized Occupant(s):**

**Melissa Huskey (Dependant),**

hereinafter called Resident(s). No other person(s) except those herein stated may occupy premises without written approval of Owner.

### I. TERM

This Agreement creates a 12 month and 0 day tenancy, commencing 08/30/2011, and Terminating 08/29/2012. Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is 10,428.00.

### II. PROPERTY

Owner hereby rents to Resident for the term of this agreement the property located at: 4141 Palm Avenue #121, Sacramento, CA 95842

### III. LOW-INCOME HOUSING CREDIT

The premises are to be operated in accordance with the requirements of the low-income housing credit Program under Section 42 of the Internal Revenue Code of 1988, as amended (the "Program"). Resident's rights hereunder will be subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of the Landlord's tax credit. The Resident will cooperate with all LANDLORD requirements related to such compliance and the Program.

### IV. RENT

The rental for the premises is 869.00, per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4216 Palm Ave, Sacramento, CA, 95842.

The Landlord and Tenant have entered into a housing assistance payments (HAP) contract with the local public housing authority (PHA) pursuant to the Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of the tenants rent to the Landlord on behalf of the Tenant. So long as the hap contract remains in effect, the Tenant is not responsible for this portion of the rent. The additional terms and conditions of the parties rental obligations are set forth as follows:

**1. Section 8 Rent:**

A. The total contract rent shall be $869.00 per month;

B. Of the total contract rent, $369.00 shall be payable to the Landlord by the Tenant(s) each month as the Tenant's net family contribution; the remaining balance of $500.00 shall be payable to the Landlord by the local housing authority for so long as the HAP contract remains in effect.

2. Section 8 Rent adjustments: The amount of assistance that HUD pays on behalf of the Tenant may be changed during the term of the lease if: (1) HUD or the PHA determines, in accordance with HUD procedures, that an increase in rents is needed; (2) HUD or the PHA changes any allowance for utilities or services considered in computing the Tenant's share of the rent; (3) the income, the number of persons in the Tenant's household or other factors considered in determining the Tenant's rent change and HUD procedures provide that the Tenant's rent or assistance payment be adjusted to reflect the change; (4) changes in the Tenant's rent or assistance payment are required by HUD's recertification or subsidy termination procedures; (5) HUD's procedures for computing the Tenant's Assistance payment or rent change; (or) the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord or PHA.

The Rental Office can be reached by phone at (916)-344-4494. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 3:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk by depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV, below), in installments as follows:

A. The sum of $29.97 upon execution of this Rental Agreement as rent for the period beginning 08/30/2011, through 08/30/2011 payable on 08/30/2011.

B. The sum of $869.00 is due on the first day of each calendar month commencing July 2011.

C. A concession in the amount of 35.00 is to be given to Resident as part of this 12 month(s) lease and will be issued as $35.00 off move in. The 35.00 concession is due and payable back to Logan Park if the 12 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced-market rate in accordance with a formula established by one or more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.



**V.  CHANGES IN RESIDENT'S SHARE OF RENT**

The Resident agrees that the amount of rent the Resident pays may be changed during the term of the Agreement if:
A.  The Contract Administrator determines, in accordance with Program procedures, that an increase in rent is needed;
B.  The Contract Administrator changes any allowance for utilities or services considered in determining the Resident's rent;
C.  The income, the number of persons in the Resident's household or other factors considered in determining the Resident's rent change; or
D.  The procedures for determining the Resident's rent change; or
E.  The Landlord agrees to implement changes in the Resident's rent only in accordance with the time frames and administrative procedures set forth in instructions and regulations related to administration of the Program. The Landlord agrees to give the Resident at least thirty (30) days advance written notice of any increase in the Resident's rent, except as noted in paragraph 12. The Notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

**VI.  EXCESS RENTS**

If it is determined that the premises are not a qualified low-income unit because the rent paid by the Residents, plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed LIHTC code, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

**VII.  PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**VIII.  LATE CHARGES**

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 12:01 a.m. on the 4th day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 3rd day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 26.00. In the event Resident fails to pay rent on or before 12:01 a.m. on the 4th day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**IX.  SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $299.00. Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

**X.  ACCEPTANCE AND SURRENDER OF PREMISES**

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner within three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

(Page 19 of 61)

## 10. USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than 2 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who resides in the apartment over two weeks must be on the lease.



B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Boxerjf, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Braziliaro, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed.



C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store all Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damage or loss in connection therewith.

F. Harassment or Threats: Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. Nuisance and Waste: Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance or commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

## 11. RESIDENTS DUTY TO MAINTAIN PREMISES

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

## 12. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due. It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

＿＿ gas,　　　　　　Account #＿＿＿＿＿＿＿＿
_X_ electricity,　　Account #＿＿＿＿＿＿＿＿
＿＿ water/sewer/trash　　See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges

Resident agrees to pay for all utilities, services, and charges, if any, made payable by or predicated upon occupancy of residence including telephone, electricity and satellite or cable television. Resident is responsible for having utilities turned on in their name no later than the day of move in.

## 14. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

(Page 20 of 61)

**XV. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XVI. LIABILITY INSURANCE**



I understand that any property or liability insurance coverage purchased by the property manager or owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to my personal property or belongings or protect against any loss or damage resulting from my actions or omissions and/or my family and/or guest's actions or omissions. I also understand that, by not having renter's or personal liability insurance of my own, I will be liable to the property owner for certain losses and understand that I should not expect the property manager or owner to be responsible for such losses. Owner and manager recommend that every resident maintain renter's insurance coverage, at all times.



( X ) **I WILL PURCHASE RENTERS INSURANCE COVERAGE.**

     I recognize my need for insurance and want to take advantage of the program made available to residents.

(   ) **I HAVE RENTERS INSURANCE COVERAGE.**

     I have and will maintain throughout the term of my lease the following coverage

(   ) **I DO NOT HAVE RENTERS INSURANCE COVERAGE.**

     Although I recognize my need for renter's insurance, I will not at this time, be obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers, owners or third-party's property as a result of my actions or my family's actions.

**XVII. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A.   Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an off-risk renter s insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.   Loss of property due to theft

C.   Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.   The Actions or omissions of other Residents

E.   Interference with light, view or other intangible aspects of the premises.

F.   Operations in construction of any public or quasi-public work

G.   Any latent defect in the building(s)

H.   The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.   Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.   Resident agrees to indemnity, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**XIX. RECERTIFICATION**

Every year on or about the 1st day of _9 - 1 - 12_, the Landlord will request the Resident to report the income and composition of the Resident's household and to supply any other information required for the purposes of determining the Resident's continued Program eligibility. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The Landlord will verify the information supplied by the Resident and use the verified information to determine Program eligibility. You agree that all information supplied by you shall be subject to inspection by representatives from the Tax Credit Allocation Committee.

A.   If the Resident does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may require resident to vacate premises. The Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.

B.   The Resident may request to meet with the Landlord to discuss any changes resulting from the recertification processing. If the Resident requests such a meeting, the Landlord agrees to meet with the Resident and discuss how the Resident's continued Program eligibility was determined.

(Page 21 of 61)

**XX.   REPORTING CHANGES BETWEEN RECERTIFICATION**



The Residents shall notify the Landlord immediately in writing, if the household size changes, his or her income increases, Resident(s) become a full time student, or begins to receive HUD assistance. The Landlord may elect not to renew this Lease if the Resident becomes a student and the Landlord determines that the Resident's student status would disqualify the premises under the Program. The Landlord may adjust the Resident's rent and or utility allowance to reflect the Resident's status if the Resident becomes a HUD-assisted Resident.

**XXI.   CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 869.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XXII.   NOTICE TO QUIT**



TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a five equal    to thirty day's rent will be billed as liquidated damages for improper thirty day notice. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XXIII.   ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**



In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XXIV.   AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XXV.   SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXVI.   JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXVII.   LESSEE'S REPRESENTATIONS TO LESSOR**

Lessee represents and warrants that all information provided to Lessor, including the information provided in the application for the rental of the Apartment (the "Application), is true, complete and correct. If any information Lessee provides to Lessor is determined to be false, Lessee will be in breach of this Lease. Lessee understands and agrees that the Application is hereby made a part of the Lease, and a breach of any representations or warranties in the Application shall be a breach of this Lease.

**XXVIII.   PENALTIES FOR SUBMITTING FALSE INFORMATION**

If the Resident deliberately submits false information regarding income, family composition or other data on which the Resident's eligibility is based, the Landlord may require the Resident to vacate.

**XXIX.   WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXX.   RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.
Termination on Breach and Notice to Quit:  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.
In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXXI.   SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXXI. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statue, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXXII. CRIMINAL BACKGROUND INVESTIGATION**

By signing this Lease, Lessee represents that neither Lessee nor any occupant of the Apartment has, during the past five years, been convicted of any felony or misdemeanor involving sexual misconduct or a controlled substance, and that to the best of Lessee's knowledge, neither Lessee nor any occupant of the Apartment is subject of a criminal investigation or arrest warrant. Lessee hereby authorizes Lessor to perform a criminal background investigation of Lessee or any occupant of the Apartment in the event Lessor, in its sole discretion, has reason to believe that Lessee or any occupant is engaged in criminal activity in the Apartment or at the Apartment Community.

_____          6-30-11
Guy Huskey(Lessee)                 Date

_____N/A_____              _____
Melissa Huskey                     Date


_____          6-30-11
Owner Authorized agent             Date

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# EXHIBIT F

23
24
25
26
27
28

U.S., *ex rel.* Terry, et al. v. Wasatch Advantage Group, et al.
Plaintiffs' Class Action Complaint for Damages and Injunctive Relief; Jury Trial Demanded          -34-

 Wasatch Property Management

**Date : 3/10/2014**

# Resident Ledger

| Code | t0044875 | Property | lpt | Lease From | 6/30/2011 |
|------|----------|----------|-----|------------|-----------|
| Name | Roy Huskey III | Unit | 191 | Lease To | 6/29/2012 |
| Address | 4141 Palm Avenue #191 | Status | Current | Move In | 6/30/2011 |
| | | Rent | 840 | Move Out | |
| City St. Zip | Sacramento, CA 95842 | Phone(O)- | | Phone(H)- | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|------|-------------|--------|---------|---------|---------|
| 5/27/2011 | Application Fee | 35.00 | | 35.00 | 8914011 |
| 5/27/2011 | Total Deposit Amount | 299.00 | | 334.00 | 8914012 |
| 6/30/2011 | Rent for 1 days | 12.30 | | 346.30 | 8990031 |
| 6/30/2011 | Rent Subsidy for 1 days | 16.67 | | 362.97 | 8990032 |
| 6/30/2011 | Waive Application Fee | (35.00) | | 327.97 | 8990033 |
| 6/30/2011 | Renter's Insurance for 1 days | 0.52 | | 328.49 | 8990034 |
| 6/30/2011 | W/D for one day | 1.67 | | 330.16 | 8990048 |
| 6/30/2011 | Move In Concession/Resident moved in before SHRA Contract began LG | (55.74) | | 274.42 | 9353474 |
| 6/30/2011 | chk# 3802003437 pc | | 100.00 | 174.42 | 5135033 |
| 6/30/2011 | chk# 3802003487 pc | | 680.00 | (505.58) | 5135035 |
| 7/1/2011 | Washer/Dryer Rental (07/2011) | 50.00 | | (455.58) | 9016512 |
| 7/1/2011 | Monthly Rent Charges (07/2011) | 369.00 | | (86.58) | 9016513 |
| 7/1/2011 | Renter's Insurance (07/2011) | 15.58 | | (71.00) | 9016514 |
| 7/1/2011 | Housing Assistance Charge (07/2011) | 500.00 | | 429.00 | 9016515 |
| 7/31/2011 | chk# 1193420 LG | | 429.00 | 0.00 | 5189214 |
| 7/31/2011 | chk# 1193420 LG | | 554.00 | (554.00) | 5189313 |
| 8/1/2011 | Washer/Dryer Rental (08/2011) | 50.00 | | (504.00) | 9092850 |
| 8/1/2011 | Monthly Rent Charges (08/2011) | 286.00 | | (218.00) | 9092851 |
| 8/1/2011 | Renter's Insurance (08/2011) | 15.58 | | (202.42) | 9092852 |
| 8/1/2011 | Housing Assistance Charge (08/2011) | 554.00 | | 351.58 | 9092853 |
| 8/3/2011 | chk# 0000005134 LG | | 351.58 | 0.00 | 5213590 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) | 50.00 | | 50.00 | 9172072 |
| 9/1/2011 | Monthly Rent Charges (09/2011) | 286.00 | | 336.00 | 9172073 |
| 9/1/2011 | Renter's Insurance (09/2011) | 15.58 | | 351.58 | 9172074 |
| 9/1/2011 | Housing Assistance Charge (09/2011) | 554.00 | | 905.58 | 9172075 |
| 9/2/2011 | chk# 1200163 LG | | 554.00 | 351.58 | 5264983 |
| 9/2/2011 | chk# 0000005140 PC | | 352.00 | (0.42) | 5268540 |
| 10/1/2011 | Washer/Dryer Rental (10/2011) | 50.00 | | 49.58 | 9247680 |
| 10/1/2011 | Monthly Rent Charges (10/2011) | 286.00 | | 335.58 | 9247681 |
| 10/1/2011 | Renter's Insurance (10/2011) | 17.91 | | 353.49 | 9247682 |
| 10/1/2011 | Housing Assistance Charge (10/2011) | 554.00 | | 907.49 | 9247683 |
| 10/3/2011 | chk# 0000005143 LG | | 355.00 | 552.49 | 5323315 |

| Date | Description | | | | |
|------|-------------|--------|--------|--------|--------|
| 10/3/2011 | chk# 1206911 LG | | 554.00 | (1.51) | 5327632 |
| 11/1/2011 | Washer/Dryer Rental (11/2011) | 50.00 | | 48.49 | 9324179 |
| 11/1/2011 | Monthly Rent Charges (11/2011) | 286.00 | | 334.49 | 9324180 |
| 11/1/2011 | Renter's Insurance (11/2011) | 17.91 | | 352.40 | 9324181 |
| 11/1/2011 | Housing Assistance Charge (11/2011) | 554.00 | | 906.40 | 9324182 |
| 11/1/2011 | chk# 1213689 LG | | 554.00 | 352.40 | 5372885 |
| 11/2/2011 | chk# 0000005146 LG | | 355.00 | (2.60) | 5377496 |
| 12/1/2011 | Washer/Dryer Rental (12/2011) | 50.00 | | 47.40 | 9396095 |
| 12/1/2011 | Monthly Rent Charges (12/2011) | 286.00 | | 333.40 | 9396096 |
| 12/1/2011 | Renter's Insurance (12/2011) | 17.91 | | 351.31 | 9396097 |
| 12/1/2011 | Housing Assistance Charge (12/2011) | 554.00 | | 905.31 | 9396098 |
| 12/1/2011 | chk# 1220427 LG | | 554.00 | 351.31 | 5423814 |
| 12/3/2011 | chk# 14-427246913 LG | | 355.00 | (3.69) | 5433593 |
| 1/1/2012 | Washer/Dryer Rental (01/2012) | 50.00 | | 46.31 | 9467026 |
| 1/1/2012 | Monthly Rent Charges (01/2012) | 286.00 | | 332.31 | 9467027 |
| 1/1/2012 | Renter's Insurance (01/2012) | 17.91 | | 350.22 | 9467028 |
| 1/1/2012 | Housing Assistance Charge (01/2012) | 554.00 | | 904.22 | 9467029 |
| 1/3/2012 | chk# 0000005157 LG | | 355.00 | 549.22 | 5480724 |
| 1/3/2012 | chk# 1227079 LG | | 554.00 | (4.78) | 5484231 |
| 2/1/2012 | Washer/Dryer Rental (02/2012) | 50.00 | | 45.22 | 9540925 |
| 2/1/2012 | Monthly Rent Charges (02/2012) | 286.00 | | 331.22 | 9540926 |
| 2/1/2012 | Renter's Insurance (02/2012) | 17.91 | | 349.13 | 9540927 |
| 2/1/2012 | Housing Assistance Charge (02/2012) | 554.00 | | 903.13 | 9540928 |
| 2/2/2012 | chk# 1233861 LG | | 554.00 | 349.13 | 5532533 |
| 2/6/2012 | chk# 0000005159 LG | | 354.50 | (5.37) | 5543051 |
| 3/1/2012 | Washer/Dryer Rental (03/2012) | 50.00 | | 44.63 | 9611808 |
| 3/1/2012 | Monthly Rent Charges (03/2012) | 286.00 | | 330.63 | 9611809 |
| 3/1/2012 | Renter's Insurance (03/2012) | 17.91 | | 348.54 | 9611810 |
| 3/1/2012 | Housing Assistance Charge (03/2012) | 554.00 | | 902.54 | 9611811 |
| 3/2/2012 | chk# 14-437980136 LG | | 355.00 | 547.54 | 5581817 |
| 3/2/2012 | chk# 1240596 LG | | 554.00 | (6.46) | 5585407 |
| 4/1/2012 | Washer/Dryer Rental (04/2012) | 50.00 | | 43.54 | 9684691 |
| 4/1/2012 | Monthly Rent Charges (04/2012) | 286.00 | | 329.54 | 9684692 |
| 4/1/2012 | Renter's Insurance (04/2012) | 17.91 | | 347.45 | 9684693 |
| 4/1/2012 | Housing Assistance Charge (04/2012) | 554.00 | | 901.45 | 9684694 |
| 4/2/2012 | chk# 1247293 LG | | 554.00 | 347.45 | 5637573 |
| 4/3/2012 | chk# 0000005167 pc | | 355.00 | (7.55) | 5642922 |
| 5/1/2012 | Washer/Dryer Rental (05/2012) | 50.00 | | 42.45 | 9757907 |
| 5/1/2012 | Monthly Rent Charges (05/2012) | 286.00 | | 328.45 | 9757908 |
| 5/1/2012 | Renter's Insurance (05/2012) | 17.91 | | 346.36 | 9757909 |
| 5/1/2012 | Housing Assistance Charge (05/2012) | 554.00 | | 900.36 | 9757910 |
| 5/1/2012 | chk# 1253942 LG | | 554.00 | 346.36 | 5685906 |
| 5/3/2012 | chk# 0000005168 LG | | 355.00 | (8.64) | 5695427 |
| 6/1/2012 | Washer/Dryer Rental (06/2012) | 50.00 | | 41.36 | 9834103 |
| 6/1/2012 | Monthly Rent Charges (06/2012) | 286.00 | | 327.36 | 9834104 |
| 6/1/2012 | Renter's Insurance (06/2012) | 17.91 | | 345.27 | 9834105 |
| 6/1/2012 | Housing Assistance Charge (06/2012) | 554.00 | | 899.27 | 9834106 |
| 6/2/2012 | chk# 1260630 LG | | 554.00 | 345.27 | 5743049 |

| | chk# 20407832034 LG | | 355.00 | (9.73) | 5744421 |
|---|---|---|---|---|---|
| 7/1/2012 | Washer/Dryer Rental (07/2012) | 50.00 | | 40.27 | 9911295 |
| 7/1/2012 | Monthly Rent Charges (07/2012) | 286.00 | | 326.27 | 9911296 |
| 7/1/2012 | Renter's Insurance (07/2012) | 17.91 | | 344.18 | 9911297 |
| 7/1/2012 | Housing Assistance Charge (07/2012) | 554.00 | | 898.18 | 9911298 |
| 7/2/2012 | Adjust Rent to $304.00 LG | 18.00 | | 916.18 | 10013208 |
| 7/2/2012 | chk# 1267373 pc | | 554.00 | 362.18 | 5800129 |
| 7/3/2012 | chk# PSID16199404-5175-005175 Terminal PSID 16199404 - CHECK21 | | 355.00 | 7.18 | 5803217 |
| 8/1/2012 | Washer/Dryer Rental (08/2012) | 50.00 | | 57.18 | 9989035 |
| 8/1/2012 | Monthly Rent Charges (08/2012) | 286.00 | | 343.18 | 9989036 |
| 8/1/2012 | Renter's Insurance (08/2012) | 17.91 | | 361.09 | 9989037 |
| 8/1/2012 | Housing Assistance Charge (08/2012) | 554.00 | | 915.09 | 9989038 |
| 8/1/2012 | chk# 1274374 LG | | 554.00 | 361.09 | 5853143 |
| 8/3/2012 | chk# PSID17305286-5178-005178 Terminal PSID 17305286 - CHECK21 | | 355.00 | 6.09 | 5859766 |
| 8/4/2012 | Adjust Renthap to $536.00 LG | (18.00) | | (11.91) | 10013209 |
| 8/4/2012 | Adjust Rent to $304.00 LG | 18.00 | | 6.09 | 10013210 |
| 9/1/2012 | Washer/Dryer Rental (09/2012) | 50.00 | | 56.09 | 10067863 |
| 9/1/2012 | Monthly Rent Charges (09/2012) | 304.00 | | 360.09 | 10067864 |
| 9/1/2012 | Renter's Insurance (09/2012) | 17.91 | | 378.00 | 10067865 |
| 9/1/2012 | Housing Assistance Charge (09/2012) | 536.00 | | 914.00 | 10067866 |
| 9/4/2012 | chk# PSID18237843-5184-005184 Terminal PSID 18237843 - CHECK21 | | 375.00 | 539.00 | 5922037 |
| 9/7/2012 | chk# 3000215 LG | | 536.00 | 3.00 | 5929994 |
| 10/1/2012 | Washer/Dryer Rental (10/2012) | 50.00 | | 53.00 | 10144399 |
| 10/1/2012 | Monthly Rent Charges (10/2012) | 304.00 | | 357.00 | 10144400 |
| 10/1/2012 | Renter's Insurance (10/2012) | 17.91 | | 374.91 | 10144401 |
| 10/1/2012 | Housing Assistance Charge (10/2012) | 536.00 | | 910.91 | 10144402 |
| 10/2/2012 | chk# 3000425 LG | | 536.00 | 374.91 | 5969131 |
| 10/3/2012 | chk# PSID19408860-5185-005185 Terminal PSID 19408860 - CHECK21 | | 375.00 | (0.09) | 5974129 |
| 11/1/2012 | Washer/Dryer Rental (11/2012) | 50.00 | | 49.91 | 10219643 |
| 11/1/2012 | Monthly Rent Charges (11/2012) | 304.00 | | 353.91 | 10219644 |
| 11/1/2012 | Renter's Insurance (11/2012) | 17.91 | | 371.82 | 10219645 |
| 11/1/2012 | Housing Assistance Charge (11/2012) | 536.00 | | 907.82 | 10219646 |
| 11/2/2012 | chk# 300713 LG | | 536.00 | 371.82 | 6023935 |
| 11/2/2012 | chk# PSID20236493-5188-005188 Terminal PSID 20236493 - CHECK21 | | 375.00 | (3.18) | 6026199 |
| 12/1/2012 | Washer/Dryer Rental (12/2012) | 50.00 | | 46.82 | 10291510 |
| 12/1/2012 | Monthly Rent Charges (12/2012) | 304.00 | | 350.82 | 10291511 |
| 12/1/2012 | Renter's Insurance (12/2012) | 17.91 | | 368.73 | 10291512 |
| 12/1/2012 | Housing Assistance Charge (12/2012) | 536.00 | | 904.73 | 10291513 |
| 12/2/2012 | chk# 3001279 LG | | 536.00 | 368.73 | 6074746 |
| 12/3/2012 | chk# PSID21125574-5191-005191 Terminal PSID 21125574 - CHECK21 | | 375.00 | (6.27) | 6077575 |
| 1/1/2013 | Washer/Dryer Rental (01/2013) | 50.00 | | 43.73 | 10362609 |
| 1/1/2013 | Monthly Rent Charges (01/2013) | 304.00 | | 347.73 | 10362610 |
| 1/1/2013 | Renter's Insurance (01/2013) | 17.91 | | 365.64 | 10362611 |

| 1/1/2013 | Housing Assistance Charge (01/2013) | 536.00 | | | 901.64 | 10362612 |
|---|---|---|---|---|---|---|
| 1/3/2013 | chk# PSID22008570-5194-005194 Terminal PSID 22008570 - CHECK21 | | 375.00 | 526.64 | | 6125688 |
| 1/3/2013 | chk# 3002950 LG | | 536.00 | (9.36) | | 6130850 |
| 2/1/2013 | Washer/Dryer Rental (02/2013) | 50.00 | | | 40.64 | 10434776 |
| 2/1/2013 | Monthly Rent Charges (02/2013) | 304.00 | | | 344.64 | 10434777 |
| 2/1/2013 | Renter's Insurance (02/2013) | 18.16 | | | 362.80 | 10434778 |
| 2/1/2013 | Housing Assistance Charge (02/2013) | 536.00 | | | 898.80 | 10434779 |
| 2/2/2013 | chk# t0055416 LG | | 536.00 | 362.80 | | 6177856 |
| 2/2/2013 | chk# PSID22884458-5200-005200 Terminal PSID 22884458 - CHECK21 | | 375.00 | (12.20) | | 6178232 |
| 3/1/2013 | Washer/Dryer Rental (03/2013) | 50.00 | | | 37.80 | 10508798 |
| 3/1/2013 | Monthly Rent Charges (03/2013) | 304.00 | | | 341.80 | 10508799 |
| 3/1/2013 | Renter's Insurance (03/2013) | 18.16 | | | 359.96 | 10508800 |
| 3/1/2013 | Housing Assistance Charge (03/2013) | 536.00 | | | 895.96 | 10508801 |
| 3/2/2013 | chk# PSID23807147-5201-005201 Terminal PSID 23807147 - CHECK21 | | 375.00 | 520.96 | | 6230775 |
| 3/2/2013 | chk# 3006563 LG | | 536.00 | (15.04) | | 6233635 |
| 4/1/2013 | Washer/Dryer Rental (04/2013) | 50.00 | | | 34.96 | 10584957 |
| 4/1/2013 | Monthly Rent Charges (04/2013) | 304.00 | | | 338.96 | 10584958 |
| 4/1/2013 | Renter's Insurance (04/2013) | 18.16 | | | 357.12 | 10584959 |
| 4/1/2013 | Housing Assistance Charge (04/2013) | 536.00 | | | 893.12 | 10584960 |
| 4/2/2013 | chk# 3008426 RM | | 536.00 | 357.12 | | 6285061 |
| 4/3/2013 | chk# PSID24950816-5204-005204 Terminal PSID 24950816 - CHECK21 | | 375.00 | (17.88) | | 6290996 |
| 5/1/2013 | Monthly Rent Charges (05/2013) | 304.00 | | | 286.12 | 10856960 |
| 5/1/2013 | Washer/Dryer Rental (05/2013) | 50.00 | | | 336.12 | 10857246 |
| 5/1/2013 | Housing Assistance Charge (05/2013) | 536.00 | | | 872.12 | 10857545 |
| 5/1/2013 | Renter's Insurance (05/2013) | 18.16 | | | 890.28 | 10857793 |
| 5/2/2013 | chk# 3010337 LG | | 536.00 | 354.28 | | 6355031 |
| 5/3/2013 | chk# PSID25969935-5205-005205 Terminal PSID 25969935 - CHECK21 | | 375.00 | (20.72) | | 6365365 |
| 6/1/2013 | Washer/Dryer Rental (06/2013) | 50.00 | | | 29.28 | 10918002 |
| 6/1/2013 | Monthly Rent Charges (06/2013) | 304.00 | | | 333.28 | 10918003 |
| 6/1/2013 | Renter's Insurance (06/2013) | 18.16 | | | 351.44 | 10918004 |
| 6/1/2013 | Housing Assistance Charge (06/2013) | 536.00 | | | 887.44 | 10918005 |
| 6/2/2013 | chk# 3012228 LG | | 536.00 | 351.44 | | 6427718 |
| 6/4/2013 | chk# PSID27049544-7954 Terminal PSID 27049544 - CHECK21 | | 375.00 | (23.56) | | 6437760 |
| 7/1/2013 | Washer/Dryer Rental (07/2013) | 50.00 | | | 26.44 | 10994597 |
| 7/1/2013 | Monthly Rent Charges (07/2013) | 316.00 | | | 342.44 | 10994598 |
| 7/1/2013 | Renter's Insurance (07/2013) | 18.16 | | | 360.60 | 10994599 |
| 7/1/2013 | Housing Assistance Charge (07/2013) | 524.00 | | | 884.60 | 10994600 |
| 7/2/2013 | chk# 3014098 LG | | 524.00 | 360.60 | | 6483942 |
| 7/4/2013 | chk# PSID28135082-5211-005211 Terminal PSID 28135082 - CHECK21 | | 375.00 | (14.40) | | 6494135 |
| 7/29/2013 | chk# PSID28599283-5217-005217 Terminal PSID 28599283 - CHECK21 | | 375.00 | (389.40) | | 6513571 |
| 8/1/2013 | Washer/Dryer Rental (08/2013) | 50.00 | | (339.40) | | 11069620 |
| 8/1/2013 | Monthly Rent Charges (08/2013) | 316.00 | | (23.40) | | 11069621 |
| 8/1/2013 | Renter's Insurance (08/2013) | 18.16 | | (5.24) | | 11069622 |

| 8/1/2013 | Housing Assistance Charge (08/2013) | 524.00 | | 518.76 | 11069623 |
|---|---|---|---|---|---|
| 8/2/2013 | chk# 3015978 LG | | 524.00 | (5.24) | 6540841 |
| 9/1/2013 | Washer/Dryer Rental (09/2013) | 50.00 | | 44.76 | 11152355 |
| 9/1/2013 | Monthly Rent Charges (09/2013) | 316.00 | | 360.76 | 11152356 |
| 9/1/2013 | Renter's Insurance (09/2013) | 18.16 | | 378.92 | 11152357 |
| 9/1/2013 | Housing Assistance Charge (09/2013) | 524.00 | | 902.92 | 11152358 |
| 9/2/2013 | chk# 3017841 LG | | 524.00 | 378.92 | 6602389 |
| 9/3/2013 | chk# PSID30232857-3409 Terminal PSID 30232857 - CHECK21 | | 375.00 | 3.92 | 6604837 |
| 10/1/2013 | Washer/Dryer Rental (10/2013) | 50.00 | | 53.92 | 11230938 |
| 10/1/2013 | Monthly Rent Charges (10/2013) | 316.00 | | 369.92 | 11230939 |
| 10/1/2013 | Renter's Insurance (10/2013) | 18.16 | | 388.08 | 11230940 |
| 10/1/2013 | Housing Assistance Charge (10/2013) | 524.00 | | 912.08 | 11230941 |
| 10/2/2013 | chk# 3019768 LG | | 524.00 | 388.08 | 6660090 |
| 10/3/2013 | chk# PSID31540695-5232-005232 Terminal PSID 31540695 - CHECK21 | | 375.00 | 13.08 | 6668926 |
| 10/31/2013 | chk# 3021747 LG | | 524.00 | (510.92) | 6718840 |
| 11/1/2013 | Washer/Dryer Rental (11/2013) | 50.00 | | (460.92) | 11311992 |
| 11/1/2013 | Monthly Rent Charges (11/2013) | 316.00 | | (144.92) | 11311993 |
| 11/1/2013 | Renter's Insurance (11/2013) | 18.16 | | (126.76) | 11311994 |
| 11/1/2013 | Housing Assistance Charge (11/2013) | 524.00 | | 397.24 | 11311995 |
| 11/1/2013 | chk# PSID32339818-5233-005233 Terminal PSID 32339818 - CHECK21 | | 375.00 | 22.24 | 6711484 |
| 11/1/2013 | chk# PSID32375491-373 Terminal PSID 32375491 - CHECK21 | | 13.08 | 9.16 | 6712744 |
| 12/1/2013 | Washer/Dryer Rental (12/2013) | 50.00 | | 59.16 | 11399107 |
| 12/1/2013 | Monthly Rent Charges (12/2013) | 316.00 | | 375.16 | 11399108 |
| 12/1/2013 | Renter's Insurance (12/2013) | 18.16 | | 393.32 | 11399109 |
| 12/1/2013 | Housing Assistance Charge (12/2013) | 524.00 | | 917.32 | 11399110 |
| 12/2/2013 | chk# 3023681 LG | | 524.00 | 393.32 | 6776437 |
| 12/3/2013 | chk# PSID33892599-5240-005240 Terminal PSID 33892599 - CHECK21 | | 393.32 | 0.00 | 6781837 |
| 1/1/2014 | Renter's Insurance (01/2014) | 18.16 | | 18.16 | 11472327 |
| 1/1/2014 | Washer/Dryer Rental (01/2014) | 50.00 | | 68.16 | 11472506 |
| 1/1/2014 | Housing Assistance Charge (01/2014) | 524.00 | | 592.16 | 11472706 |
| 1/1/2014 | Monthly Rent Charges (01/2014) | 316.00 | | 908.16 | 11472909 |
| 1/2/2014 | chk# 3025589 LG | | 524.00 | 384.16 | 6825934 |
| 1/3/2014 | chk# PSID35122030-5241-005241 Terminal PSID 35122030 - CHECK21 | | 384.16 | 0.00 | 6846850 |
| 2/1/2014 | Washer/Dryer Rental (02/2014) | 50.00 | | 50.00 | 11547992 |
| 2/1/2014 | Monthly Rent Charges (02/2014) | 316.00 | | 366.00 | 11547993 |
| 2/1/2014 | Renter's Insurance (02/2014) | 18.16 | | 384.16 | 11547994 |
| 2/1/2014 | Housing Assistance Charge (02/2014) | 524.00 | | 908.16 | 11547995 |
| 2/3/2014 | chk# 3027494 LG | | 524.00 | 384.16 | 6901517 |
| 2/3/2014 | chk# PSID36492777-5242-005242 Terminal PSID 36492777 - CHECK21 | | 384.16 | 0.00 | 6902775 |
| 3/1/2014 | Washer/Dryer Rental (03/2014) | 50.00 | | 50.00 | 11620590 |
| 3/1/2014 | Monthly Rent Charges (03/2014) | 316.00 | | 366.00 | 11620591 |
| 3/1/2014 | Renter's Insurance (03/2014) | 18.16 | | 384.16 | 11620592 |
| 3/1/2014 | Housing Assistance Charge (03/2014) | 524.00 | | 908.16 | 11620593 |
| 3/1/2014 | chk# PSID37800480-5246-005246 Terminal PSID 37800480 - | | 384.16 | 524.00 | 6948928 |

Case 2:15-cv-00799-K JM DB    Document 1    Filed 04/14/15    Page 82 of 82

| | CHECK21 | | | | |
|---|---|---|---|---|---|
| 3/3/2014 | chk# 3029376 LG | | | 524.00 | 0.00 | 6955921 |