1  Andrew Wolff, SBN 195092
   David Lavine, SBN 166744
2  LAW OFFICES OF ANDREW WOLFF, PC
   1956 Webster St., Suite 275
3  Oakland, California 94612
   (510) 834-3300
4  (510) 834-3377 (Fax)
   david@awolfflaw.com
5
   Jesse Newmark, SBN 247488
6  Shira Levine, SBN 293080
   CENTRO LEGAL DE LA RAZA
7  3400 East 12th Street
   Oakland, California 94601
8  (510) 437-1554 x115
   (510) 437-9164 (Fax)
9  jessenewmark@centrolegal.org

10 Attorneys for Plaintiffs/Relators
   Denika Terry and Roy Huskey III
11

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14                  SACRAMENTO DIVISION

15

16 UNITED STATES OF AMERICA, *ex rel.*        Case No. 2:15 CV 0799 KJM DB
   DENIKA TERRY and ROY HUSKEY III,
17 and each of them for themselves individually,  **DECLARATION OF ROY HUSKEY III**
   and for all other persons similarly situated and  **IN SUPPORT OF PLAINTIFFS'**
18 on behalf of the UNITED STATES OF          **MOTION FOR CLASS CERTIFICATION**
   AMERICA,
19                                            **CLASS ACTION**
           Plaintiffs/Relators,
20                                            Date:      September 22, 2017
       vs.                                    Time:      10:00 a.m.
21                                            Judge:     Kimberly J. Mueller
   WASATCH ADVANTAGE GROUP, LLC,              Dept.:     Courtroom 3, 15th Floor
22 WASATCH PROPERTY MANAGEMENT,
   INC., WASATCH POOL HOLDINGS,
23 LLC, CHESAPEAKE COMMONS
   HOLDINGS, LLC, LOGAN PARK
24 APARTMENTS, LLC, LOGAN PARK
   APARTMENTS, LP, and DOES 1-30,
25
           Defendants.
26

27

28

*U.S. ex rel. Terry v. Wasatch Advantage Group*
2:15 CV 07799 KJM DB

1.      I am a named plaintiff in the above-referenced matter.  I have personal knowledge of the facts set forth in this declaration, and, if called upon, could and would testify thereto.

2.      I offer this declaration in support of my adequacy to serve as a proposed class representative.  I am a member of the proposed class, and an outspoken proponent of the tenants' rights to be vindicated by this case.

3.      On or about June 30, 2011, I reached an agreement for the rental of Apartment 191 of the Logan Park Apartments on Palm Avenue in Sacramento, subject to the approval of the Sacramento Housing Agency.

4.      On or about July 8, 2011, the Sacramento Housing Agency, the owner and I approved the rental agreement and entered into a HAP Contract for my residence.  A true and accurate copy of this HAP Contract is attached as Exhibit A.  Pursuant to the HAP Contract, my rent was $840 per month, with the Sacramento Housing Agency responsible for $554 of the contract rent, with the remainder my responsibility.  Section 5(e) of Part C of the Tenancy Addendum to my HAP Contract further provides:  "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner.  Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."

5.      During the proposed class period, I received housing assistance from the Sacramento Housing Agency under the Section 8 program, paid directly to the property owner.

6.      Beginning on or around July 8, 2011, and continuing throughout my tenancy ending in mid-2015, I was required to pay additional rent payments, or "side payments," not set forth in my HAP Contract or yearly subsidy adjustment notices.  Each month for years running, I had to pay extra for my in-unit washer and dryer appliances, and for renter's insurance, as reflected in my rent ledger, attached hereto as Exhibit B.

*U.S. ex rel. Terry v. Wasatch Advantage Group*
2:15 CV 07799 KJM DB

-1-

7.      As a result, I paid several thousand dollars in additional rent payments during my tenancy, even though my contribution to rent under the HAP contract was limited to approximately $3,500 - $4,000 a year.

8.      I was never told by building management that I did not have to pay for these additional charges.  To the contrary, I was told by building management that I could be evicted for non-payment of these charges.  I was afraid that if I did not comply that I could lose my apartment or even my Section 8 housing voucher.

9.      These additional payments caused me stress, and left me wondering whether I would be able to pay my bills, and why I was being charged more than the amount the government computed for me as my monthly housing contribution.

10.      I retained my counsel to investigate my claims of being charged more than I was supposed to pay.  I understood from the beginning of this engagement that my counsel would be investigating not only my claims of being overcharged, but also those of all other affected residents in my complex and others with the same owner as well.  I understand that my counsel are trying to obtain money for us, as well as changes to the owner's "side agreement" practices.

11.      I understand that as a class representative, this case is about a lot more than just my family and me.  I am responsible to protect the interests of other tenants who will be in the class, and will continue to be so.  My counsel are required to look after the interests of all affected tenants together with mine, and have explained to me that there are many rules they must follow to make sure the class is treated properly.  I am not aware of any class members with conflicts of interest with each other.

12.      I have never been a class representative in any other class action lawsuit.

13.      I have not been offered any money or other incentive to be a class representative. I understand that the Court may award an "incentive" payment to me at the end of the case, but I know that it is up to the Court to award or approve such a payment, and I am not counting on it.

///

///

///

///



14.     I am acting as a class representative because I believe it was wrong for the owner of my building to charge Section 8 tenants more than the government had calculated.

I declare under penalty of perjury this 24 day of August, 2017 that the foregoing is true and correct to the best of my knowledge.

Roy Huskey III

*Terry, et al. v. Wasatch Advantage Group, et al.*
2:15 CV 07799 KJM DB         -3-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

*U.S., ex rel. Terry, et al. v. Wasatch Advantage Group*
2:15 CV 07799 KJM DB

-4-

From Case 2:15-cv-00799-KJM-DB Document 572-2 Filed 09/25/17 Page 6 of 34
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/10/15 Page 54 of 82
(Page 1 of 61)
DTH-445-1622                    07/29/2014 08:24    #554 P.015/085

**SACRAMENTO HOUSING & REDEVELOPMENT AGENCY**
**HOUSING CHOICE VOUCHER PROGRAM**
**Lease Supplemental Agreement**

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

**1. PARTIES TO THE AGREEMENT DEFINED:**

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

| | | | |
|---|---|---|---|
| a. Tenant | ROY HUSKEY III | **OWNR SPEC 2** | Tenant # t0016323 |
| b. Owner | LOGAN PARK APARTMENTS | | Vendor # 004355p |

**2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:**

ROY L. HUSKEY III                    MELISSA HUSKEY

**3. UNIT ADDRESS:** 4141 PALM AVE 191
SACRAMENTO, CA 95842

**4. INITIAL LEASE TERM:** Begins 7/8/2011 and ends 6/30/2012

**5. INITIAL CONTRACT RENT:**    $840.00    **INITIAL TENANT RENT:**    $256.00

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to-month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by "Owner". The tenant shall provide or pay for the utilities or appliances indicated below by "Tenant". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|---|---|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Refrigerator | Owner |
| Sewer | Owner |
| Trash Collection | Owner |
| Water | Owner |

| | | |
|---|---|---|
| *[signature]* ROY HUSKEY III | 916-740-8488 | 7-9-11 |
| | Telephone Number | Date |
| *[signature]* Owner / Agent | 916-344-4494 | 7/9/11 |
| | Telephone Number | Date |

JUL 15 2011

(Page 2 of 61)

**TENANCY ADDENDUM**
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program (To
be attached to Tenant Lease)

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169
Exp. 04/30/2014

**1. Section 8 Voucher Program**

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

**2. Lease**

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

**3. Use of Contract Unit**

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

**4. Rent to Owner**

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

**5. Family Payment to Owner**

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to Owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

**6. Other Fees and Charges**

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

**7. Maintenance, Utilities, and Other Services**

a. Maintenance

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including

Previous editions are obsolete

form HUD-52641-A (8/2009)
ref Handbook 7420.8

2

Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 8 of 34
From: ~~~~~~~~ 1 518 443 2872 07/29/201~ 16:55 #554 P.017/085
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/~~/15 Page 56 of 82

(Page 3 of 61)

standard practice for the building concerned as
established by the owner.

b. Utilities and appliances

   (1)  The owner must provide all utilities needed to
comply with the HQS.

   (2)  The owner is not responsible for a breach of
the HQS caused by the tenant's failure to:

     (a)  Pay for any utilities that are to be paid by
the tenant.

     (b)  Provide and maintain any appliances that
are to be provided by the tenant.

c. Family damage. The owner is not responsible for a
breach of the HQS because of damages beyond
normal wear and tear caused by any member of the
household or by a guest.

d. Housing services. The owner must provide all
housing services as agreed to in the lease.

## 8. Termination of Tenancy by Owner

a. Requirements. The owner may only terminate the
tenancy in accordance with the lease and HUD
requirements.

b. Grounds. During the term of the lease (the initial
term of the lease or any extension term), the owner
may only terminate the tenancy because of:

   (1)  Serious or repeated violation of the lease;

   (2)  Violation of Federal, State, or local law that
imposes obligations on the tenant in
connection with the occupancy or use of the
unit and the premises;

   (3)  Criminal activity or alcohol abuse (as
provided in paragraph c); or

   (4)  Other good cause (as provided in paragraph
d).

c. Criminal activity or alcohol abuse.

   (1)  The owner may terminate the tenancy during
the term of the lease if any member of the
household, a guest or another person under a
resident's control commits any of the
following types of criminal activity:

     (a)  Any criminal activity that threatens the
health or safety of, or the right to
peaceful enjoyment of the premises by,
other residents (including property
management staff residing on the
premises);

     (b)  Any criminal activity that threatens the
health or safety of, or the right to
peaceful enjoyment of their residence
by, persons residing in the immediate
vicinity of the premises;

     (c)  Any violent criminal activity on or near
the premises; or

     (d)  Any drug-related criminal activity on or
near the premises.

   (2)  The owner may terminate the tenancy during
the term of the lease if any member of the
household is:

     (a)  Fleeing to avoid prosecution, or custody
or confinement after conviction, for a
crime, or attempt to commit a crime, that

is a felony under the laws of the place
from which the individual flees, or that,
in the case of the State of New Jersey, is
a high misdemeanor; or

     (b)  Violating a condition of probation or
parole under Federal or State law.

   (3)  The owner may terminate the tenancy for
criminal activity by a household member in
accordance with this section if the owner
determines that the household member has
committed the criminal activity, regardless of
whether the household member has been
arrested or convicted for such activity.

   (4)  The owner may terminate the tenancy during
the term of the lease if any member of the
household has engaged in abuse of alcohol
that threatens the health, safety or right to
peaceful enjoyment of the premises by other
residents.

d. Other good cause for termination of tenancy

   (1)  During the initial lease term, other good cause
for termination of tenancy must be something
the family did or failed to do.

   (2)  During the initial lease term or during any
extension term, other good cause may include:

     (a)  Disturbance of neighbors,

     (b)  Destruction of property, or

     (c)  Living or housekeeping habits that cause
damage to the unit or premises.

   (3)  After the initial lease term, such good cause
may include:

     (a)  The tenant's failure to accept the owner's
offer of a new lease or revision;

     (b)  The owner's desire to use the unit for
personal or family use or for a purpose
other than use as a residential rental unit;
or

     (c)  A business or economic reason for
termination of the tenancy (such as sale of
the property, renovation of the unit, the
owner's desire to rent the unit for a higher
rent).

   (4)  The examples of other good cause in this
paragraph do not preempt any State or local
laws to the contrary.

   (5)  In the case of an owner who is an immediate
successor in interest pursuant to foreclosure
during the term of the lease, requiring the
tenant to vacate the property prior to sale shall
not constitute other good cause, except that the
owner may terminate the tenancy effective on
the date of transfer of the unit to the owner if
the owner: (a) will occupy the unit as a
primary residence; and (b) has provided the
tenant a notice to vacate at least 90 days before
the effective date of such notice. This
provision shall not affect any State or local law
that provides for longer time periods or
addition protections for tenants. This
provision will sunset on December 31, 2012
unless extended by law.

Previous editions are obsolete
form HUD-52641-A (8/2009)
ref Handbook 7420.8

3

(Page 4 of 61)

**c. Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of tenants or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public

housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing services to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

**f. Eviction by court action.** The owner may only evict the tenant by a court action.

**g. Owner notice of grounds.**
(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**9. Lease Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

**10. PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**11. Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

**12. Security Deposit**
a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

form HUD-52641-A (8/2009)
ref Handbook 7420.8

Previous editions are obsolete

Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 10 of 34
Case 2:15-cv-00799-KJM-DB Document 26 Filed 09/25/17 Page 67 of 799
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/10/15 Page 58 of 82

(Page 5 of 63)

c. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least thirty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

Previous editions are obsolete

form HUD-52641-A (3/2000)
ref Handbook 7420.8

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

**Part A of the HAP Contract: Contract Information**
(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   ROY HUSKEY III

3. **Contract Unit**

   4141 PALM AVE 151
   SACRAMENTO, CA 95842

4. **Household**
   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   ROY L HUSKEY III
   MELISSA HUSKEY

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): 07/08/2011
   The initial lease term ends on (mm/dd/yyyy): 06/30/2012

6. **Initial Rent to Owner**
   The initial rent to owner is: $840
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $554 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

6

From SHRA Fax
Case 2:15-cv-00799-KJM-DB Document 62-2 Filed 09/25/17 Page 12 of 34
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/08/15 Page 60 of 82
(Page 7 of 61)

8.   Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
| --- | --- | --- |
| | Owner | Tenant |
| Air Conditioning | | T |
| Cooking Oil/Electric | | T |
| Flat Fee Electric | | T |
| Heating - Oil/Electric | | T |
| Other Electric | | T |
| Refrigerator | O | |
| Sewer | O | |
| Trash Collection | O | |
| Water | O | |

JUL 15 2011

Signatures

Public Housing Agency: SHRA County of Sacramento Housing Authority

Print or Type Name of PHA

Signature _SILVERIO RAMOS_

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy) _07-18-11_

Owner:  LOGAN PARK APARTMENTS

Print or Type Name of Owner

Signature _Raylene Jeffery_

Print or Type Name and Title of Signatory _Raylene Jeffery, Asst Manager_

Date (mm/dd/yyyy) _7/9/11_

Mail Payments to:

LOGAN PARK APARTMENTS

Name:

4215 PALM AVE - OFFICE
C/O WASATCH PROPERTY MGMT
SACRAMENTO, CA 95842

Address (Street, City, State, Zip)



Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 13 of 34
From:                        1 916 443 8872        07/29/201   9:56     #554 P.022/085
Case 2:15-cv-00799-KJM-DA   SEALED*   Document 1   Filed 04/    15   Page 61 of 82

(Page 9 of  21)

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

**Part B of HAP Contract: Body of Contract**

**1.  Purpose**

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

**2.  Lease of Contract Unit**

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all  provisions of the tenancy addendum.
(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
(3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

**3.  Maintenance, Utilities, and Other Services**

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

**4.  Term of HAP Contract**

a. Relation to lease term. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. When HAP contract terminates.

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
(3) If the family moves from the contract unit, the HAP contract terminates automatically.
(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

8

Case 2:15-cv-00799-KJM-DB   Document 32-2   Filed 08/25/17   Page 14 of 34
From: CHASE285   1-916-443-8872   07/29/2010 03:57   #554 P.023/085
Case 2:15-cv-00799-KJM-DAD *SEALED*   Document 1   Filed 04/10/15   Page 62 of 82

(Page 9 of 61)

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

## 5. Provision and Payment for Utilities and Appliances

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

## 6. Rent to Owner: Reasonable Rent

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

## 7. PHA Payment to Owner

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the owner shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. Owner compliance with HAP contract. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. Amount of PHA payment to owner

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. Application of payment. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. Limit of PHA responsibility.

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. Overpayment to owner. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

## 8. Owner Certification

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

9

Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 15 of 34
Case 2:15-cv-00799-KJM-DB   *SEALED*   Document 1   Filed 04/13/15   Page 63 of 82

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

Previous editions are obsolete   Page 8 of 12   form HUD-52641 (8/2009)
ref Handbook 7420.8

10

Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 16 of 34
Case 2:13-cv-00799-KJM-DB Document 443-38/76 Filed 07/29/2016 Page 7 of 85 #854 P.025/085
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/16/15 Page 64 of 82

(Page 11 of 61)

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

    (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

    (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

    (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

    (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pursuant to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

    (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

    (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

    (1) Has violated obligations under a housing assistance payments contract under Section 8;

    (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

    (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

    (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

    (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

        (a) Threatens the right to peaceful enjoyment of the premises by other residents;

        (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

        (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

        (d) Is drug-related criminal activity or violent criminal activity;

    (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

    (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

11

From Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 17 of 34
Case 2:15-cv-00799-KJM-DB *SEALED* Document 1 Filed 04/XX/15 Page 65 of 82
(Page 12 of 61)

16. **Written Notices.** Any notice by the PHA or the owner in
connection with this contract must be in writing.

17. **Entire Agreement: Interpretation**

   a. The HAP contract contains the entire agreement between
   the owner and the PHA.

   b. The HAP contract shall be interpreted and implemented in
   accordance with all statutory requirements, and with all
   HUD requirements, including the HUD program
   regulations at 24 Code of Federal Regulations Part 982.

12

# Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a. Maintenance

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

13

Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 19 of 34
From Case 2:15-cv-00799-KJM-DB   Document 68-26   Filed 07/29/2017   Page 70 #354 P.028/085
Case 2:15-cv-00799-KJM-DA  *SEALED*   Document 1   Filed 04/16/15   Page 67 of 82

(Page 14 of 61)

b. Utilities and appliances
   (1) The owner must provide all utilities needed to comply
       with the HQS.
   (2) The owner is not responsible for a breach of the HQS
       caused by the tenant's failure to:
       (a) Pay for any utilities that are to be paid by the
           tenant.
       (b) Provide and maintain any appliances that are to be
           provided by the tenant.
c. Family damage. The owner is not responsible for a breach
   of the HQS because of damages beyond normal wear and
   tear caused by any member of the household or by a guest.
d. Housing services. The owner must provide all housing
   services as agreed to in the lease.

5. Termination of Tenancy by Owner
   a. Requirements. The owner may only terminate the tenancy in
      accordance with the lease and HUD requirements.
   b. Grounds. During the term of the lease (the initial term of the
      lease or any extension term), the owner may only terminate
      the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes
          obligations on the tenant in connection with the
          occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in
          paragraph c); or
      (4) Other good cause (as provided in paragraph d).
   c. Criminal activity or alcohol abuse.
      (1) The owner may terminate the tenancy during the term of
          the lease if any member of the household, a guest or
          another person under a resident's control commits any
          of the following types of criminal activity:
          (a) Any criminal activity that threatens the health or
              safety of, or the right to peaceful enjoyment of the
              premises by, other residents (including property
              management staff residing on the premises);
          (b) Any criminal activity that threatens the health or
              safety of, or the right to peaceful enjoyment of
              their residences by, persons residing in the
              immediate vicinity of the premises;
          (c) Any violent criminal activity on or near the
              premises; or
          (d) Any drug-related criminal activity on or near the
              premises.

      (2) The owner may terminate the tenancy during the term of
          the lease if any member of the household is:
          (a) Fleeing to avoid prosecution, or custody or
              confinement after conviction, for a crime, or
              attempt to commit a crime, that is a felony under
              the laws of the place from which the individual
              flees, or that, in the case of the State of New
              Jersey, is a high misdemeanor; or
          (b) Violating a condition of probation or parole under
              Federal or State law.

      (3) The owner may terminate the tenancy for criminal activity
          by a household member in accordance with this section if
          the owner determines that the household member has
          committed the criminal activity, regardless of whether the
          household member has been arrested or convicted for such
          activity.
      (4) The owner may terminate the tenancy during the term of
          the lease if any member of the household has engaged in
          abuse of alcohol that threatens the health, safety or right to
          peaceful enjoyment of the premises by other residents.

   d. Other good cause for termination of tenancy
      (1) During the initial lease term, other good cause for
          termination of tenancy must be something the family did or
          failed to do.
      (2) During the initial lease term, or during any extension term,
          other good cause may include:

          (a) Disturbance of neighbors,
          (b) Destruction of property, or
          (c) Living or housekeeping habits that cause damage to
              the unit or premises.

      (3) After the initial lease term, such good cause may include:
          (a) The tenant's failure to accept the owner's offer of a
              new lease or revision;
          (b) The owner's desire to use the unit for personal or
              family use or for a purpose other than use as a
              residential rental unit; or
          (c) A business or economic reason for termination of the
              tenancy (such as sale of the property, renovation of the
              unit, the owner's desire to rent the unit for a higher
              rent).

      (4) The examples of other good cause in this paragraph do not
          preempt any State or local laws to the contrary.
      (5) In the case of an owner who is an immediate successor in
          interest pursuant to foreclosure during the term of the lease,
          requiring the tenant to vacate the property prior to sale
          shall not constitute other good cause, except that the owner
          may terminate the tenancy effective on the date of transfer
          of the unit to the owner if the owner: (a) will occupy the
          unit as a primary residence; and (b) has provided the tenant
          a notice to vacate at least 90 days before the effective date
          of such notice. This provision shall not affect any State or
          local law that provides for longer time periods or additional
          protections for tenants. This provision will sunset on
          December 31, 2012 unless extended by law.

   e. Protections for Victims of Abuse.
      (1) An incident or incidents of actual or threatened domestic
          violence, dating violence, or stalking will not be construed
          as serious or repeated violations of the lease or other "good
          cause" for termination of the assistance, tenancy, or
          occupancy rights of such a victim.
      (2) Criminal activity directly relating to abuse, engaged in by a
          member of a tenant's household or any guest or other
          person under the tenant's control, shall not be cause for
          termination of assistance, tenancy, or occupancy rights if
          the tenant or an immediate member of the tenant's family is
          the victim or threatened victim of domestic violence, dating
          violence, or stalking.

14

Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 20 of 34
From:SHRA Exec 1 916 443 8872 07/29/2011 08:59 #554 P.029/085
Case 2:15-cv-00799-KJM-DA *SEALED* Document 1 Filed 04/10/15 Page 68 of 82

(Page 15 of 61)

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease; in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. Eviction by court action. The owner may only evict the tenant by a court action.

g. Owner notice of grounds

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9. Lease Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination
In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

15

Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 21 of 34
From:                Case 2:15-cv-00799-KJM-   Document    06/29/2015  08:39   #354 P.030/085
Case 2:15-cv-00799-KJM-DA *SEALED*   Document 1   Filed 04/3X/15   Page 69 of 82

(Page 16  of  61)

### 14.  Conflict with Other Provisions of Lease

    a.   The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

    b.   In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

### 15.  Changes in Lease or Rent

    a.   The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

    b.   In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

        (1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

        (2)  If there are any changes in lease provisions governing the term of the lease;

        (3)  If the family moves to a new unit, even if the unit is in the same building or complex.

    c.   PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

    d.   The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

### 16.  Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

### 17.  Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

16

(Page 17 of 61)

## RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
#### READ IT CAREFULLY

Wasatch Property Management, Inc. / Owners Agent
A Utah Corporation – acting as
846 N Sacramento Pkwy, Suite 400 Logan, Utah 84321

This agreement is made in Sacramento, CA, between, Logan Park Investors called Owner, by Wasatch Management Management, its authorized agent, and Lease Holder(s):

Roy Huntley

_Authorized Occupant(s)_

Marianne Huntley (Dependent int)

lease holder called Resident(s), No other person(s) except those herein noted may occupy premises without written approval of Owner.

**I.   TERM**

This Agreement creates a 12 month and 2 day tenancy, commencing _____ and Terminating 06/30/2012. Reference paragraph XIX of this Residential Rental Agreement. The total rent for this 12 month and 2 day tenancy is $9,720.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4141 Palm Avenue #104, Sacramento, CA 95842

**III.   LOW-INCOME HOUSING CREDIT**

The premises are to be operated in accordance with the requirements of the low-income housing credit Program under Section 42 of the Internal Revenue Code of 1986, as amended (the "Program"). Resident's rights hereunder are subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the credit of the premises into basis for calculation of the Landlord's tax credit. The Resident will cooperate with all LAND LORD requirements related to such compliance and the Program.

**IV.   RENT**

The rental for the premises is $810.00  per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4726 Palm Ave, Sacramento, CA 95842.

The Landlord and Tenant have entered into a housing assistance payments (HAP) contract with the local public housing authority (PHA) pursuant to the Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of the Rent named on behalf of the Tenant. So long as the housing contract remains in effect, the Tenant is responsible for the portion of the rent. The additional terms and conditions of the parties rental obligations are set forth as follows:

1. Section 8 Rent:
   A. The total contract rent shall be $810.00 per month.
   B. Of the total contract rent, $740.00 shall be payable to the Landlord by the Tenant(s) each month as the Tenant's net family contribution. The remaining balance of $70.00 shall be payable to the Landlord by the local housing authority for as long as the HAP contract remains in effect.

2. Section 8 Rent adjustments: The amount of assistance that HUD pays on behalf of the Tenant may be changed during the term of the lease if: (1) HUD or the PHA determines, in accordance with HUD procedures, that an increase is needed to account; (2) HUD or the PHA changes any allowance for utilities or services considered in computing the Tenant's share of the rent; (3) the income, dependents of persons in the Tenant's household or other income sources...

[several faded lines]

The Rental Office can be reached by phone at (916) 344-4494. Unless otherwise posted, payment can be made in person at the Owner's office between 8:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends, in addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a delay in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any rent due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order unless subject to paragraph IV. below, in total monthies as follows:

A. The sum of $810.00 being execution of this Rental Agreement to rent for the period beginning 06/30/2011, through 06/30/2011 payable on 06/30/2011.

B. Thereafter $740.00, is the rent that is due on the 1st day of each calendar month commencing July 2011.

C. A concession in the amount of $70.00 is to be given to Resident as part of this 12 month(s) lease and will be based on $70.00 of rent. The $70.00 concession is due and payable back to Logan Park (the 12 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph II of this Agreement may be less than the standard monthly rental required by the Owner for this premises—The Owner has subsidized its portion to the Resident(s) at a reduced amount as an incentive to renting this subsidized premises. Should the market rate increase at any time, the Owner, as the market premium, may increase from time to time to reflect the Resident(s) monthly rental obligation as set forth in this Agreement, and in accordance with such Subsidies. In such event, Owner, or Owners agent, will provide Resident with written notification of at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though July and forth in Paragraph IV of this agreement.

17

Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 23 of 34
Case 2:15-cv-00799-KJM-DAD Document 1 Filed 04/13/15 Page 74 of 82
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/13/15 Page 71 of 82

(Page 18 of 61)

## V. CHANGES IN RESIDENT'S SHARE OF RENT

The Resident agrees that the amount of rent the Resident pays may be changed during the term of this Agreement if:

A. The Contract Administrator determines, in accordance with Program procedures, that an increase in rent is needed.

B. The Contract Administrator changes any allowances for utilities or services considered in determining the Resident's rent.

C. The income, the number of persons in the Resident's household or other factors considered in determining the Resident's rent.

D. The procedures for determining the Resident's rent change; or

E. The Landlord agrees to implement changes in the Resident's rent only in accordance with the time frames and administrative procedures set forth in instructions and regulations issued by administrators of the Program. The Landlord agrees to give the Resident at least thirty (30) days notice of any increase in the Resident's rent, except as noted in paragraph VI. The notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reason for the change in rent. The notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

## VI. EXCESS RENT

If it is determined that the premises are not a specified low-income unit because the rent paid by the Resident, plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed under LIHTC rules, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

## VII. PRORATIONS

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

## VIII. LATE CHARGES

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when due by the Lease results in charges/fees to Landlord in the form of, among other things, administrative and collection costs. Landlord and Tenant further understand and agree that because these management expenses are calculated and paid with respect to the whole of the entire complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount of $25.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment/rent paid on or before 12:01 a.m. on the 4th day of the month. This late charge shall be deemed to be additional rent due under the Lease. Landlord will accept a check after the 3rd day of month, in the event any check tendered by Resident by payment of rent is returned by the bank for the "Insufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay in cash immediately a charge of $25.00, in the event Resident fails to pay rent on or before 12:01 a.m. on the 4th day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payments with cashier check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

## IX. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT

Resident shall pay Owner, upon execution of this agreement, a security deposit of $325.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that nothing is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is/are utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing, for less than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owner which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to accept full liability for any amount not covered by the security deposit. Rental for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

## X. ACCEPTANCE OF PREMISES

A. Resident accepts said premises and furniture and appliances as listed on the Move-in, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the conclusion of this Rental Agreement to promptly surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical wiring, lighting fixtures and appurtenances and receptacles for trash, and accepts the same, as is, And acknowledges that Owner is in good condition and/or repair, unless noted to the contrary in the Move-in, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the said/rented premises to Owner, or remain liable for the payment of rent until delivery is made.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Move-out Furniture Inventory have been received in good condition and that Owner's delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be checked conclusively correct in all particulars except as in those cases, defects or objections as to which Resident gives written notice to Owner with three (5) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

18

Case 2:15-cv-00799-KJM-DB Document 72-2 Filed 08/25/17 Page 24 of 34
Case 2:15-cv-00799-KJM-DB Document 86-26 Filed 07/29/2017 05.09 #554 P.033/085
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/XX/15 Page 72 of 82

(Page 19 of 61)

**10.    USE OF THE PREMISES**

A.  The premises are rented for residential use only and shall be occupied by not more than 2 occupants. Resident agrees that no persons other than 19 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of Any Kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without consent, a fine of $500.00 will be assessed plus carpet deposit and back rent. You will accept all breeds of dogs...

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would jeopardize or be in conflict with applicable law...

E.  Resident shall not perform work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without...

F.  Statement of Threats: Letters and such others to whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste. Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance or commission of a nuisance, and shall not commit or breach the commission of waste, upon the Unit or property (common area, or any part thereof).

**11.    RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than ordinary wear) occurs...

**12.    UTILITIES**

Resident must be responsible for the payment of utility services including gas, electricity and water including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collection Charges. Resident shall pay for each...

|       | Gas            | Account # |
|-------|----------------|-----------|
| X     | Electricity    | Account # _____ |
|       | Trash/sewer/water | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges |

Resident agrees to pay for all utilities, services, and charges, if any, made payable by or predicated upon occupancy of residence including telephone, electricity and satellite or cable television. Resident is responsible for having utilities turned on in their name no later than the day of move in.

**14.    INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for making necessary or agreed repairs, decorations, alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be 9:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to eliminate such emergency.



www.inyourhome.com

WASATCH

Page 4 of 28

From :
Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 25 of 34
Case 2:15-cv-00799-KJM-DAD 1D0cument38726   Filed 07/29/2017   Page #554 P.034/085
Case 2:15-cv-00799-KJM-DAD *SEALED*   Document 1   Filed 04/16/15   Page 73 of 82

(Page 20 of 61)

## IX.   RESTRICTION OF PREMISES

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is useable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owner's control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

## X.   LIABILITY INSURANCE

I understand that any property or liability insurance coverage purchased by the property manager or Owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to my personal property or belongings or present against any loss or damage resulting from my actions or exclusions and or any faulty and/or special conditions or exclusions. I also understand that, by not having Owner's or personal liability insurance of my own, I will be liable to third parties and to the property owner for certain losses and understand that I should not expect the property manager or owner to be responsible for such losses. Owner and owner's or management that every resident maintain renter's insurance coverage, at all times.

( X )   **IWILL PURCHASE RENTERS INSURANCE COVERAGE.**
      I recognize the need for insurance and want to take advantage of the program made available to residents.

(   )   **IHAVE RENTERS INSURANCE COVERAGE.**
      I have and will maintain throughout the term of my lease the following coverage

(   )   **IDO NOT HAVE RENTERS INSURANCE COVERAGE.**
      Although I recognize my need for renter's insurance, I will not obtain same. In obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers, owners or third-party property as a result of my actions or my family's actions.

## XI.   WAIVER OF LIABILITY

Resident agrees to assume responsibility for the following:

A.   Resident understands that Management's insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all risk renter's insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or to the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.   Loss of property due to theft

C.   Sewer, gas, electricity, failing pipes, leakage of water from pipes, rain, snow, malfunction of appliances, sewage or dampness of any nature whatsoever to those items kid damages too beyond the control of Owner.

D.   The Actions or omissions of other Residents

E.   Inhabitance with light, view or other intangible aspects of the premises.

F.   Conditions in construction of any pools or quasi-public areas

G.   Any latent defect in the building(s)

H.   The loss by resident or guest of any televisions, laundry room, clubhouse, swimming pool, patio of all terraces and/or any other ancillary facility furnished by Agent for Resident's use.

I.   Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, at any condition of the premises that may be unsafe or unhealthy.

J.   Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident. Residents, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address of which the offender resides or the community of residence and ZIP Code in which he or she resides.

## XII.   RECERTIFICATION

Every year on or about the 1st day of ___2-1-13___, the Landlord will request the Resident to report the income and composition of the Resident's household and to supply any other information required for the purpose of determining the Resident's continued Program eligibility. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The Landlord will verify the information supplied by the Resident and use the verified information to determine Program eligibility. You agree that all information supplied by you shall be subject to inspection by representatives from the Tax Credit Allocation Committee.

A.   If the Resident does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may require resident to vacate premises. This Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.

B.   The Resident may request to meet with the Landlord to discuss any changes resulting from the recertification processing. If the Resident requests such a meeting, the Landlord agrees to meet with the Resident and discuss how the Resident's continued Program eligibility was determined.

20

Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 26 of 34
From: Case 2:15-cv-00799-KJM-DB   1 916 443 8872   07/29/20   09:01   #554 P.035/085
Case 2:15-cv-00799-KJM-DAD *SEALED*   Document 1   Filed 04/13/15   Page 74 of 82

[Page 21 of 61]

## XX. REPORTING CHANGES BETWEEN RECERTIFICATION



The Resident shall notify the Landlord immediately in writing, if the household size changes, if a member of the household leaves, if there is an income increase. Resident(s) becomes a full time student, or begins to receive HUD assistance. The Landlord may elect not to renew this Lease if the Resident becomes a student and the Landlord determines that the Resident's student status would disqualify the premises under the Program. The Landlord may adjust the Resident's rent and or utility allowance to reflect the Resident's status if the Resident becomes a HUD-assisted Resident.

## XXI. CANCELLATION FEE

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 892.00. Each payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is canceled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall notice all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

## XXII. NOTICE TO QUIT



TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that at least, sixteen another gets there will be returned to the rental office by 12:00am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is provided by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Any and all rates and/or fees are subject to change upon expiration of lease term.

## XXIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES



In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $100.00 unless otherwise provided by law.

## XXIV. AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

## XIV. SUBLETTING

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest but without the prior written consent of Owner. Any such assignment or subletting without consent is void.

## XXV. JOINT AND SEVERAL RESPONSIBILITY

Each Resident of the premises named pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

## XXVI. LESSEE'S REPRESENTATIONS TO LESSOR

Lessee represents and warrants that all information provided to Lessor, including the information provided in the application for the rental of the Apartment (the "Application), is true, complete and correct. If any information Lessee provides to Lessor is contained in his lease, Lessee will be in breach of this Lease. Lessee understands and agrees that the Application is hereby made a part of the Lease, and a breach of any representation or warranties in the Application shall be a breach of this Lease.

## XXVII. PENALTIES FOR SUBMITTING FALSE INFORMATION

If the Resident deliberately submits false information regarding income, family composition or other data on which the Resident's eligibility is based, the Landlord may require the Resident to vacate.

## XXX. WAIVER OF BREACH

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

## XXX. RULES AND REGULATIONS

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of this Lease Agreement.

## XXXI. SECURITY

Resident acknowledges and agrees that Owner and Owner's agents have not promised to provide paid security to Resident and are not responsible for any criminal act which occurs in damage or loss to Resident's property or in injury to any person whatsoever.

21

From: Case 2:15-cv-00799-KJM-DB Document 62-2 Filed 08/25/17 Page 27 of 34
Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/30/15 Page 75 of 82
07/29/201 9:01 #554 P.036/085
1-916-445-8872
Case 22 of 61)

## XXXI. ENVIRONMENTAL REPRESENTATIONS

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second-hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or exposure and/or acceptable replacement of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or whomever live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks incident or related to the presence in the Apartment Community of any and all health affecting substances, any power then to vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, as claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, employees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

## XXXII. CRIMINAL BACKGROUND INVESTIGATION

By signing this Lease, Lessee represents that neither Lessee nor any occupant of the Apartment has, during the past five years, been convicted of any felony or misdemeanor involving sexual misconduct or a controlled substance, and that to the best of Lessee's knowledge, neither Lessee nor any occupant of the Apartment is subject of a criminal investigation or arrest warrant. Lessee hereby authorizes Lessor to perform a criminal background investigation of Lessee or any occupant of the Apartment in the event Lessor, in its sole discretion, has reason to believe that Lessee or any occupant is engaged in criminal activity in the Apartment or at the Apartment Community.

_____     6-30-11
(co-signing Lessee)                 Date

_____N/A_____      _____
Melissa Hinckley                    Date

_____     6-30-11
Owner Authorized agent              Date

22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

*U.S., ex rel. Terry, et al. v. Wasatch Advantage Group*
2:15 CV 07799 KJM DB

-5-

Ledge Case 2:15-cv-00799-KJM-DB Document 62-2 Filed 08/04/17 Page 29 of 34
Case 2:15-cv-00799-KJM-DA *SEALED* Document 1 Filed 04/ /15 Page 77 of 82
Page 1 of 6



**Wasatch Property Management**

Date : 3/10/2014

# Resident Ledger

| | | | | | |
|---|---|---|---|---|---|
| Code | t0044875 | Property | lot | Lease From | 6/30/2011 |
| Name | Roy Huskey III | Unit | 191 | Lease To | 6/29/2012 |
| Address | 4141 Palm Avenue #191 | Status | Current | Move In | 6/30/2011 |
| | | Rent | 840 | Move Out | |
| City St. Zip | Sacramento, CA 95842 | Phone(O)- | | Phone(H)- | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 5/27/2011 | Application Fee | 35.00 | | 35.00 | 8914011 |
| 5/27/2011 | Total Deposit Amount | 299.00 | | 334.00 | 8914012 |
| 6/30/2011 | Rent for 1 days | 12.30 | | 346.30 | 8990031 |
| 6/30/2011 | Rent Subsidy for 1 days | 16.67 | | 362.97 | 8990032 |
| 6/30/2011 | Waive Application Fee | (35.00) | | 327.97 | 8990033 |
| 6/30/2011 | Renter's Insurance for 1 days | 0.52 | | 328.49 | 8990034 |
| 6/30/2011 | W/D for one day | 1.67 | | 330.16 | 8990048 |
| 6/30/2011 | Move In Concession/Resident moved in before SHRA Contract began LG | (55.74) | | 274.42 | 9353474 |
| 6/30/2011 | chk# 3802003437 pc | | 100.00 | 174.42 | 5135033 |
| 6/30/2011 | chk# 3802003487 pc | - | 680.00 | (505.58) | 5135035 |
| 7/1/2011 | Washer/Dryer Rental (07/2011) | 50.00 | | (455.58) | 9016512 |
| 7/1/2011 | Monthly Rent Charges (07/2011) | 369.00 | | (86.58) | 9016513 |
| 7/1/2011 | Renter's Insurance (07/2011) | 15.58 | | (71.00) | 9016514 |
| 7/1/2011 | Housing Assistance Charge (07/2011) | 500.00 | | 429.00 | 9016515 |
| 7/31/2011 | chk# 1193420 LG | | 429.00 | 0.00 | 5189214 |
| 7/31/2011 | chk# 1193420 LG | | 554.00 | (554.00) | 5189313 |
| 8/1/2011 | Washer/Dryer Rental (08/2011) | 50.00 | | (504.00) | 9092850 |
| 8/1/2011 | Monthly Rent Charges (08/2011) | 286.00 | | (218.00) | 9092851 |
| 8/1/2011 | Renter's Insurance (08/2011) | 15.58 | | (202.42) | 9092852 |
| 8/1/2011 | Housing Assistance Charge (08/2011) | 554.00 | | 351.58 | 9092853 |
| 8/3/2011 | chk# 0000005134 LG | | 351.58 | 0.00 | 5213590 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) | 50.00 | | 50.00 | 9172072 |
| 9/1/2011 | Monthly Rent Charges (09/2011) | 286.00 | | 336.00 | 9172073 |
| 9/1/2011 | Renter's Insurance (09/2011) | 15.58 | | 351.58 | 9172074 |
| 9/1/2011 | Housing Assistance Charge (09/2011) | 554.00 | | 905.58 | 9172075 |
| 9/2/2011 | chk# 1200163 LG | | 554.00 | 351.58 | 5264983 |
| 9/2/2011 | chk# 0000005140 PC | | 352.00 | (0.42) | 5268540 |
| 10/1/2011 | Washer/Dryer Rental (10/2011) | 50.00 | | 49.58 | 9247680 |
| 10/1/2011 | Monthly Rent Charges (10/2011) | 286.00 | | 335.58 | 9247681 |
| 10/1/2011 | Renter's Insurance (10/2011) | 17.91 | | 353.49 | 9247682 |
| 10/1/2011 | Housing Assistance Charge (10/2011) | 554.00 | | 907.49 | 9247683 |
| 10/3/2011 | chk# 0000005143 LG | | 355.00 | 552.49 | 5323315 |

Ledger Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 30 of 34
Case 2:15-cv-00799-KJM-DB   Document 66   Filed 08/04/17   Page 89 of 91
Page 2 of 6
Case 2:15-cv-00799-KJM-DAD SEALED*   Document 1   Filed 04/??/15   Page 78 of 82

| 10/3/2011 | chk# 1206911 LG | | 554.00 | (1.51) | 5327632 |
|---|---|---|---|---|---|
| 11/1/2011 | Washer/Dryer Rental (11/2011) | 50.00 | | 48.49 | 9324179 |
| 11/1/2011 | Monthly Rent Charges (11/2011) | 286.00 | | 334.49 | 9324180 |
| 11/1/2011 | Renter's Insurance (11/2011) | 17.91 | | 352.40 | 9324181 |
| 11/1/2011 | Housing Assistance Charge (11/2011) | 554.00 | | 906.40 | 9324182 |
| 11/1/2011 | chk# 1213689 LG | | 554.00 | 352.40 | 5372885 |
| 11/2/2011 | chk# 0000005146 LG | | 355.00 | (2.60) | 5377496 |
| 12/1/2011 | Washer/Dryer Rental (12/2011) | 50.00 | | 47.40 | 9396095 |
| 12/1/2011 | Monthly Rent Charges (12/2011) | 286.00 | | 333.40 | 9396096 |
| 12/1/2011 | Renter's Insurance (12/2011) | 17.91 | | 351.31 | 9396097 |
| 12/1/2011 | Housing Assistance Charge (12/2011) | 554.00 | | 905.31 | 9396098 |
| 12/1/2011 | chk# 1220427 LG | | 554.00 | 351.31 | 5423814 |
| 12/3/2011 | chk# 14-427246913 LG | | 355.00 | (3.69) | 5433593 |
| 1/1/2012 | Washer/Dryer Rental (01/2012) | 50.00 | | 46.31 | 9467026 |
| 1/1/2012 | Monthly Rent Charges (01/2012) | 286.00 | | 332.31 | 9467027 |
| 1/1/2012 | Renter's Insurance (01/2012) | 17.91 | | 350.22 | 9467028 |
| 1/1/2012 | Housing Assistance Charge (01/2012) | 554.00 | | 904.22 | 9467029 |
| 1/3/2012 | chk# 0000005157 LG | | 355.00 | 549.22 | 5480724 |
| 1/3/2012 | chk# 1227079 LG | | 554.00 | (4.78) | 5484231 |
| 2/1/2012 | Washer/Dryer Rental (02/2012) | 50.00 | | 45.22 | 9540925 |
| 2/1/2012 | Monthly Rent Charges (02/2012) | 286.00 | | 331.22 | 9540926 |
| 2/1/2012 | Renter's Insurance (02/2012) | 17.91 | | 349.13 | 9540927 |
| 2/1/2012 | Housing Assistance Charge (02/2012) | 554.00 | | 903.13 | 9540928 |
| 2/2/2012 | chk# 1233861 LG | | 554.00 | 349.13 | 5532533 |
| 2/6/2012 | chk# 0000005159 LG | | 354.50 | (5.37) | 5543051 |
| 3/1/2012 | Washer/Dryer Rental (03/2012) | 50.00 | | 44.63 | 9611808 |
| 3/1/2012 | Monthly Rent Charges (03/2012) | 286.00 | | 330.63 | 9611809 |
| 3/1/2012 | Renter's Insurance (03/2012) | 17.91 | | 348.54 | 9611810 |
| 3/1/2012 | Housing Assistance Charge (03/2012) | 554.00 | | 902.54 | 9611811 |
| 3/2/2012 | chk# 14-437980136 LG | | 355.00 | 547.54 | 5581817 |
| 3/2/2012 | chk# 1240596 LG | | 554.00 | (6.46) | 5585407 |
| 4/1/2012 | Washer/Dryer Rental (04/2012) | 50.00 | | 43.54 | 9684691 |
| 4/1/2012 | Monthly Rent Charges (04/2012) | 286.00 | | 329.54 | 9684692 |
| 4/1/2012 | Renter's Insurance (04/2012) | 17.91 | | 347.45 | 9684693 |
| 4/1/2012 | Housing Assistance Charge (04/2012) | 554.00 | | 901.45 | 9684694 |
| 4/2/2012 | chk# 1247293 LG | | 554.00 | 347.45 | 5637573 |
| 4/3/2012 | chk# 0000005167 pc | | 355.00 | (7.55) | 5642922 |
| 5/1/2012 | Washer/Dryer Rental (05/2012) | 50.00 | | 42.45 | 9757907 |
| 5/1/2012 | Monthly Rent Charges (05/2012) | 286.00 | | 328.45 | 9757908 |
| 5/1/2012 | Renter's Insurance (05/2012) | 17.91 | | 346.36 | 9757909 |
| 5/1/2012 | Housing Assistance Charge (05/2012) | 554.00 | | 900.36 | 9757910 |
| 5/1/2012 | chk# 1253942 LG | | 554.00 | 346.36 | 5685906 |
| 5/3/2012 | chk# 0000005168 LG | | 355.00 | (8.64) | 5695427 |
| 6/1/2012 | Washer/Dryer Rental (06/2012) | 50.00 | | 41.36 | 9834103 |
| 6/1/2012 | Monthly Rent Charges (06/2012) | 286.00 | | 327.36 | 9834104 |
| 6/1/2012 | Renter's Insurance (06/2012) | 17.91 | | 345.27 | 9834105 |
| 6/1/2012 | Housing Assistance Charge (06/2012) | 554.00 | | 899.27 | 9834106 |
| 6/2/2012 | chk# 1260630 LG | | 554.00 | 345.27 | 5743049 |

Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 31 of 34
Ledger Case 2:15-cv-00799-KJM   Document 66   Filed 08/04/15   Page 82 of 34
Case 2:15-cv-00799-KJM-DA *SEALED*   Document 1   Filed 04/15   Page 79 of 82   Page 3 of 6

| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| | chk# 20407832034 LG | | 355.00 | (9.73) | 5744421 |
| 7/1/2012 | Washer/Dryer Rental (07/2012) | 50.00 | | 40.27 | 9911295 |
| 7/1/2012 | Monthly Rent Charges (07/2012) | 286.00 | | 326.27 | 9911296 |
| 7/1/2012 | Renter's Insurance (07/2012) | 17.91 | | 344.18 | 9911297 |
| 7/1/2012 | Housing Assistance Charge (07/2012) | 554.00 | | 898.18 | 9911298 |
| 7/2/2012 | Adjust Rent to $304.00 LG | 18.00 | | 916.18 | 10013208 |
| 7/2/2012 | chk# 1267373 pc | | 554.00 | 362.18 | 5800129 |
| 7/3/2012 | chk# PSID16199404-5175-005175 Terminal PSID 16199404 - CHECK21 | | 355.00 | 7.18 | 5803217 |
| 8/1/2012 | Washer/Dryer Rental (08/2012) | 50.00 | | 57.18 | 9989035 |
| 8/1/2012 | Monthly Rent Charges (08/2012) | 286.00 | | 343.18 | 9989036 |
| 8/1/2012 | Renter's Insurance (08/2012) | 17.91 | | 361.09 | 9989037 |
| 8/1/2012 | Housing Assistance Charge (08/2012) | 554.00 | | 915.09 | 9989038 |
| 8/1/2012 | chk# 1274374 LG | | 554.00 | 361.09 | 5853143 |
| 8/3/2012 | chk# PSID17305286-5178-005178 Terminal PSID 17305286 - CHECK21 | | 355.00 | 6.09 | 5859766 |
| 8/4/2012 | Adjust Renthap to $536.00 LG | (18.00) | | (11.91) | 10013209 |
| 8/4/2012 | Adjust Rent to $304.00 LG | 18.00 | | 6.09 | 10013210 |
| 9/1/2012 | Washer/Dryer Rental (09/2012) | 50.00 | | 56.09 | 10067863 |
| 9/1/2012 | Monthly Rent Charges (09/2012) | 304.00 | | 360.09 | 10067864 |
| 9/1/2012 | Renter's Insurance (09/2012) | 17.91 | | 378.00 | 10067865 |
| 9/1/2012 | Housing Assistance Charge (09/2012) | 536.00 | | 914.00 | 10067866 |
| 9/4/2012 | chk# PSID18237843-5184-005184 Terminal PSID 18237843 - CHECK21 | | 375.00 | 539.00 | 5922037 |
| 9/7/2012 | chk# 3000215 LG | | 536.00 | 3.00 | 5929994 |
| 10/1/2012 | Washer/Dryer Rental (10/2012) | 50.00 | | 53.00 | 10144399 |
| 10/1/2012 | Monthly Rent Charges (10/2012) | 304.00 | | 357.00 | 10144400 |
| 10/1/2012 | Renter's Insurance (10/2012) | 17.91 | | 374.91 | 10144401 |
| 10/1/2012 | Housing Assistance Charge (10/2012) | 536.00 | | 910.91 | 10144402 |
| 10/2/2012 | chk# 3000425 LG | | 536.00 | 374.91 | 5969131 |
| 10/3/2012 | chk# PSID19408860-5185-005185 Terminal PSID 19408860 - CHECK21 | | 375.00 | (0.09) | 5974129 |
| 11/1/2012 | Washer/Dryer Rental (11/2012) | 50.00 | | 49.91 | 10219643 |
| 11/1/2012 | Monthly Rent Charges (11/2012) | 304.00 | | 353.91 | 10219644 |
| 11/1/2012 | Renter's Insurance (11/2012) | 17.91 | | 371.82 | 10219645 |
| 11/1/2012 | Housing Assistance Charge (11/2012) | 536.00 | | 907.82 | 10219646 |
| 11/2/2012 | chk# 300713 LG | | 536.00 | 371.82 | 6023935 |
| 11/2/2012 | chk# PSID20236493-5188-005188 Terminal PSID 20236493 - CHECK21 | | 375.00 | (3.18) | 6026199 |
| 12/1/2012 | Washer/Dryer Rental (12/2012) | 50.00 | | 46.82 | 10291510 |
| 12/1/2012 | Monthly Rent Charges (12/2012) | 304.00 | | 350.82 | 10291511 |
| 12/1/2012 | Renter's Insurance (12/2012) | 17.91 | | 368.73 | 10291512 |
| 12/1/2012 | Housing Assistance Charge (12/2012) | 536.00 | | 904.73 | 10291513 |
| 12/2/2012 | chk# 3001279 LG | | 536.00 | 368.73 | 6074746 |
| 12/3/2012 | chk# PSID21125574-5191-005191 Terminal PSID 21125574 - CHECK21 | | 375.00 | (6.27) | 6077575 |
| 1/1/2013 | Washer/Dryer Rental (01/2013) | 50.00 | | 43.73 | 10362609 |
| 1/1/2013 | Monthly Rent Charges (01/2013) | 304.00 | | 347.73 | 10362610 |
| 1/1/2013 | Renter's Insurance (01/2013) | 17.91 | | 365.64 | 10362611 |

Case 2:15-cv-00799-KJM-DB   Document 72-2   Filed 08/25/17   Page 33 of 34
Ledger Case 2:15-cv-00799-KJM-DB   Document 66   Filed 08/04/15   Page 83 of 82   Page 4 of 6
Case 2:15-cv-00799-KJM-DA *SEALED*   Document 1   Filed 04/10/15   Page 80 of 82

| 1/1/2013 | Housing Assistance Charge (01/2013) | 536.00 | | | 901.64 | 10362612 |
| 1/3/2013 | chk# PSID22008570-5194-005194 Terminal PSID 22008570 - CHECK21 | | 375.00 | | 526.64 | 6125688 |
| 1/3/2013 | chk# 3002950 LG | | | 536.00 | (9.36) | 6130850 |
| 2/1/2013 | Washer/Dryer Rental (02/2013) | 50.00 | | | 40.64 | 10434776 |
| 2/1/2013 | Monthly Rent Charges (02/2013) | 304.00 | | | 344.64 | 10434777 |
| 2/1/2013 | Renter's Insurance (02/2013) | 18.16 | | | 362.80 | 10434778 |
| 2/1/2013 | Housing Assistance Charge (02/2013) | 536.00 | | | 898.80 | 10434779 |
| 2/2/2013 | chk# t0055416 LG | | | 536.00 | 362.80 | 6177856 |
| 2/2/2013 | chk# PSID22884458-5200-005200 Terminal PSID 22884458 - CHECK21 | | 375.00 | | (12.20) | 6178232 |
| 3/1/2013 | Washer/Dryer Rental (03/2013) | 50.00 | | | 37.80 | 10508798 |
| 3/1/2013 | Monthly Rent Charges (03/2013) | 304.00 | | | 341.80 | 10508799 |
| 3/1/2013 | Renter's Insurance (03/2013) | 18.16 | | | 359.96 | 10508800 |
| 3/1/2013 | Housing Assistance Charge (03/2013) | 536.00 | | | 895.96 | 10508801 |
| 3/2/2013 | chk# PSID23807147-5201-005201 Terminal PSID 23807147 - CHECK21 | | 375.00 | | 520.96 | 6230775 |
| 3/2/2013 | chk# 3006563 LG | | | 536.00 | (15.04) | 6233635 |
| 4/1/2013 | Washer/Dryer Rental (04/2013) | 50.00 | | | 34.96 | 10584957 |
| 4/1/2013 | Monthly Rent Charges (04/2013) | 304.00 | | | 338.96 | 10584958 |
| 4/1/2013 | Renter's Insurance (04/2013) | 18.16 | | | 357.12 | 10584959 |
| 4/1/2013 | Housing Assistance Charge (04/2013) | 536.00 | | | 893.12 | 10584960 |
| 4/2/2013 | chk# 3008426 RM | | | 536.00 | 357.12 | 6285061 |
| 4/3/2013 | chk# PSID24950816-5204-005204 Terminal PSID 24950816 - CHECK21 | | 375.00 | | (17.88) | 6290996 |
| 5/1/2013 | Monthly Rent Charges (05/2013) | 304.00 | | | 286.12 | 10856960 |
| 5/1/2013 | Washer/Dryer Rental (05/2013) | 50.00 | | | 336.12 | 10857246 |
| 5/1/2013 | Housing Assistance Charge (05/2013) | 536.00 | | | 872.12 | 10857545 |
| 5/1/2013 | Renter's Insurance (05/2013) | 18.16 | | | 890.28 | 10857793 |
| 5/2/2013 | chk# 3010337 LG | | | 536.00 | 354.28 | 6355031 |
| 5/3/2013 | chk# PSID25969935-5205-005205 Terminal PSID 25969935 - CHECK21 | | 375.00 | | (20.72) | 6365365 |
| 6/1/2013 | Washer/Dryer Rental (06/2013) | 50.00 | | | 29.28 | 10918002 |
| 6/1/2013 | Monthly Rent Charges (06/2013) | 304.00 | | | 333.28 | 10918003 |
| 6/1/2013 | Renter's Insurance (06/2013) | 18.16 | | | 351.44 | 10918004 |
| 6/1/2013 | Housing Assistance Charge (06/2013) | 536.00 | | | 887.44 | 10918005 |
| 6/2/2013 | chk# 3012228 LG | | | 536.00 | 351.44 | 6427718 |
| 6/4/2013 | chk# PSID27049544-7954 Terminal PSID 27049544 – CHECK21 | | 375.00 | | (23.56) | 6437760 |
| 7/1/2013 | Washer/Dryer Rental (07/2013) | 50.00 | | | 26.44 | 10994597 |
| 7/1/2013 | Monthly Rent Charges (07/2013) | 316.00 | | | 342.44 | 10994598 |
| 7/1/2013 | Renter's Insurance (07/2013) | 18.16 | | | 360.60 | 10994599 |
| 7/1/2013 | Housing Assistance Charge (07/2013) | 524.00 | | | 884.60 | 10994600 |
| 7/2/2013 | chk# 3014098 LG | | | 524.00 | 360.60 | 6483942 |
| 7/4/2013 | chk# PSID28135082-5211-005211 Terminal PSID 28135082 - CHECK21 | | 375.00 | | (14.40) | 6494135 |
| 7/29/2013 | chk# PSID28599283-5217-005217 Terminal PSID 28599283 - CHECK21 | | 375.00 | (389.40) | | 6513571 |
| 8/1/2013 | Washer/Dryer Rental (08/2013) | 50.00 | | | (339.40) | 11069620 |
| 8/1/2013 | Monthly Rent Charges (08/2013) | 316.00 | | | (23.40) | 11069621 |
| 8/1/2013 | Renter's Insurance (08/2013) | 18.16 | | | (5.24) | 11069622 |



| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| 8/1/2013 | Housing Assistance Charge (08/2013) | 524.00 | | 518.76 | 11069623 |
| 8/2/2013 | chk# 3015978 LG | | 524.00 | (5.24) | 6540841 |
| 9/1/2013 | Washer/Dryer Rental (09/2013) | 50.00 | | 44.76 | 11152355 |
| 9/1/2013 | Monthly Rent Charges (09/2013) | 316.00 | | 360.76 | 11152356 |
| 9/1/2013 | Renter's Insurance (09/2013) | 18.16 | | 378.92 | 11152357 |
| 9/1/2013 | Housing Assistance Charge (09/2013) | 524.00 | | 902.92 | 11152358 |
| 9/2/2013 | chk# 3017841 LG | | 524.00 | 378.92 | 6602389 |
| 9/3/2013 | chk# PSID30232857-3409 Terminal PSID 30232857 - CHECK21 | | 375.00 | 3.92 | 6604837 |
| 10/1/2013 | Washer/Dryer Rental (10/2013) | 50.00 | | 53.92 | 11230938 |
| 10/1/2013 | Monthly Rent Charges (10/2013) | 316.00 | | 369.92 | 11230939 |
| 10/1/2013 | Renter's Insurance (10/2013) | 18.16 | | 388.08 | 11230940 |
| 10/1/2013 | Housing Assistance Charge (10/2013) | 524.00 | | 912.08 | 11230941 |
| 10/2/2013 | chk# 3019768 LG | | 524.00 | 388.08 | 6660090 |
| 10/3/2013 | chk# PSID31540695-5232-005232 Terminal PSID 31540695 - CHECK21 | | 375.00 | 13.08 | 6668926 |
| 10/31/2013 | chk# 3021747 LG | | 524.00 | (510.92) | 6718840 |
| 11/1/2013 | Washer/Dryer Rental (11/2013) | 50.00 | | (460.92) | 11311992 |
| 11/1/2013 | Monthly Rent Charges (11/2013) | 316.00 | | (144.92) | 11311993 |
| 11/1/2013 | Renter's Insurance (11/2013) | 18.16 | | (126.76) | 11311994 |
| 11/1/2013 | Housing Assistance Charge (11/2013) | 524.00 | | 397.24 | 11311995 |
| 11/1/2013 | chk# PSID32339818-5233-005233 Terminal PSID 32339818 - CHECK21 | | 375.00 | 22.24 | 6711484 |
| 11/1/2013 | chk# PSID32375491-373 Terminal PSID 32375491 - CHECK21 | | 13.08 | 9.16 | 6712744 |
| 12/1/2013 | Washer/Dryer Rental (12/2013) | 50.00 | | 59.16 | 11399107 |
| 12/1/2013 | Monthly Rent Charges (12/2013) | 316.00 | | 375.16 | 11399108 |
| 12/1/2013 | Renter's Insurance (12/2013) | 18.16 | | 393.32 | 11399109 |
| 12/1/2013 | Housing Assistance Charge (12/2013) | 524.00 | | 917.32 | 11399110 |
| 12/2/2013 | chk# 3023681 LG | | 524.00 | 393.32 | 6776437 |
| 12/3/2013 | chk# PSID33892599-5240-005240 Terminal PSID 33892599 - CHECK21 | | 393.32 | 0.00 | 6781837 |
| 1/1/2014 | Renter's Insurance (01/2014) | 18.16 | | 18.16 | 11472327 |
| 1/1/2014 | Washer/Dryer Rental (01/2014) | 50.00 | | 68.16 | 11472506 |
| 1/1/2014 | Housing Assistance Charge (01/2014) | 524.00 | | 592.16 | 11472706 |
| 1/1/2014 | Monthly Rent Charges (01/2014) | 316.00 | | 908.16 | 11472909 |
| 1/2/2014 | chk# 3025589 LG | | 524.00 | 384.16 | 6825934 |
| 1/3/2014 | chk# PSID35122030-5241-005241 Terminal PSID 35122030 - CHECK21 | | 384.16 | 0.00 | 6846850 |
| 2/1/2014 | Washer/Dryer Rental (02/2014) | 50.00 | | 50.00 | 11547992 |
| 2/1/2014 | Monthly Rent Charges (02/2014) | 316.00 | | 366.00 | 11547993 |
| 2/1/2014 | Renter's Insurance (02/2014) | 18.16 | | 384.16 | 11547994 |
| 2/1/2014 | Housing Assistance Charge (02/2014) | 524.00 | | 908.16 | 11547995 |
| 2/3/2014 | chk# 3027494 LG | | 524.00 | 384.16 | 6901517 |
| 2/3/2014 | chk# PSID36492777-5242-005242 Terminal PSID 36492777 - CHECK21 | | 384.16 | 0.00 | 6902775 |
| 3/1/2014 | Washer/Dryer Rental (03/2014) | 50.00 | | 50.00 | 11620590 |
| 3/1/2014 | Monthly Rent Charges (03/2014) | 316.00 | | 366.00 | 11620591 |
| 3/1/2014 | Renter's Insurance (03/2014) | 18.16 | | 384.16 | 11620592 |
| 3/1/2014 | Housing Assistance Charge (03/2014) | 524.00 | | 908.16 | 11620593 |
| 3/1/2014 | chk# PSID37800480-5246-005246 Terminal PSID 37800480 - | | 384.16 | 524.00 | 6948928 |

Case 2:15-cv-00799-KJM-DB Document 62-2 Filed 08/25/17 Page 84 of 34
Case 2:15-cv-00799-KJM-DB *SEALED* Document 1 Filed 04/10/15 Page 82 of 82
Page 6 of 6

| | | CHECK21 | | | | | |
|---|---|---|---|---|---|---|---|
| 3/3/2014 | | chk# 3029375 LG | | | 524.00 | 0.00 | 6955921 |