1  Andrew Wolff, SBN 195092
   David Lavine, SBN 166744
2  LAW OFFICES OF ANDREW WOLFF, PC
   1956 Webster St., Suite 275
3  Oakland, California 94612
   (510) 834-3300
4  (510) 834-3377 (Fax)
   david@awolfflaw.com
5
   Jesse Newmark, SBN 247488
6  Shira Levine, SBN 293080
   CENTRO LEGAL DE LA RAZA
7  3400 East 12th Street
   Oakland, California 94601
8  (510) 437-1554 x115
   (510) 437-9164 (Fax)
9  jessenewmark@centrolegal.org

10 Attorneys for Plaintiffs/Relators
   Denika Terry and Roy Huskey III
11

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14                  SACRAMENTO DIVISION

15

16 UNITED STATES OF AMERICA, *ex rel.*          Case No. 2:15 CV 0799 KJM DB
   DENIKA TERRY and ROY HUSKEY III,
17 and each of them for themselves individually,  **DECLARATION OF DAVID LAVINE IN**
   and for all other persons similarly situated and  **SUPPORT OF PLAINTIFFS' MOTION**
18 on behalf of the UNITED STATES OF            **FOR CLASS CERTIFICATION**
   AMERICA,
19                                               **CLASS ACTION**
            Plaintiffs/Relators,
20                                               Date:      September 22, 2017
            vs.                                  Time:      10:00 a.m.
21                                               Judge:     Kimberly J. Mueller
   WASATCH ADVANTAGE GROUP, LLC,                 Dept.:     Courtroom 3, 15th Floor
22 WASATCH PROPERTY MANAGEMENT,
   INC., WASATCH POOL HOLDINGS,
23 LLC, CHESAPEAKE COMMONS
   HOLDINGS, LLC, LOGAN PARK
24 APARTMENTS, LLC, LOGAN PARK
   APARTMENTS, LP, and DOES 1-30,
25
            Defendants.
26

27

28

*U.S. ex rel. Terry v. Wasatch Advantage Group*
2:15 CV 07799 KJM DB

1.      I am attorney of record for plaintiffs in the above-referenced matter. I have personal knowledge of the facts set forth in this declaration, and, if called upon, could and would testify thereto.

2.      I offer this declaration in support of the adequacy of proposed class counsel.

3.      The firm I work for, the Law Office of Andrew Wolff, P.C., has represented tenants on contingency in hundreds of habitability cases, and has achieved settlements or won verdicts in nearly all of them. Without the assistance of this law office, many of these tenants would go unrepresented, and some would likely continue to live in squalor or in other conditions unfit for human habitation. It was because of one such habitability case that the alleged violations in the current case were discovered.

4.      This firm is accustomed to bringing and successfully prosecuting class cases predicated on violations of laws protecting tenants affecting a wide range of tenants. By way of example, this firm represents a putative class of tenants at the Empyrean Towers complex in downtown Oakland in a case which has just settled and will shortly be facing court consideration of a motion for preliminary approval of settlement and for class certification for purposes of proposed settlement predicated on state law protecting tenants from successive move-outs and check-ins, and in conjunction with a wider settlement of a related lawsuit brought by the City of Oakland against Empyrean Towers and its owner. *Mendez, et al., v. Empyrean Towers,* case numbers RG15764051, RG15765508, RG15781768). Additionally, this office has represented certified classes in Alameda County Superior Court consisting of hundreds of tenants in several cases alleging violations of a Fremont ordinance designed to protect against rent increases without the benefit of dispute resolution resources. *Fernandez v. Villas Papillon, LLC* RG13683606); *Antonio v. Crossroads Village, LLC* (RG14709405); *Ausman v. Countrywood, LLC* (RG15758204). The first of these cases resulted in a trial and judgment favoring the class, with the other cases pending at earlier stages. This firm, in short, is experienced in providing legal services to large classes of distressed tenants.

5.      Additionally, this firm has co-counseled with the legal team at Centro Legal de La Raza, a non-profit organization skilled at working with immigrants and low-income clients in

need of legal assistance. The accompanying declaration of Jesse Newmark addresses his and his office's experience in working with clients in need.

6.     I have been an attorney for nearly 24 years. I have had primary or secondary responsibility for class actions through the pleading, discovery, class certification and mediation stages in the securities and consumer arenas which eventually settled for tens of millions of dollars. I also managed a practice for more than four years based on "private attorney general" claims of chemical toxicity in consumer products, over dozens of representative actions which settled collectively for many millions of dollars. I have tried upwards of 20 cases, most of them in federal court. As in earlier cases, I will pursue class certification and other case developments favoring the class with dedication and fervor.

7.     Based on my training and experience working with low-income tenants, especially those on assistance, I conclude that this kind of case would not likely attract experienced counsel and would not likely be prosecuted short of my firm's involvement. Low-income tenants are a challenging group to represent individually, and those challenges are only compounded when working with them on a class-wide basis. Their financial distress or health issues often occupies them to the exclusion of most else, as they try to stay afloat and avoid eviction and, perhaps, homelessness. Deftness and patience are critical in working with them, beyond what may ordinarily be required in working with, for example, a class of security holders or consumer purchasers. This firm, and co-counsel's organization, have experience in managing large-scale cases with this vulnerable population, are aware of no related or similar litigation seeking to assist Section 8 tenants with keeping their rent costs affordable and true to the government's calculation of how much they should be paying toward rent, and will do all that we can to serve the putative class well. The alternative is neglect of a needy community that can scarcely afford any further neglect.

8.     Despite a foundational interrogatory served on, and repeated follow-up requests directed to, opposing counsel, plaintiffs' counsel have not received through discovery a class list, or other comprehensive compilation of Section 8 tenants potentially eligible for relief through this action. Instead, opposing counsel has replied that plaintiffs' counsel should compile such a

class list ourselves based on the document production – even through deposition testimony made clear that certain Section 8 tenant files could not be located, and thus were not provided.  Thus, plaintiffs are left to estimate the size of the class without further assistance from opposing counsel until the matter may be pressed during merits discovery.

9.      Attached as Exhibits A - K are true and correct copies of the following types of documents:

a.      Housing Assistant Payment (HAP) contracts and instructions as Exhibit A;

b.      Additional Services Agreements as Exhibit B;

c.      Residential Rental Agreements as Exhibit C;

d.      Resident Ledgers as Exhibit D;

e.      Move-In Congratulations Letters as Exhibit E;

f.      Monthly Cost Breakdowns and Monthly Statements of Rental Accounts as Exhibit F;

g.      Renewal Notifications as Exhibit G;

h.      Simplify Your Life Letters as Exhibit H;

i.      30-Day and 60-Day Notices of Resident's Intent to Vacate as Exhibit I;

j.      3-Day Notices to Perform Financial Covenant of Lease or Quit as Exhibit J; and

k.      Applicant Consents as Exhibit K.

10.     Attached as Exhibit L are true and correct excerpts of the deposition transcript of Dave Tanforan, taken on August 9, 2017.

11.     Attached as Exhibit M are true and correct excerpts of the deposition transcript of Janae Jarvis, taken on August 9, 2017.

12.     Attached as Exhibit N are true and correct excerpts of the deposition transcript of Shawn Fetter, taken on August 9, 2017.

//

//

//

13.     Attached as Exhibit O are true and correct excerpts of the deposition of Sylvia Gamboa, taken on October 8, 2014.

14.     To the best of my investigation, the interests of the proposed class representatives are not antagonistic to those of the proposed class with respect to the additional service charges at issue in this case, as all Section 8 tenants eligible for class membership experienced those charges and were injured by them.

I declare under penalty of perjury this 25th day of August, 2017 that the foregoing is true and correct to the best of my knowledge.

/s/_____
David Lavine

# EXHIBIT A

DocuSign Envelope ID: 3FAF45E3-7D25-48A4-....0-12F4623AB605

## Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

### Instructions for use of HAP Contract

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

### Use of this form
Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

### Use for special housing types
In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

### How to fill in Part A
Section by Section Instructions

**Section 2: Tenant**
Enter full name of tenant.

**Section 3. Contract Unit**
Enter address of unit, including apartment number, if any.

**Section 4. Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

**Section 5. Initial Lease Term**
Enter first date and last date of initial lease term.
The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:
- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

**Section 6. Initial Rent to Owner**
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

**Section 7. Housing Assistance Payment**
Enter the initial amount of the monthly housing assistance payment.

**Section 8. Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

CV000093

DocuSign Envelope ID: 3FAF45E3-7D25-48AB  0-12F4623AB605

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing**
**and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

---

### Part A of the HAP Contract : Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   ARNOLD LIM

3. **Contract Unit**

   4625 NOGAL ST #D
   SAN DIEGO, CA  92102

4. **Household**
   The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.
   ARNOLD AGUILAR LIM
   HO SENG LIM
   FLORIDA AGUILAR LIM
   PERLITA AGUILAR LIM

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): **09/29/2016**
   The initial lease term ends on (mm/dd/yyyy): **08/31/2017**

6. **Initial Rent to Owner**
   The initial rent to owner is: $2169
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $1,331 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---



CV000094

DocuSign Envelope ID: 3FAF45E3-7D25-48AB D-12F4623AB605

## 8.   Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T".  Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
| --- | --- | --- |
| | Owner | Tenant |
| MTW Svcs-Water | | T |
| (Heating-Gas) | | T |
| (Cooking-Gas) | | T |
| (Other-Electric) | | T |
| (Water Heater-Gas) | O | |
| (Water and Sewer) | | T |
| (Range and/or Microwave) | O | |
| (Refrigerator) | O | |

## Signatures
**Public Housing Agency: San Diego Housing Commission**

**Owner:  CREEKSIDE HOLDINGS LTD**

Print or Type Name of PHA

*Lorretta Timis*
Signature

Print or Type Name of Owner

*Ofelia Pena*
Signature

Lorretta Timis

ofelia Pena

Print or Type Name and Title of Signatory

Print or Type Name and Title of Signatory

10/5/2016

10/5/2016

Date (mm/dd/yyyy)

Date (mm/dd/yyyy)

**Mail Payments to:**

**CREEKSIDE HOLDINGS LTD**

Name

220 47TH ST #C
SAN DIEGO, CA  92102

Address (Street, City, State, Zip)

form HUD-52641 (04/2015)
ref Handbook 7420.8

3

CV000095

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-12F4623AB605

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

**Part B of HAP Contract: Body of Contract**

**1. Purpose**

    a. This is a HAP contract between the PHA and the Owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

    b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

    c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

    d. The family will reside in the contract unit with asssistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

**2. Lease of Contract Unit**

    a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

    b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

    c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

    d. The owner certifies that:

        (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

        (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

        (3) The lease is consistent with State and local law.

    e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

**3. Maintenance, Utilities, and Other Services**

    a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

    b. The owner must provide all utilities needed to comply with the HQS.

    c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

    d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

    e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

    f. The PHA must notify the owner of any HQS defects shown by the inspection.

    g. The owner must provide all housing services as agreed to in the lease.

**4. Term of HAP Contract**

    a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

    b. **When HAP contract terminates.**

        (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

        (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

        (3) If the family moves from the contract unit, the HAP contract terminates automatically.

        (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

        (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

        (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

---

form HUD-52641 (04/2015)
ref Handbook 7420.8

CV000096

DocuSign Envelope ID: 3FAF45E3-7D25-48AB   0-12F4623AB605

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

**5. Provision and Payment for Utilities and Appliances**

　　a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

　　b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

　　c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

**6. Rent to Owner: Reasonable Rent**

　　a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

　　b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

　　　　(1) The location, quality, size, unit type, and age of the contract unit; and

　　　　(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

　　c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

　　d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

**7. PHA Payment to Owner**

　　a. **When paid**

　　　　(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

　　　　(2) The PHA must pay housing assistance payments promptly when due to the owner.

　　　　(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

　　　　(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

　　b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

　　c. **Amount of PHA payment to owner**

　　　　(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

　　　　(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

　　　　(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

　　d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

　　e. **Limit of PHA responsibility.**

　　　　(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

　　　　(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

　　f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

**8. Owner Certification**

　　During the term of this contract, the owner certifies that:

　　　　a. The owner is maintaining the contract unit and premises in accordance with the HQS.

form HUD-52641 (04/2015)
ref Handbook 7420.8

DocuSign Envelope ID: 3FAF45E3-7D25-48AE-0-12F4623AB605

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.



CV000098

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-12F4623AB605

### 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:
  (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);
  (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;
  (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
  (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

### 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:
  (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or
  (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):
  (1) Has violated obligations under a housing assistance payments contract under Section 8;
  (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;
  (3) Has engaged in any drug-related criminal activity or any violent criminal activity;
  (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;
  (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
    (a) Threatens the right to peaceful enjoyment of the premises by other residents;
    (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;
    (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or
    (d) Is drug-related criminal activity or violent criminal activity;
  (6) Has a history or practice of renting units that fail to meet State or local housing codes; or
  (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

### 15. Foreclosure.
In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**



CV000099

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-́12F4623AB605

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

---



CV000100

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-▊▊▊▊▊2F4623AB605

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance Housing Choice Voucher Program**

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 04/30/2018)

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.
   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or
(2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**
      (1) The owner must maintain the unit and premises in accordance with the HQS.
      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

---

9

CV000101

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-B    12F4623AB605

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
       (a) Pay for any utilities that are to be paid by the tenant.
       (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).
   c. **Criminal activity or alcohol abuse.**
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
          (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
          (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
          (c) Any violent criminal activity on or near the premises; or
          (d) Any drug-related criminal activity on or near the premises.
      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
          (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
          (b) Violating a condition of probation or parole under Federal or State law.

      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. **Other good cause for termination of tenancy**
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause may include:
          (a) Disturbance of neighbors,
          (b) Destruction of property, or
          (c) Living or housekeeping habits that cause damage to the unit or premises.
      (3) After the initial lease term, such good cause may include:
          (a) The tenant's failure to accept the owner's offer of a new lease or revision;
          (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
          (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
      (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
      (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

   e. **Protections for Victims of Abuse.**
      (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
      (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

---

Page 10 of 12                    form HUD-52641 (04/2015)
ref Handbook 7420.8

10

CV000102

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-\_\_12F4623AB605

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f.   **Eviction by court action.** The owner may only evict the tenant by a court action.

g.   **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**9.   Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

**10. PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**11.   Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

**12.   Security Deposit**
a.   The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.   When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.   The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.   If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

**13.   Prohibition of Discrimination**

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

CV000103

DocuSign Envelope ID: 3FAF45E3-7D25-48AB-8112F4623AB605

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

   (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

   (2) If there are any changes in lease provisions governing the term of the lease;

   (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

12

CV000104

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

---

**Part A of the HAP Contract: Contract Information**

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
    This HAP contract has three parts:
       Part A:  Contract Information
       Part B:  Body of Contract
       Part C:  Tenancy Addendum

2. **Tenant**

    Renesha R Cunningham

3. **Contract Unit**

    4498 N Cornelia Ave Apt C126
    Fresno, CA  93722

4. **Household**

    The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

    Renesha R Cunningham

    Xavier Youngblood

    Zaria Imani Youngblood

5. **Initial Lease Term**
    The initial lease term begins on (mm/dd/yyyy): 07/28/2011

    The initial lease term ends on (mm/dd/yyyy): 07/31/2012

6. **Initial Rent to Owner**
    The initial rent to owner is: $ 679.00
    During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

    The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 397.00 per month.
    The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

Previous editions are obsolete

Page 2 of 12

form HUD-52641 (8/2009)
ref Handbook 7420.8

13

CY006786

8. **Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|------|-------------------|---|---|---|-------------|---------|
| Heating | ☑ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | T |
| Cooking | ☐ Natural gas | ☐ Bottle gas | ☑ Oil or Electric | ☐ Coal or Other | O | T |
| Water Heating | ☑ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | O | T |
| Other Electric | | | | | T | T |
| Water | | | | | T | T |
| Sewer | | | | | T | T |
| Trash Collection | | | | | T | T |
| Air Conditioning | | | | | O | T |
| Refrigerator | | | | | O | O |
| Range/Microwave | | | | | O | O |
| Other (specify) | Water,Sewer,Garbage: T/T | | | | | |

**Signatures:**

| **Public Housing Agency** | **Owner** |
|---|---|
| Housing Authority of the City of Fresno | Wasatch Pool Holdings Llc |
| Print or Type Name of PHA | Print or Type Name of Owner |
| *[signature]* | *[signature]* |
| Signature | Signature |
| ANGELA QUINTERO | *Elizabeth Rodriguez* |
| Print or Type Name and Title of Signatory | Print or Type Name and Title of Signatory |
| 07/28/2011 | 07/28/2011 |
| Date (mm/dd/yyyy) | Date (mm/dd/yyyy) |

**Mail Payments to:**

Wasatch Pool Holdings Llc
Name

Address (street, city, State, Zip)

Dba Stonepine Apt
4498 N Cornelia
Fresno, CA  93722

---

form HUD-52641 (8/2009)
ref Handbook 7420.8

(4)

CY006787

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

1. **Purpose**

   a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

   d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

   c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

   d. The owner certifies that:

      (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

      (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

      (3) The lease is consistent with State and local law.

   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

   b. The owner must provide all utilities needed to comply with the HQS.

   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

   f. The PHA must notify the owner of any HQS defects shown by the inspection.

   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

   a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

   b. **When HAP contract terminates.**

      (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

      (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

      (3) If the family moves from the contract unit, the HAP contract terminates automatically.

      (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

      (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

      (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

form HUD-52641 (8/2009)
ref Handbook 7420.8

CY006788

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market,

governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

form HUD-52641 (8/2009)
ref Handbook 7420.8

CY006789

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9.   Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10.   Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial action or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11.   PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12.   Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of

form HUD-52641 (8/2009)
ref Handbook 7420.8



CY006790

the contract unit or the premises or with implementation of the HAP contract.

13. **Conflict of Interest**

  a. "Covered individual" means a person or entity who is a member of any of the following classes:

    (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

    (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

    (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

    (4) Any member of the Congress of the United States.

  b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

  c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

  d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

  e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

  f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

  g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

14. **Assignment of the HAP Contract**

  a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

  b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

  c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

  d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

    (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

    (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

  e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

  f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

    (1) Has violated obligations under a housing assistance payments contract under Section 8;

    (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

    (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

    (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

    (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

    (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

    (7) Has not paid State or local real estate taxes, fines or assessments.

  g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. **Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

form HUD-52641 (8/2009)
ref Handbook 7420.8

18

CY006791

16.   **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

17.   **Entire Agreement: Interpretation**

a.   The HAP contract contains the entire agreement between the owner and the PHA.

b    The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

form **HUD-52641** (8/2009)
ref Handbook 7420.8

19

CY006792

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:
   (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**

---

Previous editions are obsolete

Page 9 of 12

form HUD-52641 (8/2009)
ref Handbook 7420.8

20

CY006793

SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
HOUSING CHOICE VOUCHER PROGRAM
**Lease Supplemental Agreement**

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

1. PARTIES TO THE AGREEMENT DEFINED:

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

| a. | Tenant | **TANESHA YATES** | Tenant # | **t0028695** |
| b. | Owner | **ASPEN PARK APARTMENTS** | Vendor # | **v0007904** |

2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:

**TANESHA L. YATES**          **TERRY D. MCCOY**
**ARIYAH L. YATES**

3. UNIT ADDRESS: **7826 SUMMERSDALE DR 434**
**SACRAMENTO, CA 95823**

4. INITIAL LEASE TERM:  Begins **10/1/2015** and ends **9/30/2016**

5. INITIAL CONTRACT RENT:     **$859.00**     INITIAL TENANT RENT:     **$0.00**

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by **"Owner"**. The tenant shall provide or pay for the utilities or appliances indicated below by **"Tenant"**. Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
| --- | --- |
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Sewer | Tenant |
| Trash Collection | Tenant |
| Water | Tenant |
| Range/Microwave | Owner |
| Refrigerator | Owner |
| Water Heat - Natural Gas | Owner |

| | | |
| --- | --- | --- |
| *Tanesha Yates* (signature) | (559) 470-5064 | 10-17-15 |
| TANESHA YATES | Telephone Number | Date |
| *Owner / Agent* (signature) | 916 395-4000 | 10/17/15 |
| Owner / Agent | Telephone Number | Date |

form HUD-52641 (1/2007)
ref Handbook 7420.8

24

AP000061

**Housing Assistance Payments ntract (HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Depart t of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

> Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

> Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**
Enter first date and last date of initial lease term.
The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:
- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**
Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

---



25

AP000063

**Housing Assistance Payments ⸺ntract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Depa⸺ nt of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   TANESHA YATES

3. **Contract Unit**

   7826 SUMMERSDALE DR 434
   SACRAMENTO, CA. 95823

4. **Household**
   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   TANESHA L YATES
   TERRY D MCCOY
   ARIYAH L YATES

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): **10/01/2015**
   The initial lease term ends on (mm/dd/yyyy): **09/30/2016**

6. **Initial Rent to Owner**
   The initial rent to owner is: $859
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $859 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

form HUD-52641 (09/2014)
ref Handbook 7420.8



AP000064

## 8. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | | Paid By | |
|---|---|---|---|---|
| | Owner | Tenant | Owner | Tenant |
| Air Conditioning | | T | | |
| Cooking Oil/Electric | | T | | |
| Flat Fee Electric | | T | | |
| Heating - Oil/Electric | | T | | |
| Other Electric | | T | | |
| Range/Microwave | O | | | |
| Refrigerator | O | | | |
| Sewer | | T | | |
| Trash Collection | | T | | |
| Water | | T | | |
| Water Heat - Natural Gas | O | | | |

## Signatures

**Public Housing Agency: SHRA County of Sacramento Housing Authority**

_____
Print or Type Name of PHA

_____
Signature

_____
Print or Type Name and Title of Signatory

_____
Date (mm/dd/yyyy)

**Owner:  ASPEN PARK APARTMENTS**

_Wasatch Premier Communities_
Print or Type Name of Owner

_Tina Blossomgame_
Signature

_Tina Blossomgame Leasing Agent_
Print or Type Name and Title of Signatory

_10/17/15_
Date (mm/dd/yyyy)

**Mail Payments to:**

**ASPEN PARK APARTMENTS**
Name

5152 MACK RD
WASATCH PREMIER COMMUNITIES
SACRAMENTO, CA  95823

Address (Street, City, State, Zip)

form HUD-52641 (09/2014)
ref Handbook 7420.8

27

AP000062

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

**Part B of HAP Contract: Body of Contract**

1. **Purpose**
   a. This is a HAP contract between the PHA and the Owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).
   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.
   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.
   d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**
   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.
   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.
   c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).
   d. The owner certifies that:
      (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
      (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
      (3) The lease is consistent with State and local law.
   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**
   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).
   b. The owner must provide all utilities needed to comply with the HQS.
   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.
   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.
   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.
   f. The PHA must notify the owner of any HQS defects shown by the inspection.
   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**
   a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).
   b. **When HAP contract terminates.**
      (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
      (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
      (3) If the family moves from the contract unit, the HAP contract terminates automatically.
      (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
      (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
      (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

form HUD-52641 (09/2014)
ref Handbook 7420.8



AP000065

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**
   a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.
   b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.
   c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**
   a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.
   b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:
      (1) The location, quality, size, unit type, and age of the contract unit; and
      (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.
   c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.
   d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**
   a. **When paid**
      (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.
      (2) The PHA must pay housing assistance payments promptly when due to the owner.
      (3) If housing assistance payments are not paid promptly when due after the first two calender months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

      (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

   b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

   c. **Amount of PHA payment to owner**
      (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.
      (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.
      (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

   d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   e. **Limit of PHA responsibility.**
      (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.
      (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

   f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**
   During the term of this contract, the owner certifies that:
   a. The owner is maintaining the contract unit and premises in accordance with the HQS.



AP000066

b. The contract unit is leased to the ten.  The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner h... .ugaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

---

30

AP000067

### 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

### 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

(3) Has engaged in any drug-related criminal activity or any violent criminal activity;

(4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

(5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

(a) Threatens the right to peaceful enjoyment of the premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

### 15. Foreclosure. In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

31

AP000068

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

    a.   The HAP contract contains the entire agreement between the owner and the PHA.

    b.   The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

32

AP000069

**Housing Assistance Payments ̸ ntract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Depa      ̸ nt of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.
   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**
      (1) The owner must maintain the unit and premises in accordance with the HQS.
      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

form HUD-52641 (09/2014)
ref Handbook 7420.8

AP000070

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
       (a) Pay for any utilities that are to be paid by the tenant.
       (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. **Criminal activity or alcohol abuse.**
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
          (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
          (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
          (c) Any violent criminal activity on or near the premises; or
          (d) Any drug-related criminal activity on or near the premises.
      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
          (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
          (b) Violating a condition of probation or parole under Federal or State law.

      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. **Other good cause for termination of tenancy**
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause may include:
          (a) Disturbance of neighbors,
          (b) Destruction of property, or
          (c) Living or housekeeping habits that cause damage to the unit or premises.
      (3) After the initial lease term, such good cause may include:
          (a) The tenant's failure to accept the owner's offer of a new lease or revision;
          (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
          (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
      (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
      (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

   e. **Protections for Victims of Abuse.**
      (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
      (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f.   **Eviction by court action.** The owner may only evict the tenant by a court action.

g.   **Owner notice ur grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9.  Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

## 10.  PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11.  Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12.  Security Deposit

a.   The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.   When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.   The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.   If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13.  Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

---

form HUD-52641 (09/2014)
ref Handbook 7420.8



AP000072

**14. Conflict with Other Provisions of Lease**

    a.   The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

    b.   In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

**15. Changes in Lease or Rent**

    a.   The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

    b.   In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

       (1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

       (2)  If there are any changes in lease provisions governing the term of the lease;

       (3)  If the family moves to a new unit, even if the unit is in the same building or complex.

    c.   PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

    d.   The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

**16. Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

**17. Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.



36

AP000073

# EXHIBIT B

## ADDITIONAL SERVICES AGREEMENT

Apartment # C126

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for The Courtyard at Central Park (hereinafter the "Community") and Renesha Cunningham*** (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein.  This Agreement is made a part of that certain Residential Rental Agreement, dated 07/28/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance (This is available as a pay with rent option), or | | 15.58 |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 40.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (20.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $55.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $55.58 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee        (if applicable) | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed.  I have read the foregoing and acknowledge the contents thereof, dated 07/28/2011

| | |
|---|---|
| *(signature)* Renesha Cunningham  **(Lessee)** | _____ Date |
| N/A Zaria Youngblood | _____ Date |
| N/A Xavier Youngblood | _____ Date |
| *(signature)* Owner authorized agent | 7-28-11 Date |

LD303.01 Revised  07/15/2008



CY006672

**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personalty and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in this Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.



CY006673

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

| | |
|---|---|
| Renesha Cunningham***(Lessee) | Date |
| N/A | |
| Zaria Youngblood | Date |
| N/A | |
| Xavier Youngblood | Date |

Owner authorized agent                    7-28-11
                                          Date

LD303.61 Revised 7/15/08

WASATCH
PREMIER COMMUNITIES

3

CY006674

 

## ADDITIONAL SERVICES AGREEMENT

Apartment # 001

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community") and Ronnie Block (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or this "Lessee(s) under the terms of this Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 06/01/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property: | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number: # _____ | 40.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number _____ | 0.00 |
| Reserved Covered Parking | Space Number _____ | 0.00 |
| Reserved Uncovered Parking | Space Number _____ | 0.00 |
| Enclosed Private Garage | Space Number _____ | 0.00 |
| Renter's Insurance (This is available as a pay with rent option); or | | 15.58 |
| Insurance Provider Name _____ Policy # _____ | | |

| Services: | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 0.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Corporate Service | | 0.00 |
| Month-to-Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $55.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $55.58 |

| Fees: | | |
|---|---|---|
| Lease Initiation Fee:   (if applicable) | | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 06/01/2011.

_Ronnie R Block_                    _6-1-11_
Ronnie Block (Lessee)                Date


_R. Hassell_                        _cc/1/11_
Owner authorized agent              Date

LD300.01 Revised. 07/15/2008

4

CP000045




**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.



CP000046

 

14. Assignability By Lessor: All Lessor's rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessee's duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder; and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessor's authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_Ronnie B Block_          _6-1-11_
Ronnie Block(Lessee)          Date

_R. Wassell_          _6/1/11_
Owner authorized agent          Date

LD303-31 Revised 7/15/06

6

CP000047

## ADDITIONAL SERVICES AGREEMENT

Apartment # S149

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for The Courtyard at Central Park (hereinafter the "Community") and Tamara Barfield (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 01/12/2012 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property: | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance (This is available as a pay with rent option), or | | 17.91 |
| Insurance Provider Name _____ Policy # _____ | | |

| Services: | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 0.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $17.91 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $17.91 |

| Fees: | | |
|---|---|---|
| Lease Initiation Fee     (if applicable) | | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 01/12/2012

Tamara Barfield(Lessee)                          1-12-12
                                                 Date

N/A
Joshua Asuncion                                  Date


Owner authorized agent                           1/12/12
                                                 Date

LD303.01 Revised 07/15/2008



TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

8

CY032776

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.


_Tamara Barfield_ (signature)     1-12-12
Tamara Barfield(Lessee)            Date

_____N/A_____
Joshua Asuncion                    Date


_E. Rodriguez_ (signature)         1/12/12
Owner authorized agent             Date

LD303.01 Revised 7/16/06



9

CY032777

## ADDITIONAL SERVICES AGREEMENT

Apart. # C128

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Courtyard at Central Park (hereinafter the "Community") and Anamaria Gallardo (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 10/01/2013 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $55.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Garage (Attached/Detached/Direct Access) | Space #: | $0.00 |

**Services**

| | | |
|---|---|---|
| Renter's Insurance  (This is available as a "Pay-with-Rent" option) ,OR | | $18.16 |
| Insurance Provider Name: Assurant  Policy # | | |
| Internet Service and/or Cable Television and/or Media Package | | $0.00 |
| RentPlus | | $5.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (0.00 for 0 animals, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $78.16 |
| | Taxes (if applicable) | $0.00 |
| | **Total Monthly Payment Due** | **$78.16** |

**Fees**

| | | |
|---|---|---|
| Lease Initiation Fee  (if applicable) | | $0.00 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | 0.00 |
| | Total Fees Due at Initiation of this Agreement | **$0.00** |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated 08/01/2016.

_____     8-1-16
Anamaria Gallardo (Lessee)                Date

_____     8/1/16
Owner's Authorized Agent                    Date

LD303.01 Revised 11/15/2013


WASATCH
PROPERTY MANAGEMENT

CY007125

**ADDITIONAL SERVICES AGREEMENT**                                     Apartment # 224C

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Creekside Villa Apartments (hereinafter the "Community") and Norweitta Wilson (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 01/26/2016 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $0.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Garage (Attached/Detached/Direct Access) | Space #: | $0.00 |

**Services**

| | | |
|---|---|---|
| Renter's Insurance          (This is available as a "Pay-with-Rent" option) | | $18.16 |
| ,OR | | |
| Insurance Provider Name: Assurant   Policy # | | |
| Internet Service and/or Cable Television and/or Media Package | | $0.00 |
| RentPlus | | $5.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (0.00 for 0 animals, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $23.16 |
| | Taxes (if applicable) | $0.00 |
| | **Total Monthly Payment Due** | **$23.16** |

**Fees**

| | | |
|---|---|---|
| Lease Initiation Fee        (if applicable) | | $0.00 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | Total Fees Due at Initiation of this Agreement | **$0.00** |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated 01/26/2016.

_____          _____
Norweitta Wilson(Lessee)                          Date   1/26/16

_____          _____
Owner's Authorized Agent                          Date   1/26/16

LD303.01 Revised 11/15/2013

*www.isyourhome.com*



**ADDITIONAL SERVICES AGREEMENT**                                                       Apartment # 434

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Aspen Park Apartments  (hereinafter the "Community") and Tanesha Yates (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items  (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein .  This Agreement is not made a part of that certain Residential Rental Agreement, dated 10/02/2015 (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $15.00  TY |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Garage (Attached/Detached/Direct Access) | Space #: | $0.00 |

**Services**

| | | |
|---|---|---|
| Renter's Insurance        (This is available as a "Pay-with-Rent" option) | | $18.16  TY |
| ,OR | | |
| Insurance Provider Name: assurant,   Policy # | | |
| Internet Service and/or Cable Television and/or Media Package | | $0.00 |
| RentPlus | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (0.00 for 0 animals, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |

| | | |
|---|---|---|
| | Total Charges for Property & Services | $33.16 |
| | Taxes (if applicable) | $0.00 |
| | **Total Monthly Payment Due** | **$33.16**  TY |

**Fees**

| | | |
|---|---|---|
| Lease Initiation Fee        (if applicable) | | $0.00 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:**  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter , unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease.  I have read the foregoing and acknowledge the contents thereof, dated 10/02/2015.

_Tanesha Yates_                              10-2-15
Tanesha Yates(Lessee)                    Date

_(signature)_                                   10/12/15
Owner / Authorized Agent                 Date

LD100-04 Revised 11/19/2012



WASATCH
PROPERTY MANAGEMENT

12

AP000051

 

# ADDITIONAL SERVICES AGREEMENT

Apartment # 004

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community") and Mary Cooper (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 02/26/2009 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $50.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: 490 | $10.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Garage (Attached/Detached/Direct Access) | Space #: | $0.00 |

| Services | | |
|---|---|---|
| Renter's insurance     (This is available as a "Pay-with-Rent" option) ;OR | | $16.16 |
| Insurance Provider Name: Rogers, Policy #: | | |
| Internet Service and/or Cable Television and/or Media Package | | $0.00 |
| RentPlus | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (0.00 for 0 animals, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $76.16 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $76.16 |

| Fees | | |
|---|---|---|
| Lease Initiation Fee     (if applicable) | | $0.00 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | Total Fees Due at Initiation of this Agreement | $0.00 |

Payment:  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated 08/01/2015.

X Mary Cooper _____     _____
Mary Cooper (Lessee)                    Date

_____     7/23/15
Owner's Authorized Agent                    Date

LD020.01 Revised 11/19/2013

www.isyourhome.com                    WASATCH

CP000273

13

## ADDITIONAL SERVICES AGREEMENT

Apartment # A-7

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Peppertree Apartment Holding, LP (hereinafter the "Community") and Alesia Young (hereinafter the "Resident(s)" under the terms of the Residential Rental Agreement.

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 06/17/2015 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $0.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Enclosed Private Garage | Space #: | $0.00 |
| Renter's Insurance     (This is available as a pay with rent option) | | $0.00 |
| , OR | | |
| Insurance Provider Name: AARP,  Policy # | | |

| Services | | |
|---|---|---|
| Internet Service and/or Media Package and/or Cable Television | | $0.00 |
| RentPlus | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (40.00 for 1 animals, limit 2 per household) | | $40.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $40.00 |
| | Taxes (if applicable) | $0.00 |
| | **Total Monthly Payment Due** | **$40.00** |

| Fees | | |
|---|---|---|
| Lease Initiation Fee      (If applicable) | | $0 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | Total Fees Due at Initiation of this Agreement | **$0.00** |

Payment: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated

_(signature)_ 6-17-15

Alesia Young                                    Date

_(signature)_ 6/17/15

Owner authorized agent                          Date

LS303.01 Revised 11/15/2013

www.usyourhome.com

WASATCH

14

# ADDITIONAL SERVICES AGREEMENT 

 Apartment # 001

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community") and Ronnie Block (hereinafter the "Resident(s) under the terms of the Lease (defined below) or the (Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services"), listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 06/01/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $40.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $10.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Garage (Attached/Detached/Direct Access) | Space #: | $0.00 |

| Services | | |
|---|---|---|
| Renter's Insurance     (This is available as a "Pay-with-Rent" option) | | $18.16 |
| ,OR | | |
| Insurance Provider Name: Not Applicable,  Policy # | | |
| Internet Service and/or Cable Television and/or Media Package | | $0.00 |
| RentPlus | | $5.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (0.00 for 0 animals, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $73.16 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | **$73.16** |

| Fees | | |
|---|---|---|
| Lease Initiation Fee    (if applicable) | | $0.00 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | Total Fees Due at Initiation of this Agreement | **$0.00** |

**Payment**: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated 06/01/2015

Ronnie L Block     5-14-15
_____        _____
Ronnie Block(Lessee)                              Date

_____        _____
Owner's Authorized Agent                        Date                    LD303.01 Revised 11/18/2013

www.isyourhome.com              

15

## ADDITIONAL SERVICES AGREEMENT

Apartment # 102

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Heritage Park-Tax Credit  (hereinafter the "Community") and Hi Soon Masterson (hereinafter the "Resident(s) under the terms of the Residential Rental Agreement.

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 05/01/2009 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement:

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $0.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Enclosed Private Garage | Space #: | $0.00 |
| Renter's Insurance        (This is available as a pay with rent option) | | $0.00 |
| ,OR | | |
| Insurance Provider Name: ,  Policy # | | |
| **Services** | | |
| Internet Service and/or Media Package and/or Cable Television | | 0 |
| RentPlus | | $5.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (0.00 for 0 animals, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $5.00 |
| | Taxes (if applicable) | $0.00 |
| | **Total Monthly Payment Due** | **$5.00** |
| **Fees** | | |
| Lease Initiation Fee        (if applicable) | | 0 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | **Total Fees Due at Initiation of this Agreement** | **$0.00** |

Payment:  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated

_Hi SHOON Masta_      1-22-15
Hi Soon Masterson      Date

_Susan Carrillo_      1-22-15
Owner authorized agent      Date

L03C3.01 Revised 11/15/2013

www.isyourhome.com

WASATCH
PROPERTY MANAGEMENT

16

HET005727

## ADDITIONAL SERVICES AGREEMENT
Apartment # 290D

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Creekside Villa Apartments  (hereinafter the "Community") and Tony Hart***  (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein.  This Agreement is made a part of that certain Residential Rental Agreement, dated 01/08/2009 (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 75.00 |
| Renter's Insurance | | 17.91 (This is available as a pay with rent option), or |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | |
|---|---|
| Internet Service | $ _____ |
| Cable Television Service | 0.00 |
| Intrusion and Security Alarm Service | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | $ Estimated _____ |
| Housekeeping Services | 0.00 |
| Pet Rent (35.00 x  1# of pets, limit 2 per household) | $35.00 |
| Coporate Service | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | $0.00 |
| | Total Charges for Property & Services | $127.91 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $127.91 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee     (if applicable) | |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:**  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed.  I have read the foregoing and acknowledge the contents thereof, dated 01/01/2012

_Tony Hart_
Tony Hart* (Lessee)

_11/21/11_
Date

_Ofeli Peso_
Owner Authorized agent

_11-21-11_
Date

LD303.01 Revised  07/15/2008

www.isyourhome.com

WASATCH
PREMIER COMMUNITIES

17

CV005625

# ADDITIONAL SERVICES AGREEMENT

Apartment # 590A

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for River Oaks Apartments (hereinafter the "Community") and Artie Hainline*** (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 07/01/2001 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance | | 15.58 (This is available as a pay with rent option), or |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 36.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 1# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $51.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $51.58 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee (if applicable) | |
| Pet Sanitizing and Cleaning Fee (if applicable) | 150.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $150.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 07/29/2011

Artie Hainline*** (Lessee)   7-26-2011
Date

Tom McLoury
Owner Authorized agent   7/26/11
Date

LC303.01 Revised 07/15/2008

www.isyourhome.com





RO000344

## ADDITIONAL SERVICES AGREEMENT

Apartment # S151

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for The Courtyard at Central Park  (hereinafter the "Community") and Teresa Moya (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 12/16/2009 (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 15.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance | | 15.58 (This is available as a pay with rent option), or |
| Insurance Provider Name _____ , Policy # _____ | | |

**Services:**

| | |
|---|---|
| Internet Service | $ _____ |
| Cable Television Service | 40.00 |
| Intrusion and Security Alarm Service | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | $ Estimated _____ |
| Housekeeping Services | 0.00 |
| Pet Rent (0.00 x  1# of pets, limit 2 per household) | $0.00 |
| Coporate Service | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | $0.00 |
| Total Charges for Property & Services | $70.58 |
| Taxes (if applicable) | $0.00 |
| Total Monthly Payment Due | $70.58 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee     (if applicable) | |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:**  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed.  I have read the foregoing and acknowledge the contents thereof, dated 04/01/2011

_Teresa Moya_     3-31-11
Teresa Moya(Lessee)     Date

_____     _____
N/A     Date
Jose Ceja Jr

_____     3/31/11
Owner Authorized agent     Date

LD303.01 Revised 07/15/2008

19

CY033041

**ADDITIONAL SERVICES AGREEMENT**                                                    Apartment # C126

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for The Courtyard at Central Park  (hereinafter the "Community") and Maisha Brown (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 03/10/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

Property:                                                                                      Monthly Charge

| | | |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance (This is available as a pay with rent option), or | | 15.58 |
| Insurance Provider Name _____ , Policy # _____ | | |

Services:

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 40.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $  Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $55.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $55.58 |

Fees:

| | |
|---|---|
| Lease Initiation Fee        (If applicable) | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

Payment: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed.  I have read the foregoing and acknowledge the contents thereof, dated  03/10/2011

_Maisha Brown_                              3/10/11
Maisha Brown(Lessee)                         Date

N/A
Darlene Hicks                                Date

_signature_                                  3/10/11
Owner/authorized agent                       Date

LD303.01 Revised  07/15/2008

www.isyourhome.com





CY006612

TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease.  The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property.  The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement.  The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion.  Lessee shall not make any alterations, additions, or improvements to the Property.  Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor.  Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges.  Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement.  If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fee(s) or for a failure to perform any other obligation contained in the Agreement.  In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property.  Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice of intent to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer.  Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied.  Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion.  Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.




CY006613

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.


Maisha Brown (Lessee)     3/10/11
_____    Date

N/A
_____    _____
Daniene Hicks             Date


_____    3/10/11
Owner authorized agent      Date

LD303.01 Revised 7/15/08

WASATCH
PREMIER COMMUNITIES



CY006614

**ADDITIONAL SERVICES AGREEMENi**                                                   Apartment # 598D

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for River Oaks Apartments (hereinafter the "Community") and Amber Pereira*** (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 05/01/2005 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property: | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance | | 0.00 (This is available as a pay with rent option), or |
| Insurance Provider Name _State Farm_  Policy # _87-WT-9513-9   0063-5235-23_ | | |

| Services: | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 36.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 1# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $35.00 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $36.00 |

| Fees: | | |
|---|---|---|
| Lease Initiation Fee   (if applicable) | | |
| Pet Sanitizing and Cleaning Fee (if applicable) | | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at initiation of this Agreement | | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 12/17/2010.

_Amber Pereira_                    _12-17-10_
Amber Pereira***(Lessee)            Date

_[signature]_                      _12-17-10_
Owner Authorized agent             Date

LD303.01 Revised 07/15/2008

23

RO000250

## ADDITIONAL SERVICES AGREEMENT

Apartment #

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Creekside Villa Apartments (hereinafter the "Community") and Beatriz Luna***, Joel Mendoza (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 06/18/2009 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance | | 15.58 (This is available as a pay with rent option), or |
| Insurance Provider Name _____ , Policy # _____ | | |

**Services:**

| | |
|---|---|
| Internet Service | $ _____ |
| Cable Television Service | 0.00 |
| Intrusion and Security Alarm Service | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | $ Estimated _____ |
| Housekeeping Services | 0.00 |
| Pet Rent (30.00 x 1# of pets, limit 2 per household) | $30.00 |
| Coporate Service | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | $0.00 |

| | |
|---|---|
| Total Charges for Property & Services | $45.58 |
| Taxes (if applicable) | $0.00 |
| Total Monthly Payment Due | $45.58 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee     (if applicable) | |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 09/01/2010

| | |
|---|---|
| _Beaty Luna_ | 9-6-10 |
| Beatriz Luna *(Lessee) | Date |
| _Will M_ | 9-6-10 |
| Joel Mendoza (Lessee) | Date |
| N/A | |
| Ana Luna | Date |
| N/A | |
| Fernando Hernandez | Date |
| _Ofelia Perez_ | |
| Owner Authorized agent | Date |

LD303.01 Revised 07/15/2008

24

CV000362

**ADDITIONAL SERVICES AGREEMENT**                                                    Apartment #

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Creekside Villa Apartments (hereinafter the "Community") and Beatriz Luna, Joel Mendoza (Lessee) (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 06/18/2009 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

Property:                                                                          Monthly Charge

| | | |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number _____ | 0.00 |
| Reserved Covered Parking | Space Number _____ | 0.00 |
| Reserved Uncovered Parking | Space Number _____ | 0.00 |
| Enclosed Private Garage | Space Number _____ | 0.00 |
| Renter's Insurance (This is available as a pay with rent option), or | | 15.58 |
| Insurance Provider Name _____ Policy # _____ | | |

Services:

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 0.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $15.58 |
| | Taxes (If applicable) | $0.00 |
| | Total Monthly Payment Due | $15.58 |

Fees:

| | | |
|---|---|---|
| Lease Initiation Fee (If applicable) | | 0.00 |
| Pet Sanitizing and Cleaning Fee (If applicable) | | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

Payment: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 06/29/2009

Resident _Beatz Luna_                                    Resident _Jeff ____

OWNER
By: _Ofelia Peña_                                         Date _6/18/09_
its authorized agent

LD303.01 Revised 07/15/2008

25

CV000333

TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage Is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

WASATCH
PREMIER COMMUNITIES

26

CV000334

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_Beat Liway_
Resident

_Jul Jn_
Resident

OWNER
By:
_Gele Pm_
Its authorized agent

_6/18/09_
Date

LD303.01 Revised 7/15/08



27

CV000335

# ADDITIONAL SERVICES AGREEMENT

Apartment #

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Stonepine Apartments (hereinafter the "Community") and Dana Jones (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 09/01/2008 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 0.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance | | 15.48 (This is available as a pay with rent option), or |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 38.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Corporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $53.46 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $53.46 |

**Fees:**

| | | |
|---|---|---|
| Lease Initiation Fee     (if applicable) | | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 09/01/2008



Resident _____ Resident _____

OWNER
By: _____ 8-29-08

Its authorized agent _____ Date

LD303.01 Revised 07/15/2008



CY032860

**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement . The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees (s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing , Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

14. Assignability By Lessor. All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

29

CY032861

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs , successors and assigns.    This Agreement shall be governed by and construed in accordance with the laws of the State of California.    This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof.    No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance.    Without limiting the foregoing, this Agreement supersedes all prior communications, oral and /or written, relating to the Property, all of which are merged into these two aforementioned agreements.    No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time.    The acceptance by Lessor of the Monthly Fee (s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount.    All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly.    The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_Dana Jones_
Resident

_Dana Jones_
Resident

OWNER
By:

_____
Its authorized agent

_8-29-08_
Date

LD303.01 Revised 7/15/08



30

CY032862

## ADDITIONAL SERVICES AGREEMENT

Apartment # hv121-02

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Hayward Village Tax Credit (hereinafter the "Community") and Alpha Lee Baker-Hunter (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 5/7/07 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

|  |  | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Housewares | | $0.00 |
| Storage Space Rental | Space Number | $0.00 |
| Reserved Covered Parking | Space Number | $0.00 |
| Reserved Uncovered Parking | Space Number | $0.00 |
| Enclosed Private Garage | Space Number | $0.00 |
| Renter's Insurance | | $0.00 (This is available as a pay with rent option), or |
| Insurance Provider Name _RCU Insurance Services_____, Policy # _3004_____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $0.00 |
| Cable Television Service | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $_Estimated_____ |
| Housekeeping Services | | $0.00 |
| Pet Rent ($15 x 0.00 # of pets, limit 2 per household) | | $0.00 |
| | Total Charges for Property & Services | $0.00 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $0.00 |

**Fees:**

| | | |
|---|---|---|
| Lease Initiation Fee    (if applicable) | | $0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | $400.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | $0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $0.00 |
| Total Fees Due at Initiation of this Agreement | | $400.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated 5/5/07

Resident _____   Resident _____

OWNER
By _____   Date   MAY 7 07
Its authorized agent

LD303.01 Revised 5/1/04

31

HVT002462

**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear excepted.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

Page 9 of 25

32

HVT002463

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of CA. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_____   _____
Resident                          Resident

OWNER
By:

_____   _May 7, 07_____
Its authorized agent;             Date

LD303.01 Revised 5/1/04



33

HVT002464

# EXHIBIT C

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

Wasatch Property Management, Inc. l Owners Agent
*A Utah Corporation - registered in California*
595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321

This agreement is made in San Diego, CA , on 6/25/15 between,  Creekside Villa Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):

## Charlene Anderson

,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.   TERM**

This Agreement creates a 6 month and 0 day tenancy, commencing 08/01/2015 and Terminating 01/31/2016. The total rent for this 6 month and 0 day tenancy is $7,824.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4630 Nogal Street #C, San Diego, CA 92102

**III.   RENT**

The rental for the premises is $1,304.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 220 47th Street, San Diego, CA, 92102 . The Rental Office can be reached by phone at (619)-263-2686.  Unless otherwise posted, payment can be made in person at the Owner's office between  9:00 AM and  6:00 PM Monday through Friday and 10:00 AM through  5:00 PM on Saturday.  In addition, rent can be paid online at www.isYourHome.com  Rent received shall first be applied to all sums owed and then to the current rent due.  Rent shall be payable by check, cashier's check, certified check, credit card, or money order in installments as follows:

A. The sum of $1304.00 is due upon execution of this Rental Agreement as rent for the period beginning 08/01/2015 , through 08/31/2015 (first month prorated) payable on 08/01/2015.  All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $1,304.00, plus additional services of $18.16 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing August 2015 .

C. A concession in the amount of $0.00  is to be given to Resident as part of this 6 month(s) lease and will be issued as $0.00  off move in. The $0.00 concession is due and payable back to Creekside Villa Apartments if the 6 month lease is not fulfilled for any reason.

**IV.   LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month.  In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee.  In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required , at Owners option, to make any future payment with cashier's check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**V.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $250.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI.   ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made.  Be advised, $25.00 is the fee for after hours lockout service.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VII.   USE OF THE PREMISES**

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

www.isyourhome.com

INITIAL

B. **Without written approval of Owner, No** _____, Cats, Birds, or Any Other Animals_ of any kind shall be kept _____ llowed on the premises, nor shall the Resident permit any invited guest to have or keep any _____ ls upon the premises for any period of time. If an animal is _____ d in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 6 (six) months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed.  The maximum weight limit allowed for animals is 35 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code §308.3.1 and §308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises.  No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common areas, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

## VIII.  RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX.  UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment.  Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| X | gas, | Account # | 3509059904 |
| X | electricity, | Account # | |
| X | water/sewer/trash | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges | |

## X.  INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI.  HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy.  Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

WASATCH

INITIAL

2

CV000413

**XII.  DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII.  LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Creekside Villa Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Creekside Villa Apartments.  If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV.  WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements Insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft

C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.  The Actions or omissions of other Residents

E.  Interference with light, view or other intangible aspects of the premises.

F.  Operations in construction of any public or quasi-public work

G.  Any latent defect in the building(s)

H.  The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.

I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov.  Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV.  CANCELLATION FEE**

Upon execution of this Lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $1,304.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI.  NOTICE TO QUIT**

A.  **MONTH-TO-MONTH TENANCY:** If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner win sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.

B.  **TERM AGREEMENT:** If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.

C.  **MOVE-OUT INSPECTION:** Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..

**XVII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII.  AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX.  SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any assignment or subletting without written consent is void.

**XX.  JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

*www.isyourhome.com*





INITIAL

3

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit:  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXV. RENTPLUS ACKNOWLEDGEMENT**

Resident acknowledges that Owner offers RentPlus, a service that reports payment history to credit bureaus to assist residents in building positive rental/credit history. The monthly cost of this service is $5.00 per person for up to two persons, or $12.99 group rate for three or more persons, and will be billed to resident in conjunction with Monthly Rent and other Additional Service charges, should Resident choose to participate in RentPlus services.

Charlene Anderson         Initial           ☐ Resident agrees to participate in RentPlus services         ☒ Resident opts out of RentPlus services 

**XXVI. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:**  You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:**  On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information.  In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else.  They may be recorded by your answering machine or voice mail system.  In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail.  You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement.  You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:**  In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time.  The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns.  These calls and/or messages may be prerecorded.  You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided.  Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent.  Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions.  This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321.  You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you.  Your consent is not a condition of obtaining your Residential Rental Agreement.

*www.isyourhome.com*



XXVII. CREDIT DISCLAIMER and RELEASE

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion.  Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

_Charlene Anderson_     7-14-15
Charlene Anderson(Lessee)           Date

_(signature)_     6 / 25/ 5
Owner's Authorized Agent           Date                     LD302.01.CA Revised 11/15/2013

_www.isyourhome.com_

WASATCH

5

CV000416

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. | Owners Agent**
*A Utah Corporation - registered in California*
595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321

This agreement is made in Fresno, CA , on 7/11/13 between, The Courtyard at Central Park hereinafter called Owner, by Wasatch Property Management, its authorized agent, and

Lease Holder(s):
**Teresa Moya\*\*\***
Authorized Occupant(s):
**Jose Ceja Jr (Dependant),  Trejo Teresa (Dependant),**
hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.    TERM**

This Agreement creates a 7 month and 0 day tenancy, commencing 08/01/2013 and Terminating 02/28/2014. The total rent for this 7 month and 0 day tenancy is $5,208.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4488 North Cornelia #S151, Fresno, CA, 93722

**III.  RENT**

The rental for the premises is $744.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4488 North Cornelia, Fresno, CA, 93722 . The Rental Office can be reached by phone at (559)-275-1009. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am - 5:00 pm on weekends, unless otherwise posted. In addition, a "night drop" is available for payment when the office is not open. Rent received shall first be applied to all sums owed and then to the current rent due. Rent shall be payable by check, cashier's, certified check or money order in installments as follows:

A.   The sum of $744.00 is due upon execution of this Rental Agreement as rent for the period beginning 08/01/2013 , through 08/31/2013  (first month prorated) payable on 08/01/2013. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B.   The sum of $744.00, plus additonal services of $33.16 (refer to Additional Services Agreement), is due on the first day of each calendar month commencing August 2013 .

C.   A concession in the amount of $0.00  is to be given to Resident as part of this 7 month(s) lease and will be issued as $0.00  off move in. The $0.00  concession is due and payable back to The Courtyard at Central Park if the 7 month lease is not fulfilled for any reason.

D.   The parties agree that the monthly rental for the premises set forth in this Agreement may be less than the standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a  reduced  market rate in accordance with a formula established by one or more government financing programs.  The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Resident's monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental  adjustment.  Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in this agreement.

**IV.   LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month.  In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**V.    SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $500.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI.   ACCEPTANCE AND SURRENDER OF PREMISES**

A.   Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made.  Be advised, $25.00 is the fee for after hours lockout service.



**Wasatch
Property
Management**

INITIAL

CY033062

B. Resident acknowledges that all furniture, furnishi      nd equipment listed on the Apartment Furniture Inventory ha      een received in good condition and that Owners delivery of such item is without warranty, express      r implied, by Owner as to their fitness. Such inventory shall b      amed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

VII.   USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than <u>3</u> occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

B. <u>Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets</u> of any kind shall be kept or allowed on the premises, nor shall the Resident permit  any invited guest to have or keep any pets or other animals upon the premises for any period of time.  If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a <u>minimum of 6 (six) months old</u>, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered.  Reptiles or exotic pets are not allowed.  The maximum weight limit allowed for pets is <u>35</u> lbs.

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, Califonia Code §308.3.1 and §308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises.  No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident.  Resident agrees to "Front In" only parking and will not back into parking spaces at any time.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

VIII.   RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that it has received information on pests and pest policies and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

IX.   UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.  Resident shall pay for the following utility services.

| | | |
|---|---|---|
| ✗ gas, | Account # | 4411 5304 2302 |
| X electricity, | Account # | |
| X water/sewer/trash | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges | |

X.   INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors.  Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays).  In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

www.isyourhome.com


Wasatch
Property
Management

T.M.
INITIAL

7

**XI.   HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XII.   DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII.   LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have The Courtyard at Central Park and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or The Courtyard at Central Park. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV.   WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV.   CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty(30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $744.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI.   NOTICE TO QUIT**

A. MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty(30) days notice in writing prior to the date upon which occupancy is to be delivered. If no thirty day notice is received by Agent AND resident vacates the property, a penalty fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 02/28/2014 and if resident elects to not renew lease or submit a written thirty(30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy. Current month to month fees are $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.
B. TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or access cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a penalty fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice.

**XVII.   ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII.   AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX.   SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XX.   JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

Wasatch
Property
Management


INITIAL



CY033064

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII.  RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

Termination on Breach and Notice to Quit;  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII.  SECURITY**

Resident acknowledges and agrees that Owner and Owners agent have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXVI. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion.  Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

Teresa Moya***(Lessee)       Date 7-11-13

Owner's Authorized Agent       Date 7/11/15

LD302 01.CA Revised 05/17/2012

 Wasatch Property Management

9

CY033065

 

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. I Owners Agent
A Utah Corporation – registered in California
565 S Riverwoods Pkwy Suite 400 Logan, Utah 84321

This agreement is made in Rancho Cordova, CA , on 7/1/16 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Mary Cooper**
,hereinafter called Resident(s). No other person(s) except those herein stated may occupy premises without written approval of Owner.

**I.   TERM**
This Agreement creates a 12 month and 0 day tenancy, commencing 08/01/2015 and Terminating 07/31/2016. The total rent for this 12 month and 0 day tenancy is $9,132.00.

**II.   PROPERTY**
Owner hereby rents to Resident for the term of this agreement the property located at: 3800 Data Drive, #4, Rancho Cordova, CA 95670

**III.   RENT**
The rental for the premises is $761.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3800 Data Drive, Rancho Cordova, CA, 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between  8:00 AM and  6:00 PM Monday through Friday,  9:00 AM through  5:00 PM on Saturday, and 11:00 AM through  4:00 PM on Sunday. In addition, rent can be paid online at www.IsYourHome.com  Rent received shall first be applied to all sums owed and then to the current rent due. Rent shall be payable by check, cashier's check, certified check, credit card, or money order in installments as follows:

  A.  The sum of $761.00 is due upon execution of this Rental Agreement as rent for the period beginning 08/01/2015 , through 08/31/2015  (first month prorated) payable on 08/01/2015.  All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

  B.  The sum of $761.00, plus additional services of $78.18 (refer to Additional Services Agreement), is due, in advance, on the first day of each calendar month commencing August 2015 .

  C.  A concession in the amount of $0.00  is to be given to Resident as part of this 12 month(s) lease and will be issued as $0.00  off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 12 month lease is not fulfilled for any reason.

**IV.   LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fixed management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month.  In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**V.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**
Resident shall pay Owner, upon execution of this agreement, a security deposit of $400.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any tenant-under on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI.   ACCEPTANCE AND SURRENDER OF PREMISES**
  A.  Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made.  Be advised, $50.00 is the fee for after hours lockout service.

  B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VII.   USE OF THE PREMISES**
  A.  The premises are rented for residential use only and shall be occupied by not more than 1 occupants:  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

*www.isyourhome.com*



 

B. **Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals** of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time. If an animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a **minimum of 6 (six) months old**, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Bavenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasileiro, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Melamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 100 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code §308.3.1 and §308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees that Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common areas, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

## VII.   RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear) is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX.   UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| | |
|---|---|
| X   gas, | Account # |
| X   electricity, | Account # |
| X   water/sewer/trash | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges |

## X.   INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI.   HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to-month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.



CP000264

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-effecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE.**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damage to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXV. RENTPLUS ACKNOWLEDGEMENT**

Resident acknowledges that Owner offers RentPlus, a service that reports payment history to credit bureaus to assist residents in building positive rental/credit history. The monthly cost of this service is $5.00 per person and will be billed to resident in conjunction with Monthly Rent and other Additional Service charges, should Resident choose to participate in RentPlus services.

Mary Cooper  Initial ☐ Resident agrees to participate in RentPlus services  ☒ Resident opts out of RentPlus services

**XXVI. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder notices about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et.seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be pre-recorded. You are consenting to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in compliance with any applicable law. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

www.isyourhome.com

 WASATCH

X ____

 

**XII.   DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII.   LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV.   WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A.   Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, its agents or employees.

B.   Loss of property due to theft

C.   Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.   The Actions or omissions of other Residents

E.   Interference with light, view or other intangible aspects of the premises.

F.   Operations in construction of any public or quasi-public work

G.   Any latent defect in the building(s)

H.   The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.

I.   Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.   Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.   Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which his/ or she resides.

**XV.   CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is recuppied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $781.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement shall be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is canceled prior execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI.   NOTICE TO QUIT**

A.   **MONTH-TO-MONTH TENANCY:** If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) day rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.

B.   **TERM AGREEMENT:** If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) day written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.

C.   **MOVE-OUT INSPECTION:** Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..

**XVII.   ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII.   AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX.   SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any assignment or subletting without written consent is void.

**XX.   JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

www.isyourhome.com





 

**XXVII. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlord's discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.

X _Mary Cooper_     Date _7/23/15_
Mary Cooper (Lessee)

_____     Date _7/23/15_
Owner's Authorized Agent

LD302.01.CA Revised  11/15/2013



14

CP000267

# RESIDENTIAL RENTAL AGREEMENT

### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321*

This agreement is made in Fresno, CA , on 8/21/12 between, The Courtyard at Central Park hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):

**Teresa Moya*****
Authorized Occupant(s):

**Jose Ceja Jr (Dependant), Trejo Teresa (Dependant),**
,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 6 month and 0 day tenancy, commencing 06/21/2012 and Terminating 12/20/2012. The total rent for this 6 month and 0 day tenancy is $4,254.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4488 North Cornelia #S151, Fresno, CA 93722

**III. RENT**

The rental for the premises is $709.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4488 North Cornelia, Fresno, CA 93722 . The Rental Office can be reached by phone at (559)-275-1009. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends, unless otherwise posted. In addition, a "night drop" is available for payment when the office is not open. Rent received shall first be applied to all sums owed and then to the current rent due. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A. The sum of $236.33 is due upon execution of this Rental Agreement as rent for the period beginning 06/21/2012 , through 06/30/2012 (first month prorated) payable on 06/21/2012. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $709.00, plus additonal services of $32.91 (refer to Additional Services Addendum), is due on the first day of each calendar month commencing July 2012

C. A concession in the amount of $0.00 is to be given to Resident as part of this 6 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to The Courtyard at Central Park if the 6 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one or more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust this Agreements monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

**IV. LATE CHARGES**

Recognizing that late payments cause Owner damage in an amount that is difficult to ascertain, Resident agrees to pay to Owner a charge of $50.00 if the rent is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 5th day of the month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $25.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**V. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $500.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the remises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $25.00 is the fee for after hours lockout service.

*www.isyourhome.com*

Wasatch Property Management

INITIAL

15

CY033016

B. Resident acknowledges that upon execution of this lease, the equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or _____ified, by Owner as to their fitness. Such inventory shall be de_____ conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

## VII. USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than **3** occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B. **Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets** of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 1 (one) year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, File Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 35 lbs.

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, Califonia Code §308.3.1 and §308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

## VIII. RESIDENTS DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear) is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that it has received information on pests and pest policies and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.
_____ gas,                                Account #
_X_ electricity,                         Account # _____
_X_ water/sewer/trash        See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges

## X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.


Wasatch Property Management

T. H
INITIAL

16

XI.   **HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to-month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

XII.   **DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

XIII.   **LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have The Courtyard at Central Park and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or The Courtyard at Central Park. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

XIV.   **WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Residents use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

XV.   **CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty(30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $709.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled agter execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

XVI.   **NOTICE TO QUIT**

A. **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty(30) days notice in writing prior to the date upon which occupancy is to be delivered. If no thirty day notice is received by Agent AND resident vacates the property, a penalty fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 12/20/2012 and if resident elects to not renew lease or submit a written thirty(30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy. Current month to month fees are $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B. **TERM AGREEMENT:** Resident agrees, at least thirty(30) days prior to the expiration of a term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agress that all keys, remotes and/or access cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a penalty fee equal to thirty days rent will be billed as liquidated damages for improperthirty day notice.

XVII.   **ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement.
Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

XVIII.   **AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

XIX.   **SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

XX.   **JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent



Wasatch
Property
Management

INITIAL

CY033018

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

<u>Termination on Breach and Notice to Quit</u>:  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a <u>non-curable default</u> under the provisions of State Civil Codes and shall forthwith <u>terminate this Lease Agreement</u>.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXVI. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion.  Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.



Teresa Moya    (Lessee)                                    Date   6-21-17



Owner's Authorized Agent                                Date   6/21/17

LD302.01.CA Revised  05/17/2012

Wasatch Property Management

18

CY033019

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. ] Owners Agent
A Utah Corporation - registered in
595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321

This agreement is made in Rancho Cordova, CA , on 4/18/12 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Ronnie Block**

Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

## I. TERM

This Agreement creates a 12 month and 0 day tenancy, commencing 06/01/2012, and Terminating 05/31/2013 . Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is $9,120.00.

## II. PROPERTY

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #1, Rancho Cordova, CA  95670

## III. RENT

The rental for the premises is $760.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA, 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends, unless otherwise posted. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A. The sum of $760.00 upon execution of this Rental Agreement as rent for the period beginning  06/01/2012 , through 06/30/2012  (first month prorated) payable on 06/01/2012.

B. The sum of $760.00 is due on the first day of each calendar month commencing June 2012.

C. A concession in the amount of $0.00  is to be given to Resident as part of this 11month(s) lease and will be issued as $0.00  off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 11 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs. The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the

## IV. PRORATIONS

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

## V. LATE CHARGES

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units.  Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check other than the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay rent immediately a charge of $50.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

## VI. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT

Resident shall pay Owner, upon execution of this agreement, a security deposit of $630.00 . Said deposits shall be held byOwner as security for the faithful performance of Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon five (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners  which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

Initials: RLB

WASATCH
PREMIER COMPANIES

19

CP000124

**VII.   ACCEPTANCE AND SURRENDER OF PREMISES**

A.   Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out list as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys

B.   Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements,

**VIII.   USE OF THE PREMISES**


*Initials*

A.   The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease.   Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.   Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.   We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.   Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.   We allow a maximum of two pets per apartment.  Cats must be neutered. Reptiles or exotic pets are not allowed.   The maximum weight limit allowed for pets is 100.00 lbs.


*Initials*

C.   Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises.

D.   Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code 308.3.1** and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.   Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.   **Harassment or Threats:**   Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.   **Nuisance and Waste:**   Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX.   RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

**X.   UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment.  Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.


*Initials*

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.
Resident shall pay for the following utility services.

| X | gas, | Account # _____ |
| X | electricity, | Account # _____ |

**XI.   INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

**XII.   HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy.  Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.




CP000125

**XIII.  DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall

**XIV.  LIABILITY INSURANCE**

*Initials*

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV.  WAIVER OF LIABILITY**

*Initials*

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy.  If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft

C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.  The Actions or omissions of other Residents

E.  Interference with light, view or other intangible aspects of the premises.

F.  Operations in construction of any public or quasi-public work

G.  Any latent defect in the building(s)

H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

**XVI.  CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty (60.00) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $760.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII.  NOTICE TO QUIT**

*Initials*

A.  **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than sixty(60.00) days notice in writing prior to the end of the monthly term. If no sixty day notice is received by Agent AND resident vacates the property, a fee equal to sixty days rent will be billed as liquidated damages for improper sixty day notice. Upon the lease agreement expiration date of 05/31/2013 and if resident elects to not renew lease or submit a written sixty(60.00) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.

Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.  **TERM AGREEMENT:** Resident agrees, at least sixty(60.00) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no sixty day notice is received by Agent AND resident vacates the property, a fee equal to sixty day's rent will be billed as liquidated damages for improper sixty day notice.

**XVIII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

*Initials*

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XIX.  AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

WASATCH
PREMIER COMMUNITIES

CP000126

**XX. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIV. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXV. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

_Ronnie L Block_     _4-18-12_

Ronnie Block(Lessee)          Date


_Rori Hassell_     _4/18/12_

Owner Authorized agent          Date

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residental occupancy even if a new lease agreement is executed with Resident.

Co-Signer Signature _____

Date _____

Print Name _____

Home Telephone number _____

Address _____

City, State Zip _____

Social Security Number _____

Employer _____

LD302.01.CA Revised 01/31/2011



# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. I Owners Agent
A Utah Corporation - registered in
595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321

This agreement is made in San Diego, CA , on 5/31/12 between,  Creekside Villa Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):

**Charlene Anderson**
Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.   TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 05/31/2012,  and Terminating 05/30/2013 .  Reference paragraph XVII of this Residential Rental Agreement.  The total rent for this 12  month and 0 day tenancy is 12,588.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4630 Nogal Street #C, San Diego, CA  92102

**III.   RENT**

The rental for the premises is $1,049.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 220 47th Street , San Diego, CA, 92102 . The Rental Office can be reached by phone at (619)-263-2685.  Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends.  In addition, a "night drop" is available for payment when the office is not open.  Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop.  All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent.  Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV below), in installments as follows:

A.  The sum of $33.84 upon execution of this Rental Agreement as rent for the period beginning  05/31/2012 , through 05/31/2012  (first month prorated) payable on 05/31/2012.

B.  The sum of $1,049.00  is due on the first day of each calendar month commencing  June 2012.

C.  A concession in the amount of 0.00  is to be given to Resident as part of this 12month(s) lease and will be issued as $0.00  off move in. The 0.00 concession is due and payable back to Creekside Villa Apartments if the  12 month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs.  The parties understand  that the monthly rent determined by formules set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas.  In such event,  Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment.  Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be  obligated to pay such adjustment as though fully set forth in Paragraph III

**IV.   PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V.   LATE CHARGES**

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units.  Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the everage damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month.  This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 25.00 , in the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $250.00 . Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of such deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

**VII.   ACCEPTANCE AND SURRENDER OF PREMISES**

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use  3  keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner within three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VIII.   USE OF THE PREMISES**

A.  The premises are rented for residential use only and shall be occupied by not more than 1 occupant(s).  Resident agrees that no person's the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a  minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Beddington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered.  Reptiles or exotic pets are not allowed.The maximum weight limit allowed for pets is 35.00 lbs.

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law.  California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any belcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall be absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to low, away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.  Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX.   RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

**X.   UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in  Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Residents intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

X   gas,          Account #

X   electricity,   Account #  6942693398

**XI.   INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

CV000474

**XII. HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $ 100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XIII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIV. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have  Creekside Villa Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Creekside Villa Apartments.  If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy.  If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B. Loss of property due to theft

C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D. The Actions or omissions of other Residents

E. Interference with light, view or other intangible aspects of the premises.

F. Operations in construction of any public or quasi-public work

G. Any latent defect in the building(s)

H. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K. Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

**XVI. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty(30.00) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 1,048.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled agter execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII. NOTICE TO QUIT**

A. MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30.00) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 06/30/2015 and if resident elects to not renew lease or submit a written thirty(30.00) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.  Current month to month fee is $ 100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B. TERM AGREEMENT: Resident agrees, at least thirty(30.00) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted.  If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty day's rent will be billed as liquidated damages for improper thirty day notice.

WASATCH

XVIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney fees will not exceed $1000.00 unless otherwise provided by law.

XIX. AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

XX. SUBLETTING

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

XXI. JOINT AND SEVERAL RESPONSIBILITY

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

XXII. WAIVER OF BREACH

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

XXIII. RULES AND REGULATIONS

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

Termination on Breach and Notice to Quit:  Lessee acknowledges and agrees that any violation of the covenants of this Agreement hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

XXIV. SECURITY

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

XXV. ENVIRONMENTAL INDEMNIFICATION

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.


Charlene Anderson  5-31-12
_____       _____
Charlene Anderson(Lessee)                Date



_____       ___5/31/12_____
Owner authorized agent                   Date

WASATCH
PREMIER COMMUNITIES

CV000476

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

Co-Signer Signature _____     Date _____

Print Name _____     Home Telephone number _____

Address _____     City, State Zip _____

Social Security Number _____     Employer _____

LD302.01.CA  Revised  01/31/2011




CV000477

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. l Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321*

This agreement is made in Fresno, CA , on 3/31/11 between, The Courtyard at Central Park hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Teresa Moya**

Authorized Occupant(s):
**Jose Ceja Jr (Dependant),**
hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.    TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 04/01/2011, and Terminating 03/31/2012 . Reference paragraph XVII of this Residential Rental Agreement.  The total rent for this 12  month and 0  day tenancy is $8,508.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4488 North Cornelia #S151, Fresno, CA  93722

**III.  RENT**

The rental for the premises is $709.00  per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4488 North Cornelia , Fresno, CA. 93722 . The Rental Office can be reached by phone at (559)-275-1009.  Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends.  In addition, a "night drop" is available for payment when the office is not open.  Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop.  All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent.  Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A.  The sum of $709.00 upon execution of this Rental Agreement as rent for the period beginning 04/01/2011 , through 04/30/2011  (first month prorated) payable on 04/01/2011.

B.  The sum of $709.00  is due on the first day of each calendar month commencing April 2011.

C.  A concession in the amount of $0.00  is to be given to Resident as part of this 11month(s) lease and will be issued as $0.00  off move in. The $0.00  concession is due and payable back to The Courtyard at Central Park if the 11  month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs. The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event,  Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment.  Such notice will set forth the

**IV.  PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V.   LATE CHARGES**

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units.  Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 5th day of month.  This late charge shall be deemed to be additional rent due under the lease.  Lessor will not accept a check after the 5th day of month.  In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $25.00.  In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI.  SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $500.00 . Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners  which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

**VII.  ACCEPTANCE AND SURRENDER OF PREMISES**

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements,

**VIII.  USE OF THE PREMISES**

A.  The premises are rented for residential use only and shall be occupied by not more than 2 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.



B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit  any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 35.00 lbs.

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code 308.3.1** and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Residents, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.  **Harassment or Threats:**  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  **Nuisance and Waste:**  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX.  RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

**X.  UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  **Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.**

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

X  gas,       Account # _____
X  electricity,   Account # _____

**XI.  INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

**XII.  HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy.  Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.



CY033035

## XIII.  DESTRUCTION OF PREMISES

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall

## XIV.  LIABILITY INSURANCE

*Initials*

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have The Courtyard at Central Park and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or The Courtyard at Central Park. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

## XV.  WAIVER OF LIABILITY

*Initials*

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft

C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.  The Actions or omissions of other Residents

E.  Interference with light, view or other intangible aspects of the premises.

F.  Operations in construction of any public or quasi-public work

G.  Any latent defect in the building(s)

H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

## XVI.  CANCELLATION FEE

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $709.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

## XVII.  NOTICE TO QUIT

*Initials*

A.  MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 03/31/2012 and if resident elects to not renew lease or submit a written thirty(30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.
Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.  TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee

## XVIII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATIVE FEES AND OTHER NON-TAXABLE FEES

*Initials*

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

## XIX.  AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

*www.isyourhome.com*





CY033036

XX.  SUBLETTING

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

XXI.  JOINT AND SEVERAL RESPONSIBILITY

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

XXII.  WAIVER OF BREACH

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

XXIV.  RULES AND REGULATIONS

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Termination on Breach and Notice to Quit:  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

XXV.  SECURITY

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

XXV.  ENVIRONMENTAL INDEMNIFICATION

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and  all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

Teresa Moya (Lessee)                                    3-31-11
                                                          Date
N/A
Jose Ceja Jr                                            Date

Owner Authorized agent                                  3/31/11
                                                        Date

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

| | |
|---|---|
| Co-Signer Signature | Date |
| Print Name | Home Telephone number |
| Address | City, State Zip |
| Social Security Number | Employer |

LD302.01.CA  Revised  01/31/2011

WASATCH
PREMIER COMMUNITIES

CY033038

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. l Owners Agent
A Utah Corporation - registered in
595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321

This agreement is made in Rancho Cordova, CA., on 1/24/12 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Mary Cooper**

Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

I.    TERM    This Agreement creates a 12 month and 0 day tenancy, commencing 02/01/2012; and Terminating 01/31/2013. Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is $8,100.00.

II.   PROPERTY    Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #4, Rancho Cordova, CA. 95670

III.  RENT:
The rental for the premises is $675.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA. 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends, unless otherwise posted. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A.  The sum of $675.00 upon execution of this Rental Agreement as rent for the period beginning: 02/01/2012 , through 02/29/2012. (first month prorated) payable on 02/01/2012.

B.  The sum of $875.00 is due on the first day of each calendar month commencing February 2012.

C.  A concession in the amount of $0.00 is to be given to Resident as part of this 11month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 11 month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one or more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the

IV.   PRORATIONS

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

V.    LATE CHARGES

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $50.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

VI.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT

Resident shall pay Owner, upon execution of this agreement, a security deposit of $400.00 . Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including, theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

34

CP000308

VII.   ACCEPTANCE AND SURRENDER OF PREMISES

A.   Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-in, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys.

B.   Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements.

VIII.   USE OF THE PREMISES.

A.   The premises are rented for residential use only and shall be occupied by not more than 1 occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease.  Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.   Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit  any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 100.00 lbs.

C.   Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.   Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.   Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.   Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.   Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

IX.   RESIDENTS DUTY TO MAINTAIN PREMISES

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

X.   UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment.  Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.
Resident shall pay for the following utility services:

X   gas,   Account #: _____
X   electricity.   Account #: _____

XI.   INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs, decorations, alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

XII.   HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to-month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month-to-month tenancy.  Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

Initials (x3)

35

www.hydeohome.com

CP000309



XIII.  DESTRUCTION OF PREMISES:

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall

XIV.  LIABILITY INSURANCE

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments.  That any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

XV.  WAIVER OF LIABILITY

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter's insurance policy.  If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft.

C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.  The Actions or omissions of other Residents

E.  Interference with light, view or other intangible aspects of the premises.

F.  Operations in construction of any public or quasi-public work

G.  Any latent defect in the building(s)

H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via.

XVI.  CANCELLATION FEE

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease.  Such notice will be effective sixty (60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $575.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

XVII.  NOTICE TO QUIT

A.  MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than sixty (60) days notice in writing prior to the end of the monthly term. If no sixty day notice is received by Agent AND resident vacates the property, a fee equal to sixty days rent will be billed as liquidated damages for improper sixty day notice.  Upon the lease agreement expiration date of 01/31/2013 and if resident elects to not renew lease or submit a written sixty(60) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.
Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.  TERM AGREEMENT: Resident agrees, at least sixty (60) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date; at which time a final walk through inspection will be conducted.  If no sixty day notice is received by Agent AND resident vacates the property, a fee

XVIII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

XIX.  AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

CP000310

**XX.  SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI.  JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII.  WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIV.  RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Termination on Breach and Notice to Quit:  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXV.  SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 85, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health-affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health-affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and   all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health-affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or person living  in, occupying, using or residing in the Premises.

| | |
|---|---|
| Mary Cooper(Lessee) | 1/24/12 |
| | Date |
| Owner/Authorized agent | 1/24/12 |
| | Date |

37

CP000311

**CO-SIGNER ACKNOWLEDGEMENT** 

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residental occupancy even if a new lease agreement is executed with Resident.

Co-Signer Signature _____     Date _____

Print Name _____     Home Telephone number _____

Address _____     City, State Zip _____

Social Security Number _____     Employer _____

LD302.01.CA  Revised 01/31/2011





CP000312

# RESIDENTIAL RENTAL AGREEMENT
THIS IS A LEGALLY BINDING AGREEMENT
READ IT CAREFULLY

Wasatch Property Management, Inc. l Owners Agent
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321*

This agreement is made in San Diego, CA , on 10/12/10 between, Creekside Villa Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Cheryl D. Lacy***

Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

### I.    TERM
This Agreement creates a 7 month and 0 day tenancy, commencing 10/01/2010, and Terminating 04/30/2011 . Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 7 month and 0 day tenancy is $7,266.00.

### II.    PROPERTY
Owner hereby rents to Resident for the term of this agreement the property located at 282 47th Street #G, San Diego, CA  92102

### III.    RENT
The rental for the premises is $1,038.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 220 47th Street , San Diego, CA, 92102 . The Rental Office can be reached by phone at (619)-263-2686. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A. The sum of $1,038.00 upon execution of this Rental Agreement as rent for the period beginning  10/01/2010 , through 10/31/2010 (first month prorated) payable on 10/01/2010.

B. The sum of $1,038.00 is due on the first day of each calendar month commencing October 2010.

C. A concession in the amount of $0.00 is to be given to Resident as part of this 6month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Creekside Villa Apartments if the 6 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs. The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the

### IV.    PRORATIONS
All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

### V.    LATE CHARGES
Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $25.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

### VI.    SECURITY, REPAIR, CLEANING AND KEY DEPOSIT
Resident shall pay Owner, upon execution of this agreement, a security deposit of $1,014.50 . Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon five (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

39

CV000535

VII.   ACCEPTANCE AND SURRENDER OF PREM

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements,

VIII.   USE OF THE PREMISES

A.  The premises are rented for residential use only and shall be occupied by not more than 1 occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 35.00 lbs.

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.  Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

IX.   RESIDENTS DUTY TO MAINTAIN PREMISES

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

X.   UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

    X   gas,            Account #_____

    X   electricity,     Account #_____

XI.   INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

XII.   HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy.  Current month to month fee is $50.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

CV000536

**XIII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall


*Initials*

**XIV. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Creekside Villa Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Creekside Villa Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A.   Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.   Loss of property due to theft

C.   Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D    The Actions or omissions of other Residents

E.   Interference with light, view or other intangible aspects of the premises.

F.   Operations in construction of any public or quasi-public work

G.   Any latent defect in the building(s)

H.   The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.    Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.   Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

**XVI. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $1,038.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is canceled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII. NOTICE TO QUIT**

A.   **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30) days notice in writing prior to the end of the monthly term. If no thirth day notice is received by Agent AND resident vacates the property, a fee equal to $ 1,038.00 will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 04/30/2011 and if resident elects to not renew lease or submit a written thirty (30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.
Current month to month fee is $50.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.   **TERM AGREEMENT:** Resident agrees, at least thirty (30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date.

**XVIII. ATTORNEY FEES, COURT COSTS, AOMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XIX. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

41

CV000537

**XX. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIV. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXV. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and  all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

_____          _____
Cheryl D. Lacy***(Lessee)                        Date 10/19/10

_____          _____
Owner/ Authorized agent                           Date 10/19/11

42

CV000538

 

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. l Owners Agent
A Utah Corporation - registered in
399 North Main, Suite 200 Logan, Utah 84321

This agreement is made in Rancho Cordova, CA , on 2/25/09 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Mary Cooper**
Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.   TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 02/26/2009, and Terminating 02/25/2010 . Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is 8,100.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #4, Rancho Cordova, CA 95670

**III.   RENT**

The rental for the premises is $675.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA, 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV, below), in installments as follows:

A.  The sum of $72.32 upon execution of this Rental Agreement as rent for the period beginning   02/26/2009, through 02/28/2009  (first month prorated) payable on 02/26/2009.

B.  The sum of $675.00  is due on the first day of each calendar month commencing   March 2009.

C.  A concession in the amount of 0.00  is to be given to Resident as part of this 12month(s) lease and will be issued as $0.00  off move in. The 0.00 concession is due and payable back to Chesapeake Commons Apartments if the 12 month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one or more government financing programs. The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be  obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

**IV.   PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V.   LATE CHARGES**

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $ 50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month.  This late charge shall be deemed to be additional rent under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 25.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident will be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $400.00 . Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of the security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

CP000219




**VII.   ACCEPTANCE AND SURRENDER OF PREMISES**

A.  Resident accepts said premises and furniture and appliances as listed on the Move-in, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-in, Move-Out Checklist. Resident hereby receives for their use  3  keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.



B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VIII.   USE OF THE PREMISES**

A.  The premises are rented for residential use only and shall be occupied by not more than 1 occupant(s).  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a  minimum of one year old, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed.

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law,  California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Residents, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.  Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX.   RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

**X.   UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in  Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment.  Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

Resident shall pay for the following utility services.

|  | gas, | Account # |
|---|---|---|
| X | electricity, | Account # |
| X | water/sewer/trash | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and |

**XI.   INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

CP000220




**XII. HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to-month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $ 100.00.

**XIII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIV. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A.   Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter's insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.   Loss of property due to theft

C.   Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.   The Actions or omissions of other Residents

E.   Interference with light, view or other intangible aspects of the premises.

F.   Operations in construction of any public or quasi-public work

G.   Any latent defect in the building(s)

H.   The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.   Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.   Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**XVI. CANCELLATION FEE**

You may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 675.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII. NOTICE TO QUIT**

A.   MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to $ 675.00 will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 02/25/2010 and if resident elects to not renew lease or submit a written thirty (30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy. Current month to month fee is $ 100.00.

B.   TERM AGREEMENT: Resident agrees, at least thirty (30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 2:00 pm on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal $ 675.00 will be billed as liquidated damages for improper thirty day notice.

45

CP000221




**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement.

**XIX. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XX. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIV. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.
Termination on Breach and Notice to Quit.  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a _non-curable default_ under the provisions of State Civil Codes and shall forthwith _terminate this Lease Agreement._ In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIV. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives any and all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and _____ all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

| | | |
|---|---|---|
| _Mary Zooper_ | 2/26/9 | _____ |
| Mary Zooper | Date | Date |
| | _____ | _____ |
| | Date | Date |
| | _____ | _____ |
| | Date | Date |
| | _____ | _____ |
| | Date | Date |

OWNER
By: _____              2/26/09
   Its authorized agent                Date

CP000222

 

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residental occupancy even if a new lease agreement is executed with Resident.

| | |
|---|---|
| Co-Signer Signature | Date |
| Print Name | Home Telephone number |
| Address | City, State Zip |
| Social Security Number | Employer |

LD302.01.CA Revised 07/15/2008

CP000226

# EXHIBIT D

 **Wasatch Property Management**

Date : 8/22/2013

# Resident Ledger

| | | | | | | |
|---|---|---|---|---|---|---|
| Code | t0019698 | Property | cv | Lease From | 8/1/2013 | |
| Name | Teresa Moya*** | Unit | S151 | Lease To | 2/28/2014 | |
| Address | 4488 North Cornelia #S151 | Status | Current | Move In | 12/16/2009 | |
| | | Rent | 768 | Move Out | | |
| City St. Zip | Fresno, CA 93722 | Phone(O)- | (559) 519-1635 | Phone(H)- | (559) 777-1899 | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 11/18/2009 | Total Deposit Amount | 500.00 | | 500.00 | 7335806 |
| 11/18/2009 | Application Fee | 30.00 | | 530.00 | 7335807 |
| 12/12/2009 | Cable Revenue | 25.81 | | 555.81 | 7395041 |
| 12/12/2009 | Renter's Insurance | 10.05 | | 565.86 | 7395042 |
| 12/16/2009 | Rent for 16 days | 365.94 | | 931.80 | 7394772 |
| 12/16/2009 | Waive Application Fee | (30.00) | | 901.80 | 7394775 |
| 12/16/2009 | Move In Concession | (394.63) | | 507.17 | 7394778 |
| 12/16/2009 | chk# 14-019930245 | | 400.00 | 107.17 | 4144479 |
| 12/16/2009 | chk# 09-918637372 | | 100.00 | 7.17 | 4144480 |
| 1/1/2010 | Cable Revenue (01/2010) | 40.00 | | 47.17 | 7473319 |
| 1/1/2010 | Monthly Rent Charges (01/2010) | 709.00 | | 756.17 | 7473320 |
| 1/1/2010 | Renter's Insurance (01/2010) | 15.58 | | 771.75 | 7473321 |
| 1/1/2010 | housing payment for Jan never posted | (243.00) | | 528.75 | 8168035 |
| 1/6/2010 | chk# dir dep hap | | 443.00 | 85.75 | 4191380 |
| 1/26/2010 | chk# 09-918637784 | | 266.00 | (180.25) | 4206211 |
| 2/1/2010 | Cable Revenue (02/2010) | 40.00 | | (140.25) | 7572848 |
| 2/1/2010 | Monthly Rent Charges (02/2010) | 216.00 | | 75.75 | 7572849 |
| 2/1/2010 | Renter's Insurance (02/2010) | 15.58 | | 91.33 | 7572850 |
| 2/1/2010 | Housing Assistance Charge (02/2010) | 493.00 | | 584.33 | 7572851 |
| 2/3/2010 | chk# dir dephap | | 443.00 | 141.33 | 4242498 |
| 2/4/2010 | chk# 5856269610 | | 317.00 | (175.67) | 4245647 |
| 2/4/2010 | chk# 57-70361179 | | 10.00 | (185.67) | 4245651 |
| 2/17/2010 | chk# 09-924693681 | | 8.00 | (193.67) | 4257291 |
| 3/1/2010 | Cable Revenue (03/2010) | 40.00 | | (153.67) | 7637455 |
| 3/1/2010 | Monthly Rent Charges (03/2010) | 216.00 | | 62.33 | 7637456 |
| 3/1/2010 | Renter's Insurance (03/2010) | 15.58 | | 77.91 | 7637457 |
| 3/1/2010 | Housing Assistance Charge (03/2010) | 493.00 | | 570.91 | 7637458 |
| 3/3/2010 | chk# 57-75974667 | | 272.00 | 298.91 | 4286546 |
| 3/3/2010 | chk# dir dep hap | | 443.00 | (144.09) | 4289983 |
| 4/1/2010 | Cable Revenue (04/2010) | 40.00 | | (104.09) | 7702920 |
| 4/1/2010 | Monthly Rent Charges (04/2010) | 216.00 | | 111.91 | 7702921 |
| 4/1/2010 | Renter's Insurance (04/2010) | 15.58 | | 127.49 | 7702922 |
| 4/1/2010 | Housing Assistance Charge (04/2010) | 493.00 | | 620.49 | 7702923 |

CY033053

| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| 4/2/2010 | chk# hap dir dep | | 443.00 | 177.49 | 4330874 |
| 4/5/2010 | Late Charges | 50.00 | | 227.49 | 7711743 |
| 4/6/2010 | chk# 57-75974918 | | 216.00 | 11.49 | 4342813 |
| 4/10/2010 | chk# 103220961294 | | 105.58 | (94.09) | 4345831 |
| 4/16/2010 | chk# dir dep hap 56579 | | 266.00 | (360.09) | 4456775 |
| 4/20/2010 | Past Due Conservice | 28.10 | | (331.99) | 7725001 |
| 5/1/2010 | Cable Revenue (05/2010) | 40.00 | | (291.99) | 7804063 |
| 5/1/2010 | Renter's Insurance (05/2010) | 15.58 | | (276.41) | 7804064 |
| 5/1/2010 | Housing Assistance Charge (05/2010) | 709.00 | | 432.59 | 7804065 |
| 5/1/2010 | chk# dir dep hap | | 709.00 | (276.41) | 4383268 |
| 5/3/2010 | chk# 14-093030495 | | 55.58 | (331.99) | 4391037 |
| 5/18/2010 | Past Due Conservice | 47.59 | | (284.40) | 7827385 |
| 6/1/2010 | Cable Revenue (06/2010) | 40.00 | | (244.40) | 7873338 |
| 6/1/2010 | Renter's Insurance (06/2010) | 15.58 | | (228.82) | 7873339 |
| 6/1/2010 | Housing Assistance Charge (06/2010) | 709.00 | | 480.18 | 7873340 |
| 6/1/2010 | chk# Direct deposit Hap | | 709.00 | (228.82) | 4431900 |
| 6/2/2010 | chk# 14-093025862 | | 55.58 | (284.40) | 4438233 |
| 7/1/2010 | Cable Revenue (07/2010) | 40.00 | | (244.40) | 7976704 |
| 7/1/2010 | Renter's Insurance (07/2010) | 15.58 | | (228.82) | 7976705 |
| 7/1/2010 | Housing Assistance Charge (07/2010) | 709.00 | | 480.18 | 7976706 |
| 7/5/2010 | Late Charges | 50.00 | | 530.18 | 7985514 |
| 7/5/2010 | Housing covered all rent in addition to additionals, so late fee is being reversed. | (50.00) | | 480.18 | 7986786 |
| 7/5/2010 | chk# Direct Hap | | 709.00 | (228.82) | 4506778 |
| 7/20/2010 | 90 day balance transfer from Conservice | 40.86 | | (187.96) | 8000810 |
| 8/1/2010 | Cable Revenue (08/2010) | 40.00 | | (147.96) | 8083189 |
| 8/1/2010 | Renter's Insurance (08/2010) | 15.58 | | (132.38) | 8083190 |
| 8/1/2010 | Housing Assistance Charge (08/2010) | 709.00 | | 576.62 | 8083191 |
| 8/3/2010 | chk# Direct hap | | 709.00 | (132.38) | 4564344 |
| 8/5/2010 | Paid conservice in office. | 100.00 | | (32.38) | 8093004 |
| 9/1/2010 | Cable Revenue (09/2010) | 40.00 | | 7.62 | 8155182 |
| 9/1/2010 | Renter's Insurance (09/2010) | 15.58 | | 23.20 | 8155183 |
| 9/1/2010 | Housing Assistance Charge (09/2010) | 709.00 | | 732.20 | 8155184 |
| 9/1/2010 | chk# Direct HAP EC | | 709.00 | 23.20 | 4608689 |
| 9/3/2010 | chk# 103271987940 EC | | 55.58 | (32.38) | 4618087 |
| 9/4/2010 | Late Charges | 50.00 | | 17.62 | 8162221 |
| 9/4/2010 | Rev late fee charged in error. EC | (50.00) | | (32.38) | 8175880 |
| 9/21/2010 | Parking Stall #7 prorated. SC | 3.00 | | (29.38) | 8179296 |
| 9/21/2010 | Prorated parking charge for stall #7. EC | 3.00 | | (26.38) | 8179373 |
| 9/21/2010 | :Prog Gen Reverse for chg# 8179373 Rev double parking charge. EC | (3.00) | | (29.38) | 8179378 |
| 9/25/2010 | chk# 103271989007 EC | | 3.00 | (32.38) | 4640787 |
| 10/1/2010 | Cable Revenue (10/2010) | 40.00 | | 7.62 | 8295593 |
| 10/1/2010 | Renter's Insurance (10/2010) | 15.58 | | 23.20 | 8295594 |
| 10/1/2010 | Covered Parking Charges (10/2010) | 15.00 | | 38.20 | 8295595 |
| 10/1/2010 | Housing Assistance Charge (10/2010) | 709.00 | | 747.20 | 8295596 |
| 10/2/2010 | chk# 103271989579 EC | | 70.58 | 676.62 | 4676805 |
| 10/2/2010 | chk# Direct HAP EC | | 709.00 | (32.38) | 4676949 |

| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| 10/20/2010 | 90 day balance transfer from Conservice | 15.64 | | (16.74) | 8321692 |
| 10/25/2010 | Onsite Conservice Payment EC | 60.00 | | 43.26 | 8325922 |
| 10/25/2010 | Onsite Conservice Payment EC | 32.38 | | 75.64 | 8325990 |
| 10/25/2010 | chk# 82-01274497 Ec | | 60.00 | 15.64 | 4704560 |
| 11/1/2010 | Covered Parking Charges (11/2010) | 15.00 | | 30.64 | 8409481 |
| 11/1/2010 | Cable Revenue (11/2010) | 40.00 | | 70.64 | 8409482 |
| 11/1/2010 | Renter's Insurance (11/2010) | 15.58 | | 86.22 | 8409483 |
| 11/1/2010 | Housing Assistance Charge (11/2010) | 709.00 | | 795.22 | 8409484 |
| 11/1/2010 | chk# Direct HAP EC | | 709.00 | 86.22 | 4733513 |
| 11/3/2010 | chk# 14-227706820 EC | | 70.58 | 15.64 | 4746680 |
| 11/15/2010 | chk# 14-228849249 EC | | 16.00 | (0.36) | 4758578 |
| 12/1/2010 | Cable Revenue (12/2010) | 40.00 | | 39.64 | 8474779 |
| 12/1/2010 | Renter's Insurance (12/2010) | 15.58 | | 55.22 | 8474780 |
| 12/1/2010 | Covered Parking Charges (12/2010) | 15.00 | | 70.22 | 8474781 |
| 12/1/2010 | Housing Assistance Charge (12/2010) | 709.00 | | 779.22 | 8474782 |
| 12/1/2010 | chk# Direct HAP EC | | 709.00 | 70.22 | 4792563 |
| 12/3/2010 | chk# 14-228848417 Ec | | 70.00 | 0.22 | 4794548 |
| 1/1/2011 | Cable Revenue (01/2011) | 40.00 | | 40.22 | 8539952 |
| 1/1/2011 | Renter's Insurance (01/2011) | 15.58 | | 55.80 | 8539953 |
| 1/1/2011 | Covered Parking Charges (01/2011) | 15.00 | | 70.80 | 8539954 |
| 1/1/2011 | Housing Assistance Charge (01/2011) | 709.00 | | 779.80 | 8539955 |
| 1/3/2011 | chk# Direct HAP EC | | 709.00 | 70.80 | 4837495 |
| 1/3/2011 | chk# 102694669540 EC | | 60.00 | 10.80 | 4839173 |
| 1/3/2011 | chk# 103655282874 EC | | 10.58 | 0.22 | 4839178 |
| 1/20/2011 | 90 day balance transfer from Conservice | 28.02 | | 28.24 | 8562611 |
| 1/29/2011 | On-site conservice payment AR | 28.00 | | 56.24 | 8570150 |
| 1/29/2011 | chk# R102694670771 AR Conservice | | 28.00 | 28.24 | 4863306 |
| 2/1/2011 | Covered Parking Charges (02/2011) | 15.00 | | 43.24 | 8680475 |
| 2/1/2011 | Cable Revenue (02/2011) | 40.00 | | 83.24 | 8680476 |
| 2/1/2011 | Renter's Insurance (02/2011) | 15.58 | | 98.82 | 8680477 |
| 2/1/2011 | Housing Assistance Charge (02/2011) | 709.00 | | 807.82 | 8680478 |
| 2/1/2011 | chk# Direct HAP EC | | 709.00 | 98.82 | 4904188 |
| 2/3/2011 | chk# 82-01762432 AR | | 70.00 | 28.82 | 4904677 |
| 2/21/2011 | 90 day balance transfer from Conservice | 27.32 | | 56.14 | 8701782 |
| 3/1/2011 | Covered Parking Charges (03/2011) | 15.00 | | 71.14 | 8720543 |
| 3/1/2011 | Cable Revenue (03/2011) | 40.00 | | 111.14 | 8720544 |
| 3/1/2011 | Renter's Insurance (03/2011) | 15.58 | | 126.72 | 8720545 |
| 3/1/2011 | Housing Assistance Charge (03/2011) | 709.00 | | 835.72 | 8720546 |
| 3/3/2011 | On-site conservice payment AR | 15.00 | | 850.72 | 8751032 |
| 3/3/2011 | chk# R102772300312 AR | | 70.58 | 780.14 | 4954570 |
| 3/3/2011 | chk# R102772300323 AR | | 15.00 | 765.14 | 4954584 |
| 3/3/2011 | chk# Direct HAP EC | | 709.00 | 56.14 | 4955174 |
| 3/21/2011 | 90 day balance transfer from Conservice | 26.32 | | 82.46 | 8765642 |
| 4/1/2011 | Covered Parking Charges (04/2011) | 15.00 | | 97.46 | 8786818 |
| 4/1/2011 | Cable Revenue (04/2011) | 40.00 | | 137.46 | 8786819 |
| 4/1/2011 | Renter's Insurance (04/2011) | 15.58 | | 153.04 | 8786820 |
| 4/1/2011 | Housing Assistance Charge (04/2011) | 709.00 | | 862.04 | 8786821 |
| 4/1/2011 | HAP adj on ck#111854. EC | (569.00) | | 293.04 | 8816728 |

| | | | | | |
|---|---|---|---|---|---|
| | HAP adj on ck# 111854. EC | (42.00) | | 251.04 | 8816730 |
| 4/1/2011 | chk# Direct HAP EC | | 98.00 | 153.04 | 4994993 |
| 4/3/2011 | On-site conservice payment AR | 60.00 | | 213.04 | 8818205 |
| 4/3/2011 | chk# 14-254536318 AR | | 70.58 | 142.46 | 5004428 |
| 4/3/2011 | chk# 14-254536317 AR Conservice | | 60.00 | 82.46 | 5004434 |
| 4/3/2011 | chk# R103863800535 AR | | 23.00 | 59.46 | 5004663 |
| 4/19/2011 | chk# R103863801459 AR | | 60.00 | (0.54) | 5020130 |
| 5/1/2011 | Covered Parking Charges (05/2011) | 15.00 | | 14.46 | 8856773 |
| 5/1/2011 | Cable Revenue (05/2011) | 40.00 | | 54.46 | 8856774 |
| 5/1/2011 | Renter's Insurance (05/2011) | 15.58 | | 70.04 | 8856775 |
| 5/1/2011 | Housing Assistance Charge (05/2011) | 709.00 | | 779.04 | 8856776 |
| 5/2/2011 | Onsite Conservice Payment EC | 87.75 | | 866.79 | 8886738 |
| 5/2/2011 | chk# 103863801965 EC | | 87.75 | 779.04 | 5050155 |
| 5/3/2011 | chk# Direct HAP EC | | 709.00 | 70.04 | 5054763 |
| 5/3/2011 | chk# 82-05324677 AR | | 30.00 | 40.04 | 5058291 |
| 5/17/2011 | chk# 5881329864 | | 40.04 | 0.00 | 5071593 |
| 6/1/2011 | Covered Parking Charges (06/2011) | 15.00 | | 15.00 | 8929732 |
| 6/1/2011 | Cable Revenue (06/2011) | 40.00 | | 55.00 | 8929733 |
| 6/1/2011 | Renter's Insurance (06/2011) | 15.58 | | 70.58 | 8929734 |
| 6/1/2011 | Housing Assistance Charge (06/2011) | 709.00 | | 779.58 | 8929735 |
| 6/1/2011 | chk# dir hap dep | | 709.00 | 70.58 | 5098260 |
| 6/3/2011 | On-site conservice payment AR | 35.00 | | 105.58 | 8961705 |
| 6/3/2011 | chk# R103863803703 AR | | 70.60 | 34.98 | 5107286 |
| 6/3/2011 | chk# R103863803714 AR Conservice | | 35.00 | (0.02) | 5107290 |
| 7/1/2011 | Covered Parking Charges (07/2011) | 15.00 | | 14.98 | 9003447 |
| 7/1/2011 | Cable Revenue (07/2011) | 40.00 | | 54.98 | 9003448 |
| 7/1/2011 | Renter's Insurance (07/2011) | 15.58 | | 70.56 | 9003449 |
| 7/1/2011 | Housing Assistance Charge (07/2011) | 709.00 | | 779.56 | 9003450 |
| 7/2/2011 | chk# dir hap dep | | 709.00 | 70.56 | 5155984 |
| 7/3/2011 | Onsite Utility Collection | 76.83 | | 147.39 | 9034906 |
| 7/3/2011 | chk# 8206033006 | | 70.58 | 76.81 | 5161682 |
| 7/3/2011 | chk# 8206033007 | | 77.00 | (0.19) | 5161846 |
| 8/1/2011 | Covered Parking Charges (08/2011) | 15.00 | | 14.81 | 9079657 |
| 8/1/2011 | Cable Revenue (08/2011) | 40.00 | | 54.81 | 9079658 |
| 8/1/2011 | Renter's Insurance (08/2011) | 15.58 | | 70.39 | 9079659 |
| 8/1/2011 | Housing Assistance Charge (08/2011) | 709.00 | | 779.39 | 9079660 |
| 8/3/2011 | on-site conservice payment AR | 35.00 | | 814.39 | 9112495 |
| 8/3/2011 | chk# 58866389692 AR | | 70.58 | 743.81 | 5216914 |
| 8/3/2011 | chk# 58866389703 AR Conservice | | 35.00 | 708.81 | 5216921 |
| 8/3/2011 | chk# dir hap dep | | 709.00 | (0.19) | 5218448 |
| 9/1/2011 | Covered Parking Charges (09/2011) | 15.00 | | 14.81 | 9158574 |
| 9/1/2011 | Cable Revenue (09/2011) | 40.00 | | 54.81 | 9158575 |
| 9/1/2011 | Renter's Insurance (09/2011) | 15.58 | | 70.39 | 9158576 |
| 9/1/2011 | Housing Assistance Charge (09/2011) | 709.00 | | 779.39 | 9158577 |
| 9/1/2011 | chk# Direct HAP EC | | 709.00 | 70.39 | 5261238 |
| 9/3/2011 | Onsite Utility Collection | 30.47 | | 100.86 | 9190899 |
| 9/3/2011 | chk# 5886639983 | | 74.58 | 26.28 | 5273639 |
| 9/3/2011 | chk# 5886639985 | | 35.00 | (8.72) | 5273656 |

Ledger

| Date | Description | | | | Ref |
|---|---|---|---|---|---|
| | Covered Parking Charges (10/2011) | 15.00 | | 6.28 | 9233995 |
| 10/1/2011 | Cable Revenue (10/2011) | 40.00 | | 46.28 | 9233996 |
| 10/1/2011 | Monthly Rent Charges (10/2011) | 4.00 | | 50.28 | 9233997 |
| 10/1/2011 | Renter's Insurance (10/2011) | 17.91 | | 68.19 | 9233998 |
| 10/1/2011 | Housing Assistance Charge (10/2011) | 705.00 | | 773.19 | 9233999 |
| 10/1/2011 | chk# dir hap dep | | 705.00 | 68.19 | 5314892 |
| 10/3/2011 | chk# 14-290951026 EC | | 74.58 | (6.39) | 5326536 |
| 10/3/2011 | chk# 14-290951027 Conservice EC | | 35.00 | (41.39) | 5326825 |
| 10/4/2011 | Onsite utility payment | 35.00 | | (6.39) | 9284344 |
| 11/1/2011 | Covered Parking Charges (11/2011) | 15.00 | | 8.61 | 9310456 |
| 11/1/2011 | Cable Revenue (11/2011) | 40.00 | | 48.61 | 9310457 |
| 11/1/2011 | Monthly Rent Charges (11/2011) | 4.00 | | 52.61 | 9310458 |
| 11/1/2011 | Renter's Insurance (11/2011) | 17.91 | | 70.52 | 9310459 |
| 11/1/2011 | Housing Assistance Charge (11/2011) | 705.00 | | 775.52 | 9310460 |
| 11/3/2011 | Onsite Utility Collection | 33.64 | | 809.16 | 9342934 |
| 11/3/2011 | chk# dir hap dep | | 705.00 | 104.16 | 5379896 |
| 11/3/2011 | chk# 14361983595 ER | | 35.00 | 69.16 | 5383482 |
| 11/3/2011 | chk# 14361983596 ER | | 74.58 | (5.42) | 5383492 |
| 12/1/2011 | Covered Parking Charges (12/2011) | 15.00 | | 9.58 | 9382458 |
| 12/1/2011 | Cable Revenue (12/2011) | 40.00 | | 49.58 | 9382459 |
| 12/1/2011 | Monthly Rent Charges (12/2011) | 4.00 | | 53.58 | 9382460 |
| 12/1/2011 | Renter's Insurance (12/2011) | 17.91 | | 71.49 | 9382461 |
| 12/1/2011 | Housing Assistance Charge (12/2011) | 705.00 | | 776.49 | 9382462 |
| 12/1/2011 | chk# dir hap dep | | 705.00 | 71.49 | 5421921 |
| 12/3/2011 | chk# 10430552826 ER | | 74.58 | (3.09) | 5436771 |
| 12/3/2011 | chk# 10430552825 ER | | 35.00 | (38.09) | 5436773 |
| 12/15/2011 | Onsite Utility Collection | 38.09 | | 0.00 | 9428635 |
| 1/1/2012 | Covered Parking Charges (01/2012) | 15.00 | | 15.00 | 9453599 |
| 1/1/2012 | Cable Revenue (01/2012) | 40.00 | | 55.00 | 9453600 |
| 1/1/2012 | Monthly Rent Charges (01/2012) | 4.00 | | 59.00 | 9453601 |
| 1/1/2012 | Renter's Insurance (01/2012) | 17.91 | | 76.91 | 9453602 |
| 1/1/2012 | Housing Assistance Charge (01/2012) | 705.00 | | 781.91 | 9453603 |
| 1/2/2012 | chk# dir hap dep | | 705.00 | 76.91 | 5474402 |
| 1/3/2012 | chk# 10430552978 | | 74.58 | 2.33 | 5483738 |
| 1/3/2012 | chk# 10430552979 | | 35.00 | (32.67) | 5483741 |
| 1/6/2012 | Onsite Utility Collection | 32.67 | | 0.00 | 9492354 |
| 2/1/2012 | Covered Parking Charges (02/2012) | 15.00 | | 15.00 | 9528353 |
| 2/1/2012 | Cable Revenue (02/2012) | 40.00 | | 55.00 | 9528354 |
| 2/1/2012 | Monthly Rent Charges (02/2012) | 4.00 | | 59.00 | 9528355 |
| 2/1/2012 | Renter's Insurance (02/2012) | 17.91 | | 76.91 | 9528356 |
| 2/1/2012 | Housing Assistance Charge (02/2012) | 705.00 | | 781.91 | 9528357 |
| 2/1/2012 | chk# dir hap dep | | 705.00 | 76.91 | 5524238 |
| 2/3/2012 | Onsite Utility Collection | 32.04 | | 108.95 | 9560314 |
| 2/3/2012 | chk# 8209221176 | | 74.58 | 34.37 | 5538218 |
| 2/3/2012 | chk# 8209221177 | | 35.00 | (0.63) | 5538226 |
| 3/1/2012 | Covered Parking Charges (03/2012) | 15.00 | | 14.37 | 9599248 |
| 3/1/2012 | Cable Revenue (03/2012) | 40.00 | | 54.37 | 9599249 |
| 3/1/2012 | Monthly Rent Charges (03/2012) | 4.00 | | 58.37 | 9599250 |

CY033057

Ledger

| Date | Description | Charge | Credit | Balance | Ref |
|---|---|---|---|---|---|
| | Renter's Insurance (03/2012) | 17.91 | | 76.28 | 9599251 |
| 3/1/2012 | Housing Assistance Charge (03/2012) | 705.00 | | 781.28 | 9599252 |
| 3/1/2012 | chk# dir hap dep | | 705.00 | 76.28 | 5576378 |
| 3/3/2012 | chk# 10466802550 | | 74.58 | 1.70 | 5591361 |
| 3/3/2012 | chk# 10466802551 | | 35.00 | (33.30) | 5591366 |
| 3/4/2012 | Onsite Utility Collection | 25.99 | | (7.31) | 9632433 |
| 4/1/2012 | Covered Parking Charges (04/2012) | 15.00 | | 7.69 | 9672145 |
| 4/1/2012 | Cable Revenue (04/2012) | 40.00 | | 47.69 | 9672146 |
| 4/1/2012 | Monthly Rent Charges (04/2012) | 4.00 | | 51.69 | 9672147 |
| 4/1/2012 | Renter's Insurance (04/2012) | 17.91 | | 69.60 | 9672148 |
| 4/1/2012 | Housing Assistance Charge (04/2012) | 705.00 | | 774.60 | 9672149 |
| 4/1/2012 | chk# dir hap dep AA | | 705.00 | 69.60 | 5630796 |
| 4/5/2012 | chk# 19846333260 AA | | 74.58 | (4.98) | 5649339 |
| 5/1/2012 | Covered Parking Charges (05/2012) | 15.00 | | 10.02 | 9745396 |
| 5/1/2012 | Cable Revenue (05/2012) | 40.00 | | 50.02 | 9745397 |
| 5/1/2012 | Monthly Rent Charges (05/2012) | 4.00 | | 54.02 | 9745398 |
| 5/1/2012 | Renter's Insurance (05/2012) | 17.91 | | 71.93 | 9745399 |
| 5/1/2012 | Housing Assistance Charge (05/2012) | 705.00 | | 776.93 | 9745400 |
| 5/1/2012 | chk# dir hap dep ER | | 705.00 | 71.93 | 5684446 |
| 5/4/2012 | Onsite Utility Collection | 39.65 | | 111.58 | 9781772 |
| 5/4/2012 | Credit $4.00 wrong amount | (4.00) | | 107.58 | 9862173 |
| 5/4/2012 | chk# 3500245297 ER | | 111.58 | (4.00) | 5701212 |
| 6/1/2012 | Covered Parking Charges (06/2012) | 15.00 | | 11.00 | 9821782 |
| 6/1/2012 | Cable Revenue (06/2012) | 40.00 | | 51.00 | 9821783 |
| 6/1/2012 | Monthly Rent Charges (06/2012) | 4.00 | | 55.00 | 9821784 |
| 6/1/2012 | Renter's Insurance (06/2012) | 17.91 | | 72.91 | 9821785 |
| 6/1/2012 | Housing Assistance Charge (06/2012) | 705.00 | | 777.91 | 9821786 |
| 6/1/2012 | chk# dir hap dep | | 705.00 | 72.91 | 5738258 |
| 6/2/2012 | mailbox lock changed per resident ER | 15.00 | | 87.91 | 9852928 |
| 6/3/2012 | Onsite Utility Collection | 48.09 | | 136.00 | 9853172 |
| 6/3/2012 | chk# 3500262136 ER | | 140.00 | (4.00) | 5747234 |
| 6/21/2012 | Onsite Utility Collection | 40.25 | | 36.25 | 9877530 |
| 6/21/2012 | chk# 104666669257 ER | | 40.25 | (4.00) | 5770322 |
| 7/1/2012 | Covered Parking Charges (07/2012) | 15.00 | | 11.00 | 9899606 |
| 7/1/2012 | Monthly Rent Charges (07/2012) | 4.00 | | 15.00 | 9899607 |
| 7/1/2012 | Renter's Insurance (07/2012) | 17.91 | | 32.91 | 9899608 |
| 7/1/2012 | Housing Assistance Charge (07/2012) | 705.00 | | 737.91 | 9899609 |
| 7/1/2012 | chk# dir hap dep ER | | 705.00 | 32.91 | 5795385 |
| 7/3/2012 | chk# 3500727378 ER | | 37.00 | (4.09) | 5810747 |
| 7/3/2012 | chk# 3500727377 ER | | 35.00 | (39.09) | 5810748 |
| 7/4/2012 | Onsite Utility Collection | 34.33 | | (4.76) | 9934242 |
| 8/1/2012 | Covered Parking Charges (08/2012) | 15.00 | | 10.24 | 9977548 |
| 8/1/2012 | Monthly Rent Charges (08/2012) | 59.00 | | 69.24 | 9977549 |
| 8/1/2012 | Renter's Insurance (08/2012) | 17.91 | | 87.15 | 9977550 |
| 8/1/2012 | Housing Assistance Charge (08/2012) | 650.00 | | 737.15 | 9977551 |
| 8/1/2012 | chk# dir hap dep ER | | 650.00 | 87.15 | 5852193 |
| 8/4/2012 | Onsite Utility Collection | 34.33 | | 121.48 | 10012162 |
| 8/4/2012 | chk# PSID17401211 Terminal PSID 17401211 - CHECK21 | | 100.00 | 21.48 | 5865739 |

CY033058

Ledger

| Date | Description | | | | |
|------|-------------|---|---|---|---|
| | chk# PSID17401209-90 Terminal PSID 17401209 - CHECK21 | | 27.00 | (5.52) | 5865744 |
| 9/1/2012 | Covered Parking Charges (09/2012) | 15.00 | | 9.48 | 10056124 |
| 9/1/2012 | Monthly Rent Charges (09/2012) | 59.00 | | 68.48 | 10056125 |
| 9/1/2012 | Renter's Insurance (09/2012) | 17.91 | | 86.39 | 10056126 |
| 9/1/2012 | Housing Assistance Charge (09/2012) | 650.00 | | 736.39 | 10056127 |
| 9/1/2012 | chk# 190089 dir hap dep AA | | 650.00 | 86.39 | 5910496 |
| 9/4/2012 | chk# PSID18262917-90 Terminal PSID 18262917 - CHECK21 | | 35.00 | 51.39 | 5922796 |
| 9/4/2012 | chk# PSID18262910-90 Terminal PSID 18262910 - CHECK21 | | 86.39 | (35.00) | 5922797 |
| 9/5/2012 | Onsite Utility Collection | 35.00 | | 0.00 | 10093405 |
| 10/1/2012 | Covered Parking Charges (10/2012) | 15.00 | | 15.00 | 10132715 |
| 10/1/2012 | Monthly Rent Charges (10/2012) | 59.00 | | 74.00 | 10132716 |
| 10/1/2012 | Renter's Insurance (10/2012) | 17.91 | | 91.91 | 10132717 |
| 10/1/2012 | Housing Assistance Charge (10/2012) | 650.00 | | 741.91 | 10132718 |
| 10/1/2012 | chk# dir hap dep ER | | 650.00 | 91.91 | 5962860 |
| 10/3/2012 | Onsite Utility Payment AA | 35.00 | | 126.91 | 10169556 |
| 10/3/2012 | chk# PSID19446084-73316 Terminal PSID 19446084 - CHECK21 | | 91.91 | 35.00 | 5977137 |
| 10/3/2012 | chk# PSID19446074-73317 Terminal PSID 19446074 - CHECK21 | | 35.00 | 0.00 | 5977139 |
| 11/1/2012 | Covered Parking Charges (11/2012) | 15.00 | | 15.00 | 10207950 |
| 11/1/2012 | Monthly Rent Charges (11/2012) | 59.00 | | 74.00 | 10207951 |
| 11/1/2012 | Renter's Insurance (11/2012) | 17.91 | | 91.91 | 10207952 |
| 11/1/2012 | Housing Assistance Charge (11/2012) | 650.00 | | 741.91 | 10207953 |
| 11/1/2012 | chk# dir hap dep ER | | 650.00 | 91.91 | 6017452 |
| 11/3/2012 | chk# PSID20316399-81646 Terminal PSID 20316399 - CHECK21 | | 91.91 | 0.00 | 6031411 |
| 12/1/2012 | Covered Parking Charges (12/2012) | 15.00 | | 15.00 | 10279904 |
| 12/1/2012 | Monthly Rent Charges (12/2012) | 59.00 | | 74.00 | 10279905 |
| 12/1/2012 | Renter's Insurance (12/2012) | 17.91 | | 91.91 | 10279906 |
| 12/1/2012 | Housing Assistance Charge (12/2012) | 650.00 | | 741.91 | 10279907 |
| 12/1/2012 | chk# 203811 dir hap dep AA | | 650.00 | 91.91 | 6069014 |
| 12/4/2012 | Onsite Utility Payment AA | 35.00 | | 126.91 | 10313137 |
| 12/4/2012 | chk# PSID21250664-73619 Terminal PSID 21250664 - CHECK21 | | 35.00 | 91.91 | 6083126 |
| 12/4/2012 | chk# PSID21250665-73618 Terminal PSID 21250665 - CHECK21 | | 91.91 | 0.00 | 6083127 |
| 1/1/2013 | Covered Parking Charges (01/2013) | 15.00 | | 15.00 | 10350962 |
| 1/1/2013 | Monthly Rent Charges (01/2013) | 59.00 | | 74.00 | 10350963 |
| 1/1/2013 | Renter's Insurance (01/2013) | 17.91 | | 91.91 | 10350964 |
| 1/1/2013 | Housing Assistance Charge (01/2013) | 650.00 | | 741.91 | 10350965 |
| 1/2/2013 | Onsite Utility Payment AA | 58.97 | | 800.88 | 10382108 |
| 1/2/2013 | chk# 205657 dir hap dep AA | | 650.00 | 150.88 | 6122386 |
| 1/2/2013 | chk# PSID21962768-1138 Terminal PSID 21962768 - CHECK21 | | 91.91 | 58.97 | 6124186 |
| 1/2/2013 | chk# PSID21962775-1137 Terminal PSID 21962775 - CHECK21 | | 58.97 | 0.00 | 6124187 |
| 2/1/2013 | Covered Parking Charges (02/2013) | 15.00 | | 15.00 | 10423745 |
| 2/1/2013 | Monthly Rent Charges (02/2013) | 59.00 | | 74.00 | 10423746 |
| 2/1/2013 | Renter's Insurance (02/2013) | 18.16 | | 92.16 | 10423747 |
| 2/1/2013 | Housing Assistance Charge (02/2013) | 650.00 | | 742.16 | 10423748 |
| 2/1/2013 | chk# 208182 dir hap dep AA | | 650.00 | 92.16 | 6171740 |
| 2/4/2013 | Onsite Utility Payment AA | 42.43 | | 134.59 | 10461448 |
| 2/5/2013 | chk# PSID23171826-9942 Terminal PSID 23171826 - CHECK21 | | 42.68 | 91.91 | 6189735 |
| 2/5/2013 | chk# PSID23171821-9940 Terminal PSID 23171821 - CHECK21 | | 91.91 | 0.00 | 6189736 |
| 3/1/2013 | Covered Parking Charges (03/2013) | 15.00 | | 15.00 | 10497621 |

CY033059

| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| | Monthly Rent Charges (03/2013) | 59.00 | | 74.00 | 10497622 |
| 3/1/2013 | Renter's Insurance (03/2013) | 18.16 | | 92.16 | 10497623 |
| 3/1/2013 | Housing Assistance Charge (03/2013) | 650.00 | | 742.16 | 10497624 |
| 3/1/2013 | chk# 210837 dir hap dep AA | | 650.00 | 92.16 | 6224904 |
| 3/3/2013 | chk# PSID23888579-7811 Terminal PSID 23888579 - CHECK21 | | 168.07 | (75.91) | 6234235 |
| 3/4/2013 | Onsite Utility Payment AA | 75.91 | | 0.00 | 10533613 |
| 4/1/2013 | Covered Parking Charges (04/2013) | 15.00 | | 15.00 | 10573702 |
| 4/1/2013 | Monthly Rent Charges (04/2013) | 59.00 | | 74.00 | 10573703 |
| 4/1/2013 | Renter's Insurance (04/2013) | 18.16 | | 92.16 | 10573704 |
| 4/1/2013 | Housing Assistance Charge (04/2013) | 650.00 | | 742.16 | 10573705 |
| 4/2/2013 | chk# 213377 dir hap dep AA | | 650.00 | 92.16 | 6283592 |
| 4/3/2013 | Onsite Utility Payment AA | 34.34 | | 126.50 | 10608151 |
| 4/3/2013 | chk# PSID24996273-337 Terminal PSID 24996273 - CHECK21 | | 91.91 | 34.59 | 6294064 |
| 4/3/2013 | chk# PSID24996285-338 Terminal PSID 24996285 - CHECK21 | | 35.00 | (0.41) | 6294067 |
| 5/1/2013 | Covered Parking Charges (05/2013) | 15.00 | | 14.59 | 10803625 |
| 5/1/2013 | Monthly Rent Charges (05/2013) | 59.00 | | 73.59 | 10803644 |
| 5/1/2013 | Housing Assistance Charge (05/2013) | 650.00 | | 723.59 | 10803737 |
| 5/1/2013 | Renter's Insurance (05/2013) | 18.16 | | 741.75 | 10803777 |
| 5/2/2013 | chk# 216013 dir hap dep AA | | 630.00 | 111.75 | 6359672 |
| 5/4/2013 | Onsite Utility Payment AA | 34.34 | | 146.09 | 10865716 |
| 5/4/2013 | chk# PSID26030631-3091 Terminal PSID 26030631 - CHECK21 | | 79.00 | 67.09 | 6369021 |
| 5/4/2013 | chk# PSID26030629-3092 Terminal PSID 26030629 - CHECK21 | | 18.00 | 49.09 | 6369022 |
| 5/4/2013 | chk# PSID26030619-3093 Terminal PSID 26030619 - CHECK21 | | 15.00 | 34.09 | 6369023 |
| 5/4/2013 | chk# PSID26030632-3094 Terminal PSID 26030632 - CHECK21 | | 35.00 | (0.91) | 6369024 |
| 6/1/2013 | Covered Parking Charges (06/2013) | 15.00 | | 14.09 | 10906510 |
| 6/1/2013 | Monthly Rent Charges (06/2013) | 59.00 | | 73.09 | 10906511 |
| 6/1/2013 | Renter's Insurance (06/2013) | 18.16 | | 91.25 | 10906512 |
| 6/1/2013 | Housing Assistance Charge (06/2013) | 650.00 | | 741.25 | 10906513 |
| 6/3/2013 | chk# 218649 DIRECT HAP TC | | 630.00 | 111.25 | 6433312 |
| 6/4/2013 | chk# PSID27067186-90 Terminal PSID 27067186 - CHECK21 | | 18.00 | 93.25 | 6438762 |
| 6/4/2013 | chk# PSID27067184-90 Terminal PSID 27067184 - CHECK21 | | 15.00 | 78.25 | 6438764 |
| 6/4/2013 | chk# PSID27067183-90 Terminal PSID 27067183 - CHECK21 | | 79.00 | (0.75) | 6438765 |
| 6/4/2013 | chk# PSID27067196-90 Terminal PSID 27067196 - CHECK21 | | 35.00 | (35.75) | 6438766 |
| 6/5/2013 | made onsite utility payment AR | 35.00 | | (0.75) | 10946139 |
| 7/1/2013 | Covered Parking Charges (07/2013) | 15.00 | | 14.25 | 10983224 |
| 7/1/2013 | Monthly Rent Charges (07/2013) | 59.00 | | 73.25 | 10983225 |
| 7/1/2013 | Renter's Insurance (07/2013) | 18.16 | | 91.41 | 10983226 |
| 7/1/2013 | Housing Assistance Charge (07/2013) | 650.00 | | 741.41 | 10983227 |
| 7/1/2013 | chk# 221239 Direct HAP-AR | | 630.00 | 111.41 | 6475871 |
| 7/3/2013 | made onsite utility payment AR | 35.59 | | 147.00 | 11018141 |
| 7/3/2013 | chk# PSID28091727 Terminal PSID 28091727 - CHECK21 | | 147.00 | 0.00 | 6491242 |
| 8/1/2013 | Covered Parking Charges (08/2013) | 15.00 | | 15.00 | 11058049 |
| 8/1/2013 | Monthly Rent Charges (08/2013) 1 days | 3.68 | | 18.68 | 11058050 |
| 8/1/2013 | Monthly Rent Charges (08/2013) | 83.00 | | 101.68 | 11058051 |
| 8/1/2013 | Renter's Insurance (08/2013) | 18.16 | | 119.84 | 11058052 |
| 8/1/2013 | Housing Assistance Charge (08/2013) 1 days | 20.32 | | 140.16 | 11058053 |
| 8/1/2013 | Housing Assistance Charge (08/2013) | 661.00 | | 801.16 | 11058054 |
| 8/1/2013 | incorrect rent charge for 1 day, AR | (3.68) | | 797.48 | 11113319 |



CY033060

| | | | | | |
|---|---|---|---|---|---|
| | incorrect renthap charge for 1 day, AR | (20.32) | | | 777.16 | 11113320 |
| 8/1/2013 | chk# 223781 direct hap. AR | | 661.00 | 116.16 | 6533685 |
| 8/3/2013 | chk# PSID29182949-90 Terminal PSID 29182949 - CHECK21 | | 35.00 | 81.16 | 6547292 |
| 8/3/2013 | chk# PSID29182947-90 Terminal PSID 29182947 - CHECK21 | | 18.00 | 63.16 | 6547293 |
| 8/3/2013 | chk# PSID29182948-90 Terminal PSID 29182948 - CHECK21 | | 15.00 | 48.16 | 6547294 |
| 8/3/2013 | chk# PSID29182955-90 Terminal PSID 29182955 - CHECK21 | | 83.00 | (34.84) | 6547295 |
| 8/4/2013 | made onsite utility payment AR | 10.84 | | (24.00) | 11093110 |
| 8/19/2013 | made onsite utility payment AR | 24.16 | | 0.16 | 11109568 |
| 8/22/2013 | chk# PSID29648968-90 Terminal PSID 29648968 - CHECK21 | | 0.16 | 0.00 | 6564598 |

CY033061

**Move Out Statement**

Date: 8/11/2015

| | | | | | |
|---|---|---|---|---|---|
| Code | c4630a02 | Property | cv | Lease From | 01/01/2012 |
| Name | Margaret Wildman | Unit | 4630A | Lease To | 07/31/2012 |
| Address | 933 Kelton Road | Status | Past | Move In | 03/01/2007 |
| | | Rent | 1,049.00 | Move Out | 07/31/2015 |
| City | San Diego, CA 92114 | | | Notice | 06/15/2015 |
| Telephone | (O)-()-  (H)-(619) 501-9168 | | | | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| | Balance as of 07/01/2015 | | | $0.00 | |
| 07/01/2015 | Monthly Rent Charges (07/2015) | $240.00 | | 240.00 | 12833101 |
| 07/01/2015 | Pet Rent (07/2015) | $10.00 | | 250.00 | 12833102 |
| 07/01/2015 | Pet Rent (07/2015) | $15.00 | | 265.00 | 12833103 |
| 07/01/2015 | Housing Assistance Charge (07/2015) | $809.00 | | 1,074.00 | 12833104 |
| 07/03/2015 | chk# PSID69749173-168 Terminal PSID 69749173 - CHECK21 | | $343.00 | 731.00 | 7861902 |
| 07/08/2015 | chk# direct deposit sect 8 op | | $731.00 | 0.00 | 7870837 |
| 07/31/2015 | :Deposit credit | ($277.00) | | (277.00) | 12955455 |
| 07/31/2015 | Carpet Cleaning/Damage | $45.00 | | (232.00) | 12955456 |
| 07/31/2015 | Cleaning Charges | $100.00 | | (132.00) | 12955457 |
| 07/31/2015 | Final ConService Charge | $97.40 | | (34.60) | 12955458 |
| 07/31/2015 | Amount to be refunded | $34.60 | | 0.00 | 12955459 |

## Move Out Statement

Date: 4/26/2016

| | | | | | |
|---|---|---|---|---|---|
| Code | t0115787 | Property | ap | Lease From | 12/24/2015 |
| Name | Tamisha Vaughn (EVICT) | Unit | 313 | Lease To | 12/23/2016 |
| Address | 4964 Mack Road #313 | Status | Past | Move In | 12/24/2015 |
| | ADDRESS SERVICE REQUESTED Rent | | 889.00 | Move Out | 04/19/2016 |
| City | Sacramento, CA 95823 | | | Notice | 03/17/2016 |
| Telephone | (O)-()-   (H)-(916) 693-4429 | | | | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| | Balance as of 04/01/2016 | | | $986.98 | |
| 04/01/2016 | Monthly Rent Charges (04/2016) | $889.00 | | 1,875.98 | 13514518 |
| 04/01/2016 | Renter's Insurance (04/2016) | $18.16 | | 1,894.14 | 13514519 |
| 04/01/2016 | Rent Plus Service (04/2016) | $5.00 | | 1,899.14 | 13514520 |
| 04/04/2016 | Late Charges late fees jf | $50.00 | | 1,949.14 | 13566533 |
| 04/19/2016 | :Deposit credit | ($400.00) | | 1,549.14 | 13585656 |
| 04/19/2016 | Monthly Rent Charges (04/2016) Credit 11 days | ($325.97) | | 1,223.17 | 13585657 |
| 04/19/2016 | Renter's Insurance (04/2016) Credit 11 days | ($6.66) | | 1,216.51 | 13585658 |
| 04/19/2016 | Rent Plus Service (04/2016) Credit 11 days | ($1.83) | | 1,214.68 | 13585659 |
| 04/19/2016 | Lease Cancellation Fee | $889.00 | | 2,103.68 | 13585660 |
| 04/19/2016 | Legal Fees | $740.00 | | 2,843.68 | 13585661 |
| 04/19/2016 | Final ConService Charge | $245.50 | | 3,089.18 | 13585662 |

AP000002

**Move Out Statement**

Date: 8/10/2016

| | | | | | |
|---|---|---|---|---|---|
| Code | t0053385 | Property | cy | Lease From | 02/01/2016 |
| Name | Tamra Barfield | Unit | S149 | Lease To | 07/31/2016 |
| Address | 4045 N. Fruit ave | Status | Past | Move In | 01/12/2012 |
| | apt 114 | Rent | 785.00 | Move Out | 08/02/2016 |
| City | Fresno, CA 93705 | | | Notice | 08/01/2016 |
| Telephone | (O)-(559) 742-4302   (H)-(559) 742-4302 | | | | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| | Balance as of 08/01/2016 | | | $0.00 | |
| 08/02/2016 | :Deposit credit | ($199.00) | | (199.00) | 13891750 |
| 08/02/2016 | Monthly Rent Charges (08/2016) 2 days | $32.90 | | (166.10) | 13891751 |
| 08/02/2016 | Renter's Insurance (08/2016) 2 days | $1.17 | | (164.93) | 13891753 |
| 08/02/2016 | Covered Parking Charges (08/2016) 2 days | $0.97 | | (163.96) | 13891754 |
| 08/02/2016 | Carpet replacement | $376.04 | | 212.08 | 13891755 |
| 08/02/2016 | Final ConService Charges | $88.04 | | 300.12 | 13891756 |
| 08/02/2016 | Cleaning Charge | $142.00 | | 442.12 | 13891757 |
| 08/02/2016 | Parts & Materials | $190.00 | | 632.12 | 13891758 |
| 08/02/2016 | Maint/Paint Labor | $280.00 | | 912.12 | 13891759 |

**Date : 8/21/2016**

# Resident Ledger

| Code | t0081069 | Property | cv | Lease From | 8/1/2016 |
|------|----------|----------|-----|-----------|----------|
| Name | Anamaria Gallardo | Unit | C128 | Lease To | 3/31/2017 |
| Address | 4498 North Cornelia #C128 | Status | Current | Move In | 10/1/2013 |
| | | Rent | 785 | Move Out | |
| City St. Zip | Fresno, CA 93722 | Phone(O)- | (559) 235-9206 | Phone(H)- | (559) 668-1200 |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|------|-------------|--------|---------|---------|---------|
| 8/7/2013 | Total Deposit Amount | 350.00 | | 350.00 | 11099491 |
| 8/7/2013 | Application Fee | 35.00 | | 385.00 | 11099492 |
| 8/7/2013 | Reverse App Fee. Already paid (previous applicant) TC | (35.00) | | 350.00 | 11099495 |
| 8/22/2013 | chk# PSID29436645-90 Terminal PSID 29436645 - CHECK21 | | 100.00 | 250.00 | 6564536 |
| 10/1/2013 | Rent for 31 days | 739.00 | | 989.00 | 11252052 |
| 10/1/2013 | Renter's Insurance for 31 days | 18.16 | | 1,007.16 | 11252053 |
| 10/1/2013 | chk# PSID31221029--1879796 Terminal PSID 31221029 - CHECK21 | | 625.00 | 382.16 | 6655087 |
| 10/4/2013 | Late Charges Late Fee AR | 50.00 | | 432.16 | 11257680 |
| 10/4/2013 | no late fee charge, on housing, tenant paid amount. AR | (50.00) | | 382.16 | 11274451 |
| 10/15/2013 | chk# 229728 DIRECT HAP AR | | 347.00 | 35.16 | 6681379 |
| 10/20/2013 | chk# PSID31966941 Terminal PSID 31966941 - CHECK21 | | 10.00 | 25.16 | 6684588 |
| 10/28/2013 | chk# PSID29228392-90 Terminal PSID 29228392 - CHECK21 | | 35.00 | (9.84) | 6690517 |
| 11/1/2013 | Covered Parking Charges (11/2013) | 10.00 | | 0.16 | 11299829 |
| 11/1/2013 | Monthly Rent Charges (11/2013) | 392.00 | | 392.16 | 11299830 |
| 11/1/2013 | Renter's Insurance (11/2013) | 18.16 | | 410.32 | 11299831 |
| 11/1/2013 | Housing Assistance Charge (11/2013) | 347.00 | | 757.32 | 11299832 |
| 11/1/2013 | chk# 232132 Direct HAP AR | | 347.00 | 410.32 | 6711293 |
| 11/1/2013 | chk# PSID32424370--1892469 Terminal PSID 32424370 - CHECK21 | | 410.50 | (0.18) | 6714214 |
| 12/1/2013 | Covered Parking Charges (12/2013) | 10.00 | | 9.82 | 11387024 |
| 12/1/2013 | Monthly Rent Charges (12/2013) | 392.00 | | 401.82 | 11387025 |
| 12/1/2013 | Renter's Insurance (12/2013) | 18.16 | | 419.98 | 11387026 |
| 12/1/2013 | Housing Assistance Charge (12/2013) | 347.00 | | 766.98 | 11387027 |
| 12/1/2013 | chk# 234669 Direct HAP AR | | 347.00 | 419.98 | 6770153 |
| 12/3/2013 | chk# PSID33942481--1904144 Terminal PSID 33942481 - CHECK21 | | 410.50 | 9.48 | 6784083 |
| 12/11/2013 | chk# PSID34339106-90 Terminal PSID 34339106 - CHECK21 | | 10.00 | (0.52) | 6795861 |
| 1/1/2014 | Renter's Insurance (01/2014) | 18.16 | | 17.64 | 11459680 |
| 1/1/2014 | Housing Assistance Charge (01/2014) | 347.00 | | 364.64 | 11459871 |
| 1/1/2014 | Covered Parking Charges (01/2014) | 10.00 | | 374.64 | 11459914 |
| 1/1/2014 | Monthly Rent Charges (01/2014) | 392.00 | | 766.64 | 11459947 |
| 1/2/2014 | chk# 237162 Direct HAP AR | | 347.00 | 419.64 | 6827544 |
| 1/2/2014 | chk# PSID35001948--1914836 Terminal PSID 35001948 - CHECK21 | | 420.00 | (0.36) | 6828306 |
| 2/1/2014 | Covered Parking Charges (02/2014) | 10.00 | | 9.64 | 11535786 |
| 2/1/2014 | Monthly Rent Charges (02/2014) | 392.00 | | 401.64 | 11535787 |



CY007135

| Date | Description | | | | |
|---|---|---|---|---|---|
| 6/1/2016 | Monthly Rent Charges (06/2016) | 378.00 | | 433.00 | 13684484 |
| 6/1/2016 | Renter's Insurance (06/2016) | 18.16 | | 451.16 | 13684485 |
| 6/1/2016 | Housing Assistance Charge (06/2016) | 407.00 | | 858.16 | 13684486 |
| 6/1/2016 | Rent Plus Service (06/2016) | 5.00 | | 863.16 | 13684487 |
| 6/1/2016 | chk# 305832 Direct HAP -AR | | 407.00 | 456.16 | 8407328 |
| 6/3/2016 | Onsite conservice payment -AR | 31.75 | | 487.91 | 13722367 |
| 6/3/2016 | chk# PSID91251784--2278793 Terminal PSID 91251784 - CHECK21 | | 490.00 | (2.09) | 8419593 |
| 7/1/2016 | Covered Parking Charges (07/2016) | 15.00 | | 12.91 | 13763657 |
| 7/1/2016 | Covered Parking Charges (07/2016) | 15.00 | | 27.91 | 13763658 |
| 7/1/2016 | Covered Parking Charges (07/2016) | 15.00 | | 42.91 | 13763659 |
| 7/1/2016 | Covered Parking Charges (07/2016) | 10.00 | | 52.91 | 13763660 |
| 7/1/2016 | Monthly Rent Charges (07/2016) | 378.00 | | 430.91 | 13763661 |
| 7/1/2016 | Renter's Insurance (07/2016) | 18.16 | | 449.07 | 13763662 |
| 7/1/2016 | Housing Assistance Charge (07/2016) | 407.00 | | 856.07 | 13763663 |
| 7/1/2016 | Rent Plus Service (07/2016) | 5.00 | | 861.07 | 13763664 |
| 7/1/2016 | Onsite conservice payment -AR | 31.61 | | 892.68 | 13799946 |
| 7/1/2016 | chk# 310080 Direct HAP -AR | | 407.00 | 485.68 | 8457247 |
| 7/1/2016 | chk# PSID92715823-90 Terminal PSID 92715823 - CHECK21 | | 486.00 | (0.32) | 8459256 |
| 8/1/2016 | Covered Parking Charges (08/2016) | 10.00 | | 9.68 | 13843483 |
| 8/1/2016 | Covered Parking Charges (08/2016) | 15.00 | | 24.68 | 13843484 |
| 8/1/2016 | Covered Parking Charges (08/2016) | 15.00 | | 39.68 | 13843485 |
| 8/1/2016 | Covered Parking Charges (08/2016) | 15.00 | | 54.68 | 13843486 |
| 8/1/2016 | Monthly Rent Charges (08/2016) | 378.00 | | 432.68 | 13843487 |
| 8/1/2016 | Renter's Insurance (08/2016) | 18.16 | | 450.84 | 13843488 |
| 8/1/2016 | Housing Assistance Charge (08/2016) | 407.00 | | 857.84 | 13843489 |
| 8/1/2016 | Rent Plus Service (08/2016) | 5.00 | | 862.84 | 13843490 |
| 8/1/2016 | Monthly Rent Charge (8/2016) | 408.00 | | 1,270.84 | 13881186 |
| 8/1/2016 | Housing Assistance Charge (8/2016) | 377.00 | | 1,647.84 | 13881187 |
| 8/1/2016 | Rev Monthly Rent Charge (8/2016) | (378.00) | | 1,269.84 | 13881188 |
| 8/1/2016 | Rev Housing Assistance Charge (8/2016) | (407.00) | | 862.84 | 13881189 |
| 8/1/2016 | chk# 312333 Direct HAP EC | | 377.00 | 485.84 | 8507717 |
| 8/2/2016 | chk# PSID94773453--2304265 Terminal PSID 94773453 - CHECK21 | | 483.00 | 2.84 | 8511739 |
| 8/17/2016 | Res. cancelled parking stall #64 prorated amount of to be returned to resident AR | (11.52) | | (8.68) | 13897893 |

**Date : 10/21/2016**

# Resident Ledger

| | | | | | | |
|---|---|---|---|---|---|---|
| Code | t0128479 | Property | cv | Lease From | 9/29/2016 | |
| Name | Arnold Lim | Unit | 4625D | Lease To | 9/28/2017 | |
| Address | 4625 Nogal Street #D | Status | Current | Move In | 9/29/2016 | |
| | | Rent | 2169 | Move Out | | |
| City St. Zip | San Diego, CA 92102 | Phone(O)- | | Phone(H)- | | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 8/9/2016 | Total Deposit Amount | 1,000.00 | | 1,000.00 | 13890850 |
| 8/9/2016 | Application Fee | 40.00 | | 1,040.00 | 13890851 |
| 8/9/2016 | Additional Application Fee | 120.00 | | 1,160.00 | 13890852 |
| 8/19/2016 | Deposit | 3,298.00 | | 4,458.00 | 13899846 |
| 9/4/2016 | Late Charges Late fee | 50.00 | | 4,508.00 | 13966591 |
| 9/7/2016 | chk# PSID97797152-90 Terminal PSID 97797152 - CHECK21 | | 150.00 | 4,358.00 | 8574069 |
| 9/26/2016 | chk# PSID98401245-7-3820920 Terminal PSID 98401245 - CHECK21 | | 765.00 | 3,593.00 | 8587966 |
| 9/29/2016 | Rent for 2 days | 144.60 | | 3,737.60 | 13987802 |
| 9/29/2016 | Renter's insurance for 2 days op | 1.22 | | 3,738.82 | 13987805 |
| 10/1/2016 | Monthly Rent Charges (10/2016) | 2,169.00 | | 5,907.82 | 14005261 |
| 10/4/2016 | Late Charges Late fee | 50.00 | | 5,957.82 | 14043360 |
| 10/7/2016 | Late fee adjustment op | (50.00) | | 5,907.82 | 14051175 |
| 10/7/2016 | Late fee adjstmnt for Oct. op | (50.00) | | 5,857.82 | 14051196 |
| 10/7/2016 | chk# direct deposit sect 8 op | | 4,298.00 | 1,559.82 | 8623645 |
| 10/7/2016 | chk# direct deposit sect 8 op | | 500.00 | 1,059.82 | 8623646 |
| 10/7/2016 | chk# direct deposit sect 8 op | | 89.00 | 970.82 | 8623647 |
| 10/7/2016 | chk# direct deposit sect 8 op | | 1,331.00 | (360.18) | 8623648 |
| 10/18/2016 | Renter's insurance op | 18.16 | | (342.02) | 14058563 |
| 10/18/2016 | Incentive program 1st family to move in with veteran's program op | 500.00 | | 157.98 | 14058574 |
| 10/18/2016 | chk# direct deposit sect 8 op | | 160.00 | (2.02) | 8629506 |

15

CV000052

| | | | | | |
|---|---|---|---|---|---|
| | chk# 958 ck-Hainline/bn | | 32.00 | 475.00 | 1438155 |
| 10/1/2004 | chk# 957 ck-Hainline/bn | | 255.00 | 220.00 | 1438157 |
| 10/5/2004 | chk# 0064846 ck-Housing Auth/bn | | 219.00 | 1.00 | 1446852 |
| 10/28/2004 | small balance adj./bn | (1.00) | | 0.00 | 2794408 |
| 11/1/2004 | Monthly Rent Charges (11/04) | 549.00 | | 549.00 | 2803049 |
| 11/1/2004 | Cable Revenue (11/04) | 32.00 | | 581.00 | 2803050 |
| 11/1/2004 | Garage Rental (11/04) | 25.00 | | 606.00 | 2803051 |
| 11/1/2004 | Pet Rent (11/04) | 10.00 | | 616.00 | 2803052 |
| 11/1/2004 | Qualified Resident Concession (11/04) | (99.00) | | 517.00 | 2803053 |
| 11/1/2004 | chk# 969 ck-Hainline/bn | | 267.00 | 250.00 | 1463024 |
| 11/1/2004 | chk# 970 ck-Hainline/bn | | 32.00 | 218.00 | 1463034 |
| 11/3/2004 | chk# 0065110 ck-Housing Authority/bn | | 219.00 | (1.00) | 1469713 |
| 11/30/2004 | small bal adjust/bn | 1.00 | | 0.00 | 2893446 |
| 12/1/2004 | Monthly Rent Charges (12/2004) | 549.00 | | 549.00 | 2877435 |
| 12/1/2004 | Cable Revenue (12/2004) | 32.00 | | 581.00 | 2877436 |
| 12/1/2004 | Garage Rental (12/2004) | 25.00 | | 606.00 | 2877437 |
| 12/1/2004 | Pet Rent (12/2004) | 10.00 | | 616.00 | 2877438 |
| 12/1/2004 | Qualified Resident Concession (12/2004) | (99.00) | | 517.00 | 2877439 |
| 12/2/2004 | chk# 979 ck-Hainline/bn | | 32.00 | 485.00 | 1495145 |
| 12/2/2004 | chk# 978 ck-Hainline/bn | | 267.00 | 218.00 | 1495149 |
| 12/4/2004 | chk# 0065374 ck-Housing Authority/bn | | 219.00 | (1.00) | 1501077 |
| 12/17/2004 | small bal adjustment/bn | 1.00 | | 0.00 | 2935153 |
| 1/1/2005 | Monthly Rent Charges (01/2005) | 549.00 | | 549.00 | 2989371 |
| 1/1/2005 | Cable Revenue (01/2005) | 32.00 | | 581.00 | 2989373 |
| 1/1/2005 | Garage Rental (01/2005) | 25.00 | | 606.00 | 2989377 |
| 1/1/2005 | Pet Rent (01/2005) | 10.00 | | 616.00 | 2989379 |
| 1/1/2005 | Qualified Resident Concession (01/2005) | (99.00) | | 517.00 | 2989381 |
| 1/3/2005 | chk# 990 ck-Hainline/bn | | 267.00 | 250.00 | 1528412 |
| 1/3/2005 | chk# 991 ck-Hainline/bn | | 32.00 | 218.00 | 1528471 |
| 1/8/2005 | chk# 0000000069 ck-Housing Authority/bn | | 219.00 | (1.00) | 1534463 |
| 1/19/2005 | small balance adj/bn | 1.00 | | 0.00 | 3010507 |
| 2/1/2005 | Monthly Rent Charges (02/2005) | 549.00 | | 549.00 | 3026125 |
| 2/1/2005 | Cable Revenue (02/2005) | 32.00 | | 581.00 | 3026126 |
| 2/1/2005 | Garage Rental (02/2005) | 25.00 | | 606.00 | 3026127 |
| 2/1/2005 | Pet Rent (02/2005) | 10.00 | | 616.00 | 3026128 |
| 2/1/2005 | Qualified Resident Concession (02/2005) | (99.00) | | 517.00 | 3026129 |
| 2/3/2005 | chk# 1000 ck-Hainline/bn | | 267.00 | 250.00 | 1559274 |
| 2/3/2005 | chk# 999 ck-Hainline/bn | | 32.00 | 218.00 | 1559276 |
| 2/4/2005 | chk# 0000000305 Housing Authority/bn | | 219.00 | (1.00) | 1562281 |
| 2/14/2005 | small balance adj/bn | 1.00 | | 0.00 | 3083934 |
| 3/1/2005 | Monthly Rent Charges (03/2005) | 549.00 | | 549.00 | 3101792 |
| 3/1/2005 | Cable Revenue (03/2005) | 32.00 | | 581.00 | 3101793 |
| 3/1/2005 | Garage Rental (03/2005) | 25.00 | | 606.00 | 3101794 |
| 3/1/2005 | Pet Rent (03/2005) | 10.00 | | 616.00 | 3101795 |
| 3/1/2005 | Qualified Resident Concession (03/2005) | (99.00) | | 517.00 | 3101796 |
| 3/1/2005 | chk# 1010 ck-Hainline/bn | | 267.00 | 250.00 | 1583235 |
| 3/1/2005 | chk# 1011 ck-Hainline/bn | | 32.00 | 218.00 | 1583236 |
| 3/4/2005 | chk# 0000000525 ck-Housing Authority/bn | | 219.00 | (1.00) | 1594352 |

16

RO000314

Ledger

Page 1 of 1

**Date : 12/18/2008**

# Resident Ledger

| | | | | | |
|---|---|---|---|---|---|
| Code | t0005115 | Property | cp | Lease From | 11/18/2008 |
| Name | Christine Naughton *** | Unit | 537 | Lease To | 11/17/2009 |
| Address | 3600 Data Drive, #537 | Status | Current | Move In | 11/18/2008 |
| | | Rent | 880 | Move Out | |
| City, St. Zip | Rancho Cordova, CA 95670 | Phone(W)- | (916) 859-0527 | Phone(H)- | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 11/18/2008 | Total Deposit Amount | 499.00 | | 499.00 | 6461308 |
| 11/18/2008 | Application Fee | 35.00 | | 534.00 | 6461309 |
| 11/18/2008 | Rent for 13 days | 327.71 | | 861.71 | 6461632 |
| 11/18/2008 | Qualified Resident Concession for 13 days | (29.79) | | 831.92 | 6461633 |
| 11/18/2008 | Move In Concession | (860.00) | | (28.08) | 6461634 |
| 12/1/2008 | Covered Parking Charges (12/2008) | 10.00 | | (18.08) | 6482214 |
| 12/1/2008 | Washer/Dryer Rental (12/2008) | 35.00 | | 16.92 | 6482215 |
| 12/1/2008 | Monthly Rent Charges (12/2008) | 880.00 | | 896.92 | 6482216 |
| 12/1/2008 | Qualified Resident Concession (12/2008) | (123.75) | | 773.17 | 6482217 |
| 12/1/2008 | Pet Rent (12/2008) | 15.00 | | 788.17 | 6482218 |
| 12/3/2008 | chk# 3218 ck-hc | | 435.00 | 353.17 | 3531211 |
| 12/4/2008 | Late Charges | 50.00 | | 403.17 | 6509515 |
| 12/4/2008 | :Prog Gen Reverse for chg# 6509515 yardi billed up late fees to residents not owing | (50.00) | | 353.17 | 6518192 |
| 12/15/2008 | transferred from flooded unit/not ready concession per D.W. see file | (400.00) | | (46.83) | 6518304 |

*[Handwritten notes:]*

No Bond - 940 - 31.34 day X 12 = 376.08

w/ Bond - 816.25 - 27.21 pday X 12 = 326.92

She took possesion 11-18-08,

rec. 1 mo. free.

She also rec. 400 credit

& paid 435.

Once her dep. is transferred

I will reverse credit of

$400? Yeah!



CP013578

Date : 12/18/2008

# Resident Ledger

| Code | cp473-10 | Property | cp | Lease From | 11/2/2007 |
|------|----------|----------|-----|-----------|-----------|
| Name | Christine Naughton *** | Unit | 473 | Lease To | 4/1/2009 |
| Address | 3600 Data Drive #537 | Status | Past | Move In | 10/17/2002 |
|  |  | Rent | 825 | Move Out | 11/18/2008 |
| City St. Zip | Rancho Cordova, CA 95670 | Phone(W)- |  | Phone(H)- | (916) 859-0527 |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|------|-------------|--------|---------|---------|---------|
| 10/17/2002 | Deposit | 499.00 |  | 499.00 | 1326585 |
| 10/17/2002 | Rent for 15 Days | 432.45 |  | 931.45 | 1326586 |
| 10/17/2002 | Washer/Dryer Charge | 17.40 |  | 948.85 | 1326587 |
| 10/17/2002 | Parking Charges | 4.95 |  | 953.80 | 1326588 |
| 10/17/2002 | Pet Rent | 7.50 |  | 961.30 | 1326589 |
| 10/17/2002 | Application Fee | 25.00 |  | 986.30 | 1326590 |
| 10/17/2002 | Qualified Resident Concession | (109.95) |  | 876.35 | 1326591 |
| 10/28/2002 | chk# 87474074589 mo SS 473 |  | 500.00 | 376.35 | 800291 |
| 10/28/2002 | chk# 98773758644 mo SS 473 |  | 99.00 | 277.35 | 800299 |
| 10/28/2002 | chk# 98773758633 mo SS 473 |  | 25.00 | 252.35 | 800300 |
| 10/28/2002 | chk# 87474074590 mo SS 473 |  | 252.35 | 0.00 | 800301 |
| 11/1/2002 | Monthly Rent Charges (11/2002) | 865.00 |  | 865.00 | 1341410 |
| 11/1/2002 | Parking Charges (11/2002) | 10.00 |  | 875.00 | 1341411 |
| 11/1/2002 | Pet Rent (11/2002) | 15.00 |  | 890.00 | 1341412 |
| 11/1/2002 | Qualified Resident Concession (11/2002) | (220.00) |  | 670.00 | 1341413 |
| 11/1/2002 | Washer/Dryer Rental (11/2002) | 35.00 |  | 705.00 | 1341414 |
| 11/3/2002 | chk# 1205 ck SS 473 |  | 705.00 | 0.00 | 813024 |
| 12/1/2002 | Monthly Rent Charges (12/2002) | 865.00 |  | 865.00 | 1395197 |
| 12/1/2002 | Parking Charges (12/2002) | 10.00 |  | 875.00 | 1395198 |
| 12/1/2002 | Pet Rent (12/2002) | 15.00 |  | 890.00 | 1395199 |
| 12/1/2002 | Qualified Resident Concession (12/2002) | (220.00) |  | 670.00 | 1395200 |
| 12/1/2002 | Washer/Dryer Rental (12/2002) | 35.00 |  | 705.00 | 1395201 |
| 12/2/2002 | Concessions Per ME | (21.50) |  | 683.50 | 1415051 |
| 12/3/2002 | chk# 1208 ck SS 473 |  | 683.50 | 0.00 | 837750 |
| 1/1/2003 | Monthly Rent Charges (01/2003) | 865.00 |  | 865.00 | 1450776 |
| 1/1/2003 | Parking Charges (01/2003) | 10.00 |  | 875.00 | 1450778 |
| 1/1/2003 | Pet Rent (01/2003) | 15.00 |  | 890.00 | 1450780 |
| 1/1/2003 | Qualified Resident Concession (01/2003) | (220.00) |  | 670.00 | 1450783 |
| 1/1/2003 | Washer/Dryer Rental (01/2003) | 35.00 |  | 705.00 | 1450786 |
| 1/3/2003 | chk# 1211 ck SS |  | 705.00 | 0.00 | 864426 |
| 2/1/2003 | Monthly Rent Charges (02/2003) | 865.00 |  | 865.00 | 1494846 |
| 2/1/2003 | Parking Charges (02/2003) | 10.00 |  | 875.00 | 1494847 |
| 2/1/2003 | Pet Rent (02/2003) | 15.00 |  | 890.00 | 1494848 |
| 2/1/2003 | Qualified Resident Concession (02/2003) | (220.00) |  | 670.00 | 1494849 |
| 2/1/2003 | Washer/Dryer Rental (02/2003) | 35.00 |  | 705.00 | 1494850 |

18

CP013580



| 2/3/2003 | chk# 2800 ck SS | | 705.00 | 0.00 | 890238 |
|---|---|---|---|---|---|
| 3/1/2003 | Monthly Rent Charges (03/2003) | 865.00 | | 865.00 | 1540810 |
| 3/1/2003 | Parking Charges (03/2003) | 10.00 | | 875.00 | 1540811 |
| 3/1/2003 | Pet Rent (03/2003) | 15.00 | | 890.00 | 1540812 |
| 3/1/2003 | Qualified Resident Concession (03/2003) | (220.00) | | 670.00 | 1540813 |
| 3/1/2003 | Washer/Dryer Rental (03/2003) | 35.00 | | 705.00 | 1540814 |
| 3/4/2003 | chk# 2801 ck SS | | 705.00 | 0.00 | 921927 |
| 4/1/2003 | Monthly Rent Charges (04/2003) | 865.00 | | 865.00 | 1606198 |
| 4/1/2003 | Parking Charges (04/2003) | 10.00 | | 875.00 | 1606199 |
| 4/1/2003 | Pet Rent (04/2003) | 15.00 | | 890.00 | 1606200 |
| 4/1/2003 | Qualified Resident Concession (04/2003) | (220.00) | | 670.00 | 1606201 |
| 4/1/2003 | Washer/Dryer Rental (04/2003) | 35.00 | | 705.00 | 1606202 |
| 4/4/2003 | chk# 2806 ck SS | | 705.00 | 0.00 | 950224 |
| 5/1/2003 | Monthly Rent Charges (05/2003) | 905.00 | | 905.00 | 1653707 |
| 5/1/2003 | Parking Charges (05/2003) | 10.00 | | 915.00 | 1653708 |
| 5/1/2003 | Pet Rent (05/2003) | 15.00 | | 930.00 | 1653709 |
| 5/1/2003 | Qualified Resident Concession (05/2003) | (232.50) | | 697.50 | 1653710 |
| 5/1/2003 | Washer/Dryer Rental (05/2003) | 35.00 | | 732.50 | 1653711 |
| 5/4/2003 | chk# 2807 ck SS | | 732.50 | 0.00 | 973986 |
| 6/1/2003 | Monthly Rent Charges (06/2003) | 905.00 | | 905.00 | 1703711 |
| 6/1/2003 | Parking Charges (06/2003) | 10.00 | | 915.00 | 1703712 |
| 6/1/2003 | Pet Rent (06/2003) | 15.00 | | 930.00 | 1703713 |
| 6/1/2003 | Qualified Resident Concession (06/2003) | (232.50) | | 697.50 | 1703714 |
| 6/1/2003 | Washer/Dryer Rental (06/2003) | 35.00 | | 732.50 | 1703715 |
| 6/4/2003 | chk# 2808 ck SS | | 732.50 | 0.00 | 998811 |
| 7/1/2003 | Monthly Rent Charges (07/2003) | 905.00 | | 905.00 | 1759174 |
| 7/1/2003 | Parking Charges (07/2003) | 10.00 | | 915.00 | 1759175 |
| 7/1/2003 | Pet Rent (07/2003) | 15.00 | | 930.00 | 1759176 |
| 7/1/2003 | Qualified Resident Concession (07/2003) | (232.50) | | 697.50 | 1759177 |
| 7/1/2003 | Washer/Dryer Rental (07/2003) | 35.00 | | 732.50 | 1759178 |
| 7/3/2003 | chk# 2814 ck SS | | 732.50 | 0.00 | 1025309 |
| 8/1/2003 | Monthly Rent Charges (08/2003) | 905.00 | | 905.00 | 1825595 |
| 8/1/2003 | Parking Charges (08/2003) | 10.00 | | 915.00 | 1825596 |
| 8/1/2003 | Pet Rent (08/2003) | 15.00 | | 930.00 | 1825597 |
| 8/1/2003 | Qualified Resident Concession (08/2003) | (232.50) | | 697.50 | 1825598 |
| 8/1/2003 | Washer/Dryer Rental (08/2003) | 35.00 | | 732.50 | 1825599 |
| 8/4/2003 | chk# 2882 ck SS | | 732.50 | 0.00 | 1050361 |
| 9/1/2003 | Monthly Rent Charges (09/2003) | 905.00 | | 905.00 | 1883962 |
| 9/1/2003 | Parking Charges (09/2003) | 10.00 | | 915.00 | 1883963 |
| 9/1/2003 | Pet Rent (09/2003) | 15.00 | | 930.00 | 1883964 |
| 9/1/2003 | Qualified Resident Concession (09/2003) | (232.50) | | 697.50 | 1883966 |
| 9/1/2003 | Washer/Dryer Rental (09/2003) | 35.00 | | 732.50 | 1883968 |
| 9/4/2003 | chk# 2829 ck SS | | 732.50 | 0.00 | 1080614 |
| 10/1/2003 | Monthly Rent Charges (10/2003) | 905.00 | | 905.00 | 1941423 |
| 10/1/2003 | Parking Charges (10/2003) | 10.00 | | 915.00 | 1941424 |
| 10/1/2003 | Pet Rent (10/2003) | 15.00 | | 930.00 | 1941425 |
| 10/1/2003 | Qualified Resident Concession (10/2003) | (232.50) | | 697.50 | 1941426 |



CP013581

Ledger                                                                  Page 3 of 11

| 10/1/2003 | Washer/Dryer Rental (10/2003) | 35.00 | | 732.50 | 1941427 |
|---|---|---|---|---|---|
| 10/3/2003 | chk# 2837 ck SS | | 732.50 | 0.00 | 1105155 |
| 11/1/2003 | Monthly Rent Charges (11/2003) | 905.00 | | 905.00 | 2002173 |
| 11/1/2003 | Parking Charges (11/2003) | 10.00 | | 915.00 | 2002174 |
| 11/1/2003 | Pet Rent (11/2003) | 15.00 | | 930.00 | 2002175 |
| 11/1/2003 | Qualified Resident Concession (11/2003) | (232.50) | | 697.50 | 2002176 |
| 11/1/2003 | Washer/Dryer Rental (11/2003) | 35.00 | | 732.50 | 2002177 |
| 11/4/2003 | chk# 2839 ck SS | | 732.50 | 0.00 | 1134831 |
| 12/1/2003 | Monthly Rent Charges (12/2003) | 905.00 | | 905.00 | 2076650 |
| 12/1/2003 | Parking Charges (12/2003) | 10.00 | | 915.00 | 2076651 |
| 12/1/2003 | Pet Rent (12/2003) | 15.00 | | 930.00 | 2076652 |
| 12/1/2003 | Qualified Resident Concession (12/2003) | (232.50) | | 697.50 | 2076653 |
| 12/1/2003 | Washer/Dryer Rental (12/2003) | 35.00 | | 732.50 | 2076654 |
| 12/4/2003 | chk# 2843 ck SS | | 732.50 | 0.00 | 1160664 |
| 1/1/2004 | Monthly Rent Charges (01/2004) | 905.00 | | 905.00 | 2138561 |
| 1/1/2004 | Parking Charges (01/2004) | 10.00 | | 915.00 | 2138562 |
| 1/1/2004 | Pet Rent (01/2004) | 15.00 | | 930.00 | 2138563 |
| 1/1/2004 | Qualified Resident Concession (01/2004) | (232.50) | | 697.50 | 2138564 |
| 1/1/2004 | Washer/Dryer Rental (01/2004) | 35.00 | | 732.50 | 2138565 |
| 1/3/2004 | chk# 2845 ck SS | | 732.50 | 0.00 | 1185677 |
| 2/1/2004 | Monthly Rent Charges (02/2004) | 905.00 | | 905.00 | 2180100 |
| 2/1/2004 | Parking Charges (02/2004) | 10.00 | | 915.00 | 2180101 |
| 2/1/2004 | Pet Rent (02/2004) | 15.00 | | 930.00 | 2180102 |
| 2/1/2004 | Qualified Resident Concession (02/2004) | (232.50) | | 697.50 | 2180103 |
| 2/1/2004 | Washer/Dryer Rental (02/2004) | 35.00 | | 732.50 | 2180104 |
| 2/3/2004 | chk# 2849 ck SS | | 732.50 | 0.00 | 1214595 |
| 3/1/2004 | Monthly Rent Charges (03/04) | 905.00 | | 905.00 | 2269727 |
| 3/1/2004 | Parking Charges (03/04) | 10.00 | | 915.00 | 2269728 |
| 3/1/2004 | Pet Rent (03/04) | 15.00 | | 930.00 | 2269731 |
| 3/1/2004 | Qualified Resident Concession (03/04) | (232.50) | | 697.50 | 2269733 |
| 3/1/2004 | Washer/Dryer Rental (03/04) | 35.00 | | 732.50 | 2269735 |
| 3/4/2004 | chk# 2852 ck SS | | 732.50 | 0.00 | 1244377 |
| 4/1/2004 | Monthly Rent Charges (04/04) | 905.00 | | 905.00 | 2322294 |
| 4/1/2004 | Parking Charges (04/04) | 10.00 | | 915.00 | 2322295 |
| 4/1/2004 | Pet Rent (04/04) | 15.00 | | 930.00 | 2322296 |
| 4/1/2004 | Qualified Resident Concession (04/04) | (232.50) | | 697.50 | 2322298 |
| 4/1/2004 | Washer/Dryer Rental (04/04) | 35.00 | | 732.50 | 2322301 |
| 4/4/2004 | chk# 2856 ck SS | | 732.50 | 0.00 | 1271617 |
| 5/1/2004 | Monthly Rent Charges (05/04) | 905.00 | | 905.00 | 2414382 |
| 5/1/2004 | Parking Charges (05/04) | 10.00 | | 915.00 | 2414383 |
| 5/1/2004 | Pet Rent (05/04) | 15.00 | | 930.00 | 2414384 |
| 5/1/2004 | Qualified Resident Concession (05/04) | (183.75) | | 746.25 | 2414385 |
| 5/1/2004 | Washer/Dryer Rental (05/04) | 35.00 | | 781.25 | 2414386 |
| 5/4/2004 | chk# 2860 ck SS | | 781.25 | 0.00 | 1300102 |
| 6/1/2004 | Monthly Rent Charges (06/04) | 905.00 | | 905.00 | 2455138 |
| 6/1/2004 | Parking Charges (06/04) | 10.00 | | 915.00 | 2455139 |
| 6/1/2004 | Pet Rent (06/04) | 15.00 | | 930.00 | 2455140 |

CP013582

Ledger 

| | | | | | |
|---|---|---|---|---|---|
| 6/1/2004 | Qualified Resident Concession (06/04) | (183.75) | | 746.25 | 2455141 |
| 6/1/2004 | Washer/Dryer Rental (06/04) | 35.00 | | 781.25 | 2455142 |
| 6/4/2004 | chk# 2866 ck SS | | 781.25 | 0.00 | 1329184 |
| 7/1/2004 | Monthly Rent Charges (07/04) | 905.00 | | 905.00 | 2529266 |
| 7/1/2004 | Parking Charges (07/04) | 10.00 | | 915.00 | 2529267 |
| 7/1/2004 | Pet Rent (07/04) | 15.00 | | 930.00 | 2529268 |
| 7/1/2004 | Qualified Resident Concession (07/04) | (183.75) | | 746.25 | 2529269 |
| 7/1/2004 | Washer/Dryer Rental (07/04) | 35.00 | | 781.25 | 2529270 |
| 7/3/2004 | chk# 2874 ck SS | | 781.25 | 0.00 | 1355880 |
| 8/1/2004 | Monthly Rent Charges (08/04) | 905.00 | | 905.00 | 2592358 |
| 8/1/2004 | Parking Charges (08/04) | 10.00 | | 915.00 | 2592360 |
| 8/1/2004 | Pet Rent (08/04) | 15.00 | | 930.00 | 2592361 |
| 8/1/2004 | Qualified Resident Concession (08/04) | (183.75) | | 746.25 | 2592363 |
| 8/1/2004 | Washer/Dryer Rental (08/04) | 35.00 | | 781.25 | 2592364 |
| 8/4/2004 | chk# 2880 ck SS | | 781.25 | 0.00 | 1385444 |
| 9/1/2004 | Monthly Rent Charges (09/04) | 905.00 | | 905.00 | 2695014 |
| 9/1/2004 | Parking Charges (09/04) | 10.00 | | 915.00 | 2695015 |
| 9/1/2004 | Pet Rent (09/04) | 15.00 | | 930.00 | 2695016 |
| 9/1/2004 | Qualified Resident Concession (09/04) | (183.75) | | 746.25 | 2695017 |
| 9/1/2004 | Washer/Dryer Rental (09/04) | 35.00 | | 781.25 | 2695018 |
| 9/4/2004 | chk# 2884 ck SS | | 781.25 | 0.00 | 1416223 |
| 10/1/2004 | Monthly Rent Charges (10/04) | 905.00 | | 905.00 | 2729558 |
| 10/1/2004 | Parking Charges (10/04) | 10.00 | | 915.00 | 2729559 |
| 10/1/2004 | Pet Rent (10/04) | 15.00 | | 930.00 | 2729560 |
| 10/1/2004 | Qualified Resident Concession (10/04) | (183.75) | | 746.25 | 2729561 |
| 10/1/2004 | Washer/Dryer Rental (10/04) | 35.00 | | 781.25 | 2729562 |
| 10/4/2004 | chk# 2889 ck SS | | 781.25 | 0.00 | 1442453 |
| 11/1/2004 | Monthly Rent Charges (11/04) | 905.00 | | 905.00 | 2843526 |
| 11/1/2004 | Parking Charges (11/04) | 10.00 | | 915.00 | 2843527 |
| 11/1/2004 | Pet Rent (11/04) | 15.00 | | 930.00 | 2843528 |
| 11/1/2004 | Qualified Resident Concession (11/04) | (183.75) | | 746.25 | 2843529 |
| 11/1/2004 | Washer/Dryer Rental (11/04) | 35.00 | | 781.25 | 2843530 |
| 11/4/2004 | chk# 2896 ck SS | | 781.25 | 0.00 | 1472658 |
| 12/1/2004 | Monthly Rent Charges (12/2004) | 905.00 | | 905.00 | 2921042 |
| 12/1/2004 | Parking Charges (12/2004) | 10.00 | | 915.00 | 2921043 |
| 12/1/2004 | Pet Rent (12/2004) | 15.00 | | 930.00 | 2921044 |
| 12/1/2004 | Qualified Resident Concession (12/2004) | (183.75) | | 746.25 | 2921045 |
| 12/1/2004 | Washer/Dryer Rental (12/2004) | 35.00 | | 781.25 | 2921046 |
| 12/4/2004 | chk# 2900 ck SS | | 781.25 | 0.00 | 1501573 |
| 1/1/2005 | Monthly Rent Charges (01/2005) | 905.00 | | 905.00 | 2966637 |
| 1/1/2005 | Parking Charges (01/2005) | 10.00 | | 915.00 | 2966638 |
| 1/1/2005 | Pet Rent (01/2005) | 15.00 | | 930.00 | 2966642 |
| 1/1/2005 | Qualified Resident Concession (01/2005) | (183.75) | | 746.25 | 2966646 |
| 1/1/2005 | Washer/Dryer Rental (01/2005) | 35.00 | | 781.25 | 2966649 |
| 1/3/2005 | chk# 2908 ck SS | | 781.25 | 0.00 | 1524888 |
| 2/1/2005 | Monthly Rent Charges (02/2005) | 905.00 | | 905.00 | 3036019 |
| 2/1/2005 | Parking Charges (02/2005) | 10.00 | | 915.00 | 3036020 |

CP013583

Ledger   Page 5 of 11

| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| 2/1/2005 | Pet Rent (02/2005) | 15.00 | | 930.00 | 3036021 |
| 2/1/2005 | Qualified Resident Concession (02/2005) | (183.75) | | 746.25 | 3036022 |
| 2/1/2005 | Washer/Dryer Rental (02/2005) | 35.00 | | 781.25 | 3036023 |
| 2/4/2005 | chk# 2918 ck SS | | 781.25 | 0.00 | 1562647 |
| 3/1/2005 | Monthly Rent Charges (03/2005) | 905.00 | | 905.00 | 3112421 |
| 3/1/2005 | Parking Charges (03/2005) | 10.00 | | 915.00 | 3112422 |
| 3/1/2005 | Pet Rent (03/2005) | 15.00 | | 930.00 | 3112423 |
| 3/1/2005 | Qualified Resident Concession (03/2005) | (183.75) | | 746.25 | 3112424 |
| 3/1/2005 | Washer/Dryer Rental (03/2005) | 35.00 | | 781.25 | 3112425 |
| 3/4/2005 | chk# 2920 ck SS | | 781.25 | 0.00 | 1592455 |
| 4/1/2005 | Monthly Rent Charges (04/2005) | 935.00 | | 935.00 | 3183150 |
| 4/1/2005 | Parking Charges (04/2005) | 10.00 | | 945.00 | 3183151 |
| 4/1/2005 | Pet Rent (04/2005) | 15.00 | | 960.00 | 3183152 |
| 4/1/2005 | Qualified Resident Concession (04/2005) | (213.75) | | 746.25 | 3183153 |
| 4/1/2005 | Washer/Dryer Rental (04/2005) | 35.00 | | 781.25 | 3183154 |
| 4/4/2005 | chk# 2924 ck SS | | 781.25 | 0.00 | 1625062 |
| 5/1/2005 | Monthly Rent Charges (05/2005) | 935.00 | | 935.00 | 3264873 |
| 5/1/2005 | Parking Charges (05/2005) | 10.00 | | 945.00 | 3264874 |
| 5/1/2005 | Pet Rent (05/2005) | 15.00 | | 960.00 | 3264875 |
| 5/1/2005 | Qualified Resident Concession (05/2005) | (213.75) | | 746.25 | 3264876 |
| 5/1/2005 | Washer/Dryer Rental (05/2005) | 35.00 | | 781.25 | 3264877 |
| 5/2/2005 | chk# 2935 ck SS | | 781.25 | 0.00 | 1650436 |
| 6/1/2005 | Monthly Rent Charges (06/2005) | 935.00 | | 935.00 | 3382209 |
| 6/1/2005 | Parking Charges (06/2005) | 10.00 | | 945.00 | 3382210 |
| 6/1/2005 | Pet Rent (06/2005) | 15.00 | | 960.00 | 3382211 |
| 6/1/2005 | Qualified Resident Concession (06/2005) | (213.75) | | 746.25 | 3382212 |
| 6/1/2005 | Washer/Dryer Rental (06/2005) | 35.00 | | 781.25 | 3382213 |
| 6/4/2005 | chk# 2944 ck SS | | 781.25 | 0.00 | 1694887 |
| 7/1/2005 | Parking Charges (07/2005) | 10.00 | | 10.00 | 3448943 |
| 7/1/2005 | Washer/Dryer Rental (07/2005) | 35.00 | | 45.00 | 3448944 |
| 7/1/2005 | Monthly Rent Charges (07/2005) | 935.00 | | 980.00 | 3448945 |
| 7/1/2005 | Qualified Resident Concession (07/2005) | (213.75) | | 766.25 | 3448946 |
| 7/1/2005 | Pet Rent (07/2005) | 15.00 | | 781.25 | 3448947 |
| 7/4/2005 | chk# 1316 ck RMH | | 781.25 | 0.00 | 1723615 |
| 8/1/2005 | Parking Charges (08/2005) | 10.00 | | 10.00 | 3521306 |
| 8/1/2005 | Washer/Dryer Rental (08/2005) | 35.00 | | 45.00 | 3521307 |
| 8/1/2005 | Monthly Rent Charges (08/2005) | 935.00 | | 980.00 | 3521308 |
| 8/1/2005 | Qualified Resident Concession (08/2005) | (213.75) | | 766.25 | 3521309 |
| 8/1/2005 | Pet Rent (08/2005) | 15.00 | | 781.25 | 3521310 |
| 8/4/2005 | chk# 2950 ck RMH | | 781.25 | 0.00 | 1761717 |
| 9/1/2005 | Parking Charges (09/2005) | 10.00 | | 10.00 | 3611765 |
| 9/1/2005 | Washer/Dryer Rental (09/2005) | 35.00 | | 45.00 | 3611766 |
| 9/1/2005 | Monthly Rent Charges (09/2005) | 935.00 | | 980.00 | 3611767 |
| 9/1/2005 | Qualified Resident Concession (09/2005) | (213.75) | | 766.25 | 3611768 |
| 9/1/2005 | Pet Rent (09/2005) | 15.00 | | 781.25 | 3611769 |
| 9/3/2005 | Late Charges | 30.00 | | 811.25 | 3651513 |
| 9/4/2005 | chk# 1323 ck RMH | | 781.25 | 30.00 | 1801223 |

72

CP013584

 
| 9/8/2005 | Misplaced check/ Rent paid on time. | (30.00) | | 0.00 | 3661509 |
| 10/1/2005 | Parking Charges (10/2005) | 10.00 | | 10.00 | 3700663 |
| 10/1/2005 | Washer/Dryer Rental (10/2005) | 35.00 | | 45.00 | 3700664 |
| 10/1/2005 | Monthly Rent Charges (10/2005) | 935.00 | | 980.00 | 3700665 |
| 10/1/2005 | Qualified Resident Concession (10/2005) | (213.75) | | 766.25 | 3700666 |
| 10/1/2005 | Pet Rent (10/2005) | 15.00 | | 781.25 | 3700667 |
| 10/3/2005 | chk# 2964 ck RMH | | 781.25 | 0.00 | 1837411 |
| 11/1/2005 | Parking Charges (11/2005) | 10.00 | | 10.00 | 3783452 |
| 11/1/2005 | Washer/Dryer Rental (11/2005) | 35.00 | | 45.00 | 3783453 |
| 11/1/2005 | Monthly Rent Charges (11/2005) | 935.00 | | 980.00 | 3783454 |
| 11/1/2005 | Qualified Resident Concession (11/2005) | (213.75) | | 766.25 | 3783455 |
| 11/1/2005 | Pet Rent (11/2005) | 15.00 | | 781.25 | 3783456 |
| 11/3/2005 | chk# 2974 ck ME | | 781.25 | 0.00 | 1881959 |
| 12/1/2005 | Parking Charges (12/2005) | 10.00 | | 10.00 | 3860908 |
| 12/1/2005 | Washer/Dryer Rental (12/2005) | 35.00 | | 45.00 | 3860909 |
| 12/1/2005 | Monthly Rent Charges (12/2005) | 935.00 | | 980.00 | 3860910 |
| 12/1/2005 | Qualified Resident Concession (12/2005) | (213.75) | | 766.25 | 3860911 |
| 12/1/2005 | Pet Rent (12/2005) | 15.00 | | 781.25 | 3860912 |
| 12/3/2005 | chk# 2982 ck LN | | 781.25 | 0.00 | 1920031 |
| 1/1/2006 | Parking Charges (01/2006) | 10.00 | | 10.00 | 3951540 |
| 1/1/2006 | Washer/Dryer Rental (01/2006) | 35.00 | | 45.00 | 3951541 |
| 1/1/2006 | Monthly Rent Charges (01/2006) | 935.00 | | 980.00 | 3951542 |
| 1/1/2006 | Qualified Resident Concession (01/2006) | (213.75) | | 766.25 | 3951543 |
| 1/1/2006 | Pet Rent (01/2006) | 15.00 | | 781.25 | 3951544 |
| 1/4/2006 | chk# 2988 ck LN | | 781.25 | 0.00 | 1955093 |
| 1/31/2006 | chk# 2992 ck LN | | 781.25 | (781.25) | 1969378 |
| 2/1/2006 | Parking Charges (02/2006) | 10.00 | | (771.25) | 4034231 |
| 2/1/2006 | Washer/Dryer Rental (02/2006) | 35.00 | | (736.25) | 4034232 |
| 2/1/2006 | Monthly Rent Charges (02/2006) | 935.00 | | 198.75 | 4034233 |
| 2/1/2006 | Qualified Resident Concession (02/2006) | (213.75) | | (15.00) | 4034234 |
| 2/1/2006 | Pet Rent (02/2006) | 15.00 | | 0.00 | 4034235 |
| 3/1/2006 | Parking Charges (03/2006) | 10.00 | | 10.00 | 4117535 |
| 3/1/2006 | Washer/Dryer Rental (03/2006) | 35.00 | | 45.00 | 4117536 |
| 3/1/2006 | Monthly Rent Charges (03/2006) | 935.00 | | 980.00 | 4117537 |
| 3/1/2006 | Qualified Resident Concession (03/2006) | (213.75) | | 766.25 | 4117538 |
| 3/1/2006 | Pet Rent (03/2006) | 15.00 | | 781.25 | 4117539 |
| 3/2/2006 | chk# 2999 ck LN | | 781.25 | 0.00 | 2031092 |
| 4/1/2006 | Parking Charges (04/2006) | 10.00 | | 10.00 | 4200276 |
| 4/1/2006 | Washer/Dryer Rental (04/2006) | 35.00 | | 45.00 | 4200277 |
| 4/1/2006 | Monthly Rent Charges (04/2006) | 935.00 | | 980.00 | 4200278 |
| 4/1/2006 | Qualified Resident Concession (04/2006) | (213.75) | | 766.25 | 4200279 |
| 4/1/2006 | Pet Rent (04/2006) | 15.00 | | 781.25 | 4200280 |
| 4/4/2006 | chk# 3001 ck LN | | 781.25 | 0.00 | 2096180 |
| 5/1/2006 | Parking Charges (05/2006) | 10.00 | | 10.00 | 4287953 |
| 5/1/2006 | Washer/Dryer Rental (05/2006) | 35.00 | | 45.00 | 4287954 |
| 5/1/2006 | Monthly Rent Charges (05/2006) | 935.00 | | 980.00 | 4287955 |
| 5/1/2006 | Qualified Resident Concession (05/2006) | (213.75) | | 766.25 | 4287956 |

 
| 5/1/2006 | Pet Rent (05/2006) | 15.00 | | 781.25 | 4287957 |
|---|---|---|---|---|---|
| 5/4/2006 | chk# 3005 ck LN | | 781.25 | 0.00 | 2144557 |
| 6/1/2006 | Parking Charges (06/2006) | 10.00 | | 10.00 | 4374142 |
| 6/1/2006 | Washer/Dryer Rental (06/2006) | 35.00 | | 45.00 | 4374143 |
| 6/1/2006 | Monthly Rent Charges (06/2006) | 935.00 | | 980.00 | 4374144 |
| 6/1/2006 | Qualified Resident Concession (06/2006) | (198.75) | | 781.25 | 4374145 |
| 6/1/2006 | Pet Rent (06/2006) | 15.00 | | 796.25 | 4374146 |
| 6/3/2006 | chk# 3012 ck SKS | | 796.25 | 0.00 | 2193112 |
| 7/1/2006 | Parking Charges (07/2006) | 10.00 | | 10.00 | 4460664 |
| 7/1/2006 | Washer/Dryer Rental (07/2006) | 35.00 | | 45.00 | 4460665 |
| 7/1/2006 | Monthly Rent Charges (07/2006) | 935.00 | | 980.00 | 4460666 |
| 7/1/2006 | Qualified Resident Concession (07/2006) | (198.75) | | 781.25 | 4460667 |
| 7/1/2006 | Pet Rent (07/2006) | 15.00 | | 796.25 | 4460668 |
| 7/4/2006 | chk# 3021 ck SKS | | 796.25 | 0.00 | 2244902 |
| 8/1/2006 | Parking Charges (08/2006) | 10.00 | | 10.00 | 4546976 |
| 8/1/2006 | Washer/Dryer Rental (08/2006) | 35.00 | | 45.00 | 4546977 |
| 8/1/2006 | Monthly Rent Charges (08/2006) | 815.00 | | 860.00 | 4546978 |
| 8/1/2006 | Qualified Resident Concession (08/2006) | (78.75) | | 781.25 | 4546979 |
| 8/1/2006 | Pet Rent (08/2006) | 15.00 | | 796.25 | 4546980 |
| 8/3/2006 | chk# 3026 ck SKS | | 796.25 | 0.00 | 2294612 |
| 9/1/2006 | Parking Charges (09/2006) | 10.00 | | 10.00 | 4629388 |
| 9/1/2006 | Washer/Dryer Rental (09/2006) | 35.00 | | 45.00 | 4629389 |
| 9/1/2006 | Monthly Rent Charges (09/2006) | 815.00 | | 860.00 | 4629390 |
| 9/1/2006 | Qualified Resident Concession (09/2006) | (78.75) | | 781.25 | 4629391 |
| 9/1/2006 | Pet Rent (09/2006) | 15.00 | | 796.25 | 4629392 |
| 9/3/2006 | chk# 3033 ck SKS | | 796.25 | 0.00 | 2341999 |
| 10/1/2006 | Parking Charges (10/2006) | 10.00 | | 10.00 | 4709731 |
| 10/1/2006 | Washer/Dryer Rental (10/2006) | 35.00 | | 45.00 | 4709732 |
| 10/1/2006 | Monthly Rent Charges (10/2006) | 815.00 | | 860.00 | 4709733 |
| 10/1/2006 | Qualified Resident Concession (10/2006) | (78.75) | | 781.25 | 4709734 |
| 10/1/2006 | Pet Rent (10/2006) | 15.00 | | 796.25 | 4709735 |
| 10/4/2006 | chk# 3038 ck SKS | | 796.25 | 0.00 | 2391474 |
| 11/1/2006 | Parking Charges (11/2006) | 10.00 | | 10.00 | 4789763 |
| 11/1/2006 | Washer/Dryer Rental (11/2006) | 35.00 | | 45.00 | 4789764 |
| 11/1/2006 | Monthly Rent Charges (11/2006) | 815.00 | | 860.00 | 4789765 |
| 11/1/2006 | Qualified Resident Concession (11/2006) | (78.75) | | 781.25 | 4789766 |
| 11/1/2006 | Pet Rent (11/2006) | 15.00 | | 796.25 | 4789767 |
| 11/2/2006 | chk# 3041 ck SKS | | 796.25 | 0.00 | 2433036 |
| 12/1/2006 | Parking Charges (12/2006) | 10.00 | | 10.00 | 4866109 |
| 12/1/2006 | Washer/Dryer Rental (12/2006) | 35.00 | | 45.00 | 4866110 |
| 12/1/2006 | Monthly Rent Charges (12/2006) | 815.00 | | 860.00 | 4866111 |
| 12/1/2006 | Qualified Resident Concession (12/2006) | (78.75) | | 781.25 | 4866112 |
| 12/1/2006 | Pet Rent (12/2006) | 15.00 | | 796.25 | 4866113 |
| 12/4/2006 | chk# 3044 ck SKS | | 796.25 | 0.00 | 2482623 |
| 1/1/2007 | Parking Charges (01/2007) | 10.00 | | 10.00 | 4941173 |
| 1/1/2007 | Washer/Dryer Rental (01/2007) | 35.00 | | 45.00 | 4941174 |
| 1/1/2007 | Monthly Rent Charges (01/2007) | 815.00 | | 860.00 | 4941175 |

Ledger  

| Date | Description | Charge | Payment | Balance | Ref |
|---|---|---|---|---|---|
| 1/1/2007 | Qualified Resident Concession (01/2007) | (78.75) | | 781.25 | 4941176 |
| 1/1/2007 | Pet Rent (01/2007) | 15.00 | | 796.25 | 4941177 |
| 1/4/2007 | chk# 3021 ck SKS | | 796.25 | 0.00 | 2526708 |
| 2/1/2007 | Parking Charges (02/2007) | 10.00 | | 10.00 | 5017869 |
| 2/1/2007 | Washer/Dryer Rental (02/2007) | 35.00 | | 45.00 | 5017870 |
| 2/1/2007 | Monthly Rent Charges (02/2007) | 815.00 | | 860.00 | 5017871 |
| 2/1/2007 | Qualified Resident Concession (02/2007) | (78.75) | | 781.25 | 5017872 |
| 2/1/2007 | Pet Rent (02/2007) | 15.00 | | 796.25 | 5017873 |
| 2/3/2007 | chk# 3060 ck SKS | | 796.25 | 0.00 | 2570231 |
| 3/1/2007 | Parking Charges (03/2007) | 10.00 | | 10.00 | 5092580 |
| 3/1/2007 | Washer/Dryer Rental (03/2007) | 35.00 | | 45.00 | 5092581 |
| 3/1/2007 | Monthly Rent Charges (03/2007) | 815.00 | | 860.00 | 5092582 |
| 3/1/2007 | Qualified Resident Concession (03/2007) | (78.75) | | 781.25 | 5092583 |
| 3/1/2007 | Pet Rent (03/2007) | 15.00 | | 796.25 | 5092584 |
| 3/1/2007 | chk# 3065 ck SKS | | 796.25 | 0.00 | 2604160 |
| 4/1/2007 | Parking Charges (04/2007) | 10.00 | | 10.00 | 5166302 |
| 4/1/2007 | Washer/Dryer Rental (04/2007) | 35.00 | | 45.00 | 5166303 |
| 4/1/2007 | Monthly Rent Charges (04/2007) | 815.00 | | 860.00 | 5166304 |
| 4/1/2007 | Qualified Resident Concession (04/2007) | (78.75) | | 781.25 | 5166305 |
| 4/1/2007 | Pet Rent (04/2007) | 15.00 | | 796.25 | 5166306 |
| 4/4/2007 | chk# 3072 ck SKS | | 796.25 | 0.00 | 2662486 |
| 5/1/2007 | Parking Charges (05/2007) | 10.00 | | 10.00 | 5235677 |
| 5/1/2007 | Washer/Dryer Rental (05/2007) | 35.00 | | 45.00 | 5235678 |
| 5/1/2007 | Monthly Rent Charges (05/2007) | 825.00 | | 870.00 | 5235679 |
| 5/1/2007 | Qualified Resident Concession (05/2007) | (68.75) | | 801.25 | 5235680 |
| 5/1/2007 | Pet Rent (05/2007) | 15.00 | | 816.25 | 5235681 |
| 5/3/2007 | chk# 3081 ck SKS | | 816.25 | 0.00 | 2701081 |
| 6/1/2007 | Parking Charges (06/2007) | 10.00 | | 10.00 | 5303538 |
| 6/1/2007 | Washer/Dryer Rental (06/2007) | 35.00 | | 45.00 | 5303539 |
| 6/1/2007 | Monthly Rent Charges (06/2007) | 825.00 | | 870.00 | 5303540 |
| 6/1/2007 | Qualified Resident Concession (06/2007) | (68.75) | | 801.25 | 5303541 |
| 6/1/2007 | Pet Rent (06/2007) | 15.00 | | 816.25 | 5303542 |
| 6/4/2007 | chk# 3088 ck SKS | | 816.25 | 0.00 | 2745436 |
| 7/1/2007 | Parking Charges (07/2007) | 10.00 | | 10.00 | 5372368 |
| 7/1/2007 | Washer/Dryer Rental (07/2007) | 35.00 | | 45.00 | 5372369 |
| 7/1/2007 | Monthly Rent Charges (07/2007) | 825.00 | | 870.00 | 5372370 |
| 7/1/2007 | Qualified Resident Concession (07/2007) | (68.75) | | 801.25 | 5372371 |
| 7/1/2007 | Pet Rent (07/2007) | 15.00 | | 816.25 | 5372372 |
| 7/4/2007 | chk# 3094 ck SKS | | 816.25 | 0.00 | 2790956 |
| 8/1/2007 | Parking Charges (08/2007) | 10.00 | | 10.00 | 5442854 |
| 8/1/2007 | Washer/Dryer Rental (08/2007) | 35.00 | | 45.00 | 5442855 |
| 8/1/2007 | Monthly Rent Charges (08/2007) | 825.00 | | 870.00 | 5442856 |
| 8/1/2007 | Qualified Resident Concession (08/2007) | (68.75) | | 801.25 | 5442857 |
| 8/1/2007 | Pet Rent (08/2007) | 15.00 | | 816.25 | 5442858 |
| 8/3/2007 | chk# 3100 ck LN | | 816.25 | 0.00 | 2832171 |
| 9/1/2007 | Parking Charges (09/2007) | 10.00 | | 10.00 | 5513349 |
| 9/1/2007 | Washer/Dryer Rental (09/2007) | 35.00 | | 45.00 | 5513350 |

CP013587

Ledger    Page 9 of 11

| Date | Description | | | | |
|---|---|---|---|---|---|
| 9/1/2007 | Monthly Rent Charges (09/2007) | 825.00 | | 870.00 | 5513351 |
| 9/1/2007 | Qualified Resident Concession (09/2007) | (68.75) | | 801.25 | 5513352 |
| 9/1/2007 | Pet Rent (09/2007) | 15.00 | | 816.25 | 5513353 |
| 9/4/2007 | chk# 3106 ck LN | | 816.25 | 0.00 | 2878564 |
| 10/1/2007 | Parking Charges (10/2007) | 10.00 | | 10.00 | 5585217 |
| 10/1/2007 | Washer/Dryer Rental (10/2007) | 35.00 | | 45.00 | 5585218 |
| 10/1/2007 | Monthly Rent Charges (10/2007) | 825.00 | | 870.00 | 5585219 |
| 10/1/2007 | Qualified Resident Concession (10/2007) | (68.75) | | 801.25 | 5585220 |
| 10/1/2007 | Pet Rent (10/2007) | 15.00 | | 816.25 | 5585221 |
| 10/4/2007 | chk# 3114 CK SH | | 816.25 | 0.00 | 2925862 |
| 11/1/2007 | Parking Charges (11/2007) | 10.00 | | 10.00 | 5648351 |
| 11/1/2007 | Washer/Dryer Rental (11/2007) | 35.00 | | 45.00 | 5648352 |
| 11/1/2007 | Monthly Rent Charges (11/2007) | 825.00 | | 870.00 | 5648353 |
| 11/1/2007 | Qualified Resident Concession (11/2007) | (68.75) | | 801.25 | 5648354 |
| 11/1/2007 | Pet Rent (11/2007) | 15.00 | | 816.25 | 5648355 |
| 11/2/2007 | Maintenance Concession - Due to leak in apt. 3 nights out and insurance willhelp move items. SH | (400.00) | | 416.25 | 5687588 |
| 11/2/2007 | Renewal Concession - Sign 18 months SH | (100.00) | | 316.25 | 5687613 |
| 11/2/2007 | chk# 3122 CHK-jj | | 316.25 | 0.00 | 2962855 |
| 12/1/2007 | Parking Charges (12/2007) | 10.00 | | 10.00 | 5725694 |
| 12/1/2007 | Washer/Dryer Rental (12/2007) | 35.00 | | 45.00 | 5725695 |
| 12/1/2007 | Monthly Rent Charges (12/2007) | 825.00 | | 870.00 | 5725696 |
| 12/1/2007 | Qualified Resident Concession (12/2007) | (68.75) | | 801.25 | 5725697 |
| 12/1/2007 | Pet Rent (12/2007) | 15.00 | | 816.25 | 5725698 |
| 12/4/2007 | chk# 3127 ck LN | | 816.25 | 0.00 | 3009881 |
| 1/1/2008 | Covered Parking Charges (01/2008) | 10.00 | | 10.00 | 5793415 |
| 1/1/2008 | Washer/Dryer Rental (01/2008) | 35.00 | | 45.00 | 5793416 |
| 1/1/2008 | Monthly Rent Charges (01/2008) | 825.00 | | 870.00 | 5793417 |
| 1/1/2008 | Qualified Resident Concession (01/2008) | (68.75) | | 801.25 | 5793418 |
| 1/1/2008 | Pet Rent (01/2008) | 15.00 | | 816.25 | 5793419 |
| 1/7/2008 | chk# 3135 ck LN | | 816.25 | 0.00 | 3054018 |
| 2/1/2008 | Covered Parking Charges (02/2008) | 10.00 | | 10.00 | 5859840 |
| 2/1/2008 | Washer/Dryer Rental (02/2008) | 35.00 | | 45.00 | 5859841 |
| 2/1/2008 | Monthly Rent Charges (02/2008) | 825.00 | | 870.00 | 5859842 |
| 2/1/2008 | Qualified Resident Concession (02/2008) | (68.75) | | 801.25 | 5859843 |
| 2/1/2008 | Pet Rent (02/2008) | 15.00 | | 816.25 | 5859844 |
| 2/5/2008 | Late Charges | 50.00 | | 866.25 | 5893137 |
| 2/16/2008 | Late Charges ck was missing LN | (50.00) | | 816.25 | 5899076 |
| 2/16/2008 | Customer Service Concession LN | (25.00) | | 791.25 | 5899080 |
| 2/16/2008 | chk# 3150 ck LN | | 791.25 | 0.00 | 3102745 |
| 2/25/2008 | Amenities/Clubhouse LN | 100.00 | | 100.00 | 5903159 |
| 2/25/2008 | chk# 20050002588 mo LN | | 100.00 | 0.00 | 3106174 |
| 3/1/2008 | Covered Parking Charges (03/2008) | 10.00 | | 10.00 | 5926307 |
| 3/1/2008 | Washer/Dryer Rental (03/2008) | 35.00 | | 45.00 | 5926308 |
| 3/1/2008 | Monthly Rent Charges (03/2008) | 825.00 | | 870.00 | 5926309 |
| 3/1/2008 | Qualified Resident Concession (03/2008) | (68.75) | | 801.25 | 5926310 |
| 3/1/2008 | Pet Rent (03/2008) | 15.00 | | 816.25 | 5926311 |
| 3/4/2008 | chk# 3152 ck LN | | 741.25 | 75.00 | 3141783 |

CP013588

Ledger  

| | | | | 75.00 | 0.00 | 3142323 |
|---|---|---|---|---|---|---|
| 3/4/2008 | chk# 20050002589 mo LN | | | 75.00 | 0.00 | 3142323 |
| 4/1/2008 | Covered Parking Charges (04/2008) | 10.00 | | | 10.00 | 5993110 |
| 4/1/2008 | Washer/Dryer Rental (04/2008) | 35.00 | | | 45.00 | 5993111 |
| 4/1/2008 | Monthly Rent Charges (04/2008) | 825.00 | | | 870.00 | 5993112 |
| 4/1/2008 | Qualified Resident Concession (04/2008) | (68.75) | | | 801.25 | 5993113 |
| 4/1/2008 | Pet Rent (04/2008) | 15.00 | | | 816.25 | 5993114 |
| 4/4/2008 | chk# 3158 ck LN | | 816.25 | | 0.00 | 3188048 |
| 5/1/2008 | Covered Parking Charges (05/2008) | 10.00 | | | 10.00 | 6060170 |
| 5/1/2008 | Washer/Dryer Rental (05/2008) | 35.00 | | | 45.00 | 6060171 |
| 5/1/2008 | Monthly Rent Charges (05/2008) | 825.00 | | | 870.00 | 6060172 |
| 5/1/2008 | Qualified Resident Concession (05/2008) | (68.75) | | | 801.25 | 6060173 |
| 5/1/2008 | Pet Rent (05/2008) | 15.00 | | | 816.25 | 6060174 |
| 5/4/2008 | chk# 3265 ck LN | | 816.25 | | 0.00 | 3230546 |
| 6/1/2008 | Covered Parking Charges (06/2008) | 10.00 | | | 10.00 | 6127123 |
| 6/1/2008 | Washer/Dryer Rental (06/2008) | 35.00 | | | 45.00 | 6127124 |
| 6/1/2008 | Monthly Rent Charges (06/2008) | 825.00 | | | 870.00 | 6127125 |
| 6/1/2008 | Qualified Resident Concession (06/2008) | (68.75) | | | 801.25 | 6127126 |
| 6/1/2008 | Pet Rent (06/2008) | 15.00 | | | 816.25 | 6127127 |
| 6/4/2008 | chk# 3174 ck LN | | 816.25 | | 0.00 | 3275806 |
| 7/1/2008 | Covered Parking Charges (07/2008) | 10.00 | | | 10.00 | 6188492 |
| 7/1/2008 | Washer/Dryer Rental (07/2008) | 35.00 | | | 45.00 | 6188493 |
| 7/1/2008 | Monthly Rent Charges (07/2008) | 825.00 | | | 870.00 | 6188494 |
| 7/1/2008 | Qualified Resident Concession (07/2008) | (68.75) | | | 801.25 | 6188495 |
| 7/1/2008 | Pet Rent (07/2008) | 15.00 | | | 816.25 | 6188496 |
| 7/4/2008 | chk# 3176 ck LN | | 816.25 | | 0.00 | 3315828 |
| 8/1/2008 | Covered Parking Charges (08/2008) | 10.00 | | | 10.00 | 6243725 |
| 8/1/2008 | Washer/Dryer Rental (08/2008) | 35.00 | | | 45.00 | 6243728 |
| 8/1/2008 | Monthly Rent Charges (08/2008) | 825.00 | | | 870.00 | 6243729 |
| 8/1/2008 | Qualified Resident Concession (08/2008) | (68.75) | | | 801.25 | 6243731 |
| 8/1/2008 | Pet Rent (08/2008) | 15.00 | | | 816.25 | 6243733 |
| 8/4/2008 | Late Charges | 50.00 | | | 866.25 | 6270677 |
| 8/4/2008 | chk# 3185 ck LN | | 816.25 | | 50.00 | 3354015 |
| 8/14/2008 | pd on time | (50.00) | | | 0.00 | 6280991 |
| 9/1/2008 | Covered Parking Charges (09/2008) | 10.00 | | | 10.00 | 6304845 |
| 9/1/2008 | Washer/Dryer Rental (09/2008) | 35.00 | | | 45.00 | 6304846 |
| 9/1/2008 | Monthly Rent Charges (09/2008) | 825.00 | | | 870.00 | 6304847 |
| 9/1/2008 | Qualified Resident Concession (09/2008) | (68.75) | | | 801.25 | 6304848 |
| 9/1/2008 | Pet Rent (09/2008) | 15.00 | | | 816.25 | 6304849 |
| 9/4/2008 | chk# 3194 ck LN | | 816.25 | | 0.00 | 3397577 |
| 10/1/2008 | Covered Parking Charges (10/2008) | 10.00 | | | 10.00 | 6364118 |
| 10/1/2008 | Washer/Dryer Rental (10/2008) | 35.00 | | | 45.00 | 6364119 |
| 10/1/2008 | Monthly Rent Charges (10/2008) | 825.00 | | | 870.00 | 6364120 |
| 10/1/2008 | Qualified Resident Concession (10/2008) | (68.75) | | | 801.25 | 6364121 |
| 10/1/2008 | Pet Rent (10/2008) | 15.00 | | | 816.25 | 6364122 |
| 10/3/2008 | chk# 3202 | | 816.25 | | 0.00 | 3439031 |
| 11/1/2008 | Covered Parking Charges (11/2008) | 10.00 | | | 10.00 | 6424007 |
| 11/1/2008 | Washer/Dryer Rental (11/2008) | 35.00 | | | 45.00 | 6424008 |

# EXHIBIT E

**Aspen Park Apartments**
5152 Mack Rd.
Sacramento, CA 95823
Phone: 916-395-4000
Fax: 916-395-4872



CONGRATULATIONS on your decision to move to a Wasatch Premier Community , professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: **7826 Summersdale Drive #434, Sacramento, CA 95823**

You are scheduled to move in: 10/2/15 and will be signing a 12 month lease, which starts on 10/2/15 and will expire on 10/01/2016. Your total monthly obligation will be $892.16, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from 10/02/2015 to 10/31/2015 | | | Charges | Monthly | | Prorated | |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 863.38 | Rent | $ | 859.00 | $ | 831.29 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 40.00 | Covered Parking | $ | 15.00 | $ | 14.52 |
| Non Refundable Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| **Subtotal** | $ | 903.38 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| **Subtotal** | $ | 903.38 | Animal Rent/Animal | $ | 0.00 | $ | 0.00 |
| Sales Tax (if applicable) | $ | 0.00 | Cable or Internet or Media Package | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 400.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Less Amount Paid | $ | -140.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 1,163.38 | Renter's Insurance | $ | 18.16 | $ | 17.57 |
| Plus Addl. Deposit | $ | 0.00 | RentPlus Service | $ | 0.00 | $ | 0.00 |
| ***Total Due at Move In** | $ | 1,163.38 | Total Charges | $ | 892.16 | $ | 863.38 |
| *** Total Move In & First Month's Rent | $ | 2,055.54 | Total for Additional Services | | | $ | 33.16 |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | SMUD | 916-452-3211 | Acct #  0328651 |
| Gas Provider | n/a | n/a | Acct # |
| Cable Provider | Comcast | 916-439-7846 | |
| Phone Provider | AT&T | 877-225-0000 | Home Phone # |
| Garbage Provider | n/a | n/a | Work Phone # |
| | | | Cell Phone  # |

* Due in cashier's check or money order at the time of move-in.  Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made.  Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement.  Applicant also understands, that upon approval, the deposit(s) is subject to change based on Residential and Employment verifications and /or Credit and Background Check(s), if applicant(s) fail to meet Owner/Management Rental Criteria specifications.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease.  In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant.  If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

*As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion.  Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and It's Ownership Entities & Management named as the additional insured.*

_____
Applicant's Signature

10/2/2015
Date

Tenant/Applicant Code: 10113686
Applicant Name: Tanesha Yates
Occupants:

LD101.06 Revised 08/30/2013

**The Courtyard at Central Park**
4488 North Cornelia
Fresno, CA 93722
Phone: 559-275-1009
Fax: 559-277-0612



CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is:   4498 North Cornelia #C126,  Fresno, CA 93722

You are scheduled to move in: 7/28/11 and will be signing a 12 month lease, which starts on 7/28/11 and will expire on 07/27/2012. Your total monthly obligation will be $398.58, not including monthly utilities, which is due on the First day of each

| Charges from 07/28/2011 to 07/31/2011 | | | Charges | Monthly | | Prorated | |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 51.43 | Rent | $ | 343.00 | $ | 44.26 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 35.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Pet Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 86.43 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 86.43 | Pet Rent/Pet | $ | 0.00 | $ | 0.00 |
| Sales Tax (If applicable) | $ | 0.00 | Alarm Services | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 400.00 | Cable | $ | 40.00 | $ | 5.16 |
| Less Amount Paid | $ | -135.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 351.43 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Plus Addl. Deposit | $ | 0.00 | Renter's Insurance | $ | 15.58 | $ | 2.01 |
| **\*Total Due at Move In** | $ | 351.43 | Internet Services | $ | 0.00 | $ | 0.00 |
| **\*\*\* Total Move In & First Month's Rent** | $ | 750.01 | Total Charges | $ | 398.58 | $ | 51.43 |
| | | | Total for Additional Services | $ | 55.58 | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | PG&E | 800-743-5000 | Acct # 5211840842-7 |
| Gas Provider | PG&E | 800-743-5000 | Acct # |
| Cable Provider | Comcast | 800-824-2000 | |
| Phone Provider | AT&T | 800-891-1800 | Home Phone # |
| Garbage Provider | n/a | n/a | Work Phone # |
| | | | Cell Phone # |

\* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

\*\*\* All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease. In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant. If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

"As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $25,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured."

_Renesha Crl_                                    7/28/2011
Applicant's Signature                            Date

Applicant Code: p0243830
Applicant Name: Renesha Cunningham\*\*\*
Occupants:

LD101.06 Revised 07/07/2008

2

CY006662

**Creekside Villa Apartments**
220 47th Street
San Diego, CA 92102
Phone: 619-263-2686
Fax: 619-263-2927



**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: <u>4625 Nogal Street #D, San Diego, CA 92102</u>

You are scheduled to move in: <u>9/29/16</u> and will be signing a <u>12</u> month lease, which starts on <u>9/29/16</u> and will expire on <u>09/28/2017</u>. Your total monthly obligation will be <u>$2,187.16</u>, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from 09/29/2016 to 09/30/2016 | | Charges | Monthly | Prorated |
|---|---|---|---|---|
| Rent and Additional Services | $ 145.81 | Rent | $ 2,169.00 | $ 144.60 |
| Lease Initiation Fee | $ 0.00 | Washer/Dryer | $ 0.00 | $ 0.00 |
| Application Fee | $ 160.00 | Covered Parking | $ 0.00 | $ 0.00 |
| Non Refundable Fee | $ 0.00 | Uncovered Parking | $ 0.00 | $ 0.00 |
| **Subtotal** | $ 305.81 | Garage | $ 0.00 | $ 0.00 |
| Less Move In Special (if applicable) | $ 0.00 | Storage Rental | $ 0.00 | $ 0.00 |
| **Subtotal** | $ 305.81 | Animal Rent/Animal | $ 0.00 | $ 0.00 |
| Sales Tax (if applicable) | $ 0.00 | Cable or Internet or Media Package | $ 0.00 | $ 0.00 |
| Security Deposit | $ 4,298.00 | Utility Flat Fee | $ 0.00 | $ 0.00 |
| Less Amount Paid | $ 0.00 | Corporate | $ 0.00 | $ 0.00 |
| Utility Setup Fee | $ 0.00 | Month to Month Fee | $ 0.00 | $ 0.00 |
| Estimated Move In Cost | $ 4,603.81 | Renter's Insurance | $ 18.16 | $ 1.21 |
| Plus Addl. Deposit | $ 0.00 | RentPlus Service | $ 0.00 | $ 0.00 |
| **\*Total Due at Move In** | $ 4,603.81 | Total Charges | $ 2,187.16 | $ 145.81 |
| **\*\*\* Total Move In & First Month's Rent** | $ 6,790.97 | Total for Additional Services | | $ 18.16 |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # 1944197596Y |
|---|---|---|---|
| Electric Provider | SDG&E | 800-411-7343 | Acct # _____ |
| Gas Provider | SDG&E | 800-411-7343 | Acct # _____ |
| Cable Provider | Cox Communications | 619-262-1122 | |
| Phone Provider | AT&T | 877-225-0000 | Home Phone # _____ |
| Garbage Provider | Waste Management | 866-449-2107 | Work Phone # _____ |
| | | | Cell Phone # _____ |

\* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

\*\*\* All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement. Applicant also understands, that upon approval, the deposit(s) is subject to change based on Residential and Employment verifications and /or Credit and Background Check(s), if applicant(s) fail to meet Owner/Management Rental Criteria specifications.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease. In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant. If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

\*As of December 1, 2013, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured.\*

| | | |
|---|---|---|
| _Arnold Lim_ | 9/28/2016 | Tenant/Applicant Code: _l0128479_ |
| Applicant's Signature | Date | Applicant Name: _Arnold Lim_ |
| | | Occupants: |

LD101.06 Revised 08/30/2013

3

CV000004

**Peppertree Apartment Holding, LP**
8956 Harness Street
Spring Valley, CA 91977
Phone: 619-463-0579
Fax: 619-463-2105


**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: 8956 Harness Street, # A-7, Spring Valley, CA 91977

You are scheduled to move in: 6/17/15 and will be signing a 12 month lease, which starts on 6/17/15 and will expire on 06/16/2016. Your total monthly obligation will be $920.00, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from 06/17/15 to 06/30/2015 | | | Charges | | Monthly | | Prorated |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 429.34 | Rent | $ | 880.00 | $ | 410.67 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 40.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 469.34 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 469.34 | Animal Rent/Animal | $ | 40.00 | $ | 18.67 |
| Sales Tax (if applicable) | $ | 0.00 | Cable or Internet or Media Package | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 650.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Less Amount Paid | $ | -140.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 979.34 | Renter's Insurance | $ | 0.00 | $ | 0.00 |
| Plus Addl. Deposit | $ | 0.00 | RentPlus Service | $ | 0.00 | $ | 0.00 |
| *Total Due at Move In | $ | 979.34 | Total Charges | $ | 920.00 | $ | 429.34 |
| *** Total Move In & First Month's Rent | $ | 1,899.34 | Total for Additional Services | $ | 40.00 | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # 20695/8530 ✓ |
|---|---|---|---|
| Electric Provider | SDG&E | 800-411-7343 | Acct # |
| Gas Provider | SDG&E | 800-411-7343 | Acct # |
| Cable Provider | Cox Communication | 866-351-2115 | |
| Phone Provider | | | Home Phone # |
| Garbage Provider | Waste Management of El | 619-596-5100 | Work Phone # |
| | | | Cell Phone # |

* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement. Applicant also understands, that upon approval, the deposit(s) is subject to change based on Residential and Employment verifications and /or Credit and Background Check(s), if applicant(s) fail to meet Owner/Management Rental Criteria specifications.

The applicant is depositing herewith, the sum of $ __300__ , receipt of which is acknowledged as a non-interest bearing holding deposit (and not as rent payment) to be applied towards Applicant's security deposit pursuant to the Residential Rental Agreement and retained buy Owner for the duration of the Applicant's occupancy of Apartment #A-7, in the event the application is approved.

*As of December 1, 2003, Wasatch Premier Communities recommends each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured.*

_____
Applicant's Signature

6/17/2015
Date

Tenant/Applicant Code: t0109824
Applicant Name: Alesia Young
Occupants:

LD101.06 Revised 08/30/2013

PST000063

*(handwritten)* Resident Portion #259.00
Additional Services 55.58
Deposit 630.00
$ 944.58

**Chesapeake Commons Apartments**
3600 Data Drive
Rancho Cordova, CA 95670-7403
Phone: 916-635-1970
Fax: 916-635-9350


**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: 3600 Data Drive, #1, Rancho Cordova, CA 95670-7403

You are scheduled to move in: 6/1/11 and will be signing a 12 month lease, which starts on 6/1/11 and will expire on 05/31/2012. Your total monthly obligation will be $314.58, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from: 6/1/11 to 6/30/11 | | | Charges | Monthly | | Prorated | |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 314.58 | Rent | $ | 259.00 | $ | 259.00 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 40.00 | $ | 40.00 |
| Application Fee | $ | 35.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Pet Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 349.58 | Garage | $ | 0.00 | $ | 0.00 |
| Minus Move In Special (if apply) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 349.58 | Pet Rent/Pet | $ | 0.00 | $ | 0.00 |
| Sales Tax (if apply) | $ | 0.00 | Alarm Services | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 630.00 | Cable | $ | 0.00 | $ | 0.00 |
| Minus Amount Paid to Hold | $ | -35.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 944.58 | Month To Month Fee | $ | 0.00 | $ | 0.00 |
| Plus Addl. Deposit (if apply) | $ | 0.00 | Renter's Insurance | $ | 15.58 | | 15.58 |
| *Total Due at Move In | $ | 944.58 | Internet Services | $ | 0.00 | | 0.00 |
| ***Total Move In & First Month's Rent | $ | 1,259.16 | Total Charges | $ | 314.58 | $ | 314.58 |
| | | | Total for Additional Services $55.58 | | | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | SMUD | 888-742-7683 | Acct # _____ |
| Gas Provider | PG&E | 800-743-5000 | Acct # _____ |
| Cable Provider | Comcast | 916-825-9723 | Home Phone # _____ |
| Phone Provider | AT&T | 800-288-2020 | Work Phone # _____ |
| | | | Cell Phone # _____ |

* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease. In the event of rejection, the sum deposited (less the application fee) will be refunded to the Applicant. If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

*As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $25,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured.*

**x** *Ronnie L Block*
Applicant's Signature

5/5/2011
Date

Applicant Code: p0224255
Applicant Name: Ronnie Block
Occupants:

LD101.06 Revised 07/07/2008

5

**Aspen Park Apartments**
5152 Mack Rd.
Sacramento, CA 95823
Phone: 916-395-4000
Fax: 916-395-4872



**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community , professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: 4956 Mack Road #356, Sacramento, CA 95823

You are scheduled to move in: 10/2/15 and will be signing a 12 month lease, which starts on 10/1/15 and will expire on 09/30/2016. Your total monthly obligation will be $872.16, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from 10/02/2015 to 10/31/2015 | | | Charges | | Monthly | | Prorated |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 839.18 | Rent | $ | 849.00 | $ | 821.61 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 40.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| **Subtotal** | $ | 879.18 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| **Subtotal** | $ | 879.18 | Animal Rent/Animal | $ | 0.00 | $ | 0.00 |
| Sales Tax (if applicable) | $ | 0.00 | Cable or Internet or Media Package | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 400.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Less Amount Paid | $ | -140.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 1,139.18 | Renter's Insurance | $ | 18.16 | $ | 17.57 |
| Plus Addl. Deposit | $ | 0.00 | RentPlus Service | $ | 5.00 | $ | 0.00 |
| *Total Due at Move In | $ | 1,139.18 | Total Charges | $ | 872.16 | $ | 839.18 |
| *** Total Move In & First Month's Rent | $ | 2,011.34 | Total for Additional Services | $ | 23.16 | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | SMUD | 916-452-3211 | Acct # _____ |
| Gas Provider | n/a | n/a | Acct # _____ |
| Cable Provider | Comcast | 916-439-7846 | |
| Phone Provider | AT&T | 877-225-0000 | Home Phone # _____ |
| Garbage Provider | n/a | n/a | Work Phone # _____ |
| | | | Cell Phone # _____ |

* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement. Applicant also understands, that upon approval, the deposit(s) is subject to change based on Residential and Employment verifications and /or Credit and Background Check(s), if applicant(s) fail to meet Owner/Management Rental Criteria specifications.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease. In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant. If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

*As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured."

_____
Applicant's Signature

10/1/2015
Date

Tenant/Applicant Code: t0114470
Applicant Name: Michael Scales
Occupants:

LD101.06 Revised 08/30/2013

6

AP000078

**The Courtyard at Central Park**
4488 North Cornelia
Fresno, CA 93722
Phone: 559-275-1009
Fax:  559-277-0612



**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management.  We are committed to our resident's needs and continually strive to serve you in any way we can.  Please feel free to contact us at any time if any questions or concerns arise.  Again, thank you for choosing a Wasatch Premier Community.

Your New Address is:  <u>4488 North Cornelia #S150,  Fresno, CA 93722</u>

You are scheduled to move in: <u>5/1/13</u> and will be signing a <u>12 month</u> lease, which starts on <u>5/1/13</u> and will expire on <u>04/30/2014</u>. Your total monthly obligation will be $<u>707.16</u>, not including monthly utilities, which is due on the First day of each month.  Below is

| Charges from <u>05/01/2013</u> to <u>05/31/2013</u> | | | Charges | | Monthly | | Prorated | |
|---|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 707.16 | Rent | $ | 689.00 | $ | 689.00 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 35.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Pet Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 742.16 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 742.16 | Pet Rent/Pet | $ | 0.00 | $ | 0.00 |
| Sales Tax (if applicable) | $ | 0.00 | Cable/Internet/Media Package | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 100.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Less Amount Paid | $ | -135.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 707.16 | Renter's Insurance | $ | 18.16 | $ | 18.16 |
| Plus Addl. Deposit | $ | 0.00 | RentPlus Service | $ | 0.00 | $ | 0.00 |
| *Total Due at Move In | $ | 707.16 | Total Charges | $ | 707.16 | $ | 707.16 |
| *** Total Move In & First Month's Rent | $ | 1,414.32 | Total for Additional Services | $ | 18.16 | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released.  Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | PG&E | 800-743-5000 | Acct # |
| Gas Provider | PG&E | 800-743-5000 | Acct # <u>7611060143Z</u> |
| Cable Provider | Comcast | 800-824-2000 | |
| Phone Provider | AT&T | 800-891-1800 | Home Phone # |
| Garbage Provider | n/a | n/a | Work Phone # <u>559-449-1819</u> |
| | | | Cell Phone # <u>559-276-2972</u> |

\* Due in cashier's check or money order at the time of move-in.  Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

\*\*\* All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made.  Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease.  In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant.  If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

\*As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage.  Personal Damage Coverage is at the Residents discretion.  Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured."

_____
Applicant's Signature

4/29/2013
Date

Tenant/Applicant Code: <u>10076211</u>
Applicant Name: <u>Elizabeth Gonzalez</u>
Occupants:

LD101.06 Revised 02/24/2012

CY032954

**Creekside Villa Apartments**
220 47th Street
San Diego, CA 92102
Phone: 619-263-2686
Fax: 619-263-2927



**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: <u>4630 Nogal Street #C, San Diego, CA 92102</u>

You are scheduled to move in: <u>5/31/12</u> and will be signing a <u>12</u> month lease, which starts on <u>5/31/12</u> and will expire on <u>05/30/2013</u>. Your total monthly obligation will be $1,066.91, not including monthly utilities, which is due on the First day of each

| Charges from 05/31/2012 to 05/31/2012 | | | Charges | Monthly | | Prorated | |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 34.42 | Rent | $ | 1,049.00 | $ | 33.84 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 35.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Pet Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| **Subtotal** | $ | 69.42 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| **Subtotal** | $ | 69.42 | Pet Rent/Pet | $ | 0.00 | $ | 0.00 |
| Sales Tax (if applicable) | $ | 0.00 | Alarm Services | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 250.00 | Cable | $ | 0.00 | $ | 0.00 |
| Less Amount Paid | $ | -285.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 34.42 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Plus Addl. Deposit | $ | 0.00 | Renter's Insurance | $ | 17.91 | $ | 0.58 |
| *Total Due at Move In | $ | 34.42 | Media Package | $ | 0.00 | $ | 0.00 |
| *** Total Move In & First Month's Rent | $ | 1,101.33 | Total Charges | $ | 1,066.91 | $ | 34.42 |
| | | | Total for Additional Services | $ | 17.91 | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | SDG&E | 800-411-7343 | Acct # ___019___ |
| Gas Provider | SDG&E | 800-411-7343 | Acct # _____ |
| Cable Provider | Cox Communications | 619-262-1122 | |
| Phone Provider | AT&T | 877-225-0000 | Home Phone # _____ |
| Garbage Provider | Waste Management | 866-449-2107 | Work Phone # _____ |
| | | | Cell Phone # _____ |

* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease. In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant. If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

*As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured.*

_Charlene Anderson_
Applicant's Signature

5/31/2012
Date

Tenant/Applicant Code: t0060568
Applicant Name: _Charlene Anderson_
Occupants:

LD101.06 Revised 02/24/2012

8

CV000439

**Peppertree Apartment Holding, LP**
8956 Harness Street
Spring Valley, CA 91977
Phone: 619-463-0579
Fax: 619-463-2105



**WASATCH**

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: <u>8956 Harness Street, # I-6, Spring Valley, CA 91977</u>

You are scheduled to move in: <u>5/27/16</u> and will be signing a <u>12 month</u> lease, which starts on <u>5/27/16</u> and will expire on <u>05/26/2017</u>. Your total monthly obligation will be <u>$932.16</u>, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from 05/27/2016 to 05/31/2016 | | | Charges | Monthly | | Prorated | |
|---|---|---|---|---|---|---|---|
| Rent and Additional Services | $ | 150.35 | Rent | $ | 914.00 | $ | 147.42 |
| Lease Initiation Fee | $ | 0.00 | Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Application Fee | $ | 40.00 | Covered Parking | $ | 0.00 | $ | 0.00 |
| Non Refundable Fee | $ | 0.00 | Uncovered Parking | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 190.35 | Garage | $ | 0.00 | $ | 0.00 |
| Less Move In Special (if applicable) | $ | 0.00 | Storage Rental | $ | 0.00 | $ | 0.00 |
| Subtotal | $ | 190.35 | Animal Rent/Animal | $ | 0.00 | $ | 0.00 |
| Sales Tax (if applicable) | $ | 0.00 | Cable or Internet or Media Package | $ | 0.00 | $ | 0.00 |
| Security Deposit | $ | 300.00 | Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Less Amount Paid | $ | -140.00 | Corporate | $ | 0.00 | $ | 0.00 |
| Utility Setup Fee | $ | 0.00 | Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Estimated Move In Cost | $ | 350.35 | Renter's Insurance | $ | 18.16 | $ | 2.93 |
| Plus Addl. Deposit | $ | 0.00 | RentPlus Service | $ | 0.00 | $ | 0.00 |
| *Total Due at Move In | $ | 350.35 | Total Charges | $ | 932.16 | $ | 150.35 |
| *** Total Move In & First Month's Rent | $ | 1,282.51 | Total for Additional Services | $ | 18.16 | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Service | Provider | Phone # | Account # 70168 20097 |
|---|---|---|---|
| Electric Provider | SDG&E | 800-411-7343 | Acct # _____ |
| Gas Provider | SDG&E | 800-411-7343 | Acct # _____ |
| Cable Provider | Cox Communication | 866-351-2115 | |
| Phone Provider | | | Home Phone # _____ |
| Garbage Provider | Waste Management of El | 619-596-5100 | Work Phone # _____ |
| | | | Cell Phone # _____ |

* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement. Applicant also understands, that upon approval, the deposit(s) is subject to change based on Residential and Employment verifications and /or Credit and Background Check(s), if applicant(s) fail to meet Owner/Management Rental Criteria specifications.

The applicant is depositing herewith, the sum of $ <u>300.00</u>, receipt of which is acknowledged as a non-interest bearing holding deposit (and not as rent payment) to be applied towards Applicant's security deposit pursuant to the Residential Rental Agreement and retained buy Owner for the duration of the Applicant's occupancy of Apartment #I-6 in the event the application is approved.

*As of December 1, 2003, Wasatch Premier Communities recommends each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and It's Ownership Entities & Management named as the additional insured.*

_Janis L Carlson_
Applicant's Signature

5/27/2016
Date

Tenant/Applicant Code: _t0122749_
Applicant Name: _Janis Carlson_
Occupants:

LD101.06 Revised 08/30/2013

9

PST003915

**Stonepine Apartments**
4488 North Cornelia
Fresno, CA 93722
Phone: 559-275-1009
Fax: 559-277-0612



CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: 4488 North Cornelia #S149, Fresno, CA 93722

You are scheduled to move in: 9/1/08 and will be signing a 12 month lease, which starts on 9/1/08 and will expire on 8/31/09. Your total monthly obligation will be $712.46, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

Charges from 9/1/08 to 9/30/08

| | | | Charges | Monthly | Prorated |
|---|---|---|---|---|---|
| Rent and Additional Services | $ | 697.00 | | | |
| Lease Initiation Fee | $ | 0.00 | Rent | $ 659.00 | $ 659.00 |
| Application Fee | $ | 30.00 | Washer/Dryer | $ 0.00 | $ 0.00 |
| Non Refundable Pet Fee | $ | 0.00 | Covered Parking | $ 0.00 | $ 0.00 |
| Subtotal | $ | 727.00 | Uncovered Parking | $ 0.00 | $ 0.00 |
| Minus Move In Special (if apply) | $ | 0.00 | Garage | $ 0.00 | $ 0.00 |
| Subtotal | $ | 727.00 | Storage Rental | $ 0.00 | $ 0.00 |
| Sales Tax (if apply) | $ | 0.00 | Pet Rent/Pet | $ 0.00 | $ 0.00 |
| Security Deposit | $ | 1284.00 | Alarm Services | $ 0.00 | $ 0.00 |
| Minus Amount Paid to Hold | $ | -918.00 | Cable | $ 38.00 | $ 38.00 |
| Utility Setup Fee | $ | 0.00 | Utility Flat Fee | $ 0.00 | $ 0.00 |
| **Mandatory Renter's Insurance** | $ | 15.46 | Corporate | $ 0.00 | $ 0.00 |
| Estimated Move In Cost | $ | 1,108.46 | Month To Month Fee | $ 0.00 | $ 0.00 |
| Plus Addl. Deposit (if apply) | $ | 0.00 | Renter's Insurance | $ 15.46 | |
| **\*Total Due at Move In** | $ | **1,108.46** | | 712.46 | 697.00 |
| \*\*\*Total Move In & First Month's rent | $ | 1,820.92 | | | |

Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.

| Electric Provider | PG&E | 800-743-5000 | Acct # 9875674615 4 |
|---|---|---|---|
| Gas Provider | PG&E | 800-743-5000 | Acct # |
| Cable Provider | Comcast | 800-824-2000 | Home Phone # 271 - 8595 |
| Phone Provider | Pacific Bell | 800-310-2355 | Work Phone # |
| | | | Cell Phone # 301 - 6872 |

\* Due in cashier's check or money order at the time of move-in. Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

\*\*\* All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement.

Lessor reserves the right to reject your rental application any time prior to execution and delivery of the lease. In the event of rejections, the sum deposited (less the application fee) will be refunded to the Applicant. If Applicant withdraws the application prior to execution of lease, this deposit will be forfeited unless written cancellation is received within 72 hours from this date.

\*As of December 1, 2003, Wasatch Premier Communities requires each resident to maintain Renter's Insurance with a minimum of $25,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and it's Ownership Entities & Management named as the additional insured."

_Dana Jones_                          8/29/2008                    Applicant Code: p0004463
Applicant's Signature                  Date                        Applicant Name: Dana Jones

LD101.06 Revised 07/07/2008

10

CY032794

# EXHIBIT F

## MONTHLY COST BREAKDOWN:

| | |
|---|---|
| Apartment Base Rent | $ 1,069.00 |
| + Additional Services | $ 90.58 |
| =Subtotal of Charges | $ 1,159.58 |
| + Taxes of ___ % (if applicable) | $ 0.00 |
| =Total Monthly Obligation | $ 1,159.58 |

**Your monthly payment is due and payable to Creekside Villa Apartments, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you. Creekside Villa Apartments is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Creekside Villa Apartments .**

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (619)-263-2686. If it is after regular office hours, maintenance can be reached by calling (619)-785-7408.

**Night Services**
If you need assistance from our Night Services, please call (619)-401-9431. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader for Creekside Villa Apartments at (619)-585-8616 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08



CV005562

## MONTHLY COST BREAKDOWN:

| | |
|---|---|
| Apartment Base Rent | $ 971.00 |
| + Additional Services | $ 36.00 |
| =Subtotal of Charges | $ 1,007.00 |
| + Taxes of        % (if applicable) | $ 0.00 |
| =Total Monthly Obligation | $ 1,007.00 |

Your monthly payment is due and payable to River Oaks Apartments, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you.   River Oaks Apartments is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to River Oaks Apartments .

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (559)-584-8479.  If it is after regular office hours, maintenance can be reached by calling (559)-587-6241.

**Night Services**
If you need assistance from our Night Services, please call (559)-836-2633. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible.  If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above.  If you have additional comments you may contact the Area Leader for River Oaks Apartments at (559)-270-1110 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08



2

RO000243

 

## MONTHLY COST BREAKDOWN:

| | | |
|---|---|---|
| **Apartment Base Rent** | $ | 675.00 |
| **+ Additional Services** | $ | 15.45 |
| **=Subtotal of Charges** | $ | 690.45 |
| **+ Taxes of        % (if applicable)** | $ | 0.00 |
| **=Total Monthly Obligation** | $ | 690.45 |

**Your monthly payment is due and payable to Chesapeake Commons Apartments, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you. Chesapeake Commons Apartments is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Chesapeake Commons Apartments .**

## Our commitment to you is SERVICE.

### Maintenance
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-635-1970. If it is after regular office hours, maintenance can be reached by calling (800)-426-4652.

### Night Services
If you need assistance from our Night Services, please call (877)-206-1021. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

### Pest Control
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

### Additional Customer Service Information
As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader for Chesapeake Commons Apartments at (916)-852-9652 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08

## MONTHLY COST BREAKDOWN:

| | | |
|---|---|---|
| Apartment Base Rent | $ | 709.00 |
| + Additional Services | $ | 70.58 |
| =Subtotal of Charges | $ | 779.58 |
| + Taxes of _____ % (if applicable) | $ | 0.00 |
| =Total Monthly Obligation | $ | 779.58 |

Your monthly payment is due and payable to The Courtyard at Central Park, on or before the 1st day of each month.  You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you.   The Courtyard at Central Park  is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to The Courtyard at Central Park .

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (559)-275-1009.  If it is after regular office hours, maintenance can be reached by calling (559)-262-3865.

**Night Services**
If you need assistance from our Night Services, please call (n/a). If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible.  If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above.  If you have additional comments you may contact the Area Leader for The Courtyard at Central Park at (559)-270-1110 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08

WASATCH
PREMIER COMMUNITIES

CY033033

## MONTHLY COST BREAKDOWN:

| | |
|---|---|
| Apartment Base Rent | $ 1,422.00 |
| + Additional Services | $    45.58 |
| =Subtotal of Charges | $ 1,467.58 |
| + Taxes of        % (if applicable) | $    0.00 |
| =Total Monthly Obligation | $ 1,467.58 |

**Your monthly payment is due and payable to Creekside Villa Apartments, on or before the 1st day of each month.  You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you.   Creekside Villa Apartments  is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Creekside Villa Apartments .**

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (619)-263-2686.  If it is after regular office hours, maintenance can be reached by calling (916)-785-7408.

**Night Services**
If you need assistance from our Night Services, please call (619)-401-9431. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible.  If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above.  If you have additional comments you may contact the Area Leader for Creekside Villa Apartments at (619)-585-8616 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08

CV000359



## MONTHLY COST BREAKDOWN:

| | | |
|---|---|---|
| **Apartment Base Rent** | $ | **760.00** |
| **+ Additional Services** | $ | **57.91** |
| **=Subtotal of Charges** | $ | **817.91** |
| **+ Taxes of        % (if applicable)** | $ | **0.00** |
| **=Total Monthly Obligation** | $ | **817.91** |

Your monthly payment is due and payable to Chesapeake Commons Apartments, on or before the 1st day of each month.  You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you.   Chesapeake Commons Apartments  is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Chesapeake Commons Apartments .

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-635-1970.  If it is after regular office hours, maintenance can be reached by calling (800)-426-4652.

**Night Services**
If you need assistance from our Night Services, please call (916)-331-3175. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible.  If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above.  If you have additional comments you may contact the Area Leader for Chesapeake Commons Apartments at (916)-635-1970 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08



6

CP000123

## MONTHLY COST BREAKDOWN:

| | | |
|---|---|---|
| Apartment Base Rent | $ | 659.00 |
| + Additional Services | $ | 53.46 |
| =Subtotal of Charges | $ | 712.46 |
| + Taxes of          % (if applicable) | $ | 0.00 |
| =Total Monthly Obligation | $ | 712.46 |

Your monthly payment is due and payable to Stonepine Apartments, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you.  Stonepine Apartments is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Stonepine Apartments.

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (559)-275-1009.  If it is after regular office hours, maintenance can be reached by calling (559)-262-3865.

**Night Services**
If you need assistance from our Night Services, please call (559)-222-3474. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above.  If you have additional comments you may contact the Area Leader for Stonepine Apartments at (559)-583-0500 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08




CY032854

# Monthly Statement of Rental Account

Tony Hart
290 47th Street #D
San Diego, CA 92102

Dear Tony,

The first of the month is quickly approaching and rent will be due on April 1, 2017. This statement has been prepared for you by the rental office at Creekside Villa Apartments.

| | |
|---|---|
| Current Account Balance as of March 24, 2017 | $0.15 ~~PAST DUE~~ |
| + Monthly Rent Charges | $248.00 |
| + Garage Rental | $150.00 |
| + Renter's Insurance | $18.33 |
| **= Total Due on April 1, 2017** | **$416.48** |

Based on the current balance on your account, if any, and upcoming charges that will be billed on April 1, 2017 your payment due will be $416.48 as outlined above. **This amount does not include any utilities.**

If rent is not paid by 5:00 p.m. on the 3rd, the balance due will be $466.48, which includes the initial late fee of $50.00 and a Notice Service Fee of $0.00, if applicable by State/Local laws. Add $0.00 per day until rent is paid in full.

If you have any questions about your balance please feel free to contact the Creekside Villa Apartments office at 619-263-2686 and we will be happy to review your account with you.

Thanking you in advance for your prompt payment.

Financial Manager
Creekside Villa Apartments

CV005614

## Monthly Statement of Rental Account

Maria Cornejo
270 47th Street #A
San Diego, CA 92102

Dear Maria,

The first of the month is quickly approaching and rent will be due on April 1, 2016. This statement has been prepared for you by the rental office at Creekside Villa Apartments.

| | |
|---|---|
| Current Account Balance as of March 30, 2016 | $141.14 **PAST DUE** |
| + Monthly Rent Charges | $350.00 |
| + Renter's Insurance | $18.16 |
| **= Total Due on April 1, 2016** | **$509.30** |

Based on the current balance on your account, if any, and upcoming charges that will be billed on April 1, 2016 your payment due will be $509.30 as outlined above. **This amount does not include any utilities.**

If rent is not paid by 5:00 p.m. on the 3rd, the balance due will be $559.30, which includes the initial late fee of $50.00 and a Notice Service Fee of $0.00, if applicable by State/Local laws. Add $0.00 per day until rent is paid in full.

If you have any questions about your balance please feel free to contact the Creekside Villa Apartments office at 619-263-2686 and we will be happy to review your account with you.

Thanking you in advance for your prompt payment.

Financial Manager
Creekside Villa Apartments

CV003647

# EXHIBIT G

 

## Renewal Notification
### Chesapeake Commons Apartments

04/14/2016

**Ronnie Block**
**3600 Data Drive, #1**
**Rancho Cordova, CA 95670**

Dear  Ronnie Block,

We have enjoyed having you as a resident at Chesapeake Commons Apartments and hope you have been proud to call our community your home.  As you know, your lease will be expiring on 05/31/2016.  We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Chesapeake Commons Apartments is the best it can be and we always strive to make constant improvements.  In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs.  When you renew your lease, your new rental rate will be $843.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).  This rate will be in effect beginning 06/01/2016.

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease.  As a reminder, your new lease needs to be signed prior to 04/26/2016, or we will assume that you have chosen the month to month lease term, which is currently $1,157.16, and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Chesapeake Commons Apartments and we will be happy to assist you in completing the 60-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority!  Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Chesapeake Commons Apartments home!  It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

Sylvia Gamboa
Community Manager

# Renewal Notification
### Creekside Villa Apartments

04/01/2015

**Trina Anderson**
**264 47th Street #A**
**San Diego, CA 92102**

Dear  Trina Anderson,

We have enjoyed having you as a resident at Creekside Villa Apartments and hope you have been proud to call our community your home.  As you know, your lease expired on 03/07/2013.  We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Creekside Villa Apartments is the best it can be and we always strive to make constant improvements.  In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs.  When you renew your lease, your new rental rate will be $1,408.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).  This rate will be in effect beginning 06/01/2015.

Creekside Villa Apartments now offers RentPlus, a service that reports positive payment history to credit bureaus to assist residents in building positive rental/credit history.  The monthly cost of this service is $5.00 and will be billed to you in conjunction with Monthly Rent and other Additional Service charges, should you choose to participate in RentPlus services.

☐   Resident agrees to participate in RentPlus services      ☐   Resident opts out of RentPlus services

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease.  As a reminder, your new lease needs to be signed prior to 05/24/2015 or we will assume that you have chosen the month to month lease term, which is currently $1,508.16 and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Creekside Villa Apartments and we will be happy to assist you in completing the 60-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority!  Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Creekside Villa Apartments home!  It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

Ofelia Pena
Community Manager

*OK Contract Rent $1390.00*

Copy to Resident File-t0056368                                RS104.04 – 60 Day Notice – Renewal Notification — Revised 02/13/2015

2—

# Renewal Notification
### Heritage Park-Tax Credit

01/09/2015

**Hi Soon Masterson**
**2665 Clark Avenue, #102**
**Norco, CA 92860**

Dear   Hi Soon Masterson,

We have enjoyed having you as a resident at Heritage Park-Tax Credit and hope you have been proud to call our community your home.  As you know, your lease will be expiring on Tuesday, March 31, 2015. We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Heritage Park-Tax Credit is the best it can be and we always strive to make constant improvements.  In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs.  When you renew your lease, your new rental rate will be **$880.00**, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).  This rate will be in effect beginning Wednesday, April 1, 2015.

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease.  As a reminder, your new lease needs to be signed prior to 3/31/15 , or we will assume that you have chosen the month to month lease term, which is currently **$880.00**, and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Heritage Park-Tax Credit and we will be happy to assist you in completing the 30-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority!  Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Heritage Park-Tax Credit home!  It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

*Susan Carrillo*

Susan Carrillo
Community Manager

# Renewal Notification
**Aspen Park Apartments**

02/03/2014

**Tania Daniels**
**4964 Mack Road #414**
**Sacramento, CA 95823**

Dear  Tania Daniels,

We have enjoyed having you as a resident at Aspen Park Apartments and hope you have been proud to call our community your home. As you know, your lease will be expiring on Sunday, March 9, 2014. We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Aspen Park Apartments is the best it can be and we always strive to make constant improvements. In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs. When you renew your lease, your new rental rate will be $797.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc). This rate will be in effect beginning Monday, March 10, 2014.

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease. As a reminder, your new lease needs to be signed prior to 02/24/2014, or we will assume that you have chosen the month to month lease term, which is currently $917.16, and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Aspen Park Apartments and we will be happy to assist you in completing the 30-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority! Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Aspen Park Apartments home! It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

Laurie Hunter
Community Manager



## Renewal Notification
### Chesapeake Commons Apartments

06/25/2015

**Mary Cooper**
**3600 Data Drive, #4**
**Rancho Cordova, CA 95670**

Dear  Mary Cooper,

We have enjoyed having you as a resident at Chesapeake Commons Apartments and hope you have been proud to call our community your home.  As you know, your lease will be expiring on 07/31/2015.  We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Chesapeake Commons Apartments is the best it can be and we always strive to make constant improvements.  In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs.  When you renew your lease, your new rental rate will be $839.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).  This rate will be in effect beginning 08/01/2015.

Chesapeake Commons Apartments now offers RentPlus, a service that reports positive payment history to credit bureaus to assist residents in building positive rental/credit history.  The monthly cost of this service is $5.00 per lease holder and will be billed to you in conjunction with Monthly Rent and other Additional Service charges, should you choose to participate in RentPlus services.

☐  Resident agrees to participate in RentPlus services        ☐  Resident opts out of RentPlus services

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease.  As a reminder, your new lease needs to be signed prior to 06/26/2015, or we will assume that you have chosen the month to month lease term, which is currently $1,027.16, and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Chesapeake Commons Apartments and we will be happy to assist you in completing the 60-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority!  Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Chesapeake Commons Apartments home!  It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

Sylvia Gamboa
Community Manager

## Renewal Notification
### Creekside Villa Apartments

04/01/2015

**Charlene Anderson**
**4630 Nogal Street #C**
**San Diego, CA 92102**

Dear   Charlene Anderson,

We have enjoyed having you as a resident at Creekside Villa Apartments and hope you have been proud to call our community your home. As you know, your lease *Expired* on 05/30/2013. We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Creekside Villa Apartments is the best it can be and we always strive to make constant improvements. In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs. When you renew your lease, your new rental rate will be $1,408.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc). This rate will be in effect beginning 06/01/2015.

Creekside Villa Apartments now offers RentPlus, a service that reports positive payment history to credit bureaus to assist residents in building positive rental/credit history. The monthly cost of this service is $5.00 and will be billed to you in conjunction with Monthly Rent and other Additional Service charges, should you choose to participate in RentPlus services.

☐   Resident agrees to participate in RentPlus services        ☐   Resident opts out of RentPlus services

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease. As a reminder, your new lease needs to be signed prior to 5/26/2015, or we will assume that you have chosen the month to month lease term, which is currently $1,508.16 and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Creekside Villa Apartments and we will be happy to assist you in completing the 60-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority! Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Creekside Villa Apartments home!  It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

Ofelia Pena
Community Manager

*# Contract Rent $1390.00*

Copy to Resident File 00060555                                    RS104.04 – 60 Day Notice – Renewal Notification – Revised 02/13/2015

6

CV000462



# Renewal Notification
### Chesapeake Commons Apartments

07/14/2016

**Hien Dinh**
**3600 Data Drive, #549**
**Rancho Cordova, CA 95670**

Dear  Hien Dinh,

We have enjoyed having you as a resident at Chesapeake Commons Apartments and hope you have been proud to call our community your home.  As you know, your lease will be expiring on 09/30/2016.  We have a variety of lease terms for you to choose from, please contact the office to discuss available lease terms.

Our goal is to ensure your home here at Chesapeake Commons Apartments is the best it can be and we always strive to make constant improvements.  In order to maintain those high standards, passing along minimal rate increases are sometimes necessary, which will enable us to keep up with rising costs.  When you renew your lease, your new rental rate will be $937.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).  This rate will be in effect beginning 10/01/2016.

Please contact the office at your earliest convenience to arrange a meeting to sign your new lease.  As a reminder, your new lease needs to be signed prior to 08/27/2016, or we will assume that you have chosen the month to month lease term, which is currently $1,192.16, and is subject to change due to market rent fluctuations.

In the event that life calls you elsewhere and you choose to tender your notice to vacate, please come into the office at Chesapeake Commons Apartments and we will be happy to assist you in completing the 60-Day Written Notice to Vacate.

Complete customer satisfaction is our number one priority!  Any comments, suggestions and service requests that you may have are always welcome.

Thank you for calling Chesapeake Commons Apartments home!  It's been our pleasure serving you and we look forward to having you with us for a long time.

Best regards,

Sylvia Gamboa
Community Manager

# EXHIBIT H

## SIMPLIFY YOUR LIFE
### The Courtyard at Central Park

07/24/2013

**Tenisha Boone***
**4498 North Cornelia #D221**
**Fresno, CA 93722**

Dear  Tenisha Boone***,

Can you imagine living life without a net?  We can!  Wasatch invites you to capture the moment, seize the day, and stay a while.  No one knows where tomorrow may bring you.  Until life calls you elsewhere, Wasatch is your home.

Wasatch is here to help you **Simplify Your Life**.  Not only are we committed to providing great service, we have options for you that may help you to do just that **Simplify Your Life**.  If you are unsure what the future might bring you, we are offering you a no commitment lease option.  This lease agreement is on a month to month basis with no additional fees or penalties just simply give a 30 day notice if life takes you elsewhere.  We are excited to offer you this lease at the rate of $ per month, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

However, if you know that The Courtyard at Central Park will be your home over the next several months or years we are able to offer you a 7 month lease agreement at a monthly rate of $, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

Please contact us by Tuesday, August 27, 2013 and let us know which option will best help you Simplify Your Life.

Thank you for making The Courtyard at Central Park your home.

Sincerely,

Tiffany Collins
Community Manager

Copy to Resident File-t0056711

RS104.02 – 60 Day Notice – Simplify Your Life Letter — Revised 02/04/2010

*www.isyourhome.com*

 Property Management

CY010745

# SIMPLIFY YOUR LIFE
**Aspen Park Apartments**

01/20/2014

**Tania Daniels
4964 Mack Road #414
Sacramento, CA 95823**

Dear  Tania Daniels**,**

Can you imagine living life without a net?  We can!  Wasatch invites you to capture the moment, seize the day, and stay a while.  No one knows where tomorrow may bring you.  Until life calls you elsewhere, Wasatch is your home.

Wasatch is here to help you **Simplify Your Life.**  Not only are we committed to providing great service, we have options for you that may help you to do just that **Simplify Your Life.**   If you are unsure what the future might bring you, we are offering you a no commitment lease option.  This lease agreement is on a month to month basis with no additional fees or penalties just simply give a 30 day notice if life takes you elsewhere.  We are excited to offer you this lease at the rate of  $917.16 per month, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

However, if you know that Aspen Park Apartments will be your home over the next several months or years we are able to offer you a 12 month lease agreement at a monthly rate of $797.16, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

Please contact us by Monday, February 24, 2014 and let us know which option will best help you Simplify Your Life.

Thank you for making Aspen Park Apartments your home.

Sincerely,

Laurie Hunter
Community Manager

 

# SIMPLIFY YOUR LIFE
### Chesapeake Commons Apartments

11/19/2012

**Mary Cooper**
**3600 Data Drive, #4**
**Rancho Cordova, CA 95670**

Dear  Mary Cooper,

Can you imagine living life without a net?  We can!  Wasatch invites you to capture the moment, seize the day, and stay a while.  No one knows where tomorrow may bring you.  Until life calls you elsewhere, Wasatch is your home.

Wasatch is here to help you **Simplify Your Life**.  Not only are we committed to providing great service, we have options for you that may help you to do just that **Simplify Your Life**.  If you are unsure what the future might bring you, we are offering you a no commitment lease option.  This lease agreement is on a month to month basis with no additional fees or penalties just simply give a 60 day notice if life takes you elsewhere.  We are excited to offer you this lease at the rate of $846.91 per month, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

However, if you know that Chesapeake Commons Apartments will be your home over the next several months or years we are able to offer you a 12 month lease agreement at a monthly rate of $721.91, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

Please contact us by Thursday, December 27, 2012 and let us know which option will best help you Simplify Your Life.

Thank you for making Chesapeake Commons Apartments your home.

Sincerely,

Christine Hyne
Community Manager

# SIMPLIFY YOUR LIFE
### Chesapeake Commons Apartments

07/02/2013

**William Westwood**
**3600 Data Drive, #307**
**Rancho Cordova, CA 95670**

Dear   William Westwood,

Can you imagine living life without a net?  We can!  Wasatch invites you to capture the moment, seize the
day, and stay a while.  No one knows where tomorrow may bring you.  Until life calls you elsewhere,
Wasatch is your home.

Wasatch is here to help you **Simplify Your Life**.  Not only are we committed to providing great service, we
have options for you that may help you to do just that **Simplify Your Life**.  If you are unsure what the
future might bring you, we are offering you a no commitment lease option.  This lease agreement is on a
month to month basis with no additional fees or penalties just simply give a 60 day notice if life takes you
elsewhere.  We are excited to offer you this lease at the rate of  $867.16 per month, this rate includes rent
and any applicable service items (such as parking, renter's insurance, pet, etc).

However, if you know that Chesapeake Commons Apartments will be your home over the next several
months or years we are able to offer you a 12 month lease agreement at a monthly rate of $757.16, this
rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc).

Please contact us by Tuesday, August 27, 2013 and let us know which option will best help you Simplify
Your Life.

Thank you for making Chesapeake Commons Apartments your home.

Sincerely,

Christine Hyne
Community Manager

# EXHIBIT I

## 30-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

To: Wasatch Property Management and The Courtyard at Central Park

As of, 03/04/2014 hereafter referred to as Notice Date, the undersigned Resident(s), Renesha Cunningham*** intends to terminate residency of the premises located at: 4498 North Cornelia #C126, Fresno, CA 93722 as of 05/31/2014, by 10:00 am, at which time a final walk through inspection will be completed. If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated 12/01/2013, that if Resident chooses to terminate the current lease prior to lease end date of 05/31/2014, they may:

__X__    Pay the remaining balance of the Lease Term, in monthly payments of 713.00 due and payable on or before the 1st day of each month up until the lease end date of 05/31/2014 or reoccupancy date, whichever occurs first and be eligible for a refund in the event the apartment is re-leased prior to 05/31/2014.

_____    Pay a Lease Cancellation fee of 713.00 and eliminate all rent liability for the remaining term of the Lease.

_____    A Pre-Move Out Inspection will be conducted within 7 Days of 03/04/2014 at your apartment. This inspection has been
Initials   scheduled for 3/11/14 at 9:00 (am/pm). You do not need to be present for this inspection.

1.  It is further understood as follows:
    a.  That this 30-Day Notice is required per your signed Rental Agreement.
    b.  Except as provided by law, rent shall be due and payable up to and including the date of termination or thirty(30) days after the service of the notice of 03/04/2014, whichever is later.
    c.  If all keys are not returned by 05/31/2014 at 10:00 am the resident shall be considered in occupancy of the premises without the permission of the owner.
    d.  If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be responsible for the payment of rent from the termination date stated in the notice to the Resident's actual move out date. The resident will be assessed 150% of the current month's daily rent for each day the resident remains in occupancy after 05/31/2014. Resident will be charged an administrative fee of $25.00 if the resident remains in occupancy after the termination date, cancels or modifies the Notice.
    e.  Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and The Courtyard at Central Park.
    f.  A move out condition inspection will be conducted 05/31/2014. You are encouraged to be present during the move out inspection.

2.  A final account statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the premises and subsequent move-out inspection by The Courtyard at Central Park.

RESIDENTS FORWARDING ADDRESS (PLEASE PRINT)

Name:  _Renesha Cunningham_                    2790 StoneCreek Dr
                                                        Apt #109
Street Address:  _4408 N. Sequoia_              Sacramento, CA 95833

City:  _Fresno_        State:  _CA_        Zip Code:  _93705_

Primary Phone: (559) 709-3081        Secondary Phone: (559) 709-3081

Reason for Move: N/A

| | | |
|---|---|---|
| Current Account Balance | $ | (33.92) |
| Rent Charges through Move Out Date of 05/31/2014 | $ | 1,426.00 |
| Additional Services through Move out Date of 05/31/2014 | $ | 36.32 |
| Concession Charge Back (If lease term is not being fulfilled) | $ | $0.00 |
| Lease Cancellation Fee (If applicable by above stated dates): | $ | 0.00 |
| Taxes of 0.00% (If Applicable) | $ | $0.00 |
| Total Due at Time 30 Day Notice of Resident's Intent to Vacate: | $ | $1,428.40 * |
| Plus Utilities Billing Prorate by Owners Agent | $ | |

\* The balance shown is due and payable, via Money Order or Cashier's Check, to The Courtyard at Central Park at time 30 Day Notice of Resident's Intent to Vacate is given. This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out inspection by owner's authorized agent.

_____          _____
Resident Signature                                Resident Signature

_____          Receipt of the above notice is hereby acknowledged 3/4/2014
Owner's Authorized Agent                      Copy to Resident--Original in Resident File--LD315.01.CA Revised  11/12/2013

www.isyourhome.com                    WASATCH                        C126        t0046203
                                       PROPERTY MANAGEMENT

# 30-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

To:  Wasatch Property Management and  Creekside Villa Apartments

The undersigned Resident(s), **Cheryl Lacy*\*\*** intends to terminate residency of the premises located at: **292 47th street #G, San Diego, CA 92102** as of  **05/26/2011, by 10:00 am,** at which time a final walk through inspection will be completed.  If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated **10/01/2010,** that if Resident chooses to terminate the current lease prior to lease end date of **04/30/2011,** he or she may:

_____  X _____    Pay the remaining balance of the Lease each month as rent becomes due up to the date of termantion of the
           Residential Rental Agreement or until the apartment is reoccupied again, whichever occurs first, or

_____    Pay a Lease Cancellation fee of **$1,038.00** and eliminate all rent liability for the remaining term of the.

**PTE Initials**       With your permission, a Pre-Move Out Inspection will be conducted within 7 Days of 04/27/2011 at your
           **apartment. This inspection has been scheduled for** _____ **at** _____ **(am/pm).  You do not need**
           **to be present for this inspection.**

1.  It is further understood as follows:
    a.  That this 30-Day Notice is required per your signed Rental Agreement.
    b.  Except as provided by law, rent shall be due and payable up to and including the date of termination or
        thirty(30) days after the service of the notice on **04/27/2011,** whichever is later.
    c.  If all keys are not returned by **05/26/2011 at 10:00 am** the resident shall be considered in occupancy of the premises without the
        permission of the owner.
    d.  **If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be**
        **responsible for the payment of rent from the termination dated stated in the notice to the Resident's actual move**

    **Initials**   **out date. The resident will be assessed 150% of the current month's rent for each month the resident remains in**
        **occupancy after 05/26/2011.** Resident will be charged an administrative fee of $25.00 if the resident remains in occupancy after
        the termination date, cancels or modifies the Notice.
    e.  Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and Creekside
        Villa Apartments.
    f.  **A move out condition inspection will be conducted 05/26/2011.  You are encouraged to be present during the move**
        **out inspection.**
2.  An account final statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the

Resident's Forwarding Address:  **(PLEASE PRINT)**

Name: _Cheryl D. Lacy_____

Street: _5446 Bayview Heights Pl. Apt 7_____

City _San Diego_____    State _CA_____    Zip Code _92105_____

Home Phone: (619) 358-5569      Cell Phone:

REASON FOR MOVE:    N/A

| | | |
|---|---|---|
| Current Account Balance | $ | $0.00 |
| Rent Charges through Move Out Date of 05/26/2011 | $ | 870.58 |
| Additional Services through Move out Date of 05/26/2011 | $ | 13.07 |
| Concession Charge Back (if lease term is not being fulfilled) | $ | $0.00 |
| Lease Cancellation Fee (if applicable by above stated dates): | $ | 0.00 |
| Taxes of 0.00% (If Applicable) | $ | $0.00 |
| Total Due at Time 30 Day Notice of Resident's Intent to Vacate: | $ | **$883.65** * |
| Plus Utilities Billing Prorate Provided by Owners Agent | $ | |

*The balance shown is due and payable, via Money Order or Cashier's Check, to Creekside Villa Apartments at time 30 Day Notice of Resident's Intent to Vacate is given.  This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out Inspection by owners authorized agent.

_Cheryl D. Lacy 4/27/11_____
Resident Signature                      Resident Signature .

_____                 Receipt of the above notice is hereby acknowledged 4/27/2011
Owners Authorized Agent

                        **Copy to Resident--Original in Resident File--LD315.01.CA Revised 01/31/2011**

# 60-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

To:  Wasatch Property Management and  Chesapeake Commons Apartments

The undersigned Resident(s), **Wilfred Soler** intends to terminate residency of the premises located at: **3600 Data Drive, #364, Rancho Cordova, CA 95670** as of **07/06/2012, by 10:00 am,** at which time a final walk through inspection will be completed.  If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated **06/07/2011**, that if Resident chooses to terminate the current lease prior to lease end date of **06/06/2012**, he or she may:

___X___  Pay the remaining balance of the Lease each month as rent becomes due up to the date of termantion of the Residential Rental Agreement or until the apartment is reoccupied again, whichever occurs first, or

X _N/S_  With your permission, a Pre-Move Out Inspection will be conducted within 7 Days of 06/06/2012 at your
PTE Initials  apartment. This inspection has been scheduled for _____ at _____(am/pm).  You do not need to be present for this inspection.

1.  It is further understood as follows:
    a.  That this 60-Day Notice is required per your signed Rental Agreement.
    b.  Except as provided by law, rent shall be due and payable up to and including the date of termination or sixty(60) days after the service of the notice on **06/06/2012**, whichever is later.
    c.  If all keys are not returned by **07/06/2012 at 10:00 am** the resident shall be considered in occupancy of the premises without the permission of the owner.
X _N/S_  d.  If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be
Initials       responsible for the payment of rent from the termination dated stated in the notice to the Resident's actual move out date. The resident will be assessed 150% of the current month's rent for each month the resident remains in occupancy after **07/06/2012**.  Resident will be charged an administrative fee of $25.00 if the resident remains in occupancy after the termination date, cancels or modifies the Notice.
    e.  Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and Chesapeake Commons Apartments.
    f.  A move out condition inspection will be conducted **07/06/2012**.  You are encouraged to be present during the move out inspection.
2.  An account final statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the

Resident's Forwarding Address:  (PLEASE PRINT)

Name: _WILFRED SOLER_

Street: _7301 BILBY Rd._

City _ELK GROVE_      State_CA._      Zip Code_95757_

Home Phone:       Cell Phone:

REASON FOR MOVE:      Non-Renewal

| | | |
|---|---|---|
| Current Account Balance | $ | ($9.00) |
| Rent Charges through Move Out Date of 07/06/2012 | $ | 148.84 |
| Additional Services through Move Out Date of 07/06/2012 | $ | 11.21 |
| Concession Charge Back (if lease term is not being fulfilled) | $ | $0.00 |
| Lease Cancellation Fee (if applicable by above stated dates): | $ | 0.00 |
| Taxes of 0.00% (If Applicable) | $ | $0.00 |
| Total Due at Time 60 Day Notice of Resident's Intent to Vacate: | $ | $169.05 * |
| Plus Utilities Billing Prorate Provided by Owners Agent | $ | |

_$60.63_

*The balance shown is due and payable, via Money Order or Cashier's Check, to Chesapeake Commons Apartments at time 60 Day Notice of Resident's Intent to Vacate is given. This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out inspection by owner's authorized agent.

_____          _____
Resident Signature                        Resident Signature

                                          Receipt of the above notice is hereby acknowledged 8/6/2012
_____
Owner's Authorized Agent                  Copy to Resident—Original in Resident File—LD315.01.CA Revised 01/31/2011

## 30-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

To: Wasatch Property Management and River Oaks Apartments

The undersigned Resident(s), Amber Pereira*** intends to terminate residency of the premises located at: 598 West Fargo Avenue, Apartment D, Hanford, CA 93230 as of 05/11/2012, by 10:00 am, at which time a final walk through inspection will be completed. If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated 12/17/2011, that if Resident chooses to terminate the current lease prior to lease end date of 12/16/2012, he or she may:

_____ Pay the remaining balance of the Lease each month as rent becomes due up to the date of termantion of the Residential Rental Agreement or until the apartment is reoccupied again, whichever occurs first, or

*A.P.*
PTE Initials

With your permission, a Pre-Move Out Inspection will be conducted within 7 Days of 04/12/2012 at your apartment. This inspection has been scheduled for Tues. 4/17/11 at 4pm (am/pm). You do not need to be present for this inspection.

1. It is further understood as follows:
   a. That this 30-Day Notice is required per your signed Rental Agreement.
   b. Except as provided by law, rent shall be due and payable up to and including the date of termination or thirty(30) days after the service of the notice on 04/12/2012, whichever is later.
   c. If all keys are not returned by 05/11/2012 at 10:00 am the resident shall be considered in occupancy of the premises without the permission of the owner.

*A.P.*
Initials

   d. **If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be responsible for the payment of rent from the termination dated stated in the notice to the Resident's actual move out date. The resident will be assessed 150% of the current month's rent for each month the resident remains in occupancy after 05/11/2012.** Resident will be charged an administrative fee of $25.00 if the resident remains in occupancy after the termination date, cancels or modifies the Notice.
   e. Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and River Oaks Apartments.
   f. A move out condition inspection will be conducted 05/11/2012. You are encouraged to be present during the move out inspection.

2. An account final statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the

Resident's Forwarding Address: (PLEASE PRINT)

Name: Amber Pereira

Street: 7749 Corona Ave

City: Kingsburg      State CA      Zip Code 93031

Home Phone: (559) 904-2435      Cell Phone:

REASON FOR MOVE:      Lgr Living Space

| | | |
|---|---|---|
| Current Account Balance | $ | ($35.00) |
| Rent Charges through Move Out Date of 05/11/2012 | $ | 344.55 |
| Additional Services through Move out Date of 05/11/2012 | $ | 12.77 |
| Concession Charge Back (if lease term is not being fulfilled) | $ | $0.00 |
| Lease Cancellation Fee (if applicable by above stated dates): | $ | 971.00 |
| Taxes of 0.00% (if Applicable) | $ | $0.00 |
| Total Due at Time 30 Day Notice of Resident's Intent to Vacate: | $ | $1,293.32 * |
| Plus Utilities Billing Prorate Provided by Owners Agent | $ | |

*The balance shown is due and payable, via Money Order or Cashier's Check, to River Oaks Apartments at time 30 Day Notice of Resident's Intent to Vacate is given. This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out inspection by owner's authorized agent.*

_Amber Pereira_
Resident Signature

_Collins_
Owner's Authorized Agent

_____
Resident Signature

Receipt of the above notice is hereby acknowledged 4/13/2012

Copy to Resident–Original in Resident File–LD315.01.CA Revised 01/31/2011

4

RO000287

## 60-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

### To:  Wasatch Property Management and  Courtyard at Central Park

As of, <u>05/31/2016</u> hereafter referred to as Notice Date, the undersigned Resident(s), **Tamra Barfield** intends to terminate residency of the premises located at: <u>4488 North Cornelia #S149, Fresno, CA 93722</u> as of <u>07/31/2016, by 10:00 am,</u> at which time a final walk through inspection will be completed.  If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated <u>02/01/2016</u>, that if Resident chooses to terminate the current lease prior to lease end date of <u>07/31/2016</u>, they may:

<u>X</u>  Pay the remaining balance of the Lease Term, in monthly payments of <u>785.00</u> due and payable on or before the 1st day of each month up until the lease end date of <u>07/31/2016</u> or reoccupancy date, whichever occurs first and be eligible for a refund in the event the apartment is re-leased prior to <u>07/31/2016</u>.

_____  Pay a Lease Cancellation fee of <u>785.00</u> and eliminate all rent liability for the remaining term of the Lease.

**TB**
Initials  A Pre-Move Out inspection will be conducted within 7 Days of 05/31/2016 at your apartment.  This inspection has been scheduled for _6/1/16_ at _3:30_ (am/pm).  You do not need to be present for this inspection.

1.  It is further understood as follows:
    a.  That this 60-Day Notice is required per your signed Rental Agreement.
    b.  Except as provided by law, rent shall be due and payable up to and including the date of termination or sixty(60) days after the service of the notice of 05/31/2016, whichever is later.
    c.  If all keys are not returned by <u>07/31/2016 at 10:00 am</u> the resident shall be considered in occupancy of the premises without the permission of the owner.
    d.  If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be responsible for the payment of rent from the termination date stated in the notice to the Resident's actual move out date.
    e.  Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and Courtyard at Central Park.
    f.  A move out condition inspection will be conducted <u>07/31/2016</u>.  You are encouraged to be present during the move out inspection.

2.  A final account statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the premises and subsequent move-out inspection by Courtyard at Central Park .

### RESIDENT'S FORWARDING ADDRESS (PLEASE PRINT)

Name: _____

Street Address: _____

City: _____   State: _____   Zip Code: _____

Email Address: _____

Primary Phone: _____   Secondary Phone: _____

Reason for Move: <u>Financial Problems</u>

| | | |
|---|---|---|
| Current Account Balance | $ | 0.00 |
| Rent Charges through Move Out Date of <u>07/31/2016</u> | $ | 1,570.00 |
| Additional Services through Move out Date of <u>07/31/2016</u> | $ | 66.32 |
| Concession Charge Back *(if lease term is not being fulfilled)* | $ | $0.00 |
| Lease Cancellation Fee *(if applicable by above stated dates)*: | $ | 0.00 |
| Taxes of 0.00% *(if Applicable)* | $ | $0.00 |
| Total Due at Time 60 Day Notice of Resident's Intent to Vacate: | $ | **$1,636.32** * |
| Plus Utilities Billing Prorate Provided by Owners Agent | $ | _____ |

*The balance shown is due and payable, via Electronic Funds, Money Order or Cashier's Check, to Courtyard at Central Park at time 60 Day Notice of Resident's Intent to Vacate is given.  This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out inspection by owner's authorized agent.

X _Tamra Barfield_____          _____
Resident Signature                                Resident Signature

_____          Receipt of the above notice is hereby acknowledged <u>5/31/2016</u>
Owner's Authorized Agent                          Copy to Resident--Original in Resident File--LD316.01.CA Revised  11/12/2013

CY032649

# EXHIBIT J

# THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT
## OF LEASE OR QUIT

TO: Charlene Anderson
   And all others at:
   4630 Nogal Street #C
   San Diego, CA 92102

NOTICE IS HEREBY GIVEN that you are in breach of the lease agreement under which your hold possession of the premises at:
   **4630 Nogal Street #C, San Diego, CA 92102**
Your lease provides that you are obligated to pay the following charges, which you have failed to do:

| Date of Charge | Description | Amount |
|---|---|---|
| 07/01/2015 | Renters Insurance | 18.16 |

You have breached the lease due to the following infractions:

   Failure to pay amount due in accordance with the above referenced item(s).

Within three (3) days after service of this notice, you must do the following:

   Pay to Creekside Villa Apartments the sum of **$68.16**, to cure the breach of the lease agreement.

Or deliver possession of the premises to the undersigned. Your failure to perform the covenant breached as specified, or vacate the premises within three (3) days, will cause the undersigned to initiate legal proceedings against you to declare the forfeiture of your rental agreement, recover possession of the premises, and to seek judgment for rent owed through the expiration date of this notice, together with damages of each day of occupancy after that date, attorneys fees if provided for in your rental agreement.

Payment shall be made only by cashier's check, certified check or money order to the owner's agent, Wasatch Property Management, at **220 47th Street San Diego CA 92102, 619-263-2686. The office hours, unless otherwise posted at the rental office are, Mon-Fri (9:00 am - 5:00 pm), Saturdays (10:00 am - 5:00 pm) and Sundays (10:00 am - 5:00 pm). There is a drop box available to accept this payment after hours.**

Date:     07/08/2015

_____
Management Agent for Owner

**********************************************************************************

## PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the foregoing Notice, of which this is a true copy, on the above-named Tenant(s) in the following manner(s):

   ☐   On 07/08/2015 I personally served the Notice to the Tenant(s) and mailed a copy by first class mail on 07/08/2015.

   ☐   I handed the Notice to _____ at the above premises and mailed a copy to the Tenant(s) at the above premises on 07/08/2015.

   ☒   I posted the Notice in a conspicuous place on the above premises and mailed a copy to the Tenant(s) at said premises on 07/08/2015.

Date:   07/08/2015

_____
Management Agent for Owner

t0060568

EC101.03-Revised 7/8/2015

## THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT OF LEASE OR QUIT

TO:   **Yvonne Allen Melvin**
      **And all others at:**
      3600 Data Dr. #429
      Rancho Cordova, CA 95670

NOTICE IS HEREBY GIVEN that you are in breach of the lease agreement under which you hold possession of the premises at:

                 3600 Data Dr. #429 Rancho Cordova, CA 95670

Your lease provides that you are obligated to pay the following charges, which you have failed to do:

| Date of Charge | Description | Amount |
|---|---|---|
| 12/01/2016 | Covered Parking Charges (12/2016) | $10.00 |
| 12/01/2016 | Renter's Insurance (12/2016) | $18.33 |
| 12/01/2016 | Rent Plus Service (12/2016) | $5.00 |
| 12/01/2016 | Washer/Dryer Rental (12/2016) | $50.00 |

**You have breached the lease due to the following infractions:**
      Failure to pay amount due in accordance with the above referenced item(s).

**Within three (3) days after service of this notice, you must do the following:**

      Pay to Chesapeake Commons Apartments the sum of  **$83.33**  to cure the breach of the lease agreement.

Or deliver possession of the premises to the undersigned. Your failure to perform the covenant breached as specified, or vacate the premises within three (3) days, will cause the undersigned to initiate legal proceedings against you to declare the forfeiture of your rental agreement, recover possession of the premises, and to seek judgment for rent owed through the expiration date of this notice, together with damages of each day of occupancy after that date, attorneys fees if provided for in your rental agreement.

Payment shall be made only by Cashier's Check , Certified Check, or Money Order to the owners agent, Wasatch Property Management, at 3600 Data Drive Rancho Cordova, CA 95670-7403, 916-635-1970. The office hours, unless otherwise posted at the rental office are, Mon-Fri (9:00 AM – 5:00 PM), Saturdays (9:00 AM – 5:00 PM) and Sundays (11:00 AM – 4:00 PM). In addition, you can make your rental payments at IsYourHome.com..

Date:   12/07/2016                          _____
                                            Management Agent for Owner

*************************************************************************************************************

## PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the foregoing Notice, of which is a true copy, on the above-named Tenant(s) in the following manner(s):

      _____ On 12/07/2016 I personally served the Notice to the Tenant(s) and mailed a copy by first class mail on 12/07/2016.

2

CPC000654

_____ I handed the Notice to _____ at the above premises and mailed a copy to the Tenant(s) at the above premises on 12/07/2016.

_____ I posted the Notice in a conspicuous place on the above premises and mailed a copy to the Tenant(s) at said premises on 12/07/2016.

Date:   12/07/2016

_____
Management Agent for Owner

CPC000655

## THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT OF LEASE OR QUIT

TO:   **Yvonne Allen Melvin**
      And all others at:
      3600 Data Dr. #429
      Rancho Cordova, CA 95670

NOTICE IS HEREBY GIVEN that you are in breach of the lease agreement under which you hold possession of the premises at:

3600 Data Dr. #429 Rancho Cordova, CA 95670

Your lease provides that you are obligated to pay the following charges, which you have failed to do:

| Date of Charge | Description | Amount |
|---|---|---|
| 07/01/2016 | Parking Charge Balance for July 2016 | $1.03 |
| 07/01/2016 | Renters Insurance for July 2016 | $18.16 |
| 07/01/2016 | RentPlus Charge for July 2016 | $5.00 |
| 08/01/2016 | Renters Insurance Balance for August 2016 | $11.00 |
| 10/01/2016 | RentPlus Charge for October 2016 | $5.00 |
| 10/01/2016 | Renters Insurance Balance for October 2016 | $18.16 |
| 10/01/2016 | Wash/Dryer Charges for October 2016 | $50.00 |
| 10/01/2016 | Parking Charges for October 2016 | $10.00 |

You have breached the lease due to the following infractions:
    Failure to pay amount due in accordance with the above referenced item(s).

Within three (3) days after service of this notice, you must do the following:

    Pay to Chesapeake Commons Apartments the sum of  _$118.35_  to cure the breach of the lease agreement.

Or deliver possession of the premises to the undersigned. Your failure to perform the covenant breached as specified, or vacate the premises within three (3) days, will cause the undersigned to initiate legal proceedings against you to declare the forfeiture of your rental agreement, recover possession of the premises, and to seek judgment for rent owed through the expiration date of this notice, together with damages of each day of occupancy after that date, attorneys fees if provided for in your rental agreement.

Payment shall be made only by Cashier's Check , Certified Check, or Money Order to the owners agent, Wasatch Property Management, at 3600 Data Drive Rancho Cordova, CA 95670-7403, 916-635-1970. The office hours, unless otherwise posted at the rental office are, Mon-Fri (9:00 AM – 5:00 PM), Saturdays (9:00 AM – 5:00 PM) and Sundays (11:00 AM – 4:00 PM). In addition, you can make your rental payments at IsYourHome.com..

Date:   10/08/2016                                    _____
                                                      Management Agent for Owner
*****************************************************************************************************

### PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the foregoing Notice, of which is a true copy, on the above-named Tenant(s) in the following manner(s):

CPC000658

_____ On 10/08/2016 I personally served the Notice to the Tenant(s) and mailed a copy by first class mail on 10/08/2016.

_____ I handed the Notice to _____ at the above premises and mailed a copy to the Tenant(s) at the above premises on 10/08/2016.

_____ I posted the Notice in a conspicuous place on the above premises and mailed a copy to the Tenant(s) at said premises on 10/08/2016.

Date:   10/08/2016

_____
Management Agent for Owner

5

CPC000659

## THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT OF LEASE OR QUIT

TO:   Yvonne Allen Melvin
      And all others at:
      3600 Data Dr. #429
      Rancho Cordova, CA 95670

**NOTICE IS HEREBY GIVEN** that you are in breach of the lease agreement under which you hold possession of the premises at:

3600 Data Dr. #429 Rancho Cordova, CA 95670

Your lease provides that you are obligated to pay the following charges, which you have failed to do:

| Date of Charge | Description | Amount |
| --- | --- | --- |
| 1/01/2017 | Covered Parking Charges (01/2017) | $10.00 |
| 1/01/2017 | Washer/Dryer Rental (01/2017) | $50.00 |
| 1/01/2017 | Renter's Insurance (01/2017) | $18.33 |
| 1/01/2017 | Rent Plus Service (01/2017) | $5.00 |

You have breached the lease due to the following infractions:
Failure to pay amount due in accordance with the above referenced item(s).

**Within three (3) days** after service of this notice, you must do the following:

Pay to Chesapeake Commons Apartments the sum of _**$83.33**_ to cure the breach of the lease agreement.

Or deliver possession of the premises to the undersigned. Your failure to perform the covenant breached as specified, or vacate the premises within three (3) days, will cause the undersigned to initiate legal proceedings against you to declare the forfeiture of your rental agreement, recover possession of the premises, and to seek judgment for rent owed through the expiration date of this notice, together with damages of each day of occupancy after that date, attorneys fees if provided for in your rental agreement.

Payment shall be made only by Cashier's Check , Certified Check, or Money Order to the owners agent, Wasatch Property Management, at **3600 Data Drive Rancho Cordova, CA 95670-7403, 916-635-1970. The office hours, unless otherwise posted at the rental office are, Mon-Fri (9:00 AM – 5:00 PM), Saturdays (9:00 AM – 5:00 PM) and Sundays (11:00 AM – 4:00 PM).** In addition, you can make your rental payments at IsYourHome.com..

Date:   1/11/2017

Management Agent for Owner

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the foregoing Notice, of which is a true copy, on the above-named Tenant(s) in the following manner(s):

_____ On 1/11/2017 I personally served the Notice to the Tenant(s) and mailed a copy by first class mail on 1/11/2017.

_____ I handed the Notice to _____ at the above premises and mailed a copy to the Tenant(s) at the above premises on 1/11/2017

__X__ I posted the Notice in a conspicuous place on the above premises and mailed a copy to the Tenant(s) at said premises on 1/11/2017.

CPC000660

Date:  1/11/2017

_____
Management Agent for Owner

7

CPC000661

## THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT
## OF LEASE OR QUIT

TO: Tina Williams
And all others at:
4498 North Cornelia #A-243
Fresno, CA 93722

NOTICE IS HEREBY GIVEN that you are in breach of the lease agreement under which your hold possession of the premises at:

4498 North Cornelia #A243 Fresno, CA 93722

Your lease provides that you are obligated to pay the following charges, which you have failed to do:

_____ Paragraph V—Late Charges,

_____ Paragraph V—Returned Check Charges

_____ Paragraph X—Utilities

_____ Paragraph XII—Holdovers-Month to Month Fees

_____ Paragraph XVII—Attorney Fees, Court Costs, Administration Fees & Other Fees

__X__ Additional Services Agreement—Water, Garbage, Sewer

You have breached the lease due to the following infractions:

Failure to pay amount due in accordance with the above referenced item(s).

Within three (3) days after service of this notice, you must do the following:

Pay to Stonepine Apartments the sum of _459.57_, to cure the breach of the lease agreement.

Or deliver possession of the premises to the undersigned. Your failure to perform the covenant breached as specified, or vacate the premises within three (3) days, will cause the undersigned to initiate legal proceedings against you to declare the forfeiture of your rental agreement, recover possession of the premises, and to seek judgment for rent owed through the expiration date of this notice, together with damages of each day of occupancy after that date, attorneys fees if provided for in your rental agreement.

Payment shall be made only by cashier's check, certified check or money order to the owner's agent, Wasatch Property Management, at 4488 North Cornelia Fresno, CA 93722, 559-275-1009 . The office hours, unless otherwise posted at the rental office are, Mon-Fri (9:00 am - 5:00 pm), Saturdays (10:00 am - 5:00 pm) and Sundays (10:00 am - 5:00 pm). There is a drop box available to accept this payment after hours.

Date: 5/13/10

Diane Manzo

Management Agent for Owner

*********************************************************************************************************************

## PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the foregoing Notice, of which this is a true copy, on the above-named Tenant(s) in the following manner(s):

__X__ On 5/13/2010 I personally served the Notice to the Tenant(s) and mailed a copy by first class mail on 5/13/2010.

☐ I handed the Notice to _____ at the above premises and mailed a copy to the Tenant(s) at the above premises on _____ 2010.

☐ I posted the Notice in a conspicuous place on the above premises and mailed a copy to the Tenant(s) at said premises on _____ 2010.

stl22004

WASATCH
PREMIER COMMUNITIES

EC101.03-Revised 2/18/2010

8

## THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT
## OF LEASE OR QUIT

TO: Irene Dominguez***
And all others at:
4488 North Cornelia #M112
Fresno, CA 93722

NOTICE IS HEREBY GIVEN that you are in breach of the lease agreement under which your hold possession of the premises at:

### 4488 North Cornelia #M112, Fresno, CA 93722

Your lease provides that you are obligated to pay the following charges, which you have failed to do:

~~Paragraph V—Late Charges,~~

_____ Paragraph V—Returned Check Charges

~~Paragraph X—Utilities~~

_____ Paragraph XII--Holdovers-Month to Month Fees

_____ Paragraph XVII--Attorney Fees, Court Costs, Administration Fees & Other Fees

~~Additional Services Agreement~~ — *Cable / rent, ins*

*[ see attached Ledger ]*

You have breached the lease due to the following infractions:

Failure to pay amount due in accordance with the above referenced item(s).

**Within three (3) days after service of this notice, yo**

Pay to Stonepine Apartments the sum of _____    *Call*    eement.

Or deliver possession of the premises to the undersig    *Attny*    s specified, or vacate the
premises within three (3) days, will cause the undersig    e the forfeiture of your
rental agreement, recover possession of the premises    ration date of this notice.
together with damages of each day of occupancy afte    agreement.

Payment shall be made only by cashier's check, certi    tch Property Management, at
4488 North Cornelia Fresno, CA 93722, 559-275-1(    the rental office are, Mon-Fri
(9:00 am - 5:00 pm), Saturdays (10:00 am - 5:00 pr    op box available to accept this
payment after hours.

Date:    1/13/2010

Manage

*********************************************************    ****************************

### PROOF OF SERVICE

I, the undersigned, being at least 18 years of age, declare under penalty of perjury that I served the foregoing Notice, of which this is a true copy, on the above-named Tenant(s) in the following manner(s):

☐   On 1/13/2010 I personally served the Notice to the Tenant(s) and mailed a copy by first class mail on 1/13/2010.

☐   I handed the Notice to _____ at the above premises and mailed a copy to the Tenant(s) at the above premises on 1/13/2010.

☑   I posted the Notice in a conspicuous place on the above premises and mailed a copy to the Tenant(s) at said premises on 1/13/2010.

stm11207

WASATCH
PREMIER COMMUNITIES

EC101.03-Revised 1/13/2010

9

CY021234

# EXHIBIT K

**Applicant Consent:**

The undersigned applicant(s) and co-signer(s) hereby consent to allow The Courtyard at Central Park ("owner"), itself or through its designated agents or employees, to obtain a consumer report and/or criminal record information on each of us and to obtain and verify each of our credit and employment information for the purpose of determining whether to lease an apartment to me/us. We also agree and understand that owner and its agents and employees may obtain additional consumer reports on each of us in the future to update or review our account. Upon my/our request, owner will tell me/us whether consumer reports were requested and the names and addresses of any consumer-reporting agency that provided such reports.

| _Elizabeth Gonzalez_ | 02/21/2013 | | | 02/21/2013 |
|---|---|---|---|---|
| Applicant | Date | | Applicant | Date |
| | 02/21/2013 | | | 02/21/2013 |
| Applicant | Date | | Applicant | Date |
| | 02/21/2013 | | | |
| Applicant | Date | | Applicant | Date |

**Additional Information:**

**Parking:** Applicant agrees to the management's assignment of parking spaces and acknowledges that some reserved spaces are available for an additional fee.

**Deposit:** All security deposits will be due within 72 hours of application approval. Deposits must be in the form of cashiers check or money order. Personal checks can be accepted for deposits up to 14 days before the move-in date. Keys will not be provided until all deposits and rents have been paid in full and utilities have been put into resident's name. I understand that there is a 72 hour period within which to request a refund of the holding deposit and withdraw my application for an apartment. Any fees charged for credit or reference checks are non-refundable.

**Rent:** All rent, deposits and fees must be made by check, money order, cashiers check or credit/debit payment. NO CASH IS ACCEPTED.

All payments are to be made payable to The Courtyard at Central Park Apartments. Payments must be made at the Rental Office located at 4488 North Cornelia Fresno, CA 93722. The Rental Office can be reached by phone at 559-276-1009. Unless otherwise posted, payments can be made in person at the Rental Office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on weekends. In addition, a "night drop" is available for payments when the office is not open.

**Cable:** Selected communities provide bulk cable services at a discounted rate. As a condition of leasing, Residents may be required to subscribe to these services.

**Utilities:** Resident shall be responsible for the payment of utility services, such as electricity and/or gas and may include water, sewer and refuse collections.

Resident shall not use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment unless timely written notice is first provided to the Resident and to the Owner advising of this intended interruption.

**Pets:** Restrictions. We will accept all breeds of dogs a minimum of six months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.

Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed.

**Renter's Insurance:**
Personal Liability Coverage of $50,000 is required for ALL Wasatch Property Management Residents as of December 1, 2003. Personal Property Coverage is recommended but not required.

Required paperwork for "other insurance carriers" MUST contain:

1) The resident's name must be in the same print as the rest of the information - not handwritten.
2) The resident's apartment # and community address must be clearly stated.
3) The policy period (effective date, renew date or expiration date) must be stated to verify that the policy is in force. This MUST be distinctly noted.
4) Proof of @ least $50,000 in Personal Liability coverage clearly stated. NOT to be confused with personal property, which covers resident's personal belongings only. Personal Property coverage is optional. Personal Liability coverage is required.
5) No handwritten information is acceptable for verification purposes and Insurance Applications are not acceptable proof of insurance coverage.



## Applicant Consent:

The undersigned applicant(s) and co-signer(s) hereby consent to allow Creekside Villa Apartments ("owner"), itself or through its designated agents or employees, to obtain a consumer report and/or criminal record information on each of us and to obtain and verify each of our credit and employment information for the purpose of determining whether to lease an apartment to me/us. We also agree and understand that owner and its agents and employees may obtain additional consumer reports on each of us in the future to update or review our account. Upon my/our request, owner will tell me/us whether consumer reports were requested and the names and addresses of any consumer-reporting agency that provided such reports.

| | | | |
|---|---|---|---|
| Arnold Lim | 08/09/2016 | Lim Ho Beng | 08/09/2016 |
| Applicant | Date | Applicant | Date |
| | 08/09/2016 | Florida A. Lim | 08/09/2016 |
| Applicant | Date | Applicant | Date |
| | 08/09/2016 | | 08/09/2016 |
| Applicant | Date | Applicant | Date |

## Additional Information:

**Parking:** Applicant agrees to the management's assignment of parking spaces and acknowledges that some reserved spaces are available for an additional fee.

**Deposit:** All security deposits will be due within 72 hours of application approval. Deposits must be in the form of cashiers check or money order. Keys will not be provided until all deposits and rents have been paid in full and utilities have been put into resident's name. I understand that there is a 72 hour period within which to request a refund of the holding deposit and withdraw my application for an apartment. Any fees charged for credit or reference checks are non-refundable. In addition, rent can be paid online at www.IsYourHome.com

**Rent:** All rent, deposits and fees must be made by check, money order, cashiers check or credit/debit payment. NO CASH IS ACCEPTED.

All payments are to be made payable to Creekside Villa Apartments Community. Payments must be made at the Rental Office located at 220 47th Street San Diego, CA 92102. The Rental Office can be reached by phone at 619-263-2686. Unless otherwise posted, payments can be made in person at the Rental Office between 9:00 AM and 6:00 PM Monday through Friday and between 10:00 AM and 5:00 PM on weekends.

**Cable:** Selected communities provide bulk cable services at a discounted rate. As a condition of leasing, Residents may be required to subscribe to these services.

**Satellite:** Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna _within_ the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and/or receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. Resident further agrees to pay Owner/Agent an additional $250.00 refundable deposit and sign a Satellite Dish and Antenna Addendum _prior_ to installing satellite dish or any other receiving antenna. Resident understands that failure to comply with the terms of the satellite addendum, said dish or receiving antenna may be removed by Owner/Agent without warning at the resident's expense.

**Utilities:** Resident shall be responsible for the payment of utility services, such as electricity and/or gas and may include water, sewer and refuse collections.

Resident shall not use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment unless timely written notice is first provided to the Resident and to the Owner advising of this intended interruption.

**Animals:** Restrictions. We will accept all breeds of dogs a _minimum of six months old_, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasileiro, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.

Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed.

**Renter's Insurance:**
Personal Liability Coverage of $50,000 is required for ALL Wasatch Property Management Residents as of December 1, 2003. Personal Property Coverage is recommended but not required.

Required paperwork for "other insurance carriers" MUST contain:



1) The resident's name must be in the same print as the rest of the information - not handwritten.
2) The resident's apartment # and community address must be clearly stated.
3) The policy period (effective date, renew date or expiration date) must be stated to verify that the policy is in force. This MUST be distinctly noted.
4) Proof of @ least $50,000 in Personal Liability coverage clearly stated. NOT to be confused with personal property, which covers resident's personal belongings only. Personal Property coverage is optional, Personal Liability coverage is required.
5) No handwritten information is acceptable for verification purposes and Insurance Applications are not acceptable proof of insurance coverage.

LD101.03--Revised 04/192016



The undersigned applicant(s) and co-signer(s) hereby consent to allow Aspen Park Apartments (owner/agent) through its designated agents or employees, to obtain a consumer report and/or criminal record information on each of us and to obtain and verify each of our credit and employment information for the purpose of determining whether to lease an apartment to me/us. We also agree and understand that owner and its agents and employees may obtain additional consumer reports on each of us in the future to update or review our account. Upon my/our request, owner will tell me/us whether consumer reports were requested and the names and addresses of any consumer-reporting agency that provided such reports.

| | | | |
|---|---|---|---|
| Applicant | 09/08/2015 Date | Applicant | 09/08/2015 Date |
| Applicant | 09/08/2015 Date | Applicant | 09/08/2015 Date |
| Applicant | 09/08/2015 Date | Applicant | Date |

## Additional Information:

**Parking:** Applicant agrees to the management's assignment of parking spaces and acknowledges that some reserved spaces are available for an additional fee.

**Deposit:** All security deposits will be due within 72 hours of application approval. Deposits must be in the form of cashiers check or money order. Keys will not be provided until all deposits and rents have been paid in full and utilities have been put into resident's name. I understand that there is a 72 hour period within which to request a refund of the holding deposit and withdraw my application for an apartment. Any fees charged for credit or reference checks are non-refundable. In addition, rent can be paid online at www.isYourHome.com

**Rent:** All rent, deposits and fees must be made by check, money order, cashiers check or credit/debit payment. NO CASH IS ACCEPTED.

All payments are to be made payable to Aspen Park Apartments Apartments. Payments must be made at the Rental Office located at 5152 Mack Rd. Sacramento, CA 95823. The Rental Office can be reached by phone at 916-395-4000. Unless otherwise posted, payments can be made in person at the Rental Office between 9:00 am and 6:00 am Monday through Friday, 10:00 am and 5:00 am on Saturday, and 11:00 am and 3:30 am on Sunday.

**Cable:** Selected communities provide bulk cable services at a discounted rate. As a condition of leasing, Residents may be required to subscribe to these services.

**Satellite:** Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and/or receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. Resident further agrees to pay Owner/Agent an additional $250.00 refundable deposit and sign a Satellite Dish and Antenna Addendum prior to installing satellite dish or any other receiving antenna. Resident understands that failure to comply with the terms of the satellite addendum, said dish or receiving antenna may be removed by Owner/Agent without warning at the resident's expense.

**Utilities:** Resident shall be responsible for the payment of utility services, such as electricity and/or gas and may include water, sewer and refuse collections.

Resident shall not use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment unless timely written notice is first provided to the Resident and to the Owner advising of this intended interruption.

**Animals:** Restrictions. We will accept all breeds of dogs a minimum of six months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilario, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.

Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed.

**Renter's Insurance:**
Personal Liability Coverage of $50,000 is required for ALL Wasatch Property Management Residents as of December 1, 2003. Personal Property Coverage is recommended but not required.

Required paperwork for "other insurance carriers" MUST contain:

1) The resident's name must be in the same print as the rest of the information - not handwritten.
2) The resident's apartment # and community address must be clearly stated.
3) The policy period (effective date, renew date or expiration date) must be stated to verify that the policy is in force. This MUST be distinctly noted.
4) Proof of @ least $50,000 in Personal Liability coverage clearly stated. NOT to be confused with personal property, which covers resident's personal belongings only. Personal Property coverage is optional, Personal Liability coverage is required.
5) No handwritten information is acceptable for verification purposes and Insurance Applications are not acceptable proof of insurance coverage.

www.isyourhome.com

Page 5 of 10

www.isyourhome.com

www.isyourhome.com

Page 7 of 10

AP000248

 

## Applicant Consent:

The undersigned applicant(s) and co-signer(s) hereby consent to allow Chesapeake Commons Apartments ("owner"), itself or through its designated agents or employees, to obtain a consumer report and/or consumer record information on each of us and to obtain and verify each of our credit and employment information for the purpose of determining whether to lease an apartment to me/us. We also agree and understand that owner and its agents and employees may obtain additional consumer reports on each of us in the future to update or review our account. Upon my/our request, owner will tell me/us whether consumer reports were requested and the names and addresses of any consumer-reporting agency that provided such reports.

| | 04/30/2016 | | 04/30/2016 |
|---|---|---|---|
| Applicant | Date | Applicant | Date |
| | 04/30/2016 | | 04/30/2016 |
| Applicant | Date | Applicant | Date |
| | 04/30/2016 | | 04/30/2016 |
| Applicant | Date | Applicant | Date |

## Additional Information:

**Parking:** Applicant agrees to the management's assignment of parking spaces and acknowledges that some reserved spaces are available for an additional fee.

**Deposit:** All security deposits will be due within 72 hours of application approval. Deposits must be in the form of cashiers check or money order. Keys will not be provided until all deposits and rents have been paid in full and utilities have been put into resident's name. I understand that there is a 72 hour period within which to request a refund of the holding deposit and withdraw my application for an apartment. Any fees charged for credit or reference checks are non-refundable. In addition, rent can be paid online at www.IsYourHome.com.

**Rent:** All rent, deposits and fees must be made by check, money order, cashiers check or credit/debit payment. NO CASH IS ACCEPTED.

All payments are to be made payable to Chesapeake Commons Apartments Apartments. Payments must be made at the Rental Office located at 3600 Data Drive Rancho Cordova, CA 95670-7403. The Rental Office can be reached by phone at 916-635-1970. Unless otherwise posted, payments can be made in person at the Rental Office between 9:00 AM and 6:00 PM Monday through Friday, 9:00 AM and 5:00 PM on Saturday, and 11:00 AM and 4:00 PM on Sunday.

**Cable:** Selected communities provide bulk cable services at a discounted rate. As a condition of leasing, Residents may be required to subscribe to these services.

**Satellite:** Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and/or receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. Resident further agrees to pay Owner/Agent an additional $250.00 refundable deposit and sign a Satellite Dish and Antenna Addendum prior to installing satellite dish or any other receiving antenna. Resident understands that failure to comply with the terms of the satellite addendum, said dish or receiving antenna may be removed by Owner/Agent without warning at the resident's expense.

**Utilities:** Resident shall be responsible for the payment of utility services, such as electricity and/or gas and may include water, sewer and refuse collections.

Resident shall not use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment unless timely written notice is first provided to the Resident and to the Owner advising of this intended interruption.

**Animals:** Restrictions. We will accept all breeds of dogs a minimum of six months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.

Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed.

**Renter's Insurance:**
Personal Liability Coverage of $50,000 is required for ALL Wasatch Property Management Residents as of December 1, 2003. Personal Property Coverage is recommended but not required.

Required paperwork for "other insurance carriers" MUST contain:



The resident's name must be in the same print as the rest of the information - not handwritten.
The resident's apartment # and community address must be clearly stated.          LD101.03--Revised 04/192016
The policy period (effective date, renew date or expiration date) must be stated to verify that the policy is in force. This MUST be distinctly noted.
Proof of @ least $50,000 in Personal Liability coverage clearly stated. NOT to be confused with personal property, which covers resident's personal belongings only. Personal Property coverage is optional. Personal Liability coverage is required.

5) No handwritten information is acceptable for verification purposes and Insurance Applications are not acceptable proof of insurance coverage.





CP000462

# EXHIBIT L

```
 1                  UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF CALIFORNIA
 3                      SACRAMENTO DIVISION
 4
 5   UNITED STATES OF AMERICA,    )
     ex rel. DENIKA TERRY and     )
 6   ROY HUSKEY III, and each     )
     of them for themselves       )
 7   individually, and for all    )
     other persons similarly      )
 8   situated and on behalf of    )
     the UNITED STATES OF         )
 9   AMERICA,                     )
10            Plaintiffs,         )
11   v.                           )   Case No.
12   WASATCH ADVANTAGE GROUP,     )   2:15-cv-00799-KJM-DB
     LLC, WASATCH PROPERTY        )
13   MANAGEMENT, INC., WASATCH    )   CERTIFIED
     POOL HOLDINGS, LLC,          )   TRANSCRIPT
14   CHESAPEAKE COMMONS HOLDINGS  )
     LLC, LOGAL PARK APARTMENTS,  )
15   LLC, LOGAL PARK APARTMENTS,  )
     LP, and DOES 1-30,           )
16            Defendants.         )
     _____ )
17
18                      DEPOSITION OF
19                     DAVE TANFORAN
20             WEDNESDAY, AUGUST 9, 2017
21
22   Reported by:
23   TAMARA BERLIN, CSR 9706
24   Job No. 2674876
25   Pages 1 - 233
```

Page 1

1      Q.    Is that the only other one?

2      A.    The only other vice president, yes.

3      Q.    Okay.  And then who does -- who do the vice

4   presidents report to?

5      A.    The COO.

6      Q.    What's that person's name?

7      A.    Jarom Johnson.

8      Q.    Out of Utah?

9      A.    Yes.

10     Q.    Okay.  Let me go back to your nine properties that

11   you oversee.

12           Do you have a property manager who reports to you at

13   each one?

14     A.    Yes.

15     Q.    Could I trouble you to tell me their names, assuming

16   there's someone in place there right now?

17     A.    Yeah.  That's -- I can.

18     Q.    Go ahead.

19     A.    Aspen Park, Vera Hutley.  California Place, Denise

20   Butler.  Bentree, Cornelia Fitzgerald.  Chesapeake Commons is

21   Sylvia Gamboa.  And then one manager manages three

22   properties, her name is Jody Peyton, who manages the Bridges

23   of Five Oaks, Bellwood and Jerron Place Apartments.  And the

24   Bay Area, Josh Lintatum at Piedmont.  And at Hayward, Alicia

25   Cortez.

Page 28

1    Q.   Do you fill out the HAP -- when I say "you," I mean

2    Wasatch folks -- do you fill out the HAP contract with the

3    tenant?

4    A.   Our portion of it.

5    Q.   Is it done together with the collaboration with the

6    tenant?

7    A.   With the lease, yes, with the tenant.

8    Q.   Is the residential lease done at the same time as

9    the HAP contract or is the HAP contract done first?

10   A.   I think they're done in -- at the same time.

11   Q.   Any other paperwork done at that same sitting?

12   A.   Not that I can think of.

13   Q.   If there are addendas to the lease agreements, are

14   they done at the same time?

15   A.   The addenda is part of the Lease Agreement.

16   Q.   All right.  And you're going to hear a lot about

17   this over the course of the day, but what we're calling

18   "Additional Service Agreements," I call them sometimes "side

19   agreements."  Your lawyer does not like that, so forgive me

20   if I use that term, but I'll try to keep it to "Additional

21   Service Agreements."

22        Are those done at the same time as well?

23   A.   Yes.

24   Q.   All right.  Are those part of the lease?

25   A.   Yes.

Page 65

1     Q.   In all cases?

2     A.   Yes.

3     Q.   Including for Section 8 tenants?

4     A.   Yes.

5     Q.   Do you know the numbers of the forms, the LD numbers

6  that you use?

7     A.   The LD numbers, I don't.

8     Q.   Do you know what an LD number is?

9     A.   No.

10     Q.   The number that appears in little print on the form

11  that says what kind of form it is.

12     A.   Oh, okay.  I didn't know.

13     Q.   I don't know how you refer to them.  You refer to

14  them by name, it sounds like, the forms?

15     A.   Yeah.

16     Q.   All right.  I'm going to ask you about -- about some

17  of them.

18         First off, the -- the Rental Agreement, the Lease

19  Agreement itself, is that a standard form across all your

20  properties that you supervise?

21     A.   Yes.

22     Q.   Are there any differences in it property to

23  property?

24     A.   No.

25     Q.   Where did that form of lease come from?

Page 66

1    A.    I'm not sure.

2    Q.    Is it required to be used by Wasatch policy?

3    A.    The lease, yes.

4    Q.    But that particular form of lease?

5    A.    Yes, it's part of our -- our software package.

6    Q.    So all these forms are -- are electronically held on

7    software?

8    A.    Yes.

9    Q.    Is the Residential Lease form ever updated, to your

10   knowledge?

11   A.    I think so, but I don't know what -- my -- it would

12   probably change over time, I'm just not sure, specifically.

13       MR. NAM:   I'll object that it's outside the scope of

14   this deposition.

15   BY MR. LAVINE:

16   Q.    Do you ever get notice that the lease has been

17   updated in some manner and to use this form instead?

18   A.    I think I do.  I think I have, but there's nothing

19   that just jumps to mind.

20   Q.    How many times since you've been working there would

21   you say that's happened?

22   A.    Twice.

23   Q.    Do you remember the nature of the changes to the

24   lease?  Were they pointed out to you?

25   A.    I don't.  I think it was minor changes.

Page 67

1          MR. NAM:  Objection.

2          MR. LAVINE:  One second.

3      Q.   -- that you're aware of?

4          MR. NAM:  Objection; outside the scope of this

5  deposition, overbroad.

6          THE WITNESS:  I don't know.

7  BY MR. LAVINE:

8      Q.   Have you ever been trained in an LD numeric style

9  system of identifying documents?

10     A.   No.

11     Q.   To your knowledge, has the Additional Service

12  Agreements changed in content since you've worked at Wasatch?

13     A.   No.

14     Q.   It's always been the same?

15     A.   Yes.

16     Q.   Do you know how long Wasatch, even if it's before

17  your time, has been using the Additional Service Agreements?

18         MR. NAM:  Objection; outside the scope of this

19  deposition.

20         THE WITNESS:  No, I don't.

21  BY MR. LAVINE:

22     Q.   Have they always been in circulation and use, to the

23  best of your memory?

24         MR. NAM:  Same objection.

25         THE WITNESS:  I don't know if they've always been in

                                              Page 71

1      A.   Yes.

2      Q.   Or else what?

3      A.   At that point, it's just they need to pay it.

4      Q.   All right.  Have you run into a situation in which

5  an additional service -- services charge has remained unpaid

6  by a tenant after receiving that notice?

7      A.   Yes.

8      Q.   What happens next?

9          MR. NAM:  Objection; vague, overbroad.

10          THE WITNESS:  Usually, it will go to the next month

11  and, next time any payment is made for their account, it will

12  be applied toward the additional services.

13  BY MR. LAVINE:

14      Q.   So when -- when money comes in from a tenant, it's

15  first applied to the additional services outstanding charge

16  and then to whatever else is due?

17      A.   I don't know if it's first applied, but it's applied

18  to outstanding charges first.

19      Q.   Have you run into this situation that -- where a

20  tenant still hasn't paid the additional services charge at

21  that point?

22      A.   On the following month?

23      Q.   Yes.

24      A.   Yes.

25      Q.   Then what does Wasatch do?

Page 76

1      A.    If they pay the rent or pay their following month

2   payment, it's applied towards outstanding balance, first, and

3   rent is -- is last.

4      Q.    Does that mean that sometimes the rental, in part,

5   is delinquent?

6      A.    Yes.

7      Q.    So what happens then?

8      A.    If rent is delinquent, then notice goes out to

9   collect the rent or a phone call.

10      Q.    It could be one or the other?

11      A.    It's usually both.

12      Q.    How long -- let's start with -- with the -- the

13   amount of rent in the lease.

14         How long does a tenant need to be delinquent

15   before -- strike that question.

16         At what point does Wasatch start or threaten

17   eviction proceedings for delinquency?

18         MR. NAM:  Objection; compound, out of scope of this

19   deposition.

20         THE WITNESS:  Asking for delinquent rent?

21   BY MR. LAVINE:

22      Q.    Yes.

23      A.    Delinquent rent of -- will be served a Three-Day

24   after the fifth of the month.  So if the sixth is a business

25   day, a Three-Day Notice to Pay or Quit would be issued.

                                              Page 77

```
1        Q.    After how long a delinquency?

2        A.    After five days.

3        Q.    So just to understand, after the payment deadline

4   and then another five-day grace period, if you want to call

5   it that, then the delinquency notice goes out?

6        A.    If -- for outstanding rent, yes.

7        Q.    How long does the tenant then have to pay?

8        A.    Three days.

9        Q.    And if they don't?

10       A.    They're subject to eviction.

11       Q.    It doesn't usually happen from that point forward?

12             MR. NAM:  Objection; incomplete hypothetical.

13             THE WITNESS:  It can.

14   BY MR. LAVINE:

15       Q.    Does sometimes a tenant get more time?

16       A.    They can.

17       Q.    All right.  Let me go back to the additional side

18   agreement, or additional service agreement charges.

19             Have you run into a situation where rent has been

20   paid, but, as you've called it, the Lease Agreement rent, but

21   the additional service charge expenses have not been paid?

22       A.    Yes.

23       Q.    All right.  And what is the consequence if there

24   isn't any money paid after that?

25             MR. NAM:  Objection; incomplete hypothetical.
```

Page 78

1      Q.    In other words, we're in the second month now --

2      A.    Okay.

3      Q.    -- and the tenant pays their rent, but they don't

4    pay their additional service charges, what happens?

5      A.    How -- how -- can you give me an example of how they

6    would pay -- which form -- if they wrote a check, wrote it

7    for the amount of the rent?

8      Q.    Sure.

9      A.    Use that example?  That amount would be applied

10   towards any outstanding balances and it would leave rent

11   owing.

12     Q.    And then what would happen to that tenant?

13     A.    If it goes past the grace period, the five days, a

14   Three-Day Notice to Pay Rent or Quit would be issued on the

15   sixth day business day.

16     Q.    And the Three-Day Notice would cite to nonpayment of

17   rent or nonpayment of additional service charge?

18     A.    Nonpayment of rent.

19     Q.    And if it's not cleared within the three days, then

20   what happens?

21           MR. NAM:  Objection; incomplete hypothetical.

22           THE WITNESS:  It's subject to go to eviction.

23           MR. LAVINE:  I think I understand the process.

24   Thank you for that.

25     Q.    Have you ever had tenants, to your knowledge,

Page 80

1    complain to any of the property managers or supervisor,

2    perhaps to yourself, that they didn't think that the

3    additional service charges were fair in their case?

4        A.    I haven't, no.

5        Q.    Have you heard any stories like that?

6        A.    Not until this came up.

7        Q.    Since have you -- I don't mean from the case, I mean

8    from tenants.

9        A.    No.  No, I haven't.

10       Q.    Have you heard about any tenants at Chesapeake or

11   other properties being charged for parking, even though they

12   didn't have a car?

13              MR. NAM:  Objection; outside the scope of this

14   deposition.

15              THE WITNESS:  They could be.

16   BY MR. LAVINE:

17       Q.    Is the parking charge -- let's start at Chesapeake,

18   since it's the biggest one, I guess.

19              Is a parking charge required at Chesapeake

20   Commons?

21              MR. NAM:  Objection; outside of scope of this

22   deposition.

23              THE WITNESS:  For a covered parking space.

24   BY MR. LAVINE:

25       Q.    Is every tenant at Chesapeake Commons required to

                                              Page 81

```
 1    have a covered parking space?
 2            MR. NAM:  Objection; outside of scope of this
 3    deposition.
 4            THE WITNESS:  Move in, yes.
 5            MR. NAM:  Vague as to time.
 6    BY MR. LAVINE:
 7        Q.   How much is the covered parking charge?
 8            MR. NAM:  Objection; vague as time, outside the
 9    scope of this deposition.
10            THE WITNESS:  I've seen ten and fifteen dollars,
11    depending on when they moved in.
12    BY MR. LAVINE:
13        Q.   So it depends on time, not location?
14        A.   It could be either.
15        Q.   But it's always been, since your memory, either $10
16    or $15 for that charge?
17        A.   Yes.
18        Q.   And it is required of all tenants at move in?
19            MR. NAM:  Objection; outside the scope of his
20    deposition.
21            THE WITNESS:  Depending on the property --
22    BY MR. LAVINE:
23        Q.   How much at Chesapeake?
24        A.   -- if they have -- yes.
25        Q.   All right.  You said at move in.  At some point is
```

Page 82

1    there a way not to pay it?

2         A.   We have had that happen, usually it's with a -- a

3    request for a reasonable accommodation, and we -- we grant

4    that request.

5         Q.   A reasonable accommodation based on what?

6         A.   It could be on a -- a number of things.  An example,

7    somebody that needs a -- or doesn't have a vehicle or family

8    doesn't have a vehicle and no need for a car.

9         Q.   So it's not a reasonable accommodation based on

10   disability?

11        A.   It could be.

12        Q.   All right.  But it doesn't have to be based on

13   disability; it could be just based on a circumstance for that

14   family?

15        A.   Yeah.  They could request it.

16        Q.   Are they allowed to request it at move in so they

17   don't have to get the parking charge at all?

18        A.   Yes.

19        Q.   And does Wasatch grant those requests at move in?

20        A.   It will be evaluated.

21        Q.   Do you know if Wasatch has ever granted a request to

22   be exempt from the parking charge at move in time so it never

23   made it on the rent ledger?

24        A.   Specifically, I don't know offhand.

25        Q.   But if -- if the tenant doesn't ask, it will

                                                        Page 83

```
 1    automatically be assessed?
 2         A.    It's on there, yes.
 3         Q.    And it will stay on there until -- unless and until
 4    a reasonable accommodation request comes your way?
 5         A.    Yes.
 6               MR. NAM:   Again, I object that this is outside the
 7    scope of his deposition.
 8               MR. LAVINE:   Let me ask you about Renters Insurance
 9    for a minute.
10         Q.    Are you aware if that is an item on the Additional
11    Service Agreements?
12         A.    Yes.
13               MR. NAM:   Objection; overbroad.
14    BY MR. LAVINE:
15         Q.    Is Renters Insurance required at Chesapeake
16    Commons?
17               MR. NAM:   Objection; outside the scope of this
18    deposition.
19               THE WITNESS:   Yes.
20    BY MR. LAVINE:
21         Q.    Is it required at all properties in your region?
22         A.    Yes.
23         Q.    And is that true of Section 8 tenants as well?
24         A.    I think it's optional at all properties.
25         Q.    Are you sure?
```

Page 84

1        Q.    Would a tenant -- say a Section 8 tenant telling you

2    that they couldn't afford it be a good enough reason?

3            MR. NAM:  Objection; incomplete hypothetical.

4            THE WITNESS:  I would discuss that with my

5    supervisor.

6    BY MR. LAVINE:

7        Q.    Which supervisor, again?  Tell me.

8        A.    Shawn Fetter.

9        Q.    Right.  Have you ever had a request like that come

10    your way?

11        A.    For Renters Insurance?

12        Q.    Yes.

13        A.    No.

14        Q.    For any other charge, apart from parking?

15        A.    Not apart from parking.

16        Q.    And just to be clear, Renters Insurance can be

17    attained -- obtained through a Wasatch source that you use or

18    the rent -- the renter can get it separately?

19        A.    That's correct.

20        Q.    Does the renter have to show proof of obtaining it

21    separately if they go that way?

22        A.    Yes.

23        Q.    In what format?

24        A.    Copy of their policy.

25        Q.    Do you know how many tenants opt for the

Page 91

```
 1    Wasatch-provided policy and how many tend to opt for their
 2    own choice?
 3         A.    No.   I don't track that.   I don't know.
 4         Q.    Let me ask you about washers and dryers briefly.
 5               At Chesapeake Commons, the units have in-unit
 6    hookups for washers and dryers, correct?
 7               MR. NAM:   Objection; outside of scope of this
 8    deposition.
 9               THE WITNESS:   Yes.
10    BY MR. LAVINE:
11         Q.    Is that true of all units?
12         A.    Yes.
13         Q.    Including the Section 8 tenants?
14         A.    Yes.
15         Q.    Are washer and dryer additional service charges
16    required or no?
17               MR. NAM:   Objection; vague, overbroad, outside the
18    scope of his deposition as it relates to Chesapeake
19    Commons.
20               THE WITNESS:   Yes.
21    BY MR. LAVINE:
22         Q.    And that's true of Section 8 tenancies as well?
23         A.    Yes.
24         Q.    How much is the rent today, the washer and dryer --
25         A.    Can I clarify?   This is for Chesapeake Commons we're
```

Page 92

```
1        A.    I believe so, yes.

2        Q.    You're not sure?

3        A.    No.

4        Q.    Do you remember discussing it with Ms. Gamboa?

5        A.    I don't remember the specific discussion, but it --

6    that would -- that would be who I would have talked about it

7    with.

8        Q.    But you don't remember, firmly, what that decision

9    was?

10       A.    I believe they were granted.

11       Q.    Just the one unit?

12       A.    Yes.

13       Q.    All right.  If a tenant at move in -- let's say

14   Section 8 tenant at move in didn't want that charge, could

15   they opt out of it at that point?

16       A.    At --

17             MR. NAM:  Vague as to time.

18             THE WITNESS:  At Chesapeake?

19             MR. LAVINE:  Yes.

20             THE WITNESS:  And what if they -- are you talking

21   about if it would be today?

22             MR. LAVINE:  Yes.

23             THE WITNESS:  They're moving in today?

24             MR. LAVINE:  Yes.

25             THE WITNESS:  And they wanted to not have a washer
```

Page 95

```
1    and dryer?
2             MR. LAVINE:  Yes.
3             THE WITNESS:  We -- we would require it.
4    BY MR. LAVINE:
5        Q.   You would require them to have it even so?
6        A.   Yes.
7        Q.   And charge them for it?
8        A.   Yes.
9        Q.   Has it ever been different since you've been there?
10       A.   I -- not since I've been here.
11       Q.   Have you heard in earlier times that it was
12   different?
13       A.   I don't -- I don't know if they've always had
14   washers and dryers.
15       Q.   Let me go over just to the other properties under
16   your supervision.  And I'm going to try to do them as a
17   group, then I'll break them out as need be.
18            Do all the units in all the other properties have
19   washer/dryer hookups in unit?
20            MR. NAM:  Objection; outside the scope of his
21   deposition with respect to any Bay Area residential
22   properties.
23            THE WITNESS:  No.
24   BY MR. LAVINE:
25       Q.   Do some of them?
```

Page 96

1        A.    Besides the number of days?

2        Q.    Yes, besides that.

3        A.    I -- I -- to my knowledge, the Three-Day Notice

4    is -- is used as a -- a legal form to notice a resident for a

5    nonpayment or -- or an infraction.

6        Q.    And the 10-Day?

7        A.    10-Day is similar, but I don't know what -- I'm not

8    sure what the difference is in regards to the law.  I don't

9    know.

10            MR. LAVINE:   Okay.  I'm going to mark the next in

11    order and then we're going to have lunch.

12            (Exhibit 2 marked for identification.)

13            MR. LAVINE:   This is a printout of an email.  You

14    can ignore the email portions of it.  I want to focus on the

15    bigger print, which I'll represent to you was taken off the

16    Wasatch website.

17            And it says, "Is renters insurance required?"  And

18    goes on to say, "With the interest of our residents in mind,

19    Wasatch Premier Communities does require Renters Insurance.

20    Your community's leasing specialist will be able to provide

21    more specific details.  Ask about convenience pay-with-rent

22    option."

23            So, first off, you've already testified that Renters

24    Insurance is required across the board at Wasatch as a matter

25    of policy, is that correct, or did I misunderstand?

Page 109

1          MR. NAM:  Objection; asked and answered.

2          THE WITNESS:  Yes.

3          MR. NAM:  And outside the scope of his deposition.

4          MR. LAVINE:  Again, you've got that one as many

5    times as you need it.

6     Q.   What's your convenient pay with rent option?

7     A.   I think that refers more to an online payment, so

8    where they can pay it at the same time as their rent.

9     Q.   Can it ever be paid at a different time than rent?

10    A.   Sure.  If they have their own policy, they could.

11    Q.   I see.  So does the pay with rent option refer

12   to the Wasatch-chosen provider of the insurance?

13    A.   Yeah, the company that we offer.

14    Q.   Do you know the name of that company?

15    A.   Yes.  Assurant.

16    Q.   Is it true for all nine properties that that's the

17   one that's offered?

18    A.   Yes.

19    Q.   Do you know how much it costs right now or does it

20   depend on the square footage or other things?

21    A.   I think it's pretty standard.  It's around sixteen

22   bucks a month.

23    Q.   And has that changed over time since you've seen it?

24    A.   The insurance companies change that over time.  I

25   don't think it varies by much, though.

                                              Page 110

```
 1        A.   So, at Chesapeake Commons, the washers and dryers
 2   and parking spaces were -- were mandatory until August of
 3   2016, and we were notified that SHRA had -- had an issue with
 4   that, so we went back and changed it at that point
 5   and actually issued refunds to our bond residents back for a
 6   period of time.  Since then, they -- they are optional.
 7   There's other properties that are tax credit properties to
 8   where we can't require that these items are -- additional
 9   service items are required.  So that's -- that's for three of
10   the Sacramento properties.
11            Then, the other two, they -- they are optional.
12   They -- they don't have -- they're not a tax credit, but they
13   have a bond component on there.  So for the Section 8
14   residents, they -- they've been optional.  Those are the ones
15   that -- some have washers and dryers and some don't for those
16   two properties.
17        Q.   Let me ask some follow-up.  Thank you for the
18   clarification.
19        A.   Yeah.
20        Q.   So, first off, how did all this come to you over
21   lunch?
22            MR. NAM:  Objection; calls for attorney-client
23   communications.
24            To the extent that calls for that, I'm going to
25   instruct you not to answer that, but go ahead and respond to
```

                                                        Page 112

```
 1    of all three.
 2         Q.    Right.  So let's -- let's leave the low income
 3    designated buildings and just focus on the -- the buildings
 4    that have Section 8 tenants that don't have bond designation
 5    or low income designation.
 6         A.    Okay.
 7         Q.    So those Section 8 tenants, upon move in, have to
 8    buy Renters Insurance through Wasatch's sponsored policy or
 9    through their own choice of policy?
10         A.    Yes, that's correct.
11         Q.    Okay.  Thanks for clarifying.
12         A.    Yeah.  Sorry.
13         Q.    How about with respect to the parking, did SHRA
14    issue any guidance in August 2016, or at any other time,
15    about whether you're allowed to impose a mandatory charge for
16    parking?
17         A.    I think the communication was just the washers and
18    dryers.
19         Q.    It didn't have to do with parking?
20         A.    I don't think so.
21         Q.    In light of the policy change for the washers and
22    dryers, has Wasatch reconsidered its additional service
23    agreement charges for anything else it charges extra for?
24              MR. NAM:  Objection; vague as to "reconsidered,"
25    overbroad.
```

                                                    Page 124

```
1    BY MR. LAVINE:

2        Q.   Your answer was yes?

3        A.   Yeah.

4        Q.   All right.  At first it says, "All payments received

5    for rental and additional charges shall first be applied to

6    any past balance due."

7             Could -- would that be for anything at all that's --

8    that's due to Wasatch?

9             MR. NAM:  Objection; calls for speculation.

10            THE WITNESS:  Yes.

11   BY MR. LAVINE:

12       Q.   All right.  And then to additional charges and then

13   to current rent.  Do you know why it's in that sequence?

14       A.   I don't.  I think it's just an accounting practice.

15       Q.   If you can look at Section 14.  It starts,

16   "Effective December 1, 2003, Wasatch Property Management

17   requires each resident to maintain Renters Insurance with a

18   minimum of $25,000 Personal Liability Coverage, with a

19   company of the Resident's discretion.  Residents must provide

20   proof of insurance from a third party carrier" and it goes on

21   with some other requirements.

22            First off, do you understand this to have been the

23   policy, at least since you've been there?

24       A.   Yes.

25       Q.   This is true for Section 8 tenants as well?
```

Page 129

```
 1        A.    Yes.
 2        Q.    This paragraph doesn't mention that Wasatch has a
 3   sponsored option that can be done in lieu of the -- unless
 4   I'm missing it -- in lieu of the --
 5             MR. NAM:  Third party carrier?
 6             MR. LAVINE:  Well -- all right.  Let me rephrase
 7   that question.
 8        Q.    The last sentence refers to "If at any time during
 9   the term of this lease resident is without coverage and in
10   default of their lease, resident agrees to automatically be
11   enrolled in the 'pay along with rent' program and being
12   charged accordingly."  Let's stop reading there.
13             Does that mean that the resident has to choose their
14   own carrier at the time of move in or are they offered a
15   sponsored carrier at the time of move in?  It's a little bit
16   hard for me to follow.
17             MR. NAM:  Objection; compound, calls for legal
18   conclusion.
19             THE WITNESS:  The way I understand it is they have
20   the choice of either.
21   BY MR. LAVINE:
22        Q.    Has it always been Assurant who's the -- the house
23   option?
24        A.    Yes.
25        Q.    For those who go with the pay along with rent
```

Page 130

```
 1    "Additional Services Agreement."  And it references certain
 2    charges for a tenant by the name of Ronnie Block, whose
 3    signature is at the bottom.
 4         And there are two other pages which go on further to
 5    describe an Additional Services Agreement.  If you can kindly
 6    have a look and just let me know when you're done.
 7    A.   Okay.
 8    Q.   All right.  So -- and I would also note that this
 9    document refers to Chesapeake Commons and Mr. Block,
10    apparently a tenant there.
11         In the second paragraph, second -- make that third
12    sentence, it says, "This agreement is made a part of that
13    certain Residential Rental Agreement dated June 1, 2011,
14    hereinafter the lease, by and between the resident and the
15    community Wasatch Property Management will provide the
16    services and the property as referenced and described by this
17    agreement."
18         So, first, did you know that the Additional Services
19    Agreement, at least back in 2011, was, quote/unquote, made a
20    part of the Residential Lease Agreement?
21    A.   I didn't know that's when it was made part of it,
22    but I'm aware that it is part of it.
23    Q.   Is it still that way today?
24    A.   Yes.
25    Q.   Do you know, has it been that way throughout to the
```

Page 139

1    first of your memory at Wasatch?

2        A.   Yes.

3        Q.   Okay.  Further down, you see a section for

4    "Property" and a section for "Services."  Under "Property,"

5    there is a charge of $40 for washer and dryer.

6            Do you see that?

7        A.   Yes.

8        Q.   At that time in 2011, was that charge required of

9    every tenant, Section 8 or not, at Chesapeake Commons?

10       A.   Yes.

11       Q.   Further down, there's one called "Renters

12   Insurance," and it also says this is available as a pay with

13   rent option, and it's a charge of $15.58.  And, again, back

14   in 2011, was that a required charge for Section 8 tenants?

15       A.   Yes.

16       Q.   And is that still true today?

17       A.   Yes.

18       Q.   I'm going to ask you about some of the other

19   property charges that are noted on the form, even though they

20   have zero next to them.  There's one for "Furniture

21   Residential/Purchase (See Additional Agreement for purchase

22   terms)."

23           Did Wasatch offer a program whereby tenants could

24   buy or rent furniture from Wasatch?

25       A.   Not that I've ever been a part of.

                                                    Page 140

```
1        A.    Yeah.

2        Q.    All right.  And then there's Plus Additional

3   Services.  That refers to the Additional Services Agreement

4   we just talked about?

5        A.    Yes.

6        Q.    All right.  Then there's a Subtotal, a tax, and then

7   a Total Monthly Obligation.

8              Did Wasatch regard it is an obligation for the

9   tenant to pay both the base rent and the additional services

10  every month?

11       A.    Yes.

12       Q.    Further down there's a section called "Pest

13  Control."

14       A.    Uh-huh.

15       Q.    It says, "Pest control is offered to our residents

16  at no charge."  Is that true today?

17       A.    Yes.

18       Q.    At all the properties you manage?

19       A.    Yes.

20       Q.    Do you know if tenants were ever charged for pest

21  control services for any reason?

22             MR. NAM:  Objection; vague as to time.

23             THE WITNESS:  Yes, I've known of a couple.

24  BY MR. LAVINE:

25       Q.    Since it says "Pest control is offered to our
```

Page 156

1   the person -- the tenant sign this document.

2           Do you know what the change was on this form in

3   April 2016?

4       A.   No, I don't.

5           MR. LAVINE:  You can put this document aside.

6           (Exhibit 10 marked for identification.)

7           MR. LAVINE:  This is a letter dated June 25, 2015,

8   to tenant at Chesapeake, Mary Cooper.  And it notes her lease

9   will be expiring the 31st of July, 2015.

10          I'm at the second-to-the-last sentence in the second

11  paragraph.  Wasatch writes, or Ms. Gamboa writes, "When you

12  renew your lease, your new rental rate will be $839.16, this

13  rate includes rent and any applicable service items (such as

14  parking, renter's insurance, pet, etc.)  This rate will be in

15  effect beginning August 1, 2015."

16          First off, was it regular practice at Chesapeake to

17  notify tenants that their lease was ending and that a renewal

18  was coming up?

19      A.   Yes.

20      Q.   And was it standard to let them know that their

21  rental rate was the base rent, plus the additional service

22  amount?

23      A.   Combined amount, yes.

24      Q.   Down near the -- after the check boxes, second

25  sentence, it says, "As a reminder, your new lease needs to be

                                                    Page 167

```
 1              Was that, in fact, the policy and practice at
 2    Wasatch?
 3              MR. NAM:  Objection; outside the scope of this
 4    deposition.
 5              MR. LAVINE:  Again, there's a running objection
 6    there.
 7              THE WITNESS:  Yes.
 8              MR. LAVINE:  Like the eighth time.
 9              You can put that document aside.  We'll circulate
10    the next in order.
11              (Exhibit 13 marked for identification.)
12              MR. LAVINE:  This is a document called "Three-Day
13    Notice to Perform Financial Covenant of Lease or Quit".
14              It's directed to a tenant Yvonne Allen Melvin,
15    M-e-l-v-i-n, at Chesapeake.
16              And it says, in small print, "Your lease provides
17    that you are obligated to pay the following charges, which
18    have failed to do:" -- and it lists four charges dated the
19    first of December 2016.  They are the Covered Parking
20    Charges, Renters Insurance charge, the RentPlus Service
21    charge and the Washer/Dryer Rental, for a total of, looks
22    like, $83.33, if I'm adding that up right.
23              It goes on to say, "You have breached the lease due
24    to the following infractions:  Failure to pay amount due in
25    accordance with the above referenced items within three days
```

Page 174

1    after service of this notice, you must do the following:  Pay

2    to Chesapeake Commons Apartments the sum of $83.33 to cure

3    the breach of the lease agreement.  Or deliver possession of

4    the premises to the undersigned.  Your failure to perform the

5    covenant as specified, or vacate the premises within three

6    days, will cause the undersigned to initiate legal

7    proceedings against you to declare the forfeiture of your

8    rental agreement, recover possession of premises, and to seek

9    judgment for rent owed through the expiration date of this

10   notice, together with damages of each day of occupancy after

11   that date, attorneys fees if provided for in your rental

12   agreement."  I'll stop there.

13           First off, have you seen a letter looking like this

14   before?

15       A.    Yeah.

16       Q.    Have you seen it go out to multiple tenants?

17       A.    It's not something that I review with any

18   regularity.

19       Q.    Who's the Management Agent who signed?  Can you tell

20   by the signature?

21       A.    I think it's Lori -- Lori Hassell.

22       Q.    Okay.

23       A.    I'm not sure, though, could be Laura.  There's two

24   Ls there.

25       Q.    Okay.  So, first off, let me ask, was it the policy

                                                    Page 175

```
 1    of Wasatch to declare a breach of the Lease Agreement based

 2    on the failure to pay the charges that are in default here?

 3              MR. NAM:  Objection; overbroad as to time and vague,

 4    calls for a legal conclusion.

 5              THE WITNESS:  Yes, collection effort.

 6    BY MR. LAVINE:

 7       Q.   This is more than collection.  It says initiate

 8    legal proceedings.

 9              Do you know what those entailed?

10              MR. NAM:  Objection; argumentative.

11              THE WITNESS:  Could be --

12              MR. NAM:  Also legal conclusion.

13              THE WITNESS:  To me, it would give you the ability

14    to press forward if you weren't able to collect.

15    BY MR. LAVINE:

16       Q.   I don't see -- unless I missed that -- I don't see

17    anything in here about collection efforts, apart from demand

18    of payment.

19              Was there a collection service that was used for

20    these kinds of notices?

21       A.   No.

22              MR. NAM:  Objection; vague as to time.

23    BY MR. LAVINE:

24       Q.   How did you go about collection efforts?

25              MR. NAM:  Objection; vague as to time, overbroad.
```

Page 176

```
 1              THE WITNESS:  The office staff would post a notice
 2      or a phone call or both.
 3      BY MR. LAVINE:
 4         Q.   Was there a third party collector that Wasatch used
 5      to follow up with tenants like this in these circumstances?
 6              MR. NAM:  Objection; vague as to time.
 7              THE WITNESS:  No, not at this point in time.
 8      BY MR. LAVINE:
 9         Q.   It says also that Wasatch can declare the forfeiture
10      of the rental agreement and recover possession of the
11      premises.
12              Was that in the policy of Wasatch in the event that
13      the additional service charges were missed?
14         A.   That was an option.
15         Q.   Was the policy to state that to the tenants?
16         A.   To -- to state it?
17         Q.   Yes.
18         A.   Yes.
19         Q.   As a matter of practice, was it put into force that
20      way?
21              MR. NAM:  Objection; vague as to time.
22              THE WITNESS:  As a matter of practice, no.
23      BY MR. LAVINE:
24         Q.   Did you ever have a tenant say to you, "I paid my
25      rent.  Why are you trying to kick me out?"
```

Page 177

1   Was she evicted?  Did she survive this letter?  What

2   happened?

3        A.   I don't know.  What was the year?

4        Q.   It's dated 2016, December, so in the last year.  Do

5   you know her?

6        A.   No I don't know her, specifically.  I don't recall

7   her being on an eviction action, either.

8             MR. LAVINE:  You can put this document aside.

9   Circulate the next in order.

10            (Exhibit 14 marked for identification.)

11            MR. LAVINE:  This is another letter to Ms. Melvin,

12   dated 8th of October 2016.  This is slightly earlier in time

13   than the last one.  It lists a series of delinquent charges

14   and notes, as of the 1st of July, a parking charge balance, a

15   Renters Insurance balance, a RentPlus charge balance as of

16   August 1, 2016, a Renters Insurance balance as a October 1,

17   2016, a RentPlus charge balance, a Renters Insurance balance,

18   of Washer/Dryer charges balance and a Parking charges balance

19   for a total of $118.35 with the same or very similar language

20   to what we just went over.

21        Q.   Again, was it Wasatch's policy to send a letter

22   threatening legal action against a tenant who didn't pay

23   their parking charge?

24            MR. NAM:  Objection; argumentative, overbroad vague

25   as to time.

Page 179

Veritext Legal Solutions
866 299-5127

```
 1              THE WITNESS:  Yes.

 2   BY MR. LAVINE:

 3       Q.   How about didn't pay renters insurance for a

 4   particular month?

 5              MR. NAM:  Same objections.

 6              THE WITNESS:  Are you asking if they didn't -- paid

 7   everything except for the Renters Insurance on this?

 8              MR. LAVINE:  No.  Let me restate the question.

 9              THE WITNESS:  Thank you.

10   BY MR. LAVINE:

11       Q.   Was it Wasatch's policy to send a letter threatening

12   legal proceedings if a renter did not pay their Renters

13   Insurance charge for a given month?

14       A.   So if that was the only charge on here, would the

15   same letter go out?

16       Q.   Yes.

17       A.   Yes.

18       Q.   How about the RentPlus charge, same question?

19       A.   I would assume so.

20       Q.   Okay.  How about the washer and dryer charge, same

21   question?

22       A.   Yes.

23       Q.   Did you ever hear from Section 8 tenants that they

24   were having a hard time paying these additional service

25   charges?  They were causing them financial burden?
```

```
 1              MR. NAM:  Objection; vague as to time, overbroad,
 2     incomplete hypothetical.
 3              THE WITNESS:  I don't recall any direct
 4     conversations with any -- any of the residents.
 5     BY MR. LAVINE:
 6        Q.   Do you know if Ms. Gamboa or your other property
 7     managers ever heard someone tell them something like that,
 8     section 8 tenant, that is?
 9        A.   I have -- I haven't asked them.  I don't know.
10              MR. LAVINE:  Okay.  You can put that document aside.
11     We'll circulate the next one.
12              (Exhibit 15 marked for identification.)
13              MR. LAVINE:  This letter is similar to the last two;
14     it's dated 11th of January of this year, 2017.  It reflects a
15     posting of a Three-Day Notice to Perform or Quit, and it
16     lists the same kinds of additional service charges that we've
17     seen in the earlier letters:  Covered Parking, Washer/Dryer,
18     Renters Insurance, and the RentPlus Service all delinquent
19     after January 1, 2017.  And it's for a total of $83.33.
20              And, again, as of this year, was it Wasatch's
21     practice to send these letters in the event that one or more
22     of these charges was not paid?
23              MR. NAM:  Objection; vague, overbroad.
24              THE WITNESS:  Yes.
25     BY MR. LAVINE:
```

Page 181

```
 1        Q.    Is it still that practice today?

 2        A.    Yes.

 3        Q.    With the same or very similar letter that says it

 4   will cause the undersigned to initiate legal proceedings?

 5   Does that language still carry over even today?

 6        A.    Yes.

 7             MR. LAVINE:  All right.  You can put this document

 8   aside.

 9             (Exhibit 16 marked for identification.)

10             MR. LAVINE:  So this is a letter dated the 14th of

11   July 2016.  It's called 60 Day Notice of Rental Increase.  It

12   goes to a tenant by the name of Hien, H-i-e-n, Dinh, D-i-n-h,

13   at Chesapeake Commons.

14             And I'm going to read from near the middle of it.

15   It says, (READING) In order to maintain those standards,

16   passing along rent increases are sometimes necessary, which

17   will enable to keep up with rising coast [sic]" (END READING)

18   -- I imagine that means "cost" -- (READING) Your new rate

19   will be $937.16 effective in December [sic] 1, 2016 (END

20   READING).

21             First off, was this a standard letter that was sent

22   around renewal time?

23        A.    I would -- yeah, I think so.

24        Q.    Have you seen this kind of letter before?

25        A.    Not this specific letter.  This kind of letter, yes,
```

                                                    Page 182

1   incomplete hypothetical.

2         THE WITNESS:  I would think they would know based on

3   their existing paperwork what the difference would be in

4   rent.

5         MR. LAVINE:  You can put this document aside.  We'll

6   go on to the next one.

7         (Exhibit 17 marked for identification.)

8         MR. LAVINE:  This exhibit is entitled "60-Day Notice

9   of Resident's Intent to Vacate."  It regards a resident by

10  the name of Wilfred Soler, S-o-l-e-r, from Chesapeake

11  Commons, and it is signed at the bottom.  It's -- it refers

12  to a date of the 6th of July at 10 a.m. when a final

13  walk-through inspection will be completed.

14        First off, was this the standard notice that went

15  out when a tenant indicated that they were going to leave

16  after 60 days?

17        MR. NAM:  Objection; vague as to time, incomplete

18  hypothetical.

19        THE WITNESS:  Yes.

20  BY MR. LAVINE:

21     Q.   Down in the itemization area, it says:  Current

22  Account Balance, $9; Rent Charges through Move Out Date,

23  $148.84; Additional Services through Move Out date, $11.21;

24  then there's some other zeroed out numbers and, then, Total

25  Due, $169.05.

                                          Page 186

```
 1              So would this go out automatically to a tenant if
 2    they didn't renew by the date that was indicated in their
 3    Notice of Renewal?
 4              MR. NAM:  Objection; incomplete hypothetical.
 5              THE WITNESS:  No.
 6    BY MR. LAVINE:
 7       Q.   Only if the tenant affirmatively indicated that they
 8    planned to leave?
 9       A.   Yes.
10              MR. LAVINE:  You can put this document aside.
11              Next in order, please.
12              (Exhibit 18 marked for identification.)
13              MR. LAVINE:  This is a document entitled, "Wasatch
14    File Review" -- looks like -- "Checklist," part of it is cut
15    off -- regarding resident William Redick, R-e-d-i-c-k, Jr.
16    from Chesapeake.
17              And it references a bonus at the bottom and
18    something called "Bonusable," which is circled yes.  And the
19    Amount of Bonus is $75, based on rental amount.
20       Q.   First off, what's this bonus all about?
21       A.   It's a leasing bonus.
22       Q.   Who gets it?
23       A.   Whoever leased the apartment.
24       Q.   At the time Move In or time of renewal?
25       A.   When they moved in.
```

Page 187

1     Q.    Is the ledger a standard document at Wasatch?

2     A.    Yes.

3     Q.    Was one kept for every tenant, Section 8 or not?

4     A.    Yes.

5     Q.    Was the ledger what was consulted to check whether

6  someone had an overdue balance or not?

7     A.    Yes.

8           MR. NAM:  Objection; vague as to "consulted."

9           THE WITNESS:  Yes.

10  BY MR. LAVINE:

11    Q.    All right.  On the first page -- I know this dates

12  to 2002, quite a while ago -- but there is a Washer and Dryer

13  charge at the third line item for $17.40, Parking charges for

14  4.95 -- good ol' days, huh?  The Pet Rent for 7.50 -- maybe

15  the dogs were smaller back then, I don't know -- and an

16  Application Fee of $25.

17          So was it typical to include these kinds of charges

18  in the rent ledger?

19          MR. NAM:  Objection; incomplete hypothetical.

20          THE WITNESS:  Yes.

21  BY MR. LAVINE:

22    Q.    And it still is today, just higher amounts?

23    A.    Yes, but I believe we're seeing pro rates when they

24  moved in, that's why the numbers are different.

25    Q.    Got it.  And Section 8 tenants would have these

Page 191

```
 1    items, as applicable, added to their -- their rent ledger as

 2    well?

 3         A.    Yes.

 4              MR. LAVINE:  You can put this document aside.

 5              (Exhibit 20 marked for identification.)

 6              MR. LAVINE:  This is another page of Ms. Naughton's

 7    rent ledger with rent charges, or other charges from

 8    November 18 through December 15, 2008.  And I'm going to ask

 9    you about a few of these and some of the writing down at the

10    bottom.

11         Q.    First off, the Application Fee is noted as $35.

12    What application would that be referring to, given that she's

13    been a tenant for six years?

14              MR. NAM:  Objection; vague as to time, outside the

15    scope.

16              THE WITNESS:  This is a different unit.  She

17    transferred.

18    BY MR. LAVINE:

19         Q.    So whenever a tenant moved to a new unit, there was

20    a new Application Fee?

21         A.    New deposit, new Application Fee.

22         Q.    For Section 8 tenants as well?

23         A.    For all tenants.

24         Q.    The covered parking charge is now $10 -- about

25    halfway down the list.  Washer and dryer rental is $35; the
```

Page 192

1      A.    Has anybody from HUD told me that or anybody --

2      Q.    Anybody at all.

3      A.    No.

4      Q.    Has anyone ever told you that delinquent charges

5   based on the Additional Service Agreements cannot be a basis

6   for eviction proceedings?

7      A.    Say it again.  Sorry.

8      Q.    Sure.  Has anyone ever told you that delinquency and

9   additional service charges cannot be a basis for eviction

10   proceedings?

11          MR. NAM:  Objection; calls for legal conclusion,

12   overbroad, assumes facts.

13          THE WITNESS:  Cannot be a basis?

14   BY MR. LAVINE:

15      Q.    Correct.

16      A.    No, not specifically.

17      Q.    Your form file on your computer where these -- some

18   of these forms -- or all of them, perhaps -- are generated

19   from, is there -- is that based on software that generates

20   those forms or do you have a -- a file of them that you go

21   to?  How does it work?

22      A.    Yes, there's a property manager software that we

23   use.

24      Q.    What's it called?

25      A.    Yardi.

                                              Page 223

1    Q.   How do you spell it?

2    A.   Y-a-r-d-i.

3    Q.   How long has that been in use at Wasatch?

4    A.   Since I've been here.

5    Q.   Did your other employers, property manager

6    employers, use it as well?

7    A.   I've used it, I think, at one other company.

8    Q.   What does it do?

9         MR. NAM:  Objection; overbroad, vague.

10        THE WITNESS:  It's a database software that -- it's

11   very customizable by whatever the company's needs are.  They

12   can -- they can or can't generate leases, depending if you

13   want it to do that or generate notices and populate it from

14   its database, keep track of move in and move out, those

15   things.

16   BY MR. LAVINE:

17   Q.   Do you use it yourself?

18   A.   Yes.

19   Q.   Do your property managers use it as well?

20   A.   Yes.

21   Q.   Do you know if Yardi is used across Wasatch regions

22   across Wasatch's properties?

23        MR. NAM:  Outside the scope.

24        THE WITNESS:  I think so.

25   BY MR. LAVINE:

Page 224

# EXHIBIT M

1              UNITED STATES DISTRICT COURT
2             EASTERN DISTRICT OF CALIFORNIA
                    SACRAMENTO DIVISION
3   UNITED STATES OF            )
4   AMERICA, ex rel.            )
    DENIKA TERRY and ROY        )        **CERTIFIED**
5   HUSKEY III, and each        )        **TRANSCRIPT**
    of them for themselves      )
6   individually, and for       )
7   all other persons           )  Case No.
    similarly situated and      )  2:15-cv-00799-KJM-DB
8   on behalf of the            )
    UNITED STATES OF            )
9   AMERICA,                    )
10        Plaintiffs,           )
                                )
11  vs.                         )
                                )
12  WASATCH ADVANTAGE           )
13  GROUP, LLC, WASATCH         )
    PROPERTY MANAGEMENT,        )
14  INC., WASATCH POOL          )
15  HOLDINGS, LLC,              )
    CHESAPEAKE COMMONS          )
16  HOLDINGS, LLC, LOGAN        )
    PARK APARTMENTS, LLC,       )
17  LOGAN PARK APARTMENTS,      )
18  LP, and DOES 1-30,          )
         Defendants.            )
19  _____

              Deposition of: JANAE JARVIS, CPM,
20                    Rule 30(b)(6)
              August 10, 2017 * 10:24 a.m.
21

22

23  Reporter:  Ann Fleming, RPR
    Notary Public in and for the State of Utah
24  Job No. 2674870
25  Pages 1 - 256

                                              Page 1

1        A.      Approximately 25.

2        Q.      So, that number hasn't changed much since

3   --

4        A.      The number hasn't changed.  We've sold a

5   couple properties and we've added a couple properties.

6        Q.      What I'd like you to do, given the number,

7   this may take a couple minutes, but I'd like you to

8   tell me the names of all the properties in Utah held by

9   Wasatch, and, if you know, the number of units in them?

10  Is that something you can do off the top of your head?

11       A.      Yes.

12       Q.      Impressive.  Let's try it.

13       A.      Let's start geographically so I can get

14  them in my head.  We have Four Seasons Logan.  That is

15  250 units; Falls at Riverwoods, 214 units; Devonshire,

16  68 units; Springwood, 144 units; Providence Place, 125

17  units; 600 Lofts, which is in lease-up, and is not

18  fully delivered, but we'll have 274 units; Enclave, 210

19  units; Crossroads, 240 units; Broadmoor, 348 units; San

20  Tropez, 250 units.  There's a second phase, which we

21  call Tropez West, which is 96 units, or could be 84,

22  that one.

23       Q.      I won't quibble.

24       A.      Those second phases.

25       Q.      Go ahead.

Page 21

1          A.      Parc West, which is also in lease-up,
2    we'll have 249 units; Parc at Day Dairy.  And all of
3    these Parcs are spelled P-A-R-C.  Parc at Day Dairy has
4    228 units; the Falls at Hunters Pointe has 276 units;
5    Southtowne has 276 units; San Marino has 320 units; San
6    Moritz has 390 units; Florentine has 214 units;
7    Talavera has 252 units; the Lofts has 192 or 4,
8    approximately.
9          Got to get back to my geographic map.
10   Promontory Point has 240 units; Pinehurst has 174, I
11   think.  That one is a guess a little bit, too, but it's
12   approximately that size.  And Remington has 288 units.
13   I think I've got all the locations covered, but give me
14   a minute.  Tuscany Villas Senior Housing, 76 units; and
15   Kimpton Square is 97 units.  Sometimes I'll categorize
16   those as one property because we have one manager.  The
17   same with Tropez and Tropez West; it has one manager,
18   so I consider those one location although they're two
19   developments.
20         Q.      That was, as I said, impressive.
21         A.      I believe I have them all and I believe
22   majority of them are precisely accurate.  There's a
23   couple that are off a little bit.
24         Q.      If you remember a location that you missed
25   from your list, feel free to add it --

                                          Page 22

1      A.    Okay.

2      Q.    -- as we go through.  I didn't necessarily

3   expect you to be able to do that.  So, that was very

4   helpful.

5           I'm going to ask you another question

6   about the properties.  Does each one have a property

7   manager assigned to it?  I know you said that two on

8   the same location might have a single manager, but each

9   one has its own unique manager otherwise?

10     A.    Yeah, otherwise, those locations I

11  mentioned, everyone has its own manager.

12     Q.    I'm going to ask you to go through the

13  list again and to name the property manager at each

14  one, and if they have a complicated name, if you could

15  spell it for me.  Is that something you can do off the

16  top of your head?

17     A.    Yes.  I wish I would have done it at the

18  same time, list of communities, stay in the same order.

19     Q.    It doesn't matter if the order changes,

20  and I'm going to ask you one more question about the

21  properties afterwards.  If you want to I can try to fit

22  that in now, but I'm wondering do all properties have

23  Section 8 tenants?

24     A.    No, they do not.

25     Q.    So, as you kind of bring it altogether as

                                        Page 23

```
 1   you're going through the properties, if you can tell

 2   me, as you mentioned, their name, if they have Section

 3   8 tenants in them or they don't.

 4        A.    Okay.  I should be able to do that.  I may

 5   miss one or two, so let's give it a try.  Four Seasons

 6   Logan, James Johnson is the community manager, no

 7   Section 8; Devonshire Court, Zach Haycock, manager,

 8   Section 8; Falls at Riverwoods, Joy Peterson, manager,

 9   no Section 8; Providence Place, Judith Rodriguez,

10   Section 8; 600 Lofts, Brittany Stuart, Section 8;

11   Crossroads, Breanna Cottrell, C-O-T-T-R-E-L-L, I

12   believe, Section 8.

13            Skipped a property, Springwood, Brittany

14   Conner, Section 8; Broadmoor, Jennifer Miller, Section

15   8; San Tropez, Renee Perschon, P-E-R-S-C-H-O-N, no

16   Section 8; Parc West, Gracia, G-R-A-C-I-A, Mangrum,

17   M-A-N-G-R-U-M, no Section 8; the Parc at Day Dairy,

18   Eugenia, E-U-G-E-N-I-A, Cascante, C-A-S-C-A-N-T-E, I

19   believe, no Section 8; the Falls at Hunters Pointe, Kim

20   Manduca M-A-N-D-U-C-A.  I believe there are Section 8

21   there.  That is a guess.

22        Q.    I don't want you to guess.  If you don't

23   know --

24        A.    I don't know if there are Section 8 there.

25        Q.    That's all right.
```

Page 24

1          A.       Southtowne, Cassidy, with a C, Neal,

2     N-E-A-L, no Section 8; San Marino, Brad Siddoway,

3     S-I-D-D-O-W-A-Y, no Section 8; Promontory, Erica

4     Bronson, B-R-O-N-S-O-N, Section 8; Remington, Kelly

5     Ross, Section 8; San Moritz, Emory, E-M-O-R-Y, Rainey,

6     R-A-I-N-E-Y, no Section 8; Florentine, Edith Rodriguez,

7     Section 8; Talavera, Lexy Norman, no Section 8; Lofts

8     at 7800, Arie, A-R-I-E, I can't remember Arie's last

9     name, Section 8, one Section 8 at that location.   I

10    believe I've named them all.

11         Q.       When you were regional manager, did those

12    folks or the folks who had those roles at the time

13    report to you?

14         A.       Initially, yes, all of those individuals.

15    There is another regional manager, Patrick Morse.   Some

16    of them report to him.   He reports to me.

17         Q.       So, when you moved on to vice president,

18    the regional manager role split into two?

19         A.       The regional manager role did split into

20    two, yes.

21         Q.       How is the geography broken out between

22    the two regional managers?

23         A.       Initially it was broken out by ownership.

24    Patrick oversaw all of the WPP or the Wasatch Pool

25    Holdings developments, and I oversee what we'd call

                                              Page 25

```
 1    one-off developments and I oversee all of those.  At

 2    this point, we changed that to more geographic and

 3    Patrick oversees the south area is what I would

 4    consider south of Salt Lake.

 5         Q.    Is it fair to say that all the properties

 6    that Wasatch, its various entities own and manage, are

 7    in the northern part of the state or are some of them

 8    in the south, southern boundary as well?

 9              MR. SALAZAR:  Are you talking about

10    currently or when she started?

11         Q.    (By Mr. Lavine) Let's say currently.

12         A.    Can you define south?

13         Q.    So, in other words, down by Saint George

14    or the national parks down there.

15         A.    All of our communities are either in Cache

16    Valley, which is Northern Utah, Davis County, Salt Lake

17    County and Utah County.

18         Q.    So, that's all roughly the northern half

19    of the state, correct?

20         A.    Approximately what we call along the

21    Wasatch Front.

22         Q.    Okay.  When you were regional manager, who

23    was the VP you reported to?

24         A.    I reported to -- we didn't have a VP

25    position at that time.  I reported directly to our COO,
```

Page 26

1   who, at the time, was Bradley Mishler, M-I-S-H-L-E-R.

2        Q.    At some point, Mr. Mishler left?

3        A.    Yes, Mr. Mishler technically is still

4   employed by Wasatch.  He's an emeritus status right

5   now.

6        Q.    He essentially retired?

7        A.    He still works approximately 20 hours a

8   week.

9        Q.    So much for retirement.

10       A.    Yeah.

11       Q.    All right.  Let's move now to when you

12  were promoted to vice president.  What year was that?

13       A.    It was approximately, as I mentioned, two

14  to three years ago.

15       Q.    You had mentioned that you are housed at

16  one of the properties, not at headquarters?

17       A.    We have what we consider an operations

18  office at the community that I'm at, and we -- and I am

19  housed there, yes, along with our human resource

20  director, our other regional manager, our pricing

21  manager, our recruiter and our COO.

22       Q.    Remind me, which property is that at?

23       A.    San Moritz.

24       Q.    In which city?

25       A.    Midvale.

                                              Page 27

1        Q.      Thank you.  And everybody else, at the

2   corporate level, is that the headquarters building?

3        A.      We have a headquarters in Logan and we

4   have a satellite headquarters in Carlsbad.

5        Q.      California?

6        A.      California.  And we have a small office in

7   Arizona, which is onsite, and has two individuals.

8        Q.      As vice president, you still report to the

9   COO?

10       A.      Yes.

11       Q.      And who is in that role now?

12       A.      Jarom Johnson, J-A-R-O-M.

13       Q.      Just to finish out the corporate diagram,

14  who is at the top?  Who does Mr. Johnson report to?

15       A.      Dell Loy Hansen, CEO.

16       Q.      So, Mr. Johnson is with you in Midvale as

17  the COO at headquarters; is that right?

18       A.      Yes.  Let me clarify.  The COO is

19  partially headquarters, partially at a commercial

20  building in Salt Lake City.  He also has an office at

21  Real Salt Lake, which is a local soccer team that he

22  owns, and also does have a satellite office in the

23  Carlsbad office, Carlsbad, California.

24       Q.      When you became vice president, the scope

25  of your territory expanded?

                                        Page 28

1          A.      Yes.

2          Q.      Let's talk about outside of Utah portions

3     that you supervise.  I think you mentioned Washington

4     and Colorado?

5          A.      Yes.

6          Q.      Starting with the State of Washington, how

7     many Wasatch properties are there?

8          A.      Currently there are three, but they're

9     managed by one manager.

10         Q.      And which of the Wasatch entities owns

11    them?

12         A.      Wasatch Pool Holdings.

13         Q.      Could you tell me the three names and what

14    cities they're in?

15         A.      They're all three in Renton, Washington,

16    and it's the Metropolitan Collection, Burnett Station

17    and Revo 225.

18         Q.      Do you know how long Wasatch has owned

19    those properties?

20         A.      No.

21         Q.      It goes back well before when you took

22    over the role?

23         A.      Yes.

24         Q.      Any other Wasatch-owned properties in the

25    State of Washington?

Page 29

1    A.    Yes.

2          MR. SALAZAR:  Object.  It's vague.  Go

3    ahead.

4    Q.    (By Mr. Lavine) So, you're sure, as you

5    sit here today, that Wasatch has been charging for

6    additional services through some semblance of that form

7    for at least the time you've been at Wasatch?

8          MR. SALAZAR:  Objection.  Vague as

9    phrased.

10         THE WITNESS:  Yes.

11   Q.    (By Mr. Lavine) In your earlier days, when

12   you started and you saw the forms already existing in

13   the earlier files, do you remember what additional

14   services Wasatch was charging for?

15         MR. SALAZAR:  Objection.  Vague as to

16   time.

17         THE WITNESS:  I know at the specific

18   location I worked at what Wasatch was charging

19   additional services for and that was parking.

20   Q.    (By Mr. Lavine) Was that the only one that

21   you remember from that period?

22   A.    And a cable charge, which was optional.

23   Cable charge, they could add that on.

24   Q.    Was parking mandatory or optional?

25   A.    Optional.

Page 104

1    is very similar to vehicle insurance.

2         Q.    Oh, I misunderstood.

3         A.    And it's also very comon within the

4    industry to require some form of renters insurance.

5         Q.    Do you know when Wasatch first started

6    requiring renters insurance?

7         A.    It is specified in our lease contracts.

8         Q.    No, I know, but the year, I mean, when it

9    first began?  Because in the old days, there was no

10   renters insurance.

11        A.    Right.

12        Q.    At some point, it became more of an option

13   and I guess, at some point, it became mandatory, but do

14   you know when this was?

15        A.    Approximately 2003, I believe.

16        Q.    And, from that point forward in Utah,

17   Wasatch, apart from the low-income-designated

18   buildings, Wasatch required some form of renters

19   insurance in all their buildings?

20        A.    Yes, the residents were required to supply

21   themselves with renters insurance, and give us

22   documentation.

23        Q.    And that was for Section 8 tenants as

24   well?

25        A.    That was for all tenants.

                                          Page 115

1    require payment of the separate charge for a washer and

2    dryer and some don't?

3            A.    If --

4                 MR. SALAZAR:  Overbroad.  Go ahead.

5                 THE WITNESS:  In Utah, if the washer and

6    dryer is in the unit, it is included in the rent.  If

7    it is not, if the entire community had washer and

8    dryers.  If we had a hookup community, the tenants

9    could elect to rent a washer and dryer.

10           Q.    (By Mr. Lavine) So, in other words, if

11   some units had hookups and some didn't, then, it was an

12   optional choice for the tenants?

13                MR. SALAZAR:  Objection.  Misstates

14   testimony, overbroad.

15           Q.    (By Mr. Lavine) Maybe I didn't understand.

16           A.    You said "hookups."  If the community had

17   partial washers and dryers, so, for example, not every

18   unit had a washer and dryer in it, they could elect to

19   have us add a washer and dryer.

20           Q.    In-units?

21           A.    In-units.

22           Q.    And they would pay separately for that?

23           A.    Yes.

24           Q.    Through an additional services agreement

25   charge?

Page 118

1    came from, regarding Yardi Voyager.

2         Q.     I see.  Do other forms come out of the

3    Yardi system, too?

4         A.     Yes.

5         Q.     What kinds?

6         A.     Lease documents, renewal notices, three to

7    pay or vacate notices, notice to vacate notices,

8    addendums, pet notices.

9         Q.     The Additional Service Agreements?

10         A.     Additional Service Agreements are part of

11    the lease docs.

12         Q.     As an addendum?

13         A.     Yes.

14         Q.     All right.  Now, the code number that's

15    assigned, 207.02, is it fair to surmise that each form

16    has its own code?

17         A.     Each process, not form, but each process

18    has its own code.

19         Q.     What's the difference between a process

20    and a form?

21         A.     A form is a document.  This manual is

22    talking about processes:  How to move somebody in, how

23    to move somebody out, how to process an applicant, how

24    to -- this is how to take the payment sequence.

25         Q.     Got it.  And, out of curiosity, is there

                                        Page 148

1    applies to all fees, and that's spelled out in our

2    Lease Agreement first.  However, a default, in the

3    Additional Service Agreement, could be considered a

4    nuisance eviction because they defaulted on the terms

5    of the Lease Agreement.

6         Q.    (By Mr. Lavine) So, in your view or

7    Wasatch's view, better put, is a default under the

8    additional services agreement a default under the

9    lease?

10              MR. SALAZAR:  Objection.  Legal

11   conclusion.

12              THE WITNESS:  A default, in any part of

13   the Lease Agreement, could be considered a default of

14   the lease.

15        Q.    (By Mr. Lavine) In your mind's or in

16   Wasatch's view, the additional services agreement is

17   part and parcel of the lease?

18        A.    Yes.

19        Q.    So, carrying out on the example I gave, if

20   you do have that rare situation, as you call it, by

21   which a tenant has made the rent payments but not their

22   additional service charges, would that subject them to

23   notice of delinquency and ultimately an eviction?

24              MR. SALAZAR:  Objection.  Compound, calls

25   for a legal conclusion, assumes facts.  Go ahead.

                                        Page 158

1          A.     Because it doesn't have rent in it.

2          Q.     A little bit hard to follow, but let me

3     ask some follow-up questions.  In carrying forward the

4     situation I mentioned, fully current on rent, but not

5     current on additional service charges, what kind of

6     notice would be generated to a Section 8 tenant, say,

7     who was in that situation?

8                 MR. SALAZAR:  Objection.  Incomplete

9     hypothetical, calls for a legal conclusion.  Go ahead.

10                 THE WITNESS:  I think it is difficult to

11     follow because it is such the likelihood of that ever

12     happening is so rare.  One again, because when the

13     payment comes in, it is going to be applied to all of

14     their additional services first with rent being owing.

15     So, very rare that rent would be paid and additional

16     services would not.

17                 Now, so, in a hypothetical situation,

18     which I can't ever recall happening, that it didn't go

19     to -- or it did all go to rent and those fees were then

20     left owing, we would not be able to evict for

21     nonpayment on that other than the default of additional

22     services agreement.

23          Q.     (By Mr. Lavine) And what's the consequence

24     there?

25                 MR. SALAZAR:  Objection.

                                                    Page 160

1    base rent, I should say, but they haven't paid

2    additional services agreement charges, that their next

3    payment of whatever amount is going to be applied first

4    to the additional service charges, and, then, later to

5    rent?  Is that the sequence?

6          A.    Can you repeat the question?

7          Q.    Yeah.  So, I thought I understood you

8    saying in one of your answers that, in the situation

9    whereby a Section 8 tenant has fully paid their rent,

10   they're current, but they have not paid their

11   additional service charges for a given month, their

12   next payment if they make it, that money would first be

13   applied to the additional service charges delinquency

14   before being applied to the rent, the base rent.  Did I

15   understand that correctly?

16         A.    Before applying to the base rent, yes,

17   that is correct.

18         Q.    Okay.  So, in that circumstance, if they

19   paid the amount due on base rent, they would be short

20   for that month, right, because there would have been

21   part of that payment applied to the additional service

22   charges from the prior month and rent wouldn't have

23   been made whole; is that correct?

24               MR. SALAZAR:  Objection.  Compound and

25   misstates the prior testimony.  Go ahead and clear that

Page 162

1    up, if you would.

2              THE WITNESS:  So, I want to clarify the

3    current month.  So, if someone's paid in the current

4    month -- repeat the question.

5        Q.    (By Mr. Lavine) Sure.  Say, month six,

6    someone in month six of their lease --

7        A.    Okay.

8        Q.    -- they neglected to pay their additional

9    service charges, for whatever reason, make this a

10   Section 8 tenant, month seven they make their base rent

11   payment, that money, per your earlier answer, is

12   applied first to the delinquent additional service

13   charges for month six, and, then, applied to rent in

14   month seven, correct?

15       A.    Yes.

16       Q.    All right.  So, month rent -- month seven

17   rent would be short?

18       A.    Is that a question?

19       Q.    Yes.

20       A.    Yes.

21       Q.    All right.  Then what happens to the

22   tenant?

23       A.    Then the tenant would be given a notice

24   that their rent is short.  If the tenant didn't pay it

25   within the appropriate time for the notice, they could

Page 163

1     be subject to eviction.

2          Q.    So, at that point, is there really any

3     real difference between additional service charges and

4     rent because it's the same consequences follow?

5                MR. SALAZAR:  Objection.  Argumentative as

6     phrased, calls for legal conclusion.

7                THE WITNESS:  Yes, because additional

8     services are not rent.

9          Q.    (By Mr. Lavine) You say that, but what I'm

10    wondering is, to the tenant, does it make much

11    difference?

12               MR. SALAZAR:  Objection.  Now you're

13    asking her to speculate.

14               THE WITNESS:  Yeah, I don't know what the

15    tenant . . .

16         Q.    (By Mr. Lavine) All right.  I'll leave it

17    there.  Does the form that goes out first for

18    delinquency, is it the same for whether someone didn't

19    pay their rent or someone didn't pay their additional

20    service charge, or are those two different forms?

21         A.    No, there is the same form, but rent has

22    to be included on that form.

23         Q.    When you say, "rent has to be included,"

24    what do you mean?

25         A.    So, based on your earlier example when

Page 164

```
1              MR. SALAZAR:  Objection.  Incomplete
2     hypothetical, overbroad.  Go ahead.
3              THE WITNESS:  No.
4         Q.    (By Mr. Lavine) Just making sure I'm
5     covering ground.  We've run in, occasionally, into, in
6     the document production, there's something called a
7     10-Day Notice to Quit, or something along those lines.
8     Have you run into those before?
9         A.    No.
10        Q.    Have you ever seen that in Utah?
11        A.    No.
12        Q.    If someone neglects to pay additional
13    service charges in their last month of tenancy and they
14    move out, will Wasatch apply security deposit funds to
15    that deficiency?
16        A.    Yes.
17        Q.    Will there be late fees for nonpayment of
18    those additional service charges imposed on top of
19    those additional service charges?
20             MR. SALAZAR:  Objection.  Overbroad,
21    incomplete hypothetical.  Go ahead.
22             THE WITNESS:  When they move out?
23        Q.    (By Mr. Lavine) Yes.
24        A.    Late fees are applied at the beginning of
25    the month.  If it is a prorate on move out, we don't
```

                                        Page 166

1    question.

2              THE WITNESS:  Yes.

3        Q.   (By Mr. Lavine) What is the monthly cost

4    breakdown?

5              MR. SALAZAR:  For Utah?

6              MR. LAVINE:  Generally.

7              THE WITNESS:  It breaks down the cost of

8    the total monthly obligation.

9        Q.   (By Mr. Lavine) All right.  It says, at

10   the top -- is the format in Utah the same as the one

11   you're seeing here?

12       A.   Yes.

13       Q.   It says, base rent for this particular

14   tenant, $1,000, and, then, it says, "plus additional

15   services, 11.75."  And, then, they're totaled into a

16   subtotal and a total monthly obligation as you pointed

17   out.  Is it done the same way in Utah as it's shown

18   here for Washington?

19       A.   Yes.

20       Q.   Okay.  When does this form come to the

21   tenant in their tenancy?

22             MR. SALAZAR:  You're talking about in

23   Utah, right?

24             MR. LAVINE:  Yes.

25             THE WITNESS:  At the time of lease

                                      Page 197

1    signing.

2        Q.     (By Mr. Lavine) This is a recurring form

3    that comes every month?

4        A.     No.

5        Q.     Is this explained to the tenant, at least

6    in Utah, that there's a total monthly payment expected

7    that combines the base rent and the additional

8    services?

9        A.     Yes.

10       Q.     All right.  You can put this document

11   aside.  Circulating the next one.

12              (Exhibit 11 was marked)

13       Q.     (By Mr. Lavine) This is a one-page

14   document for Broadmoor Village Apartments here in Utah.

15   It doesn't have a title, but it starts,

16   "Congratulations about your decision to move into a

17   Wasatch property," and it lists, in the third

18   paragraph, it says, "Your total monthly obligation will

19   be," and it gives, in this tenant's case, a number,

20   $987.08, and it breaks out charges in a table

21   following.

22              Is this a standard document given to the

23   tenant at the time of move in as well?

24       A.     It could be prior to move in.

25       Q.     Or prior to move in.  Okay.  And does it

                                               Page 198

1  always say your total monthly obligation will be, and,

2  then, with a blank space, to be filled in?

3           MR. SALAZAR:  Objection.  Overbroad.

4           THE WITNESS:  Yes.

5     Q.    (By Mr. Lavine) All right.  Then it lists

6  charges for December of 2015 for this tenant, and it

7  notes in the first line item rent and additional

8  services together as $891.56.  Does that first line

9  item on this form always combine rent and additional

10 services?

11          MR. SALAZAR:  Objection.  Overbroad as to

12 time.

13          THE WITNESS:  To my knowledge, yes.

14    Q.    (By Mr. Lavine) Down at the bottom,

15 there's a paragraph, the last one above the signature

16 block, and it says, "As of December 1st, 2003, Wasatch

17 Premier Communities requires each resident to maintain

18 renters insurance with a minimum of $50,000 liability

19 coverage."  So, by this time in 2015, the amount of

20 minimum coverage had increased to 50,000?

21    A.    Yes.

22    Q.    And, do you know, was that true across

23 Wasatch properties?

24    A.    I do not know.

25    Q.    Okay.  But you're over the area you

                                        Page 199

```
1    identifies that.
2         Q.    All right.  You can put this document
3    aside.  I'll send the next one around.
4              (Exhibit 19 was marked)
5         Q.    (By Mr. Lavine) Just to make sure, this is
6    Bates stamped 5634, at the bottom?
7         A.    Yes.
8         Q.    All right.  And it is a monthly statement
9    of rental account for Yvonnia Johnson, Y-V-O-N-N-I-A,
10   Johnson, out of Crossroads Apartments in Utah.  First
11   off, is this a standard form that's used in Utah?
12        A.    Yes.
13        Q.    It reflects, in the table, an account
14   balance due on a particular date, monthly rent charges,
15   washer/dryer rental, renters insurance, covered parking
16   charges.  I believe you were telling us, when we looked
17   at the Washington form equivalent, where they bundled
18   those numbers together, you always break them out in
19   this form?
20        A.    In this form, yes.
21        Q.    All right.  And, then, they're always
22   totaled together, with the rent, the base rent charges,
23   in one total at the bottom?
24        A.    Yes, when this form is being sent out.
25        Q.    You say, in the first paragraph, under the
```

Page 223

```
1    table in bold, "This Amount Does Not Include Any
2    Utilities."  Why do you highlight that and make that a
3    big point?
4         A.    Because utilities can fluctuate.
5         Q.    And, in this, in Crossroads, who pays
6    utilities?
7         A.    The tenants pay their gas and electricity
8    directly to the provider.  They pay water, sewer and
9    trash to Conserve.  They do not pay it with their
10   rent.
11        Q.    Leave this one aside.
12              (Exhibit 20 was marked)
13        Q.    (By Mr. Lavine) This, again, refers to a
14   tenant at Crossroads Apartments with something called a
15   Monthly Cost Breakdown.  We saw a similar document, but
16   I just want to make sure this is a standard form in
17   Utah?
18        A.    Yes, this is part of the Lease Agreement.
19        Q.    In every case, when this form is used, the
20   base rent is added to the additional services to reach
21   a total?
22        A.    Yes.
23        Q.    All right.  The section says, Pest
24   Control," it says, "Pest control is offered to our
25   residents at no charge."  It doesn't exclude bed bugs
```

Page 224

1  or cockroaches, which you had said sometimes are

2  charged to the tenants.  Do you know why that is?

3       A.    Because pest control is a preventive pest

4  control that we do once a year at every location.

5  That's to control the onset of pests.

6       Q.    I see, so that's not -- this doesn't refer

7  to when pests are actually seen?  It's prophylactic to

8  make sure they don't show up?

9       A.    Yeah, we have preventive pest control.

10       Q.    You can put this document aside.  I'm not

11  going to use this as an exhibit, but this is the Second

12  Amended Class Action Complaint in this case.  It was

13  just filed on this last Friday, so I'm not sure it's

14  made it to your attention, but I'm wondering if you've

15  read it or the the version that came before?

16       A.    I have actually not read either.

17       Q.    Have you been given this at all at any

18  time to read?

19       A.    No.

20       Q.    Have the allegations in it been explained

21  to you from someone other than counsel?

22       A.    No.

23       Q.    My last couple of documents are being

24  copied now, but we can just go off the record and see

25  if I have any other questions just to make best use of

Page  225

```
 1    time.  Speaking of which.
 2               (Brief interruption)
 3               MR. LAVINE:  Thank you for those.
 4               (Exhibit 21 was marked)
 5               (Exhibit 22 was marked)
 6         Q.    (By Mr. Lavine) Let's go back on the
 7    record to introduce these exhibits.  These last two
 8    exhibits are tenant files, one for a tenant at
 9    Broadmoor Village by Marissa Pace, whose name we came
10    across, and the other one as Promontory Point for a
11    tenant by the name of Andrea Peterson in Sandy, Utah.
12    Let's look at Miss Pace's tenant file.
13               First, I'm just going to have you thumb
14    through it to become familiar with the contents.  You
15    probably know it better than I do because it was just
16    given to me, and, hopefully, copied accurately from the
17    file as it was produced.  But let's take a pause and
18    just give you a chance to be familiar enough with it.
19               MR. SALAZAR:  For the record, this exhibit
20    is roughly 300 pages.
21               MR. LAVINE:  Yeah, that's about right.
22               MR. SALAZAR:  So, you want her to thumb
23    through this?
24               MR. LAVINE:  Just to be generally familiar
25    with the contents, and it looks like she's doing a good
```

Page 226

```
 1    job.
 2              MR. SALAZAR:  I don't think a witness can
 3    go through a 300-page document to become familiar with
 4    it.
 5              (Pause)
 6              THE WITNESS:  I scanned through the
 7    documents, not every page, but it looks, from the pages
 8    I did come across, that they look like common forms
 9    that we would use.
10         Q.   (By Mr. Lavine) All right.  So, first
11    place I'm going to have you thumb to in the Broadmoor
12    document for Miss Pace is 1935, so it's probably 15 or
13    so documents, pages in.  This is the instructions for
14    what we've been calling the HAP Contract, housing
15    assistance payment contract, from HUD.
16              I'm going to read the last paragraph on
17    this page.  It's called Section 8 Utilities and
18    Appliances, and it says, "The lease and the HAP
19    contract must specify what utilities and appliances are
20    to be supplied by the owner and what utilities and
21    appliances are to be supplied by the tenants.  Fill in
22    Section 8 to show who is responsible to pay for
23    utilities and appliances."
24              MR. SALAZAR:  Objection.  You left off the
25    part that says, who is to provide or pay.
```

Page 227

```
 1              MR. LAVINE:  Did I say it wrong?

 2              MR. SALAZAR:  You did.

 3              MR. SALAZAR:  The document speaks for

 4     itself.

 5              MR. LAVINE:  With that correction.

 6         Q.    (By Mr. Lavine) You can flip over to the

 7     it on next page, that's 1936.  This is a page of the

 8     HAP contract called Section 8 Utilities and

 9     Appearances -- Appliances, rather.  Before I get to

10     that part, it looks like this is slightly out of order,

11     but I think we copied it properly.

12              On 1937, there's a Section 5 called

13     Provision and Payment For Utilities and Appliances, and

14     I will read that, and, hopefully, get it all right.

15     "The lease must specify what utilities are to be

16     provided or paid by the owner or the tenant.  The lease

17     must specify what appliances are to be provided or paid

18     by the owner or the tenant.  Part A of the HAP contract

19     specifies what utilities and appliances are to be

20     provided or paid by the owner or the tenant.  The lease

21     shall be consistent with the HAP contract."

22              So, if we can flip back to 1936, the

23     bottom, there is a list of items, and I'll go through

24     them.  It's heating, cooking, water heating, other

25     electric, water, sewer, trash collection,
```

Page 228

```
 1   air-conditioning, refrigerator, range/microwave, and
 2   other.  And, on the right of the table, there's a
 3   Provided by column and a Paid by column.  The Provided
 4   by column has a zeroes of O's, standing for owner, and
 5   the Paid For column has a series of T's, standing for
 6   tenant.  First off, are these documents generally
 7   familiar to you?
 8        A.    Yes.
 9        Q.    You've been through hundreds of contracts
10   in your tenure, I'm sure?
11        A.    Not hundreds, but --
12        Q.    Many?
13        A.    Yes.
14        Q.    All right.  At Broadmoor, is it standard
15   that all the utilities and appliances that are listed
16   until we get to other, and I'll talk about that
17   separately in a minute, are paid for by the tenant?
18        A.    Yes.
19        Q.    Is that true of Section 8 tenants as well?
20        A.    Yes.
21        Q.    At your other properties in Utah, is it
22   true as well that tenants pay for all the utilities
23   listed in Section 8?
24              MR. SALAZAR:  Objection.  Overbroad.
25              THE WITNESS:  No.
```

Page 229

1        Q.      (By Mr. Lavine) All right.  Can you tell

2    me which properties there is some variation?

3               MR. SALAZAR:  Again, overbroad.

4               THE WITNESS:  I can't tell you specific,

5    but in some communities, gas is included.  Some

6    communities, heat is included.  Some communities water,

7    sewer and trash is provided by the owner.

8        Q.      (By Mr. Lavine) And paid for by the owner?

9        A.      Yes.

10       Q.      Do you know why that isn't true of

11   Broadmoor?

12       A.      Every community is unique.  I couldn't

13   tell you specifically why Broadmoor is different from

14   one other.

15       Q.      If tenants at Broadmoor wanted the owner

16   to pay for one or more of these items, do they have

17   that option?

18       A.      A tenant could submit a reasonable

19   accommodation request.

20       Q.      At the time of move in?

21       A.      At the time of move in.

22       Q.      Has that, at times, resulted in a tenant

23   being relieved of some of these costs for utilities and

24   appliances?

25               MR. SALAZAR:  Objection.  Overbroad.

                                        Page 230

1            THE WITNESS:  I can't recall anyone

2  submitting a request for that; therefore, I don't

3  recall any tenant not paying for those.

4       Q.  (By Mr. Lavine) Focusing on the other

5  category, there's nothing listed here.  Do you know if

6  the Utah properties, the lease associated, the

7  community manager, ever fill in some other items to be

8  included here?

9            MR. SALAZAR:  Objection.  Overbroad.

10          THE WITNESS:  I am not aware of any other

11  item that's filled in.

12       Q.  (By Mr. Lavine) Have you ever seen, in

13  Utah, another item filled in in the other category?

14       A.  No, I have not.

15       Q.  Have you ever seen washers and dryers

16  filled in as an appliance in the other category?

17       A.  No, I have not.

18       Q.  Do you regard washers and dryers as

19  appliances?

20       A.  I think of an appliance as something that

21  is not portable -- or something that is directly

22  attached to the unit.  So, air-conditioning,

23  refrigerator, even that is, of course, an appliance,

24  but it can be moved, but HUD does require that a

25  refrigerator be in the unit.  These are the required

Page 231

1    appliances.  And, then, our microwave ranges, outside

2    of ADA units, are also attached to the wall.  You know,

3    a washer and dryer is an appliance, but it's not a

4    required appliance.

5         Q.    In the event that there is a washer and a

6    dryer offered in-unit, would it then be practiced to

7    include the washer and dryer in the other category and

8    apportion its cost in the same way the others are?

9         A.    That would not be the standard practice.

10        Q.    Has it ever been done that way?

11        A.    I don't know.

12        Q.    Have you ever seen it done that way?

13        A.    No.

14        Q.    A couple more pages forward, one second.

15   Let's look at 1941.  This says, "Notice of Account

16   Balance."  Is this a standard form issued to tenants,

17   at times?

18        A.    Yes, at times.

19        Q.    What would be the reason for issuing it?

20        A.    If someone had what we consider a small

21   balance, which is, typically, a hundred dollars or

22   less.

23        Q.    If it were larger than that, it would be a

24   different form?

25        A.    Yes, it would be a different form.

Page 232

1      Q.      What would that form be?

2      A.      That would be the 3-day-to-pay or quit.

3      Q.      If it were were a real small number, say,

4   it was several dollars that was owed, would this notice

5   still go out?

6      A.      Yes.

7      Q.      It doesn't matter the number as long as

8   it's under a hundred?

9      A.      Yes.

10     Q.      So, this notes monthly rent charges of $42

11  have not been paid and renters insurance of $14.08 have

12  not been paid.  It says, "This balance may have been an

13  oversight or perhaps an error."  Does that happen

14  sometimes that there's an error on the tenant's side or

15  on the owner's side and somebody didn't count it

16  correctly?

17     A.      That does not happen very often, but

18  everyone is human, and a mistake could happen.

19     Q.      Any idea what $42 in rent charges would

20  be?  Would that just be a deficit of the total amount

21  that was due the prior month, or is that something else

22  associated with a separate charge?

23          MR. SALAZAR:  Objection.  Foundation,

24  calls for speculation.

25          THE WITNESS:  I do not know in this case.

                                        Page 233

1    That would have been their HAP portion of the rent, or

2    not the HAP portion, the tenant portion of the rent may

3    have only been $42.  Because it's under a hundred

4    dollars, they still would not be issued a 3-day to pay

5    or quit.

6         Q.    (By Mr. Lavine) The renters insurance or

7    some other additional service charge was delinquent for

8    under a hundred dollars, this notice would go out as

9    well?

10        A.    Yes.

11        Q.    Unless I'm missing it, I don't see a

12   deadline to correct the deficiency in this notice, just

13   calls for prompt attention.  How long, once this notice

14   is issued, does the tenant have to cure the amount

15   that's due?

16             MR. SALAZAR:  Objection.  Overbroad.

17             THE WITNESS:  It depends on the amount.

18   But there is no specific timeframe.

19        Q.    (By Mr. Lavine) Does there, at some point,

20   come a point when there would be a higher level of

21   notice issued after this one?

22        A.    Not for a small balance.  It could even

23   roll to the following month.

24        Q.    And if it does, would another notice of

25   balance, account balance go out?

Page 234

1      A.     If it exceeded a hundred dollars, a 3-day

2   notice to pay or quit would go out.  If it was under

3   the hundred dollars, this notice of account balance

4   would go out.

5      Q.     So, this could conceivably go out multiple

6   times?

7      A.     This could, yes.

8      Q.     Thanks.  You can put this aside.  We can

9   go to 1955.  We talked about cleaning service charges

10   briefly.  This is a form having to do with cleaning

11   service charges reflecting a move-out date of February

12   18th, 2017, so this year.  It notes a deep clean charge

13   of $120.  When would this kind of charge be assessed?

14      A.     This charge would be assessed at the time

15   that the work was completed and signed off by the

16   representative completing the work.

17      Q.     Why would it be assessed?

18      A.     If the apartment required cleaning and was

19   not cleaned by the resident.

20      Q.     What's a deep clean?

21      A.     A deep clean would be a clean that is

22   requiring more than just a standard clean.

23      Q.     When would that be required?  Is that in

24   all cases or just sometimes?

25      A.     Just sometimes.

Page 235

# EXHIBIT N

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT, SACRAMENTO DIVISION
 3    UNITED STATES OF          )
      AMERICA, ex rel.          )
 4    DENIKA TERRY and ROY      )
      HUSKEY III, and each      )      CERTIFIED
 5    of them for themselves    )      TRANSCRIPT
      individually, and for     )
 6    all other persons         )
      similarly situated and    )
 7    on behalf of the          )
 8    UNITED STATES OF          )
 9    AMERICA,                  )   Case No.
          Plaintiffs,           )   2:15-cv-00799-KJM-DB
10    vs.                       )
      WASATCH ADVANTAGE         )
11    GROUP, LLC, WASATCH       )
      PROPERTY MANAGEMENT,      )
12    INC., WASATCH POOL        )
      HOLDINGS, LLC,            )
13    CHESAPEAKE COMMONS        )
14    HOLDINGS, LLC, LOGAN      )
      PARK APARTMENTS,LLC,      )
15    LOGAN PARK APARTMENTS,    )
16    LP, and DOES 1-30,        )
17        Defendants.           )
18    ------------------------------------------------
19
         30(b)(6) Deposition of WASATCH ADVANTAGE GROUP
20                    By: SHAWN FETTER
21              August 11, 2017 * 10:30 a.m.
22    Reporter:  Dawn M. Perry, CSR
23    Notary Public in and for the State of Utah
24    Job No. 2674872
25    Pages 1 - 228
```

Page 1

1    Q.    So you heard the question.  Can you manage

2    that?

3    A.    I can manage it.

4    Q.    All right.  Let's try.  Take them in

5    order.  You can put a map in your head to get through

6    them.  Whatever works.

7    A.    Okay.  So the only two properties in

8    Fresno -- oh, you just want to know if the --

9    Q.    I still need the community managers'

10   names, even if they don't have Section 8 tenants.

11   A.    Let's go through all of them, then.

12   Q.    And spelling the last names if they have

13   an unusual one.

14   A.    Okay.  Okay.  So -- boy.  Start with

15   Phoenix.

16   Q.    You know what?  I'm going to take

17   Sacramento off your worry list because we've heard

18   from Dave on that, and I'm going to just assume that

19   that's correct.  So just worry about Fresno, Phoenix,

20   Tucson and Southern California.

21   A.    Okay.  Start with Phoenix.  Aztec Springs,

22   Mark Covi.  It's Covi, C-o-v-i, I believe.  They do

23   Section 8 -- they accept Section 8.

24              The Sands.  Roxanne Roe, R-o-e.  They do

25   accept Section 8.

                                           Page 32

```
 1                      Arroyo Vista.  Valerie Rios.  They do
 2      accept Section 8.
 3                      Ranchwood.  Yvonne Witcraft.  They do
 4      accept Section 8.
 5                      Glen Oaks.  Mercy Chavez.  They do accept
 6      Section 8.
 7                      Canyon Ridge.  Norma Brulee, B-r-u-l-e-e.
 8      They do accept Section 8.
 9                      That would be my Phoenix properties.
10           Q.     Thank you.
11           A.     Tucson.  Overlook at Pantano.
12      Shirley Hawse, H-a-w-s-e.  They do accept Section 8.
13                      Cimarron Place and River Point share a
14      manager, Lisa North.  They do accept Section 8.
15                      Rio Seco.  Fernando Morga.  They do accept
16      Section 8.
17                      Fres -- or let's go to San Diego.
18      Eucalyptus Grove.  Marina Dunn.  They do not accept
19      Section 8.
20                      Spring Villas.  Deanna Arcinega.  They do
21      accept Section 8.
22                      Peppertree.  Lori Wautrous.  They do
23      accept Section 8.
24                      Creekside Villas.  Ofelia Pena.  They do
25      accept Section 8.
```

                                                    Page 33

1            Canyon Club.  Roxanne Gallardo.  They do
2    accept Section 8.
3            Village Grove.  Laurie Williams.  They do
4    accept Section 8.
5            Heritage Park.  Susan Carillo.  They do
6    accept Section 8.
7            Shadow Way.  Jennifer Pomeroy.  They do
8    accept Section 8.
9            Fresno.  Edgewater Isle.  Cecilie.  I
10   can't remember her last name right now.  They do not
11   accept Section 8.
12           River Oaks.  Bianca.  I don't know how to
13   pronounce her.  It's a very long last name.  It's
14   Prova -- Provacablanca.  They do accept Section 8.
15           Courtyard at Central Park.  Erin.  I
16   cannot remember her last name right now.  They do
17   accept Section 8.
18           And Heron Pointe.  Tiffany.  And I can't
19   recall Tiffany's last name right this second.  And
20   they do -- they do not accept Section 8.
21       Q.    Nice job.
22             How long have you been vice president?
23       A.    I believe a year and a half.
24       Q.    And in terms of other vice presidents, I
25   know we met with Miss Jarvis yesterday.

                                        Page 34

```
1          A.    Yes.
2          Q.    Do you have a software that you use that
3    keeps all those forms?
4          A.    Yes.
5          Q.    Do you know what it's called?
6          A.    Yardi.
7          Q.    All right.  Do you know, is it used across
8    Wasatch or is it only used in Arizona?
9          A.    I believe it's used across Wasatch.
10         Q.    You have seen it in California as well?
11         A.    Yes.
12         Q.    All right.  Let me first talk about the
13    residential lease agreements.  Have you seen that
14    document, what it looks like?
15         A.    For?
16         Q.    For tenants in Arizona.
17         A.    Yes.
18         Q.    All right.  For the properties in Arizona,
19    is that residential lease agreement the same?  The
20    preprinted form, is it the same regardless of which
21    building you apply to?
22               MR. SALAZAR:  Objection.  Overbroad as to
23    time.
24               THE WITNESS:  Yes, time -- time will --
25    it's changed over time, but yes.
```

Page 95

1          A.     It's pretty vague, but it could happen

2     anywhere.   It depends on the locale.

3          Q.     All right.   So --

4          A.     It depends on the time of the year.

5          Q.     Yeah.

6          A.     Think about it.   You know.   Yeah.

7          Q.     I imagine that's true.

8                 Let's talk about reserved covered parking

9     at Aztec Springs.

10         A.     Okay.

11         Q.     If a tenant wants that, they have to pay a

12    separate fee for it?

13         A.     Yes.

14         Q.     Through this Additional Services

15    Agreement?

16         A.     Yes.   If they would like to reserve a

17    specific spot, yes.

18         Q.     And that would apply to Section 8 tenants

19    as well?

20         A.     All tenants.

21         Q.     And there was no way to get an

22    accommodation to have that fee lowered or removed?

23                MR. SALAZAR:   Objection.   Assumes a

24    request is made.   Incomplete hypothetical.

25                Go ahead.

                                          Page 119

1    pay one way or the other for renter's insurance?

2          A.    They have to provide -- what's not

3    optional is they have to provide renter's insurance

4    either through us or somewhere else.

5          Q.    But if you have a tenant who doesn't pay

6    the pay-with-rent option and doesn't provide their

7    own proof of insurance from another source, can they

8    still live in a Wasatch property?

9          A.    If they cannot provide renter's -- provide

10   it some how, some way they will be charged -- they

11   will come on here.  They will be charged the renter's

12   insurance.  They've got to provide it.

13         Q.    I see.

14         A.    One way or another they need to provide

15   it.

16         Q.    Is the default if they don't do it any

17   other way, they are automatically added to the

18   pay-with-rent program?

19         A.    They would have to provide to -- to stay

20   in residency there.  You have to provide renter's

21   insurance one way or the other.

22         Q.    And if they don't?

23         A.    Then they would be in breach of contract.

24         Q.    All right.  We'll get to that in some more

25   detail.

                                          Page 126

1          But during your time at Wasatch, was
2     renter's insurer optional?
3          A.    It's always optional.  It just has to be
4     provided.
5          Q.    It has to be provided.  How is that
6     optional?
7          A.    You're asking on the AS -- you're -- on
8     additional service, correct?
9          Q.    Yes.
10         A.    Okay.  As an additional service it's
11    optional.  Renter's insurance as an additional
12    service is optional.  They just must provide it.
13    They don't have to pay for it through us.
14              THE REPORTER:  I need you to slow down.
15         A.    Okay.
16         Q.    So it's optional as an additional services
17    charge, but it's not optional whether to have it or
18    not.  Is that correct?
19         A.    They need to provide renter's insurance.
20         Q.    One way or another every tenant, to live
21    at Wasatch properties in Arizona, has to have
22    renter's insurance?
23         A.    Has to provide renter's insurance, yes.
24         Q.    All right.  Has there ever been a time in
25    the Arizona properties, during your memory, when that

                                        Page 127

```
1    was not the case?  In other words, renter's insurance
2    was recommended but not required, but a tenant didn't
3    have to have it one of those two ways.
4         A.    Not that I recall.
5         Q.    And that's true for Section 8 tenants as
6    well?
7         A.    All tenants.  All residents.
8         Q.    The next service that's listed is Internet
9    service and/or cable television and/or media package.
10   Are any of those offered as additional service items
11   at the Arizona properties?
12        A.    They are not.
13        Q.    Were they ever, to your memory?
14        A.    Not to my memory.
15        Q.    Do you know why that line is on this form
16   in Arizona, then?
17        A.    I think it's on -- this is a form that's
18   available through all states.
19        Q.    For all Wasatch properties?
20        A.    I believe so.
21        Q.    So if a tenant wants Internet service or
22   cable service, they have to contract directly with a
23   service provider?
24        A.    Some type of third party, correct.
25        Q.    All right.  Let's move on to the next one.
```

Page 128

```
 1          A.     That signed up with a month-to-month

 2    initially?

 3          Q.     Or at a renewal point became a

 4    month-to-month tenant.

 5          A.     I don't know through the whole portfolio.

 6          Q.     Was this Additional Services Agreement

 7    part of the lease agreement?

 8          A.     Yes.

 9          Q.     In all cases in Arizona?

10          A.     In all cases.  Prints out with the lease

11    packet.

12          Q.     If someone were to violate this Additional

13    Services Agreement by not paying the amount stated on

14    here, would that be considered a violation of the

15    lease?

16               MR. SALAZAR:  Objection.  Incomplete

17    hypothetical.  Calls for a legal conclusion.

18               Go ahead and answer.

19               THE WITNESS:  If they -- could you repeat

20    the question, please?

21               MR. LAVINE:  Sure.

22          Q.     So if a tenant violated this Additional

23    Services Agreement by not making a charge in a

24    particular month that was on here --

25          A.     Uh-huh (affirmative).
```

Page 136

1        Q.    -- would that -- would Wasatch regard that
2    as a violation of the lease?
3        A.    Yes.
4        Q.    Can you skip over to the second tenant's
5    Additional Services Agreement?  This is 3410 at the
6    bottom.  This is a tenant -- two tenants it looks
7    like at -- also at Aztec Springs.  This is in 2013.
8    And their reserved, covered parking charge was $10
9    relative to a $30 charge in 2015.  It looks like it
10   had gone up.  Was the standard reserved, covered
11   parking charge at Aztec Springs $10 in 2013, if you
12   remember?
13       A.    It might have been.  This also could have
14   multiple spots.
15            MR. SALAZAR:  When you say "this," what
16   are you talking about?
17            THE WITNESS:  The -- the $30 could --
18   could be three spots.  I don't know.  I don't have
19   more information on it even provided.
20            MR. SALAZAR:  When you say "this," you are
21   looking at --
22            THE WITNESS:  I'm sorry.  I'm looking at
23   the first -- the AZ03548.  It specifies 30 but it
24   could be -- I don't know how many spots are in there.
25   You could have had two spots.  I don't know.

                                          Page 137

```
1              A.    Just jump in with questions.
2              Q.    Okay.  Let's start with Section III, Rent.
3    In the middle -- sorry for the small print; I'm
4    struggling with it too.  But it says in the
5    second-to-last line, "Rent received shall first be
6    applied to all sums owed and then to the current rent
7    due."
8              Stop there.  Do you know what that means?
9              MR. SALAZAR:  Object.  The language speaks
10   for itself.
11             Go ahead.
12             THE WITNESS:  Where are you at again?
13             Q.    (BY MR. LAVINE)  Section III, Rent,
14   second-to-last line.
15             A.    Okay.
16             MR. SALAZAR:  The second-to-the-last line,
17   so that would be in subsection E?
18             MR. LAVINE:  No.  Sorry.  The first
19   paragraph.
20             THE WITNESS:  Okay.
21             Q.    (BY MR. LAVINE)  Rent -- where it says --
22   starts, "Rent received."
23             A.    What was your question again?
24             Q.    Do you know what that means, "The rent
25   received shall first be applied to all sums owed and
```

Page 149

1   then to the current rent due"?

2        A.    To my knowledge, that would -- would mean

3   that monies being received would be applied to the

4   ledger balance.

5        Q.    Before being applied to current charges?

6        A.    Before being applied to current rent due,

7   if there is an outstanding ledger balance.

8        Q.    We're going to look at a ledger in a

9   little while, but the -- the ledger can have

10  additional service charges on it as well, correct?

11       A.    A ledger can have.

12       Q.    And if additional service charges are

13  delinquent, they weren't paid from the prior month

14  and the tenant comes in and pays for the current

15  month, by this sentence the money supplied would be

16  applied first to the additional service charges that

17  were delinquent and then to the current rent?

18       A.    It depends on the situation.  It could be

19  applied that way.

20       Q.    And what would be a situation when it

21  wasn't?

22       A.    A half payment, the housing payment.

23       Q.    Say that again.

24       A.    A housing payment.

25       Q.    Could you explain that a little bit

Page 150

```
1          A.     I was not.
2          Q.     Had you ever heard of a lease initiation
3    fee of $125?
4          A.     Have I ever heard of it in what way?
5          Q.     That one was imposed at $125 as opposed to
6    some other numbers that we've seen already.
7          A.     Yeah, I -- I -- I've previously stated
8    that fees had moved over time and vary per location.
9          Q.     Okay.
10         A.     Did I not?
11         Q.     I think you did.
12         A.     Yeah.
13         Q.     Let's look at the next page.  This is
14   called Terms and Conditions of Additional Services
15   Agreement.  I'm at number nine -- paragraph nine.  It
16   says, "Default by lessee on agreement.  A default
17   under this agreement is a default under the lease and
18   default under the lease is a default under this
19   agreement."
20                Do you understand that to be a true
21   statement and Wasatch policy?
22                MR. SALAZAR:  Objection.  Calls for a
23   legal conclusion.
24                Go ahead.
25                THE WITNESS:  Yes.
```

Page 182

# EXHIBIT O

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

UNLIMITED JURISDICTION

---oOo---

|  |  |
|---|---|
| DENIKA TERRY, | ) |
|       Plaintiff, | ) |
| vs. | ) |
| WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC and DOES 1-30, | ) |
|       Defendants. | ) |

Case No. 34-2014-00158417

CERTIFIED COPY

DEPOSITION OF SYLVIA GAMBOA

Wednesday, October 8, 2014

Taken Before CHERYL K. HILL, C.S.R.

Certified Shorthand Reporter License No. 13539

County of Contra Costa, State of California

BAY AREA COURT REPORTERS

22320 Foothill Boulevard, Suite 210
Hayward, California  94541

(510) 889-9400

depos@bayareacourtreporters.com
www.bayareacourtreporters.com

A.    We receive these any time a new tenant moves in that has subsidy.

Q.    Okay.  And that would be true not only for the subject property, but for the other properties that you've worked for for Wasatch.  True?

A.    Correct.

Q.    Okay.  So, any time a new tenant comes in and has a subsidy, Section 8 subsidy, they have this type of a Contract written up for that?

A.    Correct.

Q.    Okay.  And you're familiar with that process through your work?

A.    Correct.

Q.    Okay.  How many Section 8 tenants currently occupy the subject property?

A.    Don't know the exact number.  I know it exceeds over a hundred.

Q.    So, you're very familiar with the Section 8 process, it sounds like?

A.    Correct.

Q.    Okay.  And was it also true at the other properties that you talked about working at for Wasatch that those properties had a number of Section 8 tenants?

A.    Correct.

Q.    Okay.  Could you rough it for me?  I mean, give



BAY AREA COURT REPORTERS

22320 Foothill Boulevard, Suite 210          depos@bayareacourtreporters.com
Hayward, California  94541          (510) 889-9400          www.bayareacourtreporters.com

Case 2:15-cv-00799-KJM-DB   Document 72-5   Filed 08/25/17   Page 303 of 306

1    me an estimate, like, at the Valley Hi property how many

2    Section 8 tenants are there?

3        A.    It's a smaller community.  I'll probably say

4    about 50.

5        Q.    How about the --

6        A.    Valley Hi.

7        Q.    Well --

8        A.    Oh.  I'm sorry.  The --

9        Q.    50th Avenue.

10       A.    50th Avenue?

11       Q.    Yeah.

12       A.    Probably average about 15 to 20.

13       Q.    Got it.  Okay.  All right.

14             So, it seems like to me what happens in

15   relationship to Ms. Terry's tenancy, and I know you're

16   not speaking from first-hand knowledge here, but maybe we

17   can talk about in general Wasatch procedures.

18       A.    Okay.

19       Q.    It seems like that when a person with Section 8

20   Lease enters into a relationship with Wasatch Property

21   Management, the Section 8 Contract is written up and

22   signed by the parties.  True?

23       A.    Correct.

24       Q.    And then after that a Wasatch Property

25   Management Lease is also signed in addition?

DEPOSITION OF SYLVIA GAMBOA                    39

1          But this is a three-page excerpt, if you will,

2     three pages from some of those documents.

3          And if you just look at it for me.

4     A.    Okay.

5     Q.    Do you recognize what this is, Plaintiff's 3?

6     A.    It's a move-in cost sheet.

7     Q.    What type?

8     A.    Cost sheet.

9     Q.    Oh.  Okay.  Is this something that is typically

10    executed when a tenant moves in to the subject property?

11    A.    Yes.

12    Q.    Probably for all of Wasatch's --

13    A.    Correct.

14    Q.    -- apartments, a cost sheet would be executed.

15    True?

16    A.    Correct.

17    Q.    The way I imagine companies and what I've seen

18    them deploy in residential property management is in

19    general they try and do things the same for all their

20    properties.

21    A.    Correct.

22    Q.    Okay.  Is that your experience with how Wasatch

23    operates?

24    A.    Correct.

25    Q.    So, if they're doing something at the subject

DEPOSITION OF SYLVIA GAMBOA                          40

1   property, they're probably doing something at the other

2   properties the same way?

3        A.    Correct.

4        Q.    It makes it easy for you to transition from

5   those properties, I suppose.

6        A.    Correct.

7        Q.    Okay.  All right.  So, this is the cost sheet

8   that I think Ms. Terry executed when she moved in.

9              Is that true?

10       A.    I don't know.

11       Q.    Okay.

12       A.    I'm assuming.

13       Q.    Okay.  I guess we can both make that

14   understanding because it is what was provided to me from

15   you guys in relationship from her tenant file.

16       A.    Okay.

17       Q.    But it's fair to say that you've never seen

18   these documents, or have you seen these documents before?

19       A.    I have.

20       Q.    Okay.  You saw them when?

21       A.    Yesterday.

22       Q.    Got it.

23             Maybe you can just walk me through what we're

24   seeing here on the first page of Plaintiff's Number 3 in

25   relationship to this cost sheet.

BAY AREA COURT REPORTERS

22320 Foothill Boulevard, Suite 210          depos@bayareacourtreporters.com
Hayward, California 94541       (510) 889-9400     www.bayareacourtreporters.com

1          Q.   Or on her behalf, I guess.

2               Well, let's say it this way, it's not from

3     Section 8.

4          A.   It's not from Section 8.

5          Q.   And we know that because it's designated by

6     including that "S.H.R.A." on their payments?

7          A.   Correct.

8          Q.   Okay.  If somebody doesn't pay one of these

9     other charges, like, not a rental charge, but, like, the

10    washer and dryer rental, if they don't make that payment,

11    can they still be evicted at the subject property?

12         A.   Yes.

13         Q.   Because it seems like when I look at this

14    ledger that all of the debts are treated as the same.

15    They just go into one pile.  There's not a

16    differentiation between additional services and rent.

17              Do you agree?

18         A.   That's correct.

19         Q.   Okay.  So, all the charges could lead to a debt

20    that would form a basis for an eviction?

21         A.   Correct.

22              MR. BEATTY:  Next exhibit.

23              MS. REPORTER:  Exhibit Number 11.

24                         (Plaintiff's Exhibit No. 11

25                         marked for identification.)