**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
  E-Mail: Joe.Salazar@lewisbrisbois.com
YOON-WOO NAM, SB# 284644
  E-Mail: Yoon-Woo.Nam@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Wasatch Advantage Group, LLC;
Wasatch Property Management, Inc.; Wasatch
Pool Holdings, LLC, Chesapeake Commons
Holdings, LLC; Logan Park Apartments, LLC;
Logan Park Apartments, LP

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DENIKA TERRY and ROY HUSKEY III, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA, | CASE NO. 2:15-cv-00799-KJM-DB |
| | **DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| Plaintiffs/Relators, | Date:      October 20, 2017 |
| | Time:      10:00 a.m. |
| vs. | Courtroom: 3, 15th Floor |
| | The Hon. Kimberly J. Mueller |
| WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC; LOGAN PARK APARTMENTS, LP, | Trial Date:      None Set |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS AND REGULATORY OVERVIEW ........................ 2

   A.   The Wasatch Defendants ........................................................................... 2

   B.   The Class Representatives .......................................................................... 3

   C.   The Class .................................................................................................... 4

   D.   Housing Choice Voucher Program – Section 8 .......................................... 4

      1.   The HUD Regulations ..................................................................... 4

      2.   Housing Assistance Payments Contract ........................................... 6

      3.   Rent to Owner and the Reasonableness Determination .................... 6

      4.   Sacramento Housing and Redevelopment Agency ........................... 7

      5.   Limited Prohibitions on Tenant Requirements ................................. 8

      6.   Owners Responsibilities and Rights under the Section 8 Program .............. 8

III.   LEGAL ARGUMENT ......................................................................................... 9

   A.   Standard for Class Certification ................................................................. 9

   B.   Individual Questions of Law and Fact Predominate ................................ 10

      1.   Commonality Does Not Exist, Let Alone Predominate ................... 10

      2.   The Same Individualized Analysis is Required for Plaintiffs'
           Claims Under the Breach of Contract, Consumers Legal Remedies
           Act and Unfair Competition Law ................................................... 12

      3.   Individual Issues Predominate Plaintiffs' Claims Under the UCL
           and CLRA ...................................................................................... 12

   C.   The Plaintiffs' Claims are Not Typical of the Class ................................. 14

      1.   Class Representatives are Not Typical ............................................ 14

   D.   Class Action is a Not a Superior Method of Resolving This Dispute .................. 15

      1.   These Claims are Highly Individualized and Litigating them
           Together would Devolve into a Series of Mini-Trials ...................... 16

      2.   The SHRA is Obligated to Enforce the HUD Regulations, and its
           Determinations are Entitled to Deference ...................................... 16

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                                            i                               2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

        E.       The Class Definition is Defective ............................................................ 19

IV.     CONCLUSION ....................................................................................... 20

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## **TABLE OF AUTHORITIES**

### Federal Court Cases

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ........................................................................................................ 9

*Auer v. Robbins,*
    519 U.S. 452 (1997) ...................................................................................................... 18

*Bowles v. Seminole Rock & Sand Co.,*
    325 U.S. 40 (1945) ........................................................................................................ 17

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ........................................................................................................ 9

*Chin v. Chrysler Corp.,*
    182 F.R.D. 448 (N.J. Dist. Ct. 1998) ............................................................................ 16

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) ........................................................................................ 14

*General Tel. Co. of Southwest v. Falcon,*
    457 U.S. 147 (1982) ............................................................................................... 11, 14

*In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.,*
    174 F.R.D. 332 (N.J. Dist. Ct. 1997) ............................................................................ 16

*Rutledge v. Electric Hose & Rubber Co.,*
    511 F.2d 668 (9th Cir. 1975) .......................................................................................... 9

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ............................................................................................... 17, 18

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 122 (9th Cir. 1996) .......................................................................................... 16

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 1227 (9th Cir. 1996) .......................................................................................... 9

*Walmart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ...................................................................................................... 11

*Xavier v. Philip Morris USA Inc.,*
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ................................................................... 19, 20

*Zinser v. Accufix Research Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ........................................................................................ 9

### State Court Cases

*Am. Suzuki Motor Corp., Inc. v. Sup. Ct.,*
    37 Cal. App. 4th 1291 (Cal. Ct. App. 1995) ................................................................. 17

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Buckland v. Threshold Enterprises, Ltd.*,
        155 Cal. App. 4th 798 (Cal. Ct. App. 2007)......................................................... 12

*Caro v. Proctor & Gamble*,
        18 Cal. App. 4th 644 (Cal. Ct. App. 1993) ......................................................... 13

*In Re Tobacco II Cases*,
        46 Cal. 4th 298 (Cal. 2009) ............................................................................... 13

<u>State Statutory Authorities</u>

Cal. Bus. & Prof. Code §§ 17204, 17535 ........................................................................... 12

Cal. Civ. Code § 1780 ......................................................................................................... 12

<u>Federal Rules and Regulations</u>

24 C.F.R. §982.4(b) (2015) ............................................................................................. 6, 7

24 C.F.R. § 982.54(a) (2016) .............................................................................................. 18

24 C.F.R. § 982.306(c)(5) (2007) ....................................................................................... 15

24 C.F.R. § 982.310(a)(1) (2016) ..................................................................................... 8, 9

24 C.F.R. § 982.401 (2015) ................................................................................................... 6

24 C.F.R. § 982.401(b)(2)(i)-(iv) .......................................................................................... 5

24 C.F.R. § 982.451(a) (1999) .............................................................................................. 6

24 C.F.R. § 982.453 (2000) .................................................................................................. 7

24 C.F.R. § 982.507(a)(2) ................................................................................................... 10

24 C.F.R. § 982.510 (1999) ................................................................................................. 20

24 C.F.R. § 982.510(b) .......................................................................................................... 8

24 C.F.R. § 982.510(c) .......................................................................................................... 8

Fed. R. Civ. P. 23 ................................................................................................................... 2

Fed. R. Civ. P. 23(b) ..................................................................................................... 12, 16

Fed. R. Civ. P. 23(b)(2) ....................................................................................................... 15

Fed. R. Civ. P. 23(b)(3) ....................................................................................................... 10

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## I.   INTRODUCTION

2        For over ten years, the lease provisions at issue in this case have been received, analyzed,

3   and approved by the public housing authority responsible for enforcing the Housing Choice

4   Voucher Program ("Section 8") regulations and protecting tenants' rights. That extensive

5   decisional history exists for a reason. The named plaintiffs, both of whom have vacated

6   Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool

7   Holdings, LLC, Chesapeake Commons Holdings, LLC, Logan Park Apartments, LLC, Logan

8   Park Apartments, LP's (collectively, "Defendants" or "Wasatch") properties, now seek class

9   certification in furtherance of their efforts to challenge the validity of those leases. Plaintiff

10   Denika Terry was evicted in 2013 following eviction proceedings before the Sacramento County

11   Superior Court. Plaintiff Roy Huskey, III (together with Ms. Terry, "Plaintiffs") voluntarily

12   vacated his apartment rather than face evictions proceedings after his repeated tirades of racial

13   epithets towards his African American and Hispanic neighbors.

14        The operative pleading is the Second Amended Class Action Complaint for Damages and

15   Injunctive Relief Pursuant to False Claims Act, filed last month. [1] The present motion for class

16   certification abandons the class claims under the False Claims Act, the only Federal question

17   within the pleadings, in favor of three state law theories: breach of contract, violation of the

18   Consumer Legal Remedies Act ("CLRA") and unfair business practices under California's Unfair

19   Competition Law ("UCL"). ECF No. 72, Mot. Class Certification, 1:17-19.

20        In the Second Amended Complaint ("SAC"), these class representatives allege various

21   violations of federal regulations governing the Section 8 program at four Sacramento area

22   apartment complexes identified as the "Subject Properties". (2d Am. Compl. ¶¶ 3, 7). Despite the

23   limited focus in the SAC, Plaintiffs now seek class certification for tenants at properties

24   throughout the entire state. The basis of the SAC is that Defendants offer their tenants Additional

25   Services Agreements ("ASAs"), a practice going back to at least 2004 in the Sacramento area, and

26   _____

27   [1] Plaintiffs have filed a motion to amend their pleadings to file a Third Amended Complaint. Because that motion has not been heard, this Opposition will address the operative complaint.

28

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH LLP**
ATTORNEYS AT LAW

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  that these additional services constitute "illegal rent" in violation of United States Department of

2  Housing and Urban Development ("HUD") regulations. (Declaration of Jarom Johnson ("Johnson

3  Decl.") ¶ 5). Plaintiffs' burden to establish that these Agreements violate the HUD regulations

4  will require a unit by unit, property by property, and area by area analysis that must take into

5  consideration the relative housing market conditions during the relevant time period. Such a

6  particularized analysis is antithetical to class actions under Federal Rule of Civil Procedure 23.

7          Likewise, even if these individualized considerations could be overlooked, the Court is

8  less able to efficiently wade through these numerous and specialized inquiries than the local

9  housing authority, whose very expertise and delegated responsibility is to enforce the HUD

10  regulations. In fact, the Sacramento Housing and Redevelopment Agency ("SHRA") has a history

11  of working with the Wasatch defendants to informally resolve issues, further undermining the

12  need for class action litigation. Given that both class representatives no longer live at Defendants'

13  properties, neither have standing to seek injunctive relief which further detracts from their ability

14  to obtain class certification under Federal Rule of Civil Procedure 23.

15                    II.  **STATEMENT OF FACTS AND REGULATORY OVERVIEW**

16          A.        **The Wasatch Defendants**

17          Defendants own three properties in the Sacramento region: 6400 Data Drive in Rancho

18  Cordova; 6633 Valley Hi Drive in South Sacramento, and 4719 50th Avenue in South

19  Sacramento. (Johnson Decl. ¶ 1). Defendants owned a fourth property – the Logan Park property

20  at 4141 Palm Avenue in North Highlands – but sold it in 2016. (Declaration of Warren Smith

21  ("Smith Decl.") ¶ 4). During the relevant time period, Defendants rented to both Section 8 and

22  non-Section 8 tenants. In addition to the standard base rent, tenants could choose to receive

23  amenities and services by entering into an ASA. These ASAs list the service/amenity and its

24  appurtenant charge. Tenants at most Wasatch properties were required to have renter's insurance[2]

25  and tenants could procure a policy through the ASA or get a policy on their own. Most tenants

26  _____

27  [2] Tax credit properties such as Logan Park Apartments did not require renter's insurance or any other service for that matter. (Smith Decl. ¶¶ 10, 13).

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                          2                          2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  chose to get a policy through the ASA because it was more convenient to do so. (Declaration of

2  Dave Tanforan ("Tanforan Decl."), ¶ 17).

3       **B.**    <u>**The Class Representatives**</u>

4         Denika Terry was a tenant at Chesapeake Common Apartments from August 18, 2010

5  until approximately March 20, 2013 when she was evicted for failure to pay her rent. (Tanforan

6  Decl. ¶¶ 18, 21). She currently lives in Hawthorne, California but has no permanent residence.

7  (Declaration of Joseph A. Salazar Jr. ("Salazar Decl.") ¶ 2, Ex. 9 Terry Dep. 21:20-23, 22:5-11,

8  June 19, 2017). Following her eviction, she filed a habitability lawsuit against Wasatch and later

9  dismissed the same for a waiver of costs. *Id*. at ¶ 2, Ex. 9 Terry Dep. 31:14-17, 32:10-13. At

10  deposition, she confirmed that she never even read the First Amended Complaint in this case and

11  believed the class action complaint involved the same claims as in her state habitability lawsuit.

12  *Id*. at ¶ 2, Ex. 9 Terry Dep. 36:7-40:21, 108:2-12, 201:22-202:17. Also, Ms. Terry perjured herself

13  three times during the deposition when she testified that she was charged for parking despite not

14  having a car. *Id*. at ¶ 2, Ex. 9,Terry Dep. 47:9-48:8, 83:9-17, 125:18-20, 217:15-218:3. In fact,

15  Ms. Terry did have a car during the entire length of her tenancy. *Id*. at ¶ 2, Ex. 9 Terry Dep.

16  220:5-223:6, 225:9-15.

17         Roy Huskey III was a tenant at Logan Park Apartments from July 8, 2011 until

18  approximately May 31, 2015. (Smith Decl. ¶ 9). He vacated his apartment at the Logan Park

19  property after facing eviction due to multiple violations of the lease. (Smith Decl. ¶ 15).

20  Throughout his tenancy at Logan Park Apartments, Mr. Huskey demonstrated racially

21  discriminatory conduct toward minority staff and residents at Logan Park Apartments and

22  tormented African American neighbors. (Smith Decl. ¶¶ 16,18). On multiple occasions, the

23  general manager Warren Smith witnessed Mr. Huskey use racial epithets such as "nigger" and

24  "brown skins" to refer to African-American and Hispanic residents. (Smith Decl. ¶ 16). On one

25  occasion, Mr. Huskey called Mr. Smith a "nigger lover" because Mr. Smith warned Mr. Huskey

26  that his racially discriminatory conduct toward staff and residents was unacceptable. *Id*. Mr.

27  Huskey too perjured himself during his deposition when he denied making any racial slurs to his

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1              3              2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

neighbors. (Smith Decl. ¶ 16; Salazar Decl. ¶ 3, Ex. 10 Huskey Dep. 66:23-67:4, August 8, 2017). Mr. Huskey also testified and admitted to stomping around his apartment in order to annoy his African American neighbors in the apartment directly below his. (Salazar Decl. ¶ 3, Ex. 10 Huskey Dep. 65:5-14). He left the Logan Park property in May 2015 rather than face eviction proceedings so that he could avoid jeopardizing his Section 8 program eligibility. (Smith Decl. ¶¶ 20-22).

C.    **The Class**

As examined in greater detail below, the proposed Class consists of past, present and future Section 8 tenants who agreed to pay for certain items contained in ASAs. The definition is so overbroad that it makes the proposed class unwieldy and incapable of reasonable ascertainability.

D.    **Housing Choice Voucher Program – Section 8**

HUD governs the Section 8 program nationwide. The purpose of the program is to provide housing subsidies so families can live in "decent, safe, and sanitary housing." 24 C.F.R § 982.1(a) (2015). HUD authorizes public housing agencies ("PHAs") to administer the Section 8 program at the local level. *Id*. § 982.4(b) (2015). These PHAs craft and submit to HUD written administrative plans ("Administrative Plan") that establish local policies of the program. These plans must strictly follow HUD requirements and regulations. *Id*. § 982.54(a),(b) (2015). By administering the review, oversight and payment of the Section 8 program, PHAs serve as the enforcement arm of the HUD regulations at the local level. *Id*. § 982.407 (2016).

1.    **The HUD Regulations**

The HUD regulations establish what tenants and owners must do in order to comply with Section 8 requirements. The regulations include both compulsory actions that parties are required to take, as well as prohibitions advising parties of what they may not do. The relevant regulations for this case are found at 24 Code of Federal Regulations § 982.

The regulations require owners of housing "contract units" to provide a unit that meets minimum housing quality standards ("HQS") to satisfy the Section 8 program's purpose of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                                    4                        2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

"providing decent, safe, and sanitary housing." *Id*. § 982.401 (2015). The HQS consist of thirteen (13) discrete performance requirements and acceptability criteria for key aspects of housing quality including sanitary facilities, food preparation areas, appliances, and thermal control. *Id*. § 982.401(a)(2).

Notably absent from the HQS list of required appliances, services, and facilities are the additional amenities offered at Defendants' Sacramento area properties through the ASAs. These include Wi-Fi, cable television, maid service, covered parking, in-unit washers and dryers, renter's insurance and pet accommodations, among others. (Tanforan Decl. ¶ 18, Ex. 2 "Additional Services Agreement" at WAS000176-178). While the minimum HQS requirements create a "decent, safe and sanitary" unit, the ASA amenities more accurately describe household convenience items that do not qualify for housing subsidies.

Drilling deeper, the HUD regulations require sanitary facilities that must include a bathroom, fixed basin providing hot and cold water, toilet, shower or tub and a disposal system in order to meet the HQS. 24 C.F.R. § 982.401(b)(2)(i)-(iv). With respect to food preparation, an HQS approved unit must have an oven, stove or range, refrigerator, kitchen sink, and facilities and services for disposal, e.g. garbage cans. *Id*. § 982.401(c)(2)(i)-(iv) (2015). Thermal environment HQS is met if the unit provides a heating system. Air conditioning is not a requirement. *Id*. § 982.401(e)(2)(i). These components, together with the acceptability criteria comprise the basic HQS requirements.

These HQS appliances and utilities appear on the face of the Request for Tenancy Approval ("RFTA"), which is the initial document the Section 8 tenant and owner complete to commence the approval process. (Tanforan Decl. ¶ 18, Ex. 2 "Request for Tenancy Approval" at WAS000206). The RFTA must designate who will pay for the listed HQS appliances and utilities. It is no coincidence that all of the appliances and utilities that must be listed on the pre-printed RFTA are the same ones that are listed in the HUD regulations. *See*, 24 C.F.R. § 982.401. In turn, the pre-printed listing of appliances and utilities appears again in the HAP contract where the basic HQS appliances and utilities are listed. (Smith Decl. ¶ 9, Ex. 5 "Housing Assistance

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                     5                     2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  Payments Contract, Part A" at WAS000378).

2  **2.      Housing Assistance Payments Contract**

3       HUD requires that an owner of a dwelling and local PHA enter into a contract called a

4  Housing Assistance Payments contract ("HAP"). 24 C.F.R. § 982.451(a) (1999). This is a pre-

5  printed HUD form. The PHAs must also receive a complete copy of the lease agreement between

6  the owner and the Section 8 tenant. The lease agreement must include a Tenancy Addendum

7  which is Part C of the HAP contract. *Id*. § 982.162(a)(3) (1999), § 982.308(b) (1999). The

8  tenancy addendum lists in part the obligations and limitations of the owner and tenant for the term

9  of the lease and HAP contract. Under the section titled, "Lease", an owner must provide the PHA

10  a complete copy of the lease. (Smith Decl. ¶ 9, Ex. 5 "Housing Assistance Payments Contract,

11  Part C" at WAS000384, section 2 "Lease").

12  **3.      Rent to Owner and the Reasonableness Determination**

13       A critical component in this case is determining exactly what "rent to owner" is. That term

14  is defined in the Tenancy Addendum as: "The total monthly rent payable to the owner for the

15  contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the

16  PHA housing assistance payment to the owner." *Id*. at WAS000387, section 17 "Definitions". A

17  "contract unit" is defined in the Tenancy Addendum as: "The housing unit rented by the tenant

18  with assistance under the program." *Id*.

19       Rent to owner is paid by two sources: the HAP portion (government subsidy) and the

20  Family Payment to Owner (tenant portion). 24 C.F.R. §982.4(b) (2015). Under the both the HUD

21  regulations and the HAP contract (Section 5), the "Family Payment to Owner" is the tenant

22  responsibility and is that part of "rent to owner" that is not covered by the Housing Assistance

23  Payment. *Id.* Significantly, the regulations mandate that, "the monthly housing assistance

24  payment shall be credited against the monthly rent to owner for the contract unit." *Id*. §

25  982.451(b)(2). There is no such restriction or priority as to how the tenant's payment is to be

26  applied in the event of an underpayment.

27       A PHA may not approve a lease between a Section 8 tenant and owner until it has

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                    6                    2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    determined that the initial "rent to owner" is reasonable. *Id*. § 982.507 (a)(1) (2016). To be

2    reasonable, the PHA considers the housing unit's (1) location, quality, size, unit type, and age of

3    the contract unit; and (2) the amenities, housing services, maintenance and utilities. As part of that

4    analysis, the PHA must also insure that there are no extra charges for "items customarily included

5    in rent in the locality, or provided at no additional cost to unsubsidized tenants in the premises."

6    *Id*. § 982.510(c) (1999). Considering the multiple factors that go into the "rent to owner" process,

7    it is not surprising that HUD delegates these responsibilities to local PHAs that are better situated

8    to understand the local housing market including its fluctuations.

9                    **4.      Sacramento Housing and Redevelopment Agency**

10          The Sacramento Housing and Redevelopment Agency serves as the PHA for the

11   Sacramento region. (Declaration of Shannon Fox ("Fox Decl.") ¶ 2). As the local PHA, SHRA

12   administers the Section 8 program pursuant to the HUD regulations. This includes performing a

13   "rent reasonableness" analysis and determining whether additional services or amenities charged

14   to Section 8 tenants violate the HUD regulations or the SHRA Administrative Plan. *Id*. at ¶¶ 3, 4.

15   If the SHRA believes a proposed lease fails to conform to the HAP contract requirements, its

16   practice is to work with the parties informally to resolve the issue. In addition, the HAP Contract

17   and HUD Regulations delegate substantial enforcement authority to the SHRA. These

18   enforcement tools include recovery of overpayments, suspension of the housing assistance

19   payments to the owner, abatement and even termination of the HAP contract itself. The SHRA is

20   also authorized to seek judicial relief including specific performance, injunctive relief or the

21   recovery of damages. *Id*. at ¶ 5; 24 C.F.R. § 982.453 (2000).

22          The SHRA is aware that separate agreements are used in the Sacramento area market and

23   identifies them in the SHRA Administrative Plan. (Fox Decl. ¶ 5, Ex. section D at 9-3, 9-4). The

24   SHRA analyzes separate agreements to determine whether they conform to HUD regulations, the

25   HQS requirements in particular, and the Administrative Plan. If a proposed separate agreement

26   conforms to the above, they will be allowed by the SHRA. *Id*. at ¶ 6. The SHRA knows the four

27   Wasatch properties identified in the SAC, and knows that Wasatch uses ASAs that are the subject

28

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    of this litigation and has no objection to their use. *Id.* at ¶ 9.

2          Likewise, the SHRA does not require appliances such as washers and dryers to be listed

3    on page one of the HAP contract because washers and dryers are not appliances that are part of

4    the HQS requirements. A separate agreement that lists the washer and dryer and its cost is

5    acceptable to the SHRA so long as it does not violate any other HUD prohibition. *Id.* at ¶ 7. As to

6    Wasatch's requirement that tenants have renter's insurance, there is no prohibition within the

7    HUD regulations or the Administrative Plan that would apply. *Id.* at ¶ 8.

8          **5.     Limited Prohibitions on Tenant Requirements**

9          The HAP contract and the HUD regulations prohibit an owner from requiring a tenant to

10   pay for certain items. Specifically, the regulations prohibit an owner from requiring the tenant to

11   pay charges for (1) meals or (2) supportive services. 24 C.F.R. § 982.510(b) (1999). In the HAP

12   contract, this proscription extends to furniture provided by the owner. (Smith Decl. ¶ 9, Ex. 5

13   "Housing Assistance Payments Contract, Part C" at WAS000384, section 6(a) "Other Fee and

14   Charges"). Both the HAP contract and HUD regulations also prohibit an owner from charging a

15   tenant additional amounts *for items customarily included in rent in the locality . . . .*" (emphasis

16   added) *Id*. at WAS000384, section 6(c); 24 C.F.R. § 982.510(c). Neither the HUD regulations nor

17   the HAP contract prohibit the lease from requiring the tenant from paying other charges.

18   Likewise, the HUD regulations themselves recognize that tenants may have other payment

19   obligations under the lease. 24 C.F.R. § 982.310(a)(1) (2016). They provide that the owner may

20   terminate the lease for failure to pay "…other amounts due under the lease" and may deduct from

21   the security deposit "other amounts the tenant owes under the lease." *Id*. § 982.313(c) (1995).

22         **6.     Owners Responsibilities and Rights under the Section 8 Program**

23         Section 8 property owners such as Wasatch must comply with the PHA administrative

24   plan and the HUD regulations or risk being in breach of the HAP contract. This could lead to

25   termination of housing assistance payments or even termination of the HAP contract by the PHA.

26   *Id*. § 982.453(b). An owner must maintain the housing unit in accordance with HQS, collect the

27   family rent to owner and enforce the tenant's obligations under the lease. *Id*. §

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    982.453(b)(2),(5),(6). If an owner has a history of failing to terminate the tenancies of Section 8

2    tenants who threaten the right to peaceful enjoyment of the premises by other residents, the PHA

3    may deny approval of a Section 8 tenancy with the owner. *Id*. § 982.306(c)(1),(5) (2007).

4         During the tenancy, the owner may terminate the lease if the Section 8 tenant commits

5    serious or repeated violations of the terms and conditions. *Id*. § 982.310 (a)(1). This includes

6    termination for failure to pay rent or "other amounts due under the lease." *Id*. If an owner wishes

7    to evict a tenant, it must institute a court action. *Id*. § 982.310(f). The decision to terminate a

8    tenancy is discretionary, and the owner may consider a number of approved factors including

9    whether the failure to enforce a provision would affect the community and the overall demand for

10   assisted housing by families that will adhere to the lease responsibilities. *Id*. § 982.310(h)(i)-(vii).

11                                   **III.   LEGAL ARGUMENT**

12        **A.        Standard for Class Certification**

13        Class actions are an "exception to the usual rule that litigation is conducted by and on

14   behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).

15   The party seeking certification bears the burden of demonstrating that "each of the four

16   requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)" have been met.

17   *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186 (9th Cir. 2001), *Rutledge v. Electric*

18   *Hose & Rubber Co*., 511 F.2d 668, 673 (9th Cir. 1975) (same). A district court may certify a class

19   only if it is satisfied "after a rigorous analysis" that all of the prerequisites of Rule 23 are met.

20   *Zinser*, 253 F.3d at 1186 (citing *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir.

21   1996)). Plaintiffs here seek certification primarily under Rule 23(b)(3),[3] which requires that

22   common issues predominate over individual issues and that a class be superior to other methods

23   for resolving the case. *See* Fed. R. Civ. P. 23(b)(3); *Amchem Prods., Inc. v. Windsor,* 521 U.S.

24   591, 615 (1997). Plaintiffs fail to meet these standards in numerous respects.

---

26   [3] Alternatively, Plaintiffs seeks certification under Rule 23(b)(2) which provides injunctive or declaratory relief that

27   is unavailable because both representatives have vacated the premises and therefore do not have standing to pursue
     this type of relief.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                    9                    2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

B.      **Individual Questions of Law and Fact Predominate**

1.      **Commonality Does Not Exist, Let Alone Predominate**

Plaintiffs analyze the question of whether there are common issues of law and fact with a level of abstraction that cannot withstand rigorous analysis. For example, Plaintiffs frame the purportedly common question of law as whether the additional charges agreed to in the ASA's constitute added rent that is prohibited under the HAP Contracts and leases. ECF No. 72, Mot. Class Certification, 12:19. However, making that single determination requires answers to dozens of individualized questions. Even then, that determination would only be applicable to the specific tenant in question, and that specific unit and for a finite period of time.

Whether the specific ASA is legal depends on the analysis of what was considered part of "rent to owner" at the time of the lease. That question requires an analysis of all of the factors that go into that determination: location, quality, size, unit type, and age of the specific "contract unit" as well as a consideration of what amenities, housing services, maintenance, and utilities are included at that time. Further, and crucial to this determination, is an analysis that determines whether the claimed "side agreements" are for items customarily included in rent in the locality. The comparison goes further because the court would then have to determine whether the amenity or service in question was for a studio, one bedroom, two bedroom or larger unit so that the comparison can hold water. As with most markets, this analysis will change over time, a reality that explains why the PHA is obligated at the beginning of every initial lease, and annually thereafter, to go through the "rent reasonable" determination process. 24 C.F.R. § 982.507(a)(2).

This also explains why a particular item within an ASA might be valid for a unit one day, and yet be different a month or two later. If the market changes, an owner may have to include or remove certain amenities into a base rent to stay consistent with the market for that locality. Market data ages about as well as a gallon of milk, and sours even faster when the market is in flux. What this discussion shows is that there is not a single factual determination that can be applied across Plaintiffs' proposed class because of the variability of the housing market over time (in this case a period of six years), variability at the four property locations (North

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Highlands, South Sacramento, Rancho Cordova), variability of unit sizes (studio, multi-bedroom,

2  upstairs/downstairs), variability in age of the developments, and variability in the included

3  facilities (pool, spa, gated exterior, *etc*.).

4       Wasatch's own practices exemplify the realities of a dynamic rental market. Wasatch

5  management meets on a monthly basis to discuss unit pricing and whether certain amenities or

6  services needed to be included in the base rent. (Tanforan Decl. ¶ 6). As part of that discussion,

7  Sacramento area Regional Manager Dave Tanforan would research what competitor properties

8  were charging in order to advise management about his recommendations for adjusting rents. *Id*.

9  at ¶ 4. Adjustments would track the market in terms of pricing, as well as what would be included

10 in the base rent. *Id*. This monthly price analysis was the practice for the Sacramento region until

11 approximately March of 2016 when Wasatch regional managers began using specialty software to

12 evaluate rental charges in the local market. (*See id*. at ¶¶ 4-5).

13      To justify class action treatment, there must be issues "common to the class as a whole"

14 and relief must "turn on questions of law applicable in the same manner to each member of the

15 class." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982). To be capable of

16 efficient classwide resolution, determining the common question's "truth or falsity" must resolve

17 "in one stroke" an issue that is "central to the validity of each of the claims." *Walmart Stores, Inc.*

18 *v. Dukes,* 564 U.S. 338, 350 (2011). Because the validity of a particular ASA requires a

19 particularized analysis of multiple inputs unique to that unit, the validity of a particular tenancy

20 cannot be determined with a singular stroke. To the contrary, each tenancy has to be evaluated

21 according to location, time, unit and market criteria to determine whether the ASA includes items

22 that should otherwise be part of "rent to owner."

23      A class action for damages cannot be certified where the questions of law or fact common

24 to the class do not predominate over questions affecting the individual members and, on balance,

25 a class action is not superior to other methods available for adjudicating the controversy. Fed. R.

26 Civ. P. 23(b) (3). What predominates in this case is a virtual unit by unit analysis that must take

27 into consideration a number of variables identified above.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                              11                      2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

2.      **The Same Individualized Analysis is Required for Plaintiffs' Claims Under the Breach of Contract, Consumers Legal Remedies Act and Unfair Competition Law**

Plaintiffs' second, third, and fourth causes of action are for Breach of Contract, violations of the Consumers Legal Remedies Act, and violations of California's Unfair Competition Law. These causes of action generally allege that by charging for items beyond the Plaintiffs' portion of the rent to owner, Defendants violated the HAP contracts and thereby are liable under the particular cause of action. (*See* 2d Am. Compl. ¶¶ 139, 150, 156, 157). As before, the core question is whether the ASA agreements violate the HUD restrictions limiting "rent to owner" payments. And as before, that question spawns the individualized analysis that is required to produce an answer. For all of the reasons set forth above, this individualized inquiry defeats any claims of commonality of law or fact.[4]

3.      **Individual Issues Predominate Plaintiffs' Claims Under the UCL and CLRA**

The UCL authorizes lawsuits only by persons who have suffered "injury in fact" and have lost money or property "as a result of" unfair competition. Cal. Bus. & Prof. Code §§ 17204, 17535. The CLRA similarly limits claims to persons who suffered "any damage *as a result of . . . a method, act, or practice declared to be unlawful by Section 1770 . . . .*" Cal. Civ. Code § 1780. A plaintiff suffers injury "as a result" of a misrepresentation under the CLRA if he or she "actually relied on the relevant representations or omissions." *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. App. 4th 798, 810 (Cal. Ct. App. 2007). Reliance remains an element under the UCL and California law requires that the omission or misrepresentation be "material." *In Re Tobacco II Cases,* 46 Cal. 4th 298, 307 (Cal. 2009).

Plaintiffs attempt to avoid the individual issues presented by the UCL and CLRA claims by arguing, without any legal or factual analysis, that the lease contracts are substantially similar

---

[4] Contrary to Plaintiffs' suggestion, these significant inquiries cannot be overcome by just creating a sub-class of tenants. Each property is unique to itself, and within each property there is varying unit sizes, differences in the desirability of the location (next to pool or street), and then the variability over time for what might be included in "rent to owner." Add to this the variability of the cost of additional services, variability in what amenities a tenant may have paid for and the geometric growth of sub-classes becomes quickly untenable. (Tanforan Decl. ¶¶ 4-5).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                              12                        2:15-cv-00799-KJM-DB
DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

and thus there is a common set of facts to be adjudicated. But the elements alleged require

individualized analysis. The CLRA cause of action contains allegations that Wasatch engaged in

"deceptive practices" and "affirmative misrepresentations that they would not collect amounts

beyond the contract rent", and that these "misrepresentations and concealment were made with

the knowledge of their likely effect on tenants . . . ." (*See* 2d Am. Compl. ¶¶ 144, 150, 151).

Setting aside for a moment that there is absolutely no evidence presented by Plaintiffs to support

these allegations, the issue remains whether they would be material to a tenant. The issue of

materiality is not something that is imputed to the plaintiffs across an entire class. To the contrary,

what is or is not material to a tenant is a matter of individual inquiry.

A "single determination of materiality" is not possible here. In *Caro v. Proctor & Gamble*,

18 Cal. App. 4th 644 (Cal. Ct. App. 1993), the court affirmed denial of certification of a CLRA

claim asserting that consumers overpaid for orange juice as a result of a deceptive advertising and

labeling campaign that misrepresented the orange juice as "fresh" and contained "no additives."

*Id.* at 668. The *Caro* court concluded that whether any particular misrepresentation was

"material" – *i.e.*, whether the consumer was deceived by it and relied upon it – turned upon

consumers' "personal assumptions about the nature of the products they wanted to buy and upon

reading various portions of the [orange juice carton] labels." *Id.* at 668-69. Therefore, "whether

any asserted misrepresentation induced the purchase of . . . . orange juice would vary from

consumer to consumer" and the issue of liability was not susceptible to classwide proof. *Id.* at

668.

Similar reasons compel denying class certification in this case. First, there is no classwide

proof that all tenants who purchased the additional services[5] were forced to do so. At deposition,

Ms. Terry admitted that she actually appreciated having a washer and dryer in her apartment and

she would have had to travel 10 miles away to do her laundry without the in-unit appliance.

(Salazar Decl. ¶ 2, Ex. 9 Terry Dep. 119:18-120:20). Next, it is just as likely that the tenants who

---

[5] The only property that required the use of in-unit washers/dryers and covered parking was the Chesapeake
Commons property in Rancho Cordova. That requirement ended in August 2016. (Tanforan Decl. ¶ 12).

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 signed up for these additional services, did so because they wanted them. Thus, individual

2 inquiries are necessary just to determine if tenants thought the alleged misrepresentations were

3 material which defeats any claim that there is a common set of facts to adjudicate across the class.

4       Just as importantly, there is no evidence that Wasatch made any misrepresentations to

5 anyone. To the extent that the court might certify a class based upon an allegation, there should

6 first be some evidence in support. According to the declaration of Dave Tanforan, the additional

7 services offered at the Wasatch properties were largely optional. (Tanforan Declaration ¶ 10). Far

8 from concealing the ASA, Wasatch in every instance included it as part of the lease agreements it

9 submitted to the SHRA. (Fox Decl. ¶ 9).

10       **C.**     <u>**The Plaintiffs' Claims are Not Typical of the Class**</u>

11       Typicality determines whether plaintiffs' claims are the same or similar to the proposed

12 class. A plaintiff's claim is typical if it arises from the same course of conduct that gives rise to

13 the claims of the other class members and is based on the same legal theory as their claims. The

14 claims of the purported class representative need not be identical to the claims of other class

15 members, but the class representative "must be part of the class and possess the same interest and

16 suffer the same injury as the class members." *General Tel. Co. of Southwest*, 457 U.S. at 156. A

17 class action may not be appropriate where the class representative claims a different type of injury

18 than that being asserted on behalf of other class members. *Id.* at 157-158.

19       **1.**     **Class Representatives are Not Typical**

20       The class representatives lack the typicality necessary to certify a class because they are

21 subject to unique defenses that other putative class members currently living in Wasatch

22 properties would not be subject to. Typicality may be lacking where the purported class

23 representative is subject to some unique defense that could not be asserted against other members

24 of the class (e.g., waiver, release, estoppel, etc.). *Ellis v. Costco Wholesale Corp.* 657 F.3d 970,

25 984 (9th Cir. 2011) (class representative does not meet typicality requirements if he or she will be

26 preoccupied with defenses unique to representative.)

27       Denika Terry was evicted for failure to pay rent, an eviction that is not only permitted by

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    the HAP contract and the HUD regulations but is a business necessity for a property owner.

2    Tracing her resident ledger, Terry owed $316 of rent to owner, which is distinct and separate from

3    the amount owed for additional services. (Tanforan Decl. ¶¶ 19-21). Because Ms. Terry was

4    evicted pursuant to a judicial proceeding, her suit is subject to the affirmative defense of *res*

5    *judicata*. In addition, she perjured herself at least three times in her deposition which makes her a

6    poor candidate to represent herself, let alone a class. (Salazar Decl. ¶ 2, Ex. 9 Terry Dep. 47:15-

7    25; 83:9-22, 125:3-20, 222:10-19, 225:9-15). Finally, because she no longer lives at Chesapeake

8    Commons Apartments, she has no standing to represent a class under Federal Rule of Civil

9    Procedure 23(b)(2) seeking injunctive or declaratory relief.

10    Roy Huskey, III is scarcely better. He was not required to sign up for any additional

11    service or appliances and did so voluntarily. (Smith Decl. ¶¶ 10, 13). Mr. Huskey was evicted

12    because of his repeated racist conduct. (Smith Decl. ¶ 19). He violated other tenants' right to

13    peaceful enjoyment of the premises by yelling racist epithets at his African-American and

14    Hispanic neighbors. (Smith Decl. ¶¶ 16, 18, Ex. 7). Wasatch as an owner was obligated to evict

15    Mr. Huskey and did so initially by issuing a Three Day Notice. (Smith Decl. ¶ 15, Ex. 6). At Mr.

16    Huskey's request, he was given 30 days to vacate. (Smith Decl. ¶ 21, Ex. 8). Failure to evict a

17    disruptive tenant such as Mr. Huskey would expose Wasatch to repercussions from the SHRA. 24

18    C.F.R. § 982.306(c)(5) (2007). In the end, he chose to leave Logan Park Apartments rather than

19    face lawful eviction. (Smith Decl. ¶ 22).

20    In short, if the proposed class included tenants who were judicially evicted for not paying

21    their portion of the rent to owner or breached their lease by yelling racial epithets, Ms. Terry and

22    Mr. Huskey would be perfect. However, for purposes of this action, they have such unique defects

23    that they cannot adequately represent the defined class.

24    **D.     Class Action is a Not a Superior Method of Resolving This Dispute**

25    To certify a class, the Court must find that "a class action is superior to other available

26    methods of fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b). This element

27    is clearly lacking here, both because of the nature of the proposed claims and because the SHRA

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    is in the best position to effectuate relief.

2         **1.    These Claims are Highly Individualized and Litigating them Together
              would Devolve into a Series of Mini-Trials**

3

4         Plaintiffs' claims each require claimant-specific litigation to determine whether the "rent

5    to owner" limitations were violated and if so, what each tenant's damages came to, including the

6    highly plaintiff specific claim for "general damages." The ASAs of each property are different, as

7    tenants on these properties can opt into a variety of different amenities and services. As such, each

8    tenancy would have to be evaluated independently by the jury in light of market conditions for

9    that locality at that particular time. The presentation of historic market data, comparable property

10   data, what was considered the "locality", vacancy rates, 30 day notice rates and the cumulative

11   evidence that would return for each year of the tenancy would be daunting for even the most

12   enthusiastic juror. Additionally, the litigation would devolve into a series of individualized mini-

13   trials, thereby creating overwhelming manageability concerns. In this regard, it is not surprising

14   that Plaintiffs' memorandum fails to provide any roadmap for how their claims would be litigated

15   and adjudicated consistent with the due process rights of all parties.[6]

16        **2.    The SHRA is Obligated to Enforce the HUD Regulations, and its
              Determinations are Entitled to Deference**

17

18        If the primary motivation for this lawsuit is ensuring compliance with the HUD

19   regulations, the superior method for resolving the ASA issue lies with the SHRA. That agency has

20   full authority to investigate complaints by consumers and others relating to alleged illegal "side

21   agreements."[7] The evidence of this remedy is evidenced by past dialog between the SHRA and

22   _____

23   [6]    The trial plan requirement is a well-established requirement of class certification as a necessary tool for
     evaluating whether common issues indeed predominate over those that require sub-classing or individual trials. *See*
24   *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 122, 1234 (9th Cir. 1996) (abuse of discretion where "[t]here has been no
     showing by Plaintiffs of how the class trial could be conducted").
25   [7]    *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 (N.J. Dist. Ct. 1998) ("the administrative remedy provided by
     NHTSA, including recall of vehicles for inspection and/or repair, is more appropriate than civil litigation seeking
26   equitable relief and money damages in a federal court"); *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig. v.*
     *Ford Motor Co.,* 174 F.R.D. 332, 353 (N.J. Dist. Ct. 1997); *Am. Suzuki Motor Corp., Inc. v. Sup. Ct.,* 37 Cal. App.
27   4th 1291, 1299-1300 (Cal. Ct. App. 1995) ("The remedy which will best promote consumer safety . . . is to petition
     [NHTSA] for a defect investigation.")

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4832-2695-9951.1                              16                          2:15-cv-00799-KJM-DB
              DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1   Wasatch management, which resulted in a fast, fair and efficient resolution – including cash

2   reimbursement to tenants – when the SHRA had a concern about Wasatch's advertising.

3   (Tanforan Decl. ¶ 13; Johnson Decl. ¶ 12). The SHRA is obligated to evaluate each of these

4   leases for compliance with the HUD regulations, and where a lease is noncompliant, the SHRA is

5   obligated to enforce those regulations.

6       In order to fulfill its enforcement obligations, the SHRA reviews each RFTA before

7   approving a Section 8 tenant's lease. Many Wasatch leases in the Sacramento area contain what

8   Plaintiffs refer to as "side deals." These "side deals" are not side deals at all – they are charges for

9   services and amenities beyond those included in the rent to owner in compliance with the HQS.

10  These approvals represent an established practice of permitting these ASAs, and that practice –

11  reflected in the Shannon Fox declaration – is entitled to a degree of deference from this Court.

12      In the seminal case *Skidmore v. Swift & Co.*, the United States Supreme Court considered

13  whether informal agency pronouncements were entitled to judicial deference. *Skidmore v. Swift &*

14  *Co.*, 323 U.S. 134 (1944).[8] In holding that they were, the Court reasoned that in the course of an

15  agency's duties, the agency "accumulate[s] a considerable experience in the problems of

16  ascertaining . . . a knowledge of the customs prevailing in reference to their solution. From these

17  he is obliged to reach conclusions as to conduct without the law, so that he should seek

18  injunctions to stop it, and that within the law, so that he has no call to interfere." *Id.* at 137-138.

19  For that reason, the Court held that rulings, interpretations, and opinions of an agency, "while not

20  controlling upon the courts by reason of their authority, do constitute a body of experience and

21  informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 140.

22      The level of deference courts should give these materials varies based on "the

23  thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier

24

25  [8] Defendants note that the legality of the type of "side deal" Plaintiffs complain of has been addressed by HUD. (*See* Housing Choice Voucher Program Guidebook, available at

26  https://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/programs/hcv/forms/guidebook The interpretation of HUD regulations in that guidebook is entitled to *Chevron*-level deference under *Bowles v.*

27  *Seminole Rock & Sand Co.*, 325 U.S. 40 (1945). Because the SHRA's opinions on these specific leases are more pertinent, Defendants focus primarily on them.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* As such, the SHRA's consistent approval of the type of lease that Plaintiffs complains of is itself persuasive authority that those leases are permissible. But the SHRA's approval of these leases goes beyond their individual decisions on RFTA's. Those decisions are based on the Administrative Plan for the program, which is published annually. (*See* 2017 Administrative Plan, *available at* https://www.shra.org/Portals/0/pdf/public_housing/Sacramento %20City%20and%20County%20Housing%20Choice%20Voucher%20Administrative%20Plan.p df?ver=2017-01-26-115029-147.) Administrative plans such as these are precisely the type of document afforded deference under *Skidmore*, especially where the plans are required to be consistent with the HUD regulations. 24 C.F.R. § 982.54(a) (2016).

Additionally, the permissibility of these leases is articulated in Shannon Fox declaration. The Supreme Court has stated that agency opinions are no less worthy of deference because they are contained in a legal brief. *Auer v. Robbins*, 519 U.S. 452, 462 (1997). While the document afforded deference in *Auer* was an amicus brief – different than the declaration here – there is no principled reason to afford a sworn statement by an agency's representative less legitimacy than a legal brief. *Id.*

In sum, the agency bound to enforce the HUD regulations concerning Section 8 housing has clearly stated, in three distinct ways, that the leases Plaintiffs complain of are permissible under Section 8. As the Court pointed out in *Skidmore*, "good judicial administration of [an] Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified for very good reasons. The fact that the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect." *Skidmore*, 323 U.S. at 140. That in and of itself, however, is not why a class action suit is inappropriate here. What makes a class action suit so inappropriate is that Plaintiffs have not brought their concerns to the SHRA, which is bound to enforce the regulations at issue here. Not only have they not exhausted administrative remedies, they have not even attempted to pursue them. The agency is in the best position to evaluate the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   legitimacy of these leases. It has already done so once – at the request of each individual plaintiff,

2   who was seeking approval of his lease – and has had no occasion to reconsider that position.

3       This Court should not take up a case that threatens to undermine statewide administrative

4   policy implementing federal regulations with Plaintiffs who have made no effort to address their

5   complaints with the agency itself.

6       **E.    The Class Definition is Defective**

7       Plaintiffs define their class in their Second Amended Complaint as follows: "All persons

8   who: 1) in the time period starting six years prior to the date of filing this Complaint up to the

9   final resolution of the matter; 2) are, have been, or during the pendency of this action become

10  tenants of Defendants at one or more of the four subject properties located in Northern California;

11  3) have participated or will participate in the "Section 8" Housing Choice Voucher Program in

12  connection with their tenancies at the Subject Properties; and 4) are charged additional rent

13  payments in excess of their individual portions of the contract rent, as set forth in their HAP

14  Contracts."[9]

15      This class definition is defective. It is so overbroad that it violates the ascertainability

16  requirement of a certifiable class. "Ascertainability is needed for properly enforcing the

17  preclusive effect of final judgment. The class definition must be clear in its applicability so that it

18  will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of

19  any relief and who gets the burden of any loss. . . . Indeed, courts of appeals have found class

20  certification to be inappropriate where ascertaining class membership would require

21  unmanageable individualized inquiry." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075,

22  1089 (N.D. Cal. 2011).

23      Plaintiffs' proposed class necessitates precisely the type of unmanageable individualized

24  _____

25  [9] Defendants assume that Plaintiffs' class definition's reference to people who "are charged additional rent payments
26  in excess of their individual portion of the contract rent" refers to the ASAs discussed throughout this brief. To the
    extent it refers to literal additional rent payments, there are no such class members, and the representative plaintiffs
27  themselves would not qualify. Defendants will proceed as though Plaintiffs are referring to payments for additional
    amenities or services under the ASAs.

28

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  inquiry discussed by the *Xavier* court. As explained above, the HUD regulations permit these

2  ASAs, so long as they do not charge for items customarily included in base rent in the locality. 24

3  C.F.R. § 982.510. The SHRA's Administrative Plan recognizes the existence of these ASAs, and

4  explicitly contemplates an individualized inquiry to determine their validity. (Fox Decl. ¶ 5, Ex.

5  section D at 9-3, 9-4).

6      Determining which class members, if any, were party to invalid ASAs would be

7  problematic, and that issue on its own is enough to derail Plaintiffs' attempt at class certification.

8  However, the issues with Plaintiffs' definition run even deeper – as currently defined, the class

9  encompasses all tenants with ASAs, whether those agreements are valid, or not. Most, if not all,

10  of these ASAs are valid, meaning most of the proposed class members will be entirely uninjured.

11  This definition is plainly overbroad, and the proposed class is not ascertainable as a result.

12      Additionally, Plaintiffs' class, as defined in their Motion for Class Certification,

13  encompasses tenants who were parties to ASAs at all of Defendants' properties in California.

14  ECF No. 72, Mot. Class Certification, 2:15-19. This is far broader than the class definition

15  contained in the SAC, which limits the class to tenants who were parties to ASAs at Defendants'

16  four Sacramento area properties. To the extent that these definitions conflict, it is the operative

17  pleading that controls the scope of this litigation. Plaintiffs' attempt to retroactively expand the

18  class at this late stage and circumvent their own pleadings should be given no effect.

19                          IV.    **CONCLUSION**

20      For the foregoing reasons, Defendants respectfully request the Court to deny Plaintiffs'

21  Motion for Class Certification.

1

DATED: September 8, 2017                 **LEWIS BRISBOIS BISGAARD & SMITH LLP**

2

3                                        By:        /s/ Joseph A. Salazar, Jr.

4                                            Joseph A. Salazar, Jr.
                                             Yoon-Woo Nam
5                                            Attorneys for Wasatch Advantage Group, LLC;
                                             Wasatch Property Management, Inc.; Wasatch
6                                            Pool Holdings, LLC, Chesapeake Commons
                                             Holdings, LLC; Logan Park Apartments, LLC;
7                                            Logan Park Apartments, LP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION