1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551

2     E-Mail: Joe.Salazar@lewisbrisbois.com
YOON-WOO NAM, SB# 284644

3     E-Mail: Yoon-Woo.Nam@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700

4  Sacramento, California 95833
Telephone: 916.564.5400

5  Facsimile: 916.564.5444

6  Attorneys for Wasatch Advantage Group, LLC;
Wasatch Property Management, Inc.; Wasatch

7  Pool Holdings, LLC, Chesapeake Commons
Holdings, LLC; Logan Park Apartments, LLC;

8  Logan Park Apartments, LP

9

10                **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF CALIFORNIA**

12                  **SACRAMENTO DIVISION**

13

14  UNITED STATES OF AMERICA, ex rel.      CASE NO. 2:15-cv-00799-KJM-DB
DENIKA TERRY and ROY HUSKEY III,

15  and each of them for themselves individually,   **DECLARATION OF DAVE TANFORAN**
and for all other persons similarly situated and  **IN SUPPORT OF DEFENDANTS'**

16  on behalf of the UNITED STATES OF      **OPPOSITION TO MOTION FOR CLASS**
AMERICA,                                **CERTIFICATION**

17
                                        Date:    September 22, 2017

18          Plaintiffs/Relators,         Time:    10:00 a.m.
                                        Crtrm.:  3, 15th Floor

19          vs.
                                        The Hon. Kimberly J. Mueller

20  WASATCH ADVANTAGE GROUP, LLC,
WASATCH PROPERTY MANAGEMENT,            Trial Date:     None Set

21  INC., WASATCH POOL HOLDINGS, LLC,
CHESAPEAKE COMMONS HOLDINGS,

22  LLC, LOGAN PARK APARTMENTS, LLC;
LOGAN PARK APARTMENTS, LP,

23          Defendants.

24

25          I, Dave Tanforan, declare as follows:

26          1.      I am the Regional Manager of the Sacramento area and Bay Area residential

27  properties (the "Properties") managed by Wasatch Property Management, Inc. I have over 28

28  years of experience in property management in the Sacramento area and surrounding regions. I


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4824-6594-6959.1                                              2:15-cv-00799-KJM-DB

1  have been employed by Wasatch Property Management, Inc. since October 2014. I am

2  knowledgeable of the practices and policies implemented at the Properties that pre-date my

3  employment with Wasatch based on my discussions with upper level management, review of

4  documents and in my preparation for a deposition as a corporate witness of Wasatch.

5      2.    I have personal knowledge of the facts set forth herein, and if called as a witness to

6  testify thereto, I could competently and truthfully do so.

7      3.    Since October 2014, my office has been located at Chesapeake Commons

8  Apartments in Rancho Cordova, California. My job duties include oversight of operations and

9  finances at the Properties.

10      4.    Before March of 2016, the base market rental charge for any given unit at the

11  Properties was determined at an internal monthly review. This review consisted of obtaining

12  market survey information for each sub-market area for each property. For example, Rancho

13  Cordova is a sub-market of Sacramento and Mack Road is a further sub-market of South

14  Sacramento. My staff and I would identify four to five competing, similar properties in the area

15  and we would contact them by telephone or find information about them on the property's website

16  to identify their current rental charges. Factors used to compare similar properties were apartment

17  availability; unit type; amenities offered as part of the base market rental charge; market supply

18  and demand; occupancy percentage; lease percentage; the number of on-notice units, i.e. the

19  number of notices to vacate received by current residents; and upgrades to a unit in last 28 days

20  including new cabinets, new light package, new plumbing fixtures, new flooring, and/or new

21  countertops.

22      5.    Since March of 2016, Wasatch Property Management, Inc. has used Real Page

23  software called YieldStar. As I understand it, the software aggregates data that considers a large

24  number of factors from multiple sources every weekday to calculate an optimal rental charge for a

25  unit. As a result, the market rental rate for a new resident at any given unit at the Properties will

26  fluctuate daily based on the YieldStar calculation. YieldStar considers multiple factors to

27  determine the rental charge, including apartment availability; unit type; market supply and

28  demand; pricing model performance; floor plan; occupancy percentage; lease percentage;

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DECLARATION OF DAVE TANFORAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1  sustainability capability; the number of on-notice units; upgrades to a unit in last 28 days; and the

2  sub-market area.

3        6.      During bi-monthly meetings with a property manager from one or more of the

4  Properties and the Wasatch Property Management, Inc. pricing manager, I further evaluate

5  whether the YieldStar market rental charge for a unit at a property should be increased or

6  decreased to meet our 96 percent occupancy rate goal. If I need to improve the occupancy rate, I

7  will adjust the market rental charge accordingly.

8        7.      I have significant knowledge of and experience with the Housing Choice Voucher

9  Program, also known as the Section 8 Program, and its implementation at the Properties. I have

10 significant experience and familiarity working with Section 8 tenants at the Properties including

11 the documents involved with Section 8 tenancies. These documents include the Housing

12 Assistance Payments contract, Request For Tenancy Approval, lease agreement and Additional

13 Services Agreement, if applicable.

14       8.      The Additional Services Agreements are used by Wasatch Property Management,

15 Inc. to offer additional amenities and services to all residents of the Properties at the same rental

16 rate, although additional services are not offered at some tax credit properties. The additional

17 services and amenities offered at the Properties have never overlapped with or included the

18 appliances, utilities and services found in the Request For Tenancy Approval or Housing

19 Assistance Payments contract. Those appliances, utilities and services must be furnished by the

20 owner under the Section 8 Program administered by the public housing agency in the locality.

21       9.      The Sacramento Housing and Redevelopment Agency is the public housing agency

22 that administers the Section 8 Program in the Sacramento area. Neither this agency nor any public

23 housing agency administering the Section 8 Programs at other properties has ever requested me or

24 my staff to stop using Additional Services Agreements or to stop the offering amenities and

25 services in the agreements to Section 8 Program tenants.

26       10.     The practice at the Properties that offer additional services and amenities, except

27 for Chesapeake Commons Apartments, has been and is to give all residents the option of renting a

28 washer and dryer, covered parking and/or purchasing renter's insurance through the Properties

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4824-6594-6959.1               3             2:15-cv-00799-KJM-DB

DECLARATION OF DAVE TANFORAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1   under the Additional Services Agreements, which are part of the lease agreement. The amenities

2   and services offered to the residents of the Properties are washer and dryer rental, covered parking,

3   RentPlus credit reporting and renter's insurance. These amenities are offered as an option to all

4   residents eligible to rent them regardless of whether they were Section 8 tenants or non-Section 8

5   tenants. The amenities are offered at the same price to all tenants. Any increases to these charges

6   are applied uniformly to all residents regardless of their Section 8 Program status.

7       11.     As both policy and practice at the Properties, Section 8 Program tenants are not

8   evicted for their failure to pay for additional services. Evictions are only initiated when the Section

9   8 Program tenant fails to pay for their portion of the rent as listed in the Housing Assistance

10  Payments contract for their unit.

11      12.     Until August 2016, all residents at Chesapeake Commons Apartments rented the

12  in-unit washers and dryers and covered parking spaces as part of their lease agreements. Attached

13  hereto as Exhibit 1 is a true and correct copy of excerpts of testimony I gave in a deposition

14  regarding the same. If residents did not want these services at Chesapeake Commons Apartments,

15  they had the option of finding alternative housing, although some exceptions were made such as

16  Ms. Terry's request to stop paying for covered parking.

17      13.     In April 2016, a number of residents at Chesapeake Commons Apartments were

18  credited for the additional services charges they paid for washers and dryers from August 2015 to

19  approximately April 2016 when the laundry facilities were not available for use. This occurred

20  after SHRA notified Chesapeake Commons Apartments of an issue with the advertising language

21  Wasatch used for its washer and dryer rentals.

22      14.     Beginning in August 2016, Chesapeake Commons Apartments gave residents the

23  option of not renting the in-unit washers and dryers and covered parking spaces through the

24  Additional Services Agreements as part of their lease. Purchasing RentPlus (a credit reporting

25  service) and renter's insurance from Chesapeake Commons Apartments has always been optional

26  for all residents.

27      15.     All residents of the Properties including Section 8 tenants who elect to pay for and

28  receive additional services are informed of the total monthly charges they will incur for the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4824-6594-6959.1                    4                    2:15-cv-00799-KJM-DB

DECLARATION OF DAVE TANFORAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1   services before they are actually incurred. The practice at the Properties is to give the Section 8

2   tenant a copy of the Housing Assistance Payment contract and lease agreement including

3   Additional Services Agreement, if applicable, for each tenancy period. These documents showed

4   the monthly rent to be paid by the Section 8 tenant and the separate monthly cost for any

5   additional services the tenant desired for the tenancy period.

6          16.     The washers and dryers at the Properties are smaller than the full-size appliances,

7   and they are stacked atop one another. A resident who chooses to rent a washer and dryer can later

8   elect to not renew the Additional Services Agreement. If this happens, my staff would remove the

9   washer and dryer from the unit. At Chesapeake Commons Apartments, all residents had the option

10  to use on-site common laundry facilities. There has been at least one instance where a multi-year

11  tenant decided to stop renting a washer and dryer after his/her lease term ended and the appliances

12  were removed.

13         17.     All residents of the Properties are required to have renter's insurance under the

14  lease agreement. The renter's insurance can be purchased as an additional service or a resident has

15  the option to purchase the insurance through a vendor of their choosing. Most tenants choose to

16  get renter's insurance as an additional service because of its convenience. No public housing

17  agency in the Sacramento area or Bay Area has ever asked me or my staff to discontinue the

18  practice of requiring tenants to have renter's insurance.

19         18.     Plaintiff Denika Terry was a tenant at Chesapeake Common Apartments from

20  August 18, 2010 until approximately March 20, 2013. She entered into an annual lease agreement

21  and Additional Services Agreement for a washer and dryer, covered parking and renter's

22  insurance. Attached hereto as Exhibit 2 are true and correct copies of a lease agreement,

23  Additional Services Agreement and Request For Tenancy Approval during Ms. Terry's tenancy at

24  Chesapeake Commons Apartments.

25         19.     On or about February 5, 2013, Chesapeake Commons Apartments informed Ms.

26  Terry that she would be evicted for failure to pay rent. Attached hereto as Exhibit 3 is a true and

27  correct copy of a Three Day Notice to Pay Rent or Quit. As the document states, Ms. Terry was

28  evicted for her failure to pay the tenant portion of the rent and her outstanding balance reflected

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DECLARATION OF DAVE TANFORAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1 the rent owing; the balance did not include late charges, washer/dryer charges, parking charges or

2 any other additional service charges.

3      20.    On or about March 1, 2013, attorneys for Chesapeake Commons Apartments and

4 Ms. Terry reached a Stipulation in Settlement. Under the terms of this Stipulation, Chesapeake

5 Commons Apartments was to dismiss the unlawful detainer filed in the Sacramento County

6 Superior Court for Ms. Terry's failure to pay rent. In exchange for the dismissal, Ms. Terry was to

7 pay the outstanding rent and other charges she owed to Chesapeake Commons Apartments.

8 Attached hereto as Exhibit 4 is a true and correct copy of the Stipulation in Settlement.

9      21.    Due to Ms. Terry's failure to honor the terms of the Stipulation in Settlement and

10 failure to pay the outstanding rent she owed, the unlawful detainer was adjudicated by the court

11 and Ms. Terry was evicted.

12      I declare under penalty of perjury under the laws of the United States of America that the

13 foregoing is true and correct and that this declaration was executed on September 8, 2017, at

14 Oakland, California.

15

16

17

                           Dave Tanforan

18

19

20

21

22

23

24

25

26

27

28


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DECLARATION OF DAVE TANFORAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1  the rent owing; the balance did not include late charges, washer/dryer charges, parking charges or

2  any other additional service charges.

3         20.  On or about March 1, 2013, attorneys for Chesapeake Commons Apartments and

4  Ms. Terry reached a Stipulation in Settlement. Under the terms of this Stipulation, Chesapeake

5  Commons Apartments was to dismiss the unlawful detainer filed in the Sacramento County

6  Superior Court for Ms. Terry's failure to pay rent. In exchange for the dismissal, Ms. Terry was to

7  pay the outstanding rent and other charges she owed to Chesapeake Commons Apartments.

8  Attached hereto as Exhibit 4 is a true and correct copy of the Stipulation in Settlement.

9         21.  Due to Ms. Terry's failure to honor the terms of the Stipulation in Settlement and

10  failure to pay the outstanding rent she owed, the unlawful detainer was adjudicated by the court

11  and Ms. Terry was evicted.

12         I declare under penalty of perjury under the laws of the United States of America that the

13  foregoing is true and correct and that this declaration was executed on September 8, 2017, at

14  Oakland, California.

15

16

17

                                           Dave Tanforan

18

19

20

21

22

23

24

25

26

27

28



4824-0359-6959.1

6

2:15-cv-00799-KJM-DB

DECLARATION OF DAVE TANFORAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

# EXHIBIT 1

1                   UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3                  SACRAMENTO DIVISION

4

5  UNITED STATES OF AMERICA,  )

   ex rel. DENIKA TERRY and   )

6  ROY HUSKEY III, and each   )

   of them for themselves     )

7  individualy, and for all   )

   other persons similarly    )

8  situated and on behalf of  )

   the UNITED STATES OF       )

9  AMERICA,                 )

10         Plaintiffs,     )

11  v.                  )  Case No.

12  WASATCH ADVANTAGE GROUP,  )  2:15-cv-00799-KJM-DB

   LLC, WASATCH PROPERTY     )

13  MANAGEMENT, INC., WASATCH  )

   POOL HOLDINGS, LLC,       )

14  CHESAPEAKE COMMONS HOLDINGS)

   LLC, LOGAL PARK APARTMENTS,)

15  LLC, LOGAL PARK APARTMENTS,)

   LP, and DOES 1-30,      )

16         Defendants.     )

   _____)

17

18                    DEPOSITION OF

19                   DAVE TANFORAN

20            WEDNESDAY, AUGUST 9, 2017

21

22  Reported by:

23  TAMARA BERLIN, CSR 9706

24  Job No. 2674876

25  Pages 1 - 233

                                       Page 1

```
1        Q.   And when you say pay with rent option, does that

2   mean that payment is made to Wasatch and not directly to

3   Assurant?

4        A.   I believe so, so they can -- they can pay it with

5   their rent and then Wasatch is able to forward that payment

6   on to Assurant.

7        Q.   When you say pay with rent, does that mean paid

8   in -- with the same channel?  In other words, if it's a

9   check, they can just include it in the check amount?

10        A.   Whatever payment method they use.  It could be a

11   check.

12        Q.   Just add it on to your total?

13        A.   Could be, yeah.

14           MR. LAVINE:  All right.  Let's leave that document

15   alone.  And it is almost ten to one.  Let's have our lunch

16   break.

17           (Lunch recess.)

18           MR. LAVINE:  Let's go back on the record.  Hope

19   everyone had a good lunch.  I understand the witness wants to

20   correct some information earlier discussed.  Feel free.

21           THE WITNESS:  On the additional service charges,

22   they -- whether they're mandatory or not, there's some

23   variations in that.  I just want to clarify that.

24   BY MR. LAVINE:

25        Q.   Go ahead.
```

Page 111

1        A.   So, at Chesapeake Commons, the washers and dryers

2    and parking spaces were -- were mandatory until August of

3    2016, and we were notified that SHRA had -- had an issue with

4    that, so we went back and changed it at that point

5    and actually issued refunds to our bond residents back for a

6    period of time.  Since then, they -- they are optional.

7    There's other properties that are tax credit properties to

8    where we can't require that these items are -- additional

9    service items are required.  So that's -- that's for three of

10   the Sacramento properties.

11        Then, the other two, they -- they are optional.

12   They -- they don't have -- they're not a tax credit, but they

13   have a bond component on there.  So for the Section 8

14   residents, they -- they've been optional.  Those are the ones

15   that -- some have washers and dryers and some don't for those

16   two properties.

17        Q.   Let me ask some follow-up.  Thank you for the

18   clarification.

19        A.   Yeah.

20        Q.   So, first off, how did all this come to you over

21   lunch?

22        MR. NAM:  Objection; calls for attorney-client

23   communications.

24        To the extent that calls for that, I'm going to

25   instruct you not to answer that, but go ahead and respond to

Page 112

EXHIBIT 2

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY



**Wasatch Property Management, Inc. l Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321*

This agreement is made in Rancho Cordova, CA , on 9/20/10 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Denika Terry**
Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.   TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 09/20/2010, and Terminating 09/19/2011 . Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is 10,320.00.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #391, Rancho Cordova, CA, 95670

**III.   RENT**



The rental for the premises is $860.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA, 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A.  The sum of $315.33 upon execution of this Rental Agreement as rent for the period beginning  09/20/2010 , through 09/30/2010 (first month prorated) payable on 09/20/2010 .

B.  The sum of $860.00, is due on the first day of each calendar month commencing  October 2010.

C.  A concession in the amount of 0.00 is to be given to Resident as part of this 12month(s) lease and will be issued as $0.00 off move in. The 0.00 concession is due and payable back to Chesapeake Commons Apartments if the 12 month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs. The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas.  In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be  obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

**IV.   PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V.   LATE CHARGES**



Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual costs.  Because of this, Landlord and Tenant understand and agree that the amount $ 50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 50.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**



Resident shall pay Owner, upon execution of this agreement, a security deposit of $325.00  Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy,  Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

WAS000169

**VII.   ACCEPTANCE AND SURRENDER OF PREMISES**

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use  3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VIII.   USE OF THE PREMISES**



Initials

A.  The premises are rented for residential use only and shall be occupied by not more than 1 occupant(s).  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease.  Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a  minimum of one year old , except for pure breeds or mixed breeds or any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered.  Reptiles or exotic pets are not allowed.The maximum weight limit allowed for pets is 0.00 lbs.



Initials

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law,  California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled grills, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.   Harassment or Threats:   Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste:   Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX.   RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

**X.   UTILITIES**



Initials

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in  Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

X  gas,                        Account # _____.
X  electricity,                Account # _____.
X  water/sewer/trash            See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and

**XI.   INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

WAS000170

**XII. HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XIII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIV. LIABILITY INSURANCE**


Initials

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have  Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments.  If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV. WAIVER OF LIABILITY**


Initials

Resident agrees to assume responsibility for the following:

A.   Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy.  If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.   Loss of property due to theft

C.   Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D   The Actions or omissions of other Residents

E.   Interference with light, view or other intangible aspects of the premises.

F.   Operations in construction of any public or quasi-public work

G.   Any latent defect in the building(s)

H.   The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.   Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.   Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.   Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**XVI. CANCELLATION FEE**

You may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 860.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII. NOTICE TO QUIT**


Initials

A.   **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30) days notice in writing prior to the end of the monthly term. If no thirtyday notice is received by Agent AND resident vacates the property, a fee equal to $  860.00  will be billed as liquidated damages for improper thirty day notice.  Upon the lease agreement expiration date of 09/19/2011 and if resident elects to not renew lease or submit a written thirty (30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.  Current month to month fee is $ 100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.   **TERM AGREEMENT:** Resident agrees, at least thirty (30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted.  If no thirty day notice is received by Agent AND resident vacates the property, a fee equal $ 860.00 will be billed as liquidated damages for improper thirty day notice.

WAS000171

 

**XVIII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

*Initials*

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XIX.  AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XX.  SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI.  JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII.  WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIII.  RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

Termination on Breach and Notice to Quit.  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIV.  SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV.  ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

_____     9 - 20 - 2010 .
Denika Terry(Lessee)                              Date


_____     9/20/10
Owner authorized agent                          Date

WAS000172

 

## ADDITIONAL SERVICES AGREEMENT

Apartment # 391

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community") and Denika Terry (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 09/20/2010 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 40.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 10.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance (This is available as a pay with rent option), or | | 15.58 |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 0.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $65.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $65.58 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee     (if applicable) | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 09/20/2010

_Denika Terry_ (Signature)                    9-20-2010
Denika Terry (Lessee)                          Date

_(signature)_                                  9/20/10
Owner authorized agent                         Date

LD303.01 Revised 07/15/2008

WAS000176




**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease.  The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property.  The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion.  Lessee shall not make any alterations, additions, or improvements to the Property.  Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor.  Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges.  Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement.  If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement.  In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property.  Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer.  Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied  Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion.  Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

WASATCH
PREMIER COMMUNITIES

WAS000177



14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an  assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof.   No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance.  Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements.  No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time.  The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any provision or breach hereof or of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount.  All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly.  The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_Denika A. Terry_ .     9-20-2010 .
Denika Terry(Lessee)         Date

_____     9/20/10
Owner authorized agent         Date             LD303.01 Revised 7/15/08



WAS000178

**Request for Tenancy Approval**
Housing Choice Voucher Program

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 9/30/2010)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.   This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

Eligible families submit this information to the Public Housing Authority (PHA) when applying for housing assistance under Section 8 of the U.S. Housing Act of l937 (42 U.S.C. 1437f).   The PHA uses the information  to determine if the family is eligible, if the unit is eligible, and if the lease complies with program and statutory requirements.   Responses are required to obtain a benefit from the Federal Government.  The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency (PHA) | 2. Address of Unit (street address, apartment number, city, State & zip code) |
|---|---|
| Sacramento Housing and Redevelopment agency | 3600 Data Drive  Rancho Cordova CA 95670 |

| 3. Requested Beginning Date of Lease | 4. Number of Bedrooms | 5. Year Constructed | 6. Proposed Rent | 7. Security Deposit Amt. | 8. Date Unit Available for Inspection |
|---|---|---|---|---|---|
| 9/1/10 | 2 | 1984 | $860.00 | $325.00 | 8/30/10 |

**9. Type of House/Apartment**

☐ Single Family Detached  ☐ Semi-Detached / Row House  ☐ Manufactured Home  ☐ Garden / Walkup  ☐ Elevator / High-Rise

**10. If this unit is subsidized, indicate type of subsidy:**

☐ Section 202   ☐ Section 221(d)(3)(BMIR)   ☐ Section 236 (Insured or noninsured)   ☐ Section 515 Rural Development

☐ Home   ☐ Tax Credit

☐ Other · (Describe Other Subsidy, Including Any State or Local Subsidy)

**11. Utilities and Appliances**
The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T".  Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | Provided by | Paid by |
|---|---|---|---|
| Heating | ☐ Natural gas  ☐ Bottle gas  ☐ Oil  ☒ Electric  ☐ Coal or Other | O | T |
| Cooking | ☐ Natural gas  ☐ Bottle gas  ☐ Oil  ☒ Electric  ☐ Coal or Other | O | T |
| Water Heating | ☐ Natural gas  ☐ Bottle gas  ☐ Oil  ☐ Electric  ☐ Coal or Other | O | T |
| Other Electric | | O | |
| Water | | O | T |
| Sewer | | O | T |
| Trash Collection | | O | T |
| Air Conditioning | | O | T |
| Refrigerator | | O | O |
| Range/Microwave | | O | O |
| Other (specify) | | | |

WAS000206

EXHIBIT 3

**THREE-DAY NOTICE TO PAY RENT OR QUIT**

Denika Terry
**And Any Others In Possession:**
36000 Data Dr #391
Rancho Cordova, CA 95670

Dear   And Any Others In Possession:

PLEASE TAKE NOTICE: that rent has not been paid for the premises herein after described and held occupied by you, and that the sum of $810.25 is now due and unpaid from 2/1/13 to 2/26/13. This total does not include late charges, washer/dryer charges, parking charges or any other additional service items that you may have.

You are hereby required to pay said rent to the undersigned, or authorized agent, within three (3) days from the service of this notice upon you, or to remove your belongings from and deliver the possession of said premises to the undersigned within three (3) days, or the undersigned will institute legal proceedings against you to recover possession of said premises, past due rent, rental damages, court costs, process server fees, attorney's fees and to declare a forfeiture of your Lease and/or Rental Agreement.  The premises herein referred to are as described below:

36000 Data Dr #391 Rancho Cordova cA 95670

Payment shall be made only by cashier's check, certified check or money order to the owner's agent, .  Payment shall be delivered to , or any other Wasatch employee at  , , .  **The office hours, unless otherwise posted at the rental office are, Mon-Fri (9:00 am - 5:00 pm), Saturdays (10:00 am - 5:00 pm) and Sundays ().  There is a drop box available to accept this payment after hours.**

_____      2/5/2013
Management Representative

---

**PROOF OF SERVICE**

I, the undersigned, being at least 18 years of age, declare under penalty of perjury under the laws of the State of California, that I served the foregoing Notice, of which this is a true copy, on the above named Resident(s) personally.

_____ PERSONAL SERVICE -- On _____, _____, I delivered the notice to the Resident(s) personally.

_____ BY LEAVING A COPY -- On _____, _____ with _____, a person of suitable age and discretion at the residence or usual place of business of said Resident(s), Resident(s) being absent there from; and on _____, _____ I mailed a second copy to the Resident(s) at his or her residence.

___X___ BY POSTING A COPY -- On _____ Feb 5 , 2013 I posted the notice in a conspicuous place on the property, there being no person of suitable age or discretion to be found at any know place of residence or business of said Resident(s); and On ___2/5/13_____ I mailed a second copy to the Resident(s) at the place where the property is situated.

Executed 2/5/13  at Rancho Cordova CA by _____
                                          Management Representative

_____          _____
Resident                          Resident

WAS000122

EXHIBIT 4

1 | LAW OFFICES
RICHARD M. MEHIGAN (SBN 78866)
2 | A Professional Corporation
1420 River Park Drive, Suite 120
3 | Sacramento, California 95815
Telephone: (916) 646-0800
4 | Our File No. 130378 lo

5 | Attorney for Plaintiff

*Failed to Make payment*

6

1
7

8         SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO

9

10 | CHESAPEAKE COMMONS,                   CASE NO. 13UD01502

11 |           Plaintiff,

12 |    vs.

13 | DENIKA TERRY, et al.,                  STIPULATION
IN SETTLEMENT
14 |          Defendants.

15

16 |        Plaintiff, CHESAPEAKEK COMMONS HOLDINGS, LLC, (hereafter referred to

17 | as "plaintiff"), by and through its attorney, and defendant, DENIKA TERRY, (hereafter referred to

18 | as "defendant"), stipulate as follows:

19 |        1.  That plaintiff filed this unlawful detainer proceeding on February 20, 2013, to

20 | recover possession of the premises located at 3600 Data Drive, #391, Rancho Cordova, California.

21 |        2.  That without the admission by either party of fault or liability, the parties enter

22 | into this Stipulation in Settlement (hereafter referred to as "Stipulation") freely in order to resolve

23 | this proceeding without the additional cost and uncertainty that would accompany further litigation

24 | and in order to allow defendant the opportunity to keep her tenancy in the premises.

25 |        3.  That defendant shall pay to plaintiff the sum of $1,293.16 (hereafter "principal"),

26 | representing $578.16 due for the premises through and including March 31, 2013; reimbursement

27 | for $400.00 attorney's fees; and reimbursement for $315.00 court costs.  Said $1,293.16 principal

28 | shall be paid as follows: not less than $778.16 on or before March 3, 2013, with the $515.00

1

**Stipulation in Settlement**

1  remaining balance of principal to be paid at a rate of not less than $200.00 per month, commencing

2  on or before April 3, 2013, and continuing at a monthly rate of not less than $200.00 on or before

3  the 3rd day of each month thereafter until the entire balance of principal is paid.

4          4.  That for such period of time as defendant remains in possession of the premises

5  while paying the principal owed, she shall also pay the prospective monthly rent for April 2013

6  through June 2013, on or before the 3rd day of each of said months, said monthly rental payments

7  to become due during the period of time that defendant is allowed to pay the principal due pursuant

8  to this Stipulation; provided, however, that upon the defendant's payment in full of the $1,293.16

9  principal due pursuant to this Stipulation prior to the accrual of a prospective month's rent, this

10  proceeding is to be dismissed as provided hereinafter, and this provision relating to the defendant's

11  obligation to pay such prospective rental payments shall no longer be enforceable through this

12  proceeding.

13          5.  That each payment specified herein shall be made without any additional prior

14  notice or warning to defendant in the form of cashier's check, certified check or money order,

15  payable to Chesapeake Commons Apartments, and it shall be actually, physically received at the

16  Office of Chesapeake Commons Apartments not later than 4:30 p.m. on its specified date.  Plaintiff

17  may continue with the prosecution of this matter, including, but not limited to, the obtaining of the

18  entry of a clerk's judgment awarding plaintiff possession of the premises and the issuance of a Writ

19  of Possession of Real Property; however, for as long as defendant makes each payment provided

20  herein in timely fashion, plaintiff shall not cause her to be dispossessed from the premises through

21  this unlawful detainer proceeding.

22          6.  That if defendant should fail to make any principal payment as provided by this

23  Stipulation in timely fashion or in the specified manner, then plaintiff may immediately upon an *ex*

24  *parte* basis (without further notice or hearing by the Court) take such steps as are necessary to obtain

25  the immediate issuance of a Writ of Possession of Real Property which plaintiff may use to

26  dispossess defendant and all tenants, subtenants, named claimants and any other occupants from the

27  premises.

28  ///////// /////////

2

**Stipulation in Settlement**

WAS000117

7. That if defendant should fail to make any prospective rental payment provided herein in timely fashion or in the specified manner, then plaintiff may immediately upon an *ex parte* basis (without further notice or hearing by the Court) take such steps as are necessary to obtain the immediate issuance of a Writ of Possession of Real Property which plaintiff may use to dispossess defendant and all tenants, subtenants, named claimants and any other occupants from the premises. However, not less than 72 hours prior to obtaining such Writ of Possession pertaining only to a default by defendant in the payment only of any prospective rent, plaintiff shall notify defendant in writing of plaintiff's intention to obtain such Writ of Possession. Said 72 hours' notice is intended to provide defendant with an opportunity to present such reason as she may have as to why she should not be dispossessed from the premises for such nonpayment of prospective rent. Code of Civil Procedure §1013 shall not apply to any service of such notice by mail so as to extend the 72-hour period of time for defendant to present any such legal reason to the Court.

8. That upon its filing with the court, this Stipulation shall constitute an appearance by defendant in this matter; provided however, that plaintiff shall not file this Stipulation with the Court unless it is necessary in order to have possession of said premises awarded to plaintiff, to have judgment entered pursuant to its terms, or otherwise required by the Court. If it should become necessary to file this Stipulation with the Court in order to have possession of the premises awarded after a default by defendant in her obligations under this Stipulation or in order to have a money judgment entered, then plaintiff may immediately upon an *ex parte* basis (without further notice or hearing by the Court) file this Stipulation with the Court together with a Declaration setting forth the facts attendant to the defendant's default. Upon such filing and plaintiff's request, the Court may award plaintiff the restitution and possession of the premises as to defendant and all tenants, subtenants, named claimants and any other occupants, together with the forfeiture of the tenancy agreement, and a money judgment as provided hereafter.

9. That if defendant fails to complete her performance under this Stipulation by failing to make any payment when due and plaintiff obtains possession of the premises, then after possession of the premises has been recovered, plaintiff may upon an *ex parte* basis (without further notice or hearing by the Court) proceed to have a judgment entered in this matter or to convert it to

3

**Stipulation in Settlement**

1  an ordinary civil matter.  Any judgment which may be obtained on either a default basis or based

2  upon the filing of this Stipulation (1) may declare the defendant's tenancy forfeited and (2) may

3  award plaintiff any principal remaining unpaid together with any unpaid rent accruing after March

4  31, 2013 (after credit for any payment made pursuant to this Stipulation); such additional attorney's

5  fees as allowed by the Court, provided however, that the parties agree that such sum should not be

6  less than $150.00; and any additional court costs incurred by plaintiff after the execution of this

7  Stipulation, such as costs incurred by plaintiff in effecting the removal of defendant from the

8  premises and/or for the filing of this Stipulation.  Any judgment entered pursuant to this Stipulation

9  shall be considered a "final judgment" within the meaning of Civil Code §1785.13(a)(3).

10       10.   That if defendant makes each payment provided for herein in timely fashion, then

11  plaintiff shall dismiss this proceeding with prejudice, and except as otherwise specifically provided

12  herein, the parties shall bear their respective court costs and attorney's fees attendant to this matter.

13       11.   That the parties hereto are entering into this Stipulation for the limited purpose

14  of effecting a settlement of this unlawful detainer proceeding and such Stipulation shall not affect

15  any rights afforded plaintiff pursuant to Code of Civil Procedure, section 1174.5; Civil Code, section

16  1951.2; or any other provision of law as may pertain to defendant's vacating the premises which are

17  the subject of this proceeding prior to the expiration of the lease for the premises.

18       12.   That if it should be determined that any portion of this Stipulation is invalid or

19  unenforceable, then the portion determined to be invalid or unenforceable shall be removed, and the

20  balance of this Stipulation shall remain in full force and effect.

21       13.   That time is of the essence and that no supplement, modification or amendment

22  to this Stipulation will be binding unless executed in writing by each party.  No waiver of any

23  provisions of this Stipulation will be deemed or will constitute a waiver of any other provisions,

24  whether or not similar, nor will any waiver constitute a continuing waiver.  No waiver will be

25  binding unless executed in writing by the party making the waiver expressly identifying the

26  provision(s) to be waived.

27       14.   That the parties agree that this Stipulation may be executed in counterparts and

28  will be binding upon the parties as though one original had been signed by all parties; that pursuant

4

**Stipulation in Settlement**

1  to California Rules of Court, Rule 2.305(d), signatures by facsimile or e-mailed copy shall be

2  deemed original signatures for all purposes; that plaintiff may file a faxed or e-mailed copy of this

3  Stipulation as if it contained original signatures; and that the Court may enforce the terms of this

4  Stipulation if it contains one or more copies of the parties' signatures.

5          15.  That plaintiff's counsel has informed defendant that he has been authorized to

6  resolve this matter on the terms set forth in this Stipulation; that the parties are aware that before

7  entry of judgment or dismissal may be obtained pursuant to Code of Civil Procedure, section 664.6,

8  plaintiff's assent to the settlement of this matter as contained herein must be demonstrated to the

9  satisfaction of the Court; and that such assent may be demonstrated by providing the Court with a

10 facsimile or other copy of this Stipulation with the approval of plaintiff or of its authorized agent,

11 either by attachment as Exhibit "A" hereto or by subsequent submission to the Court.

12          Dated:   March 1, 2013

13

14          _____

15          DENIKA TERRY, Defendant

16

17          _____

18          RICHARD M. MEHIGAN
            Attorney for Plaintiff

19

20

21

22

23

24

25

26

27

28

5

**Stipulation in Settlement**

WAS000120