1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
2    E-Mail: Joe.Salazar@lewisbrisbois.com
YOON-WOO NAM, SB# 284644
3    E-Mail: Yoon-Woo.Nam@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
4  Sacramento, California 95833
Telephone: 916.564.5400
5  Facsimile: 916.564.5444

6  Attorneys for Wasatch Advantage Group, LLC;
Wasatch Property Management, Inc.; Wasatch
7  Pool Holdings, LLC, Chesapeake Commons
Holdings, LLC; Logan Park Apartments, LLC;
8  Logan Park Apartments, LP

9

10              **UNITED STATES DISTRICT COURT**

11             **EASTERN DISTRICT OF CALIFORNIA**

12                **SACRAMENTO DIVISION**

13

14  UNITED STATES OF AMERICA, ex rel.          CASE NO. 2:15-cv-00799-KJM-DB
DENIKA TERRY and ROY HUSKEY III,
15  and each of them for themselves individually,   **DECLARATION OF WARREN SMITH IN**
and for all other persons similarly situated and  **SUPPORT OF DEFENDANTS'**
16  on behalf of the UNITED STATES OF          **OPPOSITION TO MOTION FOR CLASS**
AMERICA,                                    **CERTIFICATION**
17
Plaintiffs/Relators,     Date:      September 22, 2017
18                                               Time:      10:00 a.m.
vs.                                   Crtrm.:    3, 15th Floor
19
WASATCH ADVANTAGE GROUP, LLC,     The Hon. Kimberly J. Mueller
20  WASATCH PROPERTY MANAGEMENT,
INC., WASATCH POOL HOLDINGS, LLC,    Trial Date:      None Set
21  CHESAPEAKE COMMONS HOLDINGS,
LLC, LOGAN PARK APARTMENTS, LLC;
22  LOGAN PARK APARTMENTS, LP,

23              Defendants.

24

25       I, Warren Smith, declare as follows:

26       1.       I am the General Manager of Logan Park Apartments located in Sacramento,

27  California and a Regional Manager for Reliant Property Management, based in San Francisco,

28

4853-0351-3678.1                                              2:15-cv-00799-KJM-DB
DECLARATION OF WARREN SMITH IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1   California. I have over 18 years of experience working at or being involved with Logan Park

2   Apartments.

3       2.      I have personal knowledge of the facts set forth herein, and if called as a witness to

4   testify thereto, I could competently and truthfully do so.

5       3.      In 2008, I was employed as a General Manager of Logan Park Apartments by

6   Wasatch Property Management, Inc. Also, Logan Park Apartments were owned by Logan Park,

7   L.P.

8       4.      In 2016, I became an employee of Reliant Property Management after Logan Park,

9   L.P. sold Logan Park Apartments to The Reliant Group.

10      5.      I have not been employed by Wasatch Property Management, Inc. since 2016.

11      6.      My office is located at Logan Park Apartments and it has been there since 2005.

12  My general job duties include oversight of all aspects of operational compliance and financial

13  responsibilities of Logan Park Apartments.

14      7.      I have significant knowledge of and experience with the Housing Choice Voucher

15  Program, also known as the Section 8 Program, and its implementation at Logan Park Apartments.

16  I have significant experience and familiarity working with Section 8 tenants at Logan Park

17  Apartments including the documents involved with Section 8 tenancies. These documents include

18  the Housing Assistance Payments contract, Request For Tenancy Approval, lease agreement and

19  Additional Services Agreement.

20      8.      During the period of time Logan Park, L.P. owned and managed Logan Park

21  Apartments, Wasatch Property Management, Inc. used the Additional Services Agreements to

22  offer additional amenities and services to Logan Park Apartment residents. The additional services

23  and amenities were always distinct from the appliances, utilities and/or services found in the

24  Request For Tenancy Approval or Housing Assistance Payments contract. Those appliances and

25  utilities listed in the HAP contract must be furnished by the owner under the Section 8 Program

26  administered by the Sacramento Housing and Redevelopment Agency. The HAP contract will also

27  designate who pays for those owner provided appliances and utilities.

28

DECLARATION OF WARREN SMITH IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

9.      Plaintiff Roy Huskey, III was a tenant at Logan Park Apartments from July 8, 2011 until approximately May 31, 2015. Attached hereto as Exhibit 5 are true and correct copies a lease agreement, Additional Services Agreements and HAP Contract during Mr. Huskey's tenancy at Logan Park Apartments.

10.     The practice at Logan Park Apartments was and is to offer all residents the option of renting a washer and dryer and acquiring renter's insurance through Logan Park Apartments under the Additional Services Agreements, which are part of the lease agreement. From 2008 and through 2016, the amenities and services offered to Logan Park Apartment residents were washer and dryer rental and renter's insurance. The Additional Services Agreement form shows added amenities beyond the Washer/Dryer and insurance items, but they were not available at this location. The available amenities were offered as an option to all residents regardless of whether they were Section 8 tenants or non-Section 8 tenants and were offered at the same price to all tenants.

11.     Since 2008 and through 2016, the practice of Logan Park Apartments was to give a Section 8 tenant a copy of the Housing Assistance Payment contract and lease agreement including Additional Services Agreement for each tenancy period. These documents showed the monthly rent to be paid by the Section 8 tenant and the separate monthly cost for any additional services the tenant desired for the tenancy period. The complete lease package, which included the completed Additional Services Agreement, were sent to the Sacramento Housing and Redevelopment Agency for review and approval.

12.     Since 2008, the washers and dryers at Logan Park Apartments have been they smaller than full-size type that can be stacked on top of one another. A resident at Logan Park Apartments who chooses to rent a washer and dryer has the option to stop renting them at the end of a lease period. At that time, Logan Park Apartments would remove the washer and dryer from the apartment. All residents had the option to use one of three community laundromats at Logan Park Apartments instead of renting a washer and dryer.

13.     Since 2008 and through 2016, all Logan Park residents had an option to have renter's insurance under the lease agreement. The renter's insurance could be purchased as an

DECLARATION OF WARREN SMITH IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1  additional service or a resident had the option to purchase the insurance through an agent/broker of

2  their choosing.

3      14.    In July 2011, Mr. Huskey began his tenancy at Logan Park Apartments and entered

4  into an annual lease agreement and Additional Services Agreement for a washer and dryer and

5  renter's insurance. Mr. Huskey had the option of choosing an apartment unit that did not have a

6  washer and dryer. He also had the option of not entering into the Additional Services Agreement

7  and removing the washer and dryer from his unit. Mr. Huskey selected a unit with a washer and

8  dryer and continued to keep these until the end of his tenancy. He also acquired renter's insurance

9  through Logan Park Apartment throughout his tenancy. From 2011 to 2016, Logan Park

10 Apartments did not increase the charges for the washer and dryer rental and renter's insurance.

11     15.    On or about April 22, 2015, Logan Park Apartments informed Mr. Huskey that he

12 would be evicted from his apartment due to multiple violations of the lease. Attached hereto as

13 Exhibit 6 is a true and correct copy of a Three Day Notice to Perform Covenant of Lease or Quit.

14     16.    Throughout his tenancy at Logan Park Apartments, Mr. Huskey demonstrated

15 racially discriminatory conduct toward staff and residents at Logan Park Apartments. On multiple

16 occasions, I witnessed Mr. Huskey use racial epithets such as "nigger" and "brown skins" to refer

17 to African-American and Hispanic residents. He also verbally abused Russian residents. He once

18 called me a "nigger lover" because I told him that his racially discriminatory conduct toward staff

19 and residents was unacceptable.

20     17.    Approximately two times a month throughout his tenancy at Logan Park

21 Apartments, Mr. Huskey provoked minority residents by using racial epithets toward them and

22 when confronted by these same residents (sometimes physically) he would retreat to the leasing

23 office and complain about them. During these instances, Mr. Huskey refused to interact with staff

24 members of color and only wished to speak with Linda Grieve, Renee Richardson, or me because

25 we are Caucasian.

26     18.    I received frequent complaints from an African-American woman who lived across

27 from Mr. Huskey that he tormented her one or twice a week and called her racial epithets. I

28 received a complaint from an African American pastor and his wife who lived below Mr. Huskey

DECLARATION OF WARREN SMITH IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
CLASS CERTIFICATION

1   that Mr. Huskey called them and their family members "niggas and bitches." Attached hereto as
2   Exhibit 7 are true and correct copies of letters from residents complaining about Mr. Huskey's
3   racially discriminatory conduct.

4       19.     Logan Park Apartments has always been an inclusive and diverse community. It is
5   a violation of the lease for a resident to disturb, annoy, endanger or inconvenience other residents
6   and neighbors. Because neither I nor Wasatch and Reliant tolerate racially discriminatory behavior
7   at Logan Park Apartments, and due to Mr. Huskey's repeated offenses, my staff and I were
8   compelled to begin the eviction process against Mr. Huskey for his safety and the safety of other
9   residents and staff.

10      20.     After informing Mr. Huskey of Logan Park Apartment's intent to evict him, I
11  presented Mr. Huskey with the option of vacating the premises without an eviction so that his
12  Housing Choice Voucher would not be jeopardized. It is my understanding that a Section 8 tenant
13  who is evicted may lose his Section 8 Program eligibility.

14      21.     In the ten days Logan Park Apartments gave him to respond to the eviction notice,
15  Mr. Huskey informed me that he wished to avoid the eviction. On or about May 13, 2015, Mr.
16  Huskey gave notice to Logan Park Apartments that he would be terminating his tenancy. Attached
17  as Exhibit 8 is a true and correct copy of a 30 Day Notice of Resident's Intent to Vacate signed by
18  Mr. Huskey.

19      22.     Mr. Huskey moved out of Logan Park Apartments on or about May 31, 2015.

20      I declare under penalty of perjury under the laws of the United States of America that the
21  foregoing is true and correct and that this declaration was executed on September 8, 2017, at
22  Sacramento, California.

23

24                                          _____
25                                          Warren Smith
                                                            9/8/17
26

27

28

4853-0351-3678.1                                    5                    2:15-cv-00799-KJM-DB
DECLARATION OF WARREN SMITH IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR
                              CLASS CERTIFICATION

# EXHIBIT 5



# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321*

This agreement is made in Sacramento, CA  between,  Logan Park hereinafter called Owner, by Wasatch Management Management, its authorized agent, and
Lease Holder(s):

**Roy Huskey**

Authorized Occupant(s):

**Melissa Huskey (Dependant),**

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.  TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 06/30/2011,  and Terminating 06/29/2012 .  Reference paragraph XVII of this Residential Rental Agreement.  The total rent for this 12  month and 0 day tenancy is 10,428.00.

**II.  PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at:  4141 Palm Avenue #191, Sacramento, CA  95842

**III.  LOW-INCOME HOUSING CREDIT**

The premises are to be operated in accordance with the requirements of the low-income housing credit Program under Section 42 of the Internal Revenue Code of 1986, as amended (the "Program"). Resident's rights hereunder will be subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of the Landlord's tax credit. The Resident will cooperate with all LANDLROD requirements related to such compliance and the Program.

*Initials*

**IV.  RENT**

The rental for the premises is 869.00  per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4215 Palm Ave, Sacramento, CA, 95842.
The Landlord and Tenant have entered into a housing assistance payments (HAP) contract with the local public housing authority (PHA) pursuant to the Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of the tenants rent to the Landlord on behalf of the Tenant. So long as the hap contract remain in effect, the Tenant is not responsible for this portion of the rent. The additional terms and conditions of the parties rental obligations are set forth as follows:
1. Section 8 Rent:
   A.  The total contract rent shall be $869.00 per month;
   B.  Of the total contract rent, $369.00 shall be payable to the Landlord by the Tenant(s) each month as the Tenant's net family contribution; the remaining balance of $500.00 shall be payable to the Landlord by the local housing authority for as long as the HAP contract remains in effect.
2. Section 8 Rent adjustments: The amount of assistance that HUD pays on behalf of the Tenant may be changed during the term of the lease if: (1) HUD or the PHA determines, in accordance with HUD procedures, that an increase in rents is needed; (2) HUD or the PHA changes any allowance for utilities or services considered in computing the Tenant's share of the rent; (3) the income, the number of persons n the Tenant's household or other factors considered in calculating the Tenant's rent change and HUD procedures provide that the Tenant's rent or assistance payment be adjusted to reflect the change; (4) changes in the Tenant's rent or assistance payment are required by HUD's recertification or subsidy termination procedures; (5) HUD's procedures for computing the Tenant's assistance payment or rent change; (6).the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord or PHA.

The Rental Office can be reached by phone at (916)-344-4494.  Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends.  In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop.  All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent.  Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

*Initials*

   A.  The sum of $28.97 upon execution of this Rental Agreement as rent for the period beginning 06/30/2011, through 06/30/2011 payable on 06/30/2011.

   B.  The sum of $869.00, is due on the first day of each calendar month commencing July 2011.

   C.  A concession in the amount of 35.00  is to be given to Resident as part of this 12 month(s) lease and will be issued as $35.00  off move in. The  35.00 concession is due and payable back to Logan Park if the 12 month lease is not fulfilled for any reason.

   D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs. The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas.  In such event,  Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment.  Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be  obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

WAS000328

**V. CHANGES IN RESIDENT'S SHARE OF RENT**

The Resident agrees that the amount of rent the Resident pays may be changed during the term of the Agreement if:

A. The Contract Administrator determines, in accordance with Program procedures, that an increase in rent is needed;

B. The Contract Administrator changes any allowance for utilities or services considered in determining the Resident's rent;

C. The income, the number of persons in the Resident's household or other factors considered in determining the Resident's

D. The procedures for determining the Resident's rent change; or

E. The Landlord agrees to implement changes in the Resident's rent only in accordance with the time frames and administrative procedures set forth in instructions and regulations related to administration of the Program. The Landlord agrees to give the Resident at least thirty (30) days advance written notice of any increase in the Resident's rent, except as noted in paragraph 12. The Notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

**VI. EXCESS RENTS**


Initials

If it is determined that the premises are not a qualified low-income unit because the rent paid by the Residents, plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed LIHTC code, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

**VII. PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**VIII. LATE CHARGES**


Initials

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount of $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 12:01 a.m. on the 4th day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 3rd day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 25.00. In the event Resident fails to pay rent on or before 12:01 a.m. on the 4th day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment by cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**IX. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Initials

Resident shall pay Owner, upon execution of this agreement, a security deposit of $299.00 . Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

**X. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use  3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

WAS000329

 

**XI.    USE OF THE PREMISES**

A.    The premises are rented for residential use only and shall be occupied by not more than 2 occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they sign this lease.  Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.



B.    Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered.  Reptiles or exotic pets are not allowed.

C.    Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.



D.    Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law,  **California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies** covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.    Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.    **Harassment or Threats:**  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.    **Nuisance and Waste:**  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**XII.    RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

**XIII    UTILITIES**



Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in  **Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.**  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  **Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.**  It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.
Resident shall pay for the following utility services.

_____  gas,                            Account # _____
__X__  electricity,                    Account # _JSV 3C4C_____
_____  water/sewer/trash        See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges

Resident agrees to pay for all utilities, services, and charges, if any, made payable by or predicated upon occupancy of residence including telephone, electricity and satellite or cable television. Resident is responsible for having utilities turned on in their name no later than the day of move in.

**XIV.    INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

WAS000330

**XV.   DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XVI. LIABILITY INSURANCE**





I understand that any property or liability insurance coverage purchased by the property manager or owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to my personal property or belongings or protect against any loss or damage resulting from my actions or omissions and/or my family and/or guest's actions or omissions. I also understand that, by not having renter's or personal liability insurance of my own, I will be liable to third parties and to the property owner for certain losses and understand that I should not expect the property manager or owner to be responsible for such losses. Owner and manager recommend that every resident maintain renter's insurance coverage, at all times.

( X ) **I WILL PURCHASE RENTERS INSURANCE COVERAGE.**
    I recognize my need for insurance and want to take advantage of the program made available to residents.

(  )  **I HAVE RENTERS INSURANCE COVERAGE.**
    I have and will maintain throughout the term of my lease the following coverage

(  )  **I DO NOT HAVE RENTERS INSURANCE COVERAGE.**
    Although I recognize my need for renter's insurance, I will not at this time, be obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers, owners or third-party's property as a result of my actions or my family's actions.

**XVII.  WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:





A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy.  If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft
C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D   The Actions or omissions of other Residents
E.  Interference with light, view or other intangible aspects of the premises.
F.  Operations in construction of any public or quasi-public work
G.  Any latent defect in the building(s)
H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.
I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure proper insurance to protect himself against losses occasioned during the term of this agreement.
K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**XIX.   RECERTIFICATION**

Every year on or about the 1st day of _2 - 1 - 12_ the Landlord will request the Resident to report the income and composition of the Resident's household and to supply any other information required for the purposes of determining the Resident's continued Program eligibility.  The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request.  The Landlord will verify the information supplied by the Resident and use the verified information to determine Program eligibility.  You agree that all information supplied by you shall be subject to inspection by representatives from the Tax Credit Allocation Committee.

A.  If the Resident does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may require resident to vacate premises.  The Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.
B.  The Resident may request to meet with the Landlord to discuss any changes resulting from the recertification processing.  If the Resident requests such a meeting, the Landlord agrees to meet with the Resident and discuss how the Resident's continued Program eligibility was determined.

WAS000331

 

**XX. REPORTING CHANGES BETWEEN RECERTIFICATION**


Initials

The Residents shall notify the Landlord immediately in writing, if the household size changes, his or her income increases, Resident(s) become a full time student, or begins to receive HUD assistance. The Landlord may elect not to renew this Lease if the Resident becomes a student and the Landlord determines that the Resident's student status would disqualify the premises under the Program. The Landlord may adjust the Resident's rent and or utility allowance to reflect the Resident's status if the Resident becomes a HUD-assisted Resident.

**XXI. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, at one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 869.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XXII. NOTICE TO QUIT**


Initials

TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty day's rent will be billed as liquidated damages for improper thirty day notice. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XXIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**


Initials

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XXIV. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XXV. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXVI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXVII. LESSEE'S REPRESENTATIONS TO LESSOR**

Lessee represents and warrants that all information provided to Lessor, including the information provided in the application for the rental of the Apartment (the "Application), is true, complete and correct. If any information Lessee provides to Lessor is determined to be false, Lessee will be in breach of this Lease. Lessee understands and agrees that the Application is hereby made a part of the Lease, and a breach of any representations or warranties in the Application shall be a breach of this Lease.

**XXVIII. PENALTIES FOR SUBMITTING FALSE INFORMATION**

If the Resident deliberately submits false information regarding income, family composition or other data on which the Resident's eligibility is based, the Landlord may require the Resident to vacate.

**XXIX. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXX. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.
Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.
In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXXI. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

WAS000332



**XXXII. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

**XXXIII. CRIMINAL BACKGROUND INVESTIGATION**

By signing this Lease, Lessee represents that neither Lessee nor any occupant of the Apartment has, during the past five years, been convicted of any felony or misdemeanor involving sexual misconduct or a controlled substance, and that to the best of Lessee's knowledge, neither Lessee nor any occupant of the Apartment is subject of a criminal investigation or arrest warrant.  Lessee hereby authorizes Lessor to perform a criminal background investigation of Lessee or any occupant of the Apartment in the event Lessor, in its sole discretion, has reason to believe that Lessee or any occupant is engaged in criminal activity in the Apartment or at the Apartment Community.

_____            6-30-11
Roy Huskey(Lessee)                               Date

_____
N/A                                                            _____
Melissa Huskey                                        Date


_____            6-30-11
Owner Authorized agent                         Date

WAS000333

 

**ADDITIONAL SERVICES AGREEMENT**                          Apartment # t0044875

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Logan Park  (hereinafter the "Community") and Roy Huskey (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein.  This Agreement is a part of that certain Residential Rental Agreement, dated 06/30/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

Property:                                                                                    Monthly Charge

| | | |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | $50.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | $0.00 |
| Reserved Covered Parking | Space Number | $0.00 |
| Reserved Uncovered Parking | Space Number | $0.00 |
| Enclosed Private Garage | Space Number | $0.00 |
| Renter's Insurance(This is available as a pay with rent option) | | $15.58,  or |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | $0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $65.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $65.58 |

**Fees:**

| | | |
|---|---|---|
| Lease Initiation Fee       (if applicable) | | $0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | $0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | $0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

Payment:  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed.  I have read the foregoing and acknowledge the contents thereof, dated 06/30/2011 LD303.01 Revised 07/15/2008

_____        6-30-11
Roy Huskey(Lessee)                      Date

_____N/A_____        _____
Melissa Huskey                          Date

_____        6-30-11
Owner Authorized agent                  Date

www.isyourhome.com                              Page 9 of 28

WAS000335



**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.



WAS000338



16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns.  This Agreement shall be governed by and construed in accordance with the laws of the State of .  This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof.   No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance.  Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements.  No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time.  The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount.  All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly.  The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_____          6-30-11
Roy Huskey(Lessee)                                    Date

_____N/A_____          _____
Melissa Huskey                                            Date

_____          6-20-11
Owner Authorized agent                             Date

LD303.01 Revised 7/15/08

WAS000339

## SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
## HOUSING CHOICE VOUCHER PROGRAM
### Lease Supplemental Agreement

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

1. PARTIES TO THE AGREEMENT DEFINED:

   As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

   a. Tenant   **ROY HUSKEY III**                            Tenant #    **t0018323**

   b. Owner    **LOGAN PARK APARTMENTS**                      Vendor #    **004359p**

2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:

   **ROY L. HUSKEY III**                    **MELISSA HUSKEY**

3. UNIT ADDRESS: **4141 PALM AVE 191**
                  **SACRAMENTO, CA  95842**

4. INITIAL LEASE TERM:   Begins   **7/8/2011**  and ends  **6/30/2012**

5. INITIAL CONTRACT RENT:   **$840.00**   INITIAL TENANT RENT:   **$286.00**

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by **"Owner"**. The tenant shall provide or pay for the utilities or appliances indicated below by **"Tenant"**. Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|------|---------|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Refrigerator | Owner |
| Sewer | Owner |
| Trash Collection | Owner |
| Water | Owner |

| | | |
|---|---|---|
| _(signature)_ | 916 - 470-8488 | 7-9-11 |
| ROY HUSKEY III | Telephone Number | Date |
| _(signature)_ | (916) 344 4494 | 7/9/11 |
| Owner / Agent | Telephone Number | Date |

WAS000374



**TENANCY ADDENDUM**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program** (To be attached to Tenant Lease)

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169
Exp. 04/30/2014

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.
   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. Maintenance
   (1) The owner must maintain the unit and premises in accordance with the HQS.
   (2) Maintenance and replacement (including

form HUD-52641-A (8/2009)
ref Handbook 7420.8

WAS000375



e. **Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public

housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**
(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9. **Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

10. **PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11. **Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

12. **Security Deposit**
a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

form HUD-52641-A (8/2009)
ref Handbook 7420.8

WAS000376



**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

## Part A of the HAP Contract: Contract Information
(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   ROY HUSKEY III

3. **Contract Unit**

   4141 PALM AVE 191
   SACRAMENTO, CA  95842

4. **Household**
   The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.
   ROY L HUSKEY III
   MELISSA  HUSKEY

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): **07/08/2011**
   The initial lease term ends on (mm/dd/yyyy): **06/30/2012**

6. **Initial Rent to Owner**
   The initial rent to owner is: $840
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $554 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is  subject to change during the HAP contract term in accordance with HUD requirements.

---

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000377

**8.    Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T".  Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
|---|---|---|
| | Owner | Tenant |
| Air Conditioning | | T |
| Cooking Oil/Electric | | T |
| Flat Fee Electric | | T |
| Heating - Oil/Electric | | T |
| Other Electric | | T |
| Refrigerator | O | |
| Sewer | O | |
| Trash Collection | O | |
| Water | O | |

**Signatures**
**Public Housing Agency: SHRA County of Sacramento Housing Authority**

Print or Type Name of PHA
_Sun Mie_

Signature
_SILVERIO RAMOS_

Print or Type Name and Title of Signatory
_07 · 18 · 11_

Date (mm/dd/yyyy)

**Owner:  LOGAN PARK APARTMENTS**

Print or Type Name of Owner
_Raylene Jeffery_

Signature
_Raylene Jeffery    Asst Manager_

Print or Type Name and Title of Signatory
_7/9/11_

Date (mm/dd/yyyy)

**Mail Payments to:**

LOGAN PARK APARTMENTS

Name

4215 PALM AVE - OFFICE
C/O WASATCH PROPERTY MGMT
SACRAMENTO, CA  95842

Address (Street, City, State, Zip)

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000378

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

**Part B of HAP Contract: Body of Contract**

**1. Purpose**

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

**2. Lease of Contract Unit**

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all   provisions of the tenancy addendum.
(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
(3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

**3. Maintenance, Utilities, and Other Services**

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

**4. Term of HAP Contract**

a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. **When HAP contract terminates.**

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
(3) If the family moves from the contract unit, the HAP contract terminates automatically.
(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

---

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000379



(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. **When paid**

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000380

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9.  Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10.  Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11.  PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12.  Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

WAS000381

## 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

## 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

## 15. Foreclosure.
In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

WAS000382



**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

WAS000383

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.
   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**
      (1) The owner must maintain the unit and premises in accordance with the HQS.
      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

---

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000384



b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

   (a) Pay for any utilities that are to be paid by the tenant.
   (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

   (1) Serious or repeated violation of the lease;
   (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
   (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
   (4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**
   (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

   (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
   (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
   (c) Any violent criminal activity on or near the premises; or
   (d) Any drug-related criminal activity on or near the premises.

   (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

   (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
   (b) Violating a condition of probation or parole under Federal or State law.

   (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
   (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**
   (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
   (2) During the initial lease term or during any extension term, other good cause may include:

   (a) Disturbance of neighbors,
   (b) Destruction of property, or
   (c) Living or housekeeping habits that cause damage to the unit or premises.

   (3) After the initial lease term, such good cause may include:

   (a) The tenant's failure to accept the owner's offer of a new lease or revision;
   (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
   (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

   (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

   (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

e. **Protections for Victims of Abuse.**
   (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
   (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

WAS000385



(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

**f.   Eviction by court action.** The owner may only evict the tenant by a court action.

**g.   Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9.   Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a.   The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.   When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.   The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.   If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

WAS000386



## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

   (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;
   (2) If there are any changes in lease provisions governing the term of the lease;
   (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000387

EXHIBIT 6



## THREE DAY NOTICE TO PERFORM COVENANT
## OF LEASE OR QUIT

To: Roy Huskey III

**and ALL TENANTS, SUBTENANTS, AND ALL OTHERS IN POSSESSION** of the premises above
NOTICE IS HEREBY GIVEN that you are in breach of the lease agreement under which you
hold possession of the premises 4141 Palm Ave. #191, Sacramento, Ca. 95842.

Your lease provides under Paragraph VIII (c). that:

> **...Resident shall not disturb, annoy, endanger or inconvenience other
> residents or neighbors, nor use the premises for any immoral or unlawful
> purpose, nor violate any law or ordinance nor commit waste or nuisance
> upon or about the premises, nor shall Resident allow any guest to do so.**

**It has been reported to the office of Logan Park that you and or your daughter playing
loud music, playing instruments and other loud noise that start around 11:45 at night.
This is a violations of your lease.**

April 22, 2015                    Manager for Owner _____

I, the undersigned, being at least 18 years of age, served this notice, of which this is a true copy, on
_____, one of the occupants listed above as follows:

[ ] On _____, _____, I delivered the notice to the occupant personally.

[ ] On _____, _____, I delivered the notice to a person of suitable age and discretion at the
occupant's residence/business after having attempted personal service at the occupant's residence, and business,
if known. On _____, _____, I mailed a second copy to the occupant at his or her residence.

[ ] On _____, _____, I posted the notice in a conspicuous place on the property, after having
attempted personal service at the occupant's residence, and business, if known, and after having been unable to
find there a person of suitable age and discretion. On _____, _____, I mailed a second copy to
the occupant at the property.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


_____
Signature

Dated: _____

WAS000430

EXHIBIT 7

May 13 - 2015

I Chrodo Harris SR. Moved in to Apt.190 @ Logan Park. Shortly After Moving In. ~~the~~ Apt.191 (Upstairs) Apt. Starts With a Music disturbance.

I Ask them to be a little Lower. The guy ask for Me to Speck to his daughter. ("I Told her We have little Kids and they need there Sleep.) After that, they have Cont. With Stamping, loud banging, Music. I Confronted Them ~~him and his daughter and self~~ They have done Nothing but bey Rude and Racies towards My Wife and Self.

Few Nights ago I caught him taking pics of My Son [7yr old] at My front door. I Confort him by asking "What's Wrong With you"? After that he and daughter Stood on Balcony and called us all type of Niggas & Bitches.

WAS000423

May 13, 2015

On March 27, 2015 was the day I moved in and been having issuse with unit # 190. Shortly after moving in there was loud noise, and music. Husband went and talked to the dad about the noise & music, He asked my husband to speak to the daughter because he couldn't control her, and that is who was making the noise & playing the music. There was also a lot of bumping. This is an everyday thing. We have been called all type of niggga's, Bitches, & stupid nix When I had company he makes them feel very uncomfortable by loud bumping, slamming of front door, & loud music. He has treating to use a teaser towards us. He has went around the apartment Complex talking bad about my family saying we are bad people, we don' take care of our kids. He has also shown people around the apartment Complex pictures of me & my family. Just on the other night my husband caught him looking inside my home and taking a picture of my son. He always taking pictures & recording my family. He never record what him or his daughter does. We have ask multiple times for them to stop the loud noise and all we have got was rudeness, been called names, and niggga's.

Deanna Weathersby

EXHIBIT 8

## 30-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

To:  Wasatch Property Management and  Logan Park          £00 18323

As of, <u>05/13/2015</u> hereafter referred to as Notice Date, the undersigned Resident(s), Roy Huskey III intends to terminate residency of the premises located at: <u>4141 Palm Avenue #191, Sacramento, CA 95842</u> as of  <u>06/12/2015, by 10:00 am,</u> at which time a final walk through inspection will be completed.  If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated <u>11/26/2014</u>, that if Resident chooses to terminate the current lease prior to lease end date of <u>05/25/2015</u>, they may:

   <u>X</u>         Pay the remaining balance of the Lease Term, in monthly payments of <u>865.00</u> due and payable on or before the 1st day of each month up until the lease end date of <u>05/25/2015</u> or reoccupancy date, whichever occurs first and be eligible for a refund in the event the apartment is re-leased prior to <u>05/25/2015</u>.

   \_\_\_\_         Pay a Lease Cancellation fee of <u>865.00</u> and eliminate all rent liability for the remaining term of the Lease.

_____  **A Pre-Move Out Inspection will be conducted within 7 Days of 05/13/2015 at your apartment.  This inspection has been scheduled for**
Initials    _____ at _____(am/pm).  **You do not need to be present for this inspection.**

1.  It is further understood as follows:
    a.  That this 30-Day Notice is required per your signed Rental Agreement.
    b.  Except as provided by law, rent shall be due and payable up to and including the date of termination or
       thirty(30) days after the service of the notice of 05/13/2015, whichever is later.
    c.  If all keys are not returned by <u>06/12/2015 at 10:00 am</u> the resident shall be considered in occupancy of the premises without the permission of the owner.
    d.  **If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be responsible for the payment of rent from the termination date stated in the notice to the Resident's actual move out date.**
    e.  Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and Logan Park.
    f.  **A move out condition inspection will be conducted <u>06/12/2015</u>.  You are encouraged to be present during the move out inspection.**

2.  A final account statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the premises and subsequent move-out inspection by Logan Park .

### RESIDENT'S FORWARDING ADDRESS (PLEASE PRINT)

Name: _____

Street Address: _____

City: _____    State: _____    Zip Code: _____

Email Address: _____

Primary Phone: _____    Secondary Phone: _____

Reason for Move: <u>Personal</u>

|  |  |  |
|---|---|---|
| Current Account Balance | $ | (17.68) |
| Rent Charges through Move Out Date of  <u>06/12/2015</u> | $ | 346.00 |
| Additional Services through Move out Date of  <u>06/12/2015</u> | $ | 33.26 |
| Concession Charge Back *(if lease term is not being fulfilled)* | $ | $0.00 |
| Lease Cancellation Fee *(if applicable by above stated dates)*: | $ | 0.00 |
| Taxes of 0.00% *(If Applicable)* | $ | $0.00 |
| Total Due at Time 30 Day Notice of Resident's Intent to Vacate: | $ | $361.58  * |
| Plus Utilities Billing Prorate Provided by Owners Agent | $ | _____ |

*\* The balance shown is due and payable, via Electronic Funds, Money Order or Cashier's Check, to Logan Park at time 30 Day Notice of Resident's Intent to Vacate is given.  This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out inspection by owner's authorized agent.*

_____     _____
Resident Signature                                    Resident Signature

Owner's Authorized Agent              Receipt of the above notice is hereby acknowledged <u>5/13/2015</u>
                                    Copy to Resident--Original in Resident File--LD315.01.CA Revised  11/12/2013



WAS000421