1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
2     E-Mail: Joe.Salazar@lewisbrisbois.com
YOON-WOO NAM, SB# 284644
3     E-Mail: Yoon-Woo.Nam@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
4  Sacramento, California 95833
Telephone: 916.564.5400
5  Facsimile: 916.564.5444

6  Attorneys for Wasatch Advantage Group, LLC;
Wasatch Property Management, Inc.; Wasatch
7  Pool Holdings, LLC, Chesapeake Commons
Holdings, LLC; Logan Park Apartments, LLC;
8  Logan Park Apartments, LP

9

10              **UNITED STATES DISTRICT COURT**

11            **EASTERN DISTRICT OF CALIFORNIA**

12               **SACRAMENTO DIVISION**

13

14  UNITED STATES OF AMERICA, ex rel.          CASE NO. 2:15-cv-00799-KJM-DB
DENIKA TERRY and ROY HUSKEY III,
15  and each of them for themselves individually,   **DECLARATION OF JOSEPH A.**
and for all other persons similarly situated and   **SALAZAR, JR. IN SUPPORT OF**
16  on behalf of the UNITED STATES OF          **DEFENDANTS' OPPOSITION TO**
AMERICA,                                    **MOTION FOR CLASS CERTIFICATION**
17
            Plaintiffs/Relators,             Date:      September 22, 2017
18                                            Time:      10:00 a.m.
            vs.                               Crtrm.:    3, 15th Floor
19
WASATCH ADVANTAGE GROUP, LLC,              The Hon. Kimberly J. Mueller
20  WASATCH PROPERTY MANAGEMENT,
INC., WASATCH POOL HOLDINGS, LLC,          Trial Date:      None Set
21  CHESAPEAKE COMMONS HOLDINGS,
LLC, LOGAN PARK APARTMENTS, LLC;
22  LOGAN PARK APARTMENTS, LP,

23          Defendants.

24

25      I, Joseph A. Salazar Jr., declare as follows:

26      1.      I am an attorney duly admitted to practice in The United States District Court,

27  Eastern District of California and I am a partner with Lewis Brisbois Bisgaard & Smith LLP,

28  attorneys of record for Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.;

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments,

2  LLC; Logan Park Apartments, LP herein. The facts set forth herein are of my own personal

3  knowledge, and if sworn I could and would competently testify thereto.

4          2.      Attached herein as Exhibit 9 is a true and correct copy of excerpts from the

5  deposition transcript of Plaintiff Denika Terry taken in Los Angeles, California on Monday, June

6  19, 2017.

7          3.      Attached herein as Exhibit 10 are excerpts from the deposition transcript of

8  Plaintiff Roy Hukey, III taken in Sacramento, California on Tuesday, August 8, 2017.

9          I declare under penalty of perjury under the laws of the State of California that the

10  foregoing is true and correct and that this declaration was executed on September 8, 2017, at

11  Sacramento, California.

12

13                                                    /s/ Joseph A. Salazar, Jr.
                                                      Joseph A. Salazar, Jr.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



DECLARATION OF JOSEPH A. SALAZAR JR. IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION
FOR CLASS CERTIFICATION

# EXHIBIT 9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| UNITED STATES OF AMERICA, ex ) rel. DENIKA TERRY and ROY ) HUSKEY III; and each of them ) for themselves individually; ) and for all other persons ) similarly situated and on ) behalf of the UNITED STATES OF ) AMERICA ) ) Plaintiffs, ) ) VS. ) WASATCH ADVANTAGE GROUP, LLC, ) et al, ) ) Defendants. ) _____) | No. 2:15-CV-000799-KJM-DB |

DEPOSITION OF DENIKA TERRY

LOS ANGELES, CALIFORNIA

MONDAY, JUNE 19, 2017




REPORTED BY:
LINDA D. WHITE

CSR NUMBER 12009

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 5 of 25

DENIKA TERRY
June 19, 2017

---

Page 2

```
 1              DEPOSITION OF DENIKA TERRY, taken
 2         on behalf of Defendants, at
           5757 West Century Boulevard,
 3         Suite 718, Los Angeles, California,
           on Monday, June 19, 2017, at
 4         10:37 a.m., before Linda D. White,
           CSR Number 12009 pursuant to
 5         Notice.

 6

 7

 8  APPEARANCE:

 9     FOR THE PLAINTIFFS:

10       LAW OFFICES OF ANDREW WOLFF, PC
         BY:  DAVID LAVINE, ESQUIRE
11       1956 Webster Street
         Suite 275
12       Oakland, California  94612
         510.834.3300
13       david@awolfflaw.com

14

15     FOR THE DEFENDANTS:

16       LEWIS BRISBOIS
         BY:  JOSEPH A. SALAZAR, JR., ESQUIRE
17       2020 West El Camino Avenue
         Suite 700
18       Sacramento, California  95833
         916.646.8201
19       joe.salazar@lewisbrisbois.com

20

21

22

23

24

25
```

---

Page 3

```
 1                 I N D E X

 2  WITNESS           EXAMINATION           PAGE

 3  DENIKA TERRY      BY MR. SALAZAR        4, 239

 4                    BY MR. LAVINE         234

 5

 6              E X H I B I T S

 7
    DEFENDANTS EXHIBITS                     PAGE
 8
    Exhibit 1    Notice of Deposition        41
 9
    Exhibit 2    Plaintiff's Responses to    41
10               Defendant's Interrogatories

11  Exhibit 3    First Amended Class Action 108
                 Complaint
12
    Exhibit 4    Letter from Chesapeake Commons 182
13               Apartments dated 12/12/2012

14  Exhibit 5    Eviction Notice            188

15  Exhibit 6    Notice of Returned Check dated 195
                 10/20/2011
16
    Exhibit 7    Settlement and Compromise  199
17               Agreement dated June 3, 2016

18  Exhibit 8    Complaint                  200

19

20

21

22

23

24

25
```

---

Page 4

 1   LOS ANGELES, CALIFORNIA MONDAY, JUNE 19, 2017
 2          10:37 A.M.
 3
 4        DENIKA TERRY,
 5     having been first duly sworn, was
 6     examined and testified as follows:
 7
 8         **EXAMINATION**
 9  BY MR. SALAZAR:
10     Q.   Would you state your full name for the record,
11  please.
12     **A.   Yes, sir.  It's Denika Gisgle Terry,**
13  **D-E-N-I-K-A; Gisgle, G-I-S-G-L-E; Terry, T-E-R-R-Y.**
14     Q.   Ms. Terry, we had an opportunity to meet just
15  briefly before the deposition.  Again, my name is
16  Joe Salazar.  I represent the defendants in this case,
17  and I'll be taking your deposition here today.
18     **A.   Okay.**
19     Q.   Have you ever had your deposition taken
20  before?
21     **A.   Yes, sir.**
22     Q.   On how many occasions?
23     **A.   Well, four -- four or five.  Approximately,**
24  **throughout the years, about four or five.**
25     Q.   Okay.  When was the last time your deposition

---

Page 5

 1  was taken?
 2     **A.   Last year, November 2016.**
 3     Q.   Okay.  What was the nature of that case?
 4     **A.   That case is ended.  We're no longer doing**
 5  **that case now.  It's done.**
 6     Q.   What was the type of case?  What was involved?
 7     **A.   It was involving me being put out of my unit.**
 8  **It was a hold on Section 8 tenants and movers for --**
 9  **till they gave the okay for any tenants to move.  It was**
10  **basically a hold for the whole, you know, tristate areas**
11  **in California.**
12          **There was no tenants to be able to move.  It**
13  **was basically a freeze of any Section 8 tenants to be**
14  **moved or asked to move without them notifying their**
15  **worker or notifying the tenant and so forth.**
16          **And so when that happened to me, I didn't even**
17  **get -- basically I was just put out.  That's all I can**
18  **say.  I didn't have no other reasoning.  No, nothing.**
19  **Just out, you know.**
20     Q.   Okay.  So you were evicted; is that correct?
21     **A.   They said that I did not -- I got evicted for**
22  **not paying rent, and that was not the case because I had**
23  **proof of rent.  And we walked inside and made sure that**
24  **the rent was paid.  And I had just proof of the rent**
25  **being paid, but we doublechecked with my mom.**

---

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

DENIKA TERRY
June 19, 2017

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 6 of 25

Page 18

1    that for a while.
2        Q.   Okay.  Do you have a permanent residence right
3    now?
4        A.   No, I don't.
5        Q.   And where is it that your mother currently
6    lives?
7        A.   She stays at 13533 Lemoli, L-E-M-O-L-I,
8    Avenue, Hawthorne, California 90250.  And that's
9    Apartment 11.
10       Q.   Is there a name of that apartment complex?
11       A.   No, they don't have a name.
12       Q.   And you have two daughters, I believe; is that
13   correct?
14       A.   Yes.
15       Q.   And they are -- what are their names?
16       A.   Mikole and Mikiyah.
17       Q.   And how old is Micole?
18       A.   Mikole just turned nine and Mikiyah just
19   turned 17.
20       Q.   When was the last time that you had a
21   permanent address?
22       A.   Not since Chesapeake.
23       Q.   Okay.  And that was November of 2016?
24       A.   Approximately 2015.
25       Q.   So the last time you had a permanent address

Page 19

1    was November of 2015?
2        A.   Actually, I will take March 19th, 2015.  It
3    was actually my daughter's fifth birthday.  They were
4    being basically thrown out.  And that's what they got
5    really firm, you know.
6        Q.   Okay.  So you left the Chesapeake apartments
7    on March 19th of 2015; is that correct?
8        A.   Yes, sir.
9        Q.   And you have not had a permanent address since
10   that time; is that correct?
11       A.   No, sir.
12       Q.   Is that a correct statement?
13       A.   Yes, sir.
14       Q.   Okay.  That's an example of where it was kind
15   of ambiguous so we cleared that up.
16       A.   Thank you.
17       Q.   Okay.  What was the reason that you came to
18   Hawthorne?
19       A.   My kids were here.
20       Q.   Once you left the Chesapeake apartments, at
21   that point did your kids go to move with your mom here?
22       A.   Actually, they left with my mom to here.  My
23   sister sent for them to come here.  And so I had to wait
24   to figure out where I was going because my sister didn't
25   have -- excuse me -- didn't have room to take me.

Page 20

1        Q.   Okay.  What was your sister's name?
2        A.   Keyanna.
3        Q.   And what is Keyanna's last name?
4        A.   Sorrelle.
5        Q.   Can you spell that, please.
6        A.   S-O-R-R-E-L-L-E.
7        Q.   And does Keyanna live at the Lemoli Avenue
8    apartment address?
9        A.   No.
10       Q.   Where does Keyanna live?
11       A.   Hawthorne.
12       Q.   And what's the address there?
13       A.   It is 1322 West 164th Street.  Excuse me.
14   that's Gardena, California 90247.
15       Q.   Okay.  Does your mom live alone -- strike
16   that.
17            Does your mom live with your two daughters
18   only at the Hawthorne address?
19       A.   Yes.
20       Q.   And do you occasionally live there with her?
21       A.   No.
22       Q.   Have you asked to live there with her?
23       A.   Yes.  I can't.
24       Q.   And why can't you?
25       A.   Because my mother is also a Section 8 tenant.

Page 21

1        Q.   And I take it if you're not listed as one of
2    the inhabitants, you can't live there?
3        A.   Yes.
4        Q.   Have you tried to get on that Section 8 list
5    with your mother so you can live there?
6        A.   Yes.
7        Q.   And do you know why that hasn't been granted?
8        MR. LAVINE:  Objection.  Calls for speculation.
9            You can answer, if you know.
10       THE WITNESS:  Because my mother is older, which
11   means that she's, you know, pay -- it will increase her
12   money as far as her rent -- increase to where she stays,
13   and my mother has a fixed income.  And so I can't -- I
14   could not put that much pressure on my mother as well as
15   her taking care of my kids already is hard.  So I rather
16   had me be out than have my kids, you know, travel around
17   with me with nowhere to go.  So I chose just to try to
18   follow my way around.
19   BY MR. SALAZAR:
20       Q.   Okay.  And since you moved down -- when did
21   you move down to Hawthorne?
22       A.   It was January of 2016.  It was actually
23   December 2015.  We got here and spent the New Year here.
24       Q.   Did you grow up somewhere around the Hawthorne
25   area?

UNITED STATES OF AMERICA vs.                                      DENIKA TERRY
WASATCH ADVANTAGE GROUP, LLC                                      June 19, 2017

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 7 of 25

Page 22

1    A.  No.
2    Q.  Do you have any friends or relatives other
3  than your sister and your mother in the Hawthorne area?
4    A.  No.
5    Q.  How was it you have a place to stay?
6    A.  I don't.  I just -- if I have a friend that
7  will let me stay, you know, a week.  Sometimes I can
8  stay a month.  Just depends.  Or if I have a way to get
9  me a room and I will do that, you know, just so I can
10  have my kids come be with me.  But I'm just trying to
11  maintain myself this whole time.
12    Q.  Okay.  Are you presently employed?
13    A.  No, I'm not.
14    Q.  When was the last time you were employed?
15    A.  It was in November of 2014.
16    Q.  And what did you do up until November of 2014?
17    A.  I was at home with my children.
18    Q.  In terms of employment, was the last time you
19  worked November of 2014?
20    A.  Yes, sir.
21    Q.  Okay.  And where were you working at that
22  time?
23    A.  I was working for My Goods Market.  M-Y Goods
24  store, formerly known as Circle K.
25    Q.  And where was that located?

Page 23

1    A.  It's in Rancho Cordova.
2    Q.  Is that the one right off the freeway?
3    A.  Yes, sir.
4    Q.  Is that -- it's not Watt, is it.  W-A-T-T.
5    A.  It is Folsom Boulevard and Mather Field.
6    Q.  It's across from that sports complex there?
7    A.  Yes.
8    Q.  Okay.  That was within walking distance of the
9  Chesapeake facility?
10    A.  Yes.
11    Q.  How come you stopped working?
12    A.  I had to basically stop because the situation
13  that was going on at the apartments and everything they
14  were putting me through.  I couldn't work, function.  So
15  I just resigned from my job, and I had to just figure
16  out what I was going to do from that point on because I
17  had my children.  They were in school.  So I really had
18  to resign because it was causing me a lot of emotional
19  issues.
20    Q.  The job was causing you the issues?
21    A.  No.  That's just, you know, that's every day.
22  But more so of me going through, having to be gone,
23  don't know what I'm going to do next, you know, where
24  I'm going to go with my kids.  It was a lot because
25  prior to that, my father had passed.  So it was

Page 24

1  emotionally a lot for me.  It was very hard.
2    Q.  Did you ever obtain a doctor's note or a
3  doctor's request that you stop working?
4    A.  No, sir.
5    Q.  Can you tell me about your educational
6  background.
7    A.  I have a high school diploma.  I was able to
8  obtain my associate's for criminal justice and medical
9  coding and billing.
10    Q.  What high school did you graduate from?
11    A.  I graduated from Hiram Johnson High School.
12    Q.  Is that the one by Florin Road?
13    A.  Yes.
14    Q.  And what year?
15    A.  '94.
16    Q.  Okay.  And then did you get an AA certificate?
17    A.  Yes.
18    Q.  Okay.  And where did you obtain that
19  Associates of Arts certificate?
20    A.  For medical billing and coding.
21    Q.  From what school?
22    A.  San Joaquin Valley College.
23    Q.  Where's that located?
24    A.  It is in Zinfandel, which is in Rancho
25  Cordova, California.

Page 25

1    Q.  Okay.  And when did you obtain that degree?
2    A.  It was a year or two.  So I will say about --
3  I will say in the year 2000 I received that.
4    Q.  Did you ever go to work or -- strike that.
5        Once you got your AA in medical coding and did
6  you also get it in criminal justice?
7    A.  No.  I'm still --
8    Q.  Okay.  So it was medical coding where you got
9  the AA?
10    A.  Yes.
11    Q.  Once you got your AA, did you start working?
12    A.  No.
13    Q.  Was there a reason why you didn't start
14  working?
15    A.  Yes.  I had to take care of my father.  He had
16  Parkinson's and liver cancer and hepatitis C.  And my
17  dad was very, very ill.  So I had to take him and from,
18  you know, to hospitals and to his treatments and chemo.
19  And I would just take care of my father until he passed.
20    Q.  Okay.  And when was that?
21    A.  It's been now four years since my dad's been
22  gone.
23    Q.  Okay.  So you took care of your dad from
24  approximately 2000 to 2012?
25    A.  Yes.

Page 30

1  **ROTC from '91 to 94. Also I achieved an art certificate**
2  **for poetry. I write music. I like -- pretty much I was**
3  **involved very lot in school academic and as well as**
4  **sports. So I was active in ROTC, drama.**
5  Q. Let me stop you right there and see if I can
6  understand correctly. You said you have a certificate
7  in ROTC?
8  **A. Yes, sir.**
9  Q. Okay. That's military?
10 **A. Yes.**
11 Q. And what type of certificate do you have?
12 **A. It was completion from high school. They --**
13 **that I basically earned my stripes. Finished the year**
14 **out, the four-year course, and basically achieved my**
15 **certificate.**
16 Q. Okay. And that was during high school?
17 **A. Yes.**
18 Q. And so you were in an ROTC program for the
19 four years you were at Hiram Johnson?
20 **A. Yes.**
21 Q. And again, I appreciate you're helping out.
22 But if you can wait until I finish my question, it makes
23 it a lot easier.
24 **A. Yes. Oh, okay. I was nervous.**
25 Q. That ROTC certificate that you received, was

Page 31

1  that in some particular area?
2  **A. Yes.**
3  Q. What was that?
4  **A. I was lieutenant in my ranks. So I was in**
5  **charge of my cadets and basically make sure they were in**
6  **uniforms. And learning everything about being able to**
7  **be prepared for Air Force.**
8  Q. At that time was it your intent to enter the
9  Air Force?
10 **A. Yes.**
11 Q. And at some point in time what was it that
12 caused you not to enter the Air Force?
13 **A. I had my daughter, my oldest.**
14 Q. Okay. So I can understand, in terms of prior
15 lawsuits, you had the habitability case against
16 Chesapeake; is that right?
17 **A. Yes.**
18 Q. And then you have this class action lawsuit
19 against the owners of Chesapeake?
20 **A. Yes.**
21 Q. Are those the only two lawsuits that
22 you've been involved in?
23 **A. Yes.**
24 Q. Okay. And my understanding is that the
25 lawsuit involving the habitability claims against

Page 32

1  Chesapeake, that was settled; is that correct?
2  **A. Yes.**
3  Q. Okay. And you were not paid any money in that
4  settlement; is that correct?
5  **A. No.**
6  Q. Is that correct that you were not paid money?
7  **A. Correct.**
8  Q. Okay. Thank you. Again, trying to clear up
9  things on the record.
10 And as part of the settlement in the
11 habitability case, Chesapeake waived any claims to past
12 moneys that you owed the apartment complex, true?
13 **A. Yes.**
14 Q. And I believe Mr. Chris Beatty was your
15 attorney for that habitability case; is that correct?
16 **A. Yes.**
17 Q. Now, in this lawsuit that we're dealing with
18 today, what is your understanding is the nature of the
19 lawsuit?
20 **A. Well, at this point I'm, like, I know I have**
21 **an understanding what's going on because I'm definitely**
22 **still going through it. But I'm more -- I don't know**
23 **how to say that, really how I'm feeling right now about**
24 **it, like.**
25 Q. What's your understanding as to the claims

Page 33

1  that you're making against Chesapeake and the owners?
2  **A. I very well understand that things that**
3  **occurred to me is very real. It happened. It hurt me**
4  **and my kids. It did a lot.**
5  Q. Okay. Are you angry at Wasatch?
6  **A. I'm more -- last -- if it was yeah, last year**
7  **anger. I have a lot of -- yeah, anger.**
8  Q. Okay. And you're currently angry with them;
9  is that correct?
10 **A. I'm hurt, if anything. I'm more hurt.**
11 Q. Okay. And what is it in this lawsuit that you
12 claim that Wasatch has done wrong?
13 **A. They have put me and my children out. They**
14 **took away a home that I had with my kids. A life that**
15 **we had. It just they destroyed -- they destroyed us.**
16 Q. Okay. Specifically what do you believe that
17 they did wrong?
18 **A. Well, they never fixed the things in my home**
19 **upon me doing the right thing as a tenant by calling**
20 **them, informing them, you know, what's going on with my**
21 **unit. Or, you know, asking for, you know, someone to**
22 **fix things right away because my children.**
23 **My oldest had asthma really bad. And it was,**
24 **you know, a lot of bad water leaks in my house, in my**
25 **ceilings, coming in from the bottom of my house flood**

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 9 of 25

DENIKA TERRY
June 19, 2017

Page 34

1  wise.  Losing things that I worked hard for.
2    Q.  When you say "losing things," water damage
3  caused problems?
4    A.  Yes, yes.
5    Q.  What else do you believe that Wasatch did
6  wrong?
7    A.  They violate my rights as a human.
8    Q.  Okay.  By doing what?
9    A.  They didn't give me a fair chance at me having
10  a proper time to leave or me getting acknowledgment of
11  what is really going on or me having a real
12  understanding of why they put me and my children out.
13    Q.  Okay.  And during this time that you're
14  talking about where Wasatch put you out and you didn't
15  understand what was going on, was Mr. Beatty your
16  attorney during this time frame?
17    A.  No.
18    Q.  Were you still living at Chesapeake at the
19  time Mr. Beatty was representing you?
20    A.  No, I was living with my mother.
21    Q.  And where did your mother live?
22    A.  She stayed in the complex, the same complex in
23  the front.  And when I had to leave expeditiously out of
24  March 19th on my daughter's birthday, I had to leave my
25  children with my mother.  And I had to sleep in the

Page 35

1  moving U-haul truck because of risk of my things being
2  stolen because it had to be parked outside because I had
3  nowhere else to take my things.
4    Q.  And you were evicted March 19 of 2015; is that
5  correct?
6    A.  That was the last day I was supposed to be out
7  of the unit.
8    Q.  And, in fact, was that the last day you were
9  at the unit?
10    A.  Yes.
11    Q.  Okay.  And, to your knowledge, was that
12  eviction as a result of a court action?
13    A.  Yes.
14    Q.  And to your knowledge, that court action was
15  approved by a judge?
16    A.  Can you repeat that question.
17    Q.  The court action that resulted in your
18  eviction, was that approved by a judge?
19    A.  I really don't know.
20    Q.  Did you see a signed Order?
21    A.  Yes.
22    Q.  Okay.  And do you recall that signed Order was
23  signed by a judge?
24    A.  Yes.
25    Q.  Okay.  And that signed Order was for the

Page 36

1  eviction, correct?
2    A.  Yes.
3    Q.  And did you also see a signed Order that you
4  were responsible for payment of moneys back to the
5  Chesapeake owners?
6    A.  Yes.
7    Q.  And is it your understanding here today that
8  the lawsuit that we're now involved in pertains to
9  problems you had with the Chesapeake apartment unit in
10  terms of flooding and the physical condition of the
11  property?
12    A.  Yes.
13    Q.  Is it your understanding that the lawsuit that
14  we're talking about here today has anything else to do
15  with the apartment complex other than it's physical
16  condition and your ultimate eviction from it?
17    MR. LAVINE:  Objection.  Compound.  A little bit
18  hard to follow.
19    But you can answer, if you know.
20    MR. SALAZAR:  That's a good objection.  Let me
21  rephrase that.
22  BY MR. SALAZAR:
23    Q.  Is it your understanding that the lawsuit that
24  we're talking about here today and the reason why we're
25  here today is because, in part, of the physical

Page 37

1  condition of your apartment complex at Chesapeake?
2    A.  Yes.
3    Q.  And it's also your understanding that the
4  lawsuit we're involved here today is, in part, as a
5  result of your eviction from that apartment complex?
6    A.  Yes.
7    Q.  Is it your understanding that the lawsuit that
8  we're here for today concerns anything else?
9    A.  Yes.
10    Q.  What else?
11    A.  Things I've gone through.  Things is what my
12  children has gone through emotionally and.
13    Q.  And do those things all relate back to the
14  eviction and the physical condition of the property?
15    A.  Yes.
16    Q.  Okay.  Do the emotions and the anger and the
17  hurt relate to anything in addition to being evicted and
18  the physical condition of the property, as you
19  understand it, for this lawsuit?
20    A.  Yeah.
21    Q.  What else?
22    A.  I guess me also just being away from my kids
23  this long.
24    Q.  Okay.  Is there anything else that you're
25  aware of that the Chesapeake apartments or the owners

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

DENIKA TERRY
June 19, 2017

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 10 of 25

Page 38

1  did that was wrong, as you see it, other than the
2  eviction and the physical condition of the apartment
3  complex while you lived there?
4      A.  Yeah, my character.  They will talk about, you
5  know, me.  And, you know, how they're serving the
6  eviction in front of others that were coming to the
7  office to pay rent or assassinate my character by saying
8  "You didn't pay your rent.  Maybe if you paid your rent
9  on time, you know, you wouldn't have this problem."
10      The treatment I was given by them was not --
11  it what was not okay.  It was not appropriate, you know.
12  It was very unprofessional.  Like, they were very not
13  professional people.  Very mean and rude people.
14      Q.  Okay.  Anything else you can think of that the
15  Defendants did that was wrongful in your mind other than
16  those things you've just told me about?
17      A.  Yes.  They had me under the impression that
18  they were giving me another unit into the apartment
19  building.  They asked me to go look at other units into
20  the apartments to see if there was one that I like that
21  they can place me in based on they already had my unit
22  for rent as I was in the unit.
23      So I did that.  I went to look around at the
24  other apartments they had to offer inside of the
25  apartment building.  Found one that I liked and it was

Page 39

1  upstairs.  And so I let the manager know which one I
2  agreed upon.  And she said, "Okay.  You can put down
3  $100 deposit to hold it."
4      I said, Okay."  The question I asked her was,
5  "This wouldn't ladder to this apartment based on I've
6  already had established, you know, rent and deposit in
7  the last unit?"
8      And she says, "No, you have to pay an
9  additional deposit, you know, on to this unit because
10  you're not in the old unit and we have to keep that
11  deposit attached to that."
12      So it didn't make sense to me.  And so I said,
13  "Okay."  So I agreed upon that apartment.
14      Next -- the next day, it was Thursday when I
15  agreed upon that apartment.  On Friday when I went to
16  doublecheck to see if I'm able to move into that
17  apartment, she told me no.
18      Q.  Okay.  So are there any other things that you
19  believe that you're claiming in this lawsuit that
20  Chesapeake or Wasatch, any of the Defendants, did
21  incorrectly or wrongfully?
22      A.  I just feel as if they just violated my rights
23  as me being a disabled personal, as me being a young
24  person.  At the time I felt like I didn't have the full,
25  you know, the full just -- for me I just felt like I

Page 40

1  didn't get the fair opportunity.  And I was a good
2  person who's -- didn't bother anyone.  And so I just
3  felt unjustified as why they did that to me.
4      And these are people that I would see all of
5  the time throughout the apartments and I thought they
6  were really nice people.  This is why I came there.  And
7  they just were not nice people at all.  They just were
8  very, very mean.  Very rude.
9      Never complied to any of my requests with the
10  fixings of the unit, or taking the matters as an
11  emergency when we're having water leaking fully into my
12  living room.  Or just them having pads that were not
13  changed out of my home which caused my kids to get
14  chronic coughing and being sick.  You know, those things
15  were never important to them.  It was kind of, like, we
16  will get to you when we get to you.  You know, it was --
17  it was not easy.
18      Q.  Okay.  And all these things that you just
19  described to me pertained to the physical condition of
20  the apartment unit; is that correct?
21      A.  Yes.
22      MR. LAVINE:  Is it about time for a break?  We've
23  been going about an hour.
24      MR. SALAZAR:  We can certainly take a break.
25  That's fine.

Page 41

1      MR. LAVINE:  Sure.
2          (A break was taken)
3      MR. SALAZAR:  Let's go ahead and mark the first in
4  order here.
5      (Whereupon Exhibit 1 was marked for identification)
6  BY MR. SALAZAR:
7      Q.  Ms. Terry, I'm showing you what's been marked
8  as Exhibit 1.  And this is the Deposition Notice for
9  today's proceedings.  Do you see that?
10      A.  Yes.
11      MR. SALAZAR:  Okay.  Next in order I'm going to
12  mark as Exhibit Number 2, your Responses to Defendants'
13  Form Interrogatories.
14      (Whereupon Exhibit 2 was marked for identification)
15  BY MR. SALAZAR:
16      Q.  Do you recall seeing some written questions
17  that my office sent for your response?
18      A.  No.  Not that I recall right at this moment.
19      Q.  Okay.  Let's go to the last page --
20      A.  Okay.
21      Q.  -- of Exhibit Number 2.
22      A.  Okay.
23      Q.  And it says "Verification" at the top.  Do you
24  see that?
25      A.  Yes.

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

Case 2:15-cv-00799-KJM-DB    Document 78-3    Filed 09/08/17    Page 11 of 25

DENIKA TERRY
June 19, 2017

Page 46

1  the certain things, the certain amounts that were
2  pertaining to the unit or pertaining to what we were
3  supposed to pay is what I signed on for.  But each time
4  it was being more fees and more fees being added that
5  had nothing to do with the fees that were requested
6  underneath the contract of Section 8.
7      So we had a fee to pay to Chesapeake, which
8  was just supposed to be our rent.  And only things that
9  was just rent and what we have to pay on our own, which
10 is our lights and gas.  Other than that, there weren't
11 supposed to be any other fees unless it was granted by
12 our worker and also by me.
13     Q.  Is it your understanding that the only extra
14 charges you were supposed to pay for as the tenant were
15 for your lights and gas?
16     MR. LAVINE:  Objection.  Misstates the witness's
17 testimony.
18         Go ahead.
19     THE WITNESS:  I was only supposed to being paying
20 for rent, insurance, and the cost of the washer and
21 dryer.  Now if it was our own washer and dryer or our
22 own refrigerator, they were not supposed to charge us
23 for those.
24 BY MR. SALAZAR:
25     Q.  Okay.  So it was your understanding that you

Page 47

1  were supposed to pay for the rent; is that correct?
2      A.  Yes.
3      Q.  Okay.  That you were supposed to pay for the
4  insurance; is that correct?
5      A.  Yes.
6      Q.  That you were supposed to pay for the washer
7  and dryer; is that correct?
8      A.  Yes.
9      Q.  Okay.  Was it your understanding that you were
10 supposed to pay for covered parking if you had it?
11     A.  Yes, and that was also another charge.  We
12 paid for our parking, which that was $10 a month.  It
13 went up every year.  So the next year I got moved in, it
14 went up to $15 for parking, for one parking stall.
15     Q.  At some point in time did you decide you
16 didn't want to pay for the covered parking so you took
17 that off the list?
18     A.  Yes, because I had no longer had a vehicle.
19 So they were -- when I first moved there, I had no
20 vehicle at all so they were already charging me for a
21 parking.
22         And I came into the office inquiring on why
23 was I being charged for parking when I don't even have a
24 vehicle.  And it's not even attached to, you know, my
25 unit.

Page 48

1      So she says, "Well, you have to pay just in
2  case you decide you want to get a car.  This will
3  already be covered because it's included."
4      But I say, "If I don't have a car, I don't
5  want to be charged for something I don't have."  So I
6  asked them to remove it and they didn't.  So I kept
7  being charged that parking fee when they were telling me
8  that they had removed it.
9      Q.  Okay.  And we will come to that in a few
10 minutes.  So what is it you hope to accomplish in this
11 lawsuit?
12     A.  I want to accomplish to have basically my life
13 back.  I want to be in a stable place with my children.
14 I want them to be happy and I want to have just
15 basically my life back.
16     Q.  Okay.  And how is this lawsuit going to do
17 that?
18     A.  I can finally go and find me a place to live
19 and be able to get my kids back with me so I can be with
20 them.  It will just put my life back to where I'm used
21 to, where I was before all of this happened.
22     Q.  Okay.  And how is the lawsuit going to do
23 that?  What's it's going to do for you?
24     A.  It's actually for me.  I feel that it will be
25 justice for me and my kids.

Page 49

1      Q.  Okay.  What type of remedy or what type of
2  relief do you want from this lawsuit?
3      MR. LAVINE:  Objection.  Calls for a legal
4  conclusion.  Calls for speculation.
5      You can answer, if you know.
6      THE WITNESS:  Repeat the question.
7  BY MR. SALAZAR:
8      Q.  Sure.  If you were to ask -- ask it this way:
9  Hypothetically, if you were to ask the judge to do
10 something, what is it that you would want a judge to do?
11     MR. LAVINE:  Objection.  Incomplete hypothetical;
12 objection to form of the question.
13     You can answer, if you understand.
14     THE WITNESS:  I want to, as I said, I want the
15 justice, meaning that I didn't put myself in this
16 position.  These people put me in this position.  These
17 people have put me and my children in this position.
18 Turned our lives upside down.
19     And I tried to do everything I could to be
20 fair, to be -- to do the right thing for myself and for
21 my children.  So yes, for me, this means everything to
22 me, not just to me but for my kids because I want to
23 give them the life that was taken away.  Things that
24 they were doing with their life, their happiness,
25 everything that we had before it started is what I want

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

Case 2:15-cv-00799-KJM-DB    Document 78-3    Filed 09/08/17    Page 12 of 25

DENIKA TERRY
June 19, 2017

Page 82

```
 1   they're out of there.  Right.
 2      Q.  Let's go to -- well, so far you told me that
 3   during your first year at Chesapeake, you were paying
 4   $10 for parking and the non-Section 8 tenants were
 5   telling you that they were paying $17.
 6         So the second year you told me that you were
 7   paying $12 for parking.  Do you have an understanding as
 8   to what the non-Section 8 tenants were paying during the
 9   second year for parking?
10      A.  Yes.  Because again, they will tell me.
11      Q.  And what was that?
12      A.  You know, I will ask, you know.  Each time we
13   will go, if I come across the person that told me that
14   information the first time and I see that person again,
15   such as Ms. Madea, I will ask her, saying, "Madea, have
16   you gotten any letters about everyone or any of the
17   Section 8 tenants receiving an increase?  Or they're
18   going to up-up the insurance?  Or they are going to
19   up-up the parking?  You know, pretty much are they were
20   going to up-up anything?"
21         And she says, "I haven't received anything.
22   But basically, you know, I've been paying the same
23   thing."  And then when she had her car towed or
24   something, she didn't have a car anymore, she asked that
25   they remove, you know, her parking fees off of there.
```

Page 83

```
 1   And so she says that, you know, "I was told that they
 2   were going to remove it and the next month I wouldn't be
 3   charged that fee for me even have a parking space at
 4   all."
 5         I said, "I requested for them to take mine off
 6   and I've not seen them do anything different but keep
 7   charging me for a parking space when I don't have a
 8   vehicle."
 9      Q.  Okay.  Did you have a car during your second
10   year at Chesapeake?
11      A.  No, I didn't have a car.
12      Q.  Did you have a car during your third year at
13   Chesapeake?
14      A.  No, I didn't have a car my third year.
15      Q.  So the entire time you lived at the Chesapeake
16   facility, you never had a car; is that correct?
17      A.  Correct.  My mother had a car.
18      Q.  Okay.  Do you know whether your mother paid
19   for parking fees?
20      A.  Yes.
21      Q.  And did she pay for parking fees?
22      A.  Yes, she did.
23      Q.  Was there a specific parking slot that you
24   were assigned?
25      A.  Yes.
```

Page 84

```
 1      Q.  And do you know what number that was?
 2      A.  Where I was at it will be, like, 3 -- I will
 3   say 317, 318.  We didn't have a specific number that
 4   attached to the apartment.  They will just say -- they
 5   will just point you a stall onto the map and they will
 6   say, "This will be where your parking is for this unit
 7   and this will be where your parking is for that unit."
 8      Q.  Were the parking stalls that were referenced
 9   for you to use, were they covered parking?
10      A.  No.
11      Q.  Okay.  Ms. Madea she was a non-Section 8
12   tenant; is that correct?
13      A.  Yes.
14      Q.  Did she tell you a dollar figure for what she
15   was paying for parking during the second year that you
16   were at Chesapeake?
17      A.  She told me, as she was now paying, it went up
18   to $12 the second year.
19      Q.  Okay.  Previously, it had been at $17.  So it
20   actually dropped to $12; is that correct?
21      A.  She says that she let them know that she no
22   longer has a car and that she wanted them to remove it
23   off of her, you know, off of her rent.
24         And so they said, "Okay."
25         She said, "Well, I need to be reimbursed for
```

Page 85

```
 1   the times that you guys have charged me for a car, you
 2   know, a car parking or for, you know, just for a parking
 3   stall and I don't even have a car.  And I advised, you
 4   know -- let you guys know already that I don't have no
 5   vehicle and that you guys need to remove it off of
 6   there.  And that how soon I will be getting my credit
 7   back?  And you guys told me I should be receiving the
 8   credit back the following month when I come in to pay my
 9   rent."
10         Did not receive it.  But they -- she says they
11   only gave her credit for it.  So I was, like, what does
12   the credit mean?  She says, well, for all the time that
13   I've not had my car there, they told me that they will
14   reimburse me for the months that they had charged me for
15   the carport."
16      Q.  Okay.  Let me ask you this:  The third year
17   you were at Chesapeake, do you have any information as
18   to what non-Section 8 tenants paid for parking?
19      A.  No.
20      Q.  Ms. Madea never told you a number?
21      A.  No.  Ms. Madea now moved.  She went back home.
22      Q.  Back home to where?
23      A.  She moved to Texas.
24      Q.  Do you stay in touch with her?
25      A.  I haven't since Ms. Madea left.
```

Page 108

1   party had any really real answer for me and why so.
2      MR. SALAZAR: I'll go ahead and show you the next
3   document in order. We're at three.
4      (Whereupon Exhibit 3 was marked for identification)
5   BY MR. SALAZAR:
6    Q.   Ms. Terry, do you recognize this document?
7    A.   Yes.
8    Q.   And what do you recognize it to be?
9    A.   Documents stating for -- this is me, what,
10   against the property?
11    Q.   Have you ever read Exhibit 3?
12    A.   No, I haven't.
13    Q.   Can you tell me who Jesse Newmark is?
14    A.   Say that again.
15    Q.   Who's Jesse Newmark?
16    A.   I don't know a Jesse.
17    Q.   Have you ever been to Centro Legal de la Raza
18   in Oakland?
19    A.   No.
20    Q.   Do you have any understanding as to whether
21   Centro Legal de la Raza is representing you in this
22   lawsuit?
23    A.   Well, I heard of a Jesse, but I didn't know
24   anything -- I've never been to Oakland. So I wouldn't
25   know if he from -- since it says here Oakland, but I

Page 109

1   never met no person from Oakland. Now, I have a Jesse
2   that I met in Sacramento. That's for Mr. Beatty.
3   That's his assistant.
4    Q.   There's a Jesse who's Mr. Beatty's assistant?
5    A.   Yes.
6    Q.   Okay. Is this the first time you learned that
7   the Centro Legal de la Raza is representing you in this
8   lawsuit?
9      MR. LAVINE: Objection. Calls for a legal
10   conclusion.
11      You can answer, if you know.
12      THE WITNESS: Repeat the question.
13   BY MR. SALAZAR:
14    Q.   Is this the first time that you learned that
15   the Centro De Legal de la Raza office is representing
16   you in this lawsuit?
17      MR. LAVINE: Same objection.
18      You can answer.
19      THE WITNESS: No. I just know Mr. Beatty have an
20   assistant named Jesse, and that's who I had spoken with
21   a couple of times.
22   BY MR. SALAZAR:
23    Q.   My question is: Is today the first time you
24   learned that the Centro Legal de la Raza firm is
25   representing you in this lawsuit?

Page 110

1      MR. LAVINE: Same objection. Calls for a legal
2   conclusion.
3      You can answer.
4      THE WITNESS: I don't know how to answer you, but I
5   only had -- I don't know of a Centro Legal like La
6   whatever. I just know of Jesse, his assistant. That's
7   it.
8   BY MR. SALAZAR:
9    Q.   Okay.
10    A.   I don't know where -- I'm thinking I don't
11   know where he from but.
12    Q.   Have you ever met somebody from the Centro
13   Legal de la Raza law firm?
14    A.   No. And again, only met Jesse here in
15   Sacramento -- where he lived in Sacramento.
16    Q.   You understood that Jesse lived in Sacramento?
17    A.   No. I only met him in Sacramento.
18    Q.   Okay.
19    A.   That's what I'm saying. Like, I never sat
20   with him, like, as -- like, as many times. I just met
21   with him over and over. No, only a couple of times.
22   And that's only when I had to speak with him over a
23   phone and that's about it. And I've never been to
24   Oakland.
25    Q.   Okay. Ms. Terry, I'm going to take you

Page 111

1   through some of the exhibits in Exhibit 3. I can
2   probably direct you to them, but a lot quicker if you
3   just hand me the document and I will show you where it
4   is.
5      MR. LAVINE: If you can announce the page number or
6   page title, if there's no number, that would help me
7   too.
8      MR. SALAZAR: Yeah. It's the Additional Services
9   Agreement. It's about midway through the packet.
10      And Terry, if you give it to me, I can zip you
11   there a lot faster. Thank you.
12      And David, actually everybody here?
13      MR. LAVINE: I got it.
14      MR. SALAZAR: The document, Exhibit 3, at the upper
15   right-hand corner, it is paginated Page blank of 196.
16   So I can zip through it a little bit quicker if we go
17   that way.
18      MR. LAVINE: That works, but I think I found it.
19      MR. SALAZAR: Okay. I'm looking at Page 92 of 196.
20      MR. LAVINE: That's where I'm at.
21   BY MR. SALAZAR:
22    Q.   And Ms. Terry, are you there?
23    A.   Yes.
24    Q.   Okay. And you will see that at the top of
25   left-hand corner, this is entitled "Additional Services

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

CASE 2:15-cv-00799-KJM-DB    Document 78-3    Filed 09/08/17    Page 14 of 25

DENIKA TERRY
June 19, 2017

Page 116

```
 1   A.  No.
 2   Q.  Did you ever contact Ms. Ramirez when you were
 3  having problems at the Chesapeake facility?
 4   A.  No.
 5   Q.  Is there any reason why you didn't contact
 6  her?
 7   A.  She's not my worker.
 8   Q.  Okay.  But Ms. Ramirez is with the public
 9  housing agency, right?
10   A.  I guess so.  She's on here.  Yes.
11   Q.  Right.  And it lists that's the agency she's
12  with, Sacramento House Authority.  Do you see that?
13   A.  Yes.
14   Q.  Okay.  And Ms. Vargas was with the City of
15  Rancho Cordova, right?
16   A.  No, she's Sacramento.  She's Sacramento.
17   Q.  So?
18   A.  But these are two different people and I never
19  met her.
20   Q.  Okay.  So you never met Ms. Ramirez?
21   A.  No.
22   Q.  And you understand that Ms. Vargas was with
23  the Sacramento Housing Authority?
24   A.  Yes.
25   Q.  Okay.  You had -- we had talked earlier about
```

Page 117

```
 1  conversations you had with somebody from City of Rancho
 2  Cordova.
 3   A.  Yes.
 4   Q.  Do you recall who it was from the City of
 5  Rancho Cordova that you talked about when you were
 6  having problems at the Chesapeake facility?
 7   A.  No.
 8   Q.  Was it a female that you were talking with at
 9  the City of Rancho Cordova?
10   A.  Yes.
11   Q.  And do you have any recollection of the name?
12  First name, last name, anything from the City of Rancho
13  Cordova?
14   A.  It's -- I believe I cannot even pronounce her
15  name correctly, so I don't want to be rude.  It's Isbia.
16  Yeah.  She's just a recent one I just been speaking
17  with.  And cannot pronounce the name correctly.  It's
18  I-S-B -- I-S-B-I-A.  And she's a worker that's currently
19  that they have that I have to speak to in regards to my
20  Section 8.
21   Q.  Okay.
22   A.  I haven't met her personally or seen her face
23  exactly.  They just told me that's who she is, who is
24  taking over that part.
25   Q.  Okay.  And she was taking over for who?
```

Page 118

```
 1   A.  For Sonya Vargas.  She's no longer even
 2  working there anymore.
 3   Q.  Okay.  So I believe your testimony earlier is
 4  that Ms. Vargas worked for the Sacramento Housing
 5  Authority, right?
 6   A.  Yes.
 7   Q.  You understand that the Sacramento Housing
 8  Authority and the City of Rancho Cordova are two
 9  different entities?
10   A.  Yes.
11   Q.  Who was it at the City of Rancho Cordova that
12  you were talking to?
13   A.  Well, at the time we wasn't quite the City of
14  Rancho Cordova yet.  We were still Sacramento.  So when
15  we had a chance to, you know, before ours -- yeah,
16  before we became Rancho Cordova, the City of Rancho
17  Cordova, we were still Sacramento.  So everyone who's on
18  Section 8 still is under Sacramento/Rancho Cordova.
19      So you know, there's really no specific -- we
20  call ourselves Rancho Cordova.  Some of them say
21  Sacramento, California.  So it just depends where you
22  live, what ZIP code you live.
23   Q.  Okay.  Let's go back.  We're going to flip
24  between the two pages that we marked out.
25   A.  Okay.
```

Page 119

```
 1   Q.  Okay.  So now looking at the second page that
 2  we've identified, which is Page 92 of 196, the
 3  Additional Services Agreement.  Are you with me?
 4   A.  Yes.
 5   Q.  Okay.  Now, in terms of the property that's
 6  identified, you see where washer and dryer are listed?
 7  It's up towards the top here (indicating).
 8   A.  Okay.  Yes.
 9   Q.  Okay.  And what was the charge for the washer
10  and dryer?
11   A.  $40.
12   Q.  Okay.  That's $40 -- that's a monthly charge,
13  right?
14   A.  Right.  This is when I first moved in, though.
15   Q.  Right.  This is -- this document is dated
16  September 20th, 2010, right?
17   A.  Okay.  Yes.
18   Q.  Thank you.  And did you, in fact, get a washer
19  and dryer in your apartment in 2010 when you moved in?
20   A.  Yes.
21   Q.  And did you utilize the washer and dryer
22  during that first year?
23   A.  Yes.
24   Q.  And was that -- did you enjoy having a washer
25  and dryer in your apartment?
```

UNITED STATES OF AMERICA vs. K.J.M-DB     DENIKA TERRY
WASATCH ADVANTAGE GROUP, LLC     June 19, 2017

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 15 of 25

Page 120

1   A. Yes, I did.
2   Q. Okay. That was a benefit for you, right?
3   A. Yes.
4   Q. Okay. If you didn't have a washer and dryer,
5  what would you have to do?
6    MR. LAVINE: Objection. Calls for speculation.
7  You can answer.
8    THE WITNESS: I go to just a local washing --
9  washing places.
10  BY MR. SALAZAR:
11   Q. Is there a laundromat nearby?
12   A. No.
13   Q. How far away is it?
14   A. About 10 minutes.
15   Q. 10 minutes by car?
16   A. Yes. Walking is 30 minutes.
17   Q. And was it more convenient to do the washing
18  and drying at your apartment as opposed to going to a
19  laundromat?
20   A. Yes.
21   Q. If you go to a laundromat, you have to stay
22  there to make sure your clothes don't get taken, right?
23   A. Yes.
24   Q. And when you go to-- well, strike that.
25    When you're able to do your laundry at home,

Page 121

1  you can buy bulk sizes of detergent, which is less
2  expensive?
3   A. No. They're very small washers and dryers.
4  So you really can't put too much in it. So you still
5  have to go to either the apartment building washer and
6  dryer, which they barely had but one, and they didn't
7  even have that one open.
8    So we had no choice but to force yourself to
9  go a local washer, you know, wash house because theirs
10  either have it locked or some of it was broken. Or it
11  was just one towards 600 units that we have to use. And
12  either they work sometimes or they don't. So if not,
13  you have to take your clothes to the local washer.
14   Q. Did you do your laundry --
15    (Reporter requests clarification)
16  BY MR. SALAZAR:
17   Q. Did you do your laundry in your apartment
18  using the washer and dryer that you rented?
19   A. Yes.
20   Q. Okay. And did you-- well, strike that.
21    Because you had a washer and dryer in your
22  unit, you did not have to go elsewhere to do your
23  laundry; is that also true?
24   A. Yes, sometimes. Yes.
25   Q. Is that true most of the time?

Page 122

1   A. Not most of the time because twice my washer
2  and dryer broke. When the washer start spinning, so
3  they had to replace that. And then the dryer stopped
4  basically getting hot. So they had to replace that as
5  well. So at that time I had to use the complex washers
6  and dryers, and they were too expensive to wash there so
7  I will go to local washer.
8   Q. And so there were two breakdowns over a
9  three-year period; is that correct?
10   A. Yes.
11   Q. Once the washer and then the dryer were
12  repaired, were you able to do all of your laundry at
13  your apartment?
14   A. Yes, except for comforters. You know, big
15  huge items like that no, you can't.
16   Q. Sure. Okay. And in terms of buying the
17  detergent, was it less expensive to buy the big boxes
18  and come home and do your laundry, or was it cheaper to
19  buy the little boxes at a laundromat?
20   A. To me, I think it's cheaper just to buy, you
21  know, the average size because it will save you.
22  Because, of course, you're not being inconvenienced
23  leaving out of your home. You know, you actually have
24  it in your house so it's accessible for you. It's
25  easier. So when I did laundry, I would just buy the

Page 123

1  normal, you know, size.
2   Q. Okay. Fair enough.
3   A. It's just me and my daughters.
4   Q. Now, going back, again, to the Additional
5  Services Agreement at Page 92 of 196 on Exhibit 3. You
6  see where there is a notation there for "reserve covered
7  parking."
8    Do you see that?
9   A. Yes.
10   Q. Okay. And what was the charge, monthly charge
11  for that?
12   A. It was $10.
13   Q. Okay. During the time you lived at
14  Chesapeake, did the charges for -- monthly charges for
15  washer and dryer change?
16   A. Repeat the question.
17   Q. During the three years that you were at the
18  Chesapeake facility, did the monthly charge for the
19  washer and dryer ever change from $40?
20   A. Yes.
21   Q. What did it change to?
22   A. No. After I left there, this is primarily
23  where the highest it's been is at $40.
24   Q. Okay. So let me ask the question again:
25  During the three-year time period that you were at the

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

DENIKA TERRY
June 19, 2017

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 16 of 25

Page 124

1 Chesapeake facility, did the $40 charge for the monthly
2 use of the washer and dryer ever change?
3    A. Well, yes, it has.
4    Q. Okay. Did it go up or down?
5    A. No. Just depends. I really can't give you a
6 direct answer. Because with me, things were always will
7 change from high to low, depending on whenever. So I
8 really can't give you an adamant definite answer, like,
9 did they stay this way at this amount? Did they change?
10 It just varies, you know.
11       Because one month I can pay -- for instance,
12 they will tell me, "Okay. Ms. Terry, your amount for
13 this month, give me $17." Okay. You pay the $17.
14       By the next month, "Oh, well, we have to
15 charge you this price because of last month."
16       You know, and I'm like, "What does last month
17 have to do with this month?"
18       So I'm really being honest that I couldn't
19 just specifically say because it's always went up, it
20 always went down. It just depends.
21    Q. Is it your testimony that the charge for the
22 monthly use of the washer and dryer would change from
23 month-to-month?
24    A. Yes.
25    Q. Okay. And did that change occur throughout

Page 125

1 the three-year period that you lived there?
2    A. Yes, sir.
3    Q. Okay. With respect to the cost for the
4 reserved covered parking of $10 per month, did that ever
5 change during the three-year period that you lived at
6 the Chesapeake facilities?
7    A. Yes, sir.
8    Q. Okay. Did that charge go up or down or
9 something else?
10    A. It went up.
11    Q. What did it go up to?
12    A. $14.
13    Q. Okay. Did it go up to $14 the second year you
14 were living there?
15    A. The second year.
16    Q. Okay. And what about the third year --
17    A. Third year.
18    Q. -- did you continue to have parking charges?
19    A. I had no car, but they were charging me for
20 the parking.
21    Q. Okay. And what did they charge you for
22 parking --
23       (Reporter requests clarification)
24 BY MR. SALAZAR:
25    Q. -- the third year when you didn't have a car?

Page 126

1    A. Yes, ma'am. It was $14.
2    Q. Okay. So that was the same as the second
3 year?
4    A. Yes, until when I almost was getting ready to
5 leave, I had another contract that they gave me that was
6 going up for another increase. And unfortunately for
7 me, I don't have -- by me losing everything, I don't
8 have it.
9       But I did receive another notice after that
10 that they would be raising the fees for the parkings
11 because of new tenancies and new rules were being
12 addressed.
13       So that's one of the rules that they had was
14 that they were having to raise the pricing for the
15 parking because of people parking different, you know,
16 people's carports that's not theirs. And people were
17 complaining about that so they were going to start
18 raising up the fees if people weren't going to park in
19 their assigned parking space.
20    Q. Okay. With respect to the renter's insurance
21 on the Additional Services Agreement, do you see that
22 line?
23    A. Okay. Yes. Right here (indicating).
24    Q. Okay. And what were you charged for the
25 renter's insurance?

Page 127

1    A. I was charged $17.58 instead of $15.58.
2    Q. Okay. So your testimony is that the fee
3 schedule here says $15.58, but you were charged $17.58.
4    A. Yes, sir.
5    Q. Do you know why there was an extra $2?
6    A. No.
7    Q. Was there any explanation ever given to you
8 why you were charged $2 more than what's listed on the
9 Additional Services Agreement?
10    A. No, sir.
11    Q. Did you ever ask?
12    A. Yes, sir.
13    Q. What response did you get?
14    A. That everyone has this increase, I'm not the
15 only one. They do this so often, you know, and I will
16 ask, "Well, why is it every month that it goes up?"
17       And they says "That's just what -- this is how
18 we being able to make sure people pay the parking.
19 Because if people doesn't use it and other tenants park
20 in your parking spot, that lets us feel that you do have
21 a car. How do we know you don't have a car? So we have
22 to charge you until you come and let us know that you
23 don't have a car or that you don't want to be charged
24 for that fee for having a carport."
25    Q. Okay. We're talking about renter's insurance

Page 200

BY MR. SALAZAR:

1  Q.   And Ms. Terry, Exhibit 8 is a lawsuit that was
2  filed by the Law Offices of Andrew Wolff.  You see
3  Mr. Beatty's name at the top here?
4  A.   Yes.
5  Q.   Okay.  And this was filed in Superior Court of
6  Sacramento.  Did you ever see this document?
7  A.   Yes, sir.
8  Q.   Okay.  And this was a document, or excuse me,
9  this was a lawsuit that was filed, I believe, in 2014,
10  if you look at the first page.
11  A.   Okay.
12  Q.   Top right hand and kind of the scratched up?
13  A.   Yes.
14  Q.   Okay.  And if you go to Page 4, paragraph 17,
15  do you see that there?
16  A.   Yes.
17  Q.   It says, "Plaintiff suffered emotional
18  distress, physical injury over payment of rent and
19  out-of-pocket expenses as a result of the aforementioned
20  habitability defects and other acts and/or omissions
21  committed by Defendants."
22      Did I read that correctly?
23  A.   Yes, sir.
24  Q.   And the overpayment of rent, you were

Page 201

1  referring to the items that we discussed today about the
2  charges that you didn't think were correct?
3  A.   Yes.
4  Q.   Okay.  And those charges included for the
5  washer and the dryer; is that correct?
6  A.   Yes, sir.
7  Q.   Those include for the parking; is that
8  correct?
9  A.   Yes.
10  Q.   And that included for the rental insurance as
11  well.  Is that also correct?
12  A.   Yes.
13  Q.   Okay.  That's all the questions I have there.
14      Ms. Terry, do you have any understanding as to
15  what's required of a class representative?
16  MR. LAVINE:  You can answer.
17  THE WITNESS: Could you kind of rephrase the
18  question --
19  BY MR. SALAZAR:
20  Q.   Sure.
21  A.   -- a little bit?
22  Q.   You've been listed as a potential class
23  representative in this federal lawsuit.  Do you have any
24  understanding of what's required of a class
25  representative?

Page 202

1  A.   Yes.
2  Q.   And what is that?
3  A.   Well, I know that I'm kind of a person that's
4  a lead of this.  I'm not sure if I'm saying it correct.
5  But my term is probably different.  I'm kind of looking
6  at it as I'm more of a person trying to just say the
7  truth and basically be a head of something.  Am I saying
8  that right?
9  Q.   All I want to know is what your understanding
10  is.
11  A.   My understanding is that I've had a bad ordeal
12  happen and I was charged with things that I shouldn't
13  have been charged for.  And I was put out for reasons
14  that -- for no reason at all.  And pretty much just
15  things that were going on at the apartments that did not
16  get done.  So I'm kind of here to really get the
17  justice.  I don't know want else to say.
18  Q.   You were evicted from your apartment pursuant
19  to a Court Order, correct?
20  A.   Yes, sir.
21  Q.   So when you say there was no reason, there
22  actually was.  There was a Court Order; true?
23  A.   True.  But my reasons for getting it, no.
24  Q.   Do you know of any other tenants at Wasatch
25  properties that were evicted pursuant to a Court Order?

Page 203

1  A.   Yes.
2  Q.   Who?
3  A.   It was Calvin, Sheri.  And the young man I
4  just talked about, Mr. Terry.  Ms. Madea.  The young
5  lady upstairs.
6  Q.   I thought Ms. Madea moved back to Texas of her
7  own accord?
8  A.   Yeah, she's gone.  But as far as -- you said
9  anyone who's had problems?
10  Q.   No.  Who else do you know that was evicted as
11  a result of a Court Order?
12  A.   No, those would be it.  Yes, sir.
13  Q.   Okay.  Calvin was evicted pursuant to a Court
14  Order?
15  A.   Yes.
16  Q.   Okay.  Sheri was evicted pursuant to a Court
17  Order?
18  A.   Yes, sir.  And her aunt.
19  Q.   What was Sheri's last name?
20  A.   Can I come back to it?  Because I got it up
21  here in my head.  I just can't remember her last name.
22  Q.   I will check back in a little bit.
23  A.   Okay.
24  Q.   Calvin's last name?
25  A.   Johnson, Calvin Johnson.

UNITED STATES OF AMERICA vs.                                                   DENIKA TERRY
WASATCH ADVANTAGE GROUP, LLC

Case 2:15-cv-00799-KJM-DB   Document 78-3   Filed 09/08/17   Page 18 of 25         June 19, 2017

---

Page 216

1   Q. Okay. And then it was after that meeting that
2 the lawsuit that we looked at in Exhibit 8 was filed; is
3 that correct?
4   A. Yes.
5   Q. Thank you. Other than your position as -- I
6 believe it was lieutenant with the ROTC program in high
7 school, have you ever held a leadership position?
8   A. Yes. I was, like, a floor customer service
9 agent lead. Yeah. I was helping a lot of the customers
10 that came in and they needed extra help or questions.
11 It's just what Walmart does. You just extend to all
12 customers.
13      So, you know, when some people come in, it was
14 my job to make sure that they were being taken care of
15 and they were properly being checked out, being assisted
16 out of the store and things of that nature and that
17 they're happy.
18   Q. When was that?
19   A. Oh, wow. It was in '99. I didn't even have
20 my daughter quite yet. So yeah, that was, like, my
21 first real job.
22   Q. Okay. Was that as what some people refer to
23 as a greeter?
24   A. Yes.
25   Q. Okay.

---

Page 217

1   A. I went from being that, a greeter, to being a
2 cashier. From being a cashier to just being from there
3 to the layaway. So I kind of worked my way around for a
4 while.
5   Q. Okay. Any other leadership positions since
6 that time?
7   A. No, sir. Just being a mom.
8   Q. You don't have any prior experience being a
9 class representative in a class action lawsuit; is that
10 correct?
11   A. No.
12   Q. Have you been promised anything in return for
13 being a class representative?
14   A. No.
15   Q. Do you expect to be paid in any way for being
16 a class representative?
17   A. Yes. I'm being honest.
18   Q. Okay. And what is your expectation?
19   A. I expect this to retrieve anything that I lost
20 and I worked hard for with my children. That's it.
21   Q. Do you have an estimate what that amount is?
22   A. I have never been good at this and honestly I
23 don't know.
24   Q. What is the amount of stuff that you've lost?
25   A. I lost my car. I lost all of my children's

---

Page 218

1 clothes. All of our pictures. All of everything, just
2 all everything. Couch, TV, everything we ever owned is
3 gone.
4   Q. Those are the items that were stolen out of
5 the U-Haul?
6   A. Yes. I had -- my daughter had a doll house
7 that was given from my dad. I -- just a lot of really
8 important, memorable things that we cannot get back
9 because of the fact that my father is gone. So yeah, a
10 lot of things that I worked hard all my life to have on
11 my own is gone so.
12   Q. If you were to go out, say, tomorrow and buy
13 those things that you lost, how much do you think they
14 would total up?
15   A. I wouldn't know because I don't really -- I
16 just know that it will be certain things like my kids'
17 bike, things that really meant things to them. I
18 probably would make sure they get those things back.
19   Q. Okay.
20   A. I would.
21   Q. Do you think you could probably get those
22 things back, at least materially. I understand that
23 sentimental value is different.
24   A. Yes.
25   Q. I respect that. From a material standpoint,

---

Page 219

1 if you were to go to a store, Target, Costco, wherever,
2 what do you think it would take in order to replace the
3 physical items that were lost?
4   MR. LAVINE: Objection. Vague. What do you mean
5 what would it take? You're talking about how much would
6 it cost?
7   MR. SALAZAR: The price, yeah. What it would cost.
8   MR. LAVINE: If you know.
9   THE WITNESS: I don't.
10 BY MR. SALAZAR:
11   Q. Do you have an estimate?
12   A. My daughters.
13   Q. More than $3,000?
14   A. Yes, sir.
15   Q. More than $4,000?
16   A. Probably so. Yes, sir. I had two rooms, two
17 big things of rooms of stuff. I just can't really -- I
18 never -- like I said, I will be blessed and I'm just
19 saying this on the record, whatever. Just as long as
20 I'm getting my life back and getting the things that my
21 kids lost and things that I worked for, I'll be happy.
22   Q. Okay.
23   A. I would.
24   Q. Would $5,000 replace those items? And again,
25 not the sentimental content, but from just the material,

---

Min-U-Script®               L.A. Reporters               (52) Pages 216 - 219
(800) 675-9700
www.LAReporters.com

Page 220

1  the clothes, the television, bicycles?
2  **A.  It will be a start.**
3  Q.  Okay.
4  **A.  I'm sorry I'm so emotional.**
5  Q.  That's fine.  You indicated you lost your car.
6  When did you lose your car?
7  A.  Well, it got taken from the street because I
8  couldn't pay to have my tax done or pay the current
9  insurance because I had no money.  So they had to take
10  my car.
11  Q.  Okay.  And when did that happen?
12  A.  They took that after I got served in all this
13  and by me trying to figure out where I was going.
14  Q.  Was that after the three-day notice?
15  A.  Yes.  And it was after the 19th, as I said.
16  Like around the 24th they took my car from in front of
17  my mom's house.
18  **Q.  That would be February 24th?**
19  **A.  That would be March 24th.**
20  Q.  Okay.  Thank you.  2013?
21  **A.  2014.  My baby is now nine.**
22  Q.  You were evicted in 2013.
23  **A.  So it was prior to 2013.  Before that.**
24  Q.  So did you lose the car in 2012 then?
25  A.  I can't give you a date.  I just know it was

Page 221

1  the time after March 19th.  And that's the time after I
2  left because when I had the U-Haul parked, I had the car
3  parked behind it.  And so the next morning when I went
4  to check out everything, the whole U-Haul was open and
5  everything taken out, gone.  My car was still okay.
6  Because I'm pretty sure people didn't think it was my
7  car.
8      So I had it sitting there.  I was going to
9  move it, but we have code enforcers that go through
10  Sacramento.  And if you do not have the current tags or
11  it's not running, they will first put a sticker on your
12  car to give you a warning.  Like, hey, we just drove by.
13  We see that your tags are not up to date or this car
14  looks abandoned.  You need to contact us.
15      So I contacted Code Enforcement and I
16  explained to them.  I said, "Ma'am," I said, "This is
17  vehicle.  I'm trying to come up with the money so I can
18  be able to move my car.  I just explained what I was
19  going through."
20      And she said, "Well, ma'am, if you don't -- if
21  you're not able to do that, could you ask a family
22  member?"
23      I said, "Ma'am, neither does my mom has any
24  money.  We just buried my dad.  You know, so we don't
25  have money."

Page 222

1  She said, "Unfortunately, if you're not able
2  to come up with the money, we have to either tow it or
3  have someone come get it.  Maybe park it in the
4  driveway."  I didn't have -- it's just my mother and I.
5  I don't have a lot of things.
6  Q.  My understanding is that Rancho Cordova is
7  especially strict on code enforcement.  Is that your
8  experience?
9  A.  Yes, they are.
10  Q.  Okay.  And again, I don't mean to badger you
11  here.  But I'm trying to figure out when the car was
12  taken.
13  A.  It was the 24th of March.
14  Q.  And the year?  Was it the same year you got
15  evicted?
16  A.  The same year I got put out.  Yes, sir.  The
17  same day I had to leave.
18  Q.  And that was 2013?
19  A.  Yes, sir.
20  Q.  Okay.  Thank you for that clarification.
21  A.  You're welcome.
22  Q.  Up until then you had had a car to use; is
23  that right?
24  A.  Yes, sir.  I bought -- I was working at
25  Walmart.  And I was able to buy my first car on my own.

Page 223

1  So that was nice.  So yeah, I was able to buy, like, a
2  Dodge Neon.  It wasn't a newer car, it was older car but
3  I liked it.  And yeah, I worked hard for my car.  And so
4  that was just one of the things.  Because I didn't have
5  the current tags and I wasn't able to have a place to
6  put it.  So they had to do their part to have it towed.
7  MR. SALAZAR: Let's take a true five minutes.  And
8  I will go over my notes and I will be able to wrap this
9  thing up.
10      (A break was taken)
11  BY MR. SALAZAR:
12  Q.  As a class representative, have you ever read
13  the Section 8 regulations?
14  **A.  Yes, I have.**
15  Q.  On how many occasions?
16  **A.  Once or twice.**
17  Q.  Have you read all of them?
18  **A.  No.**
19  Q.  How many pages do you think total you've read?
20  **A.  Maybe at the most about 10.**
21  Q.  Over what period of time?
22  **A.  In a day, just in one sitting.**
23  Q.  Okay.  And when did you read those 10 pages?
24  **A.  When I actually got on the program, I had**
25  to -- I wanted to know more about it so I read it up to

UNITED STATES OF AMERICA vs.
WASATCH ADVANTAGE GROUP, LLC

CASE 2:15-cv-00799-KJM-DB    Document 78-3    Filed 09/08/17    Page 20 of 25

DENIKA TERRY
June 19, 2017

---

Page 224

1  10 pages.  I should have kept on reading.  Yeah, 10
2  pages is about when I gotten to.
3     Q.  Okay.  And was that 2011?  2010?
4     A.  Prior to 2000.  We will get brochures, things
5  like that about the program.  And things that they are
6  going to offer, you know, little resource type things.
7  Yeah, stuff like that I will read it.
8     Q.  Since that time you read the 10 pages, have
9  you read the regulations since that time?
10    A.  No.
11    Q.  You indicated you got your Dodge Neon when you
12 were working at Walmart.  When were you working at
13 Walmart?
14    A.  It would be in the year 1999.  My daughter was
15 not born yet.  She was just still warming up.
16    Q.  And did you park the Dodge Neon at the
17 Chesapeake facility while you were living there?
18    A.  No.
19    Q.  Where did you park it?
20    A.  Outside the premises.  You have a choice, you
21 know.  If you don't want to pay for the parking stall,
22 you can park outside.
23    Q.  So if I understand it correctly, during the
24 three years that you lived at Chesapeake, you never
25 parked the Dodge Neon on the Chesapeake property; is

---

Page 225

1  that correct?
2     A.  Correct.  I had the car only a month.  And I
3  had bought it from someone off the -- off a little small
4  dealership and he was selling it.  So my mom took her
5  over and we picked the car up.  I had it for, like, a
6  month.  I had to also get ready to change it over into
7  my name and things like that.  So I didn't have it very
8  long.
9     Q.  Okay.  My understanding from what you
10 testified earlier is that you bought the Neon, the Dodge
11 Neon in 1999 while working at Walmart; is that correct?
12    A.  Yes.
13    Q.  And you owned it continuously until it was
14 towed away; is that correct?
15    A.  Correct.
16    Q.  Have you paid your attorneys anything to
17 prosecute this class action case?
18    A.  No.
19    Q.  Tell me about all the discussions you had with
20 the Wasatch corporate group.
21    A.  Zero conversation.
22    Q.  How many times did you call the Wasatch
23 corporate group?
24    A.  Well, total of 10 times.
25    Q.  When was the first time you called?

---

Page 226

1     A.  I called the first time when I wasn't getting
2  any response back from Ms. Christine or Ms. Isabel.  So
3  I asked the nice young lady for the phone number,
4  Ms. Sylvia, and she was able to give it to me.
5        She said, "Try this.  This is what I have up
6  here for it.  So try this.  If it does not work, you get
7  no answer, just come back to the office and hopefully by
8  then Ms. Christine or, you know, one of them will be
9  here so they can help you."
10    Q.  Okay.  When was it you first asked Ms. Sylvia
11 for the corporate phone number?
12    A.  I asked her for that number -- in the same
13 conversation of me saying, you know, well -- well, when
14 Ms. Christine be coming back?"
15        And she says, "Maybe tomorrow she will be
16 coming back into the office."
17        I said, "Well, is there a way I can just leave
18 a message for her to just call me."  Or sometimes
19 Ms. Christine will be on a golf cart riding through the
20 apartments.  So if I see her, I will kind of flag her
21 down and have a quick conversation with her.  Or
22 sometimes she will just call me to come into the office
23 so.
24    Q.  Okay.  Let me reframe the question.  When was
25 it that you first asked Ms. Sylvia for the phone number

---

Page 227

1  to the corporate Wasatch office?
2     A.  Around the same time that I came in to inquire
3  about what Ms. Laurie, if -- does she see if my rent is
4  paid.  When I inquired about my rent being paid, when I
5  was discussing to her about that paper I received on my
6  door for the three-day pay or quit --
7     Q.  Okay.
8     A.  -- is when I asked at that point in time to
9  see for the corporate office.  That's when she let me
10 know that, "Well, here's the number that I have."  And,
11 you know, I just kind of kept getting the wrong numbers
12 until I found it on my own.
13    Q.  Okay.  At any time you were living at
14 Chesapeake, did you have access to the Internet?
15    A.  No.  Our wires weren't working in the house so
16 we couldn't get Internet and we couldn't get a main line
17 phone.  So we pretty much had to have someone come out
18 to fix it.  They couldn't fix it.  It was something that
19 the apartments had to do because it was outside thing or
20 so.  So they couldn't fix our wires.  So all we had was
21 just cell phones and so.
22    Q.  Okay.  Did you have a smartphone that had
23 Internet access?
24    A.  Yes.
25    Q.  Did you look up on the Internet, using your

---

EXHIBIT 10

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,   )
     et al.,                     )
 5                               )
                     Plaintiff, )
 6                               )  Case No.
            vs.                  )  2:15-cv-00799-KJM-DB
 7                               )
     WASATCH ADVANTAGE GROUP,    )
 8   LLC, et al.,                )
                                 )
 9                   Defendants.)
10   _____

11

12

13

14              DEPOSITION OF ROY HUSKEY

15               Sacramento, California

16              Tuesday, August 8, 2017

17                    Volume I

18

19

20

21   Reported by:

22   LISA RICHARDSON, RPR, CRR, RMR

23   CSR No. 5883

24   Job No. 2661414

25   PAGES 1 - 136
```

Page 1

1          I even tried to talk to him, to try to

2     reason with him.  I said, "I have to be able to walk

3     to my bathroom to use it.  I have to be able to go

4     to my room, you know.  This is ridiculous."

5          Q    Did the gentleman ever -- who was living

6     below you ever accuse you of stomping around through

7     your apartment?

8          A    Yes.

9          Q    Was that true?

10          A    Towards the end, yes.

11          Q    So -- and towards the end, before you moved

12     out, you did purposely stomp around to make noise?

13          A    At the end, when I was told to leave, yes,

14     Because I had nothing to lose.  Immature, but...

15          Q    Did the tenant ever complain about the

16     stereo being too loud to you?

17          A    I'm pretty sure, yes.

18          Q    Okay.  And in your opinion, was the stereo

19     being played too loud?

20          A    No.

21          Q    Okay.  And did you ever explain to the

22     person who was living below you when he complained

23     about the volume of the stereo that it was your

24     daughter and not you?

25          A    No.  All I did is try to resolve any kind

Page 65

1   of noise, like using headphones.  I even walked even

2   lighter, the best I could.  I tried to limit my

3   walk.  I tried to reason with him.

4        Q    Did you ever ask your daughter to turn her

5   stereo down?

6        A    Yes, I have.

7        Q    And why did you ask her to do that?

8        A    Trying to keep the peace.

9        Q    Did she comply?

10       A    Yes.

11       Q    Did the person who lived below you ever

12   come up to your door and knock on it to address

13   these issues?

14       A    Not knocking, but pounding.

15       Q    Okay.  How many times did that individual

16   come upstairs to your door and pound on your door to

17   discuss the noise issues?

18       A    Noise issues, often.  It could be five,

19   ten times a day.  I could be -- him yelling and

20   screaming at me, coming home from my car, you know,

21   going up the stairs.  I don't even have to be in

22   my apartment, being approached by him.

23       Q    Did you ever call the tenant who lived

24   downstairs from you any racial epithet?

25       A    No.

Veritext Legal Solutions
866 299-5127

1     Q     Did you ever call him any names at all?

2     A     No.  I just have told him -- repeated so

3  many times, "Please leave me alone."  I remember

4  saying it so many times.

5     Q     Did you see the tenant who lived downstairs

6  that you were having problems with bother anyone

7  else, except for you?

8     A     Yes, I have.

9     Q     Who else did he bother?

10     A     There's some people around the corner that

11  I hear had arguments.  I don't know what the reason

12  was.

13     Q     During the time frame that you lived at

14  Logan Park, did you make any friends with the other

15  tenants?

16     A     I have friends, a few friends, yes.

17     Q     Okay.  And I'm talking about something more

18  than just, you know, wave as you're walking through

19  the compound or something.

20           Somebody you would socialize with?

21     A     A couple.

22     Q     Okay.

23     A     And some I still talk to today.

24     Q     Do you have any friends that still live at

25  the Logan Park facility?