Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Beth Holtzman (SBN 316400)
bholtzman@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
Tony Ruch (SBN 242717)
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
(510) 834-3300; (510) 834-3377 (Fax)

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
Micaela Alvarez (SBN 319908)
malvarez@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
(510) 437-1863; (510) 437-9164

Attorneys for Plaintiffs and Relators

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA<br><br>        Plaintiffs/Relators,<br><br>vs.<br><br>WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, and DOES 1-30,<br><br>        Defendants. | Case No.: 2:15-CV-00799-KJM-DB<br><br>CLASS ACTION<br><br>**DECLARATION OF JESSE NEWMARK IN SUPPORT OF MOTION SEEKING (1) CLARIFICATION, OR IN THE ALTERNATIVE, AMENDMENT OF THE CLASS DEFINITION, (2) COMPILATION OF THE CLASS LIST, (3) APPROVAL OF PROPOSED CLASS NOTICE, AND (4) AMENDMENTS TO THE SCHEDULING ORDER**<br><br>Date:    July 12, 2019<br>Time:    10 a.m.<br>Dept:    Courtroom 3, 15th Floor<br>Before:  Hon. Kimberly J. Mueller<br><br>Trial Date:   None Set |

DECL. OF JESSE NEWMARK IN SUPPORT OF MOT. SEEKING (1) CLARIFICATION, OR IN THE ALTERNATIVE, AMENDMENT OF THE CLASS DEFINITION (2) COMPILATION OF THE CLASS LIST, (3) APPROVAL OF PROPOSED CLASS NOTICE & (4) AMENDMENTS TO THE SCHEDULING ORDER - CASE NO. 2:15-CV-00799 KJM-DB

757613.6

I, Jesse Newmark, declare as follows:

1.      I am a member in good standing of the Bar of the State of California and Litigation Director at Centro Legal de La Raza in Oakland, California.  I am counsel to Plaintiffs and the certified classes in this case.  I am providing this declaration in support of Plaintiffs' Motion Seeking Compilation of the Class List, Approval of Proposed Class Notice, and Amendments to the Scheduling Order.  I have personal knowledge of the facts set forth in this Declaration and could and would testify competently to them.

2.      Centro Legal de la Raza joined this case in approximately May 2014.  Working closely first with our co-counsel at the Law Offices of Andrew Wolff and now also with Goldstein, Borgen, Dardarian & Ho, we have been actively involved in the discovery and motion practice in this case, including class certification.  I and my co-counsel have worked diligently to move this matter forward, but we have encountered significant resistance from Defendants in response to our requests for a class list.

3.      Plaintiffs first requested lists of putative class members and of tenants participating in the Housing Choice Voucher program (commonly known as "Section 8") in any of Defendants' properties in interrogatories propounded by Plaintiff Denika Terry prior to class certification.

4.      Defendants objected to the interrogatories and refused to provide a response. Defendants also objected to Plaintiffs' related requests for production that sought company-wide information related to Section 8 tenants and Defendants' practices related to Additional Services Agreements, and refused to provide responsive documents.

5.      Upon receiving Defendants' responses and in preparing to move for class certification, Plaintiffs met and conferred with Defendants regarding these discovery disputes, addressing each of Defendants' objections and arguing that the discovery was necessary for Plaintiffs to determine the size and membership of the class.  A true and correct copy of a meet and confer letter that is representative of these efforts, authored by my former co-counsel David Lavine, is attached to this Declaration as Exhibit 1.  These efforts were unsuccessful.

757613.6

6.      The parties submitted their discovery dispute to the Court, filing a Joint Statement Re: Discovery Disagreement on March 20, 2017.  ECF No. 47.

7.      On March 27, 2017 Magistrate Judge Deborah Barnes granted Plaintiffs' motion to compel discovery responses and ordered that "[o]n or before April 14, 2017, defendants shall produce further responses and documents covering the past six (6) years for all of defendants' facilities."  ECF No. 48 at 1-2.

8.      Following Judge Barnes' order, Defendants produced approximately a dozen CDs containing scanned copies of hard copy files relating to tenants of properties owned by Defendants or their affiliates or subsidiaries who participated in the Housing Choice Voucher Section 8 Program ("Section 8").  Each CD contains a single .pdf image file that runs to tens of thousands of pages. These .pdf image files are not searchable.  In total, the production of tenant files comprises more than 360,000 pages, each of which must be examined individually to determine its contents.

9.      Following their production of these voluminous and unwieldy tenant files, Defendants began opposing Plaintiffs' requests for a class list on the basis that Plaintiffs could compile the list themselves from the produced records.

10.     David Lavine continued to meet and confer with opposition counsel on multiple phone calls, including on or around August 5, 2017.

11.     Plaintiffs have to date conducted three depositions of Defendants' corporate representatives pursuant to Federal Rule of Civil Procedure 30(b)(6).  Each witness testified about the document collection and production; taken together, their testimony establishes that the documents produced to Plaintiffs are missing records for certain Section 8 tenants, and that Defendants have at their disposal centralized property management software that enables them to compile a list of members of the Reimbursement Class.

12.     A true and correct copy of excerpts of the deposition of Defendants' Rule 30(b)(6) witness Dave Tanforan is attached to this Declaration as Exhibit 2.

13.     A true and correct copy of excerpts of the deposition of Defendants' Rule 30(b)(6) witness Shawn Fetter is attached to this Declaration as Exhibit 3.

DECL. OF JESSE NEWMARK IN SUPPORT OF MOT. SEEKING (1) CLARIFICATION, OR IN THE ALTERNATIVE, AMENDMENT OF THE CLASS DEFINITION (2) COMPILATION OF THE CLASS LIST, (3) APPROVAL OF PROPOSED CLASS NOTICE & (4) AMENDMENTS TO THE SCHEDULING ORDER - CASE NO. 2:15-CV-00799 KJM-DB

757613.6

14.     A true and correct copy of excerpts of the deposition of Defendants' Rule 30(b)(6) witness Janae Jarvis is attached to this Declaration as Exhibit 4.

15.     Defendants continued to refuse to provide a class list, and to insist that Plaintiffs compile one themselves based on the produced documents, even after Shawn Fetter testified that some hard copy tenant files were missing from the production, and even though, as Janae Jarvis testified, Defendants had compiled a comparable list from their business records in order to guide the document production.

16.     Defendants have not updated their document production since the close of class discovery.

17.     Based on my review of the CDs of tenant files, it is clear to me that compiling a class list based on the documents produced to Plaintiffs would be an extraordinarily burdensome task. Moreover, it would be certain to produce an incomplete list.

18.     The Court certified the two classes in this case on July 30, 2018.

19.     On August 13, 2018, Defendants filed a Rule 23(f) petition in the United States Court of Appeals for the Ninth Circuit challenging the Court's class certification order.  A true and correct copy of the petition is attached to this Declaration as Exhibit 5.

20.     After the Ninth Circuit denied Defendants' Rule 23(f) petition on October 17, 2018, we again requested that Defendants produce a list of members of the Reimbursement Class to enable notice to be sent out.  Defendants refused, and argued once again that Plaintiffs should compile the class list based on the records produced to them.

21.     It became clear to myself and my co-counsel that we needed to bring on additional counsel to litigate this case.  Since the time that we moved for class certification, one of the lead attorneys on the case, David Lavine, left the Law Offices of Andrew Wolff.  My organization, Centro Legal de la Raza, is a nonprofit with limited resources; we were not in a position to increase staffing on this case to absorb the additional work necessary to force Defendants to comply with their litigation duties.

757613.6

22.     Accordingly, beginning in January 2019, we began searching for additional counsel with expertise in class actions and consumer and housing rights to join the litigation team.

23.     In March 2019, GBDH agreed to come onto the case.  Since that date, I and my colleagues and the Law Offices of Andrew Wolff have been working closely with GBDH to bring them up to speed on the case and to continue pressing Defendants on the class list and other pending issues.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct, and that this Declaration was executed this 14th day of June 2019, in Oakland, California.

_____
Jesse Newmark

757613.6

# EXHIBIT 1

# LAW OFFICES OF ANDREW WOLFF, P.C.

ATTORNEYS AT LAW
1956 WEBSTER STREET, SUITE 275
OAKLAND, CA 94612
TELEPHONE: 510-834-3300
FACSIMILE: 510-834-3377

February 24, 2017                                   *Via Facsimile and US Mail*

Yoon-Woo Nam, Esq.
Lewis Brisbois Bisgaard & Smith
2020 West El Camino Ave., Ste. 700
Sacramento, CA 95833
Fax: 916-564-5444

RE:   United States of America ex rel. Terry, et al., v. Wasatch Advantage Group, LLC, 2:15-cv-00799-KJM-DB

Dear Mr. Nam:

I write in order to meet and confer with you regarding Defendant Wasatch Advantage Group, LLC's responses to Plaintiff Terry's first set of Interrogatories and first set of Requests for Production. Defendant's responses to these discovery items were inadequate as discussed below.

*Defendant's Responses to Interrogatories*

Plaintiff propounded six interrogatories to Defendant, designed to gather necessary information to support a motion for certification. These interrogatories sought information regarding the potential size and membership of the proposed class, as well as information supporting the typicality of Plaintiffs' claims. None of Defendants' responses to Plaintiff's six interrogatories was complete or adequate. Defendant asserted the same set of objections to Interrogatory Nos. 1 to 5. Defendant refused to respond to Interrogatory Nos. 1 and 2 at all, and in response to Interrogatory Nos. 3 to 6 arbitrarily decided to limit its responses to tenants of properties in the Sacramento area. Defendant's responses are inadequate, as Defendant's objections are insufficient to excuse these incomplete responses.

Discovery in federal class action cases is governed by FRCP Rules 26 - 37. In general, pre-certification discovery is permitted of matters relevant to the certification process, e.g., number of class members, existence of common questions, typicality of claims, etc. Plaintiffs often need discovery from defendants or others in order to prove an "ascertainable class" (*Mantolete v. Bolger* (9th Cir. 1985) 767 F2d 1416). Discovery is generally permitted if a plaintiff can show that the discovery is likely to substantiate class allegations (*Nguyen v. Baxter Healthcare Corp.* (CD Cal. 2011) 275 F.R.D. 503). District courts have broad discretion to control the class

certification process, and whether or not discovery will be permitted lies within the sound discretion of the trial court (*Vinole v. Countrywide Home Loans Inc.*, (9th Cir. 2009) 571 F.3d 935).

In this case, Plaintiffs' interrogatories and requests for production are narrowly tailored within the standards of the rules regarding pre-certification discovery to seek only such information as is necessary to prove the elements of a certifiable class. This discovery is therefore proper, and absent valid objections, Defendant must respond fully and completely.

Defendant's first objection, that the disclosure of the information sought in the interrogatories would violate the privacy rights of third parties, is simply wrong. As a matter of fact, the case which Defendant cites in support of this proposition, *Pioneer Electronics (USA), Inc., v. Superior Court*, 40 Cal. 4th 360, says the opposite at page 373: "Contact information regarding the identity of potential class members is generally discoverable, so that the lead plaintiff may learn the names of other persons who might assist in prosecuting the case. (E.g., *Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 820-821, 836; *Budget Finance Plan v. Superior Court* (1973) 34 Cal.App.3d 794, 799-800; see Code Civ. Proc., § 2017.010.) Such disclosure involves no revelation of personal or business secrets, intimate activities, or similar private information, and threatens no undue intrusion into one's personal life." Indeed, it is vitally necessary for Plaintiffs to identify potential class members for the sake of determining the size of the potential class. To deny Plaintiffs this information would be to defeat the purposes of class litigation.

Defendant's second objection, that the interrogatories are unduly burdensome because of their breadth, is insufficient to excuse a substantive response as it does not specify the nature of the burden. *Thomas v. Cate*, No. 1:05-cv-01198-LJO-JMD-HC, 2010 U.S. Dist. LEXIS 21750, at *45 (E.D. Cal. Feb. 19, 2010); *Masters v. Gilmore*, No. 08-cv-02278 (D. Colo. Nov. 17, 2009); *State Farm Mut. v. Injury Rehab. Clinic, Inc.*, No. 07-CV-15129, 2008 U.S. Dist. LEXIS 50507, at *11-12 (E.D. Mich. Jun. 30, 2008). See also Fed. R. Civ. P. 33(b)(4). FRCP Rule 26(b)(2)(C)(iii) allows the Court broad discretion in balancing the burden of any response to an interrogatory against the needs and interests to be served by the response. In this case, Plaintiffs must have the information requested in these interrogatories to determine the size and membership of the class. The information is available to Defendant, and only to Defendant; there is no other way for Plaintiff to discover it. Absent a showing of burden, which Defendant has not made, the objection of undue burden cannot be sustained.

Defendant's final objection on the grounds of attorney-client privilege and attorney work product is not even properly stated. Objections to discovery must be specific, as must claims of privilege. The Ninth Circuit has held that a boilerplate privilege objection is insufficient and identified many factors for lower courts to consider when deciding if the responding party's failure to produce a privilege log within thirty days constitutes a waiver of the privileges asserted. (*Burlington N. & Santa Fe Ry. v. U.S. Dist. Court*, 408 F.3d 1142 (9th Cir.), cert. denied, 546 U.S. 939 (2005).) Defendant has not stated in any way how the information sought by these interrogatories might be privileged, nor can it do so. These interrogatories seek information regarding the identities and locations of putative class members, information that cannot be privileged.

2

These objections do not constitute an adequate basis for Defendant to refuse to respond to Interrogatory Nos. 1 and 2, nor do they form adequate basis for Defendant's arbitrary choice in responding to Interrogatory Nos. 3 to 6 to limit its responses to information related to tenants in properties located in Sacramento. Plaintiffs' complaint alleges that Defendant's violations are widespread and systematic across all of Defendant's properties, not just those in the Sacramento area. There is no excuse for Defendant not to provide the information requested.

I request that the interrogatories be amended to remove Defendant's improper objections and to provide full and complete responses to all of Plaintiff's Interrogatories.

*Defendant's Responses to Requests for Production*

Plaintiff propounded 26 requests for production to Defendant, designed to gather necessary documentation to support a motion for certification. These requests sought categories of documents relating to the potential size and membership of the proposed class, as well as documents related to the typicality of Plaintiffs' claims. Of Defendant's responses, only two, to Nos. 7 and 11, were adequate. In response to Nos. 1-6, 8-10, 12-25, Defendant asserted the same set of objections as were made to Plaintiff's Interrogatories, and again arbitrarily decided to limit its responses to current tenants of properties in the Sacramento area. Defendant also refused to respond to Request No. 26 at all. Defendant's responses are inadequate, as Defendant's objections are insufficient to excuse these incomplete responses.

None of Defendant's objections to Plaintiff's requests for production are proper. The discussion of these objections above with regard to Defendant's responses to interrogatories applies equally to Defendant's objections to this request for production. Although in responding to Plaintiff's requests, Defendant did offer to produce some documents, the offer of production is too limited to serve the purposes of the requests. Plaintiff's requests were propounded to permit Plaintiffs to learn the size and membership of the class; restricting the production without good cause to disclose only persons who are current tenants defeats this purpose and frustrates the primary goal of precertification discovery. Plaintiffs must have this information if the membership of the class is to be properly determined. I therefore request that Defendant serve an amended response to Plaintiff's Requests for Production of Documents, removing the improper objections and stating that Defendant will comply with the requests fully and completely.

I request that amended responses to Plaintiffs' Interrogatories and Requests for Production of Documents be served no later than March 2, 2017. If I do not receive them by that date, I will have no choice but to file a motion to compel.

In addition to the above, I ask that you provide written confirmation by the end of the day today of the date when Defendant's production of documents will be completed (or dates, if a tiered production is necessary), and provide the first round of production as promised in Defendant's responses. With regard to the issue of cost-shifting, Defendant as the responding party shall bear the cost of responding to the requests for production, unless Defendant can show that the burden and expense truly are inappropriate (FRCP Rule 26(b)(2)(B-C); *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003)). It is for Defendant to make a showing of the expense and burden before the Court will shift any of the costs. To date, Defendant has not done so.

I additionally ask that you provide written confirmation that you will be producing witnesses for deposition as noticed by Plaintiffs for March 7, 8, and 9, as well as the names and titles of the individuals being produced for each noticed category. Please provide this confirmation no later than March 2, 2017.

Given that the pre-certification discovery cut-off date has been set for April 14, 2017, your diligence and promptness in responding are necessary.

Thank you.

Very truly yours,

David Lavine, Esq.

DL:jg

4

# LAW OFFICES OF ANDREW WOLFF, PC

### 1956 WEBSTER STREET, SUITE 275
### OAKLAND, CA 94612
### PHONE 510-834-3300
### FAX 510-834-3377

---

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: | FROM: |
| Yoon-Woo Nam, Eswq. | Jesse Gentilin |
| COMPANY: | DATE: |
| Lewis Brisbois | February 24, 2017 |
| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
| 916-564-5444 | 5 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |
| Terry v. Wasatch Advantage Group | |

---

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

✗ ✗ ✗ Communication Result Report ( Feb. 24. 2017  1:31PM ) ✗ ✗ ✗

1)
2)

Date/Time: Feb. 24. 2017  1:09PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 9301 | Memory TX | 19165645444 | P.  5 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 3) No answer
E. 5) Exceeded max. E-mail size
E. 2) Busy
E. 4) No facsimile connection

## LAW OFFICES OF ANDREW WOLFF, PC
1956 WEBSTER STREET, SUITE 275
OAKLAND, CA 94612
PHONE 510-834-3300
FAX 510-834-3377

FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|-----|-------|
| Yoon-Woo Nam, Exwq. | Jesse Gentilin |

| COMPANY: | DATE: |
|----------|-------|
| Lewis Brisbois | February 24, 2017 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|-------------|-------------------------------------|
| 916-564-5444 | 5 |

| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
|---------------|----------------------------|

| RE: | YOUR REFERENCE NUMBER: |
|-----|------------------------|
| Terry v. Wasatch Advantage Group | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

# EXHIBIT 2

```
 1                  UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF CALIFORNIA
 3                    SACRAMENTO DIVISION
 4
 5   UNITED STATES OF AMERICA,   )
     ex rel. DENIKA TERRY and    )
 6   ROY HUSKEY III, and each    )
     of them for themselves      )
 7   individualy, and for all    )
     other persons similarly     )
 8   situated and on behalf of   )
     the UNITED STATES OF        )
 9   AMERICA,                    )
10            Plaintiffs,        )
11   v.                          )  Case No.
12   WASATCH ADVANTAGE GROUP,    )  2:15-cv-00799-KJM-DB
     LLC, WASATCH PROPERTY       )
13   MANAGEMENT, INC., WASATCH   )
     POOL HOLDINGS, LLC,         )
14   CHESAPEAKE COMMONS HOLDINGS)
     LLC, LOGAL PARK APARTMENTS,)
15   LLC, LOGAL PARK APARTMENTS,)
     LP, and DOES 1-30,          )
16            Defendants.        )
     _____)
17
18                        DEPOSITION OF
19                        DAVE TANFORAN
20                  WEDNESDAY, AUGUST 9, 2017
21
22   Reported by:
23   TAMARA BERLIN, CSR 9706
24   Job No. 2674876
25   Pages 1 - 233
```

                                                    Page 1

1       A.    For units, I -- I know the unit counts.   Tenants,

2    that would be difficult.

3       Q.    That switch made some sense, I agree.

4             Now, within that population, which of those

5    buildings house Section 8 tenants; if you know?

6       A.    All of them.

7       Q.    All right.   And do you know, either precisely or by

8    estimate, about how many Section 8 tenants are in each of

9    those buildings?

10      A.    I don't.

11      Q.    Can you give any manner of estimate at all?

12      A.    It would be a rough estimate.

13      Q.    As long as --

14      A.    If I were to estimate each one, it would be rough.

15      Q.    All right.   I'm going to ask you for some margin of

16   error after you give them, but let's try it.

17            If you could tell me in each property -- and I

18   understand it's a rough estimate -- how many Section 8

19   tenants are in each one.

20      A.    That's -- that's difficult, because that number

21   would fluctuate over time.

22      Q.    I'm sure it would.   Do your files break out in such

23   a way where you could see that number by doing a query?

24            MR. NAM:  Objection; vague as to "files."

25            THE WITNESS:  Yes.

                                                      Page 21

1    BY MR. LAVINE:

2        Q.   All right.  So rather than doing rough estimates, at

3    the break is it possible for you to reach out to someone at

4    your office to run that query and see what they can come back

5    with?

6             Again, because you're the -- the person most

7    knowledgeable for Wasatch, the duty is on you, and no one

8    else that's here today, to impart the information, so I'm

9    wondering if you can ask?

10            MR. NAM:  I'm going to object that this is outside

11   the scope of the deposition.

12            MR. LAVINE:  We're going to cover that in a minute,

13   but you can answer.

14            THE WITNESS:  Okay.  Yes.

15            MR. LAVINE:  All right.  Good.  I appreciate that.

16   And that way we don't have to deal with really rough numbers,

17   we can get a better sense.

18       Q.   Have you been asked at any time to put together a

19   Section 8 tenant list for this case?

20       A.   No.

21       Q.   Could you do that if you were asked?

22       A.   Yes.

23       Q.   I'm going to ask you a little bit about properties

24   outside your region, just to get an idea of about how the

25   regions are broken out.  As you probably know, I'm going to

Veritext Legal Solutions
866 299-5127

1        A.    Myself and the property managers.

2        Q.    The nine people who you told me about earlier?

3        A.    Seven.

4        Q.    Oh, that's right.

5        A.    One covers three.

6        Q.    All right.  Are the documents that would be

7    responsive to these requests kept on site at each property or

8    are they housed, either electronically or in paper format,

9    centrally somewhere?

10        A.    These were housed on site.

11        Q.    Is there a document repository that's not on site at

12    each other?  In other words, corporate or somewhere else?

13        A.    No.

14        Q.    So each property is responsible in your area of

15    authority for keeping its own documents?

16        A.    Yes.

17        Q.    Did you go to each of the nine properties and talk

18    to the seven property managers yourself?

19        A.    Yes.

20        Q.    All right.  Let's start with Chesapeake, just

21    because it's the name that pops into my head first.

22              When you went to Chesapeake and worked with

23    Ms. Gamboa, what did you do?

24              MR. NAM:   Objection; this exceeds the scope of this

25    Witness's deposition.

                                                      Page 38

1             THE WITNESS:  I explained to Ms. Gamboa what we

2      needed to do in order to locate and scan the documents.

3      BY MR. LAVINE:

4           Q.   How did you go about looking for them?

5           A.   Current residents are in the files, past residents

6      are archived in boxes.

7           Q.   How far do the boxes go back in residents?

8             MR. NAM:  Objection; overbroad.

9             THE WITNESS:  We located documents to 2009 and

10     forward.

11     BY MR. LAVINE:

12          Q.   Do you -- does Chesapeake Commons keep documents

13     before 2009 or do they get moved or destroyed at some point?

14            MR. NAM:  Objection; compound.

15            THE WITNESS:  There are some documents; I don't know

16     if they're complete.  Typically, they're purgeable after a

17     certain amount of years.

18     BY MR. LAVINE:

19          Q.   What's the corporate policy on that?

20          A.   I never seen the corporate policy.

21          Q.   Is it in the handbook or the manual we talked about

22     earlier?

23          A.   I don't think so.

24          Q.   Do you ever instruct your property managers,

25     Ms. Gamboa or otherwise, that at some point it's time to

                                                    Page 39

1          THE WITNESS:  There's a big range.

2   BY MR. LAVINE:

3      Q.    Give me one second.  Any other clarifications you

4   wanted to make from prior testimony?

5      A.    No.

6      Q.    All right.  I also wanted to put on the record

7   something we talked about off the record, which is, in this

8   class case, like in pretty much any other, we need to know

9   from the defendants who -- in this case, Wasatch -- how many

10  people could conceivably be in the class and be eligible for

11  class benefits, were we to prevail in the lawsuit.

12         And I am -- I'm going to ask on the record:  Do you

13  know how many Section 8 tenants are in each of your -- the

14  properties that you supervise?

15         MR. NAM:  I'm going to object that this is an

16  improper interrogatory at a deposition, overbroad, outside

17  the scope of his deposition.

18         Go ahead, if you can answer.

19         THE WITNESS:  I don't know.

20  BY MR. LAVINE:

21     Q.    Can you find out?

22     A.    Yes.

23     Q.    How do you -- how would you do that?  You had told

24  me at the break that it was more complicated then at least I

25  initially thought, but go ahead.

                                        Page 126

1      A.    Has anybody from HUD told me that or anybody --

2      Q.    Anybody at all.

3      A.    No.

4      Q.    Has anyone ever told you that delinquent charges

5   based on the Additional Service Agreements cannot be a basis

6   for eviction proceedings?

7      A.    Say it again.  Sorry.

8      Q.    Sure.  Has anyone ever told you that delinquency and

9   additional service charges cannot be a basis for eviction

10  proceedings?

11         MR. NAM:  Objection; calls for legal conclusion,

12  overbroad, assumes facts.

13         THE WITNESS:  Cannot be a basis?

14  BY MR. LAVINE:

15     Q.    Correct.

16     A.    No, not specifically.

17     Q.    Your form file on your computer where these -- some

18  of these forms -- or all of them, perhaps -- are generated

19  from, is there -- is that based on software that generates

20  those forms or do you have a -- a file of them that you go

21  to?  How does it work?

22     A.    Yes, there's a property manager software that we

23  use.

24     Q.    What's it called?

25     A.    Yardi.

                                              Page  223

Veritext Legal Solutions
866 299-5127

1      Q.    How do you spell it?

2      A.    Y-a-r-d-i.

3      Q.    How long has that been in use at Wasatch?

4      A.    Since I've been here.

5      Q.    Did your other employers, property manager

6   employers, use it as well?

7      A.    I've used it, I think, at one other company.

8      Q.    What does it do?

9            MR. NAM:  Objection; overbroad, vague.

10           THE WITNESS:  It's a database software that -- it's

11   very customizable by whatever the company's needs are.  They

12   can -- they can or can't generate leases, depending if you

13   want it to do that or generate notices and populate it from

14   its database, keep track of move in and move out, those

15   things.

16   BY MR. LAVINE:

17     Q.    Do you use it yourself?

18     A.    Yes.

19     Q.    Do your property managers use it as well?

20     A.    Yes.

21     Q.    Do you know if Yardi is used across Wasatch regions

22   across Wasatch's properties?

23           MR. NAM:  Outside the scope.

24           THE WITNESS:  I think so.

25   BY MR. LAVINE:

Page 224

```
 1                     REPORTER'S CERTIFICATE

 2

 3              I, the undersigned, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify:

 5              That prior to being examined, the witness

 6    named in the foregoing proceedings was previously sworn to

 7    testify to the truth, the whole truth, and nothing but the

 8    truth; that said proceedings were taken by me

 9    stenographically and were thereafter transcribed into

10    typewriting under my direction, said transcript being a true

11    and accurate transcription of my shorthand notes.

12              I further certify that I am neither

13    financially interested in the action nor a relative or

14    employee of any attorney of any of the parties.  In witness

15    whereof, I have this date subscribed my name.

16              Dated: August 23, 2017.

17

18

19

20

21

22

23

24         TAMARA BERLIN, CSR #9706

25         Certified Shorthand Reporter

                                         Page  233
```

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT, SACRAMENTO DIVISION
 3    UNITED STATES OF         )
      AMERICA, ex rel.         )
 4    DENIKA TERRY and ROY     )
      HUSKEY III, and each     )
 5    of them for themselves   )
      individually, and for    )
 6    all other persons        )
      similarly situated and   )
 7    on behalf of the         )
 8    UNITED STATES OF         )
 9    AMERICA,                 )   Case No.
            Plaintiffs,        )   2:15-cv-00799-KJM-DB
10    vs.                      )
      WASATCH ADVANTAGE        )
11    GROUP, LLC, WASATCH      )
      PROPERTY MANAGEMENT,     )
12    INC., WASATCH POOL       )
      HOLDINGS, LLC,           )
13    CHESAPEAKE COMMONS       )
14    HOLDINGS, LLC, LOGAN     )
      PARK APARTMENTS,LLC,     )
15    LOGAN PARK APARTMENTS,   )
16    LP, and DOES 1-30,       )
17        Defendants.          )
18    _____
19
         30(b)(6) Deposition of WASATCH ADVANTAGE GROUP
20                 By: SHAWN FETTER
21              August 11, 2017 * 10:30 a.m.
22    Reporter:  Dawn M. Perry, CSR
23    Notary Public in and for the State of Utah
24    Job No. 2674872
25    Pages 1 - 228
```

Page 1

1    time frame to be able to get those documents in to

2    you -- or in to, you know, wherever they needed to

3    be.

4         Q.    Did you make sure that your team -- one

5    person from the time was responsible for some segment

6    of the documents?

7         A.    In what way?

8         Q.    In other words, did you divvy up who was

9    responsible for what?

10        A.    Yes.

11        Q.    All right.  And who got what tasks?

12        A.    It depended on their loca -- it was per

13   locale, location.

14        Q.    Were -- did you interact with the

15   community managers over this task as well?

16        A.    I did not.

17        Q.    Only the regional managers and your one

18   area leader?

19        A.    Yeah.  That is correct.

20        Q.    Did the document review and -- I call it

21   culling, but bringing them together -- compiling

22   maybe is a better word -- did that go on schedule?

23        A.    To the -- to the best of my knowledge.

24        Q.    All right.  Do you know what the regional

25   managers and any people they tasked at the -- at the

Page 74

1    community level needed to do to get those documents

2    together?

3         A.    Yes.

4         Q.    How did they go about it?

5         A.    They needed to take the entire file and

6    scan that file in and submit that to counsel.

7         Q.    Where were the files?

8         A.    They were in the physical building.  Some

9    of them in storage.

10        Q.    And we've heard --

11        A.    Okay.  Yeah.  Sorry.

12        Q.    We've heard from the earlier two witnesses

13   this week that some were -- active files were on site

14   and archived files may have been on site or may have

15   been moved off site to storage.  Is that right?

16        A.    Correct.

17        Q.    And did you make sure that to the extent

18   that documents had to be pulled from archived files

19   that that was done?

20        A.    Yes, I did.

21        Q.    Whether those files were stored on site or

22   off site?

23        A.    Yes.  It was an extensive process.

24        Q.    Did you go to any of the buildings at all

25   to kind of keep tabs on what was going on?

Page 75

1         A.     Personally, no.  I also let it be known

2    that during this time period I was incapacitated to a

3    certain extent, so I wasn't physically able to be

4    moving around.

5         Q.     What was wrong?

6         A.     I had knee surgery.

7         Q.     Sorry.  Better now?

8         A.     Getting there.

9         Q.     Good luck with the recovery.

10              Do you know if the regional managers

11    reporting to you went on site to the property to kind

12    of oversee the document process?

13        A.     Many of them, yes.

14        Q.     Was it reported to you that all Section 8

15    tenant files for the time period that was requested

16    were, in fact, located and provided, scanned, I

17    guess?

18        A.      It was provided to me that whatever we

19    could find was found and scanned, yes.

20        Q.     Whatever you could find.  Did you ever

21    hear that some files went missing or they couldn't be

22    located?

23        A.     From the requested -- for the entire

24    requested there were a few that were not able to be

25    located.

Page 76

1        Q.     Did you ever get an explanation on what
2    happened with those?
3        A.     They were past the time frame for us on
4    needing to be kept.
5        Q.     Oh, I see.  So they had been purged
6    already?
7        A.     They had been -- they were just unable to
8    be located.  It wasn't -- nobody knew for a fact what
9    had happened to them.
10       Q.     Is there a time for the properties that
11   you oversee that there's a purge of documents after a
12   certain period?
13       A.     It varies.
14       Q.     Is there a policy by Wasatch on that?
15       A.     It really varies more on the property.
16       Q.     So the property is not getting corporate
17   guidance on when they need to destroy documents?
18       A.     We typically hold them for seven years, is
19   typical.
20       Q.     Is that a policy?
21       A.     I don't know if it's a written policy.
22       Q.     Is there a time once a year that's
23   triggered to go look at the older files and purge
24   them in each property?
25       A.     No.

Page 77

```
 1                    REPORTER'S CERTIFICATE
 2    STATE OF UTAH            )
 3                             )  ss.
 4    COUNTY OF SALT LAKE      )
 5              I, Dawn M. Perry, Certified Shorthand
      Reporter and Notary Public in and for the State of
 6    Utah, do hereby certify:
 7              That prior to being examined, the witness,
 8    SHAWN FETTER, was by me duly sworn to tell the truth,
      the whole truth, and nothing but the truth;
 9              That said deposition was taken down by me
      in stenotype on August 11, 2017, at the place therein
10    named, and was thereafter transcribed and that a true
11    and correct transcription of said testimony is set
      forth in the preceding pages.
12              I further certify that, in accordance with
      Rule 30(e), a request having been made to review the
13    transcript, a reading copy was sent to Joseph A.
      Salazar, Jr., Attorney at Law, for the witness to
14    read and sign under penalty of perjury and then
15    return to me for filing with David Lavine, Attorney
      at Law.
16              I further certify that I am not kin or
      otherwise associated with any of the parties to said
17    cause of action and that I am not interested in the
18    outcome thereof.
19              WITNESS MY HAND this 18th day of August,
20    2017.
21
22
23
24    _____
25                 Dawn M. Perry, CSR
```

Page 228

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF CALIFORNIA
                    SACRAMENTO DIVISION
 3   UNITED STATES OF         )
 4   AMERICA, ex rel.         )
     DENIKA TERRY and ROY     )
 5   HUSKEY III, and each     )
     of them for themselves   )
 6   individually, and for    )
 7   all other persons        )  Case No.
     similarly situated and   )  2:15-cv-00799-KJM-DB
 8   on behalf of the         )
     UNITED STATES OF         )
 9   AMERICA,                 )
10        Plaintiffs,         )
                              )
11   vs.                      )
                              )
12   WASATCH ADVANTAGE        )
13   GROUP, LLC, WASATCH      )
     PROPERTY MANAGEMENT,     )
14   INC., WASATCH POOL       )
15   HOLDINGS, LLC,           )
     CHESAPEAKE COMMONS       )
16   HOLDINGS, LLC, LOGAN     )
     PARK APARTMENTS, LLC,    )
17   LOGAN PARK APARTMENTS,   )
18   LP, and DOES 1-30,       )
          Defendants.         )
19   _____
          Deposition of: JANAE JARVIS, CPM,
20                  Rule 30(b)(6)
            August 10, 2017 * 10:24 a.m.
21
22
23   Reporter:  Ann Fleming, RPR
     Notary Public in and for the State of Utah
24   Job No. 2674870
25   Pages 1 - 256
```

Page 1

1        A.     Our local counsel.

2        Q.     One thing your counsel's probably already

3    told you and I'll repeat is, I'm not allowed to inquire

4    into communications with you and either your own

5    lawyers or Mr. Salazar's firm, but apart from those

6    communications, did you work with that spreadsheet at

7    all?

8        A.     No.

9        Q.     Did you review it at all?

10       A.     Yes.

11       Q.     What were you reviewing it for?

12       A.     To follow up with managers if they had

13   missing files.

14       Q.     How could you tell if any were missing?

15       A.     Because we had each unit number spelled

16   out and would track when the file came in, so if it

17   wasn't listed on the sheet, we knew it was missing.

18       Q.     Along -- well, strike that.  Either on the

19   spreadsheet or along with the spreadsheet, was there a

20   list of Section 8 tenant names kept whose files were

21   being cumulated?

22       A.     Yes.

23       Q.     Was that on the spreadsheet or was it on a

24   separate document?

25       A.     It was on a spreadsheet.

```
 1                    REPORTER'S CERTIFICATE
 2

    STATE OF UTAH            )
 3                           )  ss.
    COUNTY OF SALT LAKE      )

 4
 5             I, Ann Fleming, Registered Professional
    Reporter and Notary Public in and for the State of
 6  Utah, do hereby certify:
 7             That prior to being examined, the witness,
    Janae Jarvis, CPM, was by me duly sworn to tell the
 8  truth, the whole truth, and nothing but the truth;
 9             That said deposition was taken down by me
    in stenotype on August 10, 2017, at the place therein
10  named, and was thereafter transcribed and that a true
    and correct transcription of said testimony is set
11  forth in the preceding pages;
12             I further certify that, in accordance with
    Rule 30(e), a request having been made to review the
13  transcript, a reading copy was sent to Mr. Salazar for
    the witness to read and sign, and the original
14  transcript will be delivered to Mr. Lavine for
    safekeeping.
15             I further certify that I am not kin or
    otherwise associated with any of the parties to said
16  cause of action and that I am not interested in the
    outcome thereof.
17             WITNESS MY HAND this 16th day of August,
18  2017.
19
20
21
22
23         _____
24                   Ann Fleming, RPR
25                   Notary Public


                                        Page 256
```

# EXHIBIT 5

# Case No. _____

## In the United States Court of Appeals
## For the Ninth Circuit

WASATCH ADVANTAGE GROUP, LLC, et al.,
*Defendants-Appellants,*

v.

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY, et al.
*Plaintiffs-Appellees.*

Appeal from the United States District Court
for the Eastern District of California – Sacramento Division
Case No. 2:15-cv-00799-KJM-DB
The Honorable Kimberly J. Mueller

**PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CLASS
CERTIFICATION PURSUANT TO RULE 23(f) OF THE FEDERAL
RULES OF CIVIL PROCEDURE**

**LEWIS BRISBOIS BISGAARD &
SMITH LLP**
Jeffry A. Miller (CASBN 126074)
jeff.miller.lewisbrisbois.com
701 B Street, Suite 1900
San Diego, California 92101
Telephone: 619.233.1006
Facsimile: 619.233.8627

**LEWIS BRISBOIS BISGAARD &
SMITH LLP**
Joseph A. Salazar Jr. (CASBN 169551)
joe.salazar@lewisbrisbois.com
2020 West El Camino Avenue,
Suite 700
Sacramento, California95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

*Attorneys for Defendants-Petitioners*
**WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY
MANAGEMENT, INC.,; WASATCH POOL HOLDINGS, LLC,
CHESAPEAKE COMMONS HOLDINGS, LLC; LOGAN PARK
APARTMENTS, LLC; LOGAN PARK APARTMENTS, LP**

(2 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 2 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 36 of 107

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for defendants-petitioners states that there is no parent corporation or any publicly held corporation owning ten percent or more of defendants' stock.

Dated: August 13, 2018          Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By:   */s/ Jeffry A. Miller*
       Jeffry A. Miller
       *Attorneys for Defendants and Petitioners,*
       **WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC.,; WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC; LOGAN PARK APARTMENTS, LLC; LOGAN PARK APARTMENTS, LP**

2

(3 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 3 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 37 of 107

## STATEMENT OF RELATED CASES

In compliance with Ninth Circuit Rule 28-2.6, defendants Wasatch Advantage

Group, LLC, Wasatch Property Management Inc., Wasatch Pool Holdings, LLC,

Chesapeake Commons Holdings, LLC, Logan Park Apartments, LLC, and Logan Park

Apartments, LP state they are not aware of any related case pending in this Court.

Dated: August 13, 2018          Respectfully submitted,

                                LEWIS BRISBOIS BISGAARD & SMITH LLP


                                By:   /s/ Jeffry A. Miller
                                      Jeffry A. Miller
                                      *Attorneys for Defendants and Petitioners,*
                                      **WASATCH ADVANTAGE GROUP, LLC,
                                      WASATCH PROPERTY MANAGEMENT,
                                      INC.,; WASATCH POOL HOLDINGS,
                                      LLC, CHESAPEAKE COMMONS
                                      HOLDINGS, LLC; LOGAN PARK
                                      APARTMENTS, LLC; LOGAN PARK
                                      APARTMENTS, LP**

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 4 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 38 of 107

(4 of 73)

## **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................2

STATEMENT OF RELATED CASES ....................................................3

INTRODUCTION ........................................................................9

FACTUAL AND PROCEDURAL BACKGROUND ...........................................12

    A.    Defendants offer tenants amenities that are not required by Section 8's minimum housing quality standards via additional services agreements............................................................12

    B.    Plaintiffs' complaint. ........................................................14

    C.    Plaintiffs' move for class certification. ................................15

    D.    The district court grants class certification. .......................17

QUESTIONS PRESENTED AND RELIEF REQUESTED ...................................18

REASONS WHY THE PETITION SHOULD BE GRANTED .............................19

I.    Review Is Necessary to Address Novel Legal Issues That Are Important to Class Action Law and Likely to Evade Review.......................................20

    A.    A class has never been certified under C.F.R. § 982.451 and doing so will disincentive private landlord participation in Section 8..........20

    B.    The definition of "Rent to Owner" in 42 C.F.R. § 982.451(b)(4)(ii) is undefined. .........................................22

    C.    The deference afforded to local public agencies administering Section 8 tenancies is unresolved.......................................24

II.    The Court Manifestly Erred in Failing to Undertake a Rigorous Analysis of Rule 23's Certification Requirements.......................................27

CONCLUSION ........................................................................30

(5 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 5 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 39 of 107

CERTIFICATE OF COMPLIANCE........................................................................31

EXHIBIT A: DISTRICT COURT ORDER ...........................................................34

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 6 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 40 of 107

(6 of 73)

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                   **<u>Page</u>**

*Adoma v. Univ. of Phoenix, Inc.*,
   270 F.R.D. 543 (E.D. Cal. 2010)...........................................................................28

*Ariz. v. City of Tucson*,
   761 F.3d 1005 (9th Cir. 2014)..............................................................................26

*Chamberlan v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005)......................................................................... 19, 20

*Coleman v. Hernandez*,
   490 F. Supp. 2d 278 (D. Conn. 2007) ..................................................................20

*Gen. Tel. Co. of Southwest v. Falcon*,
   457 U.S. 147 (1982) ..............................................................................................27

*Grand Canyon Trust v. Energy Fuels Resources (U.S.A.) Inc.*,
   269 F. Supp. 3d 1173 (D. Utah 2017) ..................................................................26

*Leyva v. Medline Industries Inc.*,
   716 F.3d 510 (9th Cir. 2013)................................................................................29

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012)................................................................................29

*Microsoft Corp. v. Baker*,
   137 S. Ct. 1702 (2017) .........................................................................................19

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001).................................................................................27

*Poulos v. Caesars World, Inc.*,
   379 F.3d 654 (9th Cir. 2004)................................................................................19

*Sabi v. Sterling*,
   183 Cal. App. 4th 916 (2010)...............................................................................21

*United States ex rel. Holmes v. Win Win Real Estate, Inc.*,
   No. 2:13-CV-02149-APG-GWF, 2015 U.S. Dist. LEXIS 142532
   (D. Nev. Oct. 19, 2015)........................................................................................20

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 7 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 41 of 107

(7 of 73)

*United States ex rel. Sutton v. Reynolds*,
 564 F. Supp. 2d 1183 (D. Or. 2007)................................................................20

*Velez v. Cuyahoga Metro. Hous. Auth.*,
 795 F.3d 578 (6th Cir. 2015)..........................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) ............................................................... 27, 28, 29

*Zinser v. Accufix Reseach Inst., Inc.*,
 253 F.3d 1180 (9th Cir. 2001)........................................................................29

## Statutory Authorities

31 U.S.C. § 3729(a) ..........................................................................................15

42 U.S.C.

 § 1437(a)(1) .................................................................................................25

 § 1437f.......................................................................................................9, 15

 §§ 1437, et seq. ...........................................................................................24

Cal. Bus. & Prof. Code § 17200, et seq. ........................................................15

Cal. Civ. Code § 1750, et seq..........................................................................15

## Rules and Regulations

24 C.F.R.

 § 982.1 .........................................................................................................12

 § 982.160 .....................................................................................................25

 § 982.311 .....................................................................................................21

 § 982.4(b) ............................................................................................... 24, 25

 § 982.401 ............................................................................................... 14, 22

 § 982.405(a)-(g)...........................................................................................21

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 8 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 42 of 107

(8 of 73)

§ 982.407 .................................................................................................13

§ 982.451 ......................................................................................... 10, 18, 20

§ 982.451(b)(4)(i) ....................................................................................13

§ 982.451(b)(4)(ii) ........................................................................... passim

§ 982.507(b) ...........................................................................................21

§ 982.510(c) ...........................................................................................14

§ 982.515(c) ...........................................................................................21

Fed. R. Civ. P. 23 ..................................................................................27

Fed. R. Civ. P. 23(b)(3) ........................................................................28

(9 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 9 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 43 of 107

# INTRODUCTION

The district court's class certification order in this case raises matters of first impression for this circuit and negatively impacts the public policy benefits enshrined in Section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f ("Section 8"). Section 8 provides rental housing assistance to millions of low-income households so they can afford to rent from private landlords on the open market. Most Section 8 tenants are low-income individuals and families, the disabled, and the elderly. Affordable housing is a particular problem in metropolitan areas of California. Therefore, federal court interpretation and application of Section 8 law affects many people on a personal level.

Petitioners-Defendants, Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC, Logan Park Apartments, LLC, Logan Park Apartments ("Wasatch"), own and operate rental properties throughout California. Some of the tenants at Wasatch's properties rent units using the Section 8 program, and some do not. Wasatch offers tenant amenities that are not required by Section 8's minimum housing quality standards via Additional Services Agreements ("ASAs"). Wasatch's ASAs enable both Section 8 and non-Section 8 tenants to receive amenities such as renter's insurance, in-unit washer and dryers, and covered parking. Wasatch provides tenants with a copy of the ASA as part of their lease agreement.

(10 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 10 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 44 of 107

Plaintiffs contend the ASAs constitute an impermissible "side payment" under 24 C.F.R. § 982.451. Defendants contend it does not. The district court certified classes under Section 8 regulations for past and present tenants at Wasatch's California properties that participated in the Section 8 Housing Choice Voucher Program while paying additional charges as set forth in the ASAs.

The court allowed this case to proceed as a class action under Section 8 regulations that have never before warranted certification. The court's ruling will have a severe chilling effect on private landlords' willingness to rent to Section 8 tenants in the future. Tenants knowingly entered into the ASAs to receive optional amenities that would not otherwise be provided with the tenant's rent. The court nevertheless certified these classes because, according to the court, the lease agreements and ASAs were standardized contracts provided to all class members and all class members alleged injuries arising from the charges set forth in the ASAs, which meant all class members had common evidence for their claims. As a result, the court determined it could resolve all class members' claims by determining the legality of the ASAs.

The court's undue focus on the standardized contracts misses the point. Each tenancy, including the rental rate, was independently evaluated and approved by the public housing agency in the context of that locality's rental market. The ASAs' legality thus depends upon the definition of rent and what charges constitute rent, and these terms are undefined in the Section 8 regulations. Because local public agencies

(11 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 11 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 45 of 107

are uniquely situated to determine rental rates and evaluate additional contracts like the ASAs, the court's order also raises the specter of agency deference. Whether a state agency's administrative decisions are afforded deference is unsettled in this circuit. Additionally, the court's order will result in large-scale, class-based liability likely to have a chilling effect on private landlords' willingness to rent to Section 8 tenants.

The court's order also demonstrates that it failed to conduct a rigorous analysis of Rule 23's class certification requirements, in particular, the commonality and predominance requirements. Whether or not the ASAs *as a whole* violated federal law must be determined on a location-by-location, market-by-market and unit-by-unit basis. The rental rates and the charges included in the ASAs resulted from an individualized market analysis of each unit. The use of standardized ASAs alone, without comparing the rental rates for similar units during that time and in that region, is insufficient to establish liability. Liability instead depends upon whether the ASAs' charges for amenities should have been included in the undefined rental rate. The court's ruling presupposes that the ASAs are illegal "side payments." They are not.

Because the district court's order addresses novel legal issues with public policy ramifications, and is manifestly erroneous, this Court should grant review under Federal Rule of Civil Procedure 23(f).

(12 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 12 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 46 of 107

## FACTUAL AND PROCEDURAL BACKGROUND

**A.**   **Defendants offer tenants amenities that are not required by Section 8's minimum housing quality standards via additional services agreements.**

Under the Section 8 Housing Assistance Program for Existing Housing ("Section 8 program"), local housing authorities, along with the United States Department of Housing and Urban Development ("HUD"), subsidize lower income individuals and families, the elderly and disabled person's rental payments to private landlords. 24 C.F.R. § 982.1. Local housing authorities administer the Section 8 program according to broad directives within the regulations. Wasatch owns and operates properties that rent units to Section 8 and non-Section 8 tenants. (ECF No. 78, at 7.) HUD governs implementation of the Section 8 program nationwide by entering into annual contribution contracts with local public housing agencies. 24 C.F.R. § 982.1. Through these contracts, the public housing agencies receive funding to use as rent subsidies to pay landlords who rent to Section 8 tenants. *Id.* Tenants then look for private housing available for the total amount of rent that the public housing agency approves.

Once a landlord agrees to rent to a Section 8 tenant, the parties enter into a proposed lease agreement for a specified total rent to owner. 24 C.F.R. § 982.1. The parties then present the proposed lease agreement to the local public housing agency for approval. *Id.* If the unit meets program minimum housing quality standards and the rent is reasonable, the public housing agency will approve the lease. *Id.* Once the

(13 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 13 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 47 of 107

public housing agency approves the lease: (1) the lease becomes binding on the landlord and tenant and (2) the public housing agency and the landlord enter into a separate Housing Assistance Payments Contract ("HAP Contract"). Promulgated by HUD, the HAP Contract requires the public housing agency to make rent subsidy payments on behalf of the tenant. *Id.*

Pursuant to 24 C.F.R. § 982.451(b)(4)(i), the portion of the rent that the tenant pays the owner may not exceed the total rent to the owner minus the public housing agency payment to the owner.[1] Additionally, 24 C.F.R. § 982.451(b)(4)(ii) states that "the owner may not demand or accept any rent payment from the tenant in excess of this maximum, and must immediately return any excess rent payment to the tenant."

The Sacramento Housing and Redevelopment Agency ("SHRA") administers the program for the Sacramento region, including Wasatch's properties. The SHRA's administration duties include enforcement and payment of the program on a lease-by-lease basis. 24 C.F.R. § 982.407. (ECF No. 78-5, at 2:7-12.) Before the SHRA approves a tenancy at Wasatch's properties, it evaluates whether the housing quality standards are met and the reasonableness of the proposed rental rate. (*Id.* at 2:13-28, 3:15-27.) Intended to promote "decent, safe, and sanitary housing," the housing

---

[1]     Part C of the HAP Contract, the Tenancy Addendum, states "rent to owner" is "the total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA [Public Housing Agency] housing assistance payment to the owner." (ECF. No. 78-2, at 29.)

(14 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 14 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 48 of 107

quality standards set criteria for sanitary facilities, food preparation areas, appliances, and heating. 24 C.F.R. § 982.401. The SHRA compares the proposed rental rate to the local market by analyzing the unit's (1) location, quality, size, type, and age and (2) amenities, housing services, maintenance and utilities. 24 C.F.R § 982.507(a)(1). The SHRA also determines whether there are no extra charges for "items customarily included in rent in the locality, or provided at no additional cost to unsubsidized tenants in the premises." 24 C.F.R § 982.510(c).

Wasatch tenants customarily paid base rent in exchange for the standard items included in the housing quality standards. To receive additional amenities and services, tenants entered into an ASA. (ECF No. 78, at 7.) The ASAs included amenities such as Wi-Fi, cable television, maid service, covered parking, in-unit washers and dryers, renter's insurance and pet accommodations. (*Id.* at 10:5-9.) None of these amenities were classified as housing quality standard items. (*Id.* at 10:1-27.) The SHRA accepts separate agreements so long as the items covered are not included in the housing quality standards and are not typically included in rent to non-Section 8 tenants. (ECF No. 78-5, at 3:15-27.) The SHRA approved Wasatch's use of the ASAs. (*Id.* at 5:1-7.)

## B.   Plaintiffs' complaint.

Plaintiffs Denika Terry and Roy Huskey III filed this lawsuit, on behalf of themselves and those similarly situated, against Wasatch claiming: (1) violation of the

(15 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 15 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 49 of 107

Federal False Claims Act, 31 U.S.C. § 3729(a),[2] (2) breach of contract; (3) violation of

the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; and (4)

unlawful, fraudulent, and unfair business practices under the Unfair Competition Law,

Cal. Bus. & Prof. Code § 17200 et seq. (ECF No. 1, at 8.)

Plaintiffs contend that Wasatch unlawfully demanded additional rent, referred

to as "side payments," in excess of the class members' individual shares of rent. (ECF

No. 1, at 8.) The "side payments" allegedly included demands that class members pay

for washer and dryer rentals, renter's insurance and covered parking. Plaintiffs further

contend that during their tenancies, all class members "paid, or are in jeopardy of

paying, Defendants. . .side payments. . . ." (*Id.*) As such, Wasatch's demand and

receipt of the "side payments" from class members violated 42 U.S.C. § 1437f, 24

C.F.R. Part 982, and the class members' HAP Contracts. (*Id.* at 9.)

## C.   Plaintiffs' move for class certification.

Plaintiffs moved to certify two classes of Section 8 tenants. Under Rule

23(b)(3), plaintiffs sought to certify for damages/restitution a class of all persons who,

four years prior to the filing of the complaint through final resolution of the matter,

were tenants at any of Wasatch's California properties, participated in the Section 8

voucher program, and paid additional charges as set forth in the ASAs. (ECF No. 72-

---

[2]      Plaintiffs did not seek class certification of their False Claims Act claim.

(16 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 16 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 50 of 107

1, at 15.) Plaintiffs sought certification on the basis that Wasatch "appl[ied] common classwide policies, and the core issue in this case is whether the additional charges constitute rent." (*Id.* at 7.) Plaintiffs also moved to certify a class for declaratory and injunctive relief under Rule 23(b)(2), concerning all current and prospective Section 8 tenants at Wasatch's California properties who participate or will participate in the voucher program and pay or will pay additional charges in the ASAs. (*Id.* at 15.)

In opposition, Wasatch asserted that the commonality, predominance, typicality, ascertainability and superiority requirements for class certification were not met. (ECF No. 78, at 15-25.) Wasatch argued that individual questions of law and fact predominate because the legality of each ASA hinged on a market analysis of what charges comprised rent at the time of the lease. (*Id.* at 15.) The housing market is in constant flux. Thus, the reasonableness of the rental rate must be reevaluated at the beginning of each lease and annually thereafter. (*Id.*)

In reply, plaintiffs reiterated that certification should be granted solely because the extra charges constituted illegal, additional rent. (ECF No. 80, at 5.) Because the ASAs were included with the lease and failure to pay them was grounds for eviction, defendants ipso facto treated the ASA charges as rent. Plaintiffs did not address Wasatch's contention that the ASAs covered amenities—not quality standards—and contracting to receive amenities is not illegal. (*Id.*)

(17 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 17 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 51 of 107

**D.     The district court grants class certification.**

On July 30, 2018, the court granted plaintiffs' class certification motion and

motion for leave to file a third amended complaint. (ECF No. 92, attached hereto as

Ex. A.) The court granted certification of the following classes:

> All persons who, in the time period starting four years prior to the date of filing this Complaint through the final resolution of this matter, (1) have been tenants at any of Defendants' California properties; (2) have participated in the "Section 8" Housing Choice Voucher Program in connection with their tenancies at the California properties; and (3) have paid additional charges set forth in Additional Services Agreements in excess of their individual portions of the contract set forth in the HAP contracts.

> All persons who: (1) are or will become tenants at any of Defendants' California properties; (2) participate or will participate in the "Section 8" Housing Choice Voucher Program in connection with their tenancies at the California properties; and (3) pay or will pay additional charges set forth in Additional Services Agreements in excess of their individual portions of the contract rent set forth in the HAP Contracts.

(Ex. A, at 13:6-10, 13:14-17.)

The court stated that the "core of plaintiffs' motion for class certification is their

assertion that this case involves standard form contracts and additional side payments

improperly and illegally treated as rent." (Ex. A, at 14:26-28.) The court stated that

these standardized contracts supported finding typicality.  (*Id.* at 17:14.) The court

then considered whether there are common questions of law and fact and found that

determining whether the ASAs "violated defendants' HAP Contract provisions with

Section 8 tenants or federal law" would resolve all of plaintiffs' claims. (*Id.* at 25:21-

(18 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 18 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 52 of 107

25.) This finding was based on Wasatch's purported standardized contracts. (*Id.* at 25:25-27.)

The court also found that a class action was the superior means of litigation. The court rejected Wasatch's contentions that local public agencies, such as the SHRA, are better equipped to determine whether the ASAs constituted rent. (Ex. A, at 35:2-16.) Although local public agencies evaluate all proposed Section 8 tenancies, and are repositories of accumulated market data for their locality, the court declined to resolve whether it owed deference to their decisions. (*Id.* at 35:25-26.)

## QUESTIONS PRESENTED AND RELIEF REQUESTED

The overarching issue is whether this Court should accept review to address novel legal issues that impact class action law and correct the district court's manifest errors in certifying the class. More specifically:

1.    Whether this Court should weigh-in on the certification of a class pursuant to 24 C.F.R. § 982.451 and address novel issues regarding landlord exposure under the Section 8 program, the definition of rent under 24 C.F.R. § 982.451(b)(4)(ii) and the deference owed to the local public agencies?

2.    Whether the court manifestly erred in certifying a class without undertaking a rigorous analysis of the class certification requirements, in particular the commonality and predominance requirements?

(19 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 19 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 53 of 107

## REASONS WHY THE PETITION SHOULD BE GRANTED

Rule 23(f) permits interlocutory appeals of orders granting class certification. *Poulos v. Caesars World, Inc*., 379 F.3d 654, 662 (9th Cir. 2004). The Court's discretion is "unfettered" in ruling on Rule 23(f) petitions. *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1709 (2017). Review of class certification decisions is appropriate when the case presents:

> (1) A death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable;
>
> (2) The certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or
>
> (3) The district court's class certification decision is manifestly erroneous.

*Chamberlan v. Ford Motor Co*., 402 F.3d 952, 959 (9th Cir. 2005).

Here, the second and third criteria are met as granting Wasatch permission to appeal will allow development of class action jurisprudence and provide guidance on important, unsettled legal issues. Additionally, the court manifestly erred in certifying a class without undertaking a rigorous analysis of Rule 23's certification requirements.

I.     **Review Is Necessary to Address Novel Legal Issues That Are Important to Class Action Law and Likely to Evade Review.**

A.     **A class has never been certified under C.F.R. § 982.451 and doing so will disincentive private landlord participation in Section 8.**

Rule 23(f) review is appropriate when "an interlocutory appeal may facilitate the development of the law of class actions." *Chamberlan*, 402 F.3d at 958-59. Rule 23(f) exists because class cases "often settle or are resolved without clear resolution of procedural matters," leading to a dearth of appellate guidance. *Id.* at 958. The cases best-suited for review are those where the legal standards are "unsettled" and "important" both "to class action law" generally and "the particular litigation." *Id.* at 958-59. This situation exists here.

While courts have considered the legality of "side payments" made in excess of the rent to owner allowable under 24 C.F.R. § 982.451, none of these cases were brought on behalf of a class. *See, e.g., United States ex rel. Holmes v. Win Win Real Estate, Inc.,* No. 2:13-CV-02149-APG-GWF, 2015 U.S. Dist. LEXIS 142532, at *13-14 (D. Nev. Oct. 19, 2015) (homeowner association fees and property management fees); *U.S. ex rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183, 1187 (D. Or. 2007) (fees for landscaping); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 280 (D. Conn. 2007) (fees for water usage). The court's class certification order dramatically expands landlord liability under Section 8 and raises significant policy concerns affecting housing accessibility for such tenants. As plaintiffs' class definition includes all

(21 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 21 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 55 of 107

persons who have paid charges in the ASAs "in excess of their individual portions of contract rent set forth in the HAP Contracts," certification also necessitates that "rent" under 24 C.F.R. § 982.451(b)(4)(ii) be defined. Lastly, the court's decision fails to address the deference owed to local public agencies' administration of Section 8 tenancies. These are novel and difficult matters of first impression.

In California and the majority of states, landlords have wide discretion to accept Section 8 vouchers and participate in the program. *Sabi v. Sterling*, 183 Cal. App. 4th 916, 933 (2010). Opting into the Section 8 program can be uncertain and costly for landlords. Section 8 requires mandatory inspection prior to the public housing agency approving a lease, and also on a yearly basis, and following any allegations of damage to the unit. 24 C.F.R. § 982.405(a)-(g). Additionally, the public agency sets rental rates according to a market analysis of the local area that can result in a landlord receiving less than market value for the tenancy. 24 C.F.R. § 982.507(b). While the landlord will receive rental payments from the public agency, the tenant is also responsible for a portion of the rent. 24 C.F.R. § 982.311; 24 C.F.R. § 982.515(c). A tenant's ability to pay his or her portion may vary each month, presenting collection difficulties for the landlord. The court's decision penalizes landlords for offering amenities beyond the housing quality standards and further disincentives landlords from accepting Section 8 tenants.

(22 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 22 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 56 of 107

The certified class exposes landlords to large-scale liability for providing their tenants with modern amenities. The requirements for Section 8 units promote habitability rather than convenience. 24 C.F.R. § 982.401. Separate amenities agreements are common practice in the Sacramento region. (ECF No. 78-5, at 6:15-27.) Charging for amenities is the status quo for private landlords renting to Section 8 and non-Section 8 tenants alike. But, if plaintiffs' class becomes precedent, landlords will be left footing the bill for any items they provide Section 8 tenants beyond the bare minimum housing quality standards. Landlords that cannot afford such costs will likely cease providing amenities altogether. Non-Section 8 tenants expect such amenities and are willing to pay for them. Section 8 tenants also expect such amenities, but the court's decision curtails their ability to receive them.

Because the court's order prevents landlords from recouping amenities' cost and maintenance, it will have a chilling effect on landlords' willingness to rent to Section 8 tenants. With fewer landlords willing to assume the risk of renting to Section 8 tenants, housing affordable to disadvantaged groups will be become less available at a time when it is most needed. The disadvantaged tenants this ruling seeks to protect, ironically, will instead be harmed.

### B.    The definition of "Rent to Owner" in 42 C.F.R. § 982.451(b)(4)(ii) is undefined.

The concept of "rent"—and by extension, whether charges for amenities are included in a "rent" under 42 C.F.R. § 982.451(b)(4)(ii)—remains undefined in this

(23 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 23 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 57 of 107

circuit. This is a novel and difficult matter of first impression. In the context of ruling on short-term rental fees charged to tenants, the Sixth Circuit in *Velez v. Cuyahoga Metro. Hous. Auth.*, 795 F.3d 578 (6th Cir. 2015), considered the definition of "rent" and noted that no provision of the Housing Act or its regulations define "rent." *Id.* at 583. Interpreting rent as per its "ordinary, contemporary, common meaning," the court looked to the Supreme Court's and a dictionary's definition of rent. *Id.* at 584. The court concluded that rent means "the amount paid under the lease for the use and occupancy of the property." *Id.* at 585. As a result, the short-term fees were rent since the "definition of rent plainly includes the tenant's total expense for the use of land during the term of occupancy." *Id.*

In its order denying Wasatch's motion to dismiss plaintiffs' complaint, the district court considered the definition of "rent" offered in *Velez*, but did not choose to adopt it. (ECF No. 61, at 15.) The court found the definition over-broad:

> Although *Velez* offers a broad definition of "rent" for the purposes of Section 8, that definition does not easily encompass the additional charges here.

(ECF No. 61, at 14.) But, the court did not propose an alternative definition and barred plaintiffs from amending their complaint to assert the *Velez* definition. (*Id.* at 20.)

Despite the court's refusal to adopt the *Velez* definition, the court's present certification order does not resolve, *or even address*, what charges comprise rent under Section 8. The court instead presupposes that the amenities in Wasatch's ASAs

(24 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 24 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 58 of 107

are rent and are illegal side payments under section 982.451(b)(4)(ii). This presumption of facial invalidity flies in the face of section 982.510, which specifically allows for other charges so long as they meet criteria determined at the local level. Adopting plaintiffs' facts and argument, the court did not examine the ASAs in their proper statutory context. Section 8 defines "rent to owner" as "[t]he total monthly rent payable to the owner under the lease for the unit. Rent to owner covers payment for any housing services, maintenance and utilities that the owner is required to provide and pay for." 24 C.F.R. § 982.4(b). Does "rent to owner" include amenities that the owner is *not* required by Section 8 to provide and pay for? This Court's guidance is necessary to resolve this fundamental question.

### C. The deference afforded to local public agencies administering Section 8 tenancies is unresolved.

The court's certification order fails to give proper deference to the decisions of HUD and by extension local public housing agencies. Rejecting Wasatch's contention that local public housing agencies were the better suited forum to resolve plaintiffs' claims, the court stated it "need not resolve whether any deference is owed to the agency here in order to certify plaintiffs' Rule 23(b) class, and the court declines to do so." (Ex. A, at 35:25-26.) This is contrary to the stated purpose of the United States Housing Act of 1937, 42 U.S.C. §§ 1437, et seq.:

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this Act--

(25 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 25 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 59 of 107

(A)  to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

(B)  to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and

(C)  consistent with the objectives of this title, *to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration,* with appropriate accountability to public housing residents, localities, and the general public;

42 U.S.C. § 1437(a)(1) (emphasis added).

Thus, the Act encourages delegating authority to public housing agencies to administer and promulgate HUD's Section 8 policies at the local level. 24 C.F.R. § 982.4(b). HUD relies on public housing agencies to implement the program at localities nationwide. HUD will only contract directly with landlords for housing subsidies if there is no public housing agency organized for that locality or there is no public housing agency "able and willing" to implement the program. 24 C.F.R. § 982.160.

Public housing agencies draft administrative plans establishing local Section 8 policies. The administrative plans are approved by HUD and must strictly follow HUD requirements and regulations. *Id.* Public agencies evaluate each proposed tenancy for compliance with HUD regulations and that locality's administrative plan. This Court's guidance is needed to resolve whether a state agency is entitled to deference when the state agency is required to administer federal law.

(26 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 26 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 60 of 107

In *Grand Canyon Trust v. Energy Fuels Resources (U.S.A.) Inc.*, 269 F. Supp. 3d 1173 (D. Utah 2017), the court considered the unsettled issue of agency deference in the context of the Utah Department of Air Quality's interpretation and implementation of the Clean Air Act. *Id.* at 1195-96. In the Tenth Circuit, a "state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency." *Id.* at 1195. The court, however, compared this stance to that of other circuits and found that where the state agency's interpretation is consistent with federal law and when it administers federal regulations upon an express delegation from Congress, its regulatory decisions may "merit some deference." *Id*. (citing *Ariz. v. City of Tucson*, 761 F.3d 1005, 1014-15 (9th Cir. 2014) (concluding the state agency was owed "some deference" regarding the environmental issues in a CERCLA consent decree but not in interpreting the mandate)). The court reasoned that "the state agency has at least some expertise and Congress likely intended to draw on that expertise when permitting delegation to a state agency." *Id*.

Here, the SHRA administers the Section 8 program at the local level. The SHRA's institutional knowledge of the Sacramento housing market enables it to calculate reasonable rent and analyze fluctuations. The SHRA's policy is to review the separate agreement, analyze the charges under HUD regulations as well as the local housing market, and determine whether it is acceptable. (ECF No. 78-5, at 3:15-27.)

(27 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 27 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 61 of 107

The ASAs were provided to the SHRA for review and approval. (*Id.* at 5:1-7.) The SHRA's administrative plan does not make a "blanket statement" regarding separate agreements. (*Id.* at 3:23-24.) The SHRA was aware of and approved Wasatch's ASAs. (*Id.* at 5:1-7.)

The SHRA had the expertise necessary to administer the Section 8 program for its locality and approve Wasatch's leases. The court's decision erodes public agency's, such as the SHRA's, authority to operate under their federal mandate to implement the Section 8 program. This Court's guidance is now needed to resolve whether the SHRA's administration of Section 8 regulations pertaining to using separate agreements should be given deference.

## II.     The Court Manifestly Erred in Failing to Undertake a Rigorous Analysis of Rule 23's Certification Requirements.

The United States Supreme Court has made clear that class actions are the exception, not the rule. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Before certifying a class, a court must conduct a "rigorous analysis" to ensure Rule 23's requirements have been satisfied. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). "A class certification decision requires a thorough examination of the factual and legal allegations." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001). A party seeking class certification must affirmatively demonstrate his compliance with Federal Rule of Civil Procedure 23 thereby proving there are in fact sufficiently numerous parties, common questions of

(28 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 28 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 62 of 107

law or fact, etc. *Wal-Mart,* 564 U.S. at 350. Further, Rule 23(a) requires substantially more than mere identification of common issues. Under *Wal-Mart's* heightened standard, courts must focus on whether common questions have common answers that will resolve "each of the [class members'] claims in one stroke." *Id.*

Here, plaintiffs primarily seek certification under Federal Rule of Civil Procedure 23(b)(3), which requires a showing that common issues "predominate" over individual issues and that class adjudication is "superior" to other methods of adjudication. *Adoma v. Univ. of Phoenix, Inc.*, 270 F.R.D. 543, 547 (E.D. Cal. 2010). "Predominance overlaps with, but is not identical to, the requirements of commonality and typicality under Rule 23(a)." *Id.* Therefore these issues will be discussed together.

Plaintiffs contended below that common issues predominated because Section 8 tenants received "substantially identical lease agreements with the same HUD-form Tenancy Addendum." (ECF No. 72-1, at 18.) Finding plaintiffs' evidence persuasive, the court ruled that plaintiffs' claims require resolving whether Wasatch's additional charges in the ASAs violated their HAP Contract provisions with Section 8 tenants or federal law. (Ex. A, at 25:21-25.) The court found that because Wasatch used "the same standard form agreements" for all class members, resolving this issue would resolve all claims. (*Id.* at 25:25-27.)

But whether Wasatch purportedly used standardized contracts is not the crux of this dispute. The validity of the ASAs, and the validity of each tenancy, cannot be

(29 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 29 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 63 of 107

resolved "in one stroke." *Walmart*, 564 U.S. at 350. Whether the ASAs are legal requires a unit-by-unit analysis to determine which, if any, amenities in the ASAs should have been covered by "rent to owner." (ECF No. 78, at 16.) Such an analysis is market-based and applies only to a specific tenancy at a specific time. Each plaintiff's claims would need to undergo this analysis to determine whether the ASAs for a particular tenancy were valid under federal law, and if not, which items in the ASAs were in violation. Evidence and testimony by local public agency officials, local landlords, and expert economists would need to be offered to make each determination. As a result, this litigation would devolve into a series of complex mini-trials on liability.

Relying again on the standardized contracts, the court also found that plaintiffs' damages are subject to a common method of proof. (Ex. A, at 27:4-15.) This finding mischaracterizes Wasatch's proposed analysis of each tenancy as addressing damages alone. While variations in proof regarding the quantum of damage suffered by each class member do not, by themselves, prevent class certification, *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 513 (9th Cir. 2013), common issues do not predominate when individual evidence is required to establish which class members suffered injury caused by the defendant's conduct. *Zinser v. Accufix Reseach Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (predominance standard not met in part because causation required individualized inquiries); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596

(30 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 30 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 64 of 107

(9th Cir. 2012) ("common questions of fact do not predominate where an individualized case must be made for each member showing reliance").

The court erred in asserting class-wide proof of liability and damages exists based on Wasatch's use of "the same standard forms." (Ex. A, at 25:25-27.) Whether a particular ASA violated federal law, and in turn damaged a class member, hinges on discrete analysis supported by extensive evidence. Individualized issues of liability will predominate.

## CONCLUSION

Based upon the foregoing reasons, this Court should accept review of the district court's class certification order under Rule 23(f).

Dated: August 13, 2018                 Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP


By:   */s/ Jeffry A. Miller*
Jeffry A. Miller
*Attorneys for Defendants and Petitioners,*
**WASATCH ADVANTAGE GROUP, LLC,
WASATCH PROPERTY MANAGEMENT,
INC.,; WASATCH POOL HOLDINGS,
LLC, CHESAPEAKE COMMONS
HOLDINGS, LLC; LOGAN PARK
APARTMENTS, LLC; LOGAN PARK
APARTMENTS, LP**

(31 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 31 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 65 of 107

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. 5(b)(1)(E), this document contains 5,198 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

Dated: August 13, 2018        Respectfully submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

By:   */s/ Jeffry A. Miller*
       Jeffry A. Miller

(32 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 32 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 66 of 107

**CERTIFICATE OF SERVICE**
**USA-Terry v. Wasatch Property Mgmt.**
**USDC Case No. 2:15-cv-00799 KJM DAD**
**Ninth Circuit No. _____**

I hereby certify that I electronically field the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 13, 2018.

On August 13, 2018, I served the following document described as **PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CLASS CERTIFICATION PURSUANT TO RULE 23(f) OF THE FEDERAL RULES OF CIVIL PROCEDURE** on all interested parties in this action by placing a true copy enclosed in sealed envelopes addressed as stated on the attached service list. I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice, this document will be deposited with the U.S. Postal Service on this date with postage thereon fully prepaid at San Diego, California to addresses listed below in the ordinary course of business.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on August 13, 2018, at San Diego, California.

/s/Sherry Bernal
Sherry Bernal

(33 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 33 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 67 of 107

**SERVICE LIST**
**USA-Terry v. Wasatch Property Mgmt.**
**USDC Case No. 2:15-cv-00799 KJM DAD**
**Ninth Circuit No. _____**

Andrew Wolff
Law Office of Andrew Wolff, PC
1956 Webster Street, Ste. 275
Oakland, CA 94612
T: 510-834-3300
E-Mail: Andrew@wolfflaw.com
***Attorney for Plaintiffs***
***Denika Terry and Roy Huskey, III***


Jesse Newmark
CENTRO LEGAL DE LA RAZA
3022 International Blvd, Ste. 410
Oakland, CA 94601
Telephone: (510) 437-1554 x115
Fax: (510) 437-9164
Email: jessenewmark@centrolegal.org
***Attorney for Plaintiffs***
***Denika Terry and Roy Huskey, III***


Vincente Antonio Tennerelli
United States Attorney's Office
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4080
Email: Vincente.Tennerelli@usdoj.gov
joni.jones@usdoj.gov
***Attorney for Intervenor Plaintiff***
***United States of America***

(34 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 34 of 72
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 68 of 107

# EXHIBIT A: DISTRICT COURT ORDER

(35 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 35 of 72
Case 2:15-cv-00799-KJM-DB   Document 92   Filed 06/30/18   Page 69 of 107

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA, ex rel.        No.  2:15-cv-00799 KJM DB
     DENIKA TERRY and ROY HUSKEY III,
12   and each of them for themselves           ORDER
     individually, and for all other persons
13   similarly situated and on behalf of the
     UNITED STATES OF AMERICA,
14
                  Plaintiffs/Relators,
15
           v.
16
     WASATCH ADVANTAGE GROUP,
17   LLC, WASATCH PROPERTY
     MANAGEMENT, INC., WASATCH
18   POOL HOLDINGS, LLC, CHESAPEAKE
     COMMONS HOLDINGS, LLC, LOGAN
19   PARK APARTMENTS, LLC; LOGAN
     PARK APARTMENTS, LP,
20
                  Defendants.
21

22

23          Plaintiffs are tenants who receive rental assistance through the federally subsidized

24   Housing Choice Voucher Program commonly known as "Section 8."  They claim defendant

25   lessors improperly charged plaintiffs, as well as the putative class members they seek to

26   represent, for washer and dryer rentals, renter's insurance and covered parking.  Plaintiffs argue

27   these services constitute impermissible rent under the Section 8 contracts and regulations, and

28

                                              1

1   defendants therefore violated the Section 8 contracts and submitted false claims for

2   reimbursement under the federal program.

3           Plaintiffs now move to amend their complaint and move for class certification on

4   behalf of themselves and other similarly situated tenants at defendants' properties located in

5   California in the past four years.  Pls.' Mot. Class Cert. (Mot.), ECF No. 72-1; ECF No. 71

6   (motion to amend); *see, e.g.*, Lavine Decl. Exs. A-J, ECF No. 72-5 (including documents related

7   to tenants at defendants' properties in Fresno, Hanford, Kingsburg, Norco, Rancho Cordova,

8   Sacramento, San Diego and Spring Valley, California).  Defendants oppose both motions.  Defs.'

9   Opp'n Class Cert. (Opp'n), ECF No. 78; ECF No. 77 (opposition to motion to amend).  Plaintiffs

10  have replied.  Pls.' Reply Class Cert. (Reply), ECF No. 80; ECF No. 79 (reply to defendant's

11  opposition to motion to amend).  For the reasons discussed below, plaintiffs' motion to amend is

12  GRANTED, plaintiffs' class certification motion is GRANTED as to the Rule 23(b)(3) class and

13  plaintiffs' class certification motion is GRANTED CONDITIONALLY as to the Rule 23(b)(2)

14  class, conditioned on plaintiffs substituting a new class representative who has standing to pursue

15  declaratory and injunctive relief.

16  I.      BACKGROUND

17          A.      Factual Background

18          Because the court grants plaintiffs' motion to amend, the facts below are taken

19  primarily from the plaintiffs' third amended complaint (TAC), ECF No. 71-2.  Although

20  defendants are correct as a general matter that "it is the operative pleading that controls the scope

21  of this litigation," Opp'n at 20, courts have considered class definitions differing from those in the

22  operative complaint and relied on amended complaints filed after a motion for class certification

23  was filed.  *See, e.g.*, *Stuart v. Radioshack Corp.*, No. C-07-4499 EMC, 2009 WL 281941, at *1-4,

24  6, 13-14, 18 (N.D. Cal. Feb. 5, 2009) (granting leave to amend where plaintiff moved to file new

25  complaint after moving for class certification and defendant "pointed out [plaintiff] was asking

26  for certification of a class different from that alleged in his complaint," then relying on the new

27  complaint when addressing the motion for class certification).  Given the similarity between the

28

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 37 of 72
Case 2:15-cv-00799-KJM-DB Document 105-2 Filed 06/14/19 Page 71 of 107
Case 2:15-cv-00799-KJM-DB Document 92 Filed 07/30/18 Page 3 of 38

(37 of 73)

1　second and third amended complaints, and the absence of any prejudice to defendants if the court

2　relies on the latter, the court does so here in the interests of efficiency and justice.

3　　　　　Plaintiffs seek to represent a class of past, present and prospective tenants of

4　residential apartments owned, rented, and managed by defendants. TAC ¶¶ 1-2. Defendants'

5　properties include four apartment communities in the Sacramento area. *Id.* ¶ 3. Plaintiffs Denika

6　Terry and Roy Huskey III lived at two of them. *Id.* ¶¶ 4-5. Defendants rent numerous apartments

7　to tenants who receive rental assistance through the federally subsidized Housing Choice Voucher

8　Program, commonly known as "Section 8." *Id.* ¶ 6. The Section 8 program provides that

9　participating tenants pay between thirty percent and forty percent of their adjusted monthly

10　income toward rent and utility costs and the federal government and local housing agencies pay

11　the balance of rent directly to the property owner. *Id.* Across defendants' properties, there are

12　hundreds of Section 8 tenants. *Id.* ¶ 8. Defendants were parties to Housing Assistance Payment

13　Contracts (HAP Contracts) with plaintiffs as part of the Section 8 program. *Id.* ¶ 9. As part of

14　their usual course of business, defendants demanded additional monthly charges from plaintiffs

15　and other Section 8 tenants; the additional charges were treated no differently from rent, and were

16　in excess of the tenants' portion of the rent due under the HAP Contracts. *Id.* ¶ 10. The

17　additional payment demands included rental charges for washers and dryers, renters' insurance

18　and covered parking. *Id.*

19　　　　　Plaintiffs' claims rely on defendants' treating these additional charges no

20　differently than rent. The HAP Contracts, which are agreements between and among the tenant

21　family, the landlord and the local housing authority, establish the initial lease term and the total

22　amount of monthly rent due from the tenant. *Id.* ¶¶ 31-34. The sum of the housing assistance

23　payment by the public housing agency and the tenant's share of rent under the HAP Contract is

24　known as the contract rent, which is subject to change in limited circumstances and only after

25　notice is given. *Id.* ¶¶ 37-38. The regulations governing rent under a HAP Contract, found at 24

26　C.F.R. § 982.451, provide in pertinent part, "[t]he owner may not demand or accept any rent

27　payment from the tenant in excess of the maximum and must immediately return any excess rent

28　to the tenant." *Id.* ¶ 39 (citing 24 C.F.R. § 982.451(b)(4)(ii)). Similarly, Part C of the Tenancy

1    Addendum to the standard HAP Contract provides: "The owner may not charge or accept, from

2    the family or from any other source, any payment for rent of the unit in addition to the rent to

3    owner." *Id.* ¶ 40.

4            Plaintiffs allege defendants repeatedly demanded payment of additional charges,

5    rent payments or "side payments," all in violation of the HAP Contracts and without authorization

6    of the local housing agency or the U.S. Department of Housing and Urban Development (HUD).

7    *Id.* ¶¶ 50, 96-100, 117-21.  As noted, defendants' demand for "side payments" included payment

8    for washer and dryer rentals, renter's insurance and covered parking.  *Id.* ¶¶ 96, 117.  As an

9    example, defendants' Resident Ledger for the Terry residence for the month of January 2012

10   reflects a monthly charge of $40 for "Washer/Dryer Rental," $17.91 for "Renter's Insurance" and

11   $10 for "Covered Parking Charges."  *Id.* Ex. B.  Similarly, defendants' Resident Ledger for the

12   Huskey residence for the month of January 2012 reflects a monthly charge of $50 for

13   "Washer/Dryer Rental" and $17.91 for "Renter's Insurance."  *Id.* Ex F.  Plaintiffs periodically

14   entered into several Residential Rental Agreements, each of which included an Additional

15   Services Agreement that addressed these additional charges.  *Id.* ¶¶ 55, 64, 88-89, 110-11; *id.*

16   Exs. G, H, I (Terry Agreements); *id.* Exs. J, K (Huskey Agreements).  To enforce additional rent

17   payment requirements, defendants threatened Terry and Huskey each with eviction for

18   nonpayment of the "side payments."  TAC ¶¶ 96, 100-01, 117, 121-22.  Defendants ultimately

19   filed an eviction action against Terry for not making the unlawfully demanded "side payments."

20   *Id.* ¶ 102.

21           Based on these allegations, plaintiffs bring four claims against all defendants: (1)

22   violation of the Federal False Claims Act, 31 U.S.C. § 3729(a), for "knowingly present[ing] a

23   false or fraudulent claim for payment or approval" to the United States, *id.* ¶¶ 144-58; (2) Breach

24   of Contract, Cal. Civ. Code §§ 3300 *et seq.*, for breaching the terms of the HAP Contracts that

25   prohibit the charging of additional rent payments, *id.* ¶¶ 159-65; (3) violation of the Consumer

26   Legal Remedies Act, Cal. Civ. Code § 1750, for engaging in deceptive practices in connection

27   with the conduct of a business providing services, *id.* ¶¶ 166-77; and (4) Unfair Business

28   Practices, Cal. Bus. & Prof. Code § 17200 *et seq.*, for engaging in "unfair competition," including

4

1    any "unlawful, unfair, or fraudulent business act or practice," *id.* ¶¶ 178-92.  Plaintiffs seek

2    damages and injunctive and other equitable relief.  *Id.* ¶ 194.

3              B.    Procedural Background

4              Plaintiffs filed their initial complaint on April 14, 2015.  ECF No. 1.  After the

5    court granted in part and denied in part defendants' motion to dismiss, the plaintiffs filed a second

6    amended complaint.  ECF No. 66.

7              Now plaintiffs have filed a motion to amend the complaint based not on new

8    theories of liability, but on "evidence discovered."  ECF No. 71-1.  Defendants oppose this

9    motion, ECF No. 77, and plaintiffs have replied.  ECF No. 79.

10              On the same day as their motion to amend, plaintiffs filed a motion to certify two

11    classes.  ECF No. 72-1.  Defendants oppose this motion, ECF No. 78, and plaintiffs replied.  ECF

12    No. 80.

13              Plaintiffs have not expressly requested a hearing on the question of preliminary

14    class certification, which the court has submitted on the papers.  Min. Order, ECF No. 81; *see*

15    *also Merrill v. S. Methodist Univ.*, 806 F.2d 600, 608-09 (5th Cir. 1986) (noting district courts

16    ordinarily should hold a hearing on the question of class certification if a plaintiff expressly

17    requests one but observing Federal Rule of Civil Procedure 23 does not require an evidentiary

18    hearing).

19    II.    LEGAL STANDARD

20              A.    Motion to Amend

21              Contrary to plaintiffs' assertions, ECF No. 79 at 3, when a party seeks to amend its

22    complaint after a Rule 16 scheduling order has been issued, the party's ability to amend his

23    complaint is governed by Rule 16(b).  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608

24    (9th Cir. 1992); *see also Johnson v. St. Mary*, No. CIV S-06-0508 WBS EFB PS, 2007 WL

25    1100507, at *1 (E.D. Cal. Apr. 11, 2007), *findings and recommendations adopted*, No. CIV-S-06-

26    0508-WBS EFB PS, 2007 WL 1365400 (E.D. Cal. May 9, 2007) ("[The Eastern District],

27    applying *Johnson* [*v. Mammoth Recreations*], has confirmed that once the district court has filed a

28    pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16, a motion to amend the

(40 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 40 of 72

Case 2:15-cv-00799-KJM-DB Document 1052 Filed 06/14/19 Page 74 of 107
Case 2:13-cv-00193-KJM-DB Document 52 Filed 07/30/19 Page 6 of 38

1     pleadings is governed first by Rule 16(b), and only secondarily by Rule 15(a)").  Although

2     plaintiffs have asserted the court "issued other, superseding scheduling orders that do not mention

3     a deadline for any complaint amendments," ECF No. 79 at 3, the first amendment to the

4     scheduling order in this case, which modified only three deadlines related to class certification

5     and a status conference, clearly stated, "All other provisions in of the initial scheduling order

6     (ECF No. 39) remain in effect," ECF No. 54.  The initial scheduling order states, "No further

7     joinder of parties or amendments to pleadings is permitted without leave of court, good cause

8     having been shown."  ECF No. 39 at 2 (citing Fed. R. Civ. P. 16(b) and *Johnson*, 972 F.2d 604).

9     The court therefore analyzes plaintiffs' motion to amend under Rule 16(b), then under Rule 15(a).

10            Under Rule 16(b), a movant must demonstrate "good cause" to justify adding a

11    new defendant.  *Mammoth*, 975 F.2d at 608; *St. Mary*, 2007 WL 1100507, at *1 (citing *Jackson v.*

12    *Laureate, Inc.*, 186 F.R.D. 605, 608 (E.D. Cal. 1999); *Roberts v. Beard*, No. 15cv1044-WQH-

13    PCL, 2018 WL 454437, at *4 (S.D. Cal. Jan. 17, 2018).  "The 'good cause' standard 'focuses on

14    the diligence of the party seeking amendment.'"  *St. Mary*, 2007 WL 1100507, at *1.  "Relevant

15    inquiries [into diligence] include: whether the movant was diligent in helping the court to create a

16    workable Rule 16 order; whether matters that were not, and could not have been, foreseeable at

17    the time of the scheduling conference caused the need for amendment; and whether the movant

18    was diligent in seeking amendment once the need to amend became apparent."  *Id.*

19            If good cause exists, the party next must satisfy Rule 15(a).  *Cf. Johnson*, 975 F.2d

20    at 608 (citing approvingly *Forstmann v. Culp*, 114 F.R.D. 83, 85 (M.D.N.C.1987), for its

21    explication of this order of operations).  Federal Rule of Civil Procedure 15(a)(2) states "[t]he

22    court should freely give leave [to amend its pleading] when justice so requires," and the Ninth

23    Circuit has "stressed Rule 15's policy of favoring amendments."  *Ascon Props., Inc. v. Mobil Oil*

24    *Co.*, 866 F.2d 1149, 1160 (9th Cir.1989).  "In exercising its discretion [to grant or deny leave to

25    amend] 'a court must be guided by the underlying purpose of Rule 15—to facilitate decision on

26    the merits rather than on the pleadings or technicalities.'"  *DCD Programs, Ltd. v. Leighton*, 833

27    F.2d 183, 186 (9th Cir.1987) (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir.1981)).

28    However, "the liberality in granting leave to amend is subject to several limitations. Leave need

1    not be granted where the amendment of the complaint would cause the opposing party undue

2    prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay." *Ascon*

3    *Props.*, 866 F.2d at 1160 (internal citations omitted).

4        B.    Motion for Class Certification

5            Litigation by a class is "an exception to the usual rule" that only the individual

6    named parties bring and conduct lawsuits. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

7    (2011) (citation and internal quotation marks omitted). Only when a class action "promot[es]

8    . . . efficiency and economy of litigation" should a motion for certification be granted. *Crown,*

9    *Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983). A court considers whether class litigation

10   promotes "economies of time, effort and expense, and . . . uniformity of decisions as to persons

11   similarly situated, without sacrificing procedural fairness or bringing about other undesirable

12   results." Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment.

13           To be eligible for certification, the proposed class must be "precise, objective, and

14   presently ascertainable." *Williams v. Oberon Media, Inc.*, No. 09-8764, 2010 WL 8453723, at *2

15   (C.D. Cal. Apr. 19, 2010); *see also* 7A Charles Alan Wright, et al., *Federal Practice and*

16   *Procedure* § 1760 (3d ed. 2018) ("If the general outlines of the membership of the class are

17   determinable at the outset of the litigation, a class will be deemed to exist." (footnote with

18   citations omitted)). The proposed class definition need not identify every potential class member

19   from the very start. *See, e.g.*, *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir.

20   1975); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). This requirement

21   is a practical one. It is meant to ensure the proposed class definition will allow the court to

22   efficiently and objectively ascertain whether a particular person is a class member, *see In re TFT-*

23   *LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010), for example, so that

24   each putative class member can receive notice, *O'Connor*, 184 F.R.D. at 319.

25           Class certification is governed by Federal Rule of Civil Procedure 23. The court

26   must first determine whether to certify a putative class, and if it does, it must then define the class

27   claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g). To be certified, a

28   putative class must meet the threshold requirements of Rule 23(a) and the requirements of one of

                                        7

1    the subsections of Rule 23(b), which defines three types of classes. *Leyva v. Medline Indus., Inc.*,

2    716 F.3d 510, 512 (9th Cir. 2013). Here, plaintiffs seek certification under Rules 23(b)(2) and

3    23(b)(3). Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused

4    to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

5    declaratory relief is appropriate respecting the class as a whole." A Rule 23(b)(2) class can be

6    certified where "a single injunction or declaratory judgment would provide relief to each member

7    of the class." *Wal-mart*, 564 U.S. at 360. Rule 23(b)(3) provides for certification of a class

8    where common questions of law and fact predominate and a class action is the superior means of

9    litigation.

10        Rule 23(a) imposes four requirements on every class. First, the class must be "so

11    numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Second,

12    questions of law or fact must be common to the class. *Id.* 23(a)(2). Third, the named

13    representatives' claims or defenses must be typical of those of the class. *Id.* 23(a)(3). And fourth,

14    the representatives must "fairly and adequately protect the interests of the class." *Id*. 23(a)(4). If

15    the putative class meets these requirements, Rule 23(b)(3) imposes two additional requirements:

16    first, "that the questions of law or fact common to class members predominate over any questions

17    affecting only individual members," and second, "that a class action is superior to other available

18    methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3). The test of Rule

19    23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.,*

20    *LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S.

21    591, 623-24 (1997)).

22        "The party seeking class certification bears the burden of demonstrating that the

23    requirements of Rules 23(a) and (b) are met." *United Steel, Paper & Forestry, Rubber, Mfg.*

24    *Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO C.L.C. v. ConocoPhillips Co.*, 593

25    F.3d 802, 807 (9th Cir. 2010). This burden is real; Rule 23 embodies more than a "mere pleading

26    standard." *Wal-Mart*, 564 U.S. at 350. The party must "prove that there are *in fact* sufficiently

27    numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). The trial

28    court must then conduct a "rigorous analysis" of whether the party has met its burden, *id.*, and

1    "analyze each of the plaintiff's claims separately," *Berger v. Home Depot USA, Inc.*, 741 F.3d

2    1061, 1068 (9th Cir. 2014) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809

3    (2011)).  The court must verify the putative class's "actual, not presumed, conformance with Rule

4    23(a) . . . ." *Wal-Mart*, 564 U.S. at 351 (alterations omitted) (quoting *Gen. Tel. Co. of Sw. v.*

5    *Falcon*, 457 U.S. 147, 160 (1982)).  This inquiry often overlaps with considering the merits of the

6    plaintiffs' substantive claims.  *Wal-Mart*, 564 U.S. at 351-52.  Indeed, "a district

7    court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco*

8    *Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original) (citing *Wal-Mart*, 564

9    U.S. at 351-52); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[O]ur cases

10   requir[e] a determination that Rule 23 is satisfied, even when that requires inquiry into the merits

11   of the claim.").  These same "analytical principles" also apply to the court's analysis of whether

12   the plaintiff meets its burden under Rule 23(b).  *Comcast*, 569 U.S. at 34.

13   III.    DISCUSSION

14          A.    Motion to Amend

15          Plaintiffs move for leave to file the TAC located at ECF No. 71-2.  *See* ECF

16   No. 71-1.  Plaintiffs assert the proposed amendments "do not substantially change the character of

17   the plaintiffs' theories of liability, but rather seek to expand coverage under the TAC to all of the

18   areas in which defendants own and operate properties accepting housing choice voucher

19   (commonly known as "Section 8") tenants, rather than just to their Sacramento-area properties."

20   ECF No. 71-1 at 2.  Plaintiffs direct the court's attention to the assigned magistrate judge's

21   having granted expanded "class discovery to cover all Wasatch-owned properties over the

22   western states." *Id.*  Plaintiffs note the proposed TAC "simply conforms the allegations to

23   evidence discovered—a classic reason for amendment." *Id.*  Additionally, plaintiffs contend there

24   is no undue delay or other prejudice to defendants, "no trial date has been set, and class

25   certification has yet to be decided . . . ." *Id.* at 3.

26          In opposition, defendants contend plaintiffs "offer no explanation for their failure

27   to include the proposed expansion of their class in the Second Amended Complaint" and granting

28   this motion would permit plaintiffs "a second opportunity to seek class certification."  ECF

9

1  No. 77 at 3. Defendants contend granting leave to amend "would cause substantial delay" and

2  expense, and plaintiffs had "full knowledge of [d]efendants' other properties" when they last

3  amended their complaint.  *Id.*

4         Plaintiffs reply that their second amended complaint was limited to the

5  amendments "addressed in the order on" defendant's motion to dismiss, "and that a plaintiff is not

6  free to further amend without being granted further leave to amend by the Court." ECF No. 79 at

7  2.  Additionally, plaintiffs contend the deadline to file their prior amended complaint within 14

8  days was a relatively short time frame and fell ten days before the close of class discovery.  *Id.*

9  According to plaintiffs, "approximately half of [d]efendants' total [document] production"

10  occurred "in the final two weeks of the class period."  Plaintiffs moved for leave to file the TAC

11  "just days later, on August 25, 2017."  *Id.*  at 3.  Plaintiffs also assert defendants suffered no

12  prejudice because the TAC "was filed concurrently with the class certification motion," which

13  permitted defendants the "full briefing period and opposition brief to address the new,

14  geographically expanded allegations in the proposed TAC."  *Id.*  Plaintiffs contend they have

15  good cause for leave to file the TAC because it incorporates class discovery and they "could not

16  reasonably have moved to amend any earlier, until the evidence was in."  *Id.* at 4.

17         The court finds good cause to grant leave to plaintiffs to file the TAC.  Plaintiffs

18  have shown diligence by filing their motion to amend only 11 days after the close of class

19  discovery, which was only 12 days after "depositions of [d]efendants' persons-most-

20  knowledgeable."  *Id.* at 2; ECF No. 54 (granting joint request to modify scheduling order in part

21  to set class certification discovery deadline of August 14, 2017); *see Kendrick v. Cty. of San

22  Diego*, No. 15-cv-2615-GPC (RBB), 2017 WL 2692903, at *4 (S.D. Cal. June 22, 2017) (party

23  was diligent when it filed motion to amend when "less than a month passed").  Additionally,

24  plaintiffs are correct that the magistrate judge ordered document production and discovery

25  responses for all of defendants' properties, not just for defendants' properties in Sacramento.  *See*

26  ECF No. 48 (ordering that "defendants shall produce further responses and documents covering

27  the past six (6) years for all of defendants' facilities," nearly five months before plaintiffs filed the

28  motion to amend).  Defendants did not move for reconsideration of the magistrate judge's ruling,

1    and additional discovery has occurred. Plaintiffs' new allegations in the TAC coincide with

2    evidence supplied in their motion for class certification involving tenants at defendant properties

3    throughout California. *Compare* TAC ¶¶ 44-45 (class definitions expanded to all of California),

4    *and* Lavine Decl. Exs. A-J (including documents related to tenants at defendants' properties in

5    Fresno, Hanford, Kingsburg, Norco, Rancho Cordova, Sacramento, San Diego and Spring Valley,

6    California), *with* Second Amended Complaint (SAC) ¶ 41 (ECF No. 66) (class definition limited

7    generally to "Northern California").

8            Because the court finds good cause to grant plaintiffs leave to file the TAC, the

9    court next considers any "undue prejudice" to defendants, bad faith by plaintiffs, futility in

10   amendment, or undue delay created. *See Ascon Props.*, 866 F.2d at 1160. Defendants contend

11   granting this request would cause "substantial delay" and "undue delay and expense" throughout

12   their opposition but do not actually explain what this means. ECF No. 2-3. The only argument

13   resembling an explanation is defendants' position that they have already "invested substantial

14   time and expense during this briefing process" and granting leave to amend would "essentially hit

15   the reset button on the entire certification process." *Id.* at 3. But as plaintiffs noted, they filed

16   their motion to amend and motion to certify class on the same day. *Compare* ECF No. 71 (filed

17   August 25, 2017), *with* ECF No. 72 (filed August 25, 2017). The court's own examination of the

18   TAC reveals nothing that would delay consideration of plaintiffs' motion for class certification,

19   necessitate additional briefing by defendants or delay the case. Defendants' arguments against

20   certification, discussed more fully below, *see generally* Opp'n, would not materially differ based

21   on the new TAC allegations. *See, e.g.*, TAC ¶¶ 7-8 (modifying paragraphs and adding a new

22   paragraph speaking more generally about Section 8 tenants located at defendants' properties); *id.*

23   ¶¶ 41-42 (quoting HAP contract sections already at dispute from the onset of this case); *id.* ¶¶ 63-

24   85 (outlining defendants' practices and standard forms). The new class definitions plaintiffs

25   propose have three primary differences that do not prejudice defendants in their opposition to

26   plaintiffs' motion for class certification. *Compare* TAC ¶¶ 44-45, *with* SAC ¶ 41. First, plaintiffs

27   have shortened the proposed class period by two years. Second, plaintiffs have changed language

28   from "additional rent payments" to "additional charges set forth in Additional Services

11

1  Agreements" to better clarify the claims at issue. Third, plaintiffs have split the singular, more

2  convoluted class definition in the SAC to two separate definitions in the TAC to delineate

3  between a Rule 23(b)(3) class for damages or restitution and a Rule 23(b)(2) class for declaratory

4  and injunctive relief. And fourth, plaintiffs have expanded the class definition from Northern

5  California to all of California. Defendants' arguments are somewhat more persuasive when

6  applied to plaintiffs' new class definition covering all of California, but as explained below, those

7  arguments do not create an insufficient obstacle to class certification.

8          Beyond the changes noted above, many other aspects of the TAC remain nearly

9  identical to the SAC. *Compare*, *e.g.*, SAC ¶¶ 104-15 (class allegations), *with* TAC ¶¶ 128-39

10 (class allegations expanded to all of California); *compare* SAC ¶¶ 116-170 (relief and claims,

11 causes of action, request for jury trial, and prayer for relief), *with* TAC ¶¶ 140-194 (substantially

12 identical (relief claims, causes of action, request for jury trial, and prayer for relief). The same

13 exhibits are attached to the SAC and TAC as well. *Compare* SAC Exs. A-K, *with* TAC Exs. A-

14 K.

15         Because the court observes no prejudice, bad faith, futility or delay occasioned by

16 the proposed amendment, plaintiffs' motion to amend is GRANTED.

17         The court therefore considers the motion for class certification as based on the

18 TAC and construes defendants' opposition accordingly. *See Stuart*, 2009 WL 281941, at *1-4, 6,

19 13-14, 18 (granting leave to amend where plaintiff moved to file new complaint after moving for

20 class certification and defendant "pointed out [plaintiff] was asking for certification of a class

21 different from that alleged in his complaint," then relying on new complaint when addressing

22 motion for class certification); *cf. In re TFT–LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583,

23 590-91 (N.D. Cal. 2010) (allowing modification of class definition during class certification

24 briefing because "the proposed modifications are minor, require no additional discovery, and

25 cause no prejudice to defendants"); *Patten v. Vertical Fitness Grp., LLC*, No. 12CV1614-LAB

26 (MDD), 2013 WL 12069031, at *4 (S.D. Cal. Nov. 8, 2013) (considering the class definition

27 embodied in a motion for class certification because defendant suffered no prejudice despite

28 plaintiff's offering "one class definition in a complaint, a different class definition in a subsequent

1    motion for class certification, and essentially the original class definition in a *subsequent* first

2    amended complaint") (emphasis in original).

3        B.    <u>Motion for Class Certification</u>

4            Plaintiffs seek certification of two classes. First, plaintiffs seek certification of a

5    Rule 23(b)(3) class for damages or restitution defined as:

6            All persons who, in the time period starting four years prior to the
             date of filing this Complaint through the final resolution of this
7            matter, (1) have been tenants at any of Defendants' California
             properties; (2) have participated in the "Section 8" Housing Choice
8            Voucher Program in connection with their tenancies at the California
             properties; and (3) have paid additional charges set forth in
9            Additional Services Agreements in excess of their individual
             portions of the contract set forth in the HAP Contracts.
10

11    Mot. at 9; TAC ¶ 44.

12            Second, plaintiffs seek certification of a Rule 23(b)(2) class for declaratory and

13    injunctive relief defined as:

14            All persons who: (1) are or will become tenants at any of Defendants'
             California properties; (2) participate or will participate in the
15           "Section 8" Housing Choice Voucher Program in connection with
             their tenancies at the California properties; and (3) pay or will pay
16           additional charges set forth in Additional Services Agreements in
             excess of their individual portions of the contract rent set forth in the
17           HAP Contracts.

18    Mot. at 9; TAC ¶ 45.

19            Plaintiffs seek to certify these classes as to plaintiffs' California state law claims

20    for breach of contract, violation of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et*

21    *seq.*) and violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*). Mot.

22    at 12-18. Plaintiffs do not seek class certification on their False Claims Act claim. *Id.* at 1.

23            Plaintiffs rely on several declarations. *See* ECF Nos. 72-2, 72-3, 72-4, 72-5. For

24    example, named plaintiff Roy Huskey III's declaration describes his own experience of paying

25    "additional rent payments, or 'side payments,' not set forth in [his] HAP Contract or yearly

26    subsidy adjustment notices," including "in-unit washer and dryer appliances, and for renter's

27    insurance, as reflected in [his] rent ledger . . . ." Huskey Decl. ¶ 6, ECF No. 72-2. Huskey's

28    declaration incorporates several attached documents, including Huskey's Lease Supplemental

13

1  Agreement with attached Tenancy Addendum, HAP Contract and Residential Rental Agreement.

2  *See id.* Ex. A.  Huskey refers to a Wasatch Property Management Resident Ledger, also attached

3  to his declaration as an exhibit.  *See id.* Ex. B.

4  Named plaintiff Denika Terry makes similar contentions in her own declaration,

5  specifically referencing extra "rent payments, or 'side payments," in the form of "in-unit washer

6  and dryer appliances, for covered parking, and for renter's insurance . . . ."  Terry Decl. ¶ 6, ECF

7  No. 72-3.  Terry's declaration also contains a Lease Supplemental Agreement, HAP Contract and

8  Wasatch Property Management Resident Ledger.  *Id.* Exs. A-B.

9  Plaintiffs' attorneys have submitted declarations explaining their experience.  Jesse

10 Newmark has submitted a declaration as attorney of record for plaintiffs explaining his

11 organization's experience and his own experience in "significant class action and complex

12 litigation" as well as experience with low-income tenants.  Newmark Decl. ¶ 3, ECF No. 72-4;

13 *see also id.* ¶¶ 2-23.  David Lavine has submitted a declaration that details in part his experience

14 and his firm's experience with low-income tenant cases and class action suits.  Lavine Decl. ¶¶ 3-

15 6, ECF No. 72-5.

16 Lavine's declaration also attaches and authenticates a multitude of exemplar

17 documents related to tenants at defendants' properties.  *See id.* Exs. A-K (including HAP contract

18 examples, Additional Services Agreements, Resident Ledgers and 3-Day Notices to Perform

19 Financial Covenant of Lease or Quit that include parking charges, washer and dryer rental and

20 rental insurance calculated as the amount owed).

21 Plaintiffs have submitted excerpts of Rule 30(b)(6) deposition transcripts of Dave

22 Tanforan, the regional manager overseeing nine properties in the Sacramento area and "Bay

23 Area," Janae Jarvis, a vice president, Shawn Fetter, another vice president, and Sylvia Gamboa, a

24 property manager of multiple Sacramento properties.  *Id.* Exs. L-O; Tanforan Decl. ¶ 1, ECF No.

25 78-1.

26 The core of plaintiffs' motion for class certification is their assertion that this case

27 involves standard form contracts and additional side payments improperly and illegally treated as

28 rent.  Mot. at 3-5.  Specifically, plaintiffs contend the HAP Contracts and other documents

attached to the Terry and Huskey declarations are "standard form HAP contracts and standard forms used by [d]efendants at all of their California properties." *Id.* at 3. According to plaintiffs, "[d]efendants use company-wide software at their properties to generate identical forms." *Id.* at 3. Among these forms are Additional Services Agreements, confirmed by deposition testimony as part of the lease. *Id.* at 4; *see* Tanforan Dep. at 65:13-66:4, 139:11-140:2 (confirming Additional Services Agreements are part of the lease throughout all of Tanforan's employment). The Additional Services Agreements include charges for items such as renter's insurance, in-unit washers and dryers and parking. Mot. at 5. Based on deposition testimony and defendants' own forms, defendants would subtract the amount past due on additional charges from the next monthly rental payment, resulting in a default in rent. *Id.*; *see, e.g.*, Tanforan Dep. at 76:3-77:9. Through standard 3-Day Notices to Perform Financial Covenant of Lease or Quit, defendants would demand tenants comply with the lease or quit for past due amounts, which included parking charges, washer and dryer rental and rental insurance. *See* Lavine Decl. Ex. J; Jarvis Dep. at 234:24-235:7 (noting if delinquency for payment "exceeded a hundred dollars, a 3-day notice to pay or quit would go out"). Whether the additional charges were preconditions of leasing an apartment or optional, defendants "had a policy of treating all additional charges as rent," which included "using unpaid additional charges as grounds for eviction." Mot. at 7; *see* Tanforan Dep. at 156:8-11; Lavine Decl. Ex. J (Three-Day Notices to Perform or Quit including parking charges, renter's insurance, and washer and dryer rental).

     The court addresses the parties' specific contentions below to determine if plaintiffs have satisfied Rule 23(b)(3)'s requirements to certify a class, as to each class covered by their motion.

     1.    <u>Numerosity</u>

     Plaintiffs contend they have satisfied the numerosity requirement of Rule 23(a). Mot. at 9. Defendants do not disagree.

     Under the numerosity requirement, a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is presumptively satisfied

1    when there are at least forty members.  *See Jordan v. Los Angeles Cty.*, 669 F.2d 1311, 1319 (9th

2    Cir.1982), *vacated on other grounds by Cty. of Los Angeles v. Jordan*, 459 U.S. 810 (1982).

3              Plaintiffs have indicated an inability to compile a class list despite multiple

4    discovery requests to defendants.  Lavine Decl. ¶ 8.  According to plaintiffs, "opposing counsel

5    has replied that plaintiffs' counsel should compile such a class list ourselves based on the

6    document production" despite "deposition testimony . . . that certain Section 8 tenant files could

7    not be located, and thus were not provided."  *Id.*  Plaintiffs have therefore estimated class size

8    "until the matter maybe pressed during merits discovery."  *Id.*  Regardless, plaintiffs assert the

9    class size exceeds 150 members "in four Sacramento properties alone," and the court finds the

10   evidence provided supports this assertion.  *See* TAC ¶ 132; Lavine Decl. Exs. A-K.  Plaintiffs

11   have satisfied the numerosity requirement.  *See Westfall v. Ball Metal Beverage Container Corp.*,

12   No. 2:16-cv-02632 KJM GGH, 2018 WL 705534, at *5 (E.D. Cal. Feb. 5, 2018) (finding

13   "approximately 140 to 150 members of the proposed class. . . . satisfies the numerosity

14   requirement").

15              2.    Typicality

16              Generally speaking, plaintiffs contend the HAP Contracts and other documents

17   attached to the Terry and Huskey declarations are "standard form HAP contracts and standard

18   forms used by [d]efendants at all of their California properties."  Mot. at 3.  According to

19   plaintiffs, "[d]efendants use company-wide software at their properties to generate identical

20   forms."  Mot. at 3; *see* Tanforan Dep. at 66:18-67:8, 71:11-15, 223:22-224:24 (observing multiple

21   standard forms including the Rental Agreement, Lease Agreement and Additional Services

22   Agreements; confirming there are no differences in them property to property); Jarvis Dep. at

23   148:2-13 (confirming the Additional Services Agreement is a form out of a software system

24   assigned code number "207.02"); Fetter Dep. at 95:2-11 (confirming software believed to be used

25   "across Wasatch" and confirming the same software has been seen in California).  In addition to

26   these "nearly identical form contracts with [d]efendants," both named plaintiffs have paid

27   "additional charges," and have suffered "the same injury" of "being charged more rent than

28   allowed under federal law and HAP Contracts."  Mot. at 10.

1    For the Rule 23(b)(3) class, defendants assert named plaintiffs' claims are not

2    typical of the class because the named plaintiffs "are subject to unique defenses that other

3    putative class members currently living in Wasatch properties would not be subject to." Opp'n at

4    14-15. For Terry, this would include "the affirmative defense of *res judicata*" because she was

5    evicted in a judicial proceeding for failure to pay rent and perjury at her deposition. *Id.* at 15. For

6    Huskey, unique defenses would include his eviction for "repeated racist conduct" and his

7    voluntarily signing up for additional service or appliances. *Id.*

8    The "claims or defenses of the representative parties [must be] typical of the

9    claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The court finds the claims of the

10   named plaintiffs typical of the claims and defenses of the class. Here, plaintiffs claim defendants

11   treated additional charges as rent in violation of state law and contrary to standard form contracts

12   between defendants and their Section 8 tenants. The contracts for Terry, Huskey and the other

13   tenants are substantially identical. *Compare* Terry Decl. Ex. A, *and* Huskey Decl. Ex. A, *with*

14   Lavine Decl. Exs. A-C. Defendants' use of standard forms for these contracts supports typicality.

15   Defendants' treatment of Terry's and Huskey's additional charges does not appear to differ from

16   defendants' treatment of additional charges for other potential class members. *Compare* Terry

17   Decl. Ex. B (Resident Ledger not differentiating washer and dryer rental and renter's insurance

18   from rent itself), *and* Huskey Decl. Ex. B (Resident Ledger), *with* Lavine Decl. Exs. D-E, J

19   (example Resident Ledgers, Monthly Cost Breakdowns and Monthly Statements of Rental

20   Accounts including additional service charges, and 3-Day Notices to Perform Financial Covenant

21   of Lease or Quit including parking charges, washer/dryer rental and rental insurance). Here, there

22   is no concern about variation in named plaintiffs' damages from class members' damages because

23   "it is sufficient for typicality if the plaintiff endured a course of conduct directed against the

24   class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017).

25   Defendants specifically contend Terry owed $316 for "rent to owner . . . distinct

26   and separate from . . . additional services," Opp'n at 14, and review of Terry's Resident Ledger

27   shows $310.25 was due on February 4, 2013 without differentiation between contract rent and

28   unpaid additional charges, such as the washer/dryer rental charge from February 1, 2013 and

17

1  renter's insurance charge from February 1, 2013, Terry Decl. Ex. B. Defendants' Three-Day

2  Notice to Pay Rent or Quit does not differentiate the $310.25 between overdue rent or overdue

3  additional charges. *See* Tanforan Decl. Ex. 3, ECF No. 78-1 at 22. Defendants' asserted unique

4  defense, to the extent it has any merit, is therefore not relevant to plaintiffs' putative class claim.

5  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011) ("Differing factual

6  scenarios resulting in a claim of the same nature as other class members does not defeat

7  typicality."); *O'Connor v. Uber Techs.*, No. C-13-3826 EMC, 2015 WL 5138097, at *10 (N.D.

8  Cal. Sept. 1, 2015) ("Rule 23(a)(3)'s test of typicality is not whether there are *any* differences

9  between the representative plaintiffs and the class members they seek to represent. . . . the

10  typicality requirement simply measures whether the named [p]laintiffs' *legal claims* all arise from

11  essentially the same conduct . . . and whether their fellow class members suffered the same legal

12  injury.") (emphasis in original).

13         Defendants' argument that Terry's eviction operates as *res judicata* here also is

14  unavailing because an unlawful detainer action would not preclude plaintiffs' putative class

15  action claims. *See Vella v. Hudgins*, 20 Cal. 3d 251, 255 (1977) (noting unlawful detainer actions

16  are "summary in character" and therefore usually have "very limited res judicata effect" bearing

17  only on the right of possession that "will not prevent one who is dispossessed from bringing a

18  subsequent action to resolve questions of title, . . . or to adjudicate other legal and equitable

19  claims between the parties"); *Malkoskie v. Option One Mortg. Corp.*, 188 Cal. App. 4th 968, 975-

20  76 (2010) (finding subsequent claims challenging the validity of a foreclosure sale barred where,

21  in the unlawful detainer action, bank based its right of possession of the property on its "duly

22  perfected" legal title obtained in the nonjudicial foreclosure sale). Plaintiffs' putative class action

23  claims do not involve the right of possession or any claims related to title.

24         Additionally, Huskey's voluntary signing up for additional services would not and

25  did not change how defendants handled any past due amounts in relation to a tenant's rent

26  obligations, default, and notices to perform or quit. Nor would the defendants' basis for their 3

27  Day Notice to Perform or Quit serve as a "unique defense" that will "become the focus of the

28  litigation" over defendants' alleged treatment of additional charges as rent. *See Hanon*, 976 F.2d

18

(53 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 53 of 72
Case 2:15-cv-00799-KJM-DB Document 72 Filed 07/30/18 Page 87 of 107

1    at 508.  These "legally irrelevant" differences, along with the legally irrelevant basis for Huskey's

2    eviction, do not render Huskey's or Terry's claims atypical.  *See O'Connor*, 2015 WL 5138097,

3    at *10.

4            Finally, defendants' attacks on Terry and Huskey's credibility do not affect their

5    status as typical representatives of the class.  *See O'Connor*, 2015 WL 5138097, at *11

6    (deposition testimony was "far less damning than [defendant's] brief implies"; rejecting

7    defendant's typicality argument on this basis).  Named plaintiffs are inadequately typical based

8    on questionable credibility only when, unlike here, credibility issues are "directly relevant to the

9    litigation or there are confirmed examples of dishonesty, such as criminal conviction for fraud."

10   *Harris v. Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010).  Whether Terry owned a car

11   or not is not relevant to plaintiffs' putative class claims; whether defendants treated Terry's

12   additional charges for parking as rent is relevant.

13           Furthermore, the court does not find the Terry deposition testimony clear enough

14   to establish Terry lied, much less engaged in dishonesty akin to a "criminal conviction for fraud."

15   *Id.*  Terry did testify that she purchased a car in 1999 and responded "Yes" when asked if she

16   owned that car continuously until it was towed away in March 2013.  Terry Dep. at 222:10-18,

17   225:9-15, ECF No. 78-3.  But that testimony does not necessarily contradict Terry's assertions

18   that she "had no car" but was still being charged for the parking.  *Id.* at 125:19-20.  Nor does

19   Terry's testimony about owning a car from 1999 to 2013 necessarily contradict her statement that

20   she "no longer had a vehicle," did not have a vehicle "at all" when she "first moved there, and

21   never had a car but her "mother had a car."  *Id.* at 47:18-21, 83:15-17.  Nothing in Terry's

22   testimony indicates her ownership of the car involved possession of that car at her residence or

23   use of the parking spot for which she was charged.

24           Defendants' concerns about Huskey's credibility are not relevant because they

25   involve the circumstances of his eviction, not additional charges treated as rent.  Furthermore,

26   Huskey has denied an accusation by a defense witness and the court at this time has no basis on

27   which to determine who is correct.  *Compare* Huskey Dep. at 66:23-67:4, ECF No. 78-3 (Huskey

28

1    denying he called downstairs tenant racial epithet or any names at all), *with* Smith Decl. ¶ 16-20,

2    ECF No. 78-2.

3            Rather, Huskey's deposition testimony debatably squares with the stated reasons

4    for his Three-Day Notice to Perform Covenant of Lease or Quit: loud music, playing instruments

5    and other loud noise starting around 11:45 at night.  *Compare* Huskey Dep. at 65:5-14 (admitting

6    to purposely stomping around to make noise when he was told to leave), *with* Smith Decl. Ex. 6.

7    If anything, Smith's declaration is not consistent with the Three-Day Notice to Huskey.

8            3.    Adequacy

9            Plaintiffs contend putative class members "have suffered the same injuries from

10   [d]efendants' unlawful actions" as named plaintiffs: "being charged more rent than allowed under

11   federal law and the HAP Contracts."  Mot. at 10.  Additionally, plaintiffs contend no evidence

12   shows named plaintiffs "have any interest that is antagonistic to the interests of the class."  *Id.* at

13   11.  Last, plaintiffs contend their counsel "are highly qualified, experienced, and knowledgeable

14   in the issues raised in this litigation, and have shown themselves to be fiercely dedicated to the

15   tenants they represent."  *Id.*  Defendants do not directly address adequacy in their opposition.

16           Class representatives must be able to "fairly and adequately protect the interests of

17   the class."  Fed. R. Civ. P. 23(a)(4).  "Resolution of two questions determines legal adequacy: (1)

18   do the named plaintiffs and their counsel have any conflicts of interest with other class members

19   and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of

20   the class?"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

21           The court has reviewed declarations submitted by plaintiffs' counsel.  *See*

22   Newmark Decl. ¶¶ 2-23; Lavine Decl. ¶¶ 3-6.  There are no conflicts of interest with other

23   potential class members based on these declarations and the rest of the evidence before the court.

24   Counsel's credentials reflect long-standing advocacy for low-income tenants and sufficient

25   familiarity with class action litigation.  *See, e.g.*, Newmark Decl. ¶¶ 2, 9-12, 17-18; Lavine Decl.

26   ¶¶ 4, 6.

27           Although defendants do not expressly contend the named plaintiffs are not

28   adequate to represent the class, defendants do refer to deposition testimony in which Terry admits

                                                    20

                                                                                                        54

1    she did not read the complaint in this case and believed the class action complaint involved the

2    same claims as her state habitability lawsuit.  Opp'n at 3 (citing Terry Dep. at 36:7-40:21, 108:2-

3    12, 201:22-202:17).  Terry did testify that she understood this lawsuit to be mostly, if not

4    completely, about her eviction from the apartment complex and the physical condition of the

5    apartment complex.  Terry Dep. at 36:7-40:21.  Terry had not reviewed at least one document and

6    appeared to be unfamiliar with Centro Legal de la Raza's representation of her.  *Id.* at 108:2-

7    110:15.

8             But supplemental deposition transcripts provided by plaintiffs provide the full

9    context of Terry's understanding of her position as a class representative.  For instance, Terry

10   understood she was not "the only person that will possibly be going through the things that [she

11   is] going through."  Terry Dep. at 44:20-24, ECF No. 80-1.  Terry also clearly stated an

12   understanding of the lawsuit involving "Section 8, things like insurance."  *Id.* at 45:7-13.  Terry

13   noted she paid for insurance, for "the washers, dryers, things of that nature that was required that

14   . . . had nothing to do with Section 8—that they were charging us for . . . ."  *Id.* at 45:8-12.  Terry

15   noted "more fees and more fees being added that had nothing to do with the fees that were

16   requested underneath the contract of Section 8."  *Id.* at 46:3-6.  Terry even confirmed her

17   understanding of questioning during the deposition as involving discussion of charges for things

18   Terry did not think were correct, including the washer and dryer, parking and rental insurance.

19   *Id.* at 201:1-12.  Terry's knowledge of the facts therefore far exceeds that of someone "startlingly

20   unfamiliar" with her case.  *See Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal.

21   2004), *amended in part*, No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) ("The

22   threshold of knowledge required to qualify a class representative is low; a party must be familiar

23   with the basic elements of her claim. . . .  [The party] will be deemed inadequate only if she is

24   'startlingly unfamiliar' with the case.").  Terry sufficiently explained "the factual basis for the

25   lawsuit and why [she] believed [she] was wronged."  *Johnson v. Hartford Cas. Ins. Co.*, No. 15-

26   CV-04138-WHO, 2017 WL 2224828, at *14 (N.D. Cal. May 22, 2017) (citation omitted).

27             The court further finds Terry likely will "prosecute the action vigorously on behalf

28   of the class."  *Hanlon*, 150 F.3d at 1020.  At deposition, Terry testified she is looking at being a

1  potential class representative as "a person trying to just say the truth and basically be a head of

2  something." Terry Dep. at 202:5-7. Terry is "kind of here to really get the justice." *Id.* at

3  202:16-17.

4                       Plaintiffs have satisfied the adequacy requirement.

5                   4.       <u>Commonality and Predominance</u>

6                       For their breach of contract claim, plaintiffs contend the "core issue common to

7  the class is whether the side payments for additional charges constitute additional rent prohibited

8  under the HAP Contracts and leases." Mot. at 12. Additionally, common factual issues are

9  "whether the additional charges set forth in the side agreements constitute unlawful rent in breach

10  of the contract." *Id.* at 13. Additional common issues include whether defendants breached the

11  leases by charging or accepting payment for appliances such as in-unit laundry machines, or by

12  imposing additional charges as a precondition to tenancy. *Id.* According to plaintiffs, defendants

13  raise a common issue in their "main defense" when asserting "that federal law does not regulate

14  additional charges, the local housing agencies do not prohibit these charges, and thus such

15  charges are subject to arms-length negotiations between [d]efendants and each Section 8 tenant."

16  *Id.*

17                       For their CLRA claim, plaintiffs contend defendants violated the statute because

18  they were "prohibited by law from charging additional rent beyond the contract rent" and

19  therefore misrepresented an obligation to tenants prohibited by law. *Id.* at 15 (citing Cal. Civ.

20  Code § 1770(a)(14)). Plaintiffs also direct the court's attention to defendants' assertion of a

21  defense "common to the class: that the charges do not constitute rent." *Id.* at 16 (citing ECF

22  No. 26 at 6-7).

23                       For their UCL claim, plaintiffs assert common issues predominate in part because

24  the UCL claims here are based on defendants' unlawful business act or practice of "charging and

25  collecting additional side payments from Section 8 tenants," a policy that "violates federal law

26  prohibiting an owner from charging or accepting rent beyond the contract rent." *Id.* at 17 (citing

27  42 U.S.C. § 1437 f(c); 24 C.F.R. § 982.451(b)(4)(i)-(ii); *see also* Cal. Bus. & Prof. Code § 1700

28  (prohibiting any "unlawful, unfair, or fraudulent business act or practice"). Common questions

1　therefore include "whether federal law prohibits" defendants from charging or accepting rent

2　beyond the contract rent and whether the additional charges constitute rent. *Id.* Plaintiffs also

3　contend their UCL claim relies on their federal False Claims Act claim because defendants

4　"submitted claims to the government for payment of rent while knowingly violating these federal

5　regulations and HAP Contracts . . . ." *Id.* Plaintiffs also rely on the "fraudulent" and "unfair"

6　UCL prongs. *Id.*; *see* Cal. Bus. & Prof. Code § 17200.

7　　　　Defendants argue that making the determination "as to whether the additional

8　charges agreed to in the [Additional Services Agreements] constitute added rent that is prohibited

9　under the HAP Contracts and leases" would require "answers to dozens of individualized

10　questions" that would only apply "to the specific tenant and question, and that specific unit for a

11　finite period of time." Opp'n at 10. According to defendants, "a particular item within an

12　[Additional Services Agreement] might be valid for a unit one day, and yet be different a month

13　or two later." *Id.* Market changes could require an owner to "include or remove certain amenities

14　into a base rent to stay consistent with the market for that locality." *Id.* Defendants assert these

15　individual issues reveal no common issue common to the class for all three of plaintiffs' putative

16　class action claims. *Id.* at 12. Additionally, defendants contend showing materiality or actual

17　reliance by tenants on any purportedly deceptive, unlawful, unfair or fraudulent acts—required

18　elements for a CLRA or UCL claim—would involve individualized showings not appropriate for

19　class certification. *Id.* at 12-13. Defendants assert "there is no classwide proof that all tenants

20　who purchased the additional services were forced to do so" and that tenants might have signed

21　up for additional services "because they wanted them." *Id.* at 13-14 (footnote omitted).

22　　　　Plaintiffs contend individualized damages calculations are not a bar to class

23　certification on the common issues predominating in this case. Mot. at 13. Plaintiffs argue that

24　showing likely deception under the UCL "is an objective standard" with a modest burden of

25　proof, and actual reliance maybe inferred from a material misrepresentation to establish both the

26　CLRA and UCL claims. *Id.* at 17-18. In reply, plaintiffs contend defendants ignore plaintiffs'

27　chosen theory of liability. Reply at 4. Additionally, that some tenants voluntarily chose some

28　optional charges is irrelevant to plaintiffs' theories because defendants treat additional charges

"as rent uniformly across their properties once the tenant incurs the charges." *Id.* Additionally, defendants "ignore[d] the cases showing that causation can be determined classwide." *Id.* at 5.

As explained below, the court finds plaintiffs have shown questions of law and fact common to the class and shown these questions predominate over any questions affecting only individual class members.

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). These questions exist where class members suffer the same alleged injury, *Falcon*, 457 U.S. at 156, such that simultaneous litigation is productive, *Wal-Mart*, 564 U.S. at 350. "This does not mean merely that [class members] have all suffered a violation of the same provision of law." *Id.* Rather, the claims "must depend upon a common contention," the nature of which "is capable of classwide resolution." *Id.* Common litigation must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Although just one common question could suffice to establish commonality, *id.* at 359, the true inquiry is into "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation," *id.* at 350 (emphasis in original) (citation and internal quotation marks omitted). But "[d]issimilarities within the proposed class . . . have the potential to impede the generation of common answers." *Id.* (citation and internal quotation marks omitted).

After establishing the existence of common questions of law or fact, the proponent of a putative class also must establish that these questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). Some variation is permitted among individual plaintiffs' claims, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013), but Rule 23(b)(3) is "more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34. Courts are thus required "to take a 'close look' at whether common questions predominate over individual ones," *id.* (citation omitted), "begin[ning] . . . with the elements of the underlying

1    cause of action," *Erica P. John Fund, Inc*., 563 U.S. at 809. Plaintiffs need not show at the

2    threshold certification stage predominant questions will be answered in their favor. *Amgen, Inc.*

3    *v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 468 (2013). The court considers the merits of

4    the plaintiff's underlying claim only to the extent required by Rule 23. *Id*. at 466 (citing *Wal-*

5    *Mart*, 564 U.S. at 351 n.6); *Comcast*, 569 U.S. at 33-34 ("Such an analysis will frequently entail

6    'overlap with the merits of the plaintiff's underlying claim'. . . because the 'class determination

7    generally involves considerations that are enmeshed in the factual and legal issues comprising the

8    plaintiff's cause of action.'") (quoting *Falcon,* 457 U.S. at 160).

9          To prevail on a motion to certify a class under Rule 23(b)(3), the party seeking

10    certification must show: "(1) that the existence of individual injury resulting from the alleged . . .

11    violation . . . [is] capable of proof at trial through evidence that is common to the class rather than

12    individual to its members; and (2) that the damages resulting from that injury [are] measurable on

13    a class-wide basis through use of a common methodology." *Comcast*, 569 U.S. at 30 (citation

14    and internal quotation marks omitted). "Rule 23(b)(3), however, does not require a plaintiff

15    . . . to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen*, 568

16    U.S. at 469 (emphasis and alterations in *Amgen*) (citation and internal quotation marks omitted).

17    Similarly, because "'individualized monetary claims belong in Rule 23(b)(3),'" "the presence of

18    individual damages cannot, by itself, defeat class certification . . . ." *Leyva*, 716 F.3d at 514

19    (quoting *Wal-Mart*, 564 U.S. at 362).

20          Here, plaintiffs have established common questions of law that apply to all class

21    members' claims. Plaintiffs' claims all involve the resolution of whether defendants' "additional

22    charges set forth in Additional Services Agreements" violated defendants' HAP Contract

23    provisions with Section 8 tenants or federal law. *See* TAC ¶¶ 44-45. Resolving this issue would

24    resolve plaintiffs' breach of contract claim, CLRA claim, UCL claim under any prong, and even

25    the non-class False Claims Act claim. Defendants have not contested plaintiffs' substantial

26    evidence that defendants used the same standard forms for the various agreements that apply to

27    all potential class members. *See, e.g.*, Lavine Decl. Exs. A-K; Tanforan Dep. at 65:13-66:4,

28    139:11-140:2 (confirming Additional Services Agreements are part of the lease throughout all of

1   Tanforan's employment); Tanforan Dep. at 76:3-77:9 (confirming regular practice of defendants

2   subtracting the amount past due on additional charges from the next monthly rental payment,

3   resulting in a default in rent); Jarvis Dep. at 234:24-235:7 (noting if delinquency for payment

4   "exceeded a hundred dollars, a 3-day notice to pay or quit would go out"); Tanforan Dep. at

5   156:8-11; Lavine Decl. Ex. J (Three-Day Notices to Perform or Quit including parking charges,

6   renter's insurance, and washer and dryer rental); Lavine Decl. Ex. J (standard 3-Day Notices to

7   Perform Financial Covenant of Lease or Quit demanding tenants comply with the lease or quit for

8   past due amounts, which included parking charges, washer and dryer rental and rental insurance).

9           Defendants' assertion that resolving the above question would involve

10   individualized assessments on a tenant-by-tenant and unit-by-unit basis does not hold up under

11   close examination of the record. *See, e.g.*, Lavine Decl. Ex. D (examples of defendants' Resident

12   Ledgers, detailing defendants' tracking of additional charges such as washer/dryer rental, renter's

13   insurance and parking charges as part of the same running total along with rent); *id.* Ex. F

14   (examples of monthly statements including additional charges with monthly rent charges); *id.* Ex.

15   J (examples of Three-Day Notice to Perform Financial Covenant of Lease or Quit including

16   renter's insurance, parking charges and washer/dryer rental as part of the obligation "to cure the

17   breach of the lease agreement"). Defendants' treatment of these additional charges is consistent

18   in the record before the court. And federal law prohibits an owner from exceeding the maximum

19   monthly rent laid out in the HAP Contract, a contract that is a constant (among other agreement

20   forms) for the proposed class. *See* 42 U.S.C. § 1437f(c)(1)(A) (HAP Contract "shall establish the

21   maximum monthly rent (including utilities and all maintenance and management charges) which

22   the owner is entitled to receive . . . ."); 24 C.F.R. § 982.451(b)(3), (b)(4)(i) (total rent paid by

23   tenant plus government housing assistance paid by owner may not be more than rent to owner).

24   In the record before the court, whether the market dictated providing free parking at one location

25   or additional charges for parking at another location does not alter how defendants treated those

26   additional charges. Lavine Declaration exhibits D, F and J all serve as examples of "proof at trial

27   through evidence that is common to the class rather than individual to its members . . ." *Comcast*,

28   569 U.S. at 30 (citation and internal quotation marks omitted). As plaintiffs have noted, "What

26

1   matters is the overarching issue of whether the side agreements are subject to federal regulation

2   because they contain rent payments beyond the tenant's share of the contract rent, not the local

3   administration of those rent payments."  Mot. at 14 (citations omitted).

4          To the extent calculations would vary across tenants and different properties, those

5   calculations would reflect differences in entitlement to damages.  Because "'individualized

6   monetary claims belong in Rule 23(b)(3),'" "the presence of individual damages cannot, by itself,

7   defeat class certification . . . ." *Leyva*, 716 F.3d at 514 (quoting *Wal-Mart*, 564 U.S. at 362).

8   "[T]he rule is clear: the need for individual damages calculations does not, alone, defeat class

9   certification."  *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

10  Defendants' own records will facilitate any individual damages calculations.  *See, e.g.*, *Brown v.

11  Hain Celestial Grp., Inc.*, No. C 11-03082 LB, 2014 WL 6483216, at *16 (N.D. Cal. Nov. 18,

12  2014) (observing defendant's records "allow the parties to readily tell which products meet the

13  [relevant] threshold," observing "[t]o the extent that this raises individual issues, then, those

14  issues are easily tamed" and reasoning those issues "do not predominate over the several key

15  shared issues that dominate this case").

16         Regardless, any "fortuitous non-injury to a subset of class members does not

17  necessarily defeat certification of the entire class" in part because "the district court is well

18  situated to winnow out those non-injured members at the damages phase of the litigation, or to

19  refine the class definition."  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016);

20  *see also Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 609-10 (C.D. Cal.

21  2015).

22         Plaintiffs have shown that any "damages resulting from th[eir] injury [are]

23  measurable on a class-wide basis through use of a common methodology."  *Comcast*, 569 U.S. at

24  30 (citation and internal quotation marks omitted).  Here, damages are measurable based on

25  reference to defendants' own records and any eventual determinations whether, if any, additional

26  charges were prohibited under federal law.  *See, e.g.*, Lavine Decl. Ex. D; *Leyva*, 716 F.3d at 514

27  (calculating damages "based on the wages each employee lost due to [defendant's] unlawful

28  practices"); *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197, 219 (E.D. Cal. 2015), *order*

1   *clarified*, No. 2:13-cv-01282-KJM-AC, 2015 WL 12550898 (E.D. Cal. Mar. 30, 2015), *aff'd*, 690

2   F. App'x 526 (9th Cir. 2017), *and cert denied sub nom. Taylor Farms Pac., Inc. v. Del Carmen*

3   *Pena*, 138 S. Ct. 976 (2018) ("Damages may also be susceptible to calculation through a common

4   methodology on the basis of time records such as those already produced.").

5           California district courts commonly certify classes for breach of contract claims.

6   *See, e.g.*, *Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506 LB, 2014 WL 2734953, at *1, 22 (N.D.

7   Cal. June 13, 2014) (granting motion to certify class based in part on "breach of [plaintiffs'] form

8   mortgage contracts by [defendant]" and observing "[t]hese are identical form mortgage contracts

9   involving identical harm with relatively small damages, precisely the sort of contract claims that

10  lend[] themselves to class treatment"); *In re Med. Capital Secs. Litig.*, No. SAML 10-2145 DOC

11  (RNBx), 2011 WL 5067208, at *3 (C.D. Cal. July 26, 2011) ("[c]ourts routinely certify class

12  actions involving breaches of form contracts"; collecting cases); *Menagerie Prods. v. Citysearch*,

13  No. CV 08-4263 CAS (FMO), 2009 WL 3770668, at *9 (C.D. Cal. Nov. 9, 2009) ("'When

14  viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present

15  the classic case for treatment as a class action, and breach of contract cases are routinely certified

16  as such.'") (citing *Kleiner v. First Nat. Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983)).

17          Defendants rely on *Caro v. Proctor & Gamble*, 18 Cal. App. 4th 644 (1993), to

18  support their contention that "[a] single determination of materiality is not possible here."  Opp'n

19  at 13 (internal quotation marks omitted).  But defendants' reliance on this case is misplaced.

20  There, a California Court of Appeal affirmed the lower court's denial of class certification for

21  claims including a CLRA claim.  *Caro*, 18 Cal. App. 4th at 653-55.  The *Caro* court

22  acknowledged that "a misrepresentation's materiality involves an objective inquiry susceptible to

23  common proof."  *Id.* at 667.  The named plaintiff himself did not believe defendants' product to

24  be fresh, as it was advertised to be.  *Id.* at 668.  The court reasoned "it would be a matter of

25  individualized proof" whether class members believed defendants' product was fresh or whether

26  class members who actually read portions of the label stating "from concentrate" found

27  misleading a claim that the product contained "no additives."  *Id.* at 668.

28

The California Court of Appeal has clarified the meaning of *Caro*, stating "nothing we said in *Caro* undermines the general rule permitting common reliance where material misstatements have been made to a class of plaintiffs." *Massachusetts Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1294 (2002), *as modified on denial of reh'g* (May 29, 2002). Instead, "our holding in *Caro* merely stands for the self-evident proposition that such an inference [of common reliance] will not arise where the record will not permit it." *Id.*

Here, there are no such issues precluding an inference of common reliance. Nothing in the record indicates class members read only some portions of their series of standard form agreements. Additionally, California courts do not view "failure to read a contract before signing" as a reason alone "to refuse its enforcement." *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 20 Cal. App. 3d 668, 671 (1971); *see also Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 423 (1996) (negligent failure to read a contract will not eliminate the signing party's assent to the contract). The alleged misrepresentations of tenant obligations prohibited by law were in the agreements themselves. Nothing in the record indicates class members paid for additional charges despite not believing they had a legal obligation to pay.

Rather, "California courts often find predominance satisfied in CLRA cases because 'causation, on a classwide basis, may be established by materiality, meaning that if the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to that class[.]'" *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 522 (C.D. Cal. 2015), *modified*, 314 F.R.D. 312 (C.D. Cal. 2016) (citing *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) (collecting cases)); *see In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 982 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd*, 674 F. App'x 654 (9th Cir. 2017) (observing California's UCL, CLRA and False Advertising Law allow "plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material"). Here, plaintiffs allege the misrepresentations occurred in the standard form agreements and other documents, including Three-Day Notices to Perform Financial Covenant of Lease or Quit, misrepresenting to class members their obligation to pay additional

29

1   charges prohibited by federal law. *See* Lavine Decl. Exs. A-K. All evidence before the court

2   indicates all members of plaintiffs' proposed class received these same standard forms, including

3   deposition testimony from defendants' witnesses. *See, e.g.*, Tanforan Dep. at 65:13-66:4, 139:11-

4   140:2.

5           No issues pertaining to commonality preclude class certification of plaintiffs' UCL

6   claim. To the extent plaintiffs' claims rely on the UCL's unlawful prong, the court has already

7   addressed common issues above because the breach of contract claim overlaps with asserted

8   federal law violations and defendants' violating the CLRA would satisfy the unlawful prong.

9   Plaintiffs' False Claims Act claim involves the same issue, namely conduct violating the HAP

10  Contract provisions prohibiting defendants from charging additional rent above the contract rent.

11  *See* Mot. at 17.

12          Defendants' contentions about materiality and reliance related to the CLRA are

13  unavailing as well when applied to plaintiffs' UCL claims. *See, e.g.*, *ConAgra Foods, Inc.*, 90 F.

14  Supp. 3d 919 at 982. Claims under the fraudulent and unfair prongs of the UCL statute require a

15  plaintiff to satisfy a "modest" burden of proof: "the representative plaintiff must show that

16  members of the public are likely to be deceived by the practice." *Friedman v. AARP, Inc.*, 855

17  F.3d 1047, 1055 (9th Cir. 2017) (quoting *Prata v. Superior Court*, 91 Cal.App.4th 1128, 1144

18  (2001)). Courts "assess likelihood of deception under a 'reasonable consumer standard.'" *Id.* at

19  1055 (citation omitted). All evidence currently before the court indicates named plaintiffs, class

20  members and defendants all expected the tenant class members to pay their additional charges or

21  face eviction. No evidence suggests class members believed they were not obligated to pay

22  additional charges, including mandatory additional charges or optional charges once the tenant

23  chose those options.

24                      5.      Superiority: Rule 23(b)(3) Class

25          Plaintiffs contend a class action suit is superior to other methods here in part

26  because "the individual damages are really small" and "would be outweighed by the expense and

27  burden of separate lawsuits" that cannot be sustained by low-income individuals receiving rent

28  subsidies under Section 8. Mot. at 18. Plaintiffs' counsel are not aware of any other related

1  litigation, concentrating the litigation will be efficient and avoid inconsistent rulings, and any

2  difficulties in managing the class action may be mitigated by a separate liability phase and

3  separate damages phase for trial. *Id.* at 18-19.

4           Defendants contest plaintiffs' claims that the litigation "would devolve into a

5  series of individualized mini-trials" and would involve presentation of "historic market data,

6  comparable property data, what was considered the 'locality,' vacancy rates, 30 day notice rates,"

7  and other evidence that "would be daunting for even the most enthusiastic juror." Opp'n at 16.

8  Defendants argue plaintiffs have failed to provide "any roadmap for how their claims would be

9  litigated." *Id.* Additionally, defendants contend "the superior method for resolving the

10  [Additional Services Agreement] issue lies with" the local housing and redevelopment agency,

11  for example the Sacramento Housing and Redevelopment Agency, for relevant defendant

12  properties. *Id.* Defendants assert the court should defer to the local housing and redevelopment

13  agency's review and approval of Section 8 tenants' leases. *Id.* at 17.

14           Because predominance of common questions does not alone justify approval of a

15  Rule 23(b)(3) class action, a court must determine if "another method of handling the [case] may

16  be available which has greater practical advantages." Fed. R. Civ. P. 23(b)(3) advisory

17  committee's note to 1966 amendment. Rule 23(b)(3) requires a court find a class action is the

18  "superior" method of resolution. *Id.* This constraint is meant to lead the court "to assess the

19  relative advantages of alternative procedures for handling the total controversy." *Id.* Rule

20  23(b)(3) provides that superiority is determined by considering, for example,

21  
22        (A) the class members' interests in individually controlling the
   prosecution or defense of separate actions;

23        (B) the extent and nature of any litigation concerning the controversy
   already begun by or against class members;

24  
25        (C) the desirability or undesirability of concentrating the litigation of
   the claims in the particular forum; and

26        (D) the likely difficulties in managing the class action.

27  *Id.*; *see also Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

28

The Supreme Court has acknowledged that Rule 23(b)(3) contemplates the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem*, 521 U.S. at 617 (citation and internal quotation marks omitted). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action. . . . A class action solves this problem by aggregating the relatively paltry potential recoveries . . . ." *Id.*

The court first assesses the proposed Rule 23(b)(3) class against the factors described in Rule 23(b)(3). For the first factor, "the class members' interests in individually controlling the prosecution or defense of separate claims," Fed. R. Civ. P. 23(b)(3)(A), when smaller dollar amounts are in controversy, this factor generally favors certification. *Zinser*, 253 F.3d at 1190- 91. Resolution of this factor takes into account the policy noted above of incentivizing legitimate claims even when, as here, individual damages are modest. *Amchem, 521 U.S. at 617*; *see* Mot. at 18 ("[H]ere, the individual damages are relatively small."). Large, complex claims do not fit so well in a class as do smaller, simpler claims. *See Zinser*, 253 F.3d at 1190-91.

Here, the individual damages are quite low. *See* TAC ¶¶ 100, 121 ("additional rent payments" of $1,953.89 for named plaintiff Terry and "at least $2,239.98" for named plaintiff Huskey); *Pena*, 305 F.R.D. at 221 (finding damages estimates of $224, less than $5,528 and less than $16,168 "small claims" that "do not make individual litigation attractive or sustainable, especially when success will require analysis of large volumes of electronic timekeeping data"). Additionally, putative class members, as members of the Section 8 program, are low-income tenants who likely "lack the resources to finance and direct individual suits." *Pena*, 305 F.R.D. at 221; *see* Mot. at 18. This factor favors certification.

The second factor, the "extent and nature of any litigation concerning the controversy already commenced by or against members of the class," Fed. R. Civ. P. 23(b)(3)(B), is meant to "assur[e] judicial economy and reduc[e] the possibility of multiple lawsuits." *Zinser, 253 F.3d at 1191* (quoting 7A Charles Alan Wright, et al., *Federal Practice and*

32

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 67 of 72
(67 of 73)
Case 2:15-cv-00799-KJM-DB Document 1072 Filed 09/14/19 Page 101 of 107
Case 2:15-cv-00799-KJM-DB Document 92 Filed 07/30/18 Page 33 of 38

1    *Procedure* § 1780 (2d ed. 1986)); *see* 7A Charles Alan Wright, et al., *Federal Practice and*

2    *Procedure* § 1780 (3d ed. 2018) (same).  Here, "[p]laintiffs' counsel are not aware of any other

3    related litigation."  Mot. at 18 (citing Lavine Decl. ¶ 7).  Defendants do not assert any concerns

4    about related litigation.  This factor favors certification.

5             The third factor is "the desirability or undesirability of concentrating the litigation"

6    in this forum. Fed. R. Civ. P. 23(b)(3)(C).  The putative Rule 23(b)(3) class comprises only those

7    current and former tenants located in California, coinciding with California state law claims.

8    Mot. at 9; TAC ¶ 44.  This factor favors certification.

9             The fourth factor weighs the "likely difficulties in managing the class

10   action."  Fed. R. Civ. P. 23(b)(3)(D).  As discussed previously, defendants' concerns about

11   "individualized mini-trials" in essence repeat their concerns about individualized damages, not

12   individual determinations of liability.  *See Leyva*, 716 F.3d at 514 ("[T]he presence of individual

13   damages cannot, by itself, defeat class certification . . . .").  As recognized by other federal courts,

14   the fourth factor "overlaps with the [c]ourt's commonality and typicality analysis."  *Huynh v.*

15   *Harasz*, No. 14-CV-02367-LHK, 2015 WL 7015567, at *12 (N.D. Cal. Nov. 12, 2015).  Here, the

16   court's commonality and typicality analyses identify no difficulties in managing the class action

17   that would cause this factor to weigh against certification.

18            Additionally, defendants' contention that the Ninth Circuit requires a "trial plan" is

19   not accurate.  Defendants' cited case, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th

20   Cir. 1996), does not refer to a "trial plan."  There, the Ninth Circuit observed there was "no

21   showing by [p]laintiffs of how the class trial could be conducted."  *Id.*  The Ninth Circuit has

22   clarified *Valentino* when it rejected a defendant's "suggestion that the district court's failure to

23   adopt a trial plan or articulate how the class action would be tried was an abuse of discretion."

24   *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 n.4 (9th Cir. 2005).  "*Valentino* does not stand

25   for this proposition. . . .  Nothing in the Advisory Committee Notes suggests grafting a

26   requirement for a trial plan onto the rule."  *Id.*  Here, plaintiffs have taken the position that

27   liability "can be determined with common proof" and "damages can be easily determined based

28   on the side agreements."  Mot. at 19.  Without predetermining the question, the court's ability to

1  bifurcate a liability phase from a damages phase appears sufficient to ameliorate defendants'

2  concerns. *See id.*

3      On balance, the four factors suggest a class action is the superior means to try the

4  common questions of law and fact that predominate here.

5      The Ninth Circuit also requires district courts to consider alternative means of

6  litigating a proposed class action. *See Valentino*, 97 F.3d at 1234-35 ("A class action is the

7  superior method for managing litigation if no realistic alternative exists."). In particular,

8  individual litigation, joinder, multidistrict litigation or an administrative or other non-judicial

9  solution may be superior. *See* 7A Charles A. Wright, et al., *Federal Practice and Procedure*

10 § 1779 (3d ed. 2018).

11     Because class members here have modest claims, individual litigation is unlikely

12 to present a viable means of recovery. The number of potential plaintiffs, more than 150, also

13 makes joinder impracticable. Although multidistrict litigation could theoretically "present an

14 advantage," the court finds "the value of the claims is still small enough to suggest individual

15 actions would be inefficient." *Greer v. Dick's Sporting Goods, Inc.*, No. 215CV01063KJMCKD,

16 2017 WL 1354568, at *10 (E.D. Cal. Apr. 13, 2017), *pet. denied*, No. 17-80075, 2017 WL

17 5053965 (9th Cir. July 28, 2017). And as the *Greer* plaintiff relied on company policy as

18 evidence, so too do plaintiffs here rely on standard form documents produced by defendants that

19 do not differ throughout the geographic limits of the proposed class. Even if multidistrict

20 litigation were a superior option, the court is aware of no activity related to this case on behalf of

21 the judicial panel on multidistrict litigation or any motion requesting transfer filed by defendants

22 on the docket. *See* 28 U.S.C. § 1407(c)(i)-(ii).

23     Defendants' proposal that local housing and redevelopment agencies are

24 alternative fora for litigating plaintiff's claims also is not a viable alternative. Defendants rely on

25 "evidence of this remedy" as "past dialog between the [housing and redevelopment agency] and

26 Wasatch management, which resulted in a fair, fast and efficient resolution—including cash

27 reimbursement to tenants—when [the housing and redevelopment agency] had a concern about

28 Wasatch's advertising." Opp'n at 16-17. Defendants also direct the court's attention to approvals

34

1   of Section 8 tenant's leases, and argue these agency approvals "represent an established practice

2   of permitting these [Additional Services Agreements] . . . ." *Id.* at 17. Defendants contend this

3   court should afford agency deference to these approvals and the perspective of Shannon Fox, an

4   employee with the Sacramento Housing and Redevelopment Agency. *Id.* at 18.

5          But defendants point to no resolution mechanism made available to the parties by

6   local housing and redevelopment agencies. For instance, Shannon Fox does not indicate tenants

7   have any formal recourse through the Sacramento Housing and Redevelopment Agency. *See,*

8   *e.g.*, Fox Decl. ¶ 5, ECF No. 78-5 (explaining agency's rights and legal options based on what the

9   agency "believes" or "determines"). Defendants themselves refer to having "a history of working

10  with" their local housing and redevelopment agency to at most "informally resolve issues."

11  Opp'n at 2. This court has already provided multiple examples of courts handling the type of

12  claims at issue here, and holding "that extra charges, even when labeled as additional amenities,

13  can constitute illegal side payments." ECF No. 61 at 6-7 (citations omitted). And Fox's mere

14  declaration does not address a core issue in this case: defendants' alleged treatment of charges for

15  parking, renter's insurance and washer and dryer rental as part of a tenant's rent in documents

16  generated after a tenant's lease begins. *Compare* Lavine Decl. Ex. D (examples of defendants'

17  Resident Ledgers, detailing defendants' tracking of additional charges such as washer/dryer

18  rental, renter's insurance and parking charges as part of the same running total along with rent),

19  *id.* Ex. F (examples of monthly statements including additional charges with monthly rent

20  charges), *and id.* Ex. J (examples of Three-Day Notice to Perform Financial Covenant of Lease or

21  Quit including renter's insurance, parking charges and washer/dryer rental as part of the

22  obligation "to cure the breach of the lease agreement"), *with* Fox Decl. ¶¶ 5-9 (referring to "a

23  proposed lease," "separate agreements," "a written agreement" and "Additional Service

24  Agreements" but not to defendants' documents generated after the lease begins to track amounts

25  tenants owe). The court need not resolve whether any deference is owed to the agency here in

26  order to certify plaintiffs' Rule 23(b)(3) class, and the court declines to do so. *See Amgen*, 568

27  U.S. at 466 ("Merits questions may be considered to the extent—but only to the extent—that they

28

(70 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-1, Page 70 of 72
Case 2:15-cv-00799-KJM-DB Document 107-2 Filed 09/30/19 Page 36 of 38

1   are relevant to determining whether the Rule 23 prerequisites for class certification are

2   satisfied.").

3           The court finds the Rule 23(b)(3) class satisfies the superiority requirement.

4           6.      Ascertainability

5           Defendants contend the class definition is "so overbroad it violates the

6   ascertainability requirement of a certifiable class." Opp'n at 19. According to defendants, HUD

7   regulations permit the Additional Services Agreements "so long as they do not charge for items

8   customarily included in base rent in the locality." *Id.* at 20 (citing 24 C.F.R. § 982.510). Thus,

9   "[d]etermining which class members, if any, were party to invalid [Additional Services

10  Agreements] would be problematic . . . ." *Id.* Plaintiffs contend defendants "ignore the clear,

11  objective class definition in the proposed [TAC] and moving papers: Section 8 tenants at

12  [d]efendants' California properties who have paid additional charges during a specific time

13  period." Reply at 1. "Proposed class members are therefore readily determined from

14  [d]efendants' records." *Id.* at 3.

15          The court finds plaintiffs' definition satisfies the ascertainability requirement.

16  Plaintiffs' proposed class definition "will allow the court to efficiently and objectively ascertain

17  whether a particular person is a class member" based on defendants' records. *See Westfall*, 2018

18  WL 705534, at *2. And defendants' concerns about "additional rent payments" as part of the

19  definition is already resolved by plaintiffs' change in the definition to "additional charges set

20  forth in Additional Services Agreements." TAC ¶¶ 44-45.

21          7.      Injunctive Relief Class under Rule 23(b)(2)

22          Plaintiffs acknowledge they have both moved from defendant's properties, "and

23  thus request leave to amend the complaint to name a current tenant as a new representative of the

24  Rule 23(b)(2) class, to support injunctive relief." Mot. at 20. Plaintiffs contend the court may

25  grant certification conditioned on substituting a named plaintiff who is a current tenant. *Id.*

26  Defendants argue neither named plaintiff has standing to seek injunctive relief. Opp'n at 2, 9 n.3,

27  15. In reply, plaintiffs confirm that they seek class certification under both Rule 23(b)(2) and

28  Rule 23(b)(3). Reply at 10 (citing Mot. at 19-20).

36

1    Defendants are correct that the named plaintiffs cannot serve as representative

2    plaintiffs for a Rule 23(b)(2) class here.  *See Wal-Mart*, 564 U.S. at 360 ("Rule 23(b)(2) applies

3    only when a single injunction or declaratory judgment would provide relief to each member of the

4    class.").  But as plaintiffs request, courts may condition the grant of a motion to certify a class on

5    plaintiffs' substituting an appropriate class representative.  *See Nat'l Fed'n of Blind v. Target*

6    *Corp.*, 582 F. Supp. 2d 1185, 1209 (N.D. Cal. 2007) (granting motion to certify class but ordering

7    plaintiffs "to substitute a new class representative with respect to one claim within thirty (30)

8    days of this order" because "the court may certify the class condition upon the substitution of

9    another plaintiff") (citing *Kremens v. Bartley*, 431 U.S. 119 (1977) and *Gibson v. Local 40*, 543

10   F.2d 1259, 1263 (9th Cir. 1976)).  Additionally, "it is appropriate for the [c]ourt to certify one

11   class for injunctive relief under Rule 23(b)(2) and a separate class for other remedies under Rule

12   23(b)(3)."  *Nozzi v. Hous. Auth. of the City of Los Angeles*, No. CV 07-380 PA (FFMX), 2016

13   WL 2647677, at *5 (C.D. Cal. May 6, 2016) (citing *Kartman v. State Farm Mut. Auto Ins. Co.*,

14   634 F.3d 883, 895 (7th Cir. 2011)); *ConAgra Foods, Inc.*, 90 F. Supp. 3d at 977 ("[T]he court can

15   separately certify an injunctive relief class and, if appropriate, also certify a Rule

16   23(b)(3) damages class.").  The court finds plaintiffs' proposed definition for a Rule23(b)(2) class

17   satisfies the requirements of Rule 23(b)(2) because plaintiffs' definition refers to "additional

18   charges set forth in Additional Services Agreements in excess of their individual portions of the

19   contract rent set forth in the HAP Contracts," which generally apply to the Section 8 tenants who

20   would compose the members of this class and be eligible for injunctive relief if plaintiffs prevail

21   on the merits.  *See* TAC ¶ 45.

22   The court therefore CONDITIONALLY GRANTS plaintiffs' motion for class

23   certification as to its proposed Rule 23(b)(2) class, conditioned on plaintiffs substituting a new

24   class representative who has standing for injunctive or declaratory relief under Rule 23(b)(2),

25   within thirty (30) days.

26   IV.    <u>CONCLUSION</u>

27   Plaintiffs' motion to amend is GRANTED.  Plaintiffs' motion for class

28   certification as to the Rule 23(b)(3) class is GRANTED.  Plaintiffs' motion for class certification

37

1   as to the Rule 23(b)(2) class is CONDITIONALLY GRANTED, conditioned on plaintiffs

2   substituting a new class representative who has standing for injunctive or declaratory relief under

3   Rule 23(b)(2) within thirty (30) days.

4             This order resolves ECF Nos. 71 and 72.

5             IT IS SO ORDERED.

6   DATED:  July 30, 2018.

8                                    UNITED STATES DISTRICT JUDGE

(73 of 73)

Case: 18-80091, 08/13/2018, ID: 10976325, DktEntry: 1-2, Page 1 of 1
Case 2:15-cv-00799-KJM-DB   Document 107-2   Filed 06/14/19   Page 107 of 107

Office of the Clerk

**United States Court of Appeals for the Ninth Circuit**

Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

August 13, 2018

| | |
|---|---|
| No.: | 18-80091 |
| D.C. No.: | 2:15-cv-00799-KJM-DB |
| Short Title: | USA, et al v. Wasatch Advantage Group, LLC, et al |

Dear Appellant/Counsel

This is to acknowledge receipt of your Petition for Permission to Appeal under 23(f).

All subsequent letters and requests for information regarding this matter will be added to your file to be considered at the same time the cause is brought before the court.

The file number and the title of your case should be shown in the upper right corner of your letter to the clerk's office. All correspondence should be directed to the above address pursuant to Circuit Rule 25-1.