Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Beth Holtzman (SBN 316400)
bholtzman@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Tel:  (510) 763-9800
Fax:  (510) 835-1417

Attorneys for Plaintiffs and Relators

(Additional Counsel for Plaintiffs
and Relators on following page)

Joseph A. Salazar Jr. (SBN 169551)
Joe.Salazar@lewisbrisbois.com
Ryan Matthews (SBN 311674)
Ryan.Matthews@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Tel:  (916) 564-5400
Fax:  (916) 564-5444

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA<br><br>        Plaintiffs/Relators,<br><br>vs.<br><br>WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, and DOES 1-30,<br><br>        Defendants. | Case No.: 2:15-CV-00799-KJM-DB<br><br>CLASS ACTION<br><br>**THE PARTIES' JOINT STATEMENT REGARDING THEIR DISCOVERY DISPUTE**<br><br>Date:     June 12, 2020<br>Time:     10 a.m.<br>Dept:     Courtroom 27, 8th Floor<br>Before:  Hon. Magistrate Judge Deborah Barnes<br><br>Trial Date:    None Set |

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
Tony Ruch (SBN 242717)
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
Tel:  (510) 834-3300
Fax:  (510) 834-3377

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
Micaela Alvarez (SBN 319908)
malvarez@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
Tel:  (510) 437-1863
Fax:  (510) 437-9164

Attorneys for Plaintiffs and Relators

Plaintiffs-Relators Denika Terry, Roy Huskey III, and Tamera Livingston ("Plaintiffs"), on behalf of themselves and the certified classes, and on behalf of the United States, and Defendants Wasatch Advantage Group, LLC, et al ("Defendants"), submit this Joint Statement Regarding Discovery Disagreement ("Joint Statement") under Local Rule 251(c).

## I.   CASE BACKGROUND

This case was filed under seal on April 14, 2015 as a False Claims Act (31 U.S.C. §§ 3279 *et seq.*) ("FCA") action and putative class case for claims under state law.  Compl., ECF No. 1. Defendants are Wasatch Advantage Group, LLC and its affiliates, a landlord and management company that has residential apartments in California, Utah, Arizona, Colorado, and Washington.  The United States declined to intervene and the case was unsealed on June 16, 2016.  The Court denied Defendants' motion to dismiss on July 21, 2017 and certified damages and an injunctive relief classes for the state law claims on July 30, 2018.  Orders, ECF Nos. 61, 92.

Plaintiffs, current and former tenants at Defendants' properties, challenge Defendants' practice of charging low-income tenants participating in the Section 8 program ("Section 8") up to hundreds of dollars a year for additional service charges ("Additional Service Charge") that are separate from, and in addition to, the tenants' portion of the approved rent amount under the federally-mandated Housing Assistance Program Contracts ("HAP Contracts") that  govern their leases.  *See, e.g.*, 4th Am. Compl. ¶¶ 11-13, 57-58, 60, ECF No. 98.  These Additional Service Charges are for items like washers and dryers, parking, renters' insurance, or internet and cable, and are set out in an "Additional Services Agreement" that is part of the tenants' lease.  4th Am. Compl. ¶ 12, 58, ECF No. 98.  Defendants' liability will turn on whether these Additional Service Charges legally constitute rent.

This case has significant financial stakes and will impact a large number of Defendants' current and former tenants.  The certified damages class comprises approximately 2,500 California tenants who have each paid hundreds or thousands of dollars in Additional Service Charges since April 2011. The scope of the case, however, is not limited to California, as Plaintiffs allege that Defendants' practice of imposing additional charges on Section 8 tenants extends across their entire portfolio, violating uniform federal requirements.  Therefore, in their qui tam claims, Plaintiffs seek damages and penalties for rent subsidy amounts Defendants charged to the United States for Section 8 tenants who

1   paid Additional Service Charges in any of the five states in which Defendants operate.

2       Fact discovery is currently set to close on October 7, 2020.

3                           **II.      THE DISPUTED ISSUES**

4   **A.      Plaintiffs' Requests for Production and Defendants' Responses**

5       Plaintiff Terry's first set of Requests for Production of Documents ("RFPs"), consisting of

6   Requests Nos. 1 to 26, was served on Defendants on January 9, 2017.  *See* Bellows Decl. Ex. 1.

7   Defendants served their first responses on February 13, 2017.  These requests were subject to a

8   previous motion to compel in March 2017, as part of Plaintiffs' effort to prepare their motion for class

9   certification.  This Court granted the motion in part, requiring Defendants to produce "further . . .

10  documents covering the past six (6) years for all of defendants' facilities."  Order, ECF 48.  Defendants

11  thereafter produced more than 360,000 pages in non-unitized, non-searchable .pdf files, consisting

12  solely of scanned versions of hard-copy tenant files.  Defendants' corporate representative

13  subsequently testified that these tenant files were incomplete because some of the files "were not able

14  to be located" and "nobody knew for a fact what had happened to them."  Bellows Decl. Ex. 9, Fetter

15  Dep. 76:14-25; 77:8-9.

16      Defendants served Amended Responses on August 14, 2017.  Bellows Decl. Ex. 2.

17      For the last six months, the parties have extensively met and conferred over a narrowed subset

18  of documents and data, three of which have unfortunately ripened for court action. (The parties

19  continue to meet and confer about an email search.)

20      First, Plaintiffs seek records related to tenant complaints regarding Additional Service Charges

21  or a list of topics linked to the Section 8 program which are maintained on a centralized complaint log.

22  Defendants refuse to produce these records on the basis that they have produced *other* complaints

23  which were kept in tenant files.  Plaintiffs request immediate production of these documents.

24      Second, Defendants agreed over four months ago to produce training and policy documents

25  related to Section 8 tenancies, Additional Services Agreements and charges, and eviction notices and

26  actions, but failed to do so.  Defendants now argue that these documents are not responsive to

27  Plaintiffs' RFPs.  Plaintiffs disagree and request the immediate production of all training materials

28

2

related to Section 8, or to leases, ledgers, Additional Service Charges, evictions notices or actions, or to Defendants' centralized database (Yardi Voyager) that have been in use from April 14, 2005.

Third, Defendant initially agreed to produce responsive information in Defendants' centralized database regarding Section 8 tenants, but they now are willing to provide only individual ledgers with minimal information on them.  The individual ledgers lack crucial fields necessary for accurate and reliable analyses of that data.  Moreover, this offer does not address other relevant and responsive data that exists in Yardi. Plaintiffs seek production of all data in the Yardi database reflecting or related to resident ledgers, leases, HAP Contracts, Additional Service Charges, notices for nonpayment of rent (including nonpayment of Additional Service Charges), and eviction actions for any Section 8 tenants at any of Defendants' properties who paid Additional Services Charges at any time since April 14, 2005.  Plaintiffs also seek disclosure of information regarding the Yardi database that is necessary to fully understand the data, including the schema, relevant tables and fields, any data dictionaries, and a clear description of codes relevant to residents' ledgers and eviction notices and actions.

**B.**     **The Parties' Meet and Confer Efforts**

      **1.**     **Plaintiffs' Statement**

On November 22, 2019, Plaintiffs sent a detailed meet and confer letter seeking the production of data from Defendants' centralized property management Yardi Voyager database as well as policy documents, training documents and manuals, and communications responsive to Plaintiffs' longstanding RFPs.  Bellows Decl. Ex. 3.  Despite Plaintiffs' repeated calls and reminders to follow up, Defendants did not provide any substantive response until ***nearly two months later***, when they indicated that they largely agreed to produce the requested documents.[1]  Bellows Decl. Ex. 4.  The main areas of disagreement were around the applicable time period and the geographical scope of the production, with the Parties exchanging legal authorities through meet and confer correspondence.

---

[1] Defendants complain that Plaintiffs waited a little over two years to object to insufficiencies in their earlier production. At the time of Plaintiffs' prior discovery motion, the Parties were focused on discovery for class certification. After the classes were certified more than year later, Plaintiffs brought in new class counsel, resolved a dispute about Defendants' responsibility to produce the class list, and successfully moved the Court to clarify the scope of the class.  *See* ECF  114.  When the class notice issue was close to resolution, Plaintiffs simultaneously turned to identifying categories of data and documents necessary for merits determinations that were missing from Defendants' prior production.

782939.19

Bellows Decl. Ex. 5.

On February 6, 2020, the parties meet and conferred by phone. Defendants agreed in principle to produce the data and documents Plaintiffs requested, and stated they did not have an objection to providing data reaching ten years prior to the filing of the suit. However, Defendants were unable to provide any concrete timeline or process for the production. Defendants agreed to provide Plaintiffs with detailed information about the Yardi Voyager database, including tables, fields, and data dictionaries, and promised an update on that and the document production within the week.

After Defendants failed to provide the promised update, and failed to respond to Plaintiffs' follow-up email, the parties had another phone call on February 26, 2020. Defendants stated that Plaintiffs could expect the production of policy and training documents within the next couple weeks. Defendants indicated that they could not provide the detailed information Plaintiffs sought about the Yardi Voyager system because they were subject to a non-disclosure agreement ("NDA"), but they promised to provide sample ledgers for a handful of tenants.

The parties scheduled another phone call for March 3, 2020, but defense counsel subsequently cancelled that call and failed to respond to Plaintiffs' efforts to reschedule.

On March 9, 2020, Plaintiffs sent further meet and confer correspondence describing the history of delay and Defendants' failure to provide requested documents and data and asked for a call to determine if the parties could resolve the dispute.

Defendants indicated by email on March 13, 2020 that they were working on the production.

The parties spoke by phone on March 17, 2020. Defendants stated that there were no responsive policy or training documents. Later that day, Defendants produced sample standard ledger reports from the Yardi database. Bellows Decl. Ex. 6.

On March 30, Plaintiffs sent a further meet and confer letter that, as relevant here, (1) referred Defendants to training documents described in deposition testimony and requesting their production; (2) described why the sample ledger reports did not provide the degree of detail Plaintiffs sought and requested a copy of the NDA; and (3) requested Defendants produce a complaint log described in deposition testimony. Bellows Decl. Ex. 7. Having received no response, Plaintiffs sent follow-up emails on April 14 and April 20. Defendants did not respond to those emails.

4

On May 14, 2020, Plaintiffs sent Defendants an email stating that Defendants' unresponsiveness and long delay in making the requested production was forcing Plaintiffs to move to compel production.  Plaintiffs requested the opportunity to meet and confer about the motion.

Between May 14 and the filing of this Motion on May 22, 2020, Defendants corresponded with Plaintiffs about the categories of documents at issue, but did not respond to the request for a call.

On June 1, 2020, the Parties met and conferred by phone.  As a result of this conference, Plaintiffs narrowed their requests related to the complaints log and the data contained in Defendants' property management database.  However, the parties were unable to fully resolve their dispute.

### 2. **Defendants' Statement**

Defendants have little to add to this summary. Responsive policy documents have since been produced. Defendants, as detailed below, refuse to produce the propriety Yardi Voyager User's Manual. As noted in Plaintiffs' Statement, the initial request for a Complaint Log was made late in the meet-and-confer process. Defendants' failure to respond was unintentional, and Defendants have since discovered that no such log exists. All such complaints are contained in the tenant files, which have already been produced.

As a final note, Plaintiffs make repeated statements regarding what they refer to as unacceptable delay. Plaintiff's first meet and confer effort came on November 22, 2019—just over six months prior to the filing of the instant Motion. Defendants freely admit that they have not acted with all possible speed in response to Plaintiffs' meet and confer efforts. However, Defendants are compelled to point out that Plaintiffs waited over 27 months to bring up the purported deficiencies in Defendants' responses. As such, Plaintiffs can hardly lay full blame for the delays they complain of on Defendants.

### III.    **THE PARTIES' RESPECTIVE POSITIONS ON THE DISCOVERY DISAGREEMENT**

Because Defendants' objections to each of the RFPs at issue in this dispute are identical, the Parties first reproduce the full list of relevant RFPs, and then set out the objections, and the parties' discussion of the objections, immediately after.  The subsequent sections then address the three categories of documents at issue: (1) a complaints log maintained by Defendants' staff; (2) policy and training documents; and (3) data contained in Defendants' centralized property management database.

JOINT STATEMENT REGARDING DISCOVERY DISPUTE - CASE NO. 2:15-CV-00799 KJM-DB

**A.** **Plaintiffs' Requests for Production and Defendants' Objections Asserted in their Amended Responses to Plaintiff Terry's Requests for Production Set One**

Plaintiffs' RFPs relevant to the current discovery dispute are as follows:

**RFP 2:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to a Housing Assistance Payment Contract ("HAP CONTRACT") YOU had in the last 10 years with HUD.

**RFP 3:** Any and all documents that REFER, REFLECT, or RELATE to a lease YOU had in the last 10 years with a HUD-subsidized tenant.

**RFP 4:** Any and all documents that REFER, REFLECT, or RELATE to a resident ledger YOU maintained for a HUD-subsidized tenant.

**RFP 9:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to any and all COMMUNICATION that REFER, REFLECT, or RELATE to a HAP CONTRACT.

**RFP 12:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to any and all ADDITIONAL SERVICE CHARGES YOU made to a HUD-subsidized tenant.

**RFP 13:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to any and all COMMUNICATION that REFER, REFLECT, or RELATE to any and all ADDITIONAL SERVICE CHARGES YOU made to a HUD-subsidized tenant.

**RFP 17:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to any and all eviction actions that YOU have filed against a HUD-subsidized tenant for nonpayment of rent, including but not limited to nonpayment of ADDITIONAL SERVICE CHARGES.

**RFP 18:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to any and all notices that YOU Have provided to a HUD-subsidized tenant regarding nonpayment of rent, including but not limited to nonpayment of ADDITIONAL SERVICE CHARGES.

**RFP 20:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to whether any ADDITIONAL SERVICE CHARGE YOU made to a HUD-subsidized tenant was optional or mandatory.

**RFP 21:** Any and all DOCUMENTS that REFER, REFLECT, or RELATE to any and all COMMUNICATION that REFER, REFLECT, or RELATE to whether any ADDITIONAL SERVICE CHARGE YOU made to a HUD-subsidized tenant was optional or mandatory.

Ex 1. Defendants' Amended Response to Pl. Terry's Request for Production of Documents, Set One, interposed identical objections to each of these requests. Those objections state:

Objection. This request is overbroad and unduly burdensome because it seeks discovery of hundreds of tenants who do not have similar rental histories are Plaintiff DENIKA TERRY and is not narrowly tailored. It

1   also seeks responses that exceed the limitations period as set by the Court.
2   Objection is also made on the grounds of attorney-client privilege and
    attorney work product.

3   Bellows Decl. Ex. 2. The parties' arguments regarding these objections follow.

4   **B.**     **The Parties' Arguments Regarding Defendants' Asserted Objections**

5       **1.**     **Plaintiffs' Position**

6   The sole objection on which Defendants stand is their boilerplate objection that each RFP is

7   "not narrowly tailored." The broad discovery requests were driven by the scope of the alleged

8   violations, which relate to an unlawful practice extending across Defendants' entire portfolio of

9   residential properties. Whatever the merits of Defendants' objection to the original RFPs, Plaintiffs

10  have significantly narrowed the RFPs through the meet and confer process. This Motion addresses

11  only three specific, narrowly tailored categories of documents: Defendants' complaints log, policy and

12  training documents, and certain data from Defendants' centralized property management database.

13  The parties also continue to meet and confer about a search for emails responsive to Plaintiff Terry's

14  Requests for Production Set One. These four topics represent the entirety of the Parties' disputes

15  under Plaintiff Terry's Requests for Production Set One.

16  Defendants do not cite any authority for the proposition that requests that have been narrowed

17  through the meet and confer process should be rejected because of defects in their original drafting.

18  And contrary to Defendants' argument, the documents and data that are the subject of this motion are

19  not "new" requests—they fall in the heartland of the topics covered by the original requests for

20  production. Defendants should have known upon reviewing the requests that documents regarding

21  complaints related to, for example, Additional Service Charges and the calculation of rent for the

22  Section 8 program would be responsive, respectively, to Plaintiffs' RFPs 12 (documents related to or

23  reflecting communications regarding Additional Service Charges made to a HUD-subsidized tenant)

24  and 9 (documents related to or reflecting communications that relate to a HAP Contract). Similarly,

25  Defendants should have known that they had extensive data responsive to the RFPs in their centralized

26  property management database. *See, e.g.*, RFP 4 (documents related to ledgers for HUD-subsidized

27  tenants), RFPs 17 and 18 (documents related to eviction notices and actions based on nonpayment of

28  rent for HUD-subsidized tenants), RFPs 2 and 3 (documents related to leases and HAP contracts for

7

1  HUD-subsidized tenants).

2      And Plaintiffs *did* seek to "collaboratively" reach agreement on the production of documents

3  responsive to their RFPs.  Defendants raised several concerns during the meet and confer process, and

4  in each instance Plaintiffs responded in substance and worked to secure Defendants' agreement to

5  proceed.  In that process, Defendants never objected to the overbreadth of the original RFPs or argued

6  that Plaintiffs were abusing the discovery process by seeking the production of these documents.

7  Plaintiffs are now moving on categories of documents that are among those at the heart of Plaintiff

8  Terry's RFP Set One, that are necessary for Plaintiffs' prosecution of the case, that Plaintiffs are

9  confident do not pose an undue burden, and as to which the Parties appear to have reached an

10  impasse.[2]

11      **2.   Defendants' Position**

12      The lone argument pertaining to Defendants' objections which requires judicial resolution

13  relates to Defendants' assertions that Plaintiffs' Requests that are the subject of this Motion are not

14  narrowly tailored. Defendants believe these objections to have been well-founded, as discussed below.

15  Now, however, Plaintiffs argue that the Court should ignore the Requests for Production and treat the

16  categories of documents requested in the Motion as new Requests for Production. Such a position is

17  problematic. Defendants have had no opportunity to lodge proper objections to these purported newly

18  narrowed Requests for Production. Additionally, the phrasing and scope of these requests has

19  continued to change throughout the meet and confer process. Plaintiffs should not be allowed to

20  circumvent the standard response-and-objection process of discovery. Instead, the proper course is to

21  submit new, non-defective Requests for Production. The Federal Rules do not limit the number of

22  Requests for Production a party can propound, so there is no prejudice.

23      It goes without saying that there are circumstances in which the parties can collaboratively

24  narrow the scope of requests without depriving the responding party of a reasonable opportunity to

25  understand the request and object accordingly. A reasonable example lies with the tenant complaints

26

27  ──────────────

28  [2] In contrast, when Defendants disclosed the large number of emails that were found by the search
terms the parties collaboratively developed, Plaintiffs immediately agreed to continue refining the
search.

782939.19

1  sought by Plaintiffs. A specific Request for Production of all complaints by Section 8 tenants could,

2  through meet and confer efforts, be reasonably narrowed to all complaints from 2005 to the present

3  from Section 8 tenants relating to Additional Services Agreements. Defendants would have had the

4  opportunity to object to the substance of the request—the production of tenant complaints—as well as

5  to the scope of the request. Here, with the overbreadth of the requests in question, Defendants did not

6  have a reasonable opportunity to object to the substantive categories of documents requested.

7  Defendants properly objected to the scope, and Plaintiffs now seek to evade that objection by

8  informally transmitting new, different requests. These new requests are certainly narrower, but they

9  cannot reasonably be described as narrowed versions of the originally propounded requests. They are

10  new requests entirely, and were not properly propounded.[3]

11      Separately, Plaintiffs have indicated that treating the requested categories of documents as new

12  requests will vitiate Defendants' concerns about the scope of the requests because they intend to

13  propound new requests in the future, rather than relying on the present defective ones. The lone

14  exception, however, is staggering—a demand for e-mails pursuant to the overbroad requests that, as of

15  the last search conducted by Defendants, produced over 3.4 million responsive documents. The parties

16  have not yet settled on how to proceed, and meet and confer efforts are ongoing. However, an order

17  granting the instant Motion and overruling the objection that the requests at issue are not narrowly

18  tailored would effectively validate those requests, giving Plaintiffs improper leverage in the event the

19  parties are unable to resolve issues relating to the e-mail search.

20  **C.   Defendants' Complaints Log**

21      **1.   Plaintiffs' Position**

22      Plaintiffs seek the disclosure of entries on the complaints log related to Additional Service

23  Charges, leasing or the lease renewal process for Section 8 tenants, rent or subsidy calculation for

24  Section 8 tenants, Requests for Tenancy Approval, housing authority or HUD concerns about Wasatch

25  leases, HAP Contracts, and any fees or additional charges made to Section 8 tenants, pursuant to

26

27  _____
    [3] To the extent that Plaintiffs argue that Defendants have no authority for this position, Defendants cite
28  to Federal Rule of Civil Procedure 34, which delineates the proper procedures for propounding and
    responding to Requests for Production.

1    Plaintiffs' RFPs 2, 3, 9, 12, 13 and 21.  Contrary to Defendants' suggestion, Plaintiffs do not seek *all*

2    entries on the complaints log, regardless of relevance to the case.

3          Plaintiffs believe the log is likely to contain evidence regarding concerns raised by Section 8

4    tenants regarding Additional Service Charges and documenting the company's response.  Other entries

5    related to Section 8 tenants are relevant to show Defendants' knowledge and policies related to Section

6    8 leases and lease renewals, HAP Contracts, the HUD-mandated form called "Request for Tenancy

7    Approval," and fees charged to Section 8 tenants.  This evidence is both directly relevant to showing

8    that the company has acted with knowledge in imposing Additional Service Charges on Section 8

9    tenants, and in enabling Plaintiffs to pursue further discovery and investigation related to the subject.

10         After first ignoring Plaintiffs' request for entries from the complaints log that are responsive to

11   their RFPs,[4] Defendants now argue that they do not really have a complaints log, and that any records

12   of tenants complaints maintained centrally would represent complaints escalated from the property

13   level and therefore duplicate the documents they have already produced as part of the tenant files.

14   These arguments are inconsistent with deposition testimony from Defendants' own employees and

15   ignore the reality that the tenant files are incomplete—both because some were missing, and because

16   Defendants have not updated them in nearly three years.  Defendants also *admit* that they have a

17   "corporate-level customer relations employee" and that that employee "may have minimal records of

18   complaints with which he/she advised."  Johnson Decl. ¶ 3.

19         Deposition testimony from Defendants' employees establishes that the company maintains a

20   log regarding tenant complaints that are made to the dedicated customer relations employee.  Bellows

21   Decl. Ex. 9, Fetter Dep. 59:21-60:16, 62:8-24 (testifying about a centralized Wasatch employee

22   charged with taking and resolving complaints from tenants, and stating that she "ke[pt] a tenant

23   complaint log"); Bellows Decl. Ex. 8, Jarvis Dep. 41:22-43:14 (testifying that Wasatch had "one

24   person responsible to handle all resident complaints," and that complaints could "filter through to her"

25

26   [4] Defendants claim that Plaintiffs raised this request late in the meet and confer process.  However, the
     complaint log plainly falls into the category of communications regarding Section 8 tenancies and
27   Additional Service Charges, which were discussed in Plaintiffs November 22, 2019 letter.  Plaintiffs
     also specifically identified the complaints log in their March 30, 2020 letter, and Defendants simply
28   ignored the issue until this Motion was filed.

782939.19

1  and "[s]he would then document the complaint" and "get the responsible individuals involved to

2  handle the complaint").  Deposition testimony also establishes that while some are submitted to

3  property level personnel are stored in tenant files, tenants may also contact the dedicated customer

4  relations employee directly.  *See* Bellows Decl. Ex. 8, Jarvis. Dep. 42:18-24 (the corporate customer

5  relations employee's contact information is included in the lease agreement, and on-site customer

6  service signs list her contact information alongside the community and regional management contacts),

7  44:3-7 (complaints made at property level stored in tenant files); Bellows Decl. Ex. 7, Fetter Dep. at

8  60:11-16 (describing complaints tenants made directly to the centralized Wasatch employee).

9           Therefore, because the production would not be duplicative, and because Defendants do not

10  and cannot identify any burden or other basis for refusing the production, Plaintiffs request that the

11  Defendants be ordered to produce, within two weeks of the date of the order on this Motion, all entries

12  on the complaints log—or in records otherwise maintained by the corporate customer relations

13  employee—related to Additional Service Charges, leasing or the lease renewal process for Section 8

14  tenants, rent or subsidy calculation for Section 8 tenants, Requests for Tenancy Approval, housing

15  authority or HUD concerns about Wasatch leases, HAP Contracts, and any fees or additional charges

16  made to Section 8 tenants.[5]

17           **2.    <u>Defendants' Position</u>**

18           Defendants do not have a "Complaint Log," as such. All direct communications with tenants,

19  including any written complaints, are kept in tenant files. For several years, and now again currently,

20  Defendants employed a corporate-level customer relations employee. (Declaration of Jarom Johnson

21  ("Johnson Dec."), par. 3.) This individual would handle complaints that were escalated from the

22  property level. (Johnson Dec., par. 3.) However, all such complaints were stored in the tenant files.

23  While these escalated complaints are also stored separately, such a production would be duplicative of

24  those documents already produced in the tenant files. (Johnson Dec., par. 4.) Additionally, the

25  _____

26  [5] Because evidence of Defendants' knowledge is relevant to the FCA claims even if it predates the
    limitations period, Plaintiffs request that the production correspond to time period that the Additional

27  Service Charges have been in effect.  *See United States ex rel. Roberts v. QHG of Ind., Inc.*, No. 1:97-
    CV-174, 1998 U.S. Dist. LEXIS 23512, at *32-34 (N.D. Ind. Oct. 8, 1998) (citing 6 MOORE'S

28  FEDERAL PRACTICE § 26:41 at 26-105 – 26-106 (3d ed. 1998) (evidence predating the limitations
    period for an FCA claim is relevant and discoverable under Rule 26).

1  overwhelming majority of those escalated complaints would be entirely unrelated to Additional

2  Services Agreements or HAP Contracts. (Johnson Dec., par. 5.)

3      The most complete record of any complaints submitted by tenants, whether relating to

4  Additional Services Agreements or not, have already been produced as part of the tenant files.

5  (Johnson Dec., par. 6.)  To the extent Plaintiffs request that those Complaints be reproduced,

6  Defendants object to such a duplicative production—particularly where such a production would be

7  incomplete.

8  **D.**    **Training and Policy Documents Related to Section 8, Additional Service Charges, Leases**

9      **and the Leasing Process, and Eviction Notices and Actions**

10     **1.**    **Plaintiffs' Position**

11     Plaintiffs also seek the production of policy and training materials in use from April 14, 2005 to

12  the present that are related to Section 8 (*see* RFP  2, 3, 9), to Additional Service Charges (*see* RFP 12,

13  13, 20, 21), to leases and the leasing process (*see* RFP 3), and to eviction notices or notices to pay or

14  quit (*see* RFP 18), and to evictions or unlawful detainer actions (*see* RFP 17).

15     The record is clear that Wasatch maintains extensive training materials for its personnel.

16  Regional Vice President Janae Jarvis testified that the company has a series of online courses called

17  "how-to trainings" for their personnel.  Jarvis Dep. 57:20-58:24. Regional Manager Dave Tanforan

18  also testified that he had received Section 8 training from "how-to sections, read on our different

19  course work" when he started at Wasatch.  Tanforan Dep. 30:10-18.  Regional Vice President Fetter

20  testified that he has been trained on leasing.  Fetter Dep. 48:6-11.  Training and policy documents

21  regarding Additional Service Charges, leases and the leasing process, and eviction notices and actions

22  are all directly relevant to Defendants' policies and practices bearing on whether the Additional

23  Service Charges constitute rent (and therefore whether Defendants' collection of these charges from

24  Section 8 tenants violates the HAP Contract and federal regulations).  *See* 4th Am. Compl. ¶ 13, ECF

25  98.  Training and policy documents regarding Section 8, such as those referred to by Tanforan, are

26  relevant to show Defendants' knowledge and policies related to requirements in HAP Contracts, the

27  submission of leasing information and forms to local housing authorities, and application of other

28  policies (*e.g.*, regarding Additional Service Charges or evictions) to Section 8 tenants.

12

1    Jarvis also testified that there is a manual related to using Yardi, covering topics like "[h]ow to

2    move somebody in, how to move somebody out, how to process an applicant," among others.  Bellows

3    Decl. Ex. 8, Javis Dep. 147:23-148:1, 148:21-25.  The "Payment Sequence" document discussed in the

4    section regarding Yardi above is an excerpt from that manual, illustrating the relevance of the manual's

5    contents to the subject matter of this action.  *See id.* at 149:19-1501:11 & Ex. 3.

6    Defendants *agreed* in January to produce training documents related to Additional Service

7    Charges, evictions, and Section 8—but failed to follow through until making a partial production after

8    Plaintiffs filed this Motion.  Defendants now argue that the training materials are not responsive to

9    Plaintiffs' RFPs because they are not specific to Section 8 tenants.  However, Defendants' employees

10   testified that Section 8 tenants are subject to the same processes as other tenants, so training materials

11   related to ledgers, leases, Additional Service Charges, and evictions are relevant and responsive

12   whether or not they specifically discuss Section 8 tenants.  *See, e.g.*, Ex. 8, Jarvis Dep. 57:20-24.

13   Defendants argue that this reality illustrates the overbreadth of Plaintiffs' RFPs.  But their

14   attacks on the original RFPs are a distraction from the narrowly focused category of documents at issue

15   here—training materials are relevant to establish Defendants' policies relevant to whether the

16   Additional Service Charges qualify as rent.  Indeed, Defendants do not claim that the production would

17   be burdensome, or irrelevant to the issues in the case.

18   Defendants also complain that Plaintiffs seek documents for states other than California, but

19   this is entirely appropriate in light of Plaintiffs' FCA claim, which challenges Defendants' alleged

20   *business-wide* practice of imposing Additional Service Charges on Section 8 payments, in violation of

21   their certifications pursuant to federal regulations and uniform contracting language.  Indeed, this

22   Court already approved this geographic scope in its March 24, 2017 discovery, in compelling

23   Defendants to produce documents from all of their residential properties.  Bellows Decl. Ex. 10, Hrg.

24   Tr. 12:5-17:14, Mar. 24, 2017.

25   Defendants cite the NDA in declining to produce the Yardi manual, but they have not shown

26   that the Yardi Manual described by Jarvis' testimony is proprietary.  And the evidence suggests

27   otherwise:  the excerpt provided by Jarvis contains a prioritization list that was generated by Wasatch,

28   not Yardi.  *See* Bellows Decl. Ex. 8, Jarvis Dep. 148:21-24, 149:19-150:23.  Additionally, Defendants

13

have not provided the NDA to Plaintiffs or to the Court to demonstrate its application or scope. *But see Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678, 683 (C.D. Cal. 2009) (the party resisting disclosure has the burden to show the information sought is confidential or proprietary).

### 2. **Defendants' Position**

Defendants will first respond to Plaintiffs' position with respect to the manual that is specific to the Yardi Voyager database (the "Yardi Manual"). The Yardi Manual is subject to a Non-Disclosure Agreement. Defendants' full argument with respect to producing Yardi materials is set forth in Section E(2). In short, Plaintiffs have all the information they claim they are seeking from the materials they wish the court to compel, and such an order would place Wasatch in legal jeopardy and impose a significant burden.[6]

With respect to the remaining training materials, the defective original Requests for Production that are the basis for Plaintiffs' motion create an unusual circumstance. Plaintiffs have not made a Request for Production related to training materials. Instead, they have requested all materials relating to HAP Contracts, HUD-subsidized tenants, and ASA charges. 27 months after receiving responses to these requests, Plaintiffs specifically demanded that Defendants produce any and all training materials responsive thereto. Defendants then explained to Plaintiffs that there are no training or policy documents relating specifically to Section 8 subsidized tenants. In response, Plaintiffs have changed the nature of that informal request, and are now demanding each and every policy or training document relating to leases of any kind. This, arguably, would encompass every policy or training document of any kind, since Defendants are in the business of leasing apartment homes—an obviously overbroad demand which illustrates the facial overbreadth of the original requests themselves.

Plaintiffs' decision to utilize the original requests to make new demands puts Defendants in an untenable position. It essentially creates an open-ended, ongoing production obligation any time Plaintiffs think of a new category of documents they might like. This is indisputably the case—the

---

[6] To the extent Plaintiffs are concerned that Defendants have not followed the accounting policy laid out in the already-produced document they cite, a Request for Admission is a far more appropriate tool than requesting a wide array of confidential documents.

breadth of the requests encompasses any and all documents relating in any way to not just the class members, but any HUD-subsidized tenant in the multiple states in which Defendants operate.  While Defendants firmly object to the scope of these requests, it has still attempted to comply.  They have produced well over 100,000 pages of tenant files which contain the bulk of the data Plaintiffs are seeking.  They have further agreed to produce all tenant ledgers and, in good faith, have produced some training materials relating to the leasing process, as well as some relating to the provision of Additional Services Agreements.

However, Defendant will not and should not be compelled to produce each and every policy or training document related in any way to leases. Such a request is facially overbroad, and disproportionate to the needs of this case.  (*See* Fed. Rule Civ. Proc. 26(b)(1).) Courts should not "compel discovery responsive to a request that is impermissibly overbroad, and if answered would produce much tangential if not irrelevant information." *Cheng v. Aim Sports*, 2011 U.S. Dist. LEXIS 163153 (C.D.C.A. 2011); *see also United Oil Co., Inc. v. Parts Associates, Inc.*, 227 F.R.D. 404, 420 (D. Md. 2005) (internal quotation marks removed). That is precisely the situation here. To uphold the propriety of these requests would be to essentially require Defendants to produce anything To uphold the propriety of these requests would be to essentially require Defendants to produce anything and everything Plaintiffs demand for the remainder of this lawsuit.  Such an order would be highly inequitable, and would allow Plaintiffs to use discovery as a cudgel throughout their prosecution of this action.

Plaintiffs argue that the Court should ignore the Requests for Production that underpin their Motion to Compel because they are only asking the Court to compel certain documents. Such an argument would allow Plaintiffs to use overbroad requests such as the ones in question here as placeholders, and absent a full production of every possible responsive document, continue to fashion new, informal demands for whatever documents they like. Worse, in light of the fact that Plaintiffs argue that Defendants have waived any objections beyond the ones originally asserted, Defendants have no opportunity to object to the new, extra-judicial requests. Plaintiffs should be held to the Requests for Production they submitted, and Defendants' objection that the requests are not narrowly tailored is self-explanatory. As such, Defendants ask the Court not to compel production under these

1  requests.

2  **E.**     **Data Contained in Defendants' Yardi Voyager Database Regarding Section 8 Tenants**
3          **who have Paid Additional Service Charges**

4          **1.**     **Plaintiffs' Position**

5          Defendants' centralized property management database, called Yardi Voyager, contains data

6  reflecting charges and payments to Defendants' tenants, including their Section 8 tenants.  Plaintiffs

7  believe the database also stores information related to the eviction process, including service of

8  eviction notices.  Plaintiffs request the production of all data in the Yardi Voyager database for all of

9  Defendants' Section 8 tenants since April 2005 who have paid Additional Service Charges that is

10  related to HAP Contracts (RFP 2), leases (RFP 3), resident ledgers (RFP 4), Additional Service

11  Charges (RFP 12), eviction actions (RFP 17), and notices for nonpayment of rent or ASA charges

12  (RFP 18).[7]  Plaintiffs also request clear and detailed information on the schema or structure of the

13  database, relevant tables and fields, and codes, including any applicable data dictionary or look-up

14  tables.

15          **a.**     **Plaintiffs Need This Data to Prosecute Their Claims**

16          This data is essential to Plaintiffs' class and FCA claims.  Plaintiffs are seeking restitution of

17  the Additional Service Charges paid by Rule 23(b)(3) class members, as required by the HAP

18  Contracts, which preclude the owners from accepting payments in excess of the approved rental rate to

19  the tenant and require that "[t]he owner must immediately return any excess rent payment "to the

20  tenant." 4th Am. Compl. Ex. E at 2, ECF 98; *see also* 24 C.F.R. § 982.451(b)(4)(ii) (same).  Plaintiffs

21  need complete, detailed ledger data to conduct the analyses necessary to determine the amount of

22  additional service charges paid by each class member.  Moreover, in order for Plaintiffs to understand

23  and use this data, Defendants must provide a clear explanation of the structure, nature, and meaning of

24  the data.  *See* Fed. R. Civ. P. 34(a)(1)(A) (permitting discovery of electronically stored information "*if*

25  *necessary, after translation by the responding party into a reasonably usable form*.").

26          For their FCA claim, Plaintiffs require the same data for all of Defendants' Section 8 tenants

27  ───────────────

28  [7] Plaintiffs' RFPs define the term "documents" to include all "recorded . . . or electronic matter,"
plainly encompassing ESI such as data stored in the Yardi database.  *See* Bellows Decl. Ex. 1 at p. 3.

16

who have paid additional service charges (not just those in California) in order to prove the number and amount of claims Defendants have submitted for subsidy payments while collecting side charges in violation of their certifications and program rules.  *See* 31 USCS § 3729(a); *United States v. Baran*, No. 2:14-cv-02639-RGK-AJW, 2015 U.S. Dist. LEXIS 125190, at \*21-23 (C.D. Cal. Aug. 28, 2015).

Data in the Yardi Voyager database regarding eviction actions and notices is also relevant to Plaintiffs' contention that the Additional Service Charges are rent.  *See* Order, 7:22-25, 10:8-11:3, July 21, 2017, ECF 61 (noting relevance of eviction notices and actions based on nonpayment of additional charges to the determination that the charges were mandatory, and therefore, constitute rent).

In the course of the parties' meet and confer efforts, Plaintiffs requested detailed information about the data contained in the Yardi database so they could identify the data that needed to be extracted.  Defendants eventually refused, arguing that they are bound by an NDA, and instead provided sample "standard ledgers" for two class members.  *See* Bellows Decl. Ex. 6.

The standard ledgers Defendants propose to produce consist of a tenants' name, a series of dates, and corresponding descriptions and amounts in charge or payment columns. *See id.*  This is inadequate, as the standard ledgers omit important fields that Plaintiffs need, including:

- **The address or property identifiers for tenants' buildings,** which Plaintiffs need to conduct property-level analyses of charges that depend on the availability of certain amenities or services at different properties.  For example, Tanforan testified that all tenants at one of his buildings are required to pay for a covered parking space (an amenity that may not be available at all Defendants' buildings) when they move in.  Bellows Decl. Ex. 11, Tanforan Dep. 81:25-82:4.  Without property identifiers or addresses, Plaintiffs will not be able to detect these kinds of patterns in the data.

- **Unique tenant identifiers,** which are necessary to connect data in different tables in a database (*e.g.*, a table containing payments and charges, and a table containing information about notices to pay rent or quit and eviction actions).

- **Co-tenants on the same lease,** to accurately calculate the charges and payments at issue and not double count or undercount.

- **Data reflecting how payments are applied,** which is relevant to Plaintiffs' contention that

17

the Additional Service Charges are rent because Defendants' treat them as rent within their accounting and eviction practices. This dimension is entirely missing from the standard ledgers, even though Defendants' employees testified that Defendants have established an order of priority that Yardi uses to apply payments to outstanding balances and produced a document entitled "'Payment Sequence' for Receipting Payments." *See* Ex. 8, Jarvis Dep. 149:19-150:11 & Exhibit 3. The Payment Sequence document, however, is not definitive and in fact alludes to exceptions for "California" and "Housing Payments" that may be relevant to the case. *See id.*, Jarvis Dep. Exhibit 3. Plaintiffs need this data to determine Defendants' actual practices.

- **Codes and subcodes reflecting different kinds of transactions,** such as those categorizing charges in a standardized format (*e.g.*, base rent, parking, late fee, etc.). While the standard ledger samples do contain a description field for charges, the descriptions are not standardized and therefore cannot be efficiently or reliably used to conduct calculations over a high volume of data. It is clear that more detailed coding exists, however. For example, the "Payment Sequence" document described above lists standardized "Charge Codes." *Id.* Plaintiffs also request the production of any additional transaction coding, such as unique identifiers for transactions, and coding related to credits and charge reversals, all of which may be necessary to make sense of the data.

- **Data reflecting the balances** resulting from charges and payments, which Plaintiffs need to ensure the accuracy of their calculations and to relate unpaid charges to eviction data.

- **Data regarding eviction notices and actions,** which is relevant to Plaintiffs' contention that the Additional Services Charges are rent because Defendants serve eviction notices, and file eviction actions, based on tenants' failure to pay the Additional Services Charges. *See* Order 7:22-25, 10:8-11:3, July 21, 2017, ECF 61.

Defendants take the position that Plaintiffs should be required find most of these data points themselves in the hundreds of thousands of pages of tenant files. This is misguided for multiple reasons. First, Defendants' corporate deponent conceded that the tenant files are incomplete. *See* Bellows Decl. Ex. 9, Fetter Dep. 76:14-25; 77:8-9. (On a similar note, Defendants have not updated

their tenant files production since 2017.)  Second, Rule 26 directs litigants and the Court to consider the parties' "relative access to information."  Fed. R. Civ. P. 26(b)(1).  Defendants' Yardi database contains organized, complete data, all stored in one place, which may be queried and the relevant subset produced to Plaintiffs.  *See* Decl. of George Edwards ("Edwards Decl.") ¶¶ 11-15.   Where this data already exists, it is unreasonable to require Plaintiffs to comb through tenant files and then, by hand, enter addresses for each of the thousands of tenants into the ledger spreadsheets, link co-tenants' payments and charges together, and enter standard charge codes for the non-standardized charge descriptions.  *See, e.g.*, *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 357 (1978) (where a task like compiling data "could be performed more efficiently by the responding party, the discovery rules normally require the responding party" to do so, rather than to shift the burden to the requesting party).  In effect, Defendants are arguing that Plaintiffs should be required to go through a laborious process to create a data set that already exists—and that they should do so from concededly incomplete paper documents.  The federal rules do not contemplate such an absurd result.  *See* Fed. R. Civ. P. 26(b)(1).

### b.    Producing Existing Data Is Not Unduly Burdensome, Particularly In the Context of a Case of this Magnitude and Complexity

Defendants argued that Plaintiffs' request amounts to requiring Defendants to create a "customized ledger," a process that "would be a tenant-by-tenant endeavor which would take hundreds of man hours" and would require Defendants to create new documents solely for the purpose of this case.  That is not the case.

Plaintiffs seek the production of data that already exists in the Yardi database regarding Defendants' Section 8 tenants who have paid Additional Service Charges.  Data that exists in a database can normally be extracted efficiently with an automated query or customized report.  Plaintiffs have offered the assistance of their data extraction expert to draft a query that could be used to extract the necessary data.  Together with this Joint Statement, Plaintiffs provide a declaration from software expert George Edwards, PhD, describing how this process works and that it can be done with minimal burden on Defendants.  Edwards Decl., ¶¶ 11-15.  Defendants' affidavit supporting their claimed burden appears to contemplate that it would be necessary to pull the data tenant by tenant, but as Dr. Edwards explains, in an automated data extraction the entire body of relevant data may be

19

1    pulled at one time, and in a few simple steps.  *See id.*  Defendants' sparse affidavit, which is

2    unsupported by any description or explanation of the process required for the data pull, is inadequate to

3    support their claim of burden.

4           Further, because there is "no question that [the] data currently exists," the production of that

5    data "would not require the creation of new data."  *See Columbia Pictures Indus. v. Fung*, No. 2:06-cv-

6    05578-SVW-JC, 2007 U.S. Dist. LEXIS 97576, at *23 (C.D. Cal. June 8, 2007); *see also Cuff v. Dep't*

7    *of State Hosps.*, No. 2:16-cv-01999-MCE-DB, 2018 U.S. Dist. LEXIS 128386, at *10 (E.D. Cal. July

8    30, 2018) ("While defendants are not required to create a statistical report, they could be required to

9    provide the underlying data, if available."); *Apple Inc. v. Samsung Elecs. Co.*, No. 5:12-cv-00630-

10   LHK-PSG, 2013 U.S. Dist. LEXIS 116493, at *34 (N.D. Cal. Aug. 14, 2013) ("[R]equiring a party to

11   query an existing dynamic database for relevant information" is not equivalent to creating new

12   documents).  Moreover, "'[t]he technical burden . . . of creating a new dataset for the instant litigation

13   does not excuse production.'"  *Apple*, 2013 U.S. Dist. LEXIS 116493, at *34 (citation omitted).

14          To the extent there is a burden or cost associated with completing a custom data extraction, that

15   cost is justified by the amount in controversy (*i.e.*, restitution for 2,500 tenants in the range of hundreds

16   to thousands of dollars each, and treble damages and penalties to the United States for the FCA claim),

17   the number of people who stand to benefit from this litigation, and the importance of issues at stake in

18   the action. *See* Fed. R. Civ. P. 26(b)(1).  Additionally, as set out above, requiring Defendants to

19   produce existing data is appropriate in light of the Parties' "relative access" to information.  *See id.*

20          **c.    Defendants Must Provide Clear and Detailed Information About the Yardi**
             **System to Translate the Data into "Reasonably Useable Form"**

21          Additionally, in order to translate the data "into a reasonably useable form," Defendants must

22   provide detailed information about the structure, content, and meaning of the data.[8]  Fed. R. Civ. P.

23   34(a)(1)(A).  The Notes of Advisory Committee on the 2006 Amendments explained that in translating

24   information into a "reasonably useable form," "the responding party may need to provide some

---

[8] If Defendants accept Plaintiffs' invitation to rely on Plaintiffs' data expert to draft automated queries
to extract the data, disclosing this detailed information about the schema, tables, fields, and codes will
also be necessary to enable Plaintiffs to identify the relevant data and for the expert to draft the
queries.  Edwards Decl. ¶ 12.

reasonable amount of technical support, information on application software, or other reasonable

assistance to enable the requesting party to use the information."  The authoritative Sedona Conference

statement of principles related to database discovery, similarly, recommends that:

> in appropriate circumstances, a responding party may produce the database system information that is reasonably needed by the requesting party to obtain a basic requisite understanding of the structure, content and format of the data being produced, including relevant field names and values, the relational connections between data fields and tables, and the extent to which data fields are automatically populated by the system.

15 Sedona Conf. J. 171.

Defendants have refused to provide detailed information (or really any information) about the

structure, nature, and meaning of data contained in their Yardi database, citing an NDA they have

allegedly entered into with Yardi. In the circumstances of this case, Defendants' NDA cannot stand as

a barrier to the discovery of information that is necessary for Plaintiffs' class and FCA claims.

"Where trade secrets or other confidential commercial information is involved, the court will

balance the risk of disclosure to competitors against the risk that a protective order [or refusal to

produce the information] will impair prosecution or defense of the claims." *Nutratech, Inc. v. Syntech

Int'l, Inc.*, 242 F.R.D. 552, 554 (C.D. Cal. 2007) (citing *Brown Bag Software v. Symantec Corp.*, 960

F.2d 1465, 1470 (9th Cir. 1992)).  Trade secrets and proprietary information "have widely been held to

be discoverable upon appropriate findings and with an appropriate protective order." *MDK, Inc. v.

Mike's Train House*, 27 F.3d 116, 120 (4th Cir. 1994).  This is equally true for information protected

by commercial agreements like licenses or non-disclosure agreements.  As one court explained, a party

"cannot use its choice to enter into a software agreement as a shield against producing a relevant piece

of discovery." *Pero v. Norfolk S. Ry.*, No. 3:14-cv-16-PLR-CCS, 2014 U.S. Dist. LEXIS 166121, at

*8 (E.D. Tenn. Dec. 1, 2014); *see also I.S.E.L., Inc. v. Am. Synthol, Inc.*, No. 3:08-cv-00870-HLA-

TEM, 2009 U.S. Dist. LEXIS 101126, at *10-12 (M.D. Fla. Oct. 15, 2009) (ordering disclosure of

confidential information pursuant to protective order, notwithstanding an applicable NDA).

Here, the information about the data sought by Plaintiffs is necessary for the prosecution of

their claims.  Plaintiffs require information about the structure, nature, and meaning of the data in order

to properly analyze the data to (1) calculate restitution for the class claims, (2) calculate the number

and amount of improper subsidy charges Defendants made through the Section 8 program across all of its properties during the FCA limitations period, and (3) analyze Defendants' treatment of Additional Service Charges in their accounting as well as in serving eviction notices and filing eviction actions, in support of Plaintiffs' contention that Defendants treat the Additional Service Charges as rent.

While responding parties are entitled to "protection from misuse of trade secrets by competitors" under Rule 26(c)(1)(G), *Brown Bag*, 960 F.2d at 1470, providing the information that Plaintiffs seek in order to understand and analyze Defendants' data would not pose any risk that sensitive commercial information will be disclosed to Yardi's competitors. *Cf. Nutratech*, 242 F.R.D. at 554-56 (agreeing that the opposing party was a "competitor" and therefore requiring production of certain information to "attorneys' eyes only").

Moreover, any concerns that the information should not be disclosed publicly are adequately addressed by the parties' stipulated protective order, which permits Defendants to designate information confidential and thereby limit their disclosure and use. *See* ECF 53, ¶¶ 4, 11, 13. Courts commonly order production of proprietary information if the need to maintain confidentiality can be adequately addressed by a protective order, as it can here. *See, e.g.*, *Nutratech*, 242 F.R.D. at 554-56; *I.S.E.L., Inc*, 2009 U.S. Dist. LEXIS 101126, at *11-12.

Plaintiffs therefore request that the Court order Defendants to produce, within 30 days of the date of the order, all data in the Yardi Voyager database for all of Defendants' Section 8 tenants since April 2005 who have paid Additional Service Charges that is related to HAP Contracts, leases, resident ledgers, Additional Service Charges, eviction actions, and notices for nonpayment of rent or ASA charges . Plaintiffs further request that the Court order Defendants to produce or provide, subject to the stipulated protective order, detailed information about the schema of the database, relevant fields and tables, and values or codes in the fields, including any data dictionaries or look-up tables.

### 2.    **Defendants' Position**

Plaintiffs' position on the production of literally all data on the Yardi Voyager database relating to all of the 3,000+ class members beautifully illustrates the problems presented by their ultra-broad

---

22

782939.19

1   discovery requests.[9]  Federal Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any

2   nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of

3   the case[.]"  (Fed. Rule Civ. Proc. 26(b)(1).)  Factors to be considered when evaluating said

4   proportionality include "the importance of the issues at stake in the action, the amount in controversy,

5   the parties' relative access to relevant information, the parties' resources, the importance of the

6   discovery in resolving the issues, and whether the burden or expense of the proposed discovery

7   outweighs its likely benefit."  *Id.*

8       In this case, Defendants have already produced hundreds of thousands of pages of tenant files,

9   which cover an even larger group of tenants than the certified classIn addition, Defendants have

10  already agreed to produce all tenant ledgers, which are kept in the Yardi database.  These ledgers

11  include all charges ever imposed on these tenants, and all payments that were made.  However,

12  Plaintiffs have decided that this voluminous data is insufficient, and are demanding the production of a

13  wide array of information protected by a Non-Disclosure Agreement.

14      There are two fundamental issues with this demand.  The first is that it impose a substantial

15  burden on Defendants in response to a wildly overbroad set of requests.  Request 1, cited repeatedly by

16  Plaintiffs, demands any document related to a HUD-subsidized tenant from the last ten years.

17  Similarly, Request 13 demands any document relating to Additional Services Agreements fees charged

18  to HUD-subsidized tenants.  These Requests make no effort at limiting the scope of documents

19  requested. Despite raising this objection, Defendants have attempted to respond in good faith,

20  producing voluminous documents and volunteering to produce the tenant ledgers—an offer which

21  Plaintiffs have tacitly rejected as insufficient.

22      Plaintiffs now argue that because any single piece of data that relates to a Section 8 tenant or an

23  Additional Services Agreement in any way is responsive, Defendants are required to produce all such

24  data.  They use the overbreadth of their requests as a reason to compel responses rather than as a basis

25  for objection to their requests—an inversion of the standard discovery rules.  They also equate

26  responsiveness with necessity with no basis.  The lack of necessity is reflected by the fact that all of the

27

28  [9] Defendants again note that the Requests for Production are not limited to class members, and
    encompass all of Defendants' Section 8 tenants in each state where they operate.

data Plaintiffs seek that is omitted from the ledgers is already in their possession. Plaintiffs assert that they need the following categories of data: (1) tenants' addresses; (2)unique tenant identifiers; (3) co-tenants on the same lease; (4) data reflecting how certain payments are applied; (5) codes and subcodes reflecting different kinds of transactions; (6) data reflecting the balances; and (7) data regarding eviction notices and actions.

Items 1, 3, and 7 are already in Plaintiffs' possession, located within the tenant files. Item 4 has already been produced by a Wasatch document that Plaintiffs reference.  This document contains the information sought by Plaintiffs.  Item 6 requires that Plaintiffs perform addition.  Items 2 and 5 are only relevant if Plaintiffs have access to the entire Yardi database and are able to manipulate it as they please.

Items 2 and 5 are reflective of what Plaintiffs are really asking for. As evidenced by their purportedly generous offer to have a technical expert access the Yardi database and extract data, Plaintiffs are asking that this Court compel Defendants to turn over its entire database to a consultant retained by Plaintiffs. This would amount to an egregious violation of its Non-Disclosure Agreement, whether such a disclosure was subject to a protective order or not.

Plaintiffs attempt to justify production over the Non-Disclosure Agreement using case law that mandates production where it is necessary for prosecution of the case.  That case law holds that ordering production over a Non-Disclosure Agreement is predicated on the existence of "appropriate findings and with an appropriate protective order."  *MDK, Inc. v. Mike's Train House*, 27 F.3d 116, 120 (4th Cir. 1994).  Defendants do not dispute the validity of the protective order, but strongly disagree that there appropriate findings here such that refusal to produce the requested data would "impair prosecution or defense of the claims."  *Nutratech, Inc. v. Syntech Int'l, Inc.*, 242 F.R.D. 552, 554 (C.D. Cal. 2007) (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)).  Such impairment is impossible to show, as Plaintiffs are already in possession of all the relevant data they claim to need.

The remaining piece of the discussion is the burden that an order to produce this data would impose on Defendants.  As discussed above, breach of a Non-Disclosure Agreement would place Defendants in immediate legal jeopardy, for no better reason than streamlining the workflow for

Plaintiffs' counsel.[10]  However, Defendants have also explained to Plaintiffs' counsel that pulling every piece of data for every class member would require hundreds of man-hours.  (Declaration of Mike Christiansen, par. 4.)  That statement is supported by an affidavit from a member of Defendants' IT team.  (Declaratino of Mike Christiansen, par. 4.)  Defendants' IT Specialist is the individual who would be tasked with undertaking this burden, and his evaluation of the time it would take comes from experience and direct knowledge. As such, his assessment of this burden—a burden which, again, would be largely redundant given that all the data Plaintiffs claim to need has already been provided— should carry significant weight.

Ultimately, Plaintiffs are leveraging facially defective discovery requests to ask this Court to impose a disproportionate legal and practical discovery burden on Defendants.  Prosecution of Plaintiffs' claims does not require compelling production of data that Plaintiffs already have for the sake of convenience—particularly where such compulsion would require hundreds of man hours and place Defendants in legal jeopardy.  As such, Defendants request that the Court not compel a further response to these overbroad discovery requests with respect to each and every item of data in the Yardi Voyager database that relates to class members.

## IV.   CONCLUSION

For the above stated reasons, the Parties respectfully request that the Court resolve their discovery dispute.

Dated:  June 5, 2020

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO


 /s/ Anne Bellows
Anne Bellows

Attorneys for Plaintiff and Relators

---

[10] Defendants note that Plaintiffs' assertion that they require this data would seem to render the countless hours Defendants' personnel and counsel put into its effort to producing its thousands of tenant files useless—a conclusion that would not sit well with those who were part of that undertaking.

Dated:  June 5, 2020                          Respectfully submitted,

                                              LEWIS BRISBOIS BISGAARD & SMITH LLP


                                               _/s/ Ryan Matthews_ (as authorized on June 5, 2020)
                                              Ryan Matthews

                                              Attorneys for Defendant

782939.19