# Exhibit 2

1  Laura L. Ho (SBN 173179)
   lho@gbdhlegal.com
2  Kristen Burzynski (SBN 331433)
   kburzynski@gbdhlegal.com
3  Anne Bellows (SBN 293722)
   abellows@gbdhlegal.com
4  GOLDSTEIN, BORGEN, DARDARIAN & HO
   155 Grand Avenue, Suite 900
5  Oakland, CA 94612
   (510) 763-9800; (510) 835-1417 (Fax)
6
   Andrew Wolff (SBN 195092)
7  andrew@awolfflaw.com
   Tony Ruch (SBN 242717)
8  LAW OFFICES OF ANDREW WOLFF, PC
   1615 Broadway, 4th Floor
9  Oakland, CA 94612
   (510) 834-3300; (510) 834-3377 (Fax)
10
   Jesse Newmark (SBN 247488)
11 jessenewmark@centrolegal.org
   CENTRO LEGAL DE LA RAZA
12 3022 International Blvd., Suite 410
   Oakland, CA 94601
13 (510) 437-1863; (510) 437-9164

14 Attorneys for Plaintiffs and Relators and the Certified Classes

15

16 **UNITED STATES DISTRICT COURT**
   **EASTERN DISTRICT OF CALIFORNIA**
17 **SACRAMENTO DIVISION**

18 | UNITED STATES OF AMERICA, *ex rel.*      | Case No.: 2:15-CV-00799-KJM-DB
   | DENIKA TERRY, ROY HUSKEY III, and        |
19 | TAMERA LIVINGSTON, and each of them for  | **FIFTH AMENDED CLASS ACTION**
   | themselves individually, and for all other persons | **COMPLAINT FOR DAMAGES AND**
20 | similarly situated and on behalf of the UNITED | **INJUNCTIVE RELIEF, AND FOR RELIEF**
   | STATES OF AMERICA                        | **PURSUANT TO FALSE CLAIMS ACT**
21 |                                          |
   |        Plaintiffs/Relators,              | **CLASS ACTION**
22 |                                          |
   | vs.                                      | **JURY TRIAL DEMANDED**
23 |                                          |
   | WASATCH ADVANTAGE GROUP, LLC,            | Trial Date:   None Set
24 | WASATCH PROPERTY MANAGEMENT, INC.,       |
   | WASATCH POOL HOLDINGS, LLC,              |
25 | CHESAPEAKE APARTMENT HOLDINGS, LLC,      |
   | LOGAN PARK APARTMENTS, LLC, LOGAN        |
26 | PARK APARTMENTS, LP, ASPEN PARK          |
   | HOLDINGS, LLC, BELLWOOD JERRON           |
27 | HOLDINGS, LLC, BELLWOOD JERRON           |
   | APARTMENTS, LP, BENT TREE                |
28 | APARTMENTS, LLC, CALIFORNIA PLACE        |
   | APARTMENTS, LLC, CAMELOT LAKES           |

DMSJ000004

HOLDINGS, LLC, CANYON CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, and DOES 1-4,

                                          Defendants.

DMSJ000005

## CLASS ACTION COMPLAINT

Qui tam plaintiffs and proposed class representatives DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON ("Plaintiffs") demand a trial by jury. Plaintiffs DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON on behalf of themselves and those similarly situated, allege as follows:

## INTRODUCTION

1.     Plaintiffs seek to represent a class of past, present, and prospective tenants of Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake Apartment Holdings, LLC, Logan Park Apartments, LLC, Logan Park Apartments, LP, Aspen Park Holdings, LLC, Bellwood Jerron Apartments, LLC, Bellwood Jerron Apartments, LP, Bent Tree Apartments, LLC, California Place Apartments, LLC, Camelot Lakes Holdings, LLC, Canyon Club Holdings, LLC, Courtyard at Central Park Apartments, LLC, Creekside Holdings, LTD, Hayward Senior Apartments, LP, Heritage Park Apartments, LP, Logan Park Apartments, LP, Oak Valley Apartments, LLC, Oak Valley Holdings, LP, Peppertree Apartment Holdings, LP, Piedmont Apartments, LP, Point Natomas Apartments, LLC, Point Natomas Apartments, LP, River Oaks Holdings, LLC, Shadow Way Apartments, LP, Spring Villa Apartments, LP, Sun Valley Holdings, LTD, Village Grove Apartments, LP, Wasatch Quail Run GP, LLC, Wasatch Premier Properties, LLC, and Wasatch Pool Holdings III, LLC and Does 1-4 ("Defendants").

2.     Defendants own, rent, and/or manage residential apartment units throughout the western United States, including properties in California, Utah, Arizona and Washington.

3.     Defendants' properties include the Logan Park and Chesapeake Commons apartment communities located at 4141 Palm Avenue, Sacramento, CA 95842 ("Palm Avenue Property") and 3600 Data Drive, Rancho Cordova, CA 95670 ("Data Drive Property").

4.     At all times relevant to this Complaint, Denika Terry was Defendants' tenant at Apartment No. 391 of the Data Drive Property.

5.     At all times relevant to this Complaint, Roy Huskey III was Defendants' tenant at Apartment No. 191 of the Palm Avenue Property.

1

830228.4          DMSJ000006

6.      At all times relevant to this Complaint, Tamera Livingston was Defendants' tenant at Apartment No. 491 of the Data Drive Property.

7.      Defendants rent hundreds of apartments at their properties to tenants who receive rental assistance through the federally subsidized Housing Choice Voucher Program, commonly known as "Section 8." The Section 8 program provides that a participating tenant, renting privately owned housing, pays generally between 30 and 40 percent of their adjusted monthly income toward the rent and utility costs, while the federal government and local housing agencies pay the balance of the rent directly to the property owner.

8.      At the Data Drive and Palm Avenue Properties alone, there are more than one hundred Section 8 tenants.

9.      The certified Class includes over 2,000 class members. All are Section 8 tenants who have lived at one or more of Defendants' properties in California, at relevant times. There are likely hundreds more Section 8 tenants across Defendants' properties outside of California.

10.      At all times relevant to this Complaint, Defendants and local public housing agencies, such as the Sacramento County Housing and Redevelopment Agency, were parties to standard form Housing Assistance Payments Contracts ("HAP Contracts") mandated by the U.S. Department of Housing and Urban Development ("HUD") pursuant to the Section 8 program. These HAP Contracts include a standard form Tenancy Addendum. Defendants and Plaintiffs were parties to rental contracts incorporating the Tenancy Addendum.

11.      As part of their usual course of business, Defendants violated and continue to violate federal and state laws by demanding additional monthly rental payments from Plaintiffs and Defendants' other Section 8 tenants, in excess of the tenants' portion of the rent due under their HAP Contracts and Tenancy Addendums, and in violation of those HAP Contracts, Tenancy Addendums, and HUD regulations.

12.      These additional payment demands include rental charges for washers and dryers, renter's insurance, parking (covered and uncovered), garage rental, storage space rental, month-to-month lease fees, "Rent Plus" (a credit reporting service), pest and bedbug control, pet rent and other pet fees, and internet and cable service. Plaintiffs continue to review documents recently

830228.4                    DMSJ000007

produced by Defendants in discovery to ascertain whether Defendants unlawfully charged Section 8 tenants additional rental charges.

13.     Defendants have a policy and practice of treating theses additional charges as rent and violating Section 8 tenants' HAP Contracts, Tenancy Addendums, HUD regulations, and federal law. Specifically, Defendants: use tenant payments for contract rent to first pay for any additional charges due; combine contract rent and additional charges in standard forms informing tenants of their total "rental rate" and threatening to evict tenants for being in default under the rental agreement in that aggregate amount; deduct any unpaid additional charges from tenants' security deposits; treat a failure to pay additional charges as a breach of the lease and grounds to terminate tenancy; threaten and in fact evict tenants for failure to pay additional charges; and require tenants to agree to certain additional monthly charges, as a condition of leasing.

14.     Through these unlawful actions, Defendants knowingly presented false and fraudulent claims for payment of approval to the United States and local public housing agencies, including the Sacramento County Housing and Redevelopment Agency. These actions by the Defendants have caused the United States and local public housing agencies to suffer economic damages.

15.     This action is brought in part under the United States False Claim Acts, 31 U.S.C. §§ 3729 *et seq*.  Plaintiffs seek all and any statutory share of any award made to the United States. The United States seeks all remedies available under the False Claims Act.

## PARTIES

16.     Defendants own and manage, or at relevant times have owned and managed, 69 apartment communities with 16,344 units across five western states: California, Utah, Arizona, Colorado, and Washington. These properties range in size from 40 units to 661 units.

17.     Defendants were the owners and property managers, or the agents or employees of the owners and property managers, of the Subject Properties (defined as all properties managed by Defendant Wasatch Property Management during all relevant times in this action and that had one or more Section 8 tenants who were charged additional rent amounts beyond the amounts set forth in the HAP contracts), during all time periods relevant herein.

18.     Defendants owned, controlled, and managed the Subject Properties, including renting the apartment units at the Properties.

19.     Defendant Wasatch Advantage Group, LLC, is a limited liability corporation, registered with the Secretary of State to do business in the State of California. Defendant Wasatch Advantage Group, LLC, is an entity used by Defendants to own and/or manage properties including the Palm Avenue Property. Wasatch Advantage Group approved the sale of properties owned by Defendants Logan Park Apartments, LP,  Logan Park Apartments, LLC, Oak Valley Apartments, LP, Oak Valley Apartments LLC, Bellwood Jerron Apartments, LP, Bellwood Jerron Holdings LLC, Point Natomas Apartments, LP, and Point Natomas Apartments, LLC.

20.     Defendant Chesapeake Apartment Holdings, LLC, is a limited liability corporation, registered with the Secretary of State to do business in the State of California. Defendant Chesapeake Apartment Holdings is a signatory party to the September 20, 2010 HAP Contract for Plaintiff Denika Terry. A true and accurate copy of this HAP Contract is attached to the Complaint as Exhibit A. Upon information and belief, Defendant Chesapeake Apartment Holdings is also a signatory party to the HAP Contract for Plaintiff Tamera Livingston.

21.     Defendant Wasatch Property Management, Inc., is a corporation, registered with the Secretary of State to do business in the State of California. Defendant Wasatch Property Management is a party to the June 30, 2011 Residential Rental Agreement with Plaintiff Roy Huskey III. A true and correct copy of this lease agreement is an attachment to the HAP Contract attached to the Complaint as Exhibit E. Defendant Wasatch Property Management is also a party to the Residential Rental Agreement with Plaintiff Tamera Livingston. A true and correct copy of this lease agreement is an attachment to the Complaint as Exhibit L. Defendant Wasatch Property Management also provided the Resident Ledgers for Plaintiffs Denika Terry, Roy Huskey III, and Tamera Livingston setting forth rents received, as well as the additional, unlawful rental charges for "Washer/Dryer Rental," "Rental Insurance," and "Covered Parking." True and accurate copies of the Resident Ledgers are attached to the Complaint as Exhibits B and F and M. In addition, the HAP Contracts for Plaintiffs Denika Terry and Roy Huskey III direct that payments be mailed "cared of" Defendant Wasatch Property Management. (Exhs. A & E.) Upon information and belief,

4

DMSJ000009

the HAP Contract for Plaintiff Tamera Livingston also directs that payments be mailed "cared of" Defendant Wasatch Property Management.

22.     Both Defendants Chesapeake Apartment Holdings and Wasatch Property Management, Inc., received August 18, 2011 and/or August 10, 2012 Subsidy Adjustment Notices from the Sacramento Housing and Redevelopment Agency for Plaintiff Denika Terry. True and accurate copies of these notices are attached to the Complaint as Exhibits C and D.

23.     Both Defendants Chesapeake Apartment Holdings and Wasatch Property Management, Inc., received December 9, 2014 and/or March 13, 2017 Subsidy Adjustment Notices from the Sacramento Housing and Redevelopment Agency for Plaintiff Tamera Livingston.

24.     Defendant Logan Park Apartments, LLC, is a limited liability corporation, registered with the Secretary of State to do business in the State of California. Defendant Logan Apartments, LP, is a limited partnership, registered with the Secretary of State to do business in the State of California. Defendant Logan Park Apartments, LLC and Defendant Logan Apartments, LP is or was an entity used by Defendants to own/manage properties including Logan Park Apartments, located at 4141 Palm Avenue, Sacramento, CA 95842.  Logan Park Apartments is party to both the July 8, 2011 HAP Contract and July 30, 2011 Residential Rental Agreement for Plaintiff Roy Huskey III. (Exh. E). Based on documents produced by Defendants, Plaintiffs believe that Logan Park Apartments, LLC was an administrative general partner of Logan Park Apartments, LP, but that Defendants sold their interest in 2015 to a third party. The directors of Defendant Wasatch Advantage Group approved the sale. The allegations contained in this action pertain to the period in which Defendant Wasatch Property Management managed the Logan Park Apartment property.   Defendants have informed Plaintiffs that liability of Defendant Logan Park LLC for all actions including the conduct alleged here did not transfer in the 2015 sale.

25.     Defendant Wasatch Pool Holdings, LLC, is a limited liability corporation, registered with the Secretary of State to do business in the State of California. Defendant Wasatch Pool Holdings is an entity used by Defendants to own and/or manage properties including the Data Drive Property.

26.     Defendant Aspen Park Holdings, LLC is a limited liability corporation registered

DMSJ000010

with the Secretary of State to do business in the State of California. Defendant Aspen Park Holdings, LLC is an entity used by Defendants to own/manage properties including Aspen Park Apartments, located at 5152 Mack Road, Sacramento, CA 95823. Upon information and belief, Defendant Aspen Park Holdings, LLC is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

27.     Defendant Bellwood Jerron Apartments, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Bellwood Jerron Apartments, LLC is a limited liability corporation formerly registered with the Secretary of State to do business in the State of California. Defendant Bellwood Jerron Apartments, LP is or was an entity used by Defendants to own/manage properties including Bellwood Park Apartments, located at 339 Bell Avenue, Sacramento, CA 95838, and Jerron Place, located at 1730 Jerron Place, Sacramento, CA 95825. Upon information and belief, Defendant Bellwood Park Apartments, LP is or was a party to Residential Rental Agreements for one or more Class members and is or was a party to HAP Contracts for one or more Class members during all relevant times. Based on documents produced by Defendants, Plaintiffs believe that Bellwood Jerron Apartments, LLC was an administrative general partner of Bellwood Jerron Apartments, LP, but that Defendants sold their interest in 2015 to a third party. The directors of Defendant Wasatch Advantage Group approved the sale. Bellwood Jerron, LLC's registration has been cancelled with the Secretary of State. The allegations contained in this action pertain to the period in which Defendant Wasatch Property Management managed the Bellwood Park and Jerron Place properties. Defendants have informed Plaintiffs that liability of Bellwood Jerron, LLC for all actions including the conduct alleged here did not transfer in the 2015 sale.

28.     Defendant Bent Tree Apartments, LLC is a limited liability corporation registered with the Secretary of State to do business in the State of California. Defendant Bent Tree Apartments, LLC is an entity used by Defendants to own/manage properties including Bent Tree Apartments, located at 4350 Galbraith Drive, Sacramento, CA 95842. Upon information and belief, Defendant Bent Tree Apartments, LLC is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

830228.4

DMSJ000011

29.     Defendant California Place Apartments, LLC is a limited liability corporation registered with the Secretary of State to do business in the State of California. Defendant California Place Apartments, LLC is an entity used by Defendants to own/manage properties including California Place Apartments, located at 6633 Valley Hi Drive, Sacramento, CA 95823. Upon information and belief, Defendant California Place Apartments, LLC is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

30.     Defendant Camelot Lakes Holdings, LLC is a limited liability corporation formerly registered with the Secretary of State to do business in the State of California and currently registered with the Secretary of State of Utah to do business in that state. Defendant Camelot Lake Holdings, LLC is or was an entity used by Defendants to own/manage properties including Landing at Fancher Creek, 921 North Peach Avenue, Fresno, CA 93725. Upon information and belief, Defendant Camelot Lake Holdings, LLC is or was a party to Residential Rental Agreements with one or more Class members and is or was a party to HAP Contracts for one or more Class members during all relevant times. Defendants have informed Plaintiffs that Camelot Lakes Holdings, LLC sold its California properties and subsequently cancelled its registration with the Secretary of State. Defendant Camelot Lakes Holdings, LLC continues to own properties managed by Wasatch Property Management, LLC in Utah. The allegations contained in this action pertain to the period in which Defendants owned or managed the Landing at Fancher Creek property.

31.     Defendant Canyon Club Holdings, LLC is a limited liability corporation registered with the Secretary of State to do business in the State of California. Defendant Canyon Club Holdings, LLC is an entity used by Defendants to own/manage properties including Canyon Club Apartments, located at 305 North Canyon Drive, Oceanside, CA 92058. Upon information and belief, Defendant Canyon Club Holdings, LLC is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

32.     Defendant Courtyard at Central Park Apartments, LLC is a limited liability corporation registered with the Secretary of State to do business in the State of California. Defendant Courtyard at Central Park Apartments, LLC is an entity used by Defendants to

7

DMSJ000012

own/manage properties including Courtyard at Central Park, located at 4488 North Cornelia Ave., Fresno, CA 93722. Upon information and belief, Defendant Courtyard at Central Park Apartments is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

33.    Defendant Creekside Holdings, LTD, is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Creekside Holdings, LTD is an entity used by Defendants to own/manage properties including Creekside Villa Apartments, located at 4625 Nogal Street, San Diego, CA 92102. Upon information and belief, Defendant Creekside Holdings, LTD is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

34.    Defendant Hayward Senior Apartments, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Hayward Senior Apartments, LP is an entity used by Defendants to own/manage properties including Hayward Village, located at 22078 Arbor Avenue, Hayward, CA 94541. Upon information and belief, Defendant Hayward Senior Apartments, LP is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

35.    Defendant Heritage Park Apartments, LP is a limited partnership corporation registered with the Secretary of State to do business in the State of California. Defendant Heritage Park Apartments, LP is an entity used by Defendants to own/manage properties including Heritage Park Apartments, located at 2665 Clark Avenue, Norco, CA 92860. Upon information and belief, Defendant Heritage Park Apartments is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

36.    Defendant Oak Valley Apartments, LLC is a limited liability corporation formerly registered with the Secretary of State to do business in the State of California. Defendant Oak Valley Apartments, LLC is or was an entity used by Defendants to own/manage properties including Oak Valley Apartments, located at 5520 Harrison Street, North Highlands, CA 95660. Upon information and belief, Defendant Oak Valley Apartments, LLC is or was a party to Residential Rental Agreements with one or more Class members and is or was a party to HAP Contracts for one or

DMSJ000013
830228.4

more Class members during all relevant times. Based on documents produced by Defendants, Plaintiffs believe that Oak Valley Apartments, LLC was an administrative general partner of Oak Valley Apartments, LP, but that Defendants sold their interest in 2015 to a third party. The directors of Defendant Wasatch Advantage Group approved the sale. Defendants have informed Plaintiffs that Oak Valley Apartments LLC sold its properties in California and its registration was cancelled with the Secretary of State. The allegations contained in this action pertain to the period in which Defendant Wasatch Property Management managed the Oak Valley Apartments property. Defendants have informed Plaintiffs that liability of Defendant Oak Valley Apartments, LLC for all actions including the conduct alleged here did not transfer in the 2015 sale.

37.     Defendant Oak Valley Holdings, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Oak Valley Holdings, LP is or was an entity used by Defendants to own/manage properties including Bridges at Five Oaks, located at 5520 Harrison Street, North Highlands, CA 95660. Upon information and belief, Oak Valley Holdings, LP is or was a party to Residential Rental Agreements with one or more Class members and is or was a party to HAP Contracts for one or more Class members during all relevant times. Based on documents produced by Defendants, Plaintiffs believe that Defendants sold their interests in Bridges at Five Oaks in 2015. The directors of Defendant Wasatch Advantage Group approved the sale. The allegations contained in this action pertain to the period in which Defendant Wasatch Property Management managed the Bridges at Five Oaks property.

38.     Defendant Peppertree Apartment Holdings, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Peppertree Apartment Holdings, LP is an entity used by Defendants to own/manage properties including Peppertree Senior Apartments, located at 4956 Harness Street, Spring Valley, CA 91977. Upon information and belief, Peppertree Apartment Holdings, LP is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

39.     Defendant Piedmont Apartments, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Piedmont Apartments, LP is

DMSJ000014

1  an entity used by Defendants to own/manage properties including Piedmont Apartments, located at

2  215 West MacArthur Boulevard, Oakland, 94611. Upon information and belief, Piedmont

3  Apartments, LP is a party to Residential Rental Agreements with one or more Class members and

4  is a party to HAP Contracts for one or more Class members.

5        40.    Defendant Point Natomas Apartments, LP is a limited partnership registered with

6  the Secretary of State to do business in the State of California. Defendant Point Natomas

7  Apartments, LLC, was a limited liability corporation formerly registered with the Secretary of

8  State to d business in the State of California. Defendant Point Natomas Apartments, LP is or was

9  an entity used by Defendants to own/manage properties including Point Natomas Apartments,

10  located at 801 San Juan Road, Sacramento, CA 95834. Upon information and belief, Point

11  Natomas Apartments is or was a party to Residential Rental Agreements with one or more Class

12  members and is or was a party to HAP Contracts for one or more Class members during all

13  relevant times. Based on documents produced by Defendants, Plaintiffs believe that Defendant

14  Point Natomas Apartments, LLC, was an administrative general partner of Point Natomas

15  Apartments, LP, but that Defendants sold their interest in 2015 to a third party. The directors of

16  Defendant Wasatch Advantage Group approved the sale. The allegations contained in this action

17  pertain to the period in which Defendant Wasatch Property Management managed the Point

18  Natomas Apartments property.   Defendants have informed Plaintiffs that liability of Defendant

19  Point Natomas LLC for all actions including the conduct alleged here did not transfer in the 2015

20  sale.

21        41.    Defendant River Oaks Holdings, LLC is a limited liability corporation registered

22  with the Secretary of State to do business in the State of California. Defendant River Oaks

23  Holdings, LLC is an entity used by Defendants to own/manage properties including River Oaks

24  Apartments, located at 580 West Fargo Avenue, Hanford, CA 93230. Upon information and belief,

25  River Oaks Holdings, LLC is a party to Residential Rental Agreements with one or more Class

26  members and is a party to HAP Contracts for one or more Class members.

27        42.    Defendant Shadow Way Apartments, LP is a limited partnership registered with the

28  Secretary of State to do business in the State of California. Defendant Shadow Way Apartments,

LP is an entity used by Defendants to own/manage properties including Shadow Way Apartments, located at 4707 Yuma Avenue, Oceanside, CA 92057. Upon information and belief, Shadow Way Apartments, LP is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

43.     Defendant Spring Villa Apartments, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Spring Villa Apartments, LP is an entity used by Defendants to own/manage properties including Spring Villa Apartments, located at 8768 Jamacha Road, Spring Valley, CA 91977. Upon information and belief, Spring Villa Apartments, LP is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

44.     Defendant Sun Valley Holdings, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Sun Valley Holdings, LP is an entity used by Defendants to own/manage properties including Sun Valley Apartments, located at 4719 50th Avenue, Sacramento, CA 95823. Upon information and belief, Sun Valley Holdings, LP is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

45.     Defendant Village Grove Apartments, LP is a limited partnership registered with the Secretary of State to do business in the State of California. Defendant Village Grove Apartments, LP is an entity used by Defendants to own/manage properties including Village Grove Apartments, located at 660 North Quince Street, Escondido, CA 92025. Upon information and belief, Village Grove Apartments, LP is a party to Residential Rental Agreements with one or more Class members and is a party to HAP Contracts for one or more Class members.

46.     Defendant Wasatch Quail Run GP, LLC is a limited liability corporation formerly registered with the Secretary of State to do business in the State of California. Defendant Wasatch Quail Run GP, LLC is or was an entity used by Defendants to own/manage properties including Quail Run Apartments, located at 1016 Bellevue Avenue, Santa Rosa, CA 95407. Upon information and belief, Wasatch Quail Run GP, LLC is or was a party to Residential Rental Agreements with one or more Class members and is or was a party to HAP Contracts for one or

11

830228.4                                                                 DMSJ000016

more Class members during all relevant times. Defendants have informed Plaintiffs that Wasatch Quail Run GP sold its properties in California and its registration with the Secretary of State was cancelled. The allegations contained in this action pertain to the period in which Defendant Wasatch Property Management managed the Quail Run Apartments property.

47.     Defendant Wasatch Premier Properties, LLC is a limited liability corporate registered in Utah. Defendant Wasatch Premier Properties is the sole owner of Wasatch Pool Holdings and is a privately held real estate investment trust that has owned and/or managed at least 11 properties in California including Defendant Oak Valley Holdings LP during relevant times. Its agent is located at 16027 Aviara Parkway, Suite 220, Carlsbad, CA 92011. Because Defendant Wasatch Premier Properties engages in regular business in California and has continuous and systematic contacts with California, it is subject to California laws and jurisdiction in California courts.

48.     Defendant Wasatch Pool Holdings III, LLC is a limited liability corporation registered in Utah. Defendant Wasatch Pool Holdings III is a wholly owned subsidiary of Wasatch Pool Holdings. Because Defendant Wasatch Pool Holdings III engages in regular business in California and has continuous and systematic contacts with California, it is subject to California laws and jurisdiction in California courts.

49.     Plaintiff Denika Terry resides in California, and is a single mother of two minor children. Denika Terry suffers from a disability as defined by state and federal law in that she suffers from bipolar disorder. At all times relevant to this action, Denika Terry's sole sources of income were public assistance totaling approximately $4,408 per year for her and her two minor children. Because of her extremely limited income, Denika Terra received Section 8 rental assistance.

50.     Plaintiff Roy Huskey III resides in California, and is a single father of one minor child. At all times relevant to this Complaint, Roy Huskey III's sole sources of income was public assistance totaling approximately $15,624 per year for him and his child. Because of his extremely limited income, Roy Huskey III received Section 8 rental assistance.

51.     Plaintiff Tamera Livingston resides in Rancho Cordova, CA.

52.     Plaintiff the United States of America is *ex rel.* Denika Terry, Roy Huskey III and Tamera Livingston.

## JURISDICTION

53.     This court has federal subject matter jurisdiction because Plaintiffs bring this Complaint pursuant to the United States False Claim Acts, 31 U.S.C. §§ 3729 et seq.

54.     Venue is proper in this court because Defendants do business in its jurisdictional area, and the alleged unlawful conduct and damage to Plaintiffs, as well as the making of the contracts which are the subject of this action, occurred within its jurisdictional area.

## HOUSING CHOICE VOUCHER PROGRAM ("SECTION 8")

55.     The Housing Choice Voucher Program is a federal program intended to assist low-income families in obtaining decent, safe, sanitary, and affordable housing. The Program is authorized by Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437f. Regulations governing the Section 8 program are contained in 24 C.F.R. Part 982.

56.     The United States Department of Housing and Urban Development ("HUD") administers the Section 8 program. HUD enters into annual contribution contracts with local public housing agencies such as the Sacramento Housing and Redevelopment Agency.

57.     Pursuant to the annual contribution contract, the local public housing agency may enter into a HUD form contract, or Housing Assistance Payments Contract ("HAP Contract"), with the landlord of a dwelling unit to make monthly housing assistance payments on behalf of an eligible tenant family. Generally, participating tenant families pay 30 to 40 percent of their adjusted monthly income toward the rent and utilities, while the public housing agency pays the balance.

58.     The HAP Contract contains federally-mandated terms and is on a HUD form. The HAP Contract continues until its expiration or termination by the owners, the participant family, or the public housing agency.

59.     The HAP Contract includes a Tenancy Addendum and/or Lease Supplemental Agreement that constitute the residential lease agreement between the landlord and tenant. If the landlord also provides a separate lease form to the tenant, that form must be approved by the public housing agency. The terms of the Tenancy Addendum and Lease Supplement Agreement are

830228.4

DMSJ000018

incorporated into and expressly supersede those of any separate lease form in the event of conflicting provisions. (Exh. E at 1.)

60.     The HAP Contract for a particular dwelling unit establishes the initial lease term and total amount of monthly rent due from the tenant. The landlord may not increase the total rent payable to the landlord during the initial lease term.

61.     The HAP Contract also sets out the amount of the housing assistance payment by the public housing agency to the landlord, calculated in accordance with the regulations.

62.     The HAP Contract provides that the tenant is responsible for paying the landlord the balance of the total rent not covered by the housing assistance payment.

63.     The sum of the housing assistance payment by the public housing agency and the tenant's share of the rent payable to the landlord under the HAP Contract is known as the contract rent.

64.     The sum of the housing assistance payment and the tenant's share of the rent payable to the landlord may be adjusted due to market factors in the rental market and changes to a tenant's income. These adjustments are made in accordance with HUD requirements. Notice of these adjustments to the contract rent are provided to the landlord and tenant by the public housing agency, through a subsidy adjustment notice.

65.     The regulations that govern payment of rent under a HAP Contract are contained in 24 C.F.R. § 982.451. Subsection (b)(4)(ii) states: "The owner may not demand or accept any rent payment from the tenant in excess of the maximum and must immediately return any excess rent to the tenant."

66.     Section 5(e) of Part C of the HAP Contract and Tenancy Addendum to the standard form HAP Contracts further provides: "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease." (Exh. E at 2.)

67.     Section 8 of Part A of the HAP Contracts specifically addresses "Utilities and Appliances," requiring that: "Unless otherwise specified below, the owner shall pay for all utilities

DMSJ000019

and appliances provided by the owner." Section 5(c) of Part B of the HAP Contracts further requires that any "lease shall be consistent with the HAP contract" in this regard.

68. Section 7(b) of Part B of the HAP Contracts mandates that: "Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract."

## CLASS DEFINITION AND GENERAL ALLEGATIONS

69. Plaintiffs also bring this case as a class action pursuant to Federal Rule of Civil Procedure 23, seeking damages, injunctive, and other equitable relief on behalf of themselves, the United States, and all class members as defined below.

70. The Court has certified Plaintiffs' Rule 23(b)(3) class for damages/restitution defined as:

> All persons who, in the time period starting on April 14, 2011 (four years prior to the date of filing the initial Complaint in this action) through the final resolution of this matter, (1) have been tenants at any of Defendants' California properties; (2) have participated in the "Section 8" Housing Choice Voucher Program in connection with their tenancies at the California properties; and (3) have paid additional charges set forth in Additional Services Agreements in excess of their individual portions of the contract rent set forth in the HAP Contracts. ECF Nos. 92, 114.

71. The Court has also certified Plaintiffs' Rule 23(b)(2) class for declaratory and injunctive relief defined as:

> All persons who: (1) are or will become tenants at any of Defendants' California properties; (2) participate or will participate in the "Section 8" Housing Choice Voucher Program in connection with their tenancies at the California properties; and (3) pay or will pay additional charges set forth in Additional Services Agreements in excess of their individual portions of the contract rent set forth in the HAP Contracts. ECF No. 92.

72. As used herein, the term "Class members" shall mean and refer to the members of the proposed classes described above.

73. The "Class period" is designated as the time period starting on April 14, 2011, four years prior to the date of filing of the initial Complaint in this action. ECF No. 114 at 11.

74. Plaintiffs reserve the right to seek leave to amend and expand the Class, and to add

---

15

830228.4                                                                                    DMSJ000020

subclasses, if discovery and further investigation reveals such action is warranted.

75. As discussed in more detail above, Defendants owned, controlled, and managed the units that Class members resided in during the Class Period.

**Defendants Unlawfully Demand Additional Rental Charges.**

76. Throughout the Class period, Defendants have had a consistent policy and practice of unlawfully demanding additional rent payments, or "side payments," from their tenants whose rent is subsidized through the Section 8 program at the Subject Premises.

77. Upon information and belief, the HAP Contracts and Tenancy Addendums for the dwelling units in the Subject Premises are substantially identical with respect to all material terms, including the provisions described above that preclude the landlord from collecting payments from Class members that exceed their individual portion of the contract rent amount.

78. Upon information and belief, Defendants use software to create standard numbered forms for use at their properties, with substantially the same relevant terms and provisions.

79. Upon information and belief, Defendants colluded to devise and engage in this course of business conduct designed and intended to violate 42 U.S.C. § 1437f, 24 C.F.R. Part 982, and Defendants' HAP Contracts and Tenancy Addendums with their Section 8 tenants.

80. During the course of the Class members' tenancies, Defendants made unlawful demands to the Class members for additional rent payments, or "side payments," in excess of the Class members' individual shares of the contract rent pursuant to their HAP Contracts.

81. As set forth in Defendants standard form LD303.0l "Additional Services Agreement," Defendants' demands for "side payments" included demands that Class Members pay additional rent for: washers and dryers, renter's insurance, parking (covered and uncovered), garage rental, storage space rental, month-to-month lease fees, "Rent Plus" (a credit reporting service), pest and bedbug control, pet rent and other pet fees, and internet and cable service. Plaintiffs continue to review documents recently produced by Defendants in discovery to ascertain whether Defendants unlawfully charged Section 8 tenants additional rental charges.

82. During the course of their tenancies, all Class members paid, or are in jeopardy of paying, Defendants these additional rent payments, or "side payments," in excess of their

830228.4

DMSJ000021

individual shares of the contract rent pursuant to their HAP Contracts.

83.     Each of Defendants' demands for additional rent and receipt of these side payments from Class members violated 42 U.S.C. § 1437f, 24 C.F.R. Part 982, and the Class members' Tenancy Addendums and HAP Contracts.

84.     The additional rent payments that Defendants have unlawfully collected are individually so small that it is economically unfeasible for the Class members to pursue their remedies through individual actions.

### Defendants Are Liable For Their Unlawful Conduct Under Alter Ego, Single Enterprise, Agency, and Other Theories of Vicarious Liability.

85.     Each and every Defendant was at all relevant times the agent, employee, alter ego, and/or joint venturer of other Defendants, and they acted within the scope of that agency, employment, or alter ego, and/or in furtherance of the joint venture.

86.     In committing the acts complained of herein, each Defendant acted as the authorized agent, employee, alter ego, or representative of each other Defendant. Each act of each Defendant complained of herein was committed within the scope of said agency, employment, alter ego or other vicarious representation, and each act was ratified by each other Defendant. Each Defendant is liable, in whole or in part, for the damages and injuries suffered by Class members.

87.     As further alleged below, at all relevant times, Defendants were the alter egos of one another. There exists a unity of interest and ownership among Defendants such that any individuality and separateness between them has ceased to exist, so that the same personnel who serve as officers for Defendant Wasatch Property Management completely control, dominate, manage, and operate all other Defendant entities.

88.     Plaintiffs further and in the alternative allege that Defendants are sister or affiliate entities and were at all relevant times acting as a single enterprise to manage the Subject Properties and engage in the unlawful conduct alleged in this action. As such, this single enterprise must be held to respond as a whole for the liabilities and debts of all constituent entity Defendants.

89.     Audited financial records disclosed during discovery demonstrate that Defendants Wasatch Pool Holdings, LLC, Wasatch Pool Holdings III, LLC, and other named Defendants that

DMSJ000022
830228.4

hold specific property assets are wholly owned subsidiaries of Defendant Wasatch Premier Properties. Wasatch Premier Properties and its subsidiaries own many of the Subject Properties at issue in this case.

90.     Defendant Wasatch Premier Properties and/or its owners have affirmed that it is the guarantor of and personally liable for the debts of its subsidiary Wasatch Property Holdings. Plaintiffs continue to conduct discovery as to whether other Defendants hold themselves out as liable for the debts of other Defendants.

91.     Defendants Wasatch Advantage Group, Wasatch Property Management, LLC, Wasatch Premier Properties, LLC, and others also hold themselves out in public documents as operating as a joint enterprise.

92.     Defendants Wasatch Premier Properties, LLC, and Wasatch Pool Holdings, LLC, hold themselves out, in documents provided to government agencies, as owners of properties that are in fact nominally held by other Defendants;

93.     On information and belief, Defendants Wasatch Premier Properties, LLC, and Wasatch Property Holdings, LLC, among other Defendants, formed and used other Defendant entities to transfer to them the existing debts and liabilities.

94.     Defendants have also formed multiple entities for the sole or primary purpose of facilitating transactions such as acquiring other properties from third parties under common ownership or obtaining more favorable debt financing.

95.     Plaintiffs are also informed and believe that Defendants have at all relevant times commingled funds and failed to properly segregate funds. Plaintiffs continue to seek discovery on this issue.

96.     Defendants, including Wasatch Property Management, Wasatch Property Holdings, LLC, and Wasatch Advantage Group, LLC, have overlapping and in many cases identical directors and/or officers. These identical directors include but are not limited to Dell Loy Hansen, Bradley Mishler, and Scott Stettler, who have at all relevant times been employed at Wasatch Property Management. Directors Hansen, Mishler and Stettler, among others, are also presumed to be

830228.4

DMSJ000023

employees or agents of multiple Defendants and perform work for multiple Defendants. Plaintiffs continue to conduct discovery into the exact employment relationships among Defendants.

97. The Chief Operating Officer of Defendant Wasatch Property Management from 2016 until July 2021 described himself on his email signature and company biography on Defendants' website as Chief Operating Officer for "Wasatch Premier Communities," which is not a separate legal entity, but rather a fictitious name used by Defendants to refer to the collection of Wasatch-affiliated entities that own and invest in the Subject Properties and other residential properties.

98. Multiple named Defendants, including but not limited to Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Premier Properties, LLC, Wasatch Pool Holdings III, LLC, Aspen Park Holdings, LLC, Bent Tree Apartments, LLC, California Place Apartments, LLC, Camelot Lakes Holdings, LLC, Canyon Club Holdings, LLC, Chesapeake Apartment Holdings, LLC, Courtyard at Central Park Apartments, LLC, Oak Valley Apartments, LLC, and Wasatch Quail Run GP, LLC, and River Oaks Holdings, LLC, are entities registered to the same address in Logan, UT.

99. Defendants Peppertree Apartment Holding, LP, Piedmont Apartments, LP, Village Group Apartments, and Wasatch Advantage Group are entities registered to the same agent and address in Mission Viejo, CA.

100. Defendants Bellwood Jerron Apartments LP, Logan Park Apartments LP, and Point Natomas Apartments LP are registered to the same agent and address in San Francisco, CA.

101. Defendants also share common in-house legal services and accounting services and use common databases, email systems, and other computer systems.

102. Relevant documents disclosed also indicate that Wasatch Property Management and/or its agents and employees, including Dell Loy Hansen, as a majority shareholder of multiple Defendants, exercise control over other Defendant entities, and use them as instrumentalities or conduits for their business with respect to the alleged misconduct.

830228.4

DMSJ000024

103.    Based on financial documents disclosed in discovery, Plaintiffs allege that entities owned, operated and/or controlled by Defendant Wasatch Premier Properties, LLC, were undercapitalized and subject to its financial decision-making.

104.    The closely-held nature and the substantially overlapping and, in some cases, identical members, owners, and shareholders among multiple Defendant entities demonstrate a failure to maintain arms' length relationships in their business transactions. They have also used the corporate form to procure additional property and obtain favorable debt financing for other named Defendants. Further information on these issues is in the possession of Defendants, and Plaintiffs continue to conduct discovery into these issues.

105.    Information that can establish that Defendants are engaged in a joint venture or single enterprise, are agents of one another, and/or in equity should be considered alter egos of one another and held vicariously liable as such, is within the exclusive control of the Defendants. Plaintiffs continue to seek discovery from Defendants of this information.

106.    Because of the unity of interest and ownership among the named Defendants, adherence to the fiction of a separate existence of each corporate Defendant and treatment of their acts as individual and distinct from each other would allow an abuse of the corporate privilege, and promote unjust and inequitable results.

107.    In litigating this action since 2015, Defendants have held themselves out as the owners and managers of properties nominally owed and/or managed by other Defendants. Defendants have responded to discovery, testified, answered for, brought and defended against motions, and otherwise extensively litigated this action for all of the Subject Properties. Defendants have been represented by a single counsel and have by their actions, for the substantial majority of the litigation, suggested to Plaintiffs and the Court that they are operating as a single entity, with shared practices, procedures, defenses, and liability for the acts alleged in this action.

108.    Defendants have abused the corporate form by creating multiple entities and unevenly dispersing both revenues and liabilities deriving from the unified policies controlled by a single set of decisionmakers who dominate all of the entities across a complex network of entities. Injustice would result should only certain Defendants be held liable for the acts only nominally

20

830228.4

DMSJ000025

belonging to parents and/or sister subsidiaries, and should other Defendant entities be permitted to retain the unjust enrichment they have gained as a result of the unlawful conduct alleged in this action.

109.   Upon information and belief, during the Class period, Defendants were Qui tam plaintiffs' and Class members' landlords, and Qui tam plaintiffs and Class members were Defendants' tenants, as those terms, "landlord" and "tenant," are defined under 24 C.F.R. Part 982 and the relevant HAP Contracts and Tenancy Addendums.

**Defendants Treat Additional Charges as Rent.**

110.   Defendants have a policy and practice of treating these additional charges as rent.

111.   Defendants' standard form LD302.0I "Residential Rental Agreement" has provided at all relevant times either that: (1) "All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent."; or (2) "Rent received shall first be applied to all sums due and then to the current rent due" (emphasis added).

112.   Defendants confirmed this policy at deposition—specifically, that Section 8 tenants who fail to pay additional charges have those amounts deducted from their next monthly rental payment, and that this deduction results in a default in rent.

113.   Also confirming this policy, Defendants use standard form "Resident Ledgers" and "Move Out Statements" in accounting for charges to, payments by, and balances of Section 8 tenants. These documents show that Defendants treat contract rent and additional charges identically—combining them in the same running balance and with any rental payments by tenants applied to that balance, regardless of the nature of the charge or payment.

114.   Under the subsection for "Rent," Defendants standard form Rental Agreement provides for a total monthly amount due that expressly combines contract rent and additional charges.

115.   Defendants also combine contract rent and additional rental charges in standard forms: 1) LD315.01 "60-Day Notice of Resident's Intent to Vacate"; 2) LD101.06 an initial move-in form (which also totals both contract rent and additional rental charges in "First Month's Rent");

3) LD301.02 "Monthly Cost Breakdown"; and 4) "Monthly Statement of Rental Account" (which also totals both contract rent and additional rental charges in informing Section 8 tenants when "rent will be due," and the consequences of failure to pay such rent).

116.    Moreover, Defendants' standard form RS104.04 "Renewal Notification," expressly informs Section 8 tenants that contract rent and additional rental charges are part of the same total "rental rate": "When you renew your lease your new rental rate will be $_____, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc.)." Similarly, Defendants' standard form RS104.02 "Simplify Your Life" provides: "We are excited to offer you this lease at the rate of $_____ per month, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc.)."

117.    Defendants also have a policy and practice of deducting any unpaid additional charges from Section 8 tenants' security deposits, even though the rental agreement limits deductions from the security deposit for nonpayment to defaults in "rent" and utilities.

**Defendants Treat Additional Charges as Grounds for Eviction.**

118.    Defendants also treat additional charges as rent because Defendants have a policy and practice of treating unpaid additional charges as grounds for terminating tenancies and evicting Section 8 tenants.

119.    Defendants' standard form LD303.0l "Additional Services Agreement," setting forth the additional charges, provided at relevant times that: "A default under this Agreement is a default under the Lease . . . . If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, [such failure] . . . . shall cause [Wasatch] to terminate the Resident's tenancy . . . ."

120.    At deposition, Defendants admitted that it is in fact Defendants' policy and practice to declare a breach of the lease if a tenant defaults on additional charges, because the "Additional Services Agreement" itself is made a part of the lease.

121.    Defendants use standard form 3-day, 5-day, and 10-day notices to comply with lease or quit, to threaten Section 8 tenants with eviction for failure to pay additional charges.  At deposition, Defendants admitted that it is their policy to threaten eviction for failure to pay additional

charges.

122.    In particular, Defendants use standard form EC101.03 "THREE-DAY NOTICE TO PERFORM FINANCIAL COVENANT OF LEASE OR QUIT," to threaten tenants with eviction for failure to pay additional charges. As the standard form provides: "Your lease provides that you are obligated to pay the following charges, which you have failed to do: [listing unpaid additional charges, such as renter's insurance, parking, washer/dryer, etc.]." As the form continues: "You have breached the lease due to the following infractions: Failure to pay amount due in accordance with the above referenced item(s). Within three (3) days after services of this notice, you must do the following: Pay to [Wasatch] the sum of $[the total additional charges owed] to cure the breach of the lease agreement. Or deliver possession of the premises to the undersigned. Your failure to perform the covenant breached as specified, or vacate the premises within three (3) days, will cause the undersigned to initiate legal proceedings against you to declare the forfeiture of your rental agreement, recover possession of the premises, and to seek judgment for rent owed through the expiration date of this notice, together with damages for each day of occupancy after that date, attorney fees if provided for in your rental agreement . . . . [Y]ou can make your rental payments at IsYourHome.com."

123.    Defendants also use standard form ECl0l.01 to threaten Section 8 tenants with eviction for being "in default under the Rental Agreement in the aggregate amount of $___." Defendants' policy and practice is to include both contract rent and additional charges in this aggregate amount. The standard form further provides that: "Partial payments are not accepted by management"—meaning that tenants cannot pay only their contract rent owed to avoid eviction, but instead must pay all additional charges too. Defendants specifically threaten that: "WITHIN 5 DAYS after your receipt of this notice, you are required to pay said delinquent sums in full. Otherwise, your Rental Agreement shall thereupon immediately terminate and legal proceedings will be commenced against you to (1) recover possession of said apartment, (2) assess reasonable attorney's fees, court/other costs and (3) recover damages, all in connection with your default under the Rental Agreement."

124.    Defendants evict Section 8 tenants for failure to pay additional charges.

830228.4

DMSJ000028

**Defendants' Additional Charges Are Conditions of Leasing.**

125. Defendants also treat a number of their additional charges as rent because those charges are—or were during relevant times—mandatory conditions of leasing an apartment. These charges include renter's insurance, in-unit washer and dryers, parking at certain properties, month-to-month fees, pest and bedbug control, pet fees, and cable at certain properties.

126. Defendants' standard form LD302.01 rental agreement provides: "Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum [amount of] Personal Liability Coverage . . . . If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the 'pay along with rent' program and be charged accordingly."

127. Similarly, Defendants' standard form LD101.06 for initial move-in provides: "As of December l, 2003, Wasatch Premier Communities requires each resident to maintain Resident's Insurance with a minimum [amount of] Liability Coverage." Defendants' standard form LD101.03 "Applicant Consent," renter's insurance requirement letter, and website have the same or similar language. These documents further describe the paperwork and cover details required if a tenant chooses to obtain renter's insurance "from an approved list of carriers."

128. The standard Applicant Consent form also provides: "As a condition of leasing, Residents may be required to subscribe to [bulk cable] services."

129. A number of Defendants' standard forms describe month-to-month fees required from tenants who do not have a longer lease agreement. At deposition, Defendants admitted that month-to-month fees are part of the total rent.

130. At deposition, Defendants confirmed that additional charges for in-unit washers and dryers, as well as parking at certain properties, were conditions of tenancy until some time after filing this lawsuit. Defendants also admitted that pet fees are a condition of tenancy for all tenants with pets, and that Defendants have a policy of charging tenants for bedbug-related pest control.

131. Defendants also had a policy and practice of requiring tenants to pay non-refundable application, additional application, and lease initiation fees at move-in, as a condition of tenancy.

132. Plaintiffs continue to review documents recently produced by Defendants in

discovery to ascertain whether additional charges for other items are conditions of tenancy, and whether additional charges are also conditions of tenancy for Defendants' properties in other states.

## CLASS REPRESENTATIVES

### Plaintiff Denika Terry

133.    During the Class Period, Plaintiff Denika Terry received housing assistance from the Sacramento Housing and Redevelopment Agency ("Sacramento Housing Agency") under the Section 8 program.

134.    Denika Terry is informed and believes, and thereon alleges, that at all relevant times, Defendants were her landlords, and she was Defendants' tenant, as those terms, "landlord" and "tenant," are defined under 24 C.F.R. Part 982 and the relevant HAP Contract.

135.    On or about September 20, 2010, Denika Terry and Defendants reached an agreement for the rental of Apartment No. 391 of the Data Drive Property ("Terry Residence"}, subject to the approval of the Sacramento Housing Agency.

136.    On or about September 20, 2010, the Sacramento Housing Agency, Denika Terry, and Defendants approved the rental agreement and entered into a HAP Contract for the Terry Residence. A true and accurate copy of this HAP Contract is attached to the Complaint as Exhibit A.  Pursuant to the HAP Contract, rent for the Terry Residence was $860 per month, with the Sacramento Housing Agency responsible for $860 of the contract rent, and Denika Terry responsible for none of the contract rent. Section S(e) of Part C of the Tenancy Addendum to the Terry HAP Contract further provides: "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."

137.    Denika Terry occupied the Terry Residence pursuant to the HAP Contract, from approximately September 20, 2010, to March 20, 2013.

138.    During the course of the tenancy, the Sacramento Housing Agency sent Defendants and Denika Terry annual subsidy adjustment notices. True and accurate copies of the relevant notices are attached to the Complaint as Exhibits C and D.

DMSJ000030

139.     The first subsidy adjustment notice, effective October 1, 2011, increased the rent amount to $939 per month, with the Sacramento Housing Agency continuing to pay all of the contract rent. The second subsidy adjustment notice, effective October 1, 2012, did not change the rent amount, but decreased the Sacramento Housing Agency's assistance payment to $729 per month, and increased Denika Terry's portion to $210 per month.

140.     In accordance with the HAP Contract and subsidy adjustment notices, the Sacramento Housing Agency paid Defendants housing assistance payments in the amounts of: 1) $315, prorated, for the month of September 2010; 2) $860 per month from October 2010 through September 2011; 3) $939 per month from October 2011 through September 2012; and 4) $729 per month from October 2012 through March  2013.

141.     In sum, HUD and the Sacramento Housing Agency made a total of at least 31 rental payments to Defendants totaling $26,277 for Denika Terry.

142.     Upon information and belief, at all times during Denika Terry's tenancy, the Sacramento Housing Agency paid the housing assistance payments directly to Defendants.

143.     Beginning on or around September 20, 2010, and continuing throughout Denika Terry's tenancy, Defendants demanded that she pay them additional rent payments, or "side payments," not set forth in her HAP Contract or subsidy adjustment notices. Defendants made these "side payment" demands to Denika Terry on a monthly basis, including demands that she pay extra rent for: I) washer and dryer rentals, 2) renter's insurance, and 3) covered parking charges.

144.     These demands for "side payments" are reflected in the Defendants' Resident Ledger for the Terry Residence.  A true and accurate copy of the Resident Ledger is attached to the Complaint as Exhibit B.

145.     A comparison of the relevant HAP Contract and subsidy adjustment notices with the Residential Ledger demonstrates that Defendants made demands for "side payments" from Denika Terry for each month that she lived at the Terry Residence.

146.     Defendants demanded that Denika Terry make "side payments" in violation of the HAP Contract on at least 72 occasions.

830228.4

DMSJ000031

147.    As a result, Defendants demanded and Denika Terry paid $1,953.89 in additional rent payments from September 2010 through March 2013. In contrast, the amount of contract rent that Denika Terry was responsible for the entirety of this time period, as set forth in the HAP Contract and subsidy adjustment notices, was only $1,260. Thus, Defendants charged Denika Terry more in total unlawful rent payments than the total amount of rent for which she was responsible under the HAP Contract.

148.    Defendants threatened to evict Denika Terry and her family if she did not pay these additional rental amounts.

149.    Defendants ultimately filed an eviction action against Denika Terry for not making the unlawfully demanded "side payments."

150.    Neither the Sacramento Housing Agency nor HUD authorized Defendants to charge or collect these additional rent payments. To the contrary, these demands for additional rent payments were barred by the HAP Contract, Tenancy Addendum, and applicable Section 8 rules and related regulations, as described above.

151.    Defendants never informed Denika Terry that the Section 8 rules, the HAP Contract, and Tenancy Addendum prohibited them from demanding these additional rent payments.

152.    Due to Defendants' demands and threats of eviction, Denika Terry agreed to their demands for additional rent payments so that she would not lose her home and Section 8 voucher.

153.    Defendants' additional charges to Denika Terry were also treated by Defendants as rent and were mandatory, pursuant to Defendants' policies and procedures discussed in detail above.

154.    Plaintiff Denika Terry suffered emotional distress, physical injury, overpayment of rent, and out-of-pocket expenses as a result of the acts and omissions committed by Defendants.

**Plaintiff Roy Huskey III**

155.    During the Class Period, Plaintiff Roy Huskey III received housing assistance from the Sacramento Housing Agency under the Section 8 program.

156.    Roy Huskey III is informed and believes, and thereon alleges, that at all relevant

830228.4

DMSJ000032

times, Defendants were his landlords, and he was Defendants' tenant, as those terms, "landlord" and "tenant," are defined under 24 C.F.R. Part 982 and the relevant HAP Contract.

157.     On or about June 30, 2011, Roy Huskey III and Defendants reached an agreement for the rental of Apartment No. 191 of the Palm Avenue Property ("Huskey III Residence"), subject to the approval of the Sacramento Housing Agency.

158.     On or about July 8, 2011, the Sacramento Housing Agency, Roy Huskey III, and Defendants approved the rental agreement and entered into a HAP Contract for the Huskey III Residence. A true and accurate copy of this HAP Contract is attached to the Complaint as Exhibit E. Pursuant to the HAP Contract, rent for the Huskey III Property was $840 per month, with the Sacramento Housing Agency responsible for $554 of the contract rent, and Roy Huskey III responsible for $286 of the contract rent. Section 5(e) of Part C of the Tenancy Addendum to the Huskey III HAP Contract further provides: "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."

159.     Roy Huskey III amended his lease and tenancy in mid-2015.

160.     During the course of the tenancy, the Sacramento Housing Agency sent Defendants and Roy Huskey III annual subsidy adjustment notices.

161.     In accordance with the HAP Contract and subsidy adjustment notices, the Sacramento Housing Agency paid the Defendants housing assistance payments in the amounts of: 1) $16.67, prorated, for the month of June 2011; 2) $500 for the month of July 2011; 3) $554 per month from August 2011 through August 2012; 4) $536 per month from September 2012 through June 2013; and 5) $524 per month from beginning in July 2013 through the present.

162.     In sum, HUD and the Sacramento Housing Agency made a total of at least 34 rental payments to Defendants totaling $17,848.67, as of March 3, 2014.

163.     Upon information and belief, at all times during Roy Huskey III's tenancy, the Sacramento Housing Agency paid the housing assistance payments directly to Defendants.

164.     Beginning on or around July 8, 2011, and continuing throughout Roy Huskey III's

830228.4
DMSJ000033

tenancy, Defendants demanded that he pay them additional rent payments, or "side payments," not set forth in his HAP Contract or subsidy adjustment notices. Defendants made these "side payment" demands to Roy Huskey III on a monthly basis, including demands that he pay extra rent for: 1) washer and dryer rentals; and 2) renter's insurance.

165.    These demands for "side payments" are reflected in the Defendants' Resident Ledger for the Huskey III Residence. A true and accurate copy of the Resident Ledger through March 3, 2014, is attached as Exhibit F.

166.    A comparison of the HAP Contract with the Resident Ledger demonstrates that Defendants made demands for "side payments" from Roy Huskey III for each month that he lived at the Huskey III Property, through March 3, 2014.

167.    Defendants demanded that Roy Huskey III make "side payments" in violation of the HAP Contract on at least 70 occasions, as of March 3, 2014.

168.    As a result, Defendants demanded and Roy Huskey III paid at least $2,239.98 in additional rent payments from June 1, 2011, through March 3, 2014. In contrast, the amount of contract rent that Roy Huskey III was responsible for the entirety of this time period, as set forth in the HAP Contract and subsidy adjustment notices, was only $9,363.30.

169.    Defendants threatened to evict Roy Huskey III and his family if he did not pay these additional rental amounts.

170.    Neither the Sacramento Housing Agency nor HUD authorized Defendants to charge or collect these additional rent payments. To the contrary, these demands for additional rent payments were barred by the HAP Contract, Tenancy Addendum, and applicable Section 8 rules and related regulations, as described above.

171.    Defendants never informed Roy Huskey III that the Section 8 rules, HAP Contract, and Tenancy Addendum prohibit them from demanding these additional rent payments.

172.    Due to Defendants' demands and threats of eviction, Roy Huskey III agreed to their demands for additional rent payments so that he would not lose his home and Section 8 voucher.

173.    Defendants' additional charges to Roy Huskey III are also treated by Defendants as rent and are mandatory, pursuant to Defendants' policies and procedures discussed in detail above.

DMSJ000034

174.    Plaintiff Roy Huskey III suffered emotional distress, physical injury, overpayment of rent, and out-of-pocket expenses as a result of the acts and omissions committed by Defendants.

**Plaintiff Tamera Livingston**

175.    During the Class Period, Plaintiff Tamera Livingston received housing assistance from the Sacramento Housing Agency under the Section 8 program.

176.    Tamera Livingston is informed and believes, and thereon alleges, that at all relevant times, Defendants were her landlords, and she was Defendants' tenant, as those terms, "landlord" and "tenant," are defined under 24 C.F.R. Part 982 and the relevant HAP Contract.

177.    On or about August 1, 2012, Tamera Livingston and Defendants reached an agreement for the rental of Apartment No. 491 of the Data Drive Property ("Livingston Residence"), subject to the approval of the Sacramento Housing Agency.

178.    Upon information and belief, in 2012, the Sacramento Housing Agency, Tamera Livingston, and Defendants approved the rental agreement and entered into a HAP Contract for the Livingston Residence. Upon information and belief, pursuant to the HAP Contract, rent for the Livingston Residence was $882 per month, with the Sacramento Housing Agency responsible for $882 of the contract rent, and Tamera Livingston responsible for none of the contract rent. Upon information and belief, section 5(e) of Part C of the Tenancy Addendum to the Livingston HAP Contract further provides: "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner.  Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."

179.    Tamera Livingston has occupied the Livingston Residence pursuant to the HAP Contract, from approximately August 1, 2012 to present.

180.    During the course of the tenancy, the Sacramento Housing Agency sent Defendants and Tamera Livingston annual subsidy adjustment notices.

181.    Upon information and belief, in accordance with the HAP Contract and subsidy adjustment notices, the Sacramento Housing Agency paid Defendants housing assistance payments

830228.4          DMSJ000035

1 in the amounts of: 1) $497.00, prorated, for the month of August 2012; 2) $882 per month from

2 September 2012 through January 2013; 3) $713 per month from February 2013 through April

3 2013; and 4) $882 per month from May 2013 through January 2015; 5) $786.00 per month from

4 February 2015 through June 2015; 6) $829.00 per month from July 2015 through January 2016; 7)

5 $812.00 per month from February 2016 through March 2017; 8) $820.00 per month from April

6 2017 to March 2018; (9) $898.00 per month from April 2018 through at least February 2019. The

7 Sacramento Housing Agency continues to pay Defendants housing assistance payments for Tamera

8 Livingston.

9       182.    According to information produced by Defendants, HUD and the Sacramento

10 Housing Agency made rental payments to Defendants totaling $85,586.44 for Tamera Livingston.

11       183.    Upon information and belief, at all times during Tamera Livingston's tenancy, the

12 Sacramento Housing Agency paid the housing assistance payments directly to Defendants.

13       184.    Beginning on or around August 2010, and continuing throughout Tamera

14 Livingston's tenancy, Defendants demanded that she pay them additional rent payments, or "side

15 payments," not set forth in her HAP Contract or subsidy adjustment notices. Defendants made these

16 "side payment" demands to Tamera Livingston on a monthly basis, including demands that she pay

17 extra rent for: 1) washer and dryer rentals, 2) renter's insurance, and 3) covered parking charges.

18       185.    These demands for "side payments" are reflected in the Defendants' Resident

19 Ledger for the Livingston Residence. A true and accurate copy of the Resident Ledger is attached

20 as Exhibit M.

21       186.    Upon information and belief, a comparison of the relevant HAP Contract and

22 subsidy adjustment notices with the Residential Ledger demonstrates that Defendants made

23 demands for "side payments" from Tamera Livingston for each month that she lived at the

24 Livingston Residence.

25       187.    Defendants demanded that Tamera Livingston make "side payments" in violation of

26 the HAP Contract on at least 72 occasions.

27       188.    As a result, Defendants demanded and Tamera Livingston paid approximately

28 $3,783.96 in additional rent payments from August 2012 through the date on which the Fourth

DMSJ000036

1   Amended Complaint was filed. In contrast, the amount of contract rent that Tamera Livingston was

2   responsible for the entirety of this time period, as set forth in the HAP Contract and subsidy

3   adjustment notices, was only $6,731.00.

4       189.    Defendants threatened to evict Tamera Livingston if she did not pay these additional

5   rental amounts.

6       190.    Defendants ultimately filed an eviction action against Tamera Livingston for not

7   making the unlawfully demanded "side payments."

8       191.    Neither the Sacramento Housing Agency nor HUD authorized Defendants to charge

9   or collect these additional rent payments. To the contrary, these demands for additional rent

10  payments were barred by the HAP Contract, Tenancy Addendum, and applicable Section 8 rules and

11  related regulations, as described above.

12      192.    Defendants never informed Tamera Livingston that the Section 8 rules, the HAP

13  Contract, and Tenancy Addendum prohibited them from demanding these additional rent

14  payments.

15      193.    Due to Defendants' demands and threats of eviction, Tamera Livingston agreed to

16  their demands for additional rent payments so that she would not lose her home and Section 8

17  voucher.

18      194.    Defendants' additional charges to Tamera Livingston were also treated by

19  Defendants as rent and were mandatory, pursuant to Defendants' policies and procedures discussed

20  in detail above.

21      195.    Plaintiff Tamera Livingston suffered emotional distress, physical injury,

22  overpayment of rent, and out-of-pocket expenses as a result of the acts and omissions committed

23  by Defendants.

## CLASS ALLEGATIONS

196.    Named Plaintiffs bring this action on behalf of themselves and as representatives of

all Class members, as defined above.

197.    This action has been brought and may be properly maintained as a class action

FIFTH AMENDED COMPLAINT - CASE NO. 2:15-CV-00799 KJM-DB

830228.4                                                    DMSJ000037

because the proposed Class meets all applicable requirements of Federal Rule of Civil Procedure 23.

198. **Commonality**: The named Plaintiffs and Class members are all former, current, or future tenants of Defendants at one or more of Defendants' California properties, who in the relevant time period, have participated or will participate in the Section 8 program and receive rent subsidies from HUD subject to the protections of the Section 8 rules and related regulations described above. Class members therefore have been or are at risk of being unlawfully charged additional rent payments, or "side payments," by Defendants, as described in more detail above, in excess of their individual portions of the contract rent, set forth in their HAP Contracts. Accordingly, the named Plaintiffs and Class members have suffered or will suffer a common injury. The named Plaintiffs and Class members all share common questions of law and fact which predominate over any question or issue solely affecting individual members. These common questions of law and fact include but are not limited to:

| | |
|---|---|
| i. | Whether Defendants entered into HAP Contracts and Tenancy Addendums with Class members, and local public housing agencies in support of Class members; |
| ii. | Whether by entering into HAP Contracts and Tenancy Addendums, Defendants entered into residential lease agreements with Class members; |
| iii. | Whether HUD and the local public housing agencies made payments to Defendants for the Class members' subsidized portions of the rent; |
| iv. | Whether Defendants are bound by the relevant Section 8 program statutes and regulations, 42 U.S.C. § 1437f and 24 C.F.R. Part 982; |
| v. | Whether the relevant Section 8 program statutes and regulations, 42 |
| vi. | U.S.C. § 1437f and 24 C.F.R. Part 982, prohibit Defendants from demanding any additional rent payments, in excess of the Class members' portions of the rent under the relevant HAP Contracts; |
| vii. | Whether the relevant HAP Contracts prohibit Defendants from demanding any additional rent payments, in excess of the Class members' portions of the rent under those HAP Contracts; |
| viii. | Whether Defendants demanded and collected additional rent payments, or "side payments"—for instance, for washer and dryer rentals, renter's insurance, and covered parking charges—from the Class members, in excess of the Class members' portions of the rent under the relevant HAP Contracts; |

ix.     Whether Defendants' demands for and collection of these additional rent payments from the Class members violate the relevant Section 8 program statutes and regulations, 42 U.S.C. § 1437f and 24 C.F.R. Part 982;

x.      Whether Defendants' demands for and collection of these additional rent payments from the Class members breach the relevant HAP Contracts and Tenancy Addendums;

xi.     Whether Defendants' demands for and collection of these additional rent payments from the Class members breach Defendants' residential lease agreements with Class members;

xii.    Whether Defendants' demands for and collection of these additional rent payments from the Class members violate the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

xiii.   Whether Defendants' demands for and collection of these additional rent payments from the Class members violate California Business and Professions Code section 17200 *et seq.*

xiv.    The method of calculation and extent of damages for members of the Class.

199.    **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class members.  The named Plaintiffs and all Class members are sustaining, have sustained, or are at risk of sustaining, injuries and/or damages arising out of and caused by the Defendants' conduct as alleged in this Complaint.

200.    **Numerosity:** A class action is the only available method for the fair and efficient adjudication of this controversy.  Plaintiffs are informed and believe that Defendants own and manage, or at pertinent times have owned and managed, 69 apartment communities with 16,344 units across five western states: California, Utah, Arizona, Colorado, and Washington. Properties range in size from 40 units to 661 units. Upon information and belief, in four Sacramento properties alone, Defendants currently own and manage more than 150 units which are subsidized by HUD through the Section 8 program. As a result, there are likely to be far more than 150 Class members. Membership will be determined through analysis of the HAP Contracts for the Section 8 tenants at those Subject Properties located in California, Defendants' Resident Ledgers for these tenants, subsidy adjustment notices sent to Defendants by the local public housing agencies for these tenants, and other written communications to the named Plaintiffs and Class members.

830228.4                                                                                                    DMSJ000039

201.    **Adequacy of Representation**: The named Plaintiffs in this action are adequate representatives of the Class in that their claims are typical of those in the Class. They have been damaged as alleged herein and they are willing to go forward as representative in this class action litigation. Plaintiffs have no interests that are adverse to or conflict with those of the Class members. Plaintiffs are committed to the vigorous prosecution of this action. To that end, Plaintiffs have retained competent and experience counsel.

202.    This action is certifiable under Federal Rule of Civil Procedure 23(b)(3), because questions of law or fact common to the Class members, as described above, predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the case.

203.    In addition, a class action is superior to the other available methods for fairly and efficiently adjudicating the case because the damages suffered by individual named Plaintiffs and Class members, while not inconsequential, are relatively small, and would be outweighed by the expense and burden of separate litigation by each individual. This fact is known by Defendants, and makes it impractical for Class members to seek redress individually for the wrongful conduct alleged herein. A class action is therefore the superior method of resolving this dispute and securing justice. In addition, judicial economy would be enhanced as a class action would avoid a multiplicity of lawsuits, undue hardship, and expense for both the Court and litigants. The prosecution of separate actions would also create a risk of inconsistent ruling;, which might be dispositive of the interests of the other Class members who are not parties to the adjudications and may substantially impede their ability to adequate protect their interests.

204.    Moreover, the class definition is ascertainable and lends itself to class certification because Defendants, as well as HUD and local public housing agencies, keep records of their Section 8 tenants and rental payments. Defendants can therefore easily produce the records that would identify all Class members.

205.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(2), because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding

830228.4

DMSJ000040

1   declaratory relief with respect to the Class and necessitating that any such relief be extended to

2   Class members on a mandatory, class-wide basis.

3        206.   In addition, the court may certify the Class with respect to particular issues, as set

4   forth in detail above, under Federal Rule of Civil Procedure 23(c)(4).

5        207.   Plaintiffs are not aware of any difficulty which will be encountered in the

6   management of this litigation which should preclude its maintenance as a class action.

7   <u>**RELIEF AND CLAIMS**</u>

8        208.   As a direct and proximate result of the Defendants unlawful conduct, as set forth in

9   this Complaint, named Plaintiffs and Class members have sustained damages and are entitled to

10  relief, including but not limited to: 1) a return of all rents which were unlawfully obtained by the

11  Defendants; 2) statutory interest on such amounts according to proof; 3) additional statutory

12  damages for each Plaintiff and Class member due to the acts and omission of the Defendants

13  according to proof; 4) attorneys' fees pursuant to contract and statute; 5) injunctive relief according

14  to proof, including restoration of money wrongfully retained by Defendants, and interest thereon,

15  and an injunction to prevent Defendants from continuing their illegal practices.

16       209.   In addition, this action will result in the enforcement of important rights affecting

17  the public interest, including the right of the tenants of residential units to have their rent amounts

18  determined in a lawful manner and free of harassment and intimidation. The successful conclusion

19  of this litigation will confer a significant benefit on the general public and a large class of persons.

20  Plaintiffs and Class members are therefore entitled to an award of attorneys' fees pursuant to

21  California Code of Civil Procedure section 1021.5. The necessity and financial burden of private

22  enforcement are such as to make an award of fees under this statute appropriate. Such fees should

23  not, in the interest of justice, be paid out of the recovery.

24       210.   Periodically, through their tenancies Defendants entered into residential rental

25  agreements with Plaintiffs. True and correct copies of the residential rental agreements between

26  Defendants and Plaintiff Terry are attached to the Complaint as Exhibit G, Exhibit H and Exhibit I.

27  True and correct copies of the residential rental agreements between Defendants and Plaintiff

28  Huskey are attached  as Exhibit J, Exhibit K. A true and correct copy of the residential rental

830228.4                                                                    DMSJ000041

agreement between Defendants and Plaintiff Livingston is attached  as Exhibit L.

211.    Wherefore named Plaintiffs and Class members pray for the damages stated below.

### FIRST CAUSE OF ACTION
### VIOLATION OF <u>THE FEDERAL FALSE CLAIMS ACT</u>
### 31 U.S.C. § 3729(a)
### (All Plaintiffs v. Wasatch Advantage Group, LLC, Wasatch
### Property Management, Inc., Wasatch Pool Holdings, LLC,
### Chesapeake Apartment Holdings, LLC, Logan Park Apartments,
### LLC, and Logan Park Apartments LP ("The FCA Defendants"))

212.    Plaintiffs re-allege and incorporate into this cause of action the allegations of paragraphs 1 through 211, as if the same were set out at length herein.

213.    The False Claims Act provides that any person who "knowingly presents a false or fraudulent claim for payment or approval" to the United States is liable on each such claim for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages sustained by the United States.  In addition, any person who violates the Act is liable for the costs of the civil action brought to recover such penalty or damages. 31 U.S.C. § 3729(a).

214.    The False Claims Act defines the terms "knowing" and "knowingly" as meaning, with respect to information, that a person: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." "[N]o proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(l).

215.    The False Claims Act defines a "claim" as "any request or demand ... for money or property ... that ... is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United Statements Government" either "provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor, grantee or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

216.    For each month that the FCA Defendants accepted "additional rent payments" from Plaintiffs, Defendants endorsed and presented for payment the housing assistance checks received from local public housing agencies.

830228.4                                                                                                                   DMSJ000042

217.    In their HAP Contracts with the U.S. Department of Housing and Urban Development, FCA Defendants agreed that "During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA [local public housing agency] in accordance with HUD requirements." (Exh. E at 9, para. 6(a).)

218.    FCA Defendants also certified to the U.S. Department of Housing and Urban Development that "During the term of this contract . . . d. Except for the rent to owner, the owner has not received and will not receive any payment or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term." (Exh. A at 9-10, para. 8(d).)

219.    FCA Defendants further agreed that "e. The owner may not may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.  f. The owner must immediately return any excess rent payment to the tenant."  (Exh. A at 2, para. 5(e)-(f.).)

220.    As of March 3, 2014, FCA Defendants knowingly endorsed and presented for payment 65 separate housing assistance checks in relationship to the named Plaintiffs' tenancies, totaling $44,125.67, while demanding and collecting from Plaintiffs additional payments in violation of the relevant HAP Contracts, totaling $4,193.87.

221.    Upon information and belief, FCA Defendants' unlawful demands for and collection of additional rent payments are ongoing.

222.    Upon information and belief, FCA Defendants commit these violations as to all of their tenants who live at the Subject Properties and who receive rental subsidies from HUD and the Section 8 program.

223.    The representations and agreements that FCA Defendants provided in their HAP Contracts (and all amendments or renewals thereof) each constitute a separate false claim or representation to the United States that FCA Defendants would not demand or receive consideration for the rented premises beyond the total contract rent amount, as set forth in the HAP

DMSJ000043

830228.4

1  Contracts.

2  224.  In addition, FCA Defendants' endorsement and presentation for payment of each

3  assistance check for each month, while knowingly receiving additional rent payments from

4  Plaintiffs, constitutes a separate false claim or representation to the United States that FCA

5  Defendants did not receive any other consideration for the rented premises for that month, as set

6  forth in the HAP Contracts.

7  225.  The United States of America suffered damages as a result of violations of the False

8  Claims Act, because the money which HUD disbursed to local public housing agencies for the

9  payment of Section 8 housing assistance would not have been paid to the Defendants absent these

10  false claims and fraudulent conduct.

11  226.  The United States of America sustained damages equal to all payments made to the

12  Defendants pursuant to Plaintiffs' Section 8 assistance program, for which FCA Defendants also

13  unlawfully demanded and collected additional rent payments from Plaintiffs, totaling $44,125.67 as

14  of March 3, 2014.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### CALIFORNIA CIVIL CODE §§ 3300 ET SEQ.
### (All Plaintiffs v. All Defendants)

18  227.  Plaintiffs re-allege and incorporate into this cause of action the allegations of

19  paragraphs 1 through 226, as if the same were set out at length herein.

20  228.  By signing the relevant HAP Contracts, Tenancy Addendums, and standard form

21  rental agreements, Plaintiffs and Defendants entered into written residential rental agreements,

22  through the use of standard form leases with the same material terms.

23  229.  These lease agreements were adhesion contracts not subject to any negotiations or

24  input by Plaintiffs.

25  230.  Defendants were obligated to comply with the material terms of these agreements.

26  Due to Defendants' breach, Plaintiffs performed or were excused from performing their obligations

27  under the contracts.

28  231.  Defendants breached the terms of said agreements on multiple occasions by

charging Plaintiffs additional rental payments in violation of their HAP Contracts, including Section 5(e) of Part C of the Tenancy Addendum to the HAP Contracts which provides: "The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease."

232.     As a result of Defendants' conduct, Plaintiffs suffered damages including overpayment of rent, out of pocket expenses, physical and mental discomfort, and other damages to be ascertained at trial.

233.     Wherefore Plaintiffs pray for the damages stated below.

<div align="center">

**THIRD CAUSE OF ACTION**
**CONSUMERS LEGAL REMEDIES ACT**
**CALIFORNIA CIVIL CODE § 1750**
**(All Plaintiffs v. All Defendants)**

</div>

234.     Plaintiffs re-allege and incorporate into this cause of action the allegations of paragraphs 1 through 233, as if the same were set out at length herein.

235.     This cause of action is brought pursuant to the Consumers Legal Remedies Act California Civil Code section 1750 ("CLRA").

236.     The CLRA has adopted a comprehensive statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property or services to consumers primarily for personal, family, or household purposes.

237.     Each of the Defendants is a "person" as defined by Civil Code section 1761(c) because each is a corporation.

238.     Plaintiffs and Class members are "consumers" within the meaning of Civil Code section 1761(d) because they are individuals who leased rental property from Defendants for personal or household use.

239.     Defendants' leasing of rental property is a "service" within the meaning of California Civil Code section 1761(b).

240.     Plaintiffs' and Class members' payments for the services of Defendants are "transactions" as defined by Civil Code section 1761(e), because Defendants entered into

<div align="center">40</div>

830228.4     DMSJ000045

1  agreements to provide those services in exchange for Plaintiffs' and Class members' monetary

2  compensation.

3      241.   Plaintiffs have standing to pursue this claim as they have suffered injury in fact and

4  have lost money as a result of Defendants' actions as set forth herein.

5      242.   Plaintiffs and Class members reviewed, believed, and relied upon the statements

6  made by Defendants, including omissions of fact, that Defendants were lawfully entitled to demand

7  and collect additional rental amounts, or "side payments," in excess of the tenants' portions of the

8  rent provided in the relevant HAP Contracts. These statements and omissions include (1)

9  Defendants' affirmative misrepresentations that they would not collect amounts beyond the

10 contract rent permitted for Plaintiffs' and Class members' respective Section 8 apartments, as set

11 forth in the HAP Contracts including Section 5(e) of Part C of the Tenancy Addendums to the

12 Terry and Huskey III HAP Contracts, (2) Defendants' omission to explain in the course of

13 collecting "side payments" from Plaintiffs and Class members that such payments constitute a

14 violation of the Section 8 program.

15     243.   Defendants' misrepresentations and concealment were made with knowledge of

16 their likely effect on tenants, as members of the general public, and were done to induce Plaintiffs

17 and Class members to enter into their Section 8 HAP Contracts and to pay additional rental

18 amounts, or "side payments," in excess of the tenants' portion of the rent as provided in the

19 relevant HAP Contracts. Plaintiffs reviewed the provisions identified above and justifiably relied

20 on Defendants' misrepresentations when entering into their Section 8 HAP Contracts and paying

21 these excess rental amounts. Further, when Plaintiffs paid the "side payments" requested by

22 Defendants, they relied on Defendants' omission to explain that such "side payments" are

23 prohibited by applicable Section 8 rules and regulations, and their HAP Contracts.

24     244.   As set forth above, Defendants violated and continue to violate the CLRA by

25 engaging in practices proscribed by California Civil Code section 1770(a)(2) in transactions with

26 Plaintiffs and Class members, by misrepresenting their approval to demand and collect additional

27 rental amounts, or "side payments," by HUD and local public housing agencies.

28     245.   Plaintiffs seek an order enjoining the act and practices described above, restitution

of property, and any other injunctive or equitable relief that the Court deems proper.

## FOURTH CAUSE OF ACTION
### UNFAIR BUSINESS PRACTICES
### CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 ET SEQ.
#### (All Plaintiffs v. All Defendants)

246.    Plaintiffs re-allege and incorporate into this cause of action the allegations of paragraphs 1 through 245, as if the same were set out at length herein.

247.    California Business and Professions Code section 17200 prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice."

248.    Defendants have engaged in unfair, unlawful, and fraudulent business acts or practices as described in this Complaint, including, but not limited to, unlawfully demanding and collecting additional rental amounts, or "side payments," in excess of Plaintiffs' portions of the rent under the relevant HAP Contracts.

249.    As discussed in more detail above, Defendants' policy of demanding and collecting these additional side payments is unlawful, unfair, and/or fraudulent in that it violates the relevant HAP Contracts and at least the following laws:

       i.       Section 8 program statutes and regulations, 42 U.S.C. § 1437f and 24 C.F.R. Part 982;

      ii.      False Claims Act, 31 U.S.C. §§ 3729 et seq.;

     iii.      California Civil Code section 1750;

     iv.      California Civil Code Section 3300.

250.    Defendants' practices, as set forth herein, also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code section 17200, because (1) their conduct offended public policy, including the public polices furthered by the Section 8 program for the benefit of low-income tenants, (2) was unethical and unscrupulous, and (3) any alleged benefits from Defendants' conduct are outweighed by the injuries caused to Plaintiffs, Class members, and the general public.

251.    There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

252.    California Business and Professions Code section 17200 also prohibits any "fraudulent business act or practice."

253.    Defendants' material misrepresentations, and concealment and omission of material facts, as set forth above, were false, misleading, and/or likely to deceive the public within the meaning of California Business and Professions Code section 17200. These "fraudulent" acts include (1) Defendants' affirmative misrepresentations that they would not collect amounts beyond the contract rent permitted for Plaintiffs' and Class members' respective Section 8 apartments, as set forth in the HAP Contracts including Section 5(e) of Part C of the Tenancy Addendums to the Terry and Huskey III HAP Contracts, (2) Defendants' omission to explain in the course of collecting "side payments" from Plaintiffs and Class members that such payments constitute a violation of the Section 8 program.

254.    Defendants' misrepresentations and concealment were made with knowledge of their likely effect on tenants, as members of the general public, and were done to induce Plaintiffs and Class members to enter into their Section 8 HAP Contracts and to pay additional rental amounts, or "side payments," in excess of the tenants' portion of the rent as provided in the relevant HAP Contracts. Plaintiffs reviewed the provisions identified above and justifiably relied on Defendants' misrepresentations when entering into their Section 8 HAP Contracts and paying these excess rental amounts. Further, when Plaintiffs paid the "side payments" requested by Defendants, they relied on Defendants' omission to explain that such "side payments" are prohibited by applicable Section 8 rules and regulations, and their HAP Contracts.

255.    To this day, Defendants continue to violate the Unfair Business Practices Act by continuing to demand and collect additional rental amounts, or "side payments," in excess of the tenants' portion of the rent as provided in the relevant HAP Contracts.

256.    As a direct and proximate cause of Defendants' violation of the Unfair Business Practices Act, Plaintiffs and Class members have suffered injury in fact and actual damages.

257.    As a proximate result of Defendants' violation of the California Business and Professions Code section 17200, Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and Class members or disgorge their ill-gotten profits pursuant to

1    Business and Professions Code section 17203.

2        258.    Defendants' conduct, as described above, violates California Business and

3    Professions Code section 17200 and entitles Plaintiffs and Class members to restitution and

4    injunctive relief.

5        259.    In addition, pursuant to California Business and Professions Code section 17203,

6    Plaintiffs, both individually and on behalf of the Class, seek an order of this Court requiring

7    Defendants to immediately cease such acts of unfair competition and enjoining Defendants from

8    continuing to conduct business via the unlawful, fraudulent or unfair business acts and practices

9    complained of herein and from failing to fully disclose the true nature of their misrepresentations.

10       260.    Plaintiffs, on behalf of themselves and all others similarly situated, further request

11   injunctive relief in the form of restitution and disgorgement and all other relief allowed under

12   section 17200, plus interest, attorneys' fees, and costs pursuant to, inter alia, California Code of

13   Civil Procedure section 1021.5.

14                                **REQUEST FOR JURY TRIAL**

15       261.    Plaintiffs request a trial by jury of all issues which may be tried by a jury pursuant to

16   Rule 38 of the Federal Rules of Civil Procedure.

17                                **PRAYER FOR RELIEF**

18       262.    Plaintiffs, on behalf of themselves and the Class, and the United States of America

19   respectfully request that the Court order the following relief:

20       i.      Certify the Class and appoint Plaintiffs as representatives of the Class.

21       ii.     Certify the undersigned counsel as Class Counsel.

22       iii.    Declare that Defendants' policy of demanding and/or collecting from their

23               Section 8 tenants additional rent payments, in excess of the tenants' portion of

24               the contract rent in the relevant HAP Contracts, is unlawful.

25       iv.     Require Defendants, at their own cost, to notify all Class members of the alleged

26               violations discussed herein.

27       v.      Enjoin Defendants from continuing to demand or collect from their Section 8

28               tenants any rent payments in excess of the tenants' portion of the contract rent in

                                              44

830228.4                                                                      DMSJ000049

the relevant HAP Contracts.

vi. Enjoin Defendants also from any attempts to evict their Section 8 tenants based on any alleged failure to pay any of these unlawful demands for additional rent.

vii. Find that Defendants violated the False Claims Act and are liable to the United States of America.

viii. Assess a civil penalty against Defendants for each separate violation of the False Claims Act, in an amount of not less than $5,000 or more than $10,000.

ix. Award the United States three times the amount of damages that it sustained as a result of the Defendants' acts.

x. Award Plaintiffs the qui tam Plaintiffs' share of the proceeds.

xi. Award Plaintiff United States of America and qui tam Plaintiffs costs and reasonable attorneys' fees pursuant to contract and the False Claims Act.

xii. Order Defendants to cease and desist from violating the False Claims Act.

xiii. Find that Defendants, by breaching the relevant HAP Contracts and Tenancy Addendums, breached their residential lease agreements with Plaintiffs and Class members.

xiv. Find that Defendants violated the California Consumers Legal Remedies Act.

xv. Find that Defendants violated the California Unfair Business Practices Act.

xvi. Award treble damages according to proof for each cause of action.

xvii. Award general damages according to proof for each cause of action.

xviii. Award compensatory damages for losses resulting from humiliation, mental anguish, and emotional distress according to proof.

xix. Award incidental expenses, past, present and future.

xx. Award interest on the amount of losses incurred at the prevailing legal rate.

xxi. Award statutory penalties.

xxii. Award such other and further relief which this Court deems just and proper.

830228.4
DMSJ000050

Dated:                                    Respectfully submitted,

                                          GOLDSTEIN, BORGEN, DARDARIAN & HO


                                          _/s/ Anne P. Bellows_____
                                          Anne P. Bellows

                                          Attorneys for Plaintiff

830228.4                                                                          DMSJ000051

# EXHIBIT A

DMSJ000052

## SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
## HOUSING CHOICE VOUCHER PROGRAM
### Lease Supplemental Agreement

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions.

**1. PARTIES TO THE AGREEMENT DEFINED:**

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

a. Tenant **DENIKA TERRY**

b. Owner

Tenant # **t0006472**

Vendor #

**OWNR SPEC 1**

**2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:**

DENIKA G. TERRY      MIKIYAN C. LAMBERT

MIKOLE SERIYAH. JENKINS



RECEIVED IN OWNER SERVICES
OCT 21 2010
HCV PROGRAM

**3. UNIT ADDRESS:** 3600 DATA DR 391
RANCHO CORDOVA, CA 95670

**4. INITIAL LEASE TERM:** Begins 9/20/2010 and ends 8/31/2011

**5. INITIAL CONTRACT RENT:** $860.00     **INITIAL TENANT RENT:** $0.00

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to-month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by "Owner". The tenant shall provide or pay for the utilities or appliances indicated below by "Tenant". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|---|---|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Sewer | Tenant |
| Trash Collection | Tenant |
| Water | Tenant |
| Water Heat - Natural Gas | Tenant |

*Denika G. Terry*

DENIKA TERRY      (916) 904-4534     10-18-2010
                              Telephone Number         Date

Owner / Agent                 Telephone Number         10/18/2010
                                                      Date

DMSJ000053

From:SHRA Exec                    1 916 443 8872          09/24/201  5:53    #587 P.003/013

Case 2:15-cv-00799-KJM-DB   Document 273-4   Filed 04/22/22   Page 552 of 2156
Case 2:15-cv-00799-RJM-DAD  *SEALED*   Document 1   Filed 04/10/15   Page 31 of 82

(Page 2 of 76)

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

**Part A of the HAP Contract: Contract Information**
(To prepare the contract, fill out all contract information in Part A.)

1.  **Contents of Contract**
    This HAP contract has three parts:
        Part A: Contract Information
        Part B: Body of Contract
        Part C: Tenancy Addendum

2.  **Tenant**

    DENIKA TERRY

3.  **Contract Unit**

    3600 DATA DR 391
    RANCHO CORDOVA, CA  95670



4.  **Household**
    The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.

        DENIKA G TERRY
        MIKIYAN C LAMBERT
        MIKOLE SERIYAH JENKINS

5.  **Initial Lease Term**
    The initial lease term begins on (mm/dd/yyyy): 09/28/2010
    The initial lease term ends on (mm/dd/yyyy): 08/31/2011

6.  **Initial Rent to Owner**
    The initial rent to owner is: $860
    During the initial lease term, the owner may not raise the rent to owner.

7.  **Initial Housing Assistance Payment**
    The HAP contract term commences on the first day of the initial lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $860 per month.

    The amount of the monthly housing assistance payment by the PHA to the owner is  subject to change during the HAP contract term in accordance with HUD requirements.

DMSJ000054

From:SHRA Exec                    1 916 443 8873        08/24/2010 15:54    #587 P.004/013
Case 2:15-cv-00799-KJM-DB   Document 82-4   Filed 04/17/22   Page 553 of 216
Case 2:15-cv-00799-RJM-DAD *SEALED*   Document 1   Filed 04/10/15   Page 32 of 82

(Page 3 of 76)

## 8. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
|------|-------|--------|
|      | Owner | Tenant |
| Heating - Oil/Electric |  | T |
| Cooking Oil/Electric |  | T |
| Other Electric |  | T |
| Air Conditioning |  | T |
| Water Heat - Natural Gas |  | T |
| Water |  | T |
| Sewer |  | T |
| Trash Collection |  | T |
| Flat Fee Electric |  | T |

### Signatures

**Public Housing Agency: Sacramento Housing Authority**

*Sacramento Housing*
Print or Type Name of PHA

*Sonia Ramirez*
Signature

*Sonia Ramirez*
Print or Type Name and Title of Signatory

10 / 26 / 2010
Date (mm/dd/yyyy)

**Owner:**

_____
Print or Type Name of Owner

_____
Signature

_____
Print or Type Name and Title of Signatory

10/14/10
Date (mm/dd/yyyy)

**Mail Payments to:**

Name

3600 DATA DR - OFFICE

RANCHO CORDOVA, CA 95670

Address (Street, City, State, Zip)

DMSJ000055

From:SHRA Exec    1 916 443 8872    08/24/2010 5:54    #587 P.005/013

Case 2:15-cv-00799-KJM-DB Document 82-1 Filed 03/17/22 Page 54 of 216
Case 2:13-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/19/13 Page 33 of 82

**Housing Assistance Payment Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

**Part B of HAP Contract: Body of Contract**

1.  **Purpose**

    a.  This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

    b.  The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

    c.  During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

    d.  The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2.  **Lease of Contract Unit**

    a.  The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

    b.  The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

    c.  The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

    d.  The owner certifies that:

        (1)  The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
        (2)  The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
        (3)  The lease is consistent with State and local law.

    e.  The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3.  **Maintenance, Utilities, and Other Services**

    a.  The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

    b.  The owner must provide all utilities needed to comply with the HQS.

    c.  If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

    include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

    d.  The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

    e.  The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

    f.  The PHA must notify the owner of any HQS defects shown by the inspection.

    g.  The owner must provide all housing services as agreed to in the lease.

4.  **Term of HAP Contract**

    a.  **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

    b.  **When HAP contract terminates.**

        (1)  The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
        (2)  The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
        (3)  If the family moves from the contract unit, the HAP contract terminates automatically.
        (4)  The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
        (5)  The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
        (6)  The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

DMSJ000056

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. **When paid**

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

DMSJ000057

From:SHRA Exec                    1 916 443 8872        09/24/2013 15:54    #587 P.007/013

Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/13/15 Page 35 of 82

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

## 10. Owner's Breach of HAP Contract

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

## 11. PHA and HUD Access to Premises and Owner's Records

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

## 12. Exclusion of Third Party Rights

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

DMSJ000058

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

DMSJ000059

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

    a.  .The HAP contract contains the entire agreement between the owner and the PHA.

    b.  The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

DMSJ000060

# Housing Assistance Payment Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
### Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part C of HAP Contract: Tenancy Addendum

**1. Section 8 Voucher Program**

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

**2. Lease**

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

**3. Use of Contract Unit**

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

**4. Rent to Owner**

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

**5. Family Payment to Owner**

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

**6. Other Fees and Charges**

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

**7. Maintenance, Utilities, and Other Services**

a. **Maintenance**

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

DMSJ000061

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
      (a) Pay for any utilities that are to be paid by the tenant.
      (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
      (1) Serious or repeated violation of the lease;
      (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
      (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
      (4) Other good cause (as provided in paragraph d).

   c. **Criminal activity or alcohol abuse.**
      (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
         (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
         (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
         (c) Any violent criminal activity on or near the premises; or
         (d) Any drug-related criminal activity on or near the premises.

      (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
         (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
         (b) Violating a condition of probation or parole under Federal or State law.

      (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
      (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

   d. **Other good cause for termination of tenancy**
      (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
      (2) During the initial lease term or during any extension term, other good cause may include:
         (a) Disturbance of neighbors,
         (b) Destruction of property, or
         (c) Living or housekeeping habits that cause damage to the unit or premises.
      (3) After the initial lease term, such good cause may include:
         (a) The tenant's failure to accept the owner's offer of a new lease or revision;
         (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
         (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
      (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
      (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

   e. **Protections for Victims of Abuse.**
      (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
      (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

DMSJ000062

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9.  Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a.    The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.    When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c.    The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d.    If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

DMSJ000063

**14. Conflict with Other Provisions of Lease**

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

**15. Changes in Lease or Rent**

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

**16. Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

**17. Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

DMSJ000064

# EXHIBIT B

DMSJ000065

Ledger                                                                 Page 1 of 6
Case 2:15-cv-00799-KJM-DAD-SEALED Document 1 Filed 04/17/22 Page 43 of 82
Case 2:15-cv-00799-KJM-DAD SEALED   Document 1   Filed 04/16/15   Page 43 of 82



**Wasatch Property Management**

Date : 3/22/2013

# Resident Ledger

| | | | | | |
|---|---|---|---|---|---|
| Code | t0030362 | Property | CD | Lease From | 9/21/2012 |
| Name | Denika Terry | Unit | 391 | Lease To | 4/20/2013 |
| Address | 3600 Data Dr #391 | Status | Past | Move In | 9/20/2010 |
| | | Rent | 939 | Move Out | 3/20/2013 |
| City St. Zip | Rancho Cordova, CA 95670 | Phone(O)- | | Phone(H)- | (916) 307-2374 |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 8/2/2010 | Total Deposit Amount | 250.00 | | 250.00 | 8086253 |
| 8/2/2010 | Application Fee | 35.00 | | 285.00 | 8086254 |
| 8/27/2010 | Additional deposit due to credit*yz | 75.00 | | 360.00 | 8117093 |
| 9/20/2010 | Rent for 11 days | 315.33 | | 675.33 | 8176902 |
| 9/20/2010 | Renter's Insurance for 11 days | 5.71 | | 681.04 | 8176903 |
| 9/20/2010 | Covered Parking for 11 days | 3.67 | | 684.71 | 8176904 |
| 9/20/2010 | Washer/ Dryer charge for 11 days *yz | 14.67 | | 699.38 | 8176907 |
| 9/22/2010 | chk# 202476542840 MO- IA | | 349.05 | 350.33 | 4637836 |
| 9/22/2010 | chk# 14-169012824 MO- IA | | 35.00 | 315.33 | 4637837 |
| 9/22/2010 | chk# 14-169012823 MO- IA | | 100.00 | 215.33 | 4637838 |
| 10/1/2010 | Washer/Dryer Rental (10/2010) | 40.00 | | 255.33 | 8292089 |
| 10/1/2010 | Renter's Insurance (10/2010) | 15.58 | | 270.91 | 8292235 |
| 10/1/2010 | Covered Parking Charges (10/2010) | 10.00 | | 280.91 | 8292535 |
| 10/1/2010 | Monthly Rent Charges (10/2010) | 860.00 | | 1,140.91 | 8292536 |
| 10/2/2010 | chk# 202232505497 MO- IA | | 140.58 | 1,000.33 | 4677673 |
| 10/4/2010 | Late Charges Oct 2010 Late Fee | 50.00 | | 1,050.33 | 8304525 |
| 11/1/2010 | Covered Parking Charges (11/2010) | 10.00 | | 1,060.33 | 8383549 |
| 11/1/2010 | Washer/Dryer Rental (11/2010) | 40.00 | | 1,100.33 | 8383550 |
| 11/1/2010 | Monthly Rent Charges (11/2010) | 860.00 | | 1,960.33 | 8383551 |
| 11/1/2010 | Renter's Insurance (11/2010) | 15.58 | | 1,975.91 | 8383552 |
| 11/1/2010 | chk# 1134354 SHRA CK- IA | | 860.00 | 1,115.91 | 4718998 |
| 11/1/2010 | chk# 1134354 SHRA CK- IA | | 860.00 | 255.91 | 4719004 |
| 11/2/2010 | Resident not late In October. waiting for sec 8 ck- IA | (50.00) | | 205.91 | 8413378 |
| 11/3/2010 | SMUD Service Fee 09/20 - 10/710 | 25.00 | | 230.91 | 8414737 |
| 11/3/2010 | SMUD Electric 09/20 - 10/710 | 23.98 | | 254.89 | 8414738 |
| 11/4/2010 | Late Charges NOV 2010 LATE FEES | 50.00 | | 304.89 | 8415963 |
| 11/4/2010 | chk# 14-186750397 MO- IA | | 65.58 | 239.31 | 4749810 |
| 12/1/2010 | Covered Parking Charges (12/2010) | 10.00 | | 249.31 | 8447801 |
| 12/1/2010 | Renter's Insurance (12/2010) | 15.58 | | 264.89 | 8448219 |
| 12/1/2010 | Monthly Rent Charges (12/2010) | 860.00 | | 1,124.89 | 8449249 |
| 12/1/2010 | Washer/Dryer Rental (12/2010) | 40.00 | | 1,164.89 | 8449563 |
| 12/3/2010 | chk# 1140677 SHRA CK- IA | | 860.00 | 304.89 | 4791294 |
| 12/4/2010 | Late Charges DEC 2010 | 50.00 | | 354.89 | 8481519 |

DMSJ000066

Ledger
Page 2 of 6
Case 2:15-cv-00799-KJM-EFB Document 21364 Filed 04/17/23 Page 65 of 216
Case 2:15-cv-00799-KJM-DAD SEALED Document 1 Filed 04/14/15 Page 44 of 82

| Date | Description | Charge | Credit | Balance | Ref# |
|---|---|---|---|---|---|
| 12/6/2010 | SHRA Ck Late- IA | (50.00) | | 304.89 | 8483824 |
| 12/6/2010 | chk# 14-227566236 MO- IA | | 65.58 | 239.31 | 4798400 |
| 12/18/2010 | chk# 1146195 SHRA check/ yz | | 315.00 | (75.69) | 4807810 |
| 1/1/2011 | Covered Parking Charges (01/2011) | 10.00 | | (65.69) | 8513176 |
| 1/1/2011 | Monthly Rent Charges (01/2011) | 860.00 | | 794.31 | 8513320 |
| 1/1/2011 | Washer/Dryer Rental (01/2011) | 40.00 | | 834.31 | 8514039 |
| 1/1/2011 | Renter's Insurance (01/2011) | 15.58 | | 849.89 | 8514333 |
| 1/3/2011 | chk# 14-253723630 MO- IA | | 65.58 | 784.31 | 4838810 |
| 1/4/2011 | Late Charges Jan 2011 | 50.00 | | 834.31 | 8545897 |
| 1/4/2011 | SHRA CK LATE- IA | (50.00) | | 784.31 | 8547779 |
| 1/4/2011 | chk# 1147035 SHRA CK - IA | | 860.00 | (75.69) | 4843951 |
| 2/1/2011 | Covered Parking Charges (02/2011) | 10.00 | | (65.69) | 8661692 |
| 2/1/2011 | Washer/Dryer Rental (02/2011) | 40.00 | | (25.69) | 8661698 |
| 2/1/2011 | Monthly Rent Charges (02/2011) | 860.00 | | 834.31 | 8661699 |
| 2/1/2011 | Renter's Insurance (02/2011) | 15.58 | | 849.89 | 8661700 |
| 2/3/2011 | chk# 14-235723867 MO- IA | | 65.58 | 784.31 | 4905798 |
| 2/3/2011 | chk# 1153526 SHRA CK- IA | | 860.00 | (75.69) | 4908164 |
| 3/1/2011 | Covered Parking Charges (03/2011) | 10.00 | | (65.69) | 8717980 |
| 3/1/2011 | Washer/Dryer Rental (03/2011) | 40.00 | | (25.69) | 8717981 |
| 3/1/2011 | Monthly Rent Charges (03/2011) | 860.00 | | 834.31 | 8717982 |
| 3/1/2011 | Renter's Insurance (03/2011) | 15.58 | | 849.89 | 8717983 |
| 3/1/2011 | chk# 14-235600166 MO- IA | | 65.58 | 784.31 | 4940965 |
| 3/2/2011 | chk# 1160131 SHRA CK- IA | | 860.00 | (75.69) | 4949025 |
| 4/1/2011 | Covered Parking Charges (04/2011) | 10.00 | | (65.69) | 8784214 |
| 4/1/2011 | Washer/Dryer Rental (04/2011) | 40.00 | | (25.69) | 8784215 |
| 4/1/2011 | Monthly Rent Charges (04/2011) | 860.00 | | 834.31 | 8784216 |
| 4/1/2011 | Renter's Insurance (04/2011) | 15.58 | | 849.89 | 8784217 |
| 4/3/2011 | chk# 1166778 SHRA Ck- IA | | 860.00 | (10.11) | 5002399 |
| 4/4/2011 | chk# 14-247384337 MO- IA | | 65.58 | (75.69) | 5007308 |
| 5/1/2011 | Covered Parking Charges (05/2011) | 10.00 | | (65.69) | 8854204 |
| 5/1/2011 | Washer/Dryer Rental (05/2011) | 40.00 | | (25.69) | 8854205 |
| 5/1/2011 | Monthly Rent Charges (05/2011) | 860.00 | | 834.31 | 8854206 |
| 5/1/2011 | Renter's Insurance (05/2011) | 15.58 | | 849.89 | 8854207 |
| 5/3/2011 | chk# 1173481 SHRA CK- IA | | 860.00 | (10.11) | 5052087 |
| 5/3/2011 | chk# 68824168259 MO- IA | | 65.58 | (75.69) | 5056492 |
| 6/1/2011 | Covered Parking Charges (06/2011) | 10.00 | | (65.69) | 8927198 |
| 6/1/2011 | Washer/Dryer Rental (06/2011) | 40.00 | | (25.69) | 8927199 |
| 6/1/2011 | Monthly Rent Charges (06/2011) | 860.00 | | 834.31 | 8927200 |
| 6/1/2011 | Renter's Insurance (06/2011) | 15.58 | | 849.89 | 8927201 |
| 6/2/2011 | chk# 14-296551086 MO/ yz | | 65.58 | 784.31 | 5101701 |
| 6/3/2011 | chk# 1180089 SHRA CK- IA | | 860.00 | (75.69) | 5111303 |
| 7/1/2011 | Covered Parking Charges (07/2011) | 10.00 | | (65.69) | 9000894 |
| 7/1/2011 | Washer/Dryer Rental (07/2011) | 40.00 | | (25.69) | 9000895 |
| 7/1/2011 | Monthly Rent Charges (07/2011) | 860.00 | | 834.31 | 9000896 |
| 7/1/2011 | Renter's Insurance (07/2011) | 15.58 | | 849.89 | 9000897 |
| 7/4/2011 | Late Charges July 2011 | 50.00 | | 899.89 | 9035978 |
| 7/4/2011 | resident not late-SD | (50.00) | | 849.89 | 9036987 |
| 7/4/2011 | chk# 1186793 SHRA CK- IA | | 860.00 | (10.11) | 5162348 |

DMSJ000067

Ledger                                                                                           Page 3 of 6

Case 2:15-cv-00799-KJM-DB Document 264 Filed 04/17/23 Page 656 of 1156
Case 2:23-cv-00899-KJM-DAD  SEALED  Document 1  Filed 04/14/15  Page 45 of 82

| | Referred E. Jones #51 MI 03-19-2011- IA | (250.00) | | (260.11) | 9049013 |
|---|---|---|---|---|---|
| 7/31/2011 | chk# 1193533 SHRA CK- IA | | 860.00 | (1,120.11) | 5189028 |
| 8/1/2011 | Covered Parking Charges (08/2011) | 10.00 | | (1,110.11) | 9077122 |
| 8/1/2011 | Washer/Dryer Rental (08/2011) | 40.00 | | (1,070.11) | 9077123 |
| 8/1/2011 | Monthly Rent Charges (08/2011) | 860.00 | | (210.11) | 9077124 |
| 8/1/2011 | Renter's Insurance (08/2011) | 15.58 | | (194.53) | 9077125 |
| 8/2/2011 | Conservice- IA | 64.48 | | (130.05) | 9110793 |
| 9/1/2011 | Covered Parking Charges (09/2011) 19 days | 6.33 | | (123.72) | 9155996 |
| 9/1/2011 | Covered Parking Charges (09/2011) 11 days | 3.67 | | (120.05) | 9155997 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) 19 days | 25.33 | | (94.72) | 9155998 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) 11 days | 14.67 | | (80.05) | 9155999 |
| 9/1/2011 | Monthly Rent Charges (09/2011) | 860.00 | | 779.95 | 9156000 |
| 9/1/2011 | Renter's Insurance (09/2011) 19 days | 9.87 | | 789.82 | 9156001 |
| 9/1/2011 | Renter's Insurance (09/2011) 11 days | 5.71 | | 795.53 | 9156002 |
| 9/2/2011 | chk# 1200273 SHRA CK- IA | | 860.00 | (64.47) | 5264936 |
| 9/30/2011 | Conservice- IA | 64.47 | | 0.00 | 9220684 |
| 10/1/2011 | Covered Parking Charges (10/2011) | 10.00 | | 10.00 | 9231431 |
| 10/1/2011 | Washer/Dryer Rental (10/2011) | 40.00 | | 50.00 | 9231432 |
| 10/1/2011 | Renter's Insurance (10/2011) | 17.91 | | 67.91 | 9231433 |
| 10/1/2011 | Housing Assistance Charge (10/2011) | 939.00 | | 1,006.91 | 9231434 |
| 10/3/2011 | chk# 1207023 SHRA CK- IA | | 939.00 | 67.91 | 5326803 |
| 10/11/2011 | chk# 154 CK- IA Reversed by ctrl#5346001 | | 67.91 | 0.00 | 5338704 |
| 10/20/2011 | Returned check charge | 50.00 | | 50.00 | 9287174 |
| 10/20/2011 | chk# 154 NSF receipt Ctrl# 5338704 | | (67.91) | 117.91 | 5346001 |
| 11/1/2011 | Covered Parking Charges (11/2011) | 10.00 | | 127.91 | 9307889 |
| 11/1/2011 | Washer/Dryer Rental (11/2011) | 40.00 | | 167.91 | 9307890 |
| 11/1/2011 | Renter's Insurance (11/2011) | 17.91 | | 185.82 | 9307891 |
| 11/1/2011 | Housing Assistance Charge (11/2011) | 939.00 | | 1,124.82 | 9307892 |
| 11/1/2011 | chk# 1213799 SHRA CK- IA | | 939.00 | 185.82 | 5372087 |
| 11/3/2011 | chk# 203563099190 MO- IA | | 167.91 | 17.91 | 5381598 |
| 11/8/2011 | chk# 14-384003067 Mo- IA | | 17.95 | (0.04) | 5392087 |
| 12/1/2011 | Covered Parking Charges (12/2011) | 10.00 | | 9.96 | 9379982 |
| 12/1/2011 | Washer/Dryer Rental (12/2011) | 40.00 | | 49.96 | 9379983 |
| 12/1/2011 | Renter's Insurance (12/2011) | 17.91 | | 67.87 | 9379984 |
| 12/1/2011 | Housing Assistance Charge (12/2011) | 939.00 | | 1,006.87 | 9379985 |
| 12/2/2011 | chk# 1220535 SHRA CK- IA | | 939.00 | 67.87 | 5427993 |
| 12/3/2011 | chk# 14-384003188 MO- IA | | 67.91 | (0.04) | 5431495 |
| 1/1/2012 | Covered Parking Charges (01/2012) | 10.00 | | 9.96 | 9451113 |
| 1/1/2012 | Washer/Dryer Rental (01/2012) | 40.00 | | 49.96 | 9451114 |
| 1/1/2012 | Renter's Insurance (01/2012) | 17.91 | | 67.87 | 9451115 |
| 1/1/2012 | Housing Assistance Charge (01/2012) | 939.00 | | 1,006.87 | 9451116 |
| 1/3/2012 | chk# 1227187 SHRA CK- IA | | 939.00 | 67.87 | 5484751 |
| 1/4/2012 | chk# 14-416081488 MO- IA | | 67.91 | (0.04) | 5488021 |
| 2/1/2012 | Covered Parking Charges (02/2012) | 10.00 | | 9.96 | 9525843 |
| 2/1/2012 | Washer/Dryer Rental (02/2012) | 40.00 | | 49.96 | 9525844 |
| 2/1/2012 | Renter's Insurance (02/2012) | 17.91 | | 67.87 | 9525845 |
| 2/1/2012 | Housing Assistance Charge (02/2012) | 939.00 | | 1,006.87 | 9525846 |
| 2/1/2012 | chk# 14-442266070 MO- IA | | 65.98 | 940.89 | 5524087 |

DMSJ000068

| | | | | | |
|---|---|---|---|---|---|
| | chk# 1233969 SHRA CK- IA | | 939.00 | 1.89 | 5529942 |
| 2/15/2012 | chk# 14-442266217 MO- IA | | 1.89 | 0.00 | 5549711 |
| 3/1/2012 | Covered Parking Charges (03/2012) | 10.00 | | 10.00 | 9596712 |
| 3/1/2012 | Washer/Dryer Rental (03/2012) | 40.00 | | 50.00 | 9596713 |
| 3/1/2012 | Renter's Insurance (03/2012) | 17.91 | | 67.91 | 9596714 |
| 3/1/2012 | Housing Assistance Charge (03/2012) | 939.00 | | 1,006.91 | 9596715 |
| 3/2/2012 | chk# 14-442266328 MO -IA | | 65.58 | 941.33 | 5581673 |
| 3/3/2012 | chk# 1240704 SHRA CK- IA | | 939.00 | 2.33 | 5589221 |
| 3/16/2012 | chk# 14-474485659 MO -IA | | 2.33 | 0.00 | 5603286 |
| 4/1/2012 | Covered Parking Charges (04/2012) | 10.00 | | 10.00 | 9669608 |
| 4/1/2012 | Washer/Dryer Rental (04/2012) | 40.00 | | 50.00 | 9669609 |
| 4/1/2012 | Renter's Insurance (04/2012) | 17.91 | | 67.91 | 9669610 |
| 4/1/2012 | Housing Assistance Charge (04/2012) | 939.00 | | 1,006.91 | 9669611 |
| 4/3/2012 | Credit due to SHRA Ck- IA | (905.00) | | 101.91 | 9703594 |
| 4/3/2012 | Credit due to SHRA Ck- IA | (21.00) | | 80.91 | 9703606 |
| 4/3/2012 | chk# 104826866353 MO- IA | | 67.91 | 13.00 | 5638839 |
| 4/3/2012 | chk# 1247403 SHRA CK- IA | | 13.00 | 0.00 | 5642492 |
| 5/1/2012 | Covered Parking Charges (05/2012) | 10.00 | | 10.00 | 9742885 |
| 5/1/2012 | Washer/Dryer Rental (05/2012) | 40.00 | | 50.00 | 9742886 |
| 5/1/2012 | Renter's Insurance (05/2012) | 17.91 | | 67.91 | 9742887 |
| 5/1/2012 | Housing Assistance Charge (05/2012) | 939.00 | | 1,006.91 | 9742888 |
| 5/1/2012 | chk# 14-474485948 MO- IA | | 67.91 | 939.00 | 5685416 |
| 5/2/2012 | chk# 1254051 SHRA CK- IA | | 939.00 | 0.00 | 5690103 |
| 6/1/2012 | Covered Parking Charges (06/2012) | 10.00 | | 10.00 | 9819278 |
| 6/1/2012 | Washer/Dryer Rental (06/2012) | 40.00 | | 50.00 | 9819279 |
| 6/1/2012 | Renter's Insurance (06/2012) | 17.91 | | 67.91 | 9819280 |
| 6/1/2012 | Housing Assistance Charge (06/2012) | 939.00 | | 1,006.91 | 9819281 |
| 6/2/2012 | chk# 14-514548555 MO- IA | | 67.91 | 939.00 | 5743670 |
| 6/3/2012 | chk# 1260737 SHRA CK- IA | | 939.00 | 0.00 | 5749026 |
| 7/1/2012 | Covered Parking Charges (07/2012) | 10.00 | | 10.00 | 9897113 |
| 7/1/2012 | Washer/Dryer Rental (07/2012) | 40.00 | | 50.00 | 9897114 |
| 7/1/2012 | Renter's Insurance (07/2012) | 17.91 | | 67.91 | 9897115 |
| 7/1/2012 | Housing Assistance Charge (07/2012) | 939.00 | | 1,006.91 | 9897116 |
| 7/2/2012 | chk# 1267479 SHRA CK- IA | | 939.00 | 67.91 | 5802152 |
| 7/3/2012 | chk# PSID16254516 Terminal PSID 16254516 - CHECK21 | | 67.97 | (0.06) | 5806574 |
| 8/1/2012 | Washer/Dryer Rental (08/2012) | 40.00 | | 39.94 | 9975128 |
| 8/1/2012 | Renter's Insurance (08/2012) | 17.91 | | 57.85 | 9975129 |
| 8/1/2012 | Housing Assistance Charge (08/2012) | 939.00 | | 996.85 | 9975130 |
| 8/3/2012 | chk# 1274490 SHRA CK- IA | | 939.00 | 57.85 | 5860449 |
| 8/3/2012 | chk# PSID17344899 Terminal PSID 17344899 - CHECK21 | | 50.97 | 6.88 | 5861897 |
| 8/15/2012 | chk# PSID17700193-90 Terminal PSID 17700193 - CHECK21 | | 6.88 | 0.00 | 5876788 |
| 9/1/2012 | Washer/Dryer Rental (09/2012) | 40.00 | | 40.00 | 10053703 |
| 9/1/2012 | Renter's Insurance (09/2012) | 17.91 | | 57.91 | 10053704 |
| 9/1/2012 | Housing Assistance Charge (09/2012) | 939.00 | | 996.91 | 10053705 |
| 9/3/2012 | chk# PSID18155648 Terminal PSID 18155648 - CHECK21 | | 267.91 | 729.00 | 5917492 |
| 9/4/2012 | Late Charges Sept 2012 | 50.00 | | 779.00 | 10087604 |
| 9/5/2012 | SHRA PMT Late- IA | (50.00) | | 729.00 | 10094344 |
| 9/5/2012 | chk# 3000222 SHRA PMT- IA | | 939.00 | (210.00) | 5926375 |

DMSJ000069

| | | | | |
|---|---|---|---|---|
| | Washer/Dryer Rental (10/2012) | 40.00 | (170.00) | 10130375 |
| 10/1/2012 | Monthly Rent Charges (10/2012) | 210.00 | 40.00 | 10130376 |
| 10/1/2012 | Renter's Insurance (10/2012) | 17.91 | 57.91 | 10130377 |
| 10/1/2012 | Housing Assistance Charge (10/2012) | 729.00 | 786.91 | 10130378 |
| 10/1/2012 | chk# RSID-9769 Tenant RSID-10-769 CHECK# | | 519.00 | 5975463 |
| 10/4/2012 | Late Charges Oct 2012 | 50.00 | 569.00 | 10165598 |
| 10/5/2012 | SHRA PMT late- IA | (50.00) | 519.00 | 10171379 |
| 10/5/2012 | chk# 3000432 SHRA PMT - IA | | 729.00 | (210.00) | 5981667 |
| 11/1/2012 | Washer/Dryer Rental (11/2012) | 40.00 | (170.00) | 10205552 |
| 11/1/2012 | Monthly Rent Charges (11/2012) | 210.00 | 40.00 | 10205553 |
| 11/1/2012 | Renter's Insurance (11/2012) | 17.91 | 57.91 | 10205554 |
| 11/1/2012 | Housing Assistance Charge (11/2012) | 729.00 | 786.91 | 10205555 |
| 11/2/2012 | chk# 3000730 SHRA Direct Deposit- IA | | 729.00 | 57.91 | 6023968 |
| 12/1/2012 | chk# RSID-9737 Tenant RSID-10-9897 CHECK# | | (210.00) | 6075511 |
| 12/1/2012 | Washer/Dryer Rental (12/2012) | 40.00 | (170.00) | 10277510 |
| 12/1/2012 | Monthly Rent Charges (12/2012) | 210.00 | 40.00 | 10277511 |
| 12/1/2012 | Renter's Insurance (12/2012) | 17.91 | 57.91 | 10277512 |
| 12/1/2012 | Housing Assistance Charge (12/2012) | 729.00 | 786.91 | 10277513 |
| 12/1/2012 | chk# 3001076 SHRA Direct Deposit #3001 IA | | 729.00 | 57.91 | 6077484 |
| 1/1/2013 | Washer/Dryer Rental (01/2013) | 40.00 | 97.91 | 10348648 |
| 1/1/2013 | Monthly Rent Charges (01/2013) | 210.00 | 307.91 | 10348649 |
| 1/1/2013 | Renter's Insurance (01/2013) | 17.91 | 325.82 | 10348650 |
| 1/1/2013 | Housing Assistance Charge (01/2013) | 729.00 | 1,054.82 | 10348651 |
| 1/2/2013 | chk# 3002983 SHRA Direct Deposit ACH#3002983- IA | | 729.00 | 325.82 | 6121243 |
| 1/2/2013 | chk# RSID-9737 Tenant RSID-10-9897 CHECK# | | 260.00 | 6138887 |
| 1/4/2013 | Late Charges Jan 2013 | 50.00 | 260.00 | 10383243 |
| 2/1/2013 | Washer/Dryer Rental (02/2013) | 40.00 | 300.00 | 10421423 |
| 2/1/2013 | Monthly Rent Charges (02/2013) | 210.00 | 510.00 | 10421424 |
| 2/1/2013 | Renter's Insurance (02/2013) | 18.16 | 528.16 | 10421425 |
| 2/1/2013 | Housing Assistance Charge (02/2013) | 729.00 | 1,257.16 | 10421426 |
| 2/1/2013 | chk# 3005224 SHRA Direct Deposit 3005224- IA | | 729.00 | 528.16 | 6178922 |
| 2/4/2013 | chk# RSID-9737 Tenant RSID-10-9897 CHECK# | | 260.25 | 6186387 |
| 2/4/2013 | Late Charges Feb 2013 | 50.00 | 310.25 | 10458078 |
| 3/1/2013 | Washer/Dryer Rental (03/2013) | 40.00 | 350.25 | 10495956 |
| 3/1/2013 | Monthly Rent Charges (03/2013) | 210.00 | 560.25 | 10495957 |
| 3/1/2013 | Renter's Insurance (03/2013) | 18.16 | 578.41 | 10495958 |
| 3/1/2013 | Housing Assistance Charge (03/2013) | 729.00 | 1,307.41 | 10495959 |
| 3/3/2013 | chk# 3006596 SHRA Direct Deposit- IA | | 729.00 | 578.41 | 6236131 |
| 3/4/2013 | Late Charges Mar 2013 | 50.00 | 628.41 | 10531262 |
| 3/20/2013 | :Deposit credit | (325.00) | 303.41 | 10551413 |
| 3/20/2013 | Monthly Rent Charges (03/2013) Credit 11 days | (74.52) | 228.89 | 10551414 |
| 3/20/2013 | Housing Assistance Charge (03/2013) Credit 11 days | (258.68) | (29.79) | 10551415 |
| 3/20/2013 | Renter's Insurance (03/2013) Credit 11 days | (6.44) | (36.23) | 10551416 |
| 3/20/2013 | Washer/Dryer Rental (03/2013) Credit 11 days | (14.19) | (50.42) | 10551417 |
| 3/20/2013 | Carpet Cleaning/Damage | 706.32 | 655.90 | 10551418 |
| 3/20/2013 | Parts & Materials | 939.00 | 1,594.90 | 10551419 |
| 3/20/2013 | Maint/Paint Labor | 510.55 | 2,105.45 | 10551420 |
| 3/20/2013 | Legal Fees | 918.00 | 3,023.45 | 10551421 |

DMSJ000070

Case 2:15-cv-00799-KJM-DB Document 21364 Filed 04/17/22 Page 69 of 216
Case 2:15-cv-00799-KJM-DAD SEALED Document 1 Filed 04/14/15 Page 48 of 82

|  |  |  |  |  |
|---|---|---|---|---|
|  | Cleaning Charges | 240.00 | 3,263.45 | 10551422 |
| 3/20/2013 | Final ConService Charge | 102.59 | 3,366.04 | 10551423 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10495959 bad debt write off | (578.41) | 2,787.63 | 10552533 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551418 bad debt write off | (410.69) | 2,376.94 | 10552534 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551419 bad debt write off | (939.00) | 1,437.94 | 10552535 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551420 bad debt write off | (510.55) | 927.39 | 10552536 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551421 bad debt write off | (918.00) | 9.39 | 10552537 |
| 3/31/2013 | :Prog Gen WriteOff for chg# 10551422 bad debt write off | (9.39) | 0.00 | 10552538 |

DMSJ000071

# EXHIBIT C

DMSJ000072



**Sacramento Housing & Redevelopment Agency**

701 – 12th Street
Sacramento, CA 95814
(916) 440-1390
TTY (916) 277-1309
www.shra.org

August 18, 2011

CHESAPEAKE COMMONS
3600 DATA DR - OFFICE
RANCHO CORDOVA, CA 95670

Tenant Number:   t0006472
Vendor Number:   005076p
Unit Number:     00487489

## SUBSIDY ADJUSTMENT NOTICE

The housing assistance subsidy currently paid to the owner as rent for the tenant family's address, shown below, shall be adjusted as follows, effective  October 01, 2011

| | |
|---|---|
| CURRENT HOUSING ASSISTANCE PAYMENT: | $860.00 |
| TENANT RENT: | $0.00 |
| CONTRACT RENT: | $860.00 |
| NEW  HOUSING ASSISTANCE PAYMENT: | $939.00 |
| TENANT RENT: | $0.00 |
| CONTRACT RENT: | $939.00 |

The reason for this adjustment is:
☐ Family income changed
☐ Family composition changed
☐ Annual recertification
☑ Other:  Contract rent  increase; disregard letter dated 8/16/11

If the family has Zero Housing Assistance Payment, they will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Sylvia DeLeon
By Sam Lilly
(916) 440-1390

---

### FOR THE TENANT FAMILY

You have the right to request an informal hearing of the agency's determination provided you submit a written request within fifteen (15) days from the date of this notice.

Cc:   DENIKA TERRY
      3600 DATA DR 391
      RANCHO CORDOVA, CA 95670

SHRA_SubsidyAdjustment.doc

00048

DMSJ000073

# EXHIBIT D

DMSJ000074



**SUBSIDY ADJUSTMENT NOTICE**
**HOUSING CHOICE VOUCHERS (HCV)**

INVESTING IN COMMUNITIES

August 10, 2012

**OPS**

CHESAPEAKE COMMONS
3600 DATA DR - OFFICE C/O WASATCH PROPERTY MGMT
RANCHO CORDOVA, CA 95670

Vendor code: 005076p

RE: DENIKA TERRY  Tenant Code: t0006472

The Housing Assistance Payment (HAP) currently paid to the owner on behalf of the above-mentioned tenant has been adjusted effective 10/01/2012 as follows:

| | |
|---|---|
| CURRENT HOUSING ASSISTANCE PAYMENT: | $939.00 |
| TENANT RENT: | $0.00 |
| UTILITY REIMBURSEMENT PAYMENT (URP): | $35.00 |
| CONTRACT RENT: | $939.00 |
| | |
| NEW HOUSING ASSISTANCE PAYMENT: | $729.00 |
| TENANT RENT: | $210.00 |
| UTILITY REIMBURSEMENT PAYMENT (URP): | $0.00 |
| CONTRACT RENT: | $939.00 |

The reason for this adjustment is: Annual Recertification
Comments:

If the Housing Assistance Payment being paid to the landlord is Zero, the family will remain active in the Housing Choice Voucher program for 180 days from the above adjustment date provided they do not move from the contract unit and there are no changes in the family composition or income.

Kassie Slater
(916) 440-1390

---

**FOR THE TENANT FAMILY**
You have the right to request an Informal Hearing of the Housing Authority's rent determination provided you submit a written request within fifteen (15) days from the date of this notice.

cc: DENIKA TERRY
3600 DATA DR 391
RANCHO CORDOVA, CA 95670





Sacramento Housing & Redevelopment Agency 630 I Street, Sacramento, CA 95814
Phone (916) 440-1390 | fax (916) 449-1285 | www.shra.org



Draft 4/12/12 tt

00033

DMSJ000075

# EXHIBIT E

DMSJ000076

(Page 1 of 61)

## SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
## HOUSING CHOICE VOUCHER PROGRAM
### Lease Supplemental Agreement

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

## 1. PARTIES TO THE AGREEMENT DEFINED:

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

a. Tenant  **ROY HUSKEY III**            **OWNR SPEC 2**       Tenant #   **t0018323**

b. Owner   **LOGAN PARK APARTMENTS**                          Vendor #   **004359p**

## 2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:

**ROY L. HUSKEY III**          **MELISSA HUSKEY**

3. UNIT ADDRESS: **4141 PALM AVE 191**
**SACRAMENTO, CA 95842**

*JUL 15 2011*

4. INITIAL LEASE TERM: Begins **7/8/2011** and ends **6/30/2012**

5. INITIAL CONTRACT RENT:   **$840.00**   INITIAL TENANT RENT:   **$256.00**

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to-month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by "Owner". The tenant shall provide or pay for the utilities or appliances indicated below by "Tenant". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|---|---|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Refrigerator | Owner |
| Sewer | Owner |
| Trash Collection | Owner |
| Water | Owner |

ROY HUSKEY III     916-740-8488    7-9-11
                   Telephone Number   Date

Owner / Agent      916 344-4494     7/9/11
                   Telephone Number   Date

Previous editions are obsolete          Page 1 of 1          form HUD-52641 (1/2007)
                                                             ref Handbook 7420.8

DMSJ000077

**TENANCY ADDENDUM**
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program (To
be attached to Tenant Lease)

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing
OMB Approval No. 2577-0169
Exp. 04/30/2014

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a. Maintenance

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including

---

Previous editions are obsolete

form HUD-52641-A (8/2009)
ref Handbook 7420.8

DMSJ000078

standard practice for the building concerned as established by the owner.

b.  **Utilities and appliances**

    (1)  The owner must provide all utilities needed to comply with the HQS.

    (2)  The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

        (a)  Pay for any utilities that are to be paid by the tenant.

        (b)  Provide and maintain any appliances that are to be provided by the tenant.

c.  Family damage. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d.  Housing services. The owner must provide all housing services as agreed to in the lease.

### 8. Termination of Tenancy by Owner

a.  Requirements. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b.  Grounds. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

    (1)  Serious or repeated violation of the lease;

    (2)  Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

    (3)  Criminal activity or alcohol abuse (as provided in paragraph c); or

    (4)  Other good cause (as provided in paragraph d).

c.  Criminal activity or alcohol abuse.

    (1)  The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

        (a)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

        (b)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

        (c)  Any violent criminal activity on or near the premises; or

        (d)  Any drug-related criminal activity on or near the premises.

    (2)  The owner may terminate the tenancy during the term of the lease if any member of the household is:

        (a)  Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that

is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

        (b)  Violating a condition of probation or parole under Federal or State law.

    (3)  The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

    (4)  The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d.  Other good cause for termination of tenancy

    (1)  During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

    (2)  During the initial lease term or during any extension term, other good cause may include:

        (a)  Disturbance of neighbors,

        (b)  Destruction of property, or

        (c)  Living or housekeeping habits that cause damage to the unit or premises.

    (3)  After the initial lease term, such good cause may include:

        (a)  The tenant's failure to accept the owner's offer of a new lease or revision;

        (b)  The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

        (c)  A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

    (4)  The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

    (5)  In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

form HUD-52641-A (8/2009)
ref Handbook 7420.8

DMSJ000079

(Page 4 of 61)

e. Protections for Victims of Abuse.

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public

housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. Eviction by court action. The owner may only evict the tenant by a court action.

g. Owner notice of grounds
(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9. Lease Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

12. Security Deposit
a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

form HUD-52641-A (8/2009)
ref Handbook 7420.8

DMSJ000080

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change to the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

Previous editions are obsolete

form HUD-52641-A (8/2009)
ref Handbook 7420.8

DMSJ000081

From:SHRA Exec                    1 916 443 8872        07/29/2014 08:56    #554 P.020/085
Case 2:15-cv-00799-KJM-DB  Document 124-3  Filed 04/17/23  Page 79 of 216
Case 2:15-cv-00799-KJM-DB-SEALED   Document 1   Filed 04/14/15 Page 59 of 82

(Page 6 of 61)

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part A of the HAP Contract: Contract Information
(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
      Part A: Contract Information
      Part B: Body of Contract
      Part C: Tenancy Addendum

2. **Tenant**

   ROY HUSKEY III

3. **Contract Unit**

   4141 PALM AVE 191
   SACRAMENTO, CA 95842

4. **Household**
   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of
   the owner and the PHA.
      ROY L HUSKEY III
      MELISSA HUSKEY

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy): **07/08/2011**
   The initial lease term ends on (mm/dd/yyyy): **06/30/2012**

6. **Initial Rent to Owner**
   The initial rent to owner is: $840
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**
   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount
   of the housing assistance payment by the PHA to the owner is $554 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term
   in accordance with HUD requirements.

Previous editions are obsolete                  Page 2 of 12                form HUD-52641 (8/2009)
                                                                           ref Handbook 7420.8

DMSJ000082

**8.   Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

|  | Provided By | |
|---|---|---|
| **Item** | **Owner** | **Tenant** |
| Air Conditioning |  | T |
| Cooking Oil/Electric |  | T |
| Flat Fee Electric |  | T |
| Heating - Oil/Electric |  | T |
| Other Electric |  | T |
| Refrigerator | O |  |
| Sewer | O |  |
| Trash Collection | O |  |
| Water | O |  |

JUL 15 2011

**Signatures**
**Public Housing Agency: SHRA County of Sacramento**
**Housing Authority**

Print or Type Name of PHA
_[signature]_
Signature
SILVERIO RAMOS
Print or Type Name and Title of Signatory
07·18·11
Date (mm/dd/yyyy)

**Owner:  LOGAN PARK APARTMENTS**

Print or Type Name of Owner
_[signature]_
Signature
Raylene Jeffery  Asst Manager
Print or Type Name and Title of Signatory
7/7/11
Date (mm/dd/yyyy)

**Mail Payments to:**

**LOGAN PARK APARTMENTS**
Name

4215 PALM AVE - OFFICE
C/O WASATCH PROPERTY MGMT
SACRAMENTO, CA  95842
Address (Street, City, State, Zip)

DMSJ000083

From:SHRA Exec                    1 916 443 8872          07/29/2014 08:56     #554 P.022/085
Case 2:15-cv-00799-KJM-DAD   Document 24-3   Filed 03/17/22   Page 82 of 216
Case 2:15-cv-00799-KJM-DAD  SEALED   Document 1   Filed 04/14/15   Page 61 of 82

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

**Part B of HAP Contract: Body of Contract**

1. **Purpose**

    a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

    b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

    c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

    d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

    a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

    b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

    c. The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

    d. The owner certifies that:

        (1) The owner and the tenant have entered into a lease of the contract unit that includes all  provisions of the tenancy addendum.
        (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
        (3) The lease is consistent with State and local law.

    e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

    a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

    b. The owner must provide all utilities needed to comply with the HQS.

    c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

    d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

    e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

    f. The PHA must notify the owner of any HQS defects shown by the inspection.

    g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

    a. Relation to lease term. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

    b. When HAP contract terminates.

        (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
        (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
        (3) If the family moves from the contract unit, the HAP contract terminates automatically.
        (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
        (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
        (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

DMSJ000084

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**
   a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.
   b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.
   c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**
   a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.
   b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

      (1) The location, quality, size, unit type, and age of the contract unit; and
      (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

   c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.
   d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**
   a. **When paid**
      (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.
      (2) The PHA must pay housing assistance payments promptly when due to the owner.
      (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

      (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

   b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

   c. **Amount of PHA payment to owner**
      (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.
      (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.
      (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

   d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   e. **Limit of PHA responsibility.**
      (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.
      (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

   f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**
   During the term of this contract, the owner certifies that:
   a. The owner is maintaining the contract unit and premises in accordance with the HQS.

DMSJ000085

From:SHRA Exec                    1 916 443 8872          07/29/2014 08:57   #554 P.024/085
Case 2:15-cv-00799-KJM-DB   Document 124361   Filed 04/17/22   Page 63 of 82

(Page 10 of 61)

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

DMSJ000086

From:SHRA Exec                    1 916 443 8872        07/29/2014 08:58      #554 P.025/085
Case 2:15-cv-00799-KJM-DB Document 121-1 Filed 04/13/22 Page 85 of 216
Case 2:13-cv-00799-KJM-DAD SEALED Document 11 Filed 04/16/13 Page 64 of 82

(Page 11 of 51)

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of terminating tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

     (a) Threatens the right to peaceful enjoyment of the premises by other residents;

     (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

     (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

     (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

DMSJ000087

From:SHRA Exec                    1 916 443 8872          07/29/2014 08:58    #554 P.026/085
Case 2:15-cv-00799-KJM-DB   Document 121-4   Filed 04/17/22   Page 86 of 216

(Page 12  of  61)

16. **Written Notices.** Any notice by the PHA or the owner in
connection with this contract must be in writing.

17. **Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between
the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in
accordance with all statutory requirements, and with all
HUD requirements, including the HUD program
regulations at 24 Code of Federal Regulations Part 982.

DMSJ000088

## Housing Assistance Payments Contract (HAP Contract)
### Section 8 Tenant-Based Assistance Housing Choice Voucher Program

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
_. (exp. 09/30/2012)

### Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.
   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**
      (1) The owner must maintain the unit and premises in accordance with the HQS.
      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

DMSJ000089

b.  **Utilities and appliances**
   (1)  The owner must provide all utilities needed to comply with the HQS.
   (2)  The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
      (a)  Pay for any utilities that are to be paid by the tenant.
      (b)  Provide and maintain any appliances that are to be provided by the tenant.

c.  **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d.  **Housing services.** The owner must provide all housing services as agreed to in the lease.

B.  **Termination of Tenancy by Owner**

a.  **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b.  **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
   (1)  Serious or repeated violation of the lease;
   (2)  Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
   (3)  Criminal activity or alcohol abuse (as provided in paragraph c); or
   (4)  Other good cause (as provided in paragraph d).

c.  **Criminal activity or alcohol abuse.**
   (1)  The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
      (a)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
      (b)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
      (c)  Any violent criminal activity on or near the premises; or
      (d)  Any drug-related criminal activity on or near the premises.

   (2)  The owner may terminate the tenancy during the term of the lease if any member of the household is:
      (a)  Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
      (b)  Violating a condition of probation or parole under Federal or State law.

   (3)  The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
   (4)  The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d.  **Other good cause for termination of tenancy**
   (1)  During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
   (2)  During the initial lease term or during any extension term, other good cause may include:
      (a)  Disturbance of neighbors,
      (b)  Destruction of property, or
      (c)  Living or housekeeping habits that cause damage to the unit or premises.
   (3)  After the initial lease term, such good cause may include:
      (a)  The tenant's failure to accept the owner's offer of a new lease or revision;
      (b)  The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
      (c)  A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
   (4)  The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
   (5)  In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or additional protections for tenants. This provision will sunset on December 31, 2012 unless extended by law.

e.  **Protections for Victims of Abuse.**
   (1)  An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
   (2)  Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

DMSJ000090

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. Eviction by court action. The owner may only evict the tenant by a court action.

g. Owner notice of grounds

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint, or other initial pleading used to begin an eviction action under State or local law.

## 9. Lease: Relation to HAP Contract
If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out
The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

DMSJ000091

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing  tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.

HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.

Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

DMSJ000092

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. ) Owners Agent
A Utah Corporation - registered in
595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321

This agreement is made in Sacramento, CA between, Logan Park hereinafter called Owner, by Wasatch Management Management, its authorized agent, and Lease Holder(s):

**Roy Huskey**

Authorized Occupant(s):

**Melissa Huskey (Dependant),**

hereinafter called Resident(s). No other person(s) except herein stated may occupy premises without written approval of Owner.

I. **TERM**

This Agreement creates a 12 month and 9 day tenancy, commencing 08/26/2011, and Terminating 08/28/2012. Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 9 day tenancy is 10,428.00.

II. **PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4141 Palm Avenue #121, Sacramento, CA 95842

III. **LOW-INCOME HOUSING CREDIT**

The premises are to be operated in accordance with the requirements of the low-income housing credit Program under Section 42 of the Internal Revenue Code of 1986, as amended (the "Program"). Resident's rights hereunder will be subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of the Landlord's tax credit. The Resident will cooperate with all LANDLORD requirements related to such compliance and the Program.

IV. **RENT**

The rental for the premises is 853.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4216 Palm Ave, Sacramento, CA, 95842.
The Landlord and Tenant have entered into a housing assistance payments (HAP) contract with the local public housing authority (PHA) pursuant to the Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of the tenants rent to the Landlord on behalf of the Tenant. So long as the HAP contract remain in effect, the Tenant is not responsible for this portion of the rent. The additional terms and conditions of the parties rental obligations are set forth as follows:

1. Section 8 Rent:
   A. The total contract rent shall be $853.00 per month;
   B. Of the total contract rent, $340.00 shall be payable to the Landlord by the Tenant(s) each month as the Tenant's rent family contribution; the remaining balance of $230.16 shall be payable to the Landlord by the local housing authority for as long as the HAP contract remains in effect.

2. Section 8 Rent adjustments: The amount of assistance that HUD pays on behalf of the Tenant may be changed during the term of the lease if: (1) HUD or the PHA determines, in accordance with HUD procedures, that an increase in rents is needed; (2) HUD or the PHA changes any allowance for utilities or services considered in computing the Tenant's share of the rent; (3) the income, the number of persons in the Tenant's household or other factors considered in calculating the Tenant's rent charge and HUD procedures provide that the Tenant's rent of assistance payment be adjusted to reflect the change; (4) changes in the Tenant's rent of assistance payment are required by HUD's recalculation of subsidy termination procedures; (5) HUD's procedures for computing the Tenant's Assistance payment or rent change; (6) the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord or PHA.

The Rental Office can be reached by phone at (916)-344-4494. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 12:00 pm and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV, below), in installments as follows:

A. The sum of $29.97 upon execution of this Rental Agreement as rent for the period beginning 08/26/2011, through 08/30/2011, payable on 08/26/2011.

B. The sum of $853.00, is then on the first day of each calendar month commencing July 2011.

C. A concession in the amount of 25.00 is to be given to Resident as part of this 12 month(s) lease and will be issued as 625.00 off move in. The 25.00 concession is due and payable back to Logan Park if the 12 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one or more government financing programs. The parties understand that the monthly rent determined by formula as set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

DMSJ000093

**V. CHANGES IN RESIDENT'S SHARE OF RENT**

The Resident agrees that the amount of rent the Resident pays may be changed during the term of the Agreement if:

A.  The Contract Administrator determines, in accordance with Program procedures, that an increase in rent is needed;

B.  The Contract Administrator changes any allowance for utilities or services considered in determining the Resident's rent;

C.  The income, the number of persons in the Resident's household or other factors considered in determining the Resident's rent change; or

D.  The procedures for determining the Resident's rent change; or

E.  The Landlord agrees to implement changes in rent in accordance with the time frames and administrative procedures set forth in instructions and regulations related to administration of the Program. The Landlord agrees to give the Resident at least thirty (30) days advance written notice of any increase in the Resident's rent, except as noted in paragraph 12. The notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

**VI. EXCESS RENTS**



If it is determined that the premises are not a qualified low-income unit because the rent paid by the Residents, plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed LIHTC code, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

**VII. PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**VIII. LATE CHARGES**

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount of $50.00 constitutes a reasonable estimate of the average damages resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 12:01 a.m. on the 4th day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 3rd day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $25.00. In the event Resident fails to pay rent on or before 12:01 a.m. on the 4th day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**IX. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**



Resident shall pay Owner, upon execution of this agreement, a security deposit of $299.00. Said deposits shall be held by Owner as security for the faithful performance of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that nothing is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

**X. ACCEPTANCE AND SURRENDER OF PREMISES**

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, including grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the itemized premises to Owner, or remain liable for the payment of rent until said delivery is made.

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct if particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

DMSJ000094

## XI.   USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than 2 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasileiro, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed.

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable laws, California Code 385.3.1 and 385.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall not absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guests, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not as authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. Harassment or Threats: Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. Nuisance and Waste: Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance or commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

## XII.   RESIDENTS DUTY TO MAINTAIN PREMISES

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

## XIII.   UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due. It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill residents for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services:

_____ gas,              Account # _____
__X__ electricity,      Account # 295 3545
_____ water/sewer/trash  See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges

Resident agrees to pay for all utilities, services, and charges, if any, made payable by or predicated upon occupancy of residence including telephone, electricity and satellite or cable television. Resident is responsible for having utilities turned on in their name no later than five day of move in.

## XIV.   INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for making necessary or agreed repairs, decorations, alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, tenants, workmen or contractors. Normal business hours are hereby agreed to be 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

DMSJ000095

**XV.  DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XVI.  LIABILITY INSURANCE**

I understand that any property or liability insurance coverage purchased by the property manager or owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to my personal property or belongings or injuries caused by actions or omissions of myself or my own. I will be liable to third parties and to the property owner for certain losses and understand that I should not expect the property manager or owner to be responsible for such losses. Owner and manager recommend that every resident maintain renter's insurance coverage, at all times.

( X )  I WILL PURCHASE RENTERS INSURANCE COVERAGE.
         I recognize my need for insurance and want to take advantage of the program made available to residents.

(   )  I HAVE RENTERS INSURANCE COVERAGE.
         I have and will maintain throughout the term of my lease the following coverage

(   )  I DO NOT HAVE RENTERS INSURANCE COVERAGE.
         Although I recognize my need for renter's insurance, I will not at this time, be obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers, owners or third-party's property as a result of my actions or my family's actions.

**XVII.  WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter's insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, its agents or employees.

B.  Loss of property due to theft
C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D.  The Actions or omissions of other Residents
E.  Interference with light, view or other intangible aspects of the premises.
F.  Operations in construction of any public or quasi-public work
G.  Any latent defect in the building(s)
H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates et all entrances and exits or any other ancillary facility furnished by Agent for Residents use.
I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

**XIX.  RECERTIFICATION**

Every year on or about the 1st day of _2-1-12_ the Landlord will request the Resident to report the income and composition of the Resident's household and to supply any other information required for the purposes of determining the Resident's continued Program eligibility. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The Landlord will verify the information supplied by the Resident and use the verified information to determine Program eligibility. You agree that all information supplied by you shall be subject to inspection by representatives from the Tax Credit Allocation Committee.

A.  If the Resident does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may require resident to vacate premises. The Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.
B.  The Resident may request to meet with the Landlord to discuss any changes resulting from the recertification processing. If the Resident requests such a meeting, the Landlord agrees to meet with the Resident and discuss how the Resident's continued Program eligibility was determined.

DMSJ000096

## XX. REPORTING CHANGES BETWEEN RECERTIFICATION



The Residents shall notify the Landlord immediately in writing, if the household size changes, his or her income increases, Resident(s) become a full time student, or begins to receive HUD assistance. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 859.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

## XXI. CANCELLATION FEE

Upon execution of this lease, you may cancel your obligation under the Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus...

## XXII. NOTICE TO QUIT



TERM AGREEMENT: Resident agrees, at least thirty (30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent and resident vacates the property, a fee equal to thirty day's rent will be billed as liquidated damages for improper thirty day notice. Any and all rates and/or fees are subject to change upon expiration of lease term.

## XXIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

## XXIV. AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

## XXV. SUBLETTING

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

## XXVI. JOINT AND SEVERAL RESPONSIBILITY

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

## XXVII. LESSEE'S REPRESENTATIONS TO LESSOR

Lessee represents and warrants that all information provided to Lessor, including the information provided in the application for the rental of the Apartment (the "Application), is true, complete and correct. If any information Lessee provides to Lessor is determined to be false, Lessee will be in breach of this Lease. Lessee understands and agrees that the Application is hereby made a part of the Lease, and a breach of any representations or warranties in the Application shall be a breach of this Lease.

## XXVIII. PENALTIES FOR SUBMITTING FALSE INFORMATION

If the Resident deliberately submits false information regarding income, family composition or other data on which the Resident's eligibility is based, the Landlord may require the Resident to vacate.

## XXIX. WAIVER OF BREACH

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

## XXX. RULES AND REGULATIONS

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.
Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate the Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

## XXXI. SECURITY

Resident acknowledges and agrees that Owner and Owners agents have not provided to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

DMSJ000097

**XXXI. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXXII. CRIMINAL BACKGROUND INVESTIGATION**

By signing this Lease, Lessee represents that neither Lessee nor any occupant of the Apartment has, during the past five years, been convicted of any felony or misdemeanor involving sexual misconduct or a controlled substance, and that to the best of Lessee's knowledge, neither Lessee nor any occupant of the Apartment is subject of a criminal investigation or arrest warrant. Lessee hereby authorizes Lessor to perform a criminal background investigation of Lessee or any occupant of the Apartment in the event Lessor, in its sole discretion, has reason to believe that Lessee or any occupant is engaged in criminal activity in the Apartment or at the Apartment Community.

_____          6-30-11
Roy Huxley(Lessee)                       Date

N/A
_____          _____
Melissa Huxley                           Date


_____          6-30-11
Owner Authorized agent                   Date

**WASATCH**
PREMIER COMMUNITIES

DMSJ000098

# EXHIBIT F

DMSJ000099

Ledger
Page 1 of 6
Case 2:15-cv-00799-KJM-DB Document 21361 Filed 04/17/21 Page 98 of 216
Case 2:15-cv-00799-KJM-DB Document 1 Filed 04/17/15 Page 77 of 82

 **Wasatch Property Management**

Date : 3/10/2014

# Resident Ledger

| | | | | | | |
|---|---|---|---|---|---|---|
| Code | t0044875 | Property | lpt | Lease From | 6/30/2011 |
| Name | Roy Huskey III | Unit | 191 | Lease To | 6/29/2012 |
| Address | 4141 Palm Avenue #191 | Status | Current | Move In | 6/30/2011 |
| | | Rent | 840 | Move Out | |
| City St. Zip | Sacramento, CA 95842 | Phone(O)- | | Phone(H)- | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 5/27/2011 | Application Fee | 35.00 | | 35.00 | 8914011 |
| 5/27/2011 | Total Deposit Amount | 299.00 | | 334.00 | 8914012 |
| 6/30/2011 | Rent for 1 days | 12.30 | | 346.30 | 8990031 |
| 6/30/2011 | Rent Subsidy for 1 days | 16.67 | | 362.97 | 8990032 |
| 6/30/2011 | Waive Application Fee | (35.00) | | 327.97 | 8990033 |
| 6/30/2011 | Renter's Insurance for 1 days | 0.52 | | 328.49 | 8990034 |
| 6/30/2011 | W/D for one day | 1.67 | | 330.16 | 8990048 |
| 6/30/2011 | Move In Concession/Resident moved In before SHRA Contract began LG | (55.74) | | 274.42 | 9353474 |
| 6/30/2011 | chk# 3802003437 pc | | 100.00 | 174.42 | 5135033 |
| 6/30/2011 | chk# 3802003487 pc | | 680.00 | (505.58) | 5135035 |
| 7/1/2011 | Washer/Dryer Rental (07/2011) | 50.00 | | (455.58) | 9016512 |
| 7/1/2011 | Monthly Rent Charges (07/2011) | 369.00 | | (86.58) | 9016513 |
| 7/1/2011 | Renter's Insurance (07/2011) | 15.58 | | (71.00) | 9016514 |
| 7/1/2011 | Housing Assistance Charge (07/2011) | 500.00 | | 429.00 | 9016515 |
| 7/31/2011 | chk# 1193420 LG | | 429.00 | 0.00 | 5189214 |
| 7/31/2011 | chk# 1193420 LG | | 554.00 | (554.00) | 5189313 |
| 8/1/2011 | Washer/Dryer Rental (08/2011) | 50.00 | | (504.00) | 9092850 |
| 8/1/2011 | Monthly Rent Charges (08/2011) | 286.00 | | (218.00) | 9092851 |
| 8/1/2011 | Renter's Insurance (08/2011) | 15.58 | | (202.42) | 9092852 |
| 8/1/2011 | Housing Assistance Charge (08/2011) | 554.00 | | 351.58 | 9092853 |
| 8/3/2011 | chk# 0000005134 LG | | 351.58 | 0.00 | 5213590 |
| 9/1/2011 | Washer/Dryer Rental (09/2011) | 50.00 | | 50.00 | 9172072 |
| 9/1/2011 | Monthly Rent Charges (09/2011) | 286.00 | | 336.00 | 9172073 |
| 9/1/2011 | Renter's Insurance (09/2011) | 15.58 | | 351.58 | 9172074 |
| 9/1/2011 | Housing Assistance Charge (09/2011) | 554.00 | | 905.58 | 9172075 |
| 9/2/2011 | chk# 1200163 LG | | 554.00 | 351.58 | 5264983 |
| 9/2/2011 | chk# 0000005140 PC | | 352.00 | (0.42) | 5268540 |
| 10/1/2011 | Washer/Dryer Rental (10/2011) | 50.00 | | 49.58 | 9247680 |
| 10/1/2011 | Monthly Rent Charges (10/2011) | 286.00 | | 335.58 | 9247681 |
| 10/1/2011 | Renter's Insurance (10/2011) | 17.91 | | 353.49 | 9247682 |
| 10/1/2011 | Housing Assistance Charge (10/2011) | 554.00 | | 907.49 | 9247683 |
| 10/3/2011 | chk# 0000005143 LG | | 355.00 | 552.49 | 5323315 |

DMSJ000100

| Date | Description | | | | |
|------|-------------|------|------|------|------|
| 10/3/2011 | chk# 1206911 LG | | 554.00 | (1.51) | 5327632 |
| 11/1/2011 | Washer/Dryer Rental (11/2011) | 50.00 | | 48.49 | 9324179 |
| 11/1/2011 | Monthly Rent Charges (11/2011) | 286.00 | | 334.49 | 9324180 |
| 11/1/2011 | Renter's Insurance (11/2011) | 17.91 | | 352.40 | 9324181 |
| 11/1/2011 | Housing Assistance Charge (11/2011) | 554.00 | | 906.40 | 9324182 |
| 11/1/2011 | chk# 1213689 LG | | 554.00 | 352.40 | 5372885 |
| 11/2/2011 | chk# 0000005146 LG | | 355.00 | (2.60) | 5377496 |
| 12/1/2011 | Washer/Dryer Rental (12/2011) | 50.00 | | 47.40 | 9396095 |
| 12/1/2011 | Monthly Rent Charges (12/2011) | 286.00 | | 333.40 | 9396096 |
| 12/1/2011 | Renter's Insurance (12/2011) | 17.91 | | 351.31 | 9396097 |
| 12/1/2011 | Housing Assistance Charge (12/2011) | 554.00 | | 905.31 | 9396098 |
| 12/1/2011 | chk# 1220427 LG | | 554.00 | 351.31 | 5423814 |
| 12/3/2011 | chk# 14-427246913 LG | | 355.00 | (3.69) | 5433593 |
| 1/1/2012 | Washer/Dryer Rental (01/2012) | 50.00 | | 46.31 | 9467026 |
| 1/1/2012 | Monthly Rent Charges (01/2012) | 286.00 | | 332.31 | 9467027 |
| 1/1/2012 | Renter's Insurance (01/2012) | 17.91 | | 350.22 | 9467028 |
| 1/1/2012 | Housing Assistance Charge (01/2012) | 554.00 | | 904.22 | 9467029 |
| 1/3/2012 | chk# 0000005157 LG | | 355.00 | 549.22 | 5480724 |
| 1/3/2012 | chk# 1227079 LG | | 554.00 | (4.78) | 5484231 |
| 2/1/2012 | Washer/Dryer Rental (02/2012) | 50.00 | | 45.22 | 9540925 |
| 2/1/2012 | Monthly Rent Charges (02/2012) | 286.00 | | 331.22 | 9540926 |
| 2/1/2012 | Renter's Insurance (02/2012) | 17.91 | | 349.13 | 9540927 |
| 2/1/2012 | Housing Assistance Charge (02/2012) | 554.00 | | 903.13 | 9540928 |
| 2/2/2012 | chk# 1233861 LG | | 554.00 | 349.13 | 5532533 |
| 2/6/2012 | chk# 0000005159 LG | | 354.50 | (5.37) | 5543051 |
| 3/1/2012 | Washer/Dryer Rental (03/2012) | 50.00 | | 44.63 | 9611808 |
| 3/1/2012 | Monthly Rent Charges (03/2012) | 286.00 | | 330.63 | 9611809 |
| 3/1/2012 | Renter's Insurance (03/2012) | 17.91 | | 348.54 | 9611810 |
| 3/1/2012 | Housing Assistance Charge (03/2012) | 554.00 | | 902.54 | 9611811 |
| 3/2/2012 | chk# 14-437980136 LG | | 355.00 | 547.54 | 5581817 |
| 3/2/2012 | chk# 1240596 LG | | 554.00 | (6.46) | 5585407 |
| 4/1/2012 | Washer/Dryer Rental (04/2012) | 50.00 | | 43.54 | 9684691 |
| 4/1/2012 | Monthly Rent Charges (04/2012) | 286.00 | | 329.54 | 9684692 |
| 4/1/2012 | Renter's Insurance (04/2012) | 17.91 | | 347.45 | 9684693 |
| 4/1/2012 | Housing Assistance Charge (04/2012) | 554.00 | | 901.45 | 9684694 |
| 4/2/2012 | chk# 1247293 LG | | 554.00 | 347.45 | 5637573 |
| 4/3/2012 | chk# 0000005167 pc | | 355.00 | (7.55) | 5642922 |
| 5/1/2012 | Washer/Dryer Rental (05/2012) | 50.00 | | 42.45 | 9757907 |
| 5/1/2012 | Monthly Rent Charges (05/2012) | 286.00 | | 328.45 | 9757908 |
| 5/1/2012 | Renter's Insurance (05/2012) | 17.91 | | 346.36 | 9757909 |
| 5/1/2012 | Housing Assistance Charge (05/2012) | 554.00 | | 900.36 | 9757910 |
| 5/1/2012 | chk# 1253942 LG | | 554.00 | 346.36 | 5685906 |
| 5/3/2012 | chk# 0000005168 LG | | 355.00 | (8.64) | 5695427 |
| 6/1/2012 | Washer/Dryer Rental (06/2012) | 50.00 | | 41.36 | 9834103 |
| 6/1/2012 | Monthly Rent Charges (06/2012) | 286.00 | | 327.36 | 9834104 |
| 6/1/2012 | Renter's Insurance (06/2012) | 17.91 | | 345.27 | 9834105 |
| 6/1/2012 | Housing Assistance Charge (06/2012) | 554.00 | | 899.27 | 9834106 |
| 6/2/2012 | chk# 1260630 LG | | 554.00 | 345.27 | 5743049 |

DMSJ000101

| | | | | | |
|---|---|---|---|---|---|
| | chk# 20407832034 LG | | 355.00 | (9.73) | 5744421 |
| 7/1/2012 | Washer/Dryer Rental (07/2012) | 50.00 | | 40.27 | 9911295 |
| 7/1/2012 | Monthly Rent Charges (07/2012) | 286.00 | | 326.27 | 9911296 |
| 7/1/2012 | Renter's Insurance (07/2012) | 17.91 | | 344.18 | 9911297 |
| 7/1/2012 | Housing Assistance Charge (07/2012) | 554.00 | | 898.18 | 9911298 |
| 7/2/2012 | Adjust Rent to $304.00 LG | 18.00 | | 916.18 | 10013208 |
| 7/2/2012 | chk# 1267373 pc | | 554.00 | 362.18 | 5800129 |
| 7/3/2012 | chk# PSID16199404-5175-005175 Terminal PSID 16199404 - CHECK21 | | 355.00 | -7.18 | 5803217 |
| 8/1/2012 | Washer/Dryer Rental (08/2012) | 50.00 | | 57.18 | 9989035 |
| 8/1/2012 | Monthly Rent Charges (08/2012) | 286.00 | | 343.18 | 9989036 |
| 8/1/2012 | Renter's Insurance (08/2012) | 17.91 | | 361.09 | 9989037 |
| 8/1/2012 | Housing Assistance Charge (08/2012) | 554.00 | | 915.09 | 9989038 |
| 8/1/2012 | chk# 1274374 LG | | 554.00 | 361.09 | 5853143 |
| 8/3/2012 | chk# PSID17305286-5178-005178 Terminal PSID 17305286 - CHECK21 | | 355.00 | 6.09 | 5859766 |
| 8/4/2012 | Adjust Renthap to $536.00 LG | (18.00) | | (11.91) | 10013209 |
| 8/4/2012 | Adjust Rent to $304.00 LG | 18.00 | | 6.09 | 10013210 |
| 9/1/2012 | Washer/Dryer Rental (09/2012) | 50.00 | | 56.09 | 10067863 |
| 9/1/2012 | Monthly Rent Charges (09/2012) | 304.00 | | 360.09 | 10067864 |
| 9/1/2012 | Renter's Insurance (09/2012) | 17.91 | | 378.00 | 10067865 |
| 9/1/2012 | Housing Assistance Charge (09/2012) | 536.00 | | 914.00 | 10067866 |
| 9/4/2012 | chk# PSID18237843-5184-005184 Terminal PSID 18237843 - CHECK21 | | 375.00 | 539.00 | 5922037 |
| 9/7/2012 | chk# 3000215 LG | | 536.00 | 3.00 | 5929994 |
| 10/1/2012 | Washer/Dryer Rental (10/2012) | 50.00 | | 53.00 | 10144399 |
| 10/1/2012 | Monthly Rent Charges (10/2012) | 304.00 | | 357.00 | 10144400 |
| 10/1/2012 | Renter's Insurance (10/2012) | 17.91 | | 374.91 | 10144401 |
| 10/1/2012 | Housing Assistance Charge (10/2012) | 536.00 | | 910.91 | 10144402 |
| 10/2/2012 | chk# 3000425 LG | | 536.00 | 374.91 | 5969131 |
| 10/3/2012 | chk# PSID19408860-5185-005185 Terminal PSID 19408860 - CHECK21 | | 375.00 | (0.09) | 5974129 |
| 11/1/2012 | Washer/Dryer Rental (11/2012) | 50.00 | | 49.91 | 10219643 |
| 11/1/2012 | Monthly Rent Charges (11/2012) | 304.00 | | 353.91 | 10219644 |
| 11/1/2012 | Renter's Insurance (11/2012) | 17.91 | | 371.82 | 10219645 |
| 11/1/2012 | Housing Assistance Charge (11/2012) | 536.00 | | 907.82 | 10219646 |
| 11/2/2012 | chk# 300713 LG | | 536.00 | 371.82 | 6023935 |
| 11/2/2012 | chk# PSID20236493-5188-005188 Terminal PSID 20236493 - CHECK21 | | 375.00 | (3.18) | 6026199 |
| 12/1/2012 | Washer/Dryer Rental (12/2012) | 50.00 | | 46.82 | 10291510 |
| 12/1/2012 | Monthly Rent Charges (12/2012) | 304.00 | | 350.82 | 10291511 |
| 12/1/2012 | Renter's Insurance (12/2012) | 17.91 | | 368.73 | 10291512 |
| 12/1/2012 | Housing Assistance Charge (12/2012) | 536.00 | | 904.73 | 10291513 |
| 12/2/2012 | chk# 3001279 LG | | 536.00 | 368.73 | 6074746 |
| 12/3/2012 | chk# PSID21125574-5191-005191 Terminal PSID 21125574 - CHECK21 | | 375.00 | (6.27) | 6077575 |
| 1/1/2013 | Washer/Dryer Rental (01/2013) | 50.00 | | 43.73 | 10362609 |
| 1/1/2013 | Monthly Rent Charges (01/2013) | 304.00 | | 347.73 | 10362610 |
| 1/1/2013 | Renter's Insurance (01/2013) | 17.91 | | 365.64 | 10362611 |

DMSJ000102

Ledger                                                      Page 4 of 6
Case 2:15-cv-00799-KJM-DAD  Document 21364  Filed 04/27/21  Page 101 of 256
Case 2:15-cv-00799-KJM-DAD ***SEALED***  Document 1  Filed 04/27/15  Page 80 of 82

| Date | Description | Charge | Payment | Balance | Ref |
|------|-------------|--------|---------|---------|-----|
| 1/1/2013 | Housing Assistance Charge (01/2013) | 536.00 | | 901.64 | 10362612 |
| 1/3/2013 | chk# PSID22008570-5194-005194 Terminal PSID 22008570 - CHECK21 | | 375.00 | 526.64 | 6125688 |
| 1/3/2013 | chk# 3002950 LG | | 536.00 | (9.36) | 6130850 |
| 2/1/2013 | Washer/Dryer Rental (02/2013) | 50.00 | | 40.64 | 10434776 |
| 2/1/2013 | Monthly Rent Charges (02/2013) | 304.00 | | 344.64 | 10434777 |
| 2/1/2013 | Renter's Insurance (02/2013) | 18.16 | | 362.80 | 10434778 |
| 2/1/2013 | Housing Assistance Charge (02/2013) | 536.00 | | 898.80 | 10434779 |
| 2/2/2013 | chk# t0055416 LG | | 536.00 | 362.80 | 6177856 |
| 2/2/2013 | chk# PSID22884458-5200-005200 Terminal PSID 22884458 - CHECK21 | | 375.00 | (12.20) | 6178232 |
| 3/1/2013 | Washer/Dryer Rental (03/2013) | 50.00 | | 37.80 | 10508798 |
| 3/1/2013 | Monthly Rent Charges (03/2013) | 304.00 | | 341.80 | 10508799 |
| 3/1/2013 | Renter's Insurance (03/2013) | 18.16 | | 359.96 | 10508800 |
| 3/1/2013 | Housing Assistance Charge (03/2013) | 536.00 | | 895.96 | 10508801 |
| 3/2/2013 | chk# PSID23807147-5201-005201 Terminal PSID 23807147 - CHECK21 | | 375.00 | 520.96 | 6230775 |
| 3/2/2013 | chk# 3006563 LG | | 536.00 | (15.04) | 6233635 |
| 4/1/2013 | Washer/Dryer Rental (04/2013) | 50.00 | | 34.96 | 10584957 |
| 4/1/2013 | Monthly Rent Charges (04/2013) | 304.00 | | 338.96 | 10584958 |
| 4/1/2013 | Renter's Insurance (04/2013) | 18.16 | | 357.12 | 10584959 |
| 4/1/2013 | Housing Assistance Charge (04/2013) | 536.00 | | 893.12 | 10584960 |
| 4/2/2013 | chk# 3008426 RM | | 536.00 | 357.12 | 6285061 |
| 4/3/2013 | chk# PSID24950816-5204-005204 Terminal PSID 24950816 - CHECK21 | | 375.00 | (17.88) | 6290996 |
| 5/1/2013 | Monthly Rent Charges (05/2013) | 304.00 | | 286.12 | 10856960 |
| 5/1/2013 | Washer/Dryer Rental (05/2013) | 50.00 | | 336.12 | 10857246 |
| 5/1/2013 | Housing Assistance Charge (05/2013) | 536.00 | | 872.12 | 10857545 |
| 5/1/2013 | Renter's Insurance (05/2013) | 18.16 | | 890.28 | 10857793 |
| 5/2/2013 | chk# 3010337 LG | | 536.00 | 354.28 | 6355031 |
| 5/3/2013 | chk# PSID25969935-5205-005205 Terminal PSID 25969935 - CHECK21 | | 375.00 | (20.72) | 6365365 |
| 6/1/2013 | Washer/Dryer Rental (06/2013) | 50.00 | | 29.28 | 10918002 |
| 6/1/2013 | Monthly Rent Charges (06/2013) | 304.00 | | 333.28 | 10918003 |
| 6/1/2013 | Renter's Insurance (06/2013) | 18.16 | | 351.44 | 10918004 |
| 6/1/2013 | Housing Assistance Charge (06/2013) | 536.00 | | 887.44 | 10918005 |
| 6/2/2013 | chk# 3012228 LG | | 536.00 | 351.44 | 6427718 |
| 6/4/2013 | chk# PSID27049544-7954 Terminal PSID 27049544 - CHECK21 | | 375.00 | (23.56) | 6437760 |
| 7/1/2013 | Washer/Dryer Rental (07/2013) | 50.00 | | 26.44 | 10994597 |
| 7/1/2013 | Monthly Rent Charges (07/2013) | 316.00 | | 342.44 | 10994598 |
| 7/1/2013 | Renter's Insurance (07/2013) | 18.16 | | 360.60 | 10994599 |
| 7/1/2013 | Housing Assistance Charge (07/2013) | 524.00 | | 884.60 | 10994600 |
| 7/2/2013 | chk# 3014098 LG | | 524.00 | 360.60 | 6483942 |
| 7/4/2013 | chk# PSID28135082-5211-005211 Terminal PSID 28135082 - CHECK21 | | 375.00 | (14.40) | 6494135 |
| 7/29/2013 | chk# PSID28599283-5217-005217 Terminal PSID 28599283 - CHECK21 | | 375.00 | (389.40) | 6513571 |
| 8/1/2013 | Washer/Dryer Rental (08/2013) | 50.00 | | (339.40) | 11069620 |
| 8/1/2013 | Monthly Rent Charges (08/2013) | 316.00 | | (23.40) | 11069621 |
| 8/1/2013 | Renter's Insurance (08/2013) | 18.16 | | (5.24) | 11069622 |

DMSJ000103

Ledger                                                      Page 5 of 6
Case 2:15-cv-00799-KJM-DB Document 21364 Filed 08/17/22 Page 102 of 216
Case 2:15-cv-00799-KJM-DA *SEALED* Document 1 Filed 04/13/19 Page 81 of 82

| Date | Description | | | | |
|---|---|---|---|---|---|
| 8/1/2013 | Housing Assistance Charge (08/2013) | 524.00 | | 518.76 | 11069623 |
| 8/2/2013 | chk# 3015978 LG | | 524.00 | (5.24) | 6540841 |
| 9/1/2013 | Washer/Dryer Rental (09/2013) | 50.00 | | 44.76 | 11152355 |
| 9/1/2013 | Monthly Rent Charges (09/2013) | 316.00 | | 360.76 | 11152356 |
| 9/1/2013 | Renter's Insurance (09/2013) | 18.16 | | 378.92 | 11152357 |
| 9/1/2013 | Housing Assistance Charge (09/2013) | 524.00 | | 902.92 | 11152358 |
| 9/2/2013 | chk# 3017841 LG | | 524.00 | 378.92 | 6602389 |
| 9/3/2013 | chk# PSID30232857-3409 Terminal PSID 30232857 - CHECK21 | | 375.00 | 3.92 | 6604837 |
| 10/1/2013 | Washer/Dryer Rental (10/2013) | 50.00 | | 53.92 | 11230938 |
| 10/1/2013 | Monthly Rent Charges (10/2013) | 316.00 | | 369.92 | 11230939 |
| 10/1/2013 | Renter's Insurance (10/2013) | 18.16 | | 388.08 | 11230940 |
| 10/1/2013 | Housing Assistance Charge (10/2013) | 524.00 | | 912.08 | 11230941 |
| 10/2/2013 | chk# 3019768 LG | | 524.00 | 388.08 | 6660090 |
| 10/3/2013 | chk# PSID31540695-5232-005232 Terminal PSID 31540695 - CHECK21 | | 375.00 | 13.08 | 6668926 |
| 10/31/2013 | chk# 3021747 LG | | 524.00 | (510.92) | 6718840 |
| 11/1/2013 | Washer/Dryer Rental (11/2013) | 50.00 | | (460.92) | 11311992 |
| 11/1/2013 | Monthly Rent Charges (11/2013) | 316.00 | | (144.92) | 11311993 |
| 11/1/2013 | Renter's Insurance (11/2013) | 18.16 | | (126.76) | 11311994 |
| 11/1/2013 | Housing Assistance Charge (11/2013) | 524.00 | | 397.24 | 11311995 |
| 11/1/2013 | chk# PSID32339818-5233-005233 Terminal PSID 32339818 - CHECK21 | | 375.00 | 22.24 | 6711484 |
| 11/1/2013 | chk# PSID32375491-373 Terminal PSID 32375491 - CHECK21 | | 13.08 | 9.16 | 6712744 |
| 12/1/2013 | Washer/Dryer Rental (12/2013) | 50.00 | | 59.16 | 11399107 |
| 12/1/2013 | Monthly Rent Charges (12/2013) | 316.00 | | 375.16 | 11399108 |
| 12/1/2013 | Renter's Insurance (12/2013) | 18.16 | | 393.32 | 11399109 |
| 12/1/2013 | Housing Assistance Charge (12/2013) | 524.00 | | 917.32 | 11399110 |
| 12/2/2013 | chk# 3023681 LG | | 524.00 | 393.32 | 6776437 |
| 12/3/2013 | chk# PSID33892599-5240-005240 Terminal PSID 33892599 - CHECK21 | | 393.32 | 0.00 | 6781837 |
| 1/1/2014 | Renter's Insurance (01/2014) | 18.16 | | 18.16 | 11472327 |
| 1/1/2014 | Washer/Dryer Rental (01/2014) | 50.00 | | 68.16 | 11472506 |
| 1/1/2014 | Housing Assistance Charge (01/2014) | 524.00 | | 592.16 | 11472706 |
| 1/1/2014 | Monthly Rent Charges (01/2014) | 316.00 | | 908.16 | 11472909 |
| 1/2/2014 | chk# 3025589 LG | | 524.00 | 384.16 | 6825934 |
| 1/3/2014 | chk# PSID35122030-5241-005241 Terminal PSID 35122030 - CHECK21 | | 384.16 | 0.00 | 6846850 |
| 2/1/2014 | Washer/Dryer Rental (02/2014) | 50.00 | | 50.00 | 11547992 |
| 2/1/2014 | Monthly Rent Charges (02/2014) | 316.00 | | 366.00 | 11547993 |
| 2/1/2014 | Renter's Insurance (02/2014) | 18.16 | | 384.16 | 11547994 |
| 2/1/2014 | Housing Assistance Charge (02/2014) | 524.00 | | 908.16 | 11547995 |
| 2/3/2014 | chk# 3027494 LG | | 524.00 | 384.16 | 6901517 |
| 2/3/2014 | chk# PSID36492777-5242-005242 Terminal PSID 36492777 - CHECK21 | | 384.16 | 0.00 | 6902775 |
| 3/1/2014 | Washer/Dryer Rental (03/2014) | 50.00 | | 50.00 | 11620590 |
| 3/1/2014 | Monthly Rent Charges (03/2014) | 316.00 | | 366.00 | 11620591 |
| 3/1/2014 | Renter's Insurance (03/2014) | 18.16 | | 384.16 | 11620592 |
| 3/1/2014 | Housing Assistance Charge (03/2014) | 524.00 | | 908.16 | 11620593 |
| 3/1/2014 | chk# PSID37800480-5246-005246 Terminal PSID 37800480 - | | 384.16 | 524.00 | 6948928 |

DMSJ000104

Case 2:15-cv-00799-KJM-DAD *SEALED* Document 1 Filed 04/17/19 Page 82 of 82

|          | CHECK21          |  |        |      |         |
|----------|------------------|--|--------|------|---------|
| 3/3/2014 | chk# 3029376 LG  |  | 524.00 | 0.00 | 6955921 |

DMSJ000105

# EXHIBIT G

DMSJ000106

MONTHLY COST BREAKDOWN:

| | | |
|---|---|---|
| Apartment Base Rent | $ | 860.00 |
| + Additional Services | $ | 65.58 |
| =Subtotal of Charges | $ | 925.58 |
| + Taxes of          % (if applicable) | $ | 0.00 |
| =Total Monthly Obligation | $ | 925.58 |

Your monthly payment is due and payable to Chesapeake Commons Apartments, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you. Chesapeake Commons Apartments is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Chesapeake Commons Apartments .

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-635-1970. If it is after regular office hours, maintenance can be reached by calling (800)-426-4652.

**Night Services**
If you need assistance from our Night Services, please call (916)-331-3175. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader for Chesapeake Commons Apartments at (303)-948-7500 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9976 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08

DMSJ000107

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

Wasatch Property Management, Inc. / Owners Agent
*A Utah Corporation - registered in*
595 S Riverwoods Pkwy, Suite 100, Logan, Utah 84321

This agreement is made in Rancho Cordova, CA , on 9/20/2010 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Denika Terry**
Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.  TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 09/20/2010, and Terminating 09/19/2011 . Reference paragraph XVII of this Residential Rental Agreement.  The total rent for this 12 month and 0 day tenancy is 10,320.00.

**II.  PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #391, Rancho Cordova, CA  95670

**III.  RENT**



The rental for the premises is $860.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA  95670-7402 . The Rental Office can be reached by phone at (916)-635-1570.  Unless otherwise posted, payment can be made in person at the Owner's office between 8:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends.  In addition, a "night drop" is available for payment when the office is not open.  Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop.  All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent.  Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A.  The sum of $315.33 upon execution of this Rental Agreement as rent for the period beginning   09/20/2010 , through 09/30/2010  (first month prorated) payable on 09/20/2010.

B.  The sum of $860.00  is due on the first day of each calendar month commencing  October 2010.

C.  A concession in the amount of 0.00  is to be given to Resident as part of this 12 month(s) lease and will be issued as $ 0.00  off move in.  The 0.00 concession is due and payable back to Chesapeake Commons Apartments if the 12 month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs.  The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas.  In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment.  Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be  obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

**IV.  PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V.  LATE CHARGES**



Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs.  Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units.  Because of this, Landlord and Tenant understand and agree that the amount $ 50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month.  This late charge shall be deemed to be additional rent due under the lease.  Lessor will not accept a check after the 5th day of month.  In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay owner immediately a charge of $ 50.00.  In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI.  SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**



Resident shall pay Owner, upon execution of this agreement, a security deposit of $375.00.  Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement.  Owner shall not be obligated to pay any interest on such amounts.  Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning.  Resident agrees that deiage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy,  Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to  Resident in person or by mailing.  No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident.  As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.  Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit.  It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

*www.tsyourhome.com*

Page 2 of 28

DMSJ000108

VII.  ACCEPTANCE AND SURRENDER OF PREMISES

A.  Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use  3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B.  Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

VIII.  USE OF THE PREMISES



A.  The premises are rented for residential use only and shall be occupied by not more than 1 occupant(s). Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a  minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elhound, Fila Brasiliere, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of No pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed.The maximum weight limit allowed for pets is 0.00 lbs.



C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premise for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Residents may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.  Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

IX.  RESIDENTS DUTY TO MAINTAIN PREMISES

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice to Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

X.  UTILITIES



Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in  Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

    X  gas,    Account # _____.
    X  electricity,    Account # _____.
    X  water/sewer/trash    See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and

XI.  INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for making necessary or agreed repairs, decorations, alterations or improvements, supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

DMSJ000109

XII. **HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

XIII. **DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

XIV. **LIABILITY INSURANCE**

_Initials_

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the 'pay along with rent' program and being charged according.

XV. **WAIVER OF LIABILITY**

_Initials_

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter's insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft

C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.  The Actions or omissions of other Residents

E.  Interference with light, view or other intangible aspects of the premises.

F.  Operations in construction of any public or quasi-public work

G.  Any latent defect in the building(s)

H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

XVI. **CANCELLATION FEE**

You may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 850.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

XVII. **NOTICE TO QUIT**

_Initials_

A.  **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to $ 860.00 will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 09/19/2011 and if resident elects to not renew lease or submit a written thirty (30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.  **TERM AGREEMENT:** Resident, agrees, at least thirty (30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal $ 860.00 will be billed as liquidated damages for improper thirty day notice.

DMSJ000110

XVIII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES



In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

XIX.  AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

XX.  SUBLETTING

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

XXI.  JOINT AND SEVERAL RESPONSIBILITY

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

XXII.  WAIVER OF BREACH

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

XXIII.  RULES AND REGULATIONS

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.
Termination on Breach and Notice to Quit.  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

XXIV.  SECURITY

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

XXV.  ENVIRONMENTAL INDEMNIFICATION

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

_Denika N. Terry_                    9-20-2010 .
Denika Terry (lessee)                 Date

_[signature]_                         9/20/10
Owner authorized agent                Date

DMSJ000111

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer, Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

| | |
|---|---|
| _____ | _____ |
| Co-Signer Signature | Date |
| _____ | _____ |
| Print Name | Home Telephone number |
| _____ | _____ |
| Address | City, State Zip |
| _____ | _____ |
| Social Security Number | Employer |

LD302.01.CA Revised 07/15/2008

DMSJ000112

UTILITY ADDENDUM:
DISCLOSURE OF RESIDENT'S FINANCIAL RESPONSIBILITY FOR
WATER, SEWER AND TRASH COLLECTION CHARGES

This utility addendum is hereby incorporated into the Rental Agreement between, <u>Chesapeake Commons Apartments</u> hereinafter called Owner, by Wasatch Property Mangment, its authorized agent, and <u>Denika Terry</u> for premises located at <u>3600 Data Drive, #391, Rancho Cordova, CA 95670</u>.

1.  Resident shall pay for water and sewer service based on the method selected below:

    a.  <u>  X  </u> Number of occupants in each apartment unit. Resident shall pay for water and sewer service base on an allocation formula, not actual submeter readings. Specifically, Resident's bill will be calculated in the following manner: The property's water and sewer bills will be allocated to each apartment unit based on a percentage assigned to each apartment unit based on the number of Occupants in that apartment unit compared to the total number of occupants at the property. If Resident's unit contains a washing machine, one additional occupant will be added to the occupant count for purposes of calculating the percentage, and Resident agrees that this is a fair practice to account for increased water usage in units containing washing machines. Resident's percentage for this factor is currently <u>80.00</u>% but could change based on the number of occupants at the property or in the apartment unit. Resident's bill will be equal to the calculated monthly percentage multiplied by the property's water and sewer charges. Prior to allocating the property's water and sewer bills using the method described above, Owner will deduct <u>20.00</u>% to account for common area usage. Owner and Resident agree that the exact amount of the water used in Resident's unit and the exact amount of water used in the common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for water and sewer usage in the common areas or in other residential units.

    b.  N/A Resident shall pay for water and sewer service based on water consumed in Resident's unit 20.00. Specifically, Resident's bills will be calculated as follows: A water submeter is installed in the Resident's unit to measure the total amount of water used in the unit. Water and sewer bills will be calculated by multiplying the submetered usage by a utility rate based on the utility rates of the local utility provider (which may include base or fixed charges). Resident acknowledges that the rates paid for water and sewer service may not match the rate of the local water utility (as that rate may not be appropriate to charge to an individual unit), but that the rates used are designed in a manner to allocate Owner's actual water and sewer costs to the apartment units. Resident acknowledges that Resident may be paying for some water and sewer charges attributable to common area usage.

2.  All water and sewer related charges assessed to the property may be used to calculate the amount charged to each Resident under the selected formula described above, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all miscellaneous charges contained on the utility bills received from the local water and sewer providers.

3.  Resident shall also be billed, and shall pay, for trash service by the third party billing provider. Resident's trash bills shall be calculated in the following manner: the property's trash bill will be allocated equally to each unit on a monthly basis. The property contains 600 units, therefore resident will pay 1/600 of the trash bill monthly. Prior to allocating the property's trash bills using the method described above, Owner will deduct %<u>20.00</u> to account for common area usage. Owner and Resident agree that the exact amount of the trash costs attributable to common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for trash charges attributable to common areas or other residential units.

4.  The billing methods described above may be changed by Owner by providing Resident with 60 days prior written notice and Resident acknowledges that in certain situations it is necessary to make a change to the billing method.

5.  The water and sewer bill will be sent to Resident by Conservice, a third party billing provider. Resident acknowledges that Conservice is not a public utility. Owner reserves the right to change the third party billing provider at any time. Any disputes related to the computation of Resident's bills will be between the Resident and the Owner.

6.  Resident must make payment in full to Owner or the third party billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider when Resident fails to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or billing provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the billing provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc.

7.  Each monthly water, sewer and trash bill will include a monthly service fee not to exceed $4.32 in addition to the water, sewer and trash charges. This monthly service fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for providing billing services and may be increased (with 60 days written notice provided to Resident) if Owner's expenses or charges increase. Resident agrees to pay a one-time account processing fee in the amount of $1.95 when Resident vacates the apartment unit. This fee shall be included on Resident's final water and sewer bill. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill.

DMSJ000113



8. Resident shall promptly contact the local gas and/or electric utility(ies) to establish an account in Resident's name for the provision of gas and electric service to Resident's unit. Resident shall ensure that the start date for each such account is the Resident's move-in date. If Resident fails to comply with the conditions of this paragraph and Owner is subsequently charged with utility charges attributable to Resident's occupancy of the unit, then Resident shall be issued (and shall pay) a bill for such services by Owner or the Billing Provider (which shall include a service charge in the amount of $5.00); such service charge is used to compensate Owner for Resident's failure to become the customer of record for such accounts, including, but not limited to charges assessed by the third party billing provider to Owner for processing of the bill for the delinquent time period, opportunity cost of the money not paid and other administrative costs. Resident and Owner agree that the charge described above is a reasonable estimate of the costs incurred.

9. Failure to pay any of said charges shall be considered a material breach of this Rental Agreement and Owner shall have the right to commence legal proceedings against Resident and all occupants including but not limited to an unlawful detainer action to recover possession of the premises. Upon termination or expiration of the Lease, unpaid water and sewer bills may be deducted from Resident's security deposit, and for such purpose Owner and Resident agree that the charges described in this addendum are considered additional rent.

Date of this Addendum: Sept. 20, 2010

_Denika M. Terry_
Denika Terry (Lessee)

_September 20, 2010. September 20, 2010._
Date

_[signature]_
Owner authorized agent

_9/20/10_
Date

LD317.04.CA–Revised 07/15/08

DMSJ000114



## ADDITIONAL SERVICES AGREEMENT

Apartment # 391

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community") and Danika Terry (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or tha "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 09/20/2010 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property: | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 40.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 10.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance (This is available as a pay with rent option), or | | 15.58 |
| Insurance Provider Name _____ , Policy # _____ | | |

| Services: | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 0.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Corporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | 10.00 |

| | | |
|---|---|---|
| | Total Charges for Property & Services | $65.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $65.58 |

| Fees: | | |
|---|---|---|
| Lease Initiation Fee (if applicable) | | 0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ _____ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

Payment: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 09/20/2010

_Danika R Terry_ (signature)
Danika Terry (Lessee)

9-20-2010
Date

_(signature)_
Owner authorized agent

9/20/10
Date

LD303.01 Revised 07/15/2008

DMSJ000115



TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personality and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fees(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

DMSJ000116

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of California. This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_Denika H. Terry_                    9-20-2010
Denika Terry(Lessee)                 Date

_[signature]_                        9/20/10
Owner authorized agent               Date                              LD303.01 Revised 7/15/08

DMSJ000117




## ADDENDUM A

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner Chesapeake Commons Apartments, and Resident(s), Denika Terry, dated 09/20/2010 .

**PAINTING CHARGES (MINIMUM):**

Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess any labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resident shall be charged actual costs of painting, if necessary, including labor and materials.

| | STUDIO | 1 BEDROOM | 2 BED/1 BATH | 2 BED/2 BATH | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Complete Paint Job | $175.00 | $200.00 | $225.00 | $250.00 | $285.00 | $330.00 |
| Partial Paint | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room |

(0-12 months = cost, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20%)

**REPLACEMENT CHARGES :**

Should replacement of damaged or missing items be necessary due to damage beyond ordinary wear and tear, the following charges are typical of the actual replacement costs, including materials and labor. Only actual costs, including materials and labor if necessary will be charged to the resident.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | Cost | Int. Door | Cost | Range Knobs | 4.00 ea |
| Alarm Sensors | Cost | Int. Door Jam | Cost | Re-Key Locks | 25.00 ea |
| Appliance Rplc. | Cost | Int. Door Knob | 7.50 ea | Remotes/Key Cards | Cost |
| Cabinet Doors | Cost | Light Bulb | .60 ea | Shower Door | Cost |
| Carpet Red Stains | 25.00 ea | Light Globes (12") | 15.00 ea | Shower Rod | 2.50 ea |
| Carpet Patching | 36.00 ea | Light Globes (8") | 8.00 ea | Sink Stopper | 4.00 ea |
| Crisper Tray | Cost | Mail Box Locks | 3.50 | Smoke Detector | 10.00 ea |
| Dishwasher Rack | Cost | Mini-Blinds | Cost | Stove Burner Ring | 1.25 ea |
| Door Stops | 50 ea | Mirrors | Cost | Stove Drip Pans | 1.75 ea |
| Draperies | Cost | Mirrored Doors | Cost | Stove Elements | 9.50 ea |
| Entry Door | Cost | New Keys | .50 ea | Switch Plates | .30 ea |
| Entry Lock | 11.00 | Outlet Plates | .30 ea | Toilet Paper Roller | 2.00 ea |
| Fire Extinguisher | 30.00 | Oven Rack | Cost | Toilet Seat | 8.50 ea |
| Florescent Bulb (4) | 2.50 ea | Patio Door Blinds | Cost | Towel Bar | 8.00 ea |
| Furniture Damage | Cost | Patio Screen Door | Cost | Tub Stoppers | 7.50 ea |
| Garbage Disposal | 50.00 | Peep Holes | 2.00 | Vertical Blinds | Cost |
| Glass Rplc. | Cost | Pest Control | Cost | Wall Bumpers | 2.00 ea |
| Heat Lamp Bulb | 3.25 ea | Pet/Flea Control | Cost | Window Screens | Cost |

**CARPET**

The Resident is responsible to leave the carpet in the same clean condition it was when the resident first took occupancy. The following charges are typical of the actual carpet cleaning expense. Only the actual costs of cleaning including labor and materials, if necessary, will be charged to the resident.

| | STUDIO | 1 BEDROOM | 1 BED/LOFT | 2 BEDROOM | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Carpet Shampoo | 35.00 | 60.00 | | 70.00 | 85.00 | 105.00 |
| Carpet Deodorizing | 20.00 | 30.00 | 35.00 | 40.00 | 45.00 | 50.00 |
| Carpet Replacement | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Pet Treatment | Cost | Cost | Cost | Cost | Cost | Cost |

**CLEANING :**

It is your responsibility to leave the premises in the same clean condition as it was when you first occupied the property. If you choose not to, you will be billed for the actual costs, including labor and materials, if it becomes necessary to clean the premises. The following costs are typical of what is charged to clean the following items:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets | 2.50 ea | Kitchen Floor | 15.00 | Range Top | 7.50 |
| Bath Floor | 10.00 ea | Kitchen Sink | 2.50 ea | Refrig. Defrosting | 5.00 |
| Bath Sink | 2.00 ea | Light Fixtures | 2.50 ea | Refrigerator | 10.00 |
| Bath Tub | 15.00 ea | Medicine Cabinets | 2.50 ea | Shower Stall | 10.00 ea |
| Cabinets | 2.00 ea | Microwave | 10.00 | Storage Room | 10.00 |
| Ceiling Fan | 10.00 ea | Mini/Vertical Blinds | 35.00 | Vacuum Carpet | 15.00 |
| Commode | 15.00 ea | Mirrors | 2.50 ea | Vent Hood | 5.00 |
| Dishwasher | 10.00 | Oven | 15.00 | Vent Covers | 10.00 |
| Draperies | Cost | Patio/Balcony | 40.00 | Windows | 5.00 ea |
| Entry Way | 5.00 | Patio Window | 10.00 | Window Screens | 2.50 ea |

**LABOR:** General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at the actual costs to the landlord, if necessary, for trash removal, washing of walls, doors, door frames, switch plates, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owner's rights to pursue cause(s) for damages not specifically listed hereon.

_____  
Resident

_____  
Owner's Authorized agent

_____  
Resident

_____  
Data

ILD304.01. Revised   7/15/08

DMSJ000118

# Chesapeake Commons Apartments Community Policies

The following community policies are designed to protect the premises and to set standards for the convenience of all residents. We hope you will understand their necessity and that we may count on your cooperation. It must be understood that these policies are to be considered a part of your rental agreement and will be enforced.

### RENTAL OFFICE
Rental Office hours are posted. Business matters should be handled during these hours, except for emergencies. We are here for you. Please let us know if there is anything we can do to make your home more enjoyable.

### MAIL
The Rental Office will accept limited delivery on special delivery letters, UPS, and U.S. Postal packages. You will receive a note in your mailbox that these items have been delivered and are being held for you by the Manager (UPS will leave the notice on your door).

### ACCESS
For your protection, no person will be allowed to enter an apartment without specific written authorization from the Leaseholder. This includes family, friends, delivery person, telephone or cable company personnel, etc. Be advised, $25 is the fee for after hours lockout service.

### VISITORS
It is important for a number of reasons for us to know who is residing in our apartment community. Residents may have overnight guests for no longer than two (2) weeks at any given time. Anyone residing in the apartment longer than two (2) days must be registered in the Rental Office as an occupant and must complete a rental application as such. Any exceptions to this policy must be authorized in writing by the Manager. You are responsible for your guests while they are on the property. Please review the community policies with them to help ensure that they too respect your neighbors.

### PETS
NO dogs, cats, rabbits, birds, reptiles, or rodents are permitted to occupy the premises without specific written authorization. Guests pets are not allowed on the premises at any time, for any reason. Any damages resulting from the violation of this policy will be the responsibility of the Resident. Unauthorized pets are a violation of your lease. The maximum weight limit allowed for pets is 0.00 lbs.

### STEREOS/TVs/RADIOs/NOISE
Please moderate the volume controls, as loud stereos, TVs and radios create a disturbance among residents. We hope to keep to minimum the necessity for the Management to police the noise problem. Your consideration for your neighbors, we are sure, will result in their consideration for you. Although we ask that you be especially careful before 9:00 a.m. and after 10:00 p.m., please be aware that any noise that disturbs a resident's right to a quiet living environment is considered to be a breach of the Rental Agreement. (This also includes horn honking. Please advise your guests to refrain from this disturbing action).

### LAUNDRY
The laundry room hours and regulations are posted. Management will not be responsible for clothing left unattended. Please do not overload, over-soap or use dye in the machines. Help keep the laundry room clean and use the trash containers provided. Please remove your clothes promptly. Please help us keep the laundry rooms in good condition by also remembering to lock them when you leave.

### TRASH, REFUSE AND GARBAGE
Containers for refuse and garbage have been placed in central locations. All garbage must be well wrapped and all boxes flattened or broken down before being deposited in the containers. Please remember no feminine hygiene products or disposable diapers down the toilets.

### PATIOS/BALCONIES
For the benefit of the appearance of your apartment community, storing of furniture, bicycles, boxes, tires, trash, debris, or any other articles on your patio is expressly prohibited. Please help keep your community clean by not storing your brooms, mops, or laundry on your patio as well. These items should be kept inside and out of view. Nothing is to be hung on the exterior of the building, including on patio and balcony railings. No awnings, screens, partitions, or other projections shall be attached to the outside or other parts of the building without the prior written consent of the Owner.

### RESIDENTS
Residents are not allowed to use the driveway, parking areas, landscaped grounds, or pool and recreation room for play. NO bicycles, skateboards, or roller-states are to be used at any time on the premises. ALL residents must abide by posted rules and regulations for the pool area. Adult occupants are responsible for the actions of guests, minor occupants and their guests.

Residents shall not dig up any part of the lawn areas, nor plant any form of shrubs, trees, vines, flowers, or garden plants without the prior written consent of the Management.

Throwing articles of any kind, shaking mops or dust cloths of any nature from the windows, or in the common areas, or "littering" anywhere on the premises is strictly prohibited.

DMSJ000119



**WATERBEDS**

Waterbeds are allowed and must be fully insured against leak damage by the Resident through a reputable waterbed insurance company prior to set up. The Resident must provide a certificate of insurance with a minimum liability of $1,000 to cover any damage caused by the waterbed.

**ALTERATIONS**

Alterations to your apartment are prohibited without written consent of the Management. The following are prohibited:

a. The installation of a television antenna or satellite dish.
b. The use of LARGE nails or adhesive hangers for pictures or mirrors. Only picture hangers or small-framing nails may be used.
c. The boring, marring or puncturing of any part of the equipment, carpet, drapes, fixtures, walls, or ceiling of your apartment.
d. The changing of, or addition of, new locks.
e. Redecoration or painting
f. Replacement of any part of the apartments equipment or furnishings.
g. No aluminum foil, shades or colored blinds in the windows. All window coverings must be those that are supplied by the Management; however, if you wish to use your own drapes, they must have white backings.
h. Air conditioning apparatus or equipment installed without the prior written consent of the Owner.
i. Resident will not permit or suffer any signs, advertisements, or notices to be displayed, inscribed, painted, or affixed on any par of the outside of the demised premises or any building, except on a directory board if provided by the Landlord.

**DISPOSALS**

Disposals are quite a maintenance problem because even the most careful person will, from time to time accidentally get something in the disposal, which will jam it. Hard items such as bones, peach pits, olive pits, shellfish, cornhusks, and artichoke leaves will jam the disposal. Please do not put these or other solid items in your disposal. Do not use drain cleaners in the disposal - if the drain is slow or stopped up, contact the Manager. To keep your disposal fresh, while its running, with the water also running, drop a slice of lemon in it. Ice dropped into the disposal while running can help sharpen the blades.

**VEHICLES AND PARKING**

All cars must be registered with the office. If you have not registered your car or you have changed cars recently, please contact the Managers office to have it properly registered. Guests vehicles should be registered with the Manager if they will be parked on-site for more than one day. Illegally parked cars may be towed at the owners expense; this includes cars parked in red zones and driveways. Please do not back into the parking spaces unless you have a front license plate. The Management WILL NOT BE RESPONSIBLE for loss of property of residents or guests. No washing or repairing of cars is permitted on the property. All cars parked on the property grounds must be operable AND legal. This means current registration is required. Any vehicle parked on the premises that is not legal will be towed at the owners expense. No boats, trailers or RVs are allowed to be parked on-site at any time, for any reason.

**RECREATIONS**

Hours for use of the recreation facilities are posted. Adult occupants are responsible for the actions of guests, minor occupants and their guests. Please do not give your key to your friends.

All Posted Pool regulations must be followed:
- NO glass bottles/containers are allowed in pool areas.
- NO alcoholic beverages are allowed in pool areas.
- NO eating in the pool areas.
- NO rude swimming.
- NO cut-offs.
- NO scuba gear (including masks and fins) or inflatable toys/rafts are allowed in the pool at any time.
- NO more than TWO guests per apartment in the pool area at one time; guests must be accompanied by the Residents they are visiting.
- All residents under the age of 14 must be accompanied by an adult resident while in the pool area.
- Radios are not allowed in the pool area at any time except for use with headphones.

**VACATING**

As required by law, THIRTY (30) days written notice of intent to vacate the premises must be given to the Management. The day before you are vacating your apartment, contact the Manager for an appointment for the apartment inspection and key return. No unit will be checked out after 10:00 a.m. Please be aware, if you choose not to provide the management with a thirty day notice in writing, you will be billed for liquidated damages equal to one month rent.

DMSJ000120

**SMOKE ALARMS**

Your apartment is equipped with a smoke detection device as well as a building fire alarm. Resident understands that it is the Residents responsibility to ensure that the smoke alarm is in operating condition at all times. If it is battery operated, Resident understands Residents responsibility to perform the manufacturers recommended test to determine if the smoke detector is operating properly at least once a month. If it is not operating properly, it is Residents responsibility to notify Management immediately in writing. It is a crime to disable smoked detection devices; please leave them intact, they could save your life or that of someone you love.

**INSURANCE**

Your personal property is not covered by the apartment communities insurance, and we advise you to carry renter's insurance, as we are not liable for your personal belongings.

**SECURING COMMON AREAS**

Entrances to all pool, laundry, exercise areas and any other common areas are not to be blocked open or propped open in any manner at any time. Residents who fail to properly close or secure these areas will be subject to a $50.00 fine and/or eviction. The community amenities pose a significant safety hazard to unsupervised children.

Violation of these rules or any one of them, shall be sufficient cause for termination of this lease.

_Denika N. Terry_      9-20-2010 .
Denika Terry (Lessee)      Date

_____      9/20/10
Owner authorized agent      Date

LD305.01 Revised 7/15/08

DMSJ000121

## SAFE NEIGHBORHOODS ADDENDUM
### We Promote a Drug Free and Crime Free Environment

In Consideration of the execution or renewal of a lease of the dwelling unit, located at, _3600 Data Drive, #381, Rancho Cordova, CA 95670-7403, Chesapeake Commons Apartments_ "Owner" and _Denika Terry_, "Resident(s)", agree as follows:

1. Resident(s), any members of the residents household or a guest or other person under the residents control shall not engage in criminal activity, including drug-related activity, on or near the said premises. "Drug-related criminal activity", means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act (21 U.S.C. 802)).

2. Resident(s), any member of the residents household or a guest or other person under the residents control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on or near the said premises.

3. Resident(s), any member of the residents household or a guest or other person under the residents control, will not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug-related criminal activity, regardless or whether the individual engaging in such activity is a member of the household, or a guest.

4. Resident(s), any member of the residents household, or a guest, or other person under the residents control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance, as defined in Health & Safety Code §11350, et seq., at any locations, whether on or near the dwelling unit premises or otherwise.

5. Resident(s), any member of the residents household, or a guest, or other person under the residents control shall not engage in any illegal activity, including: prostitution, as defined in Penal Code §647(b); criminal street gang activity, as defined in Penal Code §186.20 et seq.; assault and battery, as prohibited by Penal Code §240; burglary, as prohibited in Penal Code §459; the unlawful use and discharge of firearms, as prohibited by Penal Code §245; sexual offenses, as prohibited in Penal Code §269 and §288 or any breach of the lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent or other tenant or involving imminent or actual serious property damage.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY. A single violation of any of the provisions of this added addendum shall be deemed a serious violation and material and irreparable non-compliance. It is understood that a single violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be a preponderance of the evidence.

7. In case of conflicts between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.

8. THIS LEASE ADDENDUM is incorporated into the lease executed or renewed this date _09/20/2010_ between Owner and Resident(s).


_Denika N. Terry_                    9-20-2010.
Denika Terry(Lessee)                 Date


_[signature]_                         9/20/10
Owner authorized agent               Date


LD008.01 Revised 7/15/03

DMSJ000122

## REFERENCE CONSENT ADDENDUM

Resident: Denika Terry

Address: 3600 Data Drive, #391, Rancho Cordova, CA 95670

Based on a lease start date of 09/20/2010 , expiration date of 09/19/2011.

I/we understand that by not fulfilling the above stated lease, and all applicable terms and conditions, that my file will be assigned to a collection agency and could seriously damage my credit rating and the ability to rent another place of residence.

I/we further understand that the Landlord has explained to the signers of this agreement that inquiries for credit information and terms of the lease by creditors of these parties residing at Chesapeake Commons Apartments Apartments, will release any and all information at the Landlords discretion.

I/we further understand that if I/we fail to satisfactorily complete the lease for any reason, including but not limited to: eviction for any reason, criminal activities, non-payment of rent, and for damages to the apartment community property, the Landlord will, at their option, have the right and responsibility to report the below signed names to any and all entities, including individuals, agencies and corporations, public or private, domestic and foreign.

I/we agree that the Landlord may release my name, social security number and date of birth and details of the broken lease agreement at the Landlords discretion. I/we agree to hold the Landlord and other reporting agencies harmless from any claims of damages caused by the release of this information.

I/we have read the above and it is accepted and agreed to, jointly and severally. I/we agree to all the provisions thereof and further acknowledge the receipt of a copy of this form.

| | | |
|---|---|---|
| Resident Signature | 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 | 01-27-1976. |
| | Social Security # | Date of Birth |
| Resident Signature | Social Security # | Date of Birth |
| Resident Signature | Social Security # | Date of Birth |
| Resident Signature | Social Security # | Date of Birth |
| Resident Signature | Social Security # | Date of Birth |
| Resident Signature | Social Security # | Date of Birth |

OWNER
By:

Its authorized agent

9/20/10
Date

LD367.01 Revised 7/15/06

www.usyourhome.com

Page 17 of 28

DMSJ000123

# SATELLITE DISH AND ANTENNA ADDENDUM
## TO RENTAL AGREEMENT/LEASE AGREEMENT

THIS AGREEMENT made and entered into between Chesapeake Commons Apartments, "Owner/Agent" and Denika Terry, "Resident". Resident is renting from Owner/Agent the premises located at:

3600 Data Drive, #391 Apt. 391, Rancho Cordova, CA 95670

Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. This addendum contains the restrictions Resident agrees to follow:

1. **Number and size:** Resident may install only one satellite dish or antenna within the premises that are leased to resident for Resident's exclusive use. A satellite dish may not exceed 39 inches (1 meter) in diameter. An antenna or dish may recieve but not transmit signals.

2. **Locations:** Location of the satellite dish or antenna is limited to (1) inside Resident's dwelling, or (2) in an area outside Resident's dwelling such as Resident's balcony, patio, yard, etc. of which Resident has exclusive use under the lease. Installation is not permitted on any parking area, roof, exterior wall, window, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to Resident for Resident's exclusive use.

3. **Safety and non-interference:** Resident's installation: (1) must comply with reasonable safety standards; (2) may not interfere with Owner/Agent's cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to Owner/Agent's telecommunication systems;and (4) may not be connected to Owner/Agent's electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching to a portable, heavy object; (2) clamping it to a part of the building's exterior that lay within Resident's leased premises (such as a balcony or patio railing) or (3) any other method approved by Owner/Agent. No other methods are allowed. Owner/Agent may require that Resident block the satellite dish or antenna with plants, etc., so long as it does not impair Resident's reception.

4. **Signal transmission from exterior dish or antenna to interior of dwelling:** Resident may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If Resident's satellite dish or antenna is installed outside Resident's living area (on balcony, patio, or yard of which Resident has exclusive use under lease), signals received by Resident's satellite dish or antenna may be trasmitted to the interior of Resident's dwelling only by (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accomodate the cable); or (3) any other method approved by Owner/Agent.

5. **Workmanship:** For safety purposes, Resident must obtain Owner/Agent's approval of (1) the strength and type of materials to be used for installation and (2) the person or company who will perform the installation. Installation must be done by a qualified person, or a company that has workers' compensation insurance and adequate public liability insurance. Owner/Agent's approval will not be unreasonably withheld. Resident must obtain any permits required by local ordinances for the installation and comply with any applicable local ordinances and state laws.

6. **Maintenance:** Resident will have the sole responsibility of maintaining Resident's satellite dish or antenna and all related equipment. Owner/Agent may temporarily remove the satellite dish or antenna if necessary to make repairs to the building.

DMSJ000124

7. **Removal and damages:** Resident must remove the satellite dish or antenna and all related equipment when Resident moves out of the dwelling. Resident must pay for any damages and for the cost of repairs or repainting which may be reasonably necessary to restore the leased premises to its condition prior to the installation of Resident's satellite dish or antenna and related equipment.

8. **Liability insurance and indemnity:** Resident is fully responsible for the satellite dish or antenna and related equipment. Resident shall be liable for all injury occasioned by the installation or use of the satellite dish or antenna and related equipment. Resident shall indemnify Owner/Agent for all related losses and claims.

9. **Deposit increase:** A security deposit increase (in connection with having a satellite dish or antenna) must be required by Owner/Agent. Resident's security deposit is hereby increased by an additional sum of $_____ to help protect Owner/Agent against possible repair costs, damages, or any failure to remove the satellite dish or antenna and related equipment at the time of move-out. **A security deposit increase does not imply a right to drill into or alter the leased premises.** In no case will the total amount of all security deposits Resident pays to Owner/Agent be more than that which is allowed by law (two (2) times the amount of rent for an unfurnished unit and three (3) times the amount of rent for a furnished unit).

10. **When Resident may begin installation:** Resident may start installation of satellite dish or antenna only after Resident has: (1) signed this addendum; (2) provided Owner/Agent with written evidence of the liability insurance referred to in Paragraph 8 of this addendum; (3) paid Owner/Agent the additional security deposit, if applicable, referred to in Paragraph 9 of this addendum; and (4) received Owner/Agent's written approval of the installation materials and the person or company who will do the installation.

_____     9-20-2010
Danika Terry (Lessee)                Date

_____     9/20/10
Owner authorized agent               Date

LO 313.91 Revised 7/15/06

DMSJ000125



**PROPOSITION 65 FACT SHEET**

### Office of Environmental Health Hazard Assessment
### California Environmental Protection Agency

This fact sheet was prepared by the Office of Environmental Health Hazard Assessment (OEHHA), which administers the Proposition 65 program. It provides information to tenants whose apartment managers and owners have posted or distributed Proposition 65 warnings.

**What is Proposition 65?**
In 1986, California voters approved an initiative to address their growing concerns about exposure to toxic chemicals. That initiative became the Safe Drinking Water and Toxic Enforcement Act of 1986; better know by its original name of Proposition 65. Proposition 65 requires the State to publish a list of chemicals know to cause cancer, birth defects, or other reproductive harm. The list has grown to include over 750 chemicals since it was first published in 1987.

**What chemicals are on the Proposition 65 list?**
The Proposition 65 list contains two types of chemicals: carcinogens, which can cause cancer, and reproductive toxicants, which cause birth defects or reproductive harm, such as sterility or miscarriages. Some chemicals may be additives or ingredients in pesticides, common household products, food, or drugs. Others may be industrial chemicals, dyes, or solvents used in dry cleaning, manufacturing and construction. Still others may be byproducts of chemical processes; for example, motor vehicle exhaust.

**What does a Proposition 65 warning mean?**
Under Proposition 65, businesses are required to give a "clear and reasonable" warning before knowingly exposing anyone to a listed chemical above a specified level. This warning can be included on the label of a consumer product or published in a newspaper. An equally common practice is for businesses to provide a warning at the workplace or in a public area affected by the chemical. In recent months, many apartment owners and managers have posted or distributed warning to notify tenants that they may be exposed to one or more chemicals on the Proposition 65 list. For example, a warning may be given because tenants are exposed to chemicals in pesticides applied to landscaping or structures or chemicals in housing construction materials, such as lead in paint or asbestos in ceiling coatings. A growing trend among rental property owners and other businesses is to provide warnings for chemicals on the list, such as tobacco smoke or motor exhaust, which are regularly released into the environment in or near rental housing. In some cases, however, owners and managers are providing warnings to avoid potential violations and lawsuits, even though exposure to chemicals on the Proposition 65 list has not been verified. You should discuss the warning with the owner or manager to learn why it was provided to that you and your family can make informed decisions about exposure to any of these chemicals and your health.

**Is my familys health at risk from exposure to these chemicals?**
Warnings must be provided for chemicals listed under Proposition 65 if exposure to them may present a significant risk of cancer or reproductive harm. For carcinogens, the chemical must be present at or above a level that could cause one additional case of cancer in a population of 100,000 people exposed to the chemical over a lifetime. For reproductive toxicants, the chemical must be present at or above 1/1000th of the level at which the chemical is determined to have no negative health risks (the "no-observable-effect level"). Proposition 65 generally does not prohibit a business from exposing people to listed chemicals nor does exposure to these chemicals necessarily create an immediate health risk. Also, as stated above, a warning may have been provided in some cases even though the level at which the chemical is present is actually too low to pose a significant health risk. It is important to find out why you have received the warning so that you can discover which chemicals you are exposed to, at what levels, to determine how best to protect your familys health.

DMSJ000126

**Where can I get more information?**

Speak with the housing owner or manager directly to learn why you received a Proposition 65 warning. Property owners and managers were not required to notify OEHHA when they provide tenants with a warning. However, to obtain general information on the Proposition 65 list of chemicals, you may contact OEHHA at (916) 445-6900, or visit http://www.oehha.ca.gov/prop65. Following a list of contacts for more information on Proposition 65 as well as chemicals that may be found in your home.

| Type of Information | Contact |
|---|---|
| Proposition 65 Enforcement | California Attorney General<br>(510) 622-3170, prop65@doj.ca.gov |
| Toxics Directory:<br>Agency List | OEHHA<br>(510)622-3170<br>http://www.oehha.ca.gov/public_info/TDHOMSC1a.html |
| Asbestos<br>Indoor Air Quality | Indoor Exposure Assessment Unit, Air Resources Board<br>(916) 445-0753, http://www.arb.ca.gov/thmi/fslist/htm |
| Lead | Lead Coordinator in your county government office<br>Childhood Lead Poisoning Prevention Program<br>(510) 622-5000, http://www.dca.ca.gov/childlead/ |
| Tenant Issues | Department of Consumer Affairs<br>(800) 952-5210, http://www.dca.ca.gov/<br>Department of Housing and Community Development<br>(916) 445-4782, http://www.hcd.ca.gov/ |

I have read and acknowledge receipt of this fact sheet.

_Denika N. Terry_     9-20-2010
Denika Terry(Lessee)      Date

_[signature]_     9/20/10
Owner authorized agent     Date

LD316Revised 7/15/08

www.isyourhome.com

DMSJ000127

## PREVENTION OF MOLD AND NOTICE OF DISCLOSURE

**Community:**  **Chesapeake Commons Apartments**
**Resident:**  Denika Terry                                                           t0030362

**What is Mold?**
Mold are fungi. Molds grow throughout the natural and built environment. Tiny particles of mold are present in indoor and outdoor air. In nature, molds help break down dead materials and can be found growing on soil, foods, plant matter, and other items. Mold spores are very tiny and lightweight and spread very easily through air. Mold grows can often be seen as discolorations, ranging from white to orange and from green to brown and black. When molds are present in large quantities, they can cause allergic symptoms similar to those caused by plant pollen.

**What does mold need to grow?**
Mold only needs a few simple things to grow and multiply; moisture, nutrients, and a suitable place to grow. To prevent mold, moisture problems must be prevented and treated immediately. Proper ventilation is essential in preventing mold. The following are possible causes of indoor moisture problems :

| | | |
|---|---|---|
| Humidifiers | Leaky plumbing | Leaking roofs |
| Sewer back ups | Indoor clothes drying | Shower/bath steam |
| Cooking steam | House plants | Any flooding |

As a resident of your apartment you are responsible for the prevention of mold in your apartment. Please follow these simple guidelines :

1.  Remove Excess Moisture

   a. Dry out mops and cleaning utensils thoroughly before storing inside your apartment .

   b. Wipe down bathroom walls (shower doors if applicable) immediately after bathing, allow towels to air out. Wash and dry towels often .

   c. Wipe down any condensation from interior windows and windowsills, wash and dry towels immediately .

   d. Use of dehumidifying crystals is suggested for closed or other areas where ventilation is difficult to achieve .

2.  Keep Things Clean

   a. Keep closets, dresser drawers - any place where mildew is likely to grow - as clean as possible .

   b. Soil on dirty articles can supply enough *food* for mildew to start growing when moisture and temperature are right.

   c. Greasy films, such as those that form on kitchen walls, also contain many nutrients for mildew-causing molds .

3.  Circulate the Air

   a. When the outside is drier than that inside, ventilation allows the dry air to enter, take up excess moisture, and then be carried outside .

   b. When natural breezes are not sufficient, please use your central air conditioners (FAN ONLY) and bath/laundry room exhaust *fan(s)*.

   c. Poorly ventilated closets get damp and musty during continued wet weather, and articles stored in them are apt to mildew .

   d. Try to improve the air circulation by opening the closet doors. In addition, hang the clothes loosely so that air can circulate around them .

   e. Dry all wet clothing (including clothes wet from rain or perspirations) before putting in the closet .

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor *from* any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

The following have reviewed the information above and certify, to the best of their knowledge that they understand the information and will notify management of any water intrusion.

_____               9-20-2010 .
Denika Terry(Lessee)                           Date

_____               9/20/10
Owner authorized agent                         Date

                                               EHS101.01--Revised 7/15/08

www.jsvairhome.com                                                  Page 22 of 28

DMSJ000128

## PEST CONTROL ADDENDUM

Resident(s): <u>Denika Terry</u>

Address: <u>3500 Data Drive, #391, Rancho Cordova, CA 95670</u>

This Pest Control Addendum (this "Addendum") is made part of the Apartment Lease Contract (the "Lease") by Owner and Resident.  To the extent the terms of this Addendum conflict with the Lease, the terms of this Addendum shall control.

1.    Resident acknowledges that the Apartment is free from infestation by rodents and vermin, including, but not limited to, beetles, spiders, ants, roaches, bed bugs, mice, and rats (collectively "Pest").  Resident shall keep the Apartment free from Pest infestation for the full term of the Lease.

2.    Resident shall keep the Apartment in a neat, clean, good and sanitary condition, including keeping the Apartment and all personal property in the Apartment free from Pest and their eggs.

3.    Resident shall immediately notify Owner in writing of any known or suspected Pest infestation in the Apartment.

4.    Owner or owner's contractor shall have the right to enter the Apartment at all times with or without prior notice for the purpose of inspecting for and treating Pest infestation.  Resident acknowledges and agrees that treatment may include the application of pesticides.

5.    If given at least 24 hour notice of the date on which treatment shall be applied, Resident shall complete all pre-treatment instructions provided by Owner or Owner's contractor including, but not limited to the movement or removal of any or all personal property (examples: furniture and clothing), the bagging and/or laundering of all clothing, the removal of all items from cabinets, the removal or disposal of all clutter in the Apartment, and the thorough cleaning of the

6.    Resident shall complete all post-treatment instructions provided by Owner or Owner's contractor including, but not limited to leaving traps and poison distribution systems unmolested.

7.    In the event the Owner reasonably determines that any of Resident's personal property is infested with any Pest, Owner may require that such personal property be permanently removed from the Apartment upon three day written demand and may require that such personal property be sealed prior to removal in order to keep Pest from spreading to common areas or other residences in the complex.

8.    Provided Resident fully complies with the terms of this Addendum, Owner shall provide appropriate extermination in response to the infestation of Pests.  In the event the action or inaction of Resident, a member of Resident's household, a guest or invitee of Resident, or a person under Resident's direction or control contributes to or causes the infestation or Resident refuses to provide access of comply with pre and post treatment instructions, Resident shall be responsible for the cost of the extermination in addition to the other remedies provided by the Lease.

_Denika Terry (Lessee)_                9-20-2010
Denika Terry(Lessee)                        Date

_Owner authorized agent_               9/20/10
Owner authorized agent                      Date

EHS101.02-Revised 9/7/10

www.myownhome.com

Page 23 of 28

DMSJ000129

# PET AGREEMENT

This Agreement entered into on 09/20/2010 by and between Wasatch Property Management (hereinafter referred to as "Management") acting pursuant to express written authority granted to Manager by Owner of the Chesapeake Commons Apartments and Denika Terry, Resident in consideration of their promises agree as follows:

1. Resident is renting from Management on the premises located at:

3600 Data Drive, #391 Apt. 391, Rancho Cordova, CA 95670

2. The lease agreement provides that without Management's prior written consent, no pet shall be allowed in or about said premises. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.

3. Wasatch limits pets to domestic cats, dogs, birds, and fish only. Pets are allowed on the premises **ONLY** with an appointment by management to meet your pet, a signed Pet Agreement on file, additional deposits and fees may be required, plus per month pet rent, and the full **WRITTEN** consent and knowledge of the facts by management.

4. If a pet is acquired after you move in, it is necessary to make proper arrangements with the office immediately or you will be in violation of your lease.

5. All residents with pets are required to submit a statement from a licensed veterinarian establishing each of the following: (a) the breed of the animal, (b) the animal generally is in good health, and (c) which vaccinations the animal has received, when the animal received these vaccinations and that the animal has received all vaccinations required by law. (The only exceptions would be animals designated as service animals required to accompany a resident with a verified disability for the specific purpose of aiding that person).

6. Resident desires to keep the below described pet(s) hereinafter referred to as a "Pet" and will be responsible for the written Policies as follows:

1st Pet's Name:_____ Breed:_____ Color:_____ Sex:_____

2nd Pet's Name:_____ Breed:_____ Color:_____ Sex:_____

7. **Restrictions.** We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. The maximum weight limit allowed for pets is 0.00 lbs. **Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. Renters insurance is required for ALL Wasatch Property Management Residents as of December 1, 2006.**

8. Pet is required to be "house broken" and will not cause damage to property or apartment. Pets must not annoy other Residents, due to loud or disruptive behavior. Pets will not inconvenience, or cause complaints from any other Residents or you will be subject to fines or required to remove pet from premises for violation of terms of this agreement. After third offense or complaint resident will be subject to eviction proceedings.

9. The pet must be over one year old and have been SPAYED OR NEUTERED. Upon move in Management will photograph the pet and also copy licensing and vaccination records.

10. **Vaccination:** Updated vaccination information is required by management on a yearly basis.

11. **Non-Refundable Pet Fee:**

a. Resident agrees to pay Management the sum of $0.00. Management may use therefrom such amount as is reasonably necessary for any of the damages or excessive cleaning caused by or in connection with said Pet. At the termination of this agreement, any balance shall be billed to the LEASE AGREEMENT SECURITY DEPOSIT and disbursed by law. Resident agrees to pay Management for any excess damages or costs on demand.

DMSJ000130

b.  Resident agrees to pay Management the sum of $ 0.00 as a Non-Refundable Pet Fee for normal wear and tear in the apartment caused by or in connection with said Pet.

c.  The total monthly rent stated in the Lease Agreement shall be increased by $ 0.00 per pet per month as pet rental cost.  No additional pet or change in pet types is authorized without prior written consent from Management and the payment of another deposit and/or additional rent.

12.  The pet must be kept inside the apartment, including private patio or balcony area, except when on a leash no longer than 6 feet and under the immediate control and presence of a responsible person.

13.  **Liability for Cleaning:**  Owner of pet shall be responsible for the immediate removal of pet defecation occurring anywhere on the apartment community.

14. A $75.00 fine will be charged in the event said pet is seen in landscaped, pool or other recreational areas.  A $75.00 fine will be charged to any Resident who is not cleaning up after their pet.  A $75.00 fine will also be charged if Resident is not keeping their pet on a leash at all times with the exception of the enclosed dog runs.  If any pet rule is not followed, then, upon Management discretion, Resident will immediately remove the pet from the premises.  Failure to do so will constitute a default to the Rental Agreement.  AFTER A 3rd OFFENSE  AN EVICTION WILL TAKE PLACE.

Resident initials

15.  If the pet is loose on the premises and the responsible party is not available or willing to retrieve  Pet, Management may, but is not obligated to, retrieve and return it to Resident's apartment, or board it at Resident's expense, or cause appropriate officials to impound it.  Resident agrees to indemnify Management for any damages or expense it may incur in carrying out any of the foregoing options.

16.  No pet shall be fed on an unprotected carpet within the apartment.  Resident shall prevent any  fleas or other infestation of the apartment or other property of the owner.  Upon move in and move out, front and backing of carpet will be inspected and photos taken and kept on file.

17.  Resident agrees to comply with:
    a.   Health and safety code &
    b.   All other applicable laws and regulations.

18. Resident agrees to indemnify and hold Management and the owner of these apartments harmless from any and all liability, or claims of liability, arising in connection with the pet, including attorney fees.

19.  This agreement is an addendum and part of the Lease Agreement between Manager and Resident.  In the event of default by Resident of any listed items, Resident agrees after receiving written notice of default from Management to cure the default or vacate the premises.

20.  Each Resident who signed the Lease Agreement shall sign this Pet Agreement.

**THIS IS A LEGAL DOCUMENT, READ BEFORE SIGNING.**

_Denika A. Terry_                    _9-20-2010._
Denika Terry(Lessee)                  Date

_[signature]_                         _9/20/10_
Owner authorized agent                Date

LO310.02-Revised 7/1/08

DMSJ000131

## CONCESSION APPROVAL REQUEST

Name of Resident:  Denika Terry                                                    Apartment:  391

MI Date:  09/20/2010          Lease From Date:  09/20/2010          Lease To Date:  09/19/2011

Phone #:  (916) 904-4534                              Amount of Concession $          0.00

_____ Reason for Concession: (Mark all that Apply) _____

| | | |
|---|---|---|
| _____ | 1. | Move in Concession (MICONC) |
| _____ | 2. | Application Fee Waived (APLCONC) |
| _____ | 3. | Lease Initiation Fee Waived (RDECONC) |
| _____ | 4. | Special Promo (PROMCONC) (Complete 4a) |
| | | 4a. Specify Promo _____ |
| _____ | 5. | Prompt Payment Discount (PPD) (Completed 5a-5b) |
| | | 5a. Amount of Monthly Discount $(_____) |
| | | 5b. Number of months discount is applicable _____ |
| _____ | 6. | Renewal Concession (RENCONC) |
| _____ | 7. | Resident Referral (REFCONC) (Complete 7a-7c) |
| | | 7a. Referred Who _____ |
| | | 7b. Apartment # _____ Move in Date _____ |
| | | 7c. Signature of New Resident: _____ |
| _____ | 8. | Early Bird (ERLYCONC) (Complete 8a) |
| | | 8a. Specify Month of Drawing: _____ |
| _____ | 9. | Contest Winner (CNTSTCON) (Complete 9a) |
| | | 9a. Specify Contest _____ |
| _____ | 10. | Customer Service Concession (SRVCCONC) (Complete 10a) |
| | | 10a. Specify Issue/Reason for Concession _____ |
| _____ | 11. | Maintenance Concession (MNTCCONC) (Complete 11a) |
| | | 11a. Specify Issue/Reason for Concession _____ |
| _____ | 12. | Deployment Concession (DEPLOY) |

Additional Comments:

_____

_____

_____

_____                    Date _____
Resident Signature

_____                    _____
Manager Approval                                          Regional/Area Leader Approval

Copy to Resident File   : 00030362                              CM107.01-Revised 10/07/08

DMSJ000132

# EXHIBIT H

DMSJ000133

## MONTHLY COST BREAKDOWN:

| | |
|---|---|
| **Apartment Base Rent** | $ __939.00__ |
| **+ Additional Services** | $ __65.58__ |
| **=Subtotal of Charges** | $ 1,004.58 |
| **+ Taxes of        % (if applicable)** | $ __0.00__ |
| **=Total Monthly Obligation** | $ 1,004.58 |

**Your monthly payment is due and payable to Chesapeake Commons Apartments, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you. Chesapeake Commons Apartments is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Chesapeake Commons Apartments .**

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-635-1970. If it is after regular office hours, maintenance can be reached by calling (800)-426-4652.

**Night Services**
If you need assistance from our Night Services, please call (916)-331-3175. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader for Chesapeake Commons Apartments at (916)-635-1970 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08

DMSJ000134

# RESIDENTIAL RENTAL AGREEMENT

### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. l Owners Agent**
*A Utah Corporation - registered in*
595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321

This agreement is made in Rancho Cordova, CA , on 8/30/11 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Denika Terry**

Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except those herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 09/20/2011, and Terminating 08/19/2012 . Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is $11,266.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #361, Rancho Cordova, CA 95670

**III. RENT**

The rental for the premises is $939.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA, 95670-7493 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 8:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

A. The sum of $344.30 upon execution of this Rental Agreement as rent for the period beginning 09/20/2011 , through 09/30/2011 (first month prorated) payable on 09/20/2011.

B. The sum of $939.00, is due on the first day of each calendar month commencing October 2011.

C. A concession in the amount of $0.00 is to be given to Resident as part of this 11 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 11 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one or more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the

**IV. PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V. LATE CHARGES**

Landlord and Tenant understand and agree that Tenant 's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $50.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by Resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $325.00 . Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear) and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by the security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

DMSJ000135



**VII. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furn___ and appliances as listed on the Move-In, Move-Out Check L___ is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner within three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements,

**VIII. USE OF THE PREMISES**

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.



B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any other animals upon the premises for any period of time. If a pet is found in an apartment, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasileiro, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 100.00 lbs.

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX. RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

**X. UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

X gas,       Account # _____
X electricity,   Account # _____

**XI. INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workman or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

**XII. HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to-month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

DMSJ000136

III. **DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall

IV. **LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

XV. **WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements Insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B. Loss of property due to theft

C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D. The Actions or omissions of other Residents

E. Interference with light, view or other intangible aspects of the premises.

F. Operations in construction of any public or quasi-public work

G. Any latent defect in the building(s)

H. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K. Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

XVI. **CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $936.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is affective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

XVII. **NOTICE TO QUIT**

A. **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty(30) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 09/18/2012 and if resident elects to not renew lease or submit a written thirty(30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.

Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B. **TERM AGREEMENT:** Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice.

XVIII. **ATTORNEY FEES, COURT COSTS, ADMINISTRATIVE FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

XIX. **AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

DMSJ000137

 

**X. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XII. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XIV. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXV. SECURITY**

Resident acknowledges and agree that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

Denika Terry (Lessee)          8-30-2011
                               Date

Owner/Authorized agent          8-30-2011
                               Date

DMSJ000138

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

_Denika Toney_
Co-Signer Signature

_8-30-2011_
Date

_DENIKA TONEY_
Print Name

_(916) 807-2574_
Home Telephone number

_3000 DATA DRIVE #391_
Address

_Rancho Cordova CA, 95670_
City, State Zip

_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._
Social Security Number

_____
Employer

L0302.01.CA  Revised  01/31/2011

DMSJ000139

**UTILITY ADDENDUM:**
**DISCLOSURE OF RESIDENT'S FINANCIAL RESPONSIBILITY FOR**
**WATER, SEWER AND TRASH COLLECTION CHARGES**

This utility addendum is hereby incorporated into the Rental Agreement between, <u>Chesapeake Commons Apartments</u> hereinafter called Owner, by Wasatch Property Mangment, its authorized agent, and <u>Denika Terry</u> for premises located at <u>3600 Data Drive, #391, Rancho Cordova, CA 95670</u>.

1. Resident shall pay for water and sewer service based on the method selected below:

    a.  Number of occupants in each apartment unit. Resident shall pay for water and sewer service base on an allocation formula, not actual submeter readings. Specifically, Resident's bill will be calculated in the following manner: The property's water and sewer bills will be allocated to each apartment unit based on a percentage assigned to each apartment unit based on the number of Occupants in that apartment unit compared to the total number of occupants at the property. If Resident's unit contains a washing machine, one additional occupant will be added to the occupant count for purposes of calculating the percentage, and Resident agrees that this is a fair practice to account for increased water usage in units containing washing machines. Resident's percentage for this factor is currently <u>80.00</u>% but could change based on the number of occupants at the property or in the apartment unit. Resident's bill will be equal to the calculated monthly percentage multiplied by the property's water and sewer charges. Prior to allocating the property's water and sewer bills using the method described above, Owner will deduct <u>20.00</u>% to account for common area usage. Owner and Resident agree that the exact amount of the water used in Resident's unit and the exact amount of water used in the common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for water and sewer usage in the common areas or in other residential units.

    b. _____ Resident shall pay for water and sewer service based on water consumed in Resident's unit20.00. Specifically, Resident's bills will be calculated as follows: A water submeter is installed in the Resident's unit to measure the total amount of water used in the unit. Water and sewer bills will be calculated by multiplying the submetered usage by a utility rate based on the utility rates of the local utility provider (which may include base or fixed charges). Resident acknowledges that the rates paid for water and sewer service may not match the rate of the local water utility (as that rate may not be appropriate to charge to an individual unit), but that the rates used are designed in a manner to allocate Owner's actual water and sewer costs to the apartment units. Resident acknowledges that Resident may be paying for some water and sewer charges attributable to common area usage.

2. All water and sewer related charges assessed to the property may be used to calculate the amount charged to each Resident under the selected formula described above, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all miscellaneous charges contained on the utility bills received from the local water and sewer providers.

3. Resident shall also be billed, and shall pay, for trash service by the third party billing provider. Resident's trash bills shall be calculated in the following manner: the property's trash bill will be allocated equally to each unit on a monthly basis. The property contains 600 units, therefore resident will pay 1/600 of the trash bill monthly. Prior to allocating the property's trash bills using the method described above, Owner will deduct %<u>20.00</u> to account for common area usage. Owner and Resident agree that the exact amount of the trash costs attributable to common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for trash charges attributable to common areas or other residential units.

4. The billing methods described above may be changed by Owner by providing Resident with 60 days prior written notice and Resident acknowledges that in certain situations it is necessary to make a change to the billing method.

5. The water and sewer bill will be sent to Resident by Conservice, a third party billing provider. Resident acknowledges that Conservice is not a public utility. Owner reserves the right to change the third party billing provider at any time. Any disputes related to the computation of Resident's bills will be between the Resident and the Owner.

6. Resident must make payment in full to Owner or the third party billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider when Resident fails to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or billing provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the billing provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc.

7. Each monthly water, sewer and trash bill will include a monthly service fee not to exceed $4.32 in addition to the water, sewer and trash charges. This monthly service fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for providing billing services and may be increased (with 60 days written notice provided to Resident) if Owner's expenses or charges increase. Resident agrees to pay a one-time account processing fee in the amount of $1.95 when Resident vacates the apartment unit. This fee shall be included on Resident's final water and sewer bill. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill.

8. Resident shall promptly contact the local gas and/or electric utility(ies) to establish an account in Resident's name for the provision of gas and electric service to Resident's unit. Resident shall ensure that the start date for each such account is the Resident's move-in date.

DMSJ000140


If Resident fails to comply with the conditions of this paragraph and Owner is subsequently charged with utility charges attributable to Resident's occupancy of the unit, then Resident shall be issued (and shall pay) a bill for such services by Owner or the Billing Provider (which shall include a service charge in the amount of $25.00); such service charge is used to compensate Owner for Resident's failure to become the customer of record for such accounts, including, but not limited to charges assessed by the third party billing provider to Owner for processing of the bill for the delinquent time period, opportunity cost of the money not paid and other administrative costs.

9. Failure to pay any of said charges shall be considered a material breech of this Rental Agreement and Owner shall have the right to commence legal proceedings against Resident and all occupants including but not limited to an unlawful detainer action to recover possession of the premises. Upon termination or expiration of the Lease, unpaid water and sewer bills may be deducted from Resident's security deposit, and for such purpose Owner and Resident agree that the charges described in this addendum are considered additional rent.

_Denika Terry_ (Lessee)         _8-30-2011_ Date

Owner Authorized agent         _8/30/11_ Date

LD317.01.CA--Revised 07/15/08

DMSJ000141

## ADDITIONAL SERVICES AGREEMENT

Agreement # 381

This Additional Services Agreement (hereinafter the "Agreement) is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community) and Denika Terry (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 09/20/2010 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | 40.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | 0.00 |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | 0.00 |
| Reserved Covered Parking | Space Number | 10.00 |
| Reserved Uncovered Parking | Space Number | 0.00 |
| Enclosed Private Garage | Space Number | 0.00 |
| Renter's Insurance | | 15.58 (This is available as a pay with rent option), or |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ _____ |
| Cable Television Service | | 0.00 |
| Intrusion and Security Alarm Service | | 0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated _____ |
| Housekeeping Services | | 0.00 |
| Pet Rent (0.00 x 1# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | 0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $65.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $65.58 |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee    (if applicable) | |
| Pet Sanitizing and Cleaning Fee (if applicable) | 0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | 0.00 |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 09/20/2011

Denika Terry (Lessee)                         Date   8-30-2011

Owner Authorized agent                        Date   8/30/11

LD303.01 Revised  07/15/2008

DMSJ000142

 

## ADDENDUM A

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner <u>Chesapeake Commons Apartments</u>, and Resident(s), <u>Denika Terry</u>, dated <u>09/20/2010</u> .

### PAINTING CHARGES (MINIMUM):

Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting. In the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resid shall be charged actual costs of painting, if necessary, including labor and materials.

|  | STUDIO | 1 BEDROOM | 2 BED/1 BATH | 2 BED/2 BATH | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Complete Paint Job | $175.00 | $200.00 | $225.00 | $260.00 | $295.00 | $330.00 |
| Partial Paint | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room |

(0-12 months = cost, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20%)

### REPLACEMENT CHARGES :

Should replacement of damaged or missing items be necessary due to damage beyond ordinary wear and tear, the following charges are typical of the actual replacement costs, including materials and labor. Only actual costs, including materials and labor if necessary will be charged to the resident.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | Cost | Int. Door | Cost | Range Knobs | Cost |
| Alarm Sensors | Cost | Int. Door Jam | Cost | Re-Key Locks | Cost |
| Appliance Rplc. | Cost | Int. Door Knob | Cost | Remotes/Key Cards | Cost |
| Cabinet Doors | Cost | Light Bulb | Cost | Shower Door | Cost |
| Carpet Red Stains | Cost | Light Globes (12") | Cost | Shower Rod | Cost |
| Carpet Patching | Cost | Light Globes (8") | Cost | Sink Stopper | Cost |
| Crisper Tray | Cost | Mail Box Locks | Cost | Smoke Detector | Cost |
| Dishwasher Rack | Cost | Mini-Blinds | Cost | Stove Burner Ring | Cost |
| Door Stops | Cost | Mirrors | Cost | Stove Drip Pans | Cost |
| Draperies | Cost | Mirrored Doors | Cost | Stove Elements | Cost |
| Entry Door | Cost | New Keys | Cost | Switch Plates | Cost |
| Entry Lock | Cost | Outlet Plates | Cost | Toilet Paper Roller | Cost |
| Fire Extinguisher | Cost | Oven Rack | Cost | Toilet Seat | Cost |
| Florescent Bulb (4) | Cost | Patio Door Blinds | Cost | Towel Bar | Cost |
| Furniture Damage | Cost | Patio Screen Door | Cost | Tub Stoppers | Cost |
| Garbage Disposal | Cost | Peep Holes | Cost | Vertical Blinds | Cost |
| Glass Rplc. | Cost |  |  | Wall Bumpers | Cost |
| Heat Lamp Bulb | Cost |  |  | Window Screens | Cost |

### CARPET

The Resident is responsible to leave the carpet in the same clean condition it was when the resident first took occupancy. The following charges are typical of the actual carpet cleaning expense. Only actual costs of cleaning including labor and materials, if necessary, will be charged to the resident.

|  | STUDIO | 1 BEDROOM | 1 BED/LOFT | 2 BEDROOM | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Carpet Shampoo | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Deodorizing | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Replacement | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Pet Treatment | Cost | Cost | Cost | Cost | Cost | Cost |

### CLEANING :

It is your responsibility to leave the premises in the same clean condition as it was when you first occupied the property. If you choose not to, you will be billed for the actual costs, including labor and materials, if it becomes necessary to clean the premises. The following costs are typical of what is charged to clean the following items:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets | Cost | Kitchen Floor | Cost | Range Top | Cost |
| Bath Floor | Cost | Kitchen Sink | Cost | Refrig. Defrosting | Cost |
| Bath Sink | Cost | Light Fixtures | Cost | Refrigerator | Cost |
| Bath Tub | Cost | Medicine Cabinets | Cost | Shower Stall | Cost |
| Cabinets | Cost | Microwave | Cost | Storage Room | Cost |
| Ceiling Fan | Cost | Mini/Vertical Blinds | Cost | Vacuum Carpet | Cost |
| Commode | Cost | Mirrors | Cost | Vent Hood | Cost |
| Dishwasher | Cost | Oven | Cost | Vent Covers | Cost |
| Draperies | Cost | Patio/Balcony | Cost | Windows | Cost |
| Entry Way | Cost | Patio Window | Cost | Window Screens | Cost |

**LABOR:** General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at the actual costs to the landlord, if necessary, for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed herein.

_____
Resident

_____
Owner's Authorized Agent

_____
Resident   _Denika Terry_
_8-30-2011_
Date

7LD304.01. Revised  7/15/08

DMSJ000143

**Where can I get more information?**

Speak with the housing owner or manager directly to learn why you received a Proposition 65 warning. Property owners and managers were not required to notify OEHHA when they provide tenants with a warning. However, to obtain general information on the Proposition 65 list of chemicals, you may contact OEHHA at (916) 445-6900, or visit http://www.oehha.ca.gov/prop65. Following a list of contacts for more information on Proposition 65 as well as chemicals that may be found in your home.

| Type of Information | Contact |
|---|---|
| Proposition 65 Enforcement | California Attorney General<br>(510) 622-3170, prop65@doj.ca.gov |
| Toxics Directory:<br>Agency List | OEHHA<br>(510)622-3170<br>http://www.oehha.ca.gov/public_info/TDHOMSC1a.html |
| Asbestos<br>Indoor Air Quality | Indoor Exposure Assessment Unit, Air Resources Board<br>(916) 445-0753, http://www.arb.ca.gov/thml/fslist/htm |
| Lead | Lead Coordinator in your county government office<br>Childhood Lead Poisoning Prevention Program<br>(510) 622-5000, http://www.dca.ca.gov/childlead/ |
| Tenant Issues | Department of Consumer Affairs<br>(800) 952-5210, http://www.dca.ca.gov/<br>Department of Housing and Community Development<br>(916) 445-4782, http://www.hcd.ca.gov/ |

I have read and acknowledge receipt of this fact sheet.


_____    8-30-2011.
Denika Terry (Lessee)               Date


_____    8/30/11
Owner/Authorized agent              Date                    LD316 Revised 7/15/08

DMSJ000144

## PREVENTION OF MOLD AND NOTICE OF LEASE CLOSURE

**Community: Chesapeake Commons Apartments**

**Resident:** <u>Denika Terry</u>                                                                    t0030362

#### What is Mold?

Molds are fungi. Molds grow throughout the natural and built environment. Tiny particles of mold are present in indoor and outdoor air. In nature, molds help break down dead materials and can be found growing on soil, foods, plant matter, and other items. Mold spores are very tiny and lightweight and spread very easily through air. Mold grows can often be seen as discolorations, ranging from white to orange and from green to brown and black.

When molds are present in large quantities, they can cause allergic symptoms similar to those caused by plant pollen.

#### What does mold need to grow?

Mold only needs a few simple things to grow and multiply; moisture, nutrients, and a suitable place to grow. To prevent mold, moisture problems must be prevented and treated immediately. Proper ventilation is essential in preventing mold. The following are possible causes of indoor moisture problems:

| | | |
|---|---|---|
| Humidifiers | Leaky plumbing | Leaking roofs |
| Sewer back ups | Indoor clothes drying | Shower/bath steam |
| Cooking steam | House plants | Any flooding |

As a resident of your apartment you are responsible for the prevention of mold in your apartment. Please follow these simple guidelines:

1. Remove Excess Moisture
   a. Dry out mops and cleaning utensils thoroughly before storing inside your apartment.
   b. Wipe down bathroom walls (shower doors if applicable) immediately after bathing, allow towels to air out. Wash and dry towels often.
   c. Wipe down any condensation from interior windows and windowsills, wash and dry towels immediately.
   d. Use of dehumidifying crystals is suggested for closed or other areas where ventilation is difficult to achieve.

2. Keep Things Clean
   a. Keep closets, dresser drawers - any place where mildew is likely to grow - as clean as possible.
   b. Soil on dirty articles can supply enough *food* for mildew to start growing when moisture and temperature are right.
   c. Greasy films, such as those that form on kitchen walls, also contain many nutrients for mildew-causing molds.

3. Circulate the Air
   a. When the outside is drier than that inside, ventilation allows the dry air to enter, take up excess moisture, and then be carried outside.
   b. When natural breezes are not sufficient, please use your central air conditioners (FAN ONLY) and bath/laundry room exhaust *fan(s)*.
   c. Poorly ventilated closets get damp and musty during continued wet weather, and articles stored in them are apt to mildew.
   d. Try to improve the air circulation by opening the closet doors. In addition, hang the clothes loosely so that air can circulate around them.
   e. Dry all wet clothing (including clothes wet from rain or perspirations) before putting in the closet.

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor *from* any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

The following have reviewed the information above and certify, to the best of their knowledge that they understand the information and will notify management of any water intrusion.

_____          8-30-2011
Denika Terry (Lessee)                         Date

_____          8/30/11
Owner Authorized agent                       Date                    EHS101.01—Revised 7/15/08

DMSJ000145

## PEST CONTROL ADDENDUM

Resident(s): <u>Denika Terry</u>

Address: <u>3600 Data Drive, #391, Rancho Cordova, CA 95670</u>

This Pest Control Addendum (this "Addendum") is made part of the Apartment Lease Contract (the "Lease") by Owner and Resident. To the extent the terms of this Addendum conflict with the Lease, the terms of this Addendum shall control.

1. Resident acknowledges that the Apartment is free from infestation by rodents and vermin, including, but not limited to, beetles, spiders, ants, roaches, bed bugs, mice, and rats (collectively "Pest"). Resident shall keep the Apartment free from Pest infestation for the full term of the Lease.

2. Resident shall keep the Apartment in a neat, clean, good and sanitary condition, including keeping the Apartment and all personal property in the Apartment free from Pest and their eggs.

3. Resident shall immediately notify Owner in writing of any known or suspected Pest infestation in the Apartment.

4. Owner or owner's contractor shall have the right to enter the Apartment at all times with or without prior notice for the purpose of inspecting for and treating Pest infestation. Resident acknowledges and agrees that treatment may include the application of pesticides.

5. If given at least 24 hour notice of the date on which treatment shall be applied, Resident shall complete all pre-treatment instructions provided by Owner or Owner's contractor including, but not limited to the movement or removal of any or all personal property (examples: furniture and clothing), the bagging and/or laundering of all clothing, the removal of all items from cabinets, the removal or disposal of all clutter in the Apartment, and the thorough cleaning of the Apartment.

6. Resident shall complete all post-treatment instructions provided by Owner or Owner's contractor including, but not limited to leaving traps and poison distribution systems unmolested.

7. In the event the Owner reasonably determines that any of Resident's personal property is infested with any Pest, Owner may require that such personal property be permanently removed from the Apartment upon three day written demand and may require that such personal property be sealed prior to removal in order to keep Pest from spreading to common areas or other residences in the complex.

8. Provided Resident fully complies with the terms of this Addendum, Owner shall provide appropriate extermination in response to the infestation of Pests. In the event the action or inaction of Resident, a member of Resident's household, a guest or invitee of Resident, or a person under Resident's direction or control contributes to or causes the infestation or Resident refuses to provide access of comply with pre and post treatment instructions, Resident shall be responsible for the cost of the extermination in addition to the other remedies provided by the Lease.

_____     ___8-30-2011___
Denika Terry (Lessee)                Date

OWNER
By: _____     ___8/30/11___
Its authorized agent                    Date

EHS101.02-Revised 9/7/10

DMSJ000146

## PET AGREEMENT

This Agreement entered into on <u>09/20/2011</u> by and between Wasatch Property Management (hereinafter referred to as "Management") acting pursuant to express written authority granted to Manager by Owner of the <u>Chesapeake Commons Apartments</u> and <u>Denika Terry</u>, Resident in consideration of their promises agree as follows:

1. Resident is renting from Management on the premises located at:

### 3600 Data Drive, #391 Apt. 391, Rancho Cordova, CA 95670

2.  The lease agreement provides that without Management's prior written consent, no pet shall be allowed in or about said premises.  If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.

3.  Wasatch limits pets to domestic cats, dogs, birds, and fish only.  Pets are allowed on the premises **ONLY** with an appointment by management to meet your pet, a signed Pet Agreement on file, additional deposits and fees may be required, plus per month pet rent, and the full **WRITTEN** consent and knowledge of the facts by management.

4.  If a pet is acquired after you move in, it is necessary to make proper arrangements with the office immediately or you will be in violation of your lease.

5. All residents with pets are required to submit a statement from a licensed veterinarian establishing each of the following: (a) the breed of the animal, (b) the animal generally is in good health, and (c) which vaccinations the animal has received, when the animal received these vaccinations and that the animal has received all vaccinations required by law.  (The only exceptions would be animals designated as service animals required to accompany a resident with a verified disability for the specific purpose of aiding that person).

6. Resident desires to keep the below described pet(s) hereinafter referred to as a "Pet" and will be responsible for the written Policies as follows:

1st Pet's Name:_____ Breed:_____ Color: _____ Sex:_____

2nd Pet's Name:_____ Breed:_____ Color: _____ Sex:_____

7. <u>Restrictions</u>. We will accept all breeds of dogs a <u>minimum of one year old</u>, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. The maximum weight limit allowed for pets is 100.00 lbs. **Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered.  Reptiles or exotic pets are not allowed.  Renters Insurance is required for ALL Wasatch Property Management Residents as of December 1, 2006.**

8. Pet is required to be "house broken" and will not cause damage to property or apartment. Pets must not annoy other Residents, due to loud or disruptive behavior.  Pets will not inconvenience, or cause complaints from any other Residents or you will be subject to fines or required to remove pet from premises for violation of terms of this agreement.  After third offense or complaint resident will be subject to eviction proceedings.

9. The pet must be <u>over one year old</u> and have been SPAYED OR NEUTERED.  Upon move in Management will photograph the pet and also copy licensing and vaccination records.

10. <u>Vaccination:</u>  Updated vaccination information is required by management on a yearly basis.

11. <u>Non-Refundable Pet Fee:</u>

a.   Resident agrees to pay Management the sum of <u>$0.00</u>.  Management may use therefrom such amount as is reasonably necessary for any of the damages or excessive cleaning caused by or in connection with said Pet.  At the termination of this agreement, any balance shall be billed to the LEASE AGREEMENT SECURITY DEPOSIT and disbursed by law.  Resident agrees to pay Management for any excess damages or costs on demand.

*Denika Terry.  8-30-2011.*

DMSJ000147

b. Resident agrees to pay Manager     t the sum of $0.00 as a Non-Refundable          Fee  normal wear and tear in the apartment caused by or in connection with said Pet.

c.  The total monthly rent stated in the Lease Agreement shall be increased by $0.00 per pet per month as pet rental cost. No additional pet or change in pet types is authorized without prior written consent from Management and the payment of another deposit and/or additional rent.

12.  The pet must be kept inside the apartment, including private patio or balcony area, except when on a leash no longer than 6 feet and under the immediate control and presence of a responsible person.

13.  **Liability for Cleaning:**  Owner of pet shall be responsible for the immediate removal of pet defecation occurring anywhere on the apartment community.

14. A $75.00 fine will be charged in the event said pet is seen in landscaped, pool or other recreational areas.  A $75.00 fine will be charged to any Resident who is not cleaning up after their pet.  A $75.00 fine will also be charged if Resident is not keeping their pet on a leash at all times with the exception of the enclosed dog runs.  If any pet rule is not followed, then, upon Management discretion, Resident will immediately remove the pet from the premises.  Failure to do so will constitute a default to the Rental Agreement.  AFTER A 3rd OFFENSE AN EVICTION WILL TAKE PLACE.

Resident Initials

15.  If the pet is loose on the premises and the responsible party is not available or willing to retrieve  Pet, Management may, but is not obligated to, retrieve and return it to Resident's apartment, or board it at Resident's expense, or cause appropriate officials to impound it.  Resident agrees to indemnify Management for any damages or expense it may incur in carrying out any of the foregoing options.

16. No pet shall be fed on an unprotected carpet within the apartment.  Resident shall prevent any  fleas or other infestation of the apartment or other property of the owner.  Upon move in and move out, front and backing of carpet will be inspected and photos taken and kept on file.

17.  Resident agrees to comply with:
    a.    Health and safety code &
    b.  All other applicable laws and regulations.

18. Resident agrees to indemnify and hold Management and the owner of these apartments harmless from any and all liability, or claims of liability, arising in connection with the pet, including attorney fees.

19.  This agreement is an addendum and part of the Lease Agreement between Manager and Resident.  In the event of default by Resident of any listed items, Resident agrees after receiving written notice of default from Management to cure the default or vacate the premises.

20.  Each Resident who signed the Lease Agreement shall sign this Pet Agreement.

Denika Terry (Lessee)     8-30-2011.
Date

Owner Authorized agent     8/30/11
Date

LD310.02-Revised 7/15/08

## CONCESSION APPROVAL REQUEST

Name of Resident: __Denika Terry__                                                      Apartment: __391__

MI Date: 09/20/2010          Lease From Date: __09/20/2011__          Lease To Date: __09/19/2012__

Phone #:  (916) 904-4534                        Amount of Concession $ _____ 0.00

_____ Reason for Concession: (Mark all that Apply) _____

| | | |
|---|---|---|
| _____ | 1. | Move In Concession (MICONC) |
| _____ | 2. | Application Fee Waived (APLCONC) |
| _____ | 3. | Lease Initiation Fee Waived (RDECONC) |
| _____ | 4. | Special Promo (PROMCONC) (Complete 4a) |
| | | 4a.  Specify Promo _____ |
| _____ | 5. | Prompt Payment Discount (PPD) (Completed 5a-5b) |
| | | 5a.  Amount of Monthly Discount $(_____) |
| | | 5b.  Number of months discount is applicable _____ |
| _____ | 6. | Renewal Concession (RENCONC) |
| _____ | 7. | Resident Referral (REFCONC)  (Complete 7a-7c) |
| | | 7a.  Referred Who _____ |
| | | 7b.  Apartment # _____   Move in Date _____ |
| | | 7c.  Signature of New Resident: _____ |
| _____ | 8. | Early Bird (ERLYCONC) (Complete 8a) |
| | | 8a.  Specify Month of Drawing: _____ |
| _____ | 9. | Contest Winner (CNTSTCON) (Complete 9a) |
| | | 9a.  Specify Contest _____ |
| _____ | 10. | Customer Service Concession (SRVCCONC) (Complete 10a) |
| | | 10a. Specify Issue/Reason for Concession |
| | | _____ |
| _____ | 11. | Maintenance Concession (MNTCCONC) (Complete 11a) |
| | | 11a. Specify Issue/Reason for Concession |
| | | _____ |
| _____ | 12. | Deployment Concession (DEPLOY) |

Additional Comments:
_____
_____
_____

_____                    __8-30-2011__
Resident Signature                           Date

_____                    _____
Manager Approval                             Regional/Area Leader Approval

Copy to Resident File     : t0030362                      CM107.01-Revised 10/07/08

_www.isyourhome.com_                                      Page 18 of 18

DMSJ000149

## QUALITY MOVE IN CHECKLIST

Leasing Documents:
Lease Agreement, explained and signed
Community Policies
Pet Policy/Rules
   -Size/Deposits
   -Areas to Walk Pets/Pet Waste Removal
Bond Program (if applicable)

Additional Services Programs:
Property   --Washer/Dryer
   --Furniture Rental
   --"Rent to Own" Furniture
   --Day Care Facility
   --Storage Space Rental
   --Reserved Parking Program (Garage, Covered or Uncovered)
   --Amenities (Common Areas, Clubhouse, Sport Courts, Car Wash, Vending)
   --Business Services (Copier and Fax Usage, Computer Centers, Meeting Facilities)
Services   --High Speed Internet
   --Cable Service
   --Housekeeping Services
   --Telephone Services (Smart Moves–Pacific Bell)
   --Renters Insurance
   --Intrusion and Security Alarm Service
   --Utility Service
   --Corporate Reservations
   --Pet Rent

Rent Payment/Late Payment Policy/Fees:
How to Pay Rent
When to Pay Rent
Where to Pay Rent
Late Payment Policy/Fees

Quality and Reliable Service:
Service Request Procedures
Pest Control Service Procedures
Keys and Lock Change Procedures
   -Apartment, Mailbox, Commons Areas
   -Remotes for gates and/or garages
UPS, Fedex and US Postal Package Services

After Hours Service:
How to Contact Maintenance
What is a Maintenance Emergency?
Gated/Guarded Community Entry
Guest Entry
How to Contact Night Services

Common Area Use/Hours:
Pools/Spa/Water Features
Laundry Rooms
Clubhouse/Recreation Rooms
Weight Rooms/Sport Courts
Play Grounds/Picnic Areas
Pet Runs

Surrounding Area Information:

New Home Orientation (This section to be completed with resident in the apartment home):
Move In Condition Inspections
Review Addendum A
Explain Operation of Home Features






LDG01.01 Revised 07/13/2006

www.isyourhome.com

Page 1 of 1

DMSJ000150

# EXHIBIT I

DMSJ000151

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. l Owners Agent**
*A Utah Corporation - registered in*
595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321

This agreement is made in Rancho Cordova, CA , on 8/28/12 between, Chesapeake Commons Apartments hereinafter called Owner, by **Wasatch Property Management**, its authorized agent, and
Lease Holder(s):
**Denika Terry**
,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

### I.  TERM
This Agreement creates a 7 month and 0 day tenancy, commencing 09/20/2012 and Terminating 04/19/2013. The total rent for this 7 month and 0 day tenancy is $6,573.00.

### II.  PROPERTY
Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #391, Rancho Cordova, CA  95670

### III.  RENT
The rental for the premises is $939.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive, Rancho Cordova, CA, 95670-7403 , The Rental Office can be reached by phone at (916)-635-1970.  Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am - 5:00 pm on weekends, unless otherwise posted.  In addition, a "night drop" is available for payment when the office is not open.  Rent received shall first be applied to all sums owed and then to the current rent due.  Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV, below), in installments as follows:
**A.** The sum of $344.30, is due upon execution of this Rental Agreement as rent for the period beginning 09/20/2012 , through 08/30/2012 (first month prorated) payable on 08/20/2012.  All promotions made during the term of this tenancy shall be made on the basis of a calendar month.
**B.** The sum of $939.00, plus additional services of $57.91 (refer to Additional Services Addendum), is due on the first day of each calendar month commencing October 2012.
**C.** A concession in the amount of $0.00  is to be given to Resident as part of this 7 month(s) lease and will be issued as $0.00  off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 7 month lease is not fulfilled for any reason.
**D.** The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one or more government financing programs.  The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas.  In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment.  Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

### IV.  LATE CHARGES
Recognizing that late payments cause Owner damage in an amount that is difficult to ascertain, Resident agrees to pay Owner a charge of $50.00 if the rent is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $50.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

### V.  SECURITY, REPAIR, CLEANING AND KEY DEPOSIT
Resident shall pay Owner, upon execution of this agreement, a security deposit of $325.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of the agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy,  Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

### VI.  ACCEPTANCE AND SURRENDER OF PREMISES
**A.** Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same as in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.  Be advised, $50.00 is the fee for after hours lockout service.
**B.** Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

*www.isyourhome.com*

Wasatch
Property
Management

INITIAL 

DMSJ000152

## VII. USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B. **Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets** of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a **minimum of 6 (six) months old**, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Beddington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 100 lbs.

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. <u>Harassment or Threats:</u> Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. <u>Nuisance and Waste:</u> Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

## VIII. RESIDENTS DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that it has received information on pests and pest policies and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $100 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

X  gas,                         Account #
X  electricity,                 Account #
X  water/sewer/trash            See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges

## X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI. HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to-month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

*www.isyourhome.com*

Wasatch Property Management

INITIAL

DMSJ000153

**XII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional Insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management of Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B. Loss of property due to theft

C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D. The Actions or omissions of other Residents

E. Interference with light, view or other intangible aspects of the premises.

F. Operations in construction of any public or quasi-public work

G. Any latent defect in the building(s)

H. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Residents use.

I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $939.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI. NOTICE TO QUIT**

A. MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than sixty(60) days notice in writing prior to the date upon which occupancy is to be delivered. If no sixty day notice is received by Agent AND resident vacates the property, a penalty fee equal to sixty days rent will be billed as liquidated damages for improper sixty day notice. Upon the lease agreement expiration date of 04/19/2013 and if resident elects to not renew lease or submit a written sixty(60) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy. Current month to month fees are $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B. TERM AGREEMENT: Resident agrees, at least sixty(60) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or access cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no sixty day notice is received by Agent AND resident vacates the property, a penalty fee equal to sixty days rent will be billed as liquidated damages for improper sixty day notice.

**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement.

Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XX. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

www.isyourhome.com

Wasatch Property Management

INITIAL

DMSJ000154

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner...es that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

<u>Termination on Breach and Notice to Quit:</u> Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a <u>non-curable default</u> under the provisions of State Civil Codes and shall forthwith <u>terminate this Lease Agreement.</u>

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXVI. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.



Denika Terry (Lessee)                    Date    September 5, 2012.

Owner / Authorized Agent                 Date    9/5/12

LD302.01.CA Revised  05/17/2012

Wasatch
Property
Management

DMSJ000155

## ADDENDUM:
## DISCLOSURE OF RESIDENT'S FINANCIAL RESPONSIBLE FOR
## WATER, SEWER AND TRASH COLLECTION CHARGES

This utility addendum is hereby incorporated into the Rental Agreement between, <u>Chesapeake Commons Apartments</u> hereinafter called Owner, by Wasatch Property Mangment, its authorized agent, and <u>Denika Terry</u> for premises located at <u>3600 Data Drive, #391, Rancho Cordova, CA 95670</u>.

1.  Resident shall pay for water and sewer service based on the method selected below:

    a.  __X__ Number of occupants in each apartment unit. Resident shall pay for water and sewer service base on an allocation formula, not actual submeter readings. Specifically, Resident's bill will be calculated in the following manner: The property's water and sewer bills will be allocated to each apartment unit based on a percentage assigned to each apartment unit based on the number of Occupants in that apartment unit compared to the total number of occupants at the property. If Resident's unit contains a washing machine, one additional occupant will be added to the occupant count for purposes of calculating the percentage, and Resident agrees that this is a fair practice to account for increased water usage in units containing washing machines. Resident's percentage for this factor is currently <u>80.00</u>% but could change based on the number of occupants at the property or in the apartment unit. Resident's bill will be equal to the calculated monthly percentage multiplied by the property's water and sewer charges. Prior to allocating the property's water and sewer bills using the method described above, Owner will deduct <u>20.00</u>% to account for common area usage. Owner and Resident agree that the exact amount of the water used in Resident's unit and the exact amount of water used in the common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for water and sewer usage in the common areas or in other residential units.

    b.  ____Resident shall pay for water and sewer service based on water consumed in Resident's unit. Specifically, Resident's bills will be calculated as follows: A water submeter is installed in the Resident's unit to measure the total amount of water used in the unit. Water and sewer bills will be calculated by multiplying the submetered usage by a utility rate based on the utility rates of the local utility provider (which may include base or fixed charges). Resident acknowledges that the rates paid for water and sewer service may not match the rate of the local water utility (as that rate may not be appropriate to charge to an individual unit), but that the rates used are designed in a manner to allocate Owner's actual water and sewer costs to the apartment units. Resident acknowledges that Resident may be paying for some water and sewer charges attributable to common area usage.

2.  All water and sewer related charges assessed to the property may be used to calculate the amount charged to each Resident under the selected formula described above, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all miscellaneous charges contained on the utility bills received from the local water and sewer providers.

3.  Resident shall also be billed, and shall pay, for trash service by the third party billing provider. Resident's trash bills shall be calculated in the following manner: the property's trash bill will be allocated equally to each unit on a monthly basis. The property contains 600 units, therefore resident will pay 1/600 of the trash bill monthly. Prior to allocating the property's trash bills using the method described above, Owner will deduct <u>20.00</u>% to account for common area usage. Owner and Resident agree that the exact amount of the trash costs attributable to common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for trash charges attributable to common areas or other residential units.

4.  The billing methods described above may be changed by Owner by providing Resident with 60 days prior written notice and Resident acknowledges that in certain situations it is necessary to make a change to the billing method.

5.  The water and sewer bill will be sent to Resident by Conservice, a third party billing provider. Resident acknowledges that Conservice is not a public utility. Owner reserves the right to change the third party billing provider at any time. Any disputes related to the computation of Resident's bills will be between the Resident and the Owner.

6.  Resident must make payment in full to Owner or the third party billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider when Resident fails to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or billing provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the billing provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc. Accordingly, Owner and Resident agree that if the payment is received after the enumerated due date, Resident shall immediately pay a late payment in the amount of $7.00, which is a reasonable estimate of the costs incurred.

7.  Each monthly water, sewer and trash bill will include a monthly service fee not to exceed <u>$4.32</u> in addition to the water, sewer and trash charges. This monthly service fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for providing billing services and may be increased (with 60 days written notice provided to Resident) if Owner's expenses or charges increase. Resident agrees to pay a one-time account processing fee in the amount of $1.95 when Resident vacates the apartment unit. This fee shall be included on Resident's final water and sewer bill. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill.

8.  Resident shall promptly contact the local gas and/or electric utility(ies) to establish an account in Resident's name for the provision of gas and electric service to Resident's unit. Resident shall ensure that the start date for each such account is the Resident's move-in date. If Resident fails to comply with the conditions of this paragraph and Owner is subsequently charged with utility charges attributable to Resident's occupancy of the unit, then Resident shall be issued (and shall pay) a bill for such services by Owner or the Billing Provider (which shall include a service charge in the amount of $25.00); such service charge is used to compensate Owner for Resident's failure to become the customer of

www.isyourhome.com


Wasatch
Property
Management

DMSJ000156

recoup costs ... related to charges assessed by the third party billing pr.... to Owner for processing of the bill for the delinquent time period, opportunity cc ... le money not paid and other administrative costs. ...dent and Owner agree that the charge described above is a reasonable estimate of the costs incurred.

9.  Failure to pay any of said charges shall be considered a material breech of this Rental Agreement and Owner shall have the right to commence legal proceedings against Resident and all occupants including but not limited to an unlawful detainer action to recover possession of the premises. Upon termination or expiration of the Lease, unpaid water and sewer bills may be deducted from Resident's security deposit, and for such purpose Owner and Resident agree that the charges described in this addendum are considered additional rent.

Date of this Addendum: *September 5*, 20 *12*

_Denika Terry_ (signature)   *September 5, 2012.*
Denika Terry (Lessee)          Date

(signature)   *9/5/12*
Owner's Authorized Agent   Date

LD317 01.CA--Revised 05/17/2012

www.isyourhome.com

Wasatch Property Management

DMSJ000157

## ADDITIONAL SERVICES AGREEMENT

Apar....391

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Chesapeake Commons Apartments (hereinafter the "Community") and Denika Terry (hereinafter the "Resident(s)" under the terms of the Lease (defined below) as the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 09/20/2016 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $40.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $0.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Garage (Attached/Detached/Direct Access) | Space #: | $0.00 |

| Services | | |
|---|---|---|
| Renter's Insurance (This is available as a "Pay-with-Rent" option) ,OR | | $17.91 |
| Insurance Provider Name: Not Applicable, Policy # | | |
| Internet Service and/or Media Package | | $0.00 |
| Cable Television Service | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |

| | | |
|---|---|---|
| Total Charges for Property & Services | | $57.91 |
| Taxes (if applicable) | | $0.00 |
| Total Monthly Payment Due | | $57.91 |

| Fees | | |
|---|---|---|
| Lease Initiation Fee (if applicable) | | $0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | $0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | $0.00 |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

Payment: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated 09/20/2012.



_____     Sept. 5, 2012.
Denika Terry (Lessee)                      Date

_____     9/5/12
Owner's Authorized Agent                 Date

LD303.01 Revised 09/17/2012

www.isyourhome.com

Wasatch Property Management

DMSJ000158

## ADDENDUM A

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner Chesapeake Commons Apartments, and Resident(s), Denika Terry, dated 09/20/2010 .

**PAINTING CHARGES (MINIMUM):**
Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resident shall be charged actual costs of painting, if necessary, including labor and materials.

| | STUDIO | 1 BEDROOM | 2 BED/1 BATH | 2 BED/2 BATH | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Complete Paint Job | $175.00 | $200.00 | $225.00 | $260.00 | $285.00 | $330.00 |
| Partial Paint | $45.00/room | $45.00/room | $45.00/room | $45.00/room | | $45.00/room |

(0-12 months = cost, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20%)

**REPLACEMENT CHARGES (MINIMUM):**
Should replacement of damaged or missing items be necessary in the apartment, the following charges will be assessed, any items not listed above that are damaged or missing, will be billed to the resident at the cost of replacement or repair:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | Cost | Int. Door | 80.00 ea | Range Knobs | 10.00 ea |
| Alarm Sensors | Cost | Int. Door Jam | 125.00 ea | Re-Key Locks | 25.00 ea |
| Appliance Rplc. | Cost | Int. Door Knob | 15.00 ea | Remotes/Key Cards | 30.00 ea |
| Cabinet Doors | Cost | Light Bulb | 2.00 ea | Shower Door | Cost |
| Carpet Red Stains | 25.00 ea | Light Globes (12") | 15.00 ea | Shower Rod | 8.00 ea |
| Carpet Patching | 35.00 ea | Light Globes (8") | 8.00 ea | Sink Stopper | 4.00 ea |
| Crisper Tray | 25.00 ea | Mail Box Locks | 15.00 | Smoke Detector | 20.00 ea |
| Dishwasher Rack | 45.00 ea | Mini-Blinds | Cost | Stove Burner Ring | 3.00 ea |
| Door Stops | 1.50 ea | Mirrors | Cost | Stove Drip Pans | 5.00 ea |
| Draperies | Cost | Mirrored Doors | Cost | Stove Elements | Cost |
| Entry Door | 150.00 | New Keys | 5.00 ea | Switch Plates | 1.50 ea |
| Entry Lock | 25.00 | Outlet Plates | 1.50 ea | Toilet Paper Roller | 2.00 ea |
| Fire Extinguisher | 40.00 | Oven Rack | 22.00 ea | Toilet Seat | 15.00 ea |
| Florescent Bulb (4) | 5.00 ea | Patio Door Blinds | 65.00 ea | Towel Bar | 8.00 ea |
| Furniture Damage | Cost | Patio Screen Door | Cost | Tub Stoppers | 5.00 ea |
| Garbage Disposal | 55.00 | Peep Holes | 10.00 | Vertical Blinds | Cost |
| Glass Rplc. | | | | Wall Bumpers | 2.00 ea |
| Heat Lamp Bulb | | | | Window Screens | 20.00 ea |

**CARPET (MINIMUM)**

| | STUDIO | 1 BEDROOM | 1 BED/LOFT | 2 BEDROOM | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Carpet Shampoo | 35.00 | 45.00 | 55.00 | 65.00 | 85.00 | 105.00 |
| Carpet Deodorizing | 20.00 | 30.00 | 35.00 | 40.00 | 45.00 | 50.00 |
| Carpet Replacement | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Pet Treatment | Cost | Cost | Cost | Cost | Cost | Cost |

**CLEANING (MINIMUM):**
It is your responsibility to clean the apartment when you move. If you choose not to, you will be billed as follows. Please note: These are MINIMUM charges, if your apartment is excessively dirty, they could be higher.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets | 2.50 ea | Kitchen Floor | 15.00 | Range Top | 7.50 |
| Bath Floor | 10.00 ea | Kitchen Sink | 2.50 ea | Refrig. Defrosting | 5.00 |
| Bath Sink | 2.00 ea | Light Fixtures | 2.50 ea | Refrigerator | 10.00 |
| Bath Tub | 5.00 ea | Medicine Cabinets | 2.50 ea | Shower Stall | 10.00 ea |
| Cabinets | 2.00 ea | Microwave | 10.00 | Storage Room | 10.00 |
| Ceiling Fan | 10.00 ea | Mini/Vertical Blinds | 35.00 | Vacuum Carpet | 15.00 |
| Commode | 15.00 ea | Mirrors | 2.50 ea | Vent Hood | 5.00 |
| Dishwasher | 10.00 | Oven | 15.00 | Vent Covers | 10.00 |
| Draperies | Cost | Patio/Balcony | 40.00 | Windows | 5.00 ea |
| Entry Way | 5.00 | Patio Window | 10.00 | Window Screens | 2.50 ea |

**LABOR:** General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at $40.00 per hour after the first two (2) hours for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning costs incurred. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed hereon.



_____
Resident

_____
Owner's Authorized Agent

_____     9/5/12
Resident                      Date

LD804.01.CA Revised 06/17/2012

www.isyourhome.com

Wasatch Property Management

DMSJ000159

# Chesapeake Commons Apartments Community Policies

The following community policies are designed to protect the premises and to set standards for the convenience of all residents. We hope you will understand their necessity and that we may count on your cooperation. It must be understood that these policies are to be considered a part of your rental agreement and will be enforced.

**Violation of these rules or any one of them, shall be sufficient cause for termination of this lease.**

**MAINTENANCE**

If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-635-1970. If it is after regular office hours, maintenance can be reached by calling (800)-426-4652.

**NIGHT SERVICES**

If you need assistance from our Night Services, please call (916)-331-3175. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**ADDITIONAL CUSTOMER SERVICE INFORMATION**

As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader (916)-635-1970 for Chesapeake Commons Apartments at or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

**RENTAL OFFICE**

Rental Office hours are posted. Business matters should be handled during these hours, except for emergencies. Please let us know if there is anything we can do to make your home more enjoyable.

**MAIL**

The Rental Office will accept limited delivery on special delivery letters, UPS, FedEx and U.S. Postal packages. You will receive a note in your mailbox that these items have been delivered and are being held for you by the Manager (UPS/FedEx will leave the notice on your door). Photo ID required when picking up parcels from the office.

**STEREOS/TVs/RADIOs/NOISE**

Please moderate the volume controls, as loud stereos, TVs and radios create a disturbance among residents. We hope to keep to minimum the necessity for the Management to police the noise problem. Your consideration for your neighbors, we are sure, will result in their consideration for you. Although we ask that you be especially careful before 9:00 a.m. and after 10:00 p.m., please be aware that any noise that disturbs a resident's right to a quiet living environment is considered to be a breach of the Rental Agreement. (This also includes horn honking. Please advise your guests to refrain from this disturbing action).

**PATIOS /BALCONIES**

For the benefit of the appearance of your apartment community, storing of furniture, bicycles, boxes, tires, trash, debris, or any other articles on your patio is expressly prohibited. Please help keep your community clean by not storing your brooms, mops, or laundry on your patio as well. These items should be kept inside and out of view. Nothing is to be hung on the exterior of the building, including on patio and balcony railings. No awnings, screens, partitions, or other projections shall be attached to the outside or other parts of the building without the prior written consent of the Owner.

**RESIDENTS**

Residents are not allowed to use the driveway, parking areas, landscaped grounds, or pool and recreation room for play. NO bicycles, skateboards, or roller-skates are to be used at any time on the premises. ALL residents must abide by posted rules and regulations for the pool area. ALL RESIDENTS under the age of 18 must be accompanied and supervised by a responsible adult at all times.

Residents shall not dig up any part of the lawn areas, nor plant any form of shrubs, trees, vines, flowers, or garden plants without the prior written consent of the Management.

Throwing articles of any kind, shaking mops or dust cloths of any nature from the windows, or in the common areas, or "littering" anywhere on the premises is strictly prohibited.

**ALTERATIONS**

Alterations to your apartment are prohibited without written consent of the Management. The following are prohibited:

a. The installation of a television antenna or satellite dish.
b. The use of LARGE nails or adhesive hangers for pictures or mirrors. Only picture hangers or small-framing nails may be used.
c. The boring, marring or puncturing of any part of the equipment, carpet, drapes, fixtures, walls, or ceiling of your apartment.
d. The changing of, or addition of, new locks.
e. Redecoration or painting
f. Replacement of any part of the apartments equipment or furnishings.
g. No aluminum foil, shades or colored blinds in the windows. All window coverings must be those that are supplied by the Management; however, if you wish to use your own drapes, they must have white backings.
h. Air conditioning apparatus or equipment installed without the prior written consent of the Owner.
i. Resident will not permit or suffer any signs, advertisements, or notices to be displayed, inscribed, painted, or affixed on any part of the outside of the demised premises or any building, except on a directory board if provided by the Landlord.

**COMMON AREAS**

Entrances to all pool, laundry, exercise areas, fire doors and any other common areas are not to be blocked open or propped open in any manner at any time. Residents who fail to properly close or secure these areas will be subject to a $50.00 fine and/or eviction. The community amenities pose a significant safety hazard to unsupervised children.

*www.isyourhome.com*


Wasatch Property Management

DMSJ000160

All cars must be registered with the office. If you've not registered your car or you have changed cars recently, please contact the Managers office to have it properly registered. Guest's vehicles must be registered with the Manager if they will be parked on-site for more than one day. Illegally parked cars may be towed at the owner's expense: this includes cars parked in red zones and driveways or parking spaces assigned to other residents. Please do not back into the parking spaces at any time. The Management is NOT RESPONSIBLE for loss of property of residents or guests. No washing or repairing of cars is permitted on the property. All cars parked on the property grounds must be operable AND legal. This means current registration is required. Any vehicle parked on the premises that is not legal will be towed at the owner's expense. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.

## SMOKE ALARMS

Your apartment is equipped with a smoke detection device as well as a building fire alarm. Resident understands that it is the Residents responsibility to ensure that the smoke alarm is in operating condition at all times. If it is battery operated, Resident understands Residents responsibility to perform the manufacturers recommended test to determine if the smoke detector is operating properly at least once a month. If it is not operating properly, it is Residents responsibility to notify Management immediately in writing. It is a crime to disable, dismantle, or hang anything from, or have less than 18" clearance from smoke detection/sprinkler devices; please leave them intact, they could save your life or that of someone you love.

## FIREARMS AND WEAPONS

It is the policy of this community that no firearms or weapons of any kind be carried or brought onto any of the community areas controlled by Owner. These include but are not limited to: swimming pool areas, clubhouse, leasing offices, community offices, recreational areas, parking lots, playgrounds, common areas, stairways, storage areas, and other areas controlled by Owner. This does not restrict the right of Residents to own guns and have them within their own leased premises. However, such firearms or weapons may only be transported to and from the vehicle directly to the apartment unit. Weapons and firearms may NOT be stored or kept in vehicles parked within the community. To the extent that state or local laws may contradict this policy, it shall be interpreted to be as restrictive as allowed by law.

## RECREATIONAL AREAS

Hours for use of the recreation facilities are posted. Residents under 18 years of age are allowed in the swimming pools and pool areas only when accompanied by a responsible adult. Please do not give your key to your friends.

All Posted Pool regulations must be followed:
- NO glass bottles/containers are allowed in pool areas.
- NO alcoholic beverages are allowed in pool areas or other common areas.
- NO eating in the pool areas.
- NO nude swimming.
- NO cut-offs.
- NO scuba gear (including masks and fins) or inflatable toys/rafts are allowed in the pool at any time.
- NO more than TWO guests per apartment in the pool area at one time; guests must be accompanied by the Residents they are visiting.
- Residents under the age of 14 are not allowed to use the Jacuzzi at any time.
- No one under the age of 18 is allowed in the pool area unless supervised by an adult (18 yrs. or older).
- Radios are not allowed in the pool area at any time except for use with headphones.



Denika Terry (Lessee)      September 5, 2012
_____      _____
                     Date

_____      9/5/12
Owner's Authorized Agent      Date

L0305.01 Revised 05/17/2012

Wasatch
Property
Management

DMSJ000161

## SAFE NEIGHBORHOODS ADDENDUM
## We Promote a Drug Free and Crime Free Environment

In Consideration of the execution or renewal of a lease of the dwelling unit, located at, 3600 Data Drive, #391, Rancho Cordova, CA 95670-7403, Chesapeake Commons Apartments "Owner" and Denika Terry, "Resident(s)", agree as follows:

1. Resident(s), any members of the residents household or a guest or other person under the residents control shall not engage in criminal activity: including drug-related activity, on or near the said premises. "Drug-related criminal activity", means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance
Act [21 U.S.C. 802]).

2. Resident(s), any member of the residents household or a guest or other person under the residents control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on or near the said premises.

3. Resident(s), any member of the residents household or a guest or other person under the residents control, will not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug-related criminal activity, regardless or whether the individual engaging in such activity is a member of the household, or a guest.

4. Resident(s), any member of the residents household, or a guest, or other person under the residents control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance, as defined in Health & Safety Code 511350, et seq., at any locations, whether on or near the dwelling unit premises or otherwise.

5. Resident(s), any member of the residents household, or a guest, or other person under the residents control shall not engage in any illegal activity, including; prostitution, as defined in Penal Code 8647(b); criminal street gang activity, as defined in Penal Code 8186.20 et seq.; assault and battery, as prohibited by Penal Code 8240; burglary, as prohibited in Penal Code 8469; the unlawful use and discharge of firearms, as prohibited by Penal Code 8245; sexual offenses, as prohibited in Penal Code 8269 and 8288 or any breach of the lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent or other tenant or involving imminent or actual serious property damage.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY. A single violation of any of the provisions of this added addendum shall be deemed a serious violation and material and irreparable non-compliance. It is understood that a single violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be a preponderance of the evidence.

7. In case of conflicts between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.

8. This LEASE ADDENDUM is incorporated into the lease executed or renewed this date 09/20/2012 between Owner and Resident(s).



_____     September 5, 2012.
Denika Terry (Lessee)                          Date


_____     9/5/12
Owner's Authorized Agent                     Date


LD308.01 Revised 05/17/2012

Wasatch
Property
Management

DMSJ000162

**Office of Environmental Health Hazard Assessment**
**California Environmental Protection Agency**

This fact sheet was prepared by the Office of Environmental Health Hazard Assessment (OEHHA), which administers the Proposition 65 program. It provides information to tenants whose apartment managers and owners have posted or distributed Proposition 65 warnings.

**What is Proposition 65?**

In 1986, California voters approved an initiative to address their growing concerns about exposure to toxic chemicals. That initiative became the Safe Drinking Water and Toxic Enforcement Act of 1986; better know by its original name of Proposition 65. Proposition 65 requires the State to publish a list of chemicals know to cause cancer, birth defects, or other reproductive harm. The list has grown to include over 750 chemicals since it was first published in 1987.

**What chemicals are on the Proposition 65 list?**

The Proposition 65 list contains two types of chemicals: carcinogens, which can cause cancer, and reproductive toxicants, which cause birth defects or reproductive harm, such as sterility or miscarriages. Some chemicals may be additives or ingredients in pesticides, common household products, food, or drugs. Others may be industrial chemicals, dyes, or solvents used in dry cleaning, manufacturing and construction. Still others may be byproducts of chemical processes; for example, motor vehicle exhaust.

**What does a Proposition 65 warning mean?**

Under Proposition 65, businesses are required to give a "clear and reasonable" warning before knowingly exposing anyone to a listed chemical above a specified level. This warning can be included on the label of a consumer product or published in a newspaper. An equally common practice is for businesses to provide a warning at the workplace or in a public area affected by the chemical. In recent months, many apartment owners and managers have posted or distributed warning to notify tenants that they may be exposed to one or more chemicals on the Proposition 65 list. For example, a warning may be given because tenants are exposed to chemicals in pesticides applied to landscaping or structures or chemicals in housing construction materials, such as lead in paint or asbestos in ceiling coatings. A growing trend among rental property owners and other businesses is to provide warnings for chemicals on the list, such as tobacco smoke or motor exhaust, which are regularly released into the environment in or near rental housing. In some cases, however, owners and managers are providing warnings to avoid potential violations and lawsuits, even though exposure to chemicals on the Proposition 65 list has not been verified. You should discuss the warning with the owner or manager to learn why it was provided to that you and your family can make informed decisions about exposure to any of these chemicals and your health.

**Is my familys health at risk from exposure to these chemicals?**

Warnings must be provided for chemicals listed under Proposition 65 if exposure to them may present a significant risk of cancer or reproductive harm. For carcinogens, the chemical must be present at or above a level that could cause one additional case of cancer in a population of 100,000 people exposed to the chemical over a lifetime. For reproductive toxicants, the chemical must be present at or above 1/1000th of the level at which the chemical is determined to have no negative health risks (the "no-observable-effect level"). Proposition 65 generally does not prohibit a business from exposing people to listed chemicals nor does exposure to these chemicals necessarily create an immediate health risk. Also, as stated above, a warning may have been provided in some cases even though the chemical is present is actually too low to pose a significant health risk. It is important to find out why you have received the warning so that you can discover which chemicals you are exposed to, at what levels, to determine how best to protect your familys health.

Wasatch
Property
Management

DMSJ000163

**Where can I get more information?**

Speak with the housing owner or manager directly to learn why you received a Proposition 65 warning. Property owners and managers were not required to notify OEHHA when they provide tenants with a warning. However, to obtain general information on the Proposition 65 list of chemicals, you may contact OEHHA at (916) 445-6900, or visit http://www.oehha.ca.gov/prop65. Following a list of contacts for more information on Proposition 65 as well as chemicals that may be found in your home.

| Type of Information | Contact |
|---|---|
| Proposition 65 Enforcement | California Attorney General<br>(510) 622-3170, prop65@doj.ca.gov |
| Toxics Directory:<br>Agency List | OEHHA<br>(510)622-3170<br>http://www.oehha.ca.gov/public_info/TDHOMSC1a.html |
| Asbestos<br>Indoor Air Quality | Indoor Exposure Assessment Unit, Air Resources Board<br>(916) 445-0753, http://www.arb.ca.gov/thml/fslist/htm |
| Lead | Lead Coordinator in your county government office<br>Childhood Lead Poisoning Prevention Program<br>(510) 622-5000, http://www.dca.ca.gov/childlead/ |
| Tenant Issues | Department of Consumer Affairs<br>(800) 952-5210, http://www.dca.ca.gov/<br>Department of Housing and Community Development<br>(916) 445-4782, http://www.hed.ca.gov/ |

I have read and acknowledge receipt of this fact sheet.

Denika M. Terry _____  September 5, 2012 _____
Denika Terry (Lessee)                Date

_____  9/5/12 _____
Owner's Authorized Agent             Date

LD316Revised 05/17/2012

www.isyourhome.com


Wasatch
Property
Management

DMSJ000164

PREVENTION OF MOLD AND NOTICE OF DISCLOSURE

**Community:** **Chesapeake Commons Apartments**
**Resident:** Denika Terry

### What is Mold?

Molds are fungi. Molds grow throughout the natural and built environment. Tiny particles of mold are present in indoor and outdoor air. In nature, molds help break down dead materials and can be found growing on soil, foods, plant matter, and other items. Mold spores are very tiny and lightweight and spread very easily through air. Mold grows can often be seen as discolorations, ranging from white to orange and from green to brown and black.

When molds are present in large quantities, they can cause allergic symptoms similar to those caused by plant pollen.

### What does mold need to grow?

Mold only needs a few simple things to grow and multiply; moisture, nutrients, and a suitable place to grow. To prevent mold, moisture problems must be prevented and treated immediately. Proper ventilation is essential in preventing mold. The following are possible causes of indoor moisture problems:

| | | |
|---|---|---|
| Humidifiers | Leaky plumbing | Leaking roofs |
| Sewer back ups | Indoor clothes drying | Shower/bath steam |
| Cooking steam | House plants | Any flooding |

As a resident of your apartment you are responsible for the prevention of mold in your apartment. Please follow these simple guidelines:

1. Remove Excess Moisture
   a. Dry out mops and cleaning utensils thoroughly before storing inside your apartment.
   b. Wipe down bathroom walls (shower doors if applicable) immediately after bathing, allow towels to air out. Wash and dry towels often.
   c. Wipe down any condensation from interior windows and windowsills, wash and dry towels immediately.
   d. Use of dehumidifying crystals is suggested for closed or other areas where ventilation is difficult to achieve.
2. Keep Things Clean
   a. Keep closets, dresser drawers - any place where mildew is likely to grow - as clean as possible.
   b. Soil on dirty articles can supply enough food for mildew to start growing when moisture and temperature are right.
   c. Greasy films, such as those that form on kitchen walls, also contain many nutrients for mildew-causing molds.
3. Circulate the Air
   a. When the outside is drier than inside, ventilation allows the dry air to enter, take up excess moisture, and then be carried outside.
   b. When natural breezes are not sufficient, please use your central air conditioners (FAN ONLY) and bath/laundry room exhaust fan(s).
   c. Poorly ventilated closets get damp and musty during continued wet weather, and articles stored in them are apt to mildew.
   d. Try to improve the air circulation by opening the closet doors. In addition, hang the clothes loosely so that air can circulate around them.
   e. Dry all wet clothing (including clothes wet from rain or perspirations) before putting in the closet.

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

The following have reviewed the information above and certify, to the best of their knowledge that they understand the information and will notify management of any water intrusion.

_____     _____
Denika Terry (Lessee)                Date    September 5, 2012.

_____     _____
Owner's Authorized Agent             Date    9/5/12

EHS101.01--Revised 05/17/2012

*www.isyourhome.com*

Wasatch
Property
Management

DMSJ000165

# WASATCH PROPERTY MANAGEMENT

| Property | | |
|---|---|---|
| Date of App. | Apt. No. | Type |
| Rental Amt. | Sec Dep. | Pet Dep |
| Mvl Date | Lease Term | |
| Verified By: | | |
| Approved By: | | |

## 1. RESIDENTS

| Name (Last) | (First) | (Mid., Initial, or Sr.) |
|---|---|---|
| Terry | Denika | G. |

Spouse's Name (if applicable): _____ (Middle): _____

Current Phone #: 904 4534

**Additional Occupants: (separate application required for all adults over the age of 18)**

| Name | Relationship |
|---|---|
| Mikiyah Lambert. Age 10 | Daughter. |
| Mikole Jenkins - Age 2 | Daughter. |

FOR VERIFICATION USE ON

## 2. RESIDENTIAL HISTORY (Current & Previous 2 addresses)

| Current Address | City | State | Zip |
|---|---|---|---|
| 10240 South White Rock Rd | Rancho Cordova | Ca. | 95670. |

Payment Made to: Juan Gallardo.  How Long? 5 yrs.  Rent ☒ Own ☐ Payment $ 8

Phone No./Contact Name for Verification: 1-800-

Reason for Leaving: Kulasa The Owner went into foreclosure.

FOR VERIFICATION USE ON

| Previous Address (if current, less than 2 years) | City | State | Zip |
|---|---|---|---|

Payment Made to: _____  How Long? _____  Rent ☐ Own ☐ Payment $ _____  Reason for Leaving: _____

Phone No./Contact Name for Verification: _____

| Previous Address (if current, less than 2 years) | City | State | Zip |
|---|---|---|---|

Payment Made to: _____  How Long? _____  Rent ☐ Own ☐ Payment $ _____  Reason for Leaving: _____

Phone No./Contact Name for Verification: _____

Have you ever had legal action or an eviction filed against you for non-payment of rent? If Yes, please explain: No.

## 3. EMPLOYMENT HISTORY

| Current Employer # | Address | City | State | Zip |
|---|---|---|---|---|
| | | | | |

| Position | Supervisor | Supervisor Phone # | Length of Employment |
|---|---|---|---|

How Often Paid: Monthly.  When is Next Pay Date: _____  Gross Per Check Amount: 845.00  Net Per Check Amount: $1,200 Monthly. (Condor)

FOR VERIFICATION USE ONL

| Spouse or Previous Employer | Address | City | State | Zip |
|---|---|---|---|---|

| Position | Supervisor | Supervisor Phone # | Length of Employment |
|---|---|---|---|

DMSJ000166

# EXHIBIT J

DMSJ000167

**Initial Lease**

**Year:** __2011__

DMSJ000168

## QUALITY MOVE IN CHECKLIST

**Leasing Documents:**
Lease Agreement, explained and signed
Community Policies
Pet Policy/Rules
   -Size/Deposits
   -Areas to Walk Pets/Pet Waste Removal
Bond Program (if applicable)

Resident _____ Agent for Owner _____

**Additional Services Programs:**

Property    --Washer/Dryer
    --Furniture Rental
    --"Rent to Own" Furniture
    --Day Care Facility
    --Storage Space Rental
    --Reserved Parking Program (Garage, Covered or Uncovered)
    --Amenities (Common Areas, Clubhouse, Sport Courts, Car Wash, Vending)
    --Business Services (Copier and Fax Usage, Computer Centers, Meeting Facilities)

Services    --High Speed Internet
    --Cable Service
    --Housekeeping Services
    --Telephone Services (Smart Moves-Pacific Bell)
    --Renters Insurance
    --Intrusion and Security Alarm Service
    --Utility Service
    --Corporate Reservations
    --Pet Rent

Resident _____ Agent for Owner _____

**Rent Payment/Late Payment Policy/Fees:**
How to Pay Rent
When to Pay Rent
Where to Pay Rent
Late Payment Policy/Fees

Resident _____ Agent for Owner _____

**Quality and Reliable Service:**
Service Request Procedures
Pest Control Service Procedures
Keys and Lock Change Procedures
   -Apartment, Mailbox, Commons Areas
   -Remotes for gates and/or garages
UPS, Fedex and US Postal Package Services

Resident _____ Agent for Owner _____

**After Hours Service:**
How to Contact Maintenance
What is a Maintenance Emergency?
Gated/Guarded Community Entry
Guest Entry
How to Contact Night Services

Resident _____ Agent for Owner _____

**Common Area Use/Hours:**
Pools/Spa/Water Features
Laundry Rooms
Clubhouse/Recreation Rooms
Weight Rooms/Sport Courts
Play Grounds/Picnic Areas
Pet Runs

Resident _____ Agent for Owner _____

**Surrounding Area Information:**

Resident _____ Agent for Owner _____

**New Home Orientation (This section to be completed with resident in the apartment home):**
Move In Condition Inspections
Review Addendum A
Explain Operation of Home Features

LD301.01 Revised 07/15/05

DMSJ000169

## MONTHLY COST BREAKDOWN:

| | | |
|---|---|---|
| **Apartment Base Rent** | $ | 869.00 |
| **+ Additional Services** | $ | 65.58 |
| **=Subtotal of Charges** | $ | 934.58 |
| **+ Taxes of 0.00      % (if applicable)** | $ | 0.00 |
| **=Total Monthly Obligation** | $ | 934.58 |

Your monthly payment is due and payable to Logan Park, on or before the 1st day of each month. You can make your monthly payment in personal check, cashiers check, money order or debit and/or credit card on properties that offer this service to you.  Logan Park is not responsible for the loss of any check, money order and/or cashier's check, that is not made payable, using permanent ink, to Logan Park .

## Our commitment to you is SERVICE.

**Maintenance**
If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-344-4494. If it is after regular office hours, maintenance can be reached by calling (916)-889-3885.

**Night Services**
If you need assistance from our Night Services, please call (915)-549-2385. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire, or medical personnel, please call 911.

**Pest Control**
Pest control is offered to our residents at no charge. Due to the nature of this service, a pest control service slip must be signed in the Rental Office. This service is done by a professional, licensed pest control company. Because of this, we cannot make specific time appointments, but can give you a two-hour time frame when pest control usually services our community.

**Additional Customer Service Information**
As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader for Logan Park at (559)-270-1110 or you may contact Wasatch Premier Communities Customer Service Center at 760-602-9978 or by fax at 760-602-9681 or via email at feedback@isyourhome.com.

LD301.02 Revised 07/15/08

DMSJ000170

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321*

This agreement is made in Sacramento, CA between, Logan Park hereinafter called Owner, by Wasatch Management Management, its authorized agent, and Lease Holder(s):

**Roy Huskey**

Authorized Occupant(s):

**Melissa Huskey (Dependant),**

hereinafter called Resident(s). No other person(s) except those herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 06/30/2011, and Terminating 06/29/2012. Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is 10,428.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at 4141 Palm Avenue #191, Sacramento, CA 95842

**III. LOW-INCOME HOUSING CREDIT**

RH
Initials
CV

The premises are to be operated in accordance with the requirements of the low-income housing credit Program under Section 42 of the Internal Revenue Code of 1986, as amended (the "Program"). Resident's rights hereunder will be subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of the Landlord's tax credit. The Resident will cooperate with all LANDLROD requirements related to such compliance and the Program.

**IV. RENT**

The rental for the premises is 869.00_ per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4215 Palm Ave, Sacramento, CA, 95842.
The Landlord and Tenant have entered into a housing assistance payments (HAP) contract with the local public housing authority (PHA) pursuant to the Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of the tenants rent to the Landlord on behalf of the Tenant. So long as the hap contract remain in effect, the Tenant is not responsible for this portion of the rent. The additional terms and conditions of the parties rental obligations are set forth as follows: #840.76. RH

1. **Section 8 Rent:**
   A. The total contract rent shall be $869.00 per month;
   B. Of the total contract rent, $369.00 shall be payable to the Landlord by the Tenant(s) each month as the Tenant's net family contribution; the remaining balance of $500.00 shall be payable to the Landlord by the local housing authority for as long as the HAP contract remains in effect.
2. **Section 8 Rent adjustments:** The amount of assistance that HUD pays on behalf of the Tenant may be changed during the term of the lease if: (1) HUD or the PHA determines, in accordance with HUD procedures, that an increase in rents is needed; (2) HUD or the PHA changes any allowance for utilities or services considered in computing the Tenant's share of the rent; (3) the income, the number of persons n the Tenant's household or other factors considered in calculating the Tenant's rent change and HUD procedures provide that the Tenant's rent or assistance payment be adjusted to reflect the change; (4) changes in the Tenant's rent or assistance payment are required by HUD's recertification or subsidy termination procedures; (5) HUD's procedures for computing the Tenant's assistance payment or rent change; (6) the Tenant fails to provide information on his/her income, family composition or other factors as required by the Landlord or PHA.

The Rental Office can be reached by phone at (916)-344-4494. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV, below), in installments as follows:

RH
Initials
CV

A. The sum of $28.97 upon execution of this Rental Agreement as rent for the period beginning 06/30/2011, through 06/30/2011 payable on 06/30/2011.

B. The sum of ~~$869.00~~ $840.76. RH is due on the first day of each calendar month commencing July 2011.

C. A concession in the amount of 35.00 is to be given to Resident as part of this 12month(s) lease and will be issued as $35.00 off move in. The 35.00 concession is due and payable back to Logan Park if the 12 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one ore more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formules. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in Paragraph III of this agreement.

**V.    CHANGES IN RESIDENT'S SHARE OF RENT**

The Resident agrees that the amount of rent the Resident pays may be changed during the term of the Agreement if:
A.    The Contract Administrator determines, in accordance with Program procedures, that an increase in rent is needed;
B.    The Contract Administrator changes any allowance for utilities or services considered in determining the Resident's rent;
C.    The income, the number of persons in the Resident's household or other factors considered in determining the Resident's
D.    The procedures for determining the Resident's rent change; or
E.    The Landlord agrees to implement changes in the Resident's rent only in accordance with the time frames and administrative procedures set forth in instructions and regulations related to administration of the Program. The Landlord agrees to give the Resident at least thirty (30) days advance written notice of any increase in the Resident's rent, except as noted in paragraph 12. The Notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

**VI.    EXCESS RENTS**


Initials

If it is determined that the premises are not a qualified low-income unit because the rent paid by the Residents, plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed LIHTC code, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

**VII.    PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**VIII.    LATE CHARGES**


Initials

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $ 50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 12:01 a.m. on the 4th day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 3rd day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 25.00. In the event Resident fails to pay rent on or before 12:01 a.m. on the 4th day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment by cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**IX.    SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**


Initials

Resident shall pay Owner, upon execution of this agreement, a security deposit of $ 299.00 . Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

**X.    ACCEPTANCE AND SURRENDER OF PREMISES**

A.    Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B.    Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to these errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

*www.isyourhome.com*

Page 3 of 28

DMSJ000172




**XI.   USE OF THE PREMISES**



Initials

A.  The premises are rented for residential use only and shall be occupied by not more than 2 occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease.  Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B.  Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a _minimum of one year old_, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasileno, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered.  Reptiles or exotic pets are not allowed.



Initials

C.  Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.  Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law.  California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E.  Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F.  Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G.  Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**XII.   RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

**XIII.   UTILITIES**



Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in   Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.
It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.
Resident shall pay for the following utility services.

| | | |
|---|---|---|
| ___ | gas, | Account # |
| X | electricity, | Account # _____ |
| ___ | water/sewer/trash | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges |

Resident agrees to pay for all utilities, services, and charges, if any, made payable by or predicated upon occupancy of residence including telephone, electricity and satellite or cable television.  Resident is responsible for having utilities turned on in their name no later than the day of move in.

**XIV.   INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for, making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

DMSJ000173

XV.  **DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

XVI.  **LIABILITY INSURANCE**



*Initials*

I understand that any property or liability insurance coverage purchased by the property manager or owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to my personal property or belongings or protect against any loss or damage resulting from my actions or omissions and/or my family and/or guest's actions or omissions. I also understand that, by not having renter's or personal liability insurance of my own, I will be liable to third parties and to the property owner for certain losses and understand that I should not expect the property manager or owner to be responsible for such losses. Owner and manager recommend that every resident maintain renter's insurance coverage, at all times.

( X ) **I WILL PURCHASE RENTERS INSURANCE COVERAGE.**
    I recognize my need for insurance and want to take advantage of this program made available to residents.

(  ) **I HAVE RENTERS INSURANCE COVERAGE.**
    I have and will maintain throughout the term of my lease the following coverage

(  ) **I DO NOT HAVE RENTERS INSURANCE COVERAGE.**
    Although I recognize my need for renter's insurance, I will not at this time, be obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers, owners or third-party's property as a result of my actions or my family's actions.

XVII.  **WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

*Initials*

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter's insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft
C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D.  The Actions or omissions of other Residents
E.  Interference with light, view or other intangible aspects of the premises.
F.  Operations in construction of any public or quasi-public work
G.  Any latent defect in the building(s)
H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.
I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

XIX.  **RECERTIFICATION**

*Initials*

Every year on or about the 1st day of ___2-1-12___ the Landlord will request the Resident to report the income and composition of the Resident's household and to supply any other information required for the purposes of determining the Resident's continued Program eligibility. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The Landlord will verify the information supplied by the Resident and use the verified information to determine Program eligibility. You agree that all information supplied by you shall be subject to inspection by representatives from the Tax Credit Allocation Committee.

A.  If the Resident does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may require resident to vacate premises. The Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.

B.  The Resident may request to meet with the Landlord to discuss any changes resulting from the recertification processing. If the Resident requests such a meeting, the Landlord agrees to meet with the Resident and discuss how the Resident's continued Program eligibility was determined.

DMSJ000174

**XX. REPORTING CHANGES BETWEEN RECERTIFICATION**



The Residents shall notify the Landlord immediately in writing, if the household size changes, his or her income increases, Resident(s) become a full time student, or begins to receive HUD assistance. The Landlord may elect not to renew this Lease if the Resident becomes a student and the Landlord determines that the Resident's student status would disqualify the premises under the Program. The Landlord may adjust the Resident's rent and or utility allowance to reflect the Resident's status if the Resident becomes a HUD-assisted Resident.

**XXI. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under the Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 869.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XXII. NOTICE TO QUIT**



TERM AGREEMENT: Resident agrees, at least thirty (30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty day's rent will be billed as liquidated damages for improper thirty day notice. Any and all rules and/or fees are subject to change upon expiration of lease term.

**XXIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**



In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XXIV. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XXV. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXVI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXVII. LESSEE'S REPRESENTATIONS TO LESSOR**

Lessee represents and warrants that all information provided to Lessor, including the information provided in the application for the rental of the Apartment (the "Application), is true, complete and correct. If any information Lessee provides to Lessor is determined to be false, Lessee will be in breach of this Lease. Lessee understands and agrees that the Application is hereby made a part of the Lease, and a breach of any representations or warranties in the Application shall be a breach of this Lease.

**XXVIII. PENALTIES FOR SUBMITTING FALSE INFORMATION**

If the Resident deliberately submits false information regarding income, family composition or other data on which the Resident's eligibility is based, the Landlord may require the Resident to vacate.

**XXIX. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXX. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXXI. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

DMSJ000175

**XXXII. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXXIII. CRIMINAL BACKGROUND INVESTIGATION**

By signing this Lease, Lessee represents that neither Lessee nor any occupant of the Apartment has, during the past five years, been convicted of any felony or misdemeanor involving sexual misconduct or a controlled substance, and that to the best of Lessee's knowledge, neither Lessee nor any occupant of the Apartment is subject of a criminal investigation or arrest warrant. Lessee hereby authorizes Lessor to perform a criminal background investigation of Lessee or any occupant of the Apartment in the event Lessor, in its sole discretion, has reason to believe that Lessee or any occupant is engaged in criminal activity in the Apartment or at the Apartment Community.

Roy Huskey (Lessee) _____     Date  6-30-11

N/A
Melissa Huskey _____     Date

Owner Authorized agent _____     Date  6-30-11

DMSJ000176

 

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

| | |
|---|---|
| Co-Signer Signature | Date |
| Print Name | Home Telephone number |
| Address | City, State Zip |
| Social Security Number | Employer |

LD302.01.CA Revised 01/31/2011

DMSJ000177

 ## ADDITIONAL SERVICES AGREEMENT

Apartment # 10044875

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Logan Park (hereinafter the "Community") and Roy Huskey (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is made a part of that certain Residential Rental Agreement, dated 06/30/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # ____________ | $50.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Housewares | | $ ________ |
| Storage Space Rental | Space Number | $0.00 |
| Reserved Covered Parking | Space Number | $0.00 |
| Reserved Uncovered Parking | Space Number | $0.00 |
| Enclosed Private Garage | Space Number | $0.00 |
| Renter's Insurance(This is available as a pay with rent option) | | $15.58, or |
| Insurance Provider Name ____________, Policy # ________ | | |

**Services:**

| | | |
|---|---|---|
| Internet Service | | $ ________ |
| Cable Television Service | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $ Estimated |
| Housekeeping Services | | $0.00 |
| Pet Rent (0.00 x 0# of pets, limit 2 per household) | | $0.00 |
| Coporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $65.58 |
| | Taxes (if applicable) | $0.00 |
| | Total Monthly Payment Due | $65.58 |

**Fees:**

| | | |
|---|---|---|
| Lease Initiation Fee | (if applicable) | $0.00 |
| Pet Sanitizing and Cleaning Fee (if applicable) | | $0.00 |
| Utility Service Setup Fee (See Separate Agreement for service terms) | | $0.00 |
| Intrusion and Security Alarm Service Setup Fee | | $ ________ |
| Total Fees Due at Initiation of this Agreement | | $0.00 |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. I have read the foregoing and acknowledge the contents thereof, dated 06/30/2011 LD303.01 Revised 07/15/2008

[signature] 6-30-11

Roy Huskey(Lessee) Date

N/A

Melissa Huskey Date

[signature] 6-30-11

Owner Authorized agent Date

DMSJ000178

**Wasatch Property Management**

## LOW INCOME HOUSING TAX CREDIT (LIHTC) LEASE ADDENDUM

Property Name: Logan Park Apartments       Unit: _____

Resident Name: Roy Huskey

Resident agrees to the following:

### CONDITIONS GOVERNING LIHTC APARTMENTS:

_Initials_    1.    Resident understands that this development is subject to the **Low Income Housing Tax Credit Program (LIHTC)**. Regulations and guidelines, as defined in the Internal Revenue Code of 1986, Section 42. Maximum income limits are published annually by the Department of the Housing and Urban Development.

_Initials_    2.    **ESCALATION CLAUSE/INCOME LIMITS:**    The rent at this property is governed by income limits, as periodically adjusted by HUD for the county or metropolitan statistical area (MSA). During the term of the lease, if the income limits increase, the rent which is based on the income limits may be raised with a Thirty (30) days notice to the new LIHTC maximum rent change. **This may occur during the term of the current lease.**

_Initials_    3.    **ESCALATION CLAUSE/UTILITY ALLOWANCE:**    If, during the term of this lease, the utility allowance is reviewed and changed, the net rent to the resident may change accordingly. Since the maximum LIHTC charge is resident rent plus the utility allowance, if the allowance increases the rent would decrease by the 30 day notice and should the utility decrease, the rent could be increased in the same fashion. **This may occur during the term of the current lease.**

_Initials_    4.    **REGULARLY SCHEDULED RECERTIFICATION:**    Every year, 120 days prior to the expiration of the income certification, the Owner/Agent will request the Resident to report the income and composition of the Resident's household and to supply any other information required by the Owner for the purposes of determining the Resident's eligibility under IRC Section 42. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Owner/Agent's request. The Owner/Agent will verify the information supplied by the Resident and use the verified information for compliance purposes only.

_Initials_    a.    Resident understands and agrees that a recertification of income shall be made to the Owner/Agent at least once a year from the date of the original certification at the time of admission to the property. Said recertification process must be completed prior to the annual expiration of each one-year term.

DMSJ000179

_____
Initials

b.  Resident understands and agrees to comply promptly with all requests by the Owner/Agent for information and certifications concerning the total current household income and household composition.

_____
Initials

c.  Resident understands and agrees that if the Resident does not submit the required recertification information by the date specified in the Owner/Agent request, this will be considered material of non-compliance and *will result in termination of residency.*

_____
Initials

d.  Resident understands and agrees that under IRC Section 42, many student are not LIHTC eligible. If changes in the student status render the household ineligible, residency may be terminated upon Thirty (30) days written notice. *This may occur at any time during the term of the current lease.*

_____
Initials

5.  Fraud: Should management discover at any time that the household has provided false information in regard to income or illegal household member's are living in the apartment, this would constitute a substantial violation of the lease and residency would be terminated in accordance with the State.

_____
Resident

_____
Resident

_____
Resident

_____
Management

_____
Date

_____
Date

_____
Date

_____
Date

Revised 5/11/10

**TERMS AND CONDITIONS OF ADDITIONAL SERVICES AGREEMENT**

1. Terms of Agreement: This Agreement is binding, in effect and shall expire upon the first to occur of the Lease termination or the Cancellation of this Agreement.

2. Independent Duty to Pay Rent On Residential Tenancy Unit: The Lessees duty to pay Lessor under this Agreement is independent of the Residents duty to pay rent under the Lease. The inability of the Lessor to fully perform its responsibilities as provided herein is not justification or cause for Residents non-payment or withholding of rent as required by the Lease.

3. Context Of This Agreement: This Agreement is not and shall not be construed as a conditional sale contract, an installment sales contract, a security agreement or other similar instrument.

4. Risk of Loss and Damage is Upon Lessee: Except as otherwise expressly provided herein, the Lessee bears all risk of damage, theft, or loss with respect to Property. The Property must be returned to the Lessor in substantially the same condition as at the inception of this Agreement, normal wear and tear expected.

5. Property Service: Any and all requests for service or repair to the item(s) below should be directed to the office of the Community listed above.

6. Ownership Of the Property: The Property is and shall at all times be and remain the sole and exclusive Property of the Lessor, and Lessee shall have no right, title or interest therein or thereto other than the right to the possession and use of the Property in accordance with this Agreement. The Property shall at all times be and remain personalty and shall not become part of the realty in which the Property is located.

7. Removal Or Alteration of Personal Property: The Property shall not be removed from the premises as provided under the Lease (hereinafter the "Premises") without Lessors prior written consent, which consent may be granted or withheld in the Lessors absolute discretion. Lessee shall not make any alterations, additions, or improvements to the Property. Lessee shall not remove, cover, mutilate, or deface any tags or marking identifying the Property as the property of the Lessor. Without limiting the foregoing, Lessee shall keep the Property free from all levies, liens, encumbrances, and other charges. Any unauthorized removal of the Property from the Premises is deemed theft and will be prosecuted to the fullest extent of the law.

8. Lessees Remedies: In no event shall Lessor be liable to Lessee for any loss of anticipated profits, loss of use or from any other incidental or consequential damages related to use of Property.

9. Default by Lessee on Agreement: A default under this Agreement is a default under the Lease and a default under the Lease is a default under this Agreement. If Lessee fails to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement within the time required, the Lessor may terminate not only this Agreement, but shall cause the Community to terminate the Residents tenancy upon service and expiration of a Ten Day Notice to Perform Covenant or Quit for failure to pay said Monthly Fee(s) or for a failure to perform any other obligation contained in the Agreement. In the event of termination of the Agreement for failure to pay any Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement after expiration of the service of proper notice, the Lessee hereby grants permission to the Lessor, upon not less than 24 hours advance written notice, to enter the Premises and remove said Property without liability to Lessor or any manager, owner, or agent on account of such taking.

10. Default by Resident(s) Under the Lease: Should the Resident(s) default in the payment of rent under the terms of the Lease or upon other failure to fully perform other provision of the Lease and upon expiration of an appropriate "Notice to Quit" as to the Premises, the Lessor herein may, upon not less than 24 hours advance written notice, enter the Premises for the purpose of removing the Property. Should the time period provided under the "Notice to Quit" expire, Lessor shall not be required to provide Lessee any notice to remove the Property other than said 24 hour notice of intent to enter the Premises and remove said Property.

11. Right of Lessor to Inspect Property Of This Agreement: The Lessee hereby agrees to allow the Lessor a right to inspect said Property and hereby authorizes Lessor or its agents to enter the Premises after giving an advance 24 hour notice to enter the Premises to so inspect.

12. No Warranties Regarding Property: The Lessor is neither the manufacturer of the Property nor the agent of the manufacturer. Lessee is leasing or has purchased the Property "as is" and Lessor makes no warranties regarding the Property, express or implied. Without limiting the foregoing, Lessor makes no warranty of merchantability, no warranty that the Property is fit for a particular purpose, and no warranty that the Lessee will be or is the first user of the Property.

13. No Assignment Or Subletting By Lessee: Lessee shall not assign, pledge, hypothecate or otherwise transfer or encumber this Agreement nor sublease, loan, or otherwise transfer or encumber all or any part of the Property without Lessors prior written consent, which consent may be granted or withheld in Lessors absolute discretion. Lessors consent to any of the foregoing acts shall not constitute consent to any subsequent like act by Lessee or any other person.

14. Assignability By Lessor: All Lessors rights under this Agreement and in the Property may be assigned, pledged, hypothecated, or otherwise transferred or encumbered, in whole or in part, without the consent of or notice to the Lessee. Lessee acknowledges and agrees that (1) such an assignment by Lessor will not materially change Lessees duties hereunder; (2) such an assignment by Lessor will not materially increase the burden or risk upon the Lessee hereunder, and (3) such an assignment will be permitted even if such assignment could be deemed to materially affect the interest of Lessee hereunder.

15. Operation and Usability of Property of This Agreement: All items of Property identified by the Agreement may be used only for the purpose commonly used by a typical consumer for said item. Said Property may only be used by the authorized occupants of the Premises as identified in the Lease, only for personal use, and not for any commercial or financial enterprise.

DMSJ000181



16. Enforceability Of This Agreement: This Agreement shall inure to the benefit of and is binding upon Lessor and Lessee and their respective heirs, successors and assigns. This Agreement shall be governed by and construed in accordance with the laws of the State of . This Agreement is severable and the invalidity or un-enforceability of any provision hereof shall not affect the validity or enforceability of this Agreement or any provision hereof. No warranty, or statement concerning the Property unless and then only to the extent such representation, warranty, or statement is expressly stated in this Agreement or other written document signed by an authorized agent of the Lessor.

17. Modification of Terms: Lessee acknowledges that this Agreement may be amended only by writing, signed both by the Lessee and by Lessors authorized representative.

18. Total Agreement: This Agreement and the Lease constitute the entire agreement between the Lessee and the Lessor with respect to the Property and exclusively determines the rights and duties of the parties notwithstanding any course of dealing, custom, usage of trade, or course of performance. Without limiting the foregoing, this Agreement supersedes all prior communications, oral and/or written, relating to the Property, all of which are merged into these two aforementioned agreements. No waiver by Lessor of any provision or breach hereof shall be deemed a waiver by Lessor of any other provision or breach hereof or of the same provision or breach at a later time. The acceptance by Lessor of the Monthly Fee(s) or any other amount hereunder shall not be a waiver by Lessor of any preceding breach regardless of Lessors knowledge of such preceding breach at the time of acceptance of such payment or amount. All waivers hereunder must be in writing and signed by the waiving party, and shall be effective only to the extent of such writing.

19. If any provision of this agreement is deemed unenforceable the remaining clauses will remain in effect and enforceable.

By executing hereto the Resident(s) represent and agree that they have read and understand the terms and conditions detailed above and agree to be bound accordingly. The Resident(s) further understand that, although this Agreement is separate and apart from the Lease, the expiration of this Agreement is co-terminus with the Lease.

_____ Roy Huskey (Lessee)   6-30-11 Date

_____ N/A Melissa Huskey   _____ Date

_____ Owner Authorized agent   6-20-11 Date

LD303.01 Revised 7/15/08

DMSJ000182

# ADDENDUM A

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner  Logan Park,  and Resident(s),  Roy Huskey,  dated  06/30/2011 .

## PAINTING CHARGES (MINIMUM):
Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resident shall be charged actual costs of painting, if necessary, including labor and materials.

| | STUDIO | 1 BEDROOM | 2 BED/1 BATH | 2 BED/2 BATH | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Complete Paint Job | $175.00 | $200.00 | $225.00 | $260.00 | $295.00 | $330.00 |
| Partial Paint | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room |

(0-12 months = cost, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20%)

## REPLACEMENT CHARGES:
Should replacement of damaged or missing items be necessary due to damage beyond ordinary wear and tear, the following charges are typical of the actual replacement costs, including materials and labor. Only actual costs, including materials and labor if necessary will be charged to the resident.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | Cost | Int. Door | Cost | Range Knobs | Cost |
| Alarm Sensors | Cost | Int. Door Jam | Cost | Re-Key Locks | Cost |
| Appliance Rplc. | Cost | Int. Door Knob | Cost | Remotes/Key Cards | Cost |
| Cabinet Doors | Cost | Light Bulb | Cost | Shower Door | Cost |
| Carpet Red Stains | Cost | Light Globes (12") | Cost | Shower Rod | Cost |
| Carpet Patching | Cost | Light Globes (8") | Cost | Sink Stopper | Cost |
| Crisper Tray | Cost | Mail Box Locks | Cost | Smoke Detector | Cost |
| Dishwasher Rack | Cost | Mini-Blinds | Cost | Stove Burner Ring | Cost |
| Door Stops | Cost | Mirrors | Cost | Stove Drip Pans | Cost |
| Draperies | Cost | Mirrored Doors | Cost | Stove Elements | Cost |
| Entry Door | Cost | New Keys | Cost | Switch Plates | Cost |
| Entry Lock | Cost | Outlet Plates | Cost | Toilet Paper Roller | Cost |
| Fire Extinguisher | Cost | Oven Rack | Cost | Toilet Seat | Cost |
| Florescent Bulb (4) | Cost | Patio Door Blinds | Cost | Towel Bar | Cost |
| Furniture Damage | Cost | Patio Screen Door | Cost | Tub Stoppers | Cost |
| Garbage Disposal | Cost | Peep Holes | Cost | Vertical Blinds | Cost |
| Glass Rplc. | Cost | Pest Control | Cost | Wall Bumpers | Cost |
| Heat Lamp Bulb | Cost | Pet/Flea Control | Cost | Window Screens | Cost |

## CARPET
The Resident is responsible to leave the carpet in the same clean condition it was when the resident first took occupancy. The following charges are typical of the actual carpet cleaning expense. Only the actual costs of cleaning including labor and materials, if necessary, will be charged to the resident.

| | STUDIO | 1 BEDROOM | 1 BED/LOFT | 2 BEDROOM | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Carpet Shampoo | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Deodorizing | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Replacement | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Pet Treatment | Cost | Cost | Cost | Cost | Cost | Cost |

## CLEANING :
It is your responsibility to leave the premises in the same clean condition as it was when you first occupied the property. If you choose not to, you will be billed for the actual costs, including labor and materials, if it becomes necessary to clean the premises. The following costs are typical of what is charged to clean the following items:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets | Cost | Kitchen Floor | Cost | Range Top | Cost |
| Bath Floor | Cost | Kitchen Sink | Cost | Refrig. Defrosting | Cost |
| Bath Sink | Cost | Light Fixtures | Cost | Refrigerator | Cost |
| Bath Tub | Cost | Medicine Cabinets | Cost | Shower Stall | Cost |
| Cabinets | Cost | Microwave | Cost | Storage Room | Cost |
| Ceiling Fan | Cost | Mini/Vertical Blinds | Cost | Vacuum Carpet | Cost |
| Commode | Cost | Mirrors | Cost | Vent Hood | Cost |
| Dishwasher | Cost | Oven | Cost | Vent Covers | Cost |
| Draperies | Cost | Patio/Balcony | Cost | Windows | Cost |
| Entry Way | Cost | Patio Window | Cost | Window Screens | Cost |

## LABOR:
General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at the actual costs to the landlord, if necessary, for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed herein.

Resident _____ 6-30-11
Owner's Authorized agent

Resident _____ 6-30-11
Date

LD304.01. Revised 7/15/08

www.isyourhome.com

Page 12 of 28

DMSJ000183

# Logan Park Community Policies

The following community policies are designed to protect the premises and to set standards for the convenience of all residents. We hope you will understand their necessity and that we may count on your cooperation. It must be understood that these policies are to be considered a part of your rental agreement and will be enforced.

**RENTAL OFFICE**

Rental Office hours are posted. Business matters should be handled during these hours, except for emergencies. We are here for you. Please let us know if there is anything we can do to make your home more enjoyable.

**MAIL**

The Rental Office will accept limited delivery on special delivery letters, UPS, and U.S. Postal packages. You will receive a note in your mailbox that these items have been delivered and are being held for you by the Manager (UPS will leave the notice on your door).

**ACCESS**

For your protection, no person will be allowed to enter an apartment without specific written authorization from the Leaseholder. This includes family, friends, delivery person, telephone or cable company personnel, etc. Be advised, $25 is the fee for after hours lockout service.

**VISITORS**

It is important for a number of reasons for us to know who is residing in our apartment community. Residents may have overnight guests for no longer than two (2) weeks at any given time. Anyone residing in this apartment longer than two (2) days must be registered in the Rental Office as an occupant and must complete a rental applicant as such. Any exceptions to the policy must be authorized in writing by the Manager. You are responsible for your guests while they are on the property. Please review the community policies with them to help ensure that they too respect your neighbors.

**PETS**

NO dogs, cats, rabbits, birds, reptiles, or rodents are permitted to occupy the premises without specific written authorization. Guests pets are not allowed on the premises at any time, for any reason. Any damages resulting from the violation of this policy will be the responsibility of the Resident. Unauthorized pets are a violation of your lease. The maximum weight limit allowed for pets is 45.00 lbs.

**STEREOS/TVs/RADIOs/NOISE**

Please moderate the volume controls, as loud stereos, TVs and radios create a disturbance among residents. We hope to keep to minimum the necessity for the Management to police the noise problem. Your consideration for your neighbors, we are sure, will result in their consideration for you. Although we ask that you be especially careful before 8:00 a.m. and after 10:00 p.m., please be aware that any noise that disturbs a resident's right to a quiet living environment is considered to be a breach of the Rental Agreement. (This also includes horn honking. Please advise your guests to refrain from this disturbing action).

**LAUNDRY**

The laundry room hours and regulations are posted. Management will not be responsible for clothing left unattended. Please do not overload, over-soap or use dye in the machines. Help keep the laundry room clean and use the trash containers provided. Please remove your clothes promptly. Please help us keep the laundry rooms in good condition by also remembering to lock them when you leave.

**TRASH, REFUSE AND GARBAGE**

Containers for refuse and garbage have been placed in central locations. All garbage must be well wrapped and all boxes flattened or broken down before being deposited in the containers. Please remember no feminine hygiene products or disposable diapers down the toilets.

**PATIOS/BALCONIES**

For the benefit of the appearance of your apartment community, storing of furniture, bicycles, boxes, tires, trash, debris, or any other articles on your patio is expressly prohibited. Please help keep your community clean by not storing your brooms, mops, or laundry on your patio as well. These items should be kept inside and out of view. Nothing is to be hung on the exterior of the building, including on patio and balcony railings. No awnings, screens, partitions, or other projections shall be attached to the outside or other parts of the building without the prior written consent of the Owner.

**RESIDENTS**

Residents are not allowed to use the driveway, parking areas, landscaped grounds, or pool and recreation room for play. NO bicycles, skateboards, or roller-skates are to be used at any time on the premises. ALL residents must abide by posted rules and regulations for the pool area. Adult occupants are responsible for the actions of guests, minor occupants and their guests.

**WATERBEDS**

Waterbeds are allowed and must be fully insured against leak damage by the Resident through a reputable waterbed insurance company prior to set up. The Resident must provide a certificate of insurance with a minimum liability of $1,000 to cover any damage caused by the waterbed.

DMSJ000184

Residents shall not dig up any part of the lawn areas, nor plant any form of shrubs, trees, vines, flowers, or garden plants without the prior written consent of the Management.

Throwing articles of any kind, shaking mops or dust cloths of any nature from the windows, or in the common areas, or "littering" anywhere on the premises is strictly prohibited.

## ALTERATIONS

Alterations to your apartment are prohibited without written consent of the Management. The following are prohibited:

a.  The installation of a television antenna or satellite dish.
b.  The use of LARGE nails or adhesive hangers for pictures or mirrors. Only picture hangers or small-framing nails may be used.
c.  The boring, marring or puncturing of any part of the equipment, carpet, drapes, fixtures, walls, or ceiling of your apartment.
d.  The changing of, or addition of, new locks.
e.  Redecoration or painting
f.  Replacement of any part of the apartments equipment or furnishings.
g.  No aluminum foil, shades or colored blinds in the windows. All window coverings must be those that are supplied by the Management however, if you wish to use your own drapes, they must have white backings.
h.  Air conditioning apparatus or equipment installed without the prior written consent of the Owner.
i.  Resident will not permit or suffer any signs, advertisements, or notices to be displayed, inscribed, painted, or affixed on any par of the outside of the demised premises or any building, except on a directory board if provided by the Landlord.

## DISPOSALS

Disposals are quite a maintenance problem because even the most careful person will, from time to time accidentally get something in the disposal, which will jam it. Hard items such as bones, peach pits, olive pits, shellfish, cornhusks, and artichoke leaves will jam the disposal. Please do not put these or other solid items in your disposal. Do not use drain cleaners in the disposal - if the drain is slow or stopped up, contact the Manager. To keep your disposal fresh, while its running, with the water also running, drop a slice of lemon in it. Ice dropped into the disposal while running can help sharpen the blades.

## VEHICLES AND PARKING

All cars must be registered with the office. If you have not registered your car or you have changed cars recently, please contact the Managers office to have it properly registered. Guests vehicles should be registered with the Manager if they will be parked on-site for more than one day. Illegally parked cars may be towed at the owners expense; this includes cars parked in end zones and driveways. Please do not back into the parking spaces unless you have a front license plate. The Management WILL NOT BE RESPONSIBLE for loss of property of residents or guests. No washing or repairing of cars is permitted on the property. All cars parked on the property grounds must be operable AND legal. This means current registration is required. Any vehicle parked on the premises that is not legal will be towed at the owners expense. No boats, trailers or RVs are allowed to be parked on-site at any time, for any reason.

## RECREATIONS

Hours for use of the recreation facilities are posted.  All residents under the age of 14 must be accompanied by an adult resident while in the pool area. Please do not give your key to your friends.
All Posted Pool regulations must be followed:
- NO glass bottles/containers are allowed in pool areas.
- NO alcoholic beverages are allowed in pool areas.
- NO eating in the pool areas.
- NO nude swimming.
- NO cut-offs.
- NO scuba gear (including masks and fins) or inflatable toys/rafts are allowed in the pool at any time.
- NO more than TWO guests per apartment in the pool area at one time; guests must be accompanied by the Residents they are visiting.
- All residents under the age of 14 must be accompanied by an adult resident while in the pool area.
- Radios are not allowed in the pool area at any time except for use with headphones.

## VACATING

As required by law, thirty (30) days written notice of intent to vacate the premises must be given to the Management. The day before you are vacating your apartment, contact the Manager for an appointment for the apartment inspection and key return.  No unit will be checked out after 10:00 a.m. Please be aware, if you choose not to provide the management with a thirty day notice in writing, you will be billed for liquidated damages equal to thirty days rent.

## FIREARMS AND WEAPONS

It is the policy of this community that no firearms or weapons of any kind be carried or brought onto any of the community areas controlled by Owner. These include but are not limited to: swimming pool areas, clubhouse, leasing offices, community offices, recreational areas, parking lots, playgrounds, common areas, stairways, storage areas, and other areas controlled by Owner. This does not restrict the right of Residents to own guns and have them within their own leased premises. However, such firearms or weapons may only be transported to and from the vehicle directly to the apartment unit. Weapons and firearms may NOT be stored or kept in vehicles parked within the community. To the extent that state or local laws may contradict this policy, it shall be interpreted to be as restrictive as allowed by law.

DMSJ000185

**SMOKE ALARMS**

Your apartment is equipped with a smoke detection device as well as a building fire alarm. Resident understands that it is the Residents responsibility to ensure that the smoke alarm is in operating condition at all times. If it is battery operated, Resident understands Residents responsibility to perform the manufacturers recommended test to determine if the smoke detector is operating properly at least once a month. If it is not operating properly, it is Residents responsibility to notify Management immediately in writing. It is a crime to disable smoke detection devices; please leave them intact, they could save your life or that of someone you love.

**INSURANCE**

Your personal property is not covered by the apartment communities insurance, and we advise you to carry renter's insurance, as we are not liable for your personal belongings.

**SECURING COMMON AREAS**

Entrances to all pool, laundry, exercise areas and any other common areas are not to be blocked open or propped open in any manner at any time. Residents who fail to properly close or secure these areas will be subject to e $50.00 fine and/or eviction. The community amenities pose a significant safety hazard to unsupervised children.

Violation of these rules or any one of them, shall be sufficient cause for termination of this lease.

_____     6-30-11
Roy Huskey (Lessee)                      Date

N/A
_____     _____
Melissa Huskey                              Date

_____     6-30-11
Owner Authorized agent                 Date

LD005.01 Revised 01/31/2011

www.isyourhome.com

DMSJ000186

## SAFE NEIGHBORHOODS ADDENDUM
### We Promote a Drug Free and Crime Free Environment

In Consideration of the execution or renewal of a lease of the dwelling unit, located at, 4141 Palm Avenue #181, Sacramento, CA 95842, Logan Park "Owner" and Roy Huskey, "Resident(s)", agree as follows:

1. Resident(s), any members of the residents household or a guest or other person under the residents control shall not engage in criminal activity; including drug-related activity, on or near the said premises. "Drug-related criminal activity", means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802]).

2. Resident(s), any member of the residents household or a guest or other person under the residents control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, on or near the said premises.

3. Resident(s), any member of the residents household or a guest or other person under the residents control, will not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug-related criminal activity, regardless or whether the individual engaging in such activity is a member of the household, or a guest.

4. Resident(s), any member of the residents household, or a guest, or other person under the residents control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance, as defined in Health & Safety Code §11350, et seq., at any locations, whether on or near the dwelling unit premises or otherwise.

5. Resident(s), any member of the residents household, or a guest, or other person under the residents control shall not engage in any illegal activity, including: prostitution, as defined in Penal Code §647(b); criminal street gang activity, as defined in Penal Code §186.20 et seq.; assault and battery, as prohibited by Penal Code §240; burglary, as prohibited in Penal Code §459; the unlawful use and discharge of firearms, as prohibited by Penal Code §245; sexual offenses, as prohibited in Penal Code §269 and §288 or any breach of this lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent or other tenant or involving imminent or actual serious property damage.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE LEASE AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY. A single violation of any of the provisions of this added addendum shall be deemed a serious violation and material and irreparable non-compliance. It is understood that a single violation shall be good cause for termination of the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be a preponderance of the evidence.

7. In case of conflicts between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.

8. This LEASE ADDENDUM is incorporated into the lease executed or renewed this date 6/30/2011  12:00:00AM between Owner and Resident(s).


_____
Roy Huskey(Lessee)

_____
N/A
Melissa Huskey

6-30-11
Date

_____
Date


_____
Owner Authorized agent

6-30-11
Data


LD306.01 Revised 7/15/06

DMSJ000187

 

## REFERENCE CONSENT ADDENDUM

Resident:  Roy Huskey

Address:  4141 Palm Avenue #191,  Sacramento, CA 95842

Based on a lease start date of 06/30/2011 , expiration date of 06/29/2012.

I/we understand that by not fulfilling the above stated lease, and all applicable terms and conditions, that my file will be assigned to a collection agency and could seriously damage my credit rating and the ability to rent another place of residence.

I/we further understand that the Landlord has explained to the signers of this agreement that inquiries for credit information and terms of the lease by creditors of these parties residing at Logan Park Apartments, will release any and all information at the Landlords discretion.

I/we further understand that if I/we fail to satisfactorily complete the lease for any reason, including but not limited to: eviction for any reason, criminal activities, non-payment of rent, and for damages to the apartment community property, the Landlord will, at their option, have the right and responsibility to report the below signed names to any and all entities, including individuals, agencies and corporations, public or private, domestic and foreign.

I/we agree that the Landlord may release my name, social security number and date of birth and details of the broken lease agreement at the Landlords discretion. I/we agree to hold the Landlord and other reporting agencies harmless from any claims of damages caused by the release of this information.

I/we have read the above and it is accepted and agreed to, jointly and severally. I/we agree to all the provisions thereof and further acknowledge the receipt of a copy of this form.

| | | |
|---|---|---|
| _____ | 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 | 1-21-70 |
| Resident Signature | Social Security # | Date of Birth |
| _____ | _____ | _____ |
| Resident Signature | Social Security # | Date of Birth |
| _____ | _____ | _____ |
| Resident Signature | Social Security # | Date of Birth |
| _____ | _____ | _____ |
| Resident Signature | Social Security # | Date of Birth |
| _____ | _____ | _____ |
| Resident Signature | Social Security # | Date of Birth |
| _____ | _____ | _____ |
| Resident Signature | Social Security # | Date of Birth |

OWNER
By:

_____
Its authorized agent                    Date

LD507 01 Revised 7/15/08

DMSJ000188

# SATELLITE DISH AND ANTENNA ADDENDUM
# TO RENTAL AGREEMENT/LEASE AGREEMENT

THIS AGREEMENT made and entered into between Logan Park, "Owner/Agent" and Roy Huskey, "Resident". Resident is renting from Owner/Agent the premises located at:

4141 Palm Avenue #191 Apt. 191, Sacramento, CA 95842

Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. This addendum contains the restrictions Resident agrees to follow:

1. **Number and size:** Resident may install only one satellite dish or antenna within the premises that are leased to resident for Resident's exclusive use. A satellite dish may not exceed 39 inches (1 meter) in diameter. An antenna or dish may recieve but not transmit signals.

2. **Locations:** Location of the satellite dish or antenna is limited to (1) inside Resident's dwelling, or (2) in an area outside Resident's dwelling such as Resident's balcony, patio, yard, etc. of which Resident has exclusive use under the lease. Installation is not permitted on any parking area, roof, exterior wall, window, fence or common area, or in an area that other residents are allowed to use. A satellite dish or antenna may not protrude beyond the vertical and horizontal space that is leased to Resident for Resident's exclusive use.

3. **Safety and non-interference:** Resident's installation: (1) must comply with reasonable safety standards; (2) may not interfere with Owner/Agent's cable, telephone or electrical systems or those of neighboring properties; (3) may not be connected to Owner/Agent's telecommunication systems;and (4) may not be connected to Owner/Agent's electrical system except by plugging into a 110-volt duplex receptacle. If the satellite dish or antenna is placed in a permitted outside area, it must be safely secured by one of three methods: (1) securely attaching to a portable, heavy object; (2) clamping it to a part of the building's exterior that lay within Resident's leased premises (such as a balcony or patio railing) or (3) any other method approved by Owner/Agent. No other methods are allowed. Owner/Agent may require that Resident block the satellite dish or antenna with plants, etc., so long as it does not impair Resident's reception.

4. **Signal transmission from exterior dish or antenna to interior of dwelling:** Resident may not damage or alter the leased premises and may not drill holes through outside walls, door jams, window sills, etc. If Resident's satellite dish or antenna is installed outside Resident's living area (on balcony, patio, or yard of which Resident has exclusive use under lease), signals received by Resident's satellite dish or antenna may be trasmitted to the interior of Resident's dwelling only by (1) running a "flat" cable under a door jam or window sill in a manner that does not physically alter the premises and does not interfere with proper operation of the door or window; (2) running a traditional or flat cable through a pre-existing hole in the wall (that will not need to be enlarged to accomodate the cable); or (3) any other method approved by Owner/Agent.

5. **Workmanship:** For safety purposes, Resident must obtain Owner/Agent's approval of (1) the strength and type of materials to be used for installation and (2) the person or company who will perform the installation. Installation must be done by a qualified person, or a company that has workers' compensation insurance and adequate public liability insurance. Owner/Agent's approval will not be unreasonably withheld. Resident must obtain any permits required by local ordinances for the installation and comply with any applicable local ordinances and state laws.

6. **Maintenance:** Resident will have the sole responsibility of maintaining Resident's satellite dish or antenna and all related equipment. Owner/Agent may temporarily remove the satellite dish or antenna if necessary to make repairs to the building.

DMSJ000189

7. **Removal and damages:** Resident must remove the satellite dish or antenna and all related equipment when Resident moves out of the dwelling. Resident must pay for any damages and for the cost of repairs or repainting which may be reasonably necessary to restore the leased premises to its condition prior to the installation of Resident's satellite dish or antenna and related equipment.

8. **Liability insurance and indemnity:** Resident is fully responsible for the satellite dish or antenna and related equipment. Resident shall be liable for all injury occasioned by the installation or use of the satellite dish or antenna and related equipment. Resident shall indemnify Owner/Agent for all related losses and claims.

9. **Deposit increase:** A security deposit increase (in connection with having a satellite dish or antenna) must be required by Owner/Agent. Resident's security deposit is hereby increased by an additional sum of $_____ to help protect Owner/Agent against possible repair costs, damages, or any failure to remove the satellite dish or antenna and related equipment at the time of move-out. **A security deposit increase does not imply a right to drill into or alter the leased premises.** In no case will the total amount of all security deposits Resident pays to Owner/Agent be more than that which is allowed by law (two (2) times the amount of rent for an unfurnished unit and three (3) times the amount of rent for a furnished unit).

10. **When Resident may begin installation:** Resident may start installation of satellite dish or antenna only after Resident has: (1) signed this addendum; (2) provided Owner/Agent with written evidence of the liability insurance referred to in Paragraph 8 of this addendum; (3) paid Owner/Agent the additional security deposit, if applicable, referred to in Paragraph 9 of this addendum; and (4) received Owner/Agent's written approval of the installation materials and the person or company who will do the installation.

_____    6-30-11
Roy Huskey (Lessee)              Date

_____    _____
        N/A                            Date
Melissa Huskey

_____    6-30-11
Owner Authorized agent           Date

LD-313.01 Revised 07/15/08

DMSJ000190

**PROPOSITION 65 FACT SHEET**

### Office of Environmental Health Hazard Assessment
### California Environmental Protection Agency

This fact sheet was prepared by the Office of Environmental Health Hazard Assessment (OEHHA), which administers the Proposition 65 program.  It provides information to tenants whose apartment managers and owners have posted or distributed Proposition 65 warnings.

**What is Proposition 65?**
In 1986, California voters approved an initiative to address their growing concerns about exposure to toxic chemicals.  That initiative became the Safe Drinking Water and Toxic Enforcement Act of 1986; better know by its original name of Proposition 65   Proposition 65 requires the State to publish a list of chemicals know to cause cancer, birth defects, or other reproductive harm.  The list has grown to include over 750 chemicals since it was first published in 1987

**What chemicals are on the Proposition 65 list?**
The Proposition 65 list contains two types of chemicals:  carcinogens, which can cause cancer, and reproductive toxicants, which cause birth defects or reproductive harm, such as sterility or miscarriages.  Some chemicals may be additives or ingredients in pesticides, common household products, food, or drugs.  Others may be industrial chemicals, dyes, or solvents used in dry cleaning, manufacturing and construction   Still others may be byproducts of chemical processes; for example, motor vehicle exhaust.

**What does a Proposition 65 warning mean?**
Under Proposition 65, businesses are required to give a "clear and reasonable" warning before knowingly exposing anyone to a listed chemical above a specified level.  This warning can be included on the label of a consumer product or published in a newspaper.  An equally common practice is for businesses to provide a warning at the workplace or in a public area affected by the chemical.  In recent months, many apartment owners and managers have posted or distributed warning to notify tenants that they may be exposed to one or more chemicals on the Proposition 65 list.  For example, a warning may be given because tenants are exposed to chemicals in pesticides applied to landscaping or structures or chemicals in housing construction materials, such as lead in paint or asbestos in ceiling coatings.  A growing trend among rental property owners and other businesses is to provide warnings for chemicals on the list, such as tobacco smoke or motor exhaust, which are regularly released into the environment in or near rental housing.  In some cases, however, owners and managers are providing warnings to avoid potential violations and lawsuits, even though exposure to chemicals on the Proposition 65 list has not been verified.  You should discuss the warning with the owner or manager to learn why it was provided to that you and your family can make informed decisions about exposure to any of these chemicals and your health.

**Is my familys health at risk from exposure to these chemicals?**
Warnings must be provided for chemicals listed under Proposition 65 if exposure to them may present a significant risk of cancer or reproductive harm.  For carcinogens, the chemical must be present at or above a level that could cause one additional case of cancer in a population of 100,000 people exposed to the chemical over a lifetime.  For reproductive toxicants, the chemical must be present at or above 1/1000th of the level at which the chemical is determined to have no negative health risks (the "no-observable-effect level").  Proposition 65 generally does not prohibit a business from exposing people to listed chemicals nor does exposure to these chemicals necessarily create an immediate health risk.  Also, as stated above, a warning may have been provided in some cases even though the level at which the chemical is present is actually too low to pose a significant health risk.  It is important to find out why you have received the warning so that you can discover which chemicals you are exposed to, at what levels, to determine how best to protect your familys health.

DMSJ000191

**Where can I get more information?**

Speak with the housing owner or manager directly to learn why you received a Proposition 65 warning. Property owners and managers were not required to notify OEHHA when they provide tenants with a warning. However, to obtain general information on the Proposition 65 list of chemicals, you may contact OEHHA at (916) 445-6900, or visit http://www.oehha.ca.gov/prop65. Following a list of contacts for more information on Proposition 65 as well as chemicals that may be found in your home.

| Type of Information | Contact |
| --- | --- |
| Proposition 65 Enforcement | California Attorney General<br>(510) 622-3170, prop65@doj.ca.gov |
| Toxics Directory:<br>Agency List | OEHHA<br>(510)622-3170<br>http://www.oehha.ca.gov/public_info/TDHOMSC1a.html |
| Asbestos<br>Indoor Air Quality | Indoor Exposure Assessment Unit, Air Resources Board<br>(916) 445-0753, http://www.arb.ca.gov/thml/fslist/htm |
| Lead | Lead Coordinator in your county government office<br>Childhood Lead Poisoning Prevention Program<br>(510) 622-5000, http://www.dca.ca.gov/childlead/ |
| Tenant Issues | Department of Consumer Affairs<br>(800) 952-5210, http://www.dca.ca.gov/<br>Department of Housing and Community Development<br>(916) 445-4782, http://www.hcd.ca.gov/ |

I have read and acknowledge receipt of this fact sheet.

_____    6-30-11
Roy Huskey (Lessee)                          Date

_____    _____
N/A
Melissa Huskey                                   Date

_____    6-30-11
Owner Authorized agent                      Date

LD316Revised 07/15/08

DMSJ000192

 

## PREVENTION OF MOLD AND NOTICE OF DISCLOSURE

**Community:** **Logan Park**                                          t0044875
**Resident:** **Roy Huskey**

**What is Mold?**
Molds are fungi. Molds grow throughout the natural and built environment. Tiny particles of mold are present in indoor and outdoor air. In nature, molds help break down dead materials and can be found growing on soil, foods, plant matter, and other items. Mold spores are very tiny and lightweight and spread very easily through air. Mold grows can often be seen as discolorations, ranging from white to orange and from green to brown and black. When molds are present in large quantities, they can cause allergic symptoms similar to those caused by plant pollen.

**What does mold need to grow?**
Mold only needs a few simple things to grow and multiply; moisture, nutrients, and a suitable place to grow. To prevent mold, moisture problems must be prevented and treated immediately. Proper ventilation is essential in preventing mold. The following are possible causes of indoor moisture problems :

| Humidifiers | Leaky plumbing | Leaking roofs |
| Sewer back ups | Indoor clothes drying | Shower/bath steam |
| Cooking steam | House plants | Any flooding |

As a resident of your apartment you are responsible for the prevention of mold in your apartment. Please follow these simple guidelines :

1. Remove Excess Moisture

   a. Dry out mops and cleaning utensils thoroughly before storing inside your apartment .

   b. Wipe down bathroom walls (shower doors if applicable) immediately after bathing, allow towels to air out. Wash and dry towels often .

   c. Wipe down any condensation from interior windows and windowsills, wash and dry towels immediately .

   d. Use of dehumidifying crystals is suggested for closed or other areas where ventilation is difficult to achieve .

2. Keep Things Clean

   a. Keep closets, dresser drawers - any place where mildew is likely to grow - as clean as possible .

   b. Soil on dirty articles can supply enough food for mildew to start growing when moisture and temperature are right.

   c. Greasy films, such as those that form on kitchen walls, also contain many nutrients for mildew-causing molds .

3. Circulate the Air

   a. When the outside is drier than that inside, ventilation allows the dry air to enter, take up excess moisture, and then be carried outside .

   b. When natural breezes are not sufficient, please use your central air conditioners (FAN ONLY) and bath/laundry room exhaust fan(s).

   c. Poorly ventilated closets get damp and musty during continued wet weather, and articles stored in them are apt to mildew .

   d. Try to improve the air circulation by opening the closet doors. In addition, hang the clothes loosely so that air can circulate around them .

   e. Dry all wet clothing (including clothes wet from rain or perspirations) before putting in the closet .

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

The following have reviewed the information above and certify, to the best of their knowledge that they understand the information and will notify management of any water intrusion.

_Roy Huskey (Lessee)_ _____    6-30-11
Roy Huskey (Lessee)                               Date

N/A
_____                              _____
Melissa Huskey                                   Date


_____                              6-30-11
Owner Authorized agent                           Date                    EHS101.01--Revised 07/15/0

DMSJ000193

**PEST CONTROL ADDENDUM**

Resident(s): Roy Huskey

Address: 4141 Palm Avenue #191, Sacramento, CA 95842

This Pest Control Addendum (this "Addendum") is made part of the Apartment Lease Contract (the "Lease") by Owner and Resident. To the extent the terms of this Addendum conflict with the Lease, the terms of this Addendum shall control.

1.   Resident acknowledges that the Apartment is free from infestation by rodents and vermin, including, but not limited to, beetles, spiders, ants, roaches, bed bugs, mice, and rats (collectively "Pest"). Resident shall keep the Apartment free from Pest infestation for the full term of the Lease.

2.   Resident shall keep the Apartment in a neat, clean, good and sanitary condition, including keeping the Apartment and all personal property in the Apartment free from Pest and their eggs.

3.   Resident shall immediately notify Owner in writing of any known or suspected Pest infestation in the Apartment.

4.   Owner or owner's contractor shall have the right to enter the Apartment at all times with or without prior notice for the purpose of inspecting for and treating Pest infestation. Resident acknowledges and agrees that treatment may include the application of pesticides.

5.   If given at least 24 hour notice of the date on which treatment shall be applied, Resident shall complete all pre-treatment instructions provided by Owner or Owner's contractor including, but not limited to the movement or removal of any or all personal property (examples: furniture and clothing), the bagging and/or laundering of all clothing, the removal of all items from cabinets, the removal or disposal of all clutter in the Apartment, and the thorough cleaning of the Apartment.

6.   Resident shall complete all post-treatment instructions provided by Owner or Owner's contractor including, but not limited to leaving traps and poison distribution systems unmolested.

7.   In the event the Owner reasonably determines that any of Resident's personal property is infested with any Pest, Owner may require that such personal property be permanently removed from the Apartment upon three day written demand and may require that such personal property be sealed prior to removal in order to keep Pest from spreading to common areas or other residences in the complex.

8.   Provided Resident fully complies with the terms of this Addendum, Owner shall provide appropriate extermination in response to the infestation of Pests. In the event the action or inaction of Resident, a member of Resident's household, a guest or invitee of Resident, or a person under Resident's direction or control contributes to or causes the infestation or Resident refuses to provide access of comply with pre and post treatment instructions, Resident shall be responsible for the cost of the extermination in addition to the other remedies provided by the Lease.

_____          6-30-11
Roy Huskey(Lessee)                     Date

_____N/A_____          _____
Melissa Huskey                          Date


_____          6-30-11
Owner authorized agent                 Date

EHS101.02-Revised 9/7/10

DMSJ000194

## PET AGREEMENT

This Agreement entered into on <u>06/30/2011</u> by and between Wasatch Property Management (hereinafter referred to as "Management") acting pursuant to express written authority granted to Manager by Owner of the <u>Logan Park</u> and <u>Roy Huskey</u>, Resident in consideration of their promises agree as follows:

1.  Resident is renting from Management on the premises located at:

<u>4141 Palm Avenue #191 Apt. 191, Sacramento, CA 95842</u>

2.  The lease agreement provides that without Management's prior written consent, no pet shall be allowed in or about said premises. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.

3.  Wasatch limits pets to domestic cats, dogs, birds, and fish only. Pets are allowed on the premises **ONLY** with an appointment by management to meet your pet, a signed Pet Agreement on file, additional deposits and fees may be required, plus per month pet rent, and the full **WRITTEN** consent and knowledge of the facts by management.

4.  If a pet is acquired after you move in, it is necessary to make proper arrangements with the office immediately or you will be in violation of your lease.

5.  All residents with pets are required to submit a statement from a licensed veterinarian establishing each of the following: (a) the breed of the animal, (b) that the animal generally is in good health, and (c) which vaccinations the animal has received, when the animal received these vaccinations and that the animal has received all vaccinations required by law. (The only exceptions would be animals designated as service animals required to accompany a resident with a verified disability for the specific purpose of aiding that person).

6. Resident desires to keep the below described pet(s) hereinafter referred to as a "Pet" and will be responsible for the written Policies as follows:

1st Pet's Name:_____ Breed:_____ Color: _____ Sex:_____

2nd Pet's Name:_____ Breed:_____ Color: _____ Sex:_____

7.  <u>Restrictions</u>. We will accept all breeds of dogs a <u>minimum of one year old</u>, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. The maximum weight limit allowed for pets is 45.00 lbs. **Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. Renters Insurance is required for ALL Wasatch Property Management Residents as of December 1, 2006.**

8.  Pet is required to be "house broken" and will not cause damage to property or apartment. Pets must not annoy other Residents, due to loud or disruptive behavior. Pets will not inconvenience, or cause complaints from any other Residents or you will be subject to fines or required to remove pet from premises for violation of terms of this agreement. After third offense or complaint resident will be subject to eviction proceedings.

9. The pet must be <u>over one year old</u> and have been SPAYED OR NEUTERED. Upon move in Management will photograph the pet and also copy licensing and vaccination records.

10. <u>Vaccination:</u> Updated vaccination information is required by management on a yearly basis.

11. <u>Non-Refundable Pet Fee:</u>

a.  Resident agrees to pay Management the sum of $<u>0.00</u>. Management may use therefrom such amount as is reasonably necessary for any of the damages or excessive cleaning caused by or in connection with said Pet. At the termination of this agreement, any balance shall be billed to the LEASE AGREEMENT SECURITY DEPOSIT and disbursed by law. Resident agrees to pay Management for any excess damages or costs on demand.

DMSJ000195

b. Resident agrees to pay Management the sum of $0.00 as a Non-Refundable Pet Fee for normal wear and tear in the apartment caused by or in connection with said Pet.

c. The total monthly rent stated in the Lease Agreement shall be increased by $0.00 per pet per month as pet rental cost. No additional pet or change in pet types is authorized without prior written consent from Management and the payment of another deposit and/or additional rent.

12. The pet must be kept inside the apartment, including private patio or balcony area, except when on a leash no longer than 6 feet and under the immediate control and presence of a responsible person.

13. **Liability for Cleaning:** Owner of pet shall be responsible for the immediate removal of pet defecation occurring anywhere on the apartment community.

14. A $75.00 fine will be charged in the event said pet is seen in landscaped, pool or other recreational areas. A $75.00 fine will be charged to any Resident who is not cleaning up after their pet. A $75.00 fine will also be charged if Resident is not keeping their pet on a leash at all times with the exception of the enclosed dog runs. If any pet rule is not followed, then, upon Management discretion, Resident will immediately remove the pet from the premises. Failure to do so will constitute a default to the Rental Agreement. AFTER A 3rd OFFENSE AN EVICTION WILL TAKE PLACE.

_____
Resident Initials

15. If the pet is loose on the premises and the responsible party is not available or willing to retrieve Pet, Management may, but is not obligated to, retrieve and return it to Resident's apartment, or board it at Resident's expense, or cause appropriate officials to impound it. Resident agrees to indemnify Management for any damages or expense it may incur in carrying out any of the foregoing options.

16. No pet shall be fed on an unprotected carpet within the apartment. Resident shall prevent any fleas or other infestation of the apartment or other property of the owner. Upon move in and move out, front and backing of carpet will be inspected and photos taken and kept on file.

17. Resident agrees to comply with:
    a. Health and safety code &
    b. All other applicable laws and regulations.

18. Resident agrees to indemnify and hold Management and the owner of these apartments harmless from any and all liability, or claims of liability, arising in connection with the pet, including attorney fees.

19. This agreement is an addendum and part of the Lease Agreement between Manager and Resident. In the event of default by Resident of any listed items, Resident agrees after receiving written notice of default from Management to cure the default or vacate the premises.

20. Each Resident who signed the Lease Agreement shall sign this Pet Agreement.

### THIS IS A LEGAL DOCUMENT, READ BEFORE SIGNING. LD310.02-Revised 07/15/08

_Bey Huskey (Lessee)_       6-30-11
Bey Huskey (Lessee)        Date

N/A
Melissa Huskey        Date

_signature_      6-30-11
Owner Authorized agent        Date

LD310.02-Revised 07/15/08

DMSJ000196

# MOVE-IN AND MOVE-OUT
# INSPECTION CHECKLIST

| Resident's Name<br>Roy Huskey | | | | Property Name<br>Logan Park | | |
|---|---|---|---|---|---|---|
| Address<br>4141 Palm Avenue #191 | | City<br>Sacramento | | State<br>CA | | Zip<br>95842 |
| Move In Date<br>06/30/2011 | Date of Notice | | Rent Paid Through | | Move Out Date | |

**ANY QUESTION WHICH MAY LATER ARISE CONCERNING THE CONTENT OR THE CONDITION OF THE PREMISES SHALL BE RESOLVED BY REFERRING TO THIS MOVE-IN AND MOVE-OUT CHECKLIST. PLEASE READ AND COMPLETE IT WITH CARE.**

| 1. Kitchen | SATISFACTORY: YES  NO  If NO, Please Specify: | SATISFACTORY: YES  NO  If NO, Please Specify: |
|---|---|---|
| Cabinets | | |
| Floors | | |
| Walls/Doors | | |
| Sink/Countertops | | |
| Disposal | | |
| Dishwasher | | |
| Range/Oven | | |
| Microwave | | |
| Refrigerator | | |
| Light Fixtures | | |
| Window/Screens | | |
| Other | | |
| **2. Living/Dining** | SATISFACTORY: YES  NO  If NO, Please Specify: | SATISFACTORY: YES  NO  If NO, Please Specify: |
| Doors | | |
| Walls/Ceiling | | |
| Carpeting | | |
| Windows/Screens | | |
| Blinds/Drapes | | |
| Closet(s) | | |
| Light fixtures | | |
| Other | | |
| **3. Bedrooms** | SATISFACTORY: YES  NO  If NO, Please Specify: | SATISFACTORY: YES  NO  If NO, Please Specify: |
| Doors | | |
| Walls/Ceiling | | |
| Carpeting | | |
| Windows/Screens | | |
| Blinds/Drapes | | |
| Closet(s) | | |
| Light Fixtures | | |
| Other | | |
| **4. Bathrooms** | SATISFACTORY: YES  NO  If NO, Please Specify: | SATISFACTORY: YES  NO  If NO, Please Specify: |
| Doors/Walls | | |
| Windows/Screens | | |
| Closet(s)/Cabinets | | |
| Toilet | | |
| Sink(s) | | |
| Tub/Shower | | |
| Towel Bars | | |
| Medicine Cabinet | | |
| Light Fixtures | | |
| Floors | | |
| Other | | |

DMSJ000197

| 5. Outside | SATISFACTORY:  YES   NO If NO, Please Specify: | SATISFACTORY:  YES   NO If NO, Please Specify: |
|---|---|---|
| Entryway | | |
| Patio/Balcony | | |
| Storage Closet | | |
| Light Fixtures | | |
| Other | | |
| 6. General | SATISFACTORY:  YES   NO If NO, Please Specify: | SATISFACTORY:  YES   NO If NO, Please Specify: |
| TV Adapter(s) | | |
| HVAC/Heating | | |
| Fire Extinguisher(s) | | |
| Alarm System | | |
| Ceiling Fan(s) | | |
| Other | | |
| 7. Keys/Remotes/ Access Cards | SATISFACTORY:  YES   NO If NO, Please Specify: | SATISFACTORY:  YES   NO If NO, Please Specify: |
| Apartment Key(s) | | |
| Mailbox key(s) | | |
| Common Area Key(s) | | |
| Gate/Garage Remotes | | |
| Laundry Cards | | |

THE RESIDENT ACCEPTS THE PREMISES WITH THE CONTENTS AND IN THE CONDITION AS LISTED ON THIS FORM AT THE TIME OF MOVE-IN.  THE RESIDENT ASSUMES RESPONSIBILITY FOR SURRENDERING THE PREMISES TO THE OWNER WITH THE CONTENTS AND IN THE SAME CONDITION AS LISTED ON THIS FORM AT THE TIME OF MOVE-OUT.

## SERVICE REQUESTS GENERATED AT THE TIME OF MOVE IN

| DESCRIPTION OF REPAIR NEEDED | Completed Date/Tech Name | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| MOVE-IN INSPECTION ACKNOWLEDGEMENT | MOVE-OUT INSPECTION ACKNOWLEDGEMENT |
|---|---|
| Was your apartment walked with you at Move In by a Wasatch Team Member? Yes __ No __   Initials____ | Was your apartment walked with you at Move Out by a Wasatch Team Member? Yes __ No __   Initials____ |

RESIDENT _____   DATE _6-30-11_

OWNER/AGENT _____   DATE _6-30-11_

RESIDENT _____   DATE _____

OWNER/AGENT _____   DATE _____

SM303–Revised 01/31/2011

DMSJ000198




## CONCESSION APPROVAL REQUEST

Name of Resident: __Roy Huskey__                                    Apartment: __191__

MI Date:   06/30/2011          Lease From Date: __06/30/2011__      Lease To Date: __06/29/2012__

Phone #:   () -                            Amount of Concession $        __35.00__

_____Reason for Concession: (Mark all that Apply)_____

| | | |
|---|---|---|
| _____ | 1. | Move in Concession (MICONC) |
| _____ | 2. | Application Fee Waived (APLCONC) |
| _____ | 3. | Lease Initiation Fee Waived (RDECONC) |
| _____ | 4. | Special Promo (PROMCONC) (Complete 4a) |
| | 4a. | Specify Promo _____ |
| _____ | 5. | Prompt Payment Discount (PPD) (Completed 5a-5b) |
| | 5a. | Amount of Monthly Discount $(_____) |
| | 5b. | Number of months discount is applicable _____ |
| _____ | 6. | Renewal Concession (RENCONC) |
| _____ | 7. | Resident Referral (REFCONC) (Complete 7a-7c) |
| | 7a. | Referred Who _____ |
| | 7b. | Apartment # _____    Move in Date _____ |
| | 7c. | Signature of New Resident: _____ |
| _____ | 8. | Early Bird (ERLYCONC) (Complete 8a) |
| | 8a. | Specify Month of Drawing: _____ |
| _____ | 9. | Contest Winner (CNTSTCON) (Complete 9a) |
| | 9a. | Specify Contest _____ |
| _____ | 10. | Customer Service Concession (SRVCCONC) (Complete 10a) |
| | 10a. | Specify Issue/Reason for Concession |
| | | _____ |
| _____ | 11. | Maintenance Concession (MNTCCONC) (Complete 11a) |
| | 11a. | Specify Issue/Reason for Concession |
| | | _____ |
| _____ | 12. | Deployment Concession (DEPLOY) |

Additional Comments:

_____

_____

_____

_____          ___6-30-11___

Resident Signature                 Date

_____          _____
Manager Approval                   Regional/Area Leader Approval

Copy to Resident File   : 10044875                      CM107.01-Revised 10/07/08

_www.isyourhome.com_                                    Page 28 of 28

DMSJ000199

# EXHIBIT K

DMSJ000200

Lease Renewal

Year: _2014_

DMSJ000201

## ~IDENTIAL RENTAL AGREEMEN~

THIS IS A LEGALLY BINDING AGREEMENT
READ IT CAREFULLY

**Wasatch Property Management, Inc. | Owners Agent**
A Utah Corporation - registered in California
595 S Riverwoods Pkwy, Suite 400 Logan, Utah
84321

This agreement is made in Sacramento, CA,  Logan Park hereinafter called Owner or Landlord, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
Roy Huskey III

Authorized Occupant(s):
Melissa Huskey (Dependant),
hereinafter referred to collectively as Resident or Tenant. No other person(s) except these herein stated may occupy premises without written approval of
Owner.

**I.    TERM**

This Agreement creates a 6 month and 0 day tenancy, commencing 11/26/2014, and Terminating 05/25/2015.

THIS AGREEMENT MAY NOT BE CANCELLED ONCE EXECUTED BY RESIDENT WITHOUT THE EXPRESS WRITTEN CONSENT OF THE OWNER.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4141 Palm Avenue #191, Sacramento, CA  95842

**III.  LOW-INCOME HOUSING CREDIT**

The premises are to be operated in accordance with the requirements of the Low-Income Housing Tax Credit Program (LIHTC) under Section 42 of the
Internal Revenue Code of 1986, as amended (the "Program"). Resident's rights hereunder will be subject to the requirements that must be met under the
Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of the Landlord's tax credit. The Resident will
cooperate with all Landlord requirements related to such compliance and the Program.

**IV.   RENT**

The rental for the premises is $840.00  per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at
4215 Palm Ave, Sacramento, CA, 95842.

Landlord and Tenant have entered into a housing assistance payment (HAP) contract with the local public housing authority (PHA) pursuant to the
Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of Tenant's rent to Landlord on
behalf of Tenant. So long as the HAP contract remains in effect, Tenant is not responsible for this portion of the rent. The additional terms and conditions
of the parties' rental obligations are set forth as follows:

1. Section 8 Rent:

A.  The total contract rent shall be $840.00 per month;

B.  Of the total contract rent, $840.00 shall be payable to Landlord by Tenant each month as Tenant's net family contribution; the remaining balance
of $0.00 shall be payable to Landlord by the local housing authority for as long as the HAP contract remains in effect.

2. Section 8 Rent adjustments: The amount of assistance that HUD pays on behalf of Tenant may be changed during the term of the lease if: (1)
HUD or the PHA determines, in accordance with HUD procedures, that an increase in rents is needed; (2) HUD or the PHA changes any allowance for
utilities or services considered in computing Tenant's share of the rent; (3) the income, the number of persons in Tenant's household or other factors
considered in calculating Tenant's rent change and HUD procedures provide that Tenant's rent or assistance payment be adjusted to reflect the
change; (4) changes in Tenant's rent or assistance payment are required by HUD's recertification or subsidy termination procedures; (5) HUD's
procedures for computing Tenant's assistance payment or rent change; or (6)Tenant fails to provide information on Tenant 's income, family composition
or other factors as required by Landlord or the PHA.

The Rental Office can be reached by phone at (916)-344-4494.  Unless otherwise posted, payment can be made in person at the Rental Office between
9:00 AM and  6:00 PM Monday through Friday and  9:00 AM through  6:00 PM on weekends. In addition, rent can be paid online at
www.IsYourHome.com.  Rent received shall first be applied to all sums owed and then to the current rent due.  Rent shall be payable by check,
cashier's check, certified check, credit card, or money order in installments as follows:

A.  The sum of $140.00 is due upon execution of this Rental Agreement as rent for the period beginning 11/26/2014 , through 11/30/2014  (first month
prorated) payable on 11/01/2014.  All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B.  The sum of $840.00, plus additonal services of $68.16 (refer to Additional Services Agreement), is due on the first day of each calendar month
commencing December 2014 .

C.  A concession in the amount of $0.00 is to be given to Resident as part of this 6 month lease and will be issued as $0.00 off move-in costs. The
$0.00 concession is due and payable back to Logan Park if the 6 month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in this Agreement may be less than the standard monthly rental required by the
Owner for the premises.  The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by
one or more government financing programs.  The parties understand that the monthly rent determined by formulas set forth in such financing
programs may change from time to time to adjust the Resident's monthly rental obligation as set forth in this Agreement, and in accordance with
such formulas.  In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any
monthly rental adjustment.  Such notice will set forth the amount of the adjustment and the effective date.  The Resident(s) shall thereupon be
obligated to pay such adjustment as though fully set forth in this agreement.

INITIAL

www.wearehome.com

WASATCH
PROPERTY MANAGEMENT

DMSJ000202

**V. CHANGES IN RESIDENT'S SHARE OF R** 

The Resident agrees that the amount of rent the Resident pays may be changed during the term of the Agreement if:

A. The Owner's contract administrator determines, in accordance with Program procedures, that an increase in rent is needed;

B. The Owner's contract administrator changes any allowance for utilities or services considered in determining the Resident's rent;

C. The income, the number of persons in the Resident's household or other factors considered in determining the Resident's

D. The procedures for determining the Resident's rent change; or

E. The Landlord agrees to implement changes in the Resident's rent only in accordance with the timeframes and administrative procedures set forth in instructions and regulations related to administration of the Program. The Landlord agrees to give the Resident at least thirty (30) days advance written notice of any increase in the Resident's rent, in accordance with HUD/PHA regulations. The Notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

**VI. EXCESS RENTS**

If it is determined that the premises are not a qualified low-income unit because the rent paid by the Resident(s), plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed by LIHTC code, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

**VII. LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month  In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order.

Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**VIII. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $299.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), to clean the premises, and to remedy future defaults by Resident in any obligation, including the obligation to restore, replace or return personal property or appurtenances, (exclusive of ordinary wear and tear) if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy,  Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Landlord to apply all or a portion of security deposit to amounts due from Tenant . It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit, except for any loss caused by the negligence or intentional misconduct of Owner.

**IX. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. Resident acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made.  Be advised, $25.00 is the fee for after-hours lockout service.

B. Resident acknowledges that all furniture, furnishings and equipment listed on a Unit Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

INITIAL

WASATCH PROPERTY MANAGEMENT

DMSJ000203



**X.   USE OF THE PREMISES**

A.   The premises are rented for residential use and shall not be occupied by anyone who is not named in this Residential Rental Agreement as a Resident or Authorized Occupant.  Resident may not have overnight guests for more than 14 consecutive nights, and no more than two overnight guests at a time unless we provide specific approval. Resident must obtain Owner's prior written consent to change or add Residents or Authorized Occupants, unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must go on the lease, unless emancipated, co-Resident or spouse of head of household.

Applicants warrant and acknowledge that all persons anticipated to reside in the premises are and will be legally residing within the United States

B.   Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time.  If a animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept dogs a minimum of six months old, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two animals  per apartment.  All Animals are required to be spayed or neutered.  Reptiles or exotic animals are not allowed.  The maximum weight limit allowed for animals is 45 lbs.

C.   Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D.   Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, Califonia Fire Code §308.3.1 and  §308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E.   Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises.  No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his household members or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his household members or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident.  Resident agrees to "Front In" only parking and will not back into parking spaces at any time.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith, except for any loss caused by the negligence or intentional misconduct of Owner.

F.   Harassment or Threats:  Resident and such others for whom Resident is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G.   Nuisance and Waste:  Resident and such others for whom Resident is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H.   Loitering:  Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

**XI.   RESIDENT'S DUTY TO MAINTAIN PREMISES**

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear) is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs. Resident shall keep the Apartment free from Pest Infestation for the full term of the Lease.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and the dwelling unit appears to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, that any pest problem or infestation is determined to be directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

Upon notice of the date on which treatment shall be applied, Resident shall complete all pre-treatment instructions provided by Owner or Owner's contractor including, but not limited to the movement or removal of any or all personal property (examples: furniture and clothing), the bagging and/or laundering of all clothing, the removal of all items from cabinets, the removal or disposal of all clutter in the Apartment, and the thorough cleaning of the Apartment.

Management will notify Resident(s) of any claims and notify Resident with a 24 hour written notification prior to any inspection within the Resident's unit. Resident agrees to allow management to enter the premises to assess any pest infestation claim, given 24 hour written notification.

www.wasatchhome.com

WASATCH
PROPERTY MANAGEMENT

INITIAL

DMSJ000204

## XII. UTILITIES

Responsibility for utilities will be as described below. Resident may pay for utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services:

| Owner gas, | Account # _____ |
| Tenant electricity, | Account # _____ |
| Owner water/sewer/trash | |

## XIII. ENTRY BY OWNER

Landlord will have the right to enter the premises as allowed by law. Law permits entry in case of emergency, to make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, to test smoke detectors, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen or contractors or to make an inspection pursuant to subdivision (f), when the Resident has abandoned or surrendered the premises and pursuant to court order. Landlord will serve Resident with written notice before entry.

## XIV. DESTRUCTION OF PREMISES

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner

## XV. LIABILITY INSURANCE

Resident understands that any property or liability insurance coverage purchased by the property manager or owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to Resident's personal property or belongings or protect against any loss or damage resulting from Resident's actions or omissions and/or Resident's household members and/or guest's actions or omissions Residnet also understands that, by not having renter's or personal liability insurance, Resident may be liable to third parties and to the property owner for certain losses and understand that Resident should not expect the property manager or Owner to be responsible for such losses. Owner and manager recommend that every resident maintain renter's insurance coverage, at all times.

**RESIDENT WILL PURCHASE RENTERS INSURANCE COVERAGE.**
Resident recognizes the need for insurance and Resident has chosen to take advantage of the program made available to residents, by Owner, in connection with a "pay along with rent" program for the leased premises through Assurant. Resident accepts the Owner's offer to receive the monthly fee from Resident, in addition to Resident's monthly rent, and to forward the fee on Resident's behalf to Assurant. Owner and/or Assurant are providing this fee payment service at Resident's request and they are not responsible for paying Resident's fees if Resident fails to do so. Resident also understands that failure to pay said fee when due will result in cancellation of Resident's coverage

( ) **RESIDENT HAS RENTERS INSURANCE COVERAGE.**
Resident has and will maintain throughout the term of the lease with the following renters insurance coverage through a third party insurance carrier.

| Insurance Company | Policy Number |
| _____ | _____ |

| Property Limit | Liability Limit |
| _____ | _____ |

( ) **RESIDENT DOES NOT HAVE RENTERS INSURANCE COVERAGE.**
Although Resident recognizes the need for renter's insurance, Resident will not at this time, be obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers, Owner or third-party's property as a result of the actions or Resident, occupants, household members, and guests actions.

## XVI. WAIVER OF LIABILITY

Resident agrees to assume responsibility and/or hold harmless Owner and Owner's agent(s) for the following:

Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by managements negligence. Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance. Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, except as provided by law. Owner's nonliability will include (but not be limited to) the following:

A. Loss of personal property due to theft
B. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner or due in any way to negligence of Resident or Resident's guest(s)
C. The Actions or omissions of other Residents
D. Interference with light, view or other intangible aspects of the premises
E. Operations in construction of any public or quasi-public work
F. Any latent defect in the building(s)



INITIAL

DMSJ000205

G. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use

H. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy

I. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his household members, agents or guests.

J. Pursuant to §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides

**XVII.    RECERTIFICATION**

Every year on or about the 1st day of _2/1/15_, Landlord will request Resident to report the income and composition of Resident's household and to supply any other information required for the purposes of determining Resident's continued Program eligibility. Resident agrees to provide accurate statements of this information and to do so by the date specified in Landlord's request. Landlord will verify the information supplied by Resident and use the verified information to determine Program eligibility. Resident agrees that all information supplied by Resident shall be subject to inspection by representatives from the California Tax Credit Allocation Committee (TCAC).

A. If Resident does not submit the required recertification information by the date specified in the Landlord's request, Landlord may require resident to vacate premises. Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.

B. Resident may request to meet with Landlord to discuss any changes resulting from the recertification processing. If Resident requests such a meeting, Landlord agrees to meet with Resident and discuss how Resident's continued Program eligibility was determined.

**XVIII. REPORTING CHANGES BETWEEN RECERTIFICATION**

Resident's shall notify Landlord immediately in writing, if the household size changes, his or her income increases; Resident(s) become a full time student, or begins to receive HUD assistance. Landlord may elect not to renew this Lease if Resident becomes a student and Landlord determines that the Resident's student status would disqualify the premises under the Program. Landlord may adjust the Resident's rent and or utility allowance to reflect Resident's status if Resident becomes a HUD-assisted Resident.

**XIX. EARLY TERMINATION OPTION**

Resident is expected to remain a Resident for the entire term specified in the Residential Rental Agreement. If Resident fails to do so, Resident will be responsible to Owner for all damages provided by law, including (but not limited to) rent due through the end of the term, minus rents paid by a replacement tenant (if any). This amount will vary depending upon how long it takes the Owner to find a replacement tenant. Therefore, this amount cannot be determined in advance and it is difficult to estimate.

To avoid this uncertainty, Resident may choose to exercise an early termination option. Resident may choose to pay a flat fee in advance to terminate the Residential Rental Agreement early, rather than remaining liable for rent due through the end of the term. To exercise this option, Resident must deliver to Owner:

- a written notice stating that Resident has elected to exercise this option,
- an early termination option fee of $840.00;
- rent and other amounts due through the accelerated termination date.

When Owner has received the written notice and payment, and has signed the notice, the termination date will be amended. The new termination date will be the date specified in the notice which must be at least sixty days after the written election and payment are given to Owner. Exercise of the early termination option will affect only Resident's rent obligations after the accelerated termination date; Resident must comply with all other Residential Rental Agreement obligations.

The notice will not accelerate the termination date if:

- Resident is in default under the Residential Rental Agreement at the time that Resident gives notice of Resident's exercise of the option;
- Resident provides the notice unaccompanied by the fee above; or Resident does not properly exercise the early termination option by following the procedure specified above, but vacates the property before the termination date specified in the Residential Rental Agreement.

**XX. NOTICE TO QUIT**

A. MONTH-TO-MONTH TENANCY: Residential Rental Agreement shall continue to be binding on all parties as a month-to-month agreement. Resident may terminate with a thirty (30) days' notice in writing prior to the date upon which occupancy is to be delivered. Landlord may terminate tenancy only as allowed by law.

B. TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Owner of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Owner AND resident vacates the property, a penalty fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice.

C. NOTICE OF MOVE OUT INSPECTION. TENANT HAS THE RIGHT TO BE PRESENT DURING THE MOVE OUT INSPECTION. Move-out inspection will be conducted between 9:00 am and 11:00 am on the final day of tenancy, unless alternate times are agreed to by prior written notice between the tenant and owner or owner's agent.

**XXI. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XXII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

WASATCH

INITIAL

DMSJ000206

 

**XXIII. ASSIGNMENT AND SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any assignment or subletting without written consent is void.

**XXIV. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXV. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXVI. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and residents have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Unless prohibited by law, any violation of the covenants of Resident hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Residential Rental Agreement.

**XXVII. ABANDONMENT**

Resident will be deemed to have abandoned if rent hasn't been paid for fourteen days, Owner reasonably believes that Resident has left the premises and does not intend to return, and a "Notice of Belief of Abandonment" has been mailed and the tenant has not responded within 15 days of personal service or 18 days of mailing. Any personal property remaining in the premises will be returned to Resident, placed in storage or disposed of as provided by applicable law.

**XXVIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIX. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Resident acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Owner complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Resident, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against Owner, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Owner Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Owner Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Owner Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Resident or any guest or other person living in, occupying, using or residing in the Premises.

**XXX. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Resident has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Resident agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Resident relieves Owner from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises, unless otherwise provided by law.

**XXX. RentPlus ACKNOWLEDGEMENT**

Resident acknowledges that Owner offers RentPlus, a service that reports positive payment history to credit bureaus to assist resident(s) in building positive rental/credit history. The monthly cost of this service is $5.00 and will be billed to resident in conjunction with Monthly Rent and other Additional 'Service charges, should Resident choose to participate in RentPlus services.

☐ Resident agrees to participate in RentPlus services

☒ Resident opts out of RentPlus services

Initials
Initials

DMSJ000207

 

## XXXI. ELECTRONIC COMMUNICATION

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

## XXXI. CREDIT DISCLAIMER and RELEASE

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at Owner's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Owner's discretion. Resident also agrees to hold Owner, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

Roy Hoskey III

Owner authorized agent

Date 11-26-14

Date 11-26-14

LD302 01 UT Revised 1/03/2012

www.ixyourhome.com



DMSJ000208



**WASATCH**
PROPERTY MANAGEMENT

## LOW INCOME HOUSING TAX CREDIT (LIHTC) LEASE ADDENDUM

**Property Name:** Logan Park       **Unit:** 191

**Resident Name:** Roy Huskey III

Resident agrees to the following:

### CONDITIONS GOVERNING LIHTC APARTMENTS :

_Initial_

1. Resident understands that this development is subject to the Low Income Housing Tax Credit Program (LIHTC). Regulations and guidelines, as defined in the Internal Revenue Code of 1986, Section 42. Maximum income limits are published annually by the Department of the Housing and Urban Development.

_Initial_

2. **ESCALATION CLAUSE/INCOME LIMITS:** The rent at this property is governed by income limits, as periodically adjusted by HUD for the county or metropolitan statistical area (MSA). During the term of the lease, if the income limits increase, the rent which is based on the income limits may be raised with a Thirty (30) days' notice to the new LIHTC maximum rent change. **This may occur during the term of the current lease.**

_Initial_

3. **ESCALATION CLAUSE/UTILITY ALLOWANCE:** If, during the term of this lease, the utility allowance is reviewed and changed, the net rent to the resident may change accordingly. Since the maximum LIHTC charge is resident rent plus the utility allowance, if the allowance increases the rent would decrease by the 30 day notice and should the utility decrease, the rent could be increased in the same fashion. This may occur during the term of the current lease.

_Initial_

4. **REGULARLY SCHUDULED RECERTIFICATION :** Every year, 120 days prior to the expiration of the income certification, the Owner/Agent will request the Resident to report the income and composition of the Resident's household and to supply any other information required by the Owner for the purposes of determining the Resident's eligibility under IRC Section 42. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Owner/Agent's request. The Owner/Agent will verify the information supplied by the Resident and use the verified information for compliance purposes only.

     a.    Resident understands and agrees that a recertification of income shall be made to the Owner/Agent at least once a year from the date of the original certification at the time of admission to the property. Said recertification process must be completed prior to the annual expiration of each one-year term.

     b.    Resident understands and agrees to comply promptly with all requests by the Owner/Agent for information and certifications concerning the total current household income and household composition.

     c.    Resident understands and agrees that if the Resident does not submit the required recertification information by the date specified in the Owner/Agent request, this will be considered material of non-compliance and **will result in termination of residency.**

     d.    Resident understands and agrees that under IRC Section 42, many student are not LIHTC eligible. If changes in the student status render the household ineligible, residency may be terminated upon Thirty (30) days written notice. **This may occur at any time during the term of the current lease.**

_Initial_

5. **FRAUD:** Should management discover at any time that the household has provided false information in regard to income or illegal household members are living in the apartment, this would constitute a substantial violation of the lease and residency would be terminated in accordance with the State.

_Roy Huskey III_       11-26-14
Roy Huskey III          Date

     11/26/14
Owner authorized agent       Date

BTH201.26 05/11/2012



DMSJ000209



**WASATCH**
PROPERTY MANAGEMENT

## Low Income Housing Tax Credit Lease Rider

Property Name: Logan Park                                    Unit: 191

Resident Name: Roy Huskey III

Dear Resident or Applicant:

The owner(s) of this property rents residential units under the federal Low-Income Housing Tax Credit Program (the "program") administered by the California Tax Credit Allocation Committee (TCAC). Under the program, the owner has agreed to rent some or all of the units in the property to low-income households and restrict the rents for those units. Another protection provided by federal law is that Low Income Tenants may not be evicted without good cause. The following Lease Rider is an important part of ensuring your rights to good cause for eviction.

The Lease or Rental Agreement dated 11/26/2014 is hereby amended by adding the following provision:

**Lease Rider: Good Cause for Eviction or Non-Renewal of the Lease**
Owner may not terminate the tenancy or refuse to renew the Lease or rental agreement of a Low Income Tenant except for good cause, including a serious or repeated violation of the material terms and conditions of the Lease, or a violation of applicable Federal, State, or local law. To terminate the tenancy or refuse to renew the Lease, Owner must provide written notice to the tenant of the grounds with sufficient specificity to enable the tenant to prepare a defense. The notice must be served at least three days before the termination of tenancy, and must comply with all requirements of California law and other applicable programs. Tenant has the right to enforce this requirement in state court, including presenting a defense to any eviction action brought by Owner.

To the extent that any terms contained in the Lease or rental agreement, or any other agreement between the owner and the tenant, contradict the terms of this Rider, the provisions of this Rider shall control.

By signing below, I indicate my consent to this Lease Rider.

x Nora Padilla                          _____          11/26/14
Property Representative (print)         Property Representative Signature   Date

By signing below, I indicate my consent to this Lease Rider. I/we have been given a copy of this Lease Rider.

_____              Roy Huskey                 11-26-14
Resident or Applicant Name (print)   Roy Huskey III Signature    Date

_____              _____    _____
Resident or Applicant Name (print)   Signature                   Date

_____              _____    _____
Resident or Applicant Name (print)   Signature                   Date

_____              _____    _____
Resident or Applicant Name (print)   Signature                   Date

_____              _____    _____
Resident or Applicant Name (print)   Signature                   Date



www.iscurhome.com                    WASATCH
                                     PROPERTY MANAGEMENT

DMSJ000210



# DITIONAL SERVICES AGREEMENT

Apartment # 191

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Logan Park (hereinafter the "Community") and Roy Huskey III (hereinafter the "Resident(s)" under the terms of the Residential Rental Agreement.

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 06/30/2011 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

## Property

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $50.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $0.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Enclosed Private Garage | Space #: | $0.00 |
| Renter's Insurance    (This is available as a pay with rent option) ,OR | | $18.16 |
| Insurance Provider Name: .   Policy # | | |

## Services

| Services | Monthly Charge |
|---|---|
| Internet Service and/or Media Package and/or Cable Television | 0 |
| RentPlus | $0.00 |
| Intrusion and Security Alarm Service | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | $0.00 |
| Housekeeping Services | $0.00 |
| Animal Rent (0.00 x 0# of animals, limit 2 per household) | $0.00 |
| Corporate Service | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | $0.00 |

| | |
|---|---|
| Total Charges for Property & Services | $68.16 |
| Taxes (if applicable) | $0.00 |
| Total Monthly Payment Due | $68.16 |

## Fees

| | |
|---|---|
| Lease Initiation Fee    (if applicable) | 0 |
| Non-Refundable Fee | $0.00 |
| Utility Service Setup Fee | $0.00 |
| Total Fees Due at Initiation of this Agreement | $0.00 |

Payment: The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated

_____   Date 11-26-14
Roy Huskey III

_____   Date 11-26-14
Owner authorized agent

LD303.01 Revised 11/15/2013


WASATCH
PROPERTY MANAGEMENT

DMSJ000211

 ADDENDUM A 

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner <u>Logan Park</u>, and Resident(s), <u>Roy Huskey III</u>, dated <u>06/30/2011</u> .

## PAINTING CHARGES (MINIMUM):

Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resident shall be charged actual costs of painting, if necessary, including labor and materials.

| | STUDIO | 1X1 | 1X1 LOFT | 2X1 | 2X2 | 3X2 | 4X2 | TOWNHOME |
|---|---|---|---|---|---|---|---|---|
| Complete Paint Job | n/a | 200.00 | n/a | 225.00 | 260.00 | n/a | n/a | n/a |
| Partial Paint /Room | n/a | 45.00 | n/a | 45.00 | 45.00 | n/a | n/a | n/a |
| Partial Paint /Wall | n/a | 15.00 | n/a | 15.00 | 15.00 | n/a | n/a | n/a |

(0-12 months = 100%, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33%, 31-36 months = 20%)

## REPLACEMENT CHARGES (MINIMUM):

Should replacement of damaged or missing items be necessary in the apartment, the following charges will be assessed, any items not listed above that are damaged or missing, will be billed to the resident at the cost of replacement or repair:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | Cost | Glass Rplc. | Cost | Pest Control (Fleas/BedBugs/Roaches) | Cost |
| Alarm Sensors/each | n/a | Heat Lamp Bulb/each | Cost | Range Knobs/each | 15.00 |
| Appliance Rplc. | Cost | Int. Door/each | 75.00 | Re-Key Locks | 12.00 |
| Cabinet Doors/each | 55.00 | Int. Door Jam/each | 75.00 | Remotes/Key Cards/each | Cost |
| Carpet Rod Stains/each | 20.00 | Int. Door Lock/each | 15.00 | Shower Door/each | Cost |
| Carpet Patching/each | 20.00 | Light Bulb/each | 2.00 | Shower Rod/each | 32.00 |
| Ceiling Fan/each | 129.00 | Light Globes (9")/each | 17.00 | Sink Stopper/each | 3.00 |
| Crisper Tray | 50.00 | Light Globes (12")/each | 23.00 | Smoke/CO/Radon Detector | 65.00 |
| Dishwasher Rack/each | 62.00 | Mail Box Lock/each | 12.00 | Stove Burner Ring/each | 8.00 |
| Door Stops/each | 1.00 | Mini-Blinds | Cost | Stove Drip Pan/each | 5.00 |
| Draperies | Cost | Mirrors/each | Cost | Stove Element/each | 28.00 |
| Entry Door | 220.00 | Mirrored Doors/each | Cost | Switch Plates/each | 1.00 |
| Entry Lock | 25.00 | New Keys/each | 2.00 | Toilet Paper Roller/each | 3.00 |
| Fire Extinguisher | 45.00 | Outlet Plates/each | 1.00 | Toilet Seat/each | 7.00 |
| Fireplace Grate | 25.00 | Oven Rack/each | 65.00 | Towel Bar/each | 17.00 |
| Fireplace Screen | 75.00 | Patio Door Blinds | 55.00 | Tub Stopper/each | 4.00 |
| Florescent Bulb (4)/each | 6.00 | Patio Screen Door | 75.00 | Vertical Blinds | 5.00 |
| Furniture Damage | Cost | Peep Holes | 12.00 | Wall Bumpers | Cost |
| Garbage Disposal | 42.00 | Pest Control (General) | 50.00 | Window Screens/each | 35.00 |

| FLOORING (MINIMUM) | STUDIO | 1X1 | 1X1 LOFT | 2X1 | 2X2 | 3X1 | 4X1 | TOWNHOME |
|---|---|---|---|---|---|---|---|---|
| Carpet Shampoo | n/a | 85.00 | n/a | n/a | 95.00 | n/a | n/a | n/a |
| Carpet Deodorizing | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Animal Treatment | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Replacement | n/a | 550.00 | n/a | n/a | 870.00 | n/a | n/a | n/a |
| Vinyl Replacement | n/a | 799.00 | n/a | n/a | 997.00 | n/a | n/a | n/a |

## CLEANING (MINIMUM):

It is Resident's responsibility to clean the apartment when Resident moves. If Resident chooses not to, Resident will be billed as follows. Please note: These are MINIMUM charges, if Resident's apartment is excessively dirty, they could be higher.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets/each | Cost | Fireplace | Cost | Patio Window | Cost |
| Bath Floor/each | Cost | Garage | n/a | Range Top | Cost |
| Bath Sink/each | Cost | Kitchen Floor | Cost | Refrigerator | Cost |
| Bath Tub/each | Cost | Kitchen Sink | Cost | Shower Stall/each | Cost |
| Cabinets/each | Cost | Light Fixtures/each | Cost | Storage Room | Cost |
| Ceiling Fan/each | Cost | Medicine Cabinets/each | Cost | Storage Detached | n/a |
| Closet/each | Cost | Microwave | Cost | Vacuum Carpet | Cost |
| Commode/each | Cost | Mini/Vertical Blinds/each | Cost | Vent Hood | Cost |
| Dishwasher | Cost | Mirrors/each | Cost | Vent Covers | Cost |
| Draperies | Cost | Oven | Cost | Windows/each | Cost |
| Entry Way | Cost | Patio/Balcony | Cost | Window Screens/each | Cost |

## LABOR:

General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at $40.00 per hour after the first two (2) hours for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning costs incurred. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed hereon.

Resident _____

Owner's Authorized Agent _____

Resident _11-26-14_ _____

Date _1-26-14_ _____

www.isyourhome.com

WASATCH
PROPERTY MANAGEMENT

DMSJ000212

 

# Community Policies

The following community policies are designed to protect the premises and to set standards for the convenience of all residents. We hope you will understand their necessity and that we may count on your cooperation. It must be understood that these policies are to be considered a part of your rental agreement and will be enforced. Owner may choose to modify community policies with thirty (30) days' notice to resident. Reference section RULES AND REGULATIONS of resident rental agreement for additional details of community policies and or the modification of community policies.

**Violation of these rules or any one of them, shall be sufficient cause for termination of this lease.**

### MAINTENANCE

If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (916)-344-4494. If it is after regular office hours, maintenance can be reached by calling (916)-889-3886.

### NIGHT SERVICES

If you need assistance from our Night Services, please call (915)-549-2385. If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance with police, fire department, or medical personnel, please call 911.

### ADDITIONAL CUSTOMER SERVICE INFORMATION

As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader at (559)-270-1110 for Logan Park or you may contact Wasatch Premier Communities Customer Service Center at (760) 795-6595 or by fax at (760) 602-9681 or via email at feedback@isyourhome.com.

### RENTAL OFFICE

Rental Office hours are posted. Business matters should be handled during these hours, except for emergencies. Please let us know if there is anything we can do to make your home more enjoyable.

### STEREOS/TVs/RADIOs/NOISE

Please moderate the volume controls, as loud stereos, TVs and radios create a disturbance among residents. We hope to keep to minimum the necessity for the Management to police the noise problem. Your consideration for your neighbors, we are sure, will result in their consideration for you. Although we ask that you be especially careful before 9:00 a.m. and after 10:00 p.m., please be aware that any noise that disturbs a resident's right to a quiet living environment is considered to be a breach of the Rental Agreement. (This also includes horn honking. Please advise your guests to refrain from this disturbing action).

### PATIOS/BALCONIES/EXTERIOR FRONT DOOR

For the benefit of the appearance of your apartment community, storing of furniture, bicycles, boxes, tires, trash, debris, or any other articles on your patio is expressly prohibited. Please help keep your community clean by not storing your brooms, mops, or laundry on your patio as well. These items should be kept inside and out of view. Nothing is to be hung on the exterior of the building, including on patio and balcony railings. No awnings, screens, partitions, or other projections shall be attached to the outside or other parts of the building without the prior written consent of the Owner. Exterior front door breezeway area should remain clear of trash and clutter. Failure to comply with this will result in a trash fine of $25.00 per violation.

### RESIDENTS

Residents are not allowed to use the driveway, parking areas, landscaped grounds, or pool and recreation room for recreational purposes. NO bicycles, skateboards, or roller-states are to be used at any time on the premises. ALL residents must abide by posted rules and regulations for the pool area. Residents shall not dig up any part of the lawn areas, nor plant any form of shrubs, trees, vines, flowers, or garden plants without the prior written consent of the Management.

Throwing articles of any kind, shaking mops or dust cloths of any nature from the windows, or in the common areas, or "littering" anywhere on the premises is strictly prohibited.

### ALTERATIONS

Alterations to your apartment are prohibited without written consent of the Management. The following are prohibited:

a. The installation of a television antenna or satellite dish. Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and/or receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. Resident further agrees to pay Owner/Agent an additional $250.00 refundable deposit and sign a Satellite Dish and Antenna Addendum prior to installing satellite dish or any other receiving antenna. Resident understands that failure to comply with the terms of the satellite addendum, said dish or receiving antenna may be removed by Owner/Agent without warning at the resident's expense.

b. The use of LARGE nails or adhesive hangers for pictures or mirrors. Only picture hangers or small-framing nails may be used.

c. The boring, marring or puncturing of any part of the equipment, carpet, drapes, fixtures, walls, or ceiling of your apartment.

d. The changing of, or addition of, new locks.

e. Redecoration or painting

f. Resident shall not replace or remove any of the apartment's equipment or furnishings, including but not limited to Washer/Dryer units, Refrigerator, Dishwasher, Stove/Range or Built-In Microwaves. It is prohibited for Resident to add or utilize any additional appliances, including but not limited to Deep Freezer, Upright Freezer, Portable Dishwasher or Washer/Dryer Units and/or Portable Heating or Cooling Systems in apartment. Owner/Management is not responsible for any damage or losses incurred by Resident adding or utilizing any prohibited appliances.

g. No aluminum foil, shades or colored blinds in the windows. All window coverings must be those that are supplied by the Management; however, if you wish to use your own drapes, they must have white backings.

h. Air conditioning apparatus or equipment installed without the prior written consent of the Owner.

i. Resident will not permit or suffer any signs, advertisements, or notices to be displayed, inscribed, painted, or affixed on any part of the outside of the demised premises or any building, except on a directory board if provided by the Owner.

WASATCH
PROPERTY MANAGEMENT

DMSJ000213

 

**COMMON AREAS**

Entrances to all pool, laundry, exercise areas, fire doors and any other common areas are not to be blocked open or propped open in any manner at any time. Residents who fail to properly close or secure these areas will be subject to eviction, as provided by law.

**VEHICLES & PARKING**

All cars must be registered with the office. If you have not registered your car or you have changed cars recently, please contact the Managers office to have it properly registered. Guest's vehicles must be registered with the Manager if they will be parked on-site for more than one day. Illegally parked cars may be towed at the vehicle owner's expense; this includes cars parked in red zones and driveways or parking spaces assigned to other residents. Backing into the parking spaces is prohibited at all times. The Management is NOT RESPONSIBLE for loss of property of residents or guests. No washing or repairing of cars is permitted on the property. All cars parked on the property grounds must be operable AND legal. This means current registration is required. Any vehicle parked on the premises that is not legal will be towed at the vehicle owner's expense. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.

**SMOKE AND CARBON MONOXIDE ALARMS**

Your apartment is equipped with a smoke detection device as well as a building fire alarm. The apartment may be equipped with a carbon monoxide alarm. Resident understands that it is the Residents responsibility to ensure that alarms are in operating condition at all times. If it is battery operated, Resident understands Residents responsibility to perform the manufacturers recommended test to determine if the alarms are operating properly at least once a month. If it is not operating properly, it is Residents responsibility to notify Management immediately in writing. It is a crime to disable, dismantle, or hang anything from, or have less than 18" clearance from smoke detection/sprinkler devices; please leave them intact, they could save your life or that of someone you love.

**FIREARMS AND WEAPONS**

It is the policy of this community that no firearms or weapons of any kind be carried or brought onto any of the community areas controlled by Owner These include but are not limited to: swimming pool areas, clubhouse, leasing offices, community offices, recreational areas, parking lots, playgrounds, common areas, stairways, storage areas, and other areas controlled by Owner. This does not restrict the right of Residents to own guns and have them within their own leased premises. However, such firearms or weapons may only be transported to and from the vehicle directly to the apartment unit. Weapons and firearms may NOT be stored or kept in vehicles parked within the community. To the extent that state or local laws may contradict this policy, it shall be interpreted to be as restrictive as allowed by law.

**RECREATIONAL AREAS**

Hours for use of the recreation facilities are posted. Residents under 14 years of age are allowed in the swimming pools and pool areas only when accompanied by a responsible adult. Please do not give your key to your friends.

All Posted Pool regulations must be followed:
- NO glass bottles/containers are allowed in pool areas.
- NO alcoholic beverages are allowed in pool areas or other common areas.
- NO eating in the pool areas.
- NO nude swimming.
- NO cut-offs.
- NO scuba gear (including masks and fins) or inflatable toys/rafts are allowed in the pool at any time.
- NO more than TWO guests per apartment in the pool area at one time, guests must be accompanied by the Residents they are visiting.
- Residents under the age of 14 are not allowed to use the Jacuzzi at any time.
- Radios are not allowed in the pool area at any time except for use with headphones.

Rey Huskey III                    11-26-14
_____           _____
Rey Huskey III                    Date

_____           11-26-14
Owner authorized agent            _____
                                  Date

LD305 01 Revised 11/15/2013

www.livoorhome.com



WASATCH
PROPERTY MANAGEMENT

DMSJ000214

## SAFE NEIGHBORHOODS ADDENDUM
### We Promote a Drug Free and Crime Free Environment

In Consideration of the execution or renewal of a Residential Rental Agreement of the dwelling unit, located at, 4141 Palm Avenue #191, Sacramento, CA 95842, Logan Park "Owner" and Roy Huskey III, "Resident(s)", agree as follows:

1. Resident(s), any members of the Resident's household or a guest or other person under the Resident's control shall not engage in criminal activity, including drug-related activity, on or near the said premises. "Drug-related criminal activity", means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802]), including the use of medical and/or recreational marijuana.

2. Resident(s), any member of the Resident's household or a guest or other person under the Resident's control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, including the use of medical and/or recreational marijuana, on or near the said premises.

3. Resident(s), any member of the Resident's household or a guest or other person under the Resident's control, will not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug-related criminal activity, including the use of medical and/or recreational marijuana, regardless or whether the individual engaging in such activity is a member of the household, or a guest.

4. Resident(s), any member of the Resident's household, or a guest, or other person under the Resident's control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance, including the use of medical and/or recreational marijuana, as defined in Health & Safety Code §11350, et seq., at any locations, whether on or near the dwelling unit premises or otherwise.

5. Resident(s), any member of the Resident's household, or a guest, or other person under the Resident's control shall not engage in any illegal activity, including: prostitution, as defined in Penal Code §647(b); criminal street gang activity, as defined in Penal Code §186.20 et seq.; assault and battery, as prohibited by Penal Code §240; burglary, as prohibited in Penal Code §459; the unlawful use and discharge of firearms, as prohibited by Penal Code §245; sexual offenses, as prohibited in Penal Code §269 and §288 or any breach of the lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent or other tenant or involving imminent or actual serious property damage.

6. VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE RESIDENTIAL RENTAL AGREEMENT AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY. A single violation of any of the provisions of this added addendum shall be deemed a serious violation and material and irreparable non-compliance. It is understood that a single violation shall be good cause for termination of the Residential Rental Agreement. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be a preponderance of the evidence.

7. In case of conflicts between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.

8. This Residential Rental Agreement Addendum is incorporated into the lease executed or renewed this date 11/26/2014 between Owner and Resident(s).

_____     11-26-14
Roy Huskey III(Lessee)                Date

_____     11-26-14
Owner authorized agent                Date

L0306 01 Revised  11/15/2013



WASATCH
PROPERTY MANAGEMENT

DMSJ000215



# ...atch File Review Checkli...

Resident(s) Name(s): Roy Huskey III, Melissa Huskey (Dependant).

Unit: 191   **Property Name:** Logan Park   **Lease Start Date:** 11/26/2014

| Move In: | Renewal: | TOS: | *(Check one)* |
| --- | --- | --- | --- |

**Agent:**

| | Required Applicant Information and Application Verification | MGR Signoff | Comments |
| --- | --- | --- | --- |
| **Move In Files** | File Cover Sheet & File Review Checklist | | |
| | Move In Cost Sheet | | |
| | Completed and signed application for all individuals (18 yrs and over) | | |
| | Fraud Prevention Checklist completed for each applicant (FTC Law) | | |
| | Proper ID for each applicant (Photo ID and 2nd form of ID(INS/Passport), if possible) | | |
| | Last two paystubs or proof of income for each applicant | | |
| | Resident Check Decisioner reflecting approval results or Regional Override | | |
| | —File must reflect manager approval signature on Rental Application & File Cover Commission Sheet and reflect approval deposit and approved special (if | | |
| | —File approval signed by Regional/Area Leader if credit was overridden and deposits and/or specials adjusted based on credit decision | | |
| | All Addresses Verified (Application, ID, Paystubs, Credit Reporting, (FTC Law) | | |
| | Residential Verification Form completed (2 years verified, in writing) | | |
| | Employment Verfication Form completed (2 years verified, in writing) | | |

| | Lease Documents: | Auditor Signoff | Comments |
| --- | --- | --- | --- |
| | All Lease Documents initialed & signed by resident(s) and leasing/mgmt. | | |
| | Insure lease reflects final Resident Check Approved Deposit or Regional Override | | |
| | Insure lease reflects final Concession from Application Approval or Override | | |
| | Insure all Occupant Names are listed (Lease Holders & Authorized Occps.) | | |
| | All Utilities in Resident(s) name at time of move in | | |
| | Concession Approval Request signed by resident(s) and manager | | |
| | Move In/Move Out Inspection completed by office and signed by all parties | | |

| | Lease Documents: | Auditor Signoff | Comments |
| --- | --- | --- | --- |
| **Renewals** | All Lease Documents initialed & signed by resident(s) and leasing/mgmt. | | |
| | Concession Approval Request signed by resident(s) and manager | | |
| | Proof of Renter's Insurance in file (via Assurant Charge or 3rd Party documentation) | | |
| | **Verification of Voyager Records** | Auditor Signoff | Comments |
| | Tenant screen information matches lease documentation (Lease Dates & Amounts) | | |
| | Lease Charges are properly set up (no end dates, except one time charges) | | |
| | All Occupants loaded into Voyager (Lease Holders & Authorized Occps.) | | |
| | All Vehicle, Animal and Emergency Contact Information loaded in Voyager | | |

| | Physical File Quality (applies to All files) | Auditor Signoff | Comments |
| --- | --- | --- | --- |
| **General** | Overall professional/neat appearance of file (no loose paperwork) | | |
| | Proper file order (following Tax Credit/Bond/Convention File Order Checklist) | | |
| | Properly Labeled File (all files to be labeled in consistent manner) | | |

**Resident Rental Rate:** $840.00     **Bonusable:** YES   NO   Bonus Approval Override _____

                                                                                      Initials

| Market Rate: | $960.00 | $125 mkt | $75 tc Bonus | | |
| --- | --- | --- | --- | --- | --- |
| Target Rate: | $929.00 | $75 Bonus | **Amount of Bonus** | $_____ | (based on Rental Amount) |
| ICE Rate: | $889.00 | $25 mkt | $0 tc Bonus | | |

**File Reviewed By** _____   **Date** _____

*Copy To Monthly File Commission Worksheet submitted to HR for final bonus approval and payment of bonus*     HR704 - WPM File Review Checklist (Revised 12/04)

*w....wasatchome.com*



DMSJ000216

Housing Authority Contracts

DMSJ000217

## SACRAMENTO HOUSING & REDEVELOPMENT AGENCY
## HOUSING CHOICE VOUCHER PROGRAM
### Lease Supplemental Agreement

This is a Lease Supplemental Agreement that is a legal contract between the Owner and the Tenant in regards to lease of the property. It should be carefully read by both parties before signing. This Lease Supplemental Agreement, together with the HUD-prescribed tenancy addendum, will be part of the HA-approved lease form provided by the Owner, if any, and collectively will be the Lease between Owner and Tenant. In the event of a conflict between the terms and conditions set out in the documents comprising the Lease, this Lease Supplemental Agreement shall supersede any conflicting provisions

### 1. PARTIES TO THE AGREEMENT DEFINED:

As used in this lease, the terms 'Owner' and 'Tenant' refer to the following:

a. Tenant **ROY HUSKEY III**

b. Owner **LOGAN PARK APARTMENTS**

Tenant # **t0018323**

Vendor # **004359p**

### 2. PERSONS AUTHORIZED TO RESIDE IN THE UNIT:

**ROY L. HUSKEY III**          **MELISSA HUSKEY**

### 3. UNIT ADDRESS: **4141 PALM AVE 191**
**SACRAMENTO, CA 95842**

### 4. INITIAL LEASE TERM: Begins **7/8/2011** and ends **6/30/2012**

### 5. INITIAL CONTRACT RENT: **$840.00**    INITIAL TENANT RENT: **$286.00**

After the initial one-year Lease term, the Lease shall automatically renew as a month-to-month tenancy unless the Lease is terminated by the Owner, the Tenant, or the Housing Authority for cause in accordance with the provisions of the Lease or for convenience. Under California law, Owner must provide Tenant with 90 days prior notice of Lease termination for convenience notwithstanding the month-to month Lease term.

The owner shall provide or pay for the utilities and appliances indicated below by **"Owner"**. The tenant shall provide or pay for the utilities or appliances indicated below by **"Tenant"**. Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Paid by |
|---|---|
| Air Conditioning | Tenant |
| Cooking Oil/Electric | Tenant |
| Flat Fee Electric | Tenant |
| Heating - Oil/Electric | Tenant |
| Other Electric | Tenant |
| Refrigerator | Owner |
| Sewer | Owner |
| Trash Collection | Owner |
| Water | Owner |

| | | |
|---|---|---|
| ROY HUSKEY III | 916-470-8488 | 7-9-11 |
| | Telephone Number | Date |
| Owner/ Agent | (916) 344 4494 | 7/9/11 |
| | Telephone Number | Date |

Previous editions are obsolete                Page 1 of 1                form HUD-52641 (1/2007)
ref Handbook 7420.8

DMSJ000218