Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | (Fax) (510) 835-1417

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
Telephone: (510) 834-3300 | (Fax) (510) 834-3377

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
Telephone: (510) 437-1863 | (Fax) (510) 437-9164

Jocelyn Larkin (SBN 110817)
jlarkin@impactfund.org
Lindsay Nako (SBN 239090)
lnako@impactfund.org
THE IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704
Telephone: (510) 845-3473 | (Fax) (510) 845-3654

Attorneys for Plaintiffs and Relators and the Certified Classes

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA | Case No.: 2:15-CV-00799-KJM-DB |
| | CLASS ACTION |
| Plaintiffs/Relators, | **PLAINTIFFS' AND RELATORS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | Date:    July 8, 2022 |
| | Time:    10 a.m. |
| WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, | Dept:    Courtroom 3, 15th Floor |
| | Before:  Hon. Chief Judge Kimberly J. Mueller |
| | Trial Date:    None Set |

1  LOGAN PARK APARTMENTS, LLC, LOGAN
   PARK APARTMENTS, LP, ASPEN PARK
2  HOLDINGS, LLC, BELLWOOD JERRON
   HOLDINGS, LLC, BELLWOOD JERRON
3  APARTMENTS, LP, BENT TREE
   APARTMENTS, LLC, CALIFORNIA PLACE
4  APARTMENTS, LLC, CAMELOT LAKES
   HOLDINGS, LLC, CANYON CLUB HOLDINGS,
5  LLC, COURTYARD AT CENTRAL PARK
   APARTMENTS, LLC, CREEKSIDE HOLDINGS,
6  LTD, HAYWARD SENIOR APARTMENTS, LP,
   HERITAGE PARK APARTMENTS, LP, OAK
7  VALLEY APARTMENTS, LLC, OAK VALLEY
   HOLDINGS, LP, PEPPERTREE APARTMENT
8  HOLDINGS, LP, PIEDMONT APARTMENTS, LP,
   POINT NATOMAS APARTMENTS, LLC, POINT
9  NATOMAS APARTMENTS, LP, RIVER OAKS
   HOLDINGS, LLC, SHADOW WAY
10 APARTMENTS, LP, SPRING VILLA
   APARTMENTS, LP, SUN VALLEY HOLDINGS,
11 LTD, VILLAGE GROVE APARTMENTS, LP,
   WASATCH QUAIL RUN GP, LLC, WASATCH
12 PREMIER PROPERTIES, LLC, WASATCH POOL
   HOLDINGS III, LLC,
13 and DOES 1-4,

14      Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

852407.20

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................................................... 1

II.    THE SECTION 8 PROGRAM .............................................................................. 2

III.   PROCEDURAL BACKGROUND ........................................................................ 3

IV.   THE UNDISPUTED MATERIAL FACTS SUPPORT PLAINTIFFS' MOTION. .................. 4

     A.     Wasatch Collects Additional Charges from Section 8 Tenants Beyond the Rent to Owner Authorized by Tenants' HAP Contracts. ................................ 4

     B.     Wasatch Treats the Additional Charges as Rent in Its Standard Forms and Policies. .......................................................................................................... 5

          1.    Wasatch's Forms Describe the Additional Charges as a Component of Rent. ................................................................................... 5

          2.    Wasatch's Accounting Practices Convert Additional Charges into Rent. ........... 6

          3.    Wasatch's "Rent Collections" Policies Require Section 8 Tenants to Pay Additional Charges to Remain in their Homes. ........................... 7

     C.     Wasatch Does Not Disclose Washer and Dryer Charges on the HAP Contracts. ........... 9

     D.     Wasatch Has Required Section 8 Tenants to Purchase Renters Insurance. .................. 9

V.     LEGAL STANDARD .......................................................................................... 10

VI.   ARGUMENT ....................................................................................................... 11

     A.     The Section 8 Program Prohibits Owners from Demanding or Collecting Rent Beyond the "Rent to Owner" Amounts Set by HAP Contract. ....................... 11

     B.     Wasatch's Undisputed Policies and Practices Demonstrate that Additional Charges Are Unlawful Excess Rent Charges. ................................................ 12

          1.    The Additional Charges are "Rent" Based on the Undisputed Record Showing that Wasatch Treats Them as Rent. ................................... 12

                  a.     "Rent" is Payment of a Sum for Use of Property. ................................. 13

                  b.     Wasatch's Section 8 Tenants Must Pay the Additional Charges to Continue Living in their Units. ................................................... 14

                  c.     Wasatch's Practices Undermine the Housing Choice Voucher Program's Protections Against Eviction and its Affordability Guarantees. ....................................................................... 16

          2.    Wasatch Has Charged Section 8 Tenants Unauthorized Appliance Fees in Violation of the Plain Language of Applicable HAP Contracts. ...................... 18

i

852407.20

3.    Wasatch's Renters Insurance Requirement Was Unlawful Under the HAP Contract and Federal Law ........................................................... 19

C.    The Additional Charges Violate the Unfair Competition Law. .................................. 19

D.    The Additional Charges Breach the Tenancy Addendum. ........................................... 20

VII.   CONCLUSION .............................................................................. 20

852407.20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 10

*Aujero v. CDA Todco, Inc.*,
  756 F.2d 1374 (9th Cir. 1985) ........................................................................... 13, 14

*Barrientos v. 1801-1825 Morton LLC*,
  583 F.3d 1197 (9th Cir. 2009) ................................................................................. 17

*United States ex rel. Benitez v. Galliano, LLC*,
  No. 2:15-cv-01688-LDG-NJK, 2018 WL 2247279 (D. Nev. Jan. 26, 2018) ................ 11

*Cal. Found. for Indep. Living Ctrs. v. Cnty. of Sacramento*,
  142 F. Supp. 3d 1035 (E.D. Cal. 2015) .................................................................... 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................ 10

*Coleman v. Hernandez*,
  490 F. Supp. 2d 278 (D. Conn. 2007) ................................................................ 11, 16

*United States ex rel. Holmes v. Win Win Real Est., Inc.*,
  No. 2:13-cv-02149-APG-GWF, 2015 WL 6150594 (D. Nev. Oct. 19, 2015) ............... 11

*Kelly v. Denault*,
  374 F. Supp. 3d. 884 (N.D. Cal. 2018) ................................................................. 3, 17

*M.E. Blatt Co. v. United States*,
  305 U.S. 267 (1938) ........................................................................................... 13, 14

*United States ex rel. Mathis v. Mr. Prop., Inc.*,
  No. 2:14-cv-00245-GMN-NJK, 2015 WL 1034332 (D. Nev. Mar. 10, 2015) .............. 11

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) ........................................................................................... 13

*Nozzi v. Hous. Auth.*,
  806 F.3d 1178 (9th Cir. 2015) ............................................................................... 2, 3

*United States ex rel. Price v. Peters*,
  66 F. Supp. 3d 1141 (C.D. Ill. 2013) ......................................................... 11, 14, 17

*Sager v. Hous. Comm'n of Anne Arundel Cnty.*,
  957 F. Supp. 2d 627 (D. Md. 2013) ..................................................... 14, 15, 16, 17

852407.20

*United States ex rel. Sutton v. Reynolds,*
    564 F. Supp. 2d 1183 (D. Or. 2007) ..................................................................... 3, 11

*United States v. Pileggi,*
    192 F.2d 878 (2d Cir. 1951) ..................................................................................... 19

*Velez v. Cuyahoga Metro. Hous. Auth.,*
    795 F.3d 578 (6th Cir. 2015) ..............................................................................*passim*

**State Cases**

*Brown v. Grimes,*
    192 Cal. App. 4th 265 (2011) .................................................................................... 20

*Cache Cnty. v. Beus,*
    978 P.2d. 1043 (Utah Ct. App. 1999); *Webster v. Litz*, 491 P.3d 171, 173 (Wash. Ct.
    App. 2011) ................................................................................................................ 17

*De La Torre v. CashCall, Inc.,*
    5 Cal. 5th 966 (2018) ............................................................................................... 19

*Gutierrez v. Carmax Auto Superstores Cal.,*
    19 Cal. App. 5th 1234 (2018) ................................................................................... 19

*NIVO 1 LLC v. Antunez,*
    217 Cal. App. 4th Supp. 1 (Cal. App. Dep't Super. Ct. 2013) ................................. 17

*Oasis W. Realty, LLC v. Goldman,*
    51 Cal. 4th 811 (2011) .............................................................................................. 20

*Webster v. Litz,*
    491 P.3d 171 (Wash. Ct. App. 2011) ........................................................................ 17

*Wilhite v. Scott Cnty. Hous. & Redev. Auth.,*
    759 N.W.2d 252 (Minn. Ct. App. 2009) ................................................................... 17

**Federal Statutes**

26 U.S.C.
    § 42(g)(2)(B)(i) .......................................................................................................... 10

False Claims Act, 31 U.S.C. ................................................................................ 2, 3, 4
    §§ 3729-3733 ............................................................................................................ 2, 3, 4
    § 3729(a) .................................................................................................................... 3
    § 3731(b)(2) ............................................................................................................... 3

Housing Act, 42 U.S.C.
    § 1437f ...................................................................................................................... 13
    § 1437f(a) ............................................................................................................... 2, 13
    § 1437f(c) .................................................................................................................. 13

iv

852407.20

§ 1437f(c)(1)(A) ............................................................................................. 3, 20
§ 1437f(c)(2)(A), (o)(2), (o)(3) ......................................................................... 3
§ 1437f(c)(3) ...................................................................................................... 3
§ 1437f(o)(7)(C) ............................................................................................ 15, 17

**State Statutes**

Ariz. Rev. Stat. Ann. § 33-1368(A) ...................................................................... 17

Cal. Civil Code
§ 3300 *et seq.* ..................................................................................................... 3

Cal. Consumer Legal Remedies Act, Cal. Civil Code
§ 1750 ................................................................................................................. 3

Unfair Competition Law, Cal. Bus. & Prof. Code
§ 17200 *et seq.* ......................................................................................... *passim*
§ 17204 ............................................................................................................. 19

**Rules**

Fed. R. Civ. P.
23(b)(3) .............................................................................................................. 4
56(a) ................................................................................................................. 10

**Regulations**

24 C.F.R.
§ 981.162(a)(2) ................................................................................................... 2
§ 982 ............................................................................................................. 2, 13
§ 982.1(a) ........................................................................................................... 2
§ 982.1(a)(1) ...................................................................................................... 17
§ 982.4(b) ........................................................................................................... 3
§ 982.162(a) ....................................................................................................... 2
§ 982.305(a)(3) ................................................................................................... 2
§ 982.308(f) ........................................................................................................ 2
§ 982.308(f)(2) ............................................................................................... 2, 20
§ 982.310(a) ...................................................................................................... 17
§ 982.310(a)(1) .................................................................................................. 17
§ 982.451 .......................................................................................................... 20
§ 982.451(a) ........................................................................................................ 2
§ 982.451(b)(3) ................................................................................................... 3
§ 982.451(b)(4)(i) ............................................................................................... 3
§ 982.451(b)(4)(ii) ................................................................................. 3, 11, 13, 19
§ 982.503 ............................................................................................................ 3
§ 982.507(a) ................................................................................................... 3, 18
§ 982.507(b) ................................................................................................... 3, 18
§ 982.508 ............................................................................................................ 3

**Other Authorities**

64 Fed. Reg. 56894, 56904 (Oct. 21, 1999) ............................................................. 17

Black's Law Dictionary (11th ed. 2019) ............................................................. 17

HUD-52641 (7/2019), https://www.hud.gov/sites/dfiles/OCHCO/documents/52641.pdf ................... 9

U.S. Gov't Accountability Off., *Housing Choice Voucher Program: Limited Indications
of Potential Fraud against Participants Identified* 12 (Dec. 2017)................................ 16

852407.20

## I.   **INTRODUCTION**

Wasatch Property Management ("Wasatch") has rented apartments to thousands of tenants participating in the Section 8 Housing Choice Voucher ("Section 8") program throughout California, Utah, Arizona, and Washington.  Despite agreeing in federally mandated contracts not to charge more than an approved rent amount, Wasatch has required low-income Section 8 tenants to pay additional fees for amenities like in-unit washer and dryers, renters insurance, parking, and media packages listed on "Additional Services Agreements" included with the tenants' leases.

Plaintiffs and Relators ("Plaintiffs") move for partial summary judgment against Wasatch on the issue of whether these additional charges constitute unlawful excess rent in violation of the Housing Assistance Payment Contracts ("HAP Contracts") and federal law.  The undisputed facts show that Wasatch both describes the additional charges as a component of rent and treats the charges like rent in all material respects.  Wasatch automatically applies tenant rental payments first to additional charges owing, with the express purpose of being able to treat any remaining amounts as rent.  In form notices and other communications, Wasatch tells Section 8 tenants they must pay the additional charges "to continue occupying the rental unit."  *Velez v. Cuyahoga Metro. Hous. Auth.*, 795 F.3d 578, 586 (6th Cir. 2015).  Payments that tenants are required to make to continue living in their homes constitute "rent" as the term is used in federal law governing the Section 8 program.  *Id.*  Accordingly, the Court should find that all of the charges at issue constitute illegal excess rent and grant partial summary judgment to Plaintiffs on this issue.

Undisputed facts also show that a subset of the charges qualify as unlawful excess rent on additional and independent grounds.  First, Wasatch has charged Section 8 tenants separate fees for washers and dryers despite an express prohibition on unauthorized appliance charges in the applicable HAP Contracts.  *Accord* Order Mot. Dismiss 9-10, ECF No. 61.  Second, until recently, Wasatch required Section 8 tenants to purchase renters insurance as a precondition to signing their lease.  Requiring tenants to incur additional costs to lease the unit constitutes unlawful excess rent.

Because Wasatch's additional charges violate federal regulations governing the Section 8 program, demanding and collecting those charges from Section 8 tenants constitutes an unlawful business practice in violation of the Unfair Competition Law, California Business and Professions Code

1

852407.20

section 17200 *et seq.* ("UCL").  This Court should thus find that the additional charges are a violation of the UCL on a class basis.  Similarly, because the additional charges violate the Tenancy Addendum contained in Part C of the HAP Contract, and there are no factual disputes as to any of the remaining elements, the Court should rule that the additional charges are a breach of contract on a class basis.[1]

## II.    THE SECTION 8 PROGRAM

Designed to "aid[] low-income families in obtaining a decent place to live," the Housing Choice Voucher program, commonly known as "Section 8," subsidizes low-income tenants' housing costs on the private market.  42 U.S.C. § 1437f(a); *see generally Nozzi v. Hous. Auth.*, 806 F.3d 1178, 1184-85 (9th Cir. 2015).  The Section 8 program is funded by the U.S. Department of Housing and Urban Development ("HUD") and administered by local public housing authorities ("PHAs").  24 C.F.R. § 982.1(a).  The program is governed by federal regulations with limited areas for discretion to be exercised by the PHAs.  *See generally* 24 C.F.R. Part 982.

In addition to federal law, Section 8 tenancies are governed by the HAP Contract, a standard HUD document which is signed by the landlord and the PHA at the outset of the tenancy.  24 C.F.R. §§ 982.162(a), 982.451(a).  Both the HAP Contract and the lease must include the Tenancy Addendum (Part C of the HAP Contract), which states the rights of the tenant under the HAP Contract. *Id.* §§ 981.162(a)(2), 982.305(a)(3), 982.308(f); HAP Contract Part B, ¶ 2c, Bellows Decl. Ex. 13 at 50.[2]  The tenant may enforce the Tenancy Addendum against the owner, and its terms "prevail over any other provision of the lease."  24 C.F.R. § 982.308(f)(2); *see also* HAP Contract Part C, ¶¶ 2b, 14.

Federal law limits the rent that owners can charge for contract units.  By law, the HAP Contract "establish[es] the maximum monthly rent (including utilities and all maintenance and management

---

[1] Plaintiffs also contend that Wasatch required Section 8 tenants to enroll in media packages, parking charges and/or washer and dryer charges at some properties, but do not seek summary judgment on this basis due to disputes of material fact.  Additionally, Plaintiffs are not seeking a liability finding as to their claims brought under the California Consumers Legal Remedies Act ("CLRA") or the federal False Claims Act ("FCA"), as triable issues of fact remain on these claims.  The remedies for all violations will be addressed in future proceedings.  Additionally, the vicarious liability other Defendants is reserved for Phase 2.  Order Grant'g Leave File Am. Compl. 5, ECF No. 135.

[2] Bellows Exhibit 13 collects versions of the HAP Contract that were used by HUD over the period relevant to this case, as drawn from tenant documents produced by Wasatch.  Unless otherwise noted, future citations to the HAP Contract will use the paragraph numbering reflected in the April 2015 version at pages WEAU00020649-56 of Bellow Exhibit 13 at pages 47-58.

charges) which the owner is entitled to receive." 42 U.S.C. § 1437f(c)(1)(A).  Before executing a HAP Contract, the local PHA must determine that the rent amount is "reasonable." 24 C.F.R. § 982.507(a), (b).  The PHA then calculates the tenant's share, which is limited to 30-40% of the tenant's monthly adjusted income, depending on whether the rent amount exceeds the "payment standard" set by the PHA pursuant to HUD regulations.  42 U.S.C. § 1437f(c)(2)(A), (o)(2), (o)(3); 24 C.F.R. §§ 982.503, 982.508; *see also Nozzi*, 806 F.3d at 1184-85 (explaining the "payment standard" and calculation of the tenant's share).  Some tenants are so low-income they pay nothing towards rent.  The PHA pays the balance with federal funds.  42 U.S.C. § 1437f(c)(3); 24 C.F.R. § 982.4(b).  The total paid by the tenant and the government cannot exceed the contract rent (or "rent to owner") in the HAP Contract.  24 C.F.R. § 982.451(b)(3), (b)(4)(i)-(ii); HAP Contract Part C, ¶ 5.

Both by regulation and contract, the owner is expressly forbidden to charge or collect excess rent from the tenant beyond their share of the rent to owner.  24 C.F.R. § 982.451(b)(4)(ii); HAP Contract Part C, ¶¶ 5e, 5f.  "'Collecting extra or "side" payments in excess of the family share of rent' ... qualifies as fraud and/or abuse."  *United States ex rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183, 1187 (D. Or. 2007) (quoting HUD, Housing Choice Voucher Program Guidebook 22-2 (Apr. 2001)).  "Most importantly," the program's essential purpose of "aid[ing] low-income families in obtaining housing" is "'clearly undermined when a program participant overcharges a beneficiary of the program.'"  *Kelly v. Denault*, 374 F. Supp. 3d. 884, 892 (N.D. Cal. 2018) (citation omitted).

### III.   PROCEDURAL BACKGROUND

As Relators on behalf of the United States, Plaintiffs assert that Defendants violated the FCA by certifying their compliance with the terms of the HAP Contracts and HUD regulations to receive federal subsidies, while also collecting additional rent from Section 8 tenants in the form of charges imposed by the Additional Services Agreements.  *See* 31 U.S.C. § 3729(a).  The FCA claim addresses Wasatch's companywide practices in California, Utah, Arizona, and Washington.  The liability period for the FCA claim is April 4, 2005, to the present.  *See* 31 U.S.C. § 3731(b)(2).

In addition, on behalf of the certified California classes, Plaintiffs argue that Wasatch's practices in collecting the additional charges from Section 8 tenants (1) constitute a breach of the HAP Contract, California Civil Code section 3300 *et seq.*; (2) violate the CLRA, California Civil Code section 1750;

3

852407.20

1    and (3) constitute an unlawful, unfair, and/or fraudulent business practice in violation of the UCL.  The

2    liability period for the Federal Rule of Civil Procedure 23(b)(3) ("Rule 23") class is April 14, 2011, to

3    the present.  Order 10, ECF No. 114 (clarifying the class period).

4         On September 14, 2016, Defendants moved to dismiss the complaint, arguing that because the

5    additional charges were for amenities pursuant to signed agreements, they were not "rent," and therefore

6    did not violate the HAP Contract.  Defs.' Mem. P.&A. Supp. Mot. Dismiss 5, ECF No. 26-1.  In denying

7    the motion, this Court explained that "defendants' argument that the additional charges cannot constitute

8    rent because they were part of a separate agreement may be rejected outright," noting that "[c]ourts

9    consistently have held that extra charges, even when labeled as additional amenities, can constitute

10   illegal side payments." Order Mot. Dismiss 6, ECF No. 61 (collecting cases).

11        The Court certified two California classes on July 30, 2018 (Order, ECF No. 92) and ruled on the

12   Rule 23(b)(3) class period on January 15, 2020 (Order, ECF No. 114).  On August 6, 2021, the Court

13   allowed the filing of the Fifth Amended Complaint and bifurcated the case into two phases.  Order, ECF

14   No. 135.  The litigation is currently in Phase 1, which addresses merits issues.  Vicarious liability and

15   FCA penalties and treble damages are reserved for Phase 2.  *Id.* at 5-6.  The instant motion addresses

16   many of the major issues in Phase 1, though others remain to be tried.

### IV.    THE UNDISPUTED MATERIAL FACTS SUPPORT PLAINTIFFS' MOTION.

**A.    Wasatch Collects Additional Charges from Section 8 Tenants Beyond the Rent to Owner Authorized by Tenants' HAP Contracts.**

20        For thousands of Section 8 tenants over the relevant time period, Wasatch has entered into three

21   agreements applicable here: the HAP Contract, Wasatch's standard Residential Rental Agreement, and

22   its separate "Additional Services Agreement."  Statement of Undisputed Facts ("U.F.")  Nos. 1-3, 6, filed

23   herewith.  The Additional Services Agreement is a standard form that Wasatch uses to enroll tenants in

24   monthly charges for items like parking, in-unit washers and dryers, renters insurance, media packages,

25   and an affiliated credit-reporting service called "RentPlus."  U.F. No. 3.  Wasatch separates these

26   additional service charges from what it calls the "base rent" for the unit.  U.F. No. 4.  Wasatch requires

27   tenants to pay the additional charges throughout the terms covered by the tenants' leases.  U.F. No. 5.

28

4

Throughout the relevant period, Wasatch has not included additional charges in the amount of "rent to owner" in required Section 8 paperwork, including HAP Contracts.  U.F. No. 7.  Instead, the "rent to owner" amounts supplied by Wasatch correspond to the "base rent" for the unit, exclusive of any additional service charges.  *Id*.  This is deliberate.  Separating the additional charges from the reported rent, in the context of an affordable housing program like Section 8, allows Wasatch to make more money from that unit notwithstanding the program's rent limitations.  Johnson Dep. 80:1-83:5, Nov. 10, 2021, Bellows Ex. 9 at 6-9.

**B.**   **Wasatch Treats the Additional Charges as Rent in Its Standard Forms and Policies.**

While Wasatch does not tell the government the additional charges are "rent," it requires its Section 8 tenants to pay the charges or face the threat of eviction and loss of their housing voucher.

**1.**   **Wasatch's Forms Describe the Additional Charges as a Component of Rent.**

Standard Wasatch forms used throughout the relevant period make clear that additional service charges are a component of the monthly payment required to maintain tenancy.  The "Rent" section of Wasatch's "Residential Rental Agreement" requires tenants to pay the additional service charges along with the base rent.  U.F. No. 11.  The lease also contains a page called the "Monthly Cost Breakdown" which totals "base rent" with the additional charges and any applicable tax into a "Total Monthly Obligation."  U.F. No. 12.  The form instructs tenants, "Your monthly payment is due and payable ... on or before the 1st day of each month," and specifies the methods by which tenants can make their "monthly payment."  *Id.*

When the end of a tenant's lease approaches, Wasatch sends tenants a form renewal notification letter informing them of the "new rental rate" that will take effect when they renew their lease.  U.F. No. 13.  The form letter explains that "[t]his rate includes rent and any applicable service items (such as parking, renters insurance, pet, etc.)."  *Id.*  Other standard forms used to communicate with tenants likewise combine rent and additional charges.  *See, e.g.*, U.F. No. 14 (Move-In Cost Sheets list one combined amount for "Rent and Additional Services," providing an amount for "Total Move In & First Month's Rent" that includes additional charges, and stating a "total monthly obligation ... not including monthly utilities"); U.F. No. 15 (Monthly Statements of Rental Account inform tenants that "[t]he first of

5

1  the month is quickly approaching and rent will be due," providing a "Total Due" that includes additional

2  charges, and informs tenants they will incur a late fee "[i]f rent is not paid by 5:00 pm on the 3rd").

3       A "Terms and Conditions" sheet previously included in the Additional Services Agreement

4  underscored that, just like rent, Wasatch required tenants to pay additional charges to continue their

5  tenancy: "A default under this Agreement is a default under the Lease .... If Lessee fails to pay any

6  Monthly Fee when due or if Lessee fails to perform any other obligation contained in the Agreement

7  within the time required, the Lessor may terminate not only this Agreement, but shall cause the

8  Community to terminate the Residents [sic] tenancy upon service and expiration of a Ten Day Notice to

9  Perform Covenant or Quit for failure to pay said Monthly Fee(s)[.]"  U.F. No. 8.  Wasatch eliminated

10 that page as part of an initiative to reduce the page count of the lease package, but the company's policy

11 of regarding a default under the Additional Services Agreement as a default under the lease has not

12 changed.  U.F. Nos. 9, 10.  Wasatch continues to treat payment of the charges as a mandatory

13 requirement for tenants to maintain their tenancy, as illustrated by its accounting and collections policies

14 described below.

15       **2.    <u>Wasatch's Accounting Practices Convert Additional Charges into Rent.</u>**

16       To maximize its collections leverage, throughout the relevant period Wasatch has implemented a

17 payment allocation policy designed specifically to convert any unpaid amounts—including unpaid

18 additional charges—into unpaid rent.  U.F. Nos. 16-18.  Any tenant payments are applied first to charges

19 like renters insurance, parking, washer and dryer, and media packages; whatever remains after those and

20 other charges are paid is applied to rent.  U.F. No. 16.  For much of the liability period, Wasatch leases

21 informed tenants that their rent payments would be applied first to "all sums owing" (or, in another

22 formulation, "to any past balance due, then to additional charges"), and then to rent. U.F. No. 21.  While

23 the language was removed from the lease sometime prior to 2018, the payment allocation policy has

24 remained the same throughout the relevant period.  U.F. No. 22.

25       Wasatch's own description of its payment allocation policy, or "payment priority sequence,"

26 explains its purpose:

27           The computer is programmed to apply all payments to all items other than
            RENT first, leaving any delinquent portion as RENT owed.  In most areas
28           that Wasatch operates, properties can only go to court for RENT and not for
            deposits, additional service items (pet parking, storage, etc).

6

852407.20

U.F. No. 18.  Wasatch's corporate officers and designees candidly agree that the purpose of the payment sequence is to ensure that any unpaid amounts are "rent" so that the company can initiate an eviction based on the unpaid amount.  U.F. No. 17, *see esp.* Johnson Dep. 121:7-15, 122:9-123:3, July 19, 2021, Bellows Ex. 9 at 15-17; Fetter Dep. 109:6-111:20, Oct. 27, 2021, Bellows Ex. 3 at 16-18.  They also acknowledge that the company "would be unsuccessful in pursuing … an eviction for anything but rent." Johnson Dep. 122:16-18, July 19, 2021, Bellows Ex. 9 at 16; *see also* U.F. No. 19.  The payment allocation policy circumvents that barrier by converting any unpaid additional service charges into "rent."  U.F. No. 17, 19; *see esp.* Johnson Dep. 120:2-123:3, July 19, 2021, Bellows Ex. 9 at 14-17.

Jarom Johnson, Wasatch's former Chief Operating Officer, has pointed out that this payment sequence is particularly useful in obtaining payments from low-income Section 8 tenants.  Because Section 8 tenants will lose their voucher if they are evicted for non-payment of rent, they are especially motivated to pay outstanding amounts when threatened with eviction.  Johnson Dep. 125:17-128:16, July 19, 2021, Bellows Ex. 9 at 18-21; Johnson Decl. in Supp. Opp'n Mot. Class Cert. ¶ 8, ECF No.78-4; *see* U.F. 20.

### 3.   Wasatch's "Rent Collections" Policies Require Section 8 Tenants to Pay Additional Charges to Remain in their Homes.

Other Wasatch collection policies and practices also make clear to tenants that they must pay additional charges or face eviction.  Wasatch's standard policies regarding the collection of "accounts receivable" from tenants are set out in a policy document entitled "Rent Collections Best Practices-How To."  U.F. No. 23.  The collection policies described in that document have been in place throughout the relevant period, setting aside changes required by federal, state, and local emergency measures during the COVID-19 pandemic.  U.F. No. 24.

For "small balances" under $100, Wasatch sends tenants "notice that future rents will not be accepted unless paid in full."  U.F. No. 25.  In other words, tenants must pay all outstanding charges, including any additional service charges, or Wasatch will not accept future rent payments.  *Id.*

Wasatch requires that a "Pay or Quit Notice be served to the resident" for any "large balance" of $100 or more, which can be made up in whole or in part of additional charges.  U.F. No. 26.  These notices, which are a precondition to eviction proceedings in every state where Wasatch operates, inform

tenants that they will face eviction proceedings unless they either pay the full amount stated or vacate their unit within a certain number of days (*e.g.*, three days for California).  U.F. Nos. 28, 29.

Throughout the relevant period, Wasatch has served pay or quit notices on Section 8 tenants notifying them that they must pay outstanding additional service charges in order to avoid eviction.  In some cases, the additional service charges are included with unpaid rent in a total amount outstanding, which the tenant must pay in full in order to avoid eviction.  Bellows Decl. Ex. 19 *cited in* U.F. No. 27.  In other cases, Wasatch serves pay or quit notices solely for additional service charges and other non-rent amounts (such as utilities or late fees).  Bellows Decl. Ex. 20 *cited in* U.F. No. 27.  In many instances, the sole outstanding charges on the notices are additional charges.  *Id.* at 1, 4, 6-8, 10, 13, 16, 20-26.  In fact, notwithstanding its executives' acknowledgment that Wasatch cannot evict tenants for nonpayment of non-rent charges, Wasatch has a standard pay or quit notice that is tailored precisely to demanding payment of additional service charges and other miscellaneous charges (in contrast with notices that specifically demand unpaid rent, frequently entitled "Pay Rent or Quit" notices).  The California version of this form, called a "Three Day Notice to Comply with Financial Covenant or Quit," informs tenants that they have breached their lease by failing to pay the listed charges, and that Wasatch will initiate eviction proceedings against them unless they either pay the amount owed or vacate their home within three days.  *Id.* at 1-4, 7-10, 13-14, 17, 20-27.

Although not required by the "Rent Collections" policy document, Wasatch also has encouraged its property-level personnel to serve pay or quit notices to help with collecting small balances (*i.e.*, those less than $100) from tenants, including specifically for the purposes of collecting unpaid additional charges.  Wiles Apr. 22, 2019 email (Johnson Ex. 17), Bellows Decl. Ex. 28; Johnson Dep. 147:23-150:5, Bellows Decl. Ex. 9 at 32-35; Wiles Apr. 22, 2019 email (Fetter Dep. Ex. 39), Bellows Decl. Ex.22; *cited in* U.F. 30.  And indeed, Wasatch personnel have frequently served pay or quit notices on Section 8 tenants for unpaid additional charges where the total outstanding amount is less than $100.  U.F. No. 31.  Wasatch has served such notices on Section 8 tenants for as little as one or two dollars of unpaid additional charges. Bellows Decl. Ex. 20 at 1-4, 6-10, 12-13, 18, 20-27.

8

**C.**     **Wasatch Does Not Disclose Washer and Dryer Charges on the HAP Contracts.**

Wasatch routinely charges Section 8 tenants for in-unit washers and dryers separately from the "base rent" that corresponds to the "rent to owner" set out in HAP Contracts.  U.F. No. 32.  Until recently, the "Utilities and Appliances" section in Part A of the HAP Contract required that, *unless otherwise specified in the HAP Contract*, "the owner shall pay for all ... appliances provided by the owner."  U.F. No. 33; HAP Contract Part A.  Wasatch uniformly failed to specify in Part A that tenants were required to pay fees for in-unit washers and dryers.  U.F. No. 34.

In July 2017 this Court ruled that collecting fees for washer and dryer charges that were not authorized in the "Utilities and Appliances" section violated the HAP Contract.  Order Mot. Dismiss 9-10, ECF No. 61.  Even after receiving this ruling, Wasatch took no steps to change its practice.  Johnson Dep. 197:11-202:8, Bellows Decl. Ex. 9 at 40-45.  Two years later, HUD updated the HAP Contract and removed the relevant language.[3]

**D.**     **Wasatch Has Required Section 8 Tenants to Purchase Renters Insurance.**

Until recently, Defendants required Section 8 tenants to purchase renters insurance as a condition of living in many Wasatch properties.[4]  U.F. No. 37.  Standard Wasatch Residential Rental Agreements from before December 2019 contained a provision requiring tenants to maintain renters insurance and stated that if they were ever without coverage during their tenancy, "resident(s) agree[d] to be enrolled in the 'pay along with rent' program and being charged accordingly."[5]  U.F. No. 38. Tenants were therefore required to make additional payments beyond their share of rent to owner for renters insurance—either to Wasatch or to a third-party insurer.  U.F No. 39.  Section 8 tenants were subject to the renters insurance requirement wherever it was in place at Wasatch-managed properties.  U.F. No. 40.

---

[3] *See* Form HUD-52641 (7/2019), https://www.hud.gov/sites/dfiles/OCHCO/documents/52641.pdf. PHA implementation of the revised form for new Section 8 move-ins was not immediate.  *See, e.g.*, WEAU00027683-84, Bellows Decl. Ex. 44 at 41-42. Tenants whose HAP Contracts contain the post-July 2019 language can be identified at the damages stage based on Wasatch's tenant files.

[4] A list of properties where the renters insurance requirement was in effect, as demonstrated by leases produced by Defendants, is set out as Exhibit 42 to the Bellows declaration filed herewith.

[5] Wasatch phased out its renters insurance requirement beginning in December 2019.  "Renters Insurance Requirement Change" (Johnson Dep. Ex. 26), Bellows Decl. Ex. 29 *discussed in* Johnson 7/19/21 Dep. 210:14-211:25, July 19, 2021, Bellows Decl. Ex. 9 at 46-47.

9

852407.20

The only exception to Wasatch's renters insurance requirement applied to some tenants at properties participating in the Low-Income Housing Tax Credit Program ("LIHTC"), a federal program that imposes rent limits.  U.F. No. 41. Wasatch's rental agreements for LIHTC properties do not include provisions requiring tenants to purchase rental insurance.  Fetter Dep. 305:13-306:19, Oct. 28, 2021, Bellows Decl. Ex. 3 at 50-51.  However, beginning in fall 2011, "for any tenant [who was] under the max tax credit rent," Wasatch made renters insurance "mandatory as long as that additional expense does not push [the tenant] over the max rent" under the LIHTC program.  Thatcher email (Jarvis Dep. Ex. 33), Bellows Decl. Ex. 25; *see also* U.F. No. 42.  This rule fell with particular force on Section 8 tenants at Wasatch's LIHTC properties, since only the amount of rent paid by the tenant counts towards the LIHTC rent limit.  *See* 26 U.S.C. § 42(g)(2)(B)(i); *see also* "How-To Voucher Rents" (Johnson Dep. Ex. 12), Bellows Decl. Ex. 26 (Wasatch training document discussing the interaction of LIHTC program and Section 8 rent amounts).  An expert analysis of Wasatch's tenant data identified 1,131 Section 8 tenants at LIHTC properties, including 909 class members, who paid renters insurance fees to Wasatch while subject to this requirement.  Breshears Report ¶¶ 13, 38-41 & Exs. 7 & 9; *see also* U.F. No. 40.

## V.   LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" as to a claim or defense, or "part of [a] claim or defense." Fed. R. Civ. P. 56(a).  The substantive law determines "which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The burden then shifts to the non-moving party to 'go beyond the pleadings' and 'designate specific facts' in the record to show a trial is necessary to resolve genuine disputes of material fact."  *Cal. Found. for Indep. Living Ctrs. v. Cnty. of Sacramento*, 142 F. Supp. 3d 1035, 1054 (E.D. Cal. 2015) (quoting *Celotex*, 477 U.S. at 324).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

## VI.   ARGUMENT

**A.   The Section 8 Program Prohibits Owners from Demanding or Collecting Rent Beyond the "Rent to Owner" Amounts Set by HAP Contract.**

Federal law and the HAP Contract limit the rent that an owner may charge a Section 8 tenant and strictly forbid the owner from charging or collecting "any payment for rent of the unit in addition to the rent to owner."  HAP Contract Part C, ¶ 5e; *see also* 24 C.F.R. § 982.451(b)(4)(ii) ("The owner may not demand or accept any rent payment from the tenant in excess of this maximum, and must immediately return any excess rent payment to the tenant").  Moreover, in signing the HAP Contract, the owner certifies that "[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration ... for rental of the contract unit."  HAP Contract Part B, ¶ 8d.

Because there is no dispute that Wasatch collects the additional charges at issue here outside of the "rent to owner" amount agreed to in the applicable HAP Contracts, those charges are unlawful if they constitute "payment for rent of the unit."  HAP Contract Part C, ¶ 5e; *see also* 24 C.F.R. § 982.451(b)(4)(i)-(ii) (prohibiting owners from demanding or accepting excess "rent payments").

Courts, including this one, have consistently held that additional charges, even when labeled as amenity fees, can constitute illegal demands for excess rent—*i.e.*, prohibited "side payments."  Order Mot. Dismiss 6, ECF No. 61 (service charges can constitute illegal side payments); *United States ex rel. Price v. Peters*, 66 F. Supp. 3d 1141, 1149 (C.D. Ill. 2013) (extra charges for storage shed violated HAP Contract; granting summary judgment to relator); *Sutton*, 564 F. Supp. 2d at 1187 (side charges for landscaping services could violate HAP Contract); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 280 (D. Conn. 2007) (extra charges for water usage were illegal side payments); *United States ex rel. Benitez v. Galliano, LLC*, No. 2:15-cv-01688-LDG-NJK, 2018 WL 2247279, at *5, *9 (D. Nev. Jan. 26, 2018) (sewer and trash fees greater than agreed to in the HAP Contract were illegal; granting summary judgment to relator); *United States ex rel. Holmes v. Win Win Real Est., Inc.*, No. 2:13-cv-02149-APG-GWF, 2015 WL 6150594, at *4 (D. Nev. Oct. 19, 2015) (property management and HOA fees were illegal charges for excess rent; granting summary judgment to relator); *United States ex rel. Mathis v. Mr. Prop., Inc.*, No. 2:14-cv-00245-GMN-NJK, 2015 WL 1034332, at *4-5 (D. Nev. Mar. 10, 2015) (pool maintenance fees could violate HAP Contract).

Add-on charges are unlawful excess rent in a number of circumstances, including several relevant here. As described above, until recently the HAP Contract expressly prohibited appliance charges unless authorized by the HAP Contract itself. Other additional charges are permitted only where optional and independent of tenancy. Charges that tenants are required to incur as a condition of living at the property are also considered unlawful excess rent, as Wasatch's own witnesses have acknowledged. *Velez*, 795 F.3d 585, 586 n.13 (citing *United States v. Pileggi,* 192 F.2d 878, 879 (2d Cir. 1951)); *see, e.g.*, Johnson Dep. 57:15-58:21, 84:23-85:4, July 19, 2021, Bellows Decl. Ex. 9 at 3-4, 10-11. Additionally, whether or not tenants are required to agree to a given charge at the outset of the lease, "a monthly charge that the tenants [are] required to pay to continue occupying the rental unit" qualifies as "rent" under the ordinary meaning of the term. *Velez*, 795 F.3d at 586; *see also* Order Mot. Dismiss 7-8, 10-11, ECF No. 61.

**B.** **Wasatch's Undisputed Policies and Practices Demonstrate that Additional Charges Are Unlawful Excess Rent Charges.**

This Court should rule as a matter of law that all of the additional fees charged by Wasatch under its Additional Services Agreements violate the HAP Contract and federal law because Wasatch treats the charges in all material respects as rent. The Court should also hold that Wasatch's washer and dryer charges and its renters insurance requirement violated the HAP Contract and federal law on additional and independent grounds applicable to those charges, as set out below.[6]

**1.** **The Additional Charges are "Rent" Based on the Undisputed Record Showing that Wasatch Treats Them as Rent.**

The record is clear and undisputed. Once a Section 8 tenant is enrolled in a charge on the Additional Services Agreement, that charge becomes part of their "total monthly obligation" or "rental rate." Wasatch's accounting and collection policies require tenants to pay the additional charges or face the threat of eviction and loss of their voucher. Because these undisputed facts satisfy the ordinary meaning of "rent" as the term is used in the Section 8 program, the Court should rule as a matter of law that the additional charges, as administered by Wasatch, are additional rent beyond the rent to owner

---

[6] Plaintiffs also contend that Section 8 tenants were required to enroll in other charges—including media charges, parking charges, and washer and dryer charges—at certain properties. Due to disputes of fact, Plaintiffs are not moving for summary judgment on this alternative theory.

1    stated in the HAP Contract and violate the HAP Contract and federal law.  *See* HAP Contract Part B,

2    ¶ 8d, Part C, ¶ 5(e) (barring additional charges for rent of the unit beyond the agreed-upon rent to owner);

3    24 C.F.R. § 982.451(b)(4)(i)-(ii) (same).

4                    a.      **"Rent" is Payment of a Sum for Use of Property.**

5           "Rent" is not explicitly defined in the statute governing the Section 8 program or its

6    implementing regulations.  *See Velez*, 795 F.3d at 582-83, 582 n.8. *See generally* 42 U.S.C. § 1437f; 24

7    C.F.R. § 982.  In construing terms in a statute, courts look to the terms' "ordinary meaning" at the time

8    the statute was enacted and analyze "'all the textual and structural clues' bearing on that meaning."  *Niz-*

9    *Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) (internal citation omitted).  In interpreting federal law,

10   courts "draw on federal definitions, not definitions that arise under the common law of discrete states."

11   *Velez*, 795 F.3d at 583 (citing *Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 739 (1989)).

12          In federal common law, rent means "a fixed sum, or property amounting to a fixed sum, to be

13   paid at stated times for the use of the property[.]"  *M.E. Blatt Co. v. United States,* 305 U.S. 267, 277-78

14   (1938) (citation omitted) *cited in Velez*, 795 F.3d at 584; *accord Aujero v. CDA Todco, Inc.*, 756 F.2d

15   1374, 1376 (9th Cir. 1985) ("Rent normally connotes '[c]onsideration paid for use or occupation of

16   property.'") (internal citation omitted).  Dictionaries contemporary to the enactment of 42 U.S.C. § 1437f

17   in 1974 describe the same meaning.  *See Velez*, 795 F.3d at 584 (collecting dictionary citations).  The use

18   of the term "rent" in the HAP Contract is likewise consistent with the understanding of rent as

19   "consideration for use of the property."  *See* HAP Contract Part B, ¶ 8d (requiring certification that

20   ""[e]xcept for the rent to owner, the owner has not received and will not receive *any payments or other*

21   *consideration ... for rental of the contract unit*") (emphasis added); *id.* Part C, ¶ 17 ("Rent to owner"

22   defined as "[t]he total monthly rent payable to the owner for the contract unit").  Similarly, as the court in

23   *Velez* observed, the context and use of "rent" in 42 U.S.C. § 1437f confirms that within the Section 8

24   program, "rent" "operates [] as the sum paid to live in and make use of rental property."  795 F.3d at 584

25   (analyzing the bill provisions later codified as § 1437f(a) and § 1437f(c)).

26          These definitions are all identical in meaning.  All turn on a causal link between a payment and

27   the tenant's right "to live in and make use" of their rental unit.  *See Velez*, 795 F.3d at 584 & citations

28

852407.20

therein; *M.E. Blatt Co.*, 305 U.S. at 177-78; *Aujero*, 756 F.2d at 1374.[7]  The additional charges at issue in this case meet that definition.

### b.   Wasatch's Section 8 Tenants Must Pay the Additional Charges to Continue Living in their Units.

There is no dispute that Wasatch considers the additional charges to be part and parcel of a tenant's monthly payment for use of their unit.  In Wasatch's standard forms, the amount of the monthly additional charges is summed with the "base rent" and the result is described to the tenant as their "Total Monthly Obligation" in the "Monthly Cost Breakdown" included in their lease.  *See* U.F. No. 12. Indeed, the term "base rent" itself acknowledges that other amounts added to it also become rent.  Some Wasatch forms expressly include the additional charges in the "rental rate" for the unit (*see, e.g.*, U.F. No. 13), while others lump the additional service charges with rent in ways that obscure any difference between the two (*see, e.g.*, U.F. Nos. 14, 15).  That Wasatch did not always call the additional charges "rent" does not change their true nature as rent.  *See, e.g.*, *Velez*, 795 F.3d at 585-86 (regardless of nomenclature, short-term fees were rent); *Peters*, 66 F. Supp. 3d at 1149 (extra charges for storage shed "clearly constitute[d] rent payments").

There is also no dispute that Wasatch deliberately links a tenant's payment of the additional service charges to their ability "to continue occupying [their] rental unit."  *See Velez*, 795 F.3d at 586. Under the undisputed payment allocation policy used by Wasatch, tenant payments are applied first to the additional charges with the acknowledged purpose of ensuring that any unpaid amount is designated "rent" and can be used as a basis for eviction proceedings.  *See* Sec. III.B.2 *supra* & record citations therein.  As another court observed in finding that a comparable payment allocation policy violated federal law under the Housing Act, by operation of this policy, a putative non-rent charge "effectively becomes rent: if it is not paid, [the tenant] may be evicted for a failure to pay rent."  *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 957 F. Supp. 2d 627, 638 (D. Md. 2013).

---

[7] *Aujero* additionally imposes an outer limit on the definition of "rent" by excluding charges (like the meal service charges at issue there) that are insufficiently connected to housing.  756 F.2d at 1376. *Aujero* recognizes that "rent" may include housing services, such as utilities, parking, maintenance and management services, and "suitable amenities."  *Id.* (citing 24 C.F.R. § 880.203(a) (1984)).

In invalidating the lease provision purporting to authorize the allocation of payments to other charges before rent, the court in *Sager* relied on a statutory provision that public housing tenants may only be evicted "for serious or repeated violation of the terms or conditions of the lease or [for] other good cause." 957 F. Supp. 2d at 633 (citing 42 U.S.C. § 1437d(l)(5)). The same language is used in the portion of the Housing Act governing the Section 8 Housing Choice Voucher program to limit the circumstances in which Section 8 tenants may be evicted. *See* 42 U.S.C. § 1437f(o)(7)(C). Because the payment allocation policy exposed a tenant to the risk of eviction due to nonpayment of charges other than rent, the court in *Sager* explained that it is a "predatory, unlawful and unreasonable" method of collecting non-rent charges that "attempts a short cut—a 'work around' the more protective procedural and substantive rights" afforded to public housing tenants under, *inter alia*, federal law. *Id.* at 634. *Sager* held that the payment allocation policy violated federal law limiting the amount of rent that can be charged to public housing tenants. *Id.* at 637-38.

HUD has repeatedly disapproved of comparable payment allocation provisions in a range of housing programs for the same reason. *See* Pls.' Req. Judicial Notice ("RJN") Exs 1-3, filed herewith. As HUD explained in one letter on this issue, "[b]y requiring that tenant payments be allocated first toward special charges, then deposits, and finally rent," the PHA was "circumventing federal regulation which we cannot condone." RJN Ex. 1, HUD Letter to R. Fitzgerald (3/29/77). "Under no circumstances," HUD explained, would it "permit [a PHA] to allocate rent payments to special charges and then attempt to evict [public housing] tenants for non-payment of rent." *Id.*; *see also* RJN Ex.3 HUD Letter to M. Varieur (7/29/91) (payment allocation policy violated federal regulations limiting grounds for eviction); RJN. Ex. 2, K. Calhoun letter (9/5/85) and HUD's response (10/21/85) (payment allocation lease provision was "improper").

As these authorities demonstrate, Wasatch's additional charges must be deemed "rent" based on its undisputed payment allocation policy. As in *Sager*, an additional charge that is nominally associated with a service or amenity "effectively becomes rent" by operation of Wasatch's payment allocation policy: "if it is not paid, [the tenant] may be evicted for a failure to pay rent." *See* 957 F. Supp. 2d at 638. Wasatch's own documents and testimony establish that this is the purpose of the payment sequence—because Wasatch cannot evict tenants for unpaid additional charges, it uses the payment

15

sequence as a "'work-around'' of its tenants' procedural and substantive rights.  *See id.* at 634; *see* U.F. Nos. 17-19.  The payment allocation policy converts the charge from a freestanding amenity fee to "a monthly charge that the tenants [are] required to pay to continue occupying the rental unit," *i.e.*, rent, as that term is construed in federal law.  *See Velez*, 795 F.3d at 586.

Wasatch even more explicitly links payment of additional charges to tenant's ability to continue living in their homes through its undisputed practice of explicitly or implicitly threatening tenants with eviction if they fail to pay the charges.  *See* Sec. III.B.3, *supra*.  As set out above, Wasatch maintains a policy and practice of serving tenants, including Section 8 tenants, with legal notices that threaten them with eviction they do not pay outstanding additional service charges.  *See* U.F. Nos. 27-31.  Even short of serving a pay or quit notice, company policy is to inform tenants that it will not accept their rent unless they have paid all outstanding charges.  U.F. No. 25.  In both cases, the message to tenants is clear: their ability to remain in their homes is contingent upon them paying the additional charges.  By operation of these undisputed companywide policies, the additional charges become part of the amount that must be paid "to live in and make use of rental property."  *See Velez*, 795 F.3d at 584; *see also Coleman*, 490 F. Supp. 2d at 280 (noting threat to evict tenant for nonpayment of water charges).  Requiring tenants to make "additional rent or other payments to the landlord ... to avoid eviction" constitutes an unlawful demand for excess rent.  *See* U.S. Gov't Accountability Off., *Housing Choice Voucher Program: Limited Indications of Potential Fraud against Participants Identified* 12 (Dec. 2017), https://www.gao.gov/assets/gao-18-53.pdf.

These tactics are coercive and predatory as applied to Section 8 tenants, who are by definition low-income, and who face loss of their voucher and a corresponding risk of homelessness if evicted.  *See* U.F. No. 20; *cf. Sager*, 957 F. Supp. 2d at 633, 637-38 (policy exposing public housing tenants to eviction for failure to pay non-rent charges was predatory and violated statutory rent limits).

### c.   Wasatch's Practices Undermine the Housing Choice Voucher Program's Protections Against Eviction and its Affordability Guarantees.

The protections against eviction embedded in the Section 8 program further underscore the impropriety of Wasatch's policies that require tenants to pay the additional charges to continue living in their homes.  Federal law prohibits owners from evicting a Section 8 tenant "except for serious or

repeated violations of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause." 42 U.S.C. § 1437f(o)(7)(C); *see also* 24 C.F.R. § 982.310(a) (same);[8] HAP Contract, Part C, ¶ 8 (same).  As the Ninth Circuit has explained, this language reflects a Congressional determination to create a federal floor of protections against eviction for Section 8 tenants. *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1204, 1207, 1210-11 (9th Cir. 2009).

Wasatch cannot make any serious argument that failure to pay additional service charges could meet the federal standard for terminating a Section 8 tenancy—particularly considering that its corporate witnesses all acknowledge Wasatch cannot evict tenants for nonpayment of the additional charges under applicable state law standards.  *See* U.F. No. 19.  The "serious" lease violation required by federal law to terminate a Section 8 tenancy must be at least as demanding as the "material" breach requirement in relevant state law.  *See NIVO 1 LLC v. Antunez*, 217 Cal. App. 4th Supp. 1, 5 (Cal. App. Dep't Super. Ct. 2013); Ariz. Rev. Stat. Ann. § 33-1368(A); *Cache Cnty. v. Beus*, 978 P.2d 1043, 1049-50 (Utah Ct. App. 1999); *Webster v. Litz*, 491 P.3d 171, 173 (Wash. Ct. App. 2011); *see also* Black's Law Dictionary (11th ed. 2019) ("serious" defined as "weighty; important"); *Wilhite*, 759 N.W.2d at 256 (same).  Wasatch's accounting and collections policies attempt to circumvent these federally secured tenant rights.  This attempt must ultimately be unsuccessful, however, as the federal definition of rent turns not on labels, but on substance.  *See, e.g.*, *Velez*, 795 F.3d at 585-86; *Peters*, 66 F. Supp. 3d at 1149; *see also Sager*, 957 F. Supp. 2d at 633, 637-38.

Wasatch's practices also undermine the Section 8 program's affordability protections.  Through the Section 8 program, "HUD pays rental subsidies so eligible families can afford decent, safe, and sanitary housing."  24 C.F.R. § 982.1(a)(1).  Thus, the program's purpose of "aid[ing] low-income families in obtaining housing" is "clearly undermined when a program participant overcharges a beneficiary of the program."  *Kelly*, 374 F. Supp. 3d at 892 (citation omitted).  By carving the additional

---

[8] While 24 C.F.R. § 982.310(a)(1) contemplates that "serious violation[s]" could include "failure to pay rent or other amounts due under the lease," HUD clarified in adopting the regulation that "minor violations" are not encompassed by this language. Section 8 Tenant-Based Assistance; Statutory Merger of Section 8 Certificate and Voucher Programs; Housing Choice Voucher Program, 64 Fed. Reg. 56894, 56904 (Oct. 21, 1999); *accord Wilhite v. Scott Cnty. Hous. & Redev. Auth.*, 759 N.W.2d 252, 256 (Minn. Ct. App. 2009) ("serious" violations exclude those causing the landlord "minor economic harms or inconvenience, but neither the landlord's property nor economic interest is significantly affected").

17

charges out of the rent to owner, Wasatch excludes the amount of those charges both from the PHA's

rent reasonableness determination and from the calculation of the subsidy to be provided on the tenant's

behalf. *See* U.F. No. 7; 24 C.F.R. §§ 982.507(a) & (b), 982.505 982.515. Yet, at the same time,

Wasatch requires Section 8 tenants to pay the charges "to continue occupying the rental unit." *See Velez*,

795 F.3d at 586. Wasatch cannot have it both ways. If payment of the charges is required for the tenant

to continue using the property, those costs are rent and Wasatch cannot evade the program's rent

limitations by simply labeling them otherwise. *See id.*

> ## 2.   Wasatch Has Charged Section 8 Tenants Unauthorized Appliance Fees in Violation of the Plain Language of Applicable HAP Contracts.

This Court has already held, construing the plain language of the HAP Contract (prior to the July

2019 version), that Wasatch may not charge Section 8 tenants for washers or dryers unless they charges

are specifically authorized by the HAP Contract, explaining:

> The HAP Contract specifically requires the owner to pay for all "utilities and appliances" unless otherwise specified in the HAP Contract. Defendants do not dispute that a laundry machine may constitute an "appliance," nor could they reasonably do so. *See* Reply 3. The HAP Contract nowhere lists laundry machines as an appliance for which the tenant is responsible. The Additional Services Agreements, which required Terry and Huskey to each pay $40 per month for laundry machines, FAC Exs. G, H. I. J. K, thereby conflicts with the HAP Contract and is superseded by it. Defendants' charging for this appliance, then, is prohibited by operation of the HAP Contract.

Order Mot. Dismiss 9-10, ECF No. 61. The undisputed record establishes that, as a routine practice

throughout the company, Section 8 tenants have been charged for washers and dryers even though their

HAP Contracts do not list or authorize the charge. *See* U.F. Nos. 32-34. For most of Wasatch's tenants

throughout most of the liability period, these washer and dryer charges violated the plain language of the

HAP Contract—constituting an additional and independent ground for holding that these appliances

charges were unlawful excess rent.[9]

---

[9] Any Section 8 tenants who moved in after July 2019 and whose HAP Contracts omit the language prohibiting unauthorized appliance charges can be identified based on Wasatch's own records.

18

852407.20

**3.** **Wasatch's Renters Insurance Requirement Was Unlawful Under the HAP Contract and Federal Law**

Because Wasatch required tenants, including Section 8 tenants, to pay for renters insurance to occupy units, renter's insurance was "an expense payable by the lessee for the occupancy of the rental unit." *Velez*, 795 F.3d at 579. This is true even though tenants could purchase insurance through a third party. *See Pileggi,* 192 F.2d at 879 (in federal law, "'rent' is received or demanded when a tenant is required as a condition of rental to purchase or pay for a service he does not want regardless of the person to whom the money must be paid.") *cited by Velez*, 795 F.3d at 585. Wasatch's undisputed renters insurance requirement thus constituted unlawful excess rent. *See* 24 C.F.R. § 982.451(b)(4)(i)-(ii); HAP Contract Part B, ¶ 8d, Part C, ¶ 5e.

**C.** **The Additional Charges Violate the Unfair Competition Law.**

A ruling that Wasatch's additional charges constitute unlawful excess rent charges would also establish a violation, on a class basis, of the UCL. The UCL provides a cause of action to challenge "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "By prohibiting unlawful business practices [the UCL] 'borrows' violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 980 (2018) (citation & quotation marks omitted). "Virtually any statute or regulation (federal or state) can serve as a predicate for a UCL unlawful practice cause of action." *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1265 (2018). For all the reasons set out above and based on the undisputed factual record, Wasatch's business practices in charging and collecting additional charges from their Section 8 tenants violate federal regulations governing the Section 8 program. *See* 24 C.F.R § 982.451(b)(4)(i)-(ii) (prohibiting owners from demanding or accepting excess rent payments). Named Plaintiffs (and class members) have suffered "injury in fact and [have] lost money or property as a result of" Wasatch unlawfully demanding and collecting the additional sums beyond the tenant's share of the rent to owner amounts in their HAP Contracts. U.F. Nos. 45-48; *see* Cal. Bus. & Prof. Code § 17204; 24 C.F.R § 982.451(b)(4)(i)-(ii).

852407.20

**D.      The Additional Charges Breach the Tenancy Addendum.**

A ruling that Wasatch's additional charges constitute excess rent charges in violation of the HAP Contract Part C, paragraph 5e, would also lead to a finding that there has been a breach of contract on a class basis (leaving only the question of which Defendant entities are liable, which is reserved for Phase 2 of the litigation).  The elements of breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Here, Plaintiffs need not demonstrate class members' performance because the contractual prohibition on charging excess rent (which mirrors the regulatory requirement) is independent of any tenant obligation. *See Brown v. Grimes*, 192 Cal. App. 4th 265, 279 (2011).

It is undisputed that class members, all of whom are current or former Section 8 tenants at Wasatch properties, have (or had) valid HAP Contracts—a fundamental requirement of the program.  Order 13, 37-38, ECF No. 92 (certifying classes of Section 8 tenants); U.F. No. 1; *see* 42 U.S.C. § 1437f(c)(1)(A); 24 C.F.R. § 982.451.  The HAP Contracts are required to contain the Tenancy Addendum set out in Part C, which becomes a part of the tenants' lease and is enforceable by tenants against the owner.  HAP Contract Part C, ¶ 2b; 24 C.F.R. § 982.308(f)(2).

The Tenancy Addendum prohibits the owner from charging or accepting "any payment for rent of the unit in addition to the rent to owner," and requires that "[t]he owner must immediately return any excess rent payment to the tenant."  HAP Contract, Part C ¶¶ 5e, 5f.  Breach is established here because the undisputed record shows that Wasatch's additional charges constitute "rent" for all the reasons set out above. *See* Sec. VII.A.  There is no dispute that the additional charges are separate from and in addition to rent to owner.  U.F. No. 7.  The fact of resulting damages to class members, consisting of the excess rent they were required to pay, is not subject to factual dispute if breach is established.  *See* U.F. No 48.

## VII.      CONCLUSION

For the above-stated reasons, Plaintiffs request that the Court hold that the additional charges Wasatch imposes on its Section 8 tenants under its Additional Services Agreement are unlawful excess rent as a matter of law, and that the charges violate the Unfair Competition Law and constitute a breach of the Tenancy Addendum on a class basis.

852407.20

Dated: April 22, 2022                    Respectfully submitted,

                                         GOLDSTEIN, BORGEN, DARDARIAN & HO


                                         */s/ Anne P. Bellows*
                                         Anne P. Bellows

                                         Attorneys for Plaintiffs and Relators

852407.20