UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

UNITED STATES OF AMERICA, ex )
rel. DENIKA TERRY, ROY HUSKEY )
III, and TAMERA LIVINGSTON, )
and each of them for )
themselves individually, and ) Case No. 2:15-CV-00799-KJM-DB
for all other persons )
similarly situated and on )
behalf of the UNITED STATES ) VOLUME I
OF AMERICA, )
) PAGES 1 - 291
        Plaintiffs, )
)
vs. )
) REMOTE VIDEOTAPED DEPOSITION OF
WASATCH ADVANTAGE GROUP, LLC, )
WASATCH PROPERTY MANAGEMENT, ) SHAWN FETTER
INC.; WASATCH POOL HOLDINGS, )
LLC, CHESAPEAKE APARTMENT ) October 27, 2021
HOLDINGS, LLC, LOGAN PARK )
APARTMENTS, LLC, LOGAN PARK )
APARTMENTS, LP, ASPEN PARK )
HOLDINGS, LLC, BELLWOOD )
JERRON HOLDINGS, BELLWOOD )
HERRON APARTMENTS, BENT TREE )
APARTMENTS, LLC, CALIFORNIA )
PLACE APARTMENTS, LLC CAMELOT )
LAKES HOLDINGS, LLC CANYON, )
CLUB HOLDINGS, COURTYARD AT )
CENTRAL PARK APARTMENTS, LLC, )
CREEKSIDE HOLDINGS, LTD, )
HAYWARD SENIOR APARTMENTS, )
LP, HERITAGE PARK APARTMENTS, )
LP, OAK VALLEY APARTMENTS, )
LP, OAK VALLEY HOLDINGS, LP, )
PEPPERTREE APARTMENT )
HOLDINGS, LP., PIEDMONT )
APARTMENTS, LP, POINT NATOMAS )
APARTMENTS, LLC, POINT )
NATOMAS APARTMENTS, LP, RIVER )
OAKS HOLDINGS, LLC, SHADOW )
WAY APARTMENTS, LP, SPRING )
VILLA APARTMENTS, LP, SUN )
VALLEY HOLDINGS, LTD, VILLAGE )
Grove APARTMENTS, LP, WASATCH )
QUAIL RUN GP, LLC, WASATCH )
PREMIER PROPERTIES, LLC, )
WASATCH POOL HOLDINGS III, )
LLC, and DOES 1-4, )
)
        Defendants. ) Reported by:
_____) Amy E. Simmons, CSR, RPR, CRR, CRC

Page 1

Veritext Legal Solutions
866 299-5127

Bellow Decl. Ex. 3, Page 1 of 66

my questions, feel free to say so.  "I don't know"    10:48:04

is an acceptable answer, but I am entitled to your    10:48:07

best estimate.  So, for example, if I ask you when    10:48:11

something occurred and you don't remember the    10:48:15

exact date but you do remember the month or the    10:48:17

season, I'm entitled to that estimate.    10:48:20

        Do you understand that?    10:48:24

    A.   Yes.    10:48:25

    Q.   So next up is objections.  So from time    10:48:26

to time, your attorney may assert objections.  And    10:48:30

generally I'll be entitled to your answer,    10:48:33

notwithstanding those objections.    10:48:35

        Do you understand that?    10:48:37

    A.   Yes.    10:48:37

    Q.   Have you taken any medication or drugs    10:48:38

that would prevent you from answering my questions    10:48:42

completely, truthfully, and accurately here today?    10:48:45

    A.   No.    10:48:48

    Q.   Is there any reason you can't give your    10:48:49

best testimony today?    10:48:51

    A.   No.    10:48:52

        (Deposition Exhibit No. 21 was marked.)    10:48:53

    Q.   (BY MS. BELLOWS)  All right.  So you can    10:48:53

go ahead and open up Exhibit 21 in your Exhibit    10:48:56

Share folder and let me know when you have it in    10:49:00

Page 11

front of you.                                                10:49:04

A.    It is in front of me.                                  10:49:14

Q.    Okay.  Do you recognize this document?                10:49:15

A.    Yes, I do.                                             10:49:16

Q.    And what is it?                                        10:49:17

A.    It is the PMK notice.                                  10:49:17

Q.    "PMK" meaning person most knowledgeable?              10:49:28

A.    Most knowledgeable, yeah.                              10:49:31

Q.    And you understand you're testifying                   10:49:34
pursuant to this notice?                                     10:49:35

A.    Yes.                                                   10:49:37

Q.    And if you look on page 3 of the                       10:49:37
document, the first section notices you to testify          10:49:40
today in your capacity as a fact witness.                   10:49:47

You understand that, correct?                               10:49:50

A.    Yes.                                                   10:49:51

Q.    So let's go through the Rule 30(b)(6)                  10:49:52
topics.  They begin on the bottom of that third             10:49:55
page.                                                        10:49:57

Can you read the first topic out loud?                      10:50:02

A.    Number 1; is that correct?                             10:50:04

Q.    Yeah.                                                  10:50:06

A.    Okay.  "Defendant's policies and                       10:50:06
practices related to the application of Section 8           10:50:09
tenants payments to charge including any                    10:50:11

Page 12

differences in California."                                    10:50:14

    Q.  Do you agree that you're the most              10:50:16

knowledgeable person to testify about that topic?      10:50:17

    A.  Yes.                                           10:50:20

        THE VIDEOGRAPHER:  I'm sorry to                10:50:23

interrupt.                                             10:50:24

        But, Mr. Fetter, when you're reading, I'm     10:50:25

losing the bottom part of your face.                   10:50:27

        THE WITNESS:  Okay.                            10:50:29

        THE VIDEOGRAPHER:  Can you tilt the            10:50:30

screen down towards you?  Is that possible?            10:50:32

        THE WITNESS:  Yeah.  I tilted it as much       10:50:33

as I can get.  How is that?  Is that better?           10:50:35

        THE VIDEOGRAPHER:  That's better.  It's        10:50:38

just that when you're reading down, I lose you.        10:50:40

        THE WITNESS:  Okay.  Gotcha.  Let me see       10:50:43

where we're at here.  How about that?                  10:50:48

        THE VIDEOGRAPHER:  Better.  Thank you.         10:50:48

        THE WITNESS:  Okay.  I'll try to get this      10:50:50

even lower.  Is that better, even better?              10:50:51

        THE VIDEOGRAPHER:  That's perfect.             10:50:59

        THE WITNESS:  Okay.  Great.                    10:51:01

        THE VIDEOGRAPHER:  Thank you.                  10:51:02

        THE WITNESS:  Okay.  Gotcha.                   10:51:04

    Q.  (BY MS. BELLOWS)  Can you read the second      10:51:05

Page 13

topic?    10:51:06

A.   The second topic on the third -- fourth    10:51:07

page, then, correct?    10:51:11

Q.   Correct.    10:51:13

A.   "2, Defendants' revisions to and use of    10:51:15

their residential leasing documents, including the    10:51:17

documents entitled 'Residential rental agreement,'    10:51:20

'Utility Addendum,' and 'Additional Service    10:51:23

Agreement.'"    10:51:26

Q.   Do you agree that you're the most    10:51:28

knowledgeable person to testify on this topic    10:51:29

today?    10:51:32

A.   Yes.    10:51:34

Q.   All right.  Let's read the third one.    10:51:35

A.   "3, Standard forms and templates used by    10:51:43

Defendants in communicating with tenants    10:51:47

including, but not limited to, eviction notices,    10:51:49

renewal notices, move-in documents, and    10:51:53

communications regarding or promoting services    10:51:56

listed on the additional services agreements."    10:51:58

Q.   Do you agree that you are the most    10:52:00

knowledgeable person to testify on this topic on    10:52:02

behalf of Defendants?    10:52:04

A.   Yes.    10:52:05

Q.   All right.  Topic No. 4.    10:52:06

Page 14

Bellow Decl. Ex. 3, Page 5 of 66

A.   Number 4, "Defendants' policies and practices related to collecting unpaid rent and additional service charges from Section 8 tenants including issuing past due notices, notices to pay or quit, notices to perform financial covenant or quit, filing of unlawful detainer actions, and other communications and procedures used to collect unpaid sums."

Q.   And do you agree that you're the most knowledgeable person to testify on that topic today?

A.   Yes.

Q.   Okay.  Have you done anything to prepare for your deposition today?

A.   Just had spoken to my counsel, Ryan, just reading this document.

Q.   Okay.  How long did you speak to your counsel for?

A.   30 minutes.

Q.   And when did that happen?

A.   This morning.

Q.   Okay.  Was anyone else present during that conversation?

A.   No.

Q.   Besides this document, Exhibit 21, have

Page 15

Bellow Decl. Ex. 3, Page 6 of 66

A.   Yeah.

12:57:29

Q.   Okay.  And can you tell me in broad strokes how Wasatch Property Management's payment sequence works?

12:57:30
12:57:32
12:57:35

A.   Yep.  So we've been over it about four times today.

12:57:36
12:57:38

Q.   If you can go ahead and tell me, I'd appreciate that.

12:57:39
12:57:41

A.   Okay.  So again, you'd have a HAP payment.  You're talking about HAP payments, right?

12:57:41
12:57:44
12:57:46

Q.   Yes.

12:57:46

A.   Only people with HAP payments?

12:57:47

Q.   Yes.  Is there a difference in -- so I understand the -- okay.  All right.

12:57:49
12:57:51

A.   I'm just making sure that I'm answering your question --

12:57:54
12:57:56

Q.   Yeah.

12:57:58

A.   -- as accurately as possible.

12:57:58

Q.   Okay.

12:58:00

A.   So a HAP payment would apply to housing, from housing.  That HAP payment would apply to rent.  And then a resident might have a portion, and their portion would be -- excuse me.  Their portion would be applied to any ASAs first and

12:58:01
12:58:05
12:58:08
12:58:15
12:58:23

Page 100

Bellow Decl. Ex. 3, Page 7 of 66

then the remainder to rent.

Q.   And by "any ASAs," you're talking about additional service charges on the additional services agreement?

A.   Correct.

Q.   So if you use the term "ASA," you'll know that's what you're referring to?

A.   Correct.

Q.   Make sure the record is clear.

So in your exhibits folder in Exhibit Share, if you can pull that up, you'll see Jarvis Exhibit 3 and that's a document entitled "Payment Sequence For Receiving Payments."

A.   Do I need to -- okay.  Exhibit Share. Okay.  Hold on here.

Q.   Try hitting refresh if it's not coming up on your folder.

A.   Let me refresh this whole thing.  You know, all I'm seeing here is the -- all I'm seeing in here, Anne, is the Terry Denika or Terry Denika versus Wasatch.  I'm seeing depositions.  I'm seeing shared -- but in the shared -- and I go Exhibit Share.  It says Anne Bellows exhibit -- okay.  Here it goes.  Maybe this is it on the side, Jarvis.

Page 101

Bellow Decl. Ex. 3, Page 8 of 66

Okay.  Jarvis Exhibit 3 is that what    13:00:27
you're looking for?    13:00:30

Q.    Yeah.  Yeah.    13:00:31

A.    Let me see this.  Okay.    13:00:32

Q.    Okay.  So you have that in front of you?    13:00:41

A.    I do have that in front of me, yes.    13:00:43

Q.    Are you familiar with this document?    13:00:45

A.    To a certain extent, yes.    13:00:47

Q.    Okay.  Does this document reflect the    13:00:53
payment priority sequence we were just discussing?    13:00:55

A.    Yeah.  And it just has just a -- yeah.    13:00:58
Yes.    13:01:01

Q.    Okay.    13:01:01

A.    It's just a charge code to it and then go    13:01:04
from there.    13:01:06

Q.    And what's a charge code?    13:01:07

A.    Just a GL account.    13:01:08

Q.    GL account means general ledger?    13:01:11

A.    Yeah, general ledger, that's it, yep.    13:01:14

Q.    Okay.  So each charge is associated    13:01:17
with a -- each kind of charge has a charge code in    13:01:20
the general ledger account?    13:01:24

A.    Yes, just what's up on top.    13:01:25

Q.    So I'm looking at the chart called    13:01:29
"Payment sequence for Wasatch Property    13:01:31

Page 102

Bellow Decl. Ex. 3, Page 9 of 66

Management."                                                    13:01:32

          Can you explain what the chart shows us?            13:01:33

     A.   Okay.  So your question is?                         13:01:35

     Q.   Can you just describe what this chart               13:02:26

shows us?                                                      13:02:28

     A.   I'm going to read to you the top of the             13:02:28

piece.  Go ahead.                                              13:02:30

     Q.   Yeah.  I'm just looking for an                      13:02:35

explanation of what it means.  You know, there's              13:02:37

these numbers --                                              13:02:39

     A.   That's what the -- that's what the top              13:02:40

will explain.                                                 13:02:42

     Q.   Okay. Great.  Go ahead.                             13:02:42

     A.   Okay.  It says, "In accordance with both            13:02:44

state and local landlord/tenant laws Wasatch has             13:02:48

adopted a 'Pay Order' that applies to all payments           13:02:51

made by the resident.  The computer is programmed            13:02:54

to apply all payments to all items other than rent          13:02:58

first" -- again, this is non-rent right, resident           13:03:03

portion -- "leaving any delinquent portion as rent          13:03:10

owed.  In most areas that Wasatch operates in,              13:03:13

properties can only go to court for rent and not            13:03:16

for deposits, additional service items, (pet,               13:03:18

parking, storage, et cetera.)  This specifically            13:03:23

applies to the California properties.  Below is             13:03:28

Page 103

Bellow Decl. Ex. 3, Page 10 of 66

the current 'Pay Order' of all Wasatch    13:03:31

properties."    13:03:33

Q.   So does this accurately describe the    13:03:40

purpose of the payment sequence?    13:03:43

A.   I believe so, yes.    13:03:44

Q.   Okay.  And then you described the    13:03:45

computer program -- when you're reading this, the    13:03:53

computer program applies payments to all other    13:03:55

items other than rents first.  So is this    13:03:58

showing --    13:04:02

A.   After the HAP charge.    13:04:02

Q.   After the HAP charge.  Okay.    13:04:03

A.   After the HAP charge.    13:04:03

Q.   Let me just look at the chart and you    13:04:09

tell me if you think that's right.  That, as a    13:04:11

tenant payment comes in, it's going to apply first    13:04:14

to the lower number items and then on down the    13:04:17

list as those get paid off.  So if there is an    13:04:19

open renter's insurance charge, which is No. 18,    13:04:22

that will get paid before an open covered parking    13:04:27

charge and on down the list?    13:04:30

A.   Yeah, because the covered parking    13:04:35

charge -- what number is the covered parking    13:04:38

charge?    13:04:40

Q.   Number 20.    13:04:41

Page 104

Bellow Decl. Ex. 3, Page 11 of 66

A.  Yeah.    13:04:42

Q.  So it's in order listed on this chart, basically?    13:04:42    13:04:46

A.  Yeah, priority payments sequence, just as it says.    13:04:46    13:04:49

Q.  Okay.  So then you mentioned the housing assistance charge, and that's No. 4, correct?    13:04:49    13:04:55

A.  Uh-huh.    13:04:57

Q.  And what does that refer to?    13:04:58

A.  Housing assistance charge.  So first -- first those other ones would have been paid before the tenant moves in.    13:04:59    13:05:04    13:05:07

Q.  Yeah.    13:05:09

A.  That's why.    13:05:10

Q.  Okay.  So I guess what I'm trying to say is I guess the housing charge is the amount of the voucher payment for the Section 8 tenant?    13:05:11    13:05:17    13:05:19

A.  Yes.    13:05:21

Q.  Is that correct?  Okay.    13:05:21

A.  The reason why that is No. 4 is because those other ones would be paid previous to the resident moving in.    13:05:25    13:05:28    13:05:30

Q.  Right, yes.  Okay.  And then so those are done sort of one-time charges upfront?    13:05:32    13:05:35

A.  Yeah.    13:05:38

Page 105

Bellow Decl. Ex. 3, Page 12 of 66

Q. And tenant --    13:05:39

A. And, again, you'll notice those are    13:05:40
deposits. And deposits are refundable.    13:05:41

Q. Okay.    13:05:47

A. Does that make sense?    13:05:47

Q. That does make sense.    13:05:48

A. So they're not charges, they're deposits.    13:05:50

Q. Got it.    13:05:53

A. So anything that was significant -- you    13:05:54
know, would signify that it would -- those    13:05:58
are -- number one would be HAP, rent HAP, rent.    13:06:02

Q. Okay. So the -- so the payment comes in    13:06:07
from the housing authority; it's always going to    13:06:10
go to the rent HAP charge?    13:06:13

A. Yeah.    13:06:14

Q. Okay.    13:06:15

A. Because the other ones are deposits, yes.    13:06:16

Q. Okay. So then there's -- just want to    13:06:18
ask, No. 32 is a month-to-month fee.    13:06:23

Can you tell me what that is for?    13:06:26

A. This might be where applicable. Again,    13:06:27
this is, again, where applicable. Like, if it's    13:06:38
not applicable or correct, they wouldn't have that    13:06:41
in there.    13:06:44

So it says -- if the pay sequence at the    13:06:45

Page 106

bottom -- you'll note if the payment sequence is    13:06:48

not applicable or correct, click erase and go from    13:06:50

there.  Apply it manually.    13:06:56

Q.   Sure.  I'm just trying to understand, the    13:07:00
month-to-month charge, when is that applicable?    13:07:03

A.   In certain areas if they decided not to    13:07:06
sign a lease and they wanted to go month to month,    13:07:12
that could be an applicable charge.    13:07:16

Q.   Okay.  And then still looking at this    13:07:22
chart, the ASAs start with No. 17, cable TV    13:07:24
charges; is that right?    13:07:31

A.   Yeah.  I mean, that could be -- that    13:07:32
could be said that, um-hmm.    13:07:43

Q.   Okay.  And then you've got on the list    13:07:44
there are different kinds of parking, storage,    13:07:46
washer and dryer?    13:07:49

A.   Yeah.    13:07:51

Q.   All there.  And then as we discussed,    13:07:51
rent is No. 29, which comes after all the    13:07:53
additional service charges.    13:07:56

A.   29 is housewares rental.    13:07:58

Q.   I meant 49.  Thank you.  49.    13:08:00

A.   Yeah, monthly rent charges, yeah, uh-huh.    13:08:03

Q.   Okay.    13:08:07

THE VIDEOGRAPHER:  Ms. Bellows, I'm sorry    13:08:09

Page 107

to interrupt.  I want to make sure it's okay with                13:08:11

you.  When the witness is looking down, I'm losing               13:08:11

part of like his chin down.                                      13:08:11

Is that okay when he's reading?                                  13:08:14

MS. BELLOWS:  Okay.  Yeah.  I think if                           13:08:14

Mr. Fetter can remember to keep your chin up as                  13:08:21

much as possible.                                                13:08:23

THE WITNESS:  Yeah.                                              13:08:23

MS. BELLOWS:  We'll do our best.  That's                         13:08:25

fine.  Thank you.                                                13:08:26

Q.  (BY MS. BELLOWS)  And then rent                              13:08:29

includes -- well, rent here just refers to that                  13:08:32

base rent amount, correct?                                       13:08:34

A.  Correct.                                                     13:08:36

Q.  And the only items that are listed below                     13:08:37

item 49 are actually credits for tenants, right?                 13:08:46

A.  Yeah, that is correct.                                       13:08:49

Q.  Okay.  So -- and as sort of stated at the                    13:08:52

top, that means that rent is the last charge to be               13:08:55

paid out of any tenant payment?                                  13:08:58

A.  According to this document, yes.                             13:09:02

Q.  Okay.  And why is that?                                      13:09:06

A.  Why is that?                                                 13:09:08

Q.  Yeah.  Why is it set up that way?                            13:09:11

A.  Well, first and foremost, we can't -- if                     13:09:14

Page 108

there's not -- hold on here.  I'm trying  13:09:22

to -- there we go.  So you can see -- I just  13:09:30

wanted to see where I'm at in relation to the chin  13:09:33

since you wanted to see.  13:09:37

So can you state that question again?  13:09:39

Q.    Why is it that the payment sequence is  13:09:43

set up to apply payments last to rent?  13:09:46

A.    In the state of California, we're not  13:09:51

able -- most states we're not able to proceed with  13:09:54

any type of -- with any type of notices for  13:09:58

anything other than rent.  So any type of -- any  13:10:07

type of money owed to try to collect any balance  13:10:10

or to try to go and get any -- any forceable,  13:10:16

unlawful detainer or anything would need to be  13:10:23

rent.  13:10:26

Q.    Okay.  So -- so in your experience,  13:10:26

Wasatch cannot evict tenants for nonpayment of  13:10:29

additional service items and other non-rent  13:10:34

amounts?  13:10:39

A.    Anybody.  Not just Wasatch.  13:10:39

Q.    Okay.  Not just Wasatch.  And that's true  13:10:41

anywhere --  13:10:44

A.    Anywhere.  13:10:45

Q.    -- Wasatch operates?  13:10:46

A.    It's true, yeah, of all -- of all  13:10:47

Page 109

Bellow Decl. Ex. 3, Page 16 of 66

property management.  That's why this is standard    13:10:50

practice.    13:10:52

Q.    Okay.  So do you agree that the reason    13:10:53

for the payment order is to enable Wasatch to go    13:10:56

to court to collect any delinquent amounts?    13:10:58

A.    Yes.    13:11:02

Q.    Okay.  And so the purpose is -- go ahead.    13:11:02

A.    No, go ahead.    13:11:08

Q.    So the purpose is to treat any delinquent    13:11:09

amounts like delinquent rent, even if the tenant    13:11:12

thought that they were paying rent but not paying    13:11:15

an additional service charge?    13:11:17

MR. MATTHEWS:  I'm going to object to    13:11:19

that as calling for speculation as to what the    13:11:21

tenant thought.    13:11:24

Q.    (BY MS. BELLOWS)  Okay.  Let me just    13:11:25

rephrase.    13:11:26

So the purpose is to treat any delinquent    13:11:27

amount as delinquent rent; is that correct?    13:11:29

A.    Any delinquent amount as delinquent rent?    13:11:31

I'm not getting that.    13:11:43

Q.    Okay.  So -- so what I'm understanding    13:11:46

this payment sequence does is that as a -- as a    13:11:49

payment comes in, it's going to apply it in a    13:11:52

predetermined order, right?    13:11:55

Page 110

A.    Okay.    13:11:56

Q.    And the result is going to be that the    13:11:57
charges that are higher up on the list are going    13:12:00
to be paid before the charges that are lower on    13:12:02
the list, right?    13:12:04

A.    Yes.    13:12:05

Q.    Okay.  And the -- the document says, "The    13:12:05
computer is programmed to apply all payments to    13:12:13
all items other than rent first, leaving any    13:12:17
delinquent portion as rent owed," right?    13:12:20

A.    Yes.    13:12:23

Q.    And you agree that's how this works?    13:12:23

A.    Yes.    13:12:25

Q.    Okay.  So then I guess what I'm trying to    13:12:26
say, is that -- that the purpose is that -- just    13:12:28
that, any unpaid amounts are going to be treated    13:12:34
as unpaid rent?    13:12:37

A.    Yes.    13:12:38

Q.    To the extent possible.    13:12:39

A.    Yes.    13:12:43

Q.    Okay.  And that's true regardless of what    13:12:44
a tenant thought they were paying or not paying?    13:12:46

A.    Yeah, that's speculation on to what they    13:12:48
would think.  I don't know what they're thinking.    13:12:51

Q.    Okay.  So let's take a hypothetical.  The    13:12:56

Page 111

tenant pays the amount that they owe for rent, and    13:13:00

they don't pay their covered parking charge    13:13:04

because they're short on funds that month.    13:13:06

The effect of the payment sequence is    13:13:09

going to be that Wasatch's system will pay off the    13:13:11

covered parking charge -- right? -- and the amount    13:13:17

that's left owing is going to be considered    13:13:19

delinquent rent; is that right?    13:13:22

MR. MATTHEWS:  Incomplete hypothetical.    13:13:23

But go ahead.    13:13:25

THE WITNESS:  Again, it would be    13:13:26

hypothetical, but yeah, we wouldn't    13:13:28

pursue -- we're going to -- I mean, it's such a    13:13:31

small amount on there, we're -- it's not -- I    13:13:34

mean, we'd -- a hypothetical of $25, $20 for a    13:13:38

thing, we're giving them a small balance letter.    13:13:47

That's it.    13:13:51

Q.   (BY MS. BELLOWS)  Okay.  But the amount    13:13:52

in your -- in Wasatch's accounting system, it    13:13:53

would be considered delinquent rent, right?    13:13:56

A.   On the way that's pulled through there,    13:13:59

correct.    13:14:02

Q.   Okay.  So another thing that you read up    13:14:02

at the top was that this is designed this way so    13:14:07

the properties can go to court.    13:14:12

Page 112

Bellow Decl. Ex. 3, Page 19 of 66

_Can you explain why Wasatch favors a_    13:14:15

_system that increases its ability to take tenants_    13:14:18

_to court?_    13:14:22

A.    _We favor a system that would allow us to_    13:14:22

_receive either rent or possession of the_    13:14:28

_apartment._    13:14:33

Q.    Okay.  And what's the reason for that?    13:14:34

A.    So that we can receive either rent or    13:14:36

possession of the apartment.    13:14:41

Q.    So that's the company's goal is to get    13:14:42

the payment or to get the apartment back?    13:14:45

A.    Well, to -- to have goods that are used    13:14:47

or consumed, right?  You have rent that you have a    13:14:52

person that -- again, this is a consumption.    13:14:57

So -- that is being consumed, i.e., rent is being    13:15:01

consumed and not paid for.  Then that's -- yeah,    13:15:07

that would be the goal.    13:15:14

Q.    Okay.  So that comment about going to    13:15:16

court is in connection with why the payment    13:15:24

sequence is set up in this -- in this way,    13:15:27

correct?    13:15:30

A.    Yeah.  And we're -- you know, we're not    13:15:30

going to go to court for 25 bucks or, you know, a    13:15:33

small amount.  That's not -- that's not going to    13:15:38

be a piece.  It's -- you know, we would like to    13:15:41

Page 113

Bellow Decl. Ex. 3, Page 20 of 66

we're in the same pieces.                                      14:23:35

                Okay.  Let's go ahead.                         14:23:38

        Q.   Okay.  So are you familiar with this              14:23:39

document?                                                      14:23:41

        A.   Somewhat.                                         14:23:41

        Q.   Okay.  It's a how-to, right?                      14:23:43

        A.   Yeah, how-to.                                     14:23:45

        Q.   And how-to's are Wasatch's training               14:23:46

documents?                                                     14:23:49

        A.   Yes.                                              14:23:49

        Q.   Or one of Wasatch's training documents?           14:23:51

        A.   Yeah.                                             14:23:53

        Q.   Okay.  So the document starts off with            14:23:54

some terminology that I think is helpful.  It uses             14:24:01

the term "accounts receivable" or "AR."                        14:24:05

                Can you just tell me briefly what that         14:24:08

means?                                                         14:24:09

        A.   Just the outstanding balance.  Let's say          14:24:09

our --                                                         14:24:13

        Q.   Okay.  So what --                                 14:24:14

        A.   Accounts receivable.                              14:24:16

        Q.   Sorry.  Can you say that again?                   14:24:17

        A.   It's exactly what it says.  Accounts              14:24:20

receivable.                                                    14:24:23

        Q.   It --                                             14:24:23

                                            Page 126

A.   Accounting term.                    14:24:25

Q.   Okay.  So that means any outstanding     14:24:26
balance owed by a tenant?                  14:24:28

A.   Correct.                            14:24:29

Q.   And that could include rent or non-rent    14:24:30
charges, right?                            14:24:32

A.   That could, yeah, anything on there.    14:24:32

Q.   And then I want to go down on the second    14:24:37
page where it talks about types of AR balances.    14:24:43

A.   Okay.                              14:24:46

Q.   The first is large balances, which are    14:24:47
defined here as any balance of $100 or more that's    14:24:52
owed to the property.                      14:24:55

A.   Okay.                              14:24:56

Q.   And according to this document, these    14:24:57
large balances are subject to late fees and    14:25:01
require that a pay or quit notice be served to the    14:25:03
resident; is that correct?                  14:25:06

A.   Yeah.  I mean, this is Utah right here.    14:25:07
Again, we're going to -- like we've talked about    14:25:14
before, say $100 was our piece of it.  Again, it's    14:25:17
really to be able to serve a notice to be able to    14:25:23
get them to come inside.  But, yeah,        14:25:25
it's -- that's kind of the threshold that we would    14:25:30
say.                                      14:25:32

Page 127

Q.   And that threshold applies in all of the    14:25:33

states that Wasatch operates in?    14:25:36

A.   Yeah, to a certain extent.  Again,    14:25:38

obviously there's some -- especially given the    14:25:44

COVID piece, this obviously has changed quite a    14:25:47

bit.  So if we're talking pre-COVID, COVID -- is    14:25:51

this all pre-COVID?    14:25:57

Q.   Yeah, I guess let's talk about practices    14:25:59

pre-COVID.    14:26:02

A.   Yeah.  I mean, there's such a giant    14:26:03

difference in what's transpired.    14:26:07

Yeah, pre-COVID, that was pretty much    14:26:08

standard on that.    14:26:11

Q.   So there's a $100 cutoff or threshold, I    14:26:12

guess, and once a balance is over $100, the tenant    14:26:17

is required to pay late fees and the property is    14:26:22

required to serve a pay or quit notice to the    14:26:27

tenant?    14:26:31

A.   Yes.  Yeah, we're a little bit more    14:26:31

liberal in California with the late fee and then    14:26:35

also the pay or quit, you know.  Again, it's    14:26:37

really being -- I shouldn't say liberal.  More    14:26:40

conservative as far as that goes.  Just really    14:26:46

being able to get them in there.  And especially    14:26:49

if we're talking about Section 8 manager,    14:26:52

Page 128

Bellow Decl. Ex. 3, Page 23 of 66

Section 8 components.  It's really being able to   14:26:56

get them in there, having them talk to us.   14:27:00

Q.   Okay.  Then the next is the small   14:27:03

balances.  Can you sort of summarize for me what   14:27:09

the procedure is here outlined for the small   14:27:13

balances?   14:27:16

A.   Yeah.  Small balances of less than $100   14:27:16

require a small balance notice to be served.   14:27:21

California doesn't have as many -- CAA, the   14:27:26

California Apartment Association, doesn't have as   14:27:31

many forms available as certain other states to be   14:27:33

able to give the small balance notice on there.   14:27:39

So it makes it a little bit harder for us to be   14:27:45

able to do, like, little small balance pieces.   14:27:48

Q.   Okay.  So let me break that down.   14:27:54

So you're saying other states use a small   14:27:58

balance form when tenants don't pay?   14:28:01

A.   Yeah.   14:28:04

Q.   Amounts that are -- if those amounts are   14:28:04

less than $100?   14:28:10

A.   Yes.   14:28:12

Q.   Okay.  But in California, you don't use   14:28:12

small balance forms?   14:28:15

A.   Sometimes we will; sometimes not.  It   14:28:16

does depend on, you know, truly, what's the   14:28:18

Page 129

Bellow Decl. Ex. 3, Page 24 of 66

A.    Um-hmm.  I do see that.                    14:30:55

Q.    Is that a correct statement of Wasatch    14:30:57
policy?                                         14:31:02

A.    Again, most of the time, yes.  We want to  14:31:03
get the discussion started.  Again, that's the   14:31:05
discussion -- our goal is not to take somebody   14:31:08
over a utility charge or anything else.  It's    14:31:15
really -- our goal is to be able to get them --  14:31:18
you know, to be able to get on track with their  14:31:21
payments.                                        14:31:24

Q.    Okay.  So the notice to them that their   14:31:24
future rent will not be accepted unless          14:31:26
their -- unless paid in full, that means they have  14:31:31
to pay all of the charges that are outstanding in   14:31:33
order for their future payment to be accepted?   14:31:36

A.    Correct.                                   14:31:38

Q.    Okay.  I want to step away from this       14:31:38
document for a moment because you mentioned, you  14:31:45
know, what geography does this apply to.  And     14:31:48
directing you to -- back in the Exhibit Share     14:31:53
folder, I've put in there Exhibit 15 from the     14:31:54
Johnson deposition.                               14:31:57

A.    Let me see if that will pop up.  Okay.     14:32:04

Q.    Okay.  And this is the email that          14:32:27
the -- how-to that we were just looking at was    14:32:31

Page 132

Bellow Decl. Ex. 3, Page 25 of 66

attached to.    14:32:33

A.   Okay.    14:32:34

Q.   Then I just wanted to direct your    14:32:35
attention to who it's sent to.  It says all    14:32:37
managers at netwasatch.com and all financial at    14:32:41
netwasatch.com.    14:32:45

Do those email addresses reach populable    14:32:46
employees in every state that Wasatch operates in?    14:32:51

When it refers to a financial form that    14:32:58
it appears these -- all of those employees are    14:33:00
being invited to, correct?    14:33:05

A.   That is correct.    14:33:06

Q.   And do you remember a series of those    14:33:07
financial forms being held?    14:33:09

A.   I do remember that.    14:33:11

Q.   Okay.  We can go back to Johnson    14:33:12
Exhibit 16 that we were just looking at.    14:33:16

A.   Okay.    14:33:19

Q.   Okay.  So then we just talked about    14:33:35
procedures for large balances answers and    14:33:36
procedures for small balances.    14:33:39

Are those procedures -- have they been    14:33:41
the same as long as you can remember at Wasatch?    14:33:44

A.   Except for -- I mean, we're talking about    14:33:46
pre-COVID, right?    14:33:52

Page 133

Bellow Decl. Ex. 3, Page 26 of 66

Q.    Yeah.   Thank you for clarifying that.    14:33:54
Except for COVID.    14:33:56

A.    Except for COVID stuff, yes, as far as I    14:33:57
can remember.    14:34:01

Q.   Okay.   And then how has that changed    14:34:01
since COVID started?    14:34:05

A.   As far as, again, just -- just obviously    14:34:06
our main point is to have communication with our    14:34:12
residents.   So --    14:34:14

Q.   Are you still serving notices?    14:34:18

A.   With the -- the notices have been what    14:34:20
has been congruent with what CAA is -- has adopted    14:34:27
as practices, you know, during specific    14:34:33
time -- time frames.    14:34:36

It's very complicated on to what notices    14:34:36
have been allowed.   And that's a whole other piece    14:34:39
of it.   But California --    14:34:45

Q.   Okay.    14:34:47

A.   California's been unique in that -- in    14:34:48
that step.    14:34:51

Q.   Okay.   So apart from California, have you    14:34:52
continued to serve the --    14:34:54

A.   Every state -- every state and    14:34:59
municipality -- this is broad -- this is really    14:35:01
broad stroke here.    14:35:05

Page 134

_Every state and every municipality has_    14:35:06

_had different things.  So you'd have to_    14:35:09

_look -- you'd have to refer to whatever state and_    14:35:12

_local municipality -- whatever legal requirements_    14:35:14

_were set up._    14:35:20

Q.   Okay.    14:35:21

A.   Since COVID, you're -- that's very, very    14:35:21

broad stroke.    14:35:25

Q.   Okay.  I guess I'm trying to figure out    14:35:28

what Wasatch's response has been.    14:35:30

Has there been, like, a notice that    14:35:31

Wasatch developed to send tenants about    14:35:35

outstanding balances since COVID started that's    14:35:38

different from what they used before?    14:35:41

A.   Since COVID started, we had, at the    14:35:43

beginning -- we had a come-and-talk-to-us, no    14:35:45

matter what your situation was.  We sent -- I    14:35:50

think we sent to most residents, come and talk to    14:35:52

us because our goal is to help you work through    14:35:56

this situation and help you work through the    14:35:59

plans.  Like, what can we plan and what's going    14:36:02

on?    14:36:06

Q.   Okay.  What about notices that are served    14:36:07

when someone has an outstanding balance?  Is there    14:36:10

any kind of -- you know, particular to the    14:36:13

Page 135

it's -- that's rare.    16:07:46

Q.    Wow.    16:07:48

A.    Most people are transplants here, so we    16:07:49
were here way before there was AC.    16:07:51

Q.    Toughed it out.    16:07:54

A.    Yeah.    16:07:55

(Deposition Exhibit No. 28 was marked.)    16:07:58

Q.    (BY MS. BELLOWS)    So I've now introduced    16:07:59
as Exhibit 28 a collection of Arizona pay or quit    16:08:01
notices.    And the first one is to a tenant named    16:08:04
Barka Yussuf, Y-u-s-s-u-f, dated October 4th,    16:08:12
2016.    16:08:18

Do you see that?    16:08:19

A.    I do see that.    16:08:19

Q.    Okay.    And the Bates is CM000560 for that    16:08:20
one, right?    16:08:28

A.    Yes.    16:08:29

Q.    Okay.    So we're on the same page?    16:08:30

A.    Yes.    16:08:32

Q.    So can you -- are you familiar with this    16:08:33
document?    16:08:36

A.    I am.    16:08:36

Q.    Okay.    And what is it?    16:08:37

A.    It's a five-day pay or quit.    16:08:38

Q.    Five-day pay or quit?    16:08:42

Page 194

A.    Yeah, uh-huh.    16:08:43

Q.    And that's a standard pay or quit notice used by Wasatch Property Management in Arizona?    16:08:44 16:08:47

A.    In Arizona, yes, five-day pay or quit.    16:08:50

Q.    Okay.  So this says, "You are hereby notified that pursuant to the rental agreement dated, by which you hold possession of the apartment described above, you are in default under the rental agreement in the aggregate amount of $105."    16:08:53 16:08:59 16:09:01 16:09:05 16:09:07 16:09:09

Do you see that?    16:09:12

A.    I do see that, yes.    16:09:13

Q.    And you're familiar with how the five-day pay or quit works from your supervision of the Arizona properties, right?    16:09:14 16:09:18 16:09:21

A.    I am in what way?  Can you expand on that?    16:09:23 16:09:28

Q.    Well, you're familiar with their function in your -- in Wasatch's management of its Arizona properties, right?    16:09:28 16:09:34 16:09:40

A.    Yes.  I just -- I'm asking, you know, we've gone through different states, right?    16:09:41 16:09:48

Q.    Yeah.    16:09:51

A.    They're all the same function, right?    16:09:52

Q.    Yeah.    16:09:54

Page 195

Bellow Decl. Ex. 3, Page 30 of 66

A.   Is to be able to get -- again, to hold the dialogue with them and, you know, say, hey, here's a charge available, or there's a charge of some sort that has been unpaid.  Rent's unpaid. And we've got -- you know, come talk to us.  And you're in breach of contract, yeah, you know, et cetera, et cetera, right?

So if that's what you're -- if that's what you're referring to, yes, I'm familiar with that.

Does that make sense, Anne?

Q.   That does make sense.  I'm actually going to ask a specific question, so let me just go ahead and get there.

Which is when it says you're in default of the rental agreement in an aggregate amount and it gives a number, does that number capture all outstanding charges with -- I'll just note the next line says it does not include late charges.

So other than late charges, does it include all outstanding charges?

A.   It could include all outstanding charges.

Q.   Okay.

A.   It does not include any late charges, no. And it could include it.  It might not be in there

Page 196

Bellow Decl. Ex. 3, Page 31 of 66

as well. So depending on what time of the month 16:11:00

it is, depending on what time those things are 16:11:06

going through there, there might be different 16:11:08

pieces. 16:11:11

Q. Okay. So it could include additional 16:11:12

services charge, for example? 16:11:16

A. It could. I don't have the ledgers up. 16:11:17

I'm speculating. 16:11:20

Q. Okay. But there's no -- there's no 16:11:21

reason to think that additional service charges 16:11:24

are necessarily excluded from this amount? 16:11:26

A. No, the only thing I can tell you is if 16:11:29

it -- these go to court, they're going to 16:11:33

be -- the only thing that's -- that you're going 16:11:37

to go to court for and get a judgment for is rent. 16:11:42

So it wouldn't do us any good to go for that. 16:11:46

Does that make sense? 16:11:48

Q. I see what you're saying about court, but 16:11:50

I guess my question is when it says you are in 16:11:54

default under the rental agreement in the 16:11:56

aggregate amount of and then gives a number, that 16:11:59

number -- would that normally include all 16:12:01

outstanding balances besides late charges? 16:12:05

A. Besides late charges, it most likely 16:12:07

will. 16:12:12

Page 197

Bellow Decl. Ex. 3, Page 32 of 66

Does Wasatch Property Management use a standard lease form in its operation?    16:40:44 16:40:46

A.   Yes, they do.    16:40:48

Q.   Okay.  And so when a -- if you could just walk me through, you know, a tenant is going to move into a property.  Where does the property personnel go to get the lease and sort of set everything up for them?    16:40:51 16:40:56 16:41:01 16:41:04 16:41:09

A.   In Yardi.    16:41:11

Q.   In Yardi.  And what do they do?  They, like, request a standard lease?  Or do they have to identify where they are?  Or how does that work?    16:41:11 16:41:14 16:41:17 16:41:19

A.   So as far as it goes with the -- let me pull this up.  With regards to -- they're just going to go through a standard application process.    16:41:19 16:41:25 16:41:31 16:41:33

Is that what you're asking about, the application process or just --    16:41:33 16:41:36

Q.   Just focusing on the lease.    16:41:38

A.   Just the leases, so they've already gone through the application process.  They're going to now move from a prospect to a tenant.    16:41:40 16:41:43 16:41:45

Q.   Okay.    16:41:49

A.   So they would just go into Yardi and go    16:41:49

Page 210

Bellow Decl. Ex. 3, Page 33 of 66

through the process, the standard there.  Yardi    16:41:53

would have already pulled the information from a    16:42:00

prospect information into a tenant screen, and the    16:42:02

lease would be auto-generated through there.    16:42:08

Q.    Okay.  And then they just press "Print"    16:42:11

and the lease comes up with the tenant's info?    16:42:13

A.    Correct.  And then they go through the    16:42:15

lease completely with the tenant and walk them    16:42:17

through that.    16:42:20

Q.    Okay.  And Yardi is essentially a managed    16:42:21

database for Wasatch Property Management, right?    16:42:24

A.    That is correct.    16:42:27

Q.    Is there a person or group of persons who    16:42:28

are responsible for the lease language?    16:42:31

A.    Yes, there is.  The lease language would    16:42:33

be -- would be through -- I believe we use NAA's    16:42:42

lease right now, the National Apartment    16:42:47

Association's lease.  And then we would have    16:42:51

in-house counsel, you know, review that.    16:42:52

Q.    Okay.  So who -- who decides when there    16:42:58

needs to be a revision to the lease?    16:43:02

A.    If we have anything that comes up, like I    16:43:05

said before, earlier in the deposition, an example    16:43:09

of that would be when the -- I'm trying to    16:43:14

remember the piece there.    16:43:28

Page 211

Bellow Decl. Ex. 3, Page 34 of 66

And they were obviously gone through by landlord/tenant and/or any type of association for -- NAA or an apartment association component.

Q.   Okay.  And, again, you mentioned earlier that Wasatch is using the NAA lease.

Can you tell me what that refers to?

A.   The National Apartment Association lease.

Q.   Okay.  And what -- in what way is Wasatch using the NAA lease?  Is this a form from the NAA website that's just, you know, downloaded and used directly by Wasatch?

A.   Yeah.  Yes, that would be correct.

Q.   And so Wasatch would have downloaded those forms and then adapted it?

A.   Correct.  That is correct.

Q.   Okay.  All right.  You should see, in your Exhibit Share folder, Jarvis Exhibit 54. This is a collection of leases that was previously marked in this case as Jarvis Exhibit 54.  And the first one has a Bates number of BT000107 on the first page.

Do you have that in front of you?

A.   I do.  Let me see this here.  It's a Bates, you said?

Q.   Yeah, Bates stamp.  It's the number in

Page 214

Bellow Decl. Ex. 3, Page 35 of 66

the lower right corner.  It's a tool that --

          A.   Oh, yes.  Yes.  Yes.  Yeah.  54, of

course, yes.

          Q.   Yeah.  And then the --

          A.   And the BT, yes, 107 is right.

          Q.   Yeah, so each document produced --

          A.   Yes, of course, yes.

          Q.   Okay.  All right.  So let's look at the

first page.  This is a lease, you know, entered

into, it says, on March 25, 2008.

          A.   Okay.

          Q.   Right?  Okay.  And I'm looking at the

rent section.  If you look at the first paragraph,

it says, you know, kind of close to the end of

that paragraph, quote, "All payments received for

rent and additional charges shall first be applied

to any past balance due and then to additional

charges and then to current rent."

               Do you see that?

          A.   I do see that.

          Q.   And this is referring to the payment

sequence that we looked at before, correct?

          A.   Uh-huh.

          Q.   And when it says "additional charges,"

what do you take that to refer to?

Page 215

Bellow Decl. Ex. 3, Page 36 of 66

A.    The additional charges we discussed    16:49:00

earlier.    16:49:03

Q.    So does "additional charges" mean    16:49:03

additional service charges?    16:49:05

A.    An ASA, yes.    16:49:06

Q.    Okay.  So that's one version.  And then    16:49:09

just so you understand, this is sort of set up to    16:49:13

show some version over the years --    16:49:16

A.    Yeah, that's what I was going to say.    16:49:19

This is from 2008, right?    16:49:21

Q.    Yes.    16:49:22

A.    Okay.    16:49:23

Q.    The next lease in this document starts on    16:49:24

page 5 of the PDF.    16:49:26

A.    Okay.    16:49:28

Q.    And it's a lease dated January 28, 2013,    16:49:34

with an initial Bates of CP000294.    16:49:38

A.    Yep.    16:49:48

Q.    Okay.  So if you look at that paragraph    16:49:49

on rent, now the language -- you know, the    16:49:51

corresponding language to what we just read is    16:49:59

"Rent received shall first be applied to all sums    16:50:01

owed and then to the current rent due."    16:50:04

Do you see that?    16:50:06

A.    Yes.    16:50:06

Page 216

Q.    Okay.    Why was that language changed?    16:50:13

A.    Why was that language changed?    16:50:19

Q.    Yeah.    16:50:22

A.    I wasn't a decision-maker at that time to be able to -- to tell you why that language has changed.    16:50:23 16:50:30 16:50:35

Q.    You have no knowledge of why it was changed?    16:50:38 16:50:40

A.    I do not know why that was changed at the time.    It was probably to -- to fulfill a best practice or -- yeah, I'd be speculating.    I would be speculating at that point.    16:50:41 16:50:44 16:50:47 16:50:53

Q.    Okay.    If you scroll down to the end of that lease, which is on page 8 of the PDF, you'll see one of those little stamps that says -- it looks like "LD302.01.CA Revised," and then it has a date of 5/17/2012.    16:50:56 16:50:57 16:51:04 16:51:11 16:51:16

Do you see that?    16:51:20

A.    I do.    16:51:20

Q.    So my understanding is that means that this lease was -- the standard lease form was revised on May 17, 2012; is that correct?    16:51:21 16:51:24 16:51:27

A.    Again, I would be making that assumption as well.    16:51:34 16:51:39

Q.    Okay.    And then if you look back at that    16:51:39

Page 217

language, it says, "Rent received shall first be    16:51:45

applied to all sums owed and then to the current    16:51:50

rent due."    16:51:54

      I find that a little confusing.  Can you    16:51:55

help -- can you tell me what all sums owed refers    16:52:00

to here?    16:52:03

    A.    What do you find confusing about that?    16:52:04

    Q.    I don't understand what it means.  Can    16:52:07

you tell me what it means?    16:52:09

    A.    That any -- any -- any balances owed will    16:52:10

be applied just exactly how we've determined in    16:52:17

the past that we've talked about, all sums that    16:52:20

are paid toward there.    16:52:24

    Q.    Okay.  So this is still referring to the    16:52:25

payment sequence?    16:52:31

    A.    The payment sequence, yeah.    16:52:32

    Q.    And the payment sequence didn't change at    16:52:34

that time, right?    16:52:37

    A.    No, the payment sequence didn't change at    16:52:37

the time.  It stayed the same.  It's just    16:52:40

a -- probably a language that's more, you    16:52:42

know -- it's just -- it's just more aggregated.    16:52:47

    Q.    Okay.  And then if you go down to page 8    16:52:49

of the document, there's a lease dated January 25,    16:52:53

2018.  And it's got an initial Bates of    16:53:01

Page 218

WEAU00000242.                                                    16:53:05

A.    Okay.                                                      16:53:14

Q.    Do you see that?                                           16:53:15

A.    I do see that.                                             16:53:16

Q.    And this is still Wasatch Property                        16:53:17
Management's standard lease, right?                              16:53:19

A.    Uh-huh.                                                    16:53:21

Q.    Okay.  And so that, then -- if you look                   16:53:23
at that first paragraph on rent, it doesn't have,               16:53:26
you know, sort of comparable language to what we                16:53:30
talked about before, right?                                     16:53:33

A.    It doesn't have that?  Is that what                       16:53:34
you're saying?                                                  16:53:40

Q.    It does not.                                              16:53:41

A.    No, I just see the -- the three -- 3B                     16:56:20
being the sum of this amount that's due upon this,              16:56:24
plus additional services of this amount.  There is             16:56:28
amounts on there.                                               16:56:33

Q.    Okay.  So in that rent section, there is                 16:56:34
no longer any information about how a tenant's                  16:56:37
rent payments will be applied, right?                           16:56:39

A.    I do not see that in this lease, no.                      16:56:43

Q.    Okay.  And as far as you know, the                       16:56:48
payment sequence that we looked at before is still              16:56:50
in effect, right?                                               16:56:52

Page 219

Bellow Decl. Ex. 3, Page 40 of 66

A.    Yes.

Q.    So why was the reference to the payment sequence removed from the lease?

A.    I don't know.

Q.    Were you involved in the decision?

A.    I was not involved in this decision.

Q.    Okay.  Who do you think likely was?

A.    Likely Jarom Johnson, if he was -- I'd have to go in there and look at when that transition happened, but it does say, you know, "The sum of this amount plus the other component is due in advance on the first day of each calendar month commencing at their commencement date on that" -- that piece.  I don't know why that would be.  It might be in the fact of it's redundant.  But --

Q.    Okay.  So I also just want to point out if you go to page 13 of the document, again, one of those stamps gives a revision date of October 18, 2017.

And I understand you're not familiar with where those stamps come from, but I just want to state my hypothesis.  I think that may be when this lease was revised.

A.    Yeah.  I'm going to assume that -- what

Page 220

Bellow Decl. Ex. 3, Page 41 of 66

you're saying as well.    16:58:32

Q.   Okay.  And then I want to talk about that    16:58:33 language that you were just referring to where it    16:58:36 says, "The sum of $1,202, plus additional services    16:58:39 of $38.33 (refer to additional services agreement)    16:58:51 is due in advance of the first day of each    16:58:58 calendar month commencing January 8" -- "January    16:59:01 2018."    16:59:05

So why is that language there?    16:59:07

A.   Saying that the rent is due on the 1st.    16:59:15

Q.   And why is the reference to the    16:59:21 additional services there?    16:59:23

A.   That's just giving a -- and my    16:59:24 interpretation is it's just showing you your    16:59:30 total, what your monthly obligation is going to    16:59:36 be.    16:59:39

Q.   Okay.  So the obligation to pay    16:59:39 additional services is stated here in this section    16:59:46 on rents, right?    16:59:49

A.   Well, the sum plus the initial services    16:59:51 is stated right there.    16:59:53

Q.   Okay.  And it makes sense to put that in    16:59:55 the rent section because it's comparable to rents,    16:59:59 right?    17:00:03

A.   Well, it's --    17:00:03

Page 221

have the overhead light on already maximum, so --   18:03:14

THE VIDEOGRAPHER:  Oh, okay.  Let me see   18:03:17
if this helps.   18:03:18

MR. MATTHEWS:  That's not better.   18:03:22

THE WITNESS:  I've got the -- this is   18:03:24
totally facing west, so this is the sun coming   18:03:26
blazing in right here.   18:03:29

THE VIDEOGRAPHER:  Go ahead and sit down.   18:03:32
If you stay centered, it -- you're lighter there.   18:03:33
You're lighter there.  Thanks.   18:03:37

THE WITNESS:  Okay.  Okay.  17.  We're on   18:03:38
17.   18:04:01

Q.  (BY MS. BELLOWS)  Okay.   18:04:02

A.  You guys can see me all right now?   18:04:03

Q.  Yes.  That's better.   18:04:05

A.  As long as I keep that right there.   18:04:06
Okay.  Keep my head where the sun's at.   18:04:09

Q.  Okay.  So this is another additional   18:04:13
services agreement.  Still a Wasatch Property   18:04:17
Management standard form?   18:04:23

A.  That I see, yes.   18:04:24

Q.  Okay.  And this one is dated -- look at   18:04:25
the bottom.  It looks like it's been signed on   18:04:30
February 1st, 2013.   18:04:33

A.  That's what I see as well, yes.   18:04:35

Page 266

Q.   Okay.  So did Wasatch stop using terms   18:10:45
and conditions of additional services agreement?   18:10:52

A.   I -- I know of a time that we wanted to   18:10:56
make sure our lease was condensed.  It was too   18:11:03
long.  And that might have been the case.   18:11:07

Q.   When did that happen?   18:11:11

A.   I can't recall the time frame of it.  I   18:11:13
just know that there was a time that we just   18:11:16
didn't want to make sure that it wasn't too, like,   18:11:19
lengthy in page count.   18:11:26

Q.   And who was involved in that decision?   18:11:27

A.   It was really Dell Loy.  Dell Loy and   18:11:30
Bradley Mishler.   18:11:34

Q.   Okay.  Okay.  So let's look at one more   18:11:35
in this same exhibit.   18:11:46

A.   Okay.   18:11:48

Q.   And --   18:11:48

A.   Thank you for adapting.  I appreciate it,   18:11:54
Anne, to not putting the "right" on there.  I   18:11:57
appreciate that.   18:12:00

Q.   Well, I can't promise it won't come back.   18:12:00

A.   It's habit.  I totally get it.  And I   18:12:03
just -- I was just saying when you do the "right,"   18:12:05
I don't -- I'm trying to delineate where the   18:12:08
question is and it stops, right?   18:12:11

Page  272

Bellow Decl. Ex. 3, Page 44 of 66

REPORTER'S CERTIFICATE

STATE OF IDAHO   )
                 )  ss.
COUNTY OF ADA    )

I, AMY E. SIMMONS, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 15th day of November, 2021.

<%11030,Signature%>

AMY E. SIMMONS
CSR, RPR, CRR, CRC and Notary
Public in and for the
State of Idaho.

My Commission Expires: 06-13-2022

Page 291

Bellow Decl. Ex. 3, Page 45 of 66

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

UNITED STATES OF AMERICA, ex )
rel. DENIKA TERRY, ROY HUSKEY )
III, and TAMERA LIVINGSTON, )
and each of them for )
themselves individually, and )  Case No. 2:15-CV-00799-KJM-DB
for all other persons )
similarly situated and on )
behalf of the UNITED STATES )           VOLUME II
OF AMERICA, )
                              )        PAGES 293 - 522
          Plaintiffs, )
                              )
vs. )
                              )  REMOTE VIDEOTAPED DEPOSITION OF
WASATCH ADVANTAGE GROUP, LLC, )
WASATCH PROPERTY MANAGEMENT, )        SHAWN FETTER
INC.; WASATCH POOL HOLDINGS, )
LLC, CHESAPEAKE APARTMENT )          October 28, 2021
HOLDINGS, LLC, LOGAN PARK )
APARTMENTS, LLC, LOGAN PARK )
APARTMENTS, LP, ASPEN PARK )
HOLDINGS, LLC, BELLWOOD )
JERRON HOLDINGS, BELLWOOD )
HERRON APARTMENTS, BENT TREE )
APARTMENTS, LLC, CALIFORNIA )
PLACE APARTMENTS, LLC CAMELOT )
LAKES HOLDINGS, LLC CANYON, )
CLUB HOLDINGS, COURTYARD AT )
CENTRAL PARK APARTMENTS, LLC, )
CREEKSIDE HOLDINGS, LTD, )
HAYWARD SENIOR APARTMENTS, )
LP, HERITAGE PARK APARTMENTS, )
LP, OAK VALLEY APARTMENTS, )
LP, OAK VALLEY HOLDINGS, LP, )
PEPPERTREE APARTMENT )
HOLDINGS, LP., PIEDMONT )
APARTMENTS, LP, POINT NATOMAS )
APARTMENTS, LLC, POINT )
NATOMAS APARTMENTS, LP, RIVER )
OAKS HOLDINGS, LLC, SHADOW )
WAY APARTMENTS, LP, SPRING )
VILLA APARTMENTS, LP, SUN )
VALLEY HOLDINGS, LTD, VILLAGE )
Grove APARTMENTS, LP, WASATCH )
QUAIL RUN GP, LLC, WASATCH )
PREMIER PROPERTIES, LLC, )
WASATCH POOL HOLDINGS III, )
LLC, and DOES 1-4, )
                              )
          Defendants. ) Reported by:
_____) Amy E. Simmons, CSR, RPR, CRR, CRC

                                                        Page 1

Bellow Decl. Ex. 3, Page 46 of 66

the language in the lease regarding the renter's 10:12:10

insurance requirement? 10:12:13

A.   I remember us talking about renter's 10:12:13

insurance, yes. 10:12:16

Q.   Okay.  And if I can just quickly recap my 10:12:16

sense of that testimony -- and please tell me any 10:12:26

corrections you have to it.  It is that the 10:12:28

renter's insurance requirements, until December 10:12:32

2019, was stated in the lease except for at tax 10:12:35

credit properties where the lease stated that the 10:12:41

renter's insurance was an optional decision for 10:12:45

the tenant to make; is that right? 10:12:49

A.   Yes, that's what I understand. 10:12:51

(Deposition Exhibit No. 32 was marked.) 10:12:53

Q.   (BY MS. BELLOWS)  Okay.  So let's look at 10:12:53

Exhibit 32, which is already in your Exhibit 10:12:55

Share.  And this is the set of leases from the 10:12:59

Section 8 tenant files produced in this case by 10:13:03

Wasatch.  And the first lease is for a tenant 10:13:05

named Deja Baro.  That's D-e-j-a, last name Baro, 10:13:10

B-a-r-o at Bent Tree Apartments. 10:13:19

A.   Okay. 10:13:20

Q.   With an initial Bates of BT004691.  And 10:13:21

it looks like this lease is dated April 9th, 2016. 10:13:28

Do you have that in front of you? 10:13:32

Page 302

A.  I do.    10:13:34

Q.  Okay.  And this is also Wasatch's    10:13:35
standard lease, correct?    10:13:37

A.  Yes.    10:13:39

Q.  Is Bent Tree a market rate property?    10:13:39

A.  It is a market rate property.    10:13:43

Q.  Okay.  So if you scroll to the third page    10:13:45
of the document, you'll see a Section XIII,    10:13:49
Liability Insurance.  Can you read that paragraph    10:13:56
out loud?  And I recognize it may require some    10:14:01
zooming in because of the small text.    10:14:04

A.  Yes.  You can see my face all right from    10:14:06
there?    10:14:09

Q.  Yes.    10:14:09

A.  Okay.  "Effective December 1st, 2003,    10:14:10
Wasatch Property Management requires each resident    10:14:14
or residents to maintain renter's insurance with a    10:14:18
minimum of $50,000 personal liability coverage    10:14:21
with a company of the renter's discretion.    10:14:25
Residents must provide proof of insurance from a    10:14:28
third-party carrier and have Bent Tree Apartments    10:14:32
and its ownership entities and the management    10:14:37
named as an additional insured, or residents may    10:14:40
participate in the pay along with rent program,    10:14:44
not affiliated with Wasatch Property Management or    10:14:47

Page 303

Bellow Decl. Ex. 3, Page 48 of 66

Bent Tree Apartments.  If at any time during the    10:14:49

term of this lease resident is without coverage    10:14:54

and in default of their lease, resident agrees to    10:14:56

automatically be enrolled in the pay along with    10:15:00

rent program and being charged accordingly."    10:15:02

Q.   Okay.  And this is the lease language    10:15:05

that was used at all of Wasatch's market rate    10:15:08

properties before the renter's insurance    10:15:11

requirement ended; is that right?    10:15:14

A.   I believe so, yes.    10:15:15

Q.   Okay.  There's a reference in here to the    10:15:17

pay along with rent program.    10:15:20

Can you just briefly tell me what that    10:15:22

refers to?    10:15:24

A.   To the best of my knowledge, it refers    10:15:25

to -- that they would have the option to be able    10:15:31

to, through a third-party affiliate, that we had    10:15:34

previously negotiated a rate for them to get    10:15:40

renter's insurance through that party.    10:15:47

Q.   And so they would pay their renter's    10:15:50

insurance fees to Wasatch and Wasatch would    10:15:54

handle --    10:15:56

A.   Would handle it, yeah.    10:15:56

Q.   Would handle it.  Okay.    10:15:58

And the paragraph also mentions that this    10:16:01

Page 304

is effective December 1st, 2003.    10:16:04

Is that -- is that the date that the    10:16:08

renter's insurance requirement went into effect?    10:16:10

A.    I'd be speculating on that, but it says    10:16:11

that on there, so I would assume that.    10:16:16

Q.    Okay.  You have no reason to think    10:16:18

differently?    10:16:20

A.    I would not.    10:16:20

Q.    Okay.  And so this is an example of where    10:16:21

renter's insurance was required in the lease    10:16:26

itself for a Section 8 tenant, correct?    10:16:28

A.    Yes.    10:16:32

Q.    Okay.  Let's look at the next example,    10:16:34

which is from Logan Park.  And it's a lease for a    10:16:37

tenant named Aaron Patterson.  And that lease    10:16:39

begins on page 8 of the PDF.  And the page that we    10:16:50

want to look at is page 11 of the PDF.    10:16:56

Do you see that?  There's a section    10:17:12

entitled "XV, Liability Insurance."    10:17:15

A.    Yes.    10:17:19

Q.    Okay.  If you want to take a moment to    10:17:20

review that section.  I won't have you read it out    10:17:23

loud because it's longer.    10:17:27

A.    Okay.    10:17:53

Q.    Okay.  So this section -- can you tell me    10:17:54

Page 305

briefly what options it provides a tenant?    10:17:57

A.    That they can -- it says -- looks to me    10:17:59

that there's three options.  The resident will    10:18:05

purchase renter's insurance coverage.  They have    10:18:07

renter's insurance coverage, or they're choosing    10:18:13

not to have renter's insurance coverage.    10:18:16

Q.    Okay.  So here it's the tenant's choice    10:18:19

whether or not to maintain renter's insurance and    10:18:24

if they do, whether or not to purchase it through    10:18:26

Wasatch Property Management; is that right?    10:18:28

A.    Or not to have renter's insurance at all.    10:18:29

Q.    Yeah.  And is the reason for that because    10:18:32

Logan Park is a tax credit property?    10:18:35

A.    That is correct.    10:18:37

Q.    And is this the language that appeared in    10:18:40

all of the leases for Wasatch Property    10:18:43

Management's tax credit properties through    10:18:47

December 2019?    10:18:50

A.    To the best of my understanding, yes.    10:18:51

Q.    Okay.  And next I'd like to look at an    10:18:54

example of a bond property.    10:18:59

Chesapeake Commons was a bond property,    10:19:01

correct?    10:19:03

A.    Yes.    10:19:03

Q.    Okay.  So if you scroll down further in    10:19:04

Page 306

Bellow Decl. Ex. 3, Page 51 of 66

this exhibit, there's a lease for a tenant named     10:19:07

Glenda Brewer, B-r-e-w-e-r, that starts on page 15     10:19:11

of the document.  And she's a tenant at Chesapeake     10:19:20

Commons, correct?     10:19:26

    A.  I see that the lease shows that she is at     10:19:27

Chesapeake, yes.     10:19:31

    Q.  Okay.  And this is a lease dated     10:19:32

August 30th, 2016, and it has a Bates number,     10:19:36

CPC021026, just to get the basics into the record.     10:19:42

    So let's look at the page Bates numbered     10:19:48

CPC021028, which is a couple pages down.     10:19:52

    And then you'll see, again, the liability     10:20:04

insurance section near the top of the page.     10:20:06

    Do you see that?     10:20:12

    A.  I do see that.     10:20:12

    Q.  And this is the language that we looked     10:20:13

at in the first lease that said that liability     10:20:17

insurance is required, correct?     10:20:20

    A.  It looks like the same -- the same     10:20:21

language that we read previously out loud.     10:20:25

    Q.  And is this the same language that was     10:20:28

used at Wasatch Property Management's other bond     10:20:30

properties up until December 2019 regarding     10:20:35

liability insurance?     10:20:40

    A.  I would make that assumption, yes.     10:20:43

Page 307

nowhere in Wasatch Property Management, in your                13:32:51

experience, has there ever been a required washer             13:32:55

and dryer?                                                     13:32:59

A.   Under my purview is all I can speak to.           13:32:59

Q.   I know.  So you're not familiar with what         13:33:02

the practices might be in other states?                        13:33:04

A.   Not under my purview, no.                          13:33:06

Q.   All right.  If you'll bear with me, I'm            13:33:15

going to introduce another document.                           13:33:19

A.   Okay.                                              13:33:23

MS. BELLOWS:  Can someone tell me what                 13:33:24

document we're up to in Mr. Fetter's deposition?               13:33:57

THE REPORTER:  39 should be the next one.              13:34:03

MS. BELLOWS:  Thank you so much.                        13:34:05

(Deposition Exhibit No. 39 was marked.)                13:34:07

Q.   (BY MS. BELLOWS)  Okay.  So I've just              13:34:30

marked as Exhibit 39 a collection of emails from               13:34:31

Duane Wiles related to AR balance summaries.                   13:34:34

A.   Okay.                                              13:34:40

Q.   And the Bates for the first one is WCDS            13:34:47

045916.                                                        13:34:51

Do you have that document up?                          13:34:57

A.   I do.                                              13:34:58

Q.   Okay.  And then if you look at this                13:34:59

document, this is -- it says "Sacramento division              13:35:08

Page 415

AR summary as of 4/22/19" for the subject.    13:35:12

And this is similar to the document we    13:35:17
looked at yesterday?    13:35:19

A.    I was going to say, this is -- the bottom    13:35:20
is exactly the same that we looked at yesterday.    13:35:26

Q.    Yeah.    Exactly.    So this is exactly the    13:35:28
same as what we looked at yesterday?    13:35:30

A.    Uh-huh.    13:35:34

Q.    And this first one is sent to the    13:35:35
Sacramento division, correct?    13:35:37

A.    This would be Sacramento, yes.    I believe    13:35:39
he uses this as a template, so, yes.    13:35:41

Q.    Okay.    And then if you scroll down to    13:35:44
page 3, there's one --    13:35:46

A.    Okay.    3?    13:35:53

Q.    -- that has a different subject.    Its    13:35:55
subject is "Lease Ups AR Summary as of 4/22/19."    13:35:59

And who is this being sent to?    13:36:04

A.    That's not over my purview, but that's    13:36:05
being sent to any community that's under -- that's    13:36:08
being leased that's a new build or a new type of    13:36:18
property that's doing a lease up.    13:36:22

Q.    I see.    So these are properties where    13:36:23
they've recently been built and they're filling    13:36:26
their units?    13:36:32

Page 416

A.   Yeah, either constructed or something there, yeah.

Q.   Okay.  And then if you look at the second page of that email, that's the same testimonial from Ashley Ruiz that we looked at yesterday, correct?

A.   The second page that was up above?

Q.   Second page of this email, so now we're talking about page 4 of the PDF.

A.   Okay.  Page 4, yeah.  It looks like, again, yeah, like he's got a form or a template that's -- yeah.

Q.   Okay.  And then the next one on page 5 is to Fresno Division.

And if you check the page 6, which is the second page of that email, that has the same testimonial, correct?

A.   That is correct.

Q.   Okay.  And then after that, there's one to the San Diego division, correct?

A.   That is correct.

Q.   And that email also has the same testimonial we looked at yesterday, right?

A.   It looks -- yeah, that looks to be the case, yes.

Page 417

Bellow Decl. Ex. 3, Page 55 of 66

Q.   And then after that, now we're on page 10    13:37:48
of the document, of the exhibit.  There's an email    13:37:55
to the Salt Lake City division, correct?    13:37:58

A.   Yes.    13:38:01

Q.   And it also has the same testimonial that    13:38:03
we looked at yesterday, correct?    13:38:06

A.   It looks like that, yes.    13:38:08

Q.   Okay.  So it looks like that testimonial    13:38:12
was distributed relatively broadly throughout the    13:38:18
company?    13:38:22

A.   These are all for the same month, right?    13:38:22

Q.   Yeah.    13:38:25

A.   Yeah.    13:38:26

Q.   And so your assumption is -- not your    13:38:28
assumption.  What you suggested earlier is that    13:38:33
Duane Wiles had a template that he used for all of    13:38:36
his AR summary emails that month?    13:38:39

A.   Probably.  It would make things go    13:38:41
faster.    13:38:44

Q.   Okay.  And that template included the    13:38:44
testimonial from Ashley Ruiz?    13:38:46

A.   That would be my -- I mean, that would be    13:38:48
the assumption looking at what you're presenting    13:38:52
to me right now.  Again, I'm not Duane, but    13:38:54
speaking, you know, for what I'm seeing, my    13:39:00

Page 418

interpretation of that would be that.                13:39:02

Q.   Yeah.   Okay.   You can put that aside.        13:39:03

Thank you.                                           13:39:09

A.   Okay.                                           13:39:09

Q.   Okay.   So we've talked about a few            13:39:18

different affordable housing programs, the tax       13:39:20

credit program, bond program, and Section 8.         13:39:23

Do you remember that testimony?                      13:39:28

A.   I remember some things, yes.                   13:39:28

Q.   Okay.   And so each of those three             13:39:31

programs has its own requirements, correct?          13:39:35

A.   They've got different -- there are             13:39:37

differences in between them, yes.                    13:39:42

Q.   And for each of these programs, Wasatch        13:39:43

Property Management must comply with those           13:39:47

requirements in order to continue to participate     13:39:48

in a program; is that right?                         13:39:50

A.   That would be to my understanding, yes.        13:39:51

Q.   Okay.   So I'd like to just drill down         13:39:55

into Section 8 a little more.                        13:39:58

Can you tell me your understanding of how            13:40:01

the Section 8 housing choice voucher program         13:40:03

works?                                               13:40:07

MR. MATTHEWS:   Object to that as                    13:40:08

overbroad.                                           13:40:09

Page 419

you'll see me the whole time.                                    17:28:59

          MS. BELLOWS:  Okay.  I've marked Exhibit          17:30:04

41.  Is that right?                                              17:30:20

          THE REPORTER:  It should be 42.                    17:30:21

          MR. MATTHEWS:  I think you marked it as           17:30:24

42.                                                              17:30:26

          MS. BELLOWS:  I did mark it 42.  I was             17:30:26

looking at the wrong page.                                       17:30:28

          THE WITNESS:  Monthly cost breakdown.             17:30:30

Okay.                                                            17:30:32

          (Deposition Exhibit No. 42 was marked.)           17:30:33

     Q.   (BY MS. BELLOWS)  So this is a collection          17:30:34

of the monthly cost breakdown sheets from the                    17:30:35

tenant files produced in this action by                          17:30:37

Defendants.                                                      17:30:39

          And if you could read the Bates stamp on          17:30:40

the first page, I would appreciate that.                         17:30:42

     A.   The revised date stamp on there?  Is that         17:30:44

what you're talking about?                                       17:30:55

     Q.   Just the Bates stamp.  I'll read it.              17:30:56

It's now loaded for me.  So this one is the first                17:30:59

is Bates CV005562.                                               17:31:02

     A.   Yeah.                                              17:31:04

     Q.   Just doing that to keep it clear in the           17:31:05

record what document we're all looking at.                       17:31:07

                                        Page 499

A.   The date stamp that you're talking about is the revised date stamp or what?

Q.   I had said "Bates," "Bates stamp."

A.   Oh, Bates stamp.  I keep on -- I thought you were saying "date stamp."  Your B sounded like a D.  I mean, that's why we use delta, right?

Q.   We're racking up the list of problems with remote depositions.

All right.  Can you tell me what this document is?

A.   This document is a monthly cost breakdown that would be in the lease, the actual lease.

Q.   I'm sorry.  What do you mean it would be in the actual lease?  The document would be in the lease or the charges reflected on it are those reflected in the lease?

A.   This document's in the actual -- usually it's in the actual lease.

Q.   Okay.  And the first line addressed is the base rent, correct?

A.   That's what it says, yes.

Q.   And can you just tell me why there's -- why it says "Base rent"?

A.   I would say that that would be your base rent.  That would be what would be the base unit

17:31:10
17:31:12
17:31:15
17:31:18
17:31:22
17:31:28
17:31:31
17:31:35
17:31:36
17:31:37
17:31:38
17:31:40
17:31:43
17:31:47
17:31:50
17:31:52
17:31:53
17:31:58
17:32:02
17:32:08
17:32:10
17:32:17
17:32:20
17:32:22
17:32:26

Page 500

Bellow Decl. Ex. 3, Page 59 of 66

of rent.

17:32:32

Q.   Does that distinguish it from some other amount?

17:32:33
17:32:36

A.   Yeah.  I mean, distinguish it to say this is the base rent plus any additional services as I read it on here.

17:32:37
17:32:41
17:32:46

Q.   Okay.  So base rent is just clarifying this is the rent exclusive of additional services?

17:32:47
17:32:50

A.   Yes.

17:32:53

Q.   Okay.

17:32:53

A.   I'll agree with you on that.

17:32:56

Q.   And then next it lists additional services?

17:32:57
17:33:00

A.   That's what --

17:33:01

Q.   And then it provides a subtotal of charges and total monthly obligation; is that correct?

17:33:02
17:33:04
17:33:06

A.   That is correct, is what I see.

17:33:06

Q.   How is the total monthly obligation used in Wasatch Property Management's business?

17:33:10
17:33:13

A.   How is that used on there?

17:33:16

Q.   Yeah.  What's the use for that concept?

17:33:25

A.   That's really vague.  Why would somebody want to know their total monthly obligation?

17:33:27
17:33:35

What's the question in that?

17:33:38

Page 501

Q.   Why is that -- well, let's start with why is it listed on this document?    17:33:39 17:33:41

A.   Would you want to know your monthly obligation?  I know that you're the one asking the questions, but --    17:33:43 17:33:45 17:33:48

Q.   Yeah, I understand what you're getting at, but for purposes of testimony, I'd rather you not state it as a rhetorical question and just tell me why it's on this document.    17:33:48 17:33:50 17:33:54 17:33:57

A.   It's important for somebody to know what their monthly obligation is so they can set it up for -- if they have ACH payment or so that they know what they're going to need to pay each month.    17:34:00 17:34:02 17:34:04 17:34:08

Q.   Okay.  And then it says right below that, "Your monthly payment is due and payable to Creekside Villas Apartments on or before the first day of each month," correct?    17:34:10 17:34:12 17:34:15 17:34:19

A.   Correct.  That's what it says.    17:34:21

Q.   And that monthly payment refers to both base rent and additional services on this agreement -- or sorry, on this form?    17:34:22 17:34:25 17:34:27

A.   On this form, uh-huh, yes.  That's what I read.    17:34:30 17:34:32

Q.   Okay.  Okay.  And then if you scroll through, you'll see other iterations of this.  And    17:34:33 17:34:57

Page 502

Bellow Decl. Ex. 3, Page 61 of 66

I guess what I'd like you to confirm is that this is a standard form that's been used throughout Wasatch's properties as long you've been working there.

A. To the best of my understanding, yes, in some form or another, we've used something like this more.

Q. Okay. Working on the next exhibit.

A. Okay. Is this one done?

Q. This one's done.

A. Okay.

(Deposition Exhibit No. 43 was marked.)

Q. (BY MS. BELLOWS) Okay. So I've just marked as Exhibit 43 another collection of forms from the Section 8 tenant files produced in this action.

A. Okay.

Q. And this one, the form is titled "Monthly statement of rental account," and the first one has a Bates number of CV005614.

A. Let me pull it up. Monthly statement of rental account, correct?

Q. Yes. Are you ready?

A. I'm ready.

Q. Okay. Can you tell me what this form is?

Page 503

4:56 p.m.

Q. (BY MS. BELLOWS) Okay. I've put in your Exhibit Share folder a document previously marked Exhibit 35 to the Johnson deposition, if you could pull that up from me. This is a letter from the tenant files produced in this action with a Bates stamp of CP014105.

A. Okay.

Q. And it's entitled "Renewal Notification."

Do you have that in front of you?

A. I have that in front of me.

Q. Do you recognize this form?

A. I do recognize this form.

Q. Is this another Wasatch standard form?

A. It is.

Q. And is it available on Yardi?

A. It would be available on Yardi, yes.

Q. For all the properties?

A. Yes.

Q. Okay. And what is the use of this form in Wasatch Property Management's business?

A. To notify the resident of a renewal, of an upcoming lease expiration and renewal.

Q. And looking at the second paragraph and the third sentence in, reads, "When you renew your

Page 510

lease, your new rental rate will be $937.16.  This 17:57:37

rate includes rent and any applicable service 17:57:42

items such as parking, renter's insurance, pet," 17:57:45

et cetera. 17:57:48

Do you see that? 17:57:49

A.    I do see that, yes. 17:57:50

Q.    Is that the standard language that's used 17:57:52

on all the renewal notifications? 17:57:54

A.    I would have to check on there, but I'd 17:57:56

make that assumption as this is a standard form. 17:58:01

Q.    Okay.  This looks familiar? 17:58:05

A.    Yes.  Like I said, it looks familiar and 17:58:06

it's a -- you know, I'd have to check to make 17:58:09

sure, to verify that would be the case, but I 17:58:12

would see it being the same, yes. 17:58:14

Q.    Okay.  And the next paragraph, it says, 17:58:16

"Please contact the office at your earliest 17:58:22

convenience to arrange a meeting to sign your new 17:58:24

lease.  As a reminder, your new lease needs to be 17:58:27

signed prior to 8/27/2016 or we will assume that 17:58:33

you have chosen the month-to-month lease term, 17:58:39

which is currently $1,192.16 and is subject to 17:58:42

change due to market rate fluctuations." 17:58:49

Do you see that? 17:58:52

A.    I see that, what you pointed out, yes. 17:58:53

Page 511

Bellow Decl. Ex. 3, Page 64 of 66

Q. And that amount is $155 higher than the new rental rate mentioned in the prior paragraph?

A. That would be the math that would be pulled out -- extrapolated from there, yes.

Q. Okay. And then -- so I just want to make sure I'm understanding.

This includes essentially all the same items as the previous amount, so the base rent and service items. And then an additional charge or additional amount added because of the month-to-month status.

Am I understanding it correctly?

A. Correct, yes.

Q. Okay.

A. If they didn't sign a lease. If they were chosen -- if they were choosing to go month to month or didn't vacate.

Q. Okay. And this is from a Section 8 tenant file, so I take it Section 8 tenants received this letter the same way anyone else does?

A. It does. And it would go through the -- to the Section 8 caseworker at that time.

Q. Okay.

A. As you can see, you know, that's 7/14,

Page 512

REPORTER'S CERTIFICATE

STATE OF IDAHO    )
                  )  ss.
COUNTY OF ADA     )

I, AMY E. SIMMONS, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 15th day of November, 2021.

                        AMY E. SIMMONS
                        CSR, RPR, CRR, CRC and Notary
                        Public in and for the
                        State of Idaho.

My Commission Expires: 06-13-2022

Page 522

Bellow Decl. Ex. 3, Page 66 of 66