Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | (Fax) (510) 835-1417

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
Telephone: (510) 834-3300 | (Fax) (510) 834-3377

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
Telephone: (510) 437-1863 | (Fax) (510) 437-9164

Jocelyn Larkin (SBN 110817)
jlarkin@impactfund.org
Lindsay Nako (SBN 239090)
lnako@impactfund.org
THE IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704
Telephone: (510) 845-3473 | (Fax) (510) 845-3654

Attorneys for Plaintiffs and Relators and the Certified Classes

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC,

Case No.: 2:15-CV-00799-KJM-DB

CLASS ACTION

**DECLARATION OF ANNE P. BELLOWS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE REMEDIES**

Date: December 8, 2023
Time: 10:00 a.m.
Dept: Courtroom 3, 15th Floor
Before: Hon. Judge Kimberly J. Mueller

Trial Date: None Set

LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC,
and DOES 1-4,

Defendants.

I, Anne P. Bellows, declare as follows:

1. I am a member in good standing of the Bar of the State of California and an attorney at the law firm Goldstein, Borgen, Dardarian & Ho ("GBDH"), in Oakland, California. I and my firm are counsel for Plaintiffs and Relators ("Plaintiffs") and have been appointed Class Counsel in this action along with the Law Offices of Andrew Wolff, PC, Centro Legal De La Raza, and the Impact Fund.

**A. <u>The Parties' Meet and Confer Efforts Regarding this Motion</u>**

2. Following the Court's Summary Judgment Order which issued on November 23, 2022, and in preparation for an upcoming Scheduling Conference, the Plaintiffs met and conferred with Defendants ("Wasatch") regarding remedies phase scheduling on December 1, 2023. On that call, for the first time, Wasatch informed Plaintiffs that it would seek to reduce class damages and restitution based on their costs of providing the additional services to class members.

3. Both on the December 1, 2023 call and by email that day, Plaintiffs informed Wasatch that their costs were irrelevant to the calculation of damages and restitution and requested that Wasatch provide authority for their position. Wasatch did not respond to the request for authority.

4. Through their meet and confer efforts, the Parties discussed and designed a discovery schedule for the remedies phase to enable an update to the data production from Wasatch's Yardi property management database; discovery regarding the costs that Wasatch now contends are relevant to calculating the class's recovery; discovery regarding policy changes that Wasatch represented it was implementing in response to the Court's summary judgment order; and expert disclosures regarding remedies issues. The Court adopted the deadlines agreed upon by the Parties at the Scheduling Conference on December 2, 2022. Minute Order, ECF No. 279.

5. Attached hereto as Exhibit 1 is a true and correct copy of a letter Plaintiffs sent to Defendants on February 9, 2023. The letter outlines the legal principles regarding damages and restitution to the class, which preclude any deduction for Defendants' costs, and requests that Defendants

either stipulate to dropping their contentions regarding costs or respond to the discovery served therewith.

6. Wasatch did not agree to drop its contentions regarding costs. In meet and confer conversations on this issue, Wasatch has suggested that it would be a "windfall" going beyond the benefit of the bargain for tenants to receive the full amount of additional service charges they paid.

7. Following the close of remedies-related discovery, Plaintiffs notified Wasatch that they intended to file the instant Motion, and the Parties met and conferred about the remedies issues presented by this Motion by phone on October 5, 2023. Wasatch agreed that these issues are appropriate for resolution by Motion for Partial Summary Judgment.

**B. Plaintiffs' Discovery of Potential Additional Class Members**

8. In the Stipulation and Order to Extent Expert and Pretrial Deadlines signed by the Court on July 11, 2023, the Court adopted the agreement of the Parties setting a deadline for Defendants to produce an updated class list by July 14, 2023. ECF No. 312. Wasatch did not meet that deadline. Consequently, Plaintiffs directed their expert accountant David Breshears, for purposes of his damages and restitution calculations, to identify class members by applying the class criteria to tenant ledger data he was provided.

9. Plaintiffs continued to request that Wasatch produce a class list so that they could prepare the supplemental class notice previously agreed to by the Parties. Joint Status Report 4, ECF No. 140. On August 9, Wasatch produced a class list that lacked the contact information necessary to enable notice.

10. Plaintiffs reviewed the class list produced by Wasatch and determined that, in addition to omitting class member contact information, it also failed to include some tenants whose qualifications as class members had already been confirmed by the ledger data produced in the action.

11. Due to the shortcomings in Wasatch's production, the Parties agreed that Plaintiffs would compile the list of class members and provide that list to the jointly retained data expert to extract the necessary contact information from Wasatch's Yardi database.

12. Based on further analysis, Plaintiffs determined that 28 tenants identified in Defendants' August 9, 2023 class list production were not included in the tenant ledger and other data produced in this case, with the result that they were omitted from the damages calculations completed by David Breshears and Plaintiffs are not able to verify if those 28 tenants meet the criteria for class membership.

13. Plaintiffs have been working with the joint data expert and with Wasatch to address the potentially omitted class members. On Thursday, October 5, 2023, Defendants' Counsel informed Plaintiffs that he had authorized the additional data work necessary to investigate these potential class members and pull their data. Accordingly, we anticipate receiving the data necessary to resolve the issue in the coming weeks.

14. I understand that David Breshears is available to analyze any additional ledgers produced for the 28 tenants and to provide updated damages and interest calculations for those tenants. Plaintiffs will either provide those updated calculations to the Court, or, if the tenants do not qualify as class members, confirm to the Court that no further updates to the calculations are necessary.

**C. <u>Evidence Supporting Plaintiffs' Motion for Summary Judgment</u>**

15. Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript of the deposition of Jarom Johnson, Defendants' designated witness under Federal Rule of Civil Procedure 30(b)(6), taken on May 31, 2023.

16. Attached hereto as Exhibit 3 is a true and correct copy of the "Notice of Deposition of Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., and Wasatch Pool Holdings, LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6)," noticing the deposition on May

31, 2023 of Defendants' person most knowledgeable regarding, as relevant here, "Defendants' costs incurred in providing Additional Services to Section 8 tenants," "Income, profits, revenues, or commissions earned by providing Additional Services to Section 8 tenants at the Subject Properties," and "Defendants' corporate and/or contractual relationships with vendors providing Additional Services to Section 8 tenants at the Subject Properties." This notice was introduced as Exhibit 69 to the deposition of Jarom Johnson at pages 7:13-8:14 of the transcript, and Jarom Johnson confirmed that he was the person most knowledgeable to discuss these topics at pages 8:10-9:25 (Ex. 2, hereto, at 4-6).

17. Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the transcript of the deposition of Shawn Fetter, taken on October 27, 2021. Shawn Fetter testified in his personal capacity and as Defendants' designated witness under Federal Rule of Civil Procedure 30(b)(6).

18. Attached hereto as Exhibit 5 is a true and correct copy of the "Second Amended Notice of Deposition of Defendants' Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., and Wasatch Pool Holdings, LLC, Pursuant to Federal Rule of Civil Procedure 30(b)(6); Notice of Deposition of Shawn Fetter," noticing the deposition of Shawn Fetter in his personal capacity and the deposition of the person most knowledgeable regarding Defendants' policies and practices related to the application of Section 8 tenant payments to charges, Defendants' revisions to their residential leasing documents, Defendants' standard forms and templates used in communicating with tenants, and Defendants' policies and practices related to collecting unpaid rent and additional services charges from Section 8 tenants on October 27, 2021. This notice was introduced as Exhibit 21 to the deposition of Shawn Fetter at 11:22-12:4, and Shawn Fetter confirmed that he was the person most knowledgeable about the topics described in the notice at 12:8-15:12 (Ex. 4, hereto, at 5-9).

19. Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the deposition of Wasatch's retained expert James McCurley, taken on September 5, 2023.

20.     Attached hereto as Exhibit 7 are true and correct copies of the Housing Assistance Payment Contracts ("HAP Contract") for the Section 8 Tenant-Based Assistance Housing Choice Voucher Program, Bates Nos. WEAU00000464-75, WEAU00016124-35, WEAU00002413-24, and WEAU00001913-43.  These documents were produced by Defendants in this litigation.  This collection contains exemplars of versions of the HAP Contract in use during the period relevant to this litigation, and includes versions of the HAP Contract promulgated by HUD in August 2009, September 2014, April 2015, and July 2019.  These documents were authenticated in Defendants' Response to Plaintiff Roy Huskey III's Request for Admission Regarding the Genuineness of Documents, Set One No. 60 (Ex. 13, hereto, at 16).

21.     Attached hereto as Exhibit 8 are true and correct copies of exemplars of "Residential Rental Agreements," Bates Nos. CP000124-28, CV000473-77, CV000412-16, CP000263-67, CPC021026-32, WEAU000003041-3045, WEAU00013422-13426.  These documents were produced by Defendants in this litigation and come from Defendants' files for tenants in the Section 8 program or Defendants' email correspondence with Public Housing Agencies as authenticated in Defendants' Response to Plaintiff Roy Huskey III's Request for Admission Regarding the Genuineness of Documents, Set One, Nos. 1, 23, 51, and 60 (Ex. 13, hereto, at 2, 7, 13, and 16).

22.     Attached hereto as Exhibit 9 is a true and correct copy of Defendants' Response to Plaintiff Tamera Livingston's Interrogatories Set Three, Number 7, served on January 17, 2023.

23.     Attached hereto as Exhibit 10 is a true and correct copy of Defendants' verification of its Response to Plaintiff Tamera Livingston's Interrogatories Set Three, and the proof of service for that verification, which were served on January 18, 2023.

24.     Attached hereto as Exhibit 11 is a true and correct copy of Defendants' Revised Amended Response Plaintiff Tamera Livingston's Interrogatories, Set Three, Number 6, and the accompanying verification, served on May 24, 2023.

25. Attached hereto as Exhibit 12 is a true and correct copy of the expert report of James McCurley disclosed by Wasatch on July 20, 2023.

26. On July 20, 2023, Plaintiffs disclosed the remedies expert report of David Breshears containing his calculations and expert opinions related to the amount of Additional Service Charges paid by class members and his calculation of prejudgment interest based on thos payments. Wasatch has not disclosed any rebuttal expert analysis or other evidence contesting the amount of class member payments or prejudgment interest calculated by Breshears.

27. Attached hereto as Exhibit 13 is a true and correct copy of Defendants' Responses to Plaintiff Roy Huskey III's Request for Admissions Regarding the Genuineness of Document, Set One, June 7, 2021.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct, and that this Declaration was executed this 6th day of October, 2023, in Oakland, California.

*/s/ Anne P. Bellows*
Anne P. Bellows



Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

Goldstein, Borgen, Dardarian & Ho

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

February 9, 2023

**Via E-Mail Only**

Joseph Salazar — Joe.Salazar@lewisbrisbois.com
Ryan Matthews — Ryan.Matthews@lewisbrisbois.com
Lewis Brisbois
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833

Re: There Is No Offset for Damages on the Class and FCA Claims

Dear Ryan,

In a meet and confer call, you suggested that Defendants would argue that damages should be reduced by the cost of providing the amenities and services listed on the Additional Services Agreements. By email on December 1 and December 5, 2022, I asked you to provide authority for this position. You have yet to do so, and, as described below, our own research confirms the contrary—that Defendants' costs do not affect the calculation of damages in this case. With the enclosed discovery, Plaintiffs initiate the fact-finding on Defendants' costs that will be necessary if Defendants insist on proceeding with their unsupported theory. However, before your clients incur the costs, inconvenience, and, ultimately, both sides' attorneys' fees for such discovery, we write in a final attempt to open the lines of communication and offer an alternative path.

In our review of the law, we do not see any basis for deducting Defendants' costs from the damages award. Indeed, the Court has already stated that the damages to the class are measured by the total amount they paid in additional service charges. *See* Summary Judgment Order, ECF No. 278 at 13-14 ("[D]efendants breached the tenancy addendum by requiring tenants to pay excess rent in the form of charges contained in the ASAs . . . . *Plaintiffs were damaged in the amount of the excess rent they were required to pay*, which the court will determine in the second phase of this litigation." (emphasis added)).

The Court's ruling is consistent with both the terms of the relevant contract and contract principles. The Tenancy Addendum provides that "[t]he owner must immediately return any excess rent payment to the tenant." HAP Contract Sec. C, ¶ 5f (incorporating 24 C.F.R. § 982.451(b)(4)(ii)). Where, as here, "contractual language is clear and explicit, it governs," *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (citing Cal. Civ. Code § 1638). Courts therefore enforce provisions that specify "particular remedies to be available in the event of a breach." Witkin, Summary 11th Contracts § 880 (2022).

The same is true for restitution under the Unfair Competition Law. The Court has already defined Plaintiffs' injury as the "lost money or property as a result of defendants' unlawful practice of requiring plaintiffs to pay additional charges beyond their share of rent set out in the HAP contracts." ECF No. 278 at 14. The UCL authorizes courts to make "such orders or judgments . . . as may be necessary to restore to any person in interest any money or property . . . which may have been acquired by means" of an unlawful business practice. Cal. Bus. & Profs. Code § 17203. Restitution under the UCL has a dual purpose: first, to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest," *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003), and second, to "penalize a defendant for past unlawful conduct and thereby deter future violations," *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 135 *as modified on denial of reh'g* (2003) (quotation marks and citation omitted).

These dual purposes are only served by the full return of the additional charges paid by class members. Defendants' unlawful business practice was the collection of excess rent from Section 8 tenants, in violation of federal regulations that the owner "may not demand or accept any rent payment from the tenant" in excess of the maximum set by the HAP Contract. *See* 24 C.F.R. § 982.451(b)(4)(ii). The same regulation mandates that owners "must immediately return any excess rent payment to the tenant." *See id.* This language clearly establishes class members' ongoing ownership interest in the service charges, already found by the Court to be excess rent. *See Beaumont*, *supra*, 111 Cal. App. 4th at 134-35 (affirming full restitution of unauthorized rent charged in violation of rent regulations, because doing so "accomplishe[d] the statutory objective of restoring to the victims sums acquired through defendants' unfair practices" and "[t]he trial court was not required to place defendants in the status quo ante").

Defendants' "windfall" argument will gain no traction here. Defendants' position relies on their continued belief that the additional charges should be understood as consideration for the amenities and services listed on the ASAs. The Court has twice "'rejected outright'" that argument. Summary Judgment Order, ECF No. 278, at 10. Defendants—not class members—implemented policies treating the additional charges as rent, and they did so for their own business advantage in eliciting payments from their tenants. *See, e.g.*, Decl. of Jarom Johnson ¶ 8, ECF No. 78-4 ("Over the course of many years, it has been our experience that Section 8 tenants are motivated to stay in the Section 8 Program and, given the chance, will clear up shortfalls"[1]). It would be a *windfall to Defendants* to allow them to keep any portion of the excess rent amounts that they charged and received in violation of the HAP Contract and federal law.[2]

Finally, Defendants' costs are also flatly irrelevant to the treble damages and penalties applicable to violations of the False Claims Act under 31 U.S.C. § 3729(a)(1). The government's damages under the FCA are measured by the "'amount that it paid out by reason of

[1] In other words, Defendants' policies that placed Section 8 tenants at risk of eviction and loss of their vouchers were intended to, and effective at, obtaining payment of any past due amounts.

[2] Defendants have also acknowledged that separate additional service charges are a means of maximizing the *rents* they can receive under program rules, demonstrating that this distinction is also illusory in their own decision-making. Johnson Dep. Vol. 2 at 81:3-83:5.

the false statements over and above what it would have paid if the claims had been truthful.'" *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (quoting *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966)). Relying on the same language of the HAP Contract at issue here, the Ninth Circuit held that the damages in a Section 8 side payment case are "the entire amount [the landlord] received from the government." *Ellis v. Zheng*, 799 Fed. Appx. 551, 552 (9th Cir. 2020). As the Ninth Circuit explained, "[b]ecause the FCA is concerned with fraud on the *government*, damages are determined not by how much [the landlord] overcharged [the tenants], but rather by how much [the landlord] overcharged the government—that is, the amounts she received from the government without lawful entitlement." *Id.* The costs borne by Defendants play no role in this calculation.

Defendants also face government civil penalties for each monthly payment received from a housing authority for a relevant tenant—as each HAP charge is its own "'claim against the government fisc' and thus its own separate FCA violation." *Ellis*, 799 Fed. Appx. at 552 (citing *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1177 (9th Cir. 2006)) (affirming a penalty award of $121,000 for 22 months of housing assistance payments on behalf of a single tenant). The minimum penalty for a single FCA violation is $13,508, and the maximum penalty is $27,018.[3] 28 CFR § 85.5(d). These mandatory penalties are set by statute and non-negotiable, upon a finding of liability.

Because Defendants' costs in providing the services have no bearing on any damages calculation, they will not be admissible at trial. And the road to that ruling will be time-consuming and expensive. Thus, we propose that the Parties instead focus on the amounts that will actually determine damages in this case: (1) "the amount of excess rent," *i.e.*, the additional service charges paid by class members, and (2) the amount of the relevant housing assistance payments received by Defendants from the Section 8 program—both of which are readily determined in the Yardi data. Attached is a proposed Stipulation to that effect.

If Defendants do not agree to the Stipulation, they will not only incur their own attorneys' fees and expert costs to litigate this issue, but they will also cause Plaintiffs to expend significant attorney time and costs on the discovery, expert work, and briefing necessary to counter Defendants' position and any evidence Defendants intend to offer related to their costs. As Plaintiffs have already won a liability ruling on two of the class claims, we are prevailing parties and will be seeking an award of our attorneys' fees, costs, and expenses incurred on the class claims both under California Code of Civil Procedure § 1021.5 and pursuant to the leases. If we are forced to engage in extensive discovery and briefing on this issue, our fees will increase accordingly—and Defendants will foot the bill.

We request that you provide a response within two weeks—*i.e.*, no later than February 23, 2023—regarding whether Defendants will agree to the Stipulation. If you do not so agree, please provide your responses to the enclosed discovery requests no later than March 14, 2023.

---

[3] For violations prior to Nov. 2, 2015, the penalty range is from $5,500 to $11,000. 28 CFR § 89.3.

Plaintiffs believe that embarking on invasive and costly discovery related to Defendants' costs in providing amenities and services would be a waste of your time as well as ours. I hope we can agree to avoid such a needless and time-consuming exercise.

Sincerely,

Anne P. Bellows

cc: Jahmy Graham
Andrew Wolff
Brenna Wood-Fitzpatrick
Jesse Newmark
Henrissa Bassey
Laura Ho
Stephanie Tilden
Jocelyn Larkin
Lindsay Nako

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION
Case No. 2:15-CV-00799-KJM-DB

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY, etc., et al,

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, etc., et al,

Defendants.

________________________________/

REMOTE DEPOSITION OF
JAROM JOHNSON, AS 30(B)(6) OF DEFENDANTS (SELECTED DAMAGES TOPICS)

Wednesday, May 31, 2023
9:30 a.m. - 3:44 p.m. (PDT)

Stenographically Reported By:
Kimberly Fontalvo, RPR,CLR
Realtime Systems Administrator

APPEARANCES:

On behalf of Plaintiffs/Relators:

THE IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94701
BY: LINDSAY NAKO, ESQ.
lnako@impactfund.org

CENTRO LEGAL DE LA RAZA
3022 International Boulevard, Suite 410
Oakland, CA 94601
BY: JESSE NEWMARK, ESQ.
jessenewmark@centrolegal.org

On behalf of Defendants:

LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833
BY: RYAN MATTHEWS, ESQ.
ryan.matthews@lewisbrisbois.com

On behalf of Defendant Hayward Senior Apartments LP:

NELSON MULLINS
19191 South Vermont Avenue, Suite 900
Torrence, CA 90502
BY: JAHMY STANFOR GRAHAM, ESQ.
jahmy.graham@nelsonmullins.com

30(B)(6) - Defendants - Selected Damages Topics - Jarom Johnson - May 31, 2023

I N D E X

| Examination | | Page |
|---|---|---|
| Direct | By Ms. Nako | 5 |
| Certificate of Oath | | 127 |
| Certificate of Reporter | | 128 |
| Read and Sign Letter to Witness | | 129 |
| Errata Sheet (forwarded upon execution) | | 130 |

EXHIBITS

| No. | | Page |
|---|---|---|
| Exhibit 6 | Previously Marked | 86 |
| Exhibit 26 | Previously Marked | 20 |
| Exhibit 35 | Previously Marked | 117 |
| Exhibit 69 | Plaintiffs' Notice of Federal Rule of Civil Procedure 30(b)(6) Corporate Depositions of Defendants (Damages Topics) | 7 |
| Exhibit 70 | Insurance Services Agreement | 14 |
| Exhibit 71 | Addendum to Insurance Services Agreement | 21 |
| Exhibit 72 | Letter dated October 16, 2019 | 22 |
| Exhibit 73 | Insurance Services Agreement | 23 |
| Exhibit 74 | Addendum to Insurance Services Agreement | 26 |
| Exhibit 75 | Blanket Bond | 27 |
| Exhibit 76 | Spreadsheet | 29 |

Page 3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Bellows Decl. Ex. 2, Page 3

acquisitions and dispositions at Wasatch Acquisitions & Capital.

Q. You have been designated today to testify as the corporate representative for Wasatch Property Management, Wasatch Advantage Group, and all of the other Defendants in this case.

Do you understand that?

A. Yep.

Q. If I refer to those Defendants collectively today as Wasatch, will you understand that what I mean?

A. Yeah.

MS. NAKO: I have marked our first exhibit of the day. Would you let me know if you see that in your Marked Exhibits folder on Exhibit Share?

(Thereupon, marked as Exhibit 69.)

A. I do not. It says, "You do not have permission to access any folder," is what it says in here. "Ask your administrator for help."

(Discussion off the record.)

MS. NAKO: Let's go back on the record.

BY MS. NAKO:

Q. We were just looking at Exhibit 69. Have you seen this document before?

A. I believe I have, yes.

Yes, I have, yes.

Q. Exhibit A to this document is entitled "Plaintiffs' Notice of Federal Rule of Civil Procedure 30(b)(6) Corporate Depositions of Defendants (Damages Topics)."

And it includes four deposition subjects on Page 8 of the PDF. Do you see that page?

A. Uh-huh.

Q. Is it your understanding that you have been designated as the corporate representative for all Defendants to provide testimony for them on Topics 2, 3 and 4 listed in this notice?

A. Yes.

Q. Would you please read Topic 2 out loud.

A. "Defendants' costs incurred in providing additional services to Section 8 tenants."

Q. As the company's corporate representative, are you prepared to testify today about your own personal knowledge, but also all information known or reasonably available to Defendants on this topic?

A. Yes.

Q. Is there anyone at Wasatch who knows more about this topic than you do?

A. No.

Q. Would you please read Topic 3 out loud.

A. "Income, profits, revenues or commissions earned by providing additional services to Section 8 tenants at the subject properties."

Q. As the company's corporate representative, are you prepared to testify about your own personal knowledge and also all information known or reasonably available to Defendants on this topic?

A. Yes.

Q. Is there anyone at Wasatch who knows more about this topic than you do?

A. No.

Q. Would you please read Topic 4 out loud.

A. "Defendants' corporate and/or contractual relationships with vendors providing additional services to Section 8 tenants at the subject properties."

Q. As the company's corporate representative, are you prepared to testify to your own personal knowledge and also all information known or reasonably available to Defendants on this topic?

A. Yes.

Q. Is there anyone at Wasatch who knows more about this topic than you do?

A. No.

Q. Off the record Ryan and I have agreed to Bates stamp it VC000870 for the record.

(Thereupon, marked as Exhibit 79.)

BY MS. NAKO:

Q. Have you seen a report like this before?

A. Yeah, I have.

Q. Have you seen this report before?

A. I believe so, yeah.

Q. What is this report?

A. So this is a report demonstrating the income from and costs associated with additional services relative to this case.

Q. Who prepared this document?

A. I worked with our accounting group to produce this document.

Q. When did you prepare it?

A. Just before we shared it with you. So I can't remember the exact date of that.

Q. I believe it was produced late last week. Does that sound right to you?

A. Yeah, that sounds correct, yes.

Q. And when you say "our accounting group," who you are referring to?

A. I'm referring to the multi-family residential accounting. So I work with individuals

inside the company that oversee bookkeeping and accounting practices of the multi-family.

Q. And how was the document prepared?

A. How was it prepared?

Q. Yes.

A. By a script.

Q. In laymen's terms.

A. We effectively run a program to pull specific information relative to the class.

Q. So is it accurate to say that this spreadsheet shows all of the individual charges paid for media and individual renters insurance by Section 8 tenants at Wasatch's California properties for the period April 2017 to the present?

A. Yeah. For Section 8 tenants, yes, uh-huh.

Q. There's a column here that contains tenant IDs. These are the same tenant IDs from Yardi, correct?

A. Yeah. So if you look at just a couple of things on this. So if you look in that column C, there are two types of tenant IDs. There's a T code, which is kind of the latest generation tracking, and then the -- if the person has been a resident for a longer period of time, then they have a tenant ID that's not a T code, I guess.

summarize it in a way that's saying if we're looking at damages, we had -- at the property level we had a premium, and we paid an expense equal to the premium. There was no benefit.

At Freedom Advisors' level, they were paid, you know, the producer fee off of the premium, and then they had overhead to be able to earn that fee.

So what we're showing is the net benefit to the parties in the suit so that you can look at it and say, okay, that's how we've looked at it from a cost standpoint. Hey, we provided a service. It had a base fee, which included a share. We're conceding that that share of revenue went to the subsidiary, and so we're demonstrating that benefit in the number.

Q. So have you run this accounting for any purpose other than this litigation?

A. No.

MR. MATTHEWS: Objection, overbroad. Vague as to "accounting."

Go ahead.

A. No. I mean, this was prepared to show the cost associated with the class. You know, both base cost and overhead associated and then the benefit

that was received as a result of providing the service.

BY MS. NAKO:

Q. Does Wasatch track net insurance revenue for any purpose in its normal business operations?

A. Does Wasatch track it?

Freedom Advisors provides a service for the purpose of creating revenue in the insurance space as a special purpose entity. So its sole purpose in existence is to create insurance offerings and to get revenue and income streams associated with that skill set.

Q. Is this report, isolating out net insurance revenue, something that Financial Advisors [sic] uses in that special purpose?

A. No, because in Freedom Advisors, they would have the cost of their officers as well.

So their income would be reduced from what we're demonstrating here.

Q. When you're saying "would," has Freedom Advisors ever relied on this accounting of net insurance revenue in its daily business?

A. No. I mean it's running its books as an independent company.

This was our way of consolidating a

CERTIFICATE OF OATH

I, the undersigned authority, certify that JAROM JOHNSON, AS 30(B)(6) OF DEFENDANTS (SELECTED DAMAGES TOPICS) REMOTELY appeared before me and was sworn on the 31st day of May, 2023.

Signed this 4th day of June, 2023.

KIMBERLY FONTALVO, RPR
Notary Public, State of Colorado
My Commission No. 20214007135
Expires: 2/23/2025

CERTIFICATE OF REPORTER

STATE OF COLORADO

I, KIMBERLY FONTALVO, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition of JAROM JOHNSON, AS 30(B)(6) OF DEFENDANTS (SELECTED DAMAGES TOPICS); that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially

interested in the action.

Dated this 4th day of June, 2023.

KIMBERLY FONTALVO, RPR, CLR

Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
(510) 834-3300; (510) 834-3377 (Fax)

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
(510) 437-1863; (510) 437-9164 (Fax)

Jocelyn D. Larkin (SBN 110817)
jlarkin@impactfund.org
Lindsay Nako (SBN 239090)
lnako@impactfund.org
THE IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94701
(510) 845-3473; (510) 845-3654 (Fax)

Attorneys for Plaintiffs and Relators and the Certified Classes

Exhibit
0069
Johnson

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC,

Case No.: 2:15-CV-00799-KJM-DB

CLASS ACTION

**PLAINTIFFS' NOTICE OF DATE AND TIME FOR FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6) CORPORATE DEPOSITION(S) OF DEFENDANTS (SELECTED DAMAGES TOPICS)**

CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, and DOES 1-4,

Defendants.

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6) and the deposition notice served by Plaintiffs on Defendants on May 5, 2023, which is attached hereto as Exhibit A, on May 31, 2023, beginning at 9:30 a.m. Pacific Time, Plaintiffs will take the deposition of Defendants' Rule 30(b)(6) designee for Topics 2 through 4 listed on Exhibit A, Jarom Johnson, to be recorded by stenographic and videographic means. This deposition will proceed with the deponent, deposition officer and/or attorneys for the parties being in separate, remote locations connected by way of audio and video technology. The exhibits will be displayed digitally and compiled by the deposition officer for the purposes of exhibit stamping and ultimate production of the final certified transcript. Log-in credentials will be provided prior to the deposition. If necessary, the deposition will be continued until completed.

Dated: May 26, 2023

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

Anne P. Bellows

Attorneys for Plaintiff and Relators

# EXHIBIT A

Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
(510) 834-3300; (510) 834-3377 (Fax)

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
(510) 437-1863; (510) 437-9164 (Fax)

Jocelyn D. Larkin (SBN 110817)
jlarkin@impactfund.org
Lindsay Nako (SBN 239090)
lnako@impactfund.org
THE IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94701
(510) 845-3473; (510) 845-3654 (Fax)

Attorneys for Plaintiffs and Relators and the Certified Classes

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA<br><br>Plaintiffs/Relators,<br><br>vs.<br><br>WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, | Case No.: 2:15-CV-00799-KJM-DB<br><br>CLASS ACTION<br><br>**PLAINTIFFS' NOTICE OF FEDERAL RULE OF CIVIL PROCEEDURE 30(b)(6) CORPORATE DEPOSITION(S) OF DEFENDANTS (DAMAGES TOPICS)** |

CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC,
and DOES 1-4,

Defendants.

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiffs will take the deposition of Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake Apartment Holdings, LLC, Logan Park Apartments, LLC, Logan Park Apartments, LP, Aspen Park Holdings, LLC, Bellwood Jerron Apartments, LP, Bellwood Jerron Holdings, LLC, Bent Tree Apartments, LLC, California Place Apartments, LLC, Camelot Lakes Holdings, LLC, Canyon Club Holdings, LLC, Courtyard at Central Park Apartments, LLC, Creekside Holdings, LTD, Hayward Senior Apartments, LP, Heritage Park Apartments, LP, Oak Valley Apartments, LLC, Oak Valley Holdings, LP, Peppertree Apartment Holdings, LP, Piedmont Apartments, LP, Point Natomas Apartments, LLC, Point Natomas Apartments, LP, River Oaks Holdings, LLC, Shadow Way Apartments, LP, Spring Villa Apartments, LP, Sun Valley Holdings, LTD, Village Grove Apartments, LP, Wasatch Quail Run GP, LLC, Wasatch Pool Holdings III, LLC, and Wasatch Premier Properties, LLC ("Defendants") on the topics detailed below upon oral examination of a company representative designated to testify on behalf of Defendants, to be recorded by stenographic and videographic means. Due to the continuing COVID-19 pandemic, this deposition will proceed with the deponent, deposition officer and/or attorneys for the parties being in separate, remote locations connected by way of audio and video technology. The exhibits will be displayed digitally and compiled by the deposition officer for the purposes of exhibit stamping and ultimate production of the final certified transcript. Log-in credentials will be provided prior to the deposition. The deposition will commence on a mutually agreeable date, and if necessary, will be continued until completed.

Defendants are requested to designate one or more Fed. R. Civ. P. 30(b)(6) witnesses who is/are knowledgeable and prepared to testify fully on behalf of Defendants regarding topics listed below. Unless otherwise noted, the time period for each topic is from April 2005 to the present.

**DEFINITIONS**

The following definitions will apply to each of the following deposition subjects:

1. "ADDITIONAL SERVICES" means any service or amenity provided to a tenant pursuant to DEFENDANTS' contracting document entitled "Additional Service Agreement."

2. "ADDITIONAL SERVICE CHARGES" means any charges made to a tenant pursuant to DEFENDANTS' contracting document entitled "Additional Service Agreement."

3. "DEFENDANT" or "DEFENDANTS" shall refer to all of the Defendants in this action collectively, and their respective officers, agents, servants, employees, independent contractors, attorneys, predecessors, successors and assigns, representatives, and all other persons acting or who have acted on their behalf.

4. "SECTION 8" shall refer to the Housing Choice Voucher program, commonly called the Section 8 program, funded by the United Stated Department of Housing and Urban Development and administered by local public housing authorities.

**DEPOSITION SUBJECTS**

1. Changes (or the absence of changes) to DEFENDANTS' policies and practices related to ADDITIONAL SERVICE CHARGES to SECTION 8 tenants for the period November 22, 2022, through to trial;

2. DEFENDANTS' costs incurred in providing ADDITIONAL SERVICES to SECTION 8 tenants;

3. Income, profits, revenues, or commissions earned by providing ADDITIONAL SERVICES to SECTION 8 tenants at the SUBJECT PROPERTIES; and

4. DEFENDANTS' corporate and/or contractual relationships with vendors providing ADDITIONAL SERVICES to SECTION 8 tenants at the SUBJECT PROPERTIES.

Dated: May 5, 2023

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

Anne P. Bellows

Attorneys for Plaintiff and Relators

# PROOF OF SERVICE

Case: *Terry, et al. v. Wasatch Advantage Group, LLC, et al.*
Case No. 2:15-CV-00799 KJM-DB

STATE OF CALIFORNIA )
) SS
COUNTY OF ALAMEDA )

I have an office in the county aforesaid. I am over the age of eighteen years and not a party to the within entitled action. My business address is 155 Grand Ave., Suite 900, Oakland, California 94612.

I declare that on the date hereof I served a copy of

**PLAINTIFFS' NOTICE OF DATE AND TIME FOR FEDERAL RULE OF CIVIL PROCEEDURE 30(b)(6) CORPORATE DEPOSITION(S) OF DEFENDANTS (SELECTED DAMAGES TOPICS)**

SEE ATTACHED SERVICE BELOW

☒ **By Electronic Service:** Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the persons at the electronic service address(es) as set forth below

☑ **(*Federal*)** I declare under the laws of the United States of America that I am employed in the office of a member of the Bar of this court at whose direction the service was made and that the foregoing is true and correct.

Executed at Oakland, California on May 26, 2023

Scott Grimes
Printed Name

[signature]
Signature

**SERVICE LIST**

Joseph A. Salazar Jr.
Joe.Salazar@lewisbrisbois.com
Ryan Matthews
Ryan.Matthews@lewisbrisbois.com
Alicia Crespo
Alicia.Crespo@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Tel: (916) 564-5400 | Fax: (916) 564-5444

Attorneys for Defendants

Jahmy Stanford Graham
jahmy.graham@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
19191 South Vermont Avenue
Suite 900
Torrance, CA 90502

Attorneys for Defendant Hayward Senior Apartments LP

Colleen M. Kennedy
Colleen.m.kennedy@usdoj.gov
Department of Justice
United States Attorney's Office
Eastern District of California
2500 Tulare Street
Suite 4401
Fresno, CA 93721
Tel: (559) 497-4080

Attorneys for United States of America

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,

Plaintiffs,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC.; WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, BELLWOOD HERRON APARTMENTS, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC CAMELOT LAKES HOLDINGS, LLC CANYON, CLUB HOLDINGS, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LP, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP., PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE Grove APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, and DOES 1-4,

Defendants.

Case No. 2:15-CV-00799-KJM-DB

VOLUME I

PAGES 1 - 291

REMOTE VIDEOTAPED DEPOSITION OF

SHAWN FETTER

October 27, 2021

Reported by:
Amy E. Simmons, CSR, RPR, CRR, CRC

REMOTE VIDEOTAPED DEPOSITION OF SHAWN FETTER

BE IT REMEMBERED that the remote videotaped deposition of SHAWN FETTER was taken via videoconference by the Plaintiffs before Veritext Legal Solutions, Amy E. Simmons, Court Reporter and Notary Public in and for the County of Ada, State of Idaho, on Wednesday, the 27th day of October, 2021, commencing at the hour of 9:43 a.m. Pacific Standard Time in the above-entitled matter.

APPEARANCES (Remotely):

For the Plaintiffs: GOLDSTEIN, BORGEN, DARDARIAN & HO
By: Anne P. Bellows, Esq.
155 Grand Avenue, Suite 900
Oakland, California 94612
Telephone: (510) 763-9800
Facsimile: (510) 835-1417
abellows@gbdhlegal.com

IMPACT FUND
By: Lindsey Nako, Esq.
2080 Addison Street, Suite 5
Berkeley, California 94704-1692
Telephone: (510) 845-3473
lnako@impactfund.org

APPEARANCES (Contd.)

For the Defendants: LEWIS BRISBOIS BISGAARD & SMITH, LLP
By: Ryan J. Matthews, Esq.
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: (916) 564-5400
Facsimile: (916) 564-5444
Ryan.Matthews@lewisbrisbois.com

Videographer: Kim Smith

I N D E X

E X A M I N A T I O N

SHAWN FETTER PAGE

By: Ms. Bellows....................................8

E X H I B I T S

NO. PAGE

Exhibit 21 Second Amended Notice of Deposition of....11
Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., and Wasatch Pool Holdings, LLC Pursuant to Federal Rule of Civil Procedure 30(b)(6); Notice of Deposition of Shawn Fetter (4 pages)

Exhibit 22 Excel Spreadsheet (1 page)................148

Exhibit 23 "Completing the Delinquency Tracker"......152
Bates Nos. WTM0000098 through 99 (2 pages)

Exhibit 24 Three-Day Notice to Pay Rent or Quit......162
Bates Nos. CPC034205 through 224 (20 pages)

Exhibit 25 Three-Day Notice to Perform Financial.....171
Covenant of Lease or Quit, Various Bates Numbers (8 pages)

Exhibit 26 10 Day Notice to Comply with Lease or.....182
Quit Premesis, Section 8, Various Bates Numbers (4 pages)

Exhibit 27 Three-day Notice to Pay or Vacate.........187
Various Bates Numbers (4 pages)

Exhibit 28 Letter to Various People, First One.......194
Dated 10/4/16 to Barka Yussuf Various Bates Numbers (6 pages)

my questions, feel free to say so. "I don't know" is an acceptable answer, but I am entitled to your best estimate. So, for example, if I ask you when something occurred and you don't remember the exact date but you do remember the month or the season, I'm entitled to that estimate. 10:48:04 10:48:07 10:48:11 10:48:15 10:48:17 10:48:20

Do you understand that? 10:48:24

A. Yes. 10:48:25

Q. So next up is objections. So from time to time, your attorney may assert objections. And generally I'll be entitled to your answer, notwithstanding those objections. 10:48:26 10:48:30 10:48:33 10:48:35

Do you understand that? 10:48:37

A. Yes. 10:48:37

Q. Have you taken any medication or drugs that would prevent you from answering my questions completely, truthfully, and accurately here today? 10:48:38 10:48:42 10:48:45

A. No. 10:48:48

Q. Is there any reason you can't give your best testimony today? 10:48:49 10:48:51

A. No. 10:48:52

(Deposition Exhibit No. 21 was marked.) 10:48:53

Q. (BY MS. BELLOWS) All right. So you can go ahead and open up Exhibit 21 in your Exhibit Share folder and let me know when you have it in 10:48:53 10:48:56 10:49:00

front of you. 10:49:04

A. It is in front of me. 10:49:14

Q. Okay. Do you recognize this document? 10:49:15

A. Yes, I do. 10:49:16

Q. And what is it? 10:49:17

A. It is the PMK notice. 10:49:17

Q. "PMK" meaning person most knowledgeable? 10:49:28

A. Most knowledgeable, yeah. 10:49:31

Q. And you understand you're testifying 10:49:34 pursuant to this notice? 10:49:35

A. Yes. 10:49:37

Q. And if you look on page 3 of the 10:49:37 document, the first section notices you to testify 10:49:40 today in your capacity as a fact witness. 10:49:47

You understand that, correct? 10:49:50

A. Yes. 10:49:51

Q. So let's go through the Rule 30(b)(6) 10:49:52 topics. They begin on the bottom of that third 10:49:55 page. 10:49:57

Can you read the first topic out loud? 10:50:02

A. Number 1; is that correct? 10:50:04

Q. Yeah. 10:50:06

A. Okay. "Defendant's policies and 10:50:06 practices related to the application of Section 8 10:50:09 tenants payments to charge including any 10:50:11

differences in California." 10:50:14

Q. Do you agree that you're the most knowledgeable person to testify about that topic? 10:50:16 10:50:17

A. Yes. 10:50:20

THE VIDEOGRAPHER: I'm sorry to interrupt. 10:50:23 10:50:24

But, Mr. Fetter, when you're reading, I'm losing the bottom part of your face. 10:50:25 10:50:27

THE WITNESS: Okay. 10:50:29

THE VIDEOGRAPHER: Can you tilt the screen down towards you? Is that possible? 10:50:30 10:50:32

THE WITNESS: Yeah. I tilted it as much as I can get. How is that? Is that better? 10:50:33 10:50:35

THE VIDEOGRAPHER: That's better. It's just that when you're reading down, I lose you. 10:50:38 10:50:40

THE WITNESS: Okay. Gotcha. Let me see where we're at here. How about that? 10:50:43 10:50:48

THE VIDEOGRAPHER: Better. Thank you. 10:50:48

THE WITNESS: Okay. I'll try to get this even lower. Is that better, even better? 10:50:50 10:50:51

THE VIDEOGRAPHER: That's perfect. 10:50:59

THE WITNESS: Okay. Great. 10:51:01

THE VIDEOGRAPHER: Thank you. 10:51:02

THE WITNESS: Okay. Gotcha. 10:51:04

Q. (BY MS. BELLOWS) Can you read the second 10:51:05

topic? 10:51:06

A. The second topic on the third -- fourth page, then, correct? 10:51:07 10:51:11

Q. Correct. 10:51:13

A. "2, Defendants' revisions to and use of their residential leasing documents, including the documents entitled 'Residential rental agreement,' 'Utility Addendum,' and 'Additional Service Agreement.'" 10:51:15 10:51:17 10:51:20 10:51:23 10:51:26

Q. Do you agree that you're the most knowledgeable person to testify on this topic today? 10:51:28 10:51:29 10:51:32

A. Yes. 10:51:34

Q. All right. Let's read the third one. 10:51:35

A. "3, Standard forms and templates used by Defendants in communicating with tenants including, but not limited to, eviction notices, renewal notices, move-in documents, and communications regarding or promoting services listed on the additional services agreements." 10:51:43 10:51:47 10:51:49 10:51:53 10:51:56 10:51:58

Q. Do you agree that you are the most knowledgeable person to testify on this topic on behalf of Defendants? 10:52:00 10:52:02 10:52:04

A. Yes. 10:52:05

Q. All right. Topic No. 4. 10:52:06

A. Number 4, "Defendants' policies and practices related to collecting unpaid rent and additional service charges from Section 8 tenants including issuing past due notices, notices to pay or quit, notices to perform financial covenant or quit, filing of unlawful detainer actions, and other communications and procedures used to collect unpaid sums." 10:52:11 10:52:14 10:52:17 10:52:22 10:52:25 10:52:29 10:52:33 10:52:36

Q. And do you agree that you're the most knowledgeable person to testify on that topic today? 10:52:39 10:52:40 10:52:42

A. Yes. 10:52:43

Q. Okay. Have you done anything to prepare for your deposition today? 10:52:43 10:52:46

A. Just had spoken to my counsel, Ryan, just reading this document. 10:52:47 10:52:54

Q. Okay. How long did you speak to your counsel for? 10:52:55 10:52:59

A. 30 minutes. 10:53:00

Q. And when did that happen? 10:53:02

A. This morning. 10:53:03

Q. Okay. Was anyone else present during that conversation? 10:53:04 10:53:11

A. No. 10:53:11

Q. Besides this document, Exhibit 21, have 10:53:12

Does Wasatch Property Management use a standard lease form in its operation? 16:40:44 16:40:46

A. Yes, they do. 16:40:48

Q. Okay. And so when a -- if you could just walk me through, you know, a tenant is going to move into a property. Where does the property personnel go to get the lease and sort of set everything up for them? 16:40:51 16:40:56 16:41:01 16:41:04 16:41:09

A. In Yardi. 16:41:11

Q. In Yardi. And what do they do? They, like, request a standard lease? Or do they have to identify where they are? Or how does that work? 16:41:11 16:41:14 16:41:17 16:41:19

A. So as far as it goes with the -- let me pull this up. With regards to -- they're just going to go through a standard application process. 16:41:19 16:41:25 16:41:31 16:41:33

Is that what you're asking about, the application process or just -- 16:41:33 16:41:36

Q. Just focusing on the lease. 16:41:38

A. Just the leases, so they've already gone through the application process. They're going to now move from a prospect to a tenant. 16:41:40 16:41:43 16:41:45

Q. Okay. 16:41:49

A. So they would just go into Yardi and go 16:41:49

through the process, the standard there. Yardi would have already pulled the information from a prospect information into a tenant screen, and the lease would be auto-generated through there. 16:41:53 16:42:00 16:42:02 16:42:08

Q. Okay. And then they just press "Print" and the lease comes up with the tenant's info? 16:42:11 16:42:13

A. Correct. And then they go through the lease completely with the tenant and walk them through that. 16:42:15 16:42:17 16:42:20

Q. Okay. And Yardi is essentially a managed database for Wasatch Property Management, right? 16:42:21 16:42:24

A. That is correct. 16:42:27

Q. Is there a person or group of persons who are responsible for the lease language? 16:42:28 16:42:31

A. Yes, there is. The lease language would be -- would be through -- I believe we use NAA's lease right now, the National Apartment Association's lease. And then we would have in-house counsel, you know, review that. 16:42:33 16:42:42 16:42:47 16:42:51 16:42:52

Q. Okay. So who -- who decides when there needs to be a revision to the lease? 16:42:58 16:43:02

A. If we have anything that comes up, like I said before, earlier in the deposition, an example of that would be when the -- I'm trying to remember the piece there. 16:43:05 16:43:09 16:43:14 16:43:28

REPORTER'S CERTIFICATE

STATE OF IDAHO )
) ss.
COUNTY OF ADA )

I, AMY E. SIMMONS, Certified Shorthand Reporter and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn remotely to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 15th day of November, 2021.

<%11030,Signature%>
AMY E. SIMMONS
CSR, RPR, CRR, CRC and Notary
Public in and for the
State of Idaho.

My Commission Expires: 06-13-2022

Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800; (510) 835-1417 (Fax)

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
(510) 834-3300; (510) 834-3377 (Fax)

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
(510) 437-1863; (510) 437-9164

Attorneys for Plaintiffs and Relators and the Certified Classes

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON, CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR

Case No.: 2:15-CV-00799-KJM-DB

CLASS ACTION

**SECOND AMENDED NOTICE OF DEPOSITION OF DEFENDANTS WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., AND WASATCH POOL HOLDINGS, LLC PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6); NOTICE OF DEPOSITION OF SHAWN FETTER**

Trial Date: None Set

**Exhibit 21**
10/27/2021
Fetter

APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, and DOES 1-4,

Defendants.

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30, Plaintiffs will take the deposition of Shawn Fetter, in his personal capacity, upon oral examination. The deposition will commence on October 27, 2021 at 9:30 a.m. Pacific Time. If the deposition is not completed on that date, it will continue from day to day unless a substitute schedule is mutually agreed-upon at or around the time of the deposition. The deposition will be taken before a notary public or other person authorized to administer oaths, and will be recorded by stenographic and videographic means.

YOU ARE FURTHER NOTIFIED that pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiffs will take the deposition of Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC, Logan Park Apartments, LLC, and Logan Park Apartments, LP ("Defendants") on the topics detailed below upon oral examination of a company representative designated to testify on behalf of Defendants. The deposition will commence on October 27, 2021 at 9:30 a.m. Pacific Time. If the deposition is not completed on that date, it will continue from day to day unless a substitute schedule is mutually agreed-upon at or around the time of the deposition. The deposition will be taken before a notary public or other person authorized to administer oaths, and will be recorded by stenographic and videographic means. Defendants have designated Shawn Fetter as their Fed. R. Civ. P. 30(b)(6) witness who is knowledgeable and prepared to testify fully on behalf of Defendants regarding topics listed below. Unless otherwise noted, the time period for each topic is from April 2005 to the present.

Due to the continuing COVID-19 pandemic, this deposition will proceed with the deponent, deposition officer and/or attorneys for the parties being in separate, remote locations connected by way of audio and video technology. The exhibits will be displayed digitally and compiled by the deposition officer for the purposes of exhibit stamping and ultimate production of the final certified transcript. Log-in credentials will be provided prior to the deposition.

**RULE 30(b)(6) DEPOSITION SUBJECTS**

1. DEFENDANTS' policies and practices related to the application of Section 8 tenant payments to charges, including any differences in California;

2. DEFENDANTS' revisions to and use of their residential leasing documents, including the documents entitled "Residential Rental Agreement," "Utility Addendum," and "Additional Services Agreement;"

3. Standard forms and templates used by DEFENDANTS in communicating with tenants, including but not limited to eviction notices, renewal notices, move-in documents, and communications regarding or promoting services listed on the Additional Services Agreements;

4. DEFENDANTS' policies and practices related to collecting unpaid rent and additional service charges from Section 8 tenants, including issuing past due notices, notices to pay rent or quit, notices to perform financial covenant or quit, filing unlawful detainer actions, and other communications and procedures used to collect unpaid sums.

Dated: October 11, 2021

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

Anne P. Bellows

Attorneys for Plaintiffs and Relators

UNITED STATES DISTRICT COURT
for the
Eastern District of California

Civil Action No. 15-cv-00799-KJM-DB

UNITED STATES ex rel. DENIKA TERRY, et al., )
Plaintiffs, )
v. )
WASATCH ADVANTAGE GROUP, LLC, et al., )
Defendant. )

JAMES MCCURLEY
SEPTEMBER 05, 2023 JOB NO. 688856

REMOTE DEPOSITION OF JAMES McCURLEY, located in California, commencing at 4:03 P.M. EST, on Tuesday, September 5, 2023, before Maureen M. Elrod, Certified Shorthand Reporter 809476, in and for the State of Florida.

STENO.COM
(310) 573-8380

STENO
Concierge@Steno.com
(888)707-8366

APPEARANCES VIA ZOOM:

FOR THE PLAINTIFF:

STEPHANIE TILDEN, ESQUIRE - via Zoom
and
LAURA LUO-YAO HO, ESQUIRE - via Zoom
and
ANNE BELLOWS, ESQUIRE - via Zoom
Goldstein Borgen Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, California 94612
(510) 763-9800
Email: stilden@gbdhlegal.com

JAMES MCCURLEY
SEPTEMBER 05, 2023
JOB NO. 688856

FOR THE DEFENDANTS:

RYAN J. MATTHEWS, ESQUIRE - via Zoom
Lewis Brisbois Bisgaard & Smith LLP
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
(916) 564-5400
Email: ryan.matthews@lewisbrisbois.com

STENO.COM
(310) 573-8380

FOR HAYWARD SENIOR APARTMENTS LP:

JAHMY S. GRAHAM, ESQUIRE - via Zoom
Nelson Mullins Riley & Scarborough LLP
19191 South Vermont Avenue
Suite 900
Torrance, California 90502
(424) 221-7400
Email: jahmy.graham@nelsonmullins.com

JESSE M. NEWMARK, ESQUIRE - via Zoom
Centro Legal de la Raza
3022 International Boulevard, Suite 410
Oakland, California 94601
(510) 437-1863
Email: jessenewmark@centrolegal.org

I N D E X

| | | PAGE |
|---|---|---|
| DIRECT EXAMINATION: | Attorney Tilden | 7 |
| CROSS-EXAMINATION: | Attorney Matthews | 128 |
| REDIRECT EXAMINATION: | Attorney Tilden | 130 |

JAMES MCCURLEY SEPTEMBER 05, 2023 JOB NO. 688856

- - - - -

PLAINTIFF'S EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 12 |
| Exhibit 2 | 5th Amended Complaint | 15 |
| Exhibit 3 | List of deposition and trial testimony | 18 |
| Exhibit 4 | Friends of Riverside Airport | 21 |
| Exhibit 5 | Statement on Standard for Forensic Service | 25 |
| Exhibit 6 | Expert report of James McCurley | 28 |
| Exhibit 7 | Engagement letter | 31 |
| Exhibit 8 | Invoice | 34 |
| Exhibit 9 | CV | 67 |
| Exhibit 10 | Court order granting Plaintiffs' motion for partial summary judgment | 85 |
| Exhibit 11 | Excel spreadsheet | 115 |
| Exhibit 12 | Expert report of David Breshears | 118 |
| Exhibit 13 | Document subpoena | 119 |

STENO.COM (310) 573-8380

(Plaintiffs' Exhibit No. 10 was marked for ID).

BY MS. TILDEN:

Q Okay. Okay. So we're just going to look quickly at Exhibit 10, before jumping back to Exhibit 6. So I introduced Exhibit 10, on the record. And this is a Court order granting Plaintiffs' motion for partial summary judgment. And I believe this was sent as an exhibit to your report, correct?

A Correct.

Q So you reviewed this document as we discussed earlier?

A Correct.

Q Do you typically review important, legal rulings in a case when you're serving as an expert in that case?

A If it's a -- if it's a -- if it's a document that's going to help educate me about the situation and the issues that I'm involved in, then, yes.

Q Great. Did you understand that the Court ruled the Defendants' additional service charges were unlawful, excess rent charges?

MR. MATTHEWS: Objection. Lacks foundation. Beyond the scope. Calls for a legal conclusion. Go ahead.

MR. McCURLEY: You know, I read the report. I didn't -- I don't know that I came away with that conclusion, but it doesn't -- I just read the report, as now, in this case, more of a lay person, lay lawyer. I'm not a lawyer. But I do -- what I took away from it is that -- I thought -- that the next phase would be damages, so.

BY MS. TILDEN:

Q Mm-hmm. Just to clarify the record, the report, you mean the Court's order?

A I'm sorry. Yes. Yes.

Q No problem. Just wanted to clear it up for the record.

A Mm-hmm.

Q Okay. So I just want to skim to page 13 to 14, on the order, under the heading, breach of contract.

A Yeah.

Q Can you just skim that paragraph, the whole paragraph, under breach of contract -- or read that paragraph. Not out loud; to yourself.

A Okay.

Q If you look at the second to the last sentence, I'll read it out loud. It says -- the second to the last sentence, of this paragraph, under breach of contract, it says: Plaintiffs were damaged in the

Q Do you know what a HAP contract -- sometimes it's also referred to as a housing assisted payment contract -- is?

A In general terms, yes. I do run across, kind of, subsidized housing situations quite a bit in the other type of work that I do.

Q Did you review a HAP contract in connection with your work with this report?

A Did I review -- I don't -- no, I don't believe I did.

Q Okay. Thanks. Okay. Back to Exhibit 6. I'm going to present it so you can see where I am.

A Okay.

Q Just looking -- just going through the sources of information a little more, numbers four to six, listed under, sources of information, these are all Excel spreadsheets, right?

A Let me -- let me double check that.

Yes. Yes.

Q Thank you. Did you review these spreadsheets for any anomalies in the data?

MR. MATTHEWS: I'll object as vague and ambiguous as to anomalies. Go ahead.

MR. McCURLEY: No, I didn't, because I didn't get to that point of our analysis. You know, it

amount of the excess rent that they were required to pay, which the Court will determine in the second phase of this litigation.

That's what it says, right?

A It does.

Q Okay. Did this sentence inform your report in any way?

A Not necessarily, no.

Q And then did you see if the Court's order referred to economic value in this paragraph?

A Well, it doesn't. I don't see it now. But I didn't -- your question was: Did I seek it? I missed what your question was.

Q Sorry. I phrased it badly. Does the Court's order refer to economic value?

A It does not.

Q Does it refer to it outside of this paragraph that we just looked at?

MR. MATTHEWS: Objection. Overbroad.

MR. McCURLEY: Yeah, I don't know the answer to that. I'd have to search.

BY MS. TILDEN:

Q Okay. Have you reviewed any regulations related to this Section 8 housing program voucher?

A No.

measurements of economic value.

Q Okay. And then was whether or not Wasatch was able to negotiate for these costs affect your understanding of the economic value of these services?

A I think it's one of the inputs, sure.

Q How would it affect -- how does it affect your understanding of economic value?

A Well, I would say that they are -- they're a large purchaser buying bulk services, that's how. Different than if you or I were to go to an insurance carrier or a cable company and negotiate for ourselves.

Q I see. Was your opinion about the economic value of the services informed by any terms or conditions of the HAP contracts entered into by Defendants?

A It was not.

Q Do you -- I was wondering if you had an understanding of what the relationship between Wasatch and the -- you know, the ultimate insurers was in terms of how they provided insurance to tenants.

A The only understanding I have is the -- is how it was described by Mr. Johnson in his deposition. I thought he actually explained it pretty clearly in his deposition. So that's -- I mean, that's all I can say, is that I would refer back to that depo.

portal and the e-mails conveying documents, you think you'd be able to do that in the next couple days?

A Yes.

Q Okay. And just a few more things. Stop viewing this.

Let's go back, really quick, to the -- to Exhibit 10, if you don't mind opening that up again.

A No, not at all.

Q And you're going to page 13.

A Thirteen?

Q Yes.

A Okay.

Q As you recall, we kind of went over the sentence -- it's the second to the last sentence, under breach of contract, where the Court says: The Plaintiffs were damaged in the amount of the excess rent they were required to a pay, which the Court will determine in the second phase of this litigation.

I was wondering, do you disagree with the Court that the amount of damages is the amount of excess rent that tenants paid?

MR. MATTHEWS: Objection. Calls for a legal conclusion. Beyond the scope of his designation. Lacks foundation. Calls for speculation. Go ahead.

MR. McCURLEY: Yeah, of course, not, I wouldn't disagree with the Court in that regard, at all. I just -- the second part of that, it says, The Court will determine in the second phase of this litigation, that's what I thought we were here to do.

BY MS. TILDEN:

Q But you don't disagree with the Court's statement in the first half of that sentence that says, they were damaged in the amount of the excess rent they were required to pay?

MR. MATTHEWS: Same set of objections. Go ahead.

MR. McCURLEY: Yeah, again, it's outside of my scope. And it's -- I would not disagree with the Court, either way.

BY MS. TILDEN:

Q Okay. And then I'm going to go back to Exhibit 6, if you don't mind opening that up and taking a look.

A Okay.

Q So just a final question or two. Can you tell me where there are any terms or sentences in your report that rely specific -- specifically on forensic accounting principles as opposed to, like, general

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, licensed by the State of Florida, being empowered to administer oaths and affirmations remotely pursuant to Administrative Order AOSC20-17, of the Supreme Court of Florida, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that before the completion of the proceedings, review of the transcript was requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: September 10, 2023

Maureen M. Elrod, CSR No. 809476
Notary Public No. HH 266810
Expires: July 17, 2026

# Housing Assistance Payments Contract (HAP Contract) Section 8 Tenant-Based Assistance Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169 (exp. 09/30/2012)

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

**Use of this form**
Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

> Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.
>
> Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**
In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**
Enter first date and last date of initial lease term.
The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**
Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

# Housing Assistance Payments Contract (HAP Contract)
# Section 8 Tenant-Based Assistance
# Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

**1. Contents of Contract**

This HAP contract has three parts:

Part A: Contract Information
Part B: Body of Contract
Part C: Tenancy Addendum

**2. Tenant**

JAMIE BURSON

**3. Contract Unit**

827 SAN JUAN RD 79
SACRAMENTO, CA 95834

**4. Household**

The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

JAMIE L BURSON
ELMAJ T ROLLERSON

**5. Initial Lease Term**

The initial lease term begins on (mm/dd/yyyy): **05/05/2015**
The initial lease term ends on (mm/dd/yyyy): **04/30/2016**

**6. Initial Rent to Owner**

The initial rent to owner is: $958
During the initial lease term, the owner may not raise the rent to owner.

**7. Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $684 per month.

The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

**8. Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an **"O"**. The tenant shall provide or pay for the utilities or appliances indicated below by a **"T"**. Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| | Provided By | |
|---|---|---|
| **Item** | **Owner** | **Tenant** |
| Air Conditioning | | T |
| Cooking Oil/Electric | | T |
| Flat Fee Electric | | T |
| Heating - Natural Gas | | T |
| Other Electric | | T |
| Range/Microwave | O | |
| Refrigerator | O | |
| Sewer | O | |
| Trash Collection | O | |
| Water | O | |
| Water Heat - Natural Gas | | T |

**Signatures**

**Public Housing Agency: SHRA County of Sacramento Housing Authority**

Print or Type Name of PHA

Signature

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Owner:**

Print or Type Name of Owner

Signature

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Mail Payments to:**

Name

Address (Street, City, State, Zip)

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169 (exp. 09/30/2012)

**Part B of HAP Contract: Body of Contract**

**1. Purpose**

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

**2. Lease of Contract Unit**

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

(3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

**3. Maintenance, Utilities, and Other Services**

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

**4. Term of HAP Contract**

a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. **When HAP contract terminates.**

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

(3) If the family moves from the contract unit, the HAP contract terminates automatically.

(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

Previous editions are obsolete Page 4 of 12 form HUD-52641 (8/2009) ref Handbook 7420.8

Confidential WEAU00000467
Bellows Decl. Ex. 7, Page 4

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

## 5. Provision and Payment for Utilities and Appliances

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

## 6. Rent to Owner: Reasonable Rent

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

## 7. PHA Payment to Owner

a. **When paid**

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

## 8. Owner Certification

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:
   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);
   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;
   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:
   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or
   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):
   (1) Has violated obligations under a housing assistance payments contract under Section 8;
   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;
   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;
   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;
   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
      (a) Threatens the right to peaceful enjoyment of the premises by other residents;
      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;
      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or
      (d) Is drug-related criminal activity or violent criminal activity;
   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or
   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

16. **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

17. **Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

Previous editions are obsolete Page 8 of 12 form HUD-52641 (8/2009) ref Handbook 7420.8

Confidential WEAU00000471

Bellows Decl. Ex. 7, Page 8

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

**a. Maintenance**

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

Previous editions are obsolete

Page 9 of 12

form HUD-52641 (8/2009)
ref Handbook 7420.8

Confidential

WEAU00000472

Bellows Decl. Ex. 7, Page 9

**b. Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

**c. Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

**d. Housing services.** The owner must provide all housing services as agreed to in the lease.

## 8. Termination of Tenancy by Owner

**a. Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

**b. Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

**c. Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

**d. Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**e. Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

### 9. Lease: Relation to HAP Contract

If the HAP contract terminates for any reason, the lease terminates automatically.

### 10. PHA Termination of Assistance

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

### 11. Family Move Out

The tenant must notify the PHA and the owner before the family moves out of the unit.

### 12. Security Deposit

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

### 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

**14. Conflict with Other Provisions of Lease**

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

**15. Changes in Lease or Rent**

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:
   (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;
   (2) If there are any changes in lease provisions governing the term of the lease;
   (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

**16. Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

**17. Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family**. The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards** (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD**. The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner**. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8**. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant**. The family member (or members) who leases the unit from the owner.

**Voucher program**. The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

# Housing Assistance Payments Contract (HAP Contract) Section 8 Tenant-Based Assistance Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

> Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.
>
> Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**

Enter first date and last date of initial lease term.
The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**

Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**

Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

**1. Contents of Contract**

This HAP contract has three parts:

Part A: Contract Information
Part B: Body of Contract
Part C: Tenancy Addendum

**2. Tenant**

YVONNE JACKSON

**3. Contract Unit**

3600 DATA DR 595
RANCHO CORDOVA, CA 95670

**4. Household**

The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

YVONNE JACKSON
Kayla Sherrie Lewis (Live-in aide)
MARIAH MERCED (Live-in aide)

**5. Initial Lease Term**

The initial lease term begins on (mm/dd/yyyy): **07/22/2016**
The initial lease term ends on (mm/dd/yyyy): **06/30/2017**

**6. Initial Rent to Owner**

The initial rent to owner is: $856
During the initial lease term, the owner may not raise the rent to owner.

**7. Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $652 per month.

The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

**8. Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | | Paid By | |
|---|---|---|---|---|
| | Owner | Tenant | Owner | Tenant |
| Air Conditioning | | T | | |
| Cooking - Natural Gas | | T | | |
| Flat Fee Electric | | T | | |
| Heating - Oil/Electric | | T | | |
| Other Electric | | T | | |
| Range/Microwave | O | | | |
| Refrigerator | O | | | |
| Sewer | O | | | |
| Trash Collection | O | | | |
| Water | O | | | |
| Water Heat - Natural Gas | | T | | |

**Signatures**

**Public Housing Agency: SHRA County of Sacramento Housing Authority**

Print or Type Name of PHA

Signature

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Owner: CHESAPEAKE COMMONS**

Print or Type Name of Owner

Signature

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Mail Payments to:**

**CHESAPEAKE COMMONS**

Name

3600 DATA DR - OFFICE
RANCHO CORDOVA, CA 95670

Address (Street, City, State, Zip)

# Housing Assistance Payments Contract (HAP Contract)
# Section 8 Tenant-Based Assistance
# Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

**Part B of HAP Contract: Body of Contract**

## 1. Purpose

a. This is a HAP contract between the PHA and the Owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with asssistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

## 2. Lease of Contract Unit

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

(3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

## 3. Maintenance, Utilities, and Other Services

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

## 4. Term of HAP Contract

a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. **When HAP contract terminates.**

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

(3) If the family moves from the contract unit, the HAP contract terminates automatically.

(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

**5. Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

**6. Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

**7. PHA Payment to Owner**

a. **When paid**

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

**8. Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.
c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.
d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.
e. The family does not own or have any interest in the contract unit.
f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.
g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.
b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:
   (1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.
   (2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.
   (3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.
   (4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.
   (5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.
b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.
c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.
d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.
e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.
f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.
b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.
c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.
b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.
c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.
d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

(3) Has engaged in any drug-related criminal activity or any violent criminal activity;

(4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

(5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

(a) Threatens the right to peaceful enjoyment of the premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing
OMB Approval No. 2577-0169 (exp. 09/30/2017)

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

**a. Maintenance**

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

Previous editions are obsolete

Page 9 of 12

form HUD-52641 (09/2014)
ref Handbook 7420.8

Confidential

WEAU00016132

Bellows Decl. Ex. 7, Page 21

**b. Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

**c. Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

**d. Housing services.** The owner must provide all housing services as agreed to in the lease.

**8. Termination of Tenancy by Owner**

**a. Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

**b. Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

**c. Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

**d. Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**e. Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

## 9. Lease: Relation to HAP Contract

If the HAP contract terminates for any reason, the lease terminates automatically.

## 10. PHA Termination of Assistance

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

## 11. Family Move Out

The tenant must notify the PHA and the owner before the family moves out of the unit.

## 12. Security Deposit

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:
   (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;
   (2) If there are any changes in lease provisions governing the term of the lease;
   (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards** (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

**Housing Assistance Payments Contract (HAP Contract) Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**
**OMB Approval 2577-0169 (Exp. 04/30/2018)**

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA) . The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins). See section by section instructions. Part B Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.

However, the PHA may choose to add the following:

Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**

Section by Section Instructions

Section 2: **Tenant**

Enter full name of tenant.

Section 3. **Contract Unit**

Enter address of unit, including apartment number, if any.

Section 4. **Household Members**

Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**

Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

Such shorter term would improve housing opportunities for the tenant, **and**

Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**

Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**

Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances**.

The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract** This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract Part
   C: Tenancy Addendum

2. **Tenant**

   Gilbert Galvan Jr

3. **Contract Unit**

   4488 N Cornelia Apt 122,
   Fresno, CA 93722

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   | | |
   |---|---|
   | Gilbert Galvan Jr | H |
   | Monique Michelle Avina | K |
   | Ciara Paulina Galvan | Y |
   | Jordan Michael Anthony Galvan | Y |

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): 10/10/2018

   The initial lease term ends on (mm/dd/yyyy): 10/09/2019

6. **Initial Rent to Owner**

   The initial rent to owner is: $ 939.00
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 364.00 per month.
The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

**8. Utilities and Appliances**
The owner shall provide or pay for the utilities and appliances indicated below by an " **O**". The tenant shall provide or pay for the utilities and appliances indicated below by a "**T**". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|
| Heating | Natural gas 4 | Bottle gas | Oil or Electric | Coal or Other | O | T |
| Cooking | Natural gas | Bottle gas | Oil or Electric 4 | Coal or Other | O | T |
| Water Heating | Natural gas 4 | Bottle gas | Oil or Electric | Coal or Other | O | T |
| Other Electric | | | | | O | T |
| Water | | | | | O | O |
| Sewer | | | | | O | O |
| Trash Collection | | | | | O | O |
| Air Conditioning | | | | | O | T |
| Refrigerator | | | | | O | O |
| Range/Microwave | | | | | O | O |
| Other (specify) | | | | | | |

**Signatures:**

**Public Housing Agency**
Housing Authority of Fresno County
Print or Type Name of PHA

Signature

D. APPLEGATE
Print or Type Name and Title of Signatory

10/25/2018
Date (mm/dd/yyyy)

**Owner**
Wasatch Pool Holdings LLC
Print or Type Name of Owner

Signature

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Mail Payments to**:

Wasatch Pool Holdings LLC
Name

4498 N Cornelia - Office,
Fresno, CA 93722
Address (street, city, State, Zip)

Gilbert Galvan Jr

t2031234

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

### 1. Purpose

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

### 2. Lease of Contract Unit

a The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

(3) The lease is consistent with State and local law.

e The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

### 3. Maintenance, Utilities, and Other Services

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

### 4. Term of HAP Contract

a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. When HAP contract terminates.

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

(3) If the family moves from the contract unit, the HAP contract terminates automatically.

(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

Previous editions are obsolete
Page 4 of 12
form **HUD-52641** (04/2015)
ref Handbook 7420.8

Confidential
WEAU00024216
Bellows Decl. Ex. 7, Page 28

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

a During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract**. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be prorated for a partial month.

d. **Application of payment**. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e **Limit of PHA responsibility**.

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f **Overpayment to owner**. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. **Prohibition of Discrimination**. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10. **Owner's Breach of HAP Contract**

a Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11. **PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12. **Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of

the contract unit or the premises or with implementation of the HAP contract.

13. **Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

14. **Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

(3) Has engaged in any drug-related criminal activity or any violent criminal activity;

(4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

(5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

(a) Threatens the right to peaceful enjoyment of the premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. **Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law**.

**16. Written Notices**. Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a **Maintenance**

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage**. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d **Housing services**. The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

a. **Requirements**. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b **Grounds**. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(5) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(6) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**e. Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

**f. Eviction by court action.** The owner may only evict the tenant by a court action.

**g. Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**9. Lease: Relation to HAP Contract**

If the HAP contract terminates for any reason, the lease terminates automatically.

**10. PHA Termination of Assistance**

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**11. Family Move Out**

The tenant must notify the PHA and the owner before the family moves out of the unit.

**12. Security Deposit**

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

**Contract unit**. The housing unit rented by the tenant with assistance under the program.

**Family**. The persons who may reside in the unit with assistance under the program.

**HAP contract**. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household**. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS)**. The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements**. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease**. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA**. Public Housing Agency.

**Premises**. The building or complex in which the contract unit is located, including common areas and grounds.

**Program**. The Section 8 housing choice voucher program.

**Rent to owner**. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8**. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant**. The family member (or members) who leases the unit from the owner.

**Voucher program**. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
exp. 7/31/2022

**Privacy Act Statement:** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied to the tenant. HUD may disclose this information to Federal, State, and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities

Section 5. **Initial Lease Term**

Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**

Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**

Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

# Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**

   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**

   Corina Olivas

3. **Contract Unit**

   4488 N Cornelia Ave Apt 153,
   Fresno, CA 93722

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   | | |
   |---|---|
   | Corina Denise Olivas | H |
   | Michael Joseph Torres | Y |
   | Marcus James Torres | Y |

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): 02/05/2020

   The initial lease term ends on (mm/dd/yyyy): 02/04/2021

6. **Initial Rent to Owner**

   The initial rent to owner is: $ 996.00
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 472.00 per month.
The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

8. Utilities and Appliances

The owner shall provide or pay for the utilities/appliances indicated below by an "**O**". The tenant shall provide or pay for the utilities/appliances indicated below by a "**T**". Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave.

| Item | Provided by Owner | Provided by Tenant | Paid by Owner | Paid by Tenant |
|---|---|---|---|---|
| Air Conditioning | O | T | | T |
| Cooking Oil_Electric | O | T | | T |
| Heat Nat Gas PG&E Climat | O | T | | T |
| Other Electric | O | T | | T |
| Range_Microwave | O | O | O | |
| Refrigerator | O | O | O | |
| Water Heating Natural Gas | O | T | | T |
| Water_Sewer_Garbage Fre | O | T | | T |

**Signatures**

**Public Housing Agency**

Housing Authority of Fresno County

Print or Type Name of PHA

Signature

DawnMarie Applegate

Print or Type Name and Title of Signatory

2/13/2020

Date (mm/dd/yyyy)

**Owner**

Wasatch Pool Holdings LLC

Print or Type Name of Owner

Signature

Yvonne Waddell

Print or Type Name and Title of Signatory

02/13/2020

Date (mm/dd/yyyy)

Mail payments to:

Wasatch Pool Holdings LLC

Name

4498 N Cornelia - Office,
Fresno, CA 93722

Address (street, city, state, zip code)

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

### 1. Purpose

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

### 2. Lease of Contract Unit

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

(3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

### 3. Maintenance, Utilities, and Other Services

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

### 4. Term of HAP Contract

a. Relation to lease term. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. When HAP contract terminates.

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

(3) If the family moves from the contract unit, the HAP contract terminates automatically.

(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing

assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

**5. Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

**6. Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

**7. PHA Payment to Owner**

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be prorated for a partial month.

d. **Application of payment** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

**8. Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP

contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract. Eligibility for HUD's programs must be made without regard to actual or perceived sexual orientation, gender identity, or marital status.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

c. Violence Against Women Act. The owner must comply with the Violence Against Women Act, as amended, and HUD's implementing regulation at 24 CFR part 5, Subpart L, and program regulations.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used

by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

(3) Has engaged in any drug-related criminal activity or any violent criminal activity;

(4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

(5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

(a) Threatens the right to peaceful enjoyment of the premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Reserved**

**16. Written Notices** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

## Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part C of HAP Contract: Tenancy Addendum

**1. Section 8 Voucher Program**

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

**2. Lease**

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

**3. Use of Contract Unit**

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

**4. Rent to Owner**

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

**5. Family Payment to Owner**

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

**6. Other Fees and Charges**

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

**7. Maintenance, Utilities, and Other Services**

a. **Maintenance**

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

**8. Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(d) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

**9. Protections for Victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking.**

a. **Purpose:** This section incorporates the protections for victims of domestic violence, dating violence, sexual assault, or stalking in accordance with subtitle N of the Violence Against Women Act of 1994, as amended (codified as amended at 42 U.S.C. 14043e et seq.) (VAWA) and implementing regulations at 24 CFR part 5, subpart L.

b. **Conflict with other Provisions:** In the event of any conflict between this provision and any other provisions included in Part C of the HAP contract, this provision shall prevail.

c. **Effect on Other Protections**: Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, sexual assault, or stalking.

d. **Definition:** As used in this Section, the terms "actual and imminent threat," "affiliated individual", "bifurcate", "dating violence," "domestic violence," "sexual assault," and "stalking" are defined in HUD's regulations at 24 CFR part 5, subpart L. The terms "Household" and "Other Person Under the Tenant's Control" are defined at 24 CFR part 5, subpart A.

e. **VAWA Notice and Certification Form:** The PHA shall provide the tenant with the "Notice of Occupancy Rights under VAWA and the certification form described under 24 CFR 5.2005(a)(1) and (2).

f. **Protection for victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking:**

(1) The landlord or the PHA will not deny admission to, deny assistance under, terminate from participation in, or evict the Tenant on the basis of or as a direct result of the fact that the Tenant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the Tenant otherwise qualifies for admission, assistance, participation, or occupancy. 24 CFR 5.2005(b)(1).

(2) The tenant shall not be denied tenancy or occupancy rights solely on the basis of criminal activity engaged in by a member of the Tenant's Household or any guest or Other Person Under the Tenant's Control, if the criminal activity is directly related to domestic violence, dating violence, sexual assault, or stalking, and the Tenant or an Affiliated Individual of the Tenant is the victim or the threatened victim of domestic violence, dating violence, sexual assault, or stalking. 24 CFR 5.2005(b)(2).

(3) An incident or incidents of actual or threatened domestic violence, dating violence, sexual assault or stalking will not be construed as serious or repeated violations of the lease by the victim or threatened victim of the incident. Nor shall it not be construed as other "good cause" for termination of the lease, tenancy, or occupancy rights of such a victim or threatened victim. 24 CFR 5.2005(c)(1) and (c)(2).

g. **Compliance with Court Orders:** Nothing in this Addendum will limit the authority of the landlord, when notified by a court order, to comply with the court order with respect to the rights of access or control of property (including civil protection orders issued to protect a victim of domestic violence, dating violence, sexual assault, or stalking) or with respect to the distribution or possession of property among members of the Tenant's Household. 24 CFR 5.2005(d)(1).

h. **Violations Not Premised on Domestic Violence, Dating Violence, Sexual Assault, or Stalking:** Nothing in this section shall be construed to limit any otherwise available authority of the Landlord to evict or the public housing authority to terminate the assistance of a Tenant for any violation not premised on an act of domestic violence, dating violence, sexual assault, or stalking that is in question against the Tenant or an Affiliated Individual of the Tenant. However, the Landlord or the PHA will not subject the tenant, who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, to a more demanding standard than other tenants in determining whether to evict or terminate assistance. 24 CFR 5.2005(d)(2).

i. **Actual and Imminent Threats:**

(1) Nothing in this section will be construed to limit the authority of the Landlord to evict the Tenant if the Landlord can demonstrate that an "actual and imminent threat" to other tenants or those employed at or providing service to the property would be present if the Tenant or lawful occupant is not evicted. In this context, words, gestures, actions, or other indicators will be construed as an actual and imminent threat if they meet the following standards for an actual and imminent threat: "Actual and imminent threat" refers to a physical danger that is real, would occur within an immediate time frame, and could result in death or serious bodily harm. In determining whether an individual would pose an actual and imminent threat, the factors to be considered include: the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the length of time before the potential harm would occur. 24 CFR 5.2005(d)(3).

(2) If an actual and imminent threat is demonstrated, eviction should be used only when there are no other actions that could be taken to reduce or eliminate the threat, including, but not limited to, transferring the victim to a different unit, barring the perpetrator from the property, contacting law enforcement to increase police presence, developing other plans to keep the property safe, or seeking other legal remedies to prevent the perpetrator from acting on a threat. Restrictions predicated on public safety cannot be based on stereotypes, but must be tailored to particularized concerns about individual residents. 24 CFR 5.2005(d)(4).

j. **Emergency Transfer:** A tenant who is a victim of domestic violence, dating violence, sexual assault, or stalking may request an emergency transfer in accordance with the PHA's emergency transfer plan. 24 CFR 5.2005(e). The PHA's emergency transfer plan must be made available upon request, and incorporate strict confidentiality measures to ensure that the PHA does not disclose a tenant's dwelling unit location to a person who committed or threatened to commit an act of domestic violence, dating violence, sexual assault, or stalking against the tenant;

For transfers in which the tenant would not be considered a new applicant, the PHA must ensure that a request for an emergency transfer receives, at a minimum, any applicable additional priority that is already provided to other types of emergency transfer requests. For transfers in which the tenant would be considered a new applicant, the plan must include policies for assisting a tenant with this transfer.

k. **Bifurcation**: Subject to any lease termination requirements or procedures prescribed by Federal, State, or local law, if any member of the Tenant's Household engages in criminal activity directly relating to domestic violence, dating violence, sexual assault, or stalking, the Landlord may "bifurcate" the Lease, or remove that Household member from the Lease, without regard to whether that Household member is a signatory to the Lease, in order to evict, remove, or terminate the occupancy rights of that Household member without evicting, removing, or otherwise

penalizing the victim of the criminal activity who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program. 24 CFR 5.2009(a).

If the Landlord bifurcates the Lease to evict, remove, or terminate assistance to a household member, and that household member is the sole tenant eligible to receive assistance, the landlord shall provide any remaining tenants or residents a period of 30 calendar days from the date of bifurcation of the lease to:

(1) Establish eligibility for the same covered housing program under which the evicted or terminated tenant was the recipient of assistance at the time of bifurcation of the lease;

(2) Establish eligibility under another covered housing program; or

(3) Find alternative housing.

l. **Family Break-up:** If the family break-up results from an occurrence of domestic violence, dating violence, sexual assault, or stalking, the PHA must ensure that the victim retains assistance. 24 CFR 982.315.

m. **Move with Continued Assistance:** The public housing agency may not terminate assistance to a family or member of the family that moves out of a unit in violation of the lease, with or without prior notification to the public housing agency if such a move occurred to protect the health or safety of a family member who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking; and who reasonably believed they were imminently threatened by harm from further violence if they remained in the dwelling unit, or if any family member has been the victim of sexual assault that occurred on the premises during the 90-calendar-day period preceding the family's request to move.

(1) The move is needed to protect the health or safety of the family or family member who is or has been a victim of domestic violence dating violence, sexual assault or stalking; and

(2) The family or member of the family reasonably believes that he or she was threatened with imminent harm from further violence if he or she remained in the dwelling unit. However, any family member that has been the victim of a sexual assault that occurred on the premises during the 90-calendar day period preceding the family's move or request to move is not required to believe that he or she was threatened with imminent harm from further violence if he or she remained in the dwelling unit. 24 CFR 982.354.

n. **Confidentiality.**

(1) The Landlord shall maintain in strict confidence any information the Tenant (or someone acting on behalf of the Tenant) submits to the Landlord concerning incidents of domestic violence, dating violence, sexual assault or stalking, including the fact that the tenant is a victim of domestic violence, dating violence, sexual assault, or stalking.

(2) The Landlord shall not allow any individual administering assistance on its behalf, or any persons within its employ, to have access to confidential information unless explicitly authorized by the Landlord for reasons that specifically call for these individuals to have access to the information pursuant to applicable Federal, State, or local law.

(3) The Landlord shall not enter confidential information into any shared database or disclose such information to any other entity or individual, except to the extent that the disclosure is requested or consented to in writing by the individual in a time-limited release; required for use in an eviction proceeding; or is required by applicable law.

**10. Eviction by court action**

The owner may only evict the tenant by a court action.

**11. Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**12. Lease: Relation to HAP Contract**

If the HAP contract terminates for any reason, the lease terminates automatically.

**13. PHA Termination of Assistance**

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**14. Family Move Out**

The tenant must notify the PHA and the owner before the family moves out of the unit.

**15. Security Deposit**

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

**16. Prohibition of Discrimination**

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease. Eligibility for HUD's programs must be made without regard to actual or perceived sexual orientation, gender identity, or marital status.

**17. Conflict with Other Provisions of Lease**

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and

regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

### 18. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

### 19. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

### 20. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family**. The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8**. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

 

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321*

This agreement is made in Rancho Cordova, CA , on 4/18/12 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Ronnie Block**

Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 06/01/2012, and Terminating 05/31/2013 . Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is $9,120.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #1, Rancho Cordova, CA 95670

**III. RENT**

The rental for the premises is $760.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive , Rancho Cordova, CA, 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends, unless otherwise posted. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

*Initials*

A. The sum of $760.00 upon execution of this Rental Agreement as rent for the period beginning 06/01/2012 , through 06/30/2012 (first month prorated) payable on 06/01/2012.

B. The sum of $760.00_ is due on the first day of each calendar month commencing June 2012.

C. A concession in the amount of $0.00 is to be given to Resident as part of this 11month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 11 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one ore more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the

**IV. PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V. LATE CHARGES**

*Initials*

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $50.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

*Initials*

Resident shall pay Owner, upon execution of this agreement, a security deposit of $630.00 . Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, If necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.



**VII. ACCEPTANCE AND SURRENDER OF PREMI**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements,

**VIII. USE OF THE PREMISES**

*Initials*

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. The maximum weight limit allowed for pets is 100.00 lbs.

*Initials*

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code 308.3.1 and 308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX. RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

**X. UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in **Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.** Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. **Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interuption of such prepayment services or to fail to pay for utility service prepayment programs when due.**

*Initials*

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

_X_ gas, Account # ____________________,
_X_ electricity, Account # ____________________,

**XI. INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

**XII. HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.




**XIII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall

**XIV. LIABILITY INSURANCE**

*Initials*

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV. WAIVER OF LIABILITY**

*Initials*

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B. Loss of property due to theft

C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D The Actions or omissions of other Residents

E. Interference with light, view or other intangible aspects of the premises.

F. Operations in construction of any public or quasi-public work

G. Any latent defect in the building(s)

H. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K. Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

**XVI. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty (60.00) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $760.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII. NOTICE TO QUIT**

*Initials*

A. **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than sixty(60.00) days notice in writing prior to the end of the monthly term. If no sixty day notice is received by Agent AND resident vacates the property, a fee equal to sixty days rent will be billed as liquidated damages for improper sixty day notice. Upon the lease agreement expiration date of 05/31/2013 and if resident elects to not renew lease or submit a written sixty(60.00) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.
Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B. **TERM AGREEMENT:** Resident agrees, at least sixty(60.00) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no sixty day notice is received by Agent AND resident vacates the property, a fee equal to sixty day's rent will be billed as liquidated damages for improper sixty day notice

**XVIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

*Initials*

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XIX. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

 

**XX. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIV. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXV. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

Ronnie L Block — 4-18-12

Ronnie Block(Lessee) — Date

Lori Hassell — 4/18/12

Owner Authorized agent — Date

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

| | |
|---|---|
| Co-Signer Signature | Date |
| Print Name | Home Telephone number |
| Address | City, State Zip |
| Social Security Number | Employer |

LD302.01.CA Revised 01/31/2011

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321*

This agreement is made in San Diego, CA , on 5/31/12 between, Creekside Villa Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
Lease Holder(s):
**Charlene Anderson**
Authorized Occupant(s):

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 05/31/2012, and Terminating 05/30/2013. Reference paragraph XVII of this Residential Rental Agreement. The total rent for this 12 month and 0 day tenancy is 12,588.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4630 Nogal Street #C, San Diego, CA 92102

**III. RENT**

The rental for the premises is $1,049.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 220 47th Street , San Diego, CA, 92102 . The Rental Office can be reached by phone at (619)-263-2686. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends. In addition, a "night drop" is available for payment when the office is not open. Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop. All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent. Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:

CA
Initials

A. The sum of $33.84 upon execution of this Rental Agreement as rent for the period beginning 05/31/2012, through 05/31/2012 (first month prorated) payable on 05/31/2012.

B. The sum of $1,049.00 is due on the first day of each calendar month commencing June 2012.

C. A concession in the amount of 0.00 is to be given to Resident as part of this 12month(s) lease and will be issued as $0.00 off move in. The 0.00 concession is due and payable back to Creekside Villa Apartments if the 12 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the standard monthly rental required by the Owner for this premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one ore more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in Paragraph III

**IV. PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V. LATE CHARGES**

CA
Initials

Landlord and Tenant understand and agree that Tenant's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units. Because of this, Landlord and Tenant understand and agree that the amount $ 50.00 constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $ 25.00. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by bank, Resident shall be required, at Owners option, to make any future payment with cashiers check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

CA
Initials

Resident shall pay Owner, upon execution of this agreement, a security deposit of **$250.00** . Said deposits shall be held byOwner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any Interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, If necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

VII. **ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys and gate cards for the demised premises to Owner, or remain liable for the payment of rent until said delivery is made.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

VIII. **USE OF THE PREMISES**

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupant(s). Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.

*Initials* CAW

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed.The maximum weight limit allowed for pets is 35.00 lbs.

*Initials* CAW

C. Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code 308.3.1 and 308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

IX. **RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by Owner.

X. **UTILITIES**

*Initials* CAW

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in **Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges.** Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. **Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interuption of such prepayment services or to fail to pay for utility service prepayment programs when due.**

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.

Resident shall pay for the following utility services.

X gas, Account # 6142693398

X electricity, Account # 

XI. **INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

**XII. HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XIII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIV. LIABILITY INSURANCE**

Initials

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Creekside Villa Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Creekside Villa Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV. WAIVER OF LIABILITY**

Initials

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy. If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B. Loss of property due to theft

C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D The Actions or omissions of other Residents

E. Interference with light, view or other intangible aspects of the premises.

F. Operations in construction of any public or quasi-public work

G. Any latent defect in the building(s)

H. The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K. Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

**XVI. CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty(30.00) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $ 1,049.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled agter execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII. NOTICE TO QUIT**

Initials

A. **MONTH-TO-MONTH TENANCY:** If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty (30.00) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice. Upon the lease agreement expiration date of 05/30/2013 and if resident elects to not renew lease or submit a written thirty(30.00) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy. Current month to month fee is $ 100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B. **TERM AGREEMENT**: Resident agrees, at least thirty(30.00) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty day's rent will be billed as liquidated damages for improper thirty day notice.



**XVIII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

Initials

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XIX. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XX. SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.

<u>Termination on Breach and Notice to Quit:</u> Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a <u>non-curable default</u> under the provisions of State Civil Codes and shall forthwith <u>terminate this Lease Agreement.</u> In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIV. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

Charlene Anderson 5-31-12

Charlene Anderson(Lessee) Date

5/31/12

Owner authorized agent Date

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

Co-Signer Signature

Date

Print Name

Home Telephone number

Address

City, State Zip

Social Security Number

Employer

LD302.01.CA Revised 01/31/2011

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in California*
*595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321*

This agreement is made in San Diego, CA , on 6/25/15 between, Creekside Villa Apartments hereinafter called Owner, by **Wasatch Property Management**, its authorized agent, and

Lease Holder(s):

**Charlene Anderson**

,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 6 month and 0 day tenancy, commencing 08/01/2015 and Terminating 01/31/2016. The total rent for this 6 month and 0 day tenancy is $7,824.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 4630 Nogal Street #C, San Diego, CA 92102

**III. RENT**

The rental for the premises is $1,304.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 220 47th Street, San Diego, CA, 92102 . The Rental Office can be reached by phone at (619)-263-2686. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 AM and 6:00 PM Monday through Friday and 10:00 AM through 5:00 PM on Saturday. In addition, rent can be paid online at www.IsYourHome.com Rent received shall first be applied to all sums owed and then to the current rent due. Rent shall be payable by check, cashier's check, certified check, credit card, or money order in installments as follows:

A. The sum of $1304.00 is due upon execution of this Rental Agreement as rent for the period beginning 08/01/2015 , through 08/31/2015 (first month prorated) payable on 08/01/2015. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $1,304.00, plus additional services of $18.16 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing August 2015 .

C. A concession in the amount of $0.00 is to be given to Resident as part of this 6 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Creekside Villa Apartments if the 6 month lease is not fulfilled for any reason.

**IV. LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month. In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**V. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $250.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises/or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $25.00 is the fee for after hours lockout service.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VII. USE OF THE PREMISES**

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

CA INITIAL

B. Without written approval of Owner, No[illegible]s, Cats, Birds, or Any Other Animals of any kind shall be ke[illegible]llowed on the premises, nor shall the Resident permit any invited guest to have or keep any[illegible] ls upon the premises for any period of time. If an animal is [illegible] in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 6 (six) months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 35 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

## VIII. RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| | |
|---|---|
| _X_ gas, | Account # 3509059904 |
| _X_ electricity, | Account # |
| _X_ water/sewer/trash | **See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charg es** |

## X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI. HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Creekside Villa Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Creekside Villa Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV. CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $1,304.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI. NOTICE TO QUIT**

A. **MONTH-TO-MONTH TENANCY: If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner win sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**

B. **TERM AGREEMENT: If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**

C. **MOVE-OUT INSPECTION: Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..**

**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX. SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any assignment or subletting without written consent is void.

**XX. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

CA INITIAL

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXV. RENTPLUS ACKNOWLEDGEMENT**

Resident acknowledges that Owner offers RentPlus, a service that reports payment history to credit bureaus to assist residents in building positive rental/credit history. The monthly cost of this service is $5.00 per person for up to two persons, or $12.99 group rate for three or more persons, and will be billed to resident in conjunction with Monthly Rent and other Additional Service charges, should Resident choose to participate in RentPlus services.

Charlene Anderson Initial  ☐ Resident agrees to participate in RentPlus services  Resident opts out of RentPlus services

**XXVI. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

**XXVII. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

Charlene Anderson 7-14-15

Charlene Anderson(Lessee) Date

[signature] 6/25/15

Owner's Authorized Agent Date

LD302.01.CA Revised 11/15/2013



 

# RESIDENTIAL RENTAL AGREEMENT

THIS IS A LEGALLY BINDING AGREEMENT
READ IT CAREFULLY

Wasatch Property Management, Inc. I Owners Agent
*A Utah Corporation – registered in California*
*595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321*

This agreement is made in Rancho Cordova, CA , on 7/1/15 between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and

Lease Holder(s):

**Mary Cooper**

,hereinafter called Resident(s). No other person(s) except those herein stated may occupy premises without written approval of Owner.

I. **TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 08/01/2015 and Terminating 07/31/2016. The total rent for this 12 month and 0 day tenancy is $9,132.00.

II. **PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 3800 Data Drive, #4, Rancho Cordova, CA 95670

III. **RENT**

The rental for the premises is $761.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3800 Data Drive, Rancho Cordova, CA, 95670-7403. The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 AM and 6:00 PM Monday through Friday, 9:00 AM through 5:00 PM on Saturday, and 11:00 AM through 4:00 PM on Sunday. In addition, rent can be paid online at www.IsYourHome.com Rent received shall first be applied to all sums owed and then to the current rent due. Rent shall be payable by check, cashier's check, certified check, credit card, or money order in installments as follows:

A. The sum of $761.00 is due upon execution of this Rental Agreement as rent for the period beginning 08/01/2015, through 08/31/2015 (first month prorated) payable on 08/01/2015. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.
B. The sum of $761.00, plus additional services of $78.16 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing August 2015.
C. A concession in the amount of $0.00 is to be given to Resident as part of this 12 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 12 month lease is not fulfilled for any reason.

IV. **LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month. In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

V. **SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $400.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

VI. **ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $50.00 is the fee for after hours lockout service.
B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

VII. **USE OF THE PREMISES**

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

INITIAL

CP000263

 

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time. If an animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 6 (six) months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasileiro, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 100 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code §308.3.1 and §308.3.1.1 or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. Harassment or Threats: Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. Nuisance and Waste: Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H. Loitering: Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

VIII. RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| | |
|---|---|
| _X_ gas, | Account # |
| _X_ electricity, | Account # |
| _X_ water/sewer/trash | See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges. |

X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

XI. HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

INITIAL

 

XXI. WAIVER OF BREACH

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

XXII. RULES AND REGULATIONS

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

XXIII. SECURITY

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

XXIV. ENVIRONMENTAL INDEMNIFICATION

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE.

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

XXV. RENTPLUS ACKNOWLEDGEMENT

Resident acknowledges that Owner offers RentPlus, a service that reports payment history to credit bureaus to assist residents in building positive rental/credit history. The monthly cost of this service is $5.00 per person and will be billed to resident in conjunction with Monthly Rent and other Additional Service charges, should Resident choose to participate in RentPlus services.

Mary Cooper Initial  ☐ Resident agrees to participate in RentPlus services  ☒ Resident opts out of RentPlus services

XXVI. ELECTRONIC COMMUNICATION

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement. 

 

XII. DESTRUCTION OF PREMISES

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

XIII. LIABILITY INSURANCE

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

XIV. WAIVER OF LIABILITY

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

XV. CANCELLATION FEE

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $781.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

XVI. NOTICE TO QUIT

A. MONTH-TO-MONTH TENANCY: If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.

B. TERM AGREEMENT: If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.
C. MOVE-OUT INSPECTION: Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property.

XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

XVIII. AMENDMENTS TO AGREEMENT

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

XIX. SUBLETTING

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any assignment or subletting without written consent is void.

XX. JOINT AND SEVERAL RESPONSIBILITY

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

 

XXVII. CREDIT DISCLAIMER and RELEASE

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

X Mary Cooper — 7/23/15

Mary Cooper(Lessee) — Date

7/23/15

Owner's Authorized Agent — Date

LD302.01.CA Revised 11/15/2013

WASATCH

X

CP000267

# ¯ESIDENTIAL RENTAL AGREEME¯¯

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in California*
*595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321*

This agreement is made in Rancho Cordova, CA , on 8/30/16 between, Chesapeake Commons Apartments hereinafter called Owner, by **Wasatch Property Management**, its authorized agent, and
Lease Holder(s):

**Glenda Brewer**
,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

## I. TERM

This Agreement creates a 12 month and 0 day tenancy, commencing 10/01/2016 and Terminating 09/30/2017. The total rent for this 12 month and 0 day tenancy is $10,272.00.

## II. PROPERTY

Owner hereby rents to Resident for the term of this agreement the property located at: 3600 Data Drive, #259, Rancho Cordova, CA 95670

## III. RENT

The rental for the premises is $856.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 3600 Data Drive, Rancho Cordova, CA, 95670-7403 . The Rental Office can be reached by phone at (916)-635-1970. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 AM and 6:00 PM Monday through Friday, 9:00 AM through 5:00 PM on Saturday, and 11:00 AM through 4:00 PM on Sunday. In addition, rent can be paid via ACH Transaction, Credit or Debit Card Transaction, Money Gram Transaction or online at www.IsYourHome.com in installments as follows:

A. The sum of $856.00 is due upon execution of this Rental Agreement as rent for the period beginning 10/01/2016 , through 10/31/2016 (first month prorated) payable on 10/01/2016. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $856.00, plus additional services of $78.16 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing October 2016 .

C. A concession in the amount of $0.00 is to be given to Resident as part of this 12 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Chesapeake Commons Apartments if the 12 month lease is not fulfilled for any reason.

## IV. LATE CHARGES

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month. In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

## V. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT

Resident shall pay Owner, upon execution of this agreement, a security deposit of $400.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

## VI. ACCEPTANCE AND SURRENDER OF PREMISES

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $50.00 is the fee for after hours lockout service.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

## VII. USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than 1 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

B. Without written approval of Owner, No Dogs, C--- Birds, or Any Other Animals of any kind shall be kept or allow--d on the premises, nor shall the Resident permit any invited guest to have or keep any animals ι the premises for any period of time. If an animal is found i. ıpartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 6 (six) months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Braslierio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 100 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

## VIII. RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| | |
|---|---|
| _X_ gas, | Account # |
| _X_ electricity, | Account # |
| _X_ water/sewer/trash | **See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges** |

## X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI. HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

WASATCH

INITIAL

**XII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV. CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $856.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI. NOTICE TO QUIT**

A. **MONTH-TO-MONTH TENANCY: If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner win sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**

B. **TERM AGREEMENT: If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**

C. **MOVE-OUT INSPECTION: Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..**

**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY JURY WAIVER**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law. Owner and Resident agree that any action or proceeding arising out of or in any way connected with this Agreement, the dwelling unit or claimed injury to or damages suffered by Owner or Resident, regardless of whether such claim is based on contract, tort, or other legal theory, shall be heard by a court sitting without a jury, and thus Resident hereby waives all rights to a trial by jury.

**XVIII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX. SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it.

**XX. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXV. RENTPLUS ACKNOWLEDGEMENT**

Resident acknowledges that Owner offers RentPlus, a service that reports payment history to credit bureaus to assist residents in building positive rental/credit history. The monthly cost of this service is $5.00 per person and will be billed to resident in conjunction with Monthly Rent and other Additional Service charges, should Resident choose to participate in RentPlus services.

Glenda Brewer Initial 

☐ Resident agrees to participate in RentPlus services ☒ Resident opts out of RentPlus services

**XXVI. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.



**CONTACTING YOU:** In signing this lease, you as dent are giving your express written consent to be contacte Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

**XXVII. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

Glenda Brewer — 8-30-2016

Glenda Brewer(Lessee) — Date

8/30/16

Owner's Authorized Agent — Date

LD302 01 CA Revised 11/15/2013

WASATCH

**UTILITY ADDENDUM:**
**DISCLOSURE OF RESIDENT'S FIN...CIAL RESPONSIBILITY FOR WATER, SEWE AND TRASH COLLECTION CHARGES**

This utility addendum is hereby incorporated into the Rental Agreement between, Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and Glenda Brewer for premises located at 3600 Data Drive, #259, Rancho Cordova, CA 9567

1. Resident shall pay for water and sewer service based on the method selected below:
   a. __X__ Number of occupants in each apartment unit. Resident shall pay for water and sewer service base on an allocation formula, not actual submeter readings. Specifically, Resident's bill will be calculated in the following manner: The property's water and sewer bills will be allocated to each apartment unit based on a percentage assigned to each apartment unit based on the number of Occupants in that apartment unit compared to the total number of occupants at the property. If Resident's unit contains a washing machine, one additional occupant will be added to the occupant count for purposes of calculating the percentage, and Resident agrees that this is a fair practice to account for increased water usage in units containing washing machines. Resident's percentage for this factor is currently 80.00% but could change based on the number of occupants at the property or in the apartment unit. Resident's bill will be equal to the calculated monthl percentage multiplied by the property's water and sewer charges. Prior to allocating the property's water and sewer bills using the method described above, Owner will deduct 20.00% to account for common area usage. Owner and Resident agree that the exact amount of the water used in Resident's unit and the exact amount of water used in the common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for water and sewer usage in the common areas or in other residential units.
   b. _____ Resident shall pay for water and sewer service based on water consumed in Resident's unit. Specifically, Resident's bills will be calculated as follows: A water submeter is installed in the Resident's unit to measure the total amount of water used in the unit. Water and sewer bills will be calculated by multiplying the submetered usage by a utility rate based on the utility rates of the local utility provider (which may include base or fixed charges). Resident acknowledges that the rates paid for water and sewer service may not match the rate of the local water utility (as that rate may not be appropriate to charge to an individual unit), but that the rates used are designed in a manner to allocate Owner's actual water and sewer costs to the apartment units. Resident acknowledges that Resident may be paying for some water and sewer charges attributable to common area usage.
2. All water and sewer related charges assessed to the property may be used to calculate the amount charged to each Resident under the selected formula described above, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all miscellaneous charges contained on the utility bills received from the local water and sewer providers.
3. Resident shall also be billed, and shall pay, for trash service by the third party billing provider. Resident's trash bills shall be calculated in the following manner: the property's trash bill will be allocated equally to each unit on a monthly basis. The property contains 600 units, therefore resident will pay 1/600 of the trash bill monthly. Prior to allocating the property's trash bills using the method described above, Owner will deduct 20.00% to account for common area usage. Owner and Resident agree that the exact amount of the trash costs attributable to common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for trash charges attributable to common areas or other residential units.
4. The billing methods described above may be changed by Owner by providing Resident with 60 days prior written notice and Resident acknowledges that in certain situations it is necessary to make a change to the billing method.
5. The water and sewer bill will be sent to Resident by Conservice, a third party billing provider. Resident acknowledges that Conservice is not a public utility. Owner reserves the right to change the third party billing provider at any time. Any disputes related to the computation of Resident's bills will be between the Resident and the Owner.
6. Resident must make payment in full to Owner or the third party billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider when Resident fails to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or billing provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the billing provider, costs in printing and mailing late notices, los opportunity costs of the payment, etc. Accordingly, Owner and Resident agree that if the payment is received after the enumerated due date, Resident shall immediately pay a late payment in the amount of $7.00, which is a reasonable estimate of the costs incurred.
7. Move-out Fee: Resident agrees to pay a one-time account processing fee in the amount of $10 when Resident vacates the apartment unit. This fee shall be included on Resident's final bill. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill
8. Each monthly water, sewer and trash bill will include a monthly service fee not to exceed $4.37 in addition to the water, sewer and trash charges. This monthly service fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for providing billing services and may be increased (with 60 days written notice provided to Resident) if Owner's expenses or charges increase. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill.
9. Resident shall promptly contact the local gas and/or electric utility(ies) to establish an account in Resident's name for the provision of gas and electric service to Resident's unit. Resident shall ensure that the start date for each such account is the Resident's move-in date. If Resident fails to comply with the conditions of this paragraph and Owner is subsequently charged with utility charges attributable to Resident's occupancy of the unit, then Resident shall be issued (and shall pay) a bill for such services by Owner or the Billing Provider (which shall include a service charge in the amount of $25.00); such service charge is used to compensate Owner for Resident's failure to become the customer of record for such accounts, including, but not limited to charges assessed by the third party billing provider to Owner for processing of the bill for the delinquent time period, opportunity cost of the money not paid and other administrative costs. Resident and Owner agree that the charge described above is a reasonable estimate of the costs incurred.

10. Failure to pay any of said charges shal[illegible] considered a material breach of this Rental Agreem[illegible] and Owner shall have the right to commence legal proceedings against Resident and [illegible] occupants including but not limited to an unlawful de[illegible]ner action to recover possession of the premises. Upon termination or expiration of the Lease, unpaid water and sewer bills may be deducted from Resident's security deposit, and for such purpose Owner and Resident agree that the charges described in this addendum are considered additional rent.

Glenda Brewer 8-30-2016

Glenda Brewer(Lessee) Date 8/30/16

Owner's Authorized Agent Date

LD317 01 CA--Revised 01/04/2014

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in California*
*595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321*

This agreement is made in Oceanside, CA , on 3/25/20 between, Canyon Club Apartments hereinafter called Owner, by **Wasatch Property Management**, its authorized agent, and

Lease Holder(s):

**Rudolph Oross, Katherine Oross (Lessee)**

,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 6 month and 0 day tenancy, commencing 05/10/2020 and Terminating 11/09/2020. The total rent for this 6 month and 0 day tenancy is $12,258.00.

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 410 Activity Way #428, Oceanside, CA 92058

**III. RENT**

The rental for the premises is $2,043.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 420 Activity Way, Oceanside, CA, 92058 . The Rental Office can be reached by phone at (760)-721-2602. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 AM and 6:00 PM Monday through Friday, 10:00 AM through 5:00 PM on Saturday, and 10:00 AM through 3:00 PM on Sunday. In addition, rent can be paid via ACH Transaction, Credit or Debit Card Transaction, Money Gram Transaction or online at www.IsYourHome.com in installments as follows:

A. The sum of $1449.87 is due upon execution of this Rental Agreement as rent for the period beginning 05/10/2020 , through 05/31/2020 (first month prorated) payable on 05/01/2020. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $2,043.00, plus additional services of $0.00 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing June 2020 .

C. A concession in the amount of $0.00 is to be given to Resident as part of this 6 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Canyon Club Apartments if the 6 month lease is not fulfilled for any reason.

**IV. LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $75.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month. In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $75.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**V. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $1,703.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $90.00 is the fee for after hours lockout service. Resident also understands that if for any reason resident loses a key or fails to return all keys at time of move out a $50.00 replacement fee will be charged to reside nt.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**VII. USE OF THE PREMISES**

A. The premises are rented for residential use only and shall be occupied by not more than 3 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time. If an animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 6 (six) months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 100 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

I. Resident shall not remove from the apartment, for any reason, any fixture or appliance. This includes, but is not limited to the stove, refrigerator, washing machine and clothes dryer. Resident's removal of any such items shall be deemed a lease violation subjecting Resident to all remedies available to Landlord in the lease.

## VIII. RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| | |
|---|---|
| ____ gas, | Account # ____________ |
| _X__ electricity, | Account # ____________ |
| _X__ water/sewer/trash | **See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges** |

## X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI. HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $150.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

INITIAL

**XII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII. LIABILITY INSURANCE**

Resident understands that any property or liability insurance coverage purchased by the property manager or owner will not protect against loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to Resident's personal property or belongings. Resident also understands that, by not having renter's or personal liability insurance, Resident may be liable to third parties and to the property owner for certain losses and understand that Resident should not expect the property manager or Owner to be responsible for such losses. Owner and property managment recommend that every resident maintain renter's insurance coverage, at all times.

☐ **RESIDENT HAS RENTER'S INSURANCE**

Resident has the following renter's insurance coverage through a third-party insurance carrier

| Insurance Company | Policy Number |
| --- | --- |
| Property Limit | Liability Limit |

☐ **RESIDENT DOES NOT HAVE RENTER'S INSURANCE**

Although Resident recognizes the need for renter's insurance, Resident does not, at this time, have such insurance coverage and may be personally responsible for any property or liability damage to the property's managers, Owner or third-party's property as a result of the actions of Resident, occupants, household members, and guests actions.

**XIV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, its agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV. CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $2,043.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI. NOTICE TO QUIT**

**A. MONTH-TO-MONTH TENANCY: If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner win sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**

**B. TERM AGREEMENT: If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**

**C. MOVE-OUT INSPECTION: Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..**

**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX. SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it. Owner may allow resident to engage in short-term vacation rentals in a limited fashion provided that Owner has approved Resident to opt into the Airbnb Friendly Buildings Program and delivered to Owner all required documentation as outlined in the Airbnb Friendly Buildings Program Addendum to Lease Agreement.

**XX. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXVI. RENTPLUS ACKNOWLEDGEMENT**

Upon execution of this agreement, Resident shall be enrolled in RentPlus, a credit reporting and financial tool which is anticipated to help Resident build credit by reporting its rent and utility payments to a credit bureau or credit bureaus on a monthly basis. After the first month of RentPlus services, there will be a financial services fee of **$8.95 per month if only one Resident is enrolled to participate, or a fee of $14.95 per month for multiple Residents** enrolled in a single residence. Participating Residents must be lease signers. The financial services fee will be charged by Conservice. Resident may opt out of the RentPlus at any time, for any or no reason, and receive additional information by logging in at **www.rentplus.com**. Fees paid will not be reimbursed or prorated. This program may be altered, changed, terminated or otherwise modified with thirty (30) days' notice to Resident. Resident acknowledges that they will be enrolled in RentPlus.

Rudolph Oross Initial ______

Katherine Oross Initial ______

**XXVII. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

**XXVIII. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

| | | | |
|---|---|---|---|
| 3/26/2020 | | 3/26/2020 | |
| Rudolph Oross(Lessee) | Date | Katherine Oross | Date |
| Kelley Chandler | 3/26/2020 | | |
| Owner's Authorized Agent | Date | | |

LD302 01.CA Revised 12/1/2019

DocuSign Envelope ID: B15D1D5B-B5F2-4416-8A[illegible] [illegible]CE15469B31

# RESIDENTIAL RENTAL AGREEMENT

THIS IS A LEGALLY BINDING AGREEMENT
READ IT CAREFULLY

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in California*
*595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321*

This agreement is made in Fresno, CA , on 8/17/18 between, Courtyard at Central Park hereinafter called Owner, by **Wasatch Property Management**, its authorized agent, and

Lease Holder(s):

**Monica Gonzales, Mathew Tilley (Lessee)**

Authorized Occupant(s):

**Logan Tilley (Dependant),**

,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

## I. TERM

This Agreement creates a 12 month and 0 day tenancy, commencing 08/17/2018 and Terminating 08/16/2019. The total rent for this 12 month and 0 day tenancy is $11,316.00.

## II. PROPERTY

Owner hereby rents to Resident for the term of this agreement the property located at: 4498 North Cornelia #B140, Fresno, CA 93722

## III. RENT

The rental for the premises is $943.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 4488 North Cornelia, Fresno, CA, 93722 . The Rental Office can be reached by phone at (559)-275-1009. Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 AM and 6:00 PM Monday through Friday and 9:00 AM through 5:00 PM on weekends. In addition, rent can be paid via ACH Transaction, Credit or Debit Card Transaction, Money Gram Transaction or online at www.IsYourHome.com in installments as follows:

A. The sum of $456.29 is due upon execution of this Rental Agreement as rent for the period beginning 08/17/2018 , through 08/31/2018 (first month prorated) payable on 08/01/2018. All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $943.00, plus additional services of $38.33 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing September 2018 .

C. A concession in the amount of $0.00 is to be given to Resident as part of this 12 month(s) lease and will be issued as $0.00 off move in. The $0.00 concession is due and payable back to Courtyard at Central Park if the 12 month lease is not fulfilled for any reason.

## IV. LATE CHARGES

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $65.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month. In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $65.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order. Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

## V. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT

Resident shall pay Owner, upon execution of this agreement, a security deposit of $900.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

## VI. ACCEPTANCE AND SURRENDER OF PREMISES

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $90.00 is the fee for after hours lockout service.

B. Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

## VII. USE OF THE PREMISES

A. The premises are rented for residential use only and shall be occupied by not more than 3 occupants. Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

INITIAL

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time. If an animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept all breeds of dogs a minimum of 6 (six) months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 35 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises. As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

F. **Harassment or Threats:** Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

I. Resident shall not remove from the apartment, for any reason, any fixture or appliance. This includes, but is not limited to the stove, refrigerator, washing machine and clothes dryer. Resident's removal of any such items shall be deemed a lease violation subjecting Resident to all remedies available to Landlord in the lease.

## VIII. RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX. UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services.

| | |
|---|---|
| ____ gas, | Account # |
| _X_ electricity, | Account # |
| _X_ water/sewer/trash | **See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges** |

## X. INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

## XI. HOLDOVERS

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement. The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy. Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

WASATCH
PROPERTY MANAGEMENT

INITIAL

DocuSign Envelope ID: B15D1D5B-B5F2-4416-8A5 CE15469B31

**XII. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII. LIABILITY INSURANCE**

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $50,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Courtyard at Central Park and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Courtyard at Central Park. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XIV. WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

A. Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.
B. Loss of property due to theft
C. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
D. The Actions or omissions of other Residents
E. Interference with light, view or other intangible aspects of the premises.
F. Operations in construction of any public or quasi-public work
G. Any latent defect in the building(s)
H. The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
I. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
J. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests. Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
K. Pursuant to Section §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV. CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $943.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI. NOTICE TO QUIT**

A. **MONTH-TO-MONTH TENANCY: If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner win sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**
B. **TERM AGREEMENT: If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**
C. **MOVE-OUT INSPECTION: Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..**

**XVII. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY JURY WAIVER**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $2,500.00 unless otherwise provided by law. Owner and Resident agree that any action or proceeding arising out of or in any way connected with this Agreement, the dwelling unit or claimed injury to or damages suffered by Owner or Resident, regardless of whether such claim is based on contract, tort, or other legal theory, shall be heard by a court sitting without a jury, and thus Resident hereby waives all rights to a trial by jury.

**XVIII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX. SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it.

**XX. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

WASATCH
PROPERTY MANAGEMENT

INITIAL

DocuSign Envelope ID: B15D1D5B-B5F2-4416-8A5... CE15469B31

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Lease Agreement.

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXV. RENTPLUS ACKNOWLEDGEMENT**

Upon execution of this agreement, Resident shall be enrolled in RentPlus, a credit reporting and financial tool which is anticipated to help Resident build credit by reporting its rent and utility payments to a credit bureau or credit bureaus on a monthly basis. After the first month of RentPlus services, there will be a financial services fee of **$8.95 per month if only one Resident is enrolled to participate, or a fee of $14.95 per month for multiple Residents** enrolled in a single residence. Participating Residents must be lease signers. The financial services fee will be charged by Conservice. Resident may opt out of the RentPlus at any time, for any or no reason, and receive additional information by logging in at **www.rentplus.com**. Fees paid will not be reimbursed or prorated. This program may be altered, changed, terminated or otherwise modified with thirty (30) days' notice to Resident. Resident acknowledges that they will be enrolled in RentPlus.

Monica Gonzales Initial ______

Mathew Tilley Initial ______

**XXVI. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

DocuSign Envelope ID: B15D1D5B-B5F2-4416-8A 3CE15469B31

**XXVII. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

| | | | |
|---|---|---|---|
| [signature] Monica Gonzales(Lessee) | 8/17/2018 Date | [signature] Mathew Tilley | 8/18/2018 Date |
| Ashley Ruiz Owner's Authorized Agent | 8/18/2018 Date | | |

LD302.01.CA Revised 10/18/2017



**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Defendants, Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan Park Apartments, LP

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY and ROY HUSKEY III, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC; LOGAN PARK APARTMENTS, LP,

Defendants.

CASE NO. 2:15-cv-00799-KJM-DB

**DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE**

The Hon. Kimberly J. Mueller

Trial Date: None Set

PROPOUNDING PARTY: Plaintiff-Relator, Tamera Livingston

RESPONDING PARTY: Defendants, Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC, Logan Park Apartments, LLC, and

Logan Park Apartments, LP

SET NO.: THREE

**INTERROGATORY NO. 6:**

Please describe in detail, with reference to specific policies, documents, communications, and the relevant dates of implementation, any and all steps DEFENDANTS have taken as a result of the Court's order in this ACTION dated November 23, 2022 to alter their policies and practices related to ADDITIONAL SERVICE CHARGES to tenants participating in the SECTION 8 program.

**RESPONSE TO INTERROGATORY NO. 6:**

DEFENDANTS have taken the following steps:

-Defendants' Payment Priority Sequence has been altered such that for all tenants, charges for Rent are the first priority.

-Defendants have issued a written directive to all properties managed by Wasatch Property Management clarifying the pre-existing policy that all Additional Services are to be optional for Section 8 tenants.

-Defendants have issued written communications to all Section 8 tenants clarifying that enrollment in any Additional Service charge is optional, and explaining that if they no longer wish to be enrolled in such charges, that they should contact the leasing office and inform them that they no longer wish to receive the Additional Services in question.

**INTERROGATORY NO. 7:**

If DEFENDANTS implemented any changes in policies and practices related to ADDITIONAL SERVICES CHARGES to tenants participating in the SECTION 8 program between the close of discovery in this ACTION on February 18, 2022 and November 23, 2022, please describe those changes in detail, with reference to specific policies, documents, communications, and the relevant dates of implementation.

///

///

///

**RESPONSE TO INTERROGATORY NO. 7:**

There were no such changes during that time period.

DATED: January 17, 2023

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: ______________________________
RYAN MATTHEWS
Attorneys for Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan Park Apartments, LP

LEWIS BRISBOIS
4861-7302-4329.1
3
Case No. 2:15-cv-00799-KJM-DB
DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE
Bellows Decl. Ex. 9, Page 3

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF SACRAMENTO**

I have read the foregoing DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE and know its contents.

☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒ I am Executive Vice President of Wasatch Property Management, Inc. , a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☒ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for Wasatch Property Management, Inc. , a party to this action. Such party is absent from the county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 17, 2023, at Logan, Utah.

Jarom Johnson
Print Name of Signatory

Signature

LEWIS BRISBOIS

4861-7302-4329.1 1 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE

Bellows Decl. Ex. 9, Page 4

**FEDERAL COURT PROOF OF SERVICE**

USA-Terry v Wasatch Property Management, et al.
Case No. 2:15-cv-00799-KJM-DB

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On January 17, 2023, I served the following document(s):

- DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒ (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 17, 2023, at Sacramento, California.

Alicia Crespo

**SERVICE LIST**
***USA-Terry v Wasatch Property Management, et al.***
**Case No. 2:15-cv-00799-KJM-DB**

| | |
|---|---|
| Andrew Wolff<br>Law Office of Andrew Wolff, PC<br>1956 Webster Street, Suite 275<br>Oakland, CA 94612 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 834-3300<br>Email: andrew@awolfflaw.com |
| Jesse Newmark<br>CENTRO LEGAL DE LA RAZA<br>3022 International Blvd., Suite 410<br>Oakland, CA 94601 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 437-1554 x115<br>Fax: (510) 437-9164<br>Email: jessenewmark@centrolegal.org |
| Laura L. Ho<br>Anne Bellows<br>Stephanie Tilden<br>GOLDSTEIN, BORGEN, DARDARIAN & HO<br>155 Grand Avenue, Suite 900<br>Oakland, CA 94612 | ***Attorneys for Plaintiffs and Relators and the Certified Classes***<br><br>Tel: (510) 763-9800<br>Fax: (510) 835-1417<br>Email: ljo@gbdhlegal.com<br>Email: abellows@gbdhlegal.com<br>Email: stilden@gbdhlegal.com<br>Email: sgrimes@gbdhlegal.com<br>Email: dvaldez@gbdhlegal.com |
| Colleen M. Kennedy<br>United States Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 | ***Attorney for Intervenor Plaintiff***<br>***United States of America***<br><br>Tel.: 916-554-2700<br>Fax: 916-554-2900<br>E: colleen.m.kennedy@usdoj.gov<br>E: caseview.ecf@usdoj.gov<br>E: kimberly.siegfried@usdoj.gov<br>E: monica.lee@usdoj.gov<br>E: usacae.ecfsaccv@usdoj.gov |
| Jocelyn D. Larkin<br>Lindsay Nako<br>The Impact Fund<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704 | ***Attorney for Plaintiffs***<br><br>Tel: (510) 845-3473 x.306<br>Fax: (510) 845-3654<br>Email: jlarkin@impactfund.org<br>Email: lnako@impactfund.org |

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF SACRAMENTO**

I have read the foregoing DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE and know its contents.

☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒ I am Executive Vice President of Wasatch Property Management, Inc. , a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☒ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for Wasatch Property Management, Inc. , a party to this action. Such party is absent from the county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 17, 2023, at Logan, Utah.

Jarom Johnson
Print Name of Signatory

Signature

LEWIS BRISBOIS

**FEDERAL COURT PROOF OF SERVICE**
USA-Terry v Wasatch Property Management, et al.
Case No. 2:15-cv-00799-KJM-DB

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On January 18, 2023, I served the following document(s):

- VERIFICATION TO DEFENDANTS' RESPONSES TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒ (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on January 18, 2023, at Sacramento, California.

Ryan Matthews

**SERVICE LIST**
***USA-Terry v Wasatch Property Management, et al.***
**Case No. 2:15-cv-00799-KJM-DB**

| | |
|---|---|
| Andrew Wolff<br>Law Office of Andrew Wolff, PC<br>1956 Webster Street, Suite 275<br>Oakland, CA 94612 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 834-3300<br>Email: andrew@awolfflaw.com |
| Jesse Newmark<br>CENTRO LEGAL DE LA RAZA<br>3022 International Blvd., Suite 410<br>Oakland, CA 94601 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 437-1554 x115<br>Fax: (510) 437-9164<br>Email: jessenewmark@centrolegal.org |
| Laura L. Ho<br>Anne Bellows<br>Stephanie Tilden<br>GOLDSTEIN, BORGEN, DARDARIAN & HO<br>155 Grand Avenue, Suite 900<br>Oakland, CA 94612 | ***Attorneys for Plaintiffs and Relators and the Certified Classes***<br><br>Tel: (510) 763-9800<br>Fax: (510) 835-1417<br>Email: lho@gbdhlegal.com<br>Email: abellows@gbdhlegal.com<br>Email: stilden@gbdhlegal.com<br>Email: sgrimes@gbdhlegal.com<br>Email: dvaldez@gbdhlegal.com |
| Colleen M. Kennedy<br>United States Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 | ***Attorney for Intervenor Plaintiff***<br>***United States of America***<br><br>Tel.: 916-554-2700<br>Fax: 916-554-2900<br>E: colleen.m.kennedy@usdoj.gov<br>E: caseview.ecf@usdoj.gov<br>E: kimberly.siegfried@usdoj.gov<br>E: monica.lee@usdoj.gov<br>E: usacae.ecfsaccv@usdoj.gov |
| Jocelyn D. Larkin<br>Lindsay Nako<br>The Impact Fund<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704 | ***Attorney for Plaintiffs***<br><br>Tel: (510) 845-3473 x.306<br>Fax: (510) 845-3654<br>Email: jlarkin@impactfund.org<br>Email: lnako@impactfund.org |

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Defendants,
Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan Park Apartments, LP

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY and ROY HUSKEY III, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC; LOGAN PARK APARTMENTS, LP,

Defendants.

CASE NO. 2:15-cv-00799-KJM-DB

**DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY**

The Hon. Kimberly J. Mueller

Trial Date: None Set

PROPOUNDING PARTY: Plaintiff-Relator, Tamera Livingston

RESPONDING PARTY: Defendants, Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., Wasatch Pool Holdings, LLC, Chesapeake

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

| | |
|---|---|
| | Commons Holdings, LLC, Logan Park Apartments, LLC, and Logan Park Apartments, LP |
| SET NO.: | THREE |

**INTERROGATORY NO. 6:**

Please describe in detail, with reference to specific policies, documents, communications, and the relevant dates of implementation, any and all steps DEFENDANTS have taken as a result of the Court's order in this ACTION dated November 23, 2022 to alter their policies and practices related to ADDITIONAL SERVICE CHARGES to tenants participating in the SECTION 8 program.

**FURTHER AMENDED RESPONSE TO INTERROGATORY NO. 6:**

DEFENDANTS have taken the following steps:

-Defendants' Payment Priority Sequence has been altered such that for all tenants, charges for Rent are the first priority. This change was implemented on November 30, 2022.

-Defendants have issued a written directive to all properties managed by Wasatch Property Management re-emphasizing the pre-existing policy that all Additional Services are to be optional for Section 8 tenants. This communication was issued on January 17, 2023.

-Defendants have issued written communications to all Section 8 tenants re-emphasizing that enrollment in any Additional Service charge is optional, and explaining that if they no longer wish to be enrolled in such charges, that they should contact the leasing office and inform them that they no longer wish to receive the Additional Services in question. All these communications to the properties referenced below were sent on January 17, 2023.

600 Lofts

Arcadia

Arcadia II

Aspen Park Apartments

Aztec Springs Apartments

Bent Tree Apartments

California Place Apartments

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

Canyon Club Apartments

Canyon Ridge Apartments

Chesapeake Commons Apartments

Cimmaron Place Apartments

Courtyard at Central Park

Creekside Villa Apartments

Crossroads Apartments

Devonshire Court West

Enclave at 1400 South

Garden Lofts

Glen Oaks Apartments

Heritage Park

Kimpton Square

Meadows at Homestead

Metropolitan Place Apartments

Promontory Point Apartments

Providence Place

Ranchwood Apartments

Remington Apartments

Revo 225

Rio Seco Apartments

River Point Apartments

Sands Apartments

Shadow Way Apartments

The Reserve at View 78

The Sage

Veranda

Village Grove Apartments.

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

95357407.1 3 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY

Bellows Decl. Ex. 11, Page 3

DATED: May 24, 2023

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: 

RYAN MATTHEWS
Attorneys for Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan Park Apartments, LP

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

95357407.1 4 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY

Bellows Decl. Ex. 11, Page 4

## VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF SACRAMENTO**

I have read the foregoing DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY and know its contents.

☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒ I am Executive Vice President of Wasatch Property Management, Inc. , a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

☒ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for Wasatch Property Management, Inc. , a party to this action. Such party is absent from the county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on May 24, 2023, at Logan, Utah.

Jarom Johnson
Print Name of Signatory

Signature

LEWIS BRISBOIS

94433018.1

**FEDERAL COURT PROOF OF SERVICE**

USA-Terry v Wasatch Property Management, et al.
Case No. 2:15-cv-00799-KJM-DB

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On May 24, 2023, I served the following document(s):

- DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒ (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on May 24, 2023, at Sacramento, California.

Alicia Crespo

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

95357407.1

1

DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY

Bellows Decl. Ex. 11, Page 6

**SERVICE LIST**
***USA-Terry v Wasatch Property Management, et al.***
**Case No. 2:15-cv-00799-KJM-DBCase No. 2:15-cv-00799-KJM-DB**

| | |
|---|---|
| Andrew Wolff<br>Law Office of Andrew Wolff, PC<br>1956 Webster Street, Suite 275<br>Oakland, CA 94612 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 834-3300<br>Email: andrew@awolfflaw.com |
| Jesse Newmark<br>CENTRO LEGAL DE LA RAZA<br>3022 International Blvd., Suite 410<br>Oakland, CA 94601 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 437-1554 x115<br>Fax: (510) 437-9164<br>Email: jessenewmark@centrolegal.org |
| Laura L. Ho<br>Anne Bellows<br>Stephanie Tilden<br>GOLDSTEIN, BORGEN, DARDARIAN & HO<br>155 Grand Avenue, Suite 900<br>Oakland, CA 94612 | ***Attorneys for Plaintiffs and Relators and the Certified Classes***<br><br>Tel: (510) 763-9800<br>Fax: (510) 835-1417<br>Email: lho@gbdhlegal.com<br>Email: abellows@gbdhlegal.com<br>Email: stilden@gbdhlegal.com<br>Email: sgrimes@gbdhlegal.com<br>Email: dvaldez@gbdhlegal.com |
| Colleen M. Kennedy<br>United States Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 | ***Attorney for Intervenor Plaintiff***<br>***United States of America***<br><br>Tel.: 916-554-2700<br>Fax: 916-554-2900<br>E: colleen.m.kennedy@usdoj.gov<br>E: caseview.ecf@usdoj.gov<br>E: kimberly.siegfried@usdoj.gov<br>E: monica.lee@usdoj.gov<br>E: usacae.ecfsaccv@usdoj.gov |
| Jocelyn D. Larkin<br>Lindsay Nako<br>The Impact Fund<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704 | ***Attorney for Plaintiffs***<br><br>Tel: (510) 845-3473 x.306<br>Fax: (510) 845-3654<br>Email: jlarkin@impactfund.org<br>Email: lnako@impactfund.org |
| Jahmy Graham<br>Nelson Mullins<br>19191 South Vermont Avenue, Suite 900<br>Torrance, CA 90502 | ***Attorneys for Defendant, Hayward Village Apartments LP***<br><br>T: 424-221-7426<br>F: 424-221-7499<br>E: jahmy.graham@nelsonmullins.com |

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

95357407.1

2

DEFENDANTS' FURTHER AMENDED RESPONSE TO PLAINTIFF TAMERA LIVINGSTON'S INTERROGATORIES, SET THREE NO. 6 ONLY

Bellows Decl. Ex. 11, Page 7



Baker Tilly US, LLP
50 Fremont Street, Suite 4000
San Francisco, CA 94105
United States of America

T: +1 (415) 956 8323
bakertilly.com

July 20, 2023


Ryan Matthews, Esq.
Joseph Salazar, Esq.
Lewis Brisbois
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833


Re:   Denika Terry et al. v. Wasatch Advantage Group LLC et al.
      United States District Court, Eastern District of California
      Case 2:15-cv-00799-KMJ-DB


Dear Mr. Matthews and Mr. Salazar


We are pleased to submit the following information related to our ongoing review in connection with the referenced case.  Our review to date has been limited to the scope of work outlined by you and to materials provided pertinent to the captioned matter.  A list of documents and information relied upon by me is contained below.


## PERSONAL QUALIFICATIONS

I have been in the field of forensic accounting for over 35 years, calculating economic damages across many business lines and industries.  I am a Director with Baker Tilly US, LLP.

My CV and 5 year testifying experience are attached.  My rate of compensation is $510 per hour plus expenses.  My fee is based on actual hours worked and is not contingent upon the outcome of this case.


## BACKGROUND

I understand the issues for our consideration are related to the quantification of additional service charges by the Defendants to Plaintiffs during a specified period defined by the Court. Specifically, I have been asked to opine on the reasonable basis for determining the economic value of additional charges associated with rental insurance and media packages (i.e., internet and cable television services).  For purposes of this report, I have not been asked to provide a final accounting of these matters as I understand the data set is not yet final.  Accordingly, I anticipate providing additional, detailed reporting associated with this matter.

Baker Tilly US, LLP trading as Baker Tilly is a member of the global network of Baker Tilly International Ltd., the members of which are separate and independent legal entities. ©2020 Baker Tilly US, LLP

**SOURCES OF INFORMATION**

In conducting my review, I relied upon the following data to date:

1. Fifth Amended Class Action Complaint for Damages and Injunctive Relief, and for Relief Pursuant to False Claims Act
2. Order Granting Pltfs MSJ and Denying Defs MSJMDD Review Folder dated 11/23/2022.
3. Expert Report of David Breshears filed 4/22/2022.
4. American Bankers Insurance Co of FL monthly invoices and detailed statements in Excel from May 2021 through April 2023
5. Account Current Statement for Freedom Advisors LLC for 01/2014 through 04/2023 in Excel.
6. Net Revenue – CA Only Excel spreadsheet.
7. Remote Deposition & Exhibits of Jarom Johnson dated May 31, 2023

**GENERAL COMMENTS**

I understand Defendant companies utilize Yardi Property Management Software for accounting and data management and that the data available for our review is sourced from that software. Yardi is a widely used service provider in this arena offering a variety of products to both domestic and international property management companies. We have relied upon reports from Yardi in conducting forensic accounting reviews in prior matters. Consequently, I believe the revenue and cost data produced from their reporting processes conforms to industry standards and is accurate and reliable.

Of the charges included in the Additional Services Agreements, renter's insurance and the various media packages have a measurable economic value in the marketplace. That value is established in each market by the cost of that product to consumers. Under the circumstances, it is reasonable to assume that cost paid for these services by Wasatch is an appropriate measure of its value. Accordingly, we believe a reasonable estimate of the damages incurred by the tenants for renter's insurance and media packages is the difference between the amounts paid to Wasatch as additional monthly service charges and the cost of those services incurred by Wasatch. I understand there are other categories of additional service charge payments that do not fall into this category because they do not have direct associated costs (i.e parking, storage, etc.). Those categories of payments would not be included in such an analysis.

Based on my review of the data provided to date, along with the deposition testimony of Mr. Johnson, I believe the specific payment amounts by tenants and the direct cost of both renters' insurance and media packages to Wasatch are readily available and can be reasonably measured during the relevant period.

Finally, it should be noted that at present I have not been asked to prepare a tenant-by-tenant analysis of the incremental payments described above. I understand those costs are still accumulating. While an analysis of the available data would be time-consuming, I, along with appropriate staff, would be able to accomplish this task in a timely manner.

Terry v Wasatch
July 20, 2023
Page 3

I trust the information above is clear. If you should have any questions, please contact the undersigned.

Sincerely,

Baker Tilly US, LLP

James W. McCurley
Director

Bellows Decl. Ex. 12, Page 3

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan Park Apartments, LP

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY and ROY HUSKEY III, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE COMMONS HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC; LOGAN PARK APARTMENTS, LP,

Defendants.

CASE NO. 2:15-cv-00799-KJM-DB

**DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE**

The Hon. Kimberly J. Mueller

Trial Date: None Set

PROPOUNDING PARTY: Plaintiff, Roy Huskey, III

RESPONDING PARTY: Defendants, Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

Park Apartments, LP

SET NO.: ONE

**REQUEST FOR ADMISSION NO. 1:**

Admit that the documents Bates stamped CP000001-CP015058 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Chesapeake Commons.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

Admit.

**REQUEST FOR ADMISSION NO. 2:**

Admit that the documents Bates stamped BWT000001-BWT002435 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Bellwood Park.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the documents Bates stamped FOT000001-FOT000645 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Bridges at Five Oaks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that the documents Bates stamped JPT000001-JPT003033 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Jerron Place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit.

**REQUEST FOR ADMISSION NO. 5:**

Admit that the documents Bates stamped FVT000001-FVT014208 are true and correct

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 2 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 2

copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Florentine Villa.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that the documents Bates stamped TVT000001-TVT003144 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Tuscany Villa.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Admit.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the documents Bates stamped PP000001-PP002578 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Promontory Point.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Admit.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the documents Bates stamped BR000001-BR002578 are true and correct copies of documents maintained by DEFENDANTS in tenant files tenants participating in the SECTION 8 program at Broadmoor.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Admit.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the documents Bates stamped GO000001-GO001909 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Glen Oaks

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admit.

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 3 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 3

**REQUEST FOR ADMISSION NO. 10:**

Admit that the documents Bates stamped CN000001-CN006088 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Canyon Ridge.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Admit.

**REQUEST FOR ADMISSION NO. 11:**

Admit that the documents Bates stamped BP000001-BP000163 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Brighton Place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 11:**

Admit.

**REQUEST FOR ADMISSION NO. 12:**

Admit that the documents Bates stamped RM000001-RM000390 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Remington.

**RESPONSE TO REQUEST FOR ADMISSION NO. 12:**

Admit.

**REQUEST FOR ADMISSION NO. 13:**

Admit that the documents Bates stamped SA000001-SA004420 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Sand Valley.

**RESPONSE TO REQUEST FOR ADMISSION NO. 13:**

Admit.

**REQUEST FOR ADMISSION NO. 14:**

Admit that the documents Bates stamped SU000001-SU000045 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Sun Valley.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4817-4022-3720.1

4

Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 4

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Admit.

**REQUEST FOR ADMISSION NO. 15:**

Admit that the documents Bates stamped AV000001-AV003720 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Arroyo Vista.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Admit.

**REQUEST FOR ADMISSION NO. 16:**

Admit that the documents Bates stamped BWT002436-BWT003111 are true and correct copies documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Bellwood Park.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Admit.

**REQUEST FOR ADMISSION NO. 17:**

Admit that the documents Bates stamped BT000001-BT014390 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Bent Tree.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 18:**

Admit that the documents Bates stamped FOT000646-FOT012885 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Bridges at Five Oaks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Defendants lack sufficient information to confirm this specific Bates Stamp range.

However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the documents Bates stamped BU000001-BU000150 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Burnett Station.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

Admit.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the documents Bates stamped CC000001-CC000006 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Canyon Club.

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

Admit.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the documents Bates stamped CM000001-CM006022 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Cimarron Place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Admit.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the documents Bates stamped CY000001-CY003307 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Courtyard.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 6 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 6

**<u>REQUEST FOR ADMISSION NO. 23</u>:**

Admit that the documents Bates stamped CV000001-CV006135 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Creekside Villa.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 23</u>:**

Admit.

**<u>REQUEST FOR ADMISSION NO. 24</u>:**

Admit that the documents Bates stamped CR000001-CR006080 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Crossroads.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 24</u>:**

Admit.

**<u>REQUEST FOR ADMISSION NO. 25</u>:**

Admit that the documents Bates stamped DW000001-DW000266 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Devonshire

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 25</u>:**

Admit.

**<u>REQUEST FOR ADMISSION NO. 26</u>:**

Admit that the documents Bates stamped ENCLAVE000001-ENCLAVE004021 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Enclave.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 26</u>:**

Admit.

**<u>REQUEST FOR ADMISSION NO. 27</u>:**

Admit that the documents Bates stamped FALLS000001-FALLS000557 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Falls at Hunters Point.

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 7 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 7

**RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

Admit.

**REQUEST FOR ADMISSION NO. 28:**

Admit that the documents Bates stamped FVT014209-FVT014256 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Florentine Villa.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Admit.

**REQUEST FOR ADMISSION NO. 29:**

Admit that the documents Bates stamped GP000001-GP000002 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Goldstone Place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Admit.

**REQUEST FOR ADMISSION NO. 30:**

Admit that the documents Bates stamped HVT000001-HVT006332 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Hayward Village.

**RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

Admit.

**REQUEST FOR ADMISSION NO. 31:**

Admit that the documents Bates stamped HET000001-HET010768 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Heritage Park.

**RESPONSE TO REQUEST FOR ADMISSION NO. 31:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 8 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 8

**REQUEST FOR ADMISSION NO. 32:**

Admit that the documents Bates stamped JPT003034-JPT003246 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Jerron Place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 32:**

Admit.

**REQUEST FOR ADMISSION NO. 33:**

Admit that the documents Bates stamped FC000001-FC001169 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Landing.

**RESPONSE TO REQUEST FOR ADMISSION NO. 33:**

Admit.

**REQUEST FOR ADMISSION NO. 34:**

Admit that the documents Bates stamped LOFTS000001-LOFTS000084 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Lofts at 7800.

**RESPONSE TO REQUEST FOR ADMISSION NO. 34:**

Admit.

**REQUEST FOR ADMISSION NO. 35:**

Admit that the documents Bates stamped MP000001-MP001219 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Metropolitan Collection.

**RESPONSE TO REQUEST FOR ADMISSION NO. 35:**

Admit.

**REQUEST FOR ADMISSION NO. 36:**

Admit that the documents Bates stamped OV000001-OV000587 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Oak Valley.

**RESPONSE TO REQUEST FOR ADMISSION NO. 36:**

Admit.

**REQUEST FOR ADMISSION NO. 37:**

Admit that the documents Bates stamped OP000001-OP003311 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Outlook at Pantano.

**RESPONSE TO REQUEST FOR ADMISSION NO. 37:**

Admit.

**REQUEST FOR ADMISSION NO. 38:**

Admit that the documents Bates stamped PST000001-PST006625 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Peppertree.

**RESPONSE TO REQUEST FOR ADMISSION NO. 38:**

Admit.

**REQUEST FOR ADMISSION NO. 39:**

Admit that the documents Bates stamped RO000001-RO000446 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at River Oaks.

**RESPONSE TO REQUEST FOR ADMISSION NO. 39:**

Admit.

**REQUEST FOR ADMISSION NO. 40:**

Admit that the documents Bates stamped RP000001-RP001314 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at River Point.

**RESPONSE TO REQUEST FOR ADMISSION NO. 40:**

Admit.

**REQUEST FOR ADMISSION NO. 41:**

Admit that the documents Bates stamped SWT000001-SWT016005 are true and correct

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 10 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 10

copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Shadow Way.

**RESPONSE TO REQUEST FOR ADMISSION NO. 41:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 42:**

Admit that the documents Bates stamped SVT000001-SVT010962 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Spring Villas.

**RESPONSE TO REQUEST FOR ADMISSION NO. 42:**

Admit.

**REQUEST FOR ADMISSION NO. 43:**

Admit that the documents Bates stamped SVT010963-SVT012164 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Spring Villas.

**RESPONSE TO REQUEST FOR ADMISSION NO. 43:**

Admit.

**REQUEST FOR ADMISSION NO. 44:**

Admit that the documents Bates stamped SPW000001-SPW006004 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Springwood.

**RESPONSE TO REQUEST FOR ADMISSION NO. 44:**

Admit.

**REQUEST FOR ADMISSION NO. 45:**

Admit that the documents Bates stamped SPW006005-SPW006459 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Springwood.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 45</u>:**

Admit.

**<u>REQUEST FOR ADMISSION NO. 46</u>:**

Admit that the documents Bates stamped VIT000001-VIT006083 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Village Grove.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 46</u>:**

Admit.

**<u>REQUEST FOR ADMISSION NO. 47</u>:**

Admit that the documents Bates stamped WA000001-WA001937 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Wasatch Hills.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 47</u>:**

Defendants admit that all documents produced relating to the Wasatch Hills property are true and correct copies of documents maintained by Defendants for tenants participating in the Section 8 program at that property. Defendants note, however, that their records reflect that those documents have the Bates prefix WH rather than WA.

**<u>REQUEST FOR ADMISSION NO. 48</u>:**

Admit that the documents Bates stamped AP000001-AP013176 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Aspen Park.

**<u>RESPONSE TO REQUEST FOR ADMISSION NO. 48</u>:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**<u>REQUEST FOR ADMISSION NO. 49</u>:**

Admit that the documents Bates stamped AZ000001-AZ012730 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 12 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 12

SECTION 8 program at Aztec Springs.

**RESPONSE TO REQUEST FOR ADMISSION NO. 49:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 50:**

Admit that the documents Bates stamped CA000001-CA013990 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at California Place.

**RESPONSE TO REQUEST FOR ADMISSION NO. 50:**

Defendants admit that all documents produced relating to the California Place property are true and correct copies of documents maintained by Defendants for tenants participating in the Section 8 program at that property. Defendants note, however, that their records reflect that the documents produced range from CA000001-CA006485.

**REQUEST FOR ADMISSION NO. 51:**

Admit that the documents Bates stamped CPC000001-CPC042914 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Chesapeake Commons.

**RESPONSE TO REQUEST FOR ADMISSION NO. 51:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 52:**

Admit that the documents Bates stamped LPT000001-LPT040287 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Logan Park.

**RESPONSE TO REQUEST FOR ADMISSION NO. 52:**

Defendants lack sufficient information to confirm this specific Bates Stamp range.

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 13 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 13

However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 53:**

Admit that the documents Bates stamped P3000001-P3000872 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Palladio.

**RESPONSE TO REQUEST FOR ADMISSION NO. 53:**

Admit.

**REQUEST FOR ADMISSION NO. 54:**

Admit that the documents Bates stamped PMT000001-PMT011790 are true and correct copies documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Piedmont.

**RESPONSE TO REQUEST FOR ADMISSION NO. 54:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 55:**

Admit that the documents Bates stamped PNT000001-PNT009212 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Natomas.

**RESPONSE TO REQUEST FOR ADMISSION NO. 55:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 56:**

Admit that the documents Bates stamped QRT000001-QRT005236 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Quail Run.

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

4817-4022-3720.1 14 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 14

**RESPONSE TO REQUEST FOR ADMISSION NO. 56:**

Admit.

**REQUEST FOR ADMISSION NO. 57:**

Admit that the documents Bates stamped RW000001-RW009927 are true and correct copies of documents maintained by DEFENDANTS in tenant files for tenants participating in the SECTION 8 program at Ranchwood.

**RESPONSE TO REQUEST FOR ADMISSION NO. 57:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 58:**

Admit that the documents Bates stamped RS000001-RS009985 are true and correct copies of documents maintained by DEFENDANTS in tenant files for participating in the SECTION 8 program at Rico Seco.

**RESPONSE TO REQUEST FOR ADMISSION NO. 58:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 59:**

Admit that the documents Bates stamped WA000445-WA001663 are true and correct copies of documents maintained by DEFENDANTS in tenant files for participating in the SECTION 8 program at Wasatch Hills.

**RESPONSE TO REQUEST FOR ADMISSION NO. 59:**

Defendants admit that all documents produced relating to the Wasatch Hills property are true and correct copies of documents maintained by Defendants for tenants participating in the Section 8 program at that property. Defendants note, however, that their records reflect that those documents have the Bates prefix WH rather than WA.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**REQUEST FOR ADMISSION NO. 60:**

Admit that the documents Bates stamped WEAU00000001-WEAU00035936 are true and correct copies of emails and their attachments between DEFENDANTS and GOVERNMENT AGENCIES.

**RESPONSE TO REQUEST FOR ADMISSION NO. 60:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 61:**

Admit that the documents Bates stamped CL00000001-CL00000439 are true and correct copies of emails and their attachments that were sent and/or received by DEFENDANTS' corporate "customer relations" employee.

**RESPONSE TO REQUEST FOR ADMISSION NO. 61:**

Admit.

**REQUEST FOR ADMISSION NO. 62:**

Admit that the documents Bates stamped WCDS 000001-WCDS 587129 are true and correct copies of emails and their attachments that were sent and/or received by DEFENDANTS' CORPORATE REPRESENTATIVES.

**RESPONSE TO REQUEST FOR ADMISSION NO. 62:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

**REQUEST FOR ADMISSION NO. 63:**

Admit that the documents Bates stamped WTM000001-WTM000092 are true and correct copies of training documents created by DEFENDANTS.

**RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Admit.

**REQUEST FOR ADMISSION NO. 64:**

Admit that the documents Bates stamped WCDS 587130-WCDS 950916 are true and correct copies of emails and their attachments that were sent and/or received by DEFENDANTS' Regional Managers and Area Leads.

**RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

Defendants lack sufficient information to confirm this specific Bates Stamp range. However, Defendants can confirm that any documents produced in the course of discovery are true and correct copies of documents maintained by Defendants in tenant files.

DATED: June 7, 2021

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: [signature]

RYAN MATTHEWS
Attorneys for Wasatch Advantage Group, LLC; Wasatch Property Management, Inc.; Wasatch Pool Holdings, LLC, Chesapeake Commons Holdings, LLC; Logan Park Apartments, LLC; Logan Park Apartments, LP

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4817-4022-3720.1 17 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 17

# VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF SACRAMENTO**

I have read the foregoing DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE and know its contents.

☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒ I am Chief Operating Officer of Wasatch Property Management, Inc., a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

- ☒ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.
- ☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for Wasatch Property Management, Inc., a party to this action. Such party is absent from the county where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 7, 2021, at Salt Lake City, Utah.

Jarom Johnson
Print Name of Signatory

[signature]
Signature

**FEDERAL COURT PROOF OF SERVICE**

USA-Terry v Wasatch Property Mgmt
2:15-cv-00799 KJM DAD

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On June 7, 2021, I served the following document(s):

- DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒ (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 7, 2021, at Sacramento, California.

Alicia Crespo

**SERVICE LIST**
**USA-Terry v Wasatch Property Mgmt**
**2:15-cv-00799 KJM DAD**

| | |
|---|---|
| Andrew Wolff<br>Law Office of Andrew Wolff, PC<br>1956 Webster Street, Ste. 275<br>Oakland, CA 94612 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: 510-834-3300<br>E-Mail: andrew@awolfflaw.com |
| Jesse Newmark<br>CENTRO LEGAL DE LA RAZA<br>3022 International Blvd, Ste. 410<br>Oakland, CA 94601 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 437-1554 x115<br>Fax: (510) 437-9164<br>Email: jessenewmark@centrolegal.org<br>Email: malvarez@centrolegal.org |
| Laura L. Ho<br>Anne Bellows<br>Goldstein, Borgen, Dardarian & Ho<br>155 Grand Avenue, Suite 900<br>Oakland, CA 94612 | ***Co-Counsel for Plaintiffs***<br><br>Tel.: 519-763-9800<br>Fax: 510-835-1417<br>Email: lho@gbdhlegal.com<br>Email: abellows@gbdhlegal.com<br>Email: sgrimes@gbdhlegal.com<br>Email: dvaldez@gbdhlegal.com<br>Email: kburzynski@gbdhlegal.com |
| Vincente Antonio Tennerelli<br>United States Attorney's Office<br>2500 Tulare Street, Suite 4401<br>Fresno, CA 93721 | ***Attorney for Intervenor Plaintiff***<br>***United States of America***<br><br>Tel.: (559) 497-4080<br>Email: Vincente.Tennerelli@usdoj.gov<br>Email: joni.jones@usdoj.gov |

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

4817-4022-3720.1 2 Case No. 2:15-cv-00799-KJM-DB

DEFENDANTS' RESPONSES TO PLAINTIFF ROY HUSKEY III'S REQUEST FOR ADMISSIONS RE GENUINENESS OF DOCUMENTS, SET ONE

Bellows Decl. Ex. 13, Page 20