**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY

CASE NO. 2:15-cv-00799-KJM-DB

**DECLARATION OF RYAN MATTHEWS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE REMEDIES**

**Date:** **December 8, 2023**
**Time:** **10:00 a.m.**
**Dept.:** **Courtroom 3, 15th Floor**
**Before:** **Hon. Chief Judge Kimberly J. Mueller**

The Hon. Kimberly J. Mueller

Trial Date: None Set

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, and DOES 1-4

Defendants.

I, Ryan Matthews, declare as follows:

1. I am an attorney duly admitted to practice in all of the courts of the State of California and I am an associate with Lewis Brisbois Bisgaard & Smith LLP, attorneys of record for Defendants herein. The facts set forth herein are of my own personal knowledge, and if sworn I could and would competently testify thereto.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Court's ruling on the parties' cross-motions for summary adjudication.

3. Defendants designated James McCurley as a retained expert in this case to testify as to the value of certain services received by Plaintiffs consistent with their Additional Services Agreements. Mr. McCurley was timely disclosed, produced a report consistent with Rule 26, and was deposed by Plaintiffs. A true and correct copy of the Expert Witness Disclosure from Defendants is attached hereto as **Exhibit B**. A true and correct copy of Mr. McCurley's deposition transcript is attached hereto as **Exhibit C**.

4. Plaintiffs have designated a large number of witnesses through their Rule 26 disclosures, all of whom have varying periods of tenancy in the properties managed by Defendants. Plaintiffs have submitted no evidence with this Motion to establish that each and every Class Plaintiff was already incurring Additional Service Charges as of 2011.

5. A true and correct copy of the tenant file for Alesia Young, who began

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW
131014307.1
2
DECLARATION OF RYAN MATTHEWS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE REMEDIES

leasing at Peppertree Apartments in 2015, is attached hereto as **Exhibit D**. Ms. Young is a class plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on this 20th day of October, 2023, at Sacramento, California.

*/s/ Ryan Matthews*
Ryan Matthews

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

131014307.1

3

DECLARATION OF RYAN MATTHEWS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE REMEDIES

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Denika Terry et al.,

Plaintiffs,

v.

Wasatch Advantage Group, LLC, et al.,

Defendants.

No. 2:15-cv-00799-KJM-DB

ORDER

Plaintiffs are tenants who receive rental assistance through the federally subsidized Section 8 Housing Choice Voucher Program. They claim defendant lessors improperly charged plaintiffs, as well as the class members they represent, for additional services and required them to purchase renter's insurance. Plaintiffs argue these services and the insurance requirement constitute impermissible rent under the Section 8 contracts and applicable regulations, and defendants therefore violated the Section 8 contracts and submitted false claims for reimbursement under the federal program.

This matter is before the court on plaintiffs' and relators' motion for partial summary judgment, Pls.' Mot. for Summ. J. (MSJ), ECF No. 242-1, and defendants' cross motion for summary judgment, or, alternatively, class certification, Defs.' MSJ, ECF No. 241. Both parties oppose the other's motion, and the matter is fully briefed. *See generally* Pls.' Opp'n, ECF No. 257; Defs.' Opp'n, ECF No. 258; Pls.' Reply, ECF No. 261; Defs.' Reply, ECF No. 263;

Pls.' Surreply, ECF No. 267. On July 8, 2022, the court heard arguments on the motions, with Anne Bellows and Lindsay Nako appearing for plaintiffs and Ryan Matthews and Joseph Salazar for defendants.

For the reasons below, the court **grants plaintiffs' motion** and **denies defendants' motions**.

## I. SECTION 8 HOUSING CHOICE VOUCHER PROGRAM

The Section 8 Housing Choice Voucher Program "aid[s] low-income families in obtaining a decent place to live," 42 U.S.C. § 1437f(a), by subsidizing the cost of renting privately-owned housing units, *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1184 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Jan. 29, 2016) (citing 42 U.S.C. § 1437f(o)). The federal Department of Housing and Urban Development (HUD) funds Section 8 while local public housing agencies administer the program. 24 C.F.R. § 982.1(a). The public housing agencies determine whether individuals are eligible for a voucher, 24 C.F.R. § 982.201, which entitles recipients to search for qualified privately-owned housing, 24 C.F.R. § 982.302. Once the voucher recipient finds a qualifying unit, the public housing agency and landlord negotiate and execute a housing assistance payment (HAP) contract. 42 U.S.C. § 1437f(c); *see also* 24 C.F.R. §§ 982.162(a), 982.451(a). The HAP contract includes a tenancy addendum listing the tenant's rights under the contract. 24 C.F.R. §§ 981.162(a)(2), 982.305(a)(3), 982.308(f). The addendum is controlling, so its terms "prevail over any other provision of the lease." *Id.* § 982.308(f)(2).

Each HAP contract also specifies the "maximum monthly rent (including utilities and all maintenance and management charges)" that the landlord may receive. 42 U.S.C. § 1437f(c)(1)(A). The maximum allowable rent must be "reasonable," 24 C.F.R. § 982.507(a),(b), as determined by the public housing agency and HUD regulations, *id.* § 982.501 et seq. Tenants pay a fixed share of their monthly income for rent, 42 U.S.C. § 1437a, with the federal government's subsidy covering the balance, *id.* § 1437f(c)(3). The total paid by the tenant and the government may not exceed the maximum rent specified in the contract. 24 C.F.R. § 982.451 et seq.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed. Defendants operate dozens of multi-family rental properties in different states across the country. Pls.' Response to Defs.' Statement of Undisputed Material Facts (SUMF) ¶ 25, ECF No. 257-5. For each tenant participating in the Section 8 program at one of defendants' properties, defendants executed a standardized HAP contract with the local public housing authority, along with a standardized residential rental agreement with the tenant. Defs.' Response to Pls.' SUMF ¶¶ 1–2, ECF No. 258-1.

Defendants maintain additional services and amenities at their properties, which are listed in standardized Additional Services Agreements (ASAs). Pls.' Response to Defs.' SUMF ¶¶ 26–27. These amenities include, but are not limited to, covered parking, in-unit washers and dryers, renters' insurance, and media packages. *Id.* ¶ 28. The amenities are not always made available on an optional basis, i.e., some tenants have been "required to enter into ASAs for one or more specific amenities as a condition of leasing." *Id.* ¶ 29. Defendants treat Section 8 and non-section 8 tenants the same with respect to the cost and availability of ASA amenities. *Id.* ¶¶ 30–31. When negotiating and entering HAP contracts, defendants have not always submitted the ASAs to the public housing agencies as part of the lease packets. *Id.* ¶ 45. Furthermore, defendants have "never included additional charges in the 'rent to owner' amount submitted to local [public housing authorities] in HAP contracts and other required Section 8 documents." Defs.' Response to Pls.' SUMF ¶ 7.

Tenants pay ASA amenity charges monthly, *id.* ¶ 3, and they must pay the charges for the duration of their lease, Pls.' Response to Defs.' SUMF ¶ 34. Amenity charges are itemized on tenant ledgers, in addition to any other amounts due under the lease, including utility charges and base rent. Pls.' Response to Defs.' SUMF ¶ 35. The accounting software defendants employ to handle tenant accounting uses a payment priority sequence, which applies tenant payments in a specified sequence to each outstanding charge. *Id.* ¶¶ 37–38. Defendants' internal policy document specifies that base rent is the last charge in the payment priority sequence, meaning tenants' payments are applied first to non-base rent charges like amenities. *Id.* ¶ 39; Defs.' Response to Pls.' SUMF ¶ 18. "The purpose of leaving rent as the final charge in the payment

priority sequence is to allow landlords to pursue evictions for delinquent amounts." Pls.' Response to Defs.' SUMF ¶ 42. Section 8 tenants evicted for non-payment of rent lose their voucher. Defs.' Response to Pls.' SUMF ¶ 20.

From April 2011, the beginning of the relevant class period, through May 2012, the ASAs included a page detailing the terms and conditions of the agreement. Defs.' Response to Pls.' SUMF ¶ 8. One term provided that a failure to pay additional service charges constituted a default under the lease, and the tenant could be evicted within ten days of nonpayment. *Id.* Even after defendants revised the standard ASA in May 2012 and removed the terms and conditions page, *id.* ¶ 9, they "continued to view a failure to pay additional service charges as a default under the lease," *id.* ¶ 10. However, defendants' corporate deponents have conceded that in the states where defendants operate, they cannot successfully evict a tenant for unpaid amenity or service charges. *Id.* ¶ 19.

"When tenants have an outstanding balance of less than $100, [defendants'] policy is to send tenants 'notice that future rents will not be accepted unless paid in full,' meaning tenants must pay all outstanding charges, including additional service charges, before [defendants] will accept future rent payments." *Id.* ¶ 25. When a tenant's balance is over $100, defendants serve the tenant with a "Pay or Quit Notice," even where a portion of the balance comprises overdue amenity charges. *Id.* ¶ 26. The notice informs tenants they will face eviction proceedings unless they pay the full balance within three days or vacate their units within ten days. *Id.* ¶¶ 28– 29. Defendants have served these notices on Section 8 tenants even where the balance is less than $100. *Id.* ¶ 31.

Until defendants revised their standard HAP contract in July 2019, it provided that "[u]nless otherwise specified" in the utilities and appliances section, the owner would pay for all utilities and appliances provided by the owner. *Id.* ¶ 33. While the utilities and appliances section did not specify tenants were required to pay fees for in-unit washers and dryers, *id.* ¶ 34, defendants charged Section 8 tenants for such units separately from the base rent set out in the HAP contracts, *id.* ¶ 32. Defendants' payment software database includes information about who

was charged for and paid for in-unit washers and dryers, and when they were charged. *Id.* ¶¶ 35–36. These tenants are identifiable from classwide data. *Id.* ¶ 36.

Defendants also required tenants to purchase renters' insurance as a condition of living in "many" of their properties up until December 2019. *Id.* ¶ 37. Specifically, for properties that did not participate in the Low-Income Housing Tax Credit program, defendants' standard residential rental agreements "contained a provision requiring tenants to maintain renters insurance and stated that if they were ever without coverage during their tenancy, 'resident(s) agree[d] to be enrolled in the "pay along with rent" program and being charged accordingly.'" *Id.* ¶ 38. Tenants subject to this requirement paid either defendants or a third-party insurer for this insurance. *Id.* ¶ 39. These tenants are identifiable from classwide data. *Id.* ¶ 44.

All three named plaintiffs and class members "paid additional service charges to Defendants separate from and in addition to the tenants' share of rent to owner under the HAP Contract." *Id.* ¶¶ 45–48.

This court previously granted in part and denied in part defendants' motion to dismiss, giving plaintiffs leave to file an amended complaint. Previous Order (July 21, 2017), ECF No. 61. This court also granted plaintiffs' motion to certify the Rule 23(b)(3) class for damages and conditionally granted their motion to certify the Rule 23(b)(2) class seeking declaratory and injunctive relief. Previous Order (July 30, 2018), ECF No. 92. After plaintiffs filed an amended complaint addressing the court's conditional grant under Rule 23(b)(2), the court certified the class and clarified the class period for damages. Previous Order (Jan. 14, 2020), ECF No. 114. Plaintiffs' operative complaint includes four claims:

(1) as relators on behalf of the United States, plaintiffs allege Wasatch's companywide practice in California, Utah, Arizona, and Washington of certifying their compliance with the terms of the HAP contract and HUD regulations, while also collecting additional rent in the form of charges, violated the Federal False Claims Act (FCA), 31 U.S.C. § 3729(a);

(2) on behalf of the certified California class and against all defendants, breach of contract in violation of California Civil Code § 3300 et seq.;

(3) on behalf of the certified California class and against all defendants, violation of the Consumer Legal Remedies Act (CLRA), Cal. Civil Code § 1750; and

(4) on behalf of the certified California class and against all defendants, unfair business practices in violation of California Business and Professions Code §§ 17200 et seq., i.e., California's Unfair Competition Law (UCL)

*See* Fifth Am. Compl. ¶¶ 212–260, ECF No. 136.

Plaintiffs offer three independent arguments in support of their motion for summary judgment on claim two for breach of contract and claim four under California's UCL, each of which they bring on a class basis. First, plaintiffs argue the charges outlined in the ASAs constitute unlawful excess rent in violation of the HAP contracts and federal law. Pls.' MSJ at 9.[1] Second, plaintiffs argue the undisputed facts show the additional charges for washers and dryers violate the plain language of the HAP contracts and constitute unlawful excess rent. Pls.' MSJ at 9–10. Third, plaintiffs argue a previous requirement that Section 8 tenants purchase renters' insurance as a precondition to signing their lease constituted unlawful excess rent. *Id.*[2]

Defendants move for summary judgment on all four of plaintiffs' claims, or, alternatively, class decertification. *See generally* Defs.' MSJ.

## III. JUDICIAL NOTICE

Plaintiffs request judicial notice of three letters HUD officials issued between 1977 and 1991. Pls.' Request for Judicial Not. (RJN), ECF No. 243. Defendants oppose the request. Defs.' Obj. to Pls.' RJN, ECF No. 263-1. Defendants argue these letters were not timely disclosed to defendants during the fact discovery period, constitute impermissible hearsay, and are offered as "de facto expert testimony." *Id.* at 2–3.

---

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

[2] Due to disputes of material fact, plaintiffs do not seek summary judgment insofar as plaintiffs contend defendants required tenants to enroll in media packages and parking charges, at some properties. Mot. at 10. Likewise, plaintiffs do not seek summary judgment or liability finding on their CLRA or FCA claims, as they argue triable issues of fact remain on these claims. *Id.*

A court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2). A court may also take judicial notice of self-authenticating documents, including those that bear "a seal purporting to be that of the United States . . . or a department [or] agency" and "a signature purporting to be an execution or attestation." Fed. R. Evid. 902(1); *see also United States v. Alvirez*, 831 F.3d 1115, 1123 (9th Cir. 2016). The court finds the three letters to be self-authenticating as they bear HUD's seal and are signed. *Cf. United States v. Perry*, No. 14-537, 2018 WL 11356695, at *4 (S.D. Ohio Nov. 7, 2018) (finding letters on U.S. Forest Service letterhead and signed to be self-authenticating documents under Rule 902(1)); *Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009) (finding EEOC letter signed by district director and containing agency's seal self-authenticated under Rule 902(1)). The court **grants** plaintiffs' request to take judicial notice of these documents without relying upon the legal conclusions or analysis contained in any of the letters.

## IV. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment must first show no material fact is in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). It can do so by showing the record establishes facts beyond genuine dispute, or it can show the adverse party "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving must then "establish that there is a genuine issue of material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). Both must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court views the record in the light most favorable to the

non-moving party and draws reasonable inferences in that party's favor. *Matsushita*, 475 U.S. at 587–88.

Cross-motions for summary judgment are evaluated separately under the same standard, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

**B. Breach of Contract**

The elements of a claim for a breach of contract in California are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

**C. California's Unfair Competition Law (UCL)**

California's UCL generally prohibits (1) unlawful, (2) unfair, and (3) fraudulent acts or practices. Cal. Bus. & Prof. Code § 17200. "Each prong . . . is a separate and distinct theory of liability . . . offer[ing] an independent basis for relief." *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Here, plaintiffs focus on the defendants' allegedly unlawful business practices. "[A] defendant's liability must be based on his personal participation in the unlawful practices and unbridled control over the practices that are found to violate section[ ] 17200 . . . ." *Abdali v. Agiliti Surgical, Inc.*, No. 19-2362, 2020 WL 5642355, at *2 (E.D. Cal. Sept. 22, 2020) (quoting *Emery v. Visa Internat. Service Ass'n*, 95 Cal. App. 4th 952, 960 (2002) (internal quotation marks and citation omitted). The unlawful prong is satisfied by showing a "predicate violation" of state or federal statute or regulation. *Shelton v. Ocwen Loan Servicing, LLC*, No. 18-02467, 2019 WL 4747669, at *10 (S.D. Cal. Sept. 30, 2019); *see also Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1265 (2018).

**D. Federal False Claims Act (FCA)**

Under the FCA, plaintiffs must establish the following elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *U.S. ex rel. Hendow v. Univ. of Phoenix*,

461 F.3d 1166, 1174 (9th Cir. 2006); 31 U.S.C. § 3729(a)(1). "[C]ertain misleading omissions . . . can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 (2016).

### E. California's Consumer Legal Remedies Act (CLRA)

California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result or that results in the sale . . . of goods or services to any consumer." Cal. Civ. Code § 1770. The CLRA should "be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices . . . ." *Id.* § 1760.

## V. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

The court first addresses each of plaintiffs' three independent arguments supporting their motion for summary judgment on claims two and four and defendants' counterarguments before resolving defendants' motions for summary judgment, or, alternatively, class decertification.

### A. Defendants' Additional Services Agreement Charges Constitute "Rent," and thus Violate Federal Law and HAP Contracts

Plaintiffs first move for partial summary judgment on the ground defendants treat additional charges under the ASAs as rent. *See generally* Pls.' MSJ. Because the total rental amount paid by the tenant and the government may not exceed the maximum rent specified in the HAP contract, *see* 24 C.F.R. § 982.451 *et seq*., treating the charges under the ASAs as rent would violate federal law and HAP contracts, thus stating claims for breach of contract and under the UCL.

Defendants misconstrue plaintiffs' motion as arguing that defendants may not "assert[] a right to be paid for lawful charges owed." Defs.' Opp'n at 7. Plaintiffs do not "seek to ban owners from charging Section 8 tenants for additional services," but only that they "follow federal law when doing so." Pls.' Reply at 6. Both the HAP contracts and federal regulations are clear that lessors are prohibited from charging or accepting from Section 8 tenants "any payment for rent of the unit in addition to the rent to owner." *See* HAP contract part C, ¶ 5e, Bellows

Decl. Ex. 13 at 31, ECF No. 247-3; 24 C.F.R. § 982.451(b)(4)(ii). Because defendants do not dispute collecting these additional charges outside of the "rent to owner" amount authorized and agreed to in the HAP contracts, *see* Defs.' Response to Pls.' SUMF ¶ 3, additional charges are unlawful if they constitute rental payments. Accordingly, the court addresses the question of what constitutes rent before evaluating whether defendants' ASA charges meet that definition.

First, in denying defendants' previous motion to dismiss, this court "rejected outright" defendants' argument that "the additional charges cannot constitute rent because they were part of a separate agreement . . . ." Previous Order (July 21, 2017) at 6. Indeed, "[c]ourts consistently have held that extra charges, even when labeled as additional amenities, can constitute illegal side payments." *Id.* (citing *U.S. ex rel. Price v. Peters*, 66 F. Supp. 3d 1141, 1149 (C.D. Ill. 2013) (extra payments for use of storage shed violated FCA); *U.S. ex rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183, 1187 (D. Or. 2007) (additional fees for landscaping could be illegal side payments); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 280 (D. Conn. 2007) (fees for water usage not included in HAP contract were side payments and therefore violated FCA); *U.S. ex rel. Holmes v. Win Real Estate, Inc.*, No. 13-02149, 2015 WL 6150594, at *5 (D. Nev. Oct. 19, 2015) (homeowner association fees and property management fees were rent and violated FCA); *U.S. ex rel. Mathis v. Mr. Property, Inc.*, No. 14-00245, 2015 WL 1034332, at *5 (D. Nev. Mar. 10, 2015) (additional fees for pool maintenance could violate FCA)). Defendants do not offer any reasons why this court should reconsider its earlier conclusion, *see generally* Defs.' Opp'n, so the court turns to consider the affirmative characteristics of rent.

Neither Section 8's governing statute nor implementing regulations define "rent". *Velez v. Cuyahoga Metropolitan Housing Authority*, 795 F.3d 578, 582–83 (6th Cir. 2015). In this court's previous order, it considered plaintiffs' "broad reading" of the Sixth Circuit's decision in *Velez* that additional charges could constitute rent because the charges were part of the "total expense for the use of land during the term of occupancy." Previous Order (July 21, 2017) at 8 (citing *Velez*, 795 F.3d at 585 (reasoning that short-term lease fees, which were basis for eviction, were not optional)). This court concluded that "even assuming *Velez* applies, plaintiffs have not alleged sufficient facts to support their 'total expense for the use of land' theory" because the

short-term fees at issue in *Velez* "were for the general use of rented premises, unlike here where some of the additional charges are associated with discrete services, utilities or appliances." *Id.* at 8–9. This court also left unresolved whether the possibility of eviction for nonpayment of additional charges, standing alone, may convert those charges into rent. *Id.* 10–11. However, it agreed that where unpaid additional charges provide a basis for eviction, this supports a claim that the charges were "mandatory." *Id.* at 10.

Plaintiffs now argue both the definition of rent in federal common law and the definition of rent in the HAP contracts turn on a "causal link between a payment and the tenant's right 'to live in and make use' of their rental unit." Pls.' MSJ at 21 (citing *Velez*, 795 F.3d at 584). Plaintiffs again cite *Velez*, but also reference *Sager v. Housing Commission of Anne Arundel County*, 957 F. Supp. 2d 627, 638 (D. Md. 2013) for the proposition that a purported non-rent charge "effectively becomes rent" where "if it is not paid, [the tenant] may be evicted for failure to pay rent." *Id.* at 23 (quoting *Sager*, 957 F. Supp. 2d at 638). At hearing, counsel for defendants argued *Sager* is inapposite because it involved a publicly owned housing project and concerned section 213(a) of the HUD Act of 1969, also known as the Brooke Amendment,[3] not the Housing Choice Voucher Program. Counsel for plaintiffs disagreed, arguing the *Sager* court's reasoning was unrelated to the housing authority's public ownership of the project, and noting the court relied on regulatory and statutory language mirroring the language in the Section 8 Housing Choice Voucher Program.

While not binding, *Sager*'s reasoning is applicable and persuasive. In *Sager*, the court disapproved of the defendant lessor's "formalistic view" that keeping rent and non-rent charges distinct for accounting purposes rendered them distinguishable because this view "ignores the

[3] The Brooke Amendment was enacted to "ensure that public housing rent is affordable for very low income families." Rep. No. 91–392 (1969), reprinted in 1969 U.S.C.C.A.N. 1524, 1541. It places a ceiling on rental prices at "30 per centum of the family's monthly adjusted income." 42 U.S.C. § 1437a(a)(1). The Amendment's governing regulations distinguish between "tenant rent" and "other charges," with rent defined as the "amount payable monthly by the family as rent to the Public Housing Authority." 24 C.F.R. § 5.603(b). Other charges do not count towards the maximum rent and include "charges to the tenant for maintenance and repair beyond normal wear and tear and for consumption of excess utilities." *Id.* § 966.4(b)(2).

practical effects of" applying plaintiff's payment to non-rent charges first, thus leaving rent due and plaintiff subject to eviction. *Sager*, 957 F. Supp. 2d at 638. The court's analysis of the functional effects of defendants' practice of applying a renter's payment first to non-rent charges translates to the facts here, regardless of whether the housing is public or private and irrespective of the law plaintiffs claim render this practice unlawful. The court agrees the definition of rent properly turns on a tenant's right "to live in and make use" of a unit, and conditioning living in a unit on the payment of ASA fees may convert those fees into unlawful rent. *See Velez*, 795 F.3d at 584.

The court now evaluates whether defendants' ASA charges meet the definition of rent described above. Plaintiffs point to three policies and practices whereby defendants purportedly treat additional charges as mandatory rent. Pls.' MSJ at 12–16. In addition to arguing defendants' forms describe the charges as a component of rent, plaintiffs maintain defendants' accounting practices effectively convert the charges into rent. *Id.* at 13–14. Plaintiffs also contend defendants' rent collection policies require their Section 8 tenants to pay the charges or face eviction. *Id.* at 15.

The undisputed facts support plaintiffs' argument that defendants describe and treat ASA charges as a component of rent, and these charges constitute rent. First, defendants do not dispute their standard rental agreements describe the additional charges as part of the total monthly obligation due, their renewal notification letters describe the charges as part of the "new rental rate" when tenants renew leases, and some forms combine rent and additional charges in several places. *See* Defs.' Response to Pls.' SUMF ¶¶ 11–15 (citing Residential Rental Agreements, Monthly Cost Breakdown forms, Renewal Notification Letters, Exemplars of Move-In Cost Sheets, and Exemplars of Monthly Statements of Rental Account). Second, defendants concede both the "additional charges are separate from and in addition to" the base rent defendants agreed to in the HAP contracts, *id.* ¶ 4, and they have never included these charges in the base rent described in the HAP contracts submitted to local public housing agencies, *id.* ¶ 7. Third, defendants agree tenants enrolled in ASAs must pay the charges for the duration of the lease, *id.* ¶ 5, and they view and treat failure to pay additional charges as a default under the lease, *id.* ¶¶

8– 10. Finally, while defendants aver the accounting software used to process payments defaults to apply payments to base rent last—and this is the standard industry practice, Pls.' Response to Defs.' SUMF ¶¶ 37, 41—they nonetheless concede this sequence also is company policy, Defs.' Response to Pls.' SUMF ¶ 16.

Defendants dispute the significance of their "Pay or Quit" notices, arguing a $100 or greater balance comprised exclusively of service charges would be "an extremely improbable scenario based on [their] accounting policies." Defs.' Response to Pls.' SUMF ¶ 26. However improbable, such a balance can accrue under defendants' policy. Johnson Dep. 137:16- 138:6, Bellows Decl. Ex. 9 at 25-26, ECF No. 246-9; *see also* Pay or Quit Notices, Bellows Decl. Ex. 20 at 1, 4, 6-8, 10, 13, 16, 20-26, ECF No. 249-6. Counsel for defendants also conceded this point at the hearing. Defendants further admit to serving pay or quit notices on Section 8 tenants demanding they pay additional charges or face evictions, even for amounts less than $100. Defs.' Response to Pls.' SUMF ¶ 27. For these reasons, the court finds the additional charges outlined in the Additional Services Agreements constitute impermissible rent in violation of both the HAP contracts and federal law. The court next addresses whether these practices warrant summary judgment on plaintiffs' breach of contract and UCL claims.

**1. Breach of Contract**

Turning first to plaintiffs' claim for breach of contract, defendants acknowledge all class members executed valid HAP contracts, Defs.' Response to Pls.' SUMF ¶ 1 (citing Defs.' Resp. to Terry Req. for Admis., Set 5. No. 44, Bellows Decl. Ex. 35), each of which includes a tenancy addendum listing the tenant's rights under the contract, 24 C.F.R. §§ 981.162(a)(2), 982.305(a)(3), 982.308(f). Defendants also concede plaintiffs can bring a breach of contract claim under the tenancy addendum. Defs.' MSJ at 14. The addendum is controlling, 24 C.F.R. § 982.308(f)(2), and the total paid by the tenant and the government may not exceed the maximum rent specified in the contract. 24 C.F.R. § 982.451 *et seq.*; *see also* HAP Contract Part C ¶ 5. Because defendants breached the tenancy addendum by requiring tenants to pay excess rent in the form of charges contained in the ASAs, the court finds summary judgment is appropriate on plaintiffs' breach of contract class claims. Plaintiffs were damaged in the amount

of the excess rent they were required to pay, which the court will determine in the second phase of this litigation. The court thus **grants** plaintiffs' motion for partial summary judgment on their breach of contract claim on a class basis.

#### 2. California's UCL

As for plaintiffs' UCL claim, defendants' practice of treating ASA charges as rent, including requiring tenants to pay the charges or face eviction, violate federal regulations governing the Section 8 program. *See* 24 C.F.R § 982.451(b)(4)(i)-(ii). Plaintiffs have suffered injury in the form of lost money or property as a result of defendants' unlawful practice of requiring plaintiffs to pay additional charges beyond their share of rent set out in the HAP contracts. Here as well, the court will determine exact damages in the second phase of this litigation. The court **grants** plaintiffs' motion for summary judgment on their UCL claim on a class basis.

### B. Defendants' Charges for In-Unit Laundry Machines Violate the Plain Terms of the HAP Contracts

Plaintiffs also move for partial summary judgment on claims two and four on the separate and independent ground that undisputed facts show the additional charges for washers and dryers violate the plain terms of the HAP contracts and constitute unlawful rent. Pls.' MSJ at 9–10. Defendants do not dispute the washer and dryer fees are not authorized by the HAP contract, which until July 2019 made unlisted appliances defendants' responsibility. Defs.' Response to Pls.' SUMF ¶¶ 32–34. This court previously found plaintiffs sufficiently alleged defendants' charges for in-unit laundry machines constituted illegal rent charges, Previous Order (July 21, 2017) at 9–10, and the record before the court now supports these allegations. Prior to July 2019, defendants' standard HAP contract provided, "[u]nless otherwise specified" in the utilities and appliances section, the owner would pay for all utilities and appliances provided by the owner. Defs.' Response to Pls.' SUMF ¶ 33. While the utilities and appliances section did not state tenants were required to pay fees for in-unit laundry, *id.* ¶ 34, Section 8 tenants were charged for such units separately from the base rent set out in the HAP contracts, *id.* ¶ 32. These charges thus violated the plain terms of the HAP contracts and constitute unlawful rent. Accordingly,

summary judgment is appropriate on the breach of contract and UCL class claims on this separate ground, and for the same reasons outlined above. *See supra* section V.A.1–2.

**C. Defendants' Requiring Tenants to Purchase Renters' Insurance Violated HAP Contracts and Federal Law**

Finally, plaintiffs move for partial summary judgment on claims two and four on the separate ground defendants' renters' insurance requirement constituted rent in violation of the HAP contracts and federal law. Pls.' MSJ at 9–10. It is undisputed defendants required tenants to purchase renters' insurance as a condition of living in "many" of their properties up until December 2019. Defs.' Response to Pls.' SUMF ¶ 37. Specifically, for properties that did not participate in the Low-Income Housing Tax Credit program, defendants' standard residential rental agreements "contained a provision requiring tenants to maintain renters insurance and stated that if they were ever without coverage during their tenancy, 'resident(s) agree[d] to be enrolled in the "pay along with rent" program and being charged accordingly.'" *Id.* ¶ 38. Tenants subject to this requirement paid either defendants or a third-party insurer for this insurance. *Id.* ¶ 39.

Defendants' Rule 30(b)(6)-designated corporate witnesses also testified their Section 8 tenants were subject to the renters' insurance requirement wherever this requirement was in place. *Id. See* Jarvis Dep. 115:16-25, Aug. 10, 2017, Bellows Decl. Ex. 5 at 9, ECF 246-5; *see also* Tanforan Dep. 140:11-16, 173:14-174:7, Bellows Decl. Ex.11 at 8-10, ECF No. 247-1. Defendants dispute this fact, citing the July 19, 2021 deposition of Jarom Johnson, defendant Wasatch's former Chief Operating Officer. Defs.' Response to Pls.' SUMF ¶ 40. However, as plaintiffs point out, "[d]efendants cannot create a dispute of fact for summary judgment by contradicting their Rule 30(b)(6) witnesses' testimony with a statement from their own corporate executive." Pls.' Obj. to Defs.' Evid. In Opp'n to Pls.' MSJ at 3–4, ECF No. 262. "Rule 30(b)(6) testimony can only be rebutted when there is an explanation for why the earlier testimony is mistaken." *Doe v. Cnty. of Kern*, No. 15- 01641, 2017 WL 1383282, at *9 (E.D. Cal. Apr. 18, 2017); *see also Snapp v. United Transp. Union*, 889 F.3d 1088, 1103-04 (9th Cir. 2018) (quoting 7 Moore's Fed. Practice – Civil § 30.25[3] (3d ed. 2016)) ("'[A] corporation generally cannot

present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative'" where the facts truly conflict absent "good reason or explanation" for the contradiction.). Here, defendants have not provided such a reason.

Thus, defendants' insurance requirement constitutes unlawful rent in violation of the HAP contracts and federal law because it was a mandatory condition of leasing defendants' property. Summary judgment is thus appropriate on the breach of contract and UCL claims on this separate ground, and for the same reasons outlined above. *See supra* section V.A.1–2.

## VI. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of plaintiffs' claims. *See generally* Defs.' MSJ. Because plaintiffs prevail on their breach of contract and unfair competition law claims, the court denies defendants' motions on these claims. The court addresses defendants' arguments as to the FCA and CLRA below.

### A. Federal False Claims Act (FCA)

Defendants argue summary judgment is appropriate on plaintiffs' claims under the FCA because defendants have "not submitted false claims to any [public housing agency]," because the agencies were "perfectly aware" of the ASAs and defendants have "consistently disclosed" the "practice of entering into those ASAs . . . ." Defs.' MSJ at 13. However, defendants' statement of undisputed material facts indicate they "*generally* submit[] the ASAs to the housing authorities," Pls. Response to Defs.' SUMF ¶ 45 (emphasis added), and plaintiffs point to multiple examples in the record where defendants omitted the ASAs from the lease packets. *Id.* (citing collection of communications with agencies administering the Section 8 program, Nako Decl. Ex. 44, ECF No. 257-2 at 359–457); *see also* Jarvis Dep. 46:1–23, Sept. 10, 2021, Nako Decl. Ex. 4, ECF No. 257-2 at 26. Plaintiffs also dispute defendants' contention that the record shows housing authorities were "generally aware" of defendants' use of ASAs with Section 8 tenants, *id.* ¶ 43 (citing Deps. of Mary Rizzo-Shuman, Barbara Cavey, and Julie Odlum, Nako Decl. Exs. 14, 13 and 16, ECF No. 257-2), or that "representatives of housing authorities have expressed approval of the use of ASAs in the context of the Housing Choice Voucher Program," *id.* ¶ 44 (citing Deps. of Barbara Cavey, Cheryl Syme, Mary Rivera, Jodie Parker, Jacqueline

Rojas, Julie Odlum, and Mary Rizzo-Sherman, Nako Decl. Exs. 13, 17, 15, 19, 16 and 14, ECF No. 257-2).

Construing the evidence in the light most favorable to the non-moving party, *Matsushita*, 475 U.S. at 587–88, there exists a dispute of material fact as to whether defendants made false statements or engaged in a fraudulent course of conduct by certifying they complied with regulations and HAP contract provisions, specifically the prohibition on accepting "payments or other consideration" beyond the agreed-upon rent. *See* HAP Contract, Part B, ¶ 8d ("Except for the rent to owner, the owner has not received and will not receive any payments or other consideration . . . for rental of the contract unit during the HAP contract term.").[4] Accordingly, the court **denies** defendants' motion as to the FCA claim.

**B. Consumer Legal Remedies Act (CLRA)**

Defendants first argue summary judgment on the CLRA class claim is appropriate because plaintiffs cannot clear the hurdle of establishing the ASA charges constitute "additional rental amounts" or "side payments." Defs.' MSJ at 15. Because the court has already found the ASA charges constitute impermissible rent, it turns to defendants' second argument—that there "is simply no evidence that [d]efendants have made any misrepresentations with respect to housing authorities' repeated approval of HAP contracts based on leases that include ASAs." *Id.* at 16. However, this is the same argument this court considered and rejected in denying defendants' motion for summary judgment on plaintiffs' FCA claim above. Additionally, omission can show deception. *See Daugherty v. Am. Honda Motor Co*., 144 Cal. App. 4th 824, 835 (2006), *as modified* (Nov. 8, 2006) ("a claim may be stated under the CLRA in terms

[4] Plaintiffs also argue government knowledge is not a defense to false statements and the public housing agencies' knowledge of the ASAs is not a defense. Pls.' Opp'n at 20 (citing *Gonzalez v. Planned Parenthood of L.A.*, No. 5-8818, 2011 WL 1481398, at *5 (C.D. Cal. Apr. 19, 2011) ("In the Ninth Circuit, the government's knowledge of the falsity of a claim does not preclude a finding of falsity."). The court need not address that argument now, as the record shows a dispute regarding whether the government had knowledge. *See* Pls. Response to Defs.' SUMF ¶ 43 (citing depositions). Furthermore, because defendants did not argue summary judgment on the FCA was warranted because plaintiffs cannot prove the second, third, and fourth elements of a FCA claim, the court does not address those elements.

constituting fraudulent omissions"). For these reasons, the court **denies** defendants' motion as to the CLRA claim.

## VII. DEFENDANTS' MOTION FOR CLASS DECERTIFICATION

"[D]ecertification is appropriate in light of changes in the law, subsequent developments in the litigation, and evidence not available at the time of certification." *Labrador v. Seattle Mortg. Co.*, No. 08-2270, 2010 WL 3768378, at *3 (N.D. Cal. Sept. 22, 2010) (citing *Dukes v. Wal–Mart Stores, Inc.* 603 F.3d 571, 579 (9th Cir.2010)). Defendants move, in the alternative, for class decertification "to the extent plaintiffs' legal theory of liability requires a showing that ASA charges are mandatory conditions of leasing . . . ." Defs. MSJ at 18–19. This court previously found class certification warranted because plaintiffs' claims "all involve the resolution of whether defendants' 'additional charges set forth in [ASAs] violated defendants' HAP Contract provisions with Section 8 tenants or federal law." Previous Order (July 30, 2018). Because this court now finds there is no material dispute defendants violated the HAP contracts and federal law by treating additional service charges as rent, class decertification is not warranted and the court **denies** defendants' motion.

## VIII. CONCLUSION

For the reasons discussed above, this court **grants plaintiffs' motion in its entirety and denies defendants' motions**.

This order resolves ECF Nos. 241, 242 and 243.

IT IS SO ORDERED.

DATED: November 23, 2022.

CHIEF UNITED STATES DISTRICT JUDGE

# Exhibit B

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

UNITED STATES OF AMERICA, ex rel. DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,

Plaintiffs/Relators,

vs.

WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS

CASE NO. 2:15-cv-00799-KJM-DB

**DEFENDANTS' DISCLOSURE OF EXPERT WITNESS TESTIMONY**

The Hon. Kimberly J. Mueller

Trial Date: None Set

APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, and DOES 1-4

Defendants.

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Defendants submit this Expert Disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2). Defendants have retained Robert Griswold to provide expert testimony regarding the facts and issues of this litigation. The subjects of Mr. Griswold's expected testimony are contained in his report pursuant to FRCP 26(a)(2)(B), which is submitted concurrently with this Disclosure. Mr. Griswold is a Certified Property Manager, as designated by IREM, and has worked in the residential property management field as a manager, consultant, and expert witness since 1987. Mr. Griswold's report is attached hereto as Exhibit A. This Report is the same Report that was previously produced in the parties' prior expert disclosure.

Defendants have also retained James McCurley to provide expert testimony regarding the facts and issues of this litigation. The subjects of Mr. McCurley's expected testimony are contained in his report pursuant to FRCP 26(a)(2)(B), which is submitted concurrently with this Disclosure. Mr. Griswold is a Forensic Accountant and licensed CPA in the State of California, and has worked in the accounting field as a CPA as detailed in his resume.. Mr. McCurley's report is attached hereto as Exhibit B.

DATED: July 20, 2023

LEWIS BRISBOIS BISGAARD & SMITH LLP

By: */s/ Ryan Matthews*
RYAN MATTHEWS
Attorneys for Defendants

# Exhibit A

GRISWOLD REAL ESTATE MANAGEMENT

Griswold Corporate Center
5703 Oberlin Drive, Suite 300
San Diego, CA 92121-1743
858-597-6100
Fax 858-597-6161

January 28, 2022

Joseph A. Salazar, Jr., Esquire
Ryan Matthews, Esquire
Lewis, Brisbois, Bisgaard & Smith, LLP
2020 W. El Camino Avenue, Suite 700
Sacramento, CA 95834
(916) 646-8213; Facsimile (916) 564-5444

Re: Terry v. Wasatch Property Management, et al; Case No. 2:15-cv-00799-KJM-DB – Rule 26 report

Dear Mr. Salazar and Mr. Matthews,

Please accept this letter as my findings and opinions concerning the standards of care and/or the custom and practice in the field of residential multi-family rental housing industry ownership, operation, property management, maintenance, plus specifically the standard of care and standards of practice for the Housing Choice Voucher Program (aka Section 8), as it pertains to the allegations and issues presented in the above lawsuit.

This letter comprises my report as to the opinions I expect to offer in this action. It further acknowledges that I have been retained as an expert to testify both at deposition and at trial, as necessary. I am familiar with the subject matter of this case, and I am prepared to offer the opinions expressed below.

In formulating these preliminary findings and opinions, I have utilized my extensive education, training and experience in many aspects of residential real estate management and specifically the professional management of residential multi-family apartment communities like the subject property. My qualifications in real estate are outlined in my Curriculum Vitae are attached as Exhibit "A".

I charge for my time as an expert witness and consultant on an hourly basis. The 2022 rates for this matter are $545 per hour for non-sworn testimony and $575 per hour for sworn testimony. I have also enclosed a copy of my current Terms of Engagement for consulting assignments which is attached as Exhibit "B".

I have also attached Exhibit "C" which is a listing of all cases in which I have consulted as an expert witness, including a list of all matters in which I have proffered sworn testimony in deposition, arbitration or trial through May 1, 2020.

I also have authored eleven (11) books and many articles on property management topics. My first book is entitled "*Property Management for Dummies*" and was published by Wiley & Sons in April 2001. To date this book has sold over 100,000 copies. My second book was co-authored with Eric Tyson and is entitled "*Real Estate Investing for Dummies*" and was published by Wiley & Sons in November 2004. This book has also sold over 100,000 copies. My third book is a complete re-write of "*Property Management for Dummies*" with the addition of extensive collateral materials on federal, state and local laws plus nearly 100 forms and is entitled "*Property Management Kit for Dummies*" and was published September 2, 2008.

My fourth book is the fully updated 2nd edition of "*Real Estate Investing for Dummies*" which was published in February 2009. My 5th book is the completely updated 3rd edition of "*Property Management Kit for Dummies*" published in 2013.

My sixth book is co-authored with Attorney Laurence Harmon and is entitled "*Landlord's Legal Kit for Dummies*" which was published in June 2014. Then, the seventh book is a completely updated 3rd edition of "*Real Estate Investing for Dummies*". In 2017, Wiley & Sons published my eighth book entitled "*Mortgage Management for Dummies*" which I co-authored with Eric Tyson. In 2018, a new book entitled "*Back to Basics – Real Estate Investing*" was also published by John Wiley & Sons especially for Barnes and Noble. In October 2019, the 4th edition of "*Real Estate Investing for Dummies*" was published and the 4th edition of "*Property Management Kit for Dummies*" was published 12/14/2021. All eleven books are available at all major bookstores and online sellers of books.

I also have written real estate columns that ran in many major newspapers throughout California and nationally for nearly 15 years. The syndicated "Rental Roundtable" column was written exclusively for California appeared in the San Diego Union-Tribune, the Los Angeles Times, and the San Francisco Chronicle. The "Rental Forum" column was written for a national audience (including some smaller newspapers in California) and was nationally syndicated by Inman News Features. Copies of these columns are available at the Inman website: www.inman.com.

Note that I have reviewed the following materials:

- Fifth Amended Class Action Complaint For Damages and Injunctive Relief, And For Relief Pursuant to False Claims filed 8/17/2021
- Defendants' Memorandum of Points And Authorities In Support Of Its Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted filed 9/14/2016
- Plaintiffs' Memorandum Of Points And Authorities In Support Of Their Opposition To Defendants' Motion To Dismiss Class Action filed 10/14/2016
- Defendants' Opposition to Motion for Class Certification dated 9/8/2017
- Order Re Motion To Amend Complaint And For Class Certification filed 7/30/2018
- Defendants' Second Further Amended Responses to Plaintiff Roy Huskey III's Interrogatories, Set Five dated 12/13/2021
- Deposition of Janae Jarvis + exhibit 3 taken on 8/10/2017
- Deposition of Shannon Fox taken on 8/7/2017
- Declaration of Shannon Fox dated 9/7/2017
- Spreadsheet entitled "S8 to ASA Adoption 1/2014 to 1/2022" – taken from Defendants' Yardi accounting and property management software (which my company uses exclusively)

To the extent my testimony requires exhibits, they may include any of the following:

- Lease packets of the representative Plaintiffs in this action, Denika Terry, Roy Huskey, and Tamera Livingston. This may include Residential Rental Agreements, Additional Service Agreements, or HAP Contracts.
- Data downloaded from Defendants' Yardi database regarding Section 8 Tenants and Additional Service Agreements.
- Pertinent sections of the Section 8 regulations promulgated by HUD and contained in Part 24 of the Code of Federal Regulations.
- Declaration of Shannon Fox dated 9/7/2017

**Statement of Opinions**

1. Additional Service Agreements (aka "ASA") like the ones utilized by Wasatch Property Management, Inc. in this case are commonplace in the multifamily residential rental property industry, including with Housing Choice Voucher Program (commonly referred to in the rental housing industry as well as by Public Housing Authorities (PHA) as "Section 8") applicants and residents. They offer residents options to enhance their living experience with amenities above and beyond what is included in "base rent" at the property.

2. Based on my review of some of Wasatch Property Management's Additional Service Agreements, I see nothing different in character about them or unique as compared with other Additional Service Agreements commonly used in the multifamily residential rental property industry, including with Housing Choice Voucher Program applicants and residents.

3. There is nothing inherently wrong or unlawful about offering tenants participating in the Housing Choice Voucher Program (HCV) the opportunity to enroll in an Additional Services Agreement. The Department of Housing and Urban Development ("HUD") has, to my knowledge, implemented no rule or regulation prohibiting the use of such agreements with Section 8 tenants.

4. The availability of ASAs is actually desirable, and many times these additional ASA items are amenities and features that will attract an HCV holder to a specific property versus another property without or with more limited or less desirable features and amenities. The whole goal of the HCV program is that the HCV holder can go into the conventional, competitive, non-subsidized rental market and find housing that best meets their needs. Many times a HCV holder will even agree to pay more than their HCV may authorize, including even base rent. This supports my opinion that the HCV program gives the HCV holder many options in a free market to optimize and locate and even participate in paying for the best housing option that meets their specific needs.

5. Based on my knowledge of the Housing Choice Voucher program, not allowing HCV holders to enroll in Additional Service Agreements based on their HCV status would amount to discrimination, as those HCV holders would not be given the same opportunities as non-HCV residents.

6. The HUD regulations controlling the HCV program specifically contemplate an HCV resident being obligated to pay amounts to the landlord other than rent. The landlord is specifically entitled to terminate an HCV tenancy based on the HCV resident's nonpayment of those non-rent amounts due under the lease.

7. Public Housing Authorities consistently approve HCV tenancies and HAP contracts with these Additional Services Agreements. The Declaration of Shannon Fox submitted with Defendants' Opposition to the Motion for Class Certification confirms my experience with Public Housing Authorities and their attitudes toward Additional Service Agreements as they pertain to the HCV program. It further is consistent with my knowledge of the HCV regulations contained in Part 24 of the Code of Federal Regulations.

8. I have reviewed Wasatch's Payment Processing Sequence, which to my understanding applies tenant payments first to outstanding non-rent amounts, such as Additional Services Charges, before applying the remainder to any outstanding rent. This accounting method is the custom and practice in the multi-family rental housing industry and meets the standard of care. This method of accounting is taught by the Institute of Real Estate Management (IREM as well as the National Apartment Association (NAA). Based on my experience with the HCV program, and my knowledge of the HUD regulations contained in Part 24 of the Code of Federal Regulations, there is nothing improper or inappropriate about this common method of accounts receivable processing. These other amounts, including Additional Service Agreement charges, are treated differently from rent amounts because they are not rent.

9. Based on my review of data provided to me from Defendants' Yardi system, roughly half of the HCV residents since 2005 have entered into an Additional Service Agreement. My understanding of the allegations of the Fifth Amended Complaint is that Plaintiffs contend that these Additional Service Agreements are mandatory. Based on my experience in the industry, this Yardi data provides clear evidence that on a company-wide basis, the ASA's are not mandatory.

10. Multifamily residential buildings frequently have different types of units and floorplans. Often, some units contain amenities like washers and dryers, while others in the same complex will not. Where a multifamily residential project's only available units contain an amenity like a washer and dryer, which is separately charged, nothing in the HUD regulations contained in Part 24 of the Code of Federal Regulations or HAP Contract requires the landlord to remove the washer and dryer to make a lower-tier unit available for an HCV resident. The voucher-holder has a meaningful choice to wait for a unit without that amenity to become available, or to search elsewhere.

11. Section 8 of the HAP Contract, which lists utilities and appliances and apportions responsibility for payment of the same as between the tenant and the owner, lists utilities and appliances which are typically required under HUD's Housing Quality Standards. (HQS.) In my experience, and based on my knowledge of the HCV regulations contained in Part 24 of the Code of Federal Regulations, there is no requirement that appliances which would not fall under the HQS be listed in that section. Non-HQS appliances could include a washer and dryer, a dishwasher, a microwave, or any number of other optional amenities.

**All of the above opinions, in response to the specific allegations made in the Fifth Amended Class Action Complaint, are expressed within a reasonable degree of certainty for the residential multi-family rental housing industry ownership, operation, property management, maintenance, including specifically the standard of care and standards of practice for the Housing Choice Voucher Program (aka "Section 8") in the multi-family residential rental housing industry.**

I will be glad to answer any questions you may have or provide additional information that supports my findings and opinions. I reserve the right to add, amend or further clarify these opinions as additional deposition transcripts and other information, documents and/or materials becomes available. I also intend to review the reports of any other relevant experts and may have additional, supplemental or rebuttal opinions at that time.

Please feel free to contact me if you have any questions or need clarification on any aspect of this opinion letter.

Sincerely,

Robert S. Griswold, CRE®, CPM®, CCIM®, RPA®, PCAM®, CCAM®, GRI®, ARM®
President

# Exhibit B

bakertilly

Baker Tilly US, LLP
50 Fremont Street, Suite 4000
San Francisco, CA 94105
United States of America

T: +1 (415) 956 8323
bakertilly.com

July 20, 2023

Ryan Matthews, Esq.
Joseph Salazar, Esq.
Lewis Brisbois
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833

Re: Denika Terry et al. v. Wasatch Advantage Group LLC et al.
United States District Court, Eastern District of California
Case 2:15-cv-00799-KMJ-DB

Dear Mr. Matthews and Mr. Salazar

We are pleased to submit the following information related to our ongoing review in connection with the referenced case. Our review to date has been limited to the scope of work outlined by you and to materials provided pertinent to the captioned matter. A list of documents and information relied upon by me is contained below.

## PERSONAL QUALIFICATIONS

I have been in the field of forensic accounting for over 35 years, calculating economic damages across many business lines and industries. I am a Director with Baker Tilly US, LLP.

My CV and 5 year testifying experience are attached. My rate of compensation is $510 per hour plus expenses. My fee is based on actual hours worked and is not contingent upon the outcome of this case.

## BACKGROUND

I understand the issues for our consideration are related to the quantification of additional service charges by the Defendants to Plaintiffs during a specified period defined by the Court. Specifically, I have been asked to opine on the reasonable basis for determining the economic value of additional charges associated with rental insurance and media packages (i.e., internet and cable television services). For purposes of this report, I have not been asked to provide a final accounting of these matters as I understand the data set is not yet final. Accordingly, I anticipate providing additional, detailed reporting associated with this matter.

Baker Tilly US, LLP trading as Baker Tilly is a member of the global network of Baker Tilly International Ltd., the members of which are separate and independent legal entities. ©2020 Baker Tilly US, LLP

## SOURCES OF INFORMATION

In conducting my review, I relied upon the following data to date:

1. Fifth Amended Class Action Complaint for Damages and Injunctive Relief, and for Relief Pursuant to False Claims Act
2. Order Granting Pltfs MSJ and Denying Defs MSJMDD Review Folder dated 11/23/2022.
3. Expert Report of David Breshears filed 4/22/2022.
4. American Bankers Insurance Co of FL monthly invoices and detailed statements in Excel from May 2021 through April 2023
5. Account Current Statement for Freedom Advisors LLC for 01/2014 through 04/2023 in Excel.
6. Net Revenue – CA Only Excel spreadsheet.
7. Remote Deposition & Exhibits of Jarom Johnson dated May 31, 2023

## GENERAL COMMENTS

I understand Defendant companies utilize Yardi Property Management Software for accounting and data management and that the data available for our review is sourced from that software. Yardi is a widely used service provider in this arena offering a variety of products to both domestic and international property management companies. We have relied upon reports from Yardi in conducting forensic accounting reviews in prior matters. Consequently, I believe the revenue and cost data produced from their reporting processes conforms to industry standards and is accurate and reliable.

Of the charges included in the Additional Services Agreements, renter's insurance and the various media packages have a measurable economic value in the marketplace. That value is established in each market by the cost of that product to consumers. Under the circumstances, it is reasonable to assume that cost paid for these services by Wasatch is an appropriate measure of its value. Accordingly, we believe a reasonable estimate of the damages incurred by the tenants for renter's insurance and media packages is the difference between the amounts paid to Wasatch as additional monthly service charges and the cost of those services incurred by Wasatch. I understand there are other categories of additional service charge payments that do not fall into this category because they do not have direct associated costs (i.e parking, storage, etc.). Those categories of payments would not be included in such an analysis.

Based on my review of the data provided to date, along with the deposition testimony of Mr. Johnson, I believe the specific payment amounts by tenants and the direct cost of both renters' insurance and media packages to Wasatch are readily available and can be reasonably measured during the relevant period.

Finally, it should be noted that at present I have not been asked to prepare a tenant-by-tenant analysis of the incremental payments described above. I understand those costs are still accumulating. While an analysis of the available data would be time-consuming, I, along with appropriate staff, would be able to accomplish this task in a timely manner.

Terry v Wasatch
July 20, 2023
Page 3

I trust the information above is clear.  If you should have any questions, please contact the undersigned.

Sincerely,

Baker Tilly US, LLP

James W. McCurley
Director

**FEDERAL COURT PROOF OF SERVICE**

USA-Terry v Wasatch Property Management, et al.
Case No. 2:15-cv-00799-KJM-DB

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On July 20, 2023, I served the following document(s):

- DEFENDANTS' DISCLOSURE OF EXPERT WITNESS TESTIMONY
- EXHIBITS A-D TO ROBERT GRISWOLD REPORT – BOX.COM SHAREFILE LINK
- EXHIBITS A-I TO JAMES MCCURLEY REPORT – BOX.COM SHAREFILE LINK

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒ (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on July 20, 2023, at Sacramento, California.

/s/ Alicia Crespo
Alicia Crespo

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**SERVICE LIST**
***USA-Terry v Wasatch Property Management, et al.***
**Case No. 2:15-cv-00799-KJM-DB**

| | |
|---|---|
| Andrew Wolff<br>Law Office of Andrew Wolff, PC<br>1956 Webster Street, Suite 275<br>Oakland, CA 94612 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 834-3300<br>Email: andrew@awolfflaw.com |
| Jesse Newmark<br>CENTRO LEGAL DE LA RAZA<br>3022 International Blvd., Suite 410<br>Oakland, CA 94601 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 437-1554 x115<br>Fax: (510) 437-9164<br>Email: jessenewmark@centrolegal.org |
| Laura L. Ho<br>Anne Bellows<br>Stephanie Tilden<br>GOLDSTEIN, BORGEN, DARDARIAN & HO<br>155 Grand Avenue, Suite 900<br>Oakland, CA 94612 | ***Attorneys for Plaintiffs and Relators and the Certified Classes***<br><br>Tel: (510) 763-9800<br>Fax: (510) 835-1417<br>Email: lho@gbdhlegal.com<br>Email: abellows@gbdhlegal.com<br>Email: stilden@gbdhlegal.com<br>Email: sgrimes@gbdhlegal.com<br>Email: dvaldez@gbdhlegal.com |
| Colleen M. Kennedy<br>United States Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 | ***Attorney for Intervenor Plaintiff***<br>***United States of America***<br><br>Tel.: 916-554-2700<br>Fax: 916-554-2900<br>E: colleen.m.kennedy@usdoj.gov<br>E: caseview.ecf@usdoj.gov<br>E: kimberly.siegfried@usdoj.gov<br>E: monica.lee@usdoj.gov<br>E: usacae.ecfsaccv@usdoj.gov |
| Jocelyn D. Larkin<br>Lindsay Nako<br>The Impact Fund<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704 | ***Attorney for Plaintiffs***<br><br>Tel: (510) 845-3473 x.306<br>Fax: (510) 845-3654<br>Email: jlarkin@impactfund.org<br>Email: lnako@impactfund.org |
| Jahmy Graham<br>Nelson Mullins<br>19191 South Vermont Avenue, Suite 900<br>Torrance, CA 90502 | ***Attorneys for Defendant, Hayward Village Apartments LP***<br><br>T: 424-221-7426<br>F: 424-221-7499<br>E: jahmy.graham@nelsonmullins.com |

# Exhibit C

# Deposition Transcript

Case Number: 15-cv-00799-KJM-DB

Date: September 5, 2023

In the matter of:

# TERRY, et al. v WASATCH ADVANTAGE GROUP, LLC, et al.

## JAMES McCURLEY

CERTIFIED COPY

Reported by:

Maureen M. Elrod
CSR No. 809476,
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT
for the
Eastern District of California

Civil Action No. 15-cv-00799-KJM-DB

UNITED STATES ex rel. DENIKA TERRY, et al., )
)
Plaintiffs, )
)
v. )
)
WASATCH ADVANTAGE GROUP, LLC, et al., )
)
Defendant. )
______________________________________________)

REMOTE DEPOSITION OF JAMES McCURLEY, located in California, commencing at 4:03 P.M. EST, on Tuesday, September 5, 2023, before Maureen M. Elrod, Certified Shorthand Reporter 809476, in and for the State of Florida.

STENO
Concierge@Steno.com
(888)707-8366

APPEARANCES VIA ZOOM:

FOR THE PLAINTIFF:

STEPHANIE TILDEN, ESQUIRE - via Zoom
and
LAURA LUO-YAO HO, ESQUIRE - via Zoom
and
ANNE BELLOWS, ESQUIRE - via Zoom
Goldstein Borgen Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, California 94612
(510) 763-9800
Email: stilden@gbdhlegal.com

JESSE M. NEWMARK, ESQUIRE - via Zoom
Centro Legal de la Raza
3022 International Boulevard, Suite 410
Oakland, California 94601
(510) 437-1863
Email: jessenewmark@centrolegal.org

FOR THE DEFENDANTS:

RYAN J. MATTHEWS, ESQUIRE - via Zoom
Lewis Brisbois Bisgaard & Smith LLP
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
(916) 564-5400
Email: ryan.matthews@lewisbrisbois.com

FOR HAYWARD SENIOR APARTMENTS LP:

JAHMY S. GRAHAM, ESQUIRE - via Zoom
Nelson Mullins Riley & Scarborough LLP
19191 South Vermont Avenue
Suite 900
Torrance, California 90502
(424) 221-7400
Email: jahmy.graham@nelsonmullins.com

I N D E X

| | | PAGE |
|---|---|---|
| DIRECT EXAMINATION: | Attorney Tilden | 7 |
| CROSS-EXAMINATION: | Attorney Matthews | 128 |
| REDIRECT EXAMINATION: | Attorney Tilden | 130 |

- - - - -

PLAINTIFF'S EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 12 |
| Exhibit 2 | 5th Amended Complaint | 15 |
| Exhibit 3 | List of deposition and trial testimony | 18 |
| Exhibit 4 | Friends of Riverside Airport | 21 |
| Exhibit 5 | Statement on Standard for Forensic Service | 25 |
| Exhibit 6 | Expert report of James McCurley | 28 |
| Exhibit 7 | Engagement letter | 31 |
| Exhibit 8 | Invoice | 34 |
| Exhibit 9 | CV | 67 |
| Exhibit 10 | Court order granting Plaintiffs' motion for partial summary judgment | 85 |
| Exhibit 11 | Excel spreadsheet | 115 |
| Exhibit 12 | Expert report of David Breshears | 118 |
| Exhibit 13 | Document subpoena | 119 |

P R O C E E D I N G S

VIDEOGRAPHER: Good afternoon. We are on the record at 1:03 p.m. Pacific time, on September 5th, 2023, to begin the deposition of James W. McCurley, in the matter of Terry, et al, versus Wasatch Advantage Group, LLC, et al.

This case is venued in United States District Court for the Eastern District of California. The case number is 15-CV-00799-KJM-DB. This deposition is taking place via Steno Connect. The legal videographer is Diogo Rosenblatt-Silva, here on behalf of Steno. And the Court Reporter is Maureen M. Elrod, also here on behalf of Steno.

Will counsel please identify yourselves and state whom you represent.

MS. TILDEN: Hello. I'm Stephanie Tilden, from Goldstein, Borgen, Dardarian, and Ho, and I represent the Plaintiffs.

MR. MATTHEWS: Thank you. Ryan Matthews, and I'm here on behalf of Defendants.

VIDEOGRAPHER: Thank you, Counsel. Would the Reporter please proceed with the statement and swearing of the witness. Thank you.

COURT REPORTER: Yes. The attorneys appearing in this deposition acknowledge that I am not

physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

The parties and their counsel further agree that, while I am a licensed notary/court reporter, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.

Hearing none, we can proceed.

My name is Maureen Elrod. My location is 1751 Glen Hammock Road, Deland, Florida, 32720. The date is September 5, 2023. The time here is 4:06 p.m. Eastern Standard Time. The Deponent's name is James W. McCurley.

Sir, can I have you present me your driver's license or an ID?

MR. McCURLEY: Wow! I wasn't prepared for the very first question. I don't have either of those on me. Can I -- can we circle back on that? I will get that before this deposition is over. It's just not on my person.

COURT REPORTER: I cannot swear you in without seeing that first.

MR. McCURLEY: Okay. Well, then, let me -- give me two minutes and I will go get it.

VIDEOGRAPHER: Counsel, should I read us off the record?

MS. TILDEN: Yes, please.

VIDEOGRAPHER: We are now off the record. The time is 1:07 p.m. Pacific time.

(Off the record at 4:07 p.m. EST).

(On the record at 4:09 p.m. EST).

VIDEOGRAPHER: We are now back on the record. The time is 1:09 p.m. Pacific time.

COURT REPORTER: Mr. McCurley, can you please present your ID?

Hold it right in front of your face. Right in front of your face, but closer to the camera.

There you go. Perfect. Okay. All right.

And can you read me your expiration date on your license?

MR. McCURLEY: You broke up. I missed that question.

COURT REPORTER: Can you read me the expiration date on your driver's license?

MR. McCURLEY: Yes, ma'am. It's 08/26/2027.

COURT REPORTER: Perfect. Since you are in the state of California and I am here in Florida -- I assume you're in California right now?

MR. McCURLEY: Yes. Yes, ma'am.

COURT REPORTER: -- may I place you under oath?

MR. McCURLEY: Yes.

COURT REPORTER: Please raise your right hand. Do you solemnly swear the testimony you're about to give is the truth, the whole truth, and nothing but the truth, so help you God?

MR. McCURLEY: I do.

COURT REPORTER: Thank you.

WHEREUPON,

JAMES McCURLEY,

having been duly sworn by this Reporter, was examined and testified upon his oath as follows:

DIRECT EXAMINATION

BY MS. TILDEN:

Q Hi, Mr. McCurley. Thank you for being here, with us, today.

A You're welcome.

Q Can you spell your name, for the record?

A Sure. It's James, J-A-M-E-S. McCurley, M-C-C-U-R-L-E-Y.

Q Thank you. As I mentioned earlier, I'm Stephanie and I'm representing the Plaintiffs. Do you understand that you're here today testifying in this deposition because you've been identified as an expert witness in this case, Terry versus Wasatch Property Management?
A Yes.
Q And where do you work?
A I work at Baker Tilly, in Sacramento, California.
Q And what's your role at Baker Tilly?
A I'm a director.
Q Do you understand that the upcoming trial will assess the amount of damages owed to the Class?
A Yes, that's my understanding.
Q How did you come to that understanding?
A I -- through discussions with my client.
Q And by your client, you mean Wasatch Property Management, or do you mean --
A Well, specifically, I mean Lewis Brisbois, the attorneys at Lewis Brisbois.
Q And you've testified as an expert witness before, correct?
A Yes.
Q Do you know how many times you've testified as

an expert witness?

A I don't have an exact number. Testified as in a trial or deposition or combined?

Q Let's start with trial.

A Trial? Half a dozen. About six times.

Q How about in a deposition?

A I don't have an exact number. It's dozens. Less than 50.

Q And always as an expert witness, correct?

A Yes.

Q Okay. I'm going to go over a few rules of the deposition. I know you're pretty familiar, but I'd like to get this on the record.

So the format of the deposition is question and answer. I'll ask you questions, so please verbalize your answers to my questions. As you speak, the court reporter will record what you're saying, word for word. And the court reporter can't transcribe nods or gestures or hand movements. So please verbalize your answer. Do you understand?

A I do.

Q The court reporter will produce a transcript of the deposition and you'll have the opportunity to make changes to the transcript. We have a right to comment on any changes that you make. And if you change

the substance of your answer, like, if you change a yes to a no, it may affect your credibility. Do you understand?

A I do.

Q Do you understand that although your testimony is here, on this video, that has much the same force and effect as though given in court?

A I do.

Q Okay. So no one wants you to guess at the meaning of any of my questions. So if you don't understand my question, please let me know and I'll try to rephrase the question so that you understand it. If you answer my question, I'll assume you understood my question the way it was asked. Do you understand?

A I do.

Q So please let me know when you need to take a break and we'll do that. I will ask you to answer any pending questions before a break, however. Is that okay?

A Sure. Yes.

Q So I'll ask you -- I may ask you some questions that require a response in terms of numbers, as I already did with the amount of depositions you've been through. But if you don't know the exact number, please say so. I may ask you for your best estimate and

I'm entitled to that. Do you understand?

A I do.

Q Is there anything that would prevent you from answering my questions completely, truthfully, and accurately here today?

A No.

Q From time to time, Mr. Matthews may object to questions that I ask. Generally, I'm still entitled to an answer, unless your attorney specifically instructs you not to answer. Do you -- do you understand?

A Yeah, I do.

Q Is anyone in the room with you, right now?

A Nope.

Q Do you have any documents with you?

A I have documents -- I'm at -- I'm at my computer, my work station, so I have documents in my, kind of, electronic form files. I also have a copy of the subpoena. And that's it. Everything else -- document wise, everything is, really, in my file, my electronic file.

Q Okay. Are any of the documents open on your computer?

A Good question. The subpoena and the -- my report.

Q Okay. Is your cell phone off right now?

A It is now.
Q Thank you.
A Yes.
Q Great. Okay. So I'm going to -- we're going to try out this exhibit sharing.
MS. TILDEN: And I'm going to mark, as Exhibit 1, your subpoena for this deposition.
(Plaintiffs' Exhibit No. 1 was marked for ID).
BY MS. TILDEN:
Q And it sounds like you've seen this document before; is that correct?
A Yes.
Q Do you understand that you are here testifying pursuant to this subpoena?
A Yes.
Q Okay. Have you had a chance to review what I'm showing you right now?
Because I'm going to take it off the screen, I think.
A Yes. Is that all of it? Is it -- oh, is this -- I guess one second.
Yes.
Q Okay. Have you done anything to prepare for your deposition today?
A Yes.

Q What did you do?

A I reviewed my file, the various documents in my file. I reviewed out report. I -- pretty much, that's it. I've reviewed my file and the report.

Q When you say your file, what documents are you referring to?

A So as part of my report, I think I had listed all documents that were in my possession at that time. So they're listed there. I can certainly read them out, if you'd like.

In addition to that, I did receive two additional documents, from Mr. Matthews, over the weekend, that I also reviewed but are not mentioned in my report because I didn't have them at the time.

Q Will you tell me what those two additional documents are?

A Yes. So now -- just so that you know what I'm doing, I'm going into my folder -- electronic folder. That's where they are.

Q Thank you for saying that on the record.

A So the first one is Plaintiffs' Designation of Rebuttal Experts. And I'm reading out to you the titles of the PDFs that I received. And the second is Plaintiffs' designation of expert, David Bre-shears -- Bresh-ears.

Q And you reviewed these two documents prior to your deposition today?
A Yes.
Q And Mr. Matthews sent them to you this weekend?
A Yes.
Q Okay. Other than these two documents, are all the other documents, that you reviewed in preparation for this deposition, listed in your report, your expert report?
A Yes.
Q Okay. Thank you. In terms of the additional documents, did you ask Mr. Matthews for those?
A I did not.
Q And did you meet with anyone in preparation for your deposition?
A I did not. I mean, I spoke to Mr. Matthews, by phone, over the weekend, but that's -- that's about it.
Q How long did you talk to Mr. Matthews on the phone?
A I don't think it was more than five to ten minutes.
Q Can you tell me what you talked about?
A He just asked me if I was ready for the

deposition; did I have any questions of him and did I feel prepared. And I answered in the affirmative, that I was prepared, not that I had any questions of him.

Q So you didn't have any questions?

A No.

Q Aside from the attorneys representing Wasatch, have you communicated with anyone about this litigation? And I mean both verbal and written, when I say communicate, including e-mails.

A I communicated internally with some staff to, kind of, put them on notice that there may be some work for them to do, but that's -- that's the extent of it.

Q And is your staff also accountants, or what are -- what is their role?

A Accountants. They're all accountants. They're both accountants.

Q So sounds like there are two people in your office that you spoke about this case with.

A Correct.

Q Okay. I'm going to take a look at the second exhibit.

MS. TILDEN: This should be Exhibit 2.

(Plaintiffs' Exhibit No. 2 was marked for ID).

BY MS. TILDEN:

Q Are you able to view it on your side and

control how you're looking at it?

Do you see it on the marked exhibit list; Exhibit 2?

A Bear with me.

Q You can?

A Okay. I can see it. And I can see -- I've got three options; view, present, and download.

Q Can you press "view", on your side?

A Yes.

Q Okay. Great. This is the 5th Amended Complaint in this action. Have you seen this document before?

A I have.

Q You actually submitted this as an exhibit to your expert report, correct?

A Yes.

Q Okay. Great. Just wanted to take a look at the caption, about halfway down -- the first page says, Exhibit A, because this is from the exhibits you submitted. But halfway down the second page, where it has the caption of the case, do you see where the Plaintiffs are listed?

A Yes.

Q Okay. So have you ever spoke to Tamara Livingston before?

A No.

Q Have you spoken to Roy Huskey, III, before?

A No.

Q How about Denika Terry; have you spoken to Denika Terry --

A No.

Q -- before?

A No, I have not.

Q Okay. And then if you look a little bit under that, we see a list of Defendants.

A Yes.

Q Can you read through that list, real quick, or just take a look at it?

A Yeah, I'm looking at it. I can read it, if you'd like.

Q No, that's okay. When I say Defendants in this deposition, can we agree that it means this group of Defendants that's listed here on the caption?

A Yes.

Q And then sometimes I might say Wasatch. If I say Wasatch, can we agree that it refers to this group of Defendants on the caption?

A Sure.

Q Great. Thank you. Just one more quick question about this. Have you ever interviewed any

current or former tenants of Defendants?

A No, I have not.

Q Okay. Thank you.

MS. TILDEN: I'm going to introduce a new exhibit, Exhibit 3.

(Plaintiffs' Exhibit No. 3 was marked for ID).

BY MS. TILDEN:

Q Do you see it?

A Oh, stop viewing. There we go. I was trying to figure out how to stop that one.

Q Yeah.

A Exhibit 3. It says Exhibit G, on the front?

Q Correct.

A Yes.

Q Great. Do you want to take a quick scroll through it?

A Sure. Okay.

Q Great. This is a list of deposition and trial testimony you've been involved in, in the past five years, correct?

A Correct.

Q And this was provided as Exhibit G to your July 20th expert report, correct?

A Correct.

Q If you can look down at the bottom left of the

second page, where it says, file JWM testimony history, and a couple other terms. Do you see, if you look down on the bottom left, it says it was printed on July 19th, 2023?

A Yes.

Q So was this document generated by your office?

A Yes.

Q Is there any reason to believe that this list is not complete?

A No.

Q Any reason to believe this list is not accurate?

A Not that I'm aware of, no.

Q Have you given an expert opinion on any case, whether or not it's listed here, involving residential property management companies?

MR. MATTHEWS: Objection. Overbroad. Go ahead.

MR. McCURLEY: I don't believe so. Not in a -- not in this context, no.

BY MS. TILDEN:

Q What do you mean by this context, may I ask?

A In litigation. Not in a litigation context. I do work outside of the litigation context, as well.

Q So you have provided other services directly

for residential property management companies?

A I have -- not necessarily for residential property management companies, but in files that involved property management companies.

Q Okay. And it sounds like you -- none of these involved litigation, you said?

A Correct.

Q Have you given an expert opinion on any case involving additional service charges, like the ones at issue here?

A Again, not in -- no -- no testimony in a litigated case, no.

Q But you're familiar with additional service charges in other context from your work?

A Yes.

Q Have you given an expert opinion on any case involving contract damages?

A I'm just looking at this list for the last five years. That's not really contract.

I don't believe so.

Q You don't believe so for the last five years or ever?

A It's -- it's -- it's possible. Yeah, I -- yeah, it is possible. But it would be more than five years ago that there's a breach of contract case that I

worked on in 10, 15, 20 years ago.

Q But you don't remember the details of any right now?

A I do not.

Q Have any of your expert opinions ever been excluded by a court or arbitrator in any case?

A No, not that I'm aware of.

Q And have you ever been disqualified by a court or arbitrator as an expert in any proceeding?

A No.

Q Thank you. Okay.

MS. TILDEN: I'm going to stop viewing Exhibit 3, and enter Exhibit 4.

(Plaintiffs' Exhibit No. 4 was marked for ID).

BY MS. TILDEN:

Q Okay. Do you see Exhibit 4?

A I do.

Q Would you go ahead and view it, please?

A Yeah.

Q Okay. Great. Do you recognize this document?

A I do.

Q Great. What is it?

A It's a report I issued on a case back in February of 2021.

Q And what was the name of the case? Can you

read it for me?

A Sure. It's the Friends of Riverside Airport versus Department of Army.

Q And you submitted this -- sorry. This -- just for the record, this document is Bates stamped starting JMS000020.

Did you provide this report to Mr. Matthews?

A Yes.

Q And this was a rebuttal report, correct?

A Correct.

Q Okay. And do you recall sitting for a deposition in this case?

A I do.

Q And do you remember if you gave trial testimony in this case?

A I did not.

Q Did not. Okay. Really, generally, what was this case about?

A It was a measurement of cleanup costs in an environmental damages case.

Q Okay.

A Very high level, general summary.

Q Great. No, that's perfect. So I'm guessing it did not involve contract damages?

A This -- I don't believe so, no.

Q Did it involve any residential property management companies?

A No.

Q Just wanted to take a look. If you could scroll down to the second page, which is -- sorry -- actually, just stay on the first page, please -- no, it's the second page, JMS000021.

A Okay.

Q You can see there's a few paragraphs up top. And I just wanted to -- could you read that last paragraph that starts with "our analysis"?

A Sure.

Q Thanks.

A Our analysis in connection with this matter is consistent with the American Institute of Certified Public Accountants Statement on Standard for Forensic Services. Those standards confirm that the general standards of the profession apply to all services performed, including forensic services. One of the listed standards states that professionals are to obtain sufficient, relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.

Q Thank you. I was hoping you'd tell me how to pronounce it. Is it just AICPA, the --

A Yes. Yes.

Q Great. What is the AICPA?

A It's the American Institute of Certified Public Accountants.

Q Is that something you can join? Are you a member?

A I am a member, yes.

Q It sounds like here that you've read the Standards for Forensic Service issued by the AICPA.

A I have, yes.

Q Are you familiar with other publications from the AICPA?

A Yes.

Q What kinds of publications do they put out?

A They put out hundreds of different publications on variety of different topics for varieties of different service lines.

Q Including forensic --

A Yeah. Correct.

Q -- accounting, correct?

A Yes.

Q Would you agree that the AICPA is a reliable authority in -- for forensic accountants?

A Yes.

Q Okay. All right. Thank you for that.

MS. TILDEN: I'm going to stop viewing this right now, and then I'm going to introduce Exhibit 5.

(Plaintiffs' Exhibit No. 5 was marked for ID).

BY MS. TILDEN:

Q If you wouldn't mind taking -- opening that, reviewing it.

A Yes.

Q Great. Exhibit 5, this is the Statement on Standard for Forensic Service. Are you familiar with this document?

A Yes, ma'am.

Q And what is it?

A It is the Statement on Standard for Forensic Services.

Q Are these the -- is this the Standards for Forensic Services that you referred to in the reports we just looked at, as Exhibit 4?

A Yes.

Q Okay. Can we take a look at the four bullet points under Standards for Forensic Service? It's paragraph six.

A Yes.

Q If you'd just take a minute and just read through them.

A You want me to read them out loud or to myself?

Q You can read them to yourself.

A Okay.

Q Okay. I'll just put on the record that these are the bullet points labeled professional competence, due professional care, planning and supervision, and sufficient relevant data, right, that you just went over?

A Correct. Correct.

Q Do you agree with the standards as are listed here?

A I do.

Q And do you follow these standards in all of your reports?

A I aspire to. I believe I do.

Q So what is your understanding of sufficient relevant data?

A Well, it states: Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.

That means -- that's pretty -- I think it's self-explanatory.

Q Okay. How do you know when sufficient,

relevant data is obtained?

A I -- well, I think it's subjective, to a certain degree. You know, it's your professional -- professional opinion.

Q Have you ever been working on a case and felt that sufficient -- you didn't have sufficient data to make a conclusion?

A Not on a litigated case, no.

Q What do you do to make sure that you have sufficient -- oh, sorry, sounds like you were going to say something.

A Well, it just -- I just was reminded that I was involved in a case, years ago, that my testimony was essentially that there wasn't sufficient data to support the claims that were being presented in that matter. So I -- you know, I -- that was part of the opinion that I presented in that case.

Q That makes sense. Do you remember the name of the case?

A I do not, but I can find it, I'm sure.

Q Okay. What were some of the things you looked at to make sure -- you know, to come to that opinion that you didn't have -- they didn't have sufficient relevant data?

A Mostly, it was accounting documents; general

ledgers, income statements, other supporting documentation that would be typically maintained by a business.

Q Okay. Okay. Thank you. I'm going to -- we're doing good, going through the exhibits.

Let's see. Now, here's the one that we'll be going back to a few times.

MS. TILDEN: I'm going to introduce Exhibit 6.

(Plaintiffs' Exhibit No. 6 was marked for ID).

MR. McCURLEY: Okay.

BY MS. TILDEN:

Q And this is the report written by Mr. James McCurley in this case, dated July 20th, 2023. Is this your -- what we're looking at here, your report?

A Yes, it is.

Q Great. Do you know that -- when this report was produced to Plaintiffs?

A I believe it was July 20th, 2023.

Q And did you draft this document?

A Yes.

Q Did anyone else assist you in drafting this report?

A No.

Q And if we can just look at page three of the exhibit. Is that your signature there?

A Yes, it is.
Q And I think we said this, but just to make sure, it's -- the report's dated July 20th of 2023, correct?
A Correct.
Q Great. We're going to go back to that a few times, so I'd just kind of keep my eye on it, but you don't -- you can take it off your screen now if you want to.
A Okay.
Q When were you first contacted about possible engagement as an expert or doing any work on this case?
A I was first contacted back in December of 2022.
Q And who contacted you?
A Mr. Salazar from Lewis Brisbois.
Q And were you engaged at that time, in December 2022?
A I was not.
Q Can you tell me a little more about the conversation with Mr. Salazar, in December?
A Yeah. He mentioned the case. He said he had a case he might need some forensic accounting on. He didn't have a lot of specifics other than it involved a Class and the potential merging of different sources of

 data to -- in connection with tenant ledgers and other documents.

So I had mentioned to him at that time that, you know, we've got people at the firm that work in Class Action litigation and I offered our CVs to -- for his consideration.

Q Did he provide you with any documents at that time?

A No.

Q Okay.

A Oh -- no. No, sorry, he did not.

Q Thanks. And then when did you -- so you talked in December. Were there any follow-ups from that call, from that first contact?

A You know, in the first couple of weeks of December, there was some back and forth. We missed connections a few times. And then, I think, ultimately, I sent him copies of our CVs in mid December. He indicated that he passed them along to the client and that's where it stood for quite some time.

Q And then when did you next get back in contact with Mr. Salazar or someone from his office?

A Yeah. I think the next contact was with Mr. Matthews. And that was in early July of this year.

Q You don't remember the exact date, do you?

A I could -- yeah, I could get that.
I think I can get that.
Q Thank you for looking.
A No problem. I must say, usually, I've got a folder -- a file folder with hard copies of things.
Oh, there it is. Yeah, that would be July 6th.
Q And what did -- what was the conversation about?
A Basically, I received an e-mail that said, you know, he was circling back with me on the conversation I had with Mr. Salazar a few months back and was wondering if we could chat about the case.
Q And then that was, sort of, like, right after the holiday weekend. Were you able to get on the phone with Mr. Matthews soon after that?
A Yeah, I believe so. I -- yes.
Q Let me -- let's take a look at another exhibit.
MS. TILDEN: I just marked Exhibit 7.
MR. McCURLEY: Okay.
(Plaintiffs' Exhibit No. 7 was marked for ID).
BY MS. TILDEN:
Q For the record, this exhibit starts with the Bates number JMS000057. What is this document?

A This is, excuse me, our engagement letter in connection with this matter.

Q Great. And it looks like -- if you could scroll down to JMS000060. It was signed on July 20th, correct?

A Correct.

Q I was actually wondering. Is this the first time you've been asked to do any analysis of data or documents for the Defendants in this case?

A No.

Q When have you -- when is the other time?

A Are you talking about in connection -- I'm sorry. Are you talking about in connection with this case or other cases?

Q Have you been engaged by Wasatch before?

A Oh, not by Wasatch. My apologies. Not by Wasatch.

Q No. Sorry. That's okay. Is this -- so it sounds like this is not the first time you've been engaged by Lewis Brisbois?

A That's correct. Yes.

Q How many times have you been engaged by them before?

A I don't know. It's multiple times over multiple years.

Q Okay. Let's take a look -- taking a look at the engagement letter, just back to the signature page. I see that there's another signature there. Who's that?

A That's Frank Wisehart. He is the -- he resides, in our office, in San Francisco.

Q And did -- he didn't have any role in preparing the expert report we looked at as Exhibit 6, right?

A He did not.

Q Because that's why he's -- just why he's a signatory?

A Yeah. He's a -- he's a partner. He's a managing partner in San Francisco and the -- all the engagement letters need to be signed by the -- kind of supervising partner.

Q Great. And then I see your signature under his, right? Also dated July 20th of 2023.

A Correct.

Q So did you complete any work on your expert report prior to signing this engagement letter?

A Yes, I'm sure I did.

Reviewed documents, basically.

Q Okay. And, you know, looking over this engagement letter, do you know -- were you given any guidelines as to how many hours you could spend working

on your expert report in this case?

A No, we were not.

Q Okay. We're going to take a look at another exhibit.

MS. TILDEN: This is going to be Exhibit 8.

(Plaintiffs' Exhibit No. 8 was marked for ID).

BY MS. TILDEN:

Q And it's -- for the record, it is Bates stamped JMS000001. What is this document?

A That is an invoice, our invoice to Mr. Matthews and Lewis Brisbois.

Q And do you know who prepared the invoice?

A Our billing department.

Q Did you give them information to help them prepare the invoice?

A You know, the invoice gets generated through our time and billing system. So it's, pretty much, auto-generated, and then I review it and approve it.

Q Okay. And do you use some kind of, like, time-tracking software while you're doing your work?

A Yes.

Q And do you keep track of your, you know, time spent on work contemporaneously?

A Yes.

Q Great. Let's take a look at the first page.

The first page states that these are charges for services through July 31st, 2023, right?

A Yes.

Q And the total for these services is $5,565, correct?

A Yes. But I will tell you, that is -- that date is an error.

Q Okay. What's wrong with the date?

A It's not -- it's not correct. It's for services rendered through the invoice date, actually. So...

Q Through August 23rd, 2023?

A Yeah.

Q Okay.

A You know, I flagged that and it didn't get fixed. That's really frustrating. That's very frustrating.

Q It happens. Let's see. Okay. So then if we go to the second page, JMS000002, that's those lists of, sort of, entries there. Can you confirm that they're between July 19th, 2023, and August 18th, 2023, you know, as listed there?

A Yes.

Q Great. So there aren't any, you know, typos you asked to get fixed here?

A I don't believe so, no.

Q Okay. And then, you know, the date of the invoice, as we said, was August 23rd. So there weren't any entries between August 18th, 2023, and August 23rd, correct?

A Well, you know, I might have to look at a calendar. It would be through the last week ended prior to August 23rd. So --

Q I see.

A -- yeah. It -- so I can look at a calendar and give you an exact date, if you'd like.

Q Yeah, that would be great. Thank you.

A Can I do that?

Well, maybe I can't do that.

Q Well, I have -- I'll represent to you that the Friday before August 23rd, was August 18th. And so Saturday was the 19th.

A There you go.

Q So this invoice is dated the 23rd, but it has the entries through August 18th, 2023.

A That's correct. And that would be the last week -- full week -- reporting week prior to the issuance of the invoice.

Q Great. All right. Let's go through the different entries here on the second page.

A Okay.
Q The first one is July 19, 2023; is that correct?
A That is correct.
Q Right. And it says: Analysis of discovery materials and expert report, right?
A Correct.
Q For one and a half hours?
A Correct.
Q Thanks. Was July 19th, 2023, the first time you looked at materials related to the case?
A No.
Q So I know we talked about December, you looked at -- well, can you remind me what you might have looked at in December of 2022?
A I don't think I looked at anything document wise. I just had a couple conversations with the client and then forwarded my CV and my colleagues' CV.
Q Sorry. Thank you so much -- that makes sense -- for reminding me.
So this is not the first time you looked at materials related to the case; July 19th, 2023. What did you look at, and when, prior to July 19th?
A Well, it was the same materials; discovery materials and the expert report. The -- our system

won't allow me to charge time to a job of this nature until we have a signed engagement letter.

So, often times, the beginning, you know, conversations that I have with a client regarding a potential new matter and the -- you know, the creation of the engagement letter, even maybe the review of the complaint, they get charged to an admin code and they don't -- they don't get -- they don't become a part of the billing.

Q So those don't get billed to the Defendants?

A Correct. Yeah.

Q Can you estimate how many -- how much time might have been billed to the admin code for this case prior to July 19th?

A Boy. Maybe an hour, hour and a half, perhaps.

Q Okay. So in terms of materials reviewed, prior to July 19th, you said you reviewed the complaint -- you may have reviewed the complaint.

A I think. Yeah, let me look.

Q Great. Thank you.

A Well, sure. I think the complaint -- and, actually, there's another document with the listing of the Class, because those are two documents that we need to do our conflict check.

Q Can you tell me more about the document

 listing the Class? I'm not sure what...

A I ask for a document so that -- because our legal department required a listing of the Class, so I asked for one and was provided with an Excel spreadsheet with what I presume to be a listing of the Class members.

Q Okay. So this is a list of all the Class members in this case?

A That's my understanding. That's my understanding, yes.

Q And it sounds like you gave that to another department to run a conflict check; you didn't do the conflict check yourself?

A Correct. Oh, no, no, no, no.

Q Okay. So do you know when you got that list?

A Early on. It would have been the 6th or the 7th of July.

Q And then when did you get the complaint to review?

A And I might be mis-categorizing complaint, because I'm not seeing a complaint in my documents. So it's possible -- that's usually what I ask for, that's why I said the complaint --

Q Right.

A -- without actually looking at the folder. I

probably used the -- you know, really, any of the documents that were produced -- probably the order granting Plaintiffs' motion for summary judgment document, that's the one I likely used.

And, really, the purpose of that is to get the names of all the players, all the law firms, and the -- you know, all the Defendants' and the Plaintiffs' legal names so that we can run the conflict check.

Q Okay. Great. Just want to go through, like, the timeline before July 19th. You were contacted by Mr. Matthews on July 6th. And then when did he start sending you documents?

A On July 6th -- ooh, bear with me.

Q Sure. Take your time.

A It's got to be -- it looks like the 6th, and then the 19th, and then the 20th.

Q Those are the dates that you received documents from --

A Yes.

Q -- Mr. Matthews?

A Correct.

Q And then which documents did you receive on 6th?

A I received the -- I received the Class list on the 6th. Mmm. When did I get...

And then I received the other documents on the 19th. I believe I got access to a file share portal, as well. And I'm looking for that e-mail. I don't see it, so I don't know the date. But it would be in that same time frame; between the 6th and the 19th.

Q You can find that date for us, later, right, that you got the portal?

A I'm sure I can, yeah. I'm not coming up with it now, but I'm sure I can.

Q Okay. So you got the Class list on July 6th. And it sounds like you, you know, sent it off to get analyzed, right? At some point -- is that correct? Sorry.

A Correct. That's correct.

Q And then at some point, between the 6th and the 19th, you got, sort of, a portal file share and you can find that information for us later regarding when it was.

A Correct.

Q And did that file share have everything that you refer to in your expert report?

A No. It had some of the things. Other things, I received directly via e-mail attachments.

Q And then did you start reviewing the materials you got from the portal between the 6th and the 19th?

Prior to the 19th, did you start reviewing those materials?

A I mean, I assume I did, but I don't -- I might have had a different remembrance of when I got this material, so.

Q Yeah. No. I appreciate that. You know, you had mentioned that you sometimes bill to an admin code for, you know, the pre-engagement letter stuff. Do you -- would you be able to produce those billing records?

A No. They're not specific. They're generic admin codes.

Q Okay.

A Yeah, I don't believe I've -- I don't think there's a note in them. I just accumulate those un-billable time and charge them to an admin code, basically.

Q Okay. Great. So is it possible that you started analyzing, you know, all the materials that you received on July 19th, like it says on the invoice here?

A It's possible, yes. It is possible.

Q I just had another quick, follow-up question again about the period between the 6th and the 19th. You sent -- you had some e-mails between you and Mr. Matthews, and as well as some telephone

 conversations?

A Yes.

Q Were you given any facts during the calls or e-mails?

A I mean, I was given -- I was educated about the issues and the case. I don't know what you mean by facts.

Q Yeah. Facts about the case, anything that informed -- how about we say anything that informed your report.

A The only thing that would have informed my report would be discussions about, you know, what they are -- you know, what they're looking for in terms of an expert -- you know, expert testimony, what topics to deal with.

Q Do you remember what topics they listed at the time?

A Yeah. Sure. It was those topics that we've -- that ultimately ended up in our report, and that I assume we're going to talk about at some point, would be the concept of, is there value associated with the -- the -- is there value associated with purchased services, particularly renter's insurance and media packages.

Q And just to be -- clarify, that's what

Mr. Matthews told you would be the topics of the report?
A Yes.
Q All right. And -- let's see. Did they give you any, like, assumptions to rely on during the conversations between July 6th and July 19th?
A No, not that I can think of.
Q Okay. Great. All right. So, finally, we can get to July 19th. You mentioned that -- here, it says you analyzed discovery materials and expert reports. Do you remember what discovery materials refers to specifically here?
A I mean, it's pretty generic. It is those documents that are listed on my -- in my report. Those all came within that window, so it would have included all of those. I can take a look at them.
Q No, that's okay, as long as your -- you're referring to the documents listed in your report --
A Correct.
Q -- as discovery?
A Correct.
Q And I just want to check. When it says expert report, are you -- what does that mean?
A Included in the materials was a -- something that was identified as an expert report. Mr. Breshears' expert report, I believe.

Q Okay. Great. That's helpful. And is that the report that you listed as a source of information in your report?

A Yes. One second.

Q I believe it's number three, expert report of David Breshears', filed 4/22/2022 --

A Got it. Right.

Q -- as listed in your report.

A Yeah, I just wanted to make sure that -- what it was called. It is under a category called sources of information. So, yeah.

Q Okay. Thank you. Thanks for checking that.

And then it looks like, on July 19th, you had e-mails to and from clients. Are these e-mails to Mr. Matthews and folks in his office?

A Correct. Associated with the delivery of the materials.

Q So was there anything else discussed in the e-mail, other than the delivery of the discovery materials?

A I don't believe so. It was more of an acknowledgement. You know, they sent an e-mail saying, here is the data, and I sent an e-mail back saying, thank you, we'll take a look and be back in touch, that type of just pleasantries, so to speak.

Q Great. So it's fair to say that there wasn't any factual information about the case in those e-mails?

A I mean, I don't believe so.

Other than attachments, the documents that were attached.

Q Right. And did the client give you any assumptions that you should rely on in these e-mails dated July 19th?

A No.

MR. MATTHEWS: Objection. Vague. Go ahead, Jim.

MR. McCURLEY: Yeah. No.

BY MS. TILDEN:

Q Okay. Great. Then on July 20th, I see the first list -- the first item listed is analysis of discovery materials, expert report. And that's for 2.2 hours.

A Mm-hmm.

Q Is that correct?

A Yes.

Q And is that the same -- would that be -- refer to the same thing as July 19th, review of documents, listed in your report, and, also, review of David Breshears' report that's also listed in your -- as a source of information?

A Yes. It's a continuation of what I did the day before, understanding that we were on a short timeline.

Q And then the next entry is July 20th, 2023, report preparation.

A Mm-hmm.

Q Can you tell me what that refers to?

A That refers to the preparation of that report, that we discussed earlier. And, you know, it's a bit of an amalgamation of, obviously, reviewing documents and writing a report.

Q Okay. And -- okay. When you say reviewing documents, that, again, refers to, you know, the documents we discussed, that were listed as sources of information?

A Yeah. I mean -- yes. I'm at my desk, reviewing all the documents. I'm writing a report. It kind of meshes together.

Q Right. And then the next entry, it's July 20th, 2023, telephone calls with client for .5 hours, right?

A Correct.

Q What were the top -- what was the topic of these telephone calls?

A Well, this would be, you know, what topics am

I to -- you know, to finalize my understanding of what's to be addressed in the report. There was a little bit of, you know -- there was a little bit of uncertainty, initially, as to what we were going to report on, the depth of the analysis that we were going to do with regard to preparing or analyzing some of the more detailed data.

And I wanted to make sure that, you know -- that I understood exactly what it is we were looking to report on and that was the purpose of those calculations. I think I addressed that in the report itself.

Q Sorry. When you say you addressed that, can you clarify what you mean?

A Sure. The report itself is one in which I express an opinion with regard to the reasonable measurement of economic value of some of the purchased services that are at issue here. We also received other, kind of, information and databases that potentially would have involved measuring those, putting a dollar figure on those, and actually testifying to an actual amount.

And I mentioned, in the report, that, you know, at present, we were not asked to do a tenant-by-tenant analysis; however, we are available -- willing,

able, and available do so if needed.

Q With respect to the databases you just mentioned, are these all listed in your report as sources of information?

A Yes. You know, I don't see the -- actually, my apologies, I don't see the Excel spreadsheet with the Class. I don't know that that's listed here.

Q Looks just like with the Class names.

A Yeah.

Q The names of the public classes.

A Yeah. Yeah.

Q Okay. But other than that, you know, the databases you're referring to are listed under sources of information?

A Correct.

Q Just bear with me one second. On those calls that are listed on July 20th, did you talk about any -- did you learn any facts or information from the client?

A I don't think I learned anything I didn't already know.

Q Did you confirm stuff you already knew?

A Yeah. You know, it was -- I believe -- I don't know. I don't know the answer. I don't want to guess.

Q Did you confirm any information related to the

databases on those calls?

A What do you mean by confirm?

Q I didn't know if you had -- did you have any questions about, you know, the database or the extent of the database --

A Actually --

Q -- completeness?

A I'm sorry. No. No. Because, you know, during the course of the call -- calls, it was determined that we were not going to be doing that in this particular -- at this particular time. So I didn't really need to worry about it at that point. I just needed to worry about what our opinions were with regard to the bigger issue, the more global issue.

Q The more global issue being?

A The measurement of -- the status of the economic value of the renter's insurance and media packages that were purchased.

Q So is it fair to say that it's during these calls you decided that you weren't going to do a final tenant-by-tenant accounting during these calls on July 20th?

A No, I didn't decide that. That was a discussion that was had with Mr. Matthews, that it was decided that the focus of the report would be more

 global in scope.

Q When you initially discussed the case with Mr. Matthews, starting in July 6th, did you raise the possibility of doing a tenant-by-tenant analysis?

A Yes.

Q Did you or Mr. Matthews? Sorry.

A Yes.

Q Both of you?

A I can't speak for Mr. Matthews. I don't really recall. But I know that was part of what I though might be the scope of the work that we were going to do.

And that goes back to my initial conversations with Mr. Salazar back in December, as well.

Q So did you have enough data on July 20th to -- 2023, to do a tenant-by-tenant analysis?

MR. MATTHEWS: I'll object as vague as to tenant-by-tenant. Go ahead.

MR. McCURLEY: Yeah. I don't know that we had enough to do a tenant-by-tenant, but I believe there was enough data there to do a valuation of the excess -- or the economic impact.

BY MS. TILDEN:

Q But you didn't do an assessment of the -- a numerical assessment of the economic impact, correct?

A Correct.

Q Can I ask what -- you mentioned that, you know, you didn't know if you had enough information to do a tenant-by-tenant analysis. Can I ask you what led you to say that?

A Well, sure. I -- we didn't have the tenant ledgers, I don't believe. So that would have been required to really start merging data. And, again, that was more because we weren't being asked to do that at that point.

Q Did you ever ask for the tenant ledgers?

A No.

Q If you had had the tenant ledgers, would you have been able to do a tenant-by-tenant analysis?

A I can't answer that question. I don't know because I haven't seen exactly what's included in the tenant ledgers. I don't know the answer to that.

Q I'm sorry if I've already asked this, but did you ask Mr. Matthews for the tenant ledgers or anyone in his office for the tenant ledgers?

A I did not.

Q And you said you didn't ask -- now I'm remembering. You said you didn't ask because you were not going to do -- you were -- you had been told not to do a tenant-by-tenant analysis at that time?

A As a part of this report, that's correct, yes.

Q Was your -- was the decision not to do a tenant-by-tenant analysis related to the amount of time you had to complete this analysis?

MR. MATTHEWS: Objection. Lacks foundation. Calls for speculation.

MR. McCURLEY: Yeah. I don't know the answer to that question.

BY MS. TILDEN:

Q So was there a reason given that -- not to do a tenant-by-tenant analysis for the July 20th report?

A I mean, I don't recall that conversation. I do know that, you know, there was a timing -- certainly, there was some timing issues, but I don't recall having that conversation. I just recall having a conversation of, you know, what do you need from us at this point. And the answer was: We need you to, you know, express your opinion on this particular issue and leave the door open for potentially additional work, if possible.

Q And it is one of your opinions that a tenant-by-tenant analysis is possible.

A Again, I don't know without seeing the records. If the records are comprehensive, then I'm sure.

Q Okay. Let's go ahead and go back to the

invoice and look at July 24th. That's after the date of your -- that's after your report was produced to Plaintiffs, correct?

A Correct.

Q And listed here is document review and discussion of next steps with staff, right?

A Correct.

Q Can you tell me what the document review on this date entailed?

A Not specifically. Just, kind of, an overview. I knew I wanted to discuss with the staff members, that I was going to task with the job, of potentially doing some data analysis. So I just wanted to refamiliarize myself with what we had, and then reach out to staff and let them know, hey, just put them on notice, basically, to make sure they had availability to even help. Because I knew, if we were to do this, it was going to be a short timeline.

Q How did you know it would be a short timeline?

A Because I already -- because everything is on a short timeline. I just -- I got the feeling. Yeah.

Q Yeah. Like, did you -- were you given a -- any information about the timeline?

A The only thing I knew at that point is that there was a trial date of August 10th. And I know that

that obviously was pushed. I don't remember when that was communicated to me. I didn't think it was going to happen, but I did want to make sure, you know, if somehow, miraculously, we received a bunch of data, if I had the staff available to do something with it.

Q And has the staff member, that you referred to here, been doing any work on this case since you talked to them?

A There's two of them and the answer is, no, they have not. And they're probably wondering why I haven't followed up with them.

Q Okay. And then going on to August 17th, 2023, subpoena review and response prep for one hour, right?

A Correct.

Q And what was this? What did this entail?

A That entailed reviewing your -- the subpoena that was presented to me and starting to -- starting to pull together documents in response to it.

Q Great. So this is the document subpoena, correct?

A Correct. Correct. Yes.

Q Great. Okay. And then on August 18th, 2023 --

A Mm-hmm.

Q -- it lists, analysis of cost database for two

hours, right?

A Yes.

Q What database are you referring to here?

A I am not certain. That -- that looks like a -- an odd description. It would -- it would be reviewing -- again, I easily could have put the same analysis of discovery materials on this one. I think I would -- my best -- my best guess of what that is, is reviewing the -- the native documents that contained the cost and the -- the information in support of Mr. Johnson's deposition, there's a couple of databases -- databases -- spreadsheets that were provided to support that.

So it was really a function of, kind of, reviewing all of that and trying to get a real good handle on that situation.

Q Are these all spreadsheets that are listed as sources of information in your report?

A Yes.

Q Can I ask what you did on the 18th that was different from the analysis you did prior to July -- on July 20th, or prior to that?

A I think -- like I said, I think it was just getting myself more acclimated. Again, just digging into the files a little bit, knowing that this file is

continuing on. A lot happened between the 20th and -- of July and the 18th of August. So I was just really reviewing the file and making sure I, you know, was ready.

Q When you say a lot happened, do you mean a lot related to the case?

A No. No. Just vacation and got sick and, you know, that kind of stuff. Personal.

Q Okay. I hear ya. Did you do anything different in this analysis of cost database on the 18th than what you did on July 20th, or earlier?

A No.

Q Okay. And did anything in your analysis on the 18th have -- affect your opinion as stated in your report?

A No.

Q Can I ask why this analysis wasn't completed -- or, you know, why this analysis wasn't completed prior to the 20th, or on the 20th?

MR. MATTHEWS: Objection. Misstates his testimony. Go ahead.

MR. McCURLEY: Yeah. I don't think that's the case. I think it was a -- it was really a -- again, I think I said, right off the bat, that's not a great description. You know, it really was a

combination of a file review, looking over everything, so I could respond to the subpoena for records. I mean, all of that congealed together and I probably put a poor choice of words on that -- that seems like it's almost a typo, but it's there, so.

BY MS. TILDEN:

Q So it's like you didn't do anything, like, new in August related to the materials than what you did --

A No.

Q -- in July?

A Correct.

Q Okay.

A Oh, I'm sorry. Correct. Yeah, that was really all in connection with just reinvigorating myself on the file and responding to the subpoena for documents.

Q That makes sense. Okay. And just for completion, let's look at the last line here, telephone call with client on August 18th, .4. That's what it says, right?

A Yeah.

Q What was the topic of those calls?

A It had to do with the request in the subpoena and my -- you know, some -- obviously, some of my

responses were, none, or I didn't have the information or -- you know, I just wanted to get some clarity on specifically what you're asking for and what am I obligated to provide.

Specifically, one of the things was those expert reports that I ultimately did attach. I was concerned about sharing reports that may -- you know, maybe were covered by some kind of protective order that I wasn't aware of. And so I wanted to just express those concerns to Mr. Matthews and he -- he addressed it with me.

Q So is it fair to say that these calls were about responding to the document subpoena and not about substantive things in your report?

A Yes.

Q Okay. Great. So --

MR. McCURLEY: Is there -- I'm sorry, can we take just a couple minutes? I need to get something to wet my whistle.

MS. TILDEN: Sure. We can take --

MR. McCURLEY: Two minutes, is all I need.

MS. TILDEN: Let's do five minutes. We'll take a five-minute break.

VIDEOGRAPHER: We are now off the record. The time is 2:28 p.m. Pacific time.

(Off the record at 5:28 p.m. EST).
(On the record at 5:36 p.m. EST).
VIDEOGRAPHER: We are now back on the record. The time is 2:36 p.m. Pacific time.
BY MS. TILDEN:
Q Great. All right. Just a couple more follow-up questions about the invoice. For the record, this is a list of entries for the hours between July 19th, 2023, and August 18, 2023, correct?
A Correct.
Q Have you billed more hours between August 18th, 2023, and today?
A I have not.
Q So just checking, you don't bill for deposition preparation?
A I will. I haven't yet.
Q I see.
A I've charged hours to the job, but I haven't billed anything yet.
Q Sorry, I didn't get the terms right. Have you charged any other hours to the job between August 18th and today?
A Yes.
Q What have you charged?
A I don't have an exact accounting of it.

Couple of hours last week. Couple of hours yesterday, that I actually haven't filled my time out for yesterday yet. And a couple of hours this morning.

Q Some of those are deposition preparation, I think, probably?

A Correct. Yeah.

Q And then are any of them different from the type of activities you have already listed in your invoice here?

A No.

Q Analysis --

A Oh, sorry. No. No. Analysis of discovery material, expert reports. I did get those two additional reports yesterday. So I spent some time going over those both yesterday and this morning. And that's generally it.

Q Okay. And then if we could -- you could produce those to us, the additional billing entries, charging entries.

A Of course. Yes.

Q Okay. So it sounds like -- do you have any pending assignments for Defendants?

A Other than this one?

Q Well, you know, when we say this one, what do you mean?

A Oh, oh, oh. Well, this one being this case. Are you talking about assignments associated with this case or other cases.

Q Yes. Yes. Yes.

A Got it. No.

Q Okay. So let's go back to your report, Exhibit 6. You can go ahead and review it so that you can control --

A Yes.

Q Do you see it on the list?

A Yes, I've got it up.

Q Okay. Great. We're going to go through it. Just, generally, though, has your opinion, as expressed in this report, changed since July 20th, 2023?

A No.

Q And does this report provide a complete statement of opinions you'll express in this case?

A As I sit here today, yes. So unless anything else is asked of me, this would be complete.

Q Were you given any assumptions that you relied on in forming your opinion?

A No.

Q You know, I know we got some exhibits with your report. Did any of the exhibits, that were submitted with your report, summarize your opinions?

A No. In this particular case, the report itself summarizes the opinions. I think the exhibits were just my CV and some of the other ancillary material.

Q So, then, do any of the exhibits, submitted with your report, support your opinion?

MR. MATTHEWS: I'll object as overbroad. Go ahead.

MR. McCURLEY: Yeah. No, there are no exhibits that -- that were produced that support my opinion, other than the report itself.

BY MS. TILDEN:

Q Thank you. I was wondering, did you talk to anyone who worked for, you know, Defendants Wasatch in forming your report?

A No.

Q And I meant, you know, Defendants by which we're also meaning Wasatch, as we discussed earlier.

A Understood, yes. I have not.

Q Okay. Thanks. All right. We're going to talk a little bit -- let's go to the introduction of your report, the first paragraph, where it says: We are pleased to submit the following information related to our ongoing review in connection with the referenced

case. Our review today has been limited to the scope of work outlined by you and to materials provided pertinent to the captioned matter.

And I just wanted to, you know -- we talked a little bit about this, but what was the scope of work that was outlined to you by, I believe, Mr. Matthews and Mr. Salazar?

A The scope of work, as it relates to this report, was to opine about the economic value of purchased services as they relate to this case.

Q Did you talk to anyone else about the scope of work?

A No.

Q And has your scope of work changed in any way since you submitted your report?

A Oh, no, not since -- no, not since I submitted my report. It narrowed, leading up to the report, to what is discussed in the report, but not since then.

Q So did it narrow from your initial discussion on July 6 about the scope of work?

(Simultaneous speakers).

MR. MATTHEWS: -- did it narrow. Go ahead.

MR. McCURLEY: Yeah, I don't know, necessarily, from July 6. Certainly, since -- from the beginning of my discussions with Mr. Salazar,

back in December, to then circling back with Mr. Matthews in early July, I had -- and it may be me, but I had a certain thought in my head as to what the game plan was. And as time went by and we talked more, that narrowed to what we have here.

BY MR. SELINSKY:

Q Can you tell me what your, you know, initial thought of what the game plan was -- in December of 2022 was?

A Well, I think I mentioned it before. It was the potential to do more data analytics with regard to specific calculations, with regard to, you know, tenants and years and amounts paid for certain, additional services.

Q And then did that change on -- when you were -- picked up the conversation again in July 2023?

A Yeah, it certainly changed between then and when we ultimately issued the report.

Q How about --

A That didn't --

Q Sorry. Please continue.

A No. That's it.

Q Did it change, you know, when you -- on July 6, when you picked up the conversation again with Mr. Matthews' office?

MR. MATTHEWS: I'll object. Assuming facts not in evidence and misstating the testimony. Go ahead.

MR. McCURLEY: Sure. Yeah, I was still under the impression that there may be some additional data analytics to be done. That's why I, kind of, put staff on notice that they may -- you know, I might need their services. So I clearly thought that there was potential for more work.

BY MS. TILDEN:

Q And then did your work -- as we discussed on July 20th, was that the date where, you know -- the scope of your work narrowed?

A I mean, ultimately, when I had those conversations on the 19th and 20th, and whenever it was, yeah, that's when it, kind of, became clear, hey, this is -- you know, we're looking for an opinion on this issue based on everything you know about the file, the case. So, yeah, I would say it narrowed right then and there.

Q Okay. Thank you.

MR. MATTHEWS: And I'll lodge a belated objection as to what "it" was and whether "it" narrowed. It assumes facts not in evidence. It's vague. It's ambiguous. Misstates testimony.

MS. TILDEN: Thank you.

BY MS. TILDEN:

Q By it, can we agree that I meant scope of work, Mr. McCurley?

A Certainly.

Q Thank you. Okay. I'm just going to quickly take a look at another exhibit, but we will get back to Exhibit 6 again.

(Plaintiffs' Exhibit No. 9 was marked for ID).

BY MS. TILDEN:

Q Do you see -- whoops -- sorry -- Exhibit 9?

A Yes.

Q And what is this?

A This is my CV.

Q Is this the document that was referred to -- as your CV, that's in the intro -- mentioned in the introduction of your report?

A Yes.

Q And you had submitted this as an exhibit with your report, right?

A Correct.

Q Do you generally keep your CV up to date?

A Yes.

Q Did you prepare this CV specifically for this expert report?

A No. No. This is pretty -- I don't want to say it's -- it's the CV that I send out when I'm asked to provide a CV.

Q Great. Just really quick, it's under education. It says you have a Bachelor of accounting -- science and accounting -- Bachelor of Science in accounting?

A That's correct.

Q Okay. Is an accountant different from an economist?

A Yes.

Q So you're not an economist, right?

A I'm not an economist.

Q Great. And then looking quickly on the second page, under "Thought leadership", kind of towards the bottom.

A Yes.

Q It says -- I notice you list three publications here.

A Yes.

Q Does this list include all publications you've authored in the last ten years?

A Yes.

Q And then none of these publications deal with contract damages, do they?

A That's correct. These are -- that was a series of construction related -- construction damage related articles.

Q Okay. Great. I think we can go back on the report, Exhibit 6. If we can look at the section that says, background, the first paragraph. I'm going to look at the second -- point you to the second sentence. And it says, specifically: I have been asked to opine on the reasonable basis for determining the economic value of additional charges associated with rental insurance and media packages; i.e. internet and cable television services.

Did I read that okay -- read that correctly?

A Yes. Yes.

Q I was wondering, is economic value a term provided to you by Defendants in your discussion?

A Sorry. I don't believe so. I mean, value -- economic value or financial value, all interchangeable.

Q Okay.

A But, certainly, the discussions were around, we need a -- we're looking for your opinion on the reasonable basis for determining value -- through an economic value.

Q Okay. Is economic value a, like, forensic accounting term?

A No. It's a general term.

Q So is it -- you mean like a layperson's term?

A Lay financial person, I guess. I wouldn't say lay. It's just a financial term, but it's a general financial as opposed to a specific term regarding specific, you know, documentation.

Q So as you mean it here, would it -- like, as you state it here, would an economist use it in the same way as you're using it here; economic value?

MR. MATTHEWS: Objection. Calls for speculation. Go ahead.

MR. McCURLEY: Yeah, I have no idea how an economist would respond to that term or use that term.

BY MS. TILDEN:

Q Are there authoritative, like, definitions of economic value that I could look up?

MR. MATTHEWS: Objection. Vague, overbroad. Go ahead.

MR. McCURLEY: I don't believe that there are. There are probably definitions out there. But, no, I don't think you'll find -- you know, it's not a specific term of art.

BY MS. TILDEN:

Q Okay. So what do you mean here when you say

economic value?

A I mean, I can think -- I'm a damages expert. I look at things in terms of economic damages. So I'm looking for how to put a dollar amount or a value -- or a concept on the economic value of a -- of a circumstance like we have here.

Again, it's a pretty narrow window that I'm looking at here, but -- so that's what -- that's what I'm talking about. I'm just talking about economic value in the overall sense as it relates to this circumstance.

Q When you say narrow window, do you mean, like, the time period?

A No. No. Window might not have been the right term. Just narrow scope of services that I'm providing, and scope of opinion.

Q So, then, in -- when you say economic value, do you mean damages in this case?

A I mean it as a way of potentially looking at damages, yeah. I believe I mentioned that later in the report, as well.

Q But you, like, specifically, didn't use damages. Was, like, the reason -- was there a reason that you didn't use damages in this opening?

MR. MATTHEWS: Objection. Vague and

ambiguous. Go ahead.

MR. McCURLEY: Yeah. There's no specific reason I didn't -- I guess it's more of an intro paragraph, introducing concepts more than any specificity.

BY MS. TILDEN:

Q Okay. Just generally, in a case that involves a breach of contract, do forensic accountants generally analyze contract terms as part of their evaluation of economic value?

A I think forensic accountants certainly would look at contract terms but would never interpret contract terms. Because contracts are basically legal documents and they would refer to the attorneys to -- for those definitions.

Q So what would they -- may I ask, what would they look at the contract terms for?

MR. MATTHEWS: Objection. Overbroad. Majorly hypothetical. Go ahead.

MR. McCURLEY: Yeah. Sorry. Yeah, background and knowledge. Just trying to understand the circumstances as much as possible.

BY MS. TILDEN:

Q I just wanted to clarify, in this paragraph, when you say -- you know, you're asked to opine on a

reasonable basis for determining the economic value of additional charges. Do you mean economic value to Defendants?

A I mean economic value to -- in connection with this case. So to Plaintiffs and Defendants.

And the Court, for that matter.

Q Can you -- sorry, can you say that again?

A I said, and the Court, for that matter.

Q Does your report anywhere describe economic value to Plaintiffs? And can you point me to where?

A If you go to the general comments section, the next page, I believe, and the middle paragraph, that's where the concepts are, kind of, laid out.

Q Can you point me, specifically, to the sentence or sentences about economic value to tenants?

A Sure. Can I -- I'm going to read the first four sentences. Is that okay?

Q Sure.

A So -- and that four was an estimate.

Of the charges included in the additional service agreements, renter's insurance and the various media packages have measurable economic -- have a measurable economic value in the marketplace. That value is established in each market by the cost of that product to consumers. Under the circumstances, it is

reasonable to assume that the cost paid for these services by Wasatch is an appropriate measure of its value. Accordingly, we believe a reasonable estimate of the damages incurred by tenants for renter's insurance and media packages is the difference between the amounts paid to Wasatch as additional monthly service charges and the cost of those services incurred by Wasatch.

That lays out the bulk of the opinion right there.

Q Okay. So you say that's -- it's reasonable to assume that a cost paid for these services by Wasatch is an appropriate measure of its value. And in that, do you mean its value to Wasatch?

A I mean its value -- its value in the marketplace for a purchaser.

Q Okay. And earlier you mentioned -- you know, you said value to the Court. Can you clarify what you mean by that?

A Well, this is a litigation case. So there's a plaintiff, there's a defendant, and there's the trier of facts. So that's really what I'm talking about. That's what I'm referring to.

Q Okay. We'll probably get back to that paragraph, but I'm going to go back up again to the background. I want just to clarify, when it says, for

the purposes of this report, I have not been asked to provide a final accounting of these matters as I understand the data set is not yet final.

I wanted to ask what data set you're referring to here?

A I think I got that from Mr. Matthews. Just that we didn't have a final measurement point on the back end since it's -- so that was my understanding. And --

Q Sorry. What do you mean by measurement point?

A Date. Date. Final date of measuring damages.

Q Okay. And you said that Mr. Matthews is the one who told you the data set's not final?

A That was my understanding of our conversation.

Q Okay. And when did he tell you this?

A That would have been in the same time frame of the 19th or 20th of July.

Q Sorry. When we talk about data sets, are we sort of referring to the same data sets that are listed in your report under source of information?

MR. MATTHEWS: I'll object as overbroad, lacking foundation. Go ahead.

MR. McCURLEY: Or any other data that might be available. So, again, I think additional data would have been needed to do a more detailed

analysis. So it's not limited to just that data.

BY MS. TILDEN:

Q We talked a little earlier about additional data. Is that the tenant ledger?

A Yes. I mean, that's a part of it. I don't know, again, without diving into the data, to know -- you know, you got to analyze it and make sure it's complete. So it could -- that would be -- that would be a starting point, I think.

Q What else would you have needed to know in order to --

MR. MATTHEWS: Objection. Lack of foundation. Calls for speculation. Go ahead.

BY MS. TILDEN:

Q What else would you need to know in order to do a final accounting?

MR. MATTHEWS: Same objections.

MR. McCURLEY: It would depend on what's in the ledger. I think I mentioned earlier how detailed, how comprehensive the -- the -- the data that's incorporated in the tenant ledgers. I don't know if it just includes rent, if it includes other payments. I just don't know all the specifics of what's in there. So it really is dependent on the data. And you don't know until you dive in.

BY MS. TILDEN:

Q But this is all data from the tenant ledgers that you've been referring to just now.

A Again, as a starting point, yes.

Q Okay. Do you have any idea what else you might need to know, outside of the information, for the tenant ledgers?

MR. MATTHEWS: Objection. Lacks foundation. Calls for speculation. Go ahead.

MR. McCURLEY: I do not.

BY MS. TILDEN:

Q So did you -- was it your understanding that damages in this case were continuing past the date of your report?

MR. MATTHEWS: Objection. Lacks foundation. Go ahead.

MR. McCURLEY: Either that, or that -- not that damages were continuing, but they might not -- I might not have all the data that would incorporate that time frame. And I don't know what that time frame is or was. I was really just leaving the door open for additional work.

BY MS. TILDEN:

Q Could you have done an analysis of the data that you had prior to the date of your report?

MR. MATTHEWS: Objection. Calls for incomplete -- calls for speculation. Incomplete hypothetical. Lacks foundation. Go ahead.

MR. McCURLEY: Could I have done an analysis; is that what your question is?

BY MS. TILDEN:

Q Yes.

A I mean, yes, we could have analyzed the data. I don't know that we could have come to any conclusions with the data. We certainly could have analyzed it.

Q Can you explain why you couldn't have come to a conclusion?

A Well, I don't know if it's complete, that's why. I think -- as I said before, I think we have part of the equation in the data that we have and there might be other information that would be needed to do a more comprehensive analysis, a damage assessment.

Q Just to go back over something we mentioned earlier, I asked you, did you understand that damages were continuing. And that was in reference to your mentioning that there was no end point. So was it -- you know, you were told that there was no end point for the damages. Is that -- did that inform your understanding that damages were continuing?

MR. MATTHEWS: Objection. Misstates the

testimony. Calls for a legal conclusion. Lacks foundation. Go ahead.

MR. McCURLEY: Yeah, I don't -- that's not -- that's not the discussion that was had. It was my understanding that -- that the data set wasn't final. I mean, I can't say it any clearer than that. The data set that we have. So it doesn't mean that damages are continuing; just that the data set might not quite be complete.

BY MS. TILDEN:

Q Were you told if there was any end point for the data set?

A No.

Q So complete doesn't necessarily mean based on a date?

A Correct.

Q It could be because some data was missing?

A Either/or, correct.

Q And it could be both?

A Correct. Correct.

Q I was wondering, have you ever been asked to prepare a report on economic value for litigation where you didn't do an actual accounting but say you can do one, as you do in this report?

A Yes.

Q When was this?

A I think I mentioned, earlier, one that -- a case I worked on that we were asked to be the defense expert on a -- on a claim that, by the time we got through all the documents, we were of the opinion that the documents, that were provided to support the claim, were insufficient to even prepare a calculation. So there's that.

I've been involved in a case where a business was dormant for a number of years before having an incident that created a claim for lost income and came to the conclusion that there was no basis for any additional claims because they were not in the business of generating revenue at the time of the loss.

And I've been involved in -- not -- again, I don't do -- a hundred percent of my work is not litigation-based. A lot of my work is other damage assessments. And there's been plenty of times, over my career, where claims have been made for damages that we didn't agree that there was a viable claim for, based on the data.

Q So it sounds like you have some experience evaluating whether there's sufficient data and information to do an accounting of damages.

A Correct.

Q Have you ever been asked to prepare a report that calculated damages where the data was still accruing at the time of your report?
A An expert report?
Q Yes.
A Not that I'm aware of.
Q How about non-litigation report?
A Happens all the time.
Q And then have you ever been asked to prepare a report that calculated damages where the data set was incomplete at the time you submitted your report?
A No. And I still haven't.
Q In this case, were you given any reason why you shouldn't do a final accounting, other than the data didn't have an end point and was possibly incomplete?
A Okay. I wasn't given that as a reason not to do an accounting in this case, either. So --
Q Oh, okay.
A -- the answer is no. And that didn't -- that doesn't apply to this case, either.
Q Okay. What was the reason you were given to not do a final accounting?
A As of the time of the writing of this report, my client, essentially, said we're looking for a -- you know, we're looking for a more narrow scope of what your

services should be, and that should be, what is your opinion with regard to the value of the services that were produced and provided. Excuse me.

Q Did you suggest that you could do an accounting through the date of the last data that you received?

A Did I suggest that we could?

Q Yes.

A No, I don't believe I suggested that. I suggested that -- I think I say it in the report -- that we are, you know, ready, willing, and able to do additional work if we are asked to do it.

Q Okay. And just quickly looking at the source of information, on your report, which is on page two --

A Mm-hmm.

Q -- we talked about how you have since been given two reports by David Breshears that are not listed here. And I believe we talked about a list of Class names that aren't listed here. Is that correct?

A Not exactly. The two reports -- one was by, I think, Mr. Breshears. The other was him and another expert -- a rebuttal expert.

Q Oh, okay.

A I can get the name, if you'd like.

Q Yes, please.

A Maryanne Russ.

Q Okay. Other than the Russ and additional Breshears' report -- oh, can you tell me what day the Breshears' report was dated, that you were given?

A I always have a hard time finding dates on these legal documents. They're never where I think they're going to be.

Q Right. The stamp is sometimes not the --

A It's never on the first page. It's always at the end.

Q We should change that.

A Yeah. Work on that.

I don't know the answer to that question.

Oh, there's his -- oh, there you go. On July 20th, 2023.

Q Thank you so much.

A Mm-hmm.

Q And then the date of the Russ report?

A Bear with me.

Q Oh, please take your time.

A July 20th, 2023.

Q And you did not review or rely on the Russ report or the July '23 Breshears' report in forming your opinions, correct?

A Correct.

Q Okay. So other than the July 2023 Breshears' report, the July 2023 Russ report, and the list of Class names, are there any other documents that you reviewed that are not listed under sources of information here?

A No, there are -- I don't think -- I don't believe so.

Q Okay. And then who selected the documents provided to you in this matter?

A I have no idea.

Q Did you request any of the categories of documents -- any categories of documents?

A No.

Q And then who did you correspond with regarding, you know, documents that would be sent to you?

A Primarily, Mr. Matthews and his staff, basically, administrative staff.

Q So it's correct to say -- since you say you didn't request any documents, is it fair to say you didn't -- you didn't request any documents, data, or other materials that you didn't receive?

A That's correct.

Q Sorry, that was a little convoluted way to ask that.

Did you review any -- actually, strike that.

 (Plaintiffs' Exhibit No. 10 was marked for ID).

BY MS. TILDEN:

Q Okay. Okay. So we're just going to look quickly at Exhibit 10, before jumping back to Exhibit 6. So I introduced Exhibit 10, on the record. And this is a Court order granting Plaintiffs' motion for partial summary judgment. And I believe this was sent as an exhibit to your report, correct?

A Correct.

Q So you reviewed this document as we discussed earlier?

A Correct.

Q Do you typically review important, legal rulings in a case when you're serving as an expert in that case?

A If it's a -- if it's a -- if it's a document that's going to help educate me about the situation and the issues that I'm involved in, then, yes.

Q Great. Did you understand that the Court ruled the Defendants' additional service charges were unlawful, excess rent charges?

MR. MATTHEWS: Objection. Lacks foundation. Beyond the scope. Calls for a legal conclusion. Go ahead.

MR. McCURLEY: You know, I read the report. I didn't -- I don't know that I came away with that conclusion, but it doesn't -- I just read the report, as now, in this case, more of a lay person, lay lawyer. I'm not a lawyer. But I do -- what I took away from it is that -- I thought -- that the next phase would be damages, so.

BY MS. TILDEN:

Q Mm-hmm. Just to clarify the record, the report, you mean the Court's order?

A I'm sorry. Yes. Yes.

Q No problem. Just wanted to clear it up for the record.

A Mm-hmm.

Q Okay. So I just want to skim to page 13 to 14, on the order, under the heading, breach of contract.

A Yeah.

Q Can you just skim that paragraph, the whole paragraph, under breach of contract -- or read that paragraph. Not out loud; to yourself.

A Okay.

Q If you look at the second to the last sentence, I'll read it out loud. It says -- the second to the last sentence, of this paragraph, under breach of contract, it says: Plaintiffs were damaged in the

amount of the excess rent that they were required to pay, which the Court will determine in the second phase of this litigation.

That's what it says, right?

A It does.

Q Okay. Did this sentence inform your report in any way?

A Not necessarily, no.

Q And then did you see if the Court's order referred to economic value in this paragraph?

A Well, it doesn't. I don't see it now. But I didn't -- your question was: Did I seek it? I missed what your question was.

Q Sorry. I phrased it badly. Does the Court's order refer to economic value?

A It does not.

Q Does it refer to it outside of this paragraph that we just looked at?

MR. MATTHEWS: Objection. Overbroad.

MR. McCURLEY: Yeah, I don't know the answer to that. I'd have to search.

BY MS. TILDEN:

Q Okay. Have you reviewed any regulations related to this Section 8 housing program voucher?

A No.

Q Do you know what a HAP contract -- sometimes it's also referred to as a housing assisted payment contract -- is?

A In general terms, yes. I do run across, kind of, subsidized housing situations quite a bit in the other type of work that I do.

Q Did you review a HAP contract in connection with your work with this report?

A Did I review -- I don't -- no, I don't believe I did.

Q Okay. Thanks. Okay. Back to Exhibit 6. I'm going to present it so you can see where I am.

A Okay.

Q Just looking -- just going through the sources of information a little more, numbers four to six, listed under, sources of information, these are all Excel spreadsheets, right?

A Let me -- let me double check that.

Yes. Yes.

Q Thank you. Did you review these spreadsheets for any anomalies in the data?

MR. MATTHEWS: I'll object as vague and ambiguous as to anomalies. Go ahead.

MR. McCURLEY: No, I didn't, because I didn't get to that point of our analysis. You know, it

didn't -- so, no, I didn't look -- we did not look at it on that level of detail.

BY MS. TILDEN:

Q Okay. And then did you review the Excel spreadsheets, referenced in four to six, for consistency with each other?

A No. Again, not yet, because there was no need based on what I was being asked to opine on.

Q Great. Number four refers to American Bankers Insurance of Florida. Do you know who that is?

A I assume it's the American Bankers Insurance Company of Florida. I guess I don't understand the question.

Q Well, what's the relationship to Wasatch?

MR. MATTHEWS: Objection. Lacks foundation. Calls for speculation. Go ahead.

MR. McCURLEY: I'd have to look. I would be guessing that they are an insurer who they provided renter's insurance.

BY MS. TILDEN:

Q Okay.

A But I don't know that for sure.

Q Okay. And then, I guess, similar question for number five; do you know who Freedom Advisors, LLC, is?

A My understanding is that Freedom Advisors was,

for lack of a better term, the broker who placed the coverage for renter's insurance or the company that acted as the broker.

Q Do you know what their relationship to Wasatch is?

MR. MATTHEWS: Objection. Vague. Go ahead.

MR. McCURLEY: I believe they are a -- either -- sister-related company, is my understanding, yes.

BY MS. TILDEN:

Q And then it says you relied on the deposition -- under seven, it says you relied on the deposition exhibits of Jarom Johnson, dated May 31th, 2023.

A Correct. I mean, I reviewed it.

Q What's Jarom Johnson's role in Wasatch?

MR. MATTHEWS: I'll object as beyond the scope of his designation and lack of foundation. Go ahead.

MR. McCURLEY: He is -- my understanding -- and, again, there are various levels of companies and sister companies. But I think he's a controller, slash, CFO, and was designated, I think, as the person most knowledgeable.

BY MS. TILDEN:

Q Great. Thank you. Okay. So going back down to the general comments, your first sentence says that: Defendants -- sorry -- I understand Defendant companies utilize Yardi Property Management software for accounting and data management, and that the data available for our review is sourced from that software.

That's what the first sentence says, right?

A Correct.

Q And then the next sentence, it says: Yardi is a widely used service provider in this arena offering a variety of products to both domestic and international property management companies.

And then it says --

A Correct.

Q -- We have relied on reports from Yardi in conducting forensic accounting reviews in prior matters. Consequently, I believe the revenue and cost data produced from their reporting processes conforms to industry standards and is accurate and reliable.

That's the first paragraph, right?

A Correct.

Q Under general comments.

A Correct.

Q So how did you come to understand that

Defendants used Yardi Property Management software?

A I was told that by either Mr. Matthews or Mr. Salazar or both. I don't know which.

Q And then when you say that it's widely used in this arena, can you tell me what arena means here?

A Property management accounting.

Q When you say that you've used -- or you relied on reports from Yardi in conducting forensic accounting reviews in prior matters, were any of these matters litigation?

A No.

Q When you've had -- but you have had experience working -- or analyzing data from the Yardi Property Management software in non-litigation context?

A Yes.

Q When you are working in non-litigation context, analyzing data from Yardi, do you typically pull the reports from Yardi yourself?

A No.

Q Do you typically give instructions for what data to pull from Yardi?

A We give instructions for what data we want. And if Yardi happens to be the management software package that's used, then that data comes from Yardi. It could come from any variety of software packages. I

don't make specific requests specific to Yardi.

Q Right. Okay. That makes sense.

A Yeah.

Q And then if you get, you know, a report generated from Yardi or some other data management software, do you typically review it for, you know, accuracy or --

A Yes, in that, typically, you know, we're looking at occupancy reports that might have revenue numbers on them and, you know -- depending -- depending on the circumstances, depending on the scope and the level of work that was being done, we'll make sure that the data from one source document is consistent with any data that we have in other source documents just so that we know we can -- you know, we can comfortably run with those numbers.

Q And then regardless of whether it's Yardi or different software database, do you typically do the same thing in the context of litigation, in terms of reviewing numbers that you get from a database for accuracy?

A If the data is there to do the analysis, the comparison, absolutely, yes.

Q Did you communicate with anyone at Wasatch regarding Wasatch's use of Yardi?

A No.

Q And Defendants didn't grant you access to their Yardi database, correct?

A No.

Q Did you ask them to pull specific information from Yardi?

A No.

Q Or from any other database?

A No.

Q If we can look at your list of sources of information, do you know whether any of these items listed, under sources of information, were pulled from Yardi?

A I do not know that. I'd say -- well, no, I don't know -- I don't know the answer to that.

Q Is it your understanding that Yardi stores information related to Wasatch's employees' salaries?

MR. MATTHEWS: Objection. Lacks foundation.

MR. McCURLEY: I don't know.

BY MS. TILDEN:

Q Do you know if Yardi stores information related to payments to insurance companies?

A Again, I don't know what Yardi does for these -- for this particular business. I just know that -- I was told that they use Yardi Property Management

software.

Q Okay.

A But at what level of service they provided, I don't know the answer to that.

Q Okay. All right. Let's go back to that paragraph that you read, starting, of the charges in the additional service agreements. You've already read that out loud.

In the first sentence, you mentioned -- it ends with the phrase, in the marketplace. Does marketplace have a set meaning in accounting?

A I think it's a general -- not -- I mean, in accounting? No, not necessarily. No. It's more of a general term.

Q Okay. And what -- what does it mean?

A It means in the economy, in the market. As prices are established in the market based on what a buyer is willing to pay to a seller for services, that's kind of the marketplace that I'm talking about.

Q And were you looking at any specific marketplace?

A Again, I'm not looking at any specific marketplace. I'm referring to the marketplace in which the services here were purchased by Wasatch.

Q In the next sentence, you say, the value --

that value is established in each market by the cost of that product to consumers. And I was wondering if cost is the only way to determine the economic value of something.

A It's -- I don't think -- is it the only way?

Q Yes.

A I don't know that it's the only way, because there's other ways to measure value. As a matter of fact, there's other ways to measure value in this case. So it's not the only way. It's what I think is a reasonable way, in the context of this case, to measure the value of the purchased services that we're talking about here.

Q Can you give me an example of another way to measure value in this case?

A Well, sure. The cost that Wasatch paid is the cost that they negotiated with the seller for bulk services. That's a measurement of the ultimate costs that they were able to negotiate. Another business may negotiate a different value. And that, obviously, would be a different value.

Wasatch placed the value on it that they then passed on to the renters as part of the additional services agreements. That's another measurement of value. So that's -- those are all different

measurements of economic value.

Q Okay. And then was whether or not Wasatch was able to negotiate for these costs affect your understanding of the economic value of these services?

A I think it's one of the inputs, sure.

Q How would it affect -- how does it affect your understanding of economic value?

A Well, I would say that they are -- they're a large purchaser buying bulk services, that's how. Different than if you or I were to go to an insurance carrier or a cable company and negotiate for ourselves.

Q I see. Was your opinion about the economic value of the services informed by any terms or conditions of the HAP contracts entered into by Defendants?

A It was not.

Q Do you -- I was wondering if you had an understanding of what the relationship between Wasatch and the -- you know, the ultimate insurers was in terms of how they provided insurance to tenants.

A The only understanding I have is the -- is how it was described by Mr. Johnson in his deposition. I thought he actually explained it pretty clearly in his deposition. So that's -- I mean, that's all I can say, is that I would refer back to that depo.

Q Okay. You then go and say, in the third sentence of the second paragraph, under, general comments: Under the circumstances, it is reasonable to assume that the cost paid for these services by Wasatch is an appropriate measure of its value.

I just wanted to know, like, where in the report you describe the specific circumstances you're referencing here.

A The circumstances is the case, their -- their -- their position as a property manager purchasing a product for -- to be, essentially, distributed to their tenants. Those circumstances. That specific circumstances of them as a purchaser of services.

Q Okay. And then when you say, it's an appropriate measure of its value --

A Mm-hmm.

Q -- are you saying that -- is that an appropriate way for an eco -- sorry -- a forensic accountant to measure the value of the services?

A I think it's a -- as I mentioned, I think it's a measure of its value. It's one measure of its value because it is an actual transaction between a buyer and a seller. So that creates a measurement of the value of those services.

Q And is that a value to Wasatch or is -- would

it be the same value to other people on the market?

A It's a value to Wasatch, in this instance.

Q Do forensic accountants consider whether or not a consumer voluntarily purchased a product in determining the value of a product or service?

MR. MATTHEWS: Objection. Overbroad. Incomplete hypothetical. Go ahead.

MR. McCURLEY: I mean, a forensic accountant -- I can't speak for the industry in general. It's not really my place. I think it's circumstance by circumstance and assignment by assignment what you're asked to do and what information that you have.

So in this case, this is the information that we have and these are the conclusions that we've drawn based on our experience and, you know, knowledge in the arena.

BY MS. TILDEN:

Q Okay. So are there any terms or conclusions, in this second paragraph, that we've just been talking over, are they specific to your expertise as a forensic accountant?

MR. MATTHEWS: I'll object to that question as vague and overbroad. Go ahead.

MR. McCURLEY: Okay. I'm sorry, can you ask

that again or can you reread that, or something?

BY MS. TILDEN:

Q Sure. Are these -- the terms -- are any of the terms, in this paragraph that we've read, financial accounting terms?

A I think they're all financial accounting terms in the -- in the -- any kind of overall sense of financial accounting. They are the terms that are available in this circumstance to describe the opinions that I'm coming to.

Q Well, I think earlier you might have said that, you know, marketplace is a general term as opposed to a forensic accounting term. So is that -- would you still agree that it's a general term?

MR. MATTHEWS: I'm going to object as vague and misstating the testimony. Go ahead.

MR. McCURLEY: Yeah. I mean, I would say that all the terms that I've used in this report are terms that I came up to, with my experience, you know, working in this field for 30-plus years, that describe the opinions that I'm trying to -- to -- to state here. They're not necessarily specific terms that are industry specific in any way. They are terms that allow me to communicate what I'm trying to communicate here with regard to the value

of these purchased services that I've been asked to opine on.

BY MS. TILDEN:

Q Okay. Thank you.

A Mm-hmm.

Q Going back to the sentence that starts: Accordingly, we believe a reasonable estimate of the damages incurred by the tenants for renter's insurance and media packages is a difference between the amounts paid to Wasatch as additional monthly service charges and the cost of those services incurred by Wasatch.

I want to say -- ask: When you say cost incurred by Wasatch, your report, right now, does not identify the relevant categories of cost, right?

MR. MATTHEWS: Objection. Misstates the document and misstates the testimony.

MR. McCURLEY: What I'm referencing here is the cost that they paid for the renter's insurance program and the cost that they paid for the media packages to various media companies. That's the cost that they incurred for these services that are in question.

BY MS. TILDEN:

Q When you say the cost that they paid for the renter's insurance, do you mean from the insurance

provider?

A I mean -- yes. I mean, to the insurance provider. This is the less than negotiated broker fee that we're talking about. So they, essentially, purchased a program of insurance -- renter's insurance for their tenants. And, as I understand it, they sold those -- or they sold them to tenants and they created a company to act as a broker.

And the way the whole compensation package, as I understand it works, is the tenants pay a gross amount for the premium. That premium gets paid as part of their additional services agreement. It's then forwarded to the insurance company, who then pays a commission to the broker.

So, you know, they've negotiated that whole sequence of events.

Q Okay. Great. I was wondering if you had any role in advising Wasatch about what they can include as costs in this case.

A No.

Q I was wondering, generally, for a forensic accountant's evaluating data about revenue and costs, do forensic accountants look differently at costs that are designated during litigation versus in the course of business?

MR. MATTHEWS: Objection. Vague and overbroad. Go ahead.

MR. McCURLEY: I'm not sure I understand the question.

BY MS. TILDEN:

Q Do you, like, look at a data set differently if you know that it was generated during litigation versus, you know, in the course of business?

A No, I don't look at a data set any differently.

Q I just wanted to -- okay. Let's take it just -- at the last sentence of this very meaty paragraph -- sorry -- second to the last. Sorry. It says: I understand that there are other categories of additional service charge payments that do not fall into this category because they do not have direct associated costs.

Was this a conclusion you came to after analyzing Defendants' documents or an assumption you were asked to make?

MR. MATTHEWS: I'll object to that question as vague and overbroad. Go ahead.

MR. McCURLEY: Yeah, I would say a little bit of both, actually. I was asked to just look at those two categories, renter's insurance and media

packages, but, you know, I certainly looked at the other categories and then determined, you know, the differentiation between what -- these two categories versus the other categories. And the answer is, you know, a direct cost associated with these as opposed to more overheads or some costs associated with the other revenue, other additional service categories.

BY MS. TILDEN:

Q Okay. So when you say direct, associated costs here, is that a distinction you're making between direct and indirect costs?

A In a general --

MR. MATTHEWS: Sorry. It's a vagueness objection. Go ahead.

MR. McCURLEY: In a general sense, the answer is yes. Yes.

BY MS. TILDEN:

Q Is that something that forensic -- you've ever been asked to analyze as an accountant, you know, categorizing things as a direct versus indirect costs?

A All the time, yes. That's a very common thing for accountants to do, to identify expense categories.

Q So can you, sort of, you know, generally explain to me what the different -- like, what is direct

and indirect?

A Sure. Sure.

Q Great. Thanks.

A Direct costs would be on a media package. They've negotiated a -- a monthly rate for cable TV access. That's a direct cost that they have incurred to provide the service to their tenants or to make the service accessible to their tenants. The cost is $10. That's the direct cost to them.

Now, they may turn around and charge the tenant $12, or however many dollars on the other side, and that's -- that's the -- that's, basically, the revenue side of the equation. The revenue is 12. The direct cost is the $10. And the difference is what they earn as either -- they call it net revenue, I think, in their system. Net profit/net revenue in this case.

So that's a direct cost. The direct cost of the product that you've purchased, that you're then providing. Some of these other services that are included, like parking, for instance, there's a charge, as I understand it, for covered parking.

Well, covered parking is provided because it's there, you know. They either purchased a covered parking lot or they build a covered parking lot years ago. There's no direct cost associated, providing that

service. And so that's the distinction that I'm trying to make.

Q Thank you. That's super helpful.

Okay. I think you -- are you offering an opinion about whether Wasatch can deduct direct costs but not indirect costs?

MR. MATTHEWS: I'll object as calling for a legal conclusion and being beyond the scope of his legal designation. Go ahead.

MR. McCURLEY: Yeah, I'm not offering an opinion in that regard. I'm just offering an opinion as to what would be a reasonable measurement of the value. But I'm not offering that opinion specifically.

BY MS. TILDEN:

Q Okay. Sorry. Just to kind of clean up the record, you're -- you're offering an opinion about the value based on direct costs?

A For these two specific categories of additional services.

Q Great. And then just to clean up the record, you're not opining -- sorry -- you are opining that Wasatch can deduct direct costs but not indirect costs?

MR. MATTHEWS: Objection. Misstates the testimony. Calls for a legal conclusion. It's

beyond the scope. Go ahead.

MR. McCURLEY: Yeah. I'm actually not opining on that, at all. I'm just stating that there's a -- as a means of determining the reasonable value that can be used to estimate damages in this case is that you should use the -- the -- the difference between the costs, which establishes the value, that Wasatch was able to generate, versus the amount that they brought in as revenue. It's got nothing to do with indirect costs whatsoever.

BY MS. TILDEN:

Q But the costs that you have, like, designated here for renter's insurance and -- not -- the costs that you've opined on for renter's insurance and media packages are direct costs?

A Correct.

Q Great. Okay. All right. So I'm going to introduce another exhibit. Let's see if it works through -- it's an Excel spreadsheet. So let's see if it works through here. You may have to -- you may have to download it. Or maybe I can show it to you. Let's see how it works. And if not, I'll have to e-mail Ryan the spreadsheet. Let's see.

Interesting. Sorry, can we go off the record for a second?

VIDEOGRAPHER: We are now off the record. The time is 3:46 p.m. Pacific time.

(Off the record at 6:46 p.m. EST).

(On the record at 6:48 p.m. EST).

VIDEOGRAPHER: We are now back on the record. The time is 3:48 p.m. Pacific time.

MS. TILDEN: Thank you so much.

BY MS. TILDEN:

Q I've marked -- I've introduced previously marked Exhibit 79 to the Johnson deposition. I'll represent to you that during the deposition of Jarom Johnson counsel agreed to Bates stamp the document VC000870. And I'll also represent to you that this is a spreadsheet referenced in your report, under sources of information, as net revenue CA. And it's an Excel spreadsheet.

Have seen this spreadsheet before?

A Yes. Yes.

Q And did you rely on it in forming your expert opinion?

A I didn't rely on it to -- boy, how do I say this? I didn't rely on it to express or to form my opinion. I relied on it to -- as a document that, kind of, shows what my opinion -- kind of supports the opinion, I guess.

Q Kind of supports the opinion in what way?

A Well, this is -- as I understand this document -- and, again, I haven't -- I don't -- it shows the amount of insurance premium, by month, paid by tenants. Then it shows -- so that shows the gross premium paid. It shows the amount that's due to the insurance carrier. And then it shows some offsets -- no. It shows the amount that's due to the insurance carrier and another -- I don't know -- another charge. And then it basically calculates the net revenue to somebody.

So this is, kind of, documents that flow of -- it informed my opinion in understanding the flow of revenue with regard -- and costs with regard to the insurance program -- the renter's insurance program.

Q Okay. And is it only the renter's insurance program?

A Actually, no. It's both. I forgot. There's two tabs. So there's a tab for revenue -- no. Sorry. The first tab's got both; it's got media and it's got insurance. My apologies.

Q No problem. No problem. And, then, do you have a sense of the general time range captured in this --

A I do.

Q -- exhibit?

A I do.

Q What is it?

A Looks like 2011 through April of 2023.

Q Do you know how this spreadsheet was prepared?

A I only know to the extent that Mr. Johnson discussed it in his deposition. I think he indicated that it was prepared in direct connection with this litigation.

Q Okay. Great. And did you have any role in deciding what information would be included in the spreadsheet?

A No.

Q I wanted to point you to column L, program compliance. I may be wrong, but when you were going through it, was this what you were referring to as an offset?

A If that's what I said. It was an unidentified column there that caught me offguard. So, yes, it's another offset where that money goes. If that goes to insurance as part of the premiums or it goes to a regulatory agency, I don't know what that is.

Q Okay. So you don't know --

A It's part of the direct costs of the product.

Q Sorry. And when you said offset earlier, do

you know -- what does offset mean?

A The difference between the revenue -- the gross revenue and the net revenue.

Q Okay. But you don't know, specifically, like, what information is captured in column L here, right?

A I do not.

Q Okay. So I was wondering -- I know we've, kind of, covered this, but now that you're looking at the sheet again, do you -- could you have completed a tenant-by-tenant analysis of costs associated with renter's insurance using this spreadsheet?

MR. MATTHEWS: Objection. Asked and answered. Go ahead.

MR. McCURLEY: If I -- if this document is complete and I had a better understanding of exactly, you know, how the tenant codes were -- I mean, there's a lot I need to know. But if this document is complete with regard to these two categories, then, yeah, I think it is. It would be a good source if the document is verified as being complete.

BY MS. TILDEN:

Q Okay. Sorry. What two -- do you mean renter's insurance and media?

A Correct.

Q Okay. Great. And then what -- like, what are the signs of completeness that you are looking for?

MR. MATTHEWS: Objection. Broad, vague, ambiguous. Go ahead.

MR. McCURLEY: Yeah, I mean, if it includes all of the tenants that are at issue here, if it includes the proper amount on the cost. Because the cost is stated by individuals. So it's an allocated cost. You know, I'd make sure that number's correct. There's things that you would need to confirm are correct.

But if they are, then, this would be as good a measure as any in terms of, here's the revenue, here's the cost, the difference is the overage.

BY MS. TILDEN:

Q One second. So if you knew -- sorry. Scratch that.

Is it your understanding that the cost captured in column F, that says, media cost per unit, contain all of the direct costs related to media packages that Wasatch is seeking to deduct?

A I mean, I don't know that. But if I was able to confirm that that's accurate, then that would be a valuable thing in terms of determining the actual differential that would be used to measure the damage.

Q Okay. If we can go to the second tab that says, media account.
A Shoot. Oh, there we go.
Q Great.
A There we go.
Q Can you point me to the earliest date in column E, which, I believe, would be the earliest date for a media charge listed on the spreadsheet?
A Looks to be April -- excuse me -- April 1 of 2011.
Q And then what about the latest date?
A Well, I see one date that says 1/1 of 2016.
Q Great.
A But there's no values next to it. But that's the latest date.
Q Is it your understanding that Wasatch continues to have costs related to California properties and providing media packages?
A I don't know. My general understanding, based on the reading of the depositions and just going through the records, is that this was done primarily back in 2011/2012. But there could be some residuals based on long-term contracts. I don't know the answer to that.
MS. TILDEN: Okay. I think this is probably a good moment to take a five-minute break, if that's

okay with you, Mr. McCurley.

MR. McCURLEY: Sure.

VIDEOGRAPHER: We are now off the record. The time is 3:58 Pacific time.

(Off the record at 6:58 p.m. EST).

(On the record at 7:06 p.m. EST).

VIDEOGRAPHER: We are now back on the record. The time is 4:06 p.m. Pacific time.

MS. TILDEN: Great. Thank you.

BY MS. TILDEN:

Q Okay. Thank you, all. Just quickly circling back to Johnson Exhibit 79, I want to ask you, Mr. McCurley, you haven't been able to confirm that the -- that the information in this spreadsheet is complete, correct?

A Well, I haven't been able to, but I haven't necessarily asked to, either. It's -- so it doesn't inform my opinion -- the overall opinion. It just demonstrates the way it worked -- the way this process worked within -- as I understand it, within this group -- you know, within this company.

Q Have you been given any access to data that could help you confirm whether or not this spreadsheet is complete?

A No.

Q So you're not offering an opinion, right now, on whether the numbers in this spreadsheet are correct?

A I am not offering an opinion on whether the numbers are correct or what the specific damages are; just on overall concept of a -- an accounting approach to how -- how to measure the damages.

MS. TILDEN: One second, please. Bear with me. I'm going to -- I'm going to pull up another exhibit really quick. And you'll probably have to download this one, as well. Here you go.

(Plaintiffs' Exhibit No. 11 was marked for ID).

BY MS. TILDEN:

Q I just introduced Exhibit 11, which is an Excel spreadsheet. Are you able to download it, Mr. McCurley?

A Yes. Let me see if it opens. Yes.

Q Okay. Great. I'm going to represent to you that this is the same Excel spreadsheet that's referenced in your report under, sources of information, as Account Current Statement for Freedom Advisors, LLC. Have you seen this spreadsheet before?

A Yes, I have.

Q Did it inform your expert opinion?

A Informed my knowledge of the processes, but

the opinion is not necessarily informed by any of the specific documents.

Q Okay. You said your expert opinion is not informed by this document?

A I'm saying it -- it is one of many things that provided me with knowledge about the systems in place here, to have an understanding of how it works, and then how that falls into place with my general understanding of determining value --

Q Mm-hmm.

A -- of service.

Q Okay. Do you know what the date range for this spreadsheet is?

A I do not. Oh, I can tell.

Q Oh. Great.

A Looks -- it's out of order. It looks like December of 2014. There's November of 2014. No. There's September -- okay. Sorry. 2014 through 2021, generally speaking.

Q Okay. You did that a lot faster than I could have. What's your understanding of how this spreadsheet was generated?

A I don't have -- I don't recall. I don't recall. I believe it was addressed in Mr. Johnson's deposition, but I don't recall how this was created or

who created it.

Q Okay. Do you know if the information in the spreadsheet is consistent with the information contained in Exhibit 79, to the Johnson deposition, the net revenue CA Excel we just looked at?

MR. MATTHEWS: Objection. Asked and answered. Go ahead.

MR. McCURLEY: Yeah. I'm not sure what you mean by consistent with. And I don't know if the data sets are exactly the same. They don't appear to be. So I don't know the answer to that question.

BY MS. TILDEN:

Q So would it be fair to say you haven't, like, looked for any overlap between this spreadsheet and Exhibit 79?

MR. MATTHEWS: Objection. Asked and answered. Go ahead.

MR. McCURLEY: I have not. I've just noted that it's -- follows a similar format of determining gross premium versus net revenue.

BY MS. TILDEN:

Q Okay. And you don't have any opinion regarding whether or not this spreadsheet is complete, correct?

A I do not.

(Plaintiffs' Exhibit No. 12 was marked for ID).

BY MS. TILDEN:

Q All right. I have just marked, as Exhibit 12, the expert report of David Breshears. Consistent with what we said -- we were talking about earlier, the stamp on the top shows it was filed on April 22nd, 2022. The report is actually dated -- I believe it's January -- I'm not actually seeing a date on here. January 28, 2022. Have seen this document before?

A Yes.

Q It was included as one of -- the document you reviewed from Mr. Breshears, under the sources of information listed in your report, right?

A Correct.

Q And you attached it, as well, as an exhibit to your report?

A Yes.

Q Does your report offer any opinion on Mr. Breshears' methodology?

A Does not.

Q Does your report offer any opinion about Mr. Breshears' calculations?

A It does not.

MS. TILDEN: Okay. All right. I'm going to -- I think I'm going to just take, like, a ten-minute break, and then just wrap it up. I know -- yeah, if you don't mind a ten-minute break and we can just wrap it up after that.

MR. McCURLEY: That's fine with me.

MR. MATTHEWS: Sure.

VIDEOGRAPHER: We're now off the record. The time is 4:15 p.m. Pacific time.

(Off the record at 7:15 p.m. EST).

(On the record at 7:27 p.m. EST).

VIDEOGRAPHER: We are now back on the record. The time is 4:27 p.m. Pacific time.

BY MS. TILDEN:

Q We're on the home stretch here. I wanted to circle back to a couple of things we discussed earlier related to your invoice. So I'm going to introduce Exhibit 13.

(Plaintiffs' Exhibit No. 13 was marked for ID).

This is the document subpoena that was sent to you. And I believe you reviewed it and replied to the subpoena, correct, Mr. McCurley?

A Correct.

Q If you can look at request number two, under

documents to be produced, that's going to be on -- I believe it's the -- it was a few pages. One, two, three --

A Yeah, I've got it here.

Q Thanks. It says: All bills, invoices, and time records related to your work, related to this action.

As we discussed earlier, you have some additional time records that weren't included in the invoice that we reviewed earlier, right?

MR. MATTHEWS: Objection. Misstates the testimony. Go ahead.

MR. McCURLEY: I got it subsequent to the issuance of that, yes.

BY MS. TILDEN:

Q Yes, I should have said it that way. Sorry. Yeah.

A No worries.

Q Would you be able to produce those relatively quickly?

A Yes.

Q In a day or two?

A Yes. Well, I say yes. I have to make sure my biller is available. So I think the answer is yes. If there's a complication, I'll let Ryan know.

Q But you can definitely produce those additional time records to us, right?

A Yes. If the staff is available to create it, I can, for sure.

Q Okay. Great. Thank you. And then if you'll look at request number three, all documents reflecting communications between you and any persons, other than Defendants' counsel, concerning this action.

A Mm-hmm.

Q You mentioned that you got an e-mail, with a portal link, sometime between July 6th and probably July 19th.

A Correct.

Q Would you be able to produce that e-mail setting the portal?

A It came from -- it came from counsel. So is it not in the documents that we've already produced?

Q It is not.

A Okay. I'll -- my apologies. I'll find that.

Q And then would you -- you mentioned that some of the documents also may have come by e-mail, not through a portal. Would you be able to forward those e-mails to us, those communications?

A Yes.

Q Okay. Great. And for both of those, the

portal and the e-mails conveying documents, you think you'd be able to do that in the next couple days?

A Yes.

Q Okay. And just a few more things. Stop viewing this.

Let's go back, really quick, to the -- to Exhibit 10, if you don't mind opening that up again.

A No, not at all.

Q And you're going to page 13.

A Thirteen?

Q Yes.

A Okay.

Q As you recall, we kind of went over the sentence -- it's the second to the last sentence, under breach of contract, where the Court says: The Plaintiffs were damaged in the amount of the excess rent they were required to a pay, which the Court will determine in the second phase of this litigation.

I was wondering, do you disagree with the Court that the amount of damages is the amount of excess rent that tenants paid?

MR. MATTHEWS: Objection. Calls for a legal conclusion. Beyond the scope of his designation. Lacks foundation. Calls for speculation. Go ahead.

MR. McCURLEY: Yeah, of course, not, I wouldn't disagree with the Court in that regard, at all. I just -- the second part of that, it says, The Court will determine in the second phase of this litigation, that's what I thought we were here to do.

BY MS. TILDEN:

Q But you don't disagree with the Court's statement in the first half of that sentence that says, they were damaged in the amount of the excess rent they were required to pay?

MR. MATTHEWS: Same set of objections. Go ahead.

MR. McCURLEY: Yeah, again, it's outside of my scope. And it's -- I would not disagree with the Court, either way.

BY MS. TILDEN:

Q Okay. And then I'm going to go back to Exhibit 6, if you don't mind opening that up and taking a look.

A Okay.

Q So just a final question or two. Can you tell me where there are any terms or sentences in your report that rely specific -- specifically on forensic accounting principles as opposed to, like, general

financial knowledge?

MR. MATTHEWS: Objection. It's vague and ambiguous. Go ahead.

MR. McCURLEY: Yeah. Forensic accounting is -- is -- you're not going to find a book that lists forensic accounting terms. Forensic accounting is creating opinions based on the data available to you. There's a lot of different definitions of forensic accounting, so.

I started doing this work before there was even a term called "forensic accounting". It was just damage assessment. So I don't know that there is anything that would contain what you're describing.

BY MS. TILDEN:

Q Okay. Well, what if I said, that rely on accounting principles as opposed to general financial knowledge, is there anything in this report?

MR. MATTHEWS: I'll object again as vague and ambiguous.

MR. McCURLEY: I mean, yeah, I think the entire thing is based on accounting principles and how I apply them in my world of forensic accounting to come up with my opinion that there is a -- a value to the services that were provided to the

tenants. And I'm just trying to place a value -- I think -- I'm coming up with my opinion of the appropriate value of those services, that's all. And I think --

BY MS. TILDEN:

Q And then -- oh, sorry. Were you -- did I cut you off?

A I think those are general accounting principles.

Q So what kind of specialized accounting training did you apply to reach the conclusion that you could assign an economic value to these services?

MR. MATTHEWS: I'll object again as vague and overbroad as to specialized accounting training.

MR. McCURLEY: I mean, I've assessed the measured damages for 35 years -- almost 35 years. It will be 35 years next month, and it's what I do on a daily basis. So I can't point to a specific text or a study course. It's accumulation of my years of service, basically.

BY MS. TILDEN:

Q Can you point to anywhere in the report where you rely on your accounting expertise to reach a specific conclusion?

A My report -- the report is the evidence of me

 relying on my experience. I don't know -- I don't know how to answer that question.

Q Okay. Are there any accepted accounting principles that your opinion is based on?

MR. MATTHEWS: Objection. Overbroad, vague, ambiguous. Go ahead.

MR. McCURLEY: Yeah, there are no generally accepted accounting principles, that I can think of, that would apply to this certain, specific situation.

BY MS. TILDEN:

Q But even if they're not generally accepted, you know, as an expert in accounting, you know, is there an accounting principle that your opinion is based on?

MR. MATTHEWS: Same objections.

MR. McCURLEY: Well, sure. Sure. That -- that -- services -- purchased services have value. They provide a benefit in the market. In this case, the purchase of insurance or the purchase of media -- media services provide a benefit, and that benefit has value. The tenants -- the tenants and -- the Plaintiffs in this case received a benefit in the form of insurance and the form of media services. The question is: How do you place a value on that?

And what I've done and what -- my opinion, the best way to place a value on that benefit is: What did it cost? What is the direct cost of that benefit? And the direct cost of that benefit is the amount that Wasatch negotiated and paid for --

(Zoom drop).

COURT REPORTER: So he said, the direct cost of that benefit is the amount that -- and then I got -- Wasatch negotiated and paid for, and that's when I lost you.

Did you hear that?

MR. McCURLEY: Yes.

COURT REPORTER: Okay. Can you finish that thought?

MR. McCURLEY: I can try. I can try.

Right. So the concept is, there's a benefit that was provided in the form of insurance services -- or insurance and media services. The way to value that is to value it based on what it cost, what a willing buyer paid to a willing seller. And that's the cost that Wasatch paid for those services.

So any damage -- from an accounting perspective, any damage could be based on the difference between the cost and what the tenants

actually paid for those services. That's, in a nutshell, what I'm trying to say here.

MS. TILDEN: Okay. I think that is the end of my questioning. Ryan, do you have questions?

MR. MATTHEWS: Very briefly.

CROSS-EXAMINATION

BY MR. MATTHEWS:

Q There were a couple of questions -- I think the question was posed twice -- about whether the value that you're talking about of these services is a value to Wasatch or a value to the tenant. Can you clarify your answer there?

A Sure. I mean, I said it's a proper measurement of the value of the service because that's what Wasatch paid to it -- paid for it. That basically means it's the value for the tenant, as well. You could argue that it's -- especially with regard to insurance, you can argue that it's a -- it's a conservative estimate because it doesn't include any kind of brokerage fees. They've taken the brokerage fees out as their commission. And that's what we're saying is, essentially, the damage here.

So you could argue that if the tenants were to go out into the market and buy renter's insurance, they're going to have to buy it through an agent or a

broker and they're going to pay those fees. We've kind of excluded them here based on, you know, Wasatch's ability to negotiate a reasonable rate, I guess.

Q And when you say a reasonable rate, are you talking about a bulk rate?

A Yes. I assume a bulk rate. I know that in Mr. Johnson's deposition, he mentioned that they definitely negotiated a bulk rate for media services and I assumed that applies to renter's insurance, as well.

Q And so just to be clear, when you're talking about estimating this value based on the direct cost to Wasatch, is that a value that the tenant, as the person who's purchasing the services, is receiving?

A Well, I'm arguing that that is one method of measuring it. And I think it's a conservative method of measuring it. That's my thought.

Q But just -- I just want to make sure we're very clear. It's the tenant, who is receiving the service, that's getting the value of that service; is that what you're saying?

A As far as I know, they got the benefit of having renter's insurance and they got the benefit of having cable TV and internet access and whatever else falls under the media services. So, yeah, absolutely.

MR. MATTHEWS: Okay. I have nothing further.

MS. TILDEN: I have a few follow-up questions.

REDIRECT EXAMINATION

BY MS. TILDEN:

Q Mr. McCurley, can you point me to where in your report you discuss brokerage fees?

A I don't.

Q Can you point me to where in your report you discuss the benefit to tenants?

A I say that the -- well, I say it by -- by determining that the value, that is achieved, should be measured by cost. So it is implied that there's a value here. The tenants are the ones that receive the value. It doesn't say that expressly in the report, but that is the gist of what I was trying to communicate in the report.

Q But the benefit to tenants is not specifically mentioned in your report, correct?

MR. MATTHEWS: Objection. Misstates the testimony. Go ahead.

MR. McCURLEY: What's mentioned is the value of the services that were produced and provided.

MS. TILDEN: Okay. Just one second.

I'm going to just check over my notes real quick.

MR. McCURLEY: Mm-hmm.

MS. TILDEN: Okay. I have no further questions.

MR. MATTHEWS: Nor do I.

VIDEOGRAPHER: Mr. Matthews, would you like to order a copy of the transcript and video?

MR. MATTHEWS: Just the transcript. And electronic is fine.

VIDEOGRAPHER: Thank you. Counsel, if there's nothing further, we're just off the record.

This concludes --

MR. GRAHAM: Just to note, Jahmy Graham still has no questions. Go ahead.

VIDEOGRAPHER: This concludes the deposition of James W. McCurley in the matter of Terry, et al, versus Wasatch Advantage Group, LLC, et al. We're now off the record. The time is 4:43 p.m. Pacific time.

(The proceedings concluded at 7:43 p.m. EST).

I have read the foregoing deposition transcript and by signing hereafter, subject to any changes I have made, approve same.

Dated: ________________________

______________________________
James McCurley

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, licensed by the State of Florida, being empowered to administer oaths and affirmations remotely pursuant to Administrative Order AOSC20-17, of the Supreme Court of Florida, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that before the completion of the proceedings, review of the transcript was requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: September 10, 2023

Maureen M. Elrod, CSR No. 809476
Notary Public No. HH 266810
Expires: July 17, 2026

# Exhibit D

# Initial Lease

**Year:** 2015

PST000001

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in California*
*595 S Riverwoods Pkwy, Suite 400 Logan, Utah 84321*

This agreement is made in Spring Valley, CA, Peppertree Apartment Holding, LP hereinafter called Owner or Landlord, by Wasatch Property Management, its authorized agent, and

Lease Holder(s):
Alesia Young

Authorized Occupant(s):

hereinafter referred to collectively as Resident or Tenant. No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I. TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 06/17/2015, and Terminating 06/16/2016.

**THIS AGREEMENT MAY NOT BE CANCELLED ONCE EXECUTED BY RESIDENT WITHOUT THE EXPRESS WRITTEN CONSENT OF THE OWNER.**

**II. PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at 8956 Harness Street, # A-7, Spring Valley, CA 91977

**III. LOW-INCOME HOUSING CREDIT**

The premises are to be operated in accordance with the requirements of the Low- Income Housing Tax Credit Program (LIHTC) under Section 42 of the Internal Revenue Code of 1986, as amended (the "Program"). Resident's rights hereunder will be subject to the requirements that must be met under the Program in order for the Landlord to qualify to take the cost of the premises into basis for calculation of the Landlord's tax credit. The Resident will cooperate with all Landlord requirements related to such compliance and the Program.

**IV. RENT**

The rental for the premises is **$1,007.00** per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at **8956 Harness Street, Spring Valley, CA, 91977**.

Landlord and Tenant have entered into a housing assistance payment (HAP) contract with the local public housing authority (PHA) pursuant to the Section 8 Housing Choice Voucher Program. The HAP contract provides that the housing authority will pay a portion of Tenant's rent to Landlord on behalf of Tenant. So long as the HAP contract remains in effect, Tenant is not responsible for this portion of the rent. The additional terms and conditions of the parties' rental obligations are set forth as follows:

1. **Section 8 Rent:**
   A. The total contract rent shall be $**1,007.00** per month;
   B. Of the total contract rent, $**390.00** shall be payable to Landlord by Tenant each month as Tenant's net family contribution; the remaining balance of $**617.00** shall be payable to Landlord by the local housing authority for as long as the HAP contract remains in effect.
2. **Section 8 Rent adjustments**: The amount of assistance that HUD pays on behalf of Tenant may be changed during the term of the lease if: (1) HUD or the PHA determines, in accordance with HUD procedures, that an increase in rents is needed; (2) HUD or the PHA changes any allowance for utilities or services considered in computing Tenant's share of the rent; (3) the income, the number of persons in Tenant's household or other factors considered in calculating Tenant's rent change and HUD procedures provide that Tenant's rent or assistance payment be adjusted to reflect the change; (4) changes in Tenant's rent or assistance payment are required by HUD's recertification or subsidy termination procedures; (5) HUD's procedures for computing Tenant's assistance payment or rent change; or (6) Tenant fails to provide information on Tenant's income, family composition or other factors as required by Landlord or the PHA.

The Rental Office can be reached by phone at (619)-463-0579. Unless otherwise posted, payment can be made in person at the Rental Office between 8:30 AM and 5:00 PM Monday through Friday. In addition, rent can be paid online at www. IsYourHome.com. Rent received shall first be applied to all sums owed and then to the current rent due. Rent shall be payable by check, cashier's check, certified check, credit card, or money order in installments as follows:

A. The sum of $469.93 is due upon execution of this Rental Agreement as rent for the period beginning 06/17/2015, through 06/30/2015 (first month prorated) payable on 06/17/2015. All proration made during the term of this tenancy shall be made on the basis of a calendar month.

B. The sum of $1,007.00, plus additional services of $40.00 *(refer to Additional Services Agreement)*, is due, in advance, on the first day of each calendar month commencing July 2015.

C. A concession in the amount of $0.00 is to be given to Resident as part of this 12 month lease and will be issued as $0.00 off move-in costs. The $0.00 concession is due and payable back to Peppertree Apartment Holding, LP if the 12 month lease is not fulfilled for any reason.

D. The parties agree that the monthly rental for the premises set forth in this Agreement may be less than the standard monthly rental required by the Owner for the premises. The Owner rents the premises to the Resident(s) at a reduced market rate in accordance with a formula established by one or more government financing programs. The parties understand that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Resident's monthly rental obligation as set forth in this Agreement, and in accordance with such formulas. In such event, Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment. Such notice will set forth the amount of the adjustment and the effective date. The Resident(s) shall thereupon be obligated to pay such adjustment as though fully set forth in this agreement.

INITIAL

**V. CHANGES IN RESIDENT'S SHARE OF RENT**

The Resident agrees that the amount of rent the Resident pays may be changed during the term of the Agreement if :

A. The Owner's contract administrator determines, in accordance with Program procedures, that an increase in rent is needed;

B. The Owner's contract administrator changes any allowance for utilities or services considered in determining the Resident's rent ;

C. The income, the number of persons in the Resident's household or other factors considered in determining the Resident's

D. The procedures for determining the Resident's rent change ; or

E. The Landlord agrees to implement changes in the Resident's rent only in accordance with the timeframes and administrative procedures set forth in instructions and regulations related to administration of the Program. The Landlord agrees to give the Resident at least thirty (30) days advance written notice of any increase in the Resident's rent, in accordance with HUD/PHA regulations. The Notice shall state the new amount the Resident is required to pay, the date the new amount is effective, and the reasons for the change in rent. The Notice will also advise the Resident that he/she may meet with the Landlord to discuss the rent change.

**VI. EXCESS RENTS**

If it is determined that the premises are not a qualified low-income unit because the rent paid by the Resident(s), plus the applicable utility allowance, for the Lease term exceeds the maximum rent allowed by LIHTC code, the Landlord shall immediately pay to the Resident the amount of such excess, with interest. If the Resident no longer occupies the premises when the excess rent determination is made, the Landlord shall use its best efforts to locate the Resident for purposes of repaying the excess rent.

**VII. LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $50.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 5th day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 5th day of the month. In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non -Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $50.00 late fee. In the event Tenant rental payment is late, or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order.

Any acceptance of rent after the 5th day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**VIII. SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $650.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), to clean the premises, and to remedy future defaults by Resident in any obligation, including the obligation to restore, replace or return personal property or appurtenances, (exclusive of ordinary wear and tear) if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Landlord to apply all or a portion of security deposit to amounts due from Tenant. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit, except for any loss caused by the negligence or intentional misconduct of Owner.

**IX. ACCEPTANCE AND SURRENDER OF PREMISES**

A. Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. Resident acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made. Be advised, $25.00 is the fee for after-hours lockout service.

B. Resident acknowledges that all furniture, furnishings and equipment listed on a Unit Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

**X. USE OF THE PREMISES**

A. The premises are rented for residential use and shall not be occupied by anyone who is not named in this Residential Rental Agreement as a Resident or Authorized Occupant. Resident may not have overnight guests for more than 14 consecutive nights, and no more than two overnight guests at a time unless we provide specific approval. Resident must obtain Owner's prior written consent to change or add Residents or Authorized Occupants, unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease, unless emancipated, co-head or spouse of head of household.

**Applicants warrant and acknowledge that all persons anticipated to reside in the premises are and will be legally residing within the United States**

B. Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time. If a animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent. We will accept dogs a minimum of six months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. All Animals are required to be spayed or neutered. Reptiles or exotic animals are not allowed. The maximum weight limit allowed for animals is 25 lbs.

C. Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

D. Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Fire Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises. Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

E. Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's. Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his household members or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his household members or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident. Resident agrees to "Front In" only parking and will not back into parking spaces at any time. Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith, except for any loss caused by the negligence or intentional misconduct of Owner.

F. **Harassment or Threats:** Resident and such others for whom Resident is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

G. **Nuisance and Waste:** Resident and such others for whom Resident is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

H. **Loitering:** Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible for in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

**XI. RESIDENT'S DUTY TO MAINTAIN PREMISES**

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear) is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs. Resident shall keep the Apartment free from Pest infestation for the full term of the Lease.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and the dwelling unit appears to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, that any pest problem or infestation is determined to be directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

Upon notice of the date on which treatment shall be applied, Resident shall complete all pre- treatment instructions provided by Owner or Owner's contractor including, but not limited to the movement or removal of any or all personal property (examples: furniture and clothing), the bagging and/or laundering of all clothing, the removal of all items from cabinets, the removal or disposal of all clutter in the Apartment, and the thorough cleaning of the Apartment.

Management will notify Resident(s) of any claims and notify Resident with a 24 hour written notification prior to any inspection within the Resident's unit. Resident agrees to allow management to enter the premises to assess any pest infestation claim, given 24 hour written notification.

WASATCH

INITIAL



**XII. UTILITIES**

Responsibility for utilities will be as described below. Resident may pay for utilities consistent with requirements for continuous and uninterrupted service. It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due. Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment. Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason , Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner. Resident shall pay for the following utility services:

<u>Owner</u> Gas, Account # 2069518530 ✓

<u>Tenant</u> Electricity, Account # ______

<u>Property</u> Water/Sewer/Trash

**See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges**

**XIII. ENTRY BY OWNER**

Landlord will have the right to enter the premises as allowed by law. Law permits entry in case of emergency, to make necessary or agreed repairs, decorations, alterations or improvements, supply necessary or agreed services, to test smoke detectors, or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen or contractors or to make an inspection pursuant to subdivision (f), when the Resident has abandoned or surrendered the premises and pursuant to court order. Landlord will serve Resident with written notice before entry.

**XIV. DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given , and Resident shall vacate the apartment and surrender the same to Owner.

**XV. LIABILITY INSURANCE**

Resident understands that any property or liability insurance coverage purchased by the property manager or owner is not intended to and will not protect against any loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to Resident's personal property or belongings or protect against any loss or damage resulting from Resident's actions or omissions and/or Resident's household members and/or guest's actions or omissions. Residnet also understands that, by not having renter's or personal liability insurance, Resident may be liable to third parties and to the property owner for certain losses and understand that Resident should not expect the property manager or Owner to be responsible for such losses. Owner and manager recommend that every resident maintain renter's insurance coverage , at all times.

( X ) **RESIDENT WILL PURCHASE RENTERS INSURANCE COVERAGE.**
Resident recognizes the need for insurance and Resident has chosen to take advantage of the program made available to residents, by Owner, in connection with a "pay along with rent" program for the leased premises through Assurant . Resident accepts the Owner's offer to receive the monthly fee from Resident, in addition to Resident's monthly rent, and to forward the fee on Resident's behalf to Assurant . Owner and/or Assurant are providing this fee payment service at Resident's request and they are not responsible for paying Resident's fees if Resident fails to do so. Resident also understands that failure to pay said fee when due will result in cancellation of Resident's coverage .

( ) **RESIDENT HAS RENTERS INSURANCE COVERAGE.**
Resident has and will maintain throughout the term of the lease with the following renters insurance coverage through a third party insurance carrier.

| ______ | ______ |
|---|---|
| **Insurance Company** | **Policy Number** |
| **Property Limit** | **Liability Limit** |

( ) **RESIDENT DOES NOT HAVE RENTERS INSURANCE COVERAGE.**
Although Resident recognizes the need for renter's insurance, Resident will not at this time, be obtaining such insurance coverage and will be personally responsible for any property or liability damage to the property's managers , Owner or third-party's property as a result of the actions or Resident, occupants, household members, and guests actions.

**XVI. WAIVER OF LIABILITY**

Resident agrees to assume responsibility and/or hold harmless Owner and Owner's agent(s) for the following:

Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by managements negligence. Management strongly encourages Resident to obtain an all-risk renters insurance policy. If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible. Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, except as provided by law. Owner's nonliability will include (but not be limited to) the following:

A. Loss of personal property due to theft
B. Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner or due in any way to negligence of Resident or Resident's guest(s)
C. The Actions or omissions of other Residents
D. Interference with light, view or other intangible aspects of the premises
E. Operations in construction of any public or quasi-public work
F. Any latent defect in the building(s)

G. The use by resident or guest of any storeroc .undry room, clubhouse, swimming pool or any other ancillar, .ility furnished by Agent for Resident's use

H. Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy

I. Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his household members, agents or guests.

J. Pursuant to §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at **www.meganslaw.ca.gov**. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides

**XVII. RECERTIFICATION**

Every year on or about the 1st day of March WM (Feb. 16') Landlord will request Resident to report the income and composition of Resident's household and to supply any other information required for the purposes of determining Resident's continued Program eligibility. Resident agrees to provide accurate statements of this information and to do so by the date specified in Landlord's request. Landlord will verify the information supplied by Resident and use the verified information to determine Program eligibility. Resident agrees that all information supplied by Resident shall be subject to inspection by representatives from the California Tax Credit Allocation Committee (TCAC).

A. If Resident does not submit the required recertification information by the date specified in the Landlord's request, Landlord may require resident to vacate premises. Landlord may implement this penalty only in accordance with the administrative procedures and time frames specified in handbooks and instructions related to the administration of the Program.

B. Resident may request to meet with Landlord to discuss any changes resulting from the recertification processing. If Resident requests such a meeting, Landlord agrees to meet with Resident and discuss how Resident's continued Program eligibility was determined.

**XVIII. REPORTING CHANGES BETWEEN RECERTIFICATION**

Resident's shall notify Landlord immediately in writing, if the household size changes, his or her income increases; Resident(s) become a full time student, or begins to receive HUD assistance. Landlord may elect not to renew this Lease if Resident becomes a student and Landlord determines that the Resident's student status would disqualify the premises under the Program. Landlord may adjust the Resident's rent and or utility allowance to reflect Resident's status if Resident becomes a HUD-assisted Resident.

**XIX. EARLY TERMINATION OPTION**

Resident is expected to remain a Resident for the entire term specified in the Residential Rental Agreement. If Resident fails to do so, Resident will be responsible to Owner for all damages provided by law, including (but not limited to) rent due through the end of the term, minus rents paid by a replacement tenant (if any). This amount will vary depending upon how long it takes the Owner to find a replacement tenant. Therefore, this amount cannot be determined in advance and it is difficult to estimate.

To avoid this uncertainty, Resident may choose to exercise an early termination option. Resident may choose to pay a flat fee in advance to terminate the Residential Rental Agreement early, rather than remaining liable for rent due through the end of the term. To exercise this option, Resident must deliver to Owner:

- a written notice stating that Resident has elected to exercise this option;
- an early termination option fee of $0.00;
- rent and other amounts due through the accelerated termination date.

When Owner has received the written notice and payment, and has signed the notice, the termination date will be amended. The new termination date will be the date specified in the notice which must be at least sixty days after the written election and payment are given to Owner. Exercise of the early termination option will affect only Resident's rent obligations after the accelerated termination date; Resident must comply with all other Residential Rental Agreement obligations.

The notice will not accelerate the termination date if:

- Resident is in default under the Residential Rental Agreement at the time that Resident gives notice of Resident's exercise of the option;
- Resident provides the notice unaccompanied by the fee above; or Resident does not properly exercise the early termination option by following the procedure specified above, but vacates the property before the termination date specified in the Residential Rental Agreement.

**XX. NOTICE TO QUIT**

A. **EXPIRATION:** If Tenant holds over upon termination of this Agreement and Landlord accepts Tenant's tender of the monthly rent provided by this Agreement, this Agreement shall continue to be binding on the parties, which Tenant or Landlord may terminate with at least thirty (30) days' notice in writing with the last day of the tenancy to be the last day of the month. Failure by Tenant to provide notice of intent to vacate to Landlord shall be deemed an election to continue the Agreement on a monthly basis.

B. **TERM AGREEMENT:** Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Owner of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/ or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted. If no thirty day notice is received by Owner AND resident vacates the property, a penalty fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice.

C. **NOTICE OF MOVE OUT INSPECTION. TENANT HAS THE RIGHT TO BE PRESENT DURING THE MOVE OUT INSPECTION.** Move-out inspections will be conducted between 9:00 am and 11:00 am on the final day of tenancy, unless alternate times are agreed to by prior written notice between the tenant and owner or owner's agent.

**XXI. ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XXII. AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XXIII. ASSIGNMENT AND SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any assignment or subletting without written consent is void.

**XXIV. JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including , but not limited to, the payment of rent.

**XXV. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXVI. RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations is attached to, and made a part of this Agreement. Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and residents have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

Termination on Breach and Notice to Quit: Unless prohibited by law, any violation of the covenants of Resident hereunder which cause either a nuisance or waste shall be deemed a non-curable default under the provisions of State Civil Codes and shall forthwith terminate this Residential Rental Agreement.

**XXVII. ABANDONMENT**

Resident will be deemed to have abandoned if rent hasn't been paid for fourteen days, Owner reasonably believes that Resident has left the premises and does not intend to return, and a "Notice of Belief of Abandonment" has been mailed and the tenant has not responded within 15 days of personal service or 18 days of mailing. Any personal property remaining in the premises will be returned to Resident, placed in storage or disposed of as provided by applicable law.

**XXVIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIX. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Resident acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community. Providing that Owner complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Resident, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances , any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against Owner, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Owner Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances , and (c) agrees to defend, indemnify and hold harmless the Owner Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Owner Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Resident or any guest or other person living in , occupying, using or residing in the Premises.

**XXX. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Resident has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Resident agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Resident relieves Owner from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises, unless otherwise provided by law.

**XXX. RentPlus ACKNOWLEDGEMENT**

Resident acknowledges that Owner offers RentPlus, a service that reports payment history to credit bureaus to assist resident (s) in building positive rental/credit history. The monthly cost of this service is $5.00 per person and will be billed to resident in conjunction with Monthly Rent and other Additional Service charges, should Resident choose to participate in RentPlus services.

Alesia Young Initial ☐ Resident agrees to participate in RentPlus services ☒ Resident opts out of RentPlus services

**XXXI. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:** You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns , to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

**XXXI. CREDIT DISCLAIMER and RELEASE**

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at Owner's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Owner's discretion. Resident also agrees to hold Owner, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

Alesia Young — Date 6-17-15

Owner authorized agent — Date 6/17/15

LD302.01.UT Revised 11/18/2013

WASATCH



## LOW INCOME HOUSING TAX CREDIT (LIHTC) LEASE ADDENDUM

**Property Name:** Peppertree Apartment Holding, LP **Unit:** A-7

**Resident Name:** Alesia Young

Resident agrees to the following:

### CONDITIONS GOVERNING LIHTC APARTMENTS:

Initial

1. Resident understands that this development is subject to the **Low Income Housing Tax Credit Program (LIHTC)**. Regulations and guidelines, as defined in the Internal Revenue Code of 1986, Section 42. Maximum income limits are published annually by the Department of the Housing and Urban Development.

Initial

2. **ESCALATION CLAUSE/INCOME LIMITS:** The rent at this property is governed by income limits, as periodically adjusted by HUD for the county or metropolitan statistical area (MSA). During the term of the lease, if the income limits increase, the rent which is based on the Income limits may be raised with a Thirty (30) days' notice to the new LIHTC maximum rent change. **This may occur during the term of the current lease.**

Initial

3. **ESCALATION CLAUSE/UTILITY ALLOWANCE:** If, during the term of this lease, the utility allowance is reviewed and changed, the net rent to the resident may change accordingly. Since the maximum LIHTC charge is resident rent plus the utility allowance, if the allowance increases the rent would decrease by the 30 day notice and should the utility decrease, the rent could be increased in the same fashion. **This may occur during the term of the current lease.**

Initial

4. **REGULARLY SCHUDULED RECERTIFICATION:** Every year, 120 days prior to the expiration of the income certification, the Owner/Agent will request the Resident to report the income and composition of the Resident's household and to supply any other information required by the Owner for the purposes of determining the Resident's eligibility under IRC Section 42. The Resident agrees to provide accurate statements of this information and to do so by the date specified in the Owner/ Agent's request. The Owner/Agent will verify the information supplied by the Resident and use the verified information for compliance purposes only.

   a. Resident understands and agrees that a recertification of income shall be made to the Owner/Agent at least once a year from the date of the original certification at the time of admission to the property. Said recertification process must be completed prior to the annual expiration of each one-year term.

   b. Resident understands and agrees to comply promptly with all requests by the Owner/Agent for information and certifications concerning the total current household income and household composition.

   c. Resident understands and agrees that if the Resident does not submit the required recertification information by the date specified in the Owner/Agent request, this will be considered material of non-compliance and ***will result in termination of residency.***

   d. Resident understands and agrees that under IRC Section 42, many student are not LIHTC eligible. If changes in the student status render the household ineligible, residency may be terminated upon Thirty (30) days written notice. ***This may occur at any time during the term of the current lease.***

Initial

5. **FRAUD:** Should management discover at any time that the household has provided false information in regard to income or illegal household members are living in the apartment, this would constitute a substantial violation of the lease and residency would be terminated in accordance with the State.

[signature] 6-17-15

Alesia Young Date

[signature] 6/17/15

Owner authorized agent Date

BTH201.28 05/11/2012

# Lease Addendums

PST000010

**UTILITY ADDENDUM:
DISCLOSURE OF RESIDENT'S FINANCIAL RESPONSIBILITY FOR
WATER, SEWER AND TRASH COLLECTION CHARGES**

This utility addendum is hereby incorporated into the Rental Agreement between, Peppertree Apartment Holding, LP hereinafter called Owner, by Wasatch Property Management, its authorized agent, and Alesia Young for premises located at 8956 Harness Street, # A-7, Spring Valley, CA 91977.

1. Resident shall pay for water and sewer service based on the method selected below:

   a. __I__ Number of occupants in each apartment unit. Resident shall pay for water and sewer service base on an allocation formula, not actual submeter readings. Specifically, Resident's bill will be calculated in the following manner: The property's water and sewer bills will be allocated to each apartment unit based on a percentage assigned to each apartment unit based on the number of Occupants in that apartment unit compared to the total number of occupants at the property. If Resident's unit contains a washing machine, one additional occupant will be added to the occupant count for purposes of calculating the percentage, and Resident agrees that this is a fair practice to account for increased water usage in units containing washing machines. Resident's percentage for this factor is currently 0.00% but could change based on the number of occupants at the property or in the apartment unit. Resident's bill will be equal to the calculated monthly percentage multiplied by the property's water and sewer charges. Prior to allocating the property's water and sewer bills using the method described above, Owner will deduct 0.00% to account for common area usage. Owner and Resident agree that the exact amount of the water used in Resident's unit and the exact amount of water used in the common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for water and sewer usage in the common areas or in other residential units.

   b. _____Resident shall pay for water and sewer service based on water consumed in Resident's unit. Specifically, Resident's bills will be calculated as follows: A water submeter is installed in the Resident's unit to measure the total amount of water used in the unit. Water and sewer bills will be calculated by multiplying the submetered usage by a utility rate based on the utility rates of the local utility provider (which may include base or fixed charges). Resident acknowledges that the rates paid for water and sewer service may not match the rate of the local water utility (as that rate may not be appropriate to charge to an individual unit), but that the rates used are designed in a manner to allocate Owner's actual water and sewer costs to the apartment units. Resident acknowledges that Resident may be paying for some water and sewer charges attributable to common area usage.

2. All water and sewer related charges assessed to the property may be used to calculate the amount charged to each Resident under the selected formula described above, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all miscellaneous charges contained on the utility bills received from the local water and sewer providers.
3. Resident shall also be billed, and shall pay, for trash service by the third party billing provider. Resident's trash bills shall be calculated in the following manner: the property's trash bill will be allocated equally to each unit on a monthly basis. The property contains 104 units, therefore resident will pay 1/104 of the trash bill monthly. Prior to allocating the property's trash bills using the method described above, Owner will deduct 0.00% to account for common area usage. Owner and Resident agree that the exact amount of the trash costs attributable to common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates. Resident acknowledges that under the billing method described above Resident may be paying for trash charges attributable to common areas or other residential units.
4. The billing methods described above may be changed by Owner by providing Resident with 60 days prior written notice and Resident acknowledges that in certain situations it is necessary to make a change to the billing method.
5. The water and sewer bill will be sent to Resident by Conservice, a third party billing provider. Resident acknowledges that Conservice is not a public utility. Owner reserves the right to change the third party billing provider at any time. Any disputes related to the computation of Resident's bills will be between the Resident and the Owner.
6. Resident must make payment in full to Owner or the third party billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider when Resident fails to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or billing provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the billing provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc. Accordingly, Owner and Resident agree that if the payment is received after the enumerated due date, Resident shall immediately pay a late payment in the amount of $7.00, which is a reasonable estimate of the costs incurred.
7. Each monthly water, sewer and trash bill will include a monthly service fee not to exceed $ 0.00 in addition to the water, sewer and trash charges. This monthly service fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for providing billing services and may be increased (with 60 days written notice provided to Resident) if Owner's expenses or charges increase. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill.
8. Resident shall promptly contact the local gas and/or electric utility(ies) to establish an account in Resident's name for the provision of gas and electric service to Resident's unit. Resident shall ensure that the start date for each such account is the Resident's move-in date. If Resident fails to comply with the conditions of this paragraph and Owner is subsequently charged with utility charges attributable to Resident's occupancy of the unit, then Resident shall be issued (and shall pay) a bill for such services by Owner or the Billing Provider (which shall include a service charge in the amount of $25.00); such service charge is used to compensate Owner for Resident's failure to become the customer of record for such accounts, including, but not limited to charges assessed by the third party billing provider to Owner for processing of the bill for the delinquent time period, opportunity cost of the money not paid and other administrative costs. Resident and Owner agree that the charge described above is a reasonable estimate of the costs incurred.
9. Failure to pay any of said charges shall be considered a material breach of this Residential Rental Agreement and Owner shall have the right to commence legal proceedings against Resident and all occupants including but not limited to an unlawful detainer action to recover possession of the premises. Upon termination or expiration of the Lease, unpaid water and sewer bills may be deducted from Resident's security deposit, and for such purpose Owner and Resident agree that the charges described in this addendum are considered additional rent.

[signature] 6-17-15
Alesia Young(Lessee) Date

[signature] 6/17/15
Owner authorized agent Date

LD317.01.UT--Revised 01/03/2014

## ADDITIONAL SERVICES AGREEMENT

Apartment # A-7

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for Peppertree Apartment Holding, LP (hereinafter the "Community") and Alesia Young (hereinafter the "Resident(s)" under the terms of the Residential Rental Agreement.

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below. This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein. This Agreement is not made a part of that certain Residential Rental Agreement, dated 06/17/2015 (hereinafter the "Lease") by and between the Resident(s) and the Community. Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

| Property | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial #: | $0.00 |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | $0.00 |
| Storage Space Rental | Space #: | $0.00 |
| Reserved Covered Parking | Space #: | $0.00 |
| Reserved Uncovered Parking | Space #: | $0.00 |
| Enclosed Private Garage | Space #: | $0.00 |
| Renter's Insurance (This is available as a pay with rent option) ,OR | | $0.00 |
| Insurance Provider Name: AARP, Policy # | | |
| **Services** | | |
| Internet Service and/or Media Package and/or Cable Television | | $0.00 |
| RentPlus | | $0.00 |
| Intrusion and Security Alarm Service | | $0.00 |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | | $0.00 |
| Housekeeping Services | | $0.00 |
| Animal Rent (40.00 for 1 animals, limit 2 per household) | | $40.00 |
| Corporate Service | | $0.00 |
| Month to Month Lease (For leases starting on MTM basis only) | | $0.00 |
| | Total Charges for Property & Services | $40.00 |
| | Taxes (if applicable) | $0.00 |
| | **Total Monthly Payment Due** | **$40.00** |
| **Fees** | | |
| Lease Initiation Fee (if applicable) | | $0 |
| Non-Refundable Fee | | $0.00 |
| Utility Service Setup Fee | | $0.00 |
| | **Total Fees Due at Initiation of this Agreement** | **$0.00** |

**Payment:** The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed. No Portion of the Monthly Fees may be held in connection with or conditioned upon the Resident(s) rent obligation as provided under the terms of the Lease. I have read the foregoing and acknowledge the contents thereof, dated

[signature] 6-17-15
Alesia Young Date

[signature] 6/17/15
Owner authorized agent Date

LD303.01 Revised 11/15/2013

## ADDENDUM A

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner Peppertree Apartment Holding, LP, and Resident(s), Alesia Young, dated 06/17/2015 .

**PAINTING CHARGES (MINIMUM):**

Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resident shall be charged actual costs of painting, if necessary, including labor and materials.

| | STUDIO | 1X1 | 1X1 LOFT | 2X1 | 2X2 | 3X2 | 4X2 | TOWNHOME |
|---|---|---|---|---|---|---|---|---|
| Complete Paint Job | n/a | 200.00 | n/a | 225.00 | n/a | n/a | n/a | n/a |
| Partial Paint /Room | n/a | 45.00 | n/a | 45.00 | n/a | n/a | n/a | n/a |
| Partial Paint /Wall | n/a | 15.00 | n/a | 15.00 | n/a | n/a | n/a | n/a |

(0-12 months = 100%, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33%, 31-36 months = 20%)

**REPLACEMENT CHARGES (MINIMUM):**

Should replacement of damaged or missing items be necessary in the apartment, the following charges will be assessed, any items not listed above that are damaged or missing, will be billed to the resident at the cost of replacement or repair:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | n/a | Glass Rplc. | Cost | Pest Control (Flea/BedBug/Rodent) | Cost |
| Alarm Sensors/each | n/a | Heat Lamp Bulb/each | 3.99 | Range Knobs/each | 5.92 |
| Appliance Rplc. | Cost | Int. Door/each | Cost | Re-Key Locks | Cost |
| Cabinet Doors/each | Cost | Int. Door Jam/each | Cost | Remotes/Key Cards/each | Cost |
| Carpet Red Stains/each | 15.00 | Int. Door Lock/each | 12.39 | Shower Door/each | Cost |
| Carpet Patching/each | 20.00 | Light Bulb/each | 1.25 | Shower Rod/each | 3.10 |
| Ceiling Fan/each | n/a | Light Globes (8")/each | Cost | Sink Stopper/each | 8.59 |
| Crisper Tray | 83.87 | Light Globes (12")/each | Cost | Smoke/CO/Radon Detector | 14.99 |
| Dishwasher Rack/each | n/a | Mail Box Locks | 6.19 | Stove Burner Ring/each | Cost |
| Door Stops/each | .52 | Mini-Blinds | Cost | Stove Drip Pan/each | 2.44 |
| Draperies | Cost | Mirrors/each | Cost | Stove Element/each | 6.89 |
| Entry Door | Cost | Mirrored Doors/each | Cost | Switch Plates/each | .48 |
| Entry Lock | 12.39 | New Keys/each | .16 | Toilet Paper Roller/each | .40 |
| Fire Extinguisher | 48.49 | Outlet Plates/each | .33 | Toilet Seat/each | 6.83 |
| Fireplace Grate | n/a | Oven Rack/each | Cost | Towel Bar/each | 10.19 |
| Fireplace Screen | n/a | Patio Door Blinds | Cost | Tub Stopper/each | 1.25 |
| Florescent Bulb (4)/each | 6.11 | Patio Screen Door | Cost | Vertical Blinds | 21.59 |
| Furniture Damage | n/a | Peep Holes | 1.59 | Wall Bumpers | Cost |
| Garbage Disposal | 52.47 | Pest Control (General) | Cost | Window Screens/each | Cost |

| FLOORING (MINIMUM) | STUDIO | 1X1 | 1X1 LOFT | 2X1 | 2X2 | 3X1 | 4X1 | TOWNHOME |
|---|---|---|---|---|---|---|---|---|
| Carpet Shampoo | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Deodorizing | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Animal Treatment | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Replacement | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Custom Replacement | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Vinyl Replacement | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |

**CLEANING (MINIMUM):**

It is Resident's responsibility to clean the apartment when Resident moves. If Resident chooses not to, Resident will be billed as follows. Please note: These are MINIMUM charges, if Resident's apartment is excessively dirty, they could be higher.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets/each | 2.50 | Fireplace | n/a | Patio Window | 10.00 |
| Bath Floor/each | 10.00 | Garage | n/a | Range Top | 4.50 |
| Bath Sink/each | 2.00 | Kitchen Floor | 15.00 | Refrigerator | 10.00 |
| Bath Tub/each | 15.00 | Kitchen Sink | 5.00 | Shower Stall/each | 10.00 |
| Cabinets/each | 2.00 | Light Fixtures/each | 2.50 | Storage Room | 10.00 |
| Ceiling Fan/each | 10.00 | Medicine Cabinets/each | 7.00 | Storage Detached | 10.00 |
| Closet/each | 10.00 | Microwave | 15.00 | Vacuum Carpet | 15.00 |
| Commode/each | 15.00 | Mini/Vertical Blinds/each | 35.00 | Vent Hood | 10.00 |
| Dishwasher | 10.00 | Mirrors/each | 5.00 | Vent Covers | 10.00 |
| Draperies | Cost | Oven | 15.00 | Windows/each | 5.00 |
| Entry Way | 5.00 | Patio/Balcony | 40.00 | Window Screens/each | 2.50 |

**LABOR:** General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at $40.00 per hour after the first two (2) hours for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning costs incurred. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed hereon.

Resident ____ [signature]

Owner's Authorized Agent ____ [signature]

Resident ____

Date 6/17/15

LD304.01.CA Revised 11/12/2013

WASATCH

# Community Policies

The following community policies are designed to protect the premises and to set standards for the convenience of all residents. We hope you will understand their necessity and that we may count on your cooperation. It must be understood that these policies are to be considered a part of your rental agreement and will be enforced. Owner may choose to modify community policies with thirty (30) days' notice to resident. Reference section RULES AND REGULATIONS of resident rental agreement for additional details of community policies and or the modification of community policies .

**Violation of these rules or any one of them, shall be sufficient cause for termination of this lease.**

**MAINTENANCE**

If there is something that requires our attention in your apartment, please call us during regular office hours so that we may schedule our maintenance team to attend to your needs. The Rental Office phone number is (619)-463-0579. If it is after regular office hours, maintenance can be reached by calling (619)-372-2549.

**NIGHT SERVICES**

If you need assistance from our Night Services, please call (). If you are unable to reach them at this number, they may be on another call, please try again. If this is an emergency, which requires assistance from police, fire department, or medical personnel, please call 911.

**ADDITIONAL CUSTOMER SERVICE INFORMATION**

As a member of our community we will strive to provide you and your family with the highest quality service possible. If for any reason we do not meet your service expectations or we exceed your expectations, please contact the Community Manager at the Rental Office phone number listed above. If you have additional comments you may contact the Area Leader at (760)-494-1387 for Peppertree Apartment Holding, LP or you may contact Wasatch Premier Communities Customer Service Center at (760) 795-6595 or by fax at (760) 602-9681 or via email at feedback@isyourhome.com.

**RENTAL OFFICE**

Rental Office hours are posted. Business matters should be handled during these hours, except for emergencies. Please let us know if there is anything we can do to make your home more enjoyable.

**STEREOS/TVs/RADIOs/NOISE**

Please moderate the volume controls, as loud stereos, TVs and radios create a disturbance among residents. We hope to keep to minimum the necessity for the Management to police the noise problem. Your consideration for your neighbors, we are sure, will result in their consideration for you. Although we ask that you be especially careful before 9:00 a.m. and after 10:00 p.m., please be aware that any noise that disturbs a resident's right to a quiet living environment is considered to be a breach of the Rental Agreement. (This also includes horn honking. Please advise your guests to refrain from this disturbing action).

**PATIOS/BALCONIES/EXTERIOR FRONT DOOR**

For the benefit of the appearance of your apartment community, storing of furniture, bicycles, boxes, tires, trash, debris, or any other articles on your patio is expressly prohibited. Please help keep your community clean by not storing your brooms, mops, or laundry on your patio as well. These items should be kept inside and out of view. Nothing is to be hung on the exterior of the building, including on patio and balcony railings. No awnings, screens, partitions, or other projections shall be attached to the outside or other parts of the building without the prior written consent of the Owner. Exterior front door breezeway area should remain clear of trash and clutter. Failure to comply with this will result in a trash fine of $25.00 per violation.

**RESIDENTS**

Residents are not allowed to use the driveway, parking areas, landscaped grounds, or pool and recreation room for recreational purposes. NO bicycles, skateboards, or roller-states are to be used at any time on the premises. ALL residents must abide by posted rules and regulations for the pool area. Residents shall not dig up any part of the lawn areas, nor plant any form of shrubs, trees, vines, flowers, or garden plants without the prior written consent of the Management.

Throwing articles of any kind, shaking mops or dust cloths of any nature from the windows, or in the common areas, or "littering" anywhere on the premises is strictly prohibited.

**ALTERATIONS**

Alterations to your apartment are prohibited without written consent of the Management. The following are prohibited:

a. The installation of a television antenna or satellite dish. Under the rules of the Federal Communications Commission (FCC), Resident has a right to install a satellite dish and/or receiving antenna within the leased premises. Owner/Agent is allowed to impose reasonable restrictions relating to the installation and maintenance of the satellite dish and/or receiving antenna. Resident is required to comply with these instructions as a condition of installing such equipment. Resident further agrees to pay Owner/Agent an additional **$0.00** refundable deposit and sign a Satellite Dish and Antenna Addendum **prior** to installing satellite dish or any other receiving antenna. Resident understands that failure to comply with the terms of the satellite addendum, said dish or receiving antenna may be removed by Owner/ Agent without warning at the resident's expense.
b. The use of LARGE nails or adhesive hangers for pictures or mirrors. Only picture hangers or small-framing nails may be used.
c. The boring, marring or puncturing of any part of the equipment, carpet, drapes, fixtures, walls, or ceiling of your apartment.
d. The changing of, or addition of, new locks.
e. Redecoration or painting
f. Resident shall not replace or remove any of the apartment's equipment or furnishings, including but not limited to Washer/Dryer units, Refrigerator, Dishwasher, Stove/Range or Built-In Microwaves. It is prohibited for Resident to add or utilize any additional appliances, including but not limited to Deep Freezer, Upright Freezer, Portable Dishwasher or Washer/Dryer Units and/or Portable Heating or Cooling Systems in apartment. Owner/Management is not responsible for any damage or losses incurred by Resident adding or utilizing any prohibited appliances.
g. No aluminum foil, shades or colored blinds in the windows. All window coverings must be those that are supplied by the Management however, if you wish to use your own drapes, they must have white backings.
h. Air conditioning apparatus or equipment installed without the prior written consent of the Owner.
i. Resident will not permit or suffer any signs, advertisements, or notices to be displayed, inscribed, painted, or affixed on any part of the outside of the demised premises or any building, except on a directory board if provided by the Owner.

**COMMON AREAS**

Entrances to all pool, laundry, exercise areas, fire doors and any other common areas are not to be blocked open or propped open in any manner at any time. Residents who fail to properly close or secure these areas will be subject to eviction, as provided by law.

**VEHICLES & PARKING**

All cars must be registered with the office. If you have not registered your car or you have changed cars recently, please contact the Managers office to have it properly registered. Guest's vehicles must be registered with the Manager if they will be parked on-site for more than one day. Illegally parked cars may be towed at the vehicle owner's expense: this includes cars parked in red zones and driveways or parking spaces assigned to other residents. **Backing into the parking spaces is prohibited at all times.** The Management is NOT RESPONSIBLE for loss of property of residents or guests. No washing or repairing of cars is permitted on the property. All cars parked on the property grounds must be operable AND legal. This means current registration is required. Any vehicle parked on the premises that is not legal will be towed at the vehicle owner's expense. No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.

#77

**SMOKE AND CARBON MONOXIDE ALARMS**

Your apartment is equipped with a smoke detection device as well as a building fire alarm. The apartment may be equipped with a carbon monoxide alarm. Resident understands that it is the Residents responsibility to ensure that alarms are in operating condition at all times. If it is battery operated, Resident understands Residents responsibility to perform the manufacturers recommended test to determine if the alarms are operating properly at least once a month. If it is not operating properly, it is Residents responsibility to notify Management immediately in writing. It is a crime to disable, dismantle, or hang anything from, or have less than 18" clearance from smoke detection/sprinkler devices; please leave them intact, they could save your life or that of someone you love.

**FIREARMS AND WEAPONS**

It is the policy of this community that no firearms or weapons of any kind be carried or brought onto any of the community areas controlled by Owner. These include but are not limited to: swimming pool areas, clubhouse, leasing offices, community offices, recreational areas, parking lots, playgrounds, common areas, stairways, storage areas, and other areas controlled by Owner. This does not restrict the right of Residents to own guns and have them within their own leased premises. However, such firearms or weapons may only be transported to and from the vehicle directly to the apartment unit. Weapons and firearms may NOT be stored or kept in vehicles parked within the community. To the extent that state or local laws may contradict this policy, it shall be interpreted to be as restrictive as allowed by law.

**RECREATIONAL AREAS**

Hours for use of the recreation facilities are posted. Residents under 14 years of age are allowed in the swimming pools and pool areas only when accompanied by a responsible adult. Please do not give your key to your friends.

All Posted Pool regulations must be followed:

- NO glass bottles/containers are allowed in pool areas.
- NO alcoholic beverages are allowed in pool areas or other common areas.
- NO eating in the pool areas.
- NO nude swimming.
- NO cut-offs.
- NO scuba gear (including masks and fins) or inflatable toys/rafts are allowed in the pool at any time.
- NO more than TWO guests per apartment in the pool area at one time; guests must be accompanied by the Residents they are visiting.
- Residents under the age of 14 are not allowed to use the Jacuzzi at any time.
- Radios are not allowed in the pool area at any time except for use with headphones.

[signature] 6-17-2015

Alesia Young Date

[signature] 6/17/15

Owner authorized agent Date

LD305.01 Revised 11/15/2013

WASATCH

# SAFE NEIGHBORHOODS ADDENDUM
## We Promote a Drug Free and Crime Free Environment

In Consideration of the execution or renewal of a Residential Rental Agreement of the dwelling unit , located at, 8956 Harness Street, # A-7, Spring Valley, CA 91977, Peppertree Apartment Holding, LP "Owner" and Alesia Young, "Resident(s)", agree as follows:

1. Resident(s), any members of the Resident's household or a guest or other person under the Resident's control shall not engage in criminal activity; including drug-related activity, on or near the said premises. "Drug-related criminal activity", means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use of a controlled substance (as defined in Section 102 of the Controlled Substance Act [21 U.S.C. 802]), including the use of medical and/or recreational marijuana.

2. Resident(s), any member of the Resident's household or a guest or other person under the Resident's control shall not engage in any act intended to facilitate criminal activity, including drug-related criminal activity, including the use of medical and/or recreational marijuana, on or near the said premises.

3. Resident(s), any member of the Resident's household or a guest or other person under the Resident's control, will not permit the dwelling unit to be used for, or to facilitate criminal activity, including drug-related criminal activity, including the use of medical and/or recreational marijuana, regardless or whether the individual engaging in such activity is a member of the household, or a guest.

4. Resident(s), any member of the Resident's household, or a guest, or other person under the Resident's control shall not engage in the unlawful manufacturing, selling, using, storing, keeping or giving of a controlled substance, including the use of medical and/or recreational marijuana, as defined in Health & Safety Code δ11350, et seq., at any locations, whether on or near the dwelling unit premises or otherwise.

5. Resident(s), any member of the Resident's household, or a guest, or other person under the Resident's control shall not engage in any illegal activity, including: prostitution, as defined in Penal Code δ647(b); criminal street gang activity, as defined in Penal Code δ186.20 et seq.; assault and battery, as prohibited by Penal Code δ240; burglary, as prohibited in Penal Code δ459; the unlawful use and discharge of firearms, as prohibited by Penal Code δ245; sexual offenses, as prohibited in Penal Code δ269 and δ288 or any breach of the lease agreement that otherwise jeopardized the health, safety and welfare of the landlord, his agent or other tenant or involving imminent or actual serious property damage.

6. **VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL AND IRREPARABLE VIOLATION OF THE RESIDENTIAL RENTAL AGREEMENT AND GOOD CAUSE FOR IMMEDIATE TERMINATION OF TENANCY.** A single violation of any of the provisions of this added addendum shall be deemed a serious violation and material and irreparable non-compliance. It is understood that a single violation shall be good cause for termination of the Residential Rental Agreement. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be a preponderance of the evidence.

7. In case of conflicts between the provisions of this addendum and any other provisions of the lease, the provisions of this addendum shall govern.

8. This Residential Rental Agreement Addendum is incorporated into the lease executed or renewed this date 06/17/2015 between Owner and Resident(s).

[signature] 6-17-15

Alesia Young(Lessee) Date

[signature] 6/17/15

Owner authorized agent Date

LD306.01 Revised 11/15/2013

WASATCH



# No Smoking Lease Addendum

**Property:** **Peppertree Apartment Holding, LP** **Unit #:** **A-7**

**Household Name:** **Alesia Young**

Reference is hereby made to a Residential Rental Agreement ("Agreement") by and between, the Resident(s), including all members of the Resident's family or household ("Resident"), and Management. The following additional provisions shall be fully applicable to the Agreement and made part thereof as though included within the Agreement itself.

PURPOSE: Resident(s) acknowledges the following: smoking increases the risk of fire; smoking is likely to damage the Resident's apartment; secondhand smoke is likely to drift from one apartment to another; exposure to secondhand smoke causes adverse health outcomes.

DEFINITIONS: Smoking shall include the inhaling, exhaling, breathing, carrying, or possession of any lighted cigarette, cigar, pipe, other product containing any amount of tobacco, or other similar lighted product. The term Management shall include property owner and agent for owners.

NO SMOKING RULE: No resident shall smoke, nor permit anyone to smoke, in the Resident's apartment. Smoking shall be prohibited in the non-smoking designated areas, including but not limited to, hallways, stairways, foyers, common rooms and facilities, decks, patios, exterior landings, front steps, entrance ways, roof tops, fire escapes, basements, storage areas, parking areas, driveways, walkways, lawns, gardens, adjoining grounds, and building facilities.

DESIGNATED SMOKING AREA: The foregoing rule notwithstanding, the Management may designate an area for smoking, provided the designated area is located outside of, and away from, any building or other location where secondhand smoke might drift back into the designated buildings. Resident (s) acknowledges that the designated smoking area may be relocated from time to time or eliminated entirely at any time during the lease term.

NO SMOKING SIGNS: Management shall post "No Smoking" signs at the entrance and exits, in common areas, and in conspicuous places on the grounds of the apartment community where smoking is prohibited.

COMPLIANCE: Resident(s) shall inform Resident's guests of the no smoking rule.

THIRD-PARTY BENEFICIARIES: Resident(s) agree that other residents in the community are the third- party beneficiaries of this No Smoking Addendum and, accordingly, a resident has the right to sue another resident for an injunction to prohibit smoking or for damages. Any exercise of these rights shall not create a presumption that the Management breached this Addendum.

DISCLAIMER: Resident(s) acknowledges the following: a) that the adoption and/or enforcement of the no-smoking rule shall not make the Management a guarantor of the Resident's health or of the smoke-free condition of the Resident's apartment and the common areas; b) the adoption nd/or enforcement of the no-smoking rule shall not, in any way, change the warranty of the habitability, the covenant of quiet enjoyment, or other duty of care owed to the Resident(s); and c) that Management's ability to police, monitor, or enforce the no-smoking rule is dependent in significant part on compliance by the Resident(s) and Resident's guests. Management specifically disclaims any implied or express warranties that the buildings designated as non-smoking, common areas where the building have been designated as non-smoking, or Resident's premises will have any higher or improved air quality standards than any other rental property. Management cannot and does not warranty or promise that the rental premises or common areas will be free from secondhand smoke.

EFFECT ON CURRENT RESIDENTS: Resident(s) acknowledges that current residents residing in the community under a prior lease, if any, will not be immediately required to cease smoking within their apartments. As a current resident(s) moves out or have their leases renewed, the smoke-free policy will become effective for their apartments if in the designated non-smoking building.

WITNESS the execution hereof under seal this 17 day of 20 15.

[signature] 6-17-15
Alesia Young Date

[signature] 6/17/15
Owner authorized agent Date

**PROPOSITION 65 FACT SHEET**

**Office of Environmental Health Hazard Assessment**
**California Environmental Protection Agency**

This fact sheet was prepared by the Office of Environmental Health Hazard Assessment (OEHHA), which administers the Proposition 65 program. It provides information to tenants whose apartment managers and owners have posted or distributed Proposition 65 warnings.

**What is Proposition 65?**
In 1986, California voters approved an initiative to address their growing concerns about exposure to toxic chemicals. That initiative became the Safe Drinking Water and Toxic Enforcement Act of 1986; better know by its original name of Proposition 65. Proposition 65 requires the State to publish a list of chemicals know to cause cancer, birth defects, or other reproductive harm. The list has grown to include over 750 chemicals since it was first published in 1987.

**What chemicals are on the Proposition 65 list?**
The Proposition 65 list contains two types of chemicals: carcinogens, which can cause cancer, and reproductive toxicants, which cause birth defects or reproductive harm, such as sterility or miscarriages. Some chemicals may be additives or ingredients in pesticides, common household products, food, or drugs. Others may be industrial chemicals, dyes, or solvents used in dry cleaning, manufacturing and construction. Still others may be byproducts of chemical processes; for example, motor vehicle exhaust.

**What does a Proposition 65 warning mean?**
Under Proposition 65, businesses are required to give a "clear and reasonable" warning before knowingly exposing anyone to a listed chemical above a specified level. This warning can be included on the label of a consumer product or published in a newspaper. An equally common practice is for businesses to provide a warning at the workplace or in a public area affected by the chemical. In recent months, many apartment owners and managers have posted or distributed warning to notify tenants that they may be exposed to one or more chemicals on the Proposition 65 list. For example, a warning may be given because tenants are exposed to chemicals in pesticides applied to landscaping or structures or chemicals in housing construction materials, such as lead in paint or asbestos in ceiling coatings. A growing trend among rental property owners and other businesses is to provide warnings for chemicals on the list, such as tobacco smoke or motor exhaust, which are regularly released into the environment in or near rental housing. In some cases, however, owners and managers are providing warnings to avoid potential violations and lawsuits, even though exposure to chemicals on the Proposition 65 list has not been verified. You should discuss the warning with the owner or manager to learn why it was provided to that you and your family can make informed decisions about exposure to any of these chemicals and your health.

**Is my familys health at risk from exposure to these chemicals?**
Warnings must be provided for chemicals listed under Proposition 65 if exposure to them may present a significant risk of cancer or reproductive harm. For carcinogens, the chemical must be present at or above a level that could cause one additional case of cancer in a population of 100,000 people exposed to the chemical over a lifetime. For reproductive toxicants, the chemical must be present at or above 1/1000th of the level at which the chemical is determined to have no negative health risks (the "no-observable-effect level"). Proposition 65 generally does not prohibit a business from exposing people to listed chemicals nor does exposure to these chemicals necessarily create an immediate health risk. Also, as stated above, a warning may have been provided in some cases even though the level at which the chemical is present is actually too low to pose a significant health risk. It is important to find out why you have received the warning so that you can discover which chemicals you are exposed to, at what levels, to determine how best to protect your familys health.



**Where can I get more information?**

Speak with the housing owner or manager directly to learn why you received a Proposition 65 warning. Property owners and managers were not required to notify OEHHA when they provide tenants with a warning. However, to obtain general information on the Proposition 65 list of chemicals, you may contact OEHHA at (916) 445-6900, or visit http://www.oehha.ca.gov/prop65. Following a list of contacts for more information on Proposition 65 as well as chemicals that may be found in your home.

| Type of Information | Contact |
|---|---|
| Proposition 65 Enforcement | California Attorney General<br>(510) 622-3170, prop65@doj.ca.gov |
| Toxics Directory:<br>Agency List | OEHHA<br>(510)622-3170<br>http://www.oehha.ca.gov/public_info/TDHOMSC1a.html |
| Asbestos<br>Indoor Air Quality | Indoor Exposure Assessment Unit, Air Resources Board<br>(916) 445-0753, http://www.arb.ca.gov/thml/fslist/htm |
| Lead | Lead Coordinator in your county government office<br>Childhood Lead Poisoning Prevention Program<br>(510) 622-5000, http://www.dca.ca.gov/childlead/ |
| Tenant Issues | Department of Consumer Affairs<br>(800) 952-5210, http://www.dca.ca.gov/<br>Department of Housing and Community Development<br>(916) 445-4782, http://www.hed.ca.gov/ |

I have read and acknowledge receipt of this fact sheet.

[signature] 6-17-15

Alesia Young(Lessee) Date

[signature] 6/17/15

Owner authorized agent Date

LD316Revised 06/12/2012

WASATCH

# PREVENTION OF MOLD AND NOTICE OF DISCLOSURE

**Community:** **Peppertree Apartment Holding, LP**
**Resident:** Alesia Young

**What is Mold?**

Molds are fungi. Molds grow throughout the natural and built environment. Tiny particles of mold are present in indoor and outdoor air. In nature, molds help break down dead materials and can be found growing on soil, foods, plant matter, and other items. Mold spores are very tiny and lightweight and spread very easily through air. Mold growth can often be seen as discolorations, ranging from white to orange and from green to brown and black.

When molds are present in large quantities, they can cause allergic symptoms similar to those caused by plant pollen.

**What does mold need to grow?**

Mold only needs a few simple things to grow and multiply; moisture, nutrients, and a suitable place to grow. To prevent mold, moisture problems must be prevented and treated immediately. Proper ventilation is essential in preventing mold. The following are possible causes of indoor moisture problems:

| | | |
|---|---|---|
| Humidifiers | Leaky plumbing | Leaking roofs |
| Sewer backups | Indoor clothes drying | Shower/Bath steam |
| Cooking steam | House plants | Any flooding |

Resident(s) is responsible for the prevention of mold in Resident's apartment. Please follow these simple guidelines :

1. Remove Excess Moisture
   a. Dry out mops and cleaning utensils thoroughly before storing inside the apartment.
   b. Wipe down bathroom walls (shower doors if applicable) immediately after bathing, allow towels to air out. Wash and dry towels often.
   c. Wipe down any condensation from interior windows and windowsills, wash and dry towels immediately.
   d. Use of dehumidifying crystals is suggested for closet or other areas where ventilation is difficult to achieve.
2. Keep Things Clean
   a. Keep closets, dresser drawers - any place where mildew is likely to grow - as clean as possible.
   b. Soil on dirty articles can supply enough *food* for mildew to start growing when moisture and temperature are right.
   c. Greasy films, such as those that form on kitchen walls, also contain many nutrients for mildew-causing molds.
3. Circulate the Air
   a. When the outside is drier than that inside, ventilation allows the dry air to enter, take up excess moisture, and then be carried outside.
   b. When natural breezes are not sufficient, please use central air conditioners (FAN ONLY) and bath/laundry room exhaust *fan(s)*.
   c. Poorly ventilated closets get damp and musty during continued wet weather, and articles stored in them are apt to mildew.
   d. Try to improve the air circulation by opening the closet doors. In addition, hang the clothes loosely so that air can circulate around them.
   e. Dry all wet clothing (including clothes wet from rain or perspirations) before putting in closets.

**In signing this Residential Rental Agreement, Resident(s) has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Resident(s) agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. To the greatest extent allowed by law, Resident(s) relieves Owner or Owner's agents *from* any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.**

**The following have reviewed the information above and certify, to the best of their knowledge that they understand the information and will notify management of any water intrusion.**

[signature] 6-17-15
Alesia Young(Lessee) Date

[signature] 6/17/15
Owner authorized agent Date

EHS101.01--Revised 11/15/2013

## ANIMAL AGREEMENT

This Agreement entered into on 06/17/2015 by and between Wasatch Property Management (hereinafter referred to as "Management") acting pursuant to express written authority granted to Management by Owner of Peppertree Apartment Holding, LP and Alesia Young, ("Resident") in consideration of Resident's promises agree as follows:

**Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two animals per apartment. Cats must be neutered. Reptiles or exotic animals are not allowed. Renters Insurance is required for ALL Wasatch Property Management residents as of December 1, 2003.**

1. Resident is renting from Management on the premises located at: **8956 Harness Street, # A-7, Spring Valley, CA 91977**
2. The lease agreement provides that without Management's prior written consent, no animal shall be allowed in or about said premises. If a animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.
3. Management limits animals to domestic cats, dogs, birds, and fish only. Animals are allowed on the premises **ONLY** with an appointment by management to meet your animal, a signed Animal Agreement on file, additional deposits and fees may be required, plus per month animal rent, and the full **WRITTEN** consent and knowledge of the facts by management.
4. If a animal is acquired after Resident(s) move in, it is necessary to make proper arrangements with the office immediately or Resident(s) will be in violation of the lease.
5. All residents with animals are required to submit a statement from a licensed veterinarian establishing each of the following: (a) the breed of the animal, (b) the animal generally is in good health, and (c) which vaccinations the animal has received, when the animal received these vaccinations and that the animal has received all vaccinations required by law. (The only exceptions would be animals designated as service animals required to accompany a resident with a verified disability for the specific purpose of aiding that person).
6. Resident desires to keep the below described animal(s), hereinafter referred to as "Animal", and will be responsible for the written Policies as follows:

| | | | |
|---|---|---|---|
| 1st Animal Bree Brodercollier mix | Color Black | Gender Femal | Name Roxy |
| 1st Animal Bree | Color | Gender | Name |

7. **Restrictions**. We will accept all breeds of dogs a minimum of 6 months old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. The maximum weight limit allowed for animals is 25 lbs.
8. Animal is required to be "house broken" and will not cause damage to property or apartment. Animals must not annoy other residents, due to loud or disruptive behavior. Animals will not inconvenience, or cause complaints from any other residents or Rensident(s) will be subject to fines or required to remove animal from premises for violation of terms of this agreement. After third offense or complaint Resident(s) will be subject to eviction proceedings.
9. The animal must be over 6 months old and have been SPAYED OR NEUTERED. Upon move in Management will photograph the animal and also copy licensing and vaccination records.
10. **Vaccination:** Updated vaccination information is required by management on a yearly basis.
11. **Additional Deposit/Non-Refundable Pet Fee/Pet Rent:**
    - a. Resident agrees to pay Management the sum of $**0.00** as Additional Deposit/Non-Refundable Fee. At the termination of this agreement, any balance shall be billed to the LEASE AGREEMENT SECURITY DEPOSIT and disbursed by law. Resident agrees to pay Management for any excess damages or costs on demand.
    - b. The total monthly rent stated in the Lease Agreement shall be increased by $**40.00** per month as additional rent. No additional animal or change in animal types is authorized without prior written consent from Management and the payment of another deposit and/or additional rent.
12. Animal must be kept inside the apartment, including private patio or balcony area, except when on a leash no longer than 6 feet and under the immediate control and presence of a responsible person.
13. **Liability for Cleaning:** Owner of animal shall be responsible for the immediate removal of animal defecation occurring anywhere on the apartment community.
14. A $75.00 fine will be charged in the event Animal is seen in landscaped, pool or other recreational areas. A $75.00 fee will be charged to any resident who is not cleaning up after Animal. A $75.00 fee will also be charged if Resident is not keeping Animal on a leash at all times with the exception of the enclosed dog runs. If any animal rule is not followed, then, upon Management discretion, Resident will immediately remove Animal from the premises. Failure to do so will constitute a default to the Rental Agreement. AFTER A 3rd OFFENSE AN EVICTION WILL TAKE PLACE.

Initial

15. If Animal is loose on the premises and the responsible party is not available or willing to retrieve Animal, Management may, but is not obligated to, retrieve and return it to Resident's apartment, or board it at Resident's expense, or cause appropriate officials to impound it. Resident agrees to indemnify Management for any damages or expense it may incur in carrying out any of the foregoing options.
16. No animal shall be fed on an unprotected carpet within the apartment. Resident shall prevent any fleas or other infestation of the apartment or other property of the owner. Upon move in and move out, front and backing of carpet will be inspected and photos taken and kept on file.

17. Resident agrees to comply with:
    a. Health and safety code &
    b. All other applicable laws and regulations.
18. Resident agrees to indemnify and hold Management and the owner of these apartments harmless from any and all liability, or claims of liability, arising in connection with Animal, including attorney fees.
19. This agreement is an addendum and part of the Lease Agreement between Management and Resident. In the event of default by Resident of any listed items, Resident agrees after receiving written notice of default from Management to cure the default or vacate the premises.
20. Each Resident who signed the Lease Agreement shall sign this Animal Agreement.

**THIS IS A LEGAL DOCUMENT. READ BEFORE SIGNING.**

[signature] 6-17-15
Alesia Young(Lessee) Date

[signature] 6/17/15
Owner authorized agent Date

LD310.02-Revised 11/18/20

WASATCH



Peppertree Apartments
8956 Harness St
Spring Valley Ca 91977

Alesia Young
289 Jonesville Rd
Unit 243
McDonough, GA 30253

6/17/16 Mailed

**Pepp tree Apartment Holding LP**
8956 Harness Street
Spring Valley CA, 91977

6/17/2016

Alesia Young,
289 Jonesville Rd Unit 243
McDonough, Ga 30253

Dear Alesia Young,:

Thank you for your residency at a community managed by Wasatch Property Management. Pursuant to the Landlord/Tenant Civil Code, enclosed is your notification and Statement of Deposit Accounts. Wasatch Property Management endeavors to be fair and equitable in assessing your deposit account. If, however, you disagree with this assessment, or wish to provide additional information, please submit your comments in writing to the address above. We will be happy to re-examine your file and respond to you promptly.

The enclosed statement reflects that you are due a refund of **$471.84**.

Once again, we wish to say thanks for choosing to live at Peppertree Apartment Holding, LP. Good luck in future endeavors.

Sincerely,

Peppertree Apartment Holding, LP

cc: Resident's file

FM100.01 09/13/2013

# Move Out Statement

Date: 6/17/2016

| | | | | | |
|---|---|---|---|---|---|
| Code | t0109824 | Property | pst | Lease From | 06/17/2015 |
| Name | Alesia Young | Unit | A-7 | Lease To | 06/16/2016 |
| Address | 289 Jonesville Rd | Status | Past | Move In | 06/17/2015 |
| | unit 243 | Rent | 1,007.00 | Move Out | 06/03/2016 |
| City | McDonough, Ga 30253 | | | Notice | 04/04/2016 |
| Telephone | (O)-() - (H)-() - | | | | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| | Balance as of 06/01/2016 | | | ($226.10) | |
| 06/01/2016 | Monthly Rent Charges (06/2016) | $399.00 | | 172.90 | 13708260 |
| 06/01/2016 | Housing Assistance Charge (06/2016) | $608.00 | | 780.90 | 13708261 |
| 06/03/2016 | :Deposit credit | ($650.00) | | 130.90 | 13735616 |
| 06/03/2016 | Monthly Rent Charges (06/2016) Credit 27 days | ($359.10) | | (228.20) | 13735617 |
| 06/03/2016 | Carpet Cleaning/Damage- high traffic area extra cleaning | $95.00 | | (133.20) | 13735619 |
| 06/03/2016 | Parts & Materials | $9.76 | | (123.44) | 13735620 |
| 06/03/2016 | Cleaning Charges | $100.00 | | (23.44) | 13735621 |
| 06/03/2016 | Amount to be refunded | $631.44 | | 608.00 | 13735622 |
| 06/03/2016 | rent through lease terms | $159.60 | | 767.60 | 13735700 |
| 06/03/2016 | Adjustment to amount to be refunded | ($159.60) | | 608.00 | 13735701 |
| 06/06/2016 | chk# DIRECT DEPOSIT HAP ADJUSTMENT 06/01/2016 DA | | $324.00 | 284.00 | 8423987 |
| 06/17/2016 | Section 8 Chargeback | $263.20 | | 547.20 | 13735671 |

4-4-2016

To Peppertree Apartment

I Alesia Young giving my sixty day notice to Vacate 8956 Harness st APT A7 Springvalley CA 91977 effective April 10, 2016 My last day at this reident Will be June 10, 2016.

Thank you

Alesia Young

[signature]

# 30-DAY NOTICE OF RESIDENT'S INTENT TO VACATE

To: Wasatch Property Management and Peppertree Apartment Holding, LP

As of, **04/04/2016** hereafter referred to as Notice Date, the undersigned Resident(s), **Alesia Young** intends to terminate residency of the premises located at: **8956 Harness Street, # A-7, Spring Valley, CA 91977** as of **06/16/2016, by 10:00 am,** at which time a final walk through inspection will be completed. If you fail to return possession of apartment by 10:00 am, you will be charged additional prorated charges (based on Total Monthly Obligation) until keys are returned.

In accordance with Resident(s) Rental Agreement dated 06/17/2015, that if Resident chooses to terminate the current lease prior to lease end date of 06/16/2016, they may:

X Pay the remaining balance of the Lease Term, in monthly payments of **1,007.00** due and payable on or before the 1st day of each month up until the lease end date of 06/16/2016 or reoccupancy date, whichever occurs first and be eligible for a refund in the event the apartment is re-leased prior to 06/16/2016.

___ Pay a Lease Cancellation fee of **0.00** and eliminate all rent liability for the remaining term of the Lease.

___ Initials **A Pre-Move Out Inspection will be conducted within 7 Days of 04/04/2016 at your apartment. This inspection has been scheduled for ______________ at __________(am/pm). You do not need to be present for this inspection.**

1. It is further understood as follows:
   a. That this 30-Day Notice is required per your signed Rental Agreement.
   b. Except as provided by law, rent shall be due and payable up to and including the date of termination or thirty(30) days after the service of the notice of 04/04/2016, whichever is later.
   c. If all keys are not returned by **06/16/2016 at 10:00 am** the resident shall be considered in occupancy of the premises without the permission of the owner.
   d. **If the Resident remains in occupancy past the stated termination date of this notice, the Resident will be responsible for the payment of rent from the termination date stated in the notice to the Resident's actual move out date.**
   e. Any cancellation, or modification of the Notice, whatsoever, must be in writing and agreed to by both the resident and Peppertree Apartment Holding, LP.
   f. **A move out condition inspection will be conducted 06/16/2016. You are encouraged to be present during the move out inspection.**

2. A final account statement and any applicable deposit refund, will be forwarded to Resident at the address listed below after release of the premises and subsequent move-out inspection by Peppertree Apartment Holding, LP .

RESIDENT'S FORWARDING ADDRESS (**PLEASE PRINT**) Oke Rd

Name: Alesia Young

Street Address: 289 Jonesville Wmd Unit 243

City: Madonna State: GA Zip Code: 30253

Email Address: Mcdonough

Primary Phone: ______________ Secondary Phone: ______________

Reason for Move: Moving out of State/Country

Mcdon

| | | |
|---|---|---|
| Current Account Balance | $ | 1,007.00 |
| Rent Charges through Move Out Date of 06/16/2016 | $ | 1,544.07 |
| Additional Services through Move out Date of 06/16/2016 | $ | 0.00 |
| Concession Charge Back *(if lease term is not being fulfilled)* | $ | $0.00 |
| Lease Cancellation Fee *(if applicable by above stated dates)*: | $ | 0.00 |
| Taxes of 0.00% *(If Applicable)* | $ | $0.00 |
| Total Due at Time 30 Day Notice of Resident's Intent to Vacate: | $ | ~~$2,551.07~~* $598.00 tenant portion thru 6/16/16 |
| Plus Utilities Billing Prorate Provided by Owners Agent | $ | ______ |

** The balance shown is due and payable, via Electronic Funds, Money Order or Cashier's Check, to Peppertree Apartment Holding, LP at time 30 Day Notice of Resident's Intent to Vacate is given. This balance is not inclusive of any other move out charges, assessments, payments, or credits; final balance will be determined at time of move out inspection by owner's authorized agent.*

Resident Signature [signature] Resident Signature

Owner's Authorized Agent [signature]

Receipt of the above notice is hereby acknowledged 4/4/2016

Copy to Resident--Original in Resident File--LD315.01.CA Revised 11/12/2013

# ADDENDUM A

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner Peppertree Apartment Holding, LP, and Resident(s), Alesia Young, dated 06/17/2015.

## PAINTING CHARGES (MINIMUM):

Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for the cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resident shall be charged actual costs of painting, if necessary, including labor and materials.

***(0-12 months = 100%, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20% Over 36 months = 0%)***

| | STUDIO | 1X1 | 1X1 LOFT | 2X1 | 2X2 | 3X2 | 4X2 | TOWNHOME |
|---|---|---|---|---|---|---|---|---|
| Complete Paint Job | n/a | 200.00 | n/a | 225.00 | n/a | n/a | n/a | n/a |
| Partial Paint /Room | n/a | 45.00 | n/a | 45.00 | n/a | n/a | n/a | n/a |
| Partial Paint /Wall | n/a | 15.00 | n/a | 15.00 | n/a | n/a | n/a | n/a |

## REPLACEMENT CHARGES (MINIMUM):

Should replacement of damaged or missing items be necessary in the apartment, the following charges will be assessed, any items not listed above that are damaged or missing, will be billed to the resident at the cost of replacement or repair:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | n/a | Glass Rplc. | Cost | Pest Control (Flea/BedBug/Rodent) | Cost |
| Alarm Sensors/each | n/a | Heat Lamp Bulb/each | 3.99 | Range Knobs/each | 5.92 |
| Appliance Rplc. | Cost | Int. Door/each | Cost | Re-Key Locks | Cost |
| Cabinet Doors/each | Cost | Int. Door Jam/each | Cost | Remotes/Key Cards/each | Cost |
| Carpet Red Stains/each | 15.00 | Int. Door Lock/each | 12.39 | Shower Door/each | Cost |
| Carpet Patching/each | 20.00 | Light Bulb/each | 1.25 | Shower Rod/each | 3.10 |
| Ceiling Fan/each | n/a | Light Globes (8")/each | Cost | Sink Stopper/each | 8.59 |
| Crisper Tray | 83.87 | Light Globes (12")/each | Cost | Smoke/CO/Radon Detector | 14.99 |
| Dishwasher Rack/each | n/a | Mail Box Locks | 6.19 | Stove Burner Ring/each | Cost |
| Door Stops/each | .52 | Mini-Blinds | Cost | Stove Drip Pan/each | 2.44 |
| Draperies | Cost | Mirrors/each | Cost | Stove Element/each | 6.89 |
| Entry Door | Cost | Mirrored Doors/each | Cost | Switch Plates/each | .48 |
| Entry Lock | 12.39 | New Keys/each | .16 | Toilet Paper Roller/each | .40 |
| Fire Extinguisher | 48.49 | Outlet Plates/each | .33 | Toilet Seat/each | 6.83 |
| Fireplace Grate | n/a | Oven Rack/each | Cost | Towel Bar/each | 10.19 |
| Fireplace Screen | n/a | Patio Door Blinds | Cost | Tub Stopper/each | 1.25 |
| Florescent Bulb (4)/each | 6.11 | Patio Screen Door | Cost | Vertical Blinds | 21.59 |
| Furniture Damage | n/a | Peep Holes | 1.59 | Wall Bumpers | Cost |
| Garbage Disposal | 52.47 | Pest Control (General) | Cost | Window Screens/each | Cost |

| FLOORING (MINIMUM) | STUDIO | 1X1 | 1X1 LOFT | 2X1 | 2X2 | 3X2 | 4X2 | TOWNHOME |
|---|---|---|---|---|---|---|---|---|
| Carpet Shampoo | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Deodorizing | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Pet Treatment | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Carpet Replacement | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Custom Replacement | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |
| Vinyl Replacement | n/a | Cost | n/a | n/a | Cost | n/a | n/a | n/a |

$40

## CLEANING CHARGES (MINIMUM):

It is your responsibility to clean the apartment when you move. If you choose not to, you will be billed as follows. Please note: These are MINIMUM charges, if your apartment is excessively dirty, they could be higher.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets/each | 2.50 | Fireplace | n/a | Patio Window | 10.00 |
| Bath Floor/each | 10.00 | Garage | n/a | Range Top | 4.50 |
| Bath Sink/each | 2.00 | Kitchen Floor | 15.00 | Refrigerator | 10.00 |
| Bath Tub/each | 15.00 | Kitchen Sink | 5.00 | Shower Stall/each | 10.00 |
| Cabinets/each | 2.00 | Light Fixtures/each | 2.50 | Storage Room | 10.00 |
| Ceiling Fan/each | 10.00 | Medicine Cabinets/each | 7.00 | Storage Detached | 10.00 |
| Closet/each | 10.00 | Microwave | 15.00 | Vacuum Carpet | 15.00 |
| Commode/each | 15.00 | Mini/Vertical Blinds/each | 35.00 | Vent Hood | 10.00 |
| Dishwasher | 10.00 | Mirrors/each | 5.00 | Vent Covers | 10.00 |
| Draperies | Cost | Oven | 15.00 | Windows/each | 5.00 |
| Entry Way | 5.00 | Patio/Balcony | 40.00 | Window Screens/each | 2.50 |

$100

**LABOR:** General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at $40.00 per hour after the first two (2) hours for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning costs incurred. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed hereon.

Resident Signature ____________________ Resident Signature ____________________

Owner's Authorized Agent ____________________

# PRE-MOVE OUT INSPECTION

**Community:** Peppertree Apartment Holding, LP **Apt #:** A-7 **Unit Type:** ps-1x1

**Resident Name:** **Hm Phone:** **Cell Phone:** (770) 885-8950

**Move In Date:** 06/17/2015 **Notice Date:** 04/04/2016 **Move Out Date:** 06/16/2016

**Inspection Date:** 4/5/16 **Inspection Time:** 9:00 AM

## APARTMENT CONDITION ASSESSMENT

**Maintenance: (circle one)** (Easy) **Medium** **Hard**

**Comments:**

1 Hrs to Complete

**Paint: (circle one)** (Touch Up) **Partial** **Complete**

**Comments:**

PAINT BEDROOM DOOR FRONT AND BACK. PAINT CLOSET DOOR FRONT, PAINT BATHROOM DOOR FRONT AND BACK. TOUCH-UP ALL WALLS

2 Hrs to Complete

**Clean: (circle one)** **Easy** **Medium** **Hard**

**Comments:**

Hrs to Complete

**Carpet: (circle applicable)** (Shampoo) **Deodorize** **Dye** **Patch** **Replace**

**Color:** ________ **Pet Treatment** **Spot Dye** **Red Stains**

**Vinyl: (circle one)** (Good) **Replace** **Color:** ________

**Comments:**

HIGH TRAFFIC STAIN, SHAMPOO TWICE

**Anti-Tip Device Installed** (Yes) **No** **Environmental Inspection Completed** **Yes** (No)

**Visable Mold** **Yes** **No**

**Comments:**

**Service Request Written for Repairs:** **Yes** ____ **No** ✓ **Request#** ________

**Comments:**

Pre-Move Out Inspection Completed By: ROBERT QUIJADA Date: 4 / 5 /2016

Copy to Team Leader Turn File--MM104.01 Revised 11/12/2013

www.isyourhome.com  A-7 t0109824

# Peppertree Apartm t Holding, LP MAINTENANC SERVICE CHARGES

**Resident Name:**
**Apt #:** A-7 **Unit Type:** ps-1x1
**Move In Date:** 06/17/2015 **Notice Date:** 4/4/16 **Move Out Date:** 06/16/2016
**Start Turn (Date/Time):** 6/6/16 **Complete (Date/Time):** 6/8/16

**ESTIMATED REPLACEMENT FEES** for items that are missing or damaged will be charged to Resident's Security Deposit. If more than one item is used, write the number used. Number of items used times the cost equals total for each line item, total all in Upper Total space.

| USED | ITEM | COST | TOTALS |
|---|---|---|---|
| | Alarm System | n/a | |
| | Alarm Sensors/each | n/a | |
| | Appliance Rplc. | Cost | |
| | Cabinet Doors/each | Cost | |
| | Carpet Red Stains/each | 15.00 | |
| | Carpet Patching/each | 20.00 | |
| | Ceiling Fan/each | n/a | |
| | Crisper Tray | 83.87 | |
| | Dishwasher Rack/each | n/a | |
| | Door Stops/each | .52 | |
| | Draperies | Cost | |
| | Entry Door | Cost | |
| | Entry Lock | 12.39 | |
| | Fire Extinguisher | 48.49 | |
| | Fireplace Grate | n/a | |
| | Fireplace Screen | n/a | |
| | Florescent Bulb/each | 6.11 | |
| | Furniture Damage | n/a | |
| | Garbage Disposal | 52.47 | |
| | Glass Rplc. | Cost | |
| | Heat Lamp Bulb/each | 3.99 | |
| | Int. Door/each | Cost | |
| | Int. Door Jam/each | Cost | |
| | Int. Door Lock/each | 12.39 | |
| | Light Bulb/each | 1.25 | |
| | Light Globes (8")/each | Cost | |
| | Light Globes (12")/each | Cost | |
| | Mail Box Locks | 6.19 | |
| | Mini-Blinds | Cost | |
| | Mirrors/each | Cost | |
| | Mirrored Doors/each | Cost | |
| | New Keys/each | .16 | |
| | Outlet Plates/each | .33 | |
| | Oven Rack/each | Cost | |
| | Patio Door Blinds | Cost | |
| | Patio Screen Door | Cost | |
| | Peep Holes | 1.59 | |
| | Pest Control (General) | Cost | |
| | Pest Control (Flea/BedBug/Rodent) | Cost | |
| | Range Knobs/each | 5.92 | |
| | Re-Key Locks | Cost | |
| | Remotes/Key Cards | Cost | |
| | Shower Door/each | Cost | |
| | Shower Rod/each | 3.10 | |
| | Sink Stopper/each | 8.59 | |
| | Smoke/CO/Ra Detector | 14.99 | |
| | Stove Burner Ring/each | Cost | |
| 4 | Stove Drip Pan/each | 2.44 | 9.76 |
| | Stove Element/each | 6.89 | |
| | Switch Plates/each | .48 | |
| | Toilet Paper Roller/each | .40 | |
| | Toilet Seat/each | 6.83 | |
| | Towel Bar/each | 10.19 | |
| | Tub Stopper/each | 1.25 | |
| | Vertical Blinds | 21.59 | |
| | Wall Bumpers | Cost | |
| | Window Screens/each | Cost | |

Upper Total Cost of Parts Used $ 9.76

**ITEMIZE ADDITIONAL LABOR TIME AND PARTS COSTS, FILL IN ANY WORK PERFORMED THEN TOTAL HOURS AND PARTS COST**

Labor charges will be assessed for excessive maintenance, painting, trash removal, washing of walls, doors, switch plates, shelving, HVAC registers, removing of contact paper, cork, mirror tiles and wallpaper and any other extra Maintenance Service costs incurred in turning the apartment, in excess of two (2) hours.

| Description of Work and Parts Used | Time Required | Parts Cost |
|---|---|---|
| 1 | | $ |
| 2 | | $ |
| 3 | | $ |
| 4 | | $ |
| 5 | | $ |

Lower Total of Labor and Parts $ Ø

[signature]
*Representative Completing Work*

| | |
|---|---|
| Total Time required to turn apartment over two (2) hours @ $40.00/hour | 2 Hr |
| = Total Maintenance Labor | $ Ø |
| + Upper Total | $ 9.76 |
| + Lower Total | $ Ø |
| **Total Maintenance Cost and Labor** | $ 9.76 |

Copy to Team Leader Turn File--M101.3.CA Revised 04/29/2014

**Peppertree Apa[illegible]nt Holding, LP PAINTING SER[illegible]CE CHARGES**

**Resident Name:**
**Apt #:A-7** **Unit Type:ps-1x1**
**Move In Date: 06/17/2015** **Notice Date: 4/4/16** **Move Out Date: 06/16/2016**

**Start Turn (Date/Time):** 6/6/16 **Complete (Date/Time):** 6/8/16

MINIMUM PAINTING CHARGES for work done in apartment will be charged to Resident's Security Deposit. Should resident occupy the apartment for less than thirty-six (36) months a prorated charge will be assessed to the security deposit. If more than one item is done, write the number of items done. Number of items times cost equals total. Total all in Upper Total space.

**0-12 months = cost, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20%**

| #DONE | COMPLETE PAINT | COST EACH | TOTAL $ |
|---|---|---|---|
| | STUDIO | n/a | |
| | 1 BEDROOM | 200.00 | |
| | 1 BEDROOM LOFT | n/a | |
| | 2 BEDROOM/1 BATH | 225.00 | |
| | 2 BEDROOM/2 BATH | n/a | |
| | 3 BEDROOM | n/a | |
| | 4 BEDROOM | | |

| #DONE | PARTIAL PAINT | COST EACH | TOTAL $ |
|---|---|---|---|
| | PER ROOM | 45.00 | |
| | PER WALL | 15.00 | |
| | PER DOOR PAINTED | | |
| | CEILING PAINTED | | |
| | 2nd COAT OF PAINT | | |

| #DONE | DRYWALL REPAIR | COST EACH | TOTAL $ |
|---|---|---|---|
| | SMALL | 25.00 | |
| | MEDIUM | 50.00 | |
| | LARGE | 75.00 | |

| #DONE | OTHER REPAIRS | COST EACH | TOTAL $ |
|---|---|---|---|
| | KILZ | COST | |
| | WALL PAPER REMOVAL | 80.00 | |
| | DEC. MIRROR REMOVAL | 80.00 | |

Upper Total Cost of Parts Used $ Ø

**ITEMIZE ADDITIONAL LABOR TIME AND PARTS COSTS, FILL IN ANY WORK PERFORMED THEN TOTAL HOURS AND PARTS COST**

Labor charges will be assessed for excessive maintenance, painting, trash removal, washing of walls, doors, switch plates, shelving, HVAC registers, removing of contact paper, cork, mirror tiles and wallpaper and any other extra Maintenance Service costs incurred in turning the apartment, in excess of two (2) hours.

| Description of Work and Parts Used | Time Required | Parts Cost |
|---|---|---|
| 1 | | $ |
| 2 | | $ |
| 3 | | $ |
| 4 | | $ |
| 5 | | $ |
| 6 | | $ |
| 7 | | $ |
| 8 | | $ |

Lower Total of Labor and Parts $ Ø

[signature]
Representative Completing Work

TOUCH-UP DOORS, WALLS AND BASEBOARD

| | |
|---|---|
| Total Time required to turn apartment over two (2) hours @ $40.00/hour | 2 HRS |
| = Total Painting Labor | $ Ø |
| + Upper Total | $ Ø |
| + Lower Total | $ Ø |
| **Total Painting Cost and Labor** | **$** Ø |

Copy to Team Leader Turn File –MM105.03.CA Revised 04/29/2014

**Peppertree Apa nt Holding, LP CLEANING SER E CHARGES**

**Resident Name:**
**Apt #:A-7 Unit Type:ps-1x1**
**Move In Date: 06/17/2015** **Notice Date: 4/4/16** **Move Out Date: 06/16/2016**

**Start Turn (Date/Time):** 6/6/16 **Complete (Date/Time):** 6/8/16

**MINIMUM CLEANING CHARGES** for items that need to be cleaned will be charged to Resident's Security Deposit. If more than one item is cleaned, write the number cleaned. Number of items cleaned times the cost equals total for each line item, total all in Upper Total space.

| #Cleaned | ITEM | COST | Total $ | #Cleaned | ITEM | COST | Total $ |
|---|---|---|---|---|---|---|---|
| | Bath Cabinets/each | 2.50 | | | Microwave | 15.00 | |
| | Bath Floor/each | 10.00 | | | Mini/Vertical Blinds/each | 35.00 | |
| | Bath Sink/each | 2.00 | | | Mirrors/each | 5.00 | |
| | Bath Tub/each | 15.00 | | | Oven | 15.00 | |
| | Cabinets/each | 2.00 | | | Patio/Balcony | 40.00 | |
| | Ceiling Fan/each | 10.00 | | | Patio Window | 10.00 | |
| | Closet/each | 10.00 | | | Range Top | 4.50 | |
| | Commode/each | 15.00 | | | Refrigerator | 10.00 | |
| | Dishwasher | 10.00 | | | Shower Stall/each | 10.00 | |
| | Draperies | Cost | | | Storage Room | 10.00 | |
| | Entry Way | 5.00 | | | Storage Room Detached | 10.00 | |
| | Fireplace | n/a | | | Vacuum Carpet | 15.00 | |
| | Garage | n/a | | | Vent Hood | 10.00 | |
| | Kitchen Floor | 15.00 | | | Vent Covers | 10.00 | |
| | Kitchen Sink | 5.00 | | | Windows/each | 5.00 | |
| | Light Fixtures/each | 2.50 | | | Window Screens/each | 2.50 | |
| | Medicine Cabinets/each | 7.00 | | | | | |

Upper Total Cost of Parts Used $

**ITEMIZE ADDITIONAL LABOR TIME AND PARTS COSTS, FILL IN ANY WORK PERFORMED THEN TOTAL HOURS AND PARTS COST**
Labor charges will be assessed for excessive maintenance, painting, trash removal, washing of walls, doors, switch plates, shelving, HVAC registers, removing of contact paper, cork, mirror tiles and wallpaper and any other extra Maintenance Service costs incurred in turning the apartment, in excess of two (2) hours.

| | Description of Work and Parts Used | Time Required | Parts Cost |
|---|---|---|---|
| 1 | SUPERIOR CLEANING $100.00 | | $ |
| 2 | | | $ |
| 3 | | | $ |
| 4 | | | $ |
| 5 | | | $ |
| 6 | | | $ |
| 7 | | | $ |
| 8 | | | $ |

Lower Total of Labor and Parts $

Representative Completing Work

| | |
|---|---|
| Total Time required to turn apartment over two (2) hours @ $40.00/hour | |
| = Total Cleaning Labor | $ |
| + Upper Total | $ |
| + Lower Total | $ |
| **Total Cleaning Cost and Labor** | $ 100.00 |

Copy to Team Leader Turn File--MM105.5.CA Revised 04/29/2014

Peppertree Apartment Holding, LP

**CARPE CLEANING/DAMAGE SERVICE C. RGES**

**Resident Name:**
**Apt #:A-7 UnitType:ps-1x1**
**Move In Date: 06/17/2015** **Notice Date: 4/4/16** **Move Out Date: 06/16/2016**

**Start Turn (Date/Time):** 6/6/16 **Complete (Date/Time):** 6/8/16

MINIMUM CARPET CLEANING/DAMAGE CHARGES for carpet that needs to be cleaned or repaired will be charged to Resident's Security Deposit. If more than one item is to be charged, write the number to be charged. Number of items charged times the cost equals total for each line item.

**CARPET CLEANING/DEODORIZING COSTS**

| # ITEM | FLOOR PLAN | SHAMPOO | DEODORIZING | DYE JOB | PET TREATMENT | TOTAL $ |
|---|---|---|---|---|---|---|
| | STUDIO | n/a | n/a | COST | n/a | |
| 1 | 1 BEDROOM | Cost $40.00 | Cost | COST | Cost | |
| | 1 BEDROOM LOFT | n/a | n/a | COST | n/a | |
| | 2 BEDROOM/1 BATH | n/a | n/a | COST | n/a | |
| | 2 BEDROOM/2 BATH | Cost | Cost | COST | Cost | |
| | 3 BEDROOM | n/a | n/a | COST | n/a | |
| | 4 BEDROOM | | | COST | | |
| | TOWNHOME | | | COST | | |

Total Cost from Cleaning List $

**CARPET REPAIR ITEM COSTS (VENDOR SERVICES)**

| # ITEM | DESCRIPTION | COST | TOTAL $ |
|---|---|---|---|
| | Red Stains | COST | |
| | Bleach Stains/Spot Dye | COST | |
| X | Grease/Oil Stains | COST | 55.00 |
| | Carpet Patches | COST | |
| | Carpet Stretching | COST | |
| | Re-Tack | COST | |

Total Cost from Cleaning List $

**CARPET REPLACEMENT COSTS**

| # ITEM | UNIT SIZE | COST |
|---|---|---|
| | STUDIO | n/a |
| | 1 BEDROOM | Cost |
| | 1 BEDROOM LOFT | n/a |
| | 2 BEDROOM/1 BATH | n/a |
| | 2 BEDROOM/2 BATH | Cost |
| | 3 BEDROOM | n/a |
| | 4 BEDROOM | |
| | TOWNHOME | |

**CUSTOM REPLACEMENT COSTS**

| # ITEM | UNIT SIZE | COST |
|---|---|---|
| | STUDIO | n/a |
| | 1 BEDROOM | Cost |
| | 1 BEDROOM LOFT | n/a |
| | 2 BEDROOM/1 BATH | n/a |
| | 2 BEDROOM/2 BATH | Cost |
| | 3 BEDROOM | n/a |
| | 4 BEDROOM | |
| | TOWNHOME | |

**VINYL REPLACEMENT COSTS**

| # ITEM | UNIT SIZE | COST |
|---|---|---|
| | STUDIO | n/a |
| | 1 BEDROOM | Cost |
| | 1 BEDROOM LOFT | n/a |
| | 2 BEDROOM/1 BATH | n/a |
| | 2 BEDROOM/2 BATH | Cost |
| | 3 BEDROOM | n/a |
| | 4 BEDROOM | |
| | TOWNHOME | |

**EQUATION FOR CARPET REPLACEMENT COST**

Life of Carpet (in months)
(AZ/NV/WA) - 60 mo | CA/CO/UT - 84 mo ______
Cost of Replacement of Carpet ______
÷ Divided by Carpet Life months ______
= Equals Cost of Carpet per Month ______
x Times # of months left in Carpet Life ______
= Equals Replacement Cost to Resident ______

Copy to Team Leader Turn File –MM105.7.CA Revised 04/28/2014

Stains $55 - superior / additional clean but for a scrub / high traffic area Bed.

www.isyourhome.com WASATCH PROPERTY MANAGEMENT A-7 t0109824

PST000033



*** I N V O I C E ***

730 Design Court, Suite 401 • Chula Vista, CA 91911 • Tel: (619) 262.8040 • 1-800-888-1568 • Fax: (619) 827.0213

| SOLD TO | JOB INFO |
|---|---|
| WAS PROP/PEPPERTREE RANCH<br>CAPITALS DEPARTMENT<br>595 S RIVERWOODS PKWY, #400<br>LOGAN, UT 84321<br><br>360-721-2602 735-755-2066 | 0001<br>WASATCH/PEPPERTREE RANCH<br>8956 HARNESS ST<br>#A7<br>SPRING VALLEY, CA 91977<br>619-397-8024 FAX: |

JOB NUMBER: 554853 INVOICE # : 534532 INVOICE DATE: 6/13/2016
BRANCH....: ORDER DATE: 6/08/2016
CUST. ID..: WAS0150 TAX ID#: INST. DATE: 6/08/2016
TYPE......: CLEAN
SALESMAN 1: JAR JARED BAILEY QUOTE NUM.:
SALESMAN 2: CUST. P.O.: 16-609532
SPECIAL INSTRUCTIONS: VAC

PAGE: 01

| 001 CLEAN 1 BED UNIT | STEAM CLEAN | 1.00 | 40.000 | 40.00 |
|---|---|---|---|---|

| TOTALS: | SUBTOTAL | SALES TAX | GROSS TOTAL | TOTAL DEPOSITS | NET TOTAL |
|---|---|---|---|---|---|
| | 40.00 | .00 | 40.00 | .00 | 40.00 |

TERMS: N 30

DUE DATE: 7/13/2016

IN THE EVENT LEGAL ACTION IS NECESSARY TO ENFORCE OR INTERPRET THIS AGREEMENT THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER THEIR REASONABLE ATTORNEY'S FEES AND COSTS, INCLUDING EXPERT COSTS.

| South Bay | San Marcos | Kearny Mesa | Temecula | Cardiff |
|---|---|---|---|---|
| 45 N. 4th Ave., Ste B | 1144 Los Vallecitos Blvd | 7475 Clairemont Mesa Blvd | 40705 Winchester Road | 2959 Manchester Ave. |
| Chula Vista , CA 91910 | San Marcos, CA 92069 | San Diego, CA 92111 | Temecula, CA 92591 | Cardiff, CA 92007 |
| **Tel. 619.427.2420** | **Tel. 760. 512.2420** | **Tel. 858.223.1104** | **Tel. 951.208.6150** | **Tel. 760.436.5552** |

**SUPERIOR CLEANING SERVICES**

P.O. BOX 1343
National City
CA 91950

(619) 227-6712
Licensed & Bonded

FOR [illegible]
LOCATION [illegible]
CONTACT [illegible] PHONE [illegible]

RESIDENTIAL ☑ COMERCIAL ☐

OTHERS ____

DAILY ☐ WEEKLY ☐ MONTHLY ☐ OTHERS ☑

| | | |
|---|---|---|
| BEDROOM ☑ | KITCHEN ☐ | RESTROOM ☐ |
| LIVING ROOM ☑ | DINNING ROOM ☐ | SIDEWALKS ☐ |
| FANS ☐ | FILL ☐ | WALLS ☐ |
| MATS ☐ | WAX ☐ | DOORS ☐ |
| RUGS ☐ | WIPE ☐ | LEDGES ☐ |
| SINKS ☐ | BUFF ☐ | FRAMES ☐ |
| DESKS ☐ | CLEAN ☑ | CHROME ☐ |
| LIGTHS ☐ | EMPTY ☐ | MIRRORS ☐ |
| TABLES ☐ | SWEEP ☐ | WINDOWS ☐ |
| CARPET ☑ | POLISH ☐ | INT. GLASS ☐ |
| TOILETS ☐ | PICK UP ☐ | ENTRANCE ☐ |
| URINALS ☐ | VACUUM ☐ | WIND. SILLS ☐ |
| ASH TRAYS ☐ | SANITIZE ☑ | DISPENSERS ☐ |
| KICKPLATES ☐ | SHAMPOO ☐ | TRASH CONT ☐ |
| STORAGES AREAS ☐ | DAMP MOP ☐ | GLASS DOOR ☐ |
| UPHOLSTERED FURNIT. ☐ | STOP CLEAN ☐ | BASEBOARDS ☐ |

| Qty | Job Description | Amount |
|---|---|---|
| 1 | [illegible] | [illegible] |
| | [illegible] | |
| | [illegible] | |

NOTES Carpet Cleaning

Sub Total $
Tax $
Total $ [illegible]

**SUPERIOR CLEANING SERVICES**

P.O. BOX 1343
National City
CA 91950

(619) 227-6712
Licensed & Bonded

FOR [illegible]
LOCATION [illegible]
CONTACT [illegible] PHONE [illegible]

RESIDENTIAL ☑ COMERCIAL ☐

OTHERS ____

DAILY ☐ WEEKLY ☐ MONTHLY ☐ OTHERS ☐

| | | |
|---|---|---|
| BEDROOM ☐ | KITCHEN ☐ | RESTROOM ☐ |
| LIVING ROOM ☐ | DINNING ROOM ☐ | SIDEWALKS ☐ |
| FANS ☐ | FILL ☐ | WALLS ☐ |
| MATS ☐ | WAX ☐ | DOORS ☐ |
| RUGS ☐ | WIPE ☐ | LEDGES ☐ |
| SINKS ☐ | BUFF ☐ | FRAMES ☐ |
| DESKS ☐ | CLEAN ☐ | CHROME ☐ |
| LIGTHS ☐ | EMPTY ☐ | MIRRORS ☐ |
| TABLES ☐ | SWEEP ☐ | WINDOWS ☐ |
| CARPET ☐ | POLISH ☐ | INT. GLASS ☐ |
| TOILETS ☐ | PICK UP ☐ | ENTRANCE ☐ |
| URINALS ☐ | VACUUM ☐ | WIND. SILLS ☐ |
| ASH TRAYS ☐ | SANITIZE ☐ | DISPENSERS ☐ |
| KICKPLATES ☐ | SHAMPOO ☐ | TRASH CONT ☐ |
| STORAGES AREAS ☐ | DAMP MOP ☐ | GLASS DOOR ☐ |

| Qty | Job Description | Amount |
|---|---|---|
| 1 | [illegible] | [illegible] |
| | [illegible] | |
| | [illegible] | |
| | [illegible] | |

NOTES

Sub Total $
Tax $
Total $

PST000035



WASATCH
PROPERTY MANAGEMENT

- ☒ **Initial Certification**
- ☐ **Recertification**
- ☐ **Interim Certification**
- ☐ **Correction**
- ☐ **Gross Rent Change**
- ☐ **Add/Delete Tenant**
- ☐ **Other** ______________

**Year:** 2015

# TENANT INCOME CERTIFICATION

☑ Initial Certification ☐ Recertification ☐ Other ____________

Effective Date: 06-17-2015
Move-In Date: 06-17-2015
(MM-DD-YYYY)

## PART I - DEVELOPMENT DATA

Property Name: Peppertree Apartment Holding, LP County: San Diego TCAC# CA- 13-864 BIN #: CA-13-86401

Address: 8956 Harness St; Spring Valley, CA 91977 Unit Number: A-7 # Bedrooms: 1 Square Footage: 455

## PART II. HOUSEHOLD COMPOSITION

☐ Vacant (Check if unit was vacant on December 31 of the Effective Date Year)

| HH Mbr # | Last Name | First Name | Middle Initial | Relationship to Head of Household | Date of Birth (MM/DD/YYYY) | F/T Student (Y or N) | Last 4 digits of Social Security # |
|---|---|---|---|---|---|---|---|
| 1 | Young | Alesia | G | HEAD | 12/30/1959 | N | 5076 |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |

## PART III. GROSS ANNUAL INCOME (USE ANNUAL AMOUNTS)

| HH Mbr # | (A) Employment or Wages | (B) Soc. Security/Pensions | (C) Public Assistance | (D) Other Income |
|---|---|---|---|---|
| 1 | 15,600.00 | 0.00 | 0.00 | 0.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTALS | $ 15,600.00 | $ 0.00 | $ 0.00 | $ 0.00 |

Add totals from (A) through (D), above TOTAL INCOME (E): $ 15,600.00

## PART IV. INCOME FROM ASSETS

| Hshld Mbr # | (F) Type of Asset | (G) C/I | (H) Cash Value of Asset | (I) Annual Income from Asset |
|---|---|---|---|---|
| 1 | Checking | C | 279.00 | 0.00 |
| 1 | Savings | C | 0.00 | 0.00 |
| 1 | Cash on Hand | C | 25.00 | 0.00 |
| | | | | |
| | | | | |
| | | TOTALS: | $ 304.00 | $ 0.00 |

Enter Column (H) Total If over $5000 $ 0.00 X Passbook Rate 0.06 % = (J) Imputed Income $ 0.00

Enter the greater of the total of column I, or J: imputed income **TOTAL INCOME FROM ASSETS (K)** $ 0.00

(L) Total Annual Household Income from all Sources [Add (E) + (K)] $ 15,600.00

## HOUSEHOLD CERTIFICATION & SIGNATURES

The information on this form will be used to determine maximum income eligibility. I/we have provided for each person(s) set forth in Part II acceptable verification of current anticipated annual income. I/we agree to notify the landlord immediately upon any member of the household moving out of the unit or any new member moving in. I/we agree to notify the landlord immediately upon any member becoming a full time student.

Under penalties of perjury, I/we certify that the information presented in this Certification is true and accurate to the best of my/our knowledge and belief. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of the lease agreement.

[signature] Signature 6-17-2015 *(Date)* ____________ Signature ____________ *(Date)*

____________ Signature ____________ *(Date)* ____________ Signature ____________ *(Date)*

PST000037

## PART V. DETERMINATION OF INCOME ELIGIBILITY

TOTAL ANNUAL HOUSEHOLD INCOME FROM ALL SOURCES: From item (L) on page 1 — $ 15,600.00

Unit Meets Federal Income Restriction at: ☑ 60% ☐ 50%

**RECERTIFICATION ONLY:** Current Federal LIHTC Income Limit x 140%: $

Unit Meets Deeper Targeting Income Restriction at: ☐ Other ____%

Household Income exceeds 140% at recertification: ☐ Yes ☐ No

Current Federal LIHTC Income Limit per Family Size: $ 34,020.00

Household Income as of Move-in: $

Household Size at Move-in:

## PART VI. RENT

Tenant Paid Monthly Rent $ 390.00
Monthly Utility Allowance $ 31.00
Other Monthly Non-optional charges: $ 0.00

Federal Rent Assistance: $ ~~0.00~~ 617
Non-Federal Rent Assistance: $ ~~617.00~~
**Total Monthly Rent Assistance:** $ 617.00

*Source: 5 (*0-8)

**GROSS MONTHLY RENT FOR UNIT:** (Tenant paid rent plus Utility Allowance & other non-optional charges) $ 421.00

Maximum Federal LIHTC Rent Limit for this unit: $ 911.00

Unit Meets Federal Rent Restriction at: ☑ 60% ☐ 50%

Unit Meets Deeper Targeting Rent Restriction at: ☐ Other: ____%

*Source of Federal Assistance
1 **HUD Multi-Family Project Based Rental Assistance (PBRA)
2 Section 8 Moderate Rehabilitation
3 Public Housing Operating Subsidy
4 HOME Rental Assistance
5 HUD Housing Choice Voucher (HCV), tenant-based
6 HUD Project-Based Voucher (PBV)
7 USDA Section 521 Rental Assistance Program
8 Other Federal Rental Assistance
0 Missing

** (PBRA) Includes: Section 8 New Construction/Substantial Rehabilitation; Section 8 Loan Management; Section 8 Property Disposition; Section 202 Project Rental Assistance Contracts (PRAC)

## PART VII. STUDENT STATUS

ARE ALL OCCUPANTS FULL TIME STUDENTS?

☐ yes ☑ no

If yes, Enter student explanation* (also attach documentation)

Enter 1-5

*Student Explanation:
1 AFDC / TANF Assistance
2 Job Training Program
3 Single Parent/Dependent Child
4 Married/Joint Return
5 Former Foster Care

## PART VIII. PROGRAM TYPE

Mark the program(s) listed below (a. through e.) for which this household's unit will be counted toward the property's occupancy requirements. Under each program marked, indicate the household's income status as established by this certification/recertification.

| a. Tax Credit ☑ | b. HOME ☐ | c. Tax Exempt ☐ | d. AHDP ☐ | e. ________ ☐ (Name of Program) |
|---|---|---|---|---|
| See Part V above. | *Income Status* | *Income Status* | *Income Status* | *Income Status* |
| | ☐ ≤ 50% AMGI | ☐ 50% AMGI | ☐ 50% AMGI | ☐ ________ |
| | ☐ ≤ 60% AMGI | ☐ 60% AMGI | ☐ 80% AMGI | ☐ OI** |
| | ☐ ≤ 80% AMGI | ☐ 80% AMGI | ☐ OI** | |
| | ☐ OI** | ☐ OI** | | |

** Upon recertification, household was determined over-income (OI) according to eligibility requirements of the program(s) marked above.

## SIGNATURE OF OWNER/REPRESENTATIVE

Based on the representations herein and upon the proof and documentation required to be submitted, the individual(s) named in Part II of this Tenant Income Certification is/are eligible under the provisions of Section 42 of the Internal Revenue Code, as amended, and the Land Use Restriction Agreement (if applicable), to live in a unit in this Project.

[signature] 6/17/15

SIGNATURE OF OWNER/REPRESENTATIVE DATE

PST000038

## PA _'IX. SUPPLEMENTAL INFORMATION . RM

The California Tax Credit Allocation Committee (CTCAC) requests the following information in order to comply with the Housing and Economic Recovery Act (HERA) of 2008, which requires all Low Income Housing Tax Credit (LIHTC) properties to collect and submit to the U.S. Department of Housing and Urban Development (HUD), certain demographic and economic information on tenants residing in LIHTC financed properties. Although the CTCAC would appreciate receiving this information, you may choose not to furnish it. You will not be discriminated against on the basis of this information, or on whether or not you choose to furnish it. If you do not wish to furnish this information, please check the box at the bottom of the page and initial.

Enter both Ethnicity and Race codes for each household member (see below for codes).

**TENANT DEMOGRAPHIC PROFILE**

| HH Mbr # | Last Name | First Name | Middle Initial | Race | Ethnicity | Disabled |
|---|---|---|---|---|---|---|
| 1 | Young | Alesia | G | 2 | 2 | 2 |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |

**The Following Race Codes should be used:**

**1** – White – A person having origins in any of the original people of Europe, the Middle East or North Africa.
**2** – Black/African American – A person having origins in any of the black racial groups of Africa. Terms such as "Haitian" or "Negro" apply to this category.
**3** – American Indian/Alaska Native – A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.
**4** – Asian – A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.
**5** – Native Hawaiian/Other Pacific Islander – A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.
**6** – Other
**7** – Did not respond. **(Please initial below)**

*Note: Multiple racial categories may be indicated as such: 31 – American Indian/Alaska Native & White, 41 – Asian & White, etc.*

**The Following Ethnicity Codes should be used:**

**1** – Hispanic – A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. Terms such as "Latino" or "Spanish Origin" apply to this category.
**2** – Not Hispanic – A person not of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.
**3** – Did not respond. **(Please initial below)**

**Disability Status:**

**1** – Yes

If any member of the household is disabled according to Fair Housing Act definition for handicap (disability):

- A physical or mental impairment which substantially limits one or more major life activities; a record of such an impairment or being regarded as having such an impairment. For a definition of "physical or mental impairment" and other terms used, please see 24 CFR 100.201, available at hhttp://www.fairhousing.com/index.cfm?method=page.display&pagename=regs_fhr_100-201.
- "Handicap" does not include current, illegal use of or addiction to a controlled substance.
- An individual shall not be considered to have a handicap solely because that individual is a transvestite.

**2** – No
**3** – Did not respond **(Please initial below)**

☐ **Resident/Applicant:** I do not wish to furnish information regarding ethnicity, race and other household composition.

(Initials) ________ ________ ________ ________ ________ ________ ________
(HH#) 1. 2. 3. 4. 5. 6. 7.

PST000039

# Tax Credit - Annual Income Calculation Worksheet

**Property Code:** pst **Household Name:** Alesia G. Young **Certification Date:** 06/17/2015

**Property Name:** Peppertree Apartment **Tenant Code:** t0109824 **Certification Type:** MI (Crtl# 158202)

**Unit Code:** A-7 **Unit Size:** 1 Br

***Dependent Allowance is not defined in affordable accounts and options.*
***Elderly Allowance is not defined in affordable accounts and options.*

| MemberName: | Relationship: | Gender: | DOB: | Age: | Citizenship: | Disabled | Elderly | F/T Student | Eligible Student | Joint Custody |
|---|---|---|---|---|---|---|---|---|---|---|
| Alesia G. Young | Head | F | 12/30/1959 | 55 | | | | | | |

## Income Calculations:

| Member: | Source: | Frequency: | | $/Hr: | Hrs/Per: | Per/Yr: | | Inc Per Yr: |
|---|---|---|---|---|---|---|---|---|
| Alesia G. Young | Non-Federal Wage | Annual | Regular | $ 15,600.00 | * 1.00 | * 1.00 | = $ | **15,600.00** |
| | | | | | **Total of all income Sources** | | **= $** | **15,600.00** |

## Asset Calculations:

| Member: | Description: | Status: | Divested: | Divest Cost: | Mkt Value: | Int %: | | Inc. per Yr: |
|---|---|---|---|---|---|---|---|---|
| Alesia G. Young | Checking | Current | | $ 0.00 | $ 279.00 | * 0.00% | = $ | 0.00 |
| Alesia G. Young | Savings | Current | | $ 0.00 | $ 0.00 | * 0.00% | = $ | 0.00 |
| Alesia G. Young | Cash on Hand | Current | | $ 0.00 | $ 25.00 | * 0.00% | = $ | 0.00 |
| | | | | **$ 0.00** | $ 304.00 | | **$** | **0.00** |

## Total Annual Income:

*If net total family assets exceeds $5,000.00 you must calculate imputed income from assets at 0.06% and use the greater of actual income from assets or imputed income from assets.*

| Total Income | | Asset Income | | **Total Annual Income** |
|---|---|---|---|---|
| $ 15,600.00 | + | $ 0.00 | = | **$ 15,600.00** |

Qualifying Income limit at 60.00%= $34,020.00 Variance= $-18,420.00



**Low Income Housing Tax Credit Lease Rider**

**Property Name:** Peppertree Apartment Holding, LP **Unit:** A-7

**Resident Name:** Alesia Young

Dear Resident or Applicant:

The owner(s) of this property rents residential units under the federal Low-Income Housing Tax Credit Program (the "program") administered by the California Tax Credit Allocation Committee (TCAC). Under the program, the owner has agreed to rent some or all of the units in the property to low-income households and restrict the rents for those units. Another protection provided by federal law is that Low Income Tenants may not be evicted without good cause. The following Lease Rider is an important part of ensuring your rights to good cause for eviction.

The Lease or Rental Agreement dated 06/17/2015 is hereby amended by adding the following provision:

**Lease Rider: Good Cause for Eviction or Non-Renewal of the Lease**
Owner may not terminate the tenancy or refuse to renew the Lease or rental agreement of a Low Income Tenant except for good cause, including a serious or repeated violation of the material terms and conditions of the Lease, or a violation of applicable Federal, State, or local law. To terminate the tenancy or refuse to renew the Lease, Owner must provide written notice to the tenant of the grounds with sufficient specificity to enable the tenant to prepare a defense. The notice must be served at least three days before the termination of tenancy, and must comply with all requirements of California law and other applicable programs. Tenant has the right to enforce this requirement in state court, including presenting a defense to any eviction action brought by Owner.

To the extent that any terms contained in the Lease or rental agreement, or any other agreement between the owner and the tenant, contradict the terms of this Rider, the provisions of this Rider shall control.

**By signing below, I indicate my consent to this Lease Rider.**

| Lori Watrous | [signature] | 6/17/15 |
|---|---|---|
| Property Representative (print) | Property Representative Signature | Date |

---

**By signing below, I indicate my consent to this Lease Rider. I/we have been given a copy of this Lease Rider.**

| Alesia Young | [signature] | 6-17-15 |
|---|---|---|
| Resident or Applicant Name (print) | Alesia Young Signature | Date |
| | | |
| Resident or Applicant Name (print) | Signature | Date |
| | | |
| Resident or Applicant Name (print) | Signature | Date |
| | | |
| Resident or Applicant Name (print) | Signature | Date |
| | | |
| Resident or Applicant Name (print) | Signature | Date |

BTH201.04 05/10/2012



WASATCH
PROPERTY MANAGEMENT

## TENANT RELEASE & CONSENT

I Alesia Young, the undersigned hereby authorize Peppertree Apartments, to obtain without liability, information regarding my employment, income, and/or assets for purposes of verifying the information provided as part of my apartment rental application or to determine my continued eligibility.

### INFORMATION COVERED

I understand that previous or current information regarding myself may be needed. Verifications and inquires that may be requested include, but are not limited to: personal identity, employment, income and assets, medical or child care allowances. I understand that this authorization cannot be used to obtain any information about me that is not pertinent to my eligibility for and continued participation as a Qualified Tenant.

### GROUPS OR INDIVIDUALS THAT MAY BE ASKED

The group or individuals that may be asked to release the above information include, but are not limited to:

Past and Present Employers
Previous Landlords (Including Public Housing Agencies)
Support and Alimony Providers
Student Status Verification

Welfare Agencies
State Unemployment Agencies
Social Security Administration
Medical and Child Care Providers
Student Financial Aid

Veterans Administration
Retirement Systems
Banks and Other Financial Institutions

### CONDITIONS

I agree that a photocopy of this authorization may be used for the purposes stated above. The original of this authorization is on file and will stay on file for one year and one month from the date signed. I understand to have a right to review this file and correct any information that I can prove is incorrect.

### SIGNATURES

Alesia Young — Applicant/Tenant Signature
Alesia Young — Print Name
5-28-15 — Date

I certify that I have observed the above-signed Applicant/Tenant complete, sign and date this document.

L Watrous — Management Signature
Lori Watrous — Print Name
5/28/15 — Date



WASATCH
PROPERTY MANAGEMENT

# STUDENT STATUS VERIFICATION

Head of Household Name: Alesia Young

Check A, B or C, as a applicable (not that students include those attending public or private elementary schools, middle or junior high schools, senior high schools, colleges, universities, technical, trade, or mechanical schools, but does not include those attending on-the-job training courses):

A. X Household contains at least one occupant who is not a student, has not been a student, and will not be a student for five or more months during the current and/or upcoming calendar year (months need not be consecutive), If this item is checked, no further information is needed.

B. ______ Household contains all students, but is qualified because the following occupant(s) ________________________________ is/are a part-time student(s). Documentation of part-time student status is required for at least one member of the household.

C. ______ Household contains all full-time students for five or more months during the current and/or upcoming calendar year (months need not be consecutive). If this item is checked, questions 1-5, below must be completed:

1. Is at least one student receiving assistance under Title IV of the Social security Act? YES NO

2. Was at least one student previously under care and placement responsibility of the state agency responsible for administering foster care? (provide documentation of participation) YES NO

3. Does at least one student participate in a program receiving assistance under Job Training Partnership Act, Workforce Investment Act, or under other similar, federal, state, local laws? (attach documentation of participation) YES NO

4. Is at least one student a single parent with child(ren) *and* this parent is not a dependent of another individual *and* the child(ren) is/are not dependent(s) of someone other than a parent? YES NO

5. Are the students married and entitled to file a joint tax return? YES NO

*Households composed entirely of full-time students that are not income eligible and satisfy one or more of the above conditions are considered eligible. If questions 1-5 are marked **NO**, or verification does not support the exception indicated, the household is considered an ineligible student household.*

All household members age 18 or older must sign and date.

[signature] Signature  6-2-15 Date

Signature  Date

Signature  Date

Revised October 2009



WASATCH
PROPERTY MANAGEMENT

Applicant/Resident Name: Alesia Young

Development Name: Peppertree

Unit Number/Identification: A-7

***Child support and/or spousal support payments that are received shall be included as income whether or not there is yet a court order awarding payment.***

***Child/Spousal support amounts awarded by the courts but not received can be excluded only when the applicant/resident certifies that payments are not being made and further documents that all reasonable legal actions to collect amounts due, including filing with the appropriate courts or agencies responsible for enforcing payment, have been taken.***

***As part of the qualification process required by federal and/or state housing programs with jurisdiction over this development the following information is needed:***

**A. Do you receive child support and/or spousal support?** **Yes** ☐ **Go to B** **No** ☒ **Go to C.1**

**B. I receive:**

**1.** Payment amount $ ______

**2.** Frequency ______

**3.** Name(s) of Recipient(s) ______

**4.** Name of source ______

*Complete multiple affidavit forms if there are multiple sources.*

**5.** Go to C.1

**C. 1. Have you been awarded child or spousal support by court order?** **Yes** ☐ **Go to C.2** **No** ☒ **Sign Form**

**2. Provide copy of entire document, enter amount of award $ ______, and frequency ______; go to C.3.**

**3. Is payment being received as awarded?** **Yes** ☐ **Go to 3.a** **No** ☐ **Go to 3.b**

**a. Indicate the manner by which payment is received and sign form.**

**i.** ____ **Enforcement agency** *Name agency* ______ *and provide agency print out*

**ii.** ____ **Court of Law** *Name court* ______

**iii.** ____ **Direct from responsible party** *Name source* ______ *and provide affidavit or statement from the source.*

**iv.** ____ **Other** *(Explain)* ______

**b. If payment not received or if amount received is less than amount awarded provide details and documentation of collection efforts.**

______

Under penalty of perjury, I certify that the information presented in this affidavit is true and accurate to the best of my knowledge. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of a lease agreement.

[signature] Applicant/Resident Signature

6-2-15 Date

06/03/2015 11:12 6194217674 THEUPSSTORE PAGE 01/01

# EMPLOYMENT VERIFICATION

**THIS SECTION TO BE COMPLETED BY MANAGEMENT AND EXECUTED BY TENANT**

TO: (Name & address of employer)
Wells Family Daycare
1413 Trailwood Ave
Chula Vista, CA 91913

Date: 06/02/2015
Employer Phone #: 619-482-0360
Employer Fax #: linmarwell@yahoo.com

YTD 5/6/15 6/1/15

0• C
900• ÷
3•86 x
52• =
12,124•35 *

RE: Alesia Young
Applicant/Tenant

412195076
Social Security Number

A-7
Unit # (if assigned)

I hereby authorize release of my em

[signature]
Signature of Applicant/Tenant

6-2-15
Date

The individual named directly above is an applicant/tenant of a housing program that requires verification of income. The information provided will remain confidential to satisfaction of that stated purpose only. Your prompt response is crucial and greatly appreciated.

Sincerely,
[signature]
Project Owner/Management Agent

**Return Form To:**
Peppertree Senior Apartments
8956 Harness Street
Spring Valley,CA 91977
Phone 619-463-0579 Fax 619-463-2105

**THIS SECTION TO BE COMPLETED BY EMPLOYER**

Employee Name: LINDA M. WELLS Job Title: Director / Owner

Presently Employed: Yes ☒ Date First Employed 5/6/2015 No ☐ Last Day of Employment __/__/__

Current Wages/Salary: $ 300 00 (check one) Date present rate effective __/__/__

☐ hourly ☑ weekly ☐ bi-weekly ☐ semi-monthly ☐ monthly ☐ yearly ☐ other

Average # of regular hours per week: 30 Year-to-date earnings: $ 900.00 from: 5/6/2015 through: 6/1/2015

Overtime Rate: $ 0 per hour Average # of overtime hours per week: 0

Shift Differential Rate: $ 0 per hour Average # of shift differential hours per week: 0

Commissions, bonuses, tips, other: $ 0 (check one)

☐ hourly ☐ weekly ☐ bi-weekly ☐ semi-monthly ☐ monthly ☐ yearly ☐ other

List any anticipated change in the employee's rate of pay within the next 12 months: NO

Effective date: __/__/__

If the employee's work is seasonal or sporadic, please indicate the layoff period(s): NO

If the employee's work is seasonal or sporadic is this employee eligible for unemployment during the layoff period? ☒ No ☐ Yes ☐ N/A

Does this employee participate in a retirement plan such as 401k? ☒ No ☐ Yes If yes, can the employee withdraw any of the funds while employed? ☐ No ☐ Yes Comments:

Additional remarks:

[signature] LINDA M. WELLS DIR/OWNER 6/3/15
Employer's Signature / Employer's Printed Name / Employer's Title / Date

1413 Trailwood ave. Chula Vista Ca. 91913
Employer [Company] Name and Address

619-482-0360 / linmarwell@yahoo.com
Phone # / Fax # / E-mail

NOTE: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction.

RECEIVE: NO.3901 06/03/2015/WED 12:26PM

Wells Family Daycare

1413 Trailwood Ave

Chula Vista Ca. 91913

619-482-0360

License #376617057

Per week

300• x
52• =
15,600•00 *

To Whom it may Concern:

Re: Alesia Young

Ms. Young was employed at my daycare on Monday May 11, 2015, her hours are 10-am – 4pm.

Monday – Friday. Any further information needed, feel free to contact me. @ $300.00 weekly (LW)

Linda Wells

Linda Wells

619-482-0360 (Home)

619-651-0609 (Cell)

 Wasatch Property Management

## CLARIFICATION RECORD

**Applicant/Resident Name:** Alesia Young **Unit #:** A-7

**Property Name:** Peppertree Sr Apartments

Upon review of the required documentation needed to process an initial certification or annual recertification, the information provided was either incomplete or unclear. This verification allows the information received, via the telephone or person-to-person conversation, to be documented.

**Following is the information discussed with the third party verifier:**

**Name of company:** ______________________

**Name of party spoken to:** Alesia Young

**Title:** Applicant **Telephone number:** 770-885-8950

**Reason for clarification:**

A:Applicant to clarify wages and unemployment benefits displayed on Tax Returns.

B: Does applicant receive any additional income/anticipate receive over next 12 month?

**Documentation of conversation:**

A:Worked at Kids are Kids - April 2014 to May 2014. Was fired. Collected unemployment from June 2014 stopped in July 2014.

B: No

I, an authorized agent for the development, swear the above information has been recorded as discussed with the third party verifier.

T Watrous | Lori Watrous | 6/10/15
Signature | Print Name | Date



WASATCH
PROPERTY MANAGEMENT

## SELF AFFIDAVIT

**THIS SECTION TO BE COMPLETED BY APPLICAN/TENANT**

I Alesia Young confirm to you the following information: A-7
Unit #

that I am Paid in Cash Every weeks by
hinda wells family day Care Center, I am unable
to provide three months Pay Stubs.

Section8 will be paying aportion rent

Under penalty of perjury, I certify that the information presented in this affidavit is true and accurate to the best of my knowledge. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of a lease agreement. I certify the above statement is true and correct to the best of my knowledge and belief.

Dated this June 3 day of Wed in this year 2015.

[signature]
Signature

Alesia Young
Print Name

[signature]
Witnessed by (Signature of Management/Agent)

Lori Watrous
Print Name

NOTE: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction.

Form **1040** Department of the Treasury - Internal Revenue Service (99)
**U.S. Individual Income Tax Return** **2014** OMB No. 1545-0074 IRS Use Only-Do not write or staple in this space.

For the year Jan. 1-Dec. 31, 2014, or other tax year beginning ,2014, ending ,20 — See separate instructions.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| ALESIA YOUNG | | 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 |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |
| | | |
| Home address (number and street). If you have a P.O. box, see instructions. | Apt. no. | Make sure the SSN(s) above and on line 6c are correct. |
| 300 PAT MELL RD APT 460 | | |
| City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions). | | Presidential Election Campaign Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse |
| MARIETTA GA 30060- | | |
| Foreign country name | Foreign province/state/county | Foreign postal code |

**Filing Status** — Check only one box.

1 [X] Single
2 [ ] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ▶
4 [ ] Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 [ ] Qualifying widow(er) with dependent child

**Exemptions**

6a [X] **Yourself.** If someone can claim you as a dependent, **do not** check box 6a
b [ ] **Spouse**

Boxes checked on 6a and 6b: 1

c **Dependents:**

| (1) First name | Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instr.) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

If more than four dependents, see instructions and check here ▶ [ ]

No. of children on 6c who: • lived with you: 0
• did not live with you due to divorce or separation (see instructions): 0
Dependents on 6c not entered above: 0

d Total number of exemptions claimed — Add numbers on lines above ▶ 1

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| Line | Description | | Line | Amount |
|---|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | 7 | 9,363. |
| 8a | **Taxable** interest. Attach Schedule B if required | | 8a | |
| b | **Tax-exempt** interest. **Do not** include on line 8a | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required | | 9a | |
| b | Qualified dividends | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | | 10 | |
| 11 | Alimony received | | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | | 12 | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 | | 14 | |
| 15a | IRA distributions 15a | b Taxable amount | 15b | |
| 16a | Pensions and annuities 16a | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | | 17 | |
| 18 | Farm income or (loss). Attach Schedule F | | 18 | |
| 19 | Unemployment compensation | | 19 | 1,278. |
| 20a | Social security benefits 20a | b Taxable amount | 20b | |
| 21 | Other income. List type and amount | | 21 | |
| 22 | Combine the amounts in the far right col for lines 7 through 21.This is your **total income** ▶ | | 22 | 10,641. |

**Adjusted Gross Income**

| Line | Description | Line | Amount | Line | Amount |
|---|---|---|---|---|---|
| 23 | Educator expenses | 23 | | | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis gov. officials. Attach Form 2106 or 2106-EZ | 24 | | | |
| 25 | Health savings account deduction. Attach Form 8889 | 25 | | | |
| 26 | Moving expenses. Attach Form 3903 | 26 | | | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE | 27 | | | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans | 28 | | | |
| 29 | Self-employed health insurance deduction | 29 | | | |
| 30 | Penalty on early withdrawal of savings | 30 | | | |
| 31a | Alimony paid b Recipient's SSN ▶ | 31a | | | |
| 32 | IRA deduction | 32 | | | |
| 33 | Student loan interest deduction | 33 | | | |
| 34 | Tuition and fees. Attach Form 8917 | 34 | | | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | | | |
| 36 | Add lines 23 through 35 | | | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** ▶ | | | 37 | 10,641. |

**For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.**
BCA

# US Schedule EIC — Earned Income Credit Worksheet — 2014

Name: ALESIA YOUNG SSN: 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

## Figure Your Credit

| | | |
|---|---|---|
| 1 | Amount from Form 1040 or 1040A, line 7, 1040EZ, line 1 | 9,363. |
| | Enter the amount included in line 1 that was received | |
| a | by penal institution inmates for their work | |
| b | as a pension or annuity from a nonqualified deferred compensation plan or a nongovernmental section 457 plan. This amount should be shown in box 11 of Form W2 and should be included in line 1 above | |
| 2 | Taxable scholarship or fellowship grant not reported on Form(s) W2 | |
| 3 | Line 1 minus line 1a, line 1b, and line 2 | 9,363. |
| 4a | If you were self-employed or reported income and expenses on Schedules C or CEZ as a statutory employee, see instructions. If a member of the clergy, check ☐ | |

| | | Nontaxable combat pay included? | | | | |
|---|---|---|---|---|---|---|
| | | Taxpayer | Spouse | Both | No | |
| | Nontaxable combat pay | | | | | |
| 5 | Earned income | | | | 9363. | 9,363. |
| 6 | Credit from EIC table on line 5 income | | | | 399. | |
| 7 | Adjusted gross income | | | | 10641. | |
| 8 | Credit from EIC table on line 7 income, if line 7 greater than<br>• $7,999 ($13,349 if married filing jointly) and no qualifying children<br>• $17,549 ($22,899 if married filing jointly) and 1 or more qualifying children | | | | 303. | |
| 9 | **Earned income credit.** If line 7 is less than $8,000 ($13,350, $17,550, $22,900), line 6. Otherwise the smaller of line 6 or line 8 | | | | 303. | 303. |

© 2014 CCH Small Firm Services All rights reserved

1500401315

Georgia Form **500** (Rev. 9/14)
Individual Income Tax Return
Georgia Department of Revenue
**2014** (Approved software version)

Fiscal Year Beginning 01-01-2014

Fiscal Year Ending 12-31-2014

DEL ☒ EXT ☐

**Page 1**

1. YOUR FIRST NAME: ALES' A | MI | YOUR SOCIAL SECURITY NUMBER: 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

LAST NAME: YOUNG | SUFFIX

Special Program Code
See Tax Booklet on Page 9

SPOUSE'S FIRST NAME | MI | SPOUSE'S SOCIAL SECURITY NUMBER

LAST NAME | SUFFIX

DEPARTMENT USE ONLY

2. ADDRESS (NUMBER AND STREET or P.O. BOX) (Use 2nd address line for Apt, Suite or Building Number): 300 'AT I-EIL RD APT 460

☒ CHECK IF ADDRESS HAS CHANGED

3. CITY (Please insert a space if the city has multiple names): MARIETTA | STATE: GA | ZIP CODE: 30060-

500 UET Exception Attached ☐

(COUNTRY IF FOREIGN)

4. Enter your Residency Status with the appropriate number ........ Residency Status ▶ 4. 1

1. FULL-YEAR RESIDENT 2. PART-YEAR RESIDENT TO 3. NONRESIDENT

Part-Year Residents and Nonresidents must omit Lines 9 thru 14 and use Schedule 3 of Form 500, page 6

5. Enter Filing Status with appropriate letter (See Tax Booklet Page 11) ........ Filing Status ▶ 5. A

A. Single B. Married filing joint C. Married filing separate (Spouse's social security number must be entered above) D. Head of Household or Qualifying Widow(er)

6. Number of exemptions (Check appropriate box(es) and enter total in 6c.) 6a. Yourself ☒ 6b. Spouse ☐ 6c. 1

7. Dependents (If you have more than 3 dependents, attach a list of additional dependents)

First Name, MI. | Last Name

Social Security Number | Relationship to You

First Name, MI. | Last Name

Social Security Number | Relationship to You

First Name, MI. | Last Name

Social Security Number | Relationship to You

**Georgia Form 500**
Individual Income Tax Return
Georgia Department of Revenue
**2014**

1500401325

**Page 2**

YOUR SOCIAL SECURITY NUMBER
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

| Line | Description | | Amount |
|---|---|---|---|
| 7a. | Number of Dependents (DO NOT include yourself or your spouse) | 7a. | |
| 7b. | Add Lines 6c and 7a. Enter total | 7b. | 1 |

**If amount on line 8, 9, 10, 13 or 15 is negative, use the minus sign (-). Example -3,450**

| Line | Description | | Amount |
|---|---|---|---|
| 8. | Federal adjusted gross income (From Federal Form 1040, 1040A or 1040 EZ) **(Do not use FEDERAL TAXABLE INCOME) If the amount on Line 8 is $40,000 or more, or your gross income is less than your W-2s you must enclose a copy of your Federal Form 1040 Pages 1 and 2.** | 8. | 10641 |
| 9. | Adjustments from Schedule 1 (See Tax Booklet on Page 11, Line 9) | 9. | |
| 10. | Georgia adjusted gross income (Net total of Line 8 and Line 9) | 10. | 10641 |
| 11. | Standard Deduction (Do not use FEDERAL STANDARD DEDUCTION) **(See Tax Booklet on Page 12 Line 11)** | 11a. | 2300 |
| b. | Self: 65 or over? ☐ Blind? ☐ Spouse: 65 or over? ☐ Blind? ☐ Total ☐ x 1,300= | 11b. | |
| c. | Total Standard Deduction (Line 11a + Line 11b) **Use EITHER Line 11c OR Line 12c (Do not write on both lines)** | 11c. | 2300 |
| 12. | Total Itemized Deductions used in computing Federal Taxable Income. If you use itemized deductions, **you must enclose Federal Schedule A** | | |
| a. | Federal Itemized Deductions (Schedule A-Form 1040) | 12a. | |
| b. | Less adjustments: (See Tax Booklet on Page 13, Line 12) | 12b. | |
| c. | Georgia Total Itemized Deductions | 12c. | |
| 13. | Subtract either Line 11c or Line 12c from Line 10; enter balance | 13. | 8341 |
| 14a. | Number on Line 6c. 1 multiply by $2,700 for filing status A or D OR multiply by $3,700 for filing status B or C | 14a. | 2700 |
| 14b. | Number on Line 7a. multiplied by $3,000 | 14b. | |
| 14c. | Add Lines 14a. and 14b. Enter total | 14c. | 2700 |
| 15. | Georgia taxable income (Line 13 less Line 14c or Schedule 3, Line 14) | 15. | 5641 |
| 16. | Tax (Use Tax Table in the Tax Booklet on Pages 20-22) | 16. | 162 |
| 17. | Credits from Schedule 2, Page 5, Line 12 of Form 500 (Enter total but not more than the amount on Line 16) | 17. | 8 |
| 18. | Balance (Line 16 less Line 17) if zero or less than zero, enter zero | 18. | 154 |
| 19. | **Georgia Income Tax Withheld on Wages and 1099s** (Enter Tax Withheld Only and enclose W-2s and/or 1099s) | 19. | 332 |
| 20. | **Other Georgia Income Tax Withheld** (Must enclose G2-A, G2-FL, G2-LP and/or G2-RP) | 20. | |

TAXWISE 01 1045-013 2014 GA 004 T1 14



Georgia Form **500**
Individual Income Tax Return
Georgia Department of Revenue
**2014**

1500401335

**Page 3**

YOUR SOCIAL SECURITY NUMBER
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

| Line | Description | | Amount |
|---|---|---|---|
| 21. | Estimated tax for 2014 and Form IT-560 | 21. | |
| 22. | Total prepayment credits **(Add Lines 19, 20 and 21)** | 22. | 332 |
| 23. | If Line 18 exceeds Line 22 enter BALANCE DUE STATE | 23. | |
| 24. | If Line 22 exceeds Line 18 enter OVERPAYMENT amount | 24. | 178 |
| 25. | **Amount to be credited to 2015 ESTIMATED TAX** | 25. | |
| 26. | Georgia Wildlife Conservation Fund **(No gift of less than $1.00)** | 26. | |
| 27. | Georgia Fund for Children and Elderly **(No gift of less than $1.00)** | 27. | |
| 28. | Georgia Cancer Research Fund **(No gift of less than $1.00)** | 28. | |
| 29. | Georgia Land Conservation Program **(No gift of less than $1.00)** | 29. | |
| 30. | Georgia National Guard Foundation **(No gift of less than $1.00)** | 30. | |
| 31. | Dog & Cat Sterilization Fund **(No gift of less than $1.00)** | 31. | |
| 32. | Saving the Cure Fund **(No gift of less than $1.00)** | 32. | |
| 33. | FOR DEPARTMENT USE ONLY | 33. | |
| 34. | Form 500 UET **(Estimated tax penalty)** | 34. | |
| 35. | (If you owe) Add Lines 23, 26 thru 34 MAKE CHECK PAYABLE TO GEORGIA DEPARTMENT OF REVENUE | 35. | |
| 36. | **(If you are due a refund)** Subtract the sum of Lines 25 thru 34 from Line 24 THIS IS YOUR REFUND | 36. | 178 |

Select only one option - See booklet page 13.

36a. **Direct Deposit** (For U.S. Accounts Only) Type: Checking [X] Savings [ ] Routing Number 322271627

36b. Debit Card [ ] Account Number 1964855862

You can help eliminate $1Million of processing costs by choosing Direct Deposit or Debit Card. If you do not select Direct Deposit or Debit Card, a paper check will be issued.

(PAYMENT) PROCESSING CENTER GEORGIA DEPARTMENT OF REVENUE PO BOX 740399 ATLANTA GA 30374-0399

(REFUND and NO BALANCE DUE) PROCESSING CENTER GEORGIA DEPARTMENT OF REVENUE PO BOX 740380 ATLANTA GA 30374-0380

ENCLOSE ALL ITEMS IN RETURN ENVELOPE. **DO NOT** STAPLE YOUR CHECK, W-2s, OTHER WITHHOLDING DOCUMENTS, OR TAX RETURN

Under penalty of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief it is true, correct and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. Georgia Public Code Section 48-2-31 requires that taxes shall be paid in lawful money of the United States, free of any expenses to the State of Georgia.

Taxpayer's Signature [ ] (Check box if deceased) PHONE NUMBER 770-885-8950 DATE

Spouse's Signature [ ] (Check box if deceased) DATE

Do you want to authorize DOR to discuss this return with the named preparer. Yes [ ]

NAME OF PREPARER OTHER THAN TAXPAYER

Signature of Preparer

PREPARER'S FEIN PREPARER'S SSN/PTIN PHONE NUMBER

[ ] I authorize the Georgia Department of Revenue to electronically notify me at the below e-mail address regarding any updates to my account(s).

TAXPAYER'S EMAIL ADDRESS

Form 1040 (2014) ALESIA YOU 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 Page **2**

## Tax and Credits

| Line | Description | Box | Amount |
|---|---|---|---|
| 38 | Amount from line 37 (adjusted gross income) | 38 | 10,641. |
| 39a | Check if: ☐ You were born before Jan. 2, 1950, ☐ Blind. ☐ Spouse was born before Jan. 2, 1950, ☐ Blind. **Total boxes checked** ▶ 39a ☐ | | |
| b | If your spouse itemizes on a separate return or you were a dual-status alien, check here ▶ 39b ☐ | | |
| 40 | **Itemized deductions** (from Schedule A) **or** your **standard deduction** (see left margin) | 40 | 6,200. |
| 41 | Subtract line 40 from line 38 | 41 | 4,441. |
| 42 | **Exemptions.** If line 38 is $152,525 or less, multiply $3,950 by the number on line 6d. Otherwise, see instructions | 42 | 3,950. |
| 43 | **Taxable income.** Subtract line 42 from line 41. If line 42 is more than line 41, enter -0- | 43 | 491. |
| 44 | **Tax** (see instructions). Check if any from: a ☐ Form(s) 8814 b ☐ Form 4972 c ☐ | 44 | 49. |
| 45 | **Alternative minimum tax** (see instructions). Attach Form 6251 | 45 | |
| 46 | Excess advance premium tax credit repayment. Attach Form 8962 | 46 | |
| 47 | Add lines 44, 45, and 46 ▶ | 47 | 49. |
| 48 | Foreign tax credit. Attach Form 1116 if required | 48 | |
| 49 | Credit for child and dependent care expenses. Attach Form 2441 | 49 | |
| 50 | Education credits from Form 8863, line 19 | 50 | |
| 51 | Retirement savings contributions credit. Attach Form 8880 | 51 | |
| 52 | Child tax credit. Attach Schedule 8812, if required | 52 | |
| 53 | Residential energy credits. Attach Form 5695 | 53 | |
| 54 | Other credits from Form: a ☐ 3800 b ☐ 8801 c ☐ | 54 | |
| 55 | Add lines 48 through 54. These are your **total credits** | 55 | |
| 56 | Subtract line 55 from line 47. If line 55 is more than line 47, enter -0- ▶ | 56 | 49. |

**Standard Deduction for-**
- People who check any box on line 39a or 39b **or** who can be claimed as a dependent, see instructions.
- All others:

Single or Married filing separately, $6,200

Married filing jointly or Qualifying widow(er), $12,400

Head of household, $9,100

## Other Taxes

| Line | Description | Box | Amount |
|---|---|---|---|
| 57 | Self-employment tax. Attach Schedule SE | 57 | |
| 58 | Unreported social security and Medicare tax from Form: a ☐ 4137 b ☐ 8919 | 58 | |
| 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| 60a | Household employment taxes from Schedule H | 60a | |
| b | First-time homebuyer credit repayment. Attach Form 5405 if required | 60b | |
| 61 | Health care: individual responsibility (see instructions) Full-year coverage ☐ | 61 | 95. |
| 62 | Taxes from: a ☐ Form 8959 b ☐ Form 8960 c ☐ Instructions; enter code(s) | 62 | |
| 63 | Add lines 56 through 62. This is your **total tax** ▶ | 63 | 144. |

## Payments

If you have a qualifying child, attach Schedule EIC.

| Line | Description | Box | Amount |
|---|---|---|---|
| 64 | Federal income tax withheld from Forms W-2 and 1099 | 64 | 522. FORM 1099 |
| 65 | 2014 estimated tax payments and amount applied from 2013 return | 65 | |
| 66a | **Earned income credit (EIC)** | 66a | 303. |
| b | Nontaxable combat pay election | 66b | |
| 67 | Additional child tax credit. Attach Form 8812 | 67 | |
| 68 | American opportunity credit from Form 8863, line 8 | 68 | |
| 69 | Net premium tax credit. Attach Form 8962 | 69 | |
| 70 | Amount paid with request for extension to file | 70 | |
| 71 | Excess social security and tier 1 RRTA tax withheld | 71 | |
| 72 | Credit for federal tax on fuels. Attach Form 4136 | 72 | |
| 73 | Credits from Form: a ☐ 2439 b ☐ Reserved c ☐ Reserved d ☐ | 73 | |
| 74 | Add lines 64, 65, 66a, and 67 through 73. These are your **total payments** ▶ | 74 | 825. |

## Refund

| Line | Description | Box | Amount |
|---|---|---|---|
| 75 | If line 74 is more than line 63, subtract line 63 from line 74. This is the amount you **overpaid** | 75 | 681. |
| 76a | Amount of line 75 you want **refunded to you.** If Form 8888 is attached, check here ▶ ☐ | 76a | 681. |
| b | Routing number 322271627 ▶ c Type: ☒ Checking ☐ Savings | | |
| d | Account number 1964855862 | | |
| 77 | Amount of line 75 you want **applied to your 2015 estimated tax** ▶ | 77 | |

Direct deposit? See instructions.

## Amount You Owe

| Line | Description | Box | Amount |
|---|---|---|---|
| 78 | **Amount you owe.** Subtract line 74 from line 63. For details on how to pay, see instructions ▶ | 78 | |
| 79 | Estimated tax penalty (see instructions) | 79 | |

## Third Party Designee

Do you want to allow another person to discuss this return with the IRS (see instructions)? ☐ **Yes.** Complete below. ☒ **No**

Designee's name ▶ Phone no. ▶ Personal identification number (PIN) ▶

## Sign Here

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See instructions. Keep a copy for your records.

Your signature: [signature] | Date: 2-28-15 | Your occupation: TEACHER | Daytime phone number: 770-885-8950

Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.)

## Paid Preparer Use Only

Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN

Firm's name ▶ LEGACY TAX | Firm's EIN ▶

Firm's address ▶ 6825 JIMMMY CARTER BLVD SUITE 1260 NORCROSS GA 30071 | Phone no.


# UNDER $5,000 ASSET CERTIFICATION

For households whose combined net assets do not exceed $4,999.99
Complete one form for households with joint assets or one form per person with separate assets. If a household contains both joint and separate assets, use separate forms and list the joint accounts on both forms with the statement (Joint) next to the applicable asset.

Household Name: Alesia Young Unit No. A-7

Development Name: Peppertree Senior City: Spring Valley

**Complete the following:**

**1. Choose one:**

☐ I/we do not have any assets at this time. *(if this box is checked, draw a line through the asset information below, place a zero in #3, sign and date)*
**OR**
☒ My/our assets include:
*(Please complete fully. Put a zero in any columns that do not apply)*

| (A) Cash Value* | (B) Int. Rate | (A*B) Annual Income | Source | (A) Cash Value* | (B) Int. Rate | (A*B) Annual Income | Source |
|---|---|---|---|---|---|---|---|
| $ ~~279.00~~ 0 | -0- | $ -0- | Savings Account | $ 279.00 | 0 | $ 0 | Checking Account |
| $ 25.00 | -0- | $ -0- | Cash on Hand | $ 0 | 0 | $ 0 | Safety Deposit Box |
| $ -0- | -0- | $ -0- | Certificates of Deposit | $ 0 | 0 | $ 0 | Money market funds |
| $ 0 | -0- | $ -0- | Stocks | $ 0 | 0 | $ 0 | Bonds |
| $ 0 | 0 | $ 0 | IRA Accounts | $ 0 | 0 | $ 0 | 401K Accounts |
| $ 0 | 0 | $ 0 | Keogh Accounts | $ 0 | 0 | $ 0 | Trust Funds |
| $ 0 | 0 | $ 0 | Equity in real estate | $ 0 | 0 | $ 0 | Land Contracts |
| $ 0 | 0 | $ 0 | Lump Sum Receipts | $ 0 | 0 | $ 0 | Capital investments |
| $ 0 | 0 | $ 0 | Life Insurance Policies (excluding Term) | | | | |
| $ 0 | 0 | $ 0 | Other Retirement/Pension Funds not named above: | | | | |
| $ 0 | 0 | $ 0 | Personal property held as an investment** : | | | | |
| $ 0 | 0 | $ 0 | Other (list): | | | | |

**PLEASE NOTE:** Certain funds (e.g., Retirement, Pension, Trust) may or may not be (fully) accessible to you. ***For instance, do not list pensions or retirement account balances that cannot be accessed without terminating employment.*** Include only those amounts which are.

**Cash value is defined as market value minus the cost of converting the asset to cash, such as broker's fees, settlement costs, outstanding loans, early withdrawal penalties, etc.*

***Personal property held as an investment may include, but is not limited to, gem or coin collections, art, antique cars, etc. Do not include necessary personal property such as, but not necessarily limited to, household furniture, daily-use autos, clothing, assets of an active business, or special equipment for use by the disabled.*

**2. Choose one:**

☒ I/we have not sold or given away assets (including cash, real estate, etc.) for less than fair market value during the past two (2) years.
**OR**
☐ Within the past two (2) years, I/we have sold or given away assets (including cash, real estate, etc.) for more than $1,000 below their fair market value (FMV). Those amounts* are included above and are equal to a total of: $ 0 (*the difference between FMV and the amount received, for each asset on which this occurred).

**3. Please complete:**
**The net family assets** *(as defined in 24 CFR 813.102)* **above do not exceed $5,000 and the annual income** (*add all annual income columns*) **from the net family assets is $ 0 . This amount is included in total gross annual income.**

Under penalty of perjury, I/we certify that the information presented in this certification is true and accurate to the best of my/our knowledge. The undersigned further understand(s) that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of a lease agreement.

[signature] 6-2-15
Applicant/Tenant Date

Applicant/Tenant Date

# TENANT INCOME CERTIFICATION QUESTIONNAIRE

*One Form per Adult Member of the Household*

**NAME:** Alesia Young

**TELEPHONE NUMBER:** (770) 770-8850

x **Initial Certification**

**Re-certification**

**BIN #** ______

**Other**

**Unit #** A-7

**INCOME INFORMATION**

| | YES | NO | | MONTHLY GROSS INCOME |
|---|---|---|---|---|
| 1. | ☐ | X | I am self employed. (List nature of self employment) ______ | (use net income from self-employment only) $______ |
| 2. | X | ☐ | I have a job and receive wages, salary, overtime pay, commissions, fees, tips, bonuses, and/or other compensation: List the businesses and/or companies that pay you:<br>Name of Employer<br>1) Wells Family Day Care<br>2) ______<br>3) ______ | <br><br>$ 1,200<br>$______<br>$______ |
| 3. | ☐ | X | I receive cash contributions of gifts including rent or utility payments, on an ongoing basis from persons not living with me. | $______ |
| 4. | ☐ | X | I receive unemployment benefits. | $______ |
| 5. | ☐ | X | I receive Veteran's Administration, GI Bill, or National Guard/Military benefits/income. | $______ |
| 6. | ☐ | X | I receive periodic social security payments. | $______ |
| 7. | ☐ | X | The household receives unearned income from family members age 17 or under (example: Social Security, Trust Fund disbursements, etc.). | $______ |
| 8. | ☐ | X | I receive Supplemental Security Income (SSI). | $______ |
| 9. | ☐ | X | I receive disability or death benefits other than Social Security. | $______ |
| 10. | ☐ | X | I receive Public Assistance Income (examples: TANF, AFDC) | $______ |
| 11. | ☐ | X | I am entitled to receive child support payments. | |
| | ☐ | X | I am currently receiving child support payments.<br>If yes, from how many persons do you receive support? ______ | $______<br>$______ |
| | ☐ | X | I am currently making efforts to collect child support owed to me. List efforts being made to collect child support:<br>______<br>______ | |
| 12. | ☐ | X | I receive alimony/spousal support payments | $______ |
| 13. | ☐ | X | I receive periodic payments from trusts, annuities, inheritance, retirement funds or pensions, insurance policies, or lottery winnings.<br>If yes, list sources:<br>1)______<br>2)______ | <br>$______<br>$______ |
| 14. | ☐ | X | I receive income from real or personal property. | (use net earned income) $______ |
| 15. | ☐ | X | Student financial aid (public or private, not including student loans)<br>Subtract cost of tuition from Aid received<br>*For Households receiving Section 8 Assistance Only* | $______ |

**ASSET INFORMATION**

| YES | NO | | INTEREST RATE | CASH VALUE |
|---|---|---|---|---|
| 16. X | ☐ | I have a checking account(s).<br>If yes, list bank(s)<br>1) Chase<br>2)____ | 0 %<br>____% | $2,7900<br>$____ |
| 17. X | ☐ | I have a savings account(s)<br>If yes, list bank(s)<br>1) Chase<br>2)____ | 0 %<br>____% | $ 0<br>$____ |
| 18. ☐ | X | I have a revocable trust(s)<br>If yes, list bank(s)<br>1)____ | ____% | $____ |
| 19. ☐ | X | I own real estate.<br>If yes, provide description:<br>____ | | $____ |
| 20. ☐ | X | I own stocks, bonds, or Treasury Bills<br>If yes, list sources/bank names<br>1)____<br>2)____<br>3)____ | ____%<br>____%<br>____% | $____<br>$____<br>$____ |
| 21. ☐ | X | I have Certificates of Deposit (CD) or Money Market Account(s).<br>If yes, list sources/bank names<br>1)____<br>2)____<br>3)____ | ____%<br>____%<br>____% | $____<br>$____<br>$____ |
| 22. ☐ | X | I have an IRA/Lump Sum Pension/Keogh Account/401K.<br>If yes, list bank(s)<br>1)____<br>2)____ | ____%<br>____% | $____<br>$____ |
| 23. ☐ | X | I have a whole life insurance policy.<br>If yes, how many policies ____ | | $____ |
| 24. X | ☐ | I have cash on hand.<br>25.00 | | $25.00 |
| 25. ☐ | X | I have disposed of assets (i.e. gave away money/assets) for less than the fair market value in the past 2 years.<br>If yes, list items and date disposed:<br>1)____<br>2)____ | | $____<br>$____ |

**STUDENT STATUS**

| YES | NO | |
|---|---|---|
| ☐ | X | Does the household consist of all persons who are full-time students (Examples: K-12, College, Trade School, etc.)? |
| ☐ | X | Does the household consist of all persons who have been a full-time student 5 months in the current calendar year? |
| ☐ | X | Does your household anticipate becoming an all full-time student household in the next 12 months? |
| | | If you answered yes to any of the previous three questions are you: |
| ☐ | ☐ | • Receiving assistance under Title IV of the Social Security Act (AFDC/TANF/Cal Works - **not** SSA/SSI) |
| ☐ | ☐ | • Enrolled in a job training program receiving assistance through the Job Training Participation Act (JTPA) or other similar program |
| ☐ | ☐ | • Married and filing (or are entitled to file) a joint tax return |
| ☐ | ☐ | • Single parent with a dependant child or children and neither you nor your child(ren) are dependent of another individual |
| ☐ | ☐ | • Previously enrolled in the Foster Care program (currently age 18-24) |

UNDER PENALTIES OF PERJURY, I CERTIFY THAT THE INFORMATION PRESENTED ON THIS FORM IS TRUE AND ACCURATE TO THE BEST OF MY/OUR KNOWLEDGE. THE UNDERSIGNED FURTHER UNDERSTANDS THAT PROVIDING FALSE REPRESENTATIONS HEREIN CONSTITUES AN ACT OF FRAUD. FALSE, MISLEADING OR INCOMPLETE INFORMATION WILL RESULT IN THE DENIAL OF APPLICATION OR TERMINATION OF THE LEASE AGREEMENT.

Alesia Young
PRINTED NAME OF APPLICANT/TENANT

[signature]
SIGNATURE OF APPLICANT/TENANT

6-2-15
DATE

[signature]
WITNESSED BY (SIGNATURE OF OWNER/REPRESENTATIVE)

6-2-15
DATE





WASATCH PROPERTY MANAGEMENT

# APPLICATION FOR RESIDENCY

RECEIVED MAY 28 2015 Date Stamp BY:

A7

EQUAL HOUSING OPPORTUNITY, Peppertree APARTMENTS WILL COMPLY WITH THE PROVISION OF ANY FEDERAL, STATE OR LOCAL LAW PROHIBITING DISCRIMINATION IN HOSING ON THE BASIS OF RACE, COLOR, CREED, ANCESTRY, NATIONAL ORGIN, SEX, SEXUAL ORIENTATION, AND FAMILIAL STATUS, SOURCE OF INCOME, AGE, DISABILITY, AIDS, OR AIDS CONDITION.

APPLICANTS NAME Alesia Young SPOUSE ———

TELEPHONE 770 885-8950 TELEPHONE ———

HOUSEHOLD COMPOSITION: PLEASE LIST THE HEAD OF HOUSEHOLD FIRST AND ALL PERSONS WHO WILL BE RESIDING WITH YOU.

| FIRST NAME | LAST NAME | MI | RELATIONSHIP TO HEAD | SOC. SEC. NO | D.O.B. | SEX | STUDENT |
|---|---|---|---|---|---|---|---|
| Alesia | Young | G | HEAD OF HOUSEHOLD | 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 | 123059 | F | ☐ YES ☒ NO |
| | | | | 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 | | | ☐YES ☐NO |
| | | | | | | | ☐YES ☐NO |
| | | | | | | | ☐YES ☐NO |
| | | | | | | | ☐YES ☐NO |
| | | | | | | | ☐YES ☐NO |
| | | | | | | | ☐YES ☐NO |

DO YOU REQUIRE A LIVE-IN AIDE? ☐ YES ☒ NO IF YES, NAME OF LIVE-IN AIDE

**STUDENT STATUS** **CHECK ONE**

| | YES | NO |
|---|---|---|
| ARE ALL OCCUPANTS OF THE HOUSEHOLD FULL TIME STUDENTS OR HAVE BEEN FULL-TIME STUDENTS DURING THE FIVE CALENDER MONTHS OF THIS YEAR? (K-12 grade or of higher education) | ☐ | ☒ |
| **If checked YES to the above, complete the following questions:** | | |
| * Is the household comprised of a single parent with dependent child(ren) and neither you nor your child(ren) are dependent of another individual? | ☐ | ☒ |
| * Are the HOH and co-applicant married and filing joint income tax return? | ☐ | ☒ |
| * Does the household receive AFDC/CalWorks or TANF –not SSA/SSI? | ☐ | ☒ |
| * Are any of the students participants in the Job Training Participation Act or other similar program? | ☐ | ☒ |
| * Household member(s) previously the Foster Care Program (age 18-24)? | ☐ | ☒ |

WHAT IS YOUR CURRENT MONTHLY RENT? $ -0-

DO YOU RECEIVE SECTION 8 ASSISTANCE? ☒ YES ☐ NO IF YES, PLEASE COMPLETE THE REST OF THIS SECTION:

NAME OF CASEWORKER LOLitA Thomas TELEPHONE 858 694 4876 VOUCHER AMOUNT $ 1007

RESIDENCY FOR THE PAST 2 YEARS PER ADULT IS REQUIRED PER THE PROGRAM REQUIREMENTS

HOUSEHOLD MEMBER: Edinborough Senior Apartments – alesia Young

CURRENT LANDLORD Elinborough Senior Apartments TELEPHONE 770 436-2447

ADDRESS 300 Pal mall RD W CITY Marietta STATE GA ZIP CODE 30060

DO YOU OWN OR RENT? Rent HOW LONG 1 year REASON FOR LEAVING Move back to SAn Diego CA

***IF RESIDENCY HAS BEEN LESS THAN TWO YEARS PER ADULT, PLEASE COMPLETE THE FOLLOWING:***

HOUSEHOLD MEMBER: Alesia Young

LANDLORD NAME Woodlawn Park Apartments TELEPHONE 770 957-2578

ADDRESS 100 Woodlawn Park DR CITY McDonough STATE GA ZIP CODE 30253

DO YOU OWN OR RENT? Rent HOW LONG 2 Years REASON FOR LEAVING Movie to TX

DO YOU HAVE ANY PETS? ☒ YES ☐ NO IF YES, HOW MANY? 1 BREED TYPE Border Collie Mix

VEHICLES THAT YOU WILL BE PARKING ON THE PROPERTY

| | | | | |
|---|---|---|---|---|
| VEHICLE #1 | MAKE Ford / MODEL Focus | YEAR 2014 / COLOR Silver | | LICENSE PLATE # PRW7560 |
| VEHICLE #2 | MAKE — / MODEL — | YEAR — / COLOR — | | LICENSE PLATE # — |
| OTHER INFORMATION | NAME — DRIVER LICENSE # / STATE | | NAME — | DRIVER LICENSE # / STATE — |
| OTHER INFORMATION | NAME 054111243 DRIVER LICENSE # / STATE GA | | NAME — | DRIVER LICENSE # / STATE — |
| IN CASE OF EMERGENCY NOTIFY | NAME Denise Young | RELATIONSHIP Sister | | TELEPHONE# 619 425 3250 |
| ADDRESS 1049 4th Ave #44 | | CITY Chula Vista | STATE CA | ZIP CODE 91911 |

LIST ALL SOURCES OF INCOM' 'REQUESTED BELOW. IF A SECTION DOESN'T APPLY, CR( 'JT OR WRITE N/A.

**WAGES BEFORE TAXES**

| NAME OF EMPLOYER | OCCUPATION | PHONE NUMBER | HOW LONG | GROSS MONTHLY INCOME |
|---|---|---|---|---|
| Wells Family Daycare | Teacher | 619 482-0360 | 2 weeks | $ 1,200 |
| | | | | $ |
| | | | | $ |
| | | | | $ |

**OTHER INCOME**

| LIST ALL SOURCE | SOURCES OF INCOME | AMOUNT PER MONTH |
|---|---|---|
| SSI / SSA | | $ 0 |
| ALIMONY / CHILD SUPPORT | | $ |
| SOCIAL SERVICES (WELFARE) | | $ |
| V.A. BENEFITS | | $ |
| INSURANCE BENEFITS | | $ |
| RETIREMENT PENSION | | $ |
| RENTAL INCOME | | $ |
| STUDENT FINANCIAL AID (EXCLUDING STUDENT LOANS) | | $ |
| OTHER INCOME | | $ 0 |

**ASSETS**

| LIST ALL SOURCE | IF YOUR ASSETS ARE TOO NUMEROUS TO LIST HERE, PLEASE COMPLETE ON A SEPARATE FORM. IF ANY OF THIS SECTION DOES NOT APPLY, WRITE N/A. | BALANCE OR CASH VALUE |
|---|---|---|
| CHECKING ACCOUNT | Chase Bank | $ 140.00 |
| SAVING(S) ACCOUNT | Chase Bank | $ -0- |
| STOCK(S) / BOND(S) | | $ 0 |
| TRUST(S) | | $ |
| MONEY MARKET(S) | | $ |
| TREASUREY BILLS | | $ |
| CERT. OF DEPOSIT(S) | | $ |
| REAL ESTATE PROPERTY | | $ |
| IRA / 401K ACCOUNT(S) | | $ |
| OTHER ASSETS | | $ |
| OTHER ASSETS | Cash on hand | 35.00 |

HAVE YOU SOLD, DISPOSED OF ANY REAL ESTATE PROPERTY OR OTHER ASSETS IN THE PAST TWO YEARS? ☐ YES ☒ NO, IF YES, WHAT WAS THE MARKET VALUE OF THE ASSET? $________

DO YOU HAVE ANYONE TEMPORARILY ABSENT FROM THE HOUSEHOLD? ☐ YES ☒ NO
IF YES EXPLAIN________

DO YOU ANTICIPATE YOUR HOUSEHOLD SIZE CHANGING IN THE NEXT TWELVE (12) MONTHS? ☐ YES ☒ NO
IF YES EXPLAIN________

DO YOU ANTICIPATE YOUR HOUSEHOLD INCOME CHANGING IN THE NEXT TWELVE (12) MONTHS? ☐ YES ☒ NO
IF YES EXPLAIN________

HAS YOUR RESIDENCY/TENANCY OR GOVERNMENT ASSISTANCE IN A SUBSIDIZED HOUSING PROGRAM EVER BEEN TERMINATED FOR FRAUD, NON-PAYMENT OF RENT, ANY OTHER LEGAL CAUSE, BY A COURT OR ADMINISTRATIVE ORDER, OR FAILURE TO COMPLY WITH RECERTIFICATION PROCEDURES? ☐ YES ☒ NO IF YES EXPLAIN ________

HAS ANYONE ANTICIPATED TO BE LIVING IN THE HOUSEHOLD (INCLUDING THOSE LISTED ABOVE) EVER BEEN CONVICTED, INDICATED, OR CURRENTLY HAS PENDING CHARGES FOR ANY FELONY OR MISDEMEANOR? IF SO, PLEASE GIVE DETAILS INCLUDING STATUS OF MATTER, WHAT CHARGES WERE BROUGHT, LOCATION OF CHARGES, DATE OF CHARGES, ETC: ☐ YES ☒ NO IF YES EXPLAIN ________

The applicant is depositing herewith, the sum of $ 300, receipt of which is acknowledged as a non interest bearing holding deposit (and not as rent payment) to be applied towards Applicant's security deposit pursuant to the Residential Rental Agreement and retained by Owner for the duration of the Applicant's occupancy of Apartment # A-7 in the event the application is approved.

I understand that all information given on this form is subject to verification. **Any information determined to be false or untrue will result in permanent cancellation, immediate eviction or possible prosecution of the application.** I also understand, it is my responsibility to contact the manager (in writing) at least every 6 months in order to keep my application on the waiting list.

YOUR SIGNATURE AUTHORIZES WASATCH PROPERTY MANAGEMENT TO VERIFY ALL INFORMATION.

| [signature] | 5-27-2015 | | |
|---|---|---|---|
| SIGNATURE OF APPLICANT | DATE | SIGNATURE OF APPLICANT | DATE |
| | | | |
| SIGNATURE OF APPLICANT | DATE | SIGNATURE OF APPLICANT | DATE |

# Resident history screening/criminal record search and credit reports

# ısatch File Review Checklis

**Resident(s) Name(s):** Alesia Young
**Unit #:** A-7 **Unit Type:** ps-1x1

| Move In: | | Renewal: | | TOS: | | *(Check one)* |
|---|---|---|---|---|---|---|

**Property Name:** Peppertree Apartment Holding, LP
**Lease Start Date:** 6/11/2015 12:00:00AM
**Agent:** Lori Watrous

**Move In Files**

| Required Applicant Information and Application Verification | MGR Signoff | Comments |
|---|---|---|
| File Cover Sheet & File Review Checklist | LW | |
| Move In Cost Sheet | LW | |
| Completed and signed application for all individuals (18 yrs and over) | LW | |
| Fraud Prevention Checklist completed for each applicant (FTC Law) | LW | |
| Proper ID for each applicant (Photo ID and 2nd form of ID(INS/Passport), if possible) | LW | |
| Last two paystubs or proof of income for each applicant | LW | |
| Resident Check Decisioner reflecting approval results or Regional Override | LW | |
| *–File must reflect manager approval signature on Rental Application & File Cover Commission Sheet and reflect approval deposit and approved special (if applicable)* | — | |
| *–File approval signed by Regional/Area Leader if credit was overridden and deposits and/or specials adjusted based on credit decision* | — | |
| All Addresses Verified (Application, ID, Paystubs, Credit Reporting, (FTC Law)) | LW | |
| Residential Verification Form completed (2 years verified, in writing) | LW | |
| Employment Verfication Form completed (2 years verified, in writing) | LW | |
| **Lease Documents:** | **Auditor Signoff** | **Comments** |
| All Lease Documents initialed & signed by resident(s) and leasing/mgmt. | [initials] | |
| Insure lease reflects final Resident Check Approved Deposit or Regional Override | [initials] | |
| Insure lease reflects final Concession from Application Approval or Override | [initials] | |
| Insure all Occupant Names are listed (Lease Holders & Authorized Occps.) | [initials] | |
| All Utilities in Resident(s) name at time of move in | [initials] | |
| Concession Approval Request signed by resident(s) and manager | [initials] | |
| Move In/Move Out Inspection completed by office and signed by all parties | [initials] | |
| **Verification of Voyager Records** | **Auditor Signoff** | **Comments** |
| Tenant screen information matches lease documentation (Lease Dates & Amounts) | [initials] | |
| Lease Charges are properly set up (no end dates, except one time charges) | [initials] | |
| All Occupants loaded into Voyager (Lease Holders & Authorized Occps.) | [initials] | |
| All Vehicle, Pet and Emergency Contact Information loaded in Voyager | [initials] | |
| Residenti has a zero/credit balance (must have current ledger in file) | [initials] | |

**Renewals**

| Verification of Voyager Records | Auditor Signoff | Comments |
|---|---|---|
| All Lease Documents initialed & signed by resident(s) and leasing/mgmt. | | |
| Concession Approval Request signed by resident(s) and manager | | |
| **Verification of Voyager Records** | **Auditor Signoff** | **Comments** |
| Tenant screen information matches lease documentation (Lease Dates & Amounts) | | |
| Lease Charges are properly set up (no end dates, except one time charges) | | |
| All Occupants loaded into Voyager (Lease Holders & Authorized Occps.) | | |
| All Vehicle, Pet and Emergency Contact Information loaded in Voyager | | |

**General**

| Physical File Quality (applies to All files) | Auditor Signoff | Comments |
|---|---|---|
| Overall professional/neat appearance of file (no loose paperwork) | [initials] | |
| Proper file order (following Tax Credit/Bond/Convention File Order Checklist) | [initials] | |
| Properly Labeled File (all files to be labeled in consistent manner) | [initials] | |

**Resident Rental Rate:** $880.00
**Market Rate:** $880.00 — $125 Bonus
**Target Rate:** $880.00 — $75 Bonus
**ICE Rate:** $880.00 — $25 Bonus

**Bonusable:** (YES) NO **Bonus Approval Overide** ________
**Tax Credit Unit?** ~~YES~~ NO
**Amount of Bonus** $ 85 ________ **(based on Rental Amount)**

[signature] — File Reviewed By
6/23/15 — Date

Copy To: Monthly File Commision Worksheet submitted to HR for final bonus approval and payment of bonus.

HR704--WPM File Review Checklist--Revised 3/20/10

PST000061

# F. Cover/Commission Sheet

Resident(s): Alesia Young | Applicant Code: p0753487 | Source: Section8.com

Property: Peppertree Apartment Holding, LP | Apt#: A-7 | Agent: Lori Watrous

Unity Type: ps-1x1 | Market Rate: $ 880.00 | Lease Rate: 880.00 | Move In Date: 6/11/15 | Lease Term: 12

LW Complete Move in Cost Sheet
LW Residential Rental Application
LW Signed Residential Rental Application Criteria
LW Completed Residential Rental Application Addendum(if Applicable)
LW Completed Supplemental rimail History Questionaire(if Applicable)
LW Copy of Drivers License or other goverment Issued ID
LW Copy of Income Verification(if Applicable)
LW Copy of Credit Report
LW Tax Credit Certification Packet(if Applicable)

LW Application Information Taken By
LW Income Verified By
LW Residential History Verified By
LW Credit Report Ran By
LW Criminal Backgroud Report Ran By
LW 2 Years Residential History
LW Anticipated Income Verified
LW Income 1.50 xs Monthly Rent Amount
— No Eviction/Judgments
— No Residential Collections

Applicant Decisioning

LW Manager Approved
____ Manager Denied
____ Date Denial Letter Sent
____ Date Applicant Notified
____ Lease Signing Appt. Set
____ Appt. Date and Time
____ Compliance Approval

$ 600 Deposit Required
$ — Last Month Rent Required
$ — Move In Special Offered
$ — Additional Deposits(Key/Remote)
$ — Utility Admin Fee(if Applicable)

Approval/Denial Comments:

Within 72 Hours of Compliance Approval:

✓ All Lease Paper Work Signed by Resident(s)
✓ All Deposits Due Collected(Cashiers Check or Money Order ONLY)

Time of Move in:

✓ Balance of Money Due Collected(Cashiers Check or Money Order ONLY)
✓ Move In Orientaion Checklist Completed with Resident
✓ Obtain all account numbers and phone numbers

Utility Account Numbers:

Electric: 2069518530

Gas:

Water/Sewer:

Phone Numbers:

Home:

Work:

Cell:

Insurance: Assurant / July 1st

Company:

Policy#:

LD101.02–Revised 07/14/2008

**Peppertree Apartment Holding, LP**
8956 Harness Street
Spring Valley, CA 91977
Phone: 619-463-0579
Fax: 619-463-2105

WASATCH

CONGRATULATIONS on your decision to move to a Wasatch Premier Community, professionally managed by Wasatch Property Management. We are committed to our resident's needs and continually strive to serve you in any way we can. Please feel free to contact us at any time if any questions or concerns arise. Again, thank you for choosing a Wasatch Premier Community.

Your New Address is: 8956 Harness Street, # A-7, Spring Valley, CA 91977

You are scheduled to move in: 6/17/15 and will be signing a 12 month lease, which starts on 6/17/15 and will expire on 06/16/2016. Your total monthly obligation will be $920.00, not including monthly utilities, which is due on the First day of each month. Below is a breakdown of your move-in costs and other important move in information.

| Charges from 06/17/2015 to 06/30/2015 | | |
|---|---|---|
| Rent and Additional Services | $ | 429.34 |
| Lease Initiation Fee | $ | 0.00 |
| Application Fee | $ | 40.00 |
| Non Refundable Fee | $ | 0.00 |
| **Subtotal** | $ | 469.34 |
| Less Move In Special (if applicable) | $ | 0.00 |
| **Subtotal** | $ | 469.34 |
| Sales Tax (if applicable) | $ | 0.00 |
| Security Deposit | $ | 650.00 |
| Less Amount Paid | $ | -140.00 |
| Utility Setup Fee | $ | 0.00 |
| Estimated Move In Cost | $ | 979.34 |
| Plus Addl. Deposit | $ | 0.00 |
| ***Total Due at Move In** | $ | **979.34** |
| *** **Total Move In & First Month's Rent** | $ | 1,899.34 |

| Charges | | Monthly | | Prorated |
|---|---|---|---|---|
| Rent | $ | 880.00 | $ | 410.67 |
| Washer/Dryer | $ | 0.00 | $ | 0.00 |
| Covered Parking | $ | 0.00 | $ | 0.00 |
| Uncovered Parking | $ | 0.00 | $ | 0.00 |
| Garage | $ | 0.00 | $ | 0.00 |
| Storage Rental | $ | 0.00 | $ | 0.00 |
| Animal Rent/Animal | $ | 40.00 | $ | 18.67 |
| Cable or Internet or Media Package | $ | 0.00 | $ | 0.00 |
| Utility Flat Fee | $ | 0.00 | $ | 0.00 |
| Corporate | $ | 0.00 | $ | 0.00 |
| Month to Month Fee | $ | 0.00 | $ | 0.00 |
| Renter's Insurance | $ | 0.00 | $ | 0.00 |
| RentPlus Service | $ | 0.00 | $ | 0.00 |
| **Total Charges** | **$** | **920.00** | **$** | **429.34** |
| **Total for Additional Services** | **$** | **40.00** | | |

**Utilities must be in your name prior to moving in and your account numbers must be presented to the rental office before keys will be released. Resident is prohibited to use any utility service prepayment program, that automatically terminates such services upon expiration of any prepayment.**

| Service | Provider | Phone # | Account # |
|---|---|---|---|
| Electric Provider | SDG&E | 800-411-7343 | Acct # 2069518530 |
| Gas Provider | SDG&E | 800-411-7343 | Acct # |
| Cable Provider | Cox Communication | 866-351-2115 | |
| Phone Provider | | | Home Phone # |
| Garbage Provider | Waste Management of El | 619-596-5100 | Work Phone # |
| | | | Cell Phone # |

*** Due in cashier's check or money order at the time of move-in.** Rent is due on the FIRST day of each month in personal check, cashier's check or money order, we DO NOT accept cash.

*** All move ins after the 20th of the month are required to pay move in costs plus first month's total charges.

Applicant understands the above acknowledged deposit will be applied against the move in costs as indicated above and that no representations, promises or agreements as to Occupancy, lease or date of possession have been made. Applicant also understands the Rental Application submitted with this deposit is not to be construed as a lease or rental agreement. Applicant also understands, that upon approval, the deposit(s) is subject to change based on Residential and Employment verifications and /or Credit and Background Check(s), if applicant(s) fail to meet Owner/Management Rental Criteria specifications.

The applicant is depositing herewith, the sum of $ 300, receipt of which is acknowledged as a non-interest bearing holding deposit (and not as rent payment) to be applied towards Applicant's security deposit pursuant to the Residential Rental Agreement and retained buy Owner for the duration of the Applicant's occupancy of Apartment #A-7 in the event the application is approved.

*As of December 1, 2003, Wasatch Premier Communities recommends each resident to maintain Renter's Insurance with a minimum of $50,000 Liability Coverage. Personal Damage Coverage is at the Residents discretion. Resident may acquire Renter's Insurance from an approved list of carriers that can be obtained from Owner or Resident must provide proof of insurance from a 3rd party carrier and have the above listed Community and It's Ownership Entities & Management named as the additional insured.*

Applicant's Signature — 6/17/2015 Date

*Tenant/Applicant Code: t0109824*
*Applicant Name: Alesia Young*
*Occupants:*

LD101.06 Revised 08/30/2013

## RAUD VERIFICATION CHECKLIST

Resident: Alesia Young

Applicant Code: p0753487

Property: Peppertree Apartment Holding, LP

Apartment #: A-7

Agent Initials

Verify all social security numbers and watch for fraud alerts
**household members with no social security number, complete "No Social Security Number" form.*

Agent Initials

Verify ALL addresses found in verification process, using the Residential Verification forms found on back office. **If names do not match complete a self-affidavit explaining differences.*

✓ Credit Report
✓ Government Issued Identification
✓ Rental Application
— Paystubs

Agent Initials

Obtain a physical address if prospect is using a PO Box or Mail Drop address

Agent Initials

Verified Date of Birth (D.O.B.) on

✓ Government Issued Identification
✓ Credit Report
Rental Application

Agent Initials

Verify License/Government Issue Photo ID is current:

| | | |
|---|---|---|
| ✓ | License Number | 054111243 |
| ✓ | State of Issuance | ca |
| | Date of Issuance | |
| ✓ | Expiration Date | 12/30/16 |

Agent Initials

Verify all Signatures match Driver's License or Government Issued Identification

Agent Initials

Check for Fraud Alerts on Credit Report and if present call the phone number on report.

Agent Initials

Check for Fraud Alert on Existing Accounts, if present, call and verify.

Verification completed by (print name): Lori Watrous

Sign Here that verification is complete: [signature]

LD101.07-Fraud Verification Checklist-Revised 7/30/09

## TATEMENT OF RENTAL POLICIES

**In compliance with State and Federal Fair Housing Guidelines, all rental property managed by Wasatch Property Management do not discriminate on the basis of race, color, religion, gender, disability, familial status or natural origin.**

***General:***
All applicants that are Head of Household must be of legal age (55 years of age or older) to rent an apartment at Peppertree Apartment Holding, LP. If negative information is found in any category below, the applicant maybe subject to denial.

***Credit History:***
Except where arrangements have been made, an applicant's credit report for the past two years must be free of bad debt or past due accounts (excluding medical). Any bankruptcy proceedings must be finalized prior to signing a lease. The applicant can have no more than 50.00% negative on their credit report based on the current status of all accounts.

This community uses a statistically sound credit scoring system to evaluate your consumer credit report. Credit scoring is based on real data and statistics so all applicants are treated objectively. Your credit report contains information about you and your credit experiences including your bill-paying history, the number and type of accounts you have, late payments, collection actions, outstanding debt, rental history and the age of your accounts. If your application is denied or accepted with conditions, you will be given the name, address and telephone number of the consumer reporting agencies, which provided your consumer information to us

Required Deposits will be as follows:

"Accept" will pay regular security deposit.
"Refer" will pay amount equal to ½ month's rent in addition to the regular security deposit.
"Low Accept" will pay amount equal to ½ month's rent in addition to the regular security deposit.
"Conditional Accept" will pay amount equal to one month's rent in addition to the regular security deposit.

***Income:***
Your monthly combined household income must be at least 1.50 times the stated monthly rent. Current verifiable income (from 3rd party reference) is required for all household members 18 years or older. Verifiable income may mean, but not limited to alimony/child support, trust account, SSI, SSA, unemployment, welfare (excluding food stamps) school grants, self employment, employment (3 months of consecutive pay stubs will be required on all new move-ins) and gift contributions. Likewise, on those properties involving tax credits, income must not be above the income limits allowed by the program.

**2015 Maximum Income Levels**

| | 1Person | 2 Person | 3 Person | 4 Person | 5 Person | 6 Person |
|---|---|---|---|---|---|---|
| 50% | 28,250.00 | 32,250.00 | 36,300.00 | 40,300.00 | 43,550.00 | 46,750.00 |
| 60% | 33,900.00 | 38,700.00 | 43,560.00 | 48,360.00 | 52,260.00 | 56,100.00 |

***Rental/Landlord History:***
An applicant must be able to provide positive landlord references for the previous two (2) years. The applicant should also be able to prove the ability to make monthly payments (rental payments preferred) on time and without demand. Two (2) years of eviction free rental history is required.

***Criminal Record:***
A criminal background check will be conducted for each applicant or occupant eighteen- (18) years or older. The application will be rejected for any of the following reported criminal related reasons:

--Any Felony conviction (No time limit)
--Any terrorism-related conviction (No time limit)
--Any drug-related conviction (No time limit)
--Any prostitution-related conviction (No time limit)
--Any sex-related conviction (No time limit)
--Any cruelty to animals-related conviction (No time limit)
--Any Misdemeanor conviction involving a crime against persons or property (No time limit)
--Any above related charges resulting in "Adjudication Withheld" and/or "Deferred Adjudication" (No time limit)
--Active status on probation or parole resulting from any of the above (No time limit)

### *Occupancy Policy:*

Occupancy shall be limited to a maximum of t\ ,2) persons per bedroom plus an additional one (1) pe...on for the entire apartment home. Occupancy is based on the number of bedrooms in a unit. A bedroom is defined as a space within the premises that is used primarily for sleeping, with at least one window and a closet space for clothing. Minimum and Maximum occupancy is as follows:

| | Minimum | Maximum |
|---|---|---|
| Studio | 1 persons | 2 persons |
| 1 Bedrooms | 1 persons | 3 persons |
| 2 Bedrooms | 2 persons | 5 persons |
| 3 Bedrooms | 3 persons | 7 persons |
| 4 Bedrooms | 4 persons | 9 persons |

### *Application Process*

- Complete an application per household, 18 years of age or older. Emancipated minors must show written legal proof of emancipation.
- Pay a non-refundable application-processing fee of $**40.00** for each adult applicant.
- If the application is approved and prior to move-in you will sign a rental agreement in which you agree to abide by all the rules and regulations and pay your security deposit and first month's rent.

### *General Requirements*

- Positive current Government identification with a picture will be required.
- A complete and accurate rental application listing a current and at least two years rental reference is required. (Incomplete applications will not be processed).
- Inaccurate or falsified information will be grounds for denial.
- Any individual, who may constitute a direct threat to the health and safety of any other individual, the community, or the property of others, will be denied.

**All properties managed by Wasatch Premier Communities comply with State and Federal Fair Housing Guidelines.**

**Rental application must be processed on all future residents 18 years of age and older. You may be required to re-qualify upon renewing your lease agreement. Co-signers must meet the same criteria listed below and reside in the local area unless approved by management. Government issued photo identification is required.**

Acceptable ***Primary*** forms of photo identification include any of the following:

- State issued Driver's License,
- Department of Motor Vehicles Identification Card

However, in the absence of a primary form of identification, one may accept one or more of the following as ***Secondary*** forms of identification, ***but only with two (2) of the Supplemental documents noted below.,***

- State Government Issued Certificate of Birth
- U.S. Active Duty/Retiree/Reservist Military Identification Card (000 10-2)
- U.S, Passport
- Federal Government Personal Identity Verification Card (PIV) Department of Defense Common Access Card
- U.S. Tribal or Bureau of Indian Affairs Identification Card
- Social Security Card
- Court Order for Name Change/Gender Change/Ad option/ Divorce
- Marriage Certificate (Government Certificate Issued)
- U.S. Government Issued Consular Report of Birth Abroad
- Foreign Passport with Appropriate Immigration Document(s)
- Certificate of Citizenship (N560)
- Certificate of Naturalization (N550)
- INS 1-551 Resident Alien Card Issued Since 1997
- INS 1-688 Temporary Resident Identification Card
- INS I-68813, I-766 Employment Authorization Card

*Please note: When validating the authenticity of secondary identification documents and forms, the data and information need to be supported by at least two (2) of the following* ***Supplemental documents:***

- Utility Bill (Address)
- Jurisdictional Voter Registration Card
- Vehicle Registration Card/Title
- Paycheck Stub with Name/Address
- Jurisdictional Public Assistance Card
- Spouse/Parent Affidavit
- Cancelled Check or Bank Statement
- Mortgage Documents

Applicant acknowledges that the following inf tion will be verified in accordance with Federal Tra mmission Guidelines issued August 1, 2009 and will be used to verify applicants ide, , and ability to qualify to live at {psaddr1} or any other . vasatch Property Management Community.

- Social security number(s)s provided by applicant(s) will be verified and any fraud alerts will be reported to proper authorities
- ALL addresses found in on Rental Application(s), Government issued ID(s), Paystub(s) and Credit Report(s) will be verified
- Application must provide a physical address if using a PO Box or Mail Drop address
- Date of Birth (D.O.B.) provided by applicant(s) on Rental Application will be verified against Government Issued Identification and Credit Report
- Verify Driver's License/Government Issue Photo ID is current and contains ID Number, State of Issuance, Date of Issuance and Expiration date.
- All Signatures must match Driver's License or Government Issued Identification
- Any/All Fraud Alerts on Credit Report will be reported to proper authorities.
- Any/All Fraud Alerts on Existing Accounts will be verified and reported to proper authorities where necessary.
- All Signatures must match Driver's License or Government Issued Identification
- Any/All Fraud Alerts on Credit Report will be reported to proper authorities.
- Any/All Fraud Alerts on Existing Accounts will be verified and reported to proper authorities where necessary.

***Pet Policy / Pet Deposit***

Pets __X__ are _____ are not allowed at this community. If allowed, additional security deposit will be required and a monthly pet fee may apply. **Breed Restrictions and size restrictions may apply see rental office for more details.* Pets that are designated as service animals to accompany a resident with a disability for the specific purpose of aiding that person are allowed at all communities.

***Rent Payment Policy***

**Your initial deposits and fees, as well as the first month's rent payment, must be paid by money order or cashier's check.** All subsequent payments for rent, deposits and fees must be paid by check, money order or cashier's check. We prefer to accept no cash.

The undersigned applicant(s) and co-signer(s) hereby consent to allow Peppertree Apartment Holding, LP ("owner"), itself or through its designated agents or employees, to obtain a consumer report and/or criminal record information on each of us and to obtain and verify each of our credit and employment information for the purpose of determining whether to lease an apartment to me/us. We also agree and understand that owner and its agents and employees may obtain additional consumer reports on each of us in the future to update or review our account. Upon my/our request, owner will tell me/us whether consumer reports were requested and the names and addresses of any consumer-reporting agency that provided such reports.

If it is discovered that the applicant has given false information or has not accurately completed the application to avoid negative information being found, the application will be denied. If a lease has been entered into and such information is discovered, the lease will be voided and legal action taken to evict.

I have read and understand that a credit check, criminal check, verification of landlord(s), employment history, and other verification necessary will be made as required to determine eligibility.

Applicant Code: p0753487 Unit #: A-7

[signature] 5-28-15
Alesia Young Signature Date

[signature] 5/28/15
Agent / Owner's Representative Date

LD101.03.Tax-Revised 7/31/09

RECEIVE: NO.3908 06/03/2015/WED 04:16PM

JUN/03/2015/WED 02:27 PM FAX No. P. 002

Faxed 6.3.15 @ 6:59

# RESIDENTIAL VERIFICATION

**THIS SECTION TO BE COMPLETED BY MANAGEMENT AND EXECUTED BY TENANT**

To: (Landlord)

Edinborough Senior Apartments
300 Pad Mell Rd W
Mariette GA 30060

Date: 6/3/2015

RE: Alesia Young — Applicant/Tenant Name

A-7 — Unit # (if assigned)

I hereby authorize release of my residential history information.

See release form — Signature of Applicant/Tenant

6/3/2015 — Date

The individual named directly above has applied for residency at Peppertree Senior Apartments. The information provided will remain confidential to satisfaction of that stated purpose only. Please complete this form as soon as possible and return by fax to (519) 463-2109. Your prompt response is crucial and greatly appreciated.

Sincerely, Lori Watrous/Community Manager — Wasatch Property Management Representative

Peppertree Apts Apartments
8956 Harness St
Spring Valley CA 91977
Phone 619-463-0579 Fax 619-463-2105

**THIS SECTION TO BE COMPLETED BY LANLORD**

Community/Landlord Name: Edinborough Senior Apts - Robin

Address: 300 Pat mell Rd SW Marietta GA 30060

Term(s) of Residency: From 4.15.2014 To: 4.30.2015

Rental Amount: $ 685 # of late Payments: 0 # of NSF Payments 0

# of Pets 1 Type Border Collie Mix Additional Deposits Paid $ 50

Have any Rental/Community Policies been violated? No

Was Notice Given By Resident Yes ☒ No ☐ Was Noticed Given By Management Yes ☐ No ☒

Was Proper Notice Given? Yes ☒ No ☐ Was Deposit Returned? Yes ☒ No ☐ Condition of Apartment Most all deposit was given

Did Resident Leave Owing Money? Yes ☐ No ☒ Would this resident(s) qualify to rent at your property again? Yes ☒ No ☐

If No, Why?

Additional remarks: She was a wonderful resident and she left the Apt very clean.

Robin Franklin — Verified by (print name); Robin Franklin — Signature; Property Manager — Position; 6/3/15 — Date

770.436.2447 — Phone #; 770.436 5409 — Fax #; Rfranklin@firstcommunities.com — E-mail

NOTE: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction.

p.1 Jun 03 15 05:29p



WASATCH
PROPERTY MANAGEMENT

## RESIDENTIAL VERIFICATION

**THIS SECTION TO BE COMPLETED BY MANAGEMENT AND EXECUTED BY TENANT**

To: (Landlord)

Woodlawn Park Apartments
100 Woodlawn Park Dr
McDorough GA 30253

Date: 6/3/2015

# 770-957-2578 WoodlawnPark_mgr@CFlane.com @CSlane.com

RE: Alesia Young
Applicant/Tenant Name

A-7
Unit # (if assigned)

I hereby authorize release of my residential history information.

See Release form
Signature of Applicant/Tenant

6/3/2015
Date

The individual named directly above has applied for residency at Peppertree Sr Apartments. The information provided will remain confidential to satisfaction of that stated purpose only. Please complete this form as soon as possible and return by fax to (619) 463-2105. Your prompt response is crucial and greatly appreciated.

Sincerely, Lori Watrous/Community Manager
Wasatch Property Management Representative

Peppertree Sr Apartments
8956 Harness St
Spring Valley CA 91977
Phone 619-463-0579 Fax 619-463-2105

**THIS SECTION TO BE COMPLETED BY LANLORD**

Community/Landlord Name: ____________________

Address: ____________________

Term(s) of Residency: From ____________ To: ____________

Rental Amount: $________ # of late Payments: ________ # of NSF Payments ________

# of Pets ________ Type ____________ Additional Deposits Paid $________

Have any Rental/Community Policies been violated? ____________________

Was Notice Given By Resident Yes ☐ No ☐ Was Noticed Given By Management Yes ☐ No ☐

Was Proper Notice Given? Yes ☐ No ☐ Was Deposit Returned? Yes ☐ No ☐ Condition of Apartment ________

Did Resident Leave Owing Money? Yes ☐ No ☐ Would this resident(s) qualify to rent at your property again? Yes ☐ No ☐

If No, Why? ____________________

Additional remarks: ____________________

Verified by (print name) ________ Signature ________ Position ________ Date __/__/__

Phone # ________ Fax # ________ E-mail ________

NOTE: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction.

**Re: Peppertree Apartments**
Woodlawn Park Manager [woodlawnpark_mgr@cflane.com]
**Sent:** Thursday, June 11, 2015 7:35 AM
**To:** Peppertree manager

Lori,
Our leasing office is currently down to a recent fire, I do not have fax/scan ability.

Alesia Young - 818 Woodlawn Park Drive, Mcdonough, GA

Move in 3/1/12
Move out 02/28/14
Monthly Rental amount $680 ( Resident portion $286)
No Late Payments
No NSF's
No complaints
No Balance at move-out

If you require additional information, please do not hesitate to contact me.

Regards,

Phyllis Banks, HCCP
Property Manager
Woodlawn Park Apartment Homes 100 Woodlawn Park Drive | McDonough, GA 30253
770.957.2578 Office | 770.957.6336 Fax | www.cflane.com

On Tue, Jun 9, 2015 at 6:44 PM, Peppertree manager <ps.manager@netwasatch.com> wrote:
Tony,
I received your message. Thank You!

Lori Watrous

Community Manager

Peppertree Senior Apartments

Wasatch Premier Communities

619 463-0579

ps.manager@netwasatch.com

---

From: Peppertree_Scanner@netwasatch.com [Peppertree_Scanner@netwasatch.com]
Sent: Tuesday, June 09, 2015 3:57 PM
To: Peppertree manager
Subject: Scanned image from Wasatch Property - Pepper Tree Apts

Reply to: Peppertree_Scanner@netwasatch.com <Peppertree_Scanner@netwasatch.com>
Device Name: Wasatch Property - Pepper Tree Apts
Device Model: MX-B402SC
Location: 8956 Harness St, Spring Valley, 91977

File Format: PDF MMR(G4)
Resolution: 200dpi x 200dpi

Attached file is scanned image in PDF format.
Use Acrobat(R)Reader(R) or Adobe(R)Reader(R) of Adobe Systems Incorporated to view the document.
Adobe(R)Reader(R) can be downloaded from the following URL:
Adobe, the Adobe logo, Acrobat, the Adobe PDF logo, and Reader are registered trademarks or trademarks of Adobe Systems Incorporated in the United States and other countries.

http://cp.mcafee.com/d/5fHCNAg6h8SyMOOYYqehPXxKVJeX3zbVEVKCUrjK-DtYsUU-rjKMUO-qerFzzqdXLFICzBxV4SJiBtxF7UwE6CdFIX4-ndwQNJdDoDOVIwwgs73DT-LPbxf:VvhWZOWqrP_f9leesJt6OaaGab_axVZicHs3jq9J4TvAXTLuZXTKrKr01qxkx_bUrmZprUPz_vJbr27N1gdcripS9YKrud7bbvploJ18uwq89aWhYQgeNGGq805SCl-Mr0HFw

APP NUMBER: 6296264
APPLICANT: ALESIA YOUNG

RESIDENTCHECK
4230 LBJ FREEWAY SUITE 407
DALLAS, TEXAS 75244
(972)404-0808 (800)491-2580

RECEIVED: 5/28/2015 11:06 AM
PRINTED: 6/3/2015

## Confidential Application

| | | | |
|---|---|---|---|
| PREPARED FOR: | PEPPERTREE SENIOR APARTMENTS WASATCH PROPERTY MANAGEME | PHONE: | 619-463-0579 |
| | 8956 HARNESS STREET | FAX: | 619-463-2105 |
| | SPRING VALLEY, CA 91977 | PREPARED BY: | JOHN CROSBIE X143 |
| LEASED BY: | LORI WATROUS | ENTERED: | 5/28/2015 11:06:10 AM |

## Applicant

APPLICANT NAME: ALESIA GAY YOUNG    SSN: XXX-XX-5076
DRIVERS LICENSE: GA 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    BIRTH DATE: 12/30/1959

UNIT: A-7 MOVE IN: 6/11/2015 RENT: 880 INCOME: 1500 DEPOSIT: 300

## SS# Verification

**SSN VERIFICATION**

INPUT SSN ISSUED: 1974 - 1976

FROM 02/01/2015 INQ COUNT FOR SSN = 1
FROM 02/01/2015 INQ COUNT FOR ADDRESS = 0

**MESSAGES/ALERTS**

SSN MATCHES

**DOB & NAME VERIFICATION**

DOB: 1959
ALESIA G YOUNG

## Credit Report

**PROFILE SUMMARY**

| | | | |
|---|---|---|---|
| PUBLIC RECORDS: | 1 | PAST DUE AMOUNT: | $0 |
| INSTALLMENT BALANCE: | $15,207 | EST. MONTHLY PAYMENT: | $279 |
| REAL ESTATE BALANCE: | -N/A- | REAL ESTATE PAYMENT: | $0.00 |
| REVOLVING BALANCE: | $1,299 | REVOLVING AVAILABLE: | 84.72% |
| CREDIT INQUIRIES: | 4 | | |
| INQUIRIES IN SIX MONTHS: | 1 | | |
| PAID ACCOUNTS: | 7 | OLDEST TRADELINE: | 2/1/1989 |
| **TOTAL TRADELINES:** | **10** | SATISFACTORY ACCOUNTS: | 10 |
| **DELINQUENT:** | **0** | PREVIOUSLY DELINQUENT: | 0 |

**ADDRESSES**

| | | | | | |
|---|---|---|---|---|---|
| 1413 TRAILWOOD AVE | CHULA VISTA | CA | 91913 | 05/15 - 05/15 | 1 |
| 300 PAT MELL RD SW APT 46D | MARIETTA | GA | 30060 | 04/14 - 03/15 | 1 |

| 3325 CHISHOLM TRL APT B | KILLEEN | TX | 76542 | 04/14 - 04/14 | 1 |
|---|---|---|---|---|---|

**EMPLOYERS**

| ST PAUL HOME SERV | 0 09SAN DIE | 04/05 | U |
|---|---|---|---|
| KIDS ARE KIDS | 0 0 | 09/09 | I |

**PUBLIC RECORDS**

| US BKPT CT GA ATLANTA | 11/9/2006 | 2/20/2007 | 1008000 | $ |
|---|---|---|---|---|
| PLAINTIFF: | | | 1 | BK 7-DISCHG |
| # 0674576CRM | | | | |

**TRADELINES**

| SUBSCRIBER | OPEN DATE | AMT-TYPE1 | AMT-TYPE2 | CONDITION |
|---|---|---|---|---|
| SUB# KOB TYP TRM ECOA | BALANCE DATE | BALANCE | PYMT LEVEL | MONTHS REV |
| | LAST PAID | MONTH PYMT | PAST DUE | MAXIMUM |
| STATUS: | PYMT HISTORY: | | | |

| **SYNCB/MERVYNS** | 2/1/1989 | $200 -L | $478 -H | PAID |
|---|---|---|---|---|
| 1314989 DC CHG REV 1 | 9/26/2007 | -N/A- | 9/1/2007 | (47) |
| | 03/04 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: B000000000000000000000000 | | | |
| *****ACCOUNT CLOSED AT GRANTORS REQUEST***** | | | | |

| **SYNCB/JCP** | 5/1/1990 | $3,600 -L | $749 -H | PAID |
|---|---|---|---|---|
| 3321860 DC CHG REV 1 | 9/19/2007 | -N/A- | 9/1/2007 | (99) |
| | 07/05 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: B000000000000000000000000 | | | |
| *****ACCOUNT CLOSED AT CONSUMERS REQUEST***** | | | | |

| **BK OF AMER** | 11/1/1994 | $2,000 -L | $2,204 -H | CLOSED |
|---|---|---|---|---|
| 1230206 BC CRC REV 1 | 2/6/2007 | $0 | 2/1/2007 | (99) |
| | 07/05 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: BC-----------CCCCCCCCCCCC | | | |
| *****ACCOUNT CLOSED AT CONSUMERS REQUEST***** | | | | |

| **CBNA** | 3/1/2001 | $1,100 -L | $1,121 -H | PAID |
|---|---|---|---|---|
| 1323180 DC CHG REV 1 | 2/3/2009 | -N/A- | 2/1/2009 | (24) |
| | 07/05 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: BCCCCCCCCCCCCCCCCCCCCCCCC | | | |
| *****ACCOUNT CLOSED AT CONSUMERS REQUEST***** | | | | |

| **SEARS/CBNA** | 3/1/2001 | $945 -L | $1,204 -H | PAID |
|---|---|---|---|---|
| 1323280 DC CHG REV 1 | 10/13/2007 | -N/A- | 10/1/2007 | (79) |
| | 07/05 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: B000000000000000000000000 | | | |

*****ACCOUNT CLOSED AT CONSUMERS REQUEST*****

| | | | | |
|---|---|---|---|---|
| **FRANKLIN CAPITAL** | 2/1/2005 | $15,132 -O | -N/A- | PAID |
| 3175030 BB AUT 072 1 | 3/31/2007 | -N/A- | 3/1/2007 | (26) |
| | 03/07 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: BCCCCCCCCCCCCCCCCCCCCCCCC | | | |

| | | | | |
|---|---|---|---|---|
| **LINCOLN AUTOMOTIVE FIN** | 2/1/2007 | $28,542 -O | -N/A- | PAID |
| 1934832 FA AUT 103 1 | 11/25/2013 | -N/A- | 11/1/2013 | (82) |
| | 11/13 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: BCCCCCCCCCCCCCCCCCCCCCCCCC | | | |

| | | | | |
|---|---|---|---|---|
| **SYNCB/CARE CREDIT** | 10/1/2010 | $3,700 -L | -N/A- | PAID |
| 1476770 BB CHG REV 1 | 12/5/2011 | -N/A- | 12/1/2011 | (14) |
| | | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: B000000000000 | | | |

*****ACCOUNT CLOSED AT GRANTORS REQUEST*****

| | | | | |
|---|---|---|---|---|
| **ALLY FINANCIAL** | 11/1/2013 | $19,309 -O | -N/A- | OPEN |
| 1918797 FA AUT 075 1 | 5/3/2015 | $15,207 | 5/1/2015 | (19) |
| | 04/15 | $279 | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: CCCCCCCCCCCCCCCCCCC | | | |

| | | | | |
|---|---|---|---|---|
| **MEDICAL PAYMENT DATA** | 3/1/2015 | $8,500 -L | $1,299 -H | OPEN |
| 1872390 MB CHG REV 1 | 5/21/2015 | $1,299 | 5/1/2015 | (3) |
| | 05/15 | -N/A- | -N/A- | |
| **STATUS:** CURR ACCT | PYMT HISTORY: CC0 | | | |

**INQUIRIES**

| | | | | |
|---|---|---|---|---|
| CHASE CARD | 2/20/2015 | 1832320 | BC | -N/A- UNK |
| FADV/RESIDENT DATA | 4/2/2014 | 1634240 | ZT | -N/A- REN |
| FORD MOTOR CREDIT CORP | 11/9/2013 | 1654320 | FA | -N/A- UNK |
| CAPITAL ONE AUTO FIN | 11/9/2013 | 1254780 | FA | -N/A- UNK |

*IF YOUR APPLICANT IS DENIED DUE TO ANYTHING IN THIS CREDIT REPORT THEY SHOULD BE REFERRED TO:*
*EXPERIAN CONSUMER ASSISTANCE AT 1-888-397-3742*

## Credit Risk Factor

**CREDIT RISK FACTOR :**

APPLICANT HAS A **6.6%** CHANCE OF GOING DELINQUENT.

**CONTRIBUTING FACTORS:**

TIME SINCE YOUNGEST ACCOUNT OPEN
NUMBER OF CREDIT INQUIRIES

EXISTING BALANCES ON ACCOUNTS
PRESENCE OF NON-SATISFACTORY RATINGS ON MORTGAGE ACCOUNTS OR LACK OF MORTGAGE ACCOUNTS

## Previous ResidentCheck Inquiries

NO PREVIOUS APPLICATIONS FOUND.

## TeleCheck Inquiry

NAME PROVIDED: YOUNG, ALESIA, GAY
LICENSE PROVIDED: GA 054111243
RESPONSE: APPROVED 4301

*IF YOUR APPLICANT IS DENIED DUE TO ANYTHING IN THIS TELECHECK INQUIRY THEY SHOULD BE REFERRED TO TELECHECK CONSUMER ASSISTANCE AT 1-800-366-2425*

## Eviction Record Search

STATUS: CLEAR

## Criminal Record Search

STATUS: CLEAR

## RentBureau

**PROFILE SUMMARY**

| | | | |
|---|---|---|---|
| NUMBER OF TRADELINES: | 1 | NUMBER OF COLLECTIONS: | 0 |
| OLDEST: | 4/1/2015 | NEWEST: | |
| NEWEST: | 4/1/2015 | | |
| TOTAL MONTHS OF RENTAL HISTORY: | 12 | TOTAL PLACED: | $0.00 |
| | | TOTAL COLLECTED: | $0.00 |
| WRITEOFFS: | | TOTAL BALANCE: | $0.00 |
| TOTAL WRITTEN OFF: | $0.00 | | |
| LATE PAYMENTS: | 0 | AVG RENT: | $685 |
| NSF CHECKS: | 0 | AVG TERM OF DOMICILE: | 12 |

**TRADELINES**

| **EDINBOROUGH** | | | MANAGER | 4/1/2015 |
|---|---|---|---|---|
| LEASE | | | | |
| FROM | TO | MOVE-IN | MOVE-OUT | NOTICE GIVEN |
| 4/15/2014 | 4/30/2015 | 4/15/2014 | 4/30/2015 | |
| PAYMENT HISTORY | WRITE-OFF | RENT | LATE PAYS | NSF |
| PPPPPPPPPPPPP........... | $0.00 | $685.00 | 0 | 0 |

**COLLECTION ACCOUNTS**

NO COLLECTION ACCOUNTS FOUND FOR INFORMATION PROVIDED ON APPLICATION

*IF YOUR APPLICANT IS DENIED DUE TO ANYTHING IN THIS RENTBUREAU INQUIRY THEY SHOULD BE REFERRED TO: RENTBUREAU, LLC - P.O. BOX 18706 ATLANTA, GA 31126 PHONE: 877-703-7368 - FAX: 404-812-4111*

## FACT Act Fraud Alert

| | |
|---|---|
| CONSUMER ALERT | CLEAR |
| CONSUMER ALERT WITH PHONE CONTACT | CLEAR |
| BUREAU ALERT | CLEAR |
| ADDRESS DISCREPANCY ALERT | IDENTIFIED |

## Scoring Recommendation

**BASED ON CRITERIA SUPPLIED BY THE CLIENT:**

| | |
|---|---|
| **CREDIT RISK FACTOR :** | 6.6 |
| **ADDITIONAL FACTORS:** | |
| APPLICATION MISSING INFORMATION | 0.0 |
| BANKRUPTCIES | 0.0 |
| CRIMINAL - FELONY CONVICTION(S) OR PENDING CASE | 0.0 |
| CRIMINAL - MISDEMEANOR CONVICTION(S) OR PENDING CASE | 0.0 |
| CRIMINAL - SEX OFFENDER | 0.0 |
| EVICTION(S) | 0.0 |
| FACT ACT FRAUD ALERT | 0.0 |
| FALSE SSN | 0.0 |
| FORECLOSURE(S) | 0.0 |
| HOUSING DEBT(S) | 0.0 |
| RENT TO INCOME RATIO (APPLICANT'S REPORTED INCOME) | 0.0 |
| RENTBUREAU REFACTORIZATION | -1.1 |
| TELECHECK | 0.0 |
| **ACCUSCORE:** | **5.5** |

**NOTES:**

**RENT TO INCOME RATIO (APPLICANT'S INPUTTED INCOME) : 1.70X**

**TOTAL UNIT RENT TO INCOME RATIO (ALL APPLICANT'S INPUTTED INCOME) : 1.70X**

**RECOMMENDATION:**

**ACCEPTED WITH REGULAR DEPOSIT**

## Status

COMMENTS:

DISCLAIMER: RESIDENTCHECK MAKES NO INDEPENDENT WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, REGARDING THE INFORMATION OBTAINED FROM THIRD-PARTY SOURCES. ALL INFORMATION SOLICITED FROM GOVERNMENT AGENCIES OR OTHER SOURCES WHOSE RECORDS ARE REASONABLY BELIEVED TO BE CURRENT AND ACCURATE, BUT RESIDENTCHECK MAKES NO GUARANTEE OR ASSURANCE AND DISCLAIMS ANY AND ALL WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, REGARDING ANY ASPECT OF THE INFORMATION OBTAINED, ASSEMBLED, REPORTED, OR OTHERWISE DISTRIBUTED TO SUBSCRIBERS OR ANY OTHER THIRD-PARTY BY ANY MEANS WHATSOEVER. ANY COMPLAINTS MAY BE DIRECTED TO: TEXAS LICENSING AGENCY (TX 07855) TEXAS DEPT OF PUBLIC SAFETY PRIVATE SECURITY BUREAU PO BOX 4087 AUSTIN, TX 78773-0001 512-424-7710. THE REQUEST FOR, RECEIPT, AND USE OF ANY INFORMATION OBTAINED BY RESIDENTCHECK FROM ANY THIRD-PARTY SOURCES IS AGREED TO HAVE A VALUE EQUAL TO THE AMOUNT PAID BY EACH SUBSCRIBER TO RESIDENTCHECK FOR THAT INQUIRY AND THE OBLIGATION AND/OR LIABILITY OF RESIDENTCHECK IN RESPECT OF THE COMPLETENESS, ACCURACY, OR CONTENT OF ANY INFORMATION DISTRIBUTED SHALL BE EXPRESSLY LIMITED TO THE COST OF THE INQUIRY CONDUCTED FOR THAT APPLICANT. RESIDENTCHECK SHALL HAVE NO RESPONSIBILITY FOR ANY SPECIAL OR CONSEQUENTIAL DAMAGES ALLEGED OR INCURRED TO ANY PARTY WHATSOEVER.

# Photo ID, Social Security or INS verification / Race and Ethnic Data

**Race and Ethnic Data Reporting Form**

**U.S. Department of Housing and Urban Development**
Office of Housing

OMB Approval No. 2502-0204
(Exp. 03/31/2014)

| Peppertree Senior | A-7 | 8956 Harness Street Spring Valley, CA 91977 |
|---|---|---|
| **Name of Property** | **Project No.** | **Address of Property** |

| Wasatch Property Management | Section 42 LIHTC |
|---|---|
| **Name of Owner/Managing Agent** | **Type of Assistance or Program Title:** |

| Alesia Young | Self |
|---|---|
| **Name of Head of Household** | **Name of Household Member** |

**Date (mm/dd/yyyy):** 6-2-15

| Ethnic Categories* | Select One |
|---|---|
| Hispanic or Latino | |
| Not-Hispanic or Latino | X |
| **Racial Categories*** | **Select All that Apply** |
| American Indian or Alaska Native | |
| Asian | |
| Black or African American | X |
| Native Hawaiian or Other Pacific Islander | |
| White | |
| Other | |

***Definitions of these categories may be found on the reverse side.**

**There is no penalty for persons who do not complete the form.**

[signature]
**Signature**

6-2-15
**Date**

**Public reporting burden** for this collection is estimated to average 10 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This information is required to obtain benefits and voluntary. HUD may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.
This information is authorized by the U.S. Housing Act of 1937 as amended, the Housing and Urban Rural Recovery Act of 1983 and Housing and Community Development Technical Amendments of 1984. This information is needed to be incompliance with OMB-mandated changes to Ethnicity and Race categories for recording the 50059 Data Requirements to HUD. Owners/agents must offer the opportunity to the head and co-head of each household to "self certify' during the application interview or lease signing. In-place tenants must complete the format as part of their next interim or annual re-certification. This process will allow the owner/agent to collect the needed information on all members of the household. Completed documents should be stapled together for each household and placed in the household's file. Parents or guardians are to complete the self-certification for children under the age of 18. Once system development funds are provide and the appropriate system upgrades have been implemented, owners/agents will be required to report the race and ethnicity data electronically to the TRACS (Tenant Rental Assistance Certification System). This information is considered non-sensitive and does no require any special protection.



form HUD-27061-H (9/2003)

PST000078



770-885-8950

12/30/59

1049 4th Ave

Apt 44

CV CA 91911

refundable

$300

$350

$40 pet rent



- ☐ **Initial Certification**
- ☒ **Recertification**
- ☐ **Interim Certification**
- ☐ **Correction**
- ☐ **Gross Rent Change**
- ☐ **Add/Delete Tenant**
- ☐ **Other** ______________

**Year:** 2016



Wasatch Property Management

## 1st Notice of Annual Recertification

Date: February 15, 2016

**Alesia Young**
**8956 Harness Street, # A-7**
**Spring Valley, CA 91977**

***Re: Annual Recertification***

Dear Alesia Young :

It's that time for the year for your Annual Recertification! We have enclosed a Renewal Tenant Questionnaire for your convenience.

The following form provided will need to be completed and returned to the business office within **3 business days**. Please ensure you have provided the appropriate contact information such as address, phone number(s), and contact person for income verification purposes. To help us process your recertification, you must bring the following information (*if applies to your household*) to your interview:

* Please provide any changes in income/student status from previous year
* Completed Questionnaire

Please stop by during business hours or call to make arrangements to schedule an appointment for an interview. We'll be happy to make time to talk with you.

Thank you for your cooperation.

Sincerely

Peppertree Apartment Holding, LP
Wasatch Property Management, Managing Agent

# CA - 1st Initial Recertification Checklist

Unit # A-7

****Please do not send this form to compliance use the Review File Worksheet*****

**Approval Documentation (depending on file scenario other verifications/forms may be requested from compliance)**

~please send to the compliance department in the order listed if applicable to the household~

Tenant Income Certification (TIC) – (per household) ______
**Verify Rent is correct on page 2 of the TIC by confirming in Yardi (use the rent amount the TIC is effective) ______
Income Calculation Worksheet ______
Tenant Release & Consent – (per adult) ______
Student Status Form (per household) ______
Single Parent Full-Time Status (if applicable, include 1040 tax return) ______
*Student Verification (**required if full or part time)** ______
****If Student at initial move-in and is no longer a student obtain "Term of Student Status Required"** ______
Student Financial Aid Verification (section 8 only) ______
Child/Spousal Support Affidavit – (per adult) ______
Child/Spousal Support Verification (if applicable) ______
Verification(s) of Income (SS/Pension/VOE/EDD/Gift/AFDC/Annuities/Other)-Required ______
All 3rd party Verification Date Stamped when received ______
If 3rd party verification is not clear where it came from (ex. banner from fax machine/date stamp from employer) keep record of envelope/fax cover sheet from employer in the file. If no record follow up with clarification from employer ______
Paid Cash (letter head from employer and 1040/4506-T returned) ______
~Tax Returns must be signed and dated (unless filed electronically) for Self Employed or Paid Cash ______
Zero Income Affidavit (no income received) ______
Affidavit of Non-Employed Status (if applicable) ______
**Anticipated income is only included if an offer letter is present ______
Assets Verified (if Over $5,000) ______
Under $5,000 Asset-per adult **unless "joint accounts" indicate "joint" and use 1 form** ______
Tenant Income Questionnaire (per adult) – if there are joint assets indicate 'joint' next to the asset ______
Verify Difference from Previous years TIC ______
Verify Term of Income from Previous Year ______
Changes in Household Form (previous year) ______
Tenant Questionnaire (per household) ______
Management verified forms were not altered ______
*Bank Statements should not be in the file unless compliance has requested and reviewed* ______

***Miscellaneous forms***
Live-In Aid (3rd party verification & agreement) ______
**Welfare Exemption (date 1/01) ______
Bond Forms (if applicable) ______
SHRA Properties – add 2 current paystubs, non-recurring contribution, SHRA calculation sheet (if applicable) ______

***Yardi no longer pulls the 50% Income and Rents Limits to the TIC if property is set up as a 40/60***

50% Set Asides – On Page 2 of the TIC the 50% Max Rent needs to be verified (write in manually) ______
50% Set Asides need to be calculated by the 140% Rule by hand since Yardi calculates from the 60% AMI Only
Manually add to the TIC (50%AMI x 140%) ______

**Revised 8/04/1**



WASATCH
PROPERTY MANAGEMENT

## TENANT RELEASE & CONSENT

I Alesia Young, the undersigned hereby authorize Peppertree Senior Apartments, to obtain without liability, information regarding my employment, income, and/or assets for purposes of verifying the information provided as part of my apartment rental application or to determine my continued eligibility.

### INFORMATION COVERED

I understand that previous or current information regarding myself may be needed. Verifications and inquires that may be requested include, but are not limited to: personal identity, employment, income and assets, medical or child care allowances. I understand that this authorization cannot be used to obtain any information about me that is not pertinent to my eligibility for and continued participation as a Qualified Tenant.

### GROUPS OR INDIVIDUALS THAT MAY BE ASKED

The group or individuals that may be asked to release the above information include, but are not limited to:

Past and Present Employers
Previous Landlords (Including Public Housing Agencies)
Support and Alimony Providers
Student Status Verification

Welfare Agencies
State Unemployment Agencies
Social Security Administration
Medical and Child Care Providers
Student Financial Aid

Veterans Administration
Retirement Systems
Banks and Other Financial Institutions

### CONDITIONS

I agree that a photocopy of this authorization may be used for the purposes stated above. The original of this authorization is on file and will stay on file for one year and one month from the date signed. I understand to have a right to review this file and correct any information that I can prove is incorrect.

### SIGNATURES

Alesia Young — Applicant/Tenant Signature
Alesia Young — Print Name
2-18-2016 — Date

I certify that I have observed the above-signed Applicant/Tenant complete, sign and date this document.

[signature] — Management Signature
Lori Watrous — Print Name
2/18/16 — Date



WASATCH
PROPERTY MANAGEMENT

# STUDENT STATUS VERIFICATION

Head of Household Name: Alesia Young

Check A, B or C, as a applicable (not that students include those attending public or private elementary schools, middle or junior high schools, senior high schools, colleges, universities, technical, trade, or mechanical schools, but does not include those attending on-the-job training courses):

A. X Household contains at least one occupant who is not a student, has not been a student, and will not be a student for five or more months during the current and/or upcoming calendar year (months need not be consecutive), If this item is checked, no further information is needed.

B. ______ Household contains all students, but is qualified because the following occupant(s) ______________________________ is/are a part-time student(s). Documentation of part-time student status is required for at least one member of the household.

C. ______ Household contains all full-time students for five or more months during the current and/or upcoming calendar year (months need not be consecutive). If this item is checked, questions 1-5, below must be completed:

1. Is at least one student receiving assistance under Title IV of the Social security Act? YES NO

2. Was at least one student previously under care and placement responsibility of the state agency responsible for administering foster care? (provide documentation of participation) YES NO

3. Does at least one student participate in a program receiving assistance under Job Training Partnership Act, Workforce Investment Act, or under other similar, federal, state, local laws? (attach documentation of participation) YES NO

4. Is at least one student a single parent with child(ren) *and* this parent is not a dependent of another individual *and* the child(ren) is/are not dependent(s) of someone other than a parent? YES NO

5. Are the students married and entitled to file a joint tax return? YES NO

*Households composed entirely of full-time students that are not income eligible and satisfy one or more of the above conditions are considered eligible. If questions 1-5 are marked **NO**, or verification does not support the exception indicated, the household is considered an ineligible student household.*

All household members age 18 or older must sign and date.

[signature] 2-18-2016
Signature Date

Signature Date

Signature Date

Revised October 2009

PST000084



Applicant/Resident Name: Alesia Young

Development Name: Peppertree

Unit Number/Identification: A-7

***Child support and/or spousal support payments that are received shall be included as income whether or not there is yet a court order awarding payment.***

***Child/Spousal support amounts awarded by the courts but not received can be excluded only when the applicant/resident certifies that payments are not being made and further documents that all reasonable legal actions to collect amounts due, including filing with the appropriate courts or agencies responsible for enforcing payment, have been taken.***

***As part of the qualification process required by federal and/or state housing programs with jurisdiction over this development the following information is needed:***

**A. Do you receive child support and/or spousal support?** **Yes** ☐ **Go to B** **No** ☒ **Go to C.1**

**B. I receive:**

1. Payment amount $ ______
2. Frequency ______
3. Name(s) of Recipient(s) ______
4. Name of source ______
   *Complete multiple affidavit forms if there are multiple sources.*
5. Go to C.1

**C. 1. Have you been awarded child or spousal support by court order?** **Yes** ☐ **Go to C.2** **No** ☒ **Sign Form**

**2. Provide copy of entire document, enter amount of award $ ______, and frequency ______; go to C.3.**

**3. Is payment being received as awarded?** **Yes** ☐ **Go to 3.a** **No** ☐ **Go to 3.b**

**a. Indicate the manner by which payment is received and sign form.**

**i.** ____ **Enforcement agency** *Name agency* ______ *and provide agency print out*

**ii.** ____ **Court of Law** *Name court* ______

**iii.** ____ **Direct from responsible party** *Name source* ______ *and provide affidavit or statement from the source.*

**iv.** ____ **Other** *(Explain)* ______

**b. If payment not received or if amount received is less than amount awarded provide details and documentation of collection efforts.**

______

Under penalty of perjury, I certify that the information presented in this affidavit is true and accurate to the best of my knowledge. The undersigned further understands that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of a lease agreement.

[signature] Applicant/Resident Signature

2-18-2016 Date

Feb 22 16 04:18p p.1
FEB/18/2016/THU 12:48 PM FAX No. P. 001/001

# EMPLOYMENT VERIFICATION

**THIS SECTION TO BE COMPLETED BY MANAGEMENT AND EXECUTED BY TENANT**

TO: (Name & address of employer)
*Lisas Lil Tikes Preschool/Corp
4351 Parks Avenue
La Mesa CA 91941

Date: 02/18/2016
Employer Phone #: 619-460-6432
Employer Fax #: 619-460-6432

RE: Alesia Young — Applicant/Tenant Name
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 — Social Security Number
A-7 — Unit # (if assigned)

I hereby authorize release of my employment information,

See Tenant Release form — Signature of Applicant/Tenant
2/18/2016 — Date

The individual named directly above is an applicant/tenant of a housing program that requires verification of income. The information provided will remain confidential to satisfaction of that stated purpose only. Your prompt response is crucial and greatly appreciated.

Sincerely, Lori Watrous
Project Owner/Management Agent

**Return Form To:**
Peppertree Apartments
8956 Harness St
Spring Valley CA 91977
Phone 619-463-0579 Fax 619-463-2105

**THIS SECTION TO BE COMPLETED BY EMPLOYER**

Employee Name: ____ Job Title: Teachers

Presently Employed: Yes [X] Date First Employed 10/21/15 No ☐ Last Day of Employment __/__/__

Current Wages/Salary: $ 11.00 (check one) Date present rate effective 10/21/15
[X] hourly ☐ weekly ☐ bi-weekly ☐ semi-monthly ☐ monthly ☐ yearly ☐ other ____

Average # of regular hours per week: 35 Year-to-date earnings: $ 2601.50 from: 1-1-16 through: 2/12/16

Overtime Rate: $ — per hour Average # of overtime hours per week: —

Shift Differential Rate: $ — per hour Average # of shift differential hours per week: —

Commissions, bonuses, tips, other: $ — (check one)
☐ hourly ☐ weekly ☐ bi-weekly ☐ semi-monthly ☐ monthly ☐ yearly ☐ other ____

List any anticipated change in the employee's rate of pay within the next 12 months: —
Effective date: __/__/__

If the employee's work is seasonal or sporadic, please indicate the layoff period(s): —

If the employee's work is seasonal or sporadic is this employee eligible for unemployment during the layoff period? ☐No ☐Yes ☐N/A

Does this employee participate in a retirement plan such as 401k? [X]No ☐Yes If yes, can the employee withdraw any of the funds while employed? ☐No ☐Yes Comments: ____

Additional remarks:

[signature] — Employer's Signature
Lisa Daniels — Employer's Printed Name
Owner — Employer's Title
2/18/16 — Date

Lisa's Lil Tikes Preschool Corp. — Employer (Company) Name and Address

619-460-6432 — Phone #
— Fax #
lisa@lisaslittikes.com — E-mail

NOTE: Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction.

RECEIVE: NO.5251 02/22/2016/MON 03:35PM

2500805400 P.01/01

# TRANSACTION REPORT

FEB/22/2016/MON 03:36 PM

FAX(RX)

| # | DATE | START T. | SENDER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|---|---|---|---|---|---|---|---|
| 001 | FEB/22 | 03:35PM | ECM | 0:00:56 | 1 | OK | ECM | 5251 |

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12979 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 01/23/2016
Period Ending: 02/05/2016
Pay Date: 02/12/2016

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Tax Override:
Federal:
State:
Local:
Social Security Number: XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 72.00 | 792.00 | 2601.50 |
| **Gross Pay** | | | **$792.00** | $2,601.50 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -64.62 | 177.58 |
| Social Security | -49.10 | 161.29 |
| Medicare | -11.48 | 37.72 |
| California State Income | -6.07 | 11.81 |
| California State DI | -7.12 | 23.41 |
| **Net Pay** | **$653.61** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 72.00 | 236.50 |

Your federal taxable wages this period are $792.00

©1998, 2006, ADP LLC All Rights Reserved

TEAR HERE

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12957 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 01/09/2016
Period Ending: 01/22/2016
Pay Date: 01/29/2016

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Tax Override:
Federal:
State:
Local:
Social Security Number: XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 63.00 | 693.00 | 1809.50 |
| **Gross Pay** | | | **$693.00** | $1,809.50 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -49.77 | 112.96 |
| Social Security | -42.97 | 112.19 |
| Medicare | -10.05 | 26.24 |
| California State Income | -3.89 | 5.74 |
| California State DI | -6.24 | 16.29 |
| **Net Pay** | **$580.08** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 63.00 | 164.50 |

Your federal taxable wages this period are $693.00

© 1998, 2006 ADP, LLC All Rights Reserved

TEAR HERE

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12911 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 12/12/2015
Period Ending: 12/25/2015
Pay Date: 01/01/2016

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Tax Override:
Federal:
State:
Local:
Social Security Number: XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 48.50 | 533.50 | 533.50 |
| **Gross Pay** | | | **$533.50** | $533.50 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -29.12 | 29.12 |
| Social Security | -33.08 | 33.08 |
| Medicare | -7.74 | 7.74 |
| California State Income | -0.38 | 0.38 |
| California State DI | -4.80 | 4.80 |
| **Net Pay** | **$458.38** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 48.50 | 48.50 |

Your federal taxable wages this period are $533.50

© 1998, 2006 ADP, LLC All Rights Reserved.

TEAR HERE

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12934 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 12/26/2015
Period Ending: 01/08/2016
Pay Date: 01/15/2016

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Tax Override:
Federal:
State:
Local:
Social Security Number: XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 53.00 | 583.00 | 1116.50 |
| **Gross Pay** | | | **$583.00** | $1,116.50 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -34.07 | 63.19 |
| Social Security | -36.14 | 69.22 |
| Medicare | -8.45 | 16.19 |
| California State Income | -1.47 | 1.85 |
| California State DI | -5.25 | 10.05 |
| **Net Pay** | **$497.62** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 53.00 | 101.50 |

Your federal taxable wages this period are $583.00

©1998, 2006, ADP, LLC All Rights Reserved.

TEAR HERE

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12888 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 11/28/2015
Period Ending: 12/11/2015
Pay Date: 12/18/2015

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Tax Override:
Federal:
State:
Local:
Social Security Number: XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 70.25 | 772.75 | 2549.25 |
| Overtime | | | 0.00 | 8.25 |
| **Gross Pay** | | | **$772.75** | $2,557.50 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -61.83 | 176.79 |
| Social Security | -47.92 | 158.57 |
| Medicare | -11.20 | 37.08 |
| California State Income | -5.78 | 13.64 |
| California State DI | -6.96 | 23.02 |
| **Net Pay** | **$639.06** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 70.25 | 232.25 |

Your federal taxable wages this period are $772.75

©1998 2004 ADP All Rights Reserved

TEAR HERE

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12865 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 11/14/2015
Period Ending: 11/27/2015
Pay Date: 12/04/2015

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Social Security Number: XXX-XX-5076

Tax Override:
Federal:
State:
Local:

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 55.00 | 605.00 | 1776.50 |
| Overtime | 16.5000 | 0.50 | 8.25 | 8.25 |
| **Gross Pay** | | | **$613.25** | $1,784.75 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -37.90 | 114.96 |
| Social Security | -38.02 | 110.65 |
| Medicare | -8.89 | 25.88 |
| California State Income | -2.27 | 7.86 |
| California State DI | -5.52 | 16.06 |
| **Net Pay** | **$520.65** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 55.50 | 162.00 |

Your federal taxable wages this period are $613.25

©1998, 2006, ADP, LLC. All Rights Reserved.

TEAR HERE

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 1120151 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

## Earnings Statement

ADP

Period Starting: 10/31/2015
Period Ending: 11/13/2015
Pay Date: 11/20/2015

Taxable Marital Status Single
Exemptions/Allowances Tax Override:
Federal 1 Federal 60.59 Flat
State 1 State 5.59 Flat
Local 0 Local:
Social Security Number XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 69.50 | 764.50 | 1171.50 |
| Gross Pay | | | **$764.50** | $1,171.50 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -60.59 | 77.06 |
| Social Security | -47.40 | 72.63 |
| Medicare | -11.09 | 16.99 |
| California State Income | -5.59 | 5.59 |
| California State DI | -6.88 | 10.54 |
| Net Pay | **$632.95** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 69.50 | 106.50 |

Your federal taxable wages this period are $764.50

| Company Code | Loc/Dept | Number | Page |
|---|---|---|---|
| RP / ILT 20079947 | 01/300 | 12820 | 1 of 1 |

Lisas Lil Tikes Preschool Corp
4351 Parks Avenue
La Mesa, CA 91941

# Earnings Statement

ADP

Period Starting: 10/17/2015
Period Ending: 10/30/2015
Pay Date: 11/06/2015

Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: 1
Local: 0
Tax Override:
Federal:
State:
Local:
Social Security Number: XXX-XX-5076

**Alesia Young**
**8956 Harness Street #A7**
**Spring Valley, CA 91977**

| Earnings | rate | hours/units | this period | year to date |
|---|---|---|---|---|
| Regular | 11.0000 | 37.00 | 407.00 | 407.00 |
| **Gross Pay** | | | **$407.00** | $407.00 |

| Statutory Deductions | this period | year to date |
|---|---|---|
| Federal Income | -16.47 | 16.47 |
| Social Security | -25.23 | 25.23 |
| Medicare | -5.90 | 5.90 |
| California State Income | 0.00 | 0.00 |
| California State DI | -3.66 | 3.66 |
| **Net Pay** | **$355.74** | |

| Other Benefits and Information | this period | year to date |
|---|---|---|
| Total Hours Worked | 37.00 | 37.00 |

Your federal taxable wages this period are $407.00

©1998, 2006, ADP, LLC All Rights Reserved.

TEAR HERE


WASATCH
PROPERTY MANAGEMENT

# UNDER $5,000 ASSET CERTIFICATION

For households whose combined net assets do not exceed $4,999.99

Complete one form for households with joint assets or one form per person with separate assets. If a household contains both joint and separate assets, use separate forms and list the joint accounts on both forms with the statement (Joint) next to the applicable asset.

Household Name: Alesia Young Unit No. A-7

Development Name: Peppertree City: Spring Valley

**Complete the following:**

1. **Choose one:**

☐ I/we do not have any assets at this time. *(if this box is checked, draw a line through the asset information below, place a zero in #3, sign and date)*

**OR**

☒ My/our assets include:
*(Please complete fully. Put a zero in any columns that do not apply)*

| (A) Cash Value* | (B) Int. Rate | (A*B) Annual Income | Source |
|---|---|---|---|
| $ 0 | 0 | $ 0 | Savings Account |
| $ | | $ | Cash on Hand |
| $ | | $ | Certificates of Deposit |
| $ | | $ | Stocks |
| $ | | $ | IRA Accounts |
| $ | | $ | Keogh Accounts |
| $ | | $ | Equity in real estate |
| $ | | $ | Lump Sum Receipts |
| $ | | $ | Life Insurance Policies (excluding Term) |
| $ | | $ | Other Retirement/Pension Funds not named above: |
| $ | | $ | Personal property held as an investment** : |
| $ | | $ | Pre-Paid Card |
| $ 0 | 0 | $ 0 | Other (list): |

| (A) Cash Value* | (B) Int. Rate | (A*B) Annual Income | Source |
|---|---|---|---|
| 1,213.79 AY | -0- | $ -0- | Checking Account |
| $ 0 | | $ | Safety Deposit Box |
| $ | | $ | Money market funds |
| $ | | $ | Bonds |
| $ | | $ | 401K Accounts |
| $ | | $ | Trust Funds |
| $ | | $ | Land Contracts |
| $ 0 | 0 | $ 0 | Capital investments |

**PLEASE NOTE:** Certain funds (e.g., Retirement, Pension, Trust) may or may not be (fully) accessible to you. ***For instance, do not list pensions or retirement account balances that cannot be accessed without terminating employment.*** Include only those amounts which are.

**Cash value is defined as market value minus the cost of converting the asset to cash, such as broker's fees, settlement costs, outstanding loans, early withdrawal penalties, etc.*

***Personal property held as an investment may include, but is not limited to, gem or coin collections, art, antique cars, etc. Do not include necessary personal property such as, but not necessarily limited to, household furniture, daily-use autos, clothing, assets of an active business, or special equipment for use by the disabled.*

2. **Choose one:**

☒ I/we have not sold or given away assets (including cash, real estate, etc.) for less than fair market value during the past two (2) years.

**OR**

☐ Within the past two (2) years, I/we have sold or given away assets (including cash, real estate, etc.) for more than $1,000 below their fair market value (FMV). Those amounts* are included above and are equal to a total of: $__________ (*the difference between FMV and the amount received, for each asset on which this occurred).

3. **Please complete:**

**The net family assets** *(as defined in 24 CFR 813.102)* **above do not exceed $5,000 and the annual income** *(add all annual income columns)* **from the net family assets is $** 0 **. This amount is included in total gross annual income.**

Under penalty of perjury, I/we certify that the information presented in this certification is true and accurate to the best of my/our knowledge. The undersigned further understand(s) that providing false representations herein constitutes an act of fraud. False, misleading or incomplete information may result in the termination of a lease agreement.

[signature] 2-18-16

Applicant/Tenant Date Applicant/Tenant Date



WASATCH
PROPERTY MANAGEMENT

# RECERT CLARIFICATION RECORD – PRIOR ASSETS

Property : Peppertree Unit #: A-7

Applicant/Resident Name: Alesia Young Date: 2/18/2016

On the certification dated 06/17/2016 (last certification date) you reported that you had a savings (checking, savings, etc.) account. You are now reporting this account does not exist. Please explain what happened to this account:

Reason for the change: ______________________________

______________________________

______________________________

______________________________

I/we hereby certify that all the information provided is true and correct to the best of my/our knowledge. I/we certify there is at least one household member remaining in the unit that was a household member at move in. I/we understand that the household does not qualify for residency if there is not an original household member currently residing in the unit.

______________________________ Signature of Applicant ______________ Date

______________________________ Signature of Applicant ______________ Date

______________________________ Signature of Applicant ______________ Date

______________________________ Signature of Management/Agent ______________ Date

**NOTE:** Section 1001 of Title 18 of the U.S. Code makes it a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction.

 Wasatch Property Management

## CLARIFICATION RECORD

**Applicant/Resident Name:** Alesia Young **Unit #:** A-7

**Property Name:** Peppertree

Upon review of the required documentation needed to process an initial certification or annual recertification, the information provided was either incomplete or unclear. This verification allows the information received, via the telephone or person-to-person conversation, to be documented.

**Following is the information discussed with the third party verifier:**

**Name of company:** ______________________

**Name of party spoken to:** Alesia Young

**Title:** ______________________ **Telephone number:** ______________________

**Reason for clarification:**

At initial certification savings account was listed with Chase bank. Re-Cert questionnaire shows no longer has a savings account.

**Documentation of conversation:**

Alesia said never had a savings account.

I, an authorized agent for the development, swear the above information has been recorded as discussed with the third party verifier.

| ______________________ | LOri Watrous | 2/18/2016 |
|---|---|---|
| Signature | Print Name | Date |



# TENANT INCOME CERTIFICATION QUESTIONNAIRE

*One Form per Adult Member of the Household*

NAME: Alesia Young

TELEPHONE NUMBER: 770-885-8950

☐ Initial Certification
☑ Re-certification
☐ Other

BIN #

Unit # A-7

INCOME INFORMATION

| | YES | NO | | MONTHLY GROSS INCOME |
|---|---|---|---|---|
| 1. | ☐ | X | I am self -employed. (List nature of self employment) | (use net income from business) $ |
| 2. | X | ☐ | I/we have a job and receive wages, salary, overtime pay, commissions, fees, tips, bonuses, and/or other compensation: List the businesses and/or companies that pay you:<br>Name of Employer<br>1) Lisas Lil Tikes<br>2)<br>3) | $<br>$<br>$ |
| 3. | ☐ | X | I receive cash contributions of gifts including rent or utility payments, on an ongoing basis from persons not living with me. | $ |
| 4. | ☐ | X | I receive unemployment benefits. | $ |
| 5. | ☐ | X | I receive Veteran's Administration, GI Bill, or National Guard/Military benefits/income. | $ |
| 6. | ☐ | X | I receive periodic social security payments. | $ |
| 7. | ☐ | X | The household receives unearned income from family members age 17 or under (example: Social Security, Trust Fund disbursements, etc.). | $ |
| 8. | ☐ | X | I receive Supplemental Security Income (SSI). | $ |
| 9. | ☐ | X | I receive disability or death benefits other than Social Security. | $ |
| 10. | ☐ | X | I receive Public Assistance Income (examples: TANF, AFDC) | $ |
| 11. | ☐<br>☐<br>☐ | X<br>X<br>X | I am entitled to receive child support payments.<br>I am currently receiving child support payments.<br>If yes, from how many persons do you receive support? ______<br>I am currently making efforts to collect child support owed to me. List efforts being made to collect child support: | $<br>$ |
| 12. | ☐ | X | I/we receive alimony/spousal support payments | $ |
| 13. | ☐ | X | I receive periodic payments from trusts, annuities, inheritance, retirement funds or pensions, insurance policies, or lottery winnings.<br>If yes, list sources:<br>1)<br>2) | $<br>$ |
| 14. | ☐ | X | I receive income from real or personal property. | (use net earned income) $ |
| 15. | ☐ | X | Student financial aid (public or private, not including student loans)<br>Subtract cost of tuition from Aid Received<br>**For Households receiving Section 8 Assistance Only* | $ |

**ASSET INFORMATION**

| # | YES | NO | | INTEREST RATE | CASH VALUE |
|---|---|---|---|---|---|
| 16. | X | ☐ | I have a checking account(s). If yes, list bank(s) 1) Chase 2)____ | 0 % / ____% | $ 1200. 1,213.70 / $____ |
| 17. | ☐ | X | I have a savings account(s) If yes, list bank(s) 1)____ 2)____ | ____% / ____% | $____ / $____ |
| 18. | ☐ | X | I have a revocable trust(s) If yes, list bank(s) 1)____ | ____% | $____ |
| 19. | ☐ | X | I own real estate. If yes, provide description: ____ | | $____ |
| 20. | ☐ | X | I own stocks, bonds, or Treasury Bills If yes, list sources/bank names 1)____ 2)____ 3)____ | ____% / ____% / ____% | $____ / $____ / $____ |
| 21. | ☐ | X | I have Certificates of Deposit (CD) or Money Market Account(s). If yes, list sources/bank names 1)____ 2)____ 3)____ | ____% / ____% / ____% | $____ / $____ / $____ |
| 22. | ☐ | X | I have an IRA/Lump Sum Pension/Keogh Account/401K. If yes, list bank(s) 1)____ 2)____ | ____% / ____% | $____ / $____ |
| 23. | ☐ | X | I have a whole life insurance policy. If yes, how many policies ____ | | $____ |
| 24. | ☐ | X | I have cash on hand. | | $____ |
| 25. | ☐ | X | I have disposed of assets (i.e. gave away money/assets) for less than the fair market value in the past 2 years. If yes, list items and date disposed: 1)____ 2)____ | | $____ / $____ |
| 26. | ☐ | X | I have a pre-paid card. If yes list sources: ____ | | $____ |

**STUDENT STATUS**

| YES | NO | |
|---|---|---|
| ☐ | X | Does the household consist of all persons who are full-time students (Examples: K-12, College, Trade School, etc.)? |
| ☐ | X | Does the household consist of all persons who have been a full-time student 5 months in the current calendar year? |
| ☐ | X | Does your household anticipate becoming an all full-time student household in the next 12 months? |
| | | If you answered yes to any of the previous three questions are you: |
| ☐ | ☐ | • Receiving assistance under Title IV of the Social Security Act (AFDC/TANF/Cal Works - **not** SSA/SSI) |
| ☐ | ☐ | • Enrolled in a job training program receiving assistance through the Job Training Participation Act (JTPA) or other similar program |
| ☐ | ☐ | • Married and filing (or are entitled to file) a joint tax return |
| ☐ | ☐ | • Single parent with a dependent child or children and neither you nor your child(ren) are dependent of another individual |
| ☐ | ☐ | • Previously enrolled in the Foster Care program (currently age 18-24) |

UNDER PENALTIES OF PERJURY, I CERTIFY THAT THE INFORMATION PRESENTED ON THIS FORM IS TRUE AND ACCURATE TO THE BEST OF MY/OUR KNOWLEDGE. THE UNDERSIGNED FURTHER UNDERSTANDS THAT PROVIDING FALSE REPRESENTATIONS HEREIN CONSTITUES AN ACT OF FRAUD. FALSE, MISLEADING OR INCOMPLETE INFORMATION WILL RESULT IN THE DENIAL OF APPLICATION OR TERMINATION OF THE LEASE AGREEMENT.

Alesia Young — PRINTED NAME OF APPLICANT/TENANT

[signature] — SIGNATURE OF APPLICANT/TENANT

2-18-2016 — DATE

[signature] — WITNESSED BY (SIGNATURE OF OWNER/REPRESENTATIVE)

2-18-16 — DATE


WASATCH

# TENANT QUESTIONNAIRE

The following information is being requested as a part of the qualification process required by federal and/or state housing programs with jurisdiction over this rental community. Please complete both side of this forms for the entire household. All adult members are required to sign and complete.

NAME Alesia Young APT NO. A7 PHONE: 770 885-8950

## FAMILY COMPOSITION

| FAMILY MEMBER NUMBER | NAME | RELATION-SHIP TO HEAD OF HOUSEHOLD | SOCIAL SECURITY NO. | BIRTHDATE | STUDENT Yes | STUDENT No |
|---|---|---|---|---|---|---|
| 1 | Alesia Young | HEAD | 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 | 12-30-59 | | X |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |

INCOME AND ASSETS – Check "Yes" or "no" and Family #

| TYPE | YES | NO | FAMILY MEMBER NUMBER(S) | MAILED FAX 1ST | MAILE DFAX 2ND | COMMENTS (FOR OFFICE USE) | REC'D |
|---|---|---|---|---|---|---|---|
| Job | | | | | | | |
| Wages | X | | | | | | |
| Tips | | X | | | | | |
| Bonuses/Commissions | | X | | | | | |
| Business/Self Employed | | X | | | | | |
| Unemployment | | X | | | | | |
| Social Security/SSI | | X | | | | | |
| Pension | | X | | | | | |
| Disability | | X | | | | | |
| Severance Payments | | X | | | | | |
| AFDC/TANF/CAL WORKS | | X | | | | | |
| Alimony | | X | | | | | |
| Child Support | | X | | | | | |
| Checking Accounts | ✓ | | Chase | | | | |
| Savings Accounts | | X | | | | | |
| Stocks/Bonds | | X | | | | | |
| T-Bills/CD's | | X | | | | | |
| Trusts Funds | | X | | | | | |
| IRA/Keogh/401K | | X | | | | | |
| Real Estate/Investments | | X | | | | | |
| Personal Property held as an Investment | | X | | | | | |
| Lump Sum Payments (lottery, gambling winnings or inheritance) | | X | | | | | |
| Scholarships | | X | | | | | |
| Grants | | X | | | | | |
| Recurring Gifts | | X | | | | | |
| Disposed of Assets (Last 2years) | | X | | | | | |
| Life Insurance (whole life) | | X | | | | | |
| Other | | X | | | | | |
| Other | | X | | | | | |

| FAMILY MEMBER NUMBER | EMPLOYER | CITY / STATE | MONTHLY INCOME | PHONE NUMBER |
|---|---|---|---|---|
| | Lisas Lil Tikes | La Mesa CA | | 619 460 6432 |
| | | | | |

| FAMILY MEMBER NUMBER | PENSION/CHILD/ALIMONY SUPPORT | MONTHLY INCOME | CITY / STATE |
|---|---|---|---|
| | n/a | n/a | n/a |
| | | | |

| FAMILY MEMBER NUMBER | SSI / SSA / AFDC / TANF | MONTHLY INCOME | CITY / STATE |
|---|---|---|---|
| | n/a | n/a | n/a |
| | | | |

| FAMILY MEMBER NUMBER | BANK INFORMATION | CHECKING OR SAVINGS | INTEREST RATE | BALANCE |
|---|---|---|---|---|
| 1 | Chase | Checking | -0- | 1,213.70 |
| | | | | |

| FAMILY MEMBER NUMBER | OTHER ASSETS | ACCOUNT 401K / IRA / CD / ETC | INTEREST RATE | CASH VALUE |
|---|---|---|---|---|
| | n/a | n/a | n/a | n/a |
| | | | | |

| FAMILY MEMBER NUMBER | OTHER INCOME | MONTHLY INCOME | CITY / STATE |
|---|---|---|---|
| | n/a | n/a | n/a |
| | | | |

| FAMILY MEMBER NUMBER | OTHER INCOME | MONTHLY INCOME | CITY / STATE |
|---|---|---|---|
| | n/a | n/a | n/a |
| | | | |

DO YOU ANTICIPATE YOUR HOUSEHOLD SIZE CHANGING IN THE NEXT TWELVE (12) MONTHS? ☐ YES ☒ NO
IF YES EXPLAIN

DO YOU ANTICIPATE YOUR HOUSEHOLD INCOME CHANGING IN THE NEXT TWELVE (12) MONTHS? ☒ YES ☒ NO ag
IF YES EXPLAIN [crossed out]

DO YOU HAVE ANYONE TEMPORARILY ABSENT FROM THE HOUSEHOLD? ☐ YES ☒ NO
IF YES EXPLAIN

ARE ALL OCCUPANTS OF THE HOUSEHOLD FULL-TIME STUDENTS OR HAVE BEEN FULL-TIME STUDENTS DURING THE FIVE CALENDER MONTHS OF THIS YEAR?
☐ YES ☒ NO IF YES EXPLAIN

HAVE YOU SOLD OR GIVEN AWAY REAL PROPERTY OR OTHER ASSETS IN THE PAST TWO YEARS?
☐ YES ☒ NO, IF YES, WHAT WAS THE MARKET VALUE OF THE ASSET?

**STATEMENT: I CERTIFY THAT ALL THE INFORMATION ON THIS INTERVIEW CHECKLIST IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE. I UNDERSTAND IT IS A PROVISION OF THE LEASE THAT I REPORT AND ASSIST IN THE VERIFICATION OF ACTUAL AMOUNTS OF ALL INCOME RECEIVED BY MYSELF AND ALL MEMBERS OF THE HOUSEHOLD. ANY FALSE STATEMENTS OR INFORMATION ARE PUNISHABLE UNDER FEDERAL LAW.**

Applicant/Resident Signature [signature] Date 2-18-2016

Applicant/Resident Signature ______ Date ______

# Housing Authority Contracts/Information
# Section 8

PST000103



County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

## NOTICE OF CHANGE IN HOUSING ASSISTANCE PAYMENT - OWNER

July 14, 2015

PEPPERTREE APARTMENT HOLDINGS, LP
PEPPERTREE SENIOR APARTMENTS
8956 HARNESS STREET, LEASING OFFICE
SPRING VALLEY, CA 91977

RE: ALESIA YOUNG
8956 HARNESS A-7
SPRING V ALLEY, CA 91977

Due to an annual or interim recertification of participant's eligibility, the Rental Assistance Contract is amended as follows:

Port-15

"RENT"

Amount of Housing Assistance Payment . . . . . . . . . . . . . . . . . . $ 617.00

Amount of Tenant Rent . . . . . . . . . . . . . . . . . . . . . . . . . . $ 390.00

Amount of Contract Rent . . . . . . . . . . . . . . . . . . . . . . . . . $ 1,007.00

THIS CHANGE BECOMES EFFECTIVE: 06/17/2015

FAMILY MEMBERS ON LEASE: *List all family members including head of household*

ALESIA YOUNG

ALL OTHER COVENANTS, TERMS AND CONDITIONS OF THE LEASE AGREEMENT AND HOUSING ASSISTANCE PAYMENTS CONTRACT REMAIN THE SAME.

Please attach this notice to your copy of the Housing Assistance Payments Contract.

Housing Representative: Brenda Soto — Phone Number: (858) 694-8744
Email Address: Brenda.Soto@sdcounty.ca.gov — FAX Number: (858) 514-6553

*Serving as the Housing Authority of the County of San Diego*



County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

**NOTICE OF CHANGE IN HOUSING ASSISTANCE PAYMENT - OWNER**

April 19, 2016

PEPPERTREE APARTMENT HOLDINGS, LP
PEPPERTREE SENIOR APARTMENTS
8956 HARNESS STREET, LEASING
SPRING VALLEY, CA 91977

RE: ALESIA YOUNG
8956 HARNESS ST A-7
SPRING V ALLEY, CA 91977

Due to an annual or interim recertification of participant's eligibility, the Rental Assistance Contract is amended as follows:

"RENT"

Amount of Housing Assistance Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 608.00

Amount of Tenant Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 399.00

Amount of Contract Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 1,007.00

THIS CHANGE BECOMES EFFECTIVE: 06/01/2016

FAMILY MEMBERS ON LEASE: *List all family members including head of household*

ALESIA YOUNG

ALL OTHER COVENANTS, TERMS AND CONDITIONS OF THE LEASE AGREEMENT AND HOUSING ASSISTANCE PAYMENTS CONTRACT REMAIN THE SAME.

Please attach this notice to your copy of the Housing Assistance Payments Contract.

Housing Representative: Brenda Soto — Phone Number: (858) 694-8744
Email Address: Brenda.Soto@sdcounty.ca.gov — FAX Number: (858) 514-6553

# Housing Assistance Payments Contract (HAP Contract) Section 8 Tenant-Based Assistance Housing Choice Voucher Program

U.S. Department of Housing and Urban Development Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**

   This HAP contract has three parts:

   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant** ALESIA YOUNG

3. **Contract Unit** 8956 HARNESS #A-7, SPRING VALLEY CA 91977

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   ALESIA YOUNG

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): 6-17-15

   The initial lease term ends on (mm/dd/yyyy): 6-16-16

6. **Initial Rent to Owner**

   The initial rent to owner is: $ 1007.00

   During the initial lease term, the owner may not raise the rent to tenant.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 617.00 per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**
OMB Approval 2577-0169 (Exp. 09/30/2017)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

### Instructions for use of HAP Contract

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA) . The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins). See section by section instructions. Part B Body of contract
Part C Tenancy addendum

### Use of this form

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.

However, the PHA may choose to add the following:

Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

### Use for special housing types

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

### How to fill in Part A

Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**
Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

Such shorter term would improve housing opportunities for the tenant, and

Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**
Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. **Prohibition of Discrimination**. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10. **Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11. **PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12. **Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d **Housing services.** The owner must provide all housing services as agreed to in the lease.

**8. Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(5) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(6) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

### 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

### 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

### 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

### 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

### 17. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

2500805400 P.01/01

TRANSACTION REP :T

JUL/09/2015/THU 03:55 PM

FAX(TX)

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | FILE |
|---|---|---|---|---|---|---|---|
| 001 | JUL/09 | 03:51PM | 18585146557 | 0:03:49 | 11 | MEMORY OK SG3 | 4216 |

07/09/2015 15:49 FAX 8586948706 RA FAX TWO 001/003

County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

# FAX

DATE: 7-9-15

SUBJECT: ALESIA YOUNG

FAX 619 463-2105

NUMBER OF PAGES: **PLEASE SIGN CONTRACT, RETURN WITH COPY OF YOUR LEASE.**

**FAX 858 514-6557**

MESSAGE: Thank You!

**Notice:** This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is **STRICTLY PROHIBITED.** If you have received this message in error, please notify the sender immediately and arrange for the return or destruction of these documents.

# Housing Assistance Payments Contract (HAP Contract)
# Section 8 Tenant-Based Assistance
# Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**

   This HAP contract has three parts:

   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant** ALESIA YOUNG

3. **Contract Unit** 8956 HARNESS #A-7, SPRING VALLEY CA 91977

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   ALESIA YOUNG

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): 6-17-15

   The initial lease term ends on (mm/dd/yyyy): 6.16.16

6. **Initial Rent to Owner**

   The initial rent to owner is: $ 1007.00

   During the initial lease term, the owner may not raise the rent to tenant.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 617.00 per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

**8. Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below b an "O". The tenant shall prov de or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay all utilities and appliances provided by the owner.

| Item | Specify fuel type | Provided by | Paid by |
|---|---|---|---|
| Heating | [ ]Natural Gas [ ]Bottle Gas [ X ]Oil or Electric [ ]Coal or Other | | T |
| Cooking | [ ]Natural Gas [ ]Bottle Gas [ X ]Oil or Electric [ ]Coal or Other | | T |
| Water Heating | [ ]Natural Gas [ ]Bottle Gas [ X]Oil or Electric [ ]Coal or Other | | O |
| Other Electric | | | T |
| Water | | | O |
| Sewer | | | O |
| Trash Collection | | | O |
| Air Conditioning | | | T |
| Refrigerator | | O | |
| Range/Microwave | | O | |
| Other (specify) | | | |
| | | | |

**Signatures:**

**Public Housing Agency**
HOUSING AUTHORITY OF THE COUNTY OF SAN DIEGO
Print or Type Name of PHA

Signature

KESONE LUANGVANNASY- Housing Specialist
Print or Type Name and Title of Signatory

June 11, 2015
Date (mm/dd/yyyy)

**Owner**
PEPPERTREE APARTMENT HOLDING -
Print or Type Name of Owner

Signature [signature]

Community Manager
Print or Type Name and Title of Signatory

7/9/15
Date (mm/dd/yyyy)

**Mail Payments to:**

PEPPERTREE APARTMENT HOLDING -
Name of Owner

595 SOUTH RIVERWOODS PARKWAY STE 400, LOGAN UT 84321
Address (Street, city, State, Zip)



TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

# FAX

DATE: 7-9-15

SUBJECT: ALESIA YOUNG

FAX 619 463-2105

NUMBER OF PAGES: **PLEASE SIGN CONTRACT, RETURN WITH COPY OF YOUR LEASE.**

**FAX 858 514-6557**

MESSAGE: Thank You!

**Notice:** This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is **STRICTLY PROHIBITED**. If you have received this message in error, please notify the sender immediately and arrange for the return or destruction of these documents.

RA 050 (03/2012)

*Serving as the Housing Authority of the County of San Diego*

2500805400 P.01/01

# TRANSACTION REPC T

JUL/09/2015/THU 03:49 PM

FAX(RX)

| # | DATE | START T. | SENDER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|---|---|---|---|---|---|---|---|
| 001 | JUL/09 | 03:46PM | 8586948706 | 0:02:49 | 3 | OK | G3 | 4215 |

# Housing Assistance Payments Contract (HAP Contract) Section 8 Tenant-Based Assistance Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

---

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**

   This HAP contract has three parts:

   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant** **ALESIA YOUNG**

3. **Contract Unit** **8956 HARNESS #A-7, SPRING VALLEY CA 91977**

4. **Household**

   The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   ALESIA YOUNG

5. **Initial Lease Term**

   The initial lease term begins on (mm/dd/yyyy): ____________________

   The initial lease term ends on (mm/dd/yyyy): ____________________

6. **Initial Rent to Owner**

   The initial rent to owner is: $ 1007.00

   During the initial lease term, the owner may not raise the rent to tenant.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 617.00 per month.

   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

101101

**Request for Tenancy Approval**
**Housing Choice Voucher Program**

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169 (exp. 4/30/2014)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

Eligible families submit this information to the Public Housing Authority (PHA) when applying for housing assistance under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The PHA uses the information to determine if the family is eligible, if the unit is eligible, and if the lease complies with program and statutory requirements. Responses are required to obtain a benefit from the Federal Government. The information requested does not lend itself to confidentiality.

1. Name of Public Housing Agency (PHA)
HOUSING AUTHORITY OF THE COUNTY OF SAN DIEGO
3989 RUFFIN RD, SAN DIEGO CA 92123-1890 FAX: (858) 694-8706

2. Address of Unit (street address, apartment number, city, State & zip code)
8956 Harness St # A-7
Spring Valley, Ca 91977

| 3. Requested Beginning Date of Lease | 4. Number of Bedrooms | 5. Year Constructed | 6. Proposed Rent | 7. Security Deposit Amount | 8. Date unit available for inspection |
|---|---|---|---|---|---|
| 6/10/15 | 1 | 1985 | 1007 | 300 | 6/10/15 |

9. Type of House/Apartment
[X] Single Family Detached [ ] Semi-Detached / Row House [ ] Manufactured Home [ ] Garden / Walkup [ ] Elevator/High-Rise

10. If this unit is subsidized, indicate type of subsidy:
[ ] Section 202 [ ] Section 221(d)(3)(BMIR) [ ] Section 236 (Insured or noninsured) [ ] Section 515 Rural Development
[ ] Home [X] Tax Credit [ ] Other (Describe Other Subsidy, Including Any State or Local Subsidy) ______

11. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | Provided by | Paid by |
|---|---|---|---|
| Heating | [ ] Natural gas [ ] Bottle gas [X] Oil or Electric [ ] Coal or Other | | T |
| Cooking | [ ] Natural gas [ ] Bottle gas [X] Oil or Electric [ ] Coal or Other | | T |
| Water Heating | [X] Natural gas [ ] Bottle gas [ ] Oil or Electric [ ] Coal or Other | | O |
| Other Electric | | | T |
| Water | | | O |
| Sewer | | | O |
| Trash Collection | | | O |
| Air Conditioning | | | T |
| Refrigerator | | O | |
| Range/Microwave | | O | |
| Other (specify) | | | |

SQUARE FOOTAGE: 455
(REQUIRED)

IS THE OWNER A RELATIVE OF THE TENANT FAMILY? YES [ ] NO [X]

12. Owner's Certifications.

a. The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units. **Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.**

| Address and unit number | Date Rented | Rental Amount |
|---|---|---|
| 1. | | |
| 2. | | |
| 3 | | |

b. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c. Check one of the following:

_____ Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

_____ The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

_____ A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

**13. The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's own responsibility.**

14. The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15. The PHA will arrange for inspection of the unit and will notify the owner and family as to whether or not the unit will be approved

**IMPORTANT NOTICE TO NEW OWNERS/LANDLORDS**

**IF YOU ARE AN OWNER/LANDLORD PARTICIPATING IN THE SECTION 8 RENTAL ASSISTANCE PROGRAM FOR THE FIRST TIME, PLEASE BE ADVISED THAT IN ORDER TO PROCESS THIS REQUEST, WE MUST BE ABLE TO VALIDATE YOUR TAXPAYER IDENTIFICATION AND CERTIFICATION, W-9 FORM, BEFORE POSTING INTO OUR SYSTEM. PLEASE READ THE ATTACHED "IMPORTANT NOTICE TO OWNERS/LANDLORDS".**

| Print or Type Name of Owner or Other Party Authorized to Execute the Lease | | Print or Type Name of Family | |
|---|---|---|---|
| Wasatch Property Management Peppertree Sr. Apartments | | Alesia Young | |
| Signature: [signature] | | Signature (s): [signature] | |
| Business Address: 8956 Harness St Spring Valley CA 91977 | | Present Address of Family (street address, apartment no., city, State, & zip code): 1049 4th Ave #44 ChulaVista CA 91911 | |
| Telephone Number: 619-463-0579 | Date (mm/dd/yyyy): 06/04/2015 | Telephone Number: 770 885-8950 | Date (mm/dd/yyyy): 5-22-15 |
| Print or Type Name of Manager, if applicable: Lori Watrous | Manager's Phone Number: 619-463-0579 | | |

**LANDLORD:** **THE PROPOSED LEASE AGREEMENT MUST BE FOR A TERM OF SIX MONTHS OR LONGER. PLEASE ATTACH A COPY OF THE PROPOSED LEASE AGREEMENT (DO NOT EXECUTE!). IF NO PROPOSED LEASE IS ATTACHED, A COURTESY LEASE WILL BE PREPARED.**

**ADDITIONAL INFORMATION ON THE SECTION 8 PROGRAM, INCLUDING THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT'S PIH 2002-01 (HA) – A NOTICE REGARDING ACCESSIBILITY REQUIREMENTS, IS AVAILABLE ON OUR WEBSITE AT:**

**WWW.CO.SAN-DIEGO.CA.US/SDHCD**

2500805400 P.01/01

TRANSACTION REPC.‿T

JUN/04/2015/THU 02:55 PM

FAX(TX)

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | FILE |
|---|---|---|---|---|---|---|---|
| 001 | JUN/04 | 02:53PM | 18586944871 | 0:01:27 | 7 | MEMORY OK SG3 | 3915 |

* 858-694-4876 phone

Atesia Young A-7

1-858-514-6530 Attn: Lolita Thomas

County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

**IMPORTANT NOTICE TO OWNERS/LANDLORDS**

Dear New Owner/Landlord:

Effective April 2013, it is mandatory that all landlords participating in the Section 8 Housing Choice Voucher Program enroll in direct deposit. In order to process a new participating owner in our system, it is necessary for the Housing Authority of the County of San Diego to have a completed Direct Deposit Authorization Form, W-9 (Request for Tax Payer Identification and Certification) and supporting document(s). Please complete the attached forms correctly and return them to the Housing Authority with your supporting documents in the enclosed envelope. **We will not be able to make a payment until the information is received.**

**INSTRUCTIONS FOR INDIVIDUALS**

- If you own this property as an individual, then enter your name as it appears on your social security card, and enter your social security number in Part I of the Form W-9.
- You **must** provide a copy of your picture ID (a valid Driver's License, State Identification Card or Military Identification Card will suffice) and a copy of your Social Security Card. (If your social security card is not available, please provide another legal document that has your name and social security number.

**INSTRUCTIONS FOR NON-INDIVIDUALS OR SMALL BUSINESS**

- Enter your name and Employer Identification Number, as it appears on your Form SS-4 in Part I of the Form W-9.
- You **must** provide a copy of Form SS-4 provided to you by the Internal Revenue Service (IRS). If you are unable to locate your Form SS-4, please provide another form provided by the IRS with your Name and Employer Identification Number (EIN).

**The Name must match the TIN in Part I of the W-9 Form**
**(Please comply with the instructions on the W-9).**

The Housing Authority will be mailing your payment according to the information provided. See examples on the backside of these instructions.

*****PLEASE NOTE**

Atesia your; A-7

1-85 -514-6530
Attn: Lolita
Thomas

County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

**IMPORTANT NOTICE TO OWNERS/LANDLORDS**

Dear New Owner/Landlord:

Effective April 2013, it is mandatory that all landlords participating in the Section 8 Housing Choice Voucher Program enroll in direct deposit. In order to process a new participating owner in our system, it is necessary for the Housing Authority of the County of San Diego to have a completed Direct Deposit Authorization Form, W-9 (Request for Tax Payer Identification and Certification) and supporting document(s). Please complete the attached forms correctly and return them to the Housing Authority with your supporting documents in the enclosed envelope. **We will not be able to make a payment until the information is received.**

**INSTRUCTIONS FOR INDIVIDUALS**

- If you own this property as an individual, then enter your name as it appears on your social security card, and enter your social security number in Part I of the Form W-9.
- You **must** provide a copy of your picture ID (a valid Driver's License, State Identification Card or Military Identification Card will suffice) and a copy of your Social Security Card. (If your social security card is not available, please provide another legal document that has your name and social security number.

**INSTRUCTIONS FOR NON-INDIVIDUALS OR SMALL BUSINESS**

- Enter your name and Employer Identification Number, as it appears on your Form SS-4 in Part I of the Form W-9.
- You **must** provide a copy of Form SS-4 provided to you by the Internal Revenue Service (IRS). If you are unable to locate your Form SS-4, please provide another form provided by the IRS with your Name and Employer Identification Number (EIN).

**The Name must match the TIN in Part I of the W-9 Form**
**(Please comply with the instructions on the W-9).**

The Housing Authority will be mailing your payment according to the information provided. See examples on the backside of these instructions.

*****PLEASE NOTE**

***If the information under Name and Taxpayer Identification Number does not match the records held by the IRS, the Housing Authority is required to withhold 31% of the payment and forward this amount to the IRS.*** The Housing Authority will not be able to refund this payment at a later date. You must contact the IRS for a refund of this payment or claim it as tax withheld when you file your income tax

Form **W-9**
(Rev. October 2007)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

Give form to the requester. Do not send to the IRS.

Name (as shown on your income tax return)
Peppertree Apartment Holdings, LP

Business name, if different from above
Peppertree Senior Apartments

Check appropriate box: ☐ Individual/Sole proprietor ☐ Corporation ☑ Partnership
☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ P
☐ Other (see instructions) ▶
☐ Exempt payee

Address (number, street, and apt. or suite no.)
595 South Riverwoods Parkway, Suite 400

Requester's name and address (optional)

City, state, and ZIP code
Logan, UT 84321

List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number
90 | 0912595

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

Sign Here | Signature of U.S. person ▶ [signature] Date ▶ 6/4/15

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

- The U.S. owner of a disregarded entity and not the entity,

# Request for Tenancy Approval
## Housing Choice Voucher Program

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 4/30/2014)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

Eligible families submit this information to the Public Housing Authority (PHA) when applying for housing assistance under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The PHA uses the information to determine if the family is eligible, if the unit is eligible, and if the lease complies with program and statutory requirements. Responses are required to obtain a benefit from the Federal Government. The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency (PHA) | 2. Address of Unit (street address, apartment number, city, State & zip code) |
|---|---|
| HOUSING AUTHORITY OF THE COUNTY OF SAN DIEGO<br>3989 RUFFIN RD, SAN DIEGO CA 92123-1890 FAX: (858) 694-8706 | 8956 Harness St # A-7<br>Spring Valley, Ca 91977 |

| 3. Requested Beginning Date of Lease | 4. Number of Bedrooms | 5. Year Constructed | 6. Proposed Rent | 7. Security Deposit Amount | 8. Date unit available for inspection |
|---|---|---|---|---|---|
| 6/10/15 | 1 | 1985 | 1007 | 300 | 6/10/15 |

9. Type of House/Apartment

[X] Single Family Detached [ ] Semi-Detached / Row House [ ] Manufactured Home [ ] Garden / Walkup [ ] Elevator/High-Rise

10. If this unit is subsidized, indicate type of subsidy:

[ ] Section 202 [ ] Section 221(d)(3)(BMIR) [ ] Section 236 (Insured or noninsured) [ ] Section 515 Rural Development

[ ] Home [X] Tax Credit [ ] Other (Describe Other Subsidy, Including Any State or Local Subsidy) ____________

11. Utilities and Appliances

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | Provided by | Paid by |
|---|---|---|---|
| Heating | [ ] Natural gas [ ] Bottle gas [X] Oil or Electric [ ] Coal or Other | | T |
| Cooking | [ ] Natural gas [ ] Bottle gas [X] Oil or Electric [ ] Coal or Other | | T |
| Water Heating | [X] Natural gas [ ] Bottle gas [ ] Oil or Electric [ ] Coal or Other | | O |
| Other Electric | | | T |
| Water | | | O |
| Sewer | | | O |
| Trash Collection | | | O |
| Air Conditioning | | | T |
| Refrigerator | | | |
| Range/Microwave | | | |
| Other (specify) | | | |

SQUARE FOOTAGE: 455
(REQUIRED)

IS THE OWNER A RELATIVE OF THE TENANT FAMILY? YES [ ] NO [✓]

12. Owner's Certifications.

a. The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units. **Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.**

| Address and unit number | Date Rented | Rental Amount |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

b. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c. Check one of the following:

_____ Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

_____ The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

_____ A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

13. **The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's own responsibility.**

14. The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15. The PHA will arrange for inspection of the unit and will notify the owner and family as to whether or not the unit will be approved.

**IMPORTANT NOTICE TO NEW OWNERS/LANDLORDS**

**IF YOU ARE AN OWNER/LANDLORD PARTICIPATING IN THE SECTION 8 RENTAL ASSISTANCE PROGRAM FOR THE FIRST TIME, PLEASE BE ADVISED THAT IN ORDER TO PROCESS THIS REQUEST, WE MUST BE ABLE TO VALIDATE YOUR TAXPAYER IDENTIFICATION AND CERTIFICATION, W-9 FORM, BEFORE POSTING INTO OUR SYSTEM. PLEASE READ THE ATTACHED "IMPORTANT NOTICE TO OWNERS/LANDLORDS".**

| Print or Type Name of Owner or Other Party Authorized to Execute the Lease | | Print or Type Name of Family | |
|---|---|---|---|
| Wasatch Property Management Peppertree Sr. Apartments | | Alesia Young | |
| Signature: Watrous | | Signature (s): Alesia Young | |
| Business Address: 8956 Harness St Spring Valley CA 91977 | | Present Address of Family (street address, apartment no., city, State, & zip code): 1049 4th Ave #44 ChulaVista CA 91911 | |
| Telephone Number: 619-463-0579 | Date (mm/dd/yyyy): 06/04/2015 | Telephone Number: 770 885-8950 | Date (mm/dd/yyyy): 5-22-15 |
| Print or Type Name of Manager, if applicable: Lori Watrous | Manager's Phone Number: 619-463-0579 | | |

**LANDLORD:** **THE PROPOSED LEASE AGREEMENT MUST BE FOR A TERM OF SIX MONTHS OR LONGER. PLEASE ATTACH A COPY OF THE PROPOSED LEASE AGREEMENT (DO NOT EXECUTE!). IF NO PROPOSED LEASE IS ATTACHED, A COURTESY LEASE WILL BE PREPARED.**

**ADDITIONAL INFORMATION ON THE SECTION 8 PROGRAM, INCLUDING THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT'S PIH 2002-01 (HA) – A NOTICE REGARDING ACCESSIBILITY REQUIREMENTS, IS AVAILABLE ON OUR WEBSITE AT:**

**WWW.CO.SAN-DIEGO.CA.US/SDHCD**



County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

# RENT REASONABLENESS CERTIFICATION

OWNER: Wasatch Property Management TENANT: Alesia Young

ADDRESS OF PROPOSED RENTAL UNIT: 8956 Harness St #A-4 Spring Valley

NUMBER OF BEDROOMS 1 NUMBER OF BATHROOMS 1 SQUARE FOOTAGE 455

Section 8 Program Regulations require contract rents be comparable to rents charged by the owner for other comparable unassisted rental units, and rents charged for similar units in the local community.

To ensure rent reasonableness, the Housing Authority **requires** at least 3 comparisons for like units in the area.

**ALL SUBSIDIZED RENTAL UNITS REQUIRE COMPARABLES IF THE SUBSIDIZED UNIT IS AN APARTMENT COMPLEX, ONE COMPARABLE MUST BE FOR AN UNASSISTED UNIT IN THE COMPLEX.**

Name of Complex/Owner: Spring Villa Apt's

Address of Comparable Unit: 8760 Jamacha Rd Spring Valley

Complex/Owner Phone Number: 619.752.3652 Current Rent: $1074

Number of Bedrooms 1X1 2X1 Number of Bathrooms 1/2 Square Footage 495-645

---

Name of Complex/Owner: Casa De Helix

Address of Comparable Unit: 3903 Conrad Dr. Spring Valley

Complex/Owner Phone Number: 619.752.3652 Current Rent: $1150 - $1595

Number of Bedrooms 1-3 Number of Bathrooms 1-2 Square Footage

---

Name of Complex/Owner: Hidden Meadows

Address of Comparable Unit: 1624 Canyon Rd Spring Valley

Complex/Owner Phone Number: 619.828-0213 Current Rent: $850 - $950

Number of Bedrooms 1-2 Number of Bathrooms 1 Square Footage

**I CERTIFY THAT THE RENT I AM REQUESTING FOR MY SECTION 8 RENTAL UNIT DOES NOT EXCEED RENTS BEING CHARGED FOR COMPARABLE UNASSISTED UNITS.**

Owner/Manager's Signature: D Watrins Date: 6/4/15

HOUSING REPRESENTATIVE: ____________________

RA 074 (11/2013)



# County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

## UNIT INFORMATION

**Dear Owner/Manager, please complete the following information regarding your rental unit:**

Address of Unit: 8956 Harness St Spring Valley

Assessor's parcel number: A-7 Age of Unit: 1985 (30 yrs)

Number of Bedrooms: 1 Number of Baths: 1 Square Footage of Unit: 440

Quality of Unit and Complex: ☐ Below Standard ☐ Standard ☒ Above Standard **TOTAL RENT $** 1007.00

| INCLUDED IN RENT | YES |
|---|---|
| MAINTENANCE SERVICES | ☑ |
| HOUSING SERVICES | ☐ |
| GAS | ☐ |
| ELECTRICITY | ☐ |
| WATER | ☑ |
| SEWER | ☑ |
| TRASH COLLECTION | ☑ |
| HOT WATER HEATING | ☐ |
| STOVE | ☑ |
| REFRIGERATOR | ☑ |
| AIR CONDITIONING SYSTEM | ☑ |
| COST OF AIR CONDITIONING | ☐ |
| POOL/JACUZZI | ☐ |
| LAUNDRY FACILITIES | ☑ |
| PLAYGROUND | ☐ |
| PARKING AREA/GARAGE | ☑ |
| RECREATION ROOM | ☑ |
| SECURITY GATES | ☑ |
| CABLE TV | ☐ |

**GAS OR ELECTRIC UTILITIES**

| | GAS | ELECTRIC |
|---|---|---|
| STOVE | ☐ | ☑ |
| HEAT | ☐ | ☑ |
| HEATING OF WATER | ☑ | ☐ |

**TYPE OF UNIT:**

- ☐ SINGLE FAMILY DETACHED HOUSE
- ☒ SEMI DETACHED (DUPLEX/TRIPLEX)
- ☐ ROWHOUSE/TOWNHOUSE (TWO STORY)
- ☐ LOW RISE/HIGH RISE (APARTMENT)
- ☐ MANUFACTURED HOME (MOBILEHOME)

Landlord's Signature: [signature] Date: 6/4/15

- Initial Lease Assisted Unit Information



# County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, owners must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. In addition, tenants/lessors must receive a federally approved pamphlet on lead-poisoning prevention.*

**Owner or Owner's Agent Disclosure**

Presence of lead-based paint and/or lead-based paint hazards (check below):

__________ **Yes.** Known lead-based paint and/or lead-based paint hazards are present in the housing. (Explain.)____________________

__X__ **No.** Owner has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

Records and reports available to the owner (check below):

__________ **Yes.** Owner has provided the tenant with all available records and reports pertaining to lead-based paint and /or lead based paint hazards in the housing. List documents.

__X__ **No.** Owner has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Tenant/Lessee's Acknowledgement (initial)**

__[initials]__ Tenant has received copies of all information listed above.

__[initials]__ Tenant has received the pamphlet *Protect Your Family from Lead in Your Home.*

**Owner/Agent's Acknowledgement (initial)**

__[initials]__ Owner/agent has informed the tenant of any knowledge of lead-based paint or lead-based paint hazards in the housing, and will comply with the regulations.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

[signature] *Owner/Lessor or Agent*

[signature] *Tenant/Lessee*

HQS 030 (11/2013)

Form **W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 2.

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:
☐ Individual/sole proprietor ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ►

☐ Exempt payee

☐ Other (see instructions) ►

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

**Part I** **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

**Social security number**
☐☐☐ – ☐☐ – ☐☐☐☐

**Employer identification number**
☐☐ – ☐☐☐☐☐☐☐

**Part II** **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and
3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here** | **Signature of U.S. person ►** | **Date ►**

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien,
- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,
- An estate (other than a foreign estate), or
- A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

**Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/disregarded entity name" line.

## Exempt Payee

If you are exempt from backup withholding, enter your name as described above and check the appropriate box for your status, then check the "Exempt payee" box in the line following the "Business name/disregarded entity name," sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following payees are exempt from backup withholding:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 9 |
| Broker transactions | Exempt payees 1 through 5 and 7 through 13. Also, C corporations. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, below, and items 4 and 5 on page 4 indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see *Exempt Payee* on page 3.

**Signature requirements.** Complete the certification as indicated in items 1 through 3, below, and items 4 and 5 on page 4.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.



TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

# DIRECT DEPOSIT AUTHORIZATION FORM

- Complete the **FINANCIAL INSTITUTION AND BUSINESS DATA** portions of this form.
- Send the form **AND AN IMPRINTED, VOIDED CHECK (*blank or handwritten checks cannot be accepted if Checking Account is selected)** to: **Housing Authority of the County of San Diego, Attn: Fiscal, 3989 Ruffin Road, San Diego, CA 92123.** The Housing Authority Fiscal staff will contact you if they have any questions. If you have any questions, please call the Housing Authority Fiscal staff at (858) 694-4862. (Fax number: (858) 694-4845).

I hereby authorize the Housing Authority of the County of San Diego, to initiate deposits and/or correcting entries to previous deposits to my account, if necessary.

## FINANCIAL INSTITUTION DATA

**PLEASE SELECT ONE:**

________Checking Account* ________Savings Account

Transit Routing No.________________ Transit Routing No.________________

Account No.________________ Account No.________________

Financial Institution Representative ________________ Financial Institution Telephone Number ________________

Financial Institution ________________ Financial Institution Address ________________

This authority will remain in force until I have given a written revocation to the Housing Authority of the County of San Diego, in a timeframe that will allow the Housing Authority of the County of San Diego, and the depository a reasonable opportunity to terminate this authorization.

## LANDLORD/OWNER DATA

**Landlord/Owner E-mail Address** ________________

Landlord/Owner Name ________________ Social Security or Tax Identification Number ________________

Landlord/Owner Address ________________ Landlord/Owner Telephone Number ________________

Signature ________________ Date ________________

RA 040 (11/2013)

*Serving as the Housing Authority of the County of San Diego*



TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

# JURISDICTION

When you are looking for a place to live it is important to know if the community or neighborhood that you are considering is in the jurisdiction of the Housing Authority of the County of San Diego.

These are the communities that are within our jurisdiction:

| | | | |
|---|---|---|---|
| Alpine | El Cajon | ✓Lincoln Acres | Solana Beach |
| ✓Bonita | ✓Escondido | Pala | ✓ Spring Valley |
| Bonsall | Fallbrook | Pauma Valley | Tecate |
| Borrego Springs | Guatay | Pine Valley | Valley Center |
| Boulevard | Imperial Beach✓ | Potrero | ✓Vista |
| ✓Chula Vista | Jamul | Poway | Warner Springs |
| Coronado | Julian | Ramona | Unincorporated |
| ✓Del Mar | Lakeside | San Marcos | |
| Descanso | La Mesa ✓ | Santa Ysabel | |
| Dulzura | Lemon Grove ✓ | Santee | |

Subject to certain restrictions and our approval, you may choose to live in a community or city other than those in our jurisdiction using the "portability feature" of the Section 8 Rental Assistance program.

If you are considering a location that is not in our jurisdiction contact your Housing Representative for information about the jurisdiction. **See list on back of this page.**

IMPORTANT: If you request to re-locate to another jurisdiction, your case will be transferred to the agency responsible for the location you have chosen. Transferring to another jurisdiction may delay the start of your rental assistance benefits due to the additional processing time required.

RA 058 (11/2013)



TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

**IMPORTANT NOTICE REGARDING**

# CRIMINAL HISTORY

Effective September 23, 1998, whenever a participant is transferring their assistance from one unit to another, the Housing Authority will conduct a criminal history check for all family members, 18 years of age and older. No transfer inspection will be conducted until this verification is done.

Adults added to a Section 8 household will have a criminal history check conducted. No adult can move into a subsidized unit until the Housing Authority has completed the eligibility verification and authorized the person to be added.

Remember, the San Diego County Housing Authority has a zero tolerance for fraud, criminal or drug related criminal activity. Fraud includes an attempt at fraud, intentional deceit, or bribery as it relates to any public monies, including the Section 8 Housing Program, California Works Opportunities and Responsibilities for Kids (Cal-Works), and Food Stamps.

The Housing Authority may elect to terminate assistance for possession and/or use of a controlled substance by any family member or guest. The manufacture, sale, or distribution, or the possession with intent to manufacture, sell, or distribute a controlled substance is strictly prohibited by any family member or guest.

Violence of any kind is strictly prohibited. There will be no tolerance for the use of physical force, or the threatened use of force, against any individual inside or outside the residence. This includes assault, battery, child abuse, domestic violence, murder, or any other kind of violence against another person or their property.

The Housing Authority will also deny participation in the program in cases where it is determined there is reasonable cause to believe that the person abuses alcohol in a way that may interfere with the health, safety or right to peaceful occupancy by other residents. This includes cases where the Housing Authority determines that there is a *pattern* of alcohol abuse.

*PR 002 (11/2013)*



# County of San Diego

TODD HENDERSON
DIRECTOR

DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT
3989 RUFFIN ROAD, SAN DIEGO, CALIFORNIA 92123-1815
Phone: 858-694-4801; Fax: 858-694-4871; TDD: 866-945-2207
Toll Free: 1-877-478-5478; Web Address: sdhcd.org

KELLY DUFFEK
ASSISTANT DIRECTOR

## INSPECTION CHECKLIST

It is necessary for the unit where you plan to receive rental assistance to pass a Housing Quality Standards (HQS) inspection before payments will be made. The unit will also need to pass inspection each year for rental assistance payments to continue. A failed inspection will delay the start of payments or endanger the continuation of payments.

The Housing Authority **will inspect** the following ten (10) areas for housing Quality Standards' (HQS) compliance:

- ☐ Living Room
- ☐ Kitchen
- ☐ Bathroom(s)
- ☐ Other Rooms Used for Living
- ☐ Secondary Rooms
- ☐ Building Exterior
- ☐ Heating and Plumbing
- ☐ General Health and Safety
- ☐ Garage
- ☐ Outbuildings

## CHECK THESE CONDITIONS TO MAKE SURE YOUR UNIT WILL BE READY TO PASS INSPECTION

- ☐ All major utilities (electricity, gas, or water) must be turned on.
- ☐ The cooking stove and oven must be clean and in working condition. All burner control knobs must be present.*
- ☐ The refrigerator must be clean and in working condition. Good door seals.
- ☐ The heating unit must be properly installed and vented and otherwise in good working order. Check with SDG&E to ensure the safety of the heating system. **The heater must be operational at the time of each inspection.**
- ☐ You must have hot and cold running water in the kitchen and bathroom(s).
- ☐ There must be a shower or bathtub that is in good working condition.
- ☐ There must be a flush toilet that works and does not leak.
- ☐ The bathroom must have a window or working ventilation fan.
- ☐ There must be no plumbing leaks or plugged drains.*
- ☐ All accessible outside doors and windows must have working locks.
- ☐ Unit must have at least one exit door without a double-keyed deadbolt lock.
- ☐ All electrical outlets must have cover plates that are not cracked or broken. **All three-prong outlets must be grounded or GFCI protected.**
- ☐ There must be no missing, broken or badly cracked windows/window panes.
- ☐ The roof must not leak.
- ☐ The hot water tank for your unit must have a pressure relief valve and downward discharge pipe. **To be inspected annually. Make sure to arrange access.**
- ☐ The carpet or linoleum must not have holes, tears, or loose seams.
- ☐ Stairs and railings, inside and out, must be secure. A stairway of four or more stairs requires a railing.
- ☐ There can be no mice, rats, or insect infestation.
- ☐ There MUST be a properly operating smoke detector on every level of the unit.
- ☐ There must be no cracking, chipping, scaling, or loose paint anywhere inside or outside of the unit, especially if a child under the age of six resides or is expected to reside in the unit.
- ☐ There must be no excessive debris in or around the unit, such as an accumulation of boxes, paper, trash, wood, tires, machine or auto parts, batteries, paint cans, or old appliances. Derelict vehicles must be removed from the premises.
- ☐ Security bars in ALL bedrooms must have a quick release device.

***ALL ITEMS MUST BE REMOVED FROM THE OVEN AND UNDER KITCHEN AND BATHROOM SINKS SO PIPES CAN BE THOROUGHLY INSPECTED!**

**IMPORTANT SAFETY ISSUE: PLEASE SECURE ALL PETS DURING THE INSPECTION.**

HQS 004 (11/2013)

# Move-In Inspection

**Year:** 2015

PST000134

#1985

# MOVE-IN AND MOVE-OUT INSPECTION CHECKLIST

| Resident's Name: Alesia Young | | | Property Name: Peppertree Apartment Holding, LP | |
|---|---|---|---|---|
| Address: 8956 Harness Street, # A-7 | | City: Spring Valley | State: CA | Zip: 91977 |
| Move In Date: 06/17/2015 | Date of Notice | Rent Paid Through | Move Out Date | |

**ANY QUESTION WHICH MAY LATER ARISE CONCERNING THE CONTENT OR THE CONDITION OF THE PREMISES SHALL BE RESOLVED BY REFERRING TO THIS MOVE-IN AND MOVE-OUT CHECKLIST. PLEASE READ AND COMPLETE IT WITH CARE.**

| **1. Kitchen** | SATISFACTORY: **YES NO** If NO, Please Specify: | SATISFACTORY: **YES NO** If NO, Please Specify: |
|---|---|---|
| Cabinets | New, | |
| Floors | brand new | |
| Walls/Doors | | |
| Sink/Countertops | | |
| Disposal | | |
| Dishwasher | n/a | |
| Range/Oven | New | |
| Microwave | | |
| Refrigerator | | |
| Light Fixtures | | |
| Window/Screens | | |
| Other | | |
| **2. Living/Dining** | SATISFACTORY: **YES NO** If NO, Please Specify: | SATISFACTORY: **YES NO** If NO, Please Specify: |
| Doors | | |
| Walls/Ceiling | New | |
| Carpeting | | |
| Windows/Screens | | |
| Blinds/Drapes | New | |
| Closet(s) | | |
| Light fixtures | | |
| Other | | |
| **3. Bedrooms** | SATISFACTORY: **YES NO** If NO, Please Specify: | SATISFACTORY: **YES NO** If NO, Please Specify: |
| Doors | | |
| Walls/Ceiling | New | |
| Carpeting | | |
| Windows/Screens | | |
| Blinds/Drapes | | |
| Closet(s) | | |
| Light Fixtures | | |
| Other | | |
| **4. Bathrooms** | SATISFACTORY: **YES NO** If NO, Please Specify: | SATISFACTORY: **YES NO** If NO, Please Specify: |
| Doors/Walls | baseboard corner of | |
| Windows/Screens | wall - chipped | |
| Closet(s)/Cabinets | | |
| Toilet | | |
| Sink(s) | | |
| Tub/Shower | | |
| Towel Bars | | |
| Medicine Cabinet | | |
| Light Fixtures | | |
| Floors | | |
| Other | | |

✓



| 5. Outside | SATISFACTORY: YES NO If NO, Please Specify: | SATISFACTORY: YES NO If NO, Please Specify: |
|---|---|---|
| Entryway | | |
| Patio/Balcony | | |
| Storage Closet | | |
| Light Fixtures | | |
| Other | | |
| **6. General** | SATISFACTORY: YES NO If NO, Please Specify: | SATISFACTORY: YES NO If NO, Please Specify: |
| Washer/Dryer | | |
| TV Adapter(s) | | |
| HVAC/Heating | | |
| Fire Extinguisher(s) | | |
| Alarm System | | |
| Ceiling Fan(s) | | |
| Other | | |
| **7. Keys/Remotes/ Access Cards** | SATISFACTORY: YES NO If NO, Please Specify: | SATISFACTORY: YES NO If NO, Please Specify: |
| Apartment Key(s) | 2 | |
| Mailbox key(s) | 1 | |
| Common Area Key(s) | | |
| Gate/Garage Remotes | | |
| Laundry Cards | | |

THE RESIDENT ACCEPTS THE PREMISES WITH THE CONTENTS AND IN THE CONDITION AS LISTED ON THIS FORM AT THE TIME OF MOVE-IN. THE RESIDENT ASSUMES RESPONSIBILITY FOR SURRENDERING THE PREMISES TO THE OWNER WITH THE CONTENTS AND IN THE SAME CONDITION AS LISTED ON THIS FORM AT THE TIME OF MOVE-OUT.

**SERVICE REQUESTS GENERATED AT THE TIME OF MOVE IN**

| DESCRIPTION OF REPAIR NEEDED | Completed Date/Tech Name | |
|---|---|---|
| Needs New Screen Door | | |
| Per Move In! | | |
| (Fire Dept ~~kick~~ had to | | |
| Enter) | | |
| | | |
| | | |
| | | |
| | | |

**Permission to Enter?** ~~Yes~~ (circled) **NO** **Initials** ____

**MOVE-IN INSPECTION ACKNOWLEDGEMENT**

Was your apartment walked with you at Move In by a Wasatch Team Member? Yes __ No __ Initials____

[signature] 6-17-15
RESIDENT DATE

[signature] 6/17/15
OWNER/AGENT DATE

**MOVE-OUT INSPECTION ACKNOWLEDGEMENT**

Was your apartment walked with you at Move Out by a Wasatch Team Member? Yes __ No __ Initials____

RESIDENT DATE

OWNER/AGENT DATE

SM303–Revised 04/14/2015

WASATCH
PROPERTY MANAGEMENT

# WASATCH PROPERTY MANAGEMENT

## QUALITY HOME SIGN OFF

THINK LIKE A CUSTOMER.

Apt. #: A-7 EMPLOYEE NAME: Lan W DATE/TIME 6/10/15

**ENTRY**
✓ EXTERIOR VIEW? ENTRY AREA?
✓ FRONT DOOR/SECURITY/SCREEN
✓ DOOR LOCK
DOOR JAM
— SMELLS/ODORS?

**GENERAL**
✓ AIR CONDITIONER CLOSET/SIDE/TOP/BEHIND
✓ A/C HEAT EXCHANGER/FILTER/DRAIN
— WATER HEATER – AREA/CONDITION/BEHIND/TOP
— W/HEATER CONNECTIONS/DRAIN/PRESSURE VALVE
✓ STORAGE/DOOR/WALLS/CEILING/LIGHT
✓ STAIRS/RAILS

**LIVING ROOM/DINING ROOM** (Brand New)
✓ DOORS
✓ BEHIND
✓ CORNERS
✓ UP/DOWN AROUND
✓ WALLS
✓ LIGHTS/COVERS
✓ CARPET
✓ BASEBOARDS
— CEILING FAN
— BLADES CLEAN
— BLADES TIGHT?
— LIGHT
✓ SWITCHES/OUTLETS/COVERS

✓ WINDOWS
✓ TRACKS
SILLS
— PATIO DOOR
— TRACK/CORNRS
— SCREENS
✓ BLINDS
✓ CLEAN
✓ SLIDE OK?
✓ VENTS
✓ AIR RETURNS
CLOSET/SHLF
(Brand New)

**KITCHEN**
✓ CABINETS
✓ DRAWERS
✓ SHELVES
✓ COUNTER TOPS
✓ EDGES
✓ DOORS
✓ WALLS
✓ CORNERS
✓ CEILING
✓ BASEBOARDS
✓ FLOORING
✓ EDGES
— DAMAGE?

**REFRIDGERATOR**
✓ INSIDE
✓ UNDER
✓ TOP
✓ GASKET TOP
BOTTOM

**DISHWASHER** (N/A)
INSIDE/OUT
GASKET
WORKING?

**STOVE**
✓ TOP
✓ SIDES
✓ UNDER
✓ EDGES
✓ BURNERS
DRIP PANS

**HOOD**
✓ FILTER
✓ LIGHT
✓ IN/UNDER
FAN

**OVEN**
✓ DOOR EDGES
✓ UNDER TOP
✓ DRAWER

**MICROWAVE** (N/A)
INSIDE/TOP
FILTERS/UNDER
LIGHT
FAN
WORKING?

**SINK**
✓ DISPOSAL
✓ FAUCET
✓ AERATOR EMPTY
✓ EMPTY/CLEAN
INSTALL/EDGES

**KITCHEN LIGHT**
✓ COVER
✓ SWITCHES
✓ RECEPTICLES

LAUNDRY n/a

**BATHROOM #1** (Brand New)
✓ CABINETS
✓ DRAWERS
✓ DOORS
✓ VANITY TOPS
✓ SHELVES
✓ MEDICINE CAB
✓ MIRRORS
✓ SHELVES
✓ VENT FAN
COVER

✓ SINK
✓ FAUCET
— CHIPS
✓ STOPPER
✓ OVER FLOW
✓ TOILET
✓ TANK/TOP
✓ TUB
✓ SURROUND
✓ TOP

✓ DOOR
✓ WALLS
✓ CORNERS
✓ BASEBOARD
✓ CEILING
✓ LIGHTS
✓ COVERS
✓ SWITCHES
✓ OUTLETS
✓ LINEN CLOSET

✓ FLOORING
✓ EDGES
✓ CORNERS
— DAMAGE
✓ CLEAN?
✓ CAULK
✓ T BAR
✓ TP HOLDE

**BATHROOM #2**

**BEDROOM #1**
✓ DOOR
✓ WALLS
✓ CORNERS
✓ CEILING
✓ BASEBOARDS
— PATIO DOOR
— TRACKS
✓ WINDOWS
✓ TRACKS
✓ W/SILLS

— FAN
— BLADES CLEAN
— BLADES TIGHT
✓ LIGHT
✓ SW/OUTLETS
✓ BLINDS
✓ CLEAN
✓ SLIDE OK?
✓ CARPET – Brand New
✓ CLOSET/LITE/SHELF

**BEDROOM #2**

**BEDROOM #3**

✓

COMMENTS

Sales Amenities: Brand new Carpet & more In!

Leasing agent review

# Correspondence

PST000138

 Wasatch Property Management

**1st Notice of Annual Recertification**

Date: February 15, 2016

**Alesia Young**
**8956 Harness Street, # A-7**
**Spring Valley, CA 91977**

***Re: Annual Recertification***

Dear Alesia Young :

It's that time for the year for your Annual Recertification! We have enclosed a Renewal Tenant Questionnaire for your convenience.

The following form provided will need to be completed and returned to the business office within **3 business days**. Please ensure you have provided the appropriate contact information such as address, phone number(s), and contact person for income verification purposes. To help us process your recertification, you must bring the following information (*if applies to your household*) to your interview:

* Please provide any changes in income/student status from previous year
* Completed Questionnaire

Please stop by during business hours or call to make arrangements to schedule an appointment for an interview. We'll be happy to make time to talk with you.

Thank you for your cooperation.

Sincerely

Peppertree Apartment Holding, LP
Wasatch Property Management, Managing Agent

# N ICE TO ENTER DWELLING . IIT
# (cc: 1954)

**TO:** Alesia Young
and Any/All Other Occupants

ALL TENANTS, SUBTENANTS, AND ALL OTHERS IN POSSESSION of the premises located at 8956 Harness Street, # A-7, Spring Valley, CA 91977.

Pursuant to California Civil Code Section 1954, and pursuant to the terms of your lease, Section XI, Inspection by Owner and pursuant to the terms and conditions of the Additional Services Agreement, Paragraph 11: Right of Lessor to inspect property, Owner/Agent hereby gives notice to the **Resident(s)/Occupant(s) living at Peppertree Apartment Holding, LP located at 8956 Harness Street, # A-7, Spring Valley, CA 91977.**

Owner, Owner's Agent or Owner's employee(s) will enter said premises on 2/9/16 during normal business hours 9:00 am - 5:00 pm for the reason set forth in the checked item(s) below:

X 1. To do necessary repairs to your apartment.

___ 2. To do necessary or agreed decorating.

___ 3. To verify Resident has vacated the premises.

___ 4. To supply necessary or agreed services.

___ 5. To exhibit the rental unit to prospective or actual purchasers.

___ 6. To exhibit the rental unit to prospective mortgagees.

___ 7. To exhibit the rental unit to prospective tenants.

___ 8. To exhibit the rental unit to workmen or contractors

___ 9. Pursuant to Court Order

___ 10. To inspect waterbed or other liquid-filled furniture

___ 11. To test smoke detector

___ 12. Other: Pre-Annual Bond/Tax Credit Inspection

Please note that if you have changed your locks and have not provided us with a key, you must provide the owner/owner's agent with a duplicate key before this inspection is to take place or you will be charged a $25 lock replacement fee.

DATED: 2/8/2016 [signature]

WASATCH

11-12-15

* Old Job:

TO Housing Representative: Brenda Soto

I stop working at Wells Family Daycare center on Oct 23, 2015

1413 Trailwood ave Chula Vista CA 91913

*Phone 619 482-0360

New Job → * On Oct 26, 2015 I Started a new Job at Lisas Lil Tikes Preschool

I worked 7 hours a day make 11.00 dollars an hour.

4351 Parks Avenue
La Mesa CA 91941

Lisa Danie
619 460-6432

Thank You
Alesia Young
[signature]

## September 2015

Alesia Young (A-7) came into my office a few weeks ago regarding her lease. She asked what it would take to break her lease? I went over the Early Termination options, with her.

First and foremost a 30 day notice is required in writing.

Art this time she would need to choose which option she would like and pay according?

A. Early termination fee equal to one month's rent.
B. Paying through the end of the lease term/rented and occupied by future tenant.

She asked if I would ref to my supervisor to see if she would be able to get out of her lease without paying anything. I advised I would forward to my supervisor. However, it is very unlikely, that it could be waived.

She then brought in a note from her lawyer stating that she needs to move back to GA due to a pending Personal Injury Claim I again advised her would not get her out of her lease. She wanted it forwarded to my supervisor. I again forwarded this to Roxanne.

I spoke with her again today 9/21/2015 she said she does not have the lease cancellation fee. I referred her again to the lease. She asked if I would rent hers out first. I told her No. That is not how it works and there are no guarantees. That with her 30 day notice she would need chose which open to pay. She asked if we had a property in GA. I said no we do not.

G Watkins
9/21/15

## Peppertree manager

**From:** Peppertree manager
**Sent:** Thursday, September 24, 2015 12:16 PM
**To:** Roxanne Gallardo
**Subject:** RE: A-7 Young

Roxanne,
Okay. Robert spoke with her this morning, regarding the door, already. He said he would work on getting it replaced. That he needs another person to assist him.

Lori Watrous
Community Manager
Peppertree Apartments
619-463-0579

---

**From:** Roxanne Gallardo
**Sent:** Thursday, September 24, 2015 10:26 AM
**To:** Peppertree manager
**Cc:** Roxanne Gallardo
**Subject:** RE: A-7 Young

Lori,
Ms. Young called me back and said she won't be able to make it today as she gets off of work at 4pm. I explained her options again and she seemed to understand, she asked if we could just waive the fees and I said no. She said she is going to stay till her lease is up than. I did remind her that if she was to move she still has to give a 30 day written notice.

She did mention that her door hasn't been fixed yet?? I told her I would call you and we would look into it.

Call me

*Roxanne Gallardo SHCM*
*Regional Manager*
*Wasatch Property Management*
*760-494-1387*
*760-602-9681 (fax)*
*rgallardo@netwasatch.com*

---

**From:** Roxanne Gallardo
**Sent:** Thursday, September 24, 2015 10:43 AM
**To:** Peppertree manager
**Cc:** Roxanne Gallardo
**Subject:** RE: A-7 Young

Lori,

I called Ms. Young back and left a message. I told her I was going to be in the area around 2 and we could just all meet in the office so there is no confusion. I told her to call me back and let me know.

*Roxanne Gallardo SHCM*
*Regional Manager*
*Wasatch Property Management*
*760-494-1387*
*760-602-9681 (fax)*
*rgallardo@netwasatch.com*

---

**From:** Peppertree manager
**Sent:** Thursday, September 24, 2015 9:55 AM
**To:** Roxanne Gallardo
**Subject:** A-7 Young

Roxanne,
Alicia Young came in my office today. She explained to me what options you gave her. I went over it as well. I reiterated that there is not guarantee. That she would be responsible until it was re-re-rented and a new tenant moves in..
Also, I explained it would be $1007 per month.
She is not understanding it. She said what I am saying and you are saying are two different options.
She is contacting you so she can get it in writing. I advised that it is all in her lease, broken down.
I explained to her I want us to be on the same page and for her to understand completely.

I also told her the 2nd floor is harder to rent that the first floors.
I don't want her to be surprised when she ends up paying full rent .

She said there must be another way to get out of her lease. I again gave her the options. I explained she is in a contract with us and that yes she can break her lease with the options we gave her(as in her lease).
She is trying any angel to get out of paying anything.

Thanks
Lori Watrous
Community Manager
Peppertree Apartments
619-463-0579

LAW OFFICE OF
MICHELLE R. CLARK, L.L.C.
ATTORNEYS & COUNSELORS AT LAW
125 EAGLES LANDING PARKWAY # 122-B
STOCKBRIDGE, GEORGIA 30281

September 2, 2015

To Whom It May Concern:

Re: Ms. Alesia Young

[illegible] writing this letter at the request of my client, Ms. Alesia Young. [illegible] has a pending Personal Injury claim with my firm in Georgia and we expect [illegible] hearings in the next coming months. Our client would be expected to travel [illegible] meetings, depositions and court dates which would be most unfortunate, [illegible]. I trust this will assist in your decision to release my client's obligations to you. If you [illegible] any questions or concerns, please do not hesitate to contact our office at (770) [illegible]

Kind Regards,

Michelle R. Clark

**TICE OF ACCOUNT BALANCE**

8/5/2015

Alesia Young
8956 Harness Street, # A-7
Spring Valley, CA 91977

Dear **Alesia Young**:

*While reviewing our records, it has come to our attention that there is currently a balance owing on your account. Our records reflect a balance of* **$0.96**, *which is explained below:*

Housing Assistance Charge $0.96 Rent

*This balance may have been an oversight, or perhaps an error. If you feel that you do not owe this amount, please stop by the Rental Center and speak with our Financial Manager at your earliest convenience with any records you may have, so that together we may reconcile your account.*
*Otherwise, please pay this amount immediately to avoid any additional charges.*

*Should you have any questions or need any additional information, please do not hesitate to contact us by phone or come into the Financial Office personally, Monday - Friday, from 9:00 am - 5:00 pm.*

*Thank you for your prompt attention to this matter.*

Sincerely,

[signature]
Financial manager
**Peppertree Apartment Holding, LP**

Rent $390
Pet Rent $40.00
Renters Insurance $18.16
HAP - $617.00 recv'd - / recv'd $438 from you
$1055.96

10109824

EC102.01 - Revised 04/29/2014



FAMILY HEALTH CENTERS
OF SAN DIEGO

FAMILY HEALTH CENTERS OF SAN DIEGO
823 Gateway Center Way, San Diego, CA 92102
Tel 619-515-2300 • Fax 619-237-1856 • www.FHCSD.org

---

Date: 10/19/2015

Patient: Alesia Gay Young

DOB: 12/30/1959

To Whom It May Concern:

Ms. Young is my patient. This letter is to inform you that her dog is a companion/service animal . Without her dog she has anxiety about her personal safety in her neighborhood. Please accommodate this need.

Thank you.

Sincerely,

Adrianna Dangremond, MD

## Unit #A-7 Simmons

Katie Dao
**Sent:** Thursday, June 26, 2014 4:09 PM
**To:** Roxanne Gallardo; Peppertree Office
**Attachments:** Carlsbad_Scanner@netwasatc~1.pdf (478 KB)

Can you please contact the resident to come into the office to print their pension statement from the web?

Thanks, Katie

**Date : 6/22/2015**

# Resident Ledger

| | | | | | |
|---|---|---|---|---|---|
| Code | t0109824 | Property | pst | Lease From | 6/17/2015 |
| Name | Alesia Young | Unit | A-7 | Lease To | 6/16/2016 |
| Address | 4th Ave | Status | Applicant | Move In | 6/17/2015 |
| | Apt 44 | Rent | 880 | Move Out | |
| City St. Zip | Chula Vista, CA 91911 | Phone(O)- | | Phone(H)- | |

| Date | Description | Charge | Payment | Balance | Chg/Rec |
|---|---|---|---|---|---|
| 5/28/2015 | Application Fee | 40.00 | | 40.00 | 12736281 |
| 5/28/2015 | Deposit Amount | 650.00 | | 690.00 | 12736282 |
| 5/28/2015 | chk# PSID67166877 | | 100.00 | 590.00 | 7803934 |
| 5/28/2015 | chk# PSID67166878 | | 40.00 | 550.00 | 7803935 |
| 6/17/2015 | chk# PSID68693248-90 Terminal PSID 68693248 - CHECK21 | | 760.00 | (210.00) | 7825361 |

(1)

# Peppertree New Move-In Eff. 6/17/15: Unit #A-7/ Young- final

Megan Clegg on behalf of Compliance Department

**Sent:** Tuesday, June 23, 2015 9:54 AM
**To:** Peppertree Office
**Cc:** Debi Baker; Compliance Department

Approved.

Thank you,

WASATCH

**Megan Clegg**
Compliance Specialist, SHCM | mclegg@netwasatch.com
1000 Aviara Parkway,Suite 220 Carlsbad, CA 92011
T: 760-494-1378| F: 760-683-6858

# Move In - June 17 2015

Peppertree manager

**Sent:** Wednesday, June 17, 2015 11:09 AM
**To:** young.alesia@yahoo.com
**Attachments:** Peppertree_Scanner@netwasa~1.pdf (51 KB)

Alesia,
Congratulations! Welcome to Peppertree :)

Here is a breakdown of the Total Due at Move in:

Total Contract Rent: $1007
Housing Assistant payment: $617.00
Tenant Portion: $390
Pet Rent: $40

Pro-rated Rent from 6/17-6/30 $182.00
Pro-rated Pet rent from 6/17-6/30 $28.00
Deposit - $300
Security Deposit -$100 $200.00
Pet Deposit $350.00

TOTAL MOVE-IN FOR JUNE

$760.00 (Due in cashiers check or money order at the time of Move-In.

We strongly recommend that you carry Renter's Insurance. We can add it along with your rent for $18.16 month.

Please contact SDG&E. The phone number is on the attachment. I will need the account number at move in.

Your address appears on the top of the Move In sheet. :)

If you have any question or concerns, please contact me.

See you soon!

Lori Watrous

Community Manager

Peppertree Senior Apartments

Wasatch Premier Communities

619 463-0579

ps.manager@netwasatch.com

---

From: Peppertree_Scanner@netwasatch.com [Peppertree_Scanner@netwasatch.com]
Sent: Wednesday, June 17, 2015 11:11 AM
To: Peppertree manager
Subject: Scanned image from Wasatch Property - Pepper Tree Apts

Reply to: Peppertree_Scanner@netwasatch.com <Peppertree_Scanner@netwasatch.com>
Device Name: Wasatch Property - Pepper Tree Apts
Device Model: MX-B402SC
Location: 8956 Harness St, Spring Valley, 91977

File Format: PDF MMR(G4)
Resolution: 200dpi x 200dpi

Attached file is scanned image in PDF format.

Use Acrobat(R)Reader(R) or Adobe(R)Reader(R) of Adobe Systems Incorporated to view the document.
Adobe(R)Reader(R) can be downloaded from the following URL:
Adobe, the Adobe logo, Acrobat, the Adobe PDF logo, and Reader are registered trademarks or trademarks of Adobe Systems Incorporated in the United States and other countries.

http://cp.mcafee.com/d/2DRPoO738QcCQm6m7T6hPXVKVJeX3zbVEVKCUrjK-DtYsUU-rjKMUC-qerFzzqdXLFICzBxV4SJjBtxF7UwE6CdFIX4-ndwQNJdDoDOVLtc88LfLZvxP3bavnKnjpojV5ZZZ5XBHFShhlKUzOEuvkzaT0QSvrhdTVeZXTLuZXCXCM0mEl8vO-6RLmm-cU_UHiSMxYqk3j6QStvvbCNP5TTzoNroqZ0Qqi1QzVEwtzlkQq0bJdDoCq80J6GTNCmd4lsQq1rPBLyq80j7_d40wJexJZwSEXJ

Valid Money Order includes: 1. Heat sensitive, red stop sign AND 2. Contains a True Watermark hold up to light to view.

MoneyGram.

INTERNATIONAL MONEY ORDER 75-1616/910

MONEY ORDER NUMBER R10678167749 7

CALL 1-800-542-3590 TO VERIFY

To Validate: Touch the stop sign, then watch it fade and reappear

106781677
MONEY ORDER

PAY TO THE ORDER OF:/ PAGAR A LA ORDEN DE: Peppertree Apartments

IMPORTANT - SEE BACK BEFORE CASHING

PAY EXACTLY $760.00

SEVEN HUNDRED SIXTY DOLLARS 00 CENTS

PURCHASER, SIGNER FOR DRAWER / COMPRADOR, FIRMA DEL LIBRADOR

PURCHASER, BY SIGNING YOU AGREE TO THE SERVICE CHARGE AND OTHER TERMS ON THE REVERSE SIDE

ADDRESS:/ DIRECCIÓN: 8956 Haines St APT 7A

Payable Through Citizens Alliance Bank Clara City, MN

ISSUER/DRAWER: MONEYGRAM PAYMENT SYSTEMS, INC.

96553710333000
2723241168155749

⑆091916187⑆ 1067 8167749 7⑈ 90

# FEDERAL COURT PROOF OF SERVICE

USA-Terry v Wasatch Property Management, et al.
Case No. 2:15-cv-00799-KJM-DB

STATE OF CALIFORNIA, COUNTY OF SACRAMENTO

At the time of service, I was over 18 years of age and not a party to the action. My business address is 2020 West El Camino Avenue, Suite 700, Sacramento, CA 95833. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On October 20, 2023, I served the following document(s):

- DECLARATION OF RYAN MATTHEWS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE REMEDIES

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒ (BY COURT'S CM/ECF SYSTEM) Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the persons listed above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on October 20, 2023, at Sacramento, California.

*/s/ Alicia Crespo*
Alicia Crespo

**SERVICE LIST**
***USA-Terry v Wasatch Property Management, et al.***
**Case No. 2:15-cv-00799-KJM-DB**

| | |
|---|---|
| Andrew Wolff<br>Law Office of Andrew Wolff, PC<br>1956 Webster Street, Suite 275<br>Oakland, CA 94612 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 834-3300<br>Email: andrew@awolfflaw.com |
| Jesse Newmark<br>CENTRO LEGAL DE LA RAZA<br>3022 International Blvd., Suite 410<br>Oakland, CA 94601 | ***Attorney for Plaintiffs***<br>***Denika Terry and Roy Huskey, III***<br><br>Tel.: (510) 437-1554 x115<br>Fax: (510) 437-9164<br>Email: jessenewmark@centrolegal.org |
| Laura L. Ho<br>Anne Bellows<br>Stephanie Tilden<br>GOLDSTEIN, BORGEN, DARDARIAN & HO<br>155 Grand Avenue, Suite 900<br>Oakland, CA 94612 | ***Attorneys for Plaintiffs and Relators and the Certified Classes***<br><br>Tel: (510) 763-9800<br>Fax: (510) 835-1417<br>Email: lho@gbdhlegal.com<br>Email: abellows@gbdhlegal.com<br>Email: stilden@gbdhlegal.com<br>Email: sgrimes@gbdhlegal.com<br>Email: dvaldez@gbdhlegal.com |
| Colleen M. Kennedy<br>United States Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, CA 95814 | ***Attorney for Intervenor Plaintiff United States of America***<br><br>Tel.: 916-554-2700<br>Fax: 916-554-2900<br>E: colleen.m.kennedy@usdoj.gov<br>E: caseview.ecf@usdoj.gov<br>E: kimberly.siegfried@usdoj.gov<br>E: monica.lee@usdoj.gov<br>E: usacae.ecfsaccv@usdoj.gov |
| Jocelyn D. Larkin<br>Lindsay Nako<br>The Impact Fund<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704 | ***Attorney for Plaintiffs***<br><br>Tel: (510) 845-3473 x.306<br>Fax: (510) 845-3654<br>Email: jlarkin@impactfund.org<br>Email: lnako@impactfund.org |
| Jahmy Graham<br>Nelson Mullins<br>19191 South Vermont Avenue, Suite 900<br>Torrance, CA 90502 | ***Attorneys for Defendant, Hayward Village Apartments LP***<br><br>T: 424-221-7426<br>F: 424-221-7499<br>E: jahmy.graham@nelsonmullins.com |

LEWIS BRISBOIS BISGAARD & SMITH LLP ATTORNEYS AT LAW

131014307.1

2

DECLARATION OF RYAN MATTHEWS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE REMEDIES