1
Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
2
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
3
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
4
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
5
Tel: (510) 763-9800 | (Fax) (510) 835-1417

6
Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
7
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
8
Oakland, CA 94612
Tel: (510) 834-3300 | (Fax) (510) 834-3377

9
Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
10
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
11
Oakland, CA 94601
Telephone: (510) 437-1863 | (Fax) (510) 437-9164
12

13
Lindsay Nako (SBN 239090)
lnako@impactfund.org
Lori Rifkin (SBN 244081)
14
lrifkin@impactfund.org
Fawn Rajbhandari-Korr (SBN 315888)
15
fkorr@impactfund.org
Meredith Dixon (SBN 346864)
16
mdixon@impactfund.org
IMPACT FUND
17
2080 Addison Street, Suite 5
Berkeley, CA 94704
18
Tel: (510) 845-3473 | Fax: (510) 845-3654

19
Attorneys for Plaintiffs and Relators and the Certified Classes
*[Additional Counsel for Relators listed on following page]*

20
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
21
**SACRAMENTO DIVISION**

22
UNITED STATES OF AMERICA, *ex rel.*
23
DENIKA TERRY, ROY HUSKEY III, and
TAMERA LIVINGSTON, and each of them for
24
themselves individually, and for all other persons
similarly situated and on behalf of the UNITED
25
STATES OF AMERICA

26
        Plaintiffs/Relators,

27
vs.

28
WASATCH ADVANTAGE GROUP, LLC,
WASATCH PROPERTY MANAGEMENT, INC.,

Case No.: 2:15-CV-00799-KJM-DB

CLASS ACTION

**AMENDED JOINT PRETRIAL**
**STATEMENT FOR PHASE I TRIAL**

Date:    March 29, 2024
Time:    10:00 a.m.
Dept:    Courtroom 3, 15th Floor
Before:  Hon. Chief Judge Kimberly J. Mueller

Trial Date:    None Set

| | |
|---|---|
| 1 | WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, |
| 2 | LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK |
| 3 | HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON |
| 4 | APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA PLACE |
| 5 | APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB HOLDINGS, |
| 6 | LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC, CREEKSIDE HOLDINGS, |
| 7 | LTD, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK |
| 8 | VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT |
| 9 | HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, |
| 10 | POINT NATOMAS APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY |
| 11 | APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, |
| 12 | LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC, WASATCH |
| 13 | PREMIER PROPERTIES, LLC, WASATCH POOL HOLDINGS III, LLC, |
| 14 | and DOES 1-4, |
| 15 |          Defendants. |

Lawrence Anthony Organ (SBN 175503)
larry@civilrightsca.com
CALIFORNIA CIVIL RIGHTS LAW GROUP
332 San Anselmo Avenue,
San Anselmo, CA 94960-2610
Tel: 415-453-4740 | Fax: 415-785-7352

Attorneys for Relators

1    This Amended Joint Pretrial Statement is submitted pursuant to Local Rule 281 for the Phase 1

2    trial[1] by the undersigned counsel. Because a group of Defendants represented by recently substituted-

3    in counsel contest both the status of certain other Defendants and the Bifurcation Order that governs

4    the scope of the Phase 1 trial, the Parties begin this Amended Joint Pretrial Statement with preliminary

5    statements that state their position on these issues.

6    **Plaintiffs' Preliminary Statement:**

7    On the eve of trial, after years of active litigation, the Defendants represented by Arnall Golden

8    & Gregory (collectively referred to by Plaintiffs as "WAG Defendants"[2]) seek to reopen long-settled

9    orders and propose numerous untimely and meritless motions in an apparent bid to delay the trial.

10    Plaintiffs strongly oppose *any* delay to trial as contrary to the goal of securing "the just, speedy, and

11    inexpensive determination" of the action.  *See* Fed R. Civ. P. 1.  Plaintiffs respectfully request that the

12    Court set trial within the period contemplated in its standing order, *i.e.*, starting between May 28 and

13    July 27, 2024.

14

15

16    [1] This Court has bifurcated the case for discovery and trial.  *See* Order Grant'g Leave File Fifth Am. Compl., Bifurcating Case for Disc. & Tr. ("Bifurcation Order") 5-6, ECF No. 135.  The case is currently in Phase I, which addresses WPM's liability under the False Claims Act, whether WPM's acts give rise to liability on the class claims, and the amount of damages and restitution under both the False Claims Act and the class claims.  *Id.* at 5.  Phase 2 will begin when Phase 1 proceedings are complete and shall address "the liability of any and all Defendant entities for the Class Claims based on alter ego liability, the single enterprise doctrine, agency principles, and Defendants' receipt of a benefit from the unlawful charges; any vicarious liability attributable to other Defendants named as to the False Claims Act claim; and penalties and treble damages under the False Claims Act."  *Id.* at 6, ECF No. 135.  The Court has already resolved liability and damages for the Class's contract claims.  *See* Order Grant'g Pls.' Mot. for Partial Summ. J. re Remedies ("Summ. J. Re Remedies Order"), ECF No. 352.

**Owner and Non-Owner Defendants' statement:** As set forth in Section 13 below, Owner and Non-Owner Defendants intend to bring a motion to set aside/modify the Bifurcation Order.

[2] "WAG Defendants" include Wasatch Advantage Group, LLC, Wasatch Premier Properties, LLC, Wasatch Pool Holdings, LLC, Wasatch Pool Holdings III, LLC, Aspen Park Holdings, LLC, Bent Tree Apartments, LLC, California Place Apartments, LLC, Camelot Lakes Holdings, LLC, Canyon Club Holdings, LLC, Chesapeake Apartment Holdings, LLC, Courtyard at Central Park Apartments, LLC, Creekside Holdings, LTD, River Oaks Holdings, LLC, Heritage Park Apartments, LP, Peppertree Apartment Holdings, LP, Shadow Way Apartments, LP, and Wasatch Quail Run GP, LLC. While these Defendants refer to themselves as "Owner and Non-Owner Defendants," Plaintiffs believe that term is misleading. The group does not include all of the Defendants that directly own or owned properties, nor all of the "non-owner" Defendants. Rather, this group is limited to Defendants that are associated with Wasatch Advantage Group.  For this reason, Plaintiffs refer to the group as "WAG Defendants."

1

894819.5

Two threshold issues that WAG Defendants believe the Court must address at the Final Pretrial Conference are the status of certain Defendants represented by Lewis Brisbois and the propriety of the Bifurcation Order.  Both issues are meritless distractions.

*Status of Certain WPM Defendants.* [3]  WAG Defendants continue to assert that eight Defendants are unrepresented corporate entities.  This assertion is baseless, as set out in Plaintiffs-Relators' Response to Owner Defendants' Notice of Unrepresented Corporate Entities (ECF No. 370).  Each Defendant was served, and each filed responsive pleadings through their counsel at Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois").  *See id.* & record citations therein; L.R. 182(a)(2) (appearance as attorney of record may be made by "signing and filing an initial document").  None raised a defense based on insufficient service of process.  *See* Fed. R. Civ. P. 12(b)(5), (h)(1). Plaintiffs can provide additional information regarding service for any or all Defendants at the Court's request.

Notably, the upcoming trial will not adjudicate the liability of *any* of these Defendants.  Only two of the entities about which WAG Defendants express concern are named as to the False Claims Act Claim: Logan Park Apartments, LLC, and Logan Park Apartments, LP.  *See* Sixth Am. Compl. ¶¶ 231-245,  ECF No. 331.  Those two entities have been Defendants in this case since 2016, represented by Lewis Brisbois throughout.  *See* Answer, ECF No. 27; Designation of Counsel for Service, ECF No. 91; Answer to Sixth Amended Compl., ECF No. 333.  There are no remaining issues in Phase 1 relevant to the other six entities, who are named Defendants only as to the class claims. Plaintiffs do not seek any injunctive relief against them as they are no longer associated with the Wasatch Group.

 Neither WAG Defendants nor their counsel represent these eight entities.  Instead, they appear to be attempting to create a basis for additional delay by raising unfounded allegations that other entities are unrepresented.  The Court should disregard this gamesmanship and set the trial within the period contemplated by its standing order.

---

[3] "WPM Defendants" include Wasatch Property Management, Logan Park Apartments, LLC, Logan Park Apartments, LP, Bellwood Jerron Holdings, LLC, Oak Valley Apartments, LLC, Piedmont Apartments, LP, Point Natomas Apartments, LLC, Sun Valley Holdings, LP, and Spring Villa Apartments.

WPM Defendants suggest only that they "may" file a Motion to Withdraw, acknowledging their continuing representation of the other entities.  That ownership of some of the Defendants may have changed hands during the course of the litigation does not alter the reality that those Defendants remain represented by their retained counsel and bound by their actions until the point that they take the necessary steps to terminate that relationship.  Again, each Defendant was served or waived service and each freely chose to appear in and litigate this case until the eve of trial through Lewis Brisbois.

*Bifurcation Order.*  WAG Defendants also ask the Court to delay setting trial to allow them to move to set aside the Bifurcation Order, although each of them expressly agreed to that Order through prior counsel. The three WAG Defendants named as to the False Claims Act claim—Wasatch Advantage Group, Wasatch Pool Holdings, and Chesapeake Apartment Holdings LLC—negotiated and stipulated to the present bifurcation of the case in 2021.  *See* Stip. and Order Grant'g Leave to File Fifth Am. Compl., Bifurcate the Case for Disc. And Tr., and Vacating Case Deadlines ("Bifurcation Order") ECF No. 135.  All WAG Defendants subsequently confirmed their consent to the bifurcation of the class claims.  *See* ECF No. 220 at 6 ("The extent of each Defendant's vicarious liability for [WPM's] conduct can be manageably tried in Phase 2").  Defendants decisively waived any objections to the Bifurcation Order first by expressly agreeing to it and then by waiting nearly three years after its entry, and until the eve of the Phase 1 trial, to raise any objections.  Because WAG Defendants have waived the issue, the Court should deny them leave to file their proposed motion to set aside the bifurcation order.

WAG Defendants attempt to escape the consequences of their reasonable strategic decision to bifurcate the case by vague and unsupported claims that their counsel was conflicted.  These claims are unsubstantiated; WAG Defendants have failed to identify any actual conflict presented by Phase 1 proceedings.[4]  *See* ECF No. 350 at 2-4.  Moreover, WAG Defendants freely chose Lewis Brisbois as

---

[4] WAG Defendants' assertion that their interests fundamentally diverge from those of Wasatch Property Management is undercut by the reality that their counsel represents multiple entities associated with the Wasatch family of companies.  The notices of substitution for the original 11 entities to retain AGG are all signed by Dell Loy Hansen, who is described on Wasatch's website as the "Founder and Chief Executive Officer of the Wasatch Group."  *See* https://www.wasatchgroup.com/our-founder/ (last accessed March 15, 2024); Notices of Substitution 337-348.  The same website lists Wasatch Property Management as a "division" of the Wasatch Group.  *See* https://www.wasatchgroup.com/divisions/ (last accessed March 15, 2024).

their "representative in the action, and [they] cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962).

Even in the absence of WAG Defendants' agreement, bifurcation would have been proper (and remains proper) in this case for all the reasons set out in the Bifurcation Order.  *See* ECF No. 135 at 3-5 (noting that bifurcation "allows early resolution of the merits issue at the center of the case" and defers potentially time consuming "discovery and litigation regarding alter ego or agency liability and related issues;" bifurcation "will serve both the convenience of the Parties and judicial economy" and preserves all Parties' federal jury rights.")  Now, years after that order, when discovery, dispositive motion briefing, and trial preparation have all taken place under its auspices, it would prejudice Plaintiffs and waste Court resources to delay the Phase 1 trial to reconsider that order.  Plaintiffs further address the propriety of the Bifurcation Order in Section 7 below.

**WPM Defendants' Preliminary Statement**

Counsel for WPM Defendants is in the process of evaluating the factual basis for the Owner and Non-Owner Defendants' Notice of Unrepresented Parties. Multiple transactions related to the ownership of the various entities and properties have been conducted during the pendency of this litigation, and counsel is still working to determine whether and to what extent these transactions impact whether each of these entities has been represented, as well as whether they have given consent to such representation. Beyond that, as previously represented to the Court, Defendants have identified a potential conflict, and that conflict may be a basis for a duly noticed Motion to Withdraw as Counsel, to be filed by Lewis Brisbois Bisgaard & Smith LLP. Counsel will supplement this statement prior to the Final Pretrial Conference once it has ascertained the status of each of these entities.

Separately, while Wasatch Property Management, Inc. does not separately assert many of the issues raised by the Owner and Non-Owner Defendants as defined below, it does join and support the various requests, legal contentions, and motions raised by those Defendants.

**Owner and Non-Owner Defendants' Statement**

Defendants Wasatch Advantage Group, LLC, Wasatch Premier Properties, LLC, Wasatch Pool Holdings, LLC, Wasatch Pool Holdings III, LLC ("Non-Owner Defendants")[5], Aspen Park Holdings, LLC, Bent Tree Apartments, LLC, California Place Apartments, LLC, Camelot Lakes Holdings, LLC, Canyon Club Holdings, LLC, Chesapeake Apartment Holdings, LLC[6], Courtyard at Central Park Apartments, LLC, Creekside Holdings, LTD, River Oaks Holdings, LLC, Heritage Park Apartments, LP, Peppertree Apartment Holdings, LP, Shadow Way Apartments, LP, and Wasatch Quail Run GP, LLC ("Owner Defendants"). These Defendants collectively refer to themselves as "Owner and Non-Owner Defendants," and to no avail they have asked Plaintiffs' counsel to not refer to these separate entities collectively as the "WAG Defendants." Plaintiffs apparently insist on using this term as a coy way of suggesting a single enterprise that does not exist.

Throughout this Joint Pretrial Statement, Owner and Non-Owner Defendants have stated, and Plaintiffs dispute that:

(1)     There is a conflict of interests between Defendant WPM and the other named defendants in the Sixth Amended Complaint.

(2)     As a result of the conflict of interests between Defendant WPM and the other defendants, it was necessary for the other defendants to retain separate counsel, (which the Non Owner and Non-Owner Defendants have done).

---

[5] **Owner and Non-Owner Defendants' statement:** Non-Owner Defendants are defendants that do not own real property nor are defined as "owner" under 42 U.S.C. §1437f(f) and 982 CFR §982.4, own units in other business entities, do not exist as business entities because they were dissolved as a matter of state law, or own no real or personal property at all.

[6] **Owner and Non-Owner Defendants' statement:** Chesapeake Apartment Holdings, LLC, a Utah limited liability company, is a named defendant in connection with Plaintiffs' Sixth Amended Complaint.  Chesapeake Commons Holdings, LLC, a Utah limited liability company, is reflected as defendant in Plaintiff's Complaint through the Fifth Amended Complaint, filed on April 14, 2021. Defendant Chesapeake Commons Holdings, LLC's counsel is unclear as to the impact of the change in Defendants before the Court. Accordingly, any reference herein to either or both Defendants Chesapeake Commons Holdings, LLC and Chesapeake Apartment Holdings, LLC includes reference to both entities for all purposes herein.

894819.5

(3)     Because there was a conflict of interests between Defendant WPM and the other defendants, questions arise as to whether the other defendants have, in fact, been represented by counsel in this litigation.

(4)     In addition to the conflict of interests that has existed between Defendant WPM and the other defendants, some of the properties and entities named in this lawsuit were sold, either before the Original Complaint was filed or on various dates since the Original Complaint was filed.

(5)     From the dates on which those certain properties and entities were sold, those properties and entities – except for Hayward Senior Apartments, L.P. – have not been represented in this litigation, nor have they ever entered into any engagement with counsel to represent them in this litigation.

The issues raised by these facts affect the litigation in this case and cannot be refuted by Plaintiffs' mere denials that they exist. Rather than address these questions in every instance in which they come up in this Joint Pretrial Statement, Defendants present this introductory statement as a general demurrer to Plaintiffs' responses to these issues.

Plaintiffs and the Owner and Non-Owner Defendants dispute the legal representation of the following eight corporate entity defendants:

(1)     Logan Park Apartments, LLC,

(2)     Logan Park Apartments, LP,

(3)     Bellwood Jerron Holdings, LLC,

(4)     Oak Valley Apartments, LLC,

(5)     Piedmont Apartments, LP,

(6)     Point Natomas Apartments, LLC,

(7)     Sun Valley Holdings, LP, and

(8)     Spring Villa Apartments.

Counsel for Owner and Non-Owner Defendants filed a Notice of Unrepresented Corporate Entities (ECF 368), and Plaintiffs filed their Response to Owner Defendants' Notice of Unrepresented Corporate Entities (ECF No. 370). Counsel for the parties have met and conferred multiple times on this issue but cannot reach an agreement as to the status of service of process and legal representation.

6

Counsel have also met and conferred multiple times on the bifurcation of trial and what effect that has on the parties other than Plaintiffs and Defendant WPM, including these eight corporate entity defendants whose legal representation is in dispute. These issues will require the Court's resolution at the final pretrial conference. Owner and Non-Owner Defendants express their positions on these issues though they do not wish to use this joint pretrial statement as a vehicle for back-and-forth argument on these issues. A failure to address each point raised on these issues in this joint pretrial statement does not waive their right to raise new and additional arguments on these issues.

Counsel for Owner and Non-Owner Defendants filed their Notice of Unrepresented Corporate Entities (E.D. CA L.R. 183(a)) to inform the Court that the above eight defendants are not currently represented by Arnall Golden Gregory LLP ("AGG"), and Owner and Non-Owner Defendants believe these eight defendants are currently unrepresented. *See* ECF 368. Accordingly, and consistent with that Notice, several defendants are not a party to this joint stipulation. Defendants Logan Park Apartments, LLC, Bellwood Jerron Holdings, LLC, Oak Valley Apartments, LLC, and Point Natomas Apartments, LLC, which constitute non-owner defendants (as defined in footnote 1), sold their administrative general partner interest and are no longer owned or controlled by any of the Defendants. Further, upon information and belief, certain owner and non-owner defendants have never been served with the Original or any subsequent amendment of the complaint. One property has been sold since the filing of the Original Complaint (Spring Villa Apartments, LP); one property has been the subject of an exchange pursuant to Section 1031 of the Internal Revenue Code and no longer owns real property (Sun Valley Holdings, Ltd.); and one entity was dissolved in 2014, over a year before the original Complaint was filed and owned no real property at the time the original Complaint was filed (Wasatch Quail Run GP, LLC). and the following Owner Defendants – Logan Park Apartments, LP, Bellwood Jerron Apartments, LP, Oak Valley Holdings LP, Piedmont Apartments, LP, Point Natomas Apartments, LP, Spring Villa Apartments LP, and Hayward Senior Apartments, L.P. – underwent some form of a change of ownership during the litigation and have not yet retained independent legal counsel nor retained AGG, with the exception of defendant Hayward Senior Apartments, L.P., who is represented by Jahmy Stanford Graham of Nelson Mullins Riley & Scarborough LLP. Owner and Non-Owner Defendants' counsel further understand, to the best of their knowledge, that Piedmont

1   Apartments, LP is represented by Adam Safer of Goulston & Storrs, P.C., but that Piedmont has not

2   received or accepted service of a summons in this action.

3         Plaintiffs falsely accuse Owner and Non-Owner Defendants of trying to delay trial by raising

4   these issues and they unwisely suggest the Court should just ignore these issues and forge ahead with

5   trial to convenience them despite eight corporate defendants not being represented by counsel. There is

6   no improper purpose or ulterior motive behind raising these issues other than to ensure all defendants

7   are afforded due process and a fair trial with counsel of their choosing.

8   **1.**    **Jurisdiction and Venue**

9         **a.**    **Plaintiffs' Statement**

10        This Court has federal subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs

11  bring this action pursuant to the United States False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.

12  The Court has authority to exercise jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C.

13  § 1367(a).

14        Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because

15  Defendants do business in its jurisdictional area, and some of the alleged unlawful conduct, including

16  the execution of some of the contracts at issue in this action, occurred within its jurisdictional area.

17        WAG Defendants' last-minute challenge to subject matter jurisdiction is entirely without merit.

18  WAG Defendants' sole argument is "Plaintiffs do not have a private right of action to enforce the HAP

19  Contracts."  As this Court has already found, however, class members have valid California contract

20  claims under the tenancy addendum contained in Part C of the HAP Contract.  Summ. J. Order 13,

21  ECF No. 278; 24 C.F.R. § 982.308(f)(2) ("The tenant shall have the right to enforce the tenancy

22  addendum against the owner, and the terms of the tenancy addendum shall prevail over any other

23  provisions of the lease."); HAP Contract Part C, ¶ 2b ("The tenant shall have the right to enforce the

24  tenancy addendum against the owner.").  WAG Defendants fail to cite this subsection which expressly

25  allows the tenant to "exercise any right or remedy against the owner under the lease . . . including

26  enforcement of the owner's obligations under the tenancy addendum," which is set out in Part C of the

27  HAP Contract, but instead cite to the inapplicable section of 24 C.F.R. § 982.456(b)(1).

28

894819.5

1    That parties can bring a breach of contract claim under the tenancy addendum is a correctly

2    decided rule of law that governs in this case, and WAG Defendants cannot relitigate this issue at trial

3    or in their pretrial filings.  *See Pepper v. United States*, 562 U.S. 476, 506 (2011) ("[W]hen a court

4    decides upon a rule of law, that decision should continue to govern the same issues in subsequent

5    stages in the same case.").[7]

6    Subject matter jurisdiction over the class claims is properly based on 28 U.S.C. § 1367(a)'s

7    provision of supplemental jurisdiction over "all other claims that are so related to" the FCA claim "that

8    they form part of the same case or controversy."   Here, all claims share a common nucleus of fact

9    related to Defendants' unlawful excess rent charges.

10        **b.    WPM Defendants' Statement**

11    WPM has not previously raised the arguments set forth by the Owner and Non-Owner

12    Defendants relating to this Court's subject matter jurisdiction. However, to the extent this Court

13    considers those arguments, WPM supports the Owner and Non-Owner Defendants' position.

14        **c.    Owner and Non-Owner Defendants' Statement**

15    The Court does not have subject matter jurisdiction over Plaintiffs' state law claims. The

16    linchpin to Plaintiffs' entire case is that the Additional Service Charges ("ASC") constitute excess rent

17    under the Housing Assistance Payments Contract ("HAP contract"). However, Plaintiffs do not have

18    standing or a private right of action to enforce the HAP contracts.  *See, e.g.*, *Willy v. Coastal Corp.*,

19    503 U.S. 131, 136-137 (1992) (federal courts are courts of limited jurisdiction; they possess only that

20    power authorized by Constitution and statute); *Leeson v. Transamerica Disability Income Plan*, 671

21    F.3d 969, 975 (9th Cir. 2012) ("federal courts have a continuing independent obligation to determine

22    whether subject-matter jurisdiction exists" over a given claim); *Richardson v. United States*, 943 F.2d

23

---

24    [7] None of the cases relied upon by WAG Defendants cast doubt on this holding. Rather, the cases
25    address the distinct and irrelevant question of whether the HAP Contract or HUD regulations create a
      federal private right of action for Section 8 tenants.  *See Hill v. Richardson*, 7 F.3d 656, 658 (7th Cir.
26    1993) ("[Section] 1437f does not create a private right of action."); *Kirby v. Richmond R.edevelopment
      and Hous. Auth.*, No. 3:04cv791, 2005 WL 5864797, *6-7 (E.D. Va. 2005) (no federal private right of
27    action against the housing authority); *Volis v. City of Los Angeles Hous. Auth*, No. CV 13–01397,
      2014 WL 12704885, at *5 (C.D. Cal. 2014) (same); *Reyes-Garay v. Integrand Assur. Co.*, 818
28    F.Supp.2d 414, 432 (D.P.R. 2011) (no federal private right of action against the landlord); *Green v.
      Konover Residential Corp.*, No. 3:95-CV-1984, 1997 WL 736528, at *8 (D. Conn. 1997) (same).

1107, 1113 (9th Cir. 1991) ("Subject matter jurisdiction cannot be conferred upon the courts by the actions of the parties and principles of estoppel and waiver do not apply."); *Janakes v. United States Postal Service*, 768 F.2d 1091 (9th Cir. 1985) ("parties cannot by stipulation or waiver grant or deny federal subject matter jurisdiction"); *Rescue Army v. Municipal Court of City of Los Angeles*, 28 Cal.2d 460, 464 (1946) ("A court has jurisdiction to determine its own jurisdiction, for a basic issue in any case before a tribunal is its power to act, and it must have authority to decide that question in the first instance.").

The express congressional "purpose" of the United States Department of Housing and Urban Development ("HUD") Tenant-Based Assistance Housing Choice Voucher Program ("HCV") is "aiding low-income families in obtaining a decent place to live and … promoting economically mixed housing." 42 U.S.C. § 1437f(a). Congress passed the United States Housing Act of 1937 for purposes of enabling HUD to allocate federal appropriation as Congress directs annually and Public Housing Agencies ("PHAs") to administer the HCV. "Federal courts have consistently held that no private right of action arises under 42 U.S.C. § 1437f, the statute that authorizes housing assistance payments." *Volis v. City of Los Angeles Housing Authority*, 2014 WL 12704885, at *5 (C.D. Cal. 2014); *see also, Hill v. Richardson*, 7 F.3d 656, 658 (7th Cir. 1993) ("[Section] 1437f does not create a private right of action."); *Kirby v. Richmond Redevelopment and Hous. Auth.*, 2005 WL 5864797, *6-7 (E.D. Va. 2005) ("No express private right of action exists in [the Housing Act] or regulations enabling a voucher participant to enforce the provisions."); *Green v. Konover Residential Corp.*, 1997 WL 736528, at *8 (D. Conn. 1997) (finding no private right of action exists under Section 1437 because Congress' intention was that "HUD should enforce the required conditions by asserting its rights under the HAP contracts, thereby foreclosing private enforcement of the requirements under the Housing Act"); *see also, Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 (1st Cir. 2007) ("Regulations alone cannot create private rights of action; the source of the right must be a statute."); *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.").

1    Plaintiffs insist they have standing to assert a private right of action, citing 24 C.F.R.

2    § 982.308(f)(2) and the tenancy addendum, but what Plaintiffs allege in their Sixth Amended

3    Complaint (ECF No. 331 is that Plaintiffs and Defendants "entered into written residential rental

4    agreements" [b]y signing the relevant HAP Contracts, Tenancy Addendums, and standard form rental

5    agreements." Id. at ¶ 247. Plaintiffs further allege that "Defendants breached the terms of [the rental

6    contracts] … by charging Plaintiffs additional rental payments *in violation of the HAP Contracts* …."

7    Id. at ¶ 250, italics added. The Court's order on summary judgment (ECF No. 278), the scope of which

8    is defined by Plaintiffs' breach of contract cause of action as pled in the Sixth Amended Complaint,

9    was based on a determination that "all class members executed valid HAP contracts …, each of which

10   includes a tenancy addendum listing the tenant's rights under the [HAP] contract …" (id. at 13:18-26),

11   and an incorrect legal premise that Plaintiffs have a right to enforce the HAP contracts. Relevant

12   federal regulations "clearly state that tenants do not have a right to enforce [HAP contract] claims

13   against HUD, the PHA or landlord." *Reyes-Garay v. Integrand Assur. Co.*, 818 F.Supp.2d 414, 432

14   (D.P.R. 2011).  Specifically, the regulations expressly provide that a voucher tenant "is not a party to

15   or a third party beneficiary of the HAP contract[,]"; "the family may not exercise any right or remedy

16   against the owner under the HAP contract" [24 CFR 982.456(b)(1)]; and "[t]he HAP contract shall not

17   be construed as creating any right of the family or other third party (other than HUD) to enforce any

18   provision of the HAP contract, or to assert any claim against HUD, the PHA or the owner under the

19   HAP contract."  24 C.F.R. § 982.456(c).

20    Equally important, an HCV tenant cannot use a lease's tenancy addendum to circumvent this

21   legal preclusion of a private right of action to enforce HAP contacts against HUD, the PHA or the

22   landlord.  *See, e.g., Reyes-Garay*, 818 F.Supp.2d at 431-432 (rejecting plaintiffs' argument that 24

23   C.F.R. 982.456(b)(2) and the tenancy addendum allowed tenants to enforce the HAP contracts).

24    Accordingly, federal statutory, regulatory, and case authority are conclusive that Plaintiffs do

25   not have standing or "any" federal or state right of action, private or otherwise, to enforce the HAP

26   contracts against any owner or PHA and, therefore, this Court lacks subject matter jurisdiction in this

27   action.

28

11

2. **Jury and Non-Jury Trial**

    a. **Plaintiffs' and WPM Defendants' Joint Statement**

The Parties have each demanded a jury trial. Sixth Am. Compl., ECF No. 331; Answer to Sixth Am. Compl., ECF No. 333; Wasatch Prop. Mgmt., Inc.'s Answer to Sixth Am. Compl., ECF No. 334. A jury trial is proper on the FCA claim. *Trustees ex rel. N. Cal. Gen. Teamsters Sec. Fund v. Fresno French Bread Bakery, Inc.*, No. 1:12-cv-0187 BAM, 2012 WL 5304765, at *2 (E.D. Cal. Oct. 25, 2012) (citing *Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990)) (describing right to jury trial "where legal rights are at issue").

Plaintiffs' certified class claims for injunctive relief under the California Unfair Competition Law ("UCL") and the California Consumer Legal Remedies Act ("CLRA") are equitable in nature and therefore are to be tried to the Court. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) (equitable issues may be tried to the judge). The Parties propose that the injunctive relief trial, limited to injunctive relief claims against Wasatch Property Management, immediately follow the conclusion of the jury trial on the FCA claim. Any factual issues that are common to both the legal and equitable claims in this case must be heard by the jury and the jury's determinations will be treated as binding. *See Beacon Theater, Inc. v. Westover*, 359 U.S. 500 (1959); *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 170 (9th Cir. 1989).

    b. **Plaintiffs' Additional Statement**

WAG Defendants' "consent" is not required for the Court to conduct the Phase 1 trial pursuant to the Court's scheduling orders and reasonable management of this case. *See generally* Fed. R. Civ. P. 16. All Defendants, including all WAG Defendants, have been duly served, have appeared in the case and defended against Plaintiffs' claims through counsel, and have long been on notice of the upcoming trial. *See* ECF No. 370 & record citations therein. The Court should therefore set this case for trial at the earliest available trial date without further delay.

Any motion by WAG Defendants to set aside or modify the Bifurcation Order is without merit. As set out in Plaintiffs' Preliminary Statement, each of the WAG Defendants consented to the current bifurcation as to all claims. Their due process rights are not jeopardized by the reasonable strategic decision they made to do so. Plaintiffs address the propriety of bifurcation further in Section 7, *infra*.

Contrary to WAG Defendants' claim, they have had years to develop and review the evidence and court record in this matter.  They are simply substituting counsel on the eve of trial.

Plaintiffs propose that any motion regarding the Bifurcation Order be filed and briefed along with the motions in limine, under the schedule that Plaintiffs propose in Section 5, *infra.*

### c.    Owner and Non-Owner Defendants' Statement

As set forth in Section 13 below, Owner and Non-Owner Defendants intend to bring a motion to set aside/modify the Bifurcation Order.  Certain owner defendants have not been served, have not entered an appearance, nor are they represented by counsel in this action.  Owner and Non-Owner Defendants are unable to consent to the order and conduct of trial as set forth in this report, and specifically to bifurcation of trial that deprives Owner and Non-Owner Defendants of their due process rights, until they and their newly substituted counsel have had adequate time to review the evidence and court record in this matter.[8]

### 3.    Undisputed Facts

### a.    Plaintiffs' Statement

There are numerous undisputed facts already established by Defendants' responses to Plaintiffs' statements of material fact in connection with the three dispositive motions ruled on by this Court.  *See* Defs.' Response to Plaintiffs' Statement of Undisputed Material Facts, ECF No. 258-1; Defs.' Response to Plaintiffs' Statement of Disputed Facts, ECF No. 263-4; Defs.' Opp. to Plaintiffs' Statement of Undisputed Material Facts re Remedies, ECF No. 326-1.  Based on those undisputed facts and other discovery materials, Plaintiffs have proposed the fact stipulations set out in **Exhibit A** hereto.  Plaintiffs provided the vast majority of these proposals to Defendants on October 23, 2023, and provided 8 additional proposed stipulated facts to Defendants on January 25, 2024.

---

[8] Owner and Non-Owner Defendants have explained in their introduction, and in section 3.c. below, that the conflict of interest between Owner and Non-Owner Defendants and Defendant WPM has existed throughout this litigation, but was not disclosed until after the bifurcation order, stipulations, and statements of facts were entered into by the Plaintiffs and WPM. Because of this conflict of interest, Owner and Non-Owner Defendants have effectively been unrepresented throughout this litigation and specifically lack privity with the stipulations agreed to by counsel for Defendant WPM. Though Plaintiffs dispute this legal conclusion, Owner and Non-Owner Defendants' motion to set aside the Bifurcation Order has merit and should be heard by the Court before setting trial.

13

1     Contrary to WAG Defendants' suggestion below, they have been represented and party to all

2  fact stipulations and statements of undisputed facts in this litigation.  *See* ECF Nos. 258-1,  263-4, and

3  326-1 (all filed on behalf of all Defendants).  WAG Defendants' substitution of counsel on the eve of

4  trial has no impact on their prior statements.  *See* ECF No. 350.  Nor do their vague and unsupported

5  claims of conflict allow them to somehow undo their earlier litigation decisions made through prior

6  retained counsel—even if their new counsel now view some of those litigation decisions as unwise.

7  *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993) ("clients must

8  be held accountable for the acts and omissions of their attorneys" as "[a]ny other notion would be

9  wholly inconsistent with our system of representative litigation.'") (citation omitted).  Moreover, the

10  allegation of conflict is without basis: WAG Defendants have not identified *any* specific conflict of

11  interest affecting *any aspect* of the Phase 1 proceedings, much less one affecting their admissions or

12  stipulations as to undisputed facts.[9]

13       **b.    Owner and Non-Owner Defendants' Statement**

14     The conflict of interest between Owner and Non-Owner Defendants and Defendant WPM has

15  existed throughout this litigation, but was not disclosed until after the bifurcation order, stipulations,

16  and statements of facts were entered into by the Plaintiffs and WPM. Because of this conflict of

17  interest, Owner and Non-Owner Defendants have effectively been unrepresented throughout this

18  litigation. Where, as here, there was a lack of privity, Plaintiffs' claims that Owner and Non-Owner

19  Defendants knowingly entered into and should be bound by stipulations agreed to by counsel for

20  Defendant WPM violate due process. Owner and Non-Owner Defendants note further that any

21  stipulations to which they are not in privity are not binding as to them, and that any stipulations that

22  impair their substantive rights require their express consent, which consent they have not given to any

23  attorney in this action. *See Assocs. Disc. Corp. v. Goldman,* 524 F.2d 1051, 1053 (3d Cir. 1975); *Sur.*

24  *Ins. Co. of California v. Williams,* 729 F.2d 581, 583 (8th Cir. 1984).

25

26  [9] As Plaintiffs have previously explained, the issues before the Court in Phase 1 of the litigation raise no conflict of interest between Wasatch Property Management and other Defendants.  *See* Pls.' Opp.
27  to Selected Defs' *Ex Parte* Application for 90-Day Continuance of Pretrial Deadlines 2-3 ECF No. 230.  The sole purported conflict mentioned by WAG Defendants in their *ex parte* application
28  concerned an issue squarely reserved for Phase 2 of the litigation, *i.e.*, which Defendants are liable to the class for the breach of contract damages.  *See* ECF No. 349 at 8.

Therefore, Owner and Non-Owner Defendants are unable to stipulate to the 70 statements fact and law proposed by Plaintiffs. Although their newly substituted counsel have been working diligently to get up to speed on the case, resolve the ownership interests in the case, and prepare the required filings, they still have not had adequate time to review the evidence and court record in this matter, which includes 27 depositions, and more than 11 terabytes of documents have been produced and are stored on three separate external hard drives. One of the hard drives alone contains more than three million pages of documents. Additionally, tens of thousands of pages of lease documents, HAP Contracts, additional services agreements, and other rental-related documents from numerous properties have been produced but Owner and Non-Owner Defendants have not had access to that discovery. Further, Owner and Non-Owner Defendants understand that Plaintiffs' were provided with extensive discovery from Defendant WPM's Yardi System, which contained essentially every piece of data retained on tenants. The numerous different data pulls from Yardi are available on a server being maintained by a jointly retained independent Yardi consultant, GelbGroup. This action also consists of hundreds of docket entries, numerous written discovery requests and responses, and expert reports.

**4.      Disputed Facts**

      **a.      False Claims Act (Jury)**

            **i.      Plaintiffs' and WPM Defendants' Statement**

Plaintiffs contend that Defendant Wasatch Property Management ("WPM") violated the FCA by knowingly submitting false or fraudulent claims for U.S. Government funds.[10] WPM certified in its

---

[10] The Phase 1 trial on the False Claims Act claim solely concerns WPM's liability. ECF No. 135 at 5. The liability of any other Defendants for WPM's conduct is reserved for Phase 2. *See id.* at 6.

**Owner and Non-Owner Defendants' statement:** Owner and Non-Owner Defendants are concerned that, as the case has developed, the bifurcation of the case without allowing them to participate in the liability determination jeopardizes their due process rights. The Bifurcation Order is premised upon a stipulation that compromises the rights of defendants who were not parties to the case, had not appeared in the case, or who did not consent to the stipulations, notwithstanding Plaintiffs' insistence to the contrary.

**Plaintiffs' statement:** WAG Defendants have never been denied the opportunity to participate in the liability determination; to the contrary, they have been actively represented in this case by counsel opposing liability at every step. WAG Defendants have all expressly consented to the bifurcation of the case, as Plaintiffs set out in Sections 2, 7, and 18 of this Joint Pretrial Statement. All Defendants made a strategic choice to have Lewis Brisbois jointly represent them as counsel through Phase 1 of this process. Lewis Brisbois continues to contest liability on the FCA Claim. *See* ECF No. 350.

Housing Assistance Payments ("HAP") Contracts that it would not receive additional payment or other consideration for rent of the unit beyond the rent agreed to in the HAP Contract, despite maintaining policies and practices that required Section 8 tenants to pay renters' insurance and other required charges, and despite charging Section 8 tenants for washer and dryer appliances without authorization in the HAP Contract.  The following facts relevant to the FCA claim are disputed:

(1)     Whether WPM acted with actual knowledge, reckless disregard, or deliberate ignorance of the falsity of its HAP Contract certifications that Defendants would not receive additional payment or other consideration for rent of the unit beyond the amount of rent to owner specified in each HAP Contract, despite requiring Section 8 tenants to pay additional service charges to live in their units;

(2)     Whether WPM was placed on notice that its policies and practices related to charging Section 8 tenants additional service fees violated the HAP Contract and the rules governing the Section 8 program;

(3)     Whether, despite being put on notice that its policies and practices related to additional service charges to Section 8 tenants violated program rules and HAP Contract certifications, WPM nonetheless failed to cure the violations;

(4)     Whether WPM maintained a policy exempting Section 8 tenants from mandatory additional service charges;

(5)     Whether the WPM's false certifications of compliance with the HAP Contract and Section 8 program rules were material to (i.e., had a "natural tendency to influence" or were "capable of influencing") the payment of U.S. Government funds pursuant to individual HAP Contracts;

(6)     The number of false claims submitted by WPM for payment with U.S. Government funds;

(7)     The amount of the United States' damages resulting from payments made as a result of WPM's false claims.

(8)     Whether the six-year or 10-year statute of limitations applies to Plaintiff-Relators' cause of action under 31 U.S.C. § 3731(b).

894819.5

1

### ii. Plaintiffs' Additional Statement

2          Contrary to WAG Defendants' suggestion below, they have been represented parties and

3   actively involved in this litigation for years now.   WAG Defendants have therefore had more than

4   ample time to develop and review the evidence and court record in this matter, including the summary

5   judgment record confirming that many of the facts they list are undisputed and/or have already been

6   resolved.  WAG Defendants' assertions aside, the definition of "rent" under the FCA is not a disputed

7   fact: it is a legal question that was resolved in November 2022 by the Court's order on summary

8   judgment.  Summ J. Order, 9-13.  The Court's rulings are the law of the case and will govern the same

9   issue throughout this case.   *See Pepper v. United States*, 562 U.S. 476, 506 (2011).

10         As explained in more detail in Plaintiffs' Points of Law (Exhibit B), the Court considered

11  federal case law, federal laws and regulations, as well as the HAP contract, and ruled that the

12  "definition of rent properly turns on a tenants' right 'to live in and make use' of a unit." *Id.* at 12.

13  Then, applying this definition of rent, the Court ruled that the additional service charges at issue in this

14  case met the definition of rent. *Id.* at 12-13.  WAG Defendants' attempt to recast the issue as the

15  question of what "rent to owner" means under the HAP contract is a red herring. The Court thoroughly

16  laid out the terms of the HAP contract in its summary judgment order.  For instance, the Court

17  explained that "[b]oth that HAP contracts and federal regulations are clear that lessors are prohibited

18  from charging or accepting from Section 8 tenants 'any payment for rent of the unit in addition to the

19  rent to owner.'" *Id.* at 9 (citing HAP contract part C, ¶ 5e).  WAG Defendants do not explain how the

20  HAP contract's prohibition on lessors accepting additional rent payments in excess of the rent to owner

21  requires reconsideration of the ruling of law already made by this Court or additional analysis of the

22  definition of rent.

23         WAG Defendants try to relitigate the legal issue of the definition of rent in the guise of

24  disputed facts, stating that, "even the type of facts required to prove Plaintiffs' false certification claim

25  are in dispute."  But there is no outstanding question of law on the definition of rent, and this Court

26  already held that the additional service charges were unlawful excess rent.

27

28

894819.5

### iii.     Owner and Non-Owner Defendants' Statement

Owner and Non-Owner Defendants cannot rule out any disputed facts and triable issues. Their newly substituted counsel still have not had adequate time to review the evidence and court record in this matter (see section 3, above). Notwithstanding this limitation, Owner and Non-Owner Defendants point out Plaintiffs have alleged that, *in addition to Defendant WPM,* certain Non-Owner Defendants, Wasatch Advantage Group, LLC, Wasatch Pool Holdings, LLC, Logan Park Apartments, LLC, and Owner-Defendants, Chesapeake Apartment Holdings, LLC, and Logan Park Apartments, LP, collectively referred to in the Sixth Amended Complaint as "the FCA Defendants," violated the False Claims Act (FCA), by falsely certifying that "…'[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration … for rental of the contract unit during the HAP contract term.'"  Plaintiffs' Sixth Amended Complaint, ECF No. 331, ¶ 237.

Plaintiffs' "false certification claim" is based on allegations that Defendants charged tenants receiving housing assistance under the Housing Choice Voucher ("HCV") Section 8 program, for amenities and services that were not included in the rental of the unit. Plaintiffs' case hinges on their characterization of these additional charges as "excess rent" or "side payments" that violated Part 982, HUD's applicable HCV Guidebook, and the HAP contracts between the owners and the PHAs that administer the HCV program. While the statutes and case law applicable to this case are fully explained in Owner and Non-Owner's points of law (Exhibit D), Plaintiffs' have alleged a "presentment claim," which requires them to prove that the Defendants knowingly submitted or caused to be submitted a claim that was false and material in that it caused the government to pay out money. 31 U.S.C. § 3729(a)(1); (b); *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006). Under the FCA, a claim for payment is a "false" claim if it rests on a false certification of compliance with the applicable federal statutes, regulations, or contractual terms. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996). To prove their false certification claim, Plaintiffs will be required to show that "(1) the Defendants explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were

894819.5

1  submitted (3) even though Defendants were not in compliance with that law, rule or regulation." *Ebeid*

2  *ex rel. U.S. v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010).

3        Therefore, expressed in its simplest form, the FCA requires Plaintiffs to prove that the

4  Defendants' certifications under the HAP contracts were "false" because the Defendants failed to

5  comply with the federal statutes, regulations, and contractual terms that govern the HCV program,

6  including the regulatory and contractual definitions and requirements for the "rent to owner" under the

7  HAP contract.[11]   The terms "rent to owner;" "gross rent;" "family share," and "housing assistance

8  payment" are all among the relevant terms that are defined in the regulations governing the HCV

9  program and found in 24 CFR Part 982.[12]

10        Throughout this litigation, Plaintiffs have advanced a definition of "rent" that does not exist in

11  the statute, regulations or HAP contract, all of which, as noted, *do* define the specific term "rent to

12  owner" that is at issue under their FCA claim. As a result of the gap in understanding between the

13  parties, even the type of facts required to prove Plaintiffs' false certification claim are in dispute, as are

14  the disputed facts and conclusions drawn from both the purported undisputed and disputed facts that

15  Plaintiffs have asserted and relied upon throughout this case. Disputed facts under Plaintiffs' FCA

16  claim include, but are not limited to:

17        (1)     Which amenities are included in the definition of the "rent to owner" that is agreed to in

18  the HAP contract, and is the subject of the alleged false certification.

19        (2)     Whether there are other factors that are reflected in or that affect the definition of "rent

20  to owner" in the HAP contract, that is the subject of the alleged false certification.

21        (3)     Whether the "rent to owner" paid to the Owner-Defendants in this case complied with

22  the statutory, regulatory, and HAP contract terms governing the program.

23

24

25

26  [11] The statutory and regulatory framework defining and governing the HCV program include, *e.g.*, the Housing Act of 1937; federal regulations and other applicable published federal guidance, including, but not limited to, 24 CFR Part 982; the HUD-approved annual Public Housing Authority

27  Administrative Plans (which vary by locale); the HUD Housing Choice Voucher Guidebooks; and the HAP contract, itself – *none of which have been considered in this case to date*.

28  [12] *See* the explanation of these requirements in Exhibit D attached.

(4)     Whether, under the HCV program, Owners may require tenants to pay for additional amenities that are not included in the "rent to owner," as that term is defined by the HAP contract and the regulations.

(5)     Whether the amenities and services at issue in this case were included in the "rent to owner" under the HAP contract or not.

(6)     Whether the charges were actually paid to the owner or to a third party.

(7)     Whether the charges for the amenities and services at issue in this case meet the definition of "excess rent payments" under the HAP contract.

(8)     Whether the certifications were, in fact, false certifications and which certifications under 24 CFR § 982.507(d) were violated by the applicable owners.

(9)     Whether the additional charges were disclosed to the PHA.

(10)     *If the additional charges were not disclosed to the PHA,* whether the PHA would have declined to pay the claim.

(11)     *If the additional charges were not disclosed and if the PHA would have declined to pay the claim,* whether Owner and Non-Owner Defendants *knew* they were falsely certifying a material fact in order to receive payment.

With respect to the definition of "rent" that Plaintiffs have advanced throughout this litigation, Owner and Non-Owner Defendants note, in particular, that it seems to be defined by whether the charge is somehow a required or mandatory condition of occupancy. While this, too, is more fully discussed in Exhibit D, these Defendants also note that, with the qualified exception of renter's insurance, every single additional charge, *including in-unit washers and dryers* was for an *optional* amenity that all tenants, *including Section 8 tenants*, were free to select or reject, and that, with respect to renter's insurance, tenants could choose between finding their own insurance provider or paying for insurance to a provider *through* Defendants. To the extent that the "mandatory or not" question has any bearing on this case (it does not; see, PIH Notice 2022-18 (June 23, 2022)), the following facts are in dispute:

(12)     Whether the charges were, in fact, mandatory.

(13)     Even if some of the charges were mandatory, whether they were also or already included in the "rent to owner" in the HAP Contract.

Because Plaintiffs have not addressed the question of "rent to owner" in the HAP Contract under the relevant authorities, and newly-substituted counsel are still reviewing the case, Owner and Non-Owner Defendants reserve the right to identify further disputed facts and to modify the above listing of disputed facts.

**b.      Liability Under the Consumer Legal Remedies Act (Judge)**

**i.      Plaintiffs' and WPM Defendants' Statement**

Plaintiffs will seek a liability finding against WPM under the CLRA during the bench-trial portion of the proceedings, reserving their CLRA claims against other Defendants associated with the Wasatch Group for Phase 2 of the litigation.  (Plaintiffs do not seek injunctive relief against Defendants no longer associated with the Wasatch Group.)  The following facts relevant to the CLRA claim are disputed:

(1)     Whether WPM's representation that it was lawfully allowed to demand payment of additional services charges through policies that treated the charges as rent was likely to mislead a reasonable consumer;

(2)     Whether a reasonable person would attach importance to the existence or non-existence of WPM's representation that it was lawfully allowed to demand payment for additional services charges through policies that treated the charges as rent;

(3)     Whether WPM knew or had reason to know that Section 8 tenants attach importance to its representation that it was lawfully allowed to demand payment for additional service charges through policies that treated the charges as rent;

(4)     Whether WPM continues to represent that it is lawfully allowed to demand payment of additional services charges through policies that continue to treat the charges as rent.

(5)     Whether a lease of real property constitutes a transaction for goods or services under the Consumer Legal Remedies Act.  (Plaintiffs regard this as a legal issue, and one that Defendants have waived, as addressed in Plaintiffs' Points of Law.  WPM asserts that this argument has not been

21

894819.5

1   waived, as it could not have been raised until this Court's ruling that the additional service charges are

2   solely defined as excess rent, as clarified in WPM's Points of Law.)

3                    ii.    **Plaintiffs' Additional Statement**

4          The unpublished California appellate opinions cited by WAG Defendants below are not

5   binding precedent, cannot be cited in briefing before California state courts, and are "certainly not

6   dispositive of how the California Supreme Court would rule." *Emps. Ins. of Wausau v. Granite State*

7   *Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003);  *see also* Cal. R. Ct. of 8.115(a) ("[A]n opinion of a

8   California Court of Appeal or superior court appellate division that is not certified for publication or

9   ordered published must not be cited or relied on by a court or a party in any other action.").

10         WAG Defendants allude to several CLRA requirements that are inapplicable here, where

11  Plaintiffs solely seek injunctive relief.  *See* Cal. Civ. Code § 1782(d) (providing that the notice letter

12  requirement and its corresponding safe harbor provision are inapplicable to injunctive relief claims);

13  Cal. Civ. Code § 1784 (establishing a *bona fide* error defense solely as to damages claims under the

14  CLRA).  The Court may disregard these irrelevant issues.

15         Contrary to WAG Defendants' position below, they have been represented parties and actively

16  involved in this litigation for years now.  The WAG Defendants have therefore had more than ample

17  time to develop and review the evidence and court record in this matter.  *See* ECF No. 350.

18                   iii.   **Owner and Non-Owner Defendants' Statement**

19         Owner and Non-Owner Defendants cannot rule out any disputed facts and triable issues. Their

20  newly substituted counsel still have not had adequate time to review the evidence and court record in

21  this matter (see section 3, above). Notwithstanding this limitation, Owner and Non-Owner Defendants

22  note that the Consumer Legal Remedies Act ("CLRA") is confined to transactions "in the sale or lease

23  of goods or services." Cal. Civ. Code § 1770(a). The Court has concluded that ASC payments were not

24  for "services" but exclusively for "rent." ECF No. 352. Owner and Non-Owner Defendants contest the

25  Court's expansive and non-statutory definition of "rent" for purposes of the HAP contract-based

26  claims and the definition of rent of non-freehold estates of real property by tenants under California

27  law for purposes of the lease, and they will appeal this issue to the Ninth Circuit should an adverse

28  final judgment be entered against them. California law is explicit: "An apartment is real property, not a

1  tangible chattel.  Because an apartment is not a tangible chattel, it is not a 'good' as that term is defined

2  in the CLRA."  *Cornu v. Norton Cmty. Apartments, L.P.*, 2009 WL 1961013, at *6 (Cal. Ct. App.

3  2009); *see also*, *Freeman v. United Dominion Realty Trust, Inc.*, 2008 WL 183837, at *9 (Cal. Ct.

4  App. 2008) ("An apartment is real property, not a tangible chattel. Accordingly, an apartment is not a

5  good or a service within the meaning of the CLRA."). Because the ASC payments cannot be both

6  "rent" under the HAP contracts and a "good" for purposes of the CLRA claim, there can be no liability

7  under the CLRA in this action.

8  　　　　Furthermore, Plaintiffs' CLRA claim that the ASCs constitute excess rent under the HAP

9  contracts is federally preempted. The Constitution's Supremacy Clause provides that federal law is

10  "the supreme Law of the Land; and the Judges in every State shall be bound thereby." U.S. Const. art.

11  VI, cl. 2.  "This means that when federal and state law conflict, federal law prevails and state law is

12  preempted."  *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018); *see also*, *Crosby*

13  *v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("Even without an express provision for

14  preemption … state law is naturally preempted to the extent of any conflict with a federal statute.").

15  Here, the CLRA claim for excess rent under the HAP contracts, which are not subject to state law,

16  conflicts with the abovementioned federal statute, regulations, and case law confirming that voucher

17  tenants do not have a private right of action to enforce HAP contacts against HUD, the PHA, or the

18  landlord – the two are mutually exclusive.  *See*, *e.g.*, 42 U.S.C. § 1437f; 24 C.F.R. § 982.456(b)(1) and

19  (c); *Reyes-Garay*, 818 F.Supp.2d at 431-432; *Kirby*, 2005 WL 5864797, *6-7.  As a result, the state

20  law claim is preempted.

21  　　　　Additionally, the CLRA is subject to a three-year statute of limitations. Cal. Civ. Code § 1783.

22  In light of Plaintiffs' representation that they solely seek injunctive relief, certain CLRA requirements

23  for preliminary notice and other provisions specific to claims for damages would not apply unless

24  Plaintiffs were to indeed seek damages at trial. Cal. Civ. Code §§ 1770, 1782(d).

25  　　　　**c.**　　**Injunctive Relief Under the Unfair Competition Law and Consumer Legal**
26  　　　　　　　　**Remedies Act (Judge)**

27  　　　　　　　　**i.**　　**Plaintiffs' and WPM Defendants' Statement**

28  The Court has already ruled that Wasatch WPM is liable under the UCL.  Summ. J. Order at

23

14, 16, ECF No. 278.  During the bench trial portion of the Phase 1 trial, the Court will determine if WPM is also liable under the CLRA.  The following disputed facts are relevant to whether injunctive relief as to WPM is appropriate under either statute:

(1)     Whether WPM's collection of excess rent, including its practices around collecting payment for additional service charges, has irreparably injured members of the class;

(2)     Whether WPM's practices around collecting payment for additional service charges have harmed the Section 8 program's goals of secure and stable housing;

(3)     Whether damages alone are inadequate to compensate for the injury WPM's practices caused to class members;

(4)     Whether the changes WPM made to its practices after the Court's November 23, 2022 Summary Judgment Order were sufficient to cure the violation, or whether WPM's forms and practices continue to treat additional service charges as rent;

(5)     Whether WPM can easily revert its Payment Priority Sequence, which they changed after this Court's November 23, 2022 Summary Judgment Order, to a Payment Priority Sequence that applies tenant payments to additional service charges first before applying payments to rent;

(6)     Whether WPM can easily revert to practices requiring Section 8 tenants to pay additional service charges as a condition of leasing;

(7)     Whether WPM's one-time letter sent to Section 8 tenants and WPM property employees stating that additional service charges must be optional for Section 8 tenants is sufficient to continue to prevent WPM from making additional service charges mandatory for Section 8 tenant;

(8)     Whether WPM has enacted policies around collecting payment for additional service charges to ensure that they could have the power of the courts to collect on unpaid amounts, including for additional service fees;

(9)     Whether WPM's practice of treating additional service charges like rent created a financial burden for Section 8 tenants;

(10)    Whether injunctive relief is warranted after balancing the hardships to Defendants and the plaintiff class;

1  (11)    Whether preventing Defendants from exceeding rent limitations under the HAP

2  Contracts through their practices related to additional service charges advances the public interest,

3  including the goals of the Section 8 program; and

4  (12)    Whether policy changes implemented by WPM in the immediate aftermath of the

5  Court's November, 2022 ruling sufficiently address the concerns identified by the Court such that

6  injunctive relief is unwarranted.

7  Contrary to the WAG Defendants' suggestion below, they have been represented parties and

8  actively involved in this litigation for years now.  The WAG Defendants have therefore had more than

9  ample time to develop and review the evidence and court record in this matter.  *See* ECF No. 350.

10  WAG Defendants also argue below that Plaintiffs cannot seek injunctive relief because they

11  have an adequate remedy at law.  As explained in Plaintiffs' Points of Law, while the damages under

12  the HAP Contract provided a monetary remedy for *past* violations, contract damages are inadequate to

13  protect class members from the harms they would suffer from future violations.

14  ## ii.    Owner and Non-Owner Defendants' Statement

15  Owner and Non-Owner Defendants cannot rule out any disputed facts and triable issues for

16  Plaintiffs' claims for injunctive relief under the UCL and CLRA. Their newly substituted counsel still

17  have not had adequate time to review the evidence and court record in this matter (see section 3,

18  above). Notwithstanding this limitation, the law is clear that Plaintiffs are not entitled to injunctive

19  relief due to their adequate remedy at law, namely state causes of action for claims related to breach of

20  the lease. Specifically, the damages arising from the breach of written contract, UCL, and CLRA

21  claims are cumulative.  The Court previously found liability and damages for the breach of contract

22  claim, with Plaintiffs acknowledging the sufficiency of their remedy under this claim. ECF Nos. 278,

23  352.  Owner and Non-Owner Defendants contest the expansive definition of "rent" in the summary

24  judgment order on liability, a matter potentially subject to appeal.  Nonetheless, legal precedent

25  dictates that a plaintiff seeking equitable relief must demonstrate the absence of an adequate legal

26  remedy.  Cases such as *Philpott v. Super. Ct.*, 1 Cal.2d 512, 517 (1934), and *Zapata Fonseca v. Goya

27  Foods Inc.*, 2016 WL 4698942, at *7 (N.D. Cal. 2016), affirm that injunctive relief is not available

28  when a legal remedy is sufficient.  In alignment with *Durkee v. Ford Motor Company*, 2014 WL

4352184, at *2-3 (N.D. Cal. 2014), and *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *3-4 (N.D. Cal. 2011), where plaintiffs may have access to an adequate legal remedy, equitable relief is precluded. Plaintiffs' UCL and CLRA claims are legally deficient because they solely seek injunctive relief to which they are not entitled due to the presence of an adequate remedy at law.

Moreover, Plaintiffs' UCL and CLRA claims are federally preempted because they are rooted in Plaintiffs' position that the ASCs constitute excess rent under the applicable HAP contract. The Supremacy Clause of the Constitution establishes federal law as "the supreme Law of the Land; and the Judges in every State shall be bound thereby." U.S. Const. art. VI, cl. 2. When federal and state law clash, federal law prevails, and state law is preempted. *Murphy*, 584 U.S. at 471; *Crosby*, 530 U.S. at 372. The UCL and CLRA claims conflict with federal statutes, regulations, and laws confirming that voucher tenants lack a private right of action to enforce HAP contracts against HUD, the PHA, or the landlord – establishing mutual exclusivity. This conflict, as supported by 42 U.S.C. § 1437f, 24 C.F.R. § 982.456(b)(1) and (c), *Reyes-Garay*, 818 F.Supp.2d at 431-432, and *Kirb*y, 2005 WL 5864797, at *6-7, results in the preemption of Plaintiffs' state law claims. Finally, federal regulation makes clear that tenants have no remedies – legal or equitable – against owners under the Housing Act of 1937. 24 CFR 982.456(b)(1).

**5.   Disputed Evidentiary Issues**

**a.   Plaintiffs' Proposed Evidentiary Motions**

Defendants collectively propose twenty-five motions in limine and WAG Defendants further propose to file six additional substantive motions. *See infra* Sections 5(b) & (c), 13. To timely and efficiently resolve the Parties' pretrial motions, Plaintiffs request that the Court set a briefing schedule, page limits, and a maximum number of motions each group of represented parties (i.e., Plaintiffs, WPM Defendants, and WAG Defendants) may file. Plaintiffs propose that each group of represented parties be limited to 10 pretrial motions, evidentiary or otherwise, and that the schedule be set as follows: (1) opening briefs due on April 12, 2024, with briefs for each motion limited to five pages (excluding the notice of motion and supporting evidence); (2) opposing briefs due May 3, 2024, limited to five pages (excluding supporting declarations); (3) reply briefs of no more than three pages each due on May 10, 2024; and (4) a hearing on May 17, 2024. WAG Defendants' protests

notwithstanding, such an order would be well within the Court's inherent power to manage motion practice and trial. *See Luce v. United States*, 469 U.S. 38, 41 n.4; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (inherent powers are "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.").

Plaintiffs intend to file the following evidentiary motions:

(1)     Request for Judicial Notice of Public Documents

(2)     Motion in Limine Regarding Summary Judgment Findings and Defendants' Admissions of Undisputed Facts

(3)     Motion in Limine to Exclude Reference to Issues Reserved for Phase 2 of this Litigation

(4)     Motion in Limine Regarding FCA Remedies

(5)     Motion in Limine Regarding Government Non-Intervention

(6)     Motion in Limine to Exclude Irrelevant Personal Information About Plaintiffs and Tenant Witnesses

(7)     Motion in Limine to Exclude the Expert Report and Testimony of Robert S. Griswold

(8)     Motion in Limine Regarding the Examination of Witnesses Associated with Defendants

(9)     Motion in Limine to Exclude Witnesses and Exhibits Not Timely Disclosed

**b.     <u>Defendant WPM's Statement</u>**

Defendant Wasatch Property Management, Inc. intends to file the following Motions:

(1)     Preclude Expert from Testifying re Damages to United States

(2)     Preclude Introduction of Hearsay HUD Video Exhibit

(3)     Preclude Hearsay Evidence re Conversations Between WPM Personnel and Non-Witness Tenants

(4)     Preclude Reference to WPM Personnel Filling Out HAP Contracts

(5)     Preclude Speculative Testimony re Knowledge of WPM Personnel

(6)     Preclude Reference to Renters' Insurance Being Required at LIHTC Properties

(7)     Preclude Reference to Actual Evictions for Non-Payment of Additional Service Charges

(8)     Preclude Reference to Established Violations of Law Prior to 11/22/2023

(9)     Preclude Introduction of Expert Reports

(10)    Preclude Introduction of Hearsay News Article Exhibits

WPM joins the Owner and Non-Owner Defendants' position below, and reserves the right to join in any additional evidentiary motions they might bring.

### c.     <u>Owner and Non-Owner Defendants' Statement</u>

Owner and Non-Owner Defendants are unable to identify the evidentiary issues. Their newly substituted counsel still have not had adequate time to review the evidence and court record in this matter. Notwithstanding this limitation, Owner and Non-Owner Defendants intend to join in Defendant WPM's motions *in limine* and to file their own evidentiary motions as follows:

(1)     Request for judicial notice of public documents.

(2)     Exclude mention or reference to the summary judgment findings on the state law claims during the FCA portion of the trial.

(3)     Exclude mention or reference to subsequent remedial measures taken by property owners during the FAC trial.

(4)     Exclude hearsay news articles and videos.

(5)     Exclude unauthenticated documents.

(6)     Exclude mention or reference to previous or other lawsuits involving defendants.

(7)     Exclude the expert report and testimony of David Breshears.

(8)     Exclude the expert report and testimony of MaryAnn Russ.

(9)     Exclude evidence irrelevant to and inconsistent with FCA elements, burdens of proof, and remedies, including but not limited to the statute of limitations period.

(10)    Allow evidence of relevant industry standards.

(11)    Exclude any mention of defendants' insurance coverage.

(12)    Exclude evidence of defendants' financial status.

(13)    Exclude character evidence.

(14)    Exclude emotional testimony and evidence of Plaintiffs' financial status.

(15)    Exclude evidence of attorney-client communications.

1   Owner and Non-Owner Defendants contend that disputed evidentiary issues at trial not

2   resolved by motions *in limine* should be resolved pursuant to Fed. R. Evid. 104 before the introduction

3   or exclusion of the disputed evidence. Owner and Non-Owner Defendants do not agree to Plaintiffs'

4   proposed limitations on their right to bring motions *in limine* or to their proposed briefing schedule.

5   The Federal Rules of Civil Procedure and the Federal Rules of Evidence provide for no such

6   limitation; in fact, there is no provision relating to motions *in limine*. The Supreme Court has described

7   motions *in limine* to include "any motion, whether made *before or during trial*, to exclude anticipated

8   prejudicial evidence before the evidence is actually offered," and lies within "the district court's

9   inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 40, 41, fns. 2, 4

10  (1984). Motions *in limine* are necessary to avoid the obviously futile attempt to "unring the bell"

11  should Plaintiffs attempt to offer irrelevant and highly prejudicial evidence at trial.  *See McEwen v.*

12  *City of Norman, Okl.*, 926 F.2d 1539, 1548 (10th Cir. 1991).

13  **6.**     **Special Factual Information in Contract Actions**

14          **a.**     **Plaintiffs' Statement**

15          There are no longer any contract issues to be tried in Phase 1 as the Court has now resolved

16  both the existence of liability (ECF No. 278) and the amount of class damages under the HAP Contract

17  (ECF No. 352).  Which Defendants are liable to the class for those damages is reserved for Phase 2 of

18  the litigation.  Bifurcation Order 6 ECF No. 135.

19          The WAG Defendants' suggestion that the jury may make findings that conflict with the

20  Court's partial summary judgment orders misunderstands the nature of summary judgment and the law

21  of the case.  Federal Rule of Civil Procedure 56 allows parties to move for summary judgment on a

22  "part of [a] claim or defense," and the court must grant that motion if "there is no genuine dispute as to

23  any material fact" affecting that issue.  Fed. R. Civ. P. 56(a).  Where, as here, a court grants partial

24  summary judgment, those "issues shall be deemed established for the trial of the case." Advisory

25  Committee Notes on Fed. R. Civ. P. 56, 1946 Amendment.  Moreover, the Court's legal conclusions

26  on the undisputed record are law of the case which should not be disturbed except in narrow and

27  demanding circumstances not present here.  *See United States v. Alexander*, 106 F.3d 874, 876 (9th

28  Cir. 1997).

894819.5

**b.  Owner and Non-Owner Defendants' Statement**

Owner Defendants are aware of the Court's Orders on Plaintiffs' motions for partial summary judgment as to liability (ECF No. 278) and the measure of damages and the prejudgment interest rate on the contract claim (ECF No. 352). However, issues to be tried on Plaintiffs' FCA, UCL and CLRA claims will require determinations by the trier of fact that may conflict with those prior Orders. Owner and Non-Owner Defendants intend to move the Court to revise those Orders according to proof at trial. See, Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

Plaintiffs' citation to *Pepper v. United States*, 562 U.S. 476 (2011) and *United States v. Alexander*, 106 F.3d 874 (9th Cir. 1997) demonstrates their confusion between the amorphous "law of the case" concept that applies after a final determination has been made, appealed and remanded, with this Court's inherent discretionary authority under Rule 54(b) to change interim orders before a final judgment is entered. Furthermore, even the law of the case authority to which Plaintiffs cite would allow this Court to correct its prior orders if convinced they are "'clearly erroneous and would work a manifest injustice.'" *Pepper* at 506-507, internal citations omitted; *see also Alexander* at 876.

**7.  Relief Sought**

**a.  Qui Tam Claims**

**i.  Plaintiffs and WPM Defendants' Joint Statement**

Under the FCA, Plaintiffs as relators on behalf of the U.S. government seek:  (1) damages corresponding to the housing assistance payments made to Defendants for Section 8 tenants as to whom WPM submitted  false claims; (2) trebling of those damages and imposition of penalties pursuant to 31 U.S.C. § 3729(a)(1); (3) an award to Relators of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d)(2) upon recovery by the United States; and (4) an award of attorneys' fees, costs, and expenses against Defendants pursuant to 31 U.S.C. § 3730(d)(2).

Of these remedies, only the amount of damages is at issue in the upcoming Phase 1 trial.  That issue will be tried to the jury along with liability under the FCA.

1

## ii.   Plaintiffs' Additional Statement

2
3
4

The WAG Defendants have chosen this portion of the Pretrial Statement to suggest, without explanation, that their Due Process rights are compromised by the bifurcation with respect to the FCA claim.  This position is without merit.

5
6
7
8

Preliminarily, Plaintiffs note that among WAG Defendants, only Wasatch Advantage Group, Wasatch Pool Holdings, and Chesapeake Apartment Holdings LLC are named as to the FCA Claim.  *See* Sixth Amended Complaint 39 ECF No. 331.  All three stipulated to the bifurcation of the case two and a half years ago, on August 5, 2021.  ECF No. 135.

9
10
11
12
13

Under the Bifurcation Order, as relevant here, the Phase 1 trial will determine "Whether WPM is liable under the False Claims Act" and "the amount of actual damages . . . to remedy any and all violations under the False Claims Act."  *Id.* at 5.  Phase 2 will address "any vicarious liability attributable to other Defendants named as to the False Claims Act claim."  As the Parties explained in the stipulation to bifurcate the case:

14
15
16
17
18

> Wasatch Property Management is the entity that signs all leases, Additional Service Agreements, and HAP Contracts, manages the properties where Defendants' Section 8 tenants live, and charges and collects the additional service charges whose legality is at issue in each of the claims.  Therefore, the claims in the case turn on Wasatch Property Management's conduct.  The claims regarding all other Defendants' liability result from their contractual and corporate relationships to Wasatch Property Management.

19
20
21
22
23
24
25

*Id.* at 4.  This bifurcation was proper under Federal Rule of Civil Procedure 42 and does not offend due process.  *See Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 998 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) ("Under Rule 42(b), the district court has broad discretion to bifurcate a trial to permit deferral of costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues."); *Exxon v. Sofec, Inc.*, 54 F.3d 570, 575-576 (9th Cir. 1995) (same) (rejecting an argument that a decision to bifurcate the trial denied a party due process).

26
27
28

Because the actions and scienter of WPM—on which the existence of a False Claims Act violation turn—do not overlap in any respect with the agency and corporate issues that will determine the vicarious liability of Wasatch Advantage Group, Wasatch Pool Holdings, and Chesapeake

31

894819.5

1  Apartment Holdings, the Bifurcation Order correctly "preserve[s] separate questions for separate fact

2  finders and is thus consistent with the Seventh Amendment."  *See Ellis v. Costco Wholesale Corp.*,

3  285 F.R.D. 492, 543 (N.D. Cal. 2012) (citation omitted).  Those three entities' "due process rights are

4  adequately protected" here where they maintain the right to participate in the Phase 1 trial to attempt to

5  defeat any liability finding, and if they are unsuccessful in that, they will "have ample opportunity" to

6  contest their vicarious liability in Phase 2.  *See id.* at 544.  Indeed, *Plaintiffs* would be gravely

7  prejudiced by any change in this structure of the litigation as their discovery regarding issues relevant

8  to WAG Defendants' vicarious liability have been deferred to Phase 2.  *See* ECF No. 135 at 5 ("this

9  case shall be bifurcated for both discovery and trial as follows: ...").  Again, the three WAG

10  Defendants named as to the FCA claim were represented parties to the original stipulation to bifurcate

11  the trial in this way, over two and a half years ago.  *See* ECF No. 135.  Their decision to substitute

12  counsel on the eve of trial does not retract their strategic decision to try the case in this manner, and

13  therefore raises no due process issues.  *See* ECF No. 350

14                    ### iii.   **Owner and Non-Owner Defendants' Statement**

15          As it currently stands, the upcoming Phase 1 trial will address liability and damages under the

16  FCA as to Defendant WPM, pursuant to the Bifurcation Order that was premised upon a stipulation

17  compromising the rights of defendants who were not parties to the case or who did not consent to the

18  stipulations.  Due Process requires that the question of Owner and Non-Owner Defendants' liability be

19  tried with that of Defendant WPM.  Owner and Non-Owner Defendants are unable to articulate a

20  position on the FCA law and issues related to this case because their newly substituted counsel still

21  have not had adequate time to review the evidence and court record in this matter.  For that reason,

22  Owner and Non-Owner Defendants cannot subscribe to Plaintiffs' limited explanation of the statute

23  and would reserve the right to develop the legal arguments as they pertain to this case further.

24  However, the elements that Plaintiffs must prove, particularly scienter and materiality, emphasize the

25  necessity for Owner and Non-Owner Defendants' participation in the Phase 1 trial.

26          Notwithstanding Owner and Non-Owner Defendants' newly substituted counsel's limitation,

27  Owner and Non-Owner Defendants have included a statement highlighting the issues they anticipate

28  arising at trial and implicated by this qui tam action.  *See* Exhibit D.

b.    **Class Claims**

i.    **Plaintiffs and WPM Defendants' Statement**

The amount of Class damages for breach of contract claims has been resolved by summary judgment.  See Summ. J. Re Remedies Order ECF No. 352.

On behalf of the injunctive relief class certified under Rule 23(b)(2), Plaintiffs seek injunctive relief against WPM pursuant to the UCL and the CLRA to ensure that Defendants do not require any of their Section 8 tenants to agree to or pay any additional service fees in order remain in their homes, and to ensure that Defendants' current and future Section 8 tenants are fully and adequately informed of their rights with regard to additional service charges.  Issues related to injunctive relief against WPM will be tried to the Court in the upcoming Phase 1 bench trial.

At the conclusion of the case, Plaintiffs will also seek attorneys' fees, costs, and expenses for their work on behalf of both classes pursuant to California Code of Civil Procedure section 1021.5, California Civil Code section 1780(e), a common fund theory, and Plaintiffs' and class members' leases.

ii.    **Plaintiffs' Additional Statement**

Contrary to the WAG Defendants' suggestion below, they have been represented parties and actively involved in this litigation for years now.  The WAG Defendants have therefore had more than ample time to develop and review the evidence and court record in this matter.  *See* ECF No. 350.

iii.    **Owner and Non-Owner Defendants' Statement**

Owner and Non-Owner Defendants are unable to articulate a position on the relief sought by Plaintiffs until they and their newly substituted counsel have had adequate time to review the evidence and court record in this matter.  However, Owner and Non-Owner Defendants dispute that "Defendants" collectively entered into leases with all class members. Class members live in different areas within the State of California that may have applicable County and City codes that supersede state landlord-tenant laws or require actions from the landlord or tenant that are not addressed in state landlord tenant laws. Moreover, any cause of action claiming representation of class plaintiffs that reside in other states are subject to the landlord-tenant laws in those other states. Furthermore, Owner and Non-Owner Defendants have preliminary information that places into dispute certain of the named

1   Plaintiffs' standing and capacity to serve as representatives of the class, including whether each of the

2   named Plaintiffs lived at a property owned by the Owner Defendants at the time of the alleged

3   wrongful conduct.

4   **8.     Points of Law**

5           Plaintiffs' statement on Points of Law is set out in **Exhibit B** attached hereto.

6           WPM Defendants' statement on Points of Law is set out in **Exhibit C** attached hereto.

7           Owner and Non-Owner Defendants' statement on Points of Law is set out in **Exhibit D**

8   attached hereto.

9   **9.     Abandoned Issues**

10          As to the False Claims Act, Plaintiffs are not pursuing liability as to charges made to Section 8

11  tenants that were not a condition of leasing, except for washer and dryer charges in the "Utilities and

12  Appliances" section of the HAP Contract prior to July 1, 2019.

13  **10.    Witnesses**

14          Plaintiffs' list of prospective witnesses is set out at **Exhibit E** hereto.

15          WPM Defendants' list of prospective witnesses is set out at **Exhibit F** hereto.

16          Owner and Non-Owner Defendants' list of prospective witnesses is set out at **Exhibit G** hereto.

17  **11.    Exhibits – Schedules and Summaries**

18          Plaintiffs' list of documents and other exhibits to be offered at trial is set out at **Exhibit H**

19  hereto.

20          WPM Defendants' list of documents and other exhibits to be offered at trial is set out at

21  **Exhibit I** hereto.

22          Owner and Non-Owner Defendants' list of documents and other exhibits to be offered at trial is

23  set out at **Exhibit J** hereto.

24  **12.    Discovery Documents**

25          Plaintiffs' list of deposition excerpts to be offered at trial is set out at **Exhibit K** hereto, and

26  their list of discovery excerpts to be offered at trial is set out at **Exhibit L** hereto.

27          WPM Defendants' list of deposition and discovery excerpts to be offered at trial is set out at

28  **Exhibit M** hereto.

34

894819.5

### a.   Plaintiffs' Statement

WAG Defendants refuse to identify specific discovery documents and depositions to be introduced at trial, as required by Local Rules, notwithstanding the extension they were granted to prepared these Amended Pretrial Filings.  WAG Defendants—both before and after their retention of new counsel—have had ample opportunity to review the discovery record and designate those portions they intend to introduce at trial.  Their failure to do so in a timely way constitutes sandbagging and gamesmanship.  Plaintiffs respectfully request that the Court preclude them from introducing any discovery responses or deposition designations not specifically identified in this Amended Joint Pretrial Statement.

### b.   Owner and Non-Owner Defendants' Statement

Owner and Non-Owner Defendants are unable to identify discovery documents and depositions to be introduced at trial. Their newly substituted counsel still have not had adequate time to review the evidence and court record in this matter. This action was initiated on April 14, 2015, nearly nine years ago, and has since involved extensive and voluminous discovery. Notably, there have been 27 depositions conducted, and the produced documents span over 11 terabytes, stored across three external hard drives. A single hard drive holds more than three million pages of documents, and tens of thousands of lease documents, HAP contracts, additional services agreements, and other rental-related records from multiple properties have been produced. Further, Owner and Non-Owner Defendants understand that Plaintiffs' were provided with extensive discovery from Defendant WPM's Yardi System, which contained essentially every piece of data retained on tenants. Additionally, the case encompasses hundreds of docket entries, numerous written discovery requests and responses, third-party subpoenas and productions, and expert reports.

Owner and Non-Owner Defendants formally engaged Arnall Golden Gregory LLP ("AGG") on January 31, 2024, just over a month ago, to represent their rights and interests moving forward. Given the prolonged duration, extensive scope, and substantial magnitude of this action, six weeks is insufficient for counsel to comprehensively analyze nine years' worth of deposition transcripts, productions, and written discovery in preparation for trial. Therefore, Owner Defendants designate all deposition transcripts, productions, and discovery requests and responses in this action for trial. They

1  will meet and confer with the other parties to confirm a reasonable timeframe before trial to distill the

2  pertinent discovery and deposition testimony into trial-ready excerpts.

3  **13.    Further Discovery or Motions**

4      **a.      Plaintiffs' Statement**

5          WAG Defendants propose filing  untimely motions on the eve of trial.  The Court should deny

6  them leave to file these motions.

7          WAG Defendants have waived any objections to the Bifurcation Order first by expressly

8  agreeing to it and then by allowing the litigation to proceed under its auspices, changing their mind

9  only on the eve of trial.  They should not be permitted to engage in motion practice on an issue that

10 they have waived at this late date.

11         The other four substantive motions—the proposed motions to amend the pleadings to state

12 affirmative defenses and assert cross claims and the proposed motions for judgment on the pleadings—

13 are well past the deadlines in the Court's scheduling orders.  *See* ECF Nos. 39, 103, 111, 126, 130,

14 132, 237 (setting deadlines for amendments to the pleadings and for dispositive merits issues);

15 Standing Scheduling Order 1-2 ECF No. 280 ("no further joinder of parties or amendments to

16 pleadings is permitted without leave of court, good cause having been shown."); *id.* at  4, 5 (providing

17 that "[a]ll purely legal issues are to be resolved by timely pretrial motions" and that "failure to raise a

18 dispositive legal issue that could have been tendered to the court by proper pretrial motion prior to the

19 dispositive motion cut-off date may constitute waiver of such issue.").

20         WAG Defendants cannot satisfy Rule 16's "good cause" standard to modify the scheduling

21 order to allow their untimely motions because they have not shown diligence—despite years of

22 participation in the litigation, represented by counsel, they have waited until the eve of the Phase 1 trial

23 to propose introducing new parties and defenses and to make dispositive merits arguments that should

24 have been raised two years ago.  *See* ECF No. 237 (dispositive motion deadline of April 22, 2022).

25 "Substitution of new counsel is not grounds to grant a motion which could have and should have been

26 filed within the deadlines established by the court's scheduling order."  *Kristensen v. Credit Payment*

27 *Servs. Inc.*, No. 212-CV00528-APGPAL, 2015 WL 12966283, at *1 (D. Nev. Mar. 17, 2015).

28

If the Court is inclined to allow them to brief any of their proposed untimely motions, Plaintiffs respectfully request that the Court set a briefing schedule and page limits, as described above in Section 5, for all remaining Phase 1 pretrial motions, including the six motions proposed by WAG Defendants below.

**b.**   **Owner and Non-Owner Defendants' Statement**

Owner and Non-Owner Defendants intend to bring the following motions:

(1)   Motion to set aside/modify bifurcation order;

(2)   Motion to modify the Court's scheduling order(s) (ECF Nos. 39, 103, 111, 126, 130, 132, 237) to extend the deadline for dispositive motions;

(3)   Motion for judgment on the pleadings regarding Plaintiffs' FCA claim;

(4)   Motion for judgment on the pleadings regarding the remaining portions of Plaintiffs' state law claims;

(5)   Motion for leave to file amend answer and affirmative defenses; and

(6)   Motion for leave to file crossclaims against applicable Public Housing Agencies.

Owner and Non-Owner Defendants do not agree to Plaintiffs' proposed briefing schedule. The aforementioned motions will be filed with proper notice and in accordance with the Federal Rules of Civil Procedure, Local Rules and this Court's scheduling orders, unless this Court orders otherwise.

**14.**   **Stipulations**

The Parties have not reached any stipulations.

**15.**   **Amendments – Dismissals**

**a.**   **Plaintiffs' Statement**

As stated above, WAG Defendants' proposed motions to amend their answer and affirmative defenses and to file crossclaims are untimely.

**b.**   **Owner and Non-Owner Defendants' Statement**

As stated in Section 13 above, Owner and Non-Owner Defendants intend to bring motions for leave to file an amend answer and affirmative defenses, and to file crossclaims against applicable PHAs.

**16.    Settlement Negotiations**

The Parties attended a court-ordered settlement conference on March 15, 2023, which concluded unsuccessfully after only a few hours.

Plaintiffs are open to pursuing further settlement negotiations and have suggested to Defendants that the Parties attend private mediation.

**17.    Agreed Statements**

The Parties agree that it is neither feasible nor advisable to present any part of the action upon an Agreed Statement of Facts.

**18.    Separate Trial of Issues**

**a.    Plaintiffs and WPM Defendants' Statement**

The Court bifurcated this case for discovery and trial in August 2021.  Bifurcation Order, ECF No. 135.  The case is currently in Phase 1, which addresses WPM's liability under the FCA, liability on the class claims, and the amount of actual damages and restitution on all claims.  *Id.* at 5, ECF No. 135.  Additionally, the Parties agree that Plaintiffs' injunctive relief claims against WPM are ripe for trial at this time.

The Court has already found liability on the class claims for breach of contract and violation of the ECF and ruled on the amount of damages and interest on the class contract claims.  Summ. J. Order, ECF No. 278, Summ J. Re Remedies Order, ECF No 352.

The jury trial portion of the Phase 1 trial will determine whether WPM is liable under the FCA, and if so, the amount of damages.

The bench trial portion of the Phase 1 trial, which Plaintiffs and WPM Defendants propose should immediately follow the jury trial, will address injunctive relief issues, including WPM's liability under the CLRA.

**b.    Plaintiffs' Separate Statement**

As discussed above, there is no due process issue.  The three WAG Defendants who are named as to the FCA Claim negotiated and stipulated to the bifurcation process through their prior counsel.  *See* ECF No. 135.  All WAG Defendants subsequently confirmed their consent to the bifurcation of the class claims.  *See* ECF No. 220 at 6 ("The extent of each Defendant's vicarious liability for [WPM's]

38

conduct can be manageably tried in Phase 2").  WAG Defendants' prior counsel continues to deny liability under the FCA and oppose injunctive relief on the class claims.  Further, the Bifurcation Order was proper under Federal Rule of Civil Procedure 42 and raises no due process concerns, even independent of  WAG Defendants' express consent to its terms.

The Defendants associated with Wasatch Group are simply substituting counsel on the eve of trial, and can of course participate in Phase 1 as they see fit.  Again, as represented parties actively involved in this litigation for years now, WAG Defendants have had ample time to develop and review the evidence and court record in this matter.  *See* ECF No. 350

### c. **Owner and Non-Owner Defendants' Statement**

As stated in Sections 2, 7 and 13 above, Owner and Non-Owner Defendants intend to bring a motion to set aside/modify the Bifurcation Order. Due process requires that Owner and Non-Owner Defendants participate in Phase 1. The Bifurcation Order is premised upon a stipulation that compromises the rights of defendants who were not parties to the case or who did not consent to the stipulations.

### 19. **Impartial Experts – Limitation of Experts**

### a. **Plaintiffs' and WPM Defendants' Joint Statement**

Neither Plaintiffs nor WPM Defendants request the appointment by the Court of an impartial witness.  Plaintiffs and WPM Defendants also agree that no limitation on the number of expert witnesses is necessary, in light of the short list of experts disclosed by the Parties.

### b. **Plaintiffs' Separate Statement**

Plaintiffs have disclosed two experts: David Breshears, a forensic accountant, and MaryAnn Russ, an expert in federal affordable housing programs, including the Section 8 Housing Choice Voucher program.

Contrary to WAG Defendants' suggestion below, they have been represented parties and actively involved in this litigation for years now.  WAG Defendants have therefore had more than ample time to develop and review the evidence and court record in this matter.  *See* ECF No. 350. Through prior counsel, WAG Defendants have already consulted with and hired experts who they defended at deposition and for whom they have provided expert reports.

c.      **Owner and Non-Owner Defendants' Statement**

Owner and Non-Owner Defendants are unable to take a position with respect to expert witnesses for trial until they and their newly substituted counsel have had adequate time to review the evidence and court record in this matter, particularly expert reports and depositions, and for Owner Defendants to consult with experts.

**20.    Attorneys' Fees**

Plaintiffs seek attorneys' fees, costs, and expenses for the class claims pursuant to California Code of Civil Procedure section 1021.5, California Civil Code section 1780(e), a common fund theory, and Plaintiffs' and class members' leases.  Additionally, Plaintiffs will seek appropriate attorneys' fees, costs, and expenses under 31 U.S.C. § 3730(d)(2).  Plaintiffs will move for attorneys' fees following the entry of judgment.  *See* L.R. 293.

**21.    Trial Exhibits – Special Handling**

None.

**22.    Trial Protective Order**

None.

**23.    Miscellaneous**

a.      **Plaintiffs' Statement Regarding Supplemental Class Notice**

Notice was issued to members of the Rule 23(b)(3) class in the spring of 2020.  As the class claims were continuing in nature, the Parties agreed in their September 30, 2021 Joint Status Report to issue supplemental class notice "following the Court's ruling on the summary judgment motions and prior to the Phase 1 trial."  Joint Status Report 6, ECF No. 140. The Parties now have a complete class list for all members of the Rule 23(b)(3) class, which now has an end date for both class membership and damages as of November 30, 2022.  *See* Order Grant'g Mot. Leave Amend Compl. & Alter Class Cut-off Date 4, ECF No. 329 (granting request to set November 30, 2022 as the class cut-off date); Notice re Updated Class Damages Calcs. in Supp. of Pls.' Mot. Partial Summ. J. re Remedies 1, ECF No. 328 (describing resolution of investigation into potential additional class members).

Plaintiffs provided Defendants with a proposed stipulation for supplemental class notice on December 18, 2023.  Plaintiffs proposed a notice period of 35 days (the same period as previously

40

1   used), with the same methods used in 2020, and a notice form based on the previous form with

2   adjustments corresponding to developments in the litigation.  WPM Defendants have not responded on

3   this issue, despite multiple inquiries and follow-up emails and phone calls from Plaintiffs.

4          WAG Defendants continue to refuse to stipulate to supplemental class notice without any

5   substantive basis for finding fault with the class notice or the class list.  In meet and confer

6   conversations, WAG Defendants indicated that they wanted to review the Yardi data to confirm the

7   identity of class members.  However, damages calculations based on an undisputed list of class

8   members have already established during partial summary judgment regarding remedies, and WAG

9   Defendants along with the other Defendants, though counsel, admitted the correctness of those

10  calculations and *a fortiori*  the correctness of the underlying class list.  Defs.' Response to Pls.'

11  Undisputed Facts No. 3-6, 8-11 ECF No. 326-1; Order Granting Mot. for Summ. J. 2, ECF No. 325

12  (noting Defendants "did not dispute the eight newly discovered tenants should be included in the

13  class.").  Supplemental class notice should not be delayed in order to allow WAG Defendants' new

14  counsel to review the class list that has already been established in the litigation and used to determine

15  class damages and prejudgment interest.

16         Plaintiffs respectfully request that the Court set a deadline of Friday, April 5, 2024, for the

17  Parties to submit their notice proposals for Court approval.  Plaintiffs believe the Parties should be able

18  to stipulate to the notice proposal Plaintiffs have already made. If the Parties are unable to agree to a

19  notice proposal, Plaintiffs request that the Court direct the Parties to submit their separate proposals to

20  the Court by that date.

21         **b.**    **Owner and Non-Owner Defendants' Statement**

22         Owner and Non-Owner Defendants are unable to stipulate to Plaintiffs' proposed supplemental

23  class notice until they and their newly substituted counsel have had adequate time to review the

24  evidence and court record in this matter, particularly the YARDI system data relating to the proposed

25  new class members.

26

27

28

894819.5

1   Dated: March 15, 2024                Respectfully submitted,

2                                        GOLDSTEIN, BORGEN, DARDARIAN & HO

3
                                         /s/ Anne P. Bellows
4                                        Anne P. Bellows

5                                        Attorneys for Plaintiffs and Relators

6
    Dated: March 15, 2024                Respectfully submitted,
7
                                         LEWIS BRISBOIS BISGAARD & SMITH
8

9                                        /s/ Ryan Matthews (as authorized 3/15/24)
                                         Ryan Matthews
10
                                         Attorneys for WPM Defendants WASATCH
11                                       PROPERTY MANAGEMENT, INC., LOGAN
                                         PARK APARTMENTS, LLC, LOGAN PARK
12                                       APARTMENTS, LP, BELLWOOD JERRON
                                         HOLDINGS, LLC, BELLWOOD JERRON
13                                       APARTMENTS, LP, HAYWARD SENIOR
                                         APARTMENTS, LP, OAK VALLEY
14                                       APARTMENTS, LLC, OAK VALLEY
                                         HOLDINGS, LP, PIEDMONT APARTMENTS,
15                                       LP, POINT NATOMAS APARTMENTS, LLC,
                                         POINT NATOMAS APARTMENTS, LP,
16                                       SPRING VILLA APARTMENTS, LP, SUN
                                         VALLEY HOLDINGS, LTD, VILLAGE
17                                       GROVE APARTMENTS, LP

18
    Dated: March 15, 2024                Respectfully submitted,
19
                                         ARNALL GOLDEN GREGORY
20

21                                       /s/ Richard Collins (as authorized 3/15/24)
                                         Richard Collins
22
                                         Attorneys for Owner and Non-Owner
23                                       Defendants WASATCH ADVANTAGE
                                         GROUP, LLC; CHESAPEAKE APARTMENT
24                                       HOLDINGS, LLC; ASPEN PARK HOLDINGS,
                                         LLC; BENT TREE APARTMENTS, LLC;
25                                       CALIFORNIA PLACE APARTMENTS, LLC;
                                         CANYON CLUB HOLDINGS, LLC;
26                                       COURTYARD AT CENTRAL PARK
                                         APARTMENTS, LLC; CREEKSIDE
27                                       HOLDINGS, LTD; RIVER OAKS HOLDINGS,
                                         LLC; WASATCH PREMIER PROPERTIES,
28                                       LLC; WASATCH POOL HOLDINGS III, LLC;

                                         42

WASATCH POOL HOLDINGS, LLC;
CAMELOT LAKES HOLDINGS, LLC;
HERITAGE PARK APARTMENTS, LP;
PEPPERTREE APARTMENT HOLDINGS, LP;
SHADOW WAY APARTMENTS, LP;
WASATCH QUAIL RUN GP, LLC

Exhibit A

Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel: (510) 763-9800 | Fax: (510) 835-1417

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
Tel: (510) 834-3300 | Fax: (510) 834-3377

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
Tel: (510) 437-1863 | Fax: (510) 437-9164

Jocelyn Larkin (SBN 110817)
jlarkin@impactfund.org
Lindsay Nako (SBN 239090)
lnako@impactfund.org
THE IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704
Tel: (510) 845-3473 | Fax: (510) 845-3654

Attorneys for Plaintiffs and Relators and the Certified Classes

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA | Case No.: 2:15-CV-00799-KJM-DB |
| | CLASS ACTION |
| | **PLAINTIFFS' PROPOSED FACT STIPULATIONS** |
| Plaintiffs/Relators, | |
| vs. | Date:    Feb. 16, 2024<br>Time:    10:00 am<br>Dept:    Courtroom 3, 15th Floor<br>Before:  Hon. Kimberley J. Mueller |
| WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, | Trial Date:    None Set |

1  |  LOGAN PARK APARTMENTS, LLC, LOGAN
PARK APARTMENTS, LP, ASPEN PARK
2  |  HOLDINGS, LLC, BELLWOOD JERRON
HOLDINGS, LLC, BELLWOOD JERRON
3  |  APARTMENTS, LP, BENT TREE
APARTMENTS, LLC, CALIFORNIA PLACE
4  |  APARTMENTS, LLC, CAMELOT LAKES
HOLDINGS, LLC, CANYON CLUB HOLDINGS,
5  |  LLC, COURTYARD AT CENTRAL PARK
APARTMENTS, LLC, CREEKSIDE HOLDINGS,
6  |  LTD, HAYWARD SENIOR APARTMENTS, LP,
HERITAGE PARK APARTMENTS, LP, OAK
7  |  VALLEY APARTMENTS, LLC, OAK VALLEY
HOLDINGS, LP, PEPPERTREE APARTMENT
8  |  HOLDINGS, LP, PIEDMONT APARTMENTS,
LP, POINT NATOMAS APARTMENTS, LLC,
9  |  POINT NATOMAS APARTMENTS, LP, RIVER
OAKS HOLDINGS, LLC, SHADOW WAY
10 |  APARTMENTS, LP, SPRING VILLA
APARTMENTS, LP, SUN VALLEY HOLDINGS,
11 |  LTD, VILLAGE GROVE APARTMENTS, LP,
WASATCH QUAIL RUN GP, LLC, WASATCH
12 |  PREMIER PROPERTIES, LLC, WASATCH
POOL HOLDINGS III, LLC,
13 |  and DOES 1-4,

14 |        Defendants.

893227.1

## PLAINTIFFS' PROPOSED FACT STIPULATIONS

Plaintiffs have proposed the following fact stipulations addressing undisputed facts established in summary judgment briefing or the discovery record.  Plaintiffs provided the large majority of these proposals to Defendants on October 23, 2023, and provided 8 additional proposed stipulated facts to Defendants on January 25, 2024.

### Definitions

1.      Defendant Wasatch Property Management, Inc., ("Wasatch") manages residential apartment communities in California, Utah, Arizona, and Washington.

2.      "Section 8" is a federal program that provides rental assistance to low-income tenants.  The Section 8 program is authorized by federal law (42 U.S.C. §1437f(o)) and is also known as the Housing Choice Voucher program.

3.      "Additional Service Charges" are the charges Wasatch made to tenants for renters' insurance, washer/dryer rental, covered parking, media, garage rental, pet rent, month-to-month fees, RentPlus, storage rental, security alarm systems, uncovered parking, and common garage access.

4.      "Additional Services Agreements" are the contracts with the same name created by Wasatch and attached to lease agreements at the Subject Properties.  Additional Services Agreements list the rules that Wasatch applied to its Additional Service Charges.

5.      "Relevant Tenants" are all tenants who lived at a Wasatch property while participating in the Section 8 program and being charged Additional Service Charges at any time from February 1, 2006[1], to December 31, 2022.

6.      "Subject Properties" are properties managed by Wasatch where Relevant Tenants were charged Additional Service Charges at any time from February 1, 2006, to December 31, 2022. This is a list of the Subject Properties:

| Property Name | Location |
|---------------|----------|
| 600 Lofts | Salt Lake City, UT |
| Arcadia | Sandy, UT |

---

[1] The earliest data available on Section 8 tenant charges begins on February 1, 2006.

1

| | |
|---|---|
| Arcadia II | Sandy, UT |
| Arroyo Vista Apartments | Glendale, AZ |
| Aspen Park Apartments | Sacramento, CA |
| Avenue 8 Studios | Las Vegas, NV |
| Aztec Springs Apartments | Mesa, AZ |
| Bellwood Park Apartments | Sacramento, CA |
| Bent Tree Apartments | Sacramento, CA |
| Bridges at Five Oaks Apartments | Highlands, CA |
| Brighton Place Apartments | Midvale, UT |
| Broadmoor Village Apartments | West Jordan, UT |
| Brookside Apartments | Phoenix, AZ |
| Burnett Station Apartments | Renton, WA |
| California Place Apartments | Sacramento, CA |
| Canyon Club Apartments | Oceanside, CA |
| Canyon Ridge Apartments | Surprise, CA |
| Chesapeake Commons Apartments | Rancho Cordova, CA |
| Cimarron Place Apartments | Tucson, CA |
| City Lofts | Salt Lake City, UT |
| Courtyard at Central Park | Fresno, CA |
| Creekside Villa Apartments | San Diego, CA |
| Crossroads Apartments | West Valley, UT |
| Devonshire Court East | North Logan, UT |
| Devonshire Court West | North Logan, UT |
| Enclave at 1400 South | Salt Lake City, UT |
| Falls at Hunters Pointe | Sandy, UT |
| Florentine Villas | Midvale, UT |

2

| Four Seasons at Southtowne | South Jordan, UT |
| Garden Lofts | Salt Lake City, UT |
| Glen Oaks Apartments | Glendale, AZ |
| Goldstone Place Apartments | Clearfield, UT |
| Hayward Village Tax Credit | Hayward, CA |
| Heritage Park Tax Credit | Norco, CA |
| Heron Pointe Apartments | Fresno, CA |
| Jerron Place | Sacramento, CA |
| Kimpton Square | Midvale, UT |
| Landing at Fancher Creek | Fresno, CA |
| Lofts at 7800 | Midvale, UT |
| Logan Park | Sacramento, CA |
| Meadows at Homestead | Logan, UT |
| Metropolitan Place Apartments | Renton, UT |
| Oak Valley Apartments | North Highlands, UT |
| Overlook at Pantano | Tucson, AZ |
| Palladio Apartments – Phase 1 | Salt Lake City, UT |
| Peppertree Apartment Holdings | Spring Valley, CA |
| Piedmont Apartments | Oakland, CA |
| Point Natomas Apartments | Sacramento, CA |
| Promontory Point Apartments | Sandy, UT |
| Providence Place | Salt Lake City, UT |
| Quail Run Apartments | Santa Rosa, CA |
| Ranchwood Apartments | Glendale, AZ |
| Remington Apartments | Midvale, UT |
| Revo 225 | Renton, WA |

| Rio Seco Apartments | Tucson, AZ |
|---|---|
| River Oaks Apartments | Hanford, CA |
| River Point Apartments | Tucson, AZ |
| Sands Apartments | Mesa, AZ |
| Shadow Way Apartments | Oceanside, CA |
| Spring Villas Apartments | Spring Valley, CA |
| Springwood Apartments | Bountiful, UT |
| Sun Valley Apartments | Sacramento, CA |
| The Reserve at View 78 | Midvale, UT |
| The Sage | American Fork, IT |
| Tuscany Villas | Midvale, UT |
| Veranda | Draper, UT |
| Village Grove Apartments | Escondido, CA |
| Wasatch Hills Apartments | Renton, WA |

7. "Pay or Quit Notices" are written communications that Wasatch uses to tell tenants that, to avoid eviction proceedings, they must either pay an overdue amount or move out of their apartment within a certain number of days. "Pay or Quit Notices" have different names, including notices to "Pay or Vacate," "Pay Rent or Quit," "Comply with Financial Covenant of Lease or Quit," and "Comply with Lease or Quit" (when the compliance is payment), as well as the untitled Arizona form notice asking for the same actions.

**Relevant Time Period**

8. Unless otherwise specified, all stipulated facts are true for the entirety of the period starting on February 1, 2006, through the date that this document is signed.

**Relevant Properties**

9. Unless otherwise specified, all stipulated facts are true for all Subject Properties.

893227.1

**The Section 8 Program**

10.     The Section 8 program helps low-income families find safe and affordable housing by using federal funds to subsidize the cost of renting privately owned housing units.  [24 C.F.R. § 982.1(a)(1)]

11.     The Section 8 program is funded by the United States Department of Housing and Urban Development ("HUD") and administered by local public housing agencies ("PHAs").  [42 U.S.C. § 1437f(o); 24 C.F.R. §§ 982.101(a), 982.51]

12.     The Section 8 program is governed by federal regulations with limited areas for PHAs to make decisions and exercise discretion. [*See* 24 C.F.R. § 982]

13.     PHAs review applications from tenants and approve eligible tenants and tenant families to participate in the Section 8 program.  Approved tenants receive a voucher that they can use to pay a portion of the monthly rent for a privately owned unit.  The tenant must pay the rest of the monthly rent.

14.     When an approved tenant finds a housing unit to rent, the PHA must decide whether the monthly rent charged by the property owner is reasonable.  [24 C.F.R. § 983.303]  The approved monthly rent is known as the "initial rent to owner."  [24 C.F.R. §§ 983.301, 983.302]  The rent to owner can be increased over time.  [24 C.F.R. § 983.302]  The PHA must approve each rent increase.  [24 C.F.R. § 983.302]

15.     A Section 8 tenant's share of the monthly rent depends on their income.  [42 U.S.C. §§ 1437f(o)(2)(A), (B); 24 C.F.R. § 982.1(a)(3)]  HUD defines how PHAs calculate the tenant's share.  [42 U.S.C. §§ 1437f(o)(2), (3); 24 C.F.R. §§ 982.1(a)(3), 982.505]  The monthly amount paid by the tenant is known as the "tenant rent."  If the tenant has little or no income, their tenant rent will be $0.

16.     The PHA uses federal money to pay the rest of the monthly rent.  [Housing and Community Development Act of 1974, PL 93–383 (S 3066), 88 Stat. 633]  This payment is known as the "housing assistance payment" or "HAP rent."  [42 U.S.C. § 1437f(o)(10)(D); 24 C.F.R. § 982.4]  If the tenant has little or no income, the HAP rent will pay all of the monthly rent for the unit.

17.     The tenant and the PHA each pay their share to the owner each month in separate payments.  [24 C.F.R. § 983.353(b)(1); 24 C.F.R. § 983.351(b)]  The total rent received by the owner may not exceed the rent to owner approved by the PHA.  [24 C.F.R. §§ 983.303]

18.     Section 8 tenants who are evicted for failing to pay their tenant rent will be removed from the Section 8 program and lose their rent voucher.  [Defs.' Response to Pls.' SUMF ¶ 20, ECF No. 258-1; Johnson Dep. 125:17-128:16, July 19, 2021; Johnson Decl. in Supp. of Defs.' Opp'n to Mot. Class Cert. ¶ 8, ECF No. 78-4]

### The Housing Assistance Payments Contract

19.     Property owners participate in the Section 8 program by agreeing to rent a housing unit to an approved tenant.  The owner's participation in the program must follow the rules listed in the Housing Assistance Payments Contract ("HAP Contract").  The owner and the PHA both sign the HAP Contract before the tenant moves into the unit.  [HAP Contract, Part B ¶1a]  The HAP Contract lasts for the whole time the tenant lives in the unit while participating in the Section 8 program.  The owner must follow the rules listed in the HAP Contract, even when they are different from other agreements between the owner and the tenant, including the lease agreement.

20.     The HAP Contract is a standard form contract created by HUD, also known as Form HUD-52641.  There have been multiple versions of the HAP Contract between February 2006 and today.  Examples of all versions of the HAP Contract since February 2006 are attached in Exhibit __.

21.     All PHAs must use the standard form HAP Contract.  PHAs may not change any of the parts of the HAP Contract that are important to this case.   [HAP Contract cover page, "Use of this form"; 24 CFR 982.451]

22.     All HAP Contracts contain three parts: Part A ("Contract Information"), Part B ("Body of Contract"), and Part C ("Tenancy Addendum").

23.     Part A of the HAP Contract, Contract Information, states the rent to owner and the HAP rent payment for the rental unit.  The difference between the rent to owner and the HAP rent payment is the tenant rent.

893227.1

24.     In Part B of the HAP Contract, the Body of the Contract, the owner promises to follow all Section 8 program requirements.

25.     Part C of the HAP Contract, the Tenancy Addendum, describes the rights of the tenant and their family under the HAP Contract and the Section 8 program.

## Wasatch's Rental Practices for Section 8 Tenants

26.     Wasatch requires every tenant, including Relevant Tenants, to sign a Residential Lease Agreement and Additional Services Agreement before they can move into a rental unit. [Defs.' Response to Pls.' SUMF ¶¶ 1–2, ECF No. 258-1]

27.     Wasatch signed a HAP Contract for each unit rented to a Relevant Tenant when the tenant signed their first Residential Lease Agreement.  [Defs.' Response to Pls.' SUMF ¶¶ 1–2, ECF No. 258-1]

28.     For each Relevant Tenant, the local PHA approved the rent to owner in the HAP Contract.  The local PHA also approved the amount of the HAP rent payment that it would transfer to Wasatch each month and the amount of tenant rent that the Relevant Tenant would pay to Wasatch each month.  Wasatch was aware of the rent to owner, the HAP rent payment, and the tenant rent for each unit rented to a Relevant Tenant.

## Wasatch's Additional Service Charges

29.     Wasatch charged Additional Service Charges to Relevant Tenants in addition to the rent to owner amount authorized by the HAP Contract.  [Defs.' Response to Pls.' SUMF ¶ 7, Defs' Resp. to Terry Request for Admiss, Set 2, No. 11]

30.     Wasatch collected Additional Service Charges from Relevant Tenants in addition to the rent to owner amount authorized by the HAP Contract.  [Defs.' Response to Pls.' SUMF ¶ 7, Defs' Resp. to Terry Request for Admiss, Set 2, No. 11]

31.     Before January 17, 2023, Wasatch required Relevant Tenants to pay Additional Services Charges for the period of time covered by their Residential Lease Agreement.  Wasatch did not allow Relevant Tenants to cancel early.  [Jarvis Dep. 18:15, May 18, 2023; Jarvis Dep. Ex. 74]

893227.1

**Wasatch's Treatment of Additional Service Charges in Its Standard Rental Forms**

32.     Wasatch's form Residential Lease Agreement includes a page entitled "Monthly Cost Breakdown" that combines "base rent" and Additional Service Charges in the tenant's "Total Monthly Obligation."  The Agreement instructs tenants that "[y]our monthly payment is due and payable . . . on or before the 1st day of each month."  [Defs.' Response to Pls.' SUMF ¶ 12]  An example of the Residential Lease Agreement is attached as Exhibit __.

33.     Wasatch's form Renewal Notification Letter describes Additional Service Charges as part of the tenant's "new rental rate," stating: "When you renew your lease, your new rental rate will be $_____, this rate includes rent and any applicable service items (such as parking, renter's insurance, pet, etc)."  [Defs.' Response to Pls.' SUMF ¶ 13]   An example of the Renewal Notification Letter is attached as Exhibit __.

34.     Wasatch's form Move-In Cost Sheet combines rent and Additional Service Charges in multiple places.  The Cost Sheet states: "Your total monthly obligation will be $____, not including utilities" (providing a number that combines monthly rent and Additional Service Charges).  The Cost Sheet lists a single amount for "Rent and Additional Services" for the first month.  The amount listed as "Total Move in & First Month's Rent" includes Additional Service Charges. [Defs.' Response to Pls.' SUMF ¶ 14]  An example of the Move-In Cost Sheet is attached as Exhibit __.

35.     Wasatch's form Monthly Statement of Rental Account tells tenants that "[t]he first of the month is quickly approaching and rent will be due," then provides a "Total Due" that includes Additional Service Charges.  The Monthly Statement of Rental Account also tells tenants that they will have to pay a late fee if the Total Due "is not paid by 5:00 pm on the 3rd."  [Defs.' Response to Pls.' SUMF ¶ 15]  An example of the Monthly Statement of Rental Account is attached as Exhibit __.

**Wasatch's Policies for Collecting Unpaid Additional Service Charges**

*Defendants' Payment Sequence Policy*

36.     Before November 30, 2022, Wasatch used a payment sequence policy to set the rules for how tenant payments must be applied to outstanding charges on the tenant ledger.  There is a

1   written document that describes the payment sequence policy.  It is called the "Payment Sequence

2   for Receipting Payments."  Under Wasatch's payment sequence policy, Wasatch first used tenant

3   payments to pay any unpaid Additional Service Charges.  Once all Additional Service Charges were

4   paid, then Wasatch used tenant payments to pay any unpaid base rent charges.  The payment

5   sequence policy is attached as Exhibit __.  [Defs.' Response to Pls.' SUMF ¶ 18; Defs.' Further

6   Amended Response to Livingston Interrog. No. 6]

7        37.    The Payment Sequence for Receipting Documents states: "The computer is

8   programmed to apply all payments to all items other than RENT first, leaving any delinquent portion

9   as RENT owed.  In most areas that Wasatch operates in, properties can only go to court for RENT

10  and not for depositions, additional service items (pet, parking, storage, etc.)."  In this document, "go

11  to court" means starting eviction proceedings against a tenant.

12       38.    On November 30, 2022, Wasatch changed its payment sequence policy for all

13  tenants, including Relevant Tenants.  The new payment sequence policy requires Wasatch to use

14  tenant payments to pay any unpaid base rent charges first.  Once all base rent charges are paid, then

15  Wasatch can use tenant payments to pay any unpaid Additional Service Charges.  [Defs.' Further

16  Amended Response to Livingston Interrog. No. 6]

17  ***Policies Regarding Outstanding Tenant Balances***

18       39.    When tenants have unpaid amounts of less than $100, Wasatch's policy is to send

19  tenants "notice that future rents will not be accepted unless paid in full."  This means that tenants

20  must pay all unpaid charges, including Additional Service Charges, before Wasatch will allow them

21  to pay rent.  [Defs.' Response to Pls.' SUMF ¶ 25]

22       40.    When tenants have unpaid amounts of $100 or more, Wasatch's policy is to send a

23  Pay or Quit Notice, even where some or all of the $100 balance is unpaid Additional Service

24  Charges.  [Order, ECF No. 278 at p. 13]

25       41.    Wasatch routinely sends Pay or Quit Notices to tenants, where the amount demanded

26  includes unpaid Additional Service Charges.  [Defs.' Response to Pls.' SUMF ¶ 27]  Examples of

27  Wasatch's commonly used Pay or Quit Notices are attached as Exhibit __.

28

42.     In California, Wasatch uses a standard Pay or Quit Notice for non-rent charges that is called "Three Day Notice to Perform Financial Covenant or Quit." [Defs.' Response to Pls.' SUMF ¶ 29] An example of the Three Day Notice to Perform Financial Covenant or Quit is attached as Exhibit __.

43.     Wasatch uses Pay or Quit Notices to help collect unpaid amounts under $100 from tenants, including Relevant Tenants. [Defs.' Response to Pls.' SUMF ¶ 30]

44.     Wasatch has sent Pay or Quit Notices to Relevant Tenants for amounts of less than $100, where the amount demanded includes or is all Additional Service Charges. [Defs.' Response to Pls.' SUMF ¶ 31]

**Wasatch's Practices Related to the Section 8 Program**

45.     Wasatch has filled out Part A of the HAP Contract for each HAP Contract they signed, including identifying the monthly base rent amount as the "initial rent to owner."

46.     Wasatch has never included Additional Service Charges in the "initial rent to owner" or later rent to owner amounts approved by PHAs.

47.     Wasatch did not ask the PHAs whether the Section 8 program allows it to charge Relevant Tenants Additional Service Charges. [Jarvis Dep. 133:3-14, Aug. 10, 2017]

48.     Wasatch has not told PHAs how its Additional Service Agreements or Additional Service Charges work at its Subject Properties. [Johnson Dep. 72:16-21, July 19, 2021]

49.     Wasatch has not received any communications from HUD indicating that HUD approves of Wasatch's practice of charging Section 8 tenants for Additional Service Charges in addition to the rent to owner. [Defs' Resp. to Terry RFA 16]

50.     Before this lawsuit, Wasatch never investigated whether its policies and practices related to Additional Service Charges comply with the requirements of the Section 8 program. [Defendants' Further Supplemental Responses to Terry Interrogatory No. 24.]

51.     Before this lawsuit, Wasatch never sought advice of legal counsel as to whether its policies and practices related to Additional Service Charges comply with the requirements of the Section 8 program. [Defendants' Further Supplemental Responses to Terry Interrogatory No. 24.]

52.     Wasatch never provided training for its officers or employees regarding the requirements of the Section 8 program.  [Defendants' Response to Terry RFA 4]

**The HAP Contract and Wasatch's Washer and Dryer Charges**

53.     Before July 1, 2019, Section 8 of Part A of the HAP Contract, titled "Utilities and Appliances," included the following directions: "The owner shall provide or pay for the utilities and appliances indicated below by an 'O'.  The tenant shall provide or pay for the utilities or appliances indicated below by a 'T'.  Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner."  These directions are in every HAP Contract completed before July 1, 2019.  [Defs.' Resp. to SUMF ¶ 33]

54.     After the instructions, Section 8 includes a table of utilities and appliances that the property owner must fill out.  Wasatch has never listed in-unit washers and dryers in the Section 8 table or anywhere else in the HAP Contract.  [Defs.' Resp. to SUMF ¶¶ 34, 35]

**Wasatch's Mandatory Renters' Insurance Requirement**

55.     Until December 2019, Wasatch required tenants to buy renters' insurance before they could move into any of the Subject Properties, except for those participating in the Low-Income Housing Tax Credit Program.  Tenants, including Relevant Tenants, made additional payments for renters' insurance beyond the rent to owner.  These additional payments either went to Wasatch as an Additional Service Charge or to a third-party insurer.  [Order, Dkt. No. 278 at pp. 15-16]

56.     In December 2019, Wasatch changed its policy to make renters' insurance optional.  Wasatch applied the new policy in new leases and lease renewals signed after December 2019. [Defs.' Resp. to SUMF ¶ 37]

57.     The Subject Properties participating in the Low-Income Housing Tax Credit Program are:

| Property Name | Location | Period of Participation |
|---|---|---|
| 600 Lofts | Salt Lake City, UT | Jun 2017 - Present |
| Arcadia | Sandy, UT | Feb 2018 - Present |
| Arcadia II | Sandy, UT | Jan 2021 - Present |

893227.1

| Bellwood Park Apartments | Sacramento, CA | Nov 2010 - Sept 2018 |
| Enclave at 1400 South | Salt Lake City, UT | Jul 2015 - Present |
| Bridges at Five Oaks | North Highlands, CA | Dec 2010 - Sept 2018 |
| Florentine Villas | Midvale, UT | Mar 2010 - Present |
| Garden Lofts | Salt Lake City, UT | Nov 2019 - Present |
| Heritage Park-Tax Credit | Norco, CA | Jul 2007 - Present |
| Hayward Village Tax Credit | Hayward, CA | Oct 2006 - Dec 2020 |
| Jerron Place | Sacramento, CA | Oct 2010 - Sept 2018 |
| Kimpton Square | Midvale, UT | Jan 2017 - Present |
| Logan Park | Sacramento, CA | Jun 1999 - Nov 2016 |
| Piedmont Apartment | Oakland, CA | Apr 2012 - Feb 2021 |
| Point Natomas Apartments | Sacramento, CA | Apr 2007 - Nov 2016 |
| Peppertree Apartment | Spring Valley, CA | Jan 2013 - Present |
| Providence Place | Salt Lake City, UT | Dec 2011 - Present |
| Quail Run Apartments | Santa Rosa, CA | Jan 2011 - Mar 2014 |
| The Reserve at View 78 | Midvale, UT | Mar 2020 - Present |
| Springwood Apartments | Bountiful, UT | Oct 2005 - Nov 2020 |
| Spring Villas Apartments | Spring Valley, CA | Jul 2006 - Present |
| Shadow Way Apartments | Oceanside, CA | Mar 2009 - Present |
| Tuscany Villas | Midvale, UT | Apr 2012 - Present |
| Veranda | Draper, UT | Jan 2018 - Present |
| Village Grove Apartment | Escondido, CA | Apr 2013 - Present |

## Wasatch's Other Mandatory Additional Service Charges

58.     Wasatch required tenants to pay mandatory Additional Service Charges for cable/media packages, parking, and washers and dryers at the properties listed below:

12

893227.1

| Property Name | Add'l Service Charge | Period of Mandatory Charge |
|---|---|---|
| Broadmoor Village Apartments | media package | May 1, 2018 - Jun 30, 2021 |
| Canyon Ridge Apartments | media package | Oct 1, 2020 - Jan 17, 2023 |
| Courtyard at Central Park | media package | Feb 1, 2008 - Jan 17, 2023 |
| Devonshire Court East | media package | Apr 1, 2019 - Jan 17, 2023 |
| Devonshire Court West | media package | Mar 1, 2019 - Jan 17, 2023 |
| Falls and Hunter Point | media package | Oct 1, 2018 - Jan 17, 2023 |
| Goldstone Place Apartments | media package | Feb 1, 2006 - Dec 31, 2015 |
| Landing a Fancher Creek | media package | Feb 1, 2006 - Jun 30, 2012 |
| Lofts at 7800 | media package | Aug 1, 2014 - Jan 17, 2023 |
| Metropolitan Place Apartments | media package | Nov 1, 2019 - Jan 17, 2023 |
| Rio Seco Apartments | media package | Sept 1, 2020 - Jan 17, 2023 |
| California Place Apartments | washer/dryer | Jul 1, 2015 - Jan 31, 2017 |
| Chesapeake Commons Apartments | washer/dryer | Feb 1, 2006 - May 30, 2016 |
| Chesapeake Commons Apartments | parking | Jun 1, 2015 - May 30, 2016 |
| Crossroads Apartments | parking | Feb 1, 2008 - Jan 17, 2023 |
| Promontory Apartments | parking | Apr 1, 2020 - Jan 17, 2023 |
| Revo 225 | parking | Jan 1, 2021 - Jan 17, 2023 |

59.     In January 2023, Wasatch created a written policy saying that Section 8 tenants did not have to pay mandatory charges.  Before January 2023, Wasatch did not have any written documents saying that Section 8 tenants did not have to pay mandatory charges.  [Defs.' Resp. to Terry RFA No. 17]

60.     In April 2016, the Sacramento Housing and Redevelopment Agency contacted Wasatch with concerns that mandatory washer and dryer charges at Chesapeake Commons violated the rules of the affordable housing bond program.

61.     Following the April 2016 inquiry from the Sacramento Housing and Redevelopment Agency, Wasatch ceased mandatory washer and dryer charges and mandatory parking charges at Chesapeake Commons.

62.     Relators and Wasatch began exchanging information, documents, and testimony from witnesses about the claims in this case in 2017.  In court cases, this exchange of information is called the "discovery" process.

63.     The first time Wasatch told Plaintiffs in the discovery process that it had an exemption from mandatory charges for Section 8 tenants was the summer of 2021. [Defs.' Resp. to Disputed Fact No. 8, ECF No. 263-4]

<u>**Wasatch's Yardi Database**</u>

64.     Since at least February 1, 2006, Wasatch has kept data related to its residential properties and tenants, including Relevant Tenants, in a central database called Yardi.  The Yardi data includes tenant ledgers showing all charges to tenants and payments from tenants.  [Joint Fact Stip. Re Yardi Data, ¶¶ 9, 23]

65.     After this case was filed, Plaintiffs and Wasatch jointly hired a data firm, Gelbgroup Consulting, to figure out the type of data available in Wasatch's Yardi database, and to extract data from that database and provide it to Plaintiffs and Wasatch.  [Joint Fact Stip. Re Yardi Data, ¶ 10]

66.     Gelbgroup Consulting provided the datasets listed in Exhibit __.  All datasets listed in Exhibit ___ are accurate and authentic excerpts of data from Wasatch's Yardi database.  [Joint Fact Stip. re Yardi Data, ¶¶ 18-33; Gelb Oct. 2022 Decl. ¶¶ 7-10]

67.     Gelbgroup Consulting identified Yardi tenant ledger data for Relevant Tenants and provided it to Plaintiffs and Wasatch.  Plaintiffs' forensic accounting expert, David Breshears, then analyzed the data.  [Joint Fact Stip. Re: Yardi Data, ¶ 23; Gelb Oct. 2022 Dec. ¶¶ 7-8]

893227.1

68.     Tenant charges and payments in Wasatch's Yardi tenant ledger data are labeled with individual "charge codes."  The following charge codes are Additional Service Charges:  [Joint Fact Stip. re Yardi Data ¶ 14]

- Security alarm (charge code "alarm")
- Cable package (charge code "cable")
- Common garage (charge code "garage")
- Furniture (charge code "furn")
- Renters' insurance (charge code "insur")
- Media Package (charge code "media")
- Month-to-month fees (charge code "mtm")
- Covered parking (charge code "park")
- Pet rent (charge code "pet")
- Storage (charge code "storage")
- Uncovered parking (charge code "uncpark")
- In-unit washer and dryer (charge code "wash")
- RentPlus (charge code "rentplus")

69.     Since February 2006, Wasatch has used the charge code "rentHAP" to identify HAP rent payments received from PHAs.  All "rentHAP" charges recorded on tenant ledgers in the Yardi data are charges that Wasatch made to PHAs under a HAP Contract that was current and binding at the time of the charge.  [Joint Fact Stip. Re: Yardi Data, ¶ 15; Defs.' Resp. to Terry RFA 44.]

### Authenticity of Documents

70.     Plaintiffs and Wasatch stipulate to the authenticity of all documents produced by Plaintiffs and Wasatch in this case, *U.S. ex rel. Terry v. Wasatch Advantage Group, LLC*, Case No. 2:15-CV-00799-KJM-DB, proceeding in the United States District Court for the Eastern District of California.

893227.1

Exhibit B

Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | (Fax) (510) 835-1417

Andrew Wolff (SBN 195092)
andrew@awolfflaw.com
LAW OFFICES OF ANDREW WOLFF, PC
1615 Broadway, 4th Floor
Oakland, CA 94612
Telephone: (510) 834-3300 | (Fax) (510) 834-3377

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
Telephone: (510) 437-1863 | (Fax) (510) 437-9164

Lindsay Nako (SBN 239090)
lnako@impactfund.org
Lori Rifkin (SBN 244081)
lrifkin@impactfund.org
Fawn Rajbhandari-Korr (SBN 315888)
fkorr@impactfund.org
Meredith Dixon (SBN 346864)
mdixon@impactfund.org
IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704
Tel: (510) 845-3473 | Fax: (510) 845-3654

Attorneys for Plaintiffs and Relators and the Certified Classes
*[Additional Counsel for Relators listed on following page]*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA,<br><br>Plaintiffs/Relators,<br><br>vs.<br><br>WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., | Case No.: 2:15-CV-00799-KJM-DB<br><br>CLASS ACTION<br><br>**PLAINTIFFS' SEPARATE STATEMENT ON POINTS OF LAW**<br><br>Date:    March 29, 2024<br>Time:    10:00 am<br>Dept:    Courtroom 3, 15th Floor<br>Before: Hon. Chief Judge Kimberly J. Mueller<br><br>Trial Date:    None Set |

1  WASATCH POOL HOLDINGS, LLC,
   CHESAPEAKE APARTMENT HOLDINGS, LLC,
2  LOGAN PARK APARTMENTS, LLC, LOGAN
   PARK APARTMENTS, LP, ASPEN PARK
3  HOLDINGS, LLC, BELLWOOD JERRON
   HOLDINGS, LLC, BELLWOOD JERRON
4  APARTMENTS, LP, BENT TREE
   APARTMENTS, LLC, CALIFORNIA PLACE
5  APARTMENTS, LLC, CAMELOT LAKES
   HOLDINGS, LLC, CANYON CLUB HOLDINGS,
6  LLC, COURTYARD AT CENTRAL PARK
   APARTMENTS, LLC, CREEKSIDE HOLDINGS,
7  LTD, HAYWARD SENIOR APARTMENTS, LP,
   HERITAGE PARK APARTMENTS, LP, OAK
8  VALLEY APARTMENTS, LLC, OAK VALLEY
   HOLDINGS, LP, PEPPERTREE APARTMENT
9  HOLDINGS, LP, PIEDMONT APARTMENTS,
   LP, POINT NATOMAS APARTMENTS, LLC,
10 POINT NATOMAS APARTMENTS, LP, RIVER
   OAKS HOLDINGS, LLC, SHADOW WAY
11 APARTMENTS, LP, SPRING VILLA
   APARTMENTS, LP, SUN VALLEY HOLDINGS,
12 LTD, VILLAGE GROVE APARTMENTS, LP,
   WASATCH QUAIL RUN GP, LLC, WASATCH
13 PREMIER PROPERTIES, LLC, WASATCH
   POOL HOLDINGS III, LLC,
14 and DOES 1-4,

15      Defendants.

16

17 Lawrence Anthony Organ (SBN 175503)
   larry@civilrightsca.com
   CALIFORNIA CIVIL RIGHTS LAW GROUP
18 332 San Anselmo Avenue,
   San Anselmo, CA 94960-2610
19 Phone: 415-453-4740 | Fax: 415-785-7352

20 Attorneys for Relators

21

22

23

24

25

26

27

28

**Plaintiffs' Separate Statement on Points of Law**

Pursuant to Local Rule 181(b)(8), Plaintiffs provide the following statement regarding points of law bearing on their claims at trial.

**A.     False Claims Act**

A defendant is liable under the FCA if it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  The elements of an FCA claim are "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis.*, 862 F.3d 890, 902 (9th Cir. 2017).

**1.     Falsity**

The existence of "a false statement or fraudulent course of conduct" may be demonstrated by false certifications or by promissory fraud. *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 675-76 (9th Cir. 2018) (express false certification); *Campie*, 862 F.3d at 902 (promissory fraud).

"Express false certification involves an entity's representation of compliance with the law as part of the process for submitting a claim when it is actually not compliant." *Silingo*, 904 F.3d at 675-76.  Wasatch Property Management ("Wasatch") certified in HAP Contracts that, "[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration ... for rental of the contract unit during the HAP contract term."  HAP Contract Part B, ¶ 8(d); *see also* Part B ¶ 6(a) & Part C ¶¶ 5(e)-(f) (limiting rent to the amount approved by the public housing agency, prohibiting additional rent charges, and requiring the immediate return of excess rent payments to the tenants).  A landlord's collection of excess rent violates its certification in the HAP Contract and establishes the falsity element under an express false certification approach.  *See Silingo*, 904 F.3d at 675-76; *see also United States ex rel. Oliver v. Parsons, Co*., 195 F.3d 457, 463 (9th Cir. 1999) (the element of falsity "is determined by whether [the defendant's] representations were accurate in light of applicable law."); *United States ex rel. Ellis v. Jing Shu Zheng*, No. 2:16-cv-01447-APG-NJK, 2018 WL 1074483, at *3 (D. Nev. Feb. 26, 2018) ("*Ellis I*"), *aff'd sub nom. Ellis v. Zheng*, 799 F. App'x 551 (9th Cir. 2020) ("*Ellis II*") (falsity established where landlord collect excess rent despite certifications and promises in the HAP Contract).

1

894998.8

1    Under a promissory fraud approach, "'liability will attach to each claim submitted to the

2  government under a contract, when the contract or extension of the government benefit was originally

3  obtained through false statements or fraudulent conduct.'" *Kelly v. Denault*, 374 F. Supp. 3d 884, 889

4  (N.D. Cal. 2018) (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th

5  Cir. 2006)). "'In other words, subsequent claims are false because of an *original fraud*,'" which may

6  include a false certification material to the defendant's participation in the program. *Campie*, 862 F.3d

7  at 902, 904 (quoting *Hendow*, 461 F.3d at 1173) (concluding that the relators' allegations of false

8  certifications "satisfied the falsity requirement under a theory of promissory fraud," with the result that

9  "each claim was fraudulent even if false representations were not made therein").

10    The Court already determined at summary judgment that Wasatch unlawfully charged Section

11  8 tenants excess rent by (1) treating additional service charges as rent, (2) requiring tenants to purchase

12  renters' insurance as a condition of leasing, and (3) making unauthorized washer and dryer charges that

13  were not disclosed on the HAP Contract.  Summ. J. Order 9-16, ECF No. 278.  This ruling establishes

14  the falsity of Wasatch's certifications in the HAP Contracts that it would not receive excess rent from

15  relevant tenants, as Wasatch was "actually not compliant" with the rent limitation that was the subject

16  of its certification.  *See Silingo*, 904 F.3d at 675-76; *see also, e.g.*, *U.S. ex rel. Sutton v. Reynolds*, 564

17  F. Supp. 2d 1183, 1187 (D. Or. 2007) (holding that collection of excess rent from Section 8 tenants

18  satisfied falsity requirement); *Ellis I*, 2018 WL 1074483, at *3 (same).[1]

19     WAG Defendants seek to relitigate the correctness of this Court's summary judgment ruling in

20  their points of law and in the Amended Joint Pretrial Statement.  WPM Defendants have now

21  jettisoned their prior Points of Law statement related to the FCA and replaced it with text identical to

22  that included in the WAG Defendants' Points of Law.

23    Contrary to Defendants' position, the Court's prior legal ruling in this case as to the definition

24  of rent applies equally to Plaintiffs' FCA claim. Before addressing summary judgment on Plaintiffs'

25  UCL and contract claims, the Court's order first determined as a matter of law that "the definition of

26

---

27  [1] WAG Defendants incorrectly state that Plaintiffs agree that the "the alleged falsity in this case lies
with the definition of 'rent' for purposes of the HAP Contract between the PHA and the owner."  The
28  falsity lies with the facts that Defendants certified that they would not charge excess rent and they did
charge excess rent in the form of additional service charges.  *See* Summ. J. Order at 13.

1 rent properly turns on a tenant's right 'to live in and make use' of a unit."  Summ. J. Order.112.  The

2 Court then found that, as a result of Wasatch's policies and practices, additional service charges

3 constituted rent under this definition, and therefore violated federal law and the HAP contract's

4 prohibition against excess rent.  *Id*. at 13.  After making this finding, the Court moved on to address

5 and granted summary judgment for Plaintiffs on their UCL and breach of contract claims, based on the

6 record of undisputed facts before the Court.  *Id*. at 13-16.  The Court's finding that additional services

7 charges were unlawful under federal law and the HAP Contract was not based on analyses of

8 California law, the UCL, or contract law.  *See id*. at 9-16.  There is no basis for either WAG

9 Defendants or WPM Defendants to relitigate summary judgment or claim that a different definition of

10 rent applies under the FCA.

11      Defendants also incorrectly represent that the Court did not analyze the relevant regulations

12 when determining the proper definition of rent.  In fact, the Court's order thoroughly explored the

13 statutory and regulatory framework and case law that Defendants now discuss in their pretrial filings as

14 if they were uncharted seas.  Summ. J. Order 3-6, 9-13.  Specifically, Plaintiffs' briefing and the

15 Court's order detailed the relevant statutory and regulatory framework governing the Section 8

16 Program, and addressed both the HAP contract and the tenancy addendum. *See, e.g.*, Pls.' & Relators'

17 Mem. of P. & A. in Supp. of Mot. for Partial Summ. J. 2-3, 11-20, ECF No. 242; Summ. J. Order 3-4.

18 The Court then explained that "[n]either Section 8's governing statute nor implementing regulations

19 define 'rent.'" Summ. J. Order at 10 (citing *Velez v. Cuyahoga Metropolitan Housing Authority*, 795 F.

20 3d 578, 582-83 (6th Cir. 2015)), before examining the definition of rent under federal common law.

21 The Court correctly explained that federal cases consistently hold that "extra charges, even when

22 labeled as additional amenities, can constitute illegal side payments." *Id*. at 10 (citations omitted).  The

23 Court also addressed the analysis of "rent" in *Velez* and *Sager v. Housing Commission of Anne Arundel*

24 *County*, 957 F. Supp. 2d 627, 638 (D. Md. 2013) before determining the definition of rent as a matter

25 of law.

26      The Court's summary judgment rulings are the law of the case and govern the issue throughout

27 this case. *See Pepper v. United States*, 562 U.S. 476, 506 (2011).  Because this Court has already held

28 that the additional service charges as impermissible excess rent under federal law, falsity under the

1  FCA has already been established.

2  **2.  Scienter**

3  To find liability, the jury must conclude that Wasatch "knowingly" presented false or

4  fraudulent claims for payment.  *See Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d

5  1201, 1211 (9th Cir. 2019) (citing 31 U.S.C. § 3729(a)(1)(A)).  "'Knowingly' is defined as having:

6  (1) actual knowledge of the information; (2) deliberate ignorance of the truth or falsity of the

7  information; or (3) reckless disregard of the truth or falsity of the information."  *Id.* (citing 31 U.S.C.

8  § 3729(b)(1)(A)).  This standard does not require "proof of specific intent to defraud." 31 U.S.C.

9  § 3729(b)(1)(B).

10  Recipients of federal funds have "some duty to make a limited inquiry so as to be reasonably

11  certain they are entitled to the money they seek."  *Godecke*, 937 F.3d at 1211 (quotation marks &

12  citation omitted).  "'Protection of the public fisc requires that those who seek public funds act with

13  scrupulous regard for the requirements of the law . . . . Those who deal with the Government are

14  expected to know the law and may not rely on the conduct of Government agents contrary to law.'"

15  *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1422 (9th Cir. 1991)

16  (quoting *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63 (1984)).

17  **3.  Materiality**

18  "Material" is defined in the FCA as "having a natural tendency to influence, or be capable of

19  influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).  This is an

20  objective test.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016)

21  ("*Escobar*") (citing "common law antecedents" setting objective "reasonable person" standards for

22  evaluating materiality); *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012)

23  ("[T]he test for materiality is an objective one.").  "A materiality inquiry under the FCA is a holistic,

24  totality-of-the-circumstances examination . . . . " *United States ex rel. Int'l Bhd. of Elec. Workers Loc.*

25  *Union No. 98 v. Farfield Co.*, 5 F.4th 315, 342 (3d Cir. 2021); *Escobar*, 579 U.S. at 191 (citing

26  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)).

27  Some of the non-exhaustive factors that may support a finding of materiality include (1) the

28  government's designation of a program requirement as a "condition of payment," *Escobar*, 579 U.S. at

4

1   190 (noting this factor is "relevant to but not dispositive of the materiality inquiry"); (2) the magnitude

2   of the violation, *id.* at 194; (3) the misrepresentation undermines the purpose of the program or affects

3   the essence of the bargain, *United States ex rel. Carmichael v. Gregory*, 270 F. Supp. 3d 67, 71

4   (D.D.C. 2017) ("*Carmichael*"); *Escobar*, 579 U.S. at 193 n.5; and (4) the government's track record of

5   enforcing the requirement at issue, *id.* at 195.

6           The design and structure of the Section 8 program and the HAP Contract are relevant to the

7   materiality inquiry at trial.  Section 8 landlords' certification in the HAP Contract that they will not

8   collect excess rent, and their compliance with that promise, are express conditions of payment.  HAP

9   Contract Part 6 ¶ 7(b).  The prohibition on collecting excess rent is further underscored by federal

10  regulations.  24 C.F.R. § 982.451(b)(4)(ii).  Federal regulations prohibit approval of a Section 8

11  tenancy "unless the rent is reasonable." 24 C.F.R. 982.1(a)(2).  In this context, courts have found no

12  room for doubt "that the amount of rent [to be] charged is a 'material' term" of the Section 8 program.

13  *Carmichael*, 270 F. Supp. 3d at 71.  Indeed, the "collection of excess rent 'affect[s] one of the most

14  basic terms of the [HAP] Contract.'"  *Kelly*, 374 F. Supp. 3d at 892 (quoting *Sutton*, 564 F. Supp. 2d at

15  1189).  "Most importantly, the Section 8 voucher program exists to aid low-income families in

16  obtaining housing, 'and that purpose is clearly undermined when a program participant overcharges a

17  beneficiary of the program.'"  *Id.* (quoting *Carmichael*, 270 F. Supp. 3d at 71).

18          **4.     Claims**

19          The final element of the FCA is the presentation of a claim for payment of federal funds.  *See*

20  *Campie*, 862 F.3d at 902, 907.  A claim for payment arises "whenever the government is asked to 'pay

21  out or forfeit moneys due.'"  *Hendow*, 461 F.3d at 1173 (citation omitted).  Claims may be actionable

22  although made to a grantee or other recipient that is charged with implementing a federally funded

23  program.  *See* 31 U.S.C. § 3729(b)(2)(A)(ii).  The Ninth Circuit recognizes that each housing

24  assistance payment received by a Section 8 landlord constitutes "its own 'claim against the government

25  fisc'" and thus its own separate FCA violation.  *Ellis II*, 799 F. App'x at 552 (citing *Hendow*, 461 F.3d

26  at 1177).

27          **5.     Damages**

28          If the jury finds liability under the FCA, then it will be tasked with determining actual damages

1    sustained by the government.  31 U.S.C. § 3729(a)(1).  A landlord who charges unlawful excess rent in

2    violation of the HAP Contract is not entitled to receive any housing assistance payments; accordingly,

3    the government's actual damages under the FCA are equal to "the entire amount [the owner] received

4    from the government."  *Ellis II*, 799 F. App'x at 552 (citing *United States v. Mackby*, 339 F.3d 1013,

5    1018-19 (9th Cir. 2003)).

6              **6.       Statute of Limitations**

7              Defendants have raised a question about the statute of limitations that applies to Plaintiffs'

8    cause of action under the FCA.  An action under the FCA must be brought either: (1) no more than six

9    years after the date on which the violation was committed; or (2) no more than three years after the

10   date "when facts material to the right of action are known or reasonably should have been known by

11   the official of the United States charged with responsibility to act in the circumstances, but in no event

12   more than 10 years after the date on which the violation is committed," "whichever occurs last."  31

13   U.S.C. § 3731(b).  Contrary to WAG Defendants' puzzling contention, it is clear that Section

14   3731(b)(2) provides a ten-year limitations period where, as here, the "official of the United States

15   charged with responsibility to act" does not learn the material facts or does not have reason to know of

16   the material facts before the suit is filed.  *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139

17   S.Ct. 1507, 1513 (2019).

18             If Defendants intend to raise the issue of statute of limitations as a defense, Defendants have

19   the burden of pleading and proving limitations bar Plaintiffs' claims.  Thus, it is Defendants' burden in

20   the first instance to plead and prove that the Government knew or should have known of the prohibited

21   conduct such that the six-year limitation applies.  Defendants have not made this showing or carried

22   their burden.  *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,* 848 F.3d 366, 383–84

23   (5th Cir. 2017) (holding that party asserting the statute-of-limitations defense bore the burden of

24   proving limitations barred the claims, including demonstrating that the Government knew or should

25   reasonably have known at the relevant time).WAG Defendants do not support their claim that the

26   Government knew or should have known the facts material to the FCA claims at the time of the

27   violations.  The relevant U.S. officials are the Attorney General and their designees in the Department

28   of Justice, as they are the officials who have the responsibility to investigate and prosecute claims

                                                          6

1   under the False Claims Act.  *See, e.g.*, *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593,

2   607-08 (S.D.N.Y. 2013) (collecting cases).  WAG Defendants say that "from the face of the operative

3   Complaint" the government knew or should have known the facts material to Relators' FCA claims,

4   but do not explain how *any* government official knew the material facts about Wasatch's practices and

5   policies around additional service charges that converted them to unlawful excess rent.  *See* Summ. J.

6   Order 9-11 (describing policies and practices which treated charges as rent).  Consequently, the

7   complaint itself was the event that triggered the statute of limitations, and a 10-year statute of

8   limitations applies.  *See Cochise*, 139 S.Ct. at 1513.

9   **B.    Consumer Legal Remedies Act**

10          California's CLRA prohibits "unfair methods of competition and unfair or deceptive acts or

11   practices," including specific acts, such as "misrepresenting the source, sponsorship, approval, or

12   certification of goods and services."  Cal. Civ. Code § 1770(a)(2).  Because Plaintiffs solely seek

13   injunctive relief under the CLRA, their claim against Wasatch Property Management under the CLRA

14   will be tried to the Court along with injunctive relief under the UCL.

15          To prove their CLRA claim, Plaintiffs must first prove that the Named Plaintiffs have "lost

16   money or property," which requires Plaintiffs to demonstrate "some form of economic injury" as a

17   result of Wasatch's unlawful practices, although "the quantum of lost money or property necessary to

18   show standing is only so much as would suffice to establish [Article III] injury in fact."  *Hinojos v.*

19   *Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc*

20   (July 8, 2013) (citations omitted); *see also Hansen v. Newegg.com Americas, Inc.*, 25 Cal. App. 5th

21   714, 724 (2018); Cal. Civ. Code § 1780(a).

22          To find that Wasatch has classwide liability under the CLRA, the Court must determine

23   whether: (1) Named Plaintiffs suffered economic injury as a result of Wasatch's unlawful practice (*see*

24   *Hinojos*, 718 F. 3d at 1104); (2) class members entered into a transaction intended to result or that

25   results in the sale or lease of goods or services for personal, family, or household purposes (Cal. Civ.

26   Code § 1770(a)); (3) Wasatch "[m]isrepresent[ed] the source, sponsorship, approval, or certification of

27   goods and services" (Cal. Civ. Code § 1780(a)(2)); and (4) the misrepresentation was material (*see*

28   *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1258 (2018)).  Plaintiffs do *not*

7

1    need to show actual reliance for every class member.  Rather, classwide "reliance may be inferred

2    when the facts show that material misrepresentations were made to the entire class."  *Kreuger v.*

3    *Wyeth*, 396 F. Supp. 3d 931, 942 (S.D. Cal. 2019) (citing *In re Vioxx*, 180 Cal. App. 4th 116, 129

4    (2009)).

5                **1.     Named Plaintiffs' Standing**

6            To establish standing under the CLRA, Named Plaintiffs must establish both that they were

7    "exposed to an unlawful practice" and that they experienced "some kind of damage" as a result.  *Meyer*

8    *v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 641 (2009); Cal. Civ. Code § 1780(a).  Plaintiffs are not

9    required to show that the misrepresentation was the "sole or even the decisive cause of the injury-

10   producing conduct."  *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020-21 (9th Cir. 2020)

11   (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326-27 (2011)).

12           The Court's November 23, 2023 Order has already found that Plaintiffs were injured by

13   Wasatch's practices: Plaintiffs "have suffered injury in the form of lost money or property as a result

14   of defendants' unlawful practice" under the UCL.  Summ. J. Order 14, ECF No. 278.  "Because the

15   'any damage' standard [of the CLRA] includes even minor pecuniary damage ... any plaintiff who has

16   standing under the UCL's ... 'lost money or property' requirement will, *a fortiori*, have suffered 'any

17   damage' for purposes of establishing CLRA standing."  *Hinojos*, 718 F.3d at 1108.  Thus, this element

18   has been satisfied.

19               **2.     Transaction For Goods or Services with Wasatch**

20           The Court will determine as a matter of fact if class members entered into a transaction for

21   goods or services with Wasatch.  California Civil Code section 1761(e) broadly defines a

22   "'transaction' as 'an agreement between a consumer and any other person, whether or not the

23   agreement is a contract enforceable by action, and includes the making of, and the performance

24   pursuant to, that agreement.'"  *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 869 (2002) (quoting

25   Cal. Civ. Code § 1761(e)).

26           It is undisputed that Wasatch Property Management, acting for other Defendants, executed

27   leases with all class members.  A lease for residential housing is understood under California law to be

28   an agreement for a "package of goods and services."  *Green v. Superior Court*, 10 Cal. 3d 616, 623

(1974).

Defendants have waived any argument on the dispositive question of whether, as a matter of law, the lease of real property constitutes a transaction for goods or services under the CLRA, by failing to raise the issue prior to the dispositive motion deadline.  *See Shewbridge v. El Dorado Irrigation Dist.*, No. CIV S−05−0740 FCD EFB, 2007 WL 1294392, at *3 (E.D. Cal. Apr. 30, 2007) (citing *North Pacifica, LLC v. City of Pacifica*, 366 F.Supp.2d 927, 930 (N.D. Cal. 2005) (finding defendant, who raised res judicata defense for first time at trial's damages phase, waived defense)). The Court's Standing Scheduling Order (ECF No-144, Oct. 28, 2021) cautioned parties that "failure to raise a dispositive legal issue that could have been tendered to the court by proper pretrial motion prior to the dispositive motion cut−off date may constitute waiver of such issue."

Additionally, it is undisputed that Wasatch Property Management, acting for other Defendants, executed Additional Service Agreements with class members putatively for the provision of goods (washers and dryers) and services (media packages and the RentPlus credit reporting service).  *See* Cal. Civ. Code § 1761(a) & (b).

### 3. Misrepresentation of the Source, Sponsorship, Approval, or Certification of Goods or Services

Plaintiffs contend that Wasatch misrepresented that it was lawfully entitled to demand and collect the additional service charges, even though they were impermissible excess rent.  The Court has already determined that Wasatch Property Management's practice of collecting additional service charges was unlawful excess rent.  Summ. J. Order 9-13, ECF No. 278.  It is undisputed that Wasatch Property Management represented that it was lawfully allowed to demand and collect the additional service charges from class members.  This is conduct that was likely to mislead a reasonable consumer. *See Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006), *as modified on denial of reh'g* (Jan. 31, 2006) (conduct that is "likely to mislead a reasonable consumer" violates the CLRA) (internal citation & quotation marks omitted).

### 4. Materiality

The Court can determine if Wasatch's misrepresentations caused injury on a classwide basis by finding that Wasatch's misrepresentations were material. *Mass. Mut. Life Ins. Co. v. Superior Court*,

9

1   97 Cal. App. 4th 1282 (2002).  To find that a misrepresentation was material, the Court will decide if a

2   "'reasonable [person] would attach importance to its existence or nonexistence'" in deciding to enter

3   into a transaction.  *Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 522 (C.D. Cal. 2015) (citing *Stearns v.*

4   *Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)).  Alternatively, the Court can find that the

5   misrepresentation was material if Wasatch knew or had reason to know that tenants attach importance

6   to the representation. *See Hinojos*, 718 F. 3d at 1107.

7   **C.    Injunctive Relief**

8          During the bench trial portion of Phase 1, Plaintiffs will seek injunctive relief as to Wasatch

9   Property Management on behalf of the certified Rule 23(b)(2) class to prevent the recurrence of

10  Wasatch's violations of the UCL and the CLRA.

11         The UCL authorizes courts to "make such orders or judgments," including injunctions, "as may

12  be necessary to prevent the use or employment by [the defendant] of any practice which constitutes

13  unfair competition."  Cal. Bus. & Prof. Code § 17203.  The Court's remedial power under this

14  provision "is extraordinarily broad."  *People v. JTH Tax, Inc.*, 212 Cal. App. 4th 1219, 1257 (2013)

15  (affirming injunctive relief order) (internal citation & quotation marks omitted). The Court has already

16  held that Wasatch violated the UCL through its unlawful practices of (1) treating additional service

17  charges as rent, and (2) requiring tenants to incur additional service charges as a condition of leasing.[2]

18  Summ. J. Order 14, 16, ECF NO. 278.

19         Similarly, a court may enjoin "methods, acts, or practices" determined to be unlawful under the

20  CLRA.  Cal. Civ. Code § 1780(a)(2).  If Wasatch is found liable under the CLRA, this claim will

21  provide a further basis for injunctive relief.

22         To support their request for injunctive relief, Plaintiffs must also show (1) irreparable injury,

23  (2) the inadequacy of legal remedies such as damages, (3) that "considering the balance of hardships

24  between the plaintiff and defendant, a remedy in equity is warranted," and (4) that "the public interest

25

26  _____

27  [2] The Court's summary judgment ruling only addressed the mandatory renters' insurance requirement, as disputes of fact remained about whether Section 8 tenants were required to incur other charges as a condition of leasing.  *See* Pls.' Mem. P. & A. in Supp. of Mot. Partial Summ. J. 2 n.1, ECF No. 242-1; Defs.' Mem. P. & A. in Supp. of Mot. Summ. J. 1-2, ECF No. 241 (both identifying disputes of fact

28  regarding other mandatory charges).

1   would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

2   391 (2006).

3           After the Court's November 2022 summary judgment ruling, Wasatch altered some of the

4   policies and practices challenged in this case, while leaving others intact.  Plaintiffs will seek

5   injunctive relief on the basis that (1) Wasatch has refused to alter some of the policies that require

6   tenants to pay additional services charges in order to continue living in their units, and (2) Wasatch

7   could easily resume the practices and policies that it has altered as a result of this Court's summary

8   judgment ruling.  A defendant's voluntary cessation of the challenged conduct will not moot a claim

9   for injunctive relief unless the defendant can demonstrate that "it is 'absolutely clear' that the allegedly

10  wrongful behavior will not recur[.]"  *Rosemere Neighborhood Ass'n v. U.S. Env't Prot. Agency*, 581

11  F.3d 1169, 1173 (9th Cir. 2009).  Additionally, there are no adequate remedies at law to protect class

12  members from the likelihood that Wasatch will reinstate its lawful practices.  While the damages under

13  the HAP Contract provided a monetary remedy for *past* violations, contract damages are inadequate to

14  protect class members from future unlawful excess rent demands.

15

16   Dated: March 15, 2024                    Respectfully submitted,

17                                            GOLDSTEIN, BORGEN, DARDARIAN & HO

18

19                                            */s/ Anne P. Bellows*
                                             Anne P. Bellows

20                                           Attorneys for Plaintiffs and Relators

21

22

23

24

25

26

27

28

---

Exhibit C

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOSEPH A. SALAZAR JR., SB# 169551
   E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
   E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

Attorneys for Defendants, WASATCH
PROPERTY MANAGEMENT, INC., LOGAN
PARK APARTMENTS, LLC, LOGAN PARK
APARTMENTS, LP, BELLWOOD JERRON
HOLDINGS, LLC, BELLWOOD JERRON
APARTMENTS, LP, HAYWARD SENIOR
APARTMENTS, LP, OAK VALLEY
APARTMENTS, LLC, OAK VALLEY
HOLDINGS, LP, PIEDMONT APARTMENTS,
LP, POINT NATOMAS APARTMENTS, LLC,
POINT NATOMAS APARTMENTS, LP,
SPRING VILLA APARTMENTS, LP, SUN
VALLEY HOLDINGS, LTD, VILLAGE
GROVE APARTMENTS, LP

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA, | CASE NO. 2:15-cv-00799-KJM-DB **DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW** |
| Plaintiffs/Relators, | Date: Time:   10:00 a.m. Crtrm.:  3 |
| vs. | The Hon. Kimberly J. Mueller |
| WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, BENT TREE | Trial Date:        None Set |

1

DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW

LEWIS
BRISBOIS

1  APARTMENTS, LLC, CALIFORNIA
   PLACE APARTMENTS, LLC, CAMELOT
2  LAKES HOLDINGS, LLC, CANYON CLUB
   HOLDINGS, LLC, COURTYARD AT
3  CENTRAL PARK APARTMENTS, LLC,
   CREEKSIDE HOLDINGS, LTD,
4  HAYWARD SENIOR APARTMENTS, LP,
   HERITAGE PARK APARTMENTS, LP,
5  OAK VALLEY APARTMENTS, LLC, OAK
   VALLEY HOLDINGS, LP, PEPPERTREE
6  APARTMENT HOLDINGS, LP, PIEDMONT
   APARTMENTS, LP, POINT NATOMAS
7  APARTMENTS, LLC, POINT NATOMAS
   APARTMENTS, LP, RIVER OAKS
8  HOLDINGS, LLC, SHADOW WAY
   APARTMENTS, LP, SPRING VILLA
9  APARTMENTS, LP, SUN VALLEY
   HOLDINGS, LTD, VILLAGE GROVE
10 APARTMENTS, LP, WASATCH QUAIL
   RUN GP, LLC, WASATCH PREMIER
11 PROPERTIES, LLC, WASATCH POOL
   HOLDINGS III, LLC, and DOES 1-4
12
        Defendants.
13

14        Pursuant to Local Rule 181(b)(8), the following statement regarding points of law bearing

15 on Plaintiffs' claims at trial is submitted by Defendants ("Wasatch Property Management, Inc.").

16

17 I.     PLAINTIFFS' FCA CLAIMS

18        A.     Wasatch Property Management, Inc.' Summary and Statement of the Case

19        Plaintiffs' allegations that Wasatch Property Management, Inc. violated the False Claims

20 Act (FCA) and the California Consumers Legal Remedies Act (CLRA) are based on their

21 allegations that Defendants unlawfully required tenants, including tenants received housing

22 assistance under the federal Housing Choice Voucher (HCV) program, to pay for elective

23 amenities that were not included in the rental payment for the unit. Plaintiffs' case hinges on their

24 characterization of these additional charges as "excess rent" or "side payments" that violated the

25 housing assistance payment (HAP) Contracts between the owners and the public housing

26 authorities (PHAs) that administer the HCV program.

27        The HAP Contract establishes the terms and conditions under which the owner agrees to

28 rent to the federally-assisted tenant and the PHA agrees to subsidize the tenant's rent for the unit.

LEWIS
BRISBOIS

1  Plaintiffs allege that, because Defendants charged for optional amenities that were not included in

2  the rent subsidized under the HAP, *i.e.,* the "rent to owner" for the "rental of the contract unit,"

3  they falsely certified, in violation of the FCA, that "[e]xcept for the rent to owner, the owner has

4  not received and will not receive any payments or other consideration … for rental of the contract

5  unit during the HAP Contract term." HAP, Part B, ¶ 8(d); Plaintiffs' Sixth Amended Complaint, ¶

6  237. Plaintiffs further allege that, if they had known of the additional charges, the PHAs would not

7  have made the housing assistance payments to Defendants, ¶ 244, and that, as a result of the

8  alleged false certifications, the government was defrauded in the full amount of all the housing

9  assistance payments that the PHAs made to the Owner Defendants from April 14, 2009[1] through

10  November 30, 2022, when the Court granted summary judgment in plaintiffs' favor on their

11  breach of contract and UCL claims. Plaintiffs' Sixth Amended Complaint, ¶ 245.

12  In granting summary judgment on the California state law breach of contract and Unfair

13  Competition Law (UCL) claims, the Court accepted the definition of "rent" that Plaintiffs have

14  promoted throughout this litigation – and that has no basis in the federal law and regulations

15  governing the HCV program. Plaintiffs' definition of "rent" does not exist in any federal statute or

16  common understanding of the word. Instead, it is devised from (a) a series of propositions that are

17  very loosely drawn from two cases: *Velez v. Cuyahoga Metropolitan Housing Authority*, 795 F.3d

18  578 (6th Cir. 2015) and *Sager v. Housing Commission of Anne Arundel County*, 957 F.Supp.2d 627

19  (D. Md. 2013), (b) asserted facts that are strongly disputed, and (c) sweeping generalizations based

20  on disputed facts.

21  Although the Court initially acknowledged the distinction between fees "for the general

22  use of rented premises" in *Velez,* and the additional charges "associated with discrete services,

23  utilities or appliances" in this case, when it denied Defendants' motion to dismiss (ECF No. 61,

24  Order at 9), the Court subsequently reversed itself on Plaintiffs' motion for partial summary

25  judgment, and found, largely based on *Sager*, that "rent" is defined by the way it is accounted for

26

27  [1] As discussed, *infra*, Plaintiffs have alleged violations as far back as 2006, but have provided no
reason or explanation for adding three years to the six-year statute of limitations under the FCA.

28

LEWIS
BRISBOIS

1  by the owner. Thus, the Court concluded that, in this case, the tenant's right "to live in and make

2  use of a unit" was conditioned "on the payment of ASA fees," and, therefore, those fees

3  constituted "unlawful rent," in breach of contract and in violation of the UCL. ECF No. 278,

4  Order at 12. Plaintiffs now seek to apply that definition of "rent" with respect to their FCA and

5  CLRA claims, as well.

6      First, however, "rent" is not defined by the way it is treated for accounting purposes; nor

7  does "rent" become "rent" because the failure to pay it is a basis for eviction. Second, tenants may

8  be evicted for other reasons than a failure to pay rent, and the failure to pay other charges for

9  which the tenant may be responsible may provide a basis for eviction if it is a "substantial

10  violation" of the lease.[2] Third, "rent" is universally understood as an exchange of money for the

11  temporary use of some form of property, and thus is defined by the terms of the exchange. Fourth,

12  a false certification claim under the FCA requires the court and jury to look to the federal statutes,

13  regulations, agency guidance, and the actual language in the HAP Contract for the definition of

14  "rent to owner," not to apply a definition of its Plaintiffs' creation. Fifth, contrary to Plaintiffs'

15  assertions, the *government's* definitions of "excess rent," "family rent to owner," "family share of

16  rent," "gross rent," "payment standard," "rent reasonableness," "rental for the contract unit," "total

17  tenant payment," "HAP," which govern for FCA purposes, *are* all clearly delineated in the statute,

18  42 USC § 1437f, the regulations, 24 CFR Parts, 888, 5 and 982, the applicable Housing Choice

19  Voucher Guidebook, HUD's Public and Indian Housing Notices, the PHAs' Administrative Plans,

20  and finally, in the HAP Contract, itself. Sixth, where courts have found illegal "side payments"

21  under a HAP Contract that resulted in actionable false claims under the FCA, they have

22  *consistently* done so based the statutes and regulations governing the HCV program and the HAP

23  Contract requirements, not by devising a definition of "rent to owner" that fit the plaintiffs' claims

24  _____

25  [2] As discussed, *infra*, in *Sager* the court was concerned with the differences in process under
26  Maryland law between an eviction for nonpayment of rent and an eviction for other reasons,
   including the nonpayment of other charges. The court's decision was based on the effects the
27  PHA's accounting processes had on tenants' state law due process rights in eviction proceedings;
   it did not craft a definition of "rent" that supersedes the definitions in federal law or that can be
28  applied to determine whether a false claim was presented under the FCA.

LEWIS
BRISBOI
S

137895726.1                               4                    Case No. 2:15-cv-00799-KJM-DB
_____
DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW

1  regarding the underlying facts.

2          B.      The False Claims Act

3          The FCA imposes liability on anyone who "knowingly presents, or causes to be presented,

4  a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A);[3] *Universal*

5  *Health Servs., Inc. v. United States ex rel. Escoba*r, 579 U.S. 176, 193 (2016). Claims under §

6  3729(a)(1)(A) are known as "presentment" claims and require that: "(1) the defendant submitted

7  or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant

8  knew the claim was false." *See United States ex rel. Tran v. Computer Scis. Corp.,* 53 F. Supp. 3d

9  104, 117, 121-22 (D.D.C. 2014). Plaintiffs' FCA claim relies on the "certification theory" of

10  liability, or "legally false certifications." Under this theory, a claim for payment is a "false" claim

11  if it rests on a false certification of compliance with the applicable federal statutes, regulations, or

12  contractual terms. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir.

13  2010). "It is the false certification of compliance which creates liability when certification is a

14  prerequisite to obtaining a government benefit." *United States ex rel. Hopper v. Anton*, 91 F.3d

15  1261, 1266 (9th Cir. 1996).

16          In this circuit, the leading FCA case is still *United States ex rel. Hendow v. University of*

17  *Phoenix*, 461 F.3d 1166 (9th Cir. 2006). A false claim under *Hendow* requires: "(1) a false

18  statement (or fraudulent course of conduct), (2) made with scienter, (3) that was material, causing

19  (4) the government to pay out money or forfeit moneys due." Id. at 1174. To prove their false

20  certification claim, Plaintiffs will be required to show that "(1) the Defendants explicitly

21  undertook to comply with a law, rule or regulation that is implicated in submitting a claim for

22  payment and that (2) claims were submitted (3) even though Defendants were not in compliance

23  with that law, rule or regulation." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.

24  2010). The essential elements of an FCA claim are "falsity," "materiality" and "scienter."

25

26

27  [3] Plaintiffs have generally pleaded violations of 31 U.S.C. § 3729(a), which lists seven types of violations. We infer from the text of ¶ 232 of the Sixth Amended Complaint, however, that

28  plaintiffs are alleging violations of 31 U.S.C. § 3729(a)(1)(A) only.

1    Since *Hendow* and *Ebeid* were decided, however, the Supreme Court has addressed the

2  FCA's "falsity" and "materiality" requirements in *Universal Health Servs. v. United States ex rel.*

3  *Escobar*, 579 U.S. 176, 181 (2016) and the "scienter" requirement in *United States ex rel. Schutte*

4  *v. SuperValu, Inc.,* 598 U.S. 739 (2023). In *Escobar*, the Court held that FCA liability can attach

5  for violating statutory or regulatory requirements, whether or not those requirements were

6  designated as conditions of payment, as long as they were *material* to the decision to pay the

7  claim. *Escobar*, 579 U.S. at 181. Materiality, which is defined in the statute as "having a natural

8  tendency to influence, or be capable of influencing, the payment or receipt of money or property,"

9  31 U.S.C. § 3729(b)(4), is a "demanding" and "rigorous" standard, which the Court outlined

10  through three examples:

11    [P]roof of materiality can include, but is not necessarily limited to, evidence
12    that the defendant knows that the Government consistently refuses to pay
      claims in the mine run of cases based on noncompliance with the particular
13    statutory, regulatory, or contractual requirement. Conversely, if the
      Government pays a particular claim in full despite its actual knowledge that
14    certain requirements were violated, that is very strong evidence that those
15    requirements are not material. Or, if the Government regularly pays a
      particular type of claim in full despite actual knowledge that certain
16    requirements were violated, and has signaled no change in position, that is
      strong evidence that the requirements are not material.
17

18    *Id.* at 194-95. Thus, under *Escobar*, an *actionable* false claim is one that was material to

19  the payment decision in that it *would not have been paid* if the government had known that the

20  claimant was not in compliance with the underlying regulations or contract, and where those

21  requirements were critical to the performance the government had contracted for under the

22  contract. Alternatively, however, a claim that is false in fact may not be actionable under the FCA

23  if the regulation or contractual requirement the claimant had falsely certified to was not a

24  governing factor in the government's decision to pay the claim. In either case, however, the key

25  questions are whether the facts that made the certification false were disclosed to, or known by, the

26  government-payer, and whether or how these facts affected or would have affected the

27  government's decision to pay the claim.

28    In *United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017, 1019 (9th Cir. 2018),

**LEWIS BRISBOIS**

DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW

1  the Ninth Circuit concluded that neither *Ebeid, n*or *Hendow,* had been overruled by *Escobar.* Post-

2  *Escobar* and in this circuit therefore, FCA liability attaches to a false certification claim if "the

3  defendant knowingly violated a requirement that the defendant knows is material to the

4  Government's payment decision." *Id*. at 181.

5       The FCA defines "knowingly" to mean that a person "(i) has actual knowledge of the

6  information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts

7  in reckless disregard of the truth or falsity of the information." 31 USC § 3729(b)(1)(A). "In short,

8  either actual knowledge, deliberate ignorance, or recklessness will suffice." *SuperValu Inc.*, 598

9  U.S. 739, 750 (2023). It "require[s] no proof of specific intent to defraud." Id. § 3729(b)(1)(B). In

10 *SuperValu*, the Supreme Court held that "[t]he FCA's scienter element refers to respondents'

11 knowledge and subjective beliefs — not to what an objectively reasonable person may have

12 known or believed." Id. at 749. Whether a person acted with scienter turns "*on what the defendant*

13 *knew when presenting the claim*." *Id*. at 752. (emphasis added).

14      In a false certification case under the FCA, therefore, all three elements – falsity,

15 materiality, and scienter – turn on the statutory, regulatory, and contractual requirements for

16 payment, the defendants' compliance with those requirements, and the importance of compliance

17 with those requirements to the government's decision to pay the claim. Here, the alleged falsity in

18 the certification centers on the definition of "rent to owner" in the certifications made under the

19 HAP Contract. It is the definition of "rent to owner" expressed in the statutes, regulations, HUD

20 policy, and the HAP Contract that determines whether the certifications were false; not, as

21 Plaintiffs have urged, a definition that does not exist in any statute, is not supported either by the

22 cases upon which they claim to rely or the facts in this case, and does not apply to any part of

23 Section 8 as set forth in the Housing Act of 1937. With respect to the specific FCA claim in this

24 case, therefore, Plaintiffs definition of rent is particularly inapposite because the statute, the

25 regulations, HUD policy, and the HAP Contract all clearly define the terms "rent to owner;"

26 "rental for the unit;" "excess rent;" and "contract rent" that are reflected in the certifications at

27 issue.

28      Under the FCA, Plaintiffs will be required to prove that Defendants knowingly made a

LEWIS
BRISBOIS

137895726.1                     7                  Case No. 2:15-cv-00799-KJM-DB
DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW

1    false statement or engaged in a fraudulent course of conduct that was material, in that it caused the

2    government to pay out money. To establish "falsity" under their false certification claim, Plaintiffs

3    will have to prove that Wasatch Property Management, Inc. knowingly failed to comply with the

4    statutory and regulatory requirements governing the HCV program, and that they falsely certified

5    that they complied with the requirements in order to receive the housing assistance payments from

6    the PHA. *Ebeid,* 616 F.3d 993, 998 (9th Cir. 2010); *Hendow*, 461 F.3d at 1174. To establish the

7    "materiality" of the alleged false certification, Plaintiffs will have to prove, under a "rigorous" and

8    "demanding" standard, that compliance with the regulations was a necessary condition for

9    payment of the claim – along the lines of the examples provided by the Supreme Court in

10   *Escobar*. *Stephens Inst.*, 909 F.3d at 1020. To establish that Wasatch Property Management, Inc.

11   acted "knowingly," Plaintiffs will have to prove that Wasatch Property Management, Inc. knew

12   that the certifications were false at the time they presented the claims. *SuperValu*, 598 U.S. at 752.

13        In other words, the only relevant definitions of "rent" that may be applied to Plaintiffs'

14   FCA claim are the definitions in the statutory and regulatory framework governing the program.

15        C.    Wasatch Property Management, Inc.' Response to Plaintiffs' Separate Statement on

16             Points of Law

17        Plaintiffs and Defendants appear to agree in principle that, under the FCA, a "false"

18   certification claim rests on an entity's representation that it has complied with the federal statutes,

19   regulations, or terms governing their contractual agreement, when, in fact they had not so

20   complied, *and* where compliance with the specific law or regulation was material to the decision

21   to pay the claim. As the parties also appear to agree, the alleged falsity in this case lies with the

22   definition of "rent" for purposes of the HAP Contract between the PHA and the owner. The parties

23   strongly disagree, however, as to the basis for the alleged falsity in this case, i.e., the correct

24   definition of "rent" underlying the alleged false claims.

25        First and foremost, however, the operative term in the HAP Contract is "rent to owner,"

26

27

28

1  and that term is clearly defined in the regulations and the HAP Contract, itself.[4]  Defendants have

2  identified and discussed in detail the statutes, regulations and terms in the HAP Contract that

3  define "rent to owner" under the HAP Contract, including what constitutes excess rent, or an

4  unlawful side payment. While it is true that the word "rent" is not defined *as a one-word*

5  *standalone term*, it is not true that the federal statutes, regulations, and HAP Contracts have left

6  the term undefined, as Plaintiffs have argued. In fact, as Defendants have noted, and specifically

7  with respect to the Section 8 program,  the terms "rent to owner;" "gross rent;" "contract rent;"

8  "rent for the unit;" "family share;" "family rent;" and "housing assistance payment" are all defined

9  in and through the federal statutes, regulations, and HAP Contract.[5] These are the definitions that

10  determine whether Defendants – or any of the thousands of owners who accept Section 8 tenants –

11  have complied with the requirements in the statutes, regulations and contract governing the

12  payment of their claims.

13       Plaintiffs insist, however, that instead of the statutory and regulatory definitions

14  established by Congress and HUD, the definition of "rent" that the Court applied to their breach of

15  contract and UCL claims must also be applied to their FCA claim. Regardless of whether the

16  definition of "rent" the Court reached to decide these claims was correct,[6]  the FCA requires the

17  Court to analyze the alleged falsity under the statutes, regulations, and terms governing the

18  contract. Where, the federal requirements underlying the alleged falsity are clear, an alternative

19  _____

20  [4] The word "rent," or some variation of the word (e.g., "rental," or "rented") appears in the HAP
Contract some 57 times. In 31 of these instances, the phrase is "rent to owner." In another 15
21  instances, the word "rent" appears on its own - but is included in a section, paragraph, or sentence
clearly headed by the words, or referring to, the "rent to owner," The phrase "excess rent" appears
22  once – in Part C of the HAP Contract.  The other 10 or so instances where the word "rent" appears
in some form include, e.g., "rent subsidy;" "unpaid rent;" "Changes in Lease or Rent," etc.
23

24  [5] Further, in fact, as Defendants have noted, the regulations expressly distinguish between the
definitions of "rent" in public housing ("tenant rent") and in private, voucher-assisted housing
25  ("rent to owner").

26  [6] As this section attests, Defendants dispute Plaintiffs' assertion that the Court's finding is "law of
the case." To protect the record, Defendants note that they oppose its application to the FCA claim
27  on the ground that is unfounded in law and regulation, as well as the fact that the applicable
definitions, especially with respect to the FCA claim, are found in the statutes, regulations, and
28  HAP Contract.

LEWIS
BRISBOIS

1    definition of "rent" drawn from Plaintiffs' characterizations of the facts and the holdings in

2    selected cases is simply inapposite to this case.

3        The Court's definition of rent was not based on, nor did it look to, the definitions in the

4    statute and regulations that apply to their FCA claim. Defendants are confused by Plaintiffs'

5    various assertions on page 3 of their Separate Statement of Law regarding this point. First,

6    Plaintiffs state that "the Court's order thoroughly explored the statutory and regulatory framework

7    and case law that [Defendants] now discuss in their pretrial filings as if they were uncharted seas.

8    Id. at 3-6, 9-13" (emphasis added). In fact, pages 3-6 of the Court's order describe the "Factual

9    and Procedural Background" of the case, and the only citations are to the SUMF and previous

10   filings in the docket; there is no discussion of the statute, 42 USC 1437f or the regulations, 24

11   CFR Part 982. In pages 9-13 of the Court's order, the only citation to the regulatory framework is

12   a catchall reference to 24 CFR § 982.451, and a statement quoting the language in the HAP

13   Contract Part C ¶ 5e.

14       Plaintiffs' further assertion that "the Court's order detailed the relevant statutory and

15   regulatory framework governing the Section 8 Program, and addressed both the HAP contract and

16   the tenancy addendum, Id. at 3-4," is similarly confusing.  The Court's recital of the SUMF does

17   not include a detailed statement of the "relevant statutory and regulatory framework;" nor does it

18   address "both the HAP contract and the tenancy addendum," as Plaintiffs appear to claim.  The

19   only discussion of the statutory and regulatory framework governing the Section 8 Program lies in

20   the two paragraphs on page 2 of the Order, where the Court briefly outlines the program.

21       With respect to Plaintiffs' further claims regarding the holding in *Velez*, the holdings in the

22   FCA cases, and the analysis of "rent" in *Velez* and *Sager*, Defendants refer to the discussion of

23   these issues above.

24       Finally, Plaintiffs' FCA claims are subject to the FCA's six-year statute of limitations. 31

25   U.S.C. § 3731(b)(1). To the extent Plaintiffs suggest that a ten-year limitations period applies

26   under 31 U.S.C. § 3731(b)(2), they are incorrect. First, the FCA does not include a ten-year statute

27   of limitations. *Houpt v. Wells Fargo Bank, N.A.*, 800 F. App'x 533, 535 (9th Cir. 2020). Instead,

28   the FCA provides a three-year statute of limitations that is triggered "when facts material to the

LEWI
S
BRISBOI
S

DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW

1   right of action are known or reasonably should have been known by the official of the United

2   States charged with responsibility to act in the circumstances, but in no event more than 10 years

3   after the date on which the violation is committed." 31 U.S.C. § 3731(b)(2); *Houpt*, 800 F. App'x

4   at 535. Accordingly, where, as here, it is clear from the face of the operative Complaint that the

5   Government knew or should have known the facts material to the Plaintiffs' FCA claims at the

6   time of the purported violation, the six-year limitations period applies.

7       D.    The Statutory and Regulatory Framework: Federally-Assisted Housing: Public

8             Housing,42 USC § 1437g, and the Housing Choice Voucher Program, 42 USC

9             §1437f

10      Congress has provided federally-assisted housing for low-income households since 1937.

11  The Housing Act of 1937, 42 USC § 1437g, provides housing assistance in the form of "public

12  housing," or units that are owned and operated by the government, typically by state or local

13  governmental entities called public housing agencies (PHAs), and rented to qualifying low-income

14  tenants for below market rates.

15      Since 1965, however, Congress has expanded the federally-assisted housing options for

16  low-income households to include a variety of settings and formats under a range of programs,

17  which have evolved over time from the program created by the Housing and Community

18  Development Act of 1974, to the current Housing Choice Voucher program under the Quality

19  Housing and Work Reform Act of 1998, 42 USC § 1437f(o)(2) and (3), which is commonly

20  referred to as the "Section 8" program.

21      The HCV program is generally administered by the PHAs, which receive funding for the

22  program, as well as funding to administer it, from the Department of Housing and Urban

23  Development (HUD). 24 CFR § 982.1(a)(1). The PHA and HUD enter into an annual

24  contributions contract (ACC), under which HUD agrees to make payments to the PHA, over a

25  specified term, to subsidize the rent to owner on behalf of low-income tenant-participants in the

26  program, and to cover the PHA administrative fee, while the PHA agrees to administer the

27  program in accordance with HUD regulations and requirements. 24 CFR § 982.151(a)(1). The

28  PHA must adopt a written Administrative Plan that establishes local policies for administration of

1  the program in accordance with HUD requirements, and PHA policy on matters for which the

2  PHA has discretion to establish local policies. 24 CFR § 982.54(a).

3      Rather than restricting tenants to government-owned public housing, the Section 8

4  program relies on owners of private property to make housing available to low-income tenants on

5  a market basis. "Tenant-based assistance" vouchers, which are the vouchers at issue in this case,

6  enable tenants to lease any unit on the private market, as long as the owner is willing to accept

7  HCV tenants.[7] 24 CFR § 982.1(b).

8      The definitions and regulations that govern federally-assisted housing generally are found

9  in 24 CFR Part 5 and apply to the HCV program, *except when a section is expressly limited to a*

10  *different program or expressly excludes the HCV program from its scope.* For example, the

11  definition of "tenant rent" in public housing, 24 CFR § 5.603, expressly states that it "is not used

12  in the Section 8 voucher program," while 24 CFR 982.4(a)(2) stipulates that "[t]he definitions of

13  "tenant rent" and "utility reimbursement" in part 5, subpart F of this title do not apply to the HCV

14  program under part 982." Public housing is distinctly different from all other housing programs

15  and completely unrelated to HCV housing as a matter of law. It is important – particularly in this

16  case *and* under the FCA – to clarify and not confuse the statutory and regulatory requirements

17  under the HCV program, either with the *public housing* requirements or with factors outside of

18  these requirements, such as how payments are accounted for, as Plaintiffs have done throughout

19  this litigation.

20      The specific definitions and regulations governing tenant-based assistance under the HCV

21  program are found in the Housing Act of 1937, 24 CFR Part 982 ("Section 8 Tenant-Based

22  Assistance: Housing Choice Voucher Program"), the applicable edition of the Housing Choice

23  Voucher Guidebook (United States Department of Housing and Urban Development, 7420.10G

24  and formerly 7420.8G), and as applicable, PIH Notices published by HUD's Office of Public and

25

26

---

27  [7] PHAs may reserve up to 20% of their vouchers for "project-based" vouchers, in which the
subsidy is tied to the unit in a specific apartment complex, but these vouchers are not at issue here.

28

LEWIS BRISBOIS

1   Indian Housing (PIH).[8]

2       PHA-owned public housing is provided exclusively for qualifying low-income households

3   at rents that are capped based on a range of factors, including the regulations set forth in 24 CFR

4   Parts 905 and 990.[9] Unlike the public housing program in which PHAs are landlords subject to

5   HUD requirements, the HCV program depends on the willingness of private owners to rent to

6   low-income tenants through the program. To that end, the HCV program is designed to enable

7   low-income tenants to meet the financial requirements for occupancy of a particular dwelling unit

8   on the same basis as unassisted tenants *without interfering with the landlord's rights to establish*

9   *conditions for occupancy generally*. In other words, the goal is to place assisted tenants on the

10   same footing with the same housing options as unassisted tenants.

11               1.      Requirements of the Housing Choice Voucher Program

12       The overarching requirement of the HCV program is that the rental for the unit be offered

13   under the same terms and in the same standard lease form for both assisted and unassisted tenants.

14   24 CFR § 982.308(b)(2). The only difference is that the HCV tenant's lease must include the

15   HUD-prescribed "tenancy addendum" to the lease that sets forth the tenancy requirements for the

16   program and the composition of the household as approved by the PHA. 24 CFR §

17   982.308(f)(1)(i)-(ii). The provisions in the HUD-required tenancy addendum must be added word-

18   for-word to the owner's standard form lease for unassisted tenants, the tenant has the right to

19   enforce the tenancy addendum against the owner, and the terms of the tenancy addendum will

20   prevail over any other *conflicting* provisions of the lease. 24 CFR § 982.308(f)(2).

21       The HCV program is administered by the PHAs, which receive funding from through

22   HUD. 24 CFR § 982.152. Once a family has been issued a Request for Tenancy Approval

23   _____

24   [8] The definitions and regulations specifically governing the public housing program are largely

25   found at 24 CFR 960 ("Admission to, and Occupancy of, Public Housing"); 965 ("PHA-Owned or
Leased Projects – General Provisions"); and 966 ("Public Housing Lease and Grievance

26   Procedure").

27   [9] Families residing in public housing may choose between rent based on either the family's
income or a "flat rent" amount generally based on 80% of the fair market rents in the area as

28   determined by HUD.

1   ("RFTA"), the tenant then seeks housing in the marketplace. The tenant must attend a mandatory

2   PHA briefing that includes a description of how the program works, the family and owner's

3   responsibilities under the program, and the locations where family may lease a unit. 24 CFR §

4   982.301(a)(1)(i-iii). As part of this briefing, the PHA must give the family an information packet

5   that covers a range of subjects including, *e.g.,* how the PHA determines the amount of the housing

6   assistance payment for a family; how it determines the maximum rent for an assisted unit; where

7   the family may lease a unit; the HUD-required "tenancy addendum" to the lease that must be

8   included in the lease; the RFTA of the assisted tenancy, and an explanation of how to request PHA

9   approval of the tenancy; the PHA payment standards, including when the PHA will consider

10  granting HUD-approved exceptions to those standards; a list of landlords who may be willing to

11  lease a unit to the family or other resources that may assist the family in locating a unit. *See, e.g.,*

12  24 CFR § 982.152(b)(2-6), (8), (11).

13         If the family finds a unit and the owner is willing to lease the unit under the program, the

14  family must submit the RFTA to the PHA along with a copy of the unsigned lease, including the

15  HUD-prescribed tenancy addendum. 24 CFR § 982.302(c). The PHA specifies the procedure for

16  requesting approval of the tenancy in its PHA Administrative Plan, and the request must be

17  submitted in the form and manner required by the PHA. 24 CFR § 982.302(d).

18         The RFTA is a 2-page HUD Form, #52517, that is signed by the owner/owner

19  representative and the household head. In addition to listing the proposed rent and amount of the

20  security deposit, the form requires the owner and tenant to identify which appliances and utilities

21  are to be paid by the owner and which by the tenant. Until 2019, the form stated that: "Unless

22  otherwise specified below, the owner shall pay for all utilities and appliances provided by the

23  owner." Since then, the form has stated: "Unless otherwise specified below, the owner shall pay

24  for all utilities and provide the refrigerator and range/microwave." The RFTA also requires the

25  owner to certify that the rent charged to the HCV tenant is not more than the rent charged for other

26  unassisted comparable units; that the owner is not related in any of the specified degrees to the

27  tenants; and that the unit and common areas meet lead-based paint requirements.

28         Before approving the tenancy by executing the HAP Contract with the owner and

1  authorizing the execution of the lease between owner and tenant, the PHA must inspect the unit to

2  determine whether it meets the Housing Quality Standards (HQS). 24 CFR §§ 982.305(a)(2) and

3  982.401. The HQS are the "minimum quality standards developed by HUD in accordance with 24

4  CFR 5.703 for the HCV program," and they define the "affirmative requirements" for federal

5  housing assistance under the program. 24 CFR § 982.4(b). The HQS for an HCV-subsidized unit

6  require hot and cold running water in both the bathroom and kitchen, including an adequate source

7  of safe drinking water in the bathroom and kitchen; its own functioning bathroom or sanitary

8  facility that is in proper operating condition and usable in privacy, containing a sink, a bathtub or

9  shower, and an interior flushable toilet; smoke detectors; a living room and a kitchen area with a

10  sink, cooking appliance, refrigerator, food preparation area, and food storage area; at least one

11  bedroom or living/sleeping room for each two persons; standard carbon monoxide detectors; two

12  working outlets or one working outlet and a permanent light within all habitable rooms; properly

13  protected outlets; where applicable, a permanently installed heating source; a guardrail when there

14  is an elevated walking surface with a drop off of 30 inches or greater; and a permanently mounted

15  light fixture in the kitchen and each bathroom. 24 CFR §982.401. The HQS establish the items and

16  services that the owner is *required* to provide in order for the PHA to approve the subsidy.

17      Once a PHA receives a signed RFTA and a copy of the proposed lease, and has inspected

18  the unit to determine if it meets the HQS requirements, the PHA determines if the proposed rent is

19  affordable and reasonable. 24 CFR § 982.305(a)(2)(4), and (5).[10] The PHA confirms that the

20  proposed rent meets the "Payment Standard," which is defined as the "maximum monthly

21  assistance payment for a family assisted in the voucher program (before deducting the total tenant

22  payment by the family)." 24 CFR § 982.4(b). Fair Market Rent (FMR) is defined as the "rent,

23  including the cost of utilities (except telephone), as established by HUD for units of varying sizes

24  (by number of bedrooms), that must be paid in the housing market area to rent privately owned,

25  _____

26  [10] If the proposed rent exceeds the amount of rent determined to be either affordable or reasonable,
the tenant, may, with assistance from the PHA, negotiate with the owner for a reduced rent. If the
27  owner does not agree to reduce the rent, the PHA typically will not subsidize the rent for the
tenancy.
28

LEWIS BRISBOIS

1  existing, decent, safe and sanitary rental housing of modest (non-luxury) nature with suitable

2  amenities." 42 U.S.C. § 1437f(c)(1); 24 CFR § 982.4(b).

3      The proposed rent is "affordable" as long the PHA determines that it does not exceed 40%

4  of the family's monthly adjusted income during the initial term of the lease. 24 CFR §

5  982.305(a)(5). Rent is "reasonable" if the PHA determines that it is not more than rent charged for

6  comparable units in the private unassisted market and for comparable unassisted units in the

7  premises or the market in which the property is located. 24 CFR § 982.4(b). To determine whether

8  the proposed rent is "reasonable," the PHA must consider the location, quality, size, unit type, and

9  age of the contract unit, and any amenities, housing services, maintenance, and utilities to be

10  provided by the owner in accordance with the lease. 24 CFR § 982.507(b)(1)-(2).

11      The lease defines the agreement between the owner and the tenant, and must specify: (1)

12  the names of the owner and the tenant; (2) the unit rented (address, apartment number, and any

13  other information needed to identify the contract unit); (3) The term of the lease (initial term and

14  any provisions for renewal); (4) the amount of the monthly rent to owner; and (5) a specification

15  of what utilities and appliances are to be supplied by the owner, and what utilities and appliances

16  are to be supplied by the family. 24 CFR § 982.308(d).

17          2.      The Definition of "Rent to Owner"

18      If the unit meets the HQS, the rent to owner for the unit is within the PHA's published

19  payment standard, the rent to owner for the unit is affordable and reasonable, and the PHA has

20  approved the form of the lease and all addenda, the owner and the PHA may enter into a Housing

21  Assistance Payments (HAP) contract. The HAP Contract is strictly between the owner and the

22  PHA. The family is not a third party or other beneficiary of the HAP Contract and may not enforce

23  any provision of the HAP Contract or enforce *any* right or remedy against the owner or PHA

24  under Part B, Section 12 of the HAP Contract. Part B ¶ 12(a).

25      The HAP Contract establishes the terms and conditions for the PHA to subsidize the *rent*

26  *for the unit*. The PHA will subsidize the "gross rent" which is defined as "the sum of the "rent to

27  owner" plus any "utility allowance." 24 CFR § 982.4(b). "Rent to owner" under the HCV

28  program, or "[t]he total monthly rent payable to the owner under the lease *for the unit*," is the

LEWIS
BRISBOIS

1   "payment for any housing services, maintenance and utilities *that the owner is required to provide*

2   *and pay for,*" *i.e.,* the housing services, maintenance, and utilities that are identified as owner-

3   provided on Part A of the HAP Contract.  24 CFR 982.4(b).

4          The definition of "rent to owner" under the HCV program differs from the definition of

5   "tenant rent" under the public housing program in ways that matter here. "Tenant rent" under the

6   public housing program is not market rent; it is a formula that equals an amount that will not

7   exceed thirty percent (30%) of an eligible tenant's income. The public housing program defines

8   "tenant rent" as simply "[t]he amount payable monthly by the family as rent to the [PHA] unit

9   owner," and expressly excludes the HCV program from the definition: "This term is not used in

10  the Section 8 voucher program." 24 CFR § 5.603. The HCV regulations also stipulate that "[t]he

11  definitions of "tenant rent" and "utility reimbursement" in part 5, subpart F of this title do not

12  apply to the HCV program under Part 982." 24 CFR § 982.4(a)(2).

13         The differences between the definitions of "tenant rent" in public housing and "rent to

14  owner" under the HCV program reflect the differences between providing PHA-owned public

15  housing for low-income tenants and enabling low-income tenants to rent housing through the

16  private market at fair market rents. "Rent to owner" is delineated as [t]he total monthly *rent*

17  payable to the owner *under the lease for the unit,*" and specifically defined as the "payment for

18  *any housing services, maintenance and utilities that the owner is required to provide and pay for*."

19  24 CFR 982.4(b) and HAP Contract Part A.

20         The housing services, maintenance, and utilities "*that the owner is required to pay for"* are

21  also defined in the HCV regulations – and must include or cover the items and services required

22  by the HQS, as well as any *additional* items and services that "are customarily included in rent in

23  the locality or provided at no additional cost to unsubsidized tenants in the premises." 24 CFR §

24  982.510(c). *These are the factors that define and are covered in the definition of "rent to owner"*

25  *under the HCV program.*

26         Items and services that are *not* required under the HQS *and* are not customarily included in

27  the "rent" under the lease, but may be provided by or through the owner, are, by definition,

28  *options* that may be independently contracted for and paid for by the tenant. Such items and

1   services (*e.g.,* typically, reserved parking spaces, internet access, cable, dish services, pet fees, in-

2   unit washers and dryers, in-unit dishwashers, special amenity access, like common room

3   reservation fees, optional renter's insurance, if the market requires it, compulsory renter's

4   insurance, etc.) may be included in the lease or in addenda to the lease. They are *not*, however,

5   included in the "rent to owner" that is subsidized under the HAP Contract because they are not

6   necessary for HQS certification and do not impact the rent for the residential space. In other

7   words, Congress never intended for the government to subsidize amenities outside of the

8   amenities identified in the HQS and any extra amenities that are included in the rent/provided at

9   no additional charge, nor did Congress intend to bar tenants from deciding how to spend their own

10  money if they elect to have additional amenities beyond those provided for in the rent payment.

11  The only requirements Congress and HUD have imposed for additional amenities that are

12  separately charged are that they be provided to assisted and unassisted tenants on the same basis,

13  and, *during the initial year of the lease only*, that the total amount of the charges under the lease

14  (rent plus charges for additional amenities) not exceed 40% of the family's adjusted monthly

15  income. 24 CFR § 982.305(a)(5); § 982.308(b)(2).

16          "Rent to owner" is the "total monthly rent payable to the owner under the lease for the

17  unit," and "covers payment for any housing services, maintenance and utilities that *the owner is*

18  *required* to provide and pay for." Id. The housing services, maintenance, and utilities that are the

19  owner's responsibility are disclosed in Part A of the HAP Contract. Part A of the HAP Contract

20  requires the owner to identify which appliances and utilities are to be paid by the owner and which

21  by the tenant, and mirrors the respective owner and tenant responsibilities identified in the RFTA.

22  Until 2019, the form stated that: "Unless otherwise specified below, the owner shall pay for all

23  utilities and appliances provided by the owner." Since 2019, the form has stated: "Unless

24  otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and

25  range/microwave."

26          The "utility allowance" that is reflected in the "rent to owner" covers the cost of the

27  utilities necessary to provide housing that complies with the housing quality standards," and may

28  *not* include "any allowance for non-essential utility costs, such as costs of cable or satellite

LEWIS
BRISBOIS

137895726.1                                    18                        Case No. 2:15-cv-00799-KJM-DB

DEFENDANT WASATCH PROPERTY MANAGEMENT, INC.'S POINT OF LAW

1   television." 24 CFR 982.517(b)(2)(i). The "utility reimbursement" is the amount of the "utility

2   allowance" that covers the utilities that, based on the HAP Contract, are the tenant's responsibility.

3   24 CFR § 982.514(b)-(c). If all the utilities are included in the rent to owner, the "rent to owner"

4   and the "gross rent" are the same.

5       The "housing assistance payment," therefore, consists of the subsidized portion of the rent

6   to owner, and an additional payment to the family if the total assistance payment exceeds the rent

7   to owner, (*i.e.,* the utility reimbursement amount that is not included in the rent to owner). 24 CFR

8   982.4(b). The amount of the "housing assistance payment" is the difference between the "gross

9   rent" and the "family share" of the rent to owner, or the portion of rent and utilities paid by the

10  family, which is calculated under 24 CFR § 515.

11              3.      The HAP Contract

12      The "rent to owner," "family rent to owner," "family share," and "housing assistance

13  payment" are all defined under 24 CFR §982.515 and established under the "HAP Contract." Part

14  B of the HAP Contract sets forth the terms and conditions for the contract. Thus, the owner must

15  maintain the contract unit and the premises in accordance with the HQS, and provide all utilities

16  *needed to comply with the HQS throughout the term of the lease*. Part B ¶ 3. In other words, the

17  utility costs for amenities outside of the HQS are *not* included in the utility allowance that is

18  provided as part of the "rent to owner" under the HAP Contract. The lease must specify what

19  utilities and appliances are to be provided or paid by the owner, the tenant, or shared by both and

20  the rent to owner may not exceed the reasonable rent for the contract unit as most recently

21  determined by the PHA in accordance with HUD requirements, *or* the rent charged by the owner

22  for comparable unassisted units in the premises. ¶¶ 5 (a)-(b), 6(b), (d). The relevant owner's

23  certifications under the HAP Contract include that:

24              a.      The owner is maintaining the contract unit and premises in accordance with

25  the HQS.

26              b.      The contract unit is leased to the tenant. The lease includes the tenancy

27  addendum (Part C of the HAP Contract) and is in accordance with the HAP Contract and program

28  requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

1      c.      The rent to owner does not exceed rents charged by owner for comparable

2 unassisted units in the premises.

3      d.      Except for the rent to owner, the owner has not received and will not receive any

4 payments or other consideration (from the family, the PHA, HUD, or any other public or private

5 source) *for rental of the contract unit* during the HAP Contract term. Part B, Section 2.

6      See, Part B ¶ 8(a)-(d).

7      Finally, Part B stipulates that the HAP Contract contains the entire agreement between the

8 owner and the PHA, and that it shall be interpreted and implemented in accordance with all

9 statutory requirements, and all HUD requirements, including the HUD program regulations at 24

10 Code of Federal Regulations Part 982. 24 CFR §982.451, HAP Contract at Part B ¶ 17(a)-(b).

11      Part C of the HAP Contract, Form 526491, and the Tenancy Addendum,  Form 52641A,

12 attached to the lease are two different documents that contain identical language but serve

13 different purposes. The Tenancy Addendum must be included in the lease between the owner and

14 the tenant, and the tenant has the right to enforce the addendum against the owner under the lease*,*

15 *not under the HAP Contract*, with the language in the addendum controlling in the event it

16 conflicts with the lease. Thus, the owner may not charge or accept any payment for rent of the unit

17 in addition to the rent to owner, which includes all housing services, maintenance, utilities, and

18 appliances to be provided and paid by the owner in accordance with the lease, and "must

19 immediately return any excess *rent* payment to the tenant[.]" Part C ¶ 5(e), (f).

20           4.      "Excess Rent" or "Side Payments" Under the HAP Contract

21      "Excess rent" or unlawful "side payments" under the HAP Contract are undisclosed

22 additional charges to occupy the dwelling unit and/or charges for items and services that the owner

23 and the PHA have agreed are included in the "rent to owner." Thus, examples of "unlawful rent"

24 under the HAP include: a surcharge by the owner for the tenant to occupy or make full use of the

25 unit or property; an additional charge for water or electricity usage; an additional charge for

26 services like sewer and trash; an additional charge for an appliance required under the HQS, such

27 as a stove or refrigerator; an additional charge for storage, or a charge for items and services that

28 unassisted tenants are not also required to pay. Congress and HUD have clearly defined "rent" for

LEWIS
BRISBOIS

1   a housing unit under the HCV program as the total cost of the items and services listed in the HQS

2   plus any additional items and services customarily included in rent in the locality or provided at no

3   additional cost to unassisted tenants.

4       E.   The Courts Have Consistently Looked to the Statutory and Regulatory Frameworks

5            to Define "Rent" and "Rent to Owner" in Federally-Assisted Housing

6            1.   Neither *Velez,* nor *Sager* Support a Definition of "Rent" or "Rent to Owner"

7                 Based on the Owner's Accounting Practices or the Risk of Eviction

8       "Rent" has always been defined by a value-based exchange in which money (or its

9   equivalent) is paid for the temporary right to use or occupy property belonging to someone else.

10  The *scope* of the exchange is defined *by* and *in* the agreement/lease between the parties.

11      The definition of rent, based on the Owner Defendants' accounting practices and the

12  possible risk of eviction, advanced by Plaintiffs on their breach of contract and UCL claims, owes

13  more to their expansive mischaracterizations of the holdings in *Velez v. Cuyahoga Metro. Hous.*

14  *Auth.*, 795 F.3d 578 (6th Cir. 2015) and *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 957

15  F.Supp.2d 627 (D. Md. 2013) than it does to the actual holdings in these cases. Plaintiffs cannot

16  extend their definition to their FCA claim, both because the statute, regulations, HAP Contract,

17  *etc.,* all clearly define the "rent to owner" reflected in the alleged false certifications, and because

18  it has no basis in law or in fact; applying it further will only compound the errors in this case.

19                 (a)   Velez

20      Based on *Velez*, Plaintiffs argued that the charges in the Additional Services Agreements

21  (ASAs) are "condition[s] of living at the property," ECF No. 242-1 at 12; that the definition of

22  "rent" turns on a causal link between a payment and the tenant's right "to live in and make use" of

23  their rental unit, Id. at 13; *Velez*, 795 F.3d at 584; and that, if the failure to pay for additional

24  charges jeopardized the tenant's right to occupy the unit, the additional charges were "excess rent

25  payments" or "prohibited side payments" in violation of the HAP contract. ECF No. 242-1 at 11.

26      First, there are no undisputed facts supporting Plaintiffs' assertion that choosing the

27  additional amenities in the ASAs was a "condition of living at the property." Every item listed in

28  the ASA is offered as a *choice* for the tenant to make, as evidenced by the fact that tenants must

1  check or initial whether they are selecting an item or not. Tenants are not required to have reserved

2  parking spaces, resident pets, cable packages, storage units, or in-unit washers and dryers as

3  conditions of occupancy, and the decision whether to have these amenities or not does not affect

4  the tenant's right "to live in and make use" of their rental unit.[11] Having chosen these amenities –

5  which are *not* included in the "rent to owner" that is defined by the HAP contract – tenants *are,*

6  however, required to pay for them. Furthermore, if a tenant no longer has a pet, or decides to park

7  on the street or to use the common laundry facilities or the local laundromat, rather than an in-unit

8  washer and dryer, and discontinues payments for the additional amenities on this basis, its right to

9  continue living in the unit is unaffected.

10        Second, Plaintiffs' citation of *Velez*, 795 F.3d at 585-86, and *United States ex rel. Price v.*

11  *Peters*, 66 F.Supp.3d 1141, 1149 (C.D. Ill. 2013) for the proposition: "That Wasatch did not

12  always call the additional charges 'rent' does not change their true nature as rent," ECF 242-1 at

13  14, misconstrues both holdings. *Velez*, did not, as Plaintiffs claimed it did, establish a general

14  proposition, that "regardless of nomenclature, short-term fees were rent." Id. at 14. The issue in

15  *Velez* was whether fees charged *to occupy the unit under a short-term lease*, rather than a full-term

16  lease, were part of the "rent to owner" under the HAP contract, *or* whether they were additional

17  service charges for which the tenant was responsible.[12] The *Velez* court defined rent generally as

18  "a fixed sum … to be paid at stated times *for the use of property*[.]") Id., at 584 (citing the

19  Supreme Court's decision in *M.E. Blatt Co. v. United States*, 305 U.S. 267, 277–78 (1938). "Since

20  _____

21  [11] Tenants *are* required to have renter's insurance as a condition of occupancy. But, they are

22  offered the *option* of including their insurance payment with their rent payment and are free to
    choose and pay for their own insurance on the open market. Furthermore, tenants who elect to use
    Defendants' "pay with rent" option, are not paying additional *rent to the owner* but are paying the

23  insurance provider *through the owner*. Furthermore, there is nothing preventing owners from
    imposing conditions of occupancy, as long as the conditions comply with state and federal law.

24  The fact that some conditions of occupancy require an expenditure by the tenant that is not
    included in the HAP contract rent also does not convert the charge into "excess rent." For

25  example, tenants are required to pay a security deposit as a condition of occupancy, but the
    government/PHA does not subsidize that payment, and requires only that it not exceed security

26  deposit rates in the area. 24 C.F.R. § 982.313

27  [12] It is worth noting that the *Velez* court clearly contemplated that a tenant might incur and be

28  responsible for charges outside of, or not covered in, the HAP contract rent to owner.

LEWIS
BRISBOIS

1   rent, no matter how it is characterized in a lease, is the price paid for the lessee's use of the

2   property for a distinct period of time, *the lease term and physical occupation of the property by a*

3   *tenant cannot be separated*." *Id*. at 586. If, as *Velez* holds, rent "operates … as the sum *paid to live*

4   *in and make use of rental property*, *Id*. at 584, then an added fee for a short-term lease is clearly

5   included in the definition of "rent," both as a general matter, *and* under the HAP contract.[13]

6          The holding in *Peters* was similarly tied to the fact that the additional charge was expressly

7   tied to the tenant's *use of the property under the lease* and did not simply hold that "extra charges

8   for storage shed 'clearly constitute[d] rent payments.'" ECF 242-1 at 14. As the Court's holding

9   made clear, but in language Plaintiffs specifically omitted from their synopsis, the owner in *Peters*

10  had required the tenant to make extra payments for the use of a storage shed "*that was part of the*

11  *dwelling unit premises*." *Peters*, 66 F.Supp.3d at 1149 (emphasis added).

12                    (b)    Sager

13         Initially, on Defendants' Motion to Dismiss (ECF No. 26), the Court rejected the "broad

14  definition" of rent in *Velez* urged by Plaintiffs, on the ground that it "does not easily encompass

15  the additional charges here." ECF No. 61 at 8. Then, the Court specifically distinguished between

16  "the short-term fees[, which] were for the general use of the rented premises," in *Velez,* and the

17  "additional charges [that] are associated with discrete services, utilities, or appliances," in this

18  case. Id. at 9. On summary judgment, however, the Court abandoned this distinction, largely based

19  on the decision in *Sager*, and pivoted to a definition of "rent" based on how payments are *treated*

20  by the owner.  This time, the Court accepted Plaintiffs' argument that the tenant's right "to live in

21  and make use of a unit" was conditioned "on the payment of ASA fees," because Defendants'

22  internal software applied tenant payments to the ASA fees first, and then to "rent," which,

23  Plaintiffs argued, meant they could be evicted for nonpayment of rent. On this basis, the Court

24  found that the fees constituted "unlawful rent," in breach of contract and in violation of the UCL.

25

26  _____

27  [13] As both the *Velez* court and this Court also noted with respect to the finding in *Velez*, while
some owners had addressed the short-term fees as discrete fees associated with holdover tenancy,
others had simply increased the rent charge and the PHA had included it as rent under the HAP.

28

1 | ECF No. 278, Order at 12.[14]

2 |     The *Sager* court did not find that the charges were unlawful – or that the order in which

3 | they were paid made them unlawful. *Sager* did *not* define "rent" based on the PHA's practice of

4 | paying other charges first, or even find that the practice "converted" the charges into "unlawful

5 | rent." ECF No. 278 at 12.

6 |     *Sager* concerned an "allocation clause" in a *public housing* lease that allowed any payment

7 | by the tenant, "which is not specifically designated, in written notation, as "rent" or "for rent" [to]

8 | be applied at the Landlord's option, as follows: first to outstanding maintenance charges and/or

9 | late fees and/or legal fees and secondly to rent." *Sager*, 957 F. Supp. 2d at 630. In addition to her

10 | state law claims, the tenant-plaintiff alleged that the clause violated the United States Housing Act

11 | and the Brooke Amendment, which caps a public housing tenant's "total tenant payment" for rent

12 | at 30% of the "family's adjusted monthly income." *See Id.* at 630, 637; 42 U.S.C. § 1437a(a)(1);

13 | 24 C.F.R. § 5.628. The question was whether the clause was invalid under these statutes, not

14 | whether the charges constituted "unlawful rent."

15 |     The action in *Sager* was brought under the statutory and regulatory framework for

16 | federally-assisted *public housing* tenants, and under provisions *that do not apply to private*

17 | *housing*. Public housing units are owned and managed by local PHAs, which rent them to low-

18 | income residents, usually at lower than market rates. HCV tenants receive vouchers, which can be

19 | used to rent at any privately owned property as long as the landlord accepts it. As the *Sager* court

20 | noted, "[p]ublic housing leases are rarely negotiated and are generally, as here, presented to

21 | tenants on a take it or leave it basis;" they are contracts of adhesion. *Sager*, 957 F. Supp. 2d at 633.

22 | In government-owned public housing, the subsidy attaches to the unit; in HCV-assisted housing,

---

24 | [14] In fact, regardless of how the owner sequences tenant payments, a tenant can be evicted for
25 | failing to pay for additional services or other charges as long as that presents a substantial
violation of the lease. The issue in *Sager* stemmed from the fact that, under Maryland law, an
26 | eviction for a substantial violation of the lease required that the tenant receive certain due process
rights, while a tenant evicted for nonpayment of rent was subject to a summary eviction procedure
27 | with fewer due process rights. The risk of eviction exists under any lease; eviction proceedings are
generally governed by state, as well as federal law; and eviction it is not a characteristic that
28 | converts a payment into "rent," under any known definition or understanding of the word.

1    the subsidy attaches to the person, which enables tenants to live in rental units of their choice. As

2    the *Sager* court noted further, "[w]hile private landlords are given some leeway under Maryland

3    law to bargain over the definition of rent, PHAs do not have such discretion." *Id*. at 633. *See also*

4    24 CFR § 982.506 (In private housing, "[t]he owner and the family negotiate the rent to owner.")

5    The term "tenant rent" in public housing is expressly defined as the "amount payable

6    monthly by the family as rent to the [PHA]," in 24 C.F.R. § 5.603(b) – which also expressly states

7    that *the term "is not used in the Section 8 voucher program."* (emphasis added). Under the Brooke

8    Amendment, the public housing tenant's rent payment is strictly limited to 30% of the adjusted

9    monthly income. By contrast, the HCV program requires only that, during the initial lease term,

10   the family share not exceed 40% of the family's monthly adjusted income. 24 C.F.R. §§

11   982.1(a)(3); 982.305(a)(5).

12   In addressing plaintiff's claim under the Brooke Amendment, the *Sager* court noted that,

13   *"[a]s the statute hinges on a precise calculation of rent*, the Amendment's governing regulations

14   clearly demarcate between 'tenant rent' and 'other charges.'" *Id*. at 637 (emphasis added). The

15   regulations governing the leases for public housing expressly distinguish between the "tenant rent"

16   and other "PHA Charges" in the lease.  24 C.F.R. § 966.4(b)(1)-(2). The PHA charges, which are

17   defined as "charges to the tenant for maintenance and repair beyond normal wear and tear and for

18   consumption of excess utilities" (id.), do not count toward the 30% ceiling under the Brooke

19   Amendment. Based on these definitions in the public housing regulations, the *Sager* court found

20   that, in effect, the allocation clause in the lease added the PHA charges to the "tenant rent" defined

21   in 24 C.F.R. § 5.603(b), raising the tenant's total rent payment above the 30% ceiling. Thus, it

22   concluded, the allocation clause violated the Brooke Amendment. *Sager*, 957 F. Supp. 2d at 637.

23   By contrast, for private housing, the PHA reviews both the "gross rent,"[15] which *includes*

24   the "rent to owner," and the "family share" *of the gross rent*, based on the Section 8 program

25

26

27

---

[15] "Gross rent" is "[t]he sum of the rent to owner plus any utility allowance. 24 C.F.R. § 982.4(b).

28

1  requirements. If the rent is less than the payment standard,[16] the family generally pays 30% of

2  their adjusted monthly income for rent, but if the rent is more than the payment standard, the

3  family pays a larger share of the rent. 24 C.F.R. § 982.1(a)(3). Where the gross rent of the unit

4  exceeds the applicable payment standard for the family, the PHA will approve the lease *as long as*

5  *the family share does not exceed 40 percent of the family's monthly adjusted income*. 24 C.F.R. §

6  982.305(a)(5). In other words, the subsidized "rent to owner" excludes the optional amenities

7  provided by the owner, but the PHA will approve the lease as long as the family is not required to

8  pay more than 40% of their adjusted monthly income toward the cost of housing. Furthermore, the

9  40% ceiling applies only during the initial term of the lease, and not after that.

10      Having found that the allocation clause was invalid under the Brooke Amendment, the

11  *Sager* court further found that the clause was "unreasonable" under 42 USC § 1437(d)(l)(2) of the

12  United States Housing Act, requires that PHAs use "leases which … do not contain unreasonable

13  terms and conditions."[17] As the *Sager* court noted, this "requires that lease terms be rationally

14  related to a legitimate housing purpose." *Sager*, 957 F.Supp.2d at 639 (citations omitted). "The

15  determination is fact dependent, and reasonableness is defined by the particular problems and

16  concerns confronting the local housing authority." Id. (citations omitted).

17      Plaintiffs' FCA claim turns, not on the reasonableness of the charges under the lease, but

18  on whether the charges were "excess rent payments" under the HAP contract. Because "rent to

19  owner" is the payment for the items and services in the HQS, plus items that are customarily

20  included in rent in the area and/or provided to unassisted tenants for no additional charge, the issue

21  under the FCA is whether the amenities and services in the ASAs were already covered by the

22  "rent to owner" in the HAP contract. The alleged falsity in this case, *i.e.,* whether the additional

23  _____

24  [16] The "payment standard" is "[t]he maximum monthly assistance payment for a family assisted in

25  the voucher program (before deducting the total tenant payment by the family). 24 C.F.R. §
    982.4(b).

26  [17] Just as the definitions of "tenant rent" in public housing and "rent to owner" in the HCV

27  program differ, the regulations governing the leases in each program also differ. Public housing
    leases are expressly governed by the regulations in 24 C.F.R. Part 966; private housing leases are

28  expressly governed under 24 C.F.R. § 982.

1  services charges were "excess rent payments" rests on this factual question, not on a definition of

2  "rent" that is loosely crafted from *Sager.*

3              2.      Cases That Found False Certification Claims Under the HAP Contract Did

4                      So Based on the Definitions in the Statutory and Regulatory Framework,

5                      and the HAP Contract

6          The courts that have addressed whether additional charges are "excess rent payments"

7  under the HAP Contract, resulting in false certification claims under the FCA, have consistently

8  construed unlawful side payments or unlawful rent under the HAP based on the definitions of rent

9  in the statute and regulations, *including in the cases purportedly relied upon by Plaintiffs*

10 *throughout this litigation. See, e.g., Thornton v. Portola Del Sol Operator, LLC,* No.

11 221CV01123APGBNW, 2023 WL 7412491, at *2 (D. Nev. Nov. 9, 2023) (owner required tenant

12 to pay common area maintenance fees); *United States ex rel. Gionson v. NVWM Realty, LLC,* No.

13 218CV01409GMNGWF, 2019 WL 2617816, at *2 (D. Nev. June 25, 2019) (HAP Contract

14 provided that owner was responsible for sewer and trash payments, but owner charged tenant $35

15 a month for these services); *Kelly v. Denault*, 374 F. Supp. 3d 884, 888 (N.D. Cal. 2018) (owner

16 increased tenants' share of the water bill to 60%; increased the rent without seeking prior approval

17 or notifying the PHA; and demanded $ 1,200 in allegedly delinquent utility payments); *United*

18 *States ex rel. Benitez v. Galliano, LLC, No. 215CV01688LDGNJK, 2018 WL 2247279, at *5 (D.*

19 *Nev. Jan. 26, 2018)* (HAP Contract rent to owner included fees for sewer and trash; landlord

20 required tenant to sign separate agreement to pay higher amount, including for sewer and trash);

21 *United States ex rel. Carmichael v. Gregory*, 270 F. Supp. 3d 67, 71–72 (D.D.C. 2017) (owner

22 required tenant to execute undisclosed revised leases for monthly rents in excess of the amount

23 permitted under the HAP Contract); *Cummings v. Hale*, No. 15-CV-04723-JCS, 2017 WL

24 3669622, at *2 (N.D. Cal. May 17, 2017), report and recommendation adopted sub nom. *United*

25 *States ex rel. Cummings v. Hale*, No. 15-CV-04723-VC, 2017 WL 3669553 (N.D. Cal. Aug. 16,

26 2017) (under the HAP Contract, owner "agreed to pay for all utility and garbage service" for the

27 apartment, but tenant paid for the utility and garbage service for the unit she was renting and also

28 another unit, which she was not renting); *Doe v. Gormley*, No. CV ADC-15-2183, 2016 WL

LEWIS BRISBOIS

1   4400301, at *1 (D. Md. Aug. 17, 2016) (after signing the lease and the HAP Contract, owner

2   required tenant to pay an additional $411.00 per month); (*United States v. Baran, No.*

3   *CV1402639RGKAJWX, 2015 WL 5446833, at *2 (C.D. Cal. Aug. 28, 2015)* (owner demanded that

4   tenant "pay extra rent directly to Defendant on the side;" side agreement was never disclosed to

5   the PHA, and PHA continued to pay the rent agreed to in the HAP Contract); *U.S. ex rel.*

6   *Salvatore v. Fleming*, No. CIV.A. 11-1157, 2015 WL 1326327, at *1–2 (W.D. Pa. Feb. 23, 2015),

7   report and recommendation adopted, No. CIV.A. 11-1157, 2015 WL 1384653 (W.D. Pa. Mar. 25,

8   2015) (owner agreed to HAP rent and to pay for water and sewage; then required tenant to pay

9   higher, unapproved rent, as well as water and sewage costs); *[18]U.S. ex rel. Mathis v. Mr.*

10   *Property, Inc.*, No. 14-00245, 2015 WL 1034332, at *5 (D. Nev. Mar. 10, 2015) (owner charged

11   tenant $150 for pool maintenance fees); *U.S. ex rel. Holmes v. Win Win Real Estate, Inc.*, No. 13-

12   02149, 2015 WL 6150594, at *5 (D. Nev. Oct. 19, 2015) (owner charged tenant for homeowner

13   association fees and property management fees); *U.S. ex rel. Richards v. R & T Invs. LLC*, 29 F.

14   Supp. 3d 553, 555–56 (W.D. Pa. 2014) (owner refused to pay for water and sewage agreed to in

15   the HAP Contract, and required tenant to pay higher rent than the PHA had approved for the unit);

16   **U.S. ex rel. Price v. Peters*, 66 F. Supp. 3d 1141, 1149 (C.D. Ill. 2013) (owner required tenant to

17   make extra payments use of storage shed "*that was part of the dwelling unit premises*") (emphasis

18   added); *U.S. ex rel. Wade v. DBS Invs., LLC*, No. 11-CV-20155, 2012 WL 3759015, at *3 (S.D.

19   Fla. Aug. 29, 2012) (owner entered into an alternative lease with tenant for rent in excess of the

20   amount approved by the HCV Program); *U.S. ex rel. Stearns v. Lane*, No. 2:08-CV-175, 2010 WL

21   3702538, at *1–2 (D. Vt. Sept. 15, 2010) (HAP rent included water charges and trash removal;

22   owner required tenant to pay higher rent than PHA had approved, plus $50 for water); *U.S. ex

23   rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183, 1187, 1189 (D. Or. 2007) (issue of fact existed as to

24   whether charges for landscaping services were for *increased taxes and utilities*, which would have

25

26

27   [18] Cases marked with an asterisk* are the cases cited by Plaintiffs in their Opposition to the
    Defendants' Motion to Dismiss and Motion for Partial Summary Judgment on the breach of

28   contract and UCL claims.

1  made them "side rent"); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 280 (D. Conn. 2007)

2  (landlord charged "additional rent" for water usage that was included in the PHA's calculation of

3  the "rent to owner" and the "utility allowance").

4  II.     PLAINTIFFS' CLRA CLAIM IS MERITLESS BECAUSE THE LEASE OF REAL

5          PROPERTY DOES NOT CONSTITUTE A TRANSACTION FOR GOODS OR

6          SERVICES

7          Plaintiffs contend that the practices at issue are actionable under the Consumer Legal

8  Remedies Act. The Consumer Legal Remedies Act provides a right of action for certain unlawful

9  practices related to "transaction[s] intended to result or that result[] in the sale or lease of goods or

10  services to any consumer." Cal. Civ. Code § 1770(a). Residential property like apartments are not

11  considered tangible chattel such that they could be defined as a "good" under a CLRA. *Cornu v.*

12  *Norton Cmty. Apartments*, *L.P.,* No. B207802, 2009 WL 1961013, at *6 Cal. Ct. App. July 9,

13  2009). Additionally, this Court has explicitly found that the payments at issue in this case were not

14  for "services", but instead were solely for "rent". (Order Granting Plaintiffs' Motion for Summary

15  Adjudication, Dkt. #352.) If the practices at issue do not concern a "transaction[s] intended to

16  result or that result[] in the sale or lease of goods or services to any consumer", Plaintiffs cannot

17  prevail under the Consumer Legal Remedies Act.

18          Plaintiffs contend that any argument that the practices at issue are not actionable because

19  they are related to a "transaction[s] intended to result or that result[] in the sale or lease of goods

20  or services to any consumer" is waived because it was not raised as a dispositive motion. This

21  argument fails to take into account the fact that it was this Court's ruling on Plaintiffs' dispositive

22  motions that gives rise to this argument in the first place—that the transactions in question were

23  not for goods or services, but in fact, were only rent, and that to the extent they concerned goods

24  or services, those concerns were "hidden benefits" of the transactions. (Order Granting Plaintiffs'

25  Motion for Summary Adjudication, Dkt. #352.) Defendants argued to the contrary, and thus could

26  not have raised this issue prior to the Court's ruling, which came long after the dispositive motion

27  cutoff.

28  III.    WHETHER THE SIX YEAR OR 10 YEAR STATUTE OF LIMITATIONS APPLIES TO

LEWIS
BRISBOI
S

1    <u>PLAINTIFF-RELATORS' CAUSE OF ACTION UNDER THE FALSE CLAIMS ACT</u>

2         Defendant anticipates that Plaintiffs will seek damages for allegedly false claims for

3    federal funds under the False Claims Act that date back as far as 2005. Under 31 U.S.C. section

4    3731(b), a civil action under the False Claims may not be brought "(1) more than 6 years after the

5    date on which the violation of section 3729 is committed, or (2) more than 3 years after the date

6    when facts material to the right of action are known or reasonably should have been known by the

7    official of the United States charged with responsibility to act in the circumstances, but in no event

8    more than 10 years after the date on which the violation is committed, whichever occurs last." 31

9    U.S.C. § 3731(b). Plaintiffs have not alleged any facts to extend the statute of limitations beyond

10   the 6 years permitted by the statute.

11   DATED:  March 15, 2024              LEWIS BRISBOIS BISGAARD & SMITH LLP

12

13                                      By:   _____/s/ Ryan Matthews_____

14                                            RYAN MATTHEWS
                                              Attorneys for Defendants, WASATCH
15                                            PROPERTY MANAGEMENT, INC., LOGAN
                                              PARK APARTMENTS, LLC, LOGAN PARK
16                                            APARTMENTS, LP, BELLWOOD JERRON
                                              HOLDINGS, LLC, BELLWOOD JERRON
17                                            APARTMENTS, LP, HAYWARD SENIOR
                                              APARTMENTS, LP, OAK VALLEY
18                                            APARTMENTS, LLC, OAK VALLEY
                                              HOLDINGS, LP, PIEDMONT APARTMENTS,
19                                            LP, POINT NATOMAS APARTMENTS, LLC,
                                              POINT NATOMAS APARTMENTS, LP,
20                                            SPRING VILLA APARTMENTS, LP, SUN
                                              VALLEY HOLDINGS, LTD, VILLAGE GROVE
21                                            APARTMENTS, LP

22

23

24

25

26

27

28

Exhibit D

1  ARNALL GOLDEN GREGORY LLP
   Richard T. Collins (Bar No. 166577)
2  rich.collins@agg.com
   2100 Pennsylvania Avenue, NW
3  Suite 350S
   Washington, D.C. 20037
4  Telephone:    202.677.4030

5  *Counsel for Defendants:*

6  WASATCH ADVANTAGE GROUP, LLC;
   CHESAPEAKE APARTMENT HOLDINGS, LLC;
7  ASPEN PARK HOLDINGS, LLC; BENT TREE
   APARTMENTS, LLC; CALIFORNIA PLACE
8  APARTMENTS, LLC; CANYON CLUB HOLDINGS,
   LLC; COURTYARD AT CENTRAL PARK
9  APARTMENTS, LLC; CREEKSIDE HOLDINGS, LTD;
   RIVER OAKS HOLDINGS, LLC; WASATCH PREMIER
10 PROPERTIES, LLC; WASATCH POOL HOLDINGS III,
   LLC; WASATCH POOL HOLDINGS, LLC; CAMELOT
11 LAKES HOLDINGS, LLC; HERITAGE PARK
   APARTMENTS, LP; PEPPERTREE APARTMENT
12 HOLDINGS, LP; SHADOW WAY APARTMENTS,
   LP; WASATCH QUAIL RUN GP, LLC
13

14

15          **UNITED STATES DISTRICT COURT**
            **EASTERN DISTRICT OF CALIFORNIA**
16                **SACRAMENTO DIVISION**

17 UNITED STATES OF AMERICA, *ex rel.*
   DENIKA TERRY, ROY HUSKEY III, and          Case No.: 2:15-CV-00799-KJM-DB
18 TAMERA LIVINGSTON, and each of them for
   themselves individually, and for all other   CLASS ACTION
19 persons similarly situated and on behalf of the
   UNITED STATES OF AMERICA                     **OWNER AND NON-OWNER**
20                                               **DEFENDANTS' SEPARATE**
               Plaintiffs/Relators,             **STATEMENT RE: POINTS OF LAW**
21                                               **(E.D. CA L.R. 181(b)(8))**
   vs.
22                                               Before:       Hon. Kimberly J. Mueller
   WASATCH ADVANTAGE GROUP, LLC,
23 WASATCH PROPERTY MANAGEMENT,
   INC., WASATCH POOL HOLDINGS, LLC,            Trial Date:   None Set
24 CHESAPEAKE APARTMENT HOLDINGS,
   LLC, LOGAN PARK APARTMENTS, LLC,
25 LOGAN PARK APARTMENTS, LP, ASPEN
   PARK HOLDINGS, LLC, BELLWOOD
26 JERRON HOLDINGS, LLC, BELLWOOD
   JERRON APARTMENTS, LP, BENT TREE
   APARTMENTS, LLC, CALIFORNIA PLACE
   APARTMENTS, LLC, CAMELOT LAKES

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW, Suite 350S
Washington, DC 20037
Telephone: 202.677.4040
www.agg.com

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

HOLDINGS, LLC, CANYON CLUB
HOLDINGS, LLC, COURTYARD AT
CENTRAL PARK APARTMENTS, LLC,
CREEKSIDE HOLDINGS, LTD, HAYWARD
SENIOR APARTMENTS, LP, HERITAGE
PARK APARTMENTS, LP, OAK VALLEY
APARTMENTS, LLC, OAK VALLEY
HOLDINGS, LP, PEPPERTREE
APARTMENT HOLDINGS, LP, PIEDMONT
APARTMENTS, LP, POINT NATOMAS
APARTMENTS, LLC, POINT NATOMAS
APARTMENTS, LP, RIVER OAKS
HOLDINGS, LLC, SHADOW WAY
APARTMENTS, LP, SPRING VILLA
APARTMENTS, LP, SUN VALLEY
HOLDINGS, LTD, VILLAGE GROVE
APARTMENTS, LP, WASATCH QUAIL
RUN GP, LLC, WASATCH PREMIER
PROPERTIES, LLC, WASATCH POOL
HOLDINGS III, LLC,
and DOES 1-4,

Defendant.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

1    Pursuant to Local Rule 181(b)(8), the following statement regarding points of law bearing

2  on Plaintiffs' claims at trial is submitted by Defendants Wasatch Advantage Group, LLC, Wasatch

3  Premier Properties, LLC, Wasatch Pool Holdings, LLC, Wasatch Pool Holdings III, LLC ("Non-

4  Owner Defendants"), Aspen Park Holdings, LLC, Bent Tree Apartments, LLC, California Place

5  Apartments, LLC, Camelot Lakes Holdings, LLC, Canyon Club Holdings, LLC, Chesapeake

6  Apartment Holdings, LLC, Courtyard at Central Park Apartments, LLC, Creekside Holdings,

7  LTD, River Oaks Holdings, LLC, Heritage Park Apartments, LP, Peppertree Apartment Holdings,

8  LP, Shadow Way Apartments, LP, and Wasatch Quail Run GP, LLC ("Owner Defendants"),

9  collectively referred to as "Owner and Non-Owner Defendants."

10  **I.    Plaintiffs' FCA Claims**

11    **A.  Owner and Non-Owner Defendants' Summary and Statement of the Case**

12    Plaintiffs' allegations that Owner and Non-Owner Defendants violated the False Claims

13  Act (FCA) and the California Consumers Legal Remedies Act (CLRA) are based on their

14  allegations that Defendants unlawfully required tenants, including tenants received housing

15  assistance under the federal Housing Choice Voucher (HCV) program, to pay for elective

16  amenities that were not included in the rental payment for the unit. Plaintiffs' case hinges on their

17  characterization of these additional charges as "excess rent" or "side payments" that violated the

18  housing assistance payment (HAP) Contracts between the owners and the public housing

19  authorities (PHAs) that administer the HCV program.

20    The HAP Contract establishes the terms and conditions under which the owner agrees to

21  rent to the federally-assisted tenant and the PHA agrees to subsidize the tenant's rent for the unit.

22  Plaintiffs allege that, because Defendants charged for optional amenities that were not included in

23  the rent subsidized under the HAP, *i.e.,* the "rent to owner" for the "rental of the contract unit,"

24  they falsely certified, in violation of the FCA, that "[e]xcept for the rent to owner, the owner has

25  not received and will not receive any payments or other consideration … for rental of the contract

26  unit during the HAP Contract term." HAP, Part B, ¶ 8(d); Plaintiffs' Sixth Amended Complaint, ¶

1

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

237. Plaintiffs further allege that, if they had known of the additional charges, the PHAs would not have made the housing assistance payments to Defendants, ¶ 244, and that, as a result of the alleged false certifications, the government was defrauded in the full amount of all the housing assistance payments that the PHAs made to the Owner Defendants from April 14, 2009[1] through November 30, 2022, when the Court granted summary judgment in plaintiffs' favor on their breach of contract and UCL claims. Plaintiffs' Sixth Amended Complaint, ¶ 245.

In granting summary judgment on the California state law breach of contract and Unfair Competition Law (UCL) claims, the Court accepted the definition of "rent" that Plaintiffs have promoted throughout this litigation – and that has no basis in the federal law and regulations governing the HCV program. Plaintiffs' definition of "rent" does not exist in any federal statute or common understanding of the word. Instead, it is devised from (a) a series of propositions that are very loosely drawn from two cases: *Velez v. Cuyahoga Metropolitan Housing Authority*, 795 F.3d 578 (6th Cir. 2015) and *Sager v. Housing Commission of Anne Arundel County*, 957 F.Supp.2d 627 (D. Md. 2013), (b) asserted facts that are strongly disputed, and (c) sweeping generalizations based on disputed facts.

Although the Court initially acknowledged the distinction between fees "for the general use of rented premises" in *Velez,* and the additional charges "associated with discrete services, utilities or appliances" in this case, when it denied Defendants' motion to dismiss (ECF No. 61, Order at 9), the Court subsequently reversed itself on Plaintiffs' motion for partial summary judgment, and found, largely based on *Sager*, that "rent" is defined by the way it is accounted for by the owner. Thus, the Court concluded that, in this case, the tenant's right "to live in and make use of a unit" was conditioned "on the payment of ASA fees," and, therefore, those fees constituted "unlawful rent," in breach of contract and in violation of the UCL. ECF No. 278, Order at 12. Plaintiffs now seek to apply that definition of "rent" with respect to their FCA and CLRA claims,

---

[1] As discussed, *infra*, Plaintiffs have alleged violations as far back as 2006, but have provided no reason or explanation for adding three years to the six-year statute of limitations under the FCA.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1    as well.

2         First, however, "rent" is not defined by the way it is treated for accounting purposes; nor

3    does "rent" become "rent" because the failure to pay it is a basis for eviction. Second, tenants may

4    be evicted for other reasons than a failure to pay rent, and the failure to pay other charges for which

5    the tenant may be responsible may provide a basis for eviction if it is a "substantial violation" of

6    the lease.[2] Third, "rent" is universally understood as an exchange of money for the temporary use

7    of some form of property, and thus is defined by the terms of the exchange. Fourth, a false

8    certification claim under the FCA requires the court and jury to look to the federal statutes,

9    regulations, agency guidance, and the actual language in the HAP Contract for the definition of

10   "rent to owner," not to apply a definition of its Plaintiffs' creation. Fifth, contrary to Plaintiffs'

11   assertions, the *government's* definitions of "excess rent," "family rent to owner," "family share of

12   rent," "gross rent," "payment standard," "rent reasonableness," "rental for the contract unit," "total

13   tenant payment," "HAP," which govern for FCA purposes, *are* all clearly delineated in the statute,

14   42 USC § 1437f, the regulations, 24 CFR Parts, 888, 5 and 982, the applicable Housing Choice

15   Voucher Guidebook, HUD's Public and Indian Housing Notices, the PHAs' Administrative Plans,

16   and finally, in the HAP Contract, itself. Sixth, where courts have found illegal "side payments"

17   under a HAP Contract that resulted in actionable false claims under the FCA, they have

18   *consistently* done so based the statutes and regulations governing the HCV program and the HAP

19   Contract requirements, not by devising a definition of "rent to owner" that fit the plaintiffs' claims

20   regarding the underlying facts.

---

24   [2] As discussed, *infra*, in *Sager* the court was concerned with the differences in process under
     Maryland law between an eviction for nonpayment of rent and an eviction for other reasons,
25   including the nonpayment of other charges. The court's decision was based on the effects the
     PHA's accounting processes had on tenants' state law due process rights in eviction proceedings;
26   it did not craft a definition of "rent" that supersedes the definitions in federal law or that can be
     applied to determine whether a false claim was presented under the FCA.

### B.  The False Claims Act

The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A);[3] *Universal Health Servs., Inc. v. United States ex rel. Escoba*r, 579 U.S. 176, 193 (2016). Claims under § 3729(a)(1)(A) are known as "presentment" claims and require that: "(1) the defendant submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *See United States ex rel. Tran v. Computer Scis. Corp.,* 53 F. Supp. 3d 104, 117, 121-22 (D.D.C. 2014). Plaintiffs' FCA claim relies on the "certification theory" of liability, or "legally false certifications." Under this theory, a claim for payment is a "false" claim if it rests on a false certification of compliance with the applicable federal statutes, regulations, or contractual terms. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010). "It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

In this circuit, the leading FCA case is still *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006). A false claim under *Hendow* requires: "(1) a false statement (or fraudulent course of conduct), (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." Id. at 1174. To prove their false certification claim, Plaintiffs will be required to show that "(1) the Defendants explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though Defendants were not in compliance with that law, rule or regulation." *Ebeid ex rel. U.S. v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010). The essential elements of an FCA claim are "falsity," "materiality" and "scienter."

Since *Hendow* and *Ebeid* were decided, however, the Supreme Court has addressed the

---

[3] Plaintiffs have generally pleaded violations of 31 U.S.C. § 3729(a), which lists seven types of violations. We infer from the text of ¶ 232 of the Sixth Amended Complaint, however, that plaintiffs are alleging violations of 31 U.S.C. § 3729(a)(1)(A) only.

4

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

FCA's "falsity" and "materiality" requirements in *Universal Health Servs. v. United States ex rel.*
*Escobar*, 579 U.S. 176, 181 (2016) and the "scienter" requirement in *United States ex rel. Schutte*
*v. SuperValu, Inc.,* 598 U.S. 739 (2023). In *Escobar*, the Court held that FCA liability can attach
for violating statutory or regulatory requirements, whether or not those requirements were
designated as conditions of payment, as long as they were *material* to the decision to pay the claim.
*Escobar*, 579 U.S. at 181. Materiality, which is defined in the statute as "having a natural tendency
to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C.
§ 3729(b)(4), is a "demanding" and "rigorous" standard, which the Court outlined through three
examples:

> [P]roof of materiality can include, but is not necessarily limited to,
> evidence that the defendant knows that the Government consistently
> refuses to pay claims in the mine run of cases based on
> noncompliance with the particular statutory, regulatory, or
> contractual requirement. Conversely, if the Government pays a
> particular claim in full despite its actual knowledge that certain
> requirements were violated, that is very strong evidence that those
> requirements are not material. Or, if the Government regularly pays
> a particular type of claim in full despite actual knowledge
> that certain requirements were violated, and has signaled no change in
> position, that is strong evidence that the requirements are not
> material.

*Id.* at 194-95. Thus, under *Escobar*, an *actionable* false claim is one that was material to the
payment decision in that it *would not have been paid* if the government had known that the
claimant was not in compliance with the underlying regulations or contract, and where those
requirements were critical to the performance the government had contracted for under the
contract. Alternatively, however, a claim that is false in fact may not be actionable under the FCA
if the regulation or contractual requirement the claimant had falsely certified to was not a
governing factor in the government's decision to pay the claim. In either case, however, the key
questions are whether the facts that made the certification false were disclosed to, or known by the
government-payer, and whether or how these facts affected or would have affected the

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

1    government's decision to pay the claim.

2        In *United States Ex Rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017, 1019 (9th Cir. 2018),

3    the Ninth Circuit concluded that neither *Ebeid, n*or *Hendow,* had been overruled by *Escobar.* Post-

4    *Escobar* and in this circuit therefore, FCA liability attaches to a false certification claim if "the

5    defendant knowingly violated a requirement that the defendant knows is material to the

6    Government's payment decision." *Id*. at 181.

7        The FCA defines "knowingly" to mean that a person "(i) has actual knowledge of the

8    information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts

9    in reckless disregard of the truth or falsity of the information." 31 USC § 3729(b)(1)(A). "In short,

10   either actual knowledge, deliberate ignorance, or recklessness will suffice." *SuperValu Inc.*, 598

11   U.S. 739, 750 (2023). It "require[s] no proof of specific intent to defraud." Id. § 3729(b)(1)(B). In

12   *SuperValu*, the Supreme Court held that "[t]he FCA's scienter element refers to respondents'

13   knowledge and subjective beliefs — not to what an objectively reasonable person may have known

14   or believed." Id. at 749. Whether a person acted with scienter turns "*on what the defendant knew*

15   *when presenting the claim*." *Id*. at 752. (emphasis added).

16       In a false certification case under the FCA, therefore, all three elements – falsity,

17   materiality, and scienter – turn on the statutory, regulatory, and contractual requirements for

18   payment, the defendants' compliance with those requirements, and the importance of compliance

19   with those requirements to the government's decision to pay the claim. Here, the alleged falsity in

20   the certification centers on the definition of "rent to owner" in the certifications made under the

21   HAP Contract. It is the definition of "rent to owner" expressed in the statutes, regulations, HUD

22   policy, and the HAP Contract that determines whether the certifications were false; not, as

23   Plaintiffs have urged, a definition that does not exist in any statute, is not supported either by the

24   cases upon which they claim to rely or the facts in this case, and does not apply to any part of

25   Section 8 as set forth in the Housing Act of 1937. With respect to the specific FCA claim in this

26   case, therefore, Plaintiffs definition of rent is particularly inapposite because the statute, the

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1  regulations, HUD policy, and the HAP Contract all clearly define the terms "rent to owner;" "rental

2  for the unit;" "excess rent;" and "contract rent" that are reflected in the certifications at issue.

3      Under the FCA, Plaintiffs will be required to prove that Defendants knowingly made a

4  false statement or engaged in a fraudulent course of conduct that was material, in that it caused the

5  government to pay out money. To establish "falsity" under their false certification claim, Plaintiffs

6  will have to prove that Owner and Non-Owner Defendants knowingly failed to comply with the

7  statutory and regulatory requirements governing the HCV program, and that they falsely certified

8  that they complied with the requirements in order to receive the housing assistance payments from

9  the PHA.  *Ebeid,* 616 F.3d 993, 998 (9th Cir. 2010); *Hendow*, 461 F.3d at 1174. To establish the

10  "materiality" of the alleged false certification, Plaintiffs will have to prove, under a "rigorous" and

11  "demanding" standard, that compliance with the regulations was a necessary condition for

12  payment of the claim – along the lines of the examples provided by the Supreme Court in *Escobar*.

13  *Stephens Inst.*, 909 F.3d at 1020. To establish that Owner and Non-Owner Defendants acted

14  "knowingly," Plaintiffs will have to prove that Owner and Non-Owner Defendants knew that the

15  certifications were false at the time they presented the claims. *SuperValu*, 598 U.S. at 752.

16      In other words, the only relevant definitions of "rent" that may be applied to Plaintiffs'

17  FCA claim are the definitions in the statutory and regulatory framework governing the program.

18  **C.  Owner and Non-Owner Defendants' Response to Plaintiffs' Separate Statement**

19      **on Points of Law**

20      Plaintiffs and Defendants appear to agree in principle that, under the FCA, a "false"

21  certification claim rests on an entity's representation that it has complied with the federal statutes,

22  regulations, or terms governing their contractual agreement, when, in fact they had not so

23  complied, *and* where compliance with the specific law or regulation was material to the decision

24  to pay the claim. As the parties also appear to agree, the alleged falsity in this case lies with the

25  definition of "rent" for purposes of the HAP Contract between the PHA and the owner. The parties

26  strongly disagree, however, as to the basis for the alleged falsity in this case, i.e., the correct

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

7

1  definition of "rent" underlying the alleged false claims.

2      First and foremost, however, the operative term in the HAP Contract is "rent to owner,"

3  and that term is clearly defined in the regulations and the HAP Contract, itself.[4]  Defendants have

4  identified and discussed in detail the statutes, regulations and terms in the HAP Contract that define

5  "rent to owner" under the HAP Contract, including what constitutes excess rent, or an unlawful

6  side payment. While it is true that the word "rent" is not defined *as a one-word standalone term*,

7  it is not true that the federal statutes, regulations, and HAP Contracts have left the term undefined,

8  as Plaintiffs have argued. In fact, as Defendants have noted, and specifically with respect to the

9  Section 8 program,  the terms "rent to owner;" "gross rent;" "contract rent;" "rent for the unit;"

10  "family share;" "family rent;" and "housing assistance payment" are all defined in and through the

11  federal statutes, regulations, and HAP Contract.[5] These are the definitions that determine whether

12  Defendants – or any of the thousands of owners who accept Section 8 tenants – have complied

13  with the requirements in the statutes, regulations and contract governing the payment of their

14  claims.

15      Plaintiffs insist, however, that instead of the statutory and regulatory definitions established

16  by Congress and HUD, the definition of "rent" that the Court applied to their breach of contract

17  and UCL claims must also be applied to their FCA claim. Regardless of whether the definition of

18  "rent" the Court reached to decide these claims was correct,[6]  the FCA requires the Court to analyze

19  _____

20  [4] The word "rent," or some variation of the word (e.g., "rental," or "rented") appears in the HAP Contract some 57 times. In 31 of these instances, the phrase is "rent to owner." In another 15

21  instances, the word "rent" appears on its own - but is included in a section, paragraph, or sentence clearly headed by the words, or referring to, the "rent to owner," The phrase "excess

22  rent" appears once – in Part C of the HAP Contract.  The other 10 or so instances where the word "rent" appears in some form include, e.g., "rent subsidy;" "unpaid rent;" "Changes in Lease or

23  Rent," etc.
   [5] Further, in fact, as Defendants have noted, the regulations expressly distinguish between the

24  definitions of "rent" in public housing ("tenant rent") and in private, voucher-assisted housing ("rent to owner").

25  [6] As this section attests, Defendants dispute Plaintiffs' assertion that the Court's finding is "law of the case." To protect the record, Defendants note that they oppose its application to the FCA

26  claim on the ground that is unfounded in law and regulation, as well as the fact that the

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

8

the alleged falsity under the statutes, regulations, and terms governing the contract. Where, the federal requirements underlying the alleged falsity are clear, an alternative definition of "rent" drawn from Plaintiffs' characterizations of the facts and the holdings in selected cases is simply inapposite to this case.

The Court's definition of rent was not based on, nor did it look to, the definitions in the statute and regulations that apply to their FCA claim. Defendants are confused by Plaintiffs' various assertions on page 3 of their Separate Statement of Law regarding this point. First, Plaintiffs state that "the Court's order thoroughly explored the statutory and regulatory framework and case law that [Defendants] now discuss in their pretrial filings as if they were uncharted seas. Id. at 3-6, 9-13" (emphasis added). In fact, pages 3-6 of the Court's order describe the "Factual and Procedural Background" of the case, and the only citations are to the SUMF and previous filings in the docket; there is no discussion of the statute, 42 USC 1437f or the regulations, 24 CFR Part 982. In pages 9-13 of the Court's order, the only citation to the regulatory framework is a catchall reference to 24 CFR § 982.451, and a statement quoting the language in the HAP Contract Part C ¶ 5e.

Plaintiffs' further assertion that "the Court's order detailed the relevant statutory and regulatory framework governing the Section 8 Program, and addressed both the HAP contract and the tenancy addendum, Id. at 3-4," is similarly confusing.  The Court's recital of the SUMF does not include a detailed statement of the "relevant statutory and regulatory framework;" nor does it address "both the HAP contract and the tenancy addendum," as Plaintiffs appear to claim.  The only discussion of the statutory and regulatory framework governing the Section 8 Program lies in the two paragraphs on page 2 of the Order, where the Court briefly outlines the program.

With respect to Plaintiffs' further claims regarding the holding in *Velez*, the holdings in the FCA cases, and the analysis of "rent" in *Velez* and *Sager*, Defendants refer to the discussion of

applicable definitions, especially with respect to the FCA claim, are found in the statutes, regulations, and HAP Contract.

9

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

these issues above.

Finally, Plaintiffs' FCA claims are subject to the FCA's six-year statute of limitations. 31 U.S.C. § 3731(b)(1). To the extent Plaintiffs suggest that a ten-year limitations period applies under 31 U.S.C. § 3731(b)(2), they are incorrect. First, the FCA does not include a ten-year statute of limitations. *Houpt v. Wells Fargo Bank, N.A.*, 800 F. App'x 533, 535 (9th Cir. 2020). Instead, the FCA provides a three-year statute of limitations that is triggered "when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed." 31 U.S.C. § 3731(b)(2); *Houpt*, 800 F. App'x at 535. Accordingly, where, as here, it is clear from the face of the operative Complaint that the Government knew or should have known the facts material to the Plaintiffs' FCA claims at the time of the purported violation, the six-year limitations period applies.

### D. The Statutory and Regulatory Framework: Federally-Assisted Housing: Public Housing, 42 USC § 1437g, and the Housing Choice Voucher Program, 42 USC §1437f

Congress has provided federally-assisted housing for low-income households since 1937. The Housing Act of 1937, 42 USC § 1437g, provides housing assistance in the form of "public housing," or units that are owned and operated by the government, typically by state or local governmental entities called public housing agencies (PHAs), and rented to qualifying low-income tenants for below market rates.

Since 1965, however, Congress has expanded the federally-assisted housing options for low-income households to include a variety of settings and formats under a range of programs, which have evolved over time from the program created by the Housing and Community Development Act of 1974, to the current Housing Choice Voucher program under the Quality Housing and Work Reform Act of 1998, 42 USC § 1437f(o)(2) and (3), which is commonly referred to as the "Section 8" program.

The HCV program is generally administered by the PHAs, which receive funding for the

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1   program, as well as funding to administer it, from the Department of Housing and Urban

2   Development (HUD). 24 CFR § 982.1(a)(1). The PHA and HUD enter into an annual contributions

3   contract (ACC), under which HUD agrees to make payments to the PHA, over a specified term, to

4   subsidize the rent to owner on behalf of low-income tenant-participants in the program, and to

5   cover the PHA administrative fee, while the PHA agrees to administer the program in accordance

6   with HUD regulations and requirements. 24 CFR § 982.151(a)(1). The PHA must adopt a written

7   Administrative Plan that establishes local policies for administration of the program in accordance

8   with HUD requirements, and PHA policy on matters for which the PHA has discretion to establish

9   local policies. 24 CFR § 982.54(a).

10      Rather than restricting tenants to government-owned public housing, the Section 8 program

11   relies on owners of private property to make housing available to low-income tenants on a market

12   basis. "Tenant-based assistance" vouchers, which are the vouchers at issue in this case, enable

13   tenants to lease any unit on the private market, as long as the owner is willing to accept HCV

14   tenants.[7] 24 CFR § 982.1(b).

15      The definitions and regulations that govern federally-assisted housing generally are found

16   in 24 CFR Part 5 and apply to the HCV program, *except when a section is expressly limited to a*

17   *different program or expressly excludes the HCV program from its scope.* For example, the

18   definition of "tenant rent" in public housing, 24 CFR § 5.603, expressly states that it "is not used

19   in the Section 8 voucher program," while 24 CFR 982.4(a)(2) stipulates that "[t]he definitions of

20   "tenant rent" and "utility reimbursement" in part 5, subpart F of this title do not apply to the HCV

21   program under part 982." Public housing is distinctly different from all other housing programs

22   and completely unrelated to HCV housing as a matter of law. It is important – particularly in this

23   case *and* under the FCA – to clarify and not confuse the statutory and regulatory requirements

24   under the HCV program, either with the *public housing* requirements or with factors outside of

---

[7] PHAs may reserve up to 20% of their vouchers for "project-based" vouchers, in which the
subsidy is tied to the unit in a specific apartment complex, but these vouchers are not at issue
here.

1   these requirements, such as how payments are accounted for, as Plaintiffs have done throughout

2   this litigation.

3        The specific definitions and regulations governing tenant-based assistance under the HCV

4   program are found in the Housing Act of 1937, 24 CFR Part 982 ("Section 8 Tenant-Based

5   Assistance: Housing Choice Voucher Program"), the applicable edition of the Housing Choice

6   Voucher Guidebook (United States Department of Housing and Urban Development, 7420.10G

7   and formerly 7420.8G), and as applicable, PIH Notices published by HUD's Office of Public and

8   Indian Housing (PIH).[8]

9        PHA-owned public housing is provided exclusively for qualifying low-income households

10  at rents that are capped based on a range of factors, including the regulations set forth in 24 CFR

11  Parts 905 and 990.[9] Unlike the public housing program in which PHAs are landlords subject to

12  HUD requirements, the HCV program depends on the willingness of private owners to rent to low-

13  income tenants through the program. To that end, the HCV program is designed to enable low-

14  income tenants to meet the financial requirements for occupancy of a particular dwelling unit on

15  the same basis as unassisted tenants *without interfering with the landlord's rights to establish*

16  *conditions for occupancy generally*. In other words, the goal is to place assisted tenants on the

17  same footing with the same housing options as unassisted tenants.

18        **1.   Requirements of the Housing Choice Voucher Program**

19        The overarching requirement of the HCV program is that the rental for the unit be offered

20  under the same terms and in the same standard lease form for both assisted and unassisted tenants.

21  24 CFR § 982.308(b)(2). The only difference is that the HCV tenant's lease must include the HUD-

22

23  ---

[8] The definitions and regulations specifically governing the public housing program are largely

24  found at 24 CFR 960 ("Admission to, and Occupancy of, Public Housing"); 965 ("PHA-Owned
    or Leased Projects – General Provisions"); and 966 ("Public Housing Lease and Grievance

25  Procedure").

[9] Families residing in public housing may choose between rent based on either the family's

26  income or a "flat rent" amount generally based on 80% of the fair market rents in the area as
    determined by HUD.

12

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1 | prescribed "tenancy addendum" to the lease that sets forth the tenancy requirements for the

2 | program and the composition of the household as approved by the PHA. 24 CFR §

3 | 982.308(f)(1)(i)-(ii). The provisions in the HUD-required tenancy addendum must be added word-

4 | for-word to the owner's standard form lease for unassisted tenants, the tenant has the right to

5 | enforce the tenancy addendum against the owner, and the terms of the tenancy addendum will

6 | prevail over any other *conflicting* provisions of the lease. 24 CFR § 982.308(f)(2).

7 |     The HCV program is administered by the PHAs, which receive funding from through

8 | HUD. 24 CFR § 982.152. Once a family has been issued a Request for Tenancy Approval

9 | ("RFTA"), the tenant then seeks housing in the marketplace. The tenant must attend a mandatory

10 | PHA briefing that includes a description of how the program works, the family and owner's

11 | responsibilities under the program, and the locations where family may lease a unit. 24 CFR §

12 | 982.301(a)(1)(i-iii). As part of this briefing, the PHA must give the family an information packet

13 | that covers a range of subjects including, *e.g.,* how the PHA determines the amount of the housing

14 | assistance payment for a family; how it determines the maximum rent for an assisted unit; where

15 | the family may lease a unit; the HUD-required "tenancy addendum" to the lease that must be

16 | included in the lease; the RFTA of the assisted tenancy, and an explanation of how to request PHA

17 | approval of the tenancy; the PHA payment standards, including when the PHA will consider

18 | granting HUD-approved exceptions to those standards; a list of landlords who may be willing to

19 | lease a unit to the family or other resources that may assist the family in locating a unit. *See, e.g.,*

20 | 24 CFR § 982.152(b)(2-6), (8), (11).

21 |     If the family finds a unit and the owner is willing to lease the unit under the program, the

22 | family must submit the RFTA to the PHA along with a copy of the unsigned lease, including the

23 | HUD-prescribed tenancy addendum. 24 CFR § 982.302(c). The PHA specifies the procedure for

24 | requesting approval of the tenancy in its PHA Administrative Plan, and the request must be

25 | submitted in the form and manner required by the PHA. 24 CFR § 982.302(d).

26 |     The RFTA is a 2-page HUD Form, #52517, that is signed by the owner/owner

ARNALL GOLDEN GREGORY LLP

representative and the household head. In addition to listing the proposed rent and amount of the security deposit, the form requires the owner and tenant to identify which appliances and utilities are to be paid by the owner and which by the tenant. Until 2019, the form stated that: "Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner." Since then, the form has stated: "Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave." The RFTA also requires the owner to certify that the rent charged to the HCV tenant is not more than the rent charged for other unassisted comparable units; that the owner is not related in any of the specified degrees to the tenants; and that the unit and common areas meet lead-based paint requirements.

Before approving the tenancy by executing the HAP Contract with the owner and authorizing the execution of the lease between owner and tenant, the PHA must inspect the unit to determine whether it meets the Housing Quality Standards (HQS). 24 CFR §§ 982.305(a)(2) and 982.401. The HQS are the "minimum quality standards developed by HUD in accordance with 24 CFR 5.703 for the HCV program," and they define the "affirmative requirements" for federal housing assistance under the program. 24 CFR § 982.4(b). The HQS for an HCV-subsidized unit require hot and cold running water in both the bathroom and kitchen, including an adequate source of safe drinking water in the bathroom and kitchen; its own functioning bathroom or sanitary facility that is in proper operating condition and usable in privacy, containing a sink, a bathtub or shower, and an interior flushable toilet; smoke detectors; a living room and a kitchen area with a sink, cooking appliance, refrigerator, food preparation area, and food storage area; at least one bedroom or living/sleeping room for each two persons; standard carbon monoxide detectors; two working outlets or one working outlet and a permanent light within all habitable rooms; properly protected outlets; where applicable, a permanently installed heating source; a guardrail when there is an elevated walking surface with a drop off of 30 inches or greater; and a permanently mounted light fixture in the kitchen and each bathroom. 24 CFR §982.401. The HQS establish the items and services that the owner is *required* to provide in order for the PHA to approve the subsidy.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1    Once a PHA receives a signed RFTA and a copy of the proposed lease, and has inspected

2    the unit to determine if it meets the HQS requirements, the PHA determines if the proposed rent

3    is affordable and reasonable. 24 CFR § 982.305(a)(2)(4), and (5).[10] The PHA confirms that the

4    proposed rent meets the "Payment Standard," which is defined as the "maximum monthly

5    assistance payment for a family assisted in the voucher program (before deducting the total tenant

6    payment by the family)." 24 CFR § 982.4(b). Fair Market Rent (FMR) is defined as the "rent,

7    including the cost of utilities (except telephone), as established by HUD for units of varying sizes

8    (by number of bedrooms), that must be paid in the housing market area to rent privately owned,

9    existing, decent, safe and sanitary rental housing of modest (non-luxury) nature with suitable

10   amenities." 42 U.S.C. § 1437f(c)(1); 24 CFR § 982.4(b).

11   The proposed rent is "affordable" as long the PHA determines that it does not exceed 40%

12   of the family's monthly adjusted income during the initial term of the lease. 24 CFR §

13   982.305(a)(5). Rent is "reasonable" if the PHA determines that it is not more than rent charged for

14   comparable units in the private unassisted market and for comparable unassisted units in the

15   premises or the market in which the property is located. 24 CFR § 982.4(b). To determine whether

16   the proposed rent is "reasonable," the PHA must consider the location, quality, size, unit type, and

17   age of the contract unit, and any amenities, housing services, maintenance, and utilities to be

18   provided by the owner in accordance with the lease. 24 CFR § 982.507(b)(1)-(2).

19   The lease defines the agreement between the owner and the tenant, and must specify: (1)

20   the names of the owner and the tenant; (2) the unit rented (address, apartment number, and any

21   other information needed to identify the contract unit); (3) The term of the lease (initial term and

22   any provisions for renewal); (4) the amount of the monthly rent to owner; and (5) a specification

23   of what utilities and appliances are to be supplied by the owner, and what utilities and appliances

24

---

25   [10] If the proposed rent exceeds the amount of rent determined to be either affordable or
     reasonable, the tenant, may, with assistance from the PHA, negotiate with the owner for a

26   reduced rent. If the owner does not agree to reduce the rent, the PHA typically will not subsidize
     the rent for the tenancy.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1   are to be supplied by the family. 24 CFR § 982.308(d).

2   **2. The Definition of "Rent to Owner"**

3   If the unit meets the HQS, the rent to owner for the unit is within the PHA's published

4   payment standard, the rent to owner for the unit is affordable and reasonable, and the PHA has

5   approved the form of the lease and all addenda, the owner and the PHA may enter into a Housing

6   Assistance Payments (HAP) contract. The HAP Contract is strictly between the owner and the

7   PHA. The family is not a third party or other beneficiary of the HAP Contract and may not enforce

8   any provision of the HAP Contract or enforce *any* right or remedy against the owner or PHA under

9   Part B, Section 12 of the HAP Contract. Part B ¶ 12(a).

10   The HAP Contract establishes the terms and conditions for the PHA to subsidize the *rent*

11   *for the unit*. The PHA will subsidize the "gross rent" which is defined as "the sum of the "rent to

12   owner" plus any "utility allowance." 24 CFR § 982.4(b). "Rent to owner" under the HCV program,

13   or "[t]he total monthly rent payable to the owner under the lease *for the unit*," is the "payment for

14   any housing services, maintenance and utilities *that the owner is required to provide and pay for*,"

15   *i.e.,* the housing services, maintenance, and utilities that are identified as owner-provided on Part

16   A of the HAP Contract.  24 CFR 982.4(b).

17   The definition of "rent to owner" under the HCV program differs from the definition of

18   "tenant rent" under the public housing program in ways that matter here. "Tenant rent" under the

19   public housing program is not market rent; it is a formula that equals an amount that will not exceed

20   thirty percent (30%) of an eligible tenant's income. The public housing program defines "tenant

21   rent" as simply "[t]he amount payable monthly by the family as rent to the [PHA] unit owner,"

22   and expressly excludes the HCV program from the definition: "This term is not used in the Section

23   8 voucher program." 24 CFR § 5.603. The HCV regulations also stipulate that "[t]he definitions

24   of "tenant rent" and "utility reimbursement" in part 5, subpart F of this title do not apply to the

25   HCV program under Part 982." 24 CFR § 982.4(a)(2).

26   The differences between the definitions of "tenant rent" in public housing and "rent to

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

16

owner" under the HCV program reflect the differences between providing PHA-owned public housing for low-income tenants and enabling low-income tenants to rent housing through the private market at fair market rents. "Rent to owner" is delineated as [t]he total monthly *rent* payable to the owner *under the lease for the unit,*" and specifically defined as the "payment for *any housing services, maintenance and utilities that the owner is required to provide and pay for.*" 24 CFR 982.4(b) and HAP Contract Part A.

The housing services, maintenance, and utilities "*that the owner is required to pay for"* are also defined in the HCV regulations – and must include or cover the items and services required by the HQS, as well as any *additional* items and services that "are customarily included in rent in the locality or provided at no additional cost to unsubsidized tenants in the premises." 24 CFR § 982.510(c). *These are the factors that define and are covered in the definition of "rent to owner" under the HCV program.*

Items and services that are *not* required under the HQS *and* are not customarily included in the "rent" under the lease, but may be provided by or through the owner, are, by definition, *options* that may be independently contracted for and paid for by the tenant. Such items and services (*e.g.,* typically, reserved parking spaces, internet access, cable, dish services, pet fees, in-unit washers and dryers, in-unit dishwashers, special amenity access, like common room reservation fees, optional renter's insurance, if the market requires it, compulsory renter's insurance, etc.) may be included in the lease or in addenda to the lease. They are *not*, however, included in the "rent to owner" that is subsidized under the HAP Contract because they are not necessary for HQS certification and do not impact the rent for the residential space. In other words, Congress never intended for the government to subsidize amenities outside of the amenities identified in the HQS and any extra amenities that are included in the rent/provided at no additional charge, nor did Congress intend to bar tenants from deciding how to spend their own money if they elect to have additional amenities beyond those provided for in the rent payment. The only requirements Congress and HUD have imposed for additional amenities that are separately

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

charged are that they be provided to assisted and unassisted tenants on the same basis, and, *during the initial year of the lease only*, that the total amount of the charges under the lease (rent plus charges for additional amenities) not exceed 40% of the family's adjusted monthly income. 24 CFR § 982.305(a)(5); § 982.308(b)(2).

 "Rent to owner" is the "total monthly rent payable to the owner under the lease for the unit," and "covers payment for any housing services, maintenance and utilities that *the owner is required* to provide and pay for." Id. The housing services, maintenance, and utilities that are the owner's responsibility are disclosed in Part A of the HAP Contract. Part A of the HAP Contract requires the owner to identify which appliances and utilities are to be paid by the owner and which by the tenant, and mirrors the respective owner and tenant responsibilities identified in the RFTA. Until 2019, the form stated that: "Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner." Since 2019, the form has stated: "Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave."

The "utility allowance" that is reflected in the "rent to owner" covers the cost of the utilities necessary to provide housing that complies with the housing quality standards," and may *not* include "any allowance for non-essential utility costs, such as costs of cable or satellite television." 24 CFR 982.517(b)(2)(i). The "utility reimbursement" is the amount of the "utility allowance" that covers the utilities that, based on the HAP Contract, are the tenant's responsibility. 24 CFR § 982.514(b)-(c). If all the utilities are included in the rent to owner, the "rent to owner" and the "gross rent" are the same.

The "housing assistance payment," therefore, consists of the subsidized portion of the rent to owner, and an additional payment to the family if the total assistance payment exceeds the rent to owner, (*i.e.,* the utility reimbursement amount that is not included in the rent to owner). 24 CFR 982.4(b). The amount of the "housing assistance payment" is the difference between the "gross rent" and the "family share" of the rent to owner, or the portion of rent and utilities paid by the

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

18

1    family, which is calculated under 24 CFR § 515.

2                    **3.   The HAP Contract**

3           The "rent to owner," "family rent to owner," "family share," and "housing assistance

4    payment" are all defined under 24 CFR §982.515 and established under the "HAP Contract." Part

5    B of the HAP Contract sets forth the terms and conditions for the contract. Thus, the owner must

6    maintain the contract unit and the premises in accordance with the HQS, and provide all utilities

7    *needed to comply with the HQS throughout the term of the lease.* Part B ¶ 3. In other words, the

8    utility costs for amenities outside of the HQS are *not* included in the utility allowance that is

9    provided as part of the "rent to owner" under the HAP Contract. The lease must specify what

10   utilities and appliances are to be provided or paid by the owner, the tenant, or shared by both and

11   the rent to owner may not exceed the reasonable rent for the contract unit as most recently

12   determined by the PHA in accordance with HUD requirements, *or* the rent charged by the owner

13   for comparable unassisted units in the premises. ¶¶ 5 (a)-(b), 6(b), (d). The relevant owner's

14   certifications under the HAP Contract include that:

15          a.      The owner is maintaining the contract unit and premises in accordance with

16   the HQS.

17          b.      The contract unit is leased to the tenant. The lease includes the tenancy

18   addendum (Part C of the HAP Contract) and is in accordance with the HAP Contract and program

19   requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

20          c.      The rent to owner does not exceed rents charged by owner for comparable

21   unassisted units in the premises.

22          d.      Except for the rent to owner, the owner has not received and will not receive

23   any payments or other consideration (from the family, the PHA, HUD, or any other public or

24   private source) *for rental of the contract unit* during the HAP Contract term. Part B, Section 2.

25   See, Part B ¶ 8(a)-(d).

26          Finally, Part B stipulates that the HAP Contract contains the entire agreement between the

19

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1  owner and the PHA, and that it shall be interpreted and implemented in accordance with all

2  statutory requirements, and all HUD requirements, including the HUD program regulations at 24

3  Code of Federal Regulations Part 982. 24 CFR §982.451, HAP Contract at Part B ¶ 17(a)-(b).

4      Part C of the HAP Contract, Form 526491, and the Tenancy Addendum,  Form 52641A,

5  attached to the lease are two different documents that contain identical language but serve different

6  purposes. The Tenancy Addendum must be included in the lease between the owner and the tenant,

7  and the tenant has the right to enforce the addendum against the owner under the lease, *not under*

8  *the HAP Contract*, with the language in the addendum controlling in the event it conflicts with the

9  lease. Thus, the owner may not charge or accept any payment for rent of the unit in addition to the

10  rent to owner, which includes all housing services, maintenance, utilities, and appliances to be

11  provided and paid by the owner in accordance with the lease, and "must immediately return any

12  excess *rent* payment to the tenant[.]" Part C ¶ 5(e), (f).

### 4.  "Excess Rent" or "Side Payments" Under the HAP Contract

14      "Excess rent" or unlawful "side payments" under the HAP Contract are undisclosed

15  additional charges to occupy the dwelling unit and/or charges for items and services that the owner

16  and the PHA have agreed are included in the "rent to owner." Thus, examples of "unlawful rent"

17  under the HAP include: a surcharge by the owner for the tenant to occupy or make full use of the

18  unit or property; an additional charge for water or electricity usage; an additional charge for

19  services like sewer and trash; an additional charge for an appliance required under the HQS, such

20  as a stove or refrigerator; an additional charge for storage, or a charge for items and services that

21  unassisted tenants are not also required to pay. Congress and HUD have clearly defined "rent" for

22  a housing unit under the HCV program as the total cost of the items and services listed in the HQS

23  plus any additional items and services customarily included in rent in the locality or provided at

24  no additional cost to unassisted tenants.

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

E.  **The Courts Have Consistently Looked to the Statutory and Regulatory Frameworks to Define "Rent" and "Rent to Owner" in Federally-Assisted Housing**

1.  **Neither *Velez,* nor *Sager* Support a Definition of "Rent" or "Rent to Owner" Based on the Owner's Accounting Practices or the Risk of Eviction**

"Rent" has always been defined by a value-based exchange in which money (or its equivalent) is paid for the temporary right to use or occupy property belonging to someone else. The *scope* of the exchange is defined *by* and *in* the agreement/lease between the parties.

The definition of rent, based on the Owner Defendants' accounting practices and the possible risk of eviction, advanced by Plaintiffs on their breach of contract and UCL claims, owes more to their expansive mischaracterizations of the holdings in *Velez v. Cuyahoga Metro. Hous. Auth.*, 795 F.3d 578 (6th Cir. 2015) and *Sager v. Hous. Comm'n of Anne Arundel Cnty.*, 957 F.Supp.2d 627 (D. Md. 2013) than it does to the actual holdings in these cases. Plaintiffs cannot extend their definition to their FCA claim, both because the statute, regulations, HAP Contract, *etc.,* all clearly define the "rent to owner" reflected in the alleged false certifications, and because it has no basis in law or in fact; applying it further will only compound the errors in this case.

a.  *Velez*

Based on *Velez*, Plaintiffs argued that the charges in the Additional Services Agreements (ASAs) are "condition[s] of living at the property," ECF No. 242-1 at 12; that the definition of "rent" turns on a causal link between a payment and the tenant's right "to live in and make use" of their rental unit, Id. at 13; *Velez*, 795 F.3d at 584; and that, if the failure to pay for additional charges jeopardized the tenant's right to occupy the unit, the additional charges were "excess rent payments" or "prohibited side payments" in violation of the HAP contract. ECF No. 242-1 at 11.

First, there are no undisputed facts supporting Plaintiffs' assertion that choosing the additional amenities in the ASAs was a "condition of living at the property." Every item listed in the ASA is offered as a *choice* for the tenant to make, as evidenced by the fact that tenants must check or initial whether they are selecting an item or not. Tenants are not required to have reserved

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1   parking spaces, resident pets, cable packages, storage units, or in-unit washers and dryers as

2   conditions of occupancy, and the decision whether to have these amenities or not does not affect

3   the tenant's right "to live in and make use" of their rental unit.[11] Having chosen these amenities –

4   which are *not* included in the "rent to owner" that is defined by the HAP contract – tenants *are,*

5   however, required to pay for them. Furthermore, if a tenant no longer has a pet, or decides to park

6   on the street or to use the common laundry facilities or the local laundromat, rather than an in-unit

7   washer and dryer, and discontinues payments for the additional amenities on this basis, its right to

8   continue living in the unit is unaffected.

9       Second, Plaintiffs' citation of *Velez*, 795 F.3d at 585-86, and *United States ex rel. Price v.*

10  *Peters*, 66 F.Supp.3d 1141, 1149 (C.D. Ill. 2013) for the proposition: "That Wasatch did not always

11  call the additional charges 'rent' does not change their true nature as rent," ECF 242-1 at 14,

12  misconstrues both holdings. *Velez*, did not, as Plaintiffs claimed it did, establish a general

13  proposition, that "regardless of nomenclature, short-term fees were rent." Id. at 14. The issue in

14  *Velez* was whether fees charged *to occupy the unit under a short-term lease*, rather than a full-term

15  lease, were part of the "rent to owner" under the HAP contract, *or* whether they were additional

16  service charges for which the tenant was responsible.[12] The *Velez* court defined rent generally as

17  "a fixed sum … to be paid at stated times *for the use of property*[.]") Id., at 584 (citing the Supreme

18  Court's decision in *M.E. Blatt Co. v. United States*, 305 U.S. 267, 277–78 (1938). "Since rent, no

19

20  [11] Tenants *are* required to have renter's insurance as a condition of occupancy. But, they are offered the *option* of including their insurance payment with their rent payment and are free to

21  choose and pay for their own insurance on the open market. Furthermore, tenants who elect to use Defendants' "pay with rent" option, are not paying additional *rent to the owner* but are

22  paying the insurance provider *through the owner*. Furthermore, there is nothing preventing owners from imposing conditions of occupancy, as long as the conditions comply with state and

23  federal law. The fact that some conditions of occupancy require an expenditure by the tenant that is not included in the HAP contract rent also does not convert the charge into "excess rent." For

24  example, tenants are required to pay a security deposit as a condition of occupancy, but the government/PHA does not subsidize that payment, and requires only that it not exceed security

25  deposit rates in the area. 24 C.F.R. § 982.313

26  [12] It is worth noting that the *Velez* court clearly contemplated that a tenant might incur and be responsible for charges outside of, or not covered in, the HAP contract rent to owner.

22

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

matter how it is characterized in a lease, is the price paid for the lessee's use of the property for a distinct period of time, *the lease term and physical occupation of the property by a tenant cannot be separated.*" *Id*. at 586. If, as *Velez* holds, rent "operates … as the sum *paid to live in and make use of rental property*, *Id*. at 584, then an added fee for a short-term lease is clearly included in the definition of "rent," both as a general matter, *and* under the HAP contract.[13]

The holding in *Peters* was similarly tied to the fact that the additional charge was expressly tied to the tenant's *use of the property under the lease* and did not simply hold that "extra charges for storage shed 'clearly constitute[d] rent payments.'" ECF 242-1 at 14. As the Court's holding made clear, but in language Plaintiffs specifically omitted from their synopsis, the owner in *Peters* had required the tenant to make extra payments for the use of a storage shed "*that was part of the dwelling unit premises." Peters*, 66 F.Supp.3d at 1149 (emphasis added).

### b. *Sager*

Initially, on Defendants' Motion to Dismiss (ECF No. 26), the Court rejected the "broad definition" of rent in *Velez* urged by Plaintiffs, on the ground that it "does not easily encompass the additional charges here." ECF No. 61 at 8. Then, the Court specifically distinguished between "the short-term fees[, which] were for the general use of the rented premises," in *Velez,* and the "additional charges [that] are associated with discrete services, utilities, or appliances," in this case. Id. at 9. On summary judgment, however, the Court abandoned this distinction, largely based on the decision in *Sager*, and pivoted to a definition of "rent" based on how payments are *treated* by the owner. This time, the Court accepted Plaintiffs' argument that the tenant's right "to live in and make use of a unit" was conditioned "on the payment of ASA fees," because Defendants' internal software applied tenant payments to the ASA fees first, and then to "rent," which, Plaintiffs argued, meant they could be evicted for nonpayment of rent. On this basis, the Court found that the fees constituted "unlawful rent," in breach of contract and in violation of the UCL. ECF No.

---

[13] As both the *Velez* court and this Court also noted with respect to the finding in *Velez*, while some owners had addressed the short-term fees as discrete fees associated with holdover tenancy, others had simply increased the rent charge and the PHA had included it as rent under the HAP.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

278, Order at 12.[14]

The *Sager* court did not find that the charges were unlawful – or that the order in which they were paid made them unlawful. *Sager* did *not* define "rent" based on the PHA's practice of paying other charges first, or even find that the practice "converted" the charges into "unlawful rent." ECF No. 278 at 12.

*Sager* concerned an "allocation clause" in a *public housing* lease that allowed any payment by the tenant, "which is not specifically designated, in written notation, as "rent" or "for rent" [to] be applied at the Landlord's option, as follows: first to outstanding maintenance charges and/or late fees and/or legal fees and secondly to rent." *Sager*, 957 F. Supp. 2d at 630. In addition to her state law claims, the tenant-plaintiff alleged that the clause violated the United States Housing Act and the Brooke Amendment, which caps a public housing tenant's "total tenant payment" for rent at 30% of the "family's adjusted monthly income." *See Id*. at 630, 637; 42 U.S.C. § 1437a(a)(1); 24 C.F.R. § 5.628. The question was whether the clause was invalid under these statutes, not whether the charges constituted "unlawful rent."

The action in *Sager* was brought under the statutory and regulatory framework for federally-assisted *public housing* tenants, and under provisions *that do not apply to private housing*. Public housing units are owned and managed by local PHAs, which rent them to low-income residents, usually at lower than market rates. HCV tenants receive vouchers, which can be used to rent at any privately owned property as long as the landlord accepts it. As the *Sager* court noted, "[p]ublic housing leases are rarely negotiated and are generally, as here, presented to tenants

---

[14] In fact, regardless of how the owner sequences tenant payments, a tenant can be evicted for failing to pay for additional services or other charges as long as that presents a substantial violation of the lease. The issue in *Sager* stemmed from the fact that, under Maryland law, an eviction for a substantial violation of the lease required that the tenant receive certain due process rights, while a tenant evicted for nonpayment of rent was subject to a summary eviction procedure with fewer due process rights. The risk of eviction exists under any lease; eviction proceedings are generally governed by state, as well as federal law; and eviction it is not a characteristic that converts a payment into "rent," under any known definition or understanding of the word.

ARNALL GOLDEN GREGORY LLP

LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1    on a take it or leave it basis;" they are contracts of adhesion. *Sager*, 957 F. Supp. 2d at 633. In

2    government-owned public housing, the subsidy attaches to the unit; in HCV-assisted housing, the

3    subsidy attaches to the person, which enables tenants to live in rental units of their choice. As the

4    *Sager* court noted further, "[w]hile private landlords are given some leeway under Maryland law

5    to bargain over the definition of rent, PHAs do not have such discretion." *Id*. at 633. *See also* 24

6    CFR § 982.506 (In private housing, "[t]he owner and the family negotiate the rent to owner.")

7          The term "tenant rent" in public housing is expressly defined as the "amount payable

8    monthly by the family as rent to the [PHA]," in 24 C.F.R. § 5.603(b) – which also expressly states

9    that *the term "is not used in the Section 8 voucher program."* (emphasis added). Under the Brooke

10   Amendment, the public housing tenant's rent payment is strictly limited to 30% of the adjusted

11   monthly income. By contrast, the HCV program requires only that, during the initial lease term,

12   the family share not exceed 40% of the family's monthly adjusted income. 24 C.F.R. §§

13   982.1(a)(3); 982.305(a)(5).

14         In addressing plaintiff's claim under the Brooke Amendment, the *Sager* court noted that,

15   *"[a]s the statute hinges on a precise calculation of rent*, the Amendment's governing regulations

16   clearly demarcate between 'tenant rent' and 'other charges.'" *Id*. at 637 (emphasis added). The

17   regulations governing the leases for public housing expressly distinguish between the "tenant rent"

18   and other "PHA Charges" in the lease.  24 C.F.R. § 966.4(b)(1)-(2). The PHA charges, which are

19   defined as "charges to the tenant for maintenance and repair beyond normal wear and tear and for

20   consumption of excess utilities" (id.), do not count toward the 30% ceiling under the Brooke

21   Amendment. Based on these definitions in the public housing regulations, the *Sager* court found

22   that, in effect, the allocation clause in the lease added the PHA charges to the "tenant rent" defined

23   in 24 C.F.R. § 5.603(b), raising the tenant's total rent payment above the 30% ceiling. Thus, it

24   concluded, the allocation clause violated the Brooke Amendment. *Sager*, 957 F. Supp. 2d at 637.

25

26

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

By contrast, for private housing, the PHA reviews both the "gross rent,"[15] which *includes* the "rent to owner," and the "family share" *of the gross rent*, based on the Section 8 program requirements. If the rent is less than the payment standard,[16] the family generally pays 30% of their adjusted monthly income for rent, but if the rent is more than the payment standard, the family pays a larger share of the rent. 24 C.F.R. § 982.1(a)(3). Where the gross rent of the unit exceeds the applicable payment standard for the family, the PHA will approve the lease *as long as the family share does not exceed 40 percent of the family's monthly adjusted income*. 24 C.F.R. § 982.305(a)(5). In other words, the subsidized "rent to owner" excludes the optional amenities provided by the owner, but the PHA will approve the lease as long as the family is not required to pay more than 40% of their adjusted monthly income toward the cost of housing. Furthermore, the 40% ceiling applies only during the initial term of the lease, and not after that.

Having found that the allocation clause was invalid under the Brooke Amendment, the *Sager* court further found that the clause was "unreasonable" under 42 USC § 1437(d)(l)(2) of the United States Housing Act, requires that PHAs use "leases which … do not contain unreasonable terms and conditions."[17] As the *Sager* court noted, this "requires that lease terms be rationally related to a legitimate housing purpose." *Sager*, 957 F.Supp.2d at 639 (citations omitted). "The determination is fact dependent, and reasonableness is defined by the particular problems and concerns confronting the local housing authority." Id. (citations omitted).

Plaintiffs' FCA claim turns, not on the reasonableness of the charges under the lease, but on whether the charges were "excess rent payments" under the HAP contract. Because "rent to

---

[15] "Gross rent" is "[t]he sum of the rent to owner plus any utility allowance. 24 C.F.R. § 982.4(b).

[16] The "payment standard" is "[t]he maximum monthly assistance payment for a family assisted in the voucher program (before deducting the total tenant payment by the family). 24 C.F.R. § 982.4(b).

[17] Just as the definitions of "tenant rent" in public housing and "rent to owner" in the HCV program differ, the regulations governing the leases in each program also differ. Public housing leases are expressly governed by the regulations in 24 C.F.R. Part 966; private housing leases are expressly governed under 24 C.F.R. § 982.

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

owner" is the payment for the items and services in the HQS, plus items that are customarily

included in rent in the area and/or provided to unassisted tenants for no additional charge, the issue

under the FCA is whether the amenities and services in the ASAs were already covered by the

"rent to owner" in the HAP contract. The alleged falsity in this case, *i.e.,* whether the additional

services charges were "excess rent payments" rests on this factual question, not on a definition of

"rent" that is loosely crafted from *Sager.*

   **2.   Cases That Found False Certification Claims Under the HAP Contract
          Did So Based on the Definitions in the Statutory and Regulatory
          Framework, and the HAP Contract**

The courts that have addressed whether additional charges are "excess rent payments"

under the HAP Contract, resulting in false certification claims under the FCA, have consistently

construe unlawful side payments or unlawful rent under the HAP based on the definitions of rent

in the statute and regulations, *including in the cases purportedly relied upon by Plaintiffs*

*throughout this litigation. See, e.g., Thornton v. Portola Del Sol Operator, LLC,* No.

221CV01123APGBNW, 2023 WL 7412491, at *2 (D. Nev. Nov. 9, 2023) (owner required tenant

to pay common area maintenance fees); *United States ex rel. Gionson v. NVWM Realty, LLC,* No.

218CV01409GMNGWF, 2019 WL 2617816, at *2 (D. Nev. June 25, 2019) (HAP Contract

provided that owner was responsible for sewer and trash payments, but owner charged tenant $35

a month for these services); *Kelly v. Denault*, 374 F. Supp. 3d 884, 888 (N.D. Cal. 2018) (owner

increased tenants' share of the water bill to 60%; increased the rent without seeking prior approval

or notifying the PHA; and demanded $ 1,200 in allegedly delinquent utility payments); *United*

*States ex rel. Benitez v. Galliano, LLC, No. 215CV01688LDGNJK, 2018 WL 2247279, at *5 (D.*

*Nev. Jan. 26, 2018)* (HAP Contract rent to owner included fees for sewer and trash; landlord

required tenant to sign separate agreement to pay higher amount, including for sewer and trash);

*United States ex rel. Carmichael v. Gregory*, 270 F. Supp. 3d 67, 71–72 (D.D.C. 2017) (owner

required tenant to execute undisclosed revised leases for monthly rents in excess of the amount

permitted under the HAP Contract); *Cummings v. Hale*, No. 15-CV-04723-JCS, 2017 WL

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

ARNALL GOLDEN GREGORY LLP
LIMITED LIABILITY PARTNERSHIP
2100 Pennsylvania Ave., NW
Suite 350S
Washington, DC 20037
Telephone: 202.677.4040

1  3669622, at *2 (N.D. Cal. May 17, 2017), report and recommendation adopted sub nom. *United*

2  *States ex rel. Cummings v. Hale*, No. 15-CV-04723-VC, 2017 WL 3669553 (N.D. Cal. Aug. 16,

3  2017) (under the HAP Contract, owner "agreed to pay for all utility and garbage service" for the

4  apartment, but tenant paid for the utility and garbage service for the unit she was renting and also

5  another unit, which she was not renting); *Doe v. Gormley*, No. CV ADC-15-2183, 2016 WL

6  4400301, at *1 (D. Md. Aug. 17, 2016) (after signing the lease and the HAP Contract, owner

7  required tenant to pay an additional $411.00 per month); (*United States v. Baran, No.*

8  *CV1402639RGKAJWX, 2015 WL 5446833, at *2 (C.D. Cal. Aug. 28, 2015)* (owner demanded that

9  tenant "pay extra rent directly to Defendant on the side;" side agreement was never disclosed to

10 the PHA, and PHA continued to pay the rent agreed to in the HAP Contract); *U.S. ex rel. Salvatore*

11 *v. Fleming*, No. CIV.A. 11-1157, 2015 WL 1326327, at *1–2 (W.D. Pa. Feb. 23, 2015), report and

12 recommendation adopted, No. CIV.A. 11-1157, 2015 WL 1384653 (W.D. Pa. Mar. 25, 2015)

13 (owner agreed to HAP rent and to pay for water and sewage; then required tenant to pay higher,

14 unapproved rent, as well as water and sewage costs); *[18]U.S. ex rel. Mathis v. Mr. Property, Inc.*,

15 No. 14-00245, 2015 WL 1034332, at *5 (D. Nev. Mar. 10, 2015) (owner charged tenant $150 for

16 pool maintenance fees); *U.S. ex rel. Holmes v. Win Win Real Estate, Inc.*, No. 13-02149, 2015

17 WL 6150594, at *5 (D. Nev. Oct. 19, 2015) (owner charged tenant for homeowner association

18 fees and property management fees); *U.S. ex rel. Richards v. R & T Invs. LLC*, 29 F. Supp. 3d 553,

19 555–56 (W.D. Pa. 2014) (owner refused to pay for water and sewage agreed to in the HAP

20 Contract, and required tenant to pay higher rent than the PHA had approved for the unit);  *U.S.*

21 *ex rel. Price v. Peters*, 66 F. Supp. 3d 1141, 1149 (C.D. Ill. 2013) (owner required tenant to make

22 extra payments use of storage shed "*that was part of the dwelling unit premises*") (emphasis

23 added); *U.S. ex rel. Wade v. DBS Invs., LLC*, No. 11-CV-20155, 2012 WL 3759015, at *3 (S.D.

24 Fla. Aug. 29, 2012) (owner entered into an alternative lease with tenant for rent in excess of the

25
26 [18] Cases marked with an asterisk* are the cases cited by Plaintiffs in their Opposition to the
Defendants' Motion to Dismiss and Motion for Partial Summary Judgment on the breach of
contract and UCL claims.

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

1  amount approved by the HCV Program); *U.S. ex rel. Stearns v. Lane*, No. 2:08-CV-175, 2010 WL

2  3702538, at *1–2 (D. Vt. Sept. 15, 2010) (HAP rent included water charges and trash removal;

3  owner required tenant to pay higher rent than PHA had approved, plus $50 for water); *U.S. ex

4  rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183, 1187, 1189 (D. Or. 2007) (issue of fact existed as

5  to whether charges for landscaping services were for *increased taxes and utilities*, which would

6  have made them "side rent"); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 280 (D. Conn. 2007)

7  (landlord charged "additional rent" for water usage that was included in the PHA's calculation of

8  the "rent to owner" and the "utility allowance").

9  **II.    Plaintiffs' UCL and CLRA Claims**

10         Owner and Non-Owner Defendants refer the Court to the sections of the joint pretrial

11  statement for their points of law on Plaintiffs' UCL and CLRA claims.

12  Dated: March 15, 2024              **ARNALL GOLDEN GREGORY LLP**

13

14                                    By: */s/ Richard T. Collins*
                                           Richard T. Collins
15                                         Attorneys for Defendants:

16                                         WASATCH ADVANTAGE GROUP, LLC;
17                                         CHESAPEAKE APARTMENT HOLDINGS,
                                           LLC; ASPEN PARK HOLDINGS, LLC; BENT
18                                         TREE APARTMENTS, LLC; CALIFORNIA
                                           PLACE APARTMENTS, LLC; CANYON
19                                         CLUB HOLDINGS, LLC; COURTYARD AT
                                           CENTRAL PARK APARTMENTS, LLC;
20                                         CREEKSIDE HOLDINGS, LTD; RIVER
                                           OAKS HOLDINGS, LLC; WASATCH
21                                         PREMIER PROPERTIES, LLC; WASATCH
                                           POOL HOLDINGS III, LLC; WASATCH
22                                         POOL HOLDINGS, LLC ; HERITAGE PARK
                                           APARTMENTS, LP; PEPPERTREE
23                                         APARTMENT HOLDINGS, LP; SHADOW
                                           WAY APARTMENTS, LP; WASATCH
24                                         QUAIL RUN GP, LLC

25

26

OWNER AND NON-OWNER DEFENDANTS' SEPARATE STATEMENT RE: POINTS OF LAW (E.D. CA L.R. 181(B)(8))

Exhibit E

**Plaintiffs' and Relators' Witness List**

Witnesses associated with Wasatch Property Management
Jarom Johnson
Janae Jarvis
Shawn Fetter
Brad Mishler
David Tanforan
Sylvia Gamboa
Tyler Raymond
Katie Dao
David Scharlach

Expert witnesses
David Breshears
MaryAnn Russ

Plaintiffs/Relators
Denika Terry
Roy Huskey III
Tamera Livingston

Current and former Wasatch tenants
Tania Borjas
Elizabeth Brooks
Brittney Bryson
Jerame Carter
Frances Crawley
Mike Cremer
Charles Crooks
Dana Davis-Lobo
Bobby Hanselman
Patricia Henderson
Denise Higgins
Ashley Mays
Edward McIlroy
Jamila Meadors
Douglas Peterson
Abraham Sheriff

886619.1

Zakiyiah Smith
Maureen Stevens
Vicky Lynn Teista
Christopher Toney
James Walton
Marsha Young
Wendy Cottingham
Alicia Lee
Timothy Naerebout
Kassandra Olvera
Penny Paxman
Sylvia Rubio
Damon Weathersby

<u>Current and former Public Housing Authority Employees</u>
Barbara Cavey
Shannon Fox
Jacqueline Rojas
Jodi Parker
Mary Rizzo Shuman
Cheryl Syme
Sonia Ramirez
Sylvia de Leon

<u>Other witnesses</u>
Geoffrey Gelb
John Bailey
Scott Grimes


Plaintiffs reserve the right to call any witness listed by any other party to this action

886619.1

Exhibit F

## Wasatch Property Management: Witness List

### Plaintiffs
Tamera Livingston
Roy Huskey III
Denika Terry

### Wasatch Property Management-Related Witnesses
Jarom Johnson
Janae Jarvis
Sean Fetter
Brad Mishler
Dave Tanforan
Warren Smith

### Expert Witnesses
Robert Griswold
James McCurley

### Housing Authority Employees
Barbara Cavey
Shannon Fox
Jacqueline Rojas
Jodi Parker
Mary Rizzo Shuman
Cheryl Syme


Defendants reserve the right to call any witness listed by any other party to this action.

Exhibit G

<u>**Owner and Non-Owner Defendants' Witness List**</u>

Initiated on April 14, 2015, almost nine years ago, this action has undergone exhaustive discovery. With 27 depositions conducted and over 11 terabytes of documents stored across three external hard drives, the records include more than three million pages on a single drive. Tens of thousands of lease documents, HAP contracts, and other rental-related records from various properties have also been produced. Additionally, Plaintiffs gained access to Defendant WPM's Yardi system, housing comprehensive tenant data. The case further involves numerous docket entries, written discovery, third-party subpoenas, and expert reports. Owner and Non-Owner Defendants retained Arnall Golden Gregory LLP ("AGG") just two months ago to represent their rights, yet the complex nature of this action requires more time for comprehensive analysis. Acknowledging this, Owner and Non-Owner Defendants identify their trial witnesses by party and property categories, and they remain open to meeting and conferring with other parties to discuss the possibility of streamlining their respective witness lists.

<u>**Plaintiffs**</u>

Tamera Livingston; Roy Huskey III; Denika Terry.

<u>**Owner and Non-Owner Defendants – Corporate Representatives**</u>

Wasatch Property Management, Inc.; Wasatch Advantage Group, LLC; Chesapeake Apartment Holdings, LLC; Wasatch Property Management, Inc.; Logan Park Apartments, LLC; Wasatch Pool Holdings, LLC; Aspen Park Holdings, LLC; Bellwood Jerron Apartments, LP; Bent Tree Apartments, LLC; California Place Apartments, LLC; Camelot Lakes Holdings, LLC; Canyon Club Holdings, LLC; Courtyard at Central Park Apartments, LLC; Creekside Holdings, LTD; Hayward Senior Apartments, LP; Heritage Park Apartments, LP; Oak Valley Apartments, LLC; Oak Valley Holdings, LP; Peppertree Apartment Holdings, LP; Piedmont Apartments, LP; Point Natomas Apartments, LP; River Oaks Holdings, LLC; Shadow Way Apartments, LP; Spring Villa Apartments, LP; Sun Valley Holdings, LP; Village Grove Apartments, LP; Wasatch Quail Run GP, LLC; Wasatch Premier Properties, LLC; Wasatch Pool Holdings III, LLC.

<u>**Experts**</u>

David Breshears; MaryAnn Russ; Robert Griswold; James McCurley.

<u>**Additional Witnesses by Property**</u>

Logan Park Apartments: former and current tenants; former and current Wasatch Property Management, Inc. ("WPM") employees; former and current Wasatch Advantage Group, LLC employees; former and current U.S. Department of housing and Urban Development ("HUD") employees; former and current employees of the Public Housing Agency ("PHA").

Chesapeake Commons Apartments: former and current tenants; former and current WPM employees; former and current Chesapeake Apartment Holdings, LLC employees; former and current HUD employees; former and current employees of the PHA.

Logan Park Apartments and Chesapeake Commons Apartments: former and current tenants; former and current WPM employees; former and current HUD employees; former and current employees of the PHA.

Logan Park Apartments: former and current tenants; former and current WPM employees; former and current Logan Park Apartments, LLC employees; former and current HUD employees; former and current employees of the PHA.
Chesapeake Commons Apartments: former and current tenants; former and current WPM employees; former and current Wasatch Pool Holdings, LLC employees; former and current HUD employees; former and current employees of the PHA.

Aspen Park Apartments: former and current tenants; former and current WPM employees; former and current Aspen Park Holdings, LLC employees; former and current HUD employees; former and current employees of the PHA.

Bellwood Park Apartments and Jerron Place: former and current tenants; former and current WPM employees; former and current Bellwood Jerron Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Bent Tree Apartments: former and current tenants; former and current WPM employees; former and current Bent Tree Apartments, LLC employees; former and current HUD employees; former and current employees of the PHA.

California Place Apartments: former and current tenants; former and current WPM employees; former and current California Place Apartments, LLC employees; former and current HUD employees; former and current employees of the PHA.

Landing at Fancher Creek Apartments: former and current tenants; former and current WPM employees; former and current Camelot Lakes Holdings, LLC employees; former and current HUD employees; former and current employees of the PHA.

Canyon Club Apartments: former and current tenants; former and current WPM employees; former and current Canyon Club Holdings, LLC employees; former and current HUD employees; former and current employees of the PHA.

Courtyard at Central Park Apartments: former and current tenants; former and current WPM employees; former and current Courtyard at Central Park Apartments, LLC employees; former and current HUD employees; former and current employees of the PHA.

Creekside Villa Apartments: former and current tenants; former and current WPM employees; former and current Creekside Holdings, LTD employees; former and current HUD employees; former and current employees of the PHA.

Hayward Village Apartments: former and current tenants; former and current WPM employees; former and current Hayward Senior Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Heritage Park Apartments: former and current tenants; former and current WPM employees; former and current Heritage Park Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Oak Valley Apartments: former and current tenants; former and current WPM employees; former and current Oak Valley Apartments, LLC employees; former and current HUD employees; former and current employees of the PHA.

Bridges at Five Oaks Apartments: former and current tenants; former and current WPM employees; former and current Oak Valley Holdings, LP employees; former and current HUD employees; former and current employees of the PHA.

Peppertree Senior Apartments: former and current tenants; former and current WPM employees; former and current Peppertree Apartment Holdings, LP employees; former and current HUD employees; former and current employees of the PHA.

Piedmont Apartments: former and current tenants; former and current WPM employees; former and current Piedmont Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Point Natomas Apartments: former and current tenants; former and current WPM employees; former and current Point Natomas Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

River Oaks Apartments: former and current tenants; former and current WPM employees; former and current River Oaks Holdings, LLC employees; former and current HUD employees; former and current employees of the PHA.

Shadow Way Apartments: former and current tenants; former and current WPM employees; former and current Shadow Way Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Spring Villa Apartments: former and current tenants; former and current WPM employees; former and current Spring Villa Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Sun Valley Apartments: former and current tenants; former and current WPM employees; former and current Sun Valley Holdings, LP employees; former and current HUD employees; former and current employees of the PHA.

Village Grove Apartments: former and current tenants; former and current WPM employees; former and current Village Grove Apartments, LP employees; former and current HUD employees; former and current employees of the PHA.

Quail Run Apartments: former and current tenants; former and current WPM employees; former and current Wasatch Quail Run GP, LLC employees; former and current HUD employees; former and current employees of the PHA.

Exhibit H

**Plaintiffs' and Relators' Exhibit List**

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 1 | Undated | File Cover Commission Sheet, Bates No. AP000389 (Jarvis Ex. 44) |
| 2 | 3/2/2016 | Lease Addenda re: C. Crooks, Mar. 2, 2016, Bates Nos. BT003001-04 |
| 3 | 12/23/2014 | Rental Agreement re: C. Crooks, Dec. 23, 2014, Bates Nos. BT003006-23 |
| 4 | 12/27/2016 | Rental Agreement re: C. Crooks, Dec. 27, 2016, Bates Nos. BT003082-100 |
| 5 | 2/7/2014 | HAP Contract re: C. Crooks, Feb. 7, 2014, Bates Nos. BT003126-33 |
| 6 | 2/17/2014 | Lease Supplemental Agreement re: C. Crooks, Feb. 17, 2014, Bates No. BT003150 |
| 7 | 12/29/2013 | Request for Tenancy Approval re: C. Crooks, Dec. 29, 2013, Bates Nos. BT003168-73 |
| 8 | 11/10/2015 | Resident Ledger re: E. Brooks, Nov. 10, 2015, Bates No. BT005098 |
| 9 | 12/10/2015 | Lease Supplemental Agreement re: E. Brooks, Dec. 10, 2015, Bates Nos. BT005109-10 |
| 10 | 12/10/2015 | HAP Contract re: E. Brooks, Dec. 10, 2015, Bates Nos. BT005111-23 |
| 11 | 10/6/2015 | Request for Tenancy Approval re: E. Brooks, Oct. 6, 2015, Bates Nos. BT005127-28 |
| 12 | 11/10/2015 | Rental Agreement re: E. Brooks, Nov. 10, 2015, Bates Nos. BT005176-81 |
| 13 | 11/10/2015 | Additional Services Agreement re: E. Brooks, Nov. 10, 2015, Bates No. BT005182 |
| 14 | 11/10/2015 | Rental Agreement Addenda re: E. Brooks, Nov. 10, 2015, Bates Nos. BT005183-90 |
| 15 | 7/7/2016 | July 2016 Marketing Plan for Heritage Park, Bates No. CL00000026 (Jarvis Ex. 39) |
| 16 | 8/2/2016 | Aug. 2, 2016 letter from L. Hassell, Bates No. CP000465 (Tanforan Ex. 12) |
| 17 | 9/15/2016 | HAP Contract re: A. Sheriff, Sept. 15, 2016, Bates Nos. CP004814-24 |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 18 | 7/20/2016 | Request for Tenancy Approval re: A. Sheriff, July 20, 2016, Bates Nos. CP004829-32 |
| 19 | 6/2/2016 | HCV Voucher re: A. Sheriff, Jun. 2, 2016, Bates No. CP004839 |
| 20 | 7/4/1905 | Initial Lease Agreement on Bond Year 2012, Bates Nos. CP006427-715 (Tanforan Ex. 23) |
| 21 | 9/1/2016 | Residential Rental Agreement re: A. Sheriff, Sept. 1, 2016, Bates Nos. CPC008541-53 |
| 22 | 9/5/2014 | Residential Rental Agreement and Lease Packet re: Damon Weathersby, Sep. 05, 2014, Bates Nos. CP009321-37 |
| 23 | 8/9/2016 | Eviction Warning and Three-Day Notice to Pay Rent or Quit re: D. Weathersby, Aug. 9, 2016, Bates Nos. CP009381-82 |
| 24 | 8/16/2014 | Request for Tenancy Approval re: D. Weathersby, Aug. 16, 2014, Bates Nos. CP009398-410 |
| 25 | 7/17/2014 | Voucher – Resident's Copy, Bates Nos. CP009411-13 |
| 26 | Undated | Balance Due Notice re: D. Weathersby, Bates No. CP009414 |
| 27 | 1/9/2016 | Eviction Warning re: D. Weathersby, Bates No. CP009418 |
| 28 | 1/4/2016 | Three-Day Notice to Pay Rent or Quit Notice re: D. Weathersby, Bates No. CP009420 |
| 29 | 9/17/2014 | SHRA Lease Supplemental Agreement and HAP contract re: D. Weathersby, Sep. 17, 2014, Bates Nos. CP009433-49 |
| 30 | Undated | Balance Due Notice re: D. Weathersby, Bates No. CP009451 |
| 31 | 3/28/2012 | Rental Agreement re: A. Mays, Mar. 28, 2012, Bates Nos. CPC010544-50 |
| 32 | 3/28/2012 | Additional Services Agreement re: A. Mays, Mar. 28, 2012, Bates No. CPC010551 |
| 33 | 3/28/2012 | Lease Addenda re: A. Mays, Mar. 28, 2012, Bates Nos. CPC010552-60 |
| 34 | 3/30/2011 | Rental Agreement re: A. Mays, Mar. 30, 2011, Bates Nos. CPC010574-80 |
| 35 | 3/30/2011 | Additional Services Agreement re: A. Mays, Mar. 30, 2011, Bates Nos. CPC010581-83 |

2

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 36 | 3/30/2011 | Lease Addenda re: A. Mays, Mar. 30, 2011, Bates Nos. CPC010584-97 |
| 37 | 4/6/2010 | Notice of Change to Lease and Contract re: A. Mays, Apr. 6, 2010, Bates Nos. CPC010611-12 |
| 38 | 3/13/2014 | Resident Ledger re: A. Mays, Mar. 13, 2014, Bates Nos. CPC010682-87 |
| 39 | 8/5/2013 | 3 Day Notice to Perform Financial Covenant of Lease or Quit re: A. Mays, Aug. 5, 2013, Bates No. CPC010700 |
| 40 | 9/9/2013 | 3 Day Notice to Perform Financial Covenant of Lease or Quit re: A. Mays, Sept. 9, 2013, Bates No. CPC010701 |
| 41 | 1/7/2013 | 3 Day Notice to Perform Financial Covenant of Lease or Quit re: A. Mays, Jan. 7, 2013, Bates No. CPC010709 |
| 42 | 3/4/2011 | 3 Day Notice to Pay Rent or Quit re: A. Mays, Mar. 4, 2011, Bates No. CPC010723 |
| 43 | 11/10/2011 | 3 Day Notice to Perform Financial Covenant of Lease or Quit re: A. Mays, Nov. 10, 2011, Bates No. CPC010739 |
| 44 | 4/11/2011 | HAP Contract re: A. Mays, Apr. 11, 2011, Bates Nos. CPC010746-54 |
| 45 | 4/8/2011 | Lease Supplemental Agreement re: A. Mays, Apr. 8, 2011, Bates No. CPC010755 |
| 46 | 4/8/2011 | Tenancy Addendum re: A. Mays, Apr. 8, 2011, Bates Nos. CPC010756-57 |
| 47 | 3/7/2011 | Voucher re: A. Mays, Mar. 7, 2011, Bates Nos. CPC010764-65 |
| 48 | 8/1/2012 | Residential Rental Agreement, Addenda, ASA re: T. Livingston, Aug. 01, 2012, Bates Nos. CPC038943-56 |
| 49 | 12/23/2014 | 90 Day Notice of Termination of Tenancy re: T. Livingston, Dec. 23, 2014, Bates Nos. CPC038970-72 |
| 50 | 8/25/2012 | HAP Contract re: T. Livingston, Aug. 25, 2012, Bates Nos. CPC038995-39000 |
| 51 | 7/11/2012 | Request for Tenancy Approval re: T. Livingston, Jul. 11, 2012, Bates Nos. CPC039007-08 |
| 52 | 9/17/2014 | Balance Due Notice  re: T. Livingston, Sep. 17, 2014, Bates Nos. CPC039080-81 |
| 53 | 5/8/2013 | Resident Ledger re: T. Livingston, May. 08, 2013, Bates Nos. CPC039140-44 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 54 | 2/4/2015 | 3 Day Notice to Pay or Quit re: T. Livingston, Feb. 04, 2015, Bates Nos. CPC039152-53 |
| 55 | 8/6/2015 | HAP Contract re: J. Meadors, Aug. 6, 2015, Bates Nos. CV002090-100 |
| 56 | 7/8/2015 | 3 Day Notice to Perform Financial Covenant of Lease or Quit re: J. Meadors, July 8, 2015, Bates Nos. CV002104-05 |
| 57 | 7/29/2015 | Addendum to Lease re: J. Meadors, July 29, 2015, Bates No. CV002144 |
| 58 | Undated | Tenancy Addendum re: J. Meadors, Bates Nos. CV002145-48 |
| 59 | 7/29/2015 | Addendum to Lease re: J. Meadors, July 29, 2015, Bates No. CV002152 |
| 60 | 7/21/2015 | Resident Ledger re: J. Meadors, July 21, 2015, Bates No. CV002164 |
| 61 | 6/25/2015 | Residential Rental Agreement re: J. Meadors, Jun. 25, 2015, Bates Nos. CV002166-81 |
| 62 | 4/30/2015 | Voucher re: J. Meadors, Apr. 30, 2015, Bates Nos. CV002196-98 |
| 63 | 2/21/2016 | Resident Ledger re: T. Borjas, Feb. 21, 2016, Bates No. CY002060 |
| 64 | 2/8/2016 | Residenial Rental Agreement re: T. Borjas, Feb. 8, 2016, Bates Nos. CY002087-92 |
| 65 | 2/8/2016 | Additional Services Agreement re: T. Borjas, Feb. 8, 2016, Bates No. CY002093 |
| 66 | 2/8/2016 | Lease Addenda re: T. Borjas, Feb. 8, 2016, Bates Nos. CY002094-101 |
| 67 | 10/28/2016 | HAP Contract Amendment re: T. Borjas, Oct. 28, 2016, Bates No. CY002117 |
| 68 | 11/22/2016 | HAP Contract Amendment re: T. Borjas, Nov. 22, 2016, Bates No. CY002118 |
| 69 | 2/11/2016 | HAP Contract re: T. Borjas, Feb. 11, 2016, Bates No. CY002119 |
| 70 | 3/17/2016 | Rider to Lease Agreement re: T. Borjas, Mar. 17, 2016, Bates No. CY002120 |
| 71 | 2/11/2016 | Utilities and Appliances Page of HAP Contract re: T. Borjas, Feb. 11, 2016, Bates No. CY002121 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 72 | 2/1/2016 | Request for Tenancy Approval re: T. Borjas, Feb. 1, 2016, Bates No. CY002125 |
| 73 | 1/26/2016 | Rent Affordability Calculator re: T. Borjas Jan. 26, 2016, Bates No. CY002126 |
| 74 | 1/19/2016 | Request for Tenancy Approval Supplemental Form re: T. Borjas Jan. 19, 2016, Bates No. CY002127 |
| 75 | 6/13/2011 | Lease Packet re: B. Bryson, Jun. 13, 2011, Bates Nos. CY008458-81 |
| 76 | 9/28/2011 | Fresno Housing Authority - HAP Contract excerpts re: B. Bryson, Sep. 28, 2011, Bates Nos. CY008505-18 |
| 77 | 6/13/2011 | Residential Rental Agreement re: B. Bryson, Jun. 13, 2011, Bates Nos. CY008543-46 |
| 78 | 10/16/2015 | Three-Day Notice to Pay Rent or Quit re: J. Carter, Bates No. CY021313 |
| 79 | 10/4/2015 | Three-Day Notice to Pay Rent or Quit re: J. Carter, Bates No. CY021322 |
| 80 | 10/16/2015 | Tenant Ledger re: J. Carter, Bates No. CY021314-21 |
| 81 | 8/16/2013 | Lease Packet re: J. Carter, Aug. 16, 2013, Bates Nos. CY021399-410 |
| 82 | 8/16/2013 | Residential Rental Agreement re: J. Carter, Bates Nos. CY021414-17 |
| 83 | 8/20/2013 | Fresno Housing Authority -- HAP Contract excerpts re: J. Carter, Aug. 20, 2013, Bates Nos. CY021433-40 |
| 84 | Undated | Addendum A to Lease re: V. Teista, Bates No. FC001065 |
| 85 | 9/14/2013 | Residential Rental Agreement re: V. Teista, Sept. 14, 2013, Bates Nos. FC001071-74 |
| 86 | 2/13/2012 | Rental Agreement and Lease Packet re: B. Hanselman, Feb. 13, 2012, Bates Nos. FOT002457-84 |
| 87 | 3/12/2012 | HAP Contract and Lease Supplemental Agreement re: B. Hanselman, Mar. 12, 2012, Bates Nos. FOT002593-605 |
| 88 | 1/8/2013 | Residential Rental Agreement and Lease Packet re: C. Toney, Jan. 08, 2013, Bates Nos. FOT003386-401 |
| 89 | 2/5/2013 | HAP Contract excerpts re: C. Toney, Feb. 05, 2013, Bates Nos. FOT003453-58 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 90 | 1/28/2013 | SHRA Lease Supplemental Agreement and HAP Contract excerpts re C. Toney, Jan. 28, 2013, Bates Nos. FOT003520-24 |
| 91 | 3/23/2015 | Residential Rental Agreement re: D. Higgins, Mar. 23, 2015, Bates Nos. LPT008377-83 |
| 92 | 7/15/2013 | Puckett & Redford PLLC "Please Start Eviction Procedures" form, Bates No. MP000673 (Jarvis Ex. 16) |
| 93 | | Housing Choice Voucher Program Guidebook, Chapter 22, Bates Nos. TERRY018054-72 |
| 94 | 1/29/2024 | [Proposed] Consent Orders Granting Substitution of Attorney for Aspen Park Holdings, Bent Tree Apartments, California Place Apartments, Canyon Club Holdings, Chesapeake Apartment Holdings, Courtyard at Central Park Apartments, Creekside Holdings, River Oaks Holdings, Wasatch Advantage Group, Wasatch Pool Holdings III, Wasatch Pool Holdings, and Wasatch Premier Properties, Jan. 29, 204, ECF Nos. 337-48 |
| 95 | | Chart regarding HAP Contract Part A excerpts and washer and dryer charges (Exhibit 46 to Bellows Decl. in Supp. Mot. Part. Summ. J., Apr. 22, 2022, ECF No. 252-6) |
| 96 | 6/3/2015 | June 3, 2015 Notice to pay or vacate letter, Bates No. OP000163 (Fetter Ex. 7) |
| 97 | 5/11/2016 | SHRA Subsidy Adjustment Notice, Bates No. PNT000093 |
| 98 | 9/18/2014 | Residential rental agreement re: Z. Smith, Sep. 18, 2014, Bates Nos. PNT000157-63 |
| 99 | 11/29/2022 | Payment Sequencing Adjustment - Payment Sequence as of Nov. 29, 2022 - Yardi Voyager - Admin - Accounts and Options - Receivable Accounts, Bates No. POL000007 (Jarvis Ex. 72) |
| 100 | 11/26/2019 | Nov. 26, 2019 email from R. Hemsley to All Office, Regionals re: Renters Insurance Requirement Change Information, including attachment, Bates Nos. POL000009-10 (Jarvis Ex. 80) |
| 101 | 1/17/2023 | Jan. 17, 2023 Email from M. Christiansen to R. Matthews, J. Jarvis re: Housing_Voucher_ASA_Letter_All_Properties, including attachment, Bates Nos. POL0002261-2954 (Jarvis Ex. 74) |
| 102 | 1/17/2023 | Jan. 17, 2023 email from D. Withers to All Managers and All Financials re: Housing Choice Voucher Program (formerly Section 8), including attachments, Bates Nos. POL0002966-79 (Jarvis Ex. 77) |
| 103 | 1/17/2023 | Jan. 17, 2023 Email chain from J. Jarvis re: Housing Choice Voucher Program (Formally Section 8), Bates No. POL002961 (Jarvis Ex. 75) |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 104 | 2/15/2023 | Template Letter to Housing Choice Voucher Tenants, Bates No. POL002962 (Jarvis Ex. 76) |
| 105 | 1/17/2023 | Jan. 17, 2023 email from D. Withers to J. Jarvis re: Housing Choice Voucher Policy (003), Bates Nos. POL002995-96 (Jarvis Ex. 79) |
| 106 | 12/5/2022 | Dec. 15, 2022 Email from R. Hemsley to J. Jarvis re: Housing Choice Voucher Program & Policy, Bates Nos. POL003149-50 (Jarvis Ex. 78) |
| 107 | Undated | R. Griswold document production, Bates Nos. RG000001-545 (Griswold Ex. 7) |
| 108 | 1/28/2022 | Jan. 28, 2022 (5:13 p.m.) email from R. Matthews re Draft - Terry v. Wasatch Property Management, et al; Case No. 2:15-cv-00799-KJM-DB – Rule 26 report, Bates Nos. RG000017-24 (Griswold Ex. 15) |
| 109 | 6/24/2020 | June 24, 2020 E-mail re Terry v. Wasatch, et al. - Class Action Litigation - Potential Expert Retention, Bates Nos. RG000025-28 (Griswold Ex. 8) |
| 110 | 1/28/2022 | Jan. 28, 2022 Email (2:10 p.m.) re Terry v. Wasatch - Docs for Disclosure, Bates Nos. RG000043-48 (Griswold Ex. 14) |
| 111 | 1/28/2022 | Jan. 28, 2022 (8:04 a.m.) email re Terry v. Wasatch Property Management, et al, Bates Nos. RG000049-52 (Griswold Ex. 10) |
| 112 | 1/28/2022 | Jan. 28, 2022 (7:30 a.m.) Email (and 8 attachments thereto) re Terry v. Wasatch Property Management, et al, Bates Nos. RG000053-530 (Griswold Ex. 11) |
| 113 | 1/27/2022 | Jan. 27, 2022 Email re Terry v. Wasatch Property Management, et al. - Expert Witness Consultation - Confidential -, Bates Nos. RG000531-33 (Griswold Ex. 9) |
| 114 | 1/28/2022 | Jan. 28, 2022 (10:05 a.m.) Email re Terry v. Wasatch - Docs for Disclosure, Bates Nos. RG000535-42 (Griswold Ex. 13) |
| 115 | 1/28/2022 | Jan. 28, 2022 (9:13 a.m.) Email re Terry v. Wasatch Documents, Bates Nos. RG000543-44 (Griswold Ex. 12) |
| 116 | 9/5/2012 | Residential Rental Agreement, Sept. 5, 2012, Bates Nos. TERRY000113-16 |
| 117 | 9/5/2012 | Additional Services Agreement, Sept. 5, 2012, Bates No. TERRY000119 |
| 118 | 3/22/2013 | D. Terry Tenant Ledger, Bates Nos. TERRY000182-87 (Terry Ex. 3 at 47-52) |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 119 | Various | Terry Residential Rental Agreements and Additional Service Agreements 2010-2011, 2011-2012, 2012-2013; Huskey Residential Rental Agreements and Additional Services Agreements: 2011-2012, 2014-2015, Bates Nos. TERRY000191-206; TERRY000537-52; TERRY000113-26; TERRY000571-96; TERRY000601-14 |
| 120 | 7/5/2011 | Housing Assistance Payments Contract and Lease re: R. Huskey, Bates No. TERRY000387 |
| 121 | 6/20/2011 | Terms and Conditions of Additional Services Agreement re: R. Huskey, Bates Nos. TERRY000437-38 |
| 122 | 6/30/2011 | Logan Park Community Policies, Bates Nos. TERRY000440-42 |
| 123 | 9/20/2010 | Residential Rental Agreement, Sept. 20, 2010, Bates Nos. TERRY000510-13 |
| 124 | 9/20/2010 | Additional Services Agreement, Sept. 20, 2010, Bates No. TERRY000517 |
| 125 | 8/30/2011 | Residential Rental Agreement dated Aug. 30, 2011, Bates Nos. TERRY000537-40 |
| 126 | 8/30/2011 | Additional Services Agreement, Aug. 30, 2011, Bates No. TERRY000544 |
| 127 | 9/5/2012 | Residential Rental Agreement for D. Terry, Bates Nos. TERRY000553-66 (Raymond Ex. 3) |
| 128 | 6/30/2011 | Residential Lease Agreement, Bates Nos. TERRY000571-77 |
| 129 | 6/30/2011 | Additional Services Agreement, Bates No. TERRY000578 |
| 130 | 11/26/2014 | Residential Rental Agreement, Bates Nos. TERRY000601-07 |
| 131 | 11/23/2021 | Press Release, "Chelsea Landlord & Property Manager Agree to $80,000," Bates Nos. TERRY001141-55 |
| 132 | 4/26/2013 | Press Release, "United States Successful In False Claims Act Cases Against Landlords Charging Housing Choice Voucher Tenants Excess Rents," Bates Nos. TERRY001156-57 |
| 133 | 9/16/2015 | Press Release, "Twin City Landlords to Pay $130,000 to Resolve Alleged Section 8 Housing Assistance Violations" Sept 16, 2015; related settlement agreement, Bates Nos. TERRY001160-78 |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 134 | 8/4/2021 | Press Release, "Tacoma Landlord Agrees to Pay $16,618 for Overcharging Homeless Veteran Tenant and Fraudulently Obtaining Federal Funds," Aug 4, 2021; related settlement agreement, Bates Nos. TERRY001179-95 |
| 135 | 3/6/2020 | Press Release, Chelsea Landlord Agrees to Settle False Claims Act Allegations," Mar. 6, 2020, Bates Nos. TERRY001196-97 |
| 136 | 6/11/2018 | Press Release, "Dorchester Landlords and Property Manager Agree to Settle False Claims Act Allegations," Jun. 11, 2018, Bates Nos. TERRY001198-99 |
| 137 | 3/7/2019 | Press Release, "FHA Program Landlord Agrees to False Claims Act Settlement," Mar. 7, 2019, Bates Nos. TERRY001200-01 |
| 138 | 9/24/2020 | Press Release, "Roxbury Landlord Agrees to Settle False Claims Act Allegations," Sept. 24, 2020, Bates Nos. TERRY001202-03 |
| 139 | 11/28/2016 | Press Release, "Sacramento Landlord Pays $75,000 to settle 'Section8' False Claims Act Allegations," Nov. 28, 2016, Bates Nos. TERRY001204-05 |
| 140 | 12/3/2020 | Press Release, "U.S. Attorney's Office Reaches Settlement Under the False Claims Act Over Allegations that Defendants Collected Excess Rent," Dec. 3, 2020, Bates Nos. TERRY001206-07 |
| 141 | 10/3/2016 | Press Release, "United States Reaches Settlement with Section 8 Landlords," Oct. 3, 2016, Bates Nos. TERRY001208-09 |
| 142 | 8/15/2018 | Press Release, "United States Resolves False Claims Act Investigation Against Landlord Charging Housing Voucher Tenants Excess Rents," Aug. 15, 2018, Bates Nos. TERRY001210-12 |
| 143 | 11/21/2019 | Housing Authority of the County of Alameda (HACA) Housing Choice Voucher Program (excerpts), Nov. 21, 2019, Bates Nos. TERRY001221-22, TERRY001543, TERRY001629, TERRY001644-45 |
| 144 | 2/2/2022 | Housing Authority of the County of Alameda (HACA) Housing Choice Voucher Program (excerpts), Feb. 2, 2022, Bates Nos. TERRY001886-87, TERRY002208, TERRY002294, TERRY002309-10 |
| 145 | 3/8/2023 | Housing Authority of the County of Alameda (HACA) Housing Choice Voucher Program (excerpts), Mar. 8, 2023, Bates Nos. TERRY002608-10, TERRY002923, TERRY003009, TERRY003024-25 |
| 146 | 1/1/2012 | Administrative Plan for the Housing Authority of Fresno County (excerpts), Jan. 1, 2012, Bates Nos. TERRY003407, TERRY003545, TERRY003700 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 147 | 1/1/2019 | Administrative Plan for the Housing Authority of Fresno County (excerpts), Jan. 1, 2019, Bates Nos. TERRY003741, TERRY003900-01, TERRY004081 |
| 148 | 1/1/2020 | Administrative Plan for the Housing Authority of Fresno County (excerpts), Jan. 1, 2020, Bates Nos. TERRY004143, TERRY004300-01, TERRY004478-79 |
| 149 | 4/3/2018 | Housing Authority of the City of Glendale's Section 8 Administrative Plan (excerpts), Apr. 3, 2018, Bates Nos. TERRY004948, TERRY005031, TERRY005046-47 |
| 150 | 7/1/2018 | Administrative Plan: Housing Choice Voucher Program for the City of Mesa Housing Authority (excerpts), July 1, 2018 (revised), Bates Nos. TERRY007053, TERRY007356, TERRY007357, TERRY007456, TERRY007471-72 |
| 151 | 7/1/2021 | Administrative Plan: Housing Choice Voucher Program for the City of Mesa Housing Authority (excerpts), July 1, 2021 (revised), Bates Nos. TERRY008301, TERRY008608-09, TERRY008711, TERRY008727-28 |
| 152 | 7/1/2022 | Administrative Plan: Housing Choice Voucher Program for the City of Mesa Housing Authority (excerpts), July 1, 2022 (revised), Bates Nos. TERRY008942, TERRY009158-59, TERRY009230, TERRY009242-43 |
| 153 | 4/20/2006 | Administrative Plan from the Oakland Housing Authority (excerpts), Apr. 20, 2006, Bates Nos. TERRY010242, TERRY010311, TERRY010325 |
| 154 | 3/24/2014 | Administrative Plan from the Oakland Housing Authority (excerpts), Mar. 24, 2014 (updated), Bates Nos. TERRY010416, TERRY010713, TERRY010798, TERRY010817 |
| 155 | 2/19/2024 | Administrative Plan from the Oakland Housing Authority (excerpts), Feb. 2019 (updated & approved), Bates Nos. TERRY010964, TERRY011244, TERRY011328, TERRY011346 |
| 156 | 12/15/2021 | HCV Administrative Plan for the Oceanside Housing Authority excerpts, Dec. 15, 2021 (effective), Bates Nos. TERRY011631-32, TERRY011961, TERRY012045, TERRY012060-61 |
| 157 | 1/7/2022 | Administrative Plan for the Housing Choice Voucher Program for the Renton Housing Authority (excerpts), Jan. 7, 2022, Bates Nos. TERRY012561, TERRY012866, TERRY012950, TERRY012966-67 |
| 158 | 7/11/1905 | Housing Authority of the County of Sacramento's Administrative Plan for the Housing Choice Voucher Program (excerpts), 2019, Bates Nos. TERRY014358, TERRY014444-45, TERRY014523-24 |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 159 | 7/14/1905 | Housing Authority of the County of Sacramento's Administrative Plan for the Housing Choice Voucher Program (excerpts), 2022, Bates Nos. TERRY014679, TERRY014769-70, TERRY014851-52 |
| 160 | 7/11/1905 | 2019 Housing Authority of the County of Salt Lake's Housing Connect – Housing Choice Voucher Administrative Plan (excerpts), Bates Nos. TERRY014984, TERRY015205-06, TERRY015271, TERRY015282-83, TERRY015357 |
| 161 | 7/15/1905 | 2023 Housing Authority of the County of Salt Lake's Housing Connect – Housing Choice Voucher Administrative Plan (excerpts), Bates Nos. TERRY015445, TERRY015699-97, TERRY015764, TERRY015777-78 |
| 162 | 6/20/2014 | San Diego Housing Commission Administrative Plan for the Section 8 Rental Assistance Program (excerpts), June 20, 2014, Bates Nos. TERRY016061, TERRY016138-39 |
| 163 | 6/15/2018 | San Diego Housing Commission Administrative Plan for the Section 8 Rental Assistance Program (excerpts), June 15, 2018, Bates Nos. TERRY016685, TERRY016765-66 |
| 164 | 9/9/2021 | San Diego Housing Commission Administrative Plan for the Section 8 Rental Assistance Program (excerpts), Sept. 9, 2021, Bates Nos. TERRY017453, TERRY017534-35 |
| 165 | 7/15/2022 | San Diego Housing Commission Administrative Plan for the Section 8 Rental Assistance Program (excerpts), July 15, 2022, Bates Nos. TERRY017714, TERRY017795-96 |
| 166 | 12/1/2017 | GAO Report to Congress, HCV Program, Dec. 2017, Bates Nos. TERRY017973-8027 |
| 167 | 2/8/2023 | Press Release, "Holyoke Landlord Agrees to $15,000 Settlement for FCA Violations," Feb. 8, 2023, Bates Nos. TERRY018104-08 |
| 168 | 7/10/2008 | OIG Fraud Alert: Bulletin on Charging Excess Rent in Housing Choice Voucher Program, July 10, 2008, Bates Nos. TERRY018120-21 |
| 169 | | "Financial Overcharging Schemes" webpage, https://www.hudoig.gov/newsroom/video-library/financial-overcharging-schemes, Bates Nos. TERRY018122-24 |
| 170 | | Video "Financial Overcharging Schemes" https://www.hudoig.gov/newsroom/video-library/financial-overcharging-schemes, Bates No. TERRY018125 |
| 171 | 5/10/2023 | Housing Authority of the County of Alameda (HACA) Housing Choice Voucher Program (excerpts), May 10, 2023, Bates Nos. TERRY018127-28, TERRY018426-27, TERRY018508, TERRY018523-24 |

11

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 172 | 7/1/2023 | Administrative Plan: Housing Choice Voucher Program for the City of Mesa Housing Authority (excerpts), July 1, 2023 (revised), Bates Nos. TERRY018950, TERRY019174-75, TERRY019246, TERRY019258-59 |
| 173 | 4/11/2023 | Davis Community Housing Authority Administrative Plan for the Housing Choice Voucher Program (excerpts), Mar. 2023 (revised), Apr. 11, 2023, Bates Nos. TERRY019477, TERRY019749, TERRY019827, TERRY019843 |
| 174 | 1/1/2023 | 2023 Administrative Plan for the Housing Authority of the City of Fresno (excerpts), Jan. 1, 2023, Bates Nos. TERRY020061, TERRY020221, TERRY020431-32 |
| 175 | 1/1/2023 | Administrative Plan for the Housing Authority of Fresno County (excerpts), Jan. 1, 2023, Bates Nos. TERRY020530, TERRY020724-25, TERRY020974-75 |
| 176 | 4/23/2024 | Administrative Plan from the Oakland Housing Authority (excerpts), Apr. 2023 (updated & approved), Bates Nos. TERRY021061, TERRY021341, TERRY021426, TERRY021444-45 |
| 177 | 7/15/1905 | Housing Authority of the County of Sacramento's Administrative Plan for the Housing Choice Voucher Program (excerpts), 2023, Bates Nos. TERRY021641, TERRY021732-33, TERRY021815-16 |
| 178 | 11/27/2023 | Housing Authority of Salt Lake City's Administrative Plan for the Housing Choice Voucher Program (excerpts), Nov. 27, 2023, Bates Nos. TERRY021949, TERRY022250, TERRY022330, TERRY022346-47 |
| 179 | 6/15/2023 | San Diego Housing Commission Administrative Plan for the Section 8 Rental Assistance Program (excerpts), June 15, 2023, Bates Nos. TERRY022694, TERRY022776-77 |
| 180 | Undated | 3 Day Notice re: D. Terry, Bates No. WAS000001 |
| 181 | 1/7/2013 | 3 Day Notice to Pay or Quit to D. Terry, Bates Nos. WAS000011-12 |
| 182 | 9/15/2012 | Residential Rental Agreement and Lease Packet re: D. Terry, Sep. 15, 2012, Bates Nos. WAS000097-100, 103-13 |
| 183 | 3/1/2013 | Stipulation in Settlement Chesapeake Commons v. Terry re: D. Terry, Mar. 01, 2013, Bates Nos. WAS000116-20 |
| 184 | 2/5/2013 | Three-Day Notice to Pay Rent or Quit to D. Terry, Bates No. WAS000122 (Terry Ex. 5) |
| 185 | 2/14/2013 | D. Terry Tenant Ledger, Bates Nos. WAS000123-27 (Terry Ex. 3) |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 186 | | Notice to D. Terry re Eviction process, Bates No. WAS000128 (Terry Ex. 5, p. 1) |
| 187 | 12/12/2012 | Letter dated Dec. 12, 2012 from Fin. Mgr., Chesapeake Commons Apts. to D. Terry re balance owing, Bates No. WAS000129 |
| 188 | 10/20/2011 | 3 Day Notice to Pay or Quit re: D. Terry, Bates No. WAS000132 |
| 189 | 2/15/2013 | 3 Day Notice to Pay or Quit to D. Terry, Bates No. WAS000137 |
| 190 | 2/14/2013 | 60 Day Notice to Vacate Guide re: D. Terry, Feb. 14, 2013, Bates Nos. WAS000139-46 |
| 191 | Undated | Monthly Cost Breakdown re: D. Terry, Bates No. WAS000149 |
| 192 | 8/30/2011 | Residential Rental Agreement and Lease Packet re: D. Terry, Aug. 30, 2011, Bates Nos. WAS000150-65 |
| 193 | | Monthly Cost Breakdown for D. Terry, Bates No. WAS000166 |
| 194 | | Monthly Cost Breakdown for D. Terry, Bates No. WAS000168 |
| 195 | 9/20/2010 | Residential Rental Agreement and Lease Packet re: D. Terry, Sep. 20, 2010, Bates Nos. WAS000169-93 |
| 196 | 9/11/2010 | Wasatch Move In Statement for D. Terry, Bates No. WAS000200 |
| 197 | 8/18/2010 | Wasatch Move In Statement for D. Terry, Bates No. WAS000201 |
| 198 | 8/2/2010 | Wasatch Move In Statement for D. Terry, Bates No. WAS000202 |
| 199 | 8/30/2010 | Request for Tenancy Approval docs re: D. Terry, Aug. 30, 2010, Bates Nos. WAS000206-09 |
| 200 | 9/26/2010 | HAP Contract excerpt for D. Terry, Bates No. WAS000215 |
| 201 | 10/18/2010 | SHRA Lease Supplemental Agreement re: D. Terry, Oct. 18, 2010, Bates Nos. WAS000216-17 |
| 202 | 6/30/2011 | Monthly Cost Breakdown for R. Huskey, Bates No. WAS000327 |
| 203 | 6/30/2011 | Residential Rental Agreement and Lease Packet re: R. Huskey, Jun. 30, 2011, Bates Nos. WAS000328-56 |

13

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 204 | 11/26/2014 | Residential Rental Agreement and Lease Packet re: R. Huskey, Nov. 26, 2014, Bates Nos. WAS000358-72 |
| 205 | 7/9/2011 | SHRA HCV Program Lease Supplemental Agreement re: R. Huskey, Jul. 09, 2011, Bates Nos. WAS000374-76 |
| 206 | 7/18/2011 | HAP Contract re: R. Huskey, Jul. 18, 2011, Bates Nos. WAS000377-87 |
| 207 | 7/9/2011 | Lease Supplemental Agreement re: R. Huskey, Bates Nos. WAS000401-02 (Huskey Ex. 34) |
| 208 | 8/31/2011 | Letter re renters insurance for R. Huskey, Bates No. WAS000429 |
| 209 | 6/30/2011 | Wasatch Welcome Letter for R. Huskey, Bates No. WAS000439 |
| 210 | 5/27/2011 | Wasatch breakdown of move-in costs for R. Huskey, Bates No. WAS000440 |
| 211 | | Wasatch Property Management Leadership Team, Bates Nos. WCDS 000329-46 (Johnson Ex. 2) |
| 212 | 9/6/2017 | Sep. 6, 2017 email from M. LaFollette to Promontory Point Office re August RI audit, Bates Nos. WCDS 010051-52 |
| 213 | 3/2/2016 | Mar. 2, 2016 email from C. Knowles to S. Stettler, R. Thatcher, J. Johnson re: WPM – Resume, including attachment, Bates Nos. WCDS 019301-25 |
| 214 | 3/21/2017 | Mar. 21, 2017 email from D. Halliday to K. Dao re: Updated Compliance How-Tos, including attachment #TC106 Voucher Rents, Bates Nos. WCDS 032627, WCDS 032644-47 (Johnson Ex. 10) |
| 215 | 6/5/2015 | Jun. 5, 2015 email from K. Dao to B. Mishler, J. Johnson re:, Bates Nos. WCDS 035743-46 (Johnson Ex. 11 & Johnson Ex. 12) |
| 216 | 2/1/2016 | Feb. 1, 2016 email from California Place Manager to K. Dao re: Housing Contracts, Bates No. WCDS 041154 |
| 217 | 4/28/2016 | Apr. 28, 2016 Email from D. Tanforan to B. Johnson, K. Dao, S. Fetter, J. Johnson re: Bond Units Credits, Bates No. WCDS 042227 (Jarvis Ex. 67) |
| 218 | 6/6/2015 | Jun. 6, 2015 Email from D. Tanforan to B. Johnson, K. Dao, S. Fetter, J. Johnson re: Bond Units Credits, Bates Nos. WCDS 044753-56 (Johnson Ex. 24) |
| 219 | 4/22/2019 | Apr. 22, 2019 emails from D. Wiles re: AR Summary, Bates Nos. WCDS 045916-17, WCDS 054797-98, WCDS 972167-68, WCDS 951181-83, WCDS 985185-87 (Jarvis Ex. 85; Fetter Ex. 39; Johnson Ex. 17) |

14

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 220 | 2/1/2016 | Feb 1, 2016 Email from K. Dao to J. Johnson re: Housing Contracts, Bates No. WCDS 056831 (Johnson Ex. 31) |
| 221 | 2/1/2016 | Feb. 1, 2016 email from K. Dao to J. Johnson re: Housing Contracts, with attachment, Bates Nos. WCDS 056831-32 (Dao Ex. 7, Johnson Ex. 31 & Johnson Ex. 32) |
| 222 | Apr. 2015 | HUD form HUD-60641, Bates No. WCDS 056832 (Johnson Ex. 32) |
| 223 | 6/5/2015 | June 5, 2015 email from J. Johnson to K. Dao, J. Jarvis, B. Mishler, R. Thatcher, S. Fetter, and S. Stocker re: Utah Section 8 Rent Increases, Bates No. WCDS 058075 (Jarvis Ex. 48) |
| 224 | 12/1/2017 | Dec. 1, 2017 email from J. Jarvis to S. Evans re: Garden Lofts Due Diligence and attachment entitled Wasatch Resume, Bates Nos. WCDS 060137-38, WCDS 060161-87 |
| 225 | 2/1/2016 | Feb. 2, 2016 email from K. Dao re: Housing Contracts, with attachment, Bates Nos. WCDS 063913-14 (Dao Ex. 9) |
| 226 | 2/1/2016 | Feb. 1, 2016 Emails from Chesapeake Commons Financial Re: Tenant Charges, Bates Nos. WCDS 072009-10 |
| 227 | 6/6/2015 | June 5, 2015 email from Scott Stettler [no email subject line, transmitting attachments], Bates No. WCDS 085381 (Fetter Ex. 33) |
| 228 | 5/15/2024 | May 2015 Month End Table of Contents / Agenda, Bates No. WCDS 085382 (Fetter Ex. 34) |
| 229 | 5/15/2024 | Ancillary Revenue Review, May 2015, Bates Nos. WCDS 085404-06 (Fetter Ex. 35) |
| 230 | 5/2/2016 | May 2, 2016 email from D. Tanforan Re: Washers Dryers and Parking Chesapeake, Bates No. WCDS 090154 |
| 231 | 2/1/2016 | Feb. 1, 2016 Email from Katie Dao re: Tenant Charges, Bates Nos. WCDS 090168-70 (Dao Ex. 10) |
| 232 | 12/12/2011 | Dec. 12, 2011 email from S. Stettler to B. Mishler re: Updated Budget summary, Bates Nos. WCDS 099711-16 (Mishler Ex. 2) |
| 233 | 5/4/2016 | May 4, 2016 email from Dave Tanforan to J. Johnson, K. Dao re: Washers Dryers and Parking Chesapeake, Bates Nos. WCDS 106748-50 (Johnson Ex. 21) |
| 234 | 1/29/2020 | Jan. 29, 2020 email from I. Furrow to T. Sullins, Bates Nos. WCDS 1138229-31 (Jarvis Ex. 28) |
| 235 | 9/16/2019 | Email from H. Palutke to T. Raymond, re: Terry et al v. Wasatch Advantage Group, LLC et al, Bates Nos. WCDS 116461-63 |
| 236 | 2/10/2016 | Feb. 10, 2016 letter from T. Raymond to V. Tenerelli re: Investigation of Wasatch, Bates Nos. WCDS 1165354-55 (Johnson Ex. 9) |

15

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 237 | 4/26/2016 | Apr. 26, 2016 email from T. Raymond to J. Johnson and others re: Qui Tam Case Review, Bates Nos. WCDS 1165467-70 (Raymond Ex. 6, Johnson Ex. 42) |
| 238 | 5/2/2016 | May 2, 2016 email from R. Funk to J. Johnson re: Qui Tam Case Review, Bates Nos. WCDS 1165471-73 (Johnson Ex. 43) |
| 239 | 2/10/2016 | Feb 10, 2016 email from R. Funk to T. Raymond re: Huskey Scans and attachment, Bates Nos. WCDS 1165517-20 |
| 240 | 2/10/2016 | Feb. 10, 2016 email from T. Raymond to J. Johnson re: Huskey Scans, with attachment, Bates Nos. WCDS 1165521-24 |
| 241 | 7/3/2016 | July 3, 2016 letter from Phillip A. Talbert, Assistant. U.S. Attorney re: U.S. ex rel. Terry v. Wasatch, No. 2:15-cv-0799 KJM-AC (E.D.C.A.), Bates No. WCDS 1165738 (Raymond Ex. 5) |
| 242 | 2/8/2019 | Feb. 8, 2019 from T. Raymond re: Summary, Bates Nos. WCDS 1165870-72 (Raymond Ex. 15) |
| 243 | 1/28/2019 | Jan. 28, 2019 email from M. Treitler re: Case of importance for CAA and NAA, Bates Nos. WCDS 1165987-94 (Raymond Ex. 8) |
| 244 | 9/10/2019 | Email from T. Raymond to M. Treitler, including selected attachments, Bates Nos. WCDS 1166266-80 (Johnson Ex. 45, Raymond Ex. 9) |
| 245 | 9/19/2019 | Sept. 19, 2019 email from T. Raymond re: Terry et al v. Wasatch Advantage Group, LIC et al; 2:15cv0799-KJM-DB, Bates No. WCDS 1166404 (Raymond Ex. 10) |
| 246 | 9/13/2019 | Sept. 13, 2019 email from T. Raymond to CAA re: Terry et al v. Wasatch Advantage Group, and excerpt of attachment, Bates Nos. WCDS 1166404-08 |
| 247 | 9/17/2019 | Sept. 17, 2019 email from L. Baker to T. Raymond re: Wasatch Property: Additional Service Agreements, Bates Nos. WCDS 1166464-69 (Raymond Ex. 11) |
| 248 | 2/9/2016 | Feb. 9, 2016 Email from T. Raymond re: Huskey Scans, Bates Nos. WCDS 1166470-72 (Raymond Ex. 2) |
| 249 | 9/17/2019 | Sept. 17, 2019 email from L. Baker to T. Raymond re: Wasatch Property: Additional Service Agreements, Bates Nos. WCDS 1167041-46 |
| 250 | 2/25/2019 | Feb. 25, 2019 memo from J. Johnson to California Apartment Association re: Potential Industry Impact of Terry et al v. Wasatch Advantage Group, LLC et al, Bates Nos. WCDS 1167051-59 (Jarvis Ex. 62) |
| 251 | 2/1/2016 | Feb. 1, 2016 email from Logan Park Leasing re: Tenant Charges, Bates Nos. WCDS 117470-71 (Dao Ex. 8) |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 252 | 5/18/2017 | May 18, 2017 email from D. Baker re: ** Rent Increases - Section 8 Participates**, Bates No. WCDS 121750 (Jarvis Ex. 49) |
| 253 | 9/24/2015 | Sept. 24, 2015 email from California Place Manager re: Available Units, Bates No. WCDS 1230295 |
| 254 | 4/28/2016 | Apr. 28, 2016 Email from D. Tanforan to Chesapeake Commons Managers re: Bond Units Credits, including attachments, Bates Nos. WCDS 1238213-318 |
| 255 | Various | Various emails re: parking at Promontory Point Apartments, Bates Nos. WCDS 1238688-89; WCDS 1455768; WCDS 1450295-98; WCDS 1433035-37; WCDS 1337751-57; WCDS 1313136-38; WCDS 1309940; WCDS 1242865-66 |
| 256 | 12/8/2016 | Dec. 8, 2016 Email from Chesapeake Commons Manager re: Questions from Review, Bates No. WCDS 1313059 |
| 257 | 2/1/2016 | Feb. 1, 2016 email from K. Dao to Cal. Place Manager re: Property Charges with attachment, Bates Nos. WCDS 1318066-68 |
| 258 | 7/4/2015 | 7/14/15 Quote for apartment at California Place, Bates No. WCDS 1327498 |
| 259 | 3/23/2017 | Mar. 23, 2017 email from D. Tanforan to J. Johnson re: Additional Services Sacramento, Bates Nos. WCDS 1472358-59 |
| 260 | 4/14/2016 | Apr. 14, 2016 email from M. Clegg to K. Dao re: California Place Audit and attachment, Bates Nos. WCDS 1480558-59 |
| 261 | 4/19/2016 | Apr. 19, 2016 email from K. Dao to D. Tanforan and J. Johnson re: Cal Place & Bent Tree, Bates Nos. WCDS 1480608-10 |
| 262 | 2/1/2016 | Feb. 1, 2016 email from Chesapeake Commons Financial Manager to K. Dao re: Housing Contracts, Bates No. WCDS 226679 |
| 263 | 2/1/2016 | Feb. 1, 2016 Email from Sun Valley Manager to K. Dao, Bates Nos. WCDS 229769-71 (Johnson Ex. 39) |
| 264 | 2/1/2016 | Feb. 1, 2016 email from K. Dao to Cal. Place Manager re: Property Charges with attachment, Bates Nos. WCDS 229772-74 |
| 265 | 2/1/2016 | Feb. 1, 2016 email from L. Tabler (Chesapeake Commons Financial) to K. Dao, J. Johnson, Chesapeake Commons Manager, Subject: Tenant Charges, 2/1/16, Bates Nos. WCDS 234861-62 (Jarvis Ex. 64) |
| 266 | 6/13/2016 | Jun. 13, 2016 email from Florentine Villas Manager, re: All company totals May 2016, Bates Nos. WCDS 236481-82 (Jarvis Ex. 38) |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 267 | 9/17/2010 | Sep. 17, 2010 email from B. Mishler to Area Leaders and other WPM staff re: Best Practice Call Minutes 9/16/10, Bates Nos. WCDS 264403-06 (Mishler Ex. 5) |
| 268 | 3/24/2017 | Mar. 24, 2017 email from L. Levanger to J. Johnson re: PEER including attachment "Financial Training Notes Outline", Bates Nos. WCDS 265415-16, WCDS 265420-21 |
| 269 | 9/16/2011 | Sept. 16, 2011 email from Reese Thatcher re: Renters Insurance on Tax Credit/ Important!!!, Bates Nos. WCDS 288818-19 (Jarvis Ex. 33) |
| 270 | 2/1/2016 | Feb. 1, 2016 Email from K. Dao to Logan Park Leasing re: tenant Charges, Bates Nos. WCDS 300625-26 (Jarvis Ex. 66) |
| 271 | 8/12/2014 | Aug. 12, 2014 email from C. Knowles to S. Stettler re: Month End, including attachment, Bates Nos. WCDS 312817-944 |
| 272 | 10/15/2020 | Oct. 15, 2020 email from Lofts Financial Manager to RentDynamics employee re: Media Package Question, Bates Nos. WCDS 3207359-61 |
| 273 | 2/23/2017 | Feb. 23, 2017 Email from S. Settler re: RentPlus Report, Bates Nos. WCDS 327944-45 |
| 274 | 2/1/2016 | Feb. 1, 2016 email from California Place Manager to K. Dao re: Tenant Charges, Bates Nos. WCDS 329050-51 (Jarvis Ex. 65) |
| 275 | 12/17/2019 | Housing Authority of Maricopa County Section 8 Voucher Program - Notice of Change, Bates No. WCDS 3343900 |
| 276 | 11/30/2020 | Email chain re A. Lee lease renewal, Bates Nos. WCDS 3440369-70 |
| 277 | 11/24/2020 | Housing Authority notice of change in lease and contract, Bates No. WCDS 3440371 |
| 278 | 11/28/2020 | Email chain re A. lease renewal, Bates Nos. WCDS 3452610-11 |
| 279 | 2/26/2021 | Feb. 26, 2021 Email from J. Britton re: Florentine Villas Past Due Account, Bates Nos. WCDS 3452785-86 |
| 280 | Undated | Renters' Insurance Requirement Change, Bates No. WCDS 387429 (Johnson Ex. 26) |
| 281 | 11/22/2011 | Nov. 22, 2011 email from R. Hansch to B. Mishler, J. Johnson, and S. Stettler re Wasatch-debulks in Fresno, Bates Nos. WCDS 397714-15 (Johnson Ex. 5) |
| 282 | 11/22/2011 | Nov. 22, 2011 Email from W. Smith to R. Hansch, B. Mishler, S. Stettler, J. Johnson re: Fresno Comcast Bulk Agreement, Bates Nos. WCDS 406006-07 (Johnson Ex. 6) |
| 283 | Undated | Katie Dao - Compliance Director biography, Bates No. WCDS 441746 (Dao Ex. 2) |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 284 | 2/1/2016 | Feb. 1, 2016 email from K. Dao to Cal. Place Manager and Chesapeake Commons Financial Re: Housing Contracts, Bates Nos. WCDS 519136-37 |
| 285 | 2/1/2016 | Feb. 2, 2016 email from J. Johnson to K. Dao re: Housing Contracts, Bates Nos. WCDS 521498-99 (Johnson Ex. 33) |
| 286 | 5/5/2015 | May 5, 2015 Email from K. Dao re: Section 8 Residents, Bates No. WCDS 547526 (Dao Ex. 3) |
| 287 | 2/13/2019 | Feb. 13, 2019 email from R. Hemsley to "All Managers" and "All Financial" re: Financial Forum, including attachment Rent Collection Best Practices How-To, Bates Nos. WCDS 551576-83 (Johnson Ex. 16) |
| 288 | 2/13/2019 | Feb. 13, 2019 email from R. Hemsley to "All Managers" and "All Financial" re: Financial Forum, and attachment, Bates Nos. WCDS 551576-83 (Jarvis Ex. 81, Johnson Ex. 16) |
| 289 | 5/29/2015 | May 29, 2015 email from B. Mishler to K. Dao, J. Johnson re: Utah – Section 8, Bates No. WCDS 565328 (Jarvis Ex. 47) |
| 290 | 2/1/2016 | Feb. 1, 2016 email from R. Thatcher re: Investigation by DOJ of imposed charges on properties, Bates Nos. WCDS 640758-59 (Dao Ex. 6) |
| 291 | 2/6/2018 | Feb. 6, 2018 email from B. Stewart to S. Gonzalez, Bates Nos. WCDS 654056-59 (Jarvis Ex. 27) |
| 292 | 4/28/2016 | Apr. 28, 2016 email from B. Johnson to K. Dao, D. Tanforan, and J. Johnson re: Bond Units Credits, Bates Nos. WCDS 682424-26 |
| 293 | 4/28/2016 | Spreadsheet, Bates No. WCDS 682529 (Jarvis Ex. 68) |
| 294 | 12/5/2015 | December 5, 2015 email from M. LaFollette to Canyon Club Office re: November RI audit, Bates Nos. WCDS 719978-79 |
| 295 | Undated | Renters Insurance Is Mandatory !!!!, Bates No. WCDS 791693 (Jarvis Ex. 30) |
| 296 | 6/5/2020 | Jun. 5, 2020 email from Devonshire Manager attaching draft FAQ re: Xfinity package, Bates Nos. WCDS 856225-26 |
| 297 | 2/20/2019 | Feb. 20, 2019 email from J. Miller to K. Manduca, J.B. Johnson, and Z. Haycock re: Devonshire Bulk, with attachment, Bates Nos. WCDS 876414-17 (Jarvis Ex. 24, Jarvis Ex. 25) |
| 298 | 9/3/2020 | Residential Rental Agreement, W9, Request for Tenancy Approval, Voucher re: Kassandra Olvera, Sep. 03, 2020, Bates Nos. WCDS3440203-22 |
| 299 | 9/3/2020 | Residential Rental Agreement, W9, Voucher form re: K. Olvera, Sep. 03, 2020, Bates Nos. WCDS3440226-46 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 300 | 10/27/2020 | HAP Contract excerpt re: K. Olvera, Oct. 27, 2020, Bates Nos. WCDS3440250-51 |
| 301 | 10/23/2020 | Residential Rental Agreement re: K. Olvera, Oct. 23, 2020, Bates Nos. WCDS3440302-19 |
| 302 | 9/25/2015 | HAP contract re: K. Olvera, Sep. 25, 2015, Bates Nos. WCDS3440322-33 |
| 303 | 2/26/2021 | Final Notice of Account Balance re: P. Paxman, Feb. 26, 2021, Bates Nos. WCDS3452785-86 |
| 304 | 1/25/2018 | Submissions of HAP Contract for B. Gonzales, WEAU00000237-60 |
| 305 | 4/25/2016 | Apr. 25, 2016 email from M. Tran re: Chesapeake Commons tenant issue, Bates Nos. WEAU00005586-89 (Dao Ex. 4) |
| 306 | 4/16/2024 | Apr. 15, 2016 email from M. Tran re: Bond Rents, Bates Nos. WEAU00011197-200 (Dao Ex. 5) |
| 307 | 9/16/2016 | Submission of HAP Contract for R. Brown, WEAU00013290-307 |
| 308 | 8/30/2015 | Submission of HAP Contract for S. Veng, WEAU00023246-52 |
| 309 | 3/20/2006 | Completing the Delinquency Tracker, Bates Nos. WTM000098-99 (Fetter Ex. 23) |
| 310 | 5/1/2021 | Invoice for Payment of Non-Rent Amounts from Renton, WA May/June 2021, Bates No. WTM000109 (Fetter Ex. 29, Fetter Ex. 30) |
| 311 | Various | Compilation of sample move-in cost forms, Bates Nos. AP000080, CY006662, CV000004, PST000063, CP000218, AP000078, CY032954, CV000439, PST003915, CY032794 (Fetter Ex. 41), and OP000179; BR002415 |
| 312 | Various | Collection of eviction notices including rent and additional service fees from produced tenant files (2017 and earlier), Bates Nos. AP000756-66, CPC034205-24, SVT008140-48. |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 313 | Various | Exemplars of HAP Contract Part A excerpts related to undisclosed washer and dryer charges (Ex. 44 to Bellows Decl. in Supp. Mot. Part. Summ. J., Apr. 22, 2022, ECF No. 252-4), Bates Nos. AZ000162, RM000177-78, ENCLAVE000183-84, RM000305-06, ENCLAVE000307-08, CR000433-34, ENCLAVE000543-44, AV000655-56, PP000682-84, AV000828-29, JPT001506-15, BR002111-12, CAP002158-59, JPT002233-34, BWT002393-95, WEAU005214-15, CAP009788-89, CP0011482-83, AZ0011625, BT012741-42, WEAU00017340-41, WEAU00019492-93, CPC026303-04, WEAU00027536-37, WEAU00027683-84, WEAU00028163-64, WCDS 625193-95, WCDS 1201234-35, WCDS 1277757-58, WCDS 1451231-32 |
| 314 | Various | Compilation of sample Monthly Cost Breakdowns, Bates Nos. BU000353, BU000051, CP00123, CP000225, CV00359, CV005562, MP000479, RO000243, CV005562, R0000243, CP000225, CY033033, CV000359, CP000123, CY032854 |
| 315 | Various | Collection of Pay or Quit Notices from Arizona, Bates Nos. CM000560, RS007132, SA002852, SA003447, AZ000324, RS000370 (Fetter Ex. 28) |
| 316 | Various | Compilation of sample Residential Rental Agreements, Bates Nos. CP000219-23, AV000110-13, CV000535-38, BR000914-18, CP000308-12, MP000052-56, CP000124-28, CV000473-77, RS000071-74, CV000412-16, MP000174-77, CP000263-67, CPC021026-32, WEAU000003566-71, WEAU00035557-61, WCDS0984056-60, LPT000030-36, ENCLAVE000922-28, WEAU00008976-97, BT000107-10, WEAU00000242-60, BT004691-97 |
| 317 | Various | Compilation of sample Housing Assistance Payment Contracts, Bates Nos. CP000688-97, WEAU00000464-75, WEAU00016124-35, WCDS625193-204, WEAU00020649-60, WCDS 1496403-15 |
| 318 | Various | Collection of Consent Forms, Bates Nos. CY032916, CV000011, AP000248, CP000462 (Fetter Ex. 36) |
| 319 | Various | Collection of Three Day Notices to Pay or Vacate from Utah, Bates Nos. ENCLAVE001784, CR001579, SPW004951, SPW002008 (Fetter Ex. 27) |
| 320 | Various | Compilation of sample Renewal Notification Letters, Bates Nos. MP000010, BR002219, BR001861, CM003333, RP00376, WAS000919, CR004671, WAS000595, CP014105, CM004363, CM000116 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 321 | Various | Compilation of sample Monthly Statement of Rental Account, Bates Nos. MP000723, CR005364, CM000404, BR001475, CV003647, CV005614, CR002390 |
| 322 | Various | Collection of 10-Day Notices to Comply with Lease or Quit Premises, Bates Nos. MP000819, MP000665, MP000119, BU000107 (Fetter Ex. 26) |
| 323 | Various | Compilation of sample Additional Service Agreements, Bates Nos. AZ003410, AZ003548, RW000204-06, BR000921-23, CP000045-47, CPC000300, RW000160, ENCLAVE000929, MP000180, FALLS00142, WEAU00000249, WEAU00035564, WCDS0984063, WEAU00008084 |
| 324 | Various | Compilation of eviction notices for unpaid additional service fees (Nov. 2022 and later), Bates Nos. TDN000004-000006, TDN000015-000018, TDN000028-000039, TDN000055-000056, TDN000075, TDN000142, TDN000143-45 TDN000159, TDN000160-000161 (Jarvis Ex. 82, Jarvis Ex. 83, Jarvis Ex. 84) |
| 325 | Various | Compilation of Additional Services Agreements for J. Bass, B. Lambert, R. Lewis, C. McKoy, D. Williams, V. Yevdich, A. Mitchell, J. Goodspeed, R. Bennett, N. Pace, A. Chinhugh, S. Cordodor, V. Pierce-Swift, K. Shea, V. Rubio, J. Archibeque, A. Crookston, K. Laing, A. Nissi-Saphir, L. Bond, E. Lowe, H. Amir, M. McArthur, L. Fambrough, A. Lihovidov, N. Bilikas, C. Clark, C. Charns, J. Padilla, and S. Aguilar |
| 326 | Various | Compilation of eviction notices for unpaid additional service fees from produced tenant files (2017 and earlier), Bates Nos. listed on attached Ex. 1 |
| 327 | Various | Various leasing emails re: media charges at Broadmoor Apartments, Bates Nos.WCDS 849872-7, WCDS 881460, WCDS 1316551-54; WCDS 1316613; WCDS 1352286, WCDS 1415513; WCDS 1419438-40; WCDS 1419791 |
| 328 | Various | Compilation of Arcadia emails related to washers and dryer, Bates Nos. WCDS 1138229-31, WCDS 1177243-44, WCDS 1191263, WCDS 1198076-77, WCDS 1207501, WCDS 1245478-84, WCDS 1246154-55, WCDS 1253238, WCDS 1277723, WCDS 1309799-801, WCDS 1312510-11, WCDS 1323621-22 |
| 329 | Various | Compilation of Florentine Villas emails related to washers and dryers, Bates Nos. WCDS 1227572-73, WCDS 1244817-18, WCDS 1309967-68, WCDS 1309969-70, WCDS 1319495-96, WCDS 1320574-75, WCDS 1325871, WCDS 1332187, WCDS 1340402-04, WCDS 1351647-48, WCDS 1351692-93, WCDS 1357687-88, WCDS 1360286-87, WCDS 1361709-10, WCDS 1361848-49, WCDS 1367971-72, WCDS 1459476 |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 330 | Various | Collection of Manager Bonus Worksheets, Bates Nos. WCDS 653356-60 (Jarvis Ex. 34) |
| 331 | Various | Collection of emails from Mary LaFollette re: various monthly RI audits, Bates Nos. WCDS 780066-67, WCDS 834752-53, WCDS 753689-90, WCDS 836304-05, WCDS 284249-50, WCDS 318363-64, WCDS 369135-36, WCDS 818313-14, WCDS 751581-82, WCDS 593405-06, WCDS 838747-48, WCDS 750884-85, WCDS 791691-93, WCDS 364368-70, WCDS 290120-21, WCDS 811625-26, WCDS 293589-90, WCDS 751558-59, WCDS 379830-31, WCDS 807958-59, WCDS 290122-23, WCDS 158281-82, WCDS 761906-07, WCDS 835596-97, WCDS 394680-81, WCDS 779720-21, WCDS 806491-92, WCDS 780526-27, WCDS 838306-07, WCDS 834750-51 (Jarvis Ex. 31) |
| 332 | Various | Compilation of emails between Wasatch and local housing agencies, Bates Nos. WEAU00000271-96, WEAU00002454-63, WEAU00002837-41, WEAU00007611-16, WEAU00008961-70, WEAU00018899-907, WEAU00021435-43, WEAU00023246-52, WEAU00026269-77, WEAU00031321-28 |
| 333 | 10/1/2021 | Subpoena To Testify at a Deposition in a Civil Action to K. Dao (Dao Ex. 1) |
| 334 | 7/28/2017 | Notice of Taking Deposition Pursuant to FRCP 30 with Request for Production of Documents (Fetter Ex. 1) |
| 335 | 10/11/2021 | Second Am. Notice of Dep. (Shawn Fetter) (Fetter Ex. 21) |
| 336 | Undated | Is renters insurance required? (Fetter Ex. 3) |
| 337 | 1/28/2022 | Defs.' Disclosure of Expert Test. Pursuant to Fed. R. Civ. P. 26(a)(2), Jan. 28, 2022 (Griswold Ex. 1) |
| 338 | 1/28/2022 | Jan. 28, 2022 Letter from R. Griswold to J. Salazar and R. Matthews re Terry v. Wasatch Property Management, et al; Case No. 2:15-cv-00799-KJM-.DB - Rule 26 (Griswold Ex. 17) |
| 339 | 2/3/2022 | Subpoena to Produce Docs., Info., or Objects or to Permit Inspection of Premises Civ. Action to Robert S. Griswold, Feb. 3, 2022 (Griswold Ex. 5) |
| 340 | 2/11/2022 | R. Griswold's Resp. to Pls.' Subpoena Documents Pursuant to Fed. R. Civ. P. 45, Feb. 11, 2022 (Griswold Ex. 6) |
| 341 | 3/3/2022 | Inman Real Estate News for Realtors & Brokers (Griswold Ex. 22) |
| 342 | 3/3/2022 | Inman Real Estate News for Realtors & Brokers Section 8 (Griswold Ex. 23) |

| Pls.' Ex No | Doc. Date | Description |
| --- | --- | --- |
| 343 | 3/15/2022 | Subpoena to Testify at a Deposition in Civil Action to Robert S. Griswold, Mar. 15, 2022 (Griswold Ex. 2) |
| 344 | Undated | List of Robert Griswold Deposition and Trial testimony (Griswold Ex. 3) |
| 345 | Undated | Register of Experts Directory, Robert S. Griswold (Griswold Ex. 4) |
| 346 | Undated | R. Griswold Curriculum Vitae (Griswold Ex. 19) |
| 347 | | R. Griswold Terms of Engagement, Rev. 1/1/22 (Griswold Ex. 16) |
| 348 | | R.S. Griswold, Property Management Kit for Dummies (4th ed.) (Griswold Ex. 20) |
| 349 | | L. Harmon & R.S. Griswold, Landlords Legal Kit for Dummies (Griswold Ex. 21) |
| 350 | 7/28/2017 | Notice of Taking Deposition Pursuant to FRCP 30 with Request for Production of Documents (Jarvis Ex. 1) |
| 351 | 8/20/2021 | Notice of Deposition of Defendants Wasatch Advantage Group, LLC, Wasatch Property Management, Inc., and Wasatch Pool Holdings, LLC Pursuant to Federal 11 Rule of Civil Procedure 30(b)(6); Notice of Deposition of Janae Jarvis (Jarvis Ex. 23) |
| 352 | 3/20/2023 | Spreadsheet: Data_ChargeCodeMappingPayOrder (Payment Sequence) 032023 (Jarvis Ex. 73) |
| 353 | 5/5/2023 | Plaintiffs' Amended Notice of Date and Time For Federal Rule Of Civil Procedure 30(b)(6) Corporate Deposition(s) of Defendants (Selected Damages Topics) (Jarvis Ex. 69) |
| 354 | Various | Metropolitan Collection, Happy Holidays! Here is a Gift from Us to You! and Renewal Notification to Elena Galura (Jarvis Ex. 17) |
| 355 | | YVS207.02 – "Payment Sequence" for Receipting Payments (Jarvis Ex. 3, Johnson Ex. 13) |
| 356 | 1/29/2016 | Letter from V. Tennerelli (Johnson Ex. 8) |
| 357 | 7/21/2017 | Order on Defendants' Motion to Dismiss, ECF No. 61 (Johnson Ex. 25) |
| 358 | 9/8/2017 | Johnson Decl. in Supp. of Defs.' Opp'n to Mot. for Class Certification, Sept. 8, 2017, ECF No. 78-4 (Johnson Ex. 14) |
| 359 | 5/26/2023 | Plaintiffs' Notice of Federal Rule of Civil Procedure 30(b)(6) Corporate Depositions of Defendants (Damages Topics), May 26, 2023 (Johnson Ex. 69) |

893086.10

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 360 | Aug. 2009 | Housing Assistance Payments Contract (HAP Contract), Aug. 2009 (Johnson Ex. 3) |
| 361 | 10/11/2021 | Plaintiffs' Notice of Deposition of Tyler Raymond (Raymond Ex. 1) |
| 362 | 10/22/2021 | Subpoena to Produce Documents Information, or Objects or to Permit Inspection of Premises in a Civil Action, Oct. 22, 2021 (Scharlach Ex. 2) |
| 363 | 7/28/2017 | Notice of Taking Deposition Pursuant to FRCP 30 with Request for Production of Documents, Jul. 28, 2017 (Tanforan Ex. 1) |
| 364 | 8/6/2017 | Aug. 6, 2017 Email from J. Newmark re: Is Renters Insurance Required, (Tanforan Ex. 2) |
| 365 | 7/9/1905 | Housing Authority of the County of Sacramento's Administrative Plan for the Housing Choice Voucher Program (excerpts), 2017 (Fox Ex. 32) |
| 366 | 1/1/2017 | Administrative Plan for the Housing Authority of Fresno County (excerpts), Jan. 1, 2017 (Cavey Ex. 5) |
| 367 | 7/20/2023 | Expert Report of MaryAnn Russ with exhibits, July 20, 2023 |
| 368 | | Data_ChargeCodeMappingPayOrder(Payment_Sequence)032023 |
| 369 | | Data01_TenantwithHAPandOther_032723 |
| 370 | | Data03_PropertyInfo_032723 |
| 371 | | Data04_TenantLeaseCharges_032723 |
| 372 | | Data21_ChargeTypeAnalysis02092022 |
| 373 | | Data21_ChargeTypeAnalysis_Data_Defeinitions |
| 374 | | Data21_ChargeTypeAnalysis_07.18.2023 |
| 375 | | Excerpt of Data1_TenantswithHAPandOther_082721.csv related to undisclosed washer and dryer charges (Exhibit 45 to Bellows Decl. in Supp. Mot. Part. Summ. J., Apr. 22, 2022, ECF No. 252-5) |
| 376 | | Housing Authority of the County of Alameda (HACA) Housing Choice Voucher Program (excerpts), Jul. 24, 2017 (Rizzo-Shuman Ex 14) |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 377 | | Tenant ledger for Abraham Sheriff (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 378 | | Tenant ledger for Alicia Lee (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 379 | | Tenant ledger for Ashley Mays (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 380 | | Tenant ledger for Bobby Hanselman (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 381 | | Tenant ledger for Brittney Bryson (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 382 | | Tenant ledger for Charles Crooks (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 383 | | Tenant ledger for Christopher Toney (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 384 | | Tenant ledger for Damon Weathersby (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 385 | | Tenant ledger for Dana Davis-Lobo (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 386 | | Tenant ledger for Denise Higgins (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 387 | | Tenant ledger for Edward Mcilroy (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 388 | | Tenant ledger for Elizabeth Brooks (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 389 | | Tenant ledger for Frances Crawley (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 390 | | Tenant ledger for James Walton (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 391 | | Tenant ledger for Jamila Meadors (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 392 | | Tenant ledger for Jerame Carter (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 393 | | Tenant ledger for Jerame Carter (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 394 | | Tenant ledger for Kassandra Olvera (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |

26

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 395 | | Tenant ledger for Marsha Young (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 396 | | Tenant ledger for Maureen Stevens (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 397 | | Tenant ledger for Mike Cremer (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 398 | | Tenant ledger for Patricia Henderson (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 399 | | Tenant ledger for Penny Paxman (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 400 | | Tenant ledger for Tania Borjas (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 401 | | Tenant ledger for Timothy Naerebout (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 402 | | Tenant ledger for Vicky Lynn Teista (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 403 | | Tenant ledger for Violet Rubio (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 404 | | Tenant ledger for Wendy Cottingham (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 405 | | Tenant ledger for Zakiyiah Smith (excerpt of Data5 files produced by Fitech Gelb on July 14, 2023) |
| 406 | | Summary of tenant ledger files (Data05, produced by Fitech Gelb on July 14, 2023) |
| 407 | | Breshears, Feb. 25, 2022 Expert Report, without exhibits ("Breshears Feb. 25, 2022 Report) |
| 408 | | Tables summarizing percentage enrollment in selected charges at selected properties as disclosed in Breshears Feb. 25, 2022 Report |
| 409 | | Chart re cable charges at Courtyard at Central Park (Breshears Feb 25, 2022 Report Ex. B.1) |
| 410 | | Chart re cable charges at Landing at Fancher Creek (Breshears Feb 25, 2022 Report Ex. B.2) |
| 411 | | Chart re cable charges at River Oaks (Breshears Feb 25, 2022 Report Ex. B.3) |
| 412 | | Chart re: washer and dryer charges at Chesapeake Commons (Breshears Feb 25, 2022 Report Ex. B.4) |

27

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 413 | | Chart re: parking charges at Chesapeake Commons (Breshears Feb 25, 2022 Report Ex. B.5) |
| 414 | | Chart re: washer and dryer charges at California Place (Breshears Feb 25, 2022 Report Ex. B.6) |
| 415 | | Chart re: washer and dryer charges at Logan Park (Breshears Feb 25, 2022 Report Ex. B.7) |
| 416 | | Chart re: parking charges at Crossroads Apartments (Breshears Feb 25, 2022 Report Ex. B.9) |
| 417 | | Chart re: parking charges at Promontory Point Apartments (Breshears Feb 25, 2022 Report Ex. B.10) |
| 418 | | Chart re: cable charges at Broadmoor Village Apartments (Breshears Feb 25, 2022 Report Ex. B.15) |
| 419 | | Chart re: cable charges at Canyon Ridge Apartments (Breshears Feb 25, 2022 Report Ex. B.15) |
| 420 | | Chart re: cable charges at Devonshire Court East (Breshears Feb 25, 2022 Report Ex. B.18) |
| 421 | | Chart re: cable charges at Devonshire Court East (Breshears Feb 25, 2022 Report Ex. B.19) |
| 422 | | Chart re: cable charges at Falls at Hunters Pointe (Breshears Feb 25, 2022 Report Ex. B.20) |
| 423 | | Chart re: cable charges at Goldstone (Breshears Feb 25, 2022 Report Ex. B.21) |
| 424 | | Chart re: cable charges at Lofts at 7800 (Breshears Feb 25, 2022 Report Ex. B.22) |
| 425 | | Chart re: cable charges at Metropolitan Place Apartments (Breshears Feb 25, 2022 Report Ex. B.23) |
| 426 | | Chart re: cable charges at Rio Seco (Breshears Feb 25, 2022 Report Ex. B.24) |
| 427 | | Summary of Section 8 and non-Section 8 Tenant Months with ASA Charges by Property and Tenant Month (Breshears Feb 25, 2022 Report Ex. C) |
| 428 | | Breshears July 20, 2023 Report |
| 429 | | Breshears curriculum vitae (Breshears July 20, 2023 Report Ex. A) |
| 430 | | Appendix to Breshears July 20, 2023 Report |

28

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 431 | | Calculations Related to Section 8 Tenants Who Paid Required Renters' Insurance Payments from February 2006 through November 2020 (Breshears July 20, 2023 Report Ex. 6) |
| 432 | | Calculations Related to Section 8 Tenants Who Paid Required Renters' Insurance Payments from November 2011 through November 2020 (Breshears July 20, 2023 Report Ex. 7) |
| 433 | | Calculations Related to Section 8 Tenants Who Paid Washer/Dryer Charges from February 2006 through June 2019 (Breshears July 20, 2023 Report Ex. 8) |
| 434 | | Calculations Related to Section 8 Tenants Who Paid Washer/Dryer Charges from August 2017 through June 2019 (Breshears July 20, 2023 Report Ex. 9) |
| 435 | | Mandatory Media Package Payments from Month of February 2006 through Month of December 2022 (Breshears July 20, 2023 Report Ex. 9) |
| 436 | | Mandatory Washer/Dryer Rental Payments from Month of February 2006 through month of December 2022 (Breshears July 20, 2023 Report Ex. 11) |
| 437 | | Mandatory Parking-Related Payments from Month of February 2006 through Month of December 2022 (Breshears July 20, 2023 Report Ex. 12) |
| 438 | | Mandatory Media Package Payments from Month of December 2011 through Month of December 2022 (Breshears July 20, 2023 Report Ex. 13) |
| 439 | | Mandatory Washer/Dryer Rental Payments from Month of December 2011 through Month of December 2022 (Breshears July 20, 2023 Report Ex. 14) |
| 440 | | Mandatory Parking-Related Payments from Month of December 2011 through Month of December 2022 (Breshears July 20, 2023 Report Ex. 15) |
| 441 | | Tables summarizing Breshears' calculations related to Section 8 tenants paying additional service charges and corresponding housing assistance payments to Defendants as disclosed in Breshears July 20, 2023 Report |
| 442 | 4/1/2023 | HAP Contract and Tenancy Addendum (HUD form 52641), https://www.hud.gov/sites/dfiles/OCHCO/documents/52641.pdf |
| 443 | | Russ Curriculum Vitae |
| 444 | 8/16/2021 | Stipulation and Order Granting Leave to File Fifth Amended Complaint, Bifurcation the Case for Discovery and Trial, and Vacating Case Deadlines, Aug. 16, 2021, ECF No. 135 |

| Pls.' Ex No | Doc. Date | Description |
|---|---|---|
| 445 | 5/13/2022 | Gelb Decl., May 14, 2022, ECF No. 257-3 |
| 446 | 1/5/2022 | Stipulation and Order to Amend the Class Certification Order, Jan. 5, 2022, ECF No. 226 |
| 447 | 10/6/2023 | Gelb Decl., Oct 6, 2023, ECF No. 323-5 |
| 448 | 11/22/2023 | Gelb Decl., Nov. 22, 2023, ECF No. 328-1 |
| 449 | 11/23/2022 | MSJ Order, ECF No. 278 |
| 450 | 3/29/1977 | Letter from H.U.D. Director C. Lucas to R. Fitzgerald, Mar. 29,1977, Ex. 1 to Req. Judicial Notice, ECF No. 243 |
| 451 | 10/21/1985 | Letter from H.U.D. Branch Chief F. Malone to K. Calhoon, Oct. 21, 1985, Ex. 3 to Req. Judicial Notice, ECF No. 243 |
| 452 | 7/29/1991 | Letter from H.U.D. Director L. Jenkins to M. Varieur, July 29, 1991, Ex. 2 to Req. Judicial Notice, ECF No. 243 |
| 453 | 3/25/2022 | Jt. Fact Stip. Re: Data Produced from Defs.' Yardi Property Management Database, Mar. 25, 2022 |
| 454 | 5/13/2022 | May 13, 2022 Response by Defendants to Plaintiffs' Statement of Undisputed Facts re Plaintiffs' Motion for Partial Summary Judgment, ECF No. 258-1 |
| 455 | 5/27/2022 | May 27, 2022 Response by Defendants to Plaintiffs' Statement of Disputed Facts re Defendants' Motion for Summary Judgment, ECF No. 263-4 |
| 456 | 5/17/2023 | Stip. & Order Re: Damages Calculation, May 17, 2023, ECF No. 308 |
| 457 | 10/20/2023 | Oct. 20, 2023 Response by Defendants to Plaintiffs' Statement of Undisputed Facts re: Plaintiffs' Motion for Partial Summary Judgment re Remedies, ECF No. 326-1 |
| 458 | | 42 U.S.C.A. § 5301 |
| 459 | | 24 CFR § 982.451 |

Plaintiffs reserve the right to introduce any exhibit designated by any other party to this action.

Exhibit A

Pls.' Ex. 416,
Compilation of eviction notices for unpaid additional service fees
from produced tenant files (2017 and earlier)

AP000662-63, AP000762-63, AP002356, AP002806, BR000003-05, BR002158, BT000178,
BT000189, BT000190, BT000191, BT000505, BT000519, BT000602, BT000603, BT000628,
BT000643, BT003816, BT003841-43, BT003846, BT003862, BT004182, BT004188,
BT004290, BT004295, BT004421, BT004459, BT007015, BT007024, BT008096, BT010946,
BT010954, BT010958, BT010966, BT011015, BT011017, BU000127, CAP004390,
CAP007193, CAP008222, CP009887-88, CP009889-90, CPC000654-55, CPC000656-57,
CPC000658-59, CPC000660-61, CPC009005, CPC010700, CPC015825, CPC016159,
CPC016980, CPC020517, CPC021867-68, CPC023341, CPC023342, CPC023344, CPC026834,
CPC028201, CPC033675, CPC033676, CPC033677, CPC033678, CPC034580, CPC034581,
CPC034585, CPC034586, CPC034660, CPC036853-54, CPC036904, CPC036928, CPC036933,
CPC036945, CPC036953, CPC036974, CPC038384, CPC038385, CPC039842-43, CR000522,
CR001502, CR001579, CR002292, CR002303, CR002306, CR002406, CR003352, CR003358,
CR003583, CR003699, CR003815, CR004019, CR004397, CR004733, CR004939, CV000502-
03, CV002104-05, CV002536, CV002966, CV003577, CV004056, CV004356, CV005701,
CV005707, CV006060, CY002348, CY005083, CY017492, CY021234, CY021482, CY021493,
CY026242, ENCLAVE000317, ENCLAVE000320, ENCLAVE001666, ENCLAVE001667,
ENCLAVE001669, ENCLAVE001671, ENCLAVE001672, ENCLAVE001674,
ENCLAVE001784, ENCLAVE001790, ENCLAVE001792, ENCLAVE002677,
ENCLAVE002833, ENCLAVE003290, ENCLAVE003896, ENCLAVE003898,
ENCLAVE003899, FOT001104, MP000119, MP000128, MP000196, MP000327, MP000599,
MP000663, MP000665, MP000691, MP000703, MP000716, MP000764, MP000819,
MP000866, PP000518, SPW000805, SPW001965, SPW001966, SPW001975, SPW001980,
SPW001983, SPW001988, SPW001989, SPW002008, SPW002765, SPW003135, SPW003185,
SPW004039, SPW004085, SPW004951, SPW004971, SPW005455, SPW005654, SPW005925,
SPW005992, SPW006003, SPW006004, SPW006264, SPW006437, SVT002679-80,
SVT002688, SVT002748, SVT003843, SVT003884, SWT000374, SWT002357, SWT002824,
SWT003319, SWT003323, SWT003325, SWT003390, SWT003599, SWT003636,
SWT004032, SWT004525, SWT004539, SWT004576, SWT004582, SWT004586,
SWT004588, SWT004607, SWT004615, SWT004618, SWT004622, SWT004631,
SWT004635, SWT004650, SWT004657, SWT004661, SWT004671, SWT004674,
SWT004675, SWT004679, SWT004684, SWT004972, SWT004975, SWT004999,
SWT005015, SWT005018, SWT005020, SWT005023, SWT005025, SWT005028,
SWT005037, SWT005039, SWT005050, SWT005058, SWT005060, SWT005062,
SWT005063, SWT005065, SWT005074, SWT005084, SWT005085, SWT005088,
SWT005101, SWT005661, SWT005668, SWT005682, SWT005683, SWT005684,
SWT005710, SWT005747, SWT005862, SWT006370, SWT006371, SWT006379,
SWT006393, SWT006402, SWT006425, SWT006659, SWT006662, SWT006853,
SWT006876, SWT007480, SWT007481, SWT007484, SWT007485, SWT007499,
SWT007684, SWT007689, SWT007693, SWT007696, SWT007698, SWT007703,
SWT007710, SWT007711, SWT007716, SWT007722, SWT007723, SWT007748, SWT007924,

SWT007928, SWT007932, SWT008223, SWT008279, SWT008589, SWT008594,
SWT008598, SWT008601, SWT008604, SWT008608, SWT008611, SWT008612, SWT008615,
SWT008618, SWT008619, SWT008626, SWT008628, SWT008635, SWT008638,
SWT008643, SWT008644, SWT008645, SWT008657, SWT008661, SWT008670,
SWT008671, SWT008676, SWT008680, SWT009043, SWT009318, SWT009322,
SWT009324, SWT009329, SWT009335, SWT009337, SWT009340, SWT009341,
SWT009359, SWT009364, SWT009366, SWT009369, SWT009381, SWT009385,
SWT009387, SWT009388, SWT009680, SWT009683, SWT009688, SWT009694,
SWT009697, SWT009701, SWT009705, SWT009716, SWT009718, SWT009739,
SWT009745, SWT010043, SWT010047, SWT010374, SWT010377, SWT010382,
SWT010386, SWT010390, SWT010394, SWT010397, SWT010400, SWT010403, SWT010411,
SWT010518, SWT010530, SWT010532, SWT010533, SWT010536, SWT010549, SWT011019,
SWT011244, SWT011271, SWT011675, SWT011676, SWT011677, SWT012386, SWT012414,
SWT012421, SWT012957, SWT012982, SWT012984, SWT012985, SWT012994,
SWT013014, SWT013016, SWT013020, SWT013022, SWT013032, SWT013368,
SWT013654, SWT014378, SWT015070, SWT015090, SWT015996, VIT002190, VIT004784

32

Exhibit I

**WPM Proposed Exhibit List:**

| Number | Description | Citation |
| --- | --- | --- |
| 301 | Denika Terry Lease Agreement | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 302 | Denika Terry HAP Contract | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 303 | Denika Terry ASA | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 304 | Denika Terry 3-Day Notices | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 305 | Denika Terry Ledger | Yardi Data from GelbGroup |
| 306 | Roy Huskey III Lease Agreement | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 307 | Roy Huskey III HAP Contract | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 308 | Roy Huskey III ASA | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 309 | Roy Huskey III 3-Day Notice | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 310 | Roy Huskey III Ledger | Yardi Data from GelbGroup |
| 311 | Tamera Livingston Lease Agreement | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 312 | Tamera Livingston HAP Contract | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 313 | Tamera Livingston ASA | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 314 | Tamera Livingston 3-Day Notice | Exhibit to Plaintiffs' Sixth Amended Complaint. |
| 315 | Tamera Livingston Ledger | Yardi Data |
| 316 | Correspondence Between WPM and Roy Huskey III | Deposition of Roy Huskey, Exh. 38. |
| 317 | Correspondence Between WPM and Denika Terry | Deposition of Denika Terry, Exh. 182, 188. |
| 318 | WPM Additional Services Agreement Presented to Jacqueline Rojas | Deposition of Jacqueline Rojas, Exh. 6. |
| 319 | WPM Additional Services Agreement Presented to Jodi Parker | Deposition of Jodi Parker, Exh. 6. |
| 320 | WPM Additional Services Agreement Presented to Barbara Cavey | Deposition of Barbara Cavey, Exh. 3. |
| 321 | Yardi Data re Rates of Enrollment by Class Members in Renters' Insurance Services, By Property, By Year | Yardi Data, GelbGroup |
| 322 | Yardi Data re Rates of Enrollment by Class Members in Parking Services, By Property, By Year | Yardi Data, GelbGroup |

| 323 | Yardi Data re Rates of Enrollment by Class Members in Media Package Services, By Property, By Year | Yardi Data, GelbGroup |
|---|---|---|
| 324 | Yardi Data re Rates of Enrollment by Class Members in Washer/Dryer Services, By Property, By Year | Yardi Data, GelbGroup |
| 325 | Exhibits re Costs Incurred to Provide Renters' Insurance to Tenants | Deposition of Jarom Johnson as PMK for WPM, Exh. 70-79. |
| 326 | Exhibits re Costs Incurred to Provide Media Packages to Tenants | Deposition of Jarom Johnson as PMK for WPM, Exh. 76-83. |
| 327 | Policy Change Document re WPM Tenant Payment Sequence | Deposition of Janae Jarvis as PMK for WPM, Exh. 72. |
| 328 | Payment Priority Sequence | Deposition of Janae Jarvis, Exh. 3. |
| 329 | Notice to Tenants re Additional Services Remaining Optional | Deposition of Janae Jarvis as PMK for WPM re Actions Taken Post 11/22/2022, Exh. 76. |
| 330 | Email to Staff re Policy of Additional Service Agreements Remaining Optional | Deposition of Janae Jarvis as PMK for WPM re Actions Taken Post 11/22/2022, Exh. 78 |
| 331 | Property Management for Dummies by Robert Griswold | Expert Report of Robert Griswold |
| 332 | Declaration of Shannon Fox | Exhibit to Defendants' Motion for Summary Adjudication. |
| 333 | Policy re Additional Service Agreements | Deposition of Janae Jarvis as PMK for WPM re Actions Taken Post 11/22/2022, Exh. 77 |
| | | |

Defendants reserve the right to introduce any exhibit designated by any other party to this action.

135528581.1

Exhibit J

<u>**Owner and Non-Owner Defendants' Exhibit List**</u>

Initiated nearly nine years ago, this action involves extensive discovery, including 27 depositions and over 11 terabytes of documents. Records include more than three million pages, tens of thousands of lease documents, and HAP contracts. Plaintiffs also accessed Defendant WPM's Yardi system for comprehensive tenant data. The case further features numerous docket entries, written discovery, third-party subpoenas, and expert reports. Owner and Non-Owner Defendants engaged Arnall Golden Gregory LLP ("AGG") just two months ago to represent their interests in this action. The complexity of this action requires more time for analysis of the evidence and record, and the identification of trial exhibits. Acknowledging this, Owner and Non-Owner Defendants list the documents and other exhibits to be offered at trial by party and property categories, and they remain open to meeting and conferring with other parties to discuss the possibility of streamlining their respective exhibit lists.

<u>**Plaintiffs**</u>

Tamera Livingston, Roy Huskey III, and Denika Terry: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by Wasatch Property Management, Inc. ("WPM"), property owners, the Public Housing Agency ("PHA"), and the U.S. Department of Housing and Urban Development ("HUD").

<u>**By Property**</u>

Logan Park Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Chesapeake Commons Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Logan Park Apartments and Chesapeake Commons Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Logan Park Apartments. Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Chesapeake Commons Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Aspen Park Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Bellwood Park Apartments and Jerron Place.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Bent Tree Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

California Place Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Landing at Fancher Creek Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Canyon Club Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Courtyard at Central Park Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Creekside Villa Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Hayward Village Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Heritage Park Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Oak Valley Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Bridges at Five Oaks Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Peppertree Senior Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Piedmont Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Point Natomas Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

River Oaks Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Shadow Way Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Spring Villa Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Sun Valley Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Village Grove Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

Quail Run Apartments.  Former and current tenants: All documents and communications related to their units, including, but not limited to, all applications, leases, additional services agreements, tenancy addendums, HAP contracts, and all related communications with and documents provided to or received by WPM, property owners, the PHA, and HUD.

**<u>Other</u>**

31 U.S.C. sections 3729 through 3733.

42 U.S.C. sections 1437, et seq., including all amendments since 1987 ("Housing Act of 1937"), in effect during the applicable facts and including amendments through the date of the filing to the conclusion of trial.

42 U.S.C. sections 3531, et seq. ("Housing Act of 1989"), in effect during the applicable facts and including amendments through the date of the filing to the conclusion of trial.

All appropriations act from October 1, 1998, through the conclusion of trial, including continuing resolutions in effect during the applicable facts and including amendments through the date of the filing to the conclusion of trial.

15 U.S.C. sections 2601, et seq. ("Toxic Substances Act") in effect during the applicable facts and including amendments through the date of the filing to the conclusion of trial.

24 C.F.R. Part 982, as amended, including all prior years as applicable during all times pertinent through the conclusion of trial.

24 C.F.R. Part 903, as amended, including all prior years as applicable during all times pertinent through the conclusion of trial.

24 C.F.R. Part 888, as amended, including all prior years as applicable during all times pertinent through the conclusion of trial.

24 C.F.R. Part 35, as amended, including all prior years as applicable during all times pertinent through the conclusion of trial.

24 C.F.R. Part 5, as amended, including all prior years as applicable during all times pertinent through the conclusion of trial.

40 C.F.R. Part 745, as amended, including all prior years as applicable during all times pertinent through the conclusion of trial.

All notices published by the U.S. Department of Housing and Urban ("HUD") Office of Policy Development and Research ("PDR"), as applicable during all times pertinent through the conclusion of trial.

All published opinions of the HUD Office of General Counsel ("OGC"), as applicable during all times pertinent through the conclusion of trial.

All Federal Register notices on any issues related to HUD, the Housing Choice Voucher program ("HCV"), all HUD Small Area Fair Market Rent ("HUD SAFMR" or "SAFMR") guidelines, and all U.S. Department of Commerce, Office of the Census Bureau, American Community Survey related materials, as applicable during all times pertinent through the conclusion of trial.

All HUD Office of Public and Indian Housing ("PIH") Notices from October 1, 1998, through the conclusion of trial.

All HCV Guidebooks published by or on behalf of HUD PIH from October 1, 1998, through the conclusion of trial, including, but not limited to, HCV Guidebook (April 2001)(7420.10G), HCV Guidebook (2015)(7420.10G), and HCV Guidebook at (7420.10(G)).

All HUD HCV Landlord Guidebooks (all versions) published at https://files.hudexchange.info/resources/documents/PIH-HCV-Landlord-Strategies-Guidebook-for-PHAs.pdf, as applicable during all times pertinent through the conclusion of trial.

All HUD Forms published by HUD from October 1, 1998, through the conclusion of trial that were approved by the White House Office of Management and Budget ("OMB") and possessing an OMB number and OMB expiration date, specifically including each PHA's annual contribution contract with HUD and all amendments.

All HUD informational, training, and other videos related to the HCV program, whether produced by HUD directly or by any technical advisor on HUD's behalf and as posted on HUD's

website or any commercially available website used by HUD, including without limitation, YouTube, as applicable during all times pertinent through the conclusion of trial.

All PHA HCV administrative and other administrative plans, annual plans, five year plans and other submittals to HUD made in compliance with the Housing Act of 1937, including, but not limited to, all PHA Administrative Plans filed by the Sacramento Housing and Redevelopment Agency and the Fresno Housing Authority, whether or not sanctioned by HUD (meaning those submitted and not sanctioned initially and subsequently accepted and those that were accepted by HUD) including all HUD, federal, State of California, County, and City, as applicable, materials cited therein.

The California Government Code, Civil Code, and Health and Safety Code, and amendments thereto.

The California Administrative Code, and all amendments thereto, from October 1, 1998 through the conclusion of trial.

The Sacramento County Code, as applicable during all times pertinent through the conclusion of trial.

The City of Sacramento Code Ordinance, as applicable during all times pertinent through the conclusion of trial.

The Fresno County Code, as applicable during all times pertinent through the conclusion of trial.

The City of Fresno Code of Ordinances, as applicable during all times pertinent through the conclusion of trial.

All publications, reports, bulletins, memoranda, audits, of HUD OIG, as applicable during all times pertinent through the conclusion of trial.

All official U.S. government or government contracted websites for all the above.

The California, Utah, Arizona, and Washington Secretary of State records related to Defendants and/or the properties at issue.

The California, Utah, Arizona, and Washington Real Estate Brokerage and Licensing Division/Agency records related to Defendants and/or the properties at issue.

Exhibit K

**Plaintiffs' and Relators' Deposition Designations**

      Pursuant to Local Rules 281(b)(12), Plaintiffs provide the following designations of deposition testimony to be used at trial.  In addition to Cover Pages, Reporter's Certificates and the witness's swearing in, Plaintiffs designate, by page and line number, the testimony of:

**Dao, Katie - Nov. 3, 2021**
- 7:6-14
- 9:21-10:5
- 10:15-14:9
- 17:1-18:6
- 19:7-20:12
- 20:24-21:8
- 22:15-24:17
- 27:18-31:12
- 34:2-16
- 36:19-37:22
- 37:25-38:22
- 46:25-47:22
- 48:23-49:10
- 49:19-52:4
- 52:14-54:2
- 68:11-71:9
- 73:23-75:20
- 80:17-21
- 86:3-98:13
- 99:13-116:12
- 116:21-119:6
- 120:6-14
- 121:11-125:20
- 126:2-15
- 127:8-24
- 131:15-134:17
- 135:11-14
- 150:19-21
- 152:2-153:22

**Fetter, Shawn – Aug. 11, 2017**
- 5:2-4
- 10:1-11:8

890841.15

**Fetter, Shawn – Aug. 11, 2017 (continued)**

      11:20-24

      12:19-22

      13:10-14:12

      14:15-27:21

      28:4-36:22

      38:22-40:24

      42:12-43:19

      44:12-20

      47:10-50:18

      50:24-52:18

      52:23-54:12

      55:3-57:6

      57:15-58:12

      59:7-20

      70:3-72:10

      72:21-73:19

      73:22-77:9

      80:1-83:13

      85:8-12

      88:13-93:19

      94:6-96:5

      98:1-99:1

      100:14-110:8

      112:7-113:3

      116:16-117:22

      119:8-120:8

      121:13-126:23

      127:1-13

      127:16-128:7

      137:4-139:14

      140:13-16

      142:5-19

      142:21-144:21

      145:24-147:3

      151:2-154:22

      158:18-159:15

      159:18-161:21

      163:15-165:13

      173:1-18

**Fetter, Shawn – Aug. 11, 2017 (continued)**
      177:13-178:21
      181:11-185:10
      196:23-197:7
      198:8-20
      200:22-201:22
      203:24-207:23
      208:7-209:3
      210:14-212:13
      212:23-214:6
      226:19-227:14

**Fetter, Shawn –Oct. 27, 2021**
      8:3-22
      11:22-13:4
      13:25-15:12
      16:8-17:15
      18:19-28:24
      29:8-30:3
      30:15-35:10
      35:21-37:17
      37:20-39:11
      46:6-24
      50:20-60:10
      60:25-70:18
      77:13-77:25
      78:18-79:25
      82:6-84:1
      90:25-91:3
      99:7-116:18
      117:5-124:15
      124:25-126:24
      127:2-128:19
      129:3-24
      131:1-134:4
      138:3-139:3
      142:10-144:16
      146:6-147:13
      152:22-155:18
      157:15-25

890841.15

**Fetter, Shawn –Oct. 27, 2021 (continued)**

      158:7-16
      159:10-162:8
      162:11-16
      163:1-4
      163:21-166:11
      166:14-169:1
      169:8-14
      170:5-11
      171:15-173:13
      174:4-175:3
      175:12-16
      176:20-23
      177:4-8
      177:14-178:4
      181:8-20
      182:3-15
      183:10-19
      184:11-185:25
      186:8-23
      187:4-9
      187:19-188:9
      189:14-192:22
      193:4-18
      194:8-195:15
      195:18-25
      196:15-22
      197:5-25
      198:13-199:17
      200:21-201:3
      201:14-21
      202:2-203:11
      204:20-205:15
      206:4-10
      208:21-209:12
      210:1-213:11
      214:4-215:11
      221:2-222:20
      244:5-9
      266:11-25

890841.15

**Fetter, Shawn –Oct. 27, 2021 (continued)**

      270:7-272:13

      279:1-281:19

**Fetter, Shawn –Oct. 28, 2021**

      302:5-308:17

      308:22-313:15

      315:16-21

      317:22-322:6

      323:11-329:11

      329:14-334:8

      334:10-340:22

      341:11-347:12

      348:9-350:11

      351:1-355:19

      356:7-11

      356:23-361:3

      362:13:17

      363:18-364:23

      391:24-393:7

      396:17-397:18

      400:17-405:18

      409:19-410:13

      411:20-413:25

      414:20-415:7

      415:16-419:1

      419:5-18

      420:4-14

      420:24-433:23

      434:3-23

      435:2-437:22

      437:24-441:9

      441:22-447:20

      447:23-460:12

      461:3-463:18

      464:1-467:8

      467:12-468:16

      469:13-473:1

      473:16-474:21

      479:23-480:25

**Fetter, Shawn – Oct. 28, 2021 (continued)**

      492:8-498:17

      499:11-503:7

      503:12-509:19

      510:2-516:3

      516:8-518:22

      519:10-23

**Jarvis, Janae – Aug. 10, 2017**

      5:3-21

      6:22-8:16

      11:7-12:7

      15:8-22:19

      23:5-25:20

      26:22-27:21

      28:1-29:17

      33:3-39:16

      40:1-41:20

      52:4-54:10

      55:15-57:24

      58:20-59:7

      60:24-64:21

      68:1-15

      71:1-6

      91:7-20

      92:11-97:6

      103:2 -104:10

      109:4-110:10

      111:16-113:2

      113:12-114:5

      115:5-116:3

      122:11-123:1

      124:24-125:19

      130:17-132:12

      133:3-6

      133:15-24

      144:25-154:7

      157:3-158:14

      158:19-160:1

      162:7-166:3

890841.15

**Jarvis, Janae – Aug. 10, 2017 (continued)**

    166:12-23
    167:13-24
    190:20-191:20
    194:21-22
    196:21-198:9
    198:12-199:21
    202:8-206:4
    211:2-212:1
    212:6-18
    214:11
    216:4-217:21
    223:4-224:22
    226:4-235:7
    243:21-245:17
    250:7-251:23
    252:8-254:9

**Jarvis, Janae – Sept. 10, 2021**

    8:3-17
    9:8-10:7
    10:18-23
    11:5-24
    12:8-15
    12:22-13:9
    14:4-24:21
    27:24-34:18
    35:6-43:3
    45:11-19
    46:4-47:10
    48:6-49:18
    50:9-57:24
    60:24-64:23
    67:23-74:2
    76:10-17
    76:25-77:12
    84:6-87:6
    88:10-90:9
    90:13-93:25
    99:8-100:5

890841.15

**Jarvis, Janae – Sept. 10, 2021 (continued)**

    100:12-102:8
    107:1-16
    108:10-110:16
    110:19-123:8
    125:4-132:14
    132:22-133:7
    134:10-135:20
    136:17-137:13
    137:24-141:21
    142:13-153:25
    162:5-24
    176:3-19
    179:4-180:8
    185:19-188:8
    195:21-196:7
    200:16-202:17
    204:6-206:22
    208:16-211:20
    212:5-20
    214:13-220:12
    220:17-223:25
    227:6-228:7
    228:16-232:11
    232:19-233:2
    233:14-235:24
    238:3-13
    239:9-19
    240:6-18
    241:12-242:2
    244:6-14
    244:20-245:3
    245:23-246:5
    246:13-248:8

**Jarvis, Janae – Sept. 14, 2021**

    255:1-22
    256:10-25
    257:1-24
    258:13-259:11

8

**Jarvis, Janae – Sept. 14, 2021 (continued)**

      259:24-260:18

      271:3-273:5

      274:3-275:7

      275:14-20

      276:21-278:23

      280:3-282:24

      283:18-22

      284:7-298:20

      299:23-300:22

      301:1-307:1

      307:13-309:13

      310:10-312:7

      312:10-315:23

      318:18-321:9

      321:19-21

      323:13-325:12

      325:25-328:14

      329:2-17

      339:25-341:6

      342:19-345:18

      348:15-355:3

      355:10-356:8

      359:3-360:1

      364:3-365:14

      367:2-371:15

      375:24-377:2

      394:7-395:12

      395:21-402:9

      403:4-15

      404:4-406:15

      407:1-414:9

      415:13-420:2

      430:17-431:15

      432:13-433:17

**Jarvis, Janae (30(b)(6) designee) – May 18, 2023**

      9:3-16

      9:25-12:16

      12:21-13:4

**Jarvis, Janae (30(b)(6) designee) – May 18, 2023 (continued)**

    14:14-17:15

    17:18-24:5

    24:11-29:20

    31:2-33:25

    34:9-37:8

    37:24-39:16

    42:6-46:4

    46:24-47:23

    49:22-56:19

    59:4-18

    60:22-66:3

    67:11-68:17

    69:1-17

    70:6-9

    70:21-71:7

    72:10-16

    72:25-73:5

    74:2-78:17

    79:22-80:11

    80:19-83:14

    83:19-85:16

    86:6-9

    86:16-87:17

    87:21-96:5

    96:10-98:15

    99:9-101:8

    102:7-22

    103:16-108:11

    110:20-111:3

    111:6-11

    112:13-113:1

    113:16-114:14

    117:23-118:16

    125:21-126:3

    128:24-129:20

    131:7 -132:17

    140:7-141:12

    141:17-144:7

    145:10-15

**Jarvis, Janae (30(b)(6) designee) – May 18, 2023 (continued)**

     145:18-147:25

     149:22-150:12

     153:7-155:2

     155:17-160:6

     160:14-18

     162:1-168:3

     177:7-18

     178:1-24

     180:2-21

**Johnson, Jarom – July 19, 2021**

     9:12-15

     9:20-23

     16:25-19:25

     24:9-25:24

     26:4-27:6

     31:1-32:4

     34:23-25

     35:20-36:23

     37:5-38:24

     42:25-43:20

     49:1-9

     51:4-52:24

     54:21-56:3

     57:1-59:9

     69:4-70:7

     71:1-73:1

     75:12-82:17

     83:13-86:9

     87:11-88:17

     90:23-93:14

     99:24-101:13

     109:3-16

     110:17-111:3

     112:17-113:5

     114:5-119:20

     120:2-123:3

     124:23-126:14

     126:25-132:3

**Johnson, Jarom – July 19, 2021 (continued)**

    133:5-136:7
    136:15-137:4
    137:16-138:6
    139:24-141:23
    145:15-146:25
    151:20-154:24
    157:24-12
    172:17-173:5
    173:21-180:10
    182:2-183:5
    184:19-186:5
    188:3-189:9
    192:6-194:6
    195:16-196:2
    197:25-198:8
    198:22-202:8
    214:15-24
    215:14-18
    227:2-229:14
    241:11-243:12
    244:9-245:8
    245:19-247:18
    248:5-251:2

**Johnson, Jarom – Nov. 10, 2021**

    6:15-18
    9:1-10:6
    16:18-17:3
    22:20-32:22
    36:8-40:6
    40:11-48:4
    50:20-23
    51:2-52:13
    53:5-58:18
    59:16-60:4
    60:14-23
    62:20-65:23
    66:3-70:14
    72:2-74:17

12

**Johnson, Jarom – Nov. 10, 2021 (continued)**

      75:16-76:19

      78:15-81:25

      82:2-83:9

      85:7-86:13

      86:20-88:11


**Mishler, Bradley – Nov. 19, 2021**

      5:12-21

      13:19 -14:6

      14:16-23

      20:12-14

      21:17-22:7

      22:21-23:7

      24:4-8

      24:16-25:3

      25:13-26:1

      26:7-27:5

      29:23-30:22

      32:20-23

      59:20-60:2

      88:24-89:9

      90:21-92:5

      92:25-93:20

      94:2-7

      94:16-95:9

      95:19-96:8

      97:11-16

      97:22-98:2

      98:9-13

      99:25-100:19

      101:10-13

      101:20-23

      106:11-107:8

      109:8-25

      113:18-21

      117:1-118:18

      119:20-121:23

      130:1-8

      131:5-132:18

**<u>Mishler, Bradley – Nov. 19, 2021 (continued)</u>**

> 133:5-22
> 134:1-8
> 134:12-137:17
> 138:10-13
> 139:4-142:4
> 143:18-144:1
> 144:13-145:8
> 146:8-150:2

**<u>Raymond, Tyler – Dec. 7, 2021</u>**

> 25:25-26:4
> 31:15-33:8
> 34:23-40:14
> 41:2-49:17
> 51:14-55:6
> 56:12-62:17
> 63:3-86:1
> 86:19-88:22
> 90:24-117:10
> 118:6-134:22
> 135:9-146:6
> 146:7-148:14
> 150:19-153:4
> 157:2-14
> 159:10-161:24
> 163:13-166:16
> 168:9-169:18
> 170:13-177:8
> 192:21-193:10

**<u>Scharlach, David – Dec. 8, 2021</u>**

> 6:14-18
> 11:8-14
> 15:21-16:15
> 18:11-19:9
> 22:5-24:18
> 31:18-32:21
> 34:25-35:3
> 38:14-39:7

**<u>Scharlach, David – Dec. 8, 2021 (continued)</u>**

      40:24-42:22

      43:7-45:4

      45:15-46:21

      50:7-51:2

      51:9-52:18


**<u>Tanforan, David, - Aug. 9, 2017</u>**

      7:1-7

      8:20-9:11

      18:7-24

      19:21-20:2

      21:4-6

      23:5-7

      24:11-25

      27:16-29:6

      30:10-31:22

      32:1-33:25

      36:14-37:6

      37:1-6212:1

      38:14-19

      47:8-48:1

      48:11-21

      49:16-54:4

      65:1-4

      66:18-67:5

      68:12-16

      72:21-73:3

      74:17-80:24

      81:10-83:20

      84:8-19

      86:8-20

      87:3-10

      92:4-93:23

      95:13-96:10

      96:15-99:11

      108:8-109:9

      109:12-110:2

      111:18-112:16

      117:25-119:11

**<u>Tanforan, David, - Aug. 9, 2017 (continued)</u>**

123:4-124:10
124:13-125:8
127:22-128:3
129:15-130:1
138:23-140:17
145:4-20
151:9-12
152:2-12
154:23-25
155:7-156:11
160:15-20
162:24-163:15
167:6-23
172:19-22
173:1-20
174:11-177:23
178:16-21
179:10-180:22
181:12-182:6
190:17-192:3
195:3-196:21
196:23
197:24-25
199:15-200:16
206:11-208:14
208:17-211:1
211:5-17
213:21-215:12
218:17-25
219:19-220:2
222:22-223:16
226:4-227:20

16

Exhibit L

**Plaintiffs' and Relators' Designation of Written Discovery Requests and Responses**

Pursuant to Local Rules 281(b)(12), Plaintiffs provide the following designations of written discovery responses to be used at trial.  In addition to cover pages, signatures pages, definitions, and verifications, Plaintiffs designate the following requests and responses:

<u>Interrogatory Responses</u>

Defendants' Responses to Plaintiff Roy Huskey III's Interrogatories, Set One, September 17, 2020:
>2

Defendants Further Supplemental Responses to Plaintiff Denika Terry's Interrogatories Set Two No.'s 24 and 25, January 29, 2021:
>24
>25

Defendants' Responses to Plaintiff Roy Huskey III's Interrogatories, Set Five, August 27, 2021:
>18
>19
>20
>22

Defendants' Amended Responses to Plaintiff Roy Huskey III's Interrogatories, Set Five, November 8, 2021:
>18

Defendants' Further Amended Responses to Plaintiff Roy Huskey III's Interrogatories, Set Five, November 17, 2021:
>20

Defendants' Third Further Amended Responses to Plaintiff Roy Huskey III's Interrogatories, Set Five, January 14, 2022:
>18

Defendants' Responses to Plaintiff Tamera Livingston's Interrogatories, Set Three, January 17, 2023:
>7

Defendants' Further Amended Response to Plaintiff Tamera Livingston's Interrogatories, Set

Three No. 6 Only, May 24, 2023:
     6

<u>Responses to Requests for Admission</u>

Defendants' Responses to Plaintiff Denika Terry's Request for Admissions, Set One, September 17, 2020:
     4
     11 (erroneously labeled 7)

Defendants' Responses to Plaintiff Denika Terry's Request for Admissions, Set Two, July 19, 2021:
     11
     12
     14

Defendants' Responses to Plaintiff Denika Terry's Request for Admissions, Set Three, August 27, 2021:
     16

Defendants' Responses to Plaintiff Denika Terry's Request for Admissions, Set Four, November 15, 2021:
     17
     26
     31
     32
     33
     34

Defendants' Responses to Plaintiff Denika Terry's Request for Admissions, Set Five, December 16, 2021:
     37
     41
     42
     44
     45
     47
     48
     50

Defendants' Responses to Plaintiff Denika Terry's Request for Admissions, Set Eight, May 1, 2023:

      61

      63

      64

      65

      66

      67

      68

<u>Responses to Requests for Admission Regarding Genuineness of Documents</u>

Defendants' Responses to Plaintiff Roy Huskey III's Requests for Admissions Re Genuineness of Documents, Set One, June 7, 2021:

      1-64

Defendants' Amended Responses to Plaintiff Roy Huskey III's Requests for Admissions Re Genuineness of Documents, Set One, August 27, 2021:

      62 (misnumbered in Defendant's  responses as Request for Admission No. 1)

      63 (misnumbered in Defendant's  responses as Request for Admission No. 2)

      64 (misnumbered in Defendant's  responses as Request for Admission No. 3)

Defendants' Responses to Plaintiff Roy Huskey III's Requests for Admissions Re Genuineness of Documents, Set Two, December 13, 2021:

      65-71

Defendants' Responses to Plaintiff Roy Huskey III's Requests for Admissions Re Genuineness of Documents, Set Three, January 14, 2022:

      72-73

Exhibit M

1 **LEWIS BRISBOIS BISGAARD & SMITH** LLP
JOSEPH A. SALAZAR JR., SB# 169551
2    E-Mail: Joe.Salazar@lewisbrisbois.com
RYAN MATTHEWS, SB# 311674
3    E-Mail: Ryan.Matthews@lewisbrisbois.com
2020 West El Camino Avenue, Suite 700
4 Sacramento, California 95833
Telephone: 916.564.5400
5 Facsimile: 916.564.5444

6 Attorneys for Defendants, WASATCH
PROPERTY MANAGEMENT, INC., LOGAN
7 PARK APARTMENTS, LLC, LOGAN PARK
APARTMENTS, LP, BELLWOOD JERRON
8 HOLDINGS, LLC, BELLWOOD JERRON
APARTMENTS, LP, CAMELOT LAKES
9 HOLDINGS, LLC, HAYWARD SENIOR
APARTMENTS, LP, HERITAGE PARK
10 APARTMENTS, LP, OAK VALLEY
APARTMENTS, LLC, OAK VALLEY
11 HOLDINGS, LP, PEPPERTREE APARTMENT
HOLDINGS, LP, PIEDMONT APARTMENTS,
12 LP, POINT NATOMAS APARTMENTS, LLC,
POINT NATOMAS APARTMENTS, LP,
13 SHADOW WAY APARTMENTS, LP, SPRING
VILLA APARTMENTS, LP, SUN VALLEY
14 HOLDINGS, LTD, VILLAGE GROVE
APARTMENTS, LP, WASATCH QUAIL RUN
15 GP, LLC

16

17                **UNITED STATES DISTRICT COURT**

18              **EASTERN DISTRICT OF CALIFORNIA**

19                  **SACRAMENTO DIVISION**

20

21 UNITED STATES OF AMERICA, ex rel.      CASE NO. 2:15-cv-00799-KJM-DB
DENIKA TERRY, ROY HUSKEY III, and
22 TAMERA LIVINGSTON, and each of them    **DEFENDANT DEPOSITION**
for themselves individually, and for all other  **DESIGNATIONS**
23 persons similarly situated and on behalf of the
UNITED STATES OF AMERICA,               The Hon. Kimberly J. Mueller
24
         Plaintiffs/Relators,           Trial Date:      None Set
25
    vs.
26
WASATCH ADVANTAGE GROUP, LLC,
27 WASATCH PROPERTY MANAGEMENT,
INC., WASATCH POOL HOLDINGS, LLC,
28 CHESAPEAKE APARTMENT HOLDINGS,

LEWIS
BRISBOIS

1  LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN
2  PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD
3  JERRON APARTMENTS, LP, BENT TREE APARTMENTS, LLC, CALIFORNIA
4  PLACE APARTMENTS, LLC, CAMELOT LAKES HOLDINGS, LLC, CANYON CLUB
5  HOLDINGS, LLC, COURTYARD AT CENTRAL PARK APARTMENTS, LLC,
6  CREEKSIDE HOLDINGS, LTD, HAYWARD SENIOR APARTMENTS, LP,
7  HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK
8  VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT
9  APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS
10 APARTMENTS, LP, RIVER OAKS HOLDINGS, LLC, SHADOW WAY
11 APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY
12 HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL
13 RUN GP, LLC, WASATCH PREMIER PROPERTIES, LLC, WASATCH POOL
14 HOLDINGS III, LLC, and DOES 1-4

15            Defendants.

16

17        Pursuant to Local Rules 281(b)(12), Defendant provide the following designations of

18  deposition testimony to be used at trial.  In addition to Cover Pages, Reporter's Certificates and

19  the witness's swearing in, Defendant designate, by page and line number, the testimony of:

20  **Cheryl Syme**

21        8:21—21:15

22        26:14—32:8

23  **Barbara Cavey**

24        7:9—23:30

25        38:1—45:12

26  **Jacqueline Rojas**

27        7:12—27:25

28        45:11—56:14

LEWIS BRISBOIS

1 | **Jodi Parker**

2 |     8:16—27:19

3 |     55:10—59:25

4 |

5 | DATED:  February ___, 2024       LEWIS BRISBOIS BISGAARD & SMITH LLP

6 |

7 |

                  By: _____

8 |                      RYAN MATTHEWS

9 |                      Attorneys for Defendants, WASATCH PROPERTY MANAGEMENT, INC., LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON APARTMENTS, LP, CAMELOT LAKES HOLDINGS, LLC, HAYWARD SENIOR APARTMENTS, LP, HERITAGE PARK APARTMENTS, LP, OAK VALLEY APARTMENTS, LLC, OAK VALLEY HOLDINGS, LP, PEPPERTREE APARTMENT HOLDINGS, LP, PIEDMONT APARTMENTS, LP, POINT NATOMAS APARTMENTS, LLC, POINT NATOMAS APARTMENTS, LP, SHADOW WAY APARTMENTS, LP, SPRING VILLA APARTMENTS, LP, SUN VALLEY HOLDINGS, LTD, VILLAGE GROVE APARTMENTS, LP, WASATCH QUAIL RUN GP, LLC

LEWIS BRISBOIS