Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
Anne Bellows (SBN 293722)
abellows@gbdhlegal.com
Stephanie Tilden (SBN 341486)
stilden@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel: (510) 763-9800 ǀ Fax: (510) 835-1417

Jesse Newmark (SBN 247488)
jessenewmark@centrolegal.org
CENTRO LEGAL DE LA RAZA
3022 International Blvd., Suite 410
Oakland, CA 94601
Tel: (510) 437-1863 ǀ Fax: (510) 437-9164

Lindsay Nako (SBN 239090)
lnako@impactfund.org
Lori Rifkin (SBN 244081)
lrifkin@impactfund.org
Fawn Rajbhandari-Korr (SBN 315888)
fkorr@impactfund.org
Meredith Dixon (SBN 346864)
mdixon@impactfund.org
IMPACT FUND
2080 Addison Street, Suite 5
Berkeley, CA 94704
Tel: (510) 845-3473 ǀ Fax: (510) 845-3654

Attorneys for Plaintiffs and Relators and the Certified Classes
*[Additional Counsel for Relators listed on following page]*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* DENIKA TERRY, ROY HUSKEY III, and TAMERA LIVINGSTON, and each of them for themselves individually, and for all other persons similarly situated and on behalf of the UNITED STATES OF AMERICA<br><br>Plaintiffs/Relators,<br><br>vs.<br><br>WASATCH ADVANTAGE GROUP, LLC, WASATCH PROPERTY MANAGEMENT, INC., WASATCH POOL HOLDINGS, LLC, CHESAPEAKE APARTMENT HOLDINGS, LLC, LOGAN PARK APARTMENTS, LLC, LOGAN PARK APARTMENTS, LP, ASPEN PARK HOLDINGS, LLC, BELLWOOD JERRON HOLDINGS, LLC, BELLWOOD JERRON | Case No.: 2:15-CV-00799-KJM-DB<br><br>CLASS ACTION<br><br>**DECLARATION OF ANNE BELLOWS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FOR REASONABLE FEES, COSTS, AND EXPENSES**<br><br>Date:    January 23, 2025<br>Time:    10:00 a.m.<br>Dept:    Courtroom 3, 15th Floor<br>Before:  Hon. Chief Judge Kimberly J. Mueller |

1  APARTMENTS, LP, BENT TREE
   APARTMENTS, LLC, CALIFORNIA PLACE
2  APARTMENTS, LLC, CAMELOT LAKES
   HOLDINGS, LLC, CANYON CLUB HOLDINGS,
3  LLC, COURTYARD AT CENTRAL PARK
   APARTMENTS, LLC, CREEKSIDE HOLDINGS,
4  LTD, HAYWARD SENIOR APARTMENTS, LP,
   HERITAGE PARK APARTMENTS, LP, OAK
5  VALLEY APARTMENTS, LLC, OAK VALLEY
   HOLDINGS, LP, PEPPERTREE APARTMENT
6  HOLDINGS, LP, PIEDMONT APARTMENTS,
   LP, POINT NATOMAS APARTMENTS, LLC,
7  POINT NATOMAS APARTMENTS, LP, RIVER
   OAKS HOLDINGS, LLC, SHADOW WAY
8  APARTMENTS, LP, SPRING VILLA
   APARTMENTS, LP, SUN VALLEY HOLDINGS,
9  LTD, VILLAGE GROVE APARTMENTS, LP,
   WASATCH QUAIL RUN GP, LLC, WASATCH
10 PREMIER PROPERTIES, LLC, WASATCH
   POOL HOLDINGS III, LLC,
11 and DOES 1-4,

12      Defendants.

13 Andrew Wolff (SBN 195092)
   andrew@awolfflaw.com
14 LAW OFFICES OF ANDREW WOLFF, PC
   1615 Broadway, 4th Floor
15 Oakland, CA 94612
   Tel: (510) 834-3300 | Fax: (510) 834-3377
16
17 Attorneys for Plaintiffs, Relators, and the Certified Classes

18 Lawrence Anthony Organ (SBN 175503)
   larry@civilrightsca.com
19 CALIFORNIA CIVIL RIGHTS LAW GROUP
   332 San Anselmo Avenue,
20 San Anselmo, CA 94960-2610
   Tel: (415) 453-4740 | Fax: (415) 785-7352

21 Attorneys for Relators

22

23

24

25

26

27

28

I, Anne Bellows, declare as follows:

1.      I am a member in good standing of the Bar of the State of California and a partner at the civil rights and class action law firm Goldstein, Borgen, Dardarian & Ho ("GBDH") in Oakland, California.  My firm is lead counsel for Plaintiffs, and we have been appointed Class Counsel in this action along with the Law Offices of Andrew Wolff, PC, Centro Legal de la Raza, and the Impact Fund.  I am providing this declaration in support of Plaintiffs' Motion for Final Approval of the Class Action Settlement (ECF No. 563) and their Motion for Reasonable Fees, Costs, and Expenses, filed herewith.  I have personal knowledge of the facts set forth in this Declaration and could and would testify competently to them.

2.      As lead counsel in this case, I have been closely involved in every aspect of the litigation since my firm joined as co-counsel in approximately March 2019.  The Court appointed me and my firm as Class Counsel on May 21, 2019.  ECF No. 106.  I described my firm's qualifications in the declaration I submitted in support of Plaintiffs' motion for preliminary approval of the class settlement on August 30, 2024.  ECF No. 544-2, ¶¶ 3-5 & Ex. B thereto.

## THE SETTLEMENT

3.      I wholeheartedly recommend final approval of the class settlement.  The settlement achieves a truly outstanding result for the Classes.  It secures complete injunctive relief that puts a decisive and enforceable end to Defendants' collection of excess rent charges from Section 8 tenants.  It also provides full damages and nearly complete prejudgment interest to the Reimbursement Class.  In short, the settlement provides an essentially complete remedy for the Class Claims.  *See generally*, Decl. of Lori Rifkin in Supp. of Pls.' Mot. for Final Approval of Class Action Settlement, Ex. A, Settlement Agreement 5-23, ECF No. 563-2.

4.      Both the injunctive relief and the monetary relief provide a significant financial benefit to Class Members, fully restoring all additional service they paid during the class period and ensuring that from here forward, Defendants' amenity fees will be fully optional for Section 8 tenants and will not be a basis for any eviction notices or other threats of eviction.

5.      The settlement also avoids risk and ensures timely relief by averting the need for trial on the injunctive relief claims, a second phase of the litigation on corporate liability that would

914063.3

1  certainly have been hard fought, Defendants' continued efforts to decertify and dismiss the class

2  claims, and appeal.

3       6.     As of the date of this filing, dozens of Class Members have contacted Class Counsel or

4  the settlement administrator, including to update their addresses and ask questions about the settlement

5  process.  Class member responses have been uniformly positive, and many expressed their

6  appreciation for the settlement.  No one has objected to or opted out of the settlement.  This

7  overwhelming support for the settlement also weighs in favor of final approval.

8  <center>**SERVICE AWARDS**</center>

9       7.     As stated in my declaration support of preliminary approval, I believe the requested

10  service awards are fair and reasonable given the excellent results for the Classes, the efforts taken and

11  sacrifices made by the Class Representatives, and their complete releases of all claims.  *See* ECF No.

12  544-2, ¶¶ 48-50.

13  <center>**ATTORNEYS' FEES, COSTS, AND EXPENSES**</center>

14       8.     GBDH's and Co-Counsel's representation of the Plaintiff and the Certified Classes in

15  this case was on a wholly contingent basis.  Along with our co-counsel, the firm devoted substantial

16  resources to this matter, both in time spent and expenses and costs.

17       9.     Pursuant to our Co-Counsel agreement, any fees, costs, and expenses awarded by the

18  Court on the Class Claims will be distributed among Co-Counsel in proportion with their lodestar, after

19  reimbursement of costs.

20       10.     In the subsections below, I provide: (1) an overview of Class Counsel's fees and costs

21  that are attributable to the Class Claims, i.e., excluding costs and fees attributable to the concurrently

22  litigated FCA claim; (2) GBDH's timekeeping practices and Class Counsel's unified approach to

23  billing judgment, task coding, and allocation of fees between the Class and FCA Claims; (3) the

24  qualifications of GBDH attorneys and staff working on this matter, along with their principle

25  responsibilities; (4) some of the principal litigation tasks handled by GBHD since we joined the case in

26  May 2019, organized by phase of the litigation; and (5) a discussion of factors support a multiplier and

27  upward departure from the benchmark fee award.

28

## OVERVIEW OF CLASS COUNSEL'S FEES, COSTS, AND EXPENSES

11.    Class Counsel's total post-billing judgment lodestar attributable to the Class Claims through November 30, 2024, summarized by biller in the table below and calculated as described in the paragraphs below, is $3,297,856.55.  Of that amount, $3,010,593.17 accrued as of July 27, 2024, the date the Parties filed their Notice of Settlement.  The remaining $287,263.38 attributable to the Class Claims reflects Class Counsel's work negotiating and drafting the final Settlement Agreement, preparing the preliminary and final approval motions, managing settlement notice and the provision of benefit consulting services, and meeting and conferring with Defendants on related issues, including injunctive relief implementation.  Additionally, Plaintiffs estimate that by the time Class Member awards are fully distributed, they will have devoted an additional 80 hours at a blended hourly rate of $500, for an additional estimated lodestar of $40,000, related to completing their work on the instant Motions; communicating with class members, the administrator, and the benefits consulting firm both at the notice and distribution stages; and preparing for and attending the final approval hearing.

| Biller | Position | Years of Experience | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| Law Offices of Andrew Wolff | | | | | |
| Andrew Wolff | Principal | 26 | $ 570 | 175.2 | $99,844.48 |
| David Lavine | Associate | 31 | $ 600 | 64.6 | $38,760.00 |
| Christopher Beatty | Associate | 17 | $ 535 | 34.2 | $18,322.41 |
| Jocelyn Sperling | Associate | 24 | $ 570 | 121.4 | $69,203.70 |
| Brenna Wood Fitzpatrick | Associate | 5 | $ 380 | 28.5 | $10,830.00 |
| Subtotal | | | | 423.9 | $236,960.59 |
| Centro Legal de la Raza | | | | | |
| Jesse Newmark | Litigation Director | 18 | $ 550 | 741.7 | $407,941.88 |
| Henrissa Bassey | Staff Attorney | 9 | $ 460 | 31.0 | $14,246.20 |
| Lee Ann Felder Heim | Paralegal | 3 | $ 150 | 45.9 | $6,882.75 |
| Subtotal | | | | 818.6 | $429,070.83 |
| Goldstein Borgen Dardarian & Ho | | | | | |
| Ho, Laura | Shareholder | 30 | $ 695 | 342.7 | $238,185.19 |
| Bellows, Anne | Partner | 11 | $ 495 | 1,723.3 | $853,033.50 |
| Burzynski, Kristen | Associate | 8 | $ 450 | 238.3 | $107,238.38 |
| Holtzman, Beth | Associate | 7 | $ 440 | 108.3 | $47,652.00 |
| Tilden, Stephanie | Associate | 3 | $ 345 | 736.6 | $254,120.96 |
| Malavé, Celina | Associate | 2 | $ 320 | 99.7 | $31,904.80 |
| Grimes, Scott | Statistician | 20 | $ 250 | 48.3 | $12,065.00 |

| Biller | Position | Years of Experience | Hourly Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| Grimes, Scott | Paralegal | 35 | $ 200 | 557.6 | $111,520.50 |
| Valdez, Damon | Paralegal | 21 | $ 200 | 515.7 | $103,132.00 |
| Giannini, Christian | Paralegal | 5 | $ 100 | 289.8 | $28,979.75 |
| Chakraborty, Gouri | Case Clerk | 3 | $ 75 | 36.7 | $2,750.25 |
| Bressler, Alexader | Law Clerk | | $ 150 | 28.7 | $4,303.50 |
| Turner, Carson | Law Clerk | | $ 150 | 69.3 | $10,395.38 |
| Subtotal | | | | 4,794.9 | $1,805,281.20 |
| Impact Fund | | | | | |
| Jocelyn Larkin | Of Counsel & former Executive Director | 41 | $ 695 | 25.9 | $17,991.81 |
| Lindsay Nako | Executive Director | 19 | $ 550 | 551.1 | $ 303,128.38 |
| Lori Rifkin | Litigation Director | 20 | $ 550 | 240.9 | $ 132,506.00 |
| Fawn Rajbhandari-Korr | Training Director & Staff Attorney | 12 | $ 495 | 247.1 | $ 122,312.03 |
| David Nahmias | Staff Attorney | 6 | $ 410 | 59.8 | $ 24,499.55 |
| Andrea Núñez | Fellow | 4 | $ 360 | 47.5 | $ 17,100.00 |
| Rianna Hidalgo | Fellows | 3 | $ 345 | 178.9 | $ 61,715.33 |
| Meredith Dixon | Staff Attorney | 2 | $ 320 | 368.7 | $ 117,997.60 |
| Cameron Hub | Law Clerk | | $ 150 | 6.8 | $ 1,026.00 |
| Rodolfo Centeno | Law Clerk | | $ 150 | 28.0 | $ 4,203.75 |
| Anna Chau | Paralegal | 3 | $ 100 | 47.3 | $ 4,731.00 |
| Kat Vidt | Paralegal | 3 | $ 100 | 41.3 | $ 4,127.75 |
| Luna Khalil | Paralegal | 3 | $ 100 | 152.0 | $ 15,204.75 |
| **Subtotal** | | | | **1,995.4** | **$ 826,543.94** |
| **Grand Total** | | | | **8,032.8** | **$ 3,297,856.55** |

12.     In my opinion, the work completed by GBDH and Co-Counsel underlying these billing records was reasonably necessary to the prosecution of the Class Claims and contributed to the excellent result obtained in the settlement.

13.     A chart summarizing the out-of-pocket costs and expenses incurred by Class Counsel in connection with litigating the Class Claims is set out below.  Including some minor additional estimated costs for legal research related to these Motions and travel for the final approval hearing, Class Counsel's costs attributed to the Class Claims total approximately **$312,000.**  The chart below is based on Co-Counsel's collaborative review of each item of cost incurred by any of the Class Counsel.

First, we excluded any costs solely relevant to the non-Class FCA Claims, for example fees paid to a jury consultant in preparation for the FCA jury trial.  Second, for all costs solely attributable to the Class Claims, such as costs related to the two rounds of pre-settlement class notice, we attributed 100% of those costs to the Class Claims.  Finally, we attributed to the Class Claims half of all costs and expenses that were generally applicable to both class and non-class claims, such as all of our expert fees.

| Cost Type | Cost Amount |
|---|---|
| Copy | $  3,076.54 |
| Court Fees/Filing Fees | $  3,549.51 |
| Court Reporters/Transcripts | $  46,680.57 |
| Document download | $  107.30 |
| Expert Witness/Consultant | $  159,464.38 |
| Federal Express and UPS | $  80.44 |
| In-House Postage | $  17.50 |
| In-house printing | $  1,343.40 |
| Meals | $  498.94 |
| Mediation | $  13,273.75 |
| Research - Online | $  17,945.20 |
| Service Fees | $  1,808.83 |
| Telephone | $  122.51 |
| Travel - airline/car/mileage/taxi/gas | $  1,517.27 |
| Travel - Lodging | $  879.22 |
| Research - Other | $  29.90 |
| Document Storage and Review Software | $  33,046.79 |
| Class Notice | $  28,465.98 |
| **Grand Total** | **$  311,908.00** |

14.     In my opinion, the costs and expenses listed above were reasonably necessary to the prosecution of the Class Claims and contributed to the excellent result obtained in the settlement.

**Time-Keeping Practices, Attribution of Fees, Billing Judgment, and Task Coding**

15.     All attorneys and legal staff at GBDH are instructed to maintain contemporaneous time records, to one-tenth of an hour, reflecting the time spent on this and other matters.  I have personally reviewed the thousands of time entries billed to this matter.  A great many of GBDH"s time records in this matter contain confidential attorney work-product.  Should the Court wish to review the time records, my firm is prepared to submit them *in camera* to avoid disclosure of protected material.

16.     In preparing the Motion for Fees, Costs, and Expenses filed herewith, Class Counsel developed and implemented a set of protocols to (1) allocate time between the Class Claims and the FCA claim, (2) apply billing judgment to fees related to the Class Claims, and (3) code entries to reflect the category of tasks at issue.  I participated in and supervised the application of these protocols, which underly the lodestar calculations for the Class Claims set out in this Declaration.

17.     ***Allocation Between Class and FCA Claims.***  To calculate hours attributable to the Class Claims, we first identified at a high level the litigation tasks completed by Class Counsel that were solely relevant either to the Class Claims to the FCA claim.  All remaining work was divided between the Class Claims and the FCA, with 50% of the hours and corresponding fees attributed to the lodestar for the Class Claims.

18.     Tasks solely relevant to the state law claims and class procedures were attributed 100% to the Class Claims, including the following categories of tasks:

a.     Research and briefing for the motion for class certification in 2017, and opposing Defendants' Rule 23(f) petition in 2018;

b.     Meet and confer and motion related to the class list, class notice, and class definition in 2019;

c.     Managing the class notice process in 2020, including ensuring that the class list was complete through analysis and meet and confer efforts, coordinating with the administrator, and communicating with class members related to the notice and the case;

d.     Amending the class certification order in January 2022 to incorporate additional Defendants;

e.     Discovery related to Defendants' argument that the class damages should be reduced to reflect the costs associated with some of the services, including a Rule 30(b)(6) deposition on this topic in May 2023 and the deposition of Defendants' disclosed damages expert on this issue, James McCurley;

f.     Discovery efforts in 2023 related to updating the class list, including expert analysis regarding this issue;

g.      All work related to Plaintiffs' motion for partial summary judgment on the issue of class damages;

h.      Opposing Defendants' motion to dismiss the state law claims on supplemental jurisdiction grounds in June and July 2024;

i.      Research and memoranda related to state law claims, class procedures, and injunctive relief, identified through word searches;

j.      Drafting the settlement notice, working with CAG to secure benefits resources and consulting for class members, and managing the settlement notice process, including communicating with class members;

k.      Analyzing and communicating with Defendants regarding their implementation of the Settlement Agreement's injunctive relief provisions; and

l.      Preparing the motion for preliminary approval, the motion for final approval, and the motion for fees, costs, and expenses on the Class Claims.

19.     Additionally, we identified tasks solely relevant to the FCA claim and excluded associated time records from the lodestar calculations for the Class Claims.  Time records excluded on this basis include:

a.      Legal research and memos regarding the legal standards and particular procedural issues related to the False Claims Act, including work identified through word searches for "FCA" and "False Claims Act."

b.      All time billed by Lawrence Organ and his firm, the California Civil Rights Group (CCRLG), who were brought on by Plaintiffs to assist with the jury trial on the FCA claim.

c.      All work related to jury instructions or the verdict form.

d.      Time related to negotiating and coordinating the relators' award under the Settlement Agreement and the Relators' Share Agreement.

20.     The great majority of our work addressed factual, legal, and procedural issues common to both Class and FCA claims, such as: developing the record regarding Defendants' policies and practices related to additional service charges, including pursuing all relevant forms of discover;, analyzing federal and public housing authority guidance and documents on relevant issues; conducting

legal research on and briefing the core legal issues in the case; negotiating the stipulation to bifurcate the litigation; all of Plaintiffs' expert disclosures (each of which addressed issues relevant to both the Class and FCA claims); briefing on all motions other than the class-specific motions listed above; and trial preparation not tied to jury procedures.  Accordingly, for all remaining time records, fifty percent of the hours and corresponding lodestar were attributed to the Class Claims.

21.     Based on these allocations, we calculated that Class Counsel devoted 9,398.8 hours, prior to billing judgment, to the Class Claims.  Class Counsel's time attributable to the FCA Claims is 8,174.1 hours, prior to billing judgment; in addition, trial counsel at CCRLG devoted more than 700 hours to the FCA Claims.

22.     ***Billing Judgment.***  In preparation for their application for fees and costs, Class Counsel adopted a uniform set of rules to guide billing judgment on time attributable to the Class Claims. Applying those rules, we made the following cuts:

a.     For attendance depositions and hearings, we limited billing to one first-chair and one-second chair attorney, except when more than two attorneys presented at a hearing (*e.g.*, the July 11, 2024 motion in limine hearing);

b.     For attendance at meetings, each organization limited billing to a maximum of one partner-level attorney and one associate-level attorney, cutting time for staff and other attorneys working on the matter even though their involvement was often important;

c.     Each organization cut time devoted to onboarding new staff onto the case;

d.     All organizations excluded administrative time, including filing and serving documents and updating the case calendar;

e.     All organizations excluded time related to negotiating and drafting co-counsel agreements, coordinating payment of costs among counsel, and reviewing invoices, calling vendors, and making cost payments;

f.     All time related to media regarding the case was eliminated;

g.     All .1 time records were cut;

1      h.     All time billed by attorneys or staff who spent less than 50 hours total on the
2    case was cut (note, however, that we did still include staff who worked less than 50 hours attributable
3    to the Class Claims if they worked more than 50 hours *total* including attributable to the FCA Claim);

4      i.     Additionally, each Co-Counsel organization made further line-item cuts in the
5    exercise of their own billing judgment.

6    23.     In total, this line-item billing judgment excluded 943 hours, corresponding to
7    $335,349.75 in fees, from the lodestar attributable to Class Counsel's work on the Class Claims.

8    24.     In addition to line-item billing judgment, we applied an additional 5% across-the-board
9    cut to our fees, reducing the lodestar by a further $173,571.40.

10    25.     Together, this resulted in a total cut of $509,011.15 from our lodestar, or 13.4% of our
11    pre-billing judgment lodestar of $3,806,867.70.

12    26.     ***Task Coding.***  Additionally, all Class Counsel applied a unified task-coding system to
13    our billing records to document the distribution of our time across the many categories of litigation
14    tasks undertaken over the last decade.  Attached hereto as **Exhibit 1** is a table listing and defining the
15    task codes we used.  Our task code system is based on the ABA Uniform Task Based Management
16    System and tailored to this case.

17    27.     Using these task codes, Class Counsel's hours and lodestar related to the Class Claims,
18    after billing judgment, is summarized in the table below:

| Task Code | Task Description | Hours | Lodestar |
|---|---|---|---|
| L100 | Case Administration | 60.8 | $ 29,552.36 |
| L110 | Fact Investigation | 505.7 | $ 151,930.18 |
| L120 | Analysis, Strategy, and Legal Research | 527.4 | $ 216,766.58 |
| L130 | Experts & Consultants | 173.4 | $ 84,313.45 |
| L160 | Settlement | 470.8 | $ 235,783.59 |
| L210 | Pleadings | 297.7 | $ 132,205.30 |
| L230 | Court Mandated Conferences | 33.3 | $ 17,496.15 |
| L240 | Summary Judgment Motions | 690.4 | $ 287,872.33 |
| L250 | Other Written Motions or Submissions | 113.3 | $ 46,900.79 |
| L260 | Class Action Procedures | 965.4 | $ 464,876.56 |
| L300 | Other Discovery | 290.3 | $ 139,134.27 |
| L310 | Written Discovery | 74.1 | $ 32,953.60 |
| L320 | Requests for Production and Document Productions | 170.2 | $ 70,060.13 |

914063.3

| Task Code | Task Description | Hours | Lodestar |
|---|---|---|---|
| L325 | Document review | 805.7 | $ 187,773.91 |
| L330 | Depositions | 619.5 | $ 271,853.19 |
| L340 | Expert Depositions | 79.2 | $ 35,623.34 |
| L350 | Discovery Motions | 204.4 | $ 85,351.33 |
| L410 | Trial Preparation Re Fact Witnesses | 415.2 | $ 166,313.41 |
| L420 | Trial Preparation Re Expert Witnesses | 110.2 | $ 51,903.25 |
| L430 | Written Motions or Submissions for Trial | 522.6 | $ 218,690.95 |
| L440 | Other Trial Preparation and Support | 727.5 | $ 290,599.06 |
| L450 | Trial and Hearing Attendance | 47.8 | $ 20,620.46 |
| L460 | Post-Trial Motions | 128.0 | $ 59,282.38 |
| **Total** | | **8,032.8** | **$ 3,297,856.55** |

### GBDH's Attorneys' Fees Attributable to the Class Claims

28.     My firm and I served as lead counsel in this case beginning with our appointment as Class Counsel in May 2019.  Over more than five and a half years, we were at the front line of litigating this hard-fought and important case, ultimately securing a truly outstanding result for the classes.

29.     The experience level and position of the billers, and a short summary of their contributions to the case, are as follows:

a.     Laura Ho has been a shareholder at the GBDH since 2005.  She has been practicing law for 30 years.  Ms. Ho's and the firm's credentials and experience are detailed in my Preliminary Approval Declaration.  *See* Bellows Prelim. Decl. ¶¶ 3, 5 & Ex. B.  Ms. Ho served as senior counsel in this case, supervising my work and the work of other GBDH staff.  In addition to provide strategic guidance on all litigation tasks based on her considerable expertise in complex class action litigation, she took a leading role in mediation preparation, settlement talks, and overseeing the preliminary and final approval process.

b.     I joined GBDH as an associate in 2017 and became a partner in 2022.  I graduated from Berkeley Law in 2013, after which I served as the Civil Rights Fellow at a nationally prominent fair housing firm, Relman, Dane & Colfax, LLC, and clerked for the Honorable Eric L. Clay on the U.S. Court of Appeals for the Sixth Circuit.  I also practiced fair housing law at Public Advocates, Inc. in San Francisco, focusing on issues related to tenant displacement.  On this matter, I

had primary responsibility for running the litigation and carrying out a significant share of litigation tasks over the course of this case, including leading discovery, meet and confer efforts, briefing, and trial preparation.  I took numerous depositions, handled all data discovery, worked with both of Plaintiffs' disclosed experts, and led and collaborated closely with Class Counsel on every aspect of their work.

   c. Beth Holtzman is a former associate at the firm and graduated from Northwestern University Pritzker School of Law in 2017.  Ms. Holtzman was responsible for drafting class notice,  responding to Class Member inquiries, drafting written discovery requests, and analyzing record evidence to guide further discovery.  She also contributed to document review.

   d. Kristen Burzynski is a former associate at the firm and graduated from the University of California, Irvine School of Law in 2016.  Ms. Burzynski was responsible for interviewing class members, researching legal and factual issues related to Defendants' corporate structure and vicarious liability, drafting written discovery requests, reviewing Defendants' document productions, and drafting declarations from class members.

   e. Stephanie Tilden is an associate at the firm and graduated from the University of California, Berkeley School of Law in 2021.  She contributed to every aspect of the litigating the case since joining the team in 2021.  During both merits and remedies discovery, she assisted with drafting discovery requests, document review, and drafting motions to compel. She analyzed the factual record and drafted several proposed fact stipulations regarding Defendants' standard policies and practices, which Defendants ultimately refused to sign.  She was the primary drafter of the stipulation amending the class certification order.  She assisted with drafting our motion for partial summary judgment on liability.  Ms. Tilden deposed Defendants' expert on class damages and played a leading role in drafting Plaintiffs' successful motion for partial summary judgment regarding remedies.  She also made extensive contributions to trial preparation and pretrial briefing.

   f. Celina Malavé is a former associate at the firm and graduated from Stanford Law School in 2022.  She was responsible for researching injunctive relief issues to guide remedies discovery and case strategy.  She drafted a motion for leave to take additional depositions, but we were able to reach a stipulation with Defendants shortly before our planned filing.  She also drafted the

1   revisions in the Sixth Amended Complaint and was the primary drafter on the motion for leave to
2   amend the complaint which was filed on August 18, 2023. ECF NO. 314.

3          g.      Former GBDH summer law clerks Carson Turner and Alexander Bressler also
4   worked on the Class Claims. Carson Turner graduated University of California, Berkeley School of
5   Law in 2022, and Alexander Bressler graduated from Stanford Law School in 2024. Both law clerks
6   contributed to legal research, document review, and other discrete litigation tasks.

7          h.      Scott Grimes and Damon Valdez are both experienced paralegals with 35 and 32
8   years of litigation experience, respectively. Mr. Grimes, in addition to his role as a senior paralegal,
9   also has an M.S. in statistics. In his capacity as a statistician, he analyzed defendants' data productions
10  for a variety of purposes related to litigation, settlement, and class notice. At the time that Christian
11  Giannini worked on this case, he was also a paralegal at GBDH; he has since graduated from UCLA
12  School of Law and returned to GBDH as an associate. Gouri Chakraborty is a case clerk at GBDH.

13         30.     GBDH's usual and customary hourly rates in the San Francisco Bay Area range from
14  $625 to $1225 for the attorneys listed above, and for the other staff from $375 to $525 at the high end
15  for Mr. Grimes in his position as statistician. GBDH's hourly rates have been previously approved by
16  numerous courts. *See, e.g.*, *Lopes et al. v. Kohl's Department Stores, Inc.*, No. RG08380189 (Alameda
17  Cty Super. Ct. Sept. 10, 2024) (approving attorney-fee award based on GBDH's 2024 hourly rates);
18  *Lawson v. Consumer Portfolio Services, Inc.*, No. 30-2018-01021149-CU-OE-CQC (Orange Cty.
19  Super. Ct. Oct. 8, 2024) (approving attorney-fee award based on GBDH's 2023 hourly rates); *Reni et*
20  *al. v. Reach Medical Holdings, LLC et al.*, No. RG20072101 (Alameda Cty. Super. Ct. Sept. 21, 2023)
21  (approving attorney-fee award exceeding lodestar based on GBDH's 2023 hourly rates); *Githieya v.*
22  *Global Tel Link Corp.*, No. 1:15-cv-0986-AT, ECF No. 369 (N.D. Ga. Aug. 30, 2022) (finding
23  GBDH's 2022 rates "reasonable and appropriate" and the fees and expenses sought "also reasonable
24  and appropriate in light of the successful result they have achieved"); *Lashbrook v. City of San Jose*,
25  No. 5:20-cv-01236-NC, ECF No. 25 (N.D. Cal. Sept. 2, 2020) (ruling that GBDH's 2020 rates were
26  "within the market range of hourly rates charged by attorneys of comparable experience, reputation,
27  and ability for similar litigation"); *Nevarez et al. v. Forty Niners Football Company, LLC, et al.*, No.
28

1  5:16-cv-07013-LHK, ECF No. 416 (N.D. Cal. Jul. 23, 2020) (approving GBDH's 2019 rates and

2  awarding full lodestar, adjusted by an upward multiplier of 1.124).

3        31.     However, in seeking fees for the Class Claims in the instant case, all Class Counsel

4  have substantially lowered our hourly rates to be in line with rates approved by the Eastern District of

5  California.  Accordingly, the hourly rates used to calculate GBDH's lodestar for purposes of the Class

6  Claims are:

| GBDH | | |
|---|:---:|:---:|
| **Attorney or Biller** | **Years of Experience** | **Hourly Rate** |
| Laura Ho, Shareholder | 30 | $695 |
| Anne Bellows, Partner | 11 | $495 |
| Kristen Burzynski, Associate | 8 | $450 |
| Beth Holtzman, Associate | 7 | $440 |
| Stephanie Tilden, Associate | 3 | $345 |
| Celina Malavé, Associate | 2 | $320 |
| Scott Grimes, Statistician | 20 | $250 |
| Scott Grimes, Paralegal | 35 | $200 |
| Damon Valdez, Paralegal | 21 | $200 |
| Christian Giannini, Paralegal | 5 | $100 |
| Gouri Chakraborty, Case Clerk | 3 | $75 |
| Law Clerks | | $150 |

16       32.     The table below shows the breakdown of GBDH's hours spent on the Class Claims by

17  task category.  These hours exclude time deducted in the exercise of billing judgment reflected above.

| Task Code | Description | Hours | Lodestar |
|---|---|---|---|
| L100 | Case Administration | 16.4 | $ 7,765.06 |
| L110 | Fact Investigation | 359.6 | $ 101,272.38 |
| L120 | Analysis, Strategy, and Legal Research | 281.3 | $ 121,700.46 |
| L130 | Experts & Consultants | 142.3 | $ 68,210.48 |
| L160 | Settlement | 190.0 | $ 88,721.45 |
| L210 | Pleadings | 144.4 | $ 53,578.58 |
| L230 | Court Mandated Conferences | 15.3 | $ 7,653.68 |
| L240 | Summary Judgment Motions | 474.3 | $ 191,496.96 |
| L250 | Other Written Motions or Submissions | 71.3 | $ 28,916.58 |
| L260 | Class Action Procedures | 425.6 | $ 181,648.31 |
| L300 | Other Discovery | 217.4 | $ 101,531.96 |
| L310 | Written Discovery | 56.8 | $ 26,013.85 |
| L320 | Requests for Production and Document Productions | 141.5 | $ 58,068.99 |
| L325 | Document review | 673.8 | $ 139,066.94 |
| L330 | Depositions | 261.3 | $ 114,408.98 |

| Task Code | Description | Hours | Lodestar |
|-----------|-------------|-------|----------|
| L340 | Expert Depositions | 47.1 | $ 19,358.15 |
| L350 | Discovery Motions | 150.9 | $ 60,054.01 |
| L410 | Trial Preparation Re Fact Witnesses | 186.1 | $ 68,736.30 |
| L420 | Trial Preparation Re Expert Witnesses | 17.3 | $ 7,978.58 |
| L430 | Written Motions or Submissions for Trial | 378.8 | $ 149,784.60 |
| L440 | Other Trial Preparation and Support | 402.9 | $ 145,644.98 |
| L450 | Trial and Hearing Attendance | 28.8 | $ 12,152.16 |
| L460 | Post-Trial Motions | 111.7 | $ 51,517.79 |
| **Total** | | **4,794.9** | **$ 1,805,281.20** |

33.     The hours spent by GBDH attorneys and staff reflect time reasonably necessary for the litigation of the case and contributed in great measure to the ultimate successful outcome.

34.     Below, I describe some of GBDH's major tasks on this case.

**Discovery, Bifurcation, and Summary Judgment (Nov. 2018 through Nov. 2022)**

35.     GBDH joined the case in the spring of 2019, after Centro Legal de la Raza and the Law Offices of Andrew Wolff had already achieved class certification.

36.     At the time, Defendants were refusing to produce the class list claiming that Plaintiffs should be required to compile the list themselves from the over 350,000 pages of scanned tenant files that Defendants had produced two years earlier.  I immediately began working on this issue with Jesse Newmark.  I drafted a meet and confer letter to Defendants outlining their duty to compile the class list under *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 356-57 (1978), Plaintiffs' valid discovery request for the list, and deposition testimony from the class certification phase describing that the tenant files were incomplete and noting the existence of a centralized Yardi property management database that stored the relevant information.

37.     The letter and related meet and confer efforts succeeded in persuading Defendants to produce the class list.  My office also drafted class notice and obtained Defendants' agreement to the notice and Plaintiffs' proposed notice procedures.  After weeks of delay, Defendants raised several last-minute concerns related to the class list, including concerns about class member privacy and their disagreement with our position that the class period began in April 2011.  Plaintiffs endeavored to resolve as many points of dispute as we could, but the Parties reached an impasse on the class

definition.  Accordingly, I drafted Plaintiffs' motion for clarification and/or amendment of the class definition and for class notice, which was filed on June 14, 2019.  ECF No. 107.

38.     In the early months of our work on the case, we also discussed mediation with Defendants.  However, after we provided a list of mediators, Defendants declined to schedule a mediation and indicated that they wanted to wait until summary judgment to engage in any settlement talks.

39.     After the Court granted Plaintiffs' motion for clarification of the class definition on January 15, 2020 (ECF No. 115), GBDH worked with opposing counsel to obtain a complete and correct class list, a task that required iterative data productions.  GBDH then coordinated the notice process with the class administrator.  We established a dedicated phone line and email for the case, which were provided in the class notice, and fielded questions from Class Members about the case.

40.     GBDH also led discovery efforts from joining the case through the close of remedies discovery, while working closely with co-counsel.  Nearly all discovery requests that Plaintiffs propounded during merits discovery were initially drafted by myself or by a GBDH associate, with input from co-counsel.  During merits discovery, Plaintiffs propounded 104 requests for production, 48 interrogatories, 60 requests for admission, and 71 requests for admission regarding authenticity.

41.     I had primary responsibility for handling meet and confer efforts with Defendants.  I drafted numerous meet and confer letters and emails, and for most of the discovery period I maintained a weekly standing call with opposing counsel.  Notwithstanding our regular call, Defendants were frequently unresponsive to Plaintiffs' discovery efforts, for example taking weeks to respond to a proposal or promising to make productions or serve updated discovery responses but failing to follow-through in a timely way (or at all).

42.     GBDH associate Stephanie Tilden and I drafted multiple motions to compel and joint statements related to document production issues as well as written discovery.  GBDH also provided strategic input and modest edits on the motions to compel drafted by Impact Fund.

43.     Our efforts to obtain document and data production required extensive meet and confer efforts and multiple motions to compel.  From the outset of merits discovery, we sought production of data related to additional service charges and Section 8 tenants from Defendants' centralized property

management database, but encountered a refusal by Defendants to extract that data in any useable form.  Eventually, in approximately January 2021, we were able to resolve the impasse by working collaboratively with Defendants to hire a joint third-party expert to manage the identification and production of responsive data.  I led all aspects of Plaintiffs' data discovery, including extensive and iterative work with the joint data expert to identify and produce data relevant to the Class Claims.  This project continued throughout 2021 and into January 2022 (and resumed again during remedies discovery).

44.     We also sought production of Defendants' electronically stored documents.  I worked extensively with opposing counsel on this issue over months, identifying relevant custodians, and proposing and narrowing search protocols.  This process was repeatedly delayed by Defendants.  Eventually, after significant persistence and effort on my part, Defendants agreed to begin production.  However, they chose to produce a high volume of electronically documents without first reviewing for responsiveness, resulting in the production of over 2.5 million pages of documents in several hard drives delivered to GBDH offices.

45.     I was primarily responsible for managing the document review process in which all of Co-Counsel participated.  GBDH senior paralegal Scott Grimes coordinated all technical aspects of this project not just for GBDH but for each Co-Counsel organization.  Our document review provided crucial insights and evidence regarding Wasatch's practices, knowledge, and actions related to Section 8 tenants and additional service charges.

46.     From the time we joined the case, GBDH also took the lead on organizing, analyzing, and reviewing the voluminous tenant files that had previously been produced by Defendants, building on the work completed by our co-counsel at Centro Legal de la Raza and the Law Offices of Andrew Wolff.  The time-consuming review and analysis of tenant files conducted by Class Counsel, including my firm, yielded invaluable evidence for the case, assisting us in identifying and proving key standardized practices across the Wasatch's properties, providing documentary support for tenant witness testimony, and enabling us to cross-check the class list to identify missing tenants.

47.     Nearly every paralegal, law clerk, or junior attorney on the case team at GBDH spent time assisting with document review of either the ESI productions or the voluminous tenant files, or

914063.3

both.  I personally spent many hours reviewing and analyzing documents from both sources.  Class Counsel's document review proved to be a crucial source of evidence for proposed fact stipulations, deposition outlines, discovery requests, evidence supporting our summary judgment motions, and eventually exhibits for trial.

48.     During merits discovery, Plaintiffs requested that Defendants update their tenant file production, which was limited to tenant files before 2017.  Defendants declined to do so.  Through meet and confer, Plaintiffs proposed that in place of the supplemental document production, the Parties stipulate to a number of standard forms and practices.  Opposing counsel was receptive to this idea. GBDH took on the project of developing the stipulation, including attaching exemplars from the existing tenant files production.  After we provided the draft stipulation, Defendants dragged their feet in responding and then eventually refused to sign.  We proposed a more limited stipulation addressing the key issue of washer and dryer charges, but Defendants again dragged their feet in responding then ultimately refused to sign.

49.     GBDH took a leading role in merits discovery depositions.  I took the following depositions:  former Chief Operating Officer of Wasatch Property Management ("WPM") Jarom Johnson (July 19, 2021, November 10, 2021), fact and Rule 30(b)(6) depositions of WPM President Janae Jarvis (September 10 & 14, 2021), fact and Rule 30(b)(6) depositions of WPM Executive Vice President Shawn Fetter (October 27 and 28, 2021), former WPM Chief Operating Office Bradley Mishler (November 19, 2021), and outside counsel David Scharlach (December 8, 2021)

50.     During Jarom Johnson's July 2021 deposition, Defendants waived attorney-client privilege related to Section 8 tenants and additional service charges, enabling Plaintiffs to obtain previously withheld documents and depose in-house and outside counsel, yielding important evidence in support of Plaintiffs' claims.

51.     In Spring 2021, a discovery dispute arose related to Plaintiffs' discovery efforts regarding Defendants' corporate structure.  Defendants lodged objections and flatly declined to provide productions and interrogatory responses to most of the discovery served on the issue.  Their sole substantive response was to list, for the first time in the litigation, the names of the entities that owned the properties where California class members lived

52.     Through meet and confer with opposing counsel, Class Counsel resolved the impasse by agreeing with Defendants to bifurcate the case and defer the corporate structure issues to a subsequent phase.  I led this meet and confer effort with significant research and drafting assistance from David Nahmias at the Impact Fund and strategic input and guidance from the rest of the Class Counsel team.

53.     In the same stipulation, the Parties agreed to the filing of the Fifth Amended Complaint to add the previously undisclosed owner entities as Defendants (replacing Doe defendants) and add further detail to Plaintiffs' vicarious liability allegations.  Opposing counsel informed me that he would represent the new Defendants; however, he did not execute a waiver of service form I provided him. As a result, my office expended numerous hours and significant service fees to accomplish personal service on the new entities, coming up against problems caused by outdated contact information or other difficulties locating and serving registered agents.  I drafted a motion for extension of time to effect service (ECF No. 153), which was granted by the Court on November 23, 2021.

54.     After all Defendants were served, GBDH negotiated a stipulation to amend the class certification order to formally incorporate the new defendants, which was signed by the Court on January 25, 2022.  *See* ECF Nos. 220, 226.

55.     Class Counsel also worked to develop the record through investigation and research. During the merits discovery period, we undertook a project of interviewing dozens current and former Section 8 tenants at Wasatch properties to gather information about Defendants' practices and identify potential trial witnesses.  GBDH drafted the interview scripts, identified tenants, pulled their tenant files from the production, coordinated the interviews, and conducted a significant number of the interviews.  All Co-Counsel organizations participated in the interview project.  Eventually, more than twenty tenants agreed to be disclosed as potential trial witnesses.

56.     Class Counsel, including GBDH, also conducted extensive research regarding the U.S. Department of Housing and Urban Development's policies and practices related to the Section 8 program.  In addition, because Defendants were contending that local housing authorities approved of their practices, we also gathered and analyzed dozens of administrative plans published by those local agencies.  Additionally, we conducted in-depth legal research on all aspects of the Class Claims.

57.     I was the lead attorney working with Plaintiffs' forensic accounting expert, David Breshears, with the participation of our staff statistician Scott Grimes and GBDH shareholder Laura Ho.  We disclosed an expert report by Mr. Breshears on January 28, 2922, and a second rebuttal report by him on February 25, 2022.  I also drafted a fact stipulation describing and providing definitions for the data produced by the joint expert, which formed the basis for Mr. Breshears' analyses.  *See* ECF No. 242-4.

58.     GBDH led Plaintiffs' motion for partial summary judgment regarding liability.  I was the primary drafter of our memorandum of points and authorities and supervised every other aspect of the filing.  Stephanie Tilden and I worked together on the separate statement of undisputed facts, and Ms. Tilden carefully compiled an extensive factual record to support the motion.  Defendants eventually admitted nearly every fact that Plaintiffs put forward, including numerous facts that had been proposed in Plaintiffs' proposed fact stipulations based on Section 8 tenant files.  I was also the lead drafter on the reply brief in support of our motion.

59.     Impact Fund took the lead on opposing Defendants' cross-motion for summary judgment, or in the alternative, decertification.  As lead counsel, I participated actively in the strategy discussions related to that brief and contributed edits.  GBDH also drafted major portions of the declaration supporting Plaintiffs' responses to Defendants' statement of undisputed facts and our further statement of disputed facts and provided extensive support in compiling the evidence.

60.     I argued the cross motions at the hearing on July 8, 2022.  The Court granted Plaintiffs' motion in its entirety, and denied Defendants' motion, on November 22, 2022. ECF No. 278.

61.     In total, GBDH devoted 2,761.8 hours to the Class Claims during this period, after the exercise of billing judgment described above.  Collectively, Class Counsel devoted 3,698.1 hours to the Class Claims during this period, after billing judgment.

### Remedies Discovery, Summary Judgment on Class Damages, and Initial Trial Preparation (Dec. 2022 through Feb. 1, 2024)

62.     Shortly after the Court's summary judgment ruling, I contacted opposing counsel to discuss mediation, whether Defendants would be altering their policies to come into compliance, and a timeline for the contemplated remedies discovery period.

914063.3

63.    Defense counsel informed me that Defendants were immediately implementing changes, but did not provide any detail, requiring Plaintiffs to conduct formal discovery on the issue. Defense counsel stated they were willing to consider mediators, but after we provided a list Defendants again declined to schedule a mediation. Defendants also disclosed that they would seek to reduce class damages based on their alleged costs of providing the additional services. As a result, it became apparent that the brief remedies discovery period that Plaintiffs had envisioned as limited to data updates and damages calculations instead would involve significant discovery on Defendants' practices and alleged costs.

64.    In a letter to Defendants dated February 9, 2024, Class Counsel outlined the lack of legal merit in their position that class damages should be reduced based on their alleged costs. A true and correct copy of this letter is attached hereto as **Exhibit 2**. We explained, "[b]ecause Defendants' costs in providing the services have no bearing on any damages calculation, they will not be admissible at trial. And the road to that ruling will be time-consuming and expensive." We requested that Defendants relinquish their argument in a formal stipulation. In the event they chose not to do so, we cautioned that they "will not only incur their own attorneys' fees and expert costs to litigate this issue, but they will also cause Plaintiffs to expend significant attorney time and costs on the discovery, expert work, and briefing necessary to counter Defendants' position."

65.    Defendants eventually agreed to a stipulation relinquishing their costs argument for the FCA claim (ECF No. 304), but they continued to pursue a reduction of class damages on that basis. Accordingly, Class Counsel conducted fact discovery on this issue, led by Lindsay Nako at the Impact Fund

66.    Class Counsel also sought to work with Defendants to ensure complete implementation of the policy changes needed to come into compliance. After we reviewed their preliminary document production regarding proposed policy changes, on February 21, 2023, we wrote Defendants a letter outlining the further changes that were required for them to come into full compliance with the Court's summary judgment ruling. A true and correct copy of this letter is attached hereto as **Exhibit 3**. We offered to work with them to ensure that the necessary changes were fully implemented. Defendants

did not take us up on that offer.  Notably, the eventual injunctive relief secured by the settlement mirrors the changes we requested in February 21, 2023.

67.     As we were pursuing discovery in January and February 2023, we also began preparing for the Court-ordered settlement conference.  I drafted significant portions of our settlement conference statement and put together a preliminary draft term sheet with input from Laura Ho and co-counsel.  I also supervised other mediation-preparation efforts, including developing mini-memos addressing key legal and factual issues that we believed could drive valuation of the case in a settlement posture.

68.     The settlement conference was held on March 15, 2023 before Magistrate Judge Carolyn Delaney.  Defendants ended the mediation early in the day without the Parties having made any meaningful progress towards resolution.

69.     We returned to discovery.  We sought Defendants' stipulation to additional depositions, but they delayed in responding.  Accordingly, GBDH associate Celina Malavé prepared a motion for leave to take additional depositions.  Before filing, we received Defendants' belated agreement to the stipulation.

70.     On May 18, 2023, I took the Rule 30(b)(6) deposition of WPM President Janae Jarvis regarding policy changes that WPM had considered and implemented since the Court's summary judgment ruling in November.

71.     During this period, GBDH, Centro Legal de la Raza, and Impact Fund continued our fact investigation related to government agency policies and practices and conducted tenant interviews regarding Defendants' policy changes.

72.     GBDH also participated significantly in expert remedies disclosure.  I again was the lead attorney working with forensic accounting expert David Breshears and handled all work with the joint data expert to update the data productions and resolve associated problems.  Additionally, Laura Ho, Stephanie Tilden, and I all contributed input on the remedies issues to be addressed by Plaintiffs' affordable housing expert, MaryAnn Russ.

73.     After Defendants disclosed a damages expert in support of their position on class damages, Class Counsel propounded expert discovery and GBDH associate Stephanie Tilden analyzed all relevant documents and took his deposition on September 5, 2023.

74.    Once again, during this period, GBDH and myself personally were forced to expend considerable time and effort to overcome Defendants' non-responsiveness even on non-controversial issues.  Throughout the summer of 2023, Defendants dragged their feet in producing an updated class list.  When they finally produced the list, our crosscheck against other records indicated multiple errors, requiring additional work by myself, Mr. Breshears, the joint expert, and Defendants that lasted well into the fall.

75.    Similarly, Defendants declined to stipulate to the filing of a Sixth Amended Complaint that would address the partial policy changes they had made since the prior year and set a cut-off date for the class damages period.  They did not communicate any substantive or procedural objection.  In the absence of their agreement, GBDH prepared and filed a motion for leave to amend the complaint. *See* ECF No. 314.  Defendants did not oppose the motion.

76.    On August 25, 2023, Plaintiffs sent a letter inviting Defendants to mediation to see if the Parties could resolve the case before December 1, 2023.  Plaintiffs cautioned Defendants that litigating the claims to judgment would significantly increase their financial exposure for Plaintiffs' fees and costs. Defendants did not agree to mediation.

77.    Shortly after the close of expert discovery regarding remedies, Class Counsel drafted and filed a motion for partial summary judgment regarding remedies, seeking a ruling that the contract damages to be awarded to the Reimbursement Class were equal to the full amount of additional service fees paid by Class Members during the class period.  Stephanie Tilden and I did the majority of the drafting for the brief, separate statement, and supporting declaration, and for the subsequent reply. *See* ECF Nos. 323, 327.  I argued the motion on December 8, 2023, and the Court granted it on February 1, 2024.  ECF Nos. 332, 352.

78.    During the summer and fall of 2023, Class Counsel also began working on trial preparation efforts.  This work included:  analyzing the extensive deposition record to designate testimony, contacting potential trial witnesses including both tenants and public housing authority employees, and drafting proposed fact stipulations after Defendants had indicated an interest in working together on that.  I supervised this work, in which GBDH, Impact Fund, and Centro Legal de

la Raza participated.  Defendants never ultimately agreed to the fact stipulation, nor even returned edits on it.

79.     Our trial preparation work continued into the new year.  Class Counsel drafted strategy memos for key witnesses, compiled the exhibit list, and drafted motions in limine and a request for judicial notice.  These tasks were shared among GBDH, Impact Fund, and Centro Legal de la Raza.

80.     Just days before the deadline for the joint pretrial statement, twelve defendants (who came to be called the ONO Defendants) substituted in new counsel.  Their entry into the case resulted in contentious pretrial filings, requiring extensive work by Class Counsel to address and counter each of the arguments raised by the new counsel.  During this period, I continued to lead meet and confer efforts.  I was also the primary drafter for the pretrial statement, including our responses to the many new arguments raised by the ONO Defendants in the short week before the first joint statement was filed.  *See* ECF No. 353.

81.     In total, GBDH devoted 1,013.2 hours to the Class Claims during this period, after the exercise of billing judgment described above.  Collectively, Class Counsel devoted 1,810.4 hours to the Class Claims during this period, after billing judgment.

**<u>Pretrial Proceedings and Settlement (Feb. 2, 2024 through Jul. 27, 2024)</u>**

82.     The Court partially granted ONO Defendants' request for an extension to the pre-trial conference date, though by less time than they had sought.  *See* ECF No. 356.  Our meet and confer efforts continued, though both sets of Defendants' proved equally unwilling to enter into fact stipulations on even basic, uncontroversial facts

83.     We filed the amended pretrial statement on March 15, 2024.  ECF No. 356.  In the interim, GBDH conducted legal research and factual analysis to address and counter the many new arguments raised by ONO Defendants.

84.     I was the primary drafter for Plaintiffs' opposition to the motion for judgment on the pleadings, with assistance from Stephanie Tilden.  I was also significantly involved in the opposition to the motion to reconsider bifurcation, providing direction and background in addition to limited drafting.

85.     GBDH also had a leading role in all other pretrial briefing, taking on the largest share of the motion in limine briefs and also authoring Plaintiffs portion of the additional three joint statements requested by the court, the opposition to Defendants' motion to amend their exhibit list, objections to exhibits, and the trial brief.

86.     GBDH staff was primarily responsible for all of the tasks required to prepare evidence for trial, including preparing deposition designations and compiling and stamping exhibits.

87.     Laura Ho, in collaboration with Impact Fund, took point on mediation.  Ms. Ho and I both worked on the mediation brief, for which Impact Fund was the primary drafter.  Ms. Ho was the lead presenter for Plaintiffs during the two-day mediation with Judge Gandhi.  Ms. Ho continued to provide significant strategic input as talks continued

88.     Following mediation, we continued to pursue settlement discussions and trial preparation on paralegal tracks.  Up until the settlement in principle was reached, we believed that the most likely outcome was that we would be going to trial, and we prepared accordingly.

89.     In addition to our briefing responsibilities, Ms. Tilden and I also devoted significant time to preparing witness exams.  Ms. Tilden worked closely with Named Plaintiffs Tamera Livingston and Roy Huskey, as well as a class member witness, to prepare their testimony for trial.  Ms. Tilden and I both prepared to take adverse direct of high-level Wasatch executives.  In collaboration with co-counsel Jesse Newmark, I also prepared Plaintiffs' affordable housing expert MaryAnn Russ to testify on injunctive relief issues.  In addition, as lead counsel, I provided insight and guidance on all other exams being developed by co-counsel.

90.     On July 27, after settlement negotiations in which Ms. Ho played a significant role alongside Impact Fund and Centro Legal de la Raza, we filed a notice of settlement.

91.     In total, GBDH devoted 774.3 hours to the Class Claims during this period, after the exercise of billing judgment described above.  Collectively, Class Counsel devoted 1,371.9 hours to the Class Claims during this period, after billing judgment.

**Settlement Agreement and Approval Proceedings (Jul. 28, 2024 to Present)**

92.     After filing the notice of settlement, Class Counsel turned to negotiating and drafting a long-form settlement agreement to ensure that the relief obtained for the Certified Classes was fully

secured and enforceable.  Centro Legal de la Raza led this work, but GBDH continued to be active in those discussions, providing strategic input on the successive drafts of the agreement.

93.     GBDH also contributed to the motion for preliminary approval, working with Named Plaintiffs on their declaration, taking lead on issues related to fees and costs, and strategizing with co-counsel.  After the Court granted preliminary approval, GBDH provided assistance and input on managing the settlement notice process, including a substantial amount of work by GBDH statistician Scott Grimes to calculate class member awards and ensure the completeness of the class list produced by Defendants.

94.     I prepared the motion for attorneys' fees, costs, and expenses.  As part of that process, I worked closely with other Class Counsel to develop and apply the rules described above allocation of time, billing judgment, and task coding.

95.     In total, GBDH devoted 245.6 hours to the Class Claims during this period, after the exercise of billing judgment described above.  Collectively, Class Counsel devoted 599.0 hours to the Class Claims during this period, after billing judgment.

96.     I expect that GBDH and Co-Counsel will collectively incur at least 80 additional hours of time to see this case through completion of the settlement, including: preparing for and appearing at the hearing on the final approval motion; working with Defendants and the Settlement Administrator on the distribution of awards to the Classes; monitoring the award distributions to the Class and responding to Class Member inquiries; and preparing and filing a report to the Court that the distribution of settlement funds has been completed.

**MULTIPLIER FACTORS**

97.     Plaintiffs seek a fee award of $4,188,000 under the Settlement Agreement.  This amount represents post-settlement fees, including anticipated additional time, of $327,263.38 and $3,860,736.62 for Class Counsel's work from the initiation of the case over ten years ago through July 27, 2024.  The pre-settlement fee amount represents an effective multiplier of 1.28 on Class Counsel's pre-settlement lodestar of $3,012,924.48, on the Class Claims for that period, even though a multiplier of 1.5 or higher would be appropriate on this record.

98. Plaintiffs' requested fee award of $4,188,000 is approximately 39% of the monetary value of the class settlement, calculated at $10,715,000 (including the $5 million qualified settlement fund, the $4.5 million for fees and costs, and valuation of the injunctive relief at $1.215 million)

99. The multiplier or upward departure is amply justified by the record.

100. The exceptional results achieved in the Settlement Agreement provide the Certified Classes essentially full relief. Achieving this superlative outcome for the Classes was only possible because of the dedicated service of Class Counsel over many years of hard-fought litigation. Obtaining essentially full relief in a settlement posture is challenging in any case, and even more so where defendants contest liability as fiercely as they did here. The outstanding success in this case was founded on Class Counsel's class certification motion and two pivotal summary judgment motions, and those motions in turn were the culmination of years of litigation.

101. This case presented notably challenging and complex issues, particularly with regard to the core merits issue of whether the additional service fees were excess rent charges in violation of the Section 8 HAP Contracts and federal law. Class Counsel's successful litigation of that issue developed an area of law that lacked clear or detailed authority, making clear that a fee is unlawful excess rent if a tenant must pay it to rent or remain in a unit. Additionally, this case presented a comparatively high number of complex procedural challenges, exemplified by the bifurcation order and Defendants' eleventh-hour attempt to undo it. At every turn, Class Counsel addressed the thorny challenges presented by this case with both skill and care.

102. GBDH and Class Counsel litigated this case on a fully contingent basis for years, with no certainty of recovery. Over a period of more than five and a half years, GBDH attorneys and staff dedicated thousands of hours to the litigation. Along with other Class Counsel, GBDH also paid significant sums out of pocket to fund experts and other litigation costs

103. Additionally, GBDH and Class Counsel understood that the ultimate size of Plaintiffs' and Class recovery would be unlikely to cover our fees and costs in the absence of fee shifting as the case challenges practices that amount to nickel-and-diming very low-income tenants. The three Named Plaintiffs' damages together total just $20,757.71.

104.    The contingency risk GBDH accepted in litigating this case was magnified by the time-intensive nature of the litigation, which required the firm to turn away other potential fee-generating work in order to continue to staff the case at an adequate and appropriate level

105.    Finally, Plaintiffs' requested upward departure from the benchmark under the percent-of-recovery method is further supported by the important fact that granting Class Counsel's fee request will not reduce payments received by Class Members.

## OTHER EXHIBITS AND CASE FACTS

106.    Based on the detailed damages calculations for Class Members in this case, Denika Terry's total damages are $2,487.09, Roy Huskey III's total damages are $6,893.32, and Tamera Livingston's total damages are $11,386.30.

107.    Attached hereto as **Exhibit 4** are excerpts from exemplar class member leases dated 2011 and 2020, containing the fee provision of the lease in place throughout that period.

108.    Attached hereto as **Exhibit 5** are exemplar HAP Contracts dated 2011 and 2021.


I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration is executed on December 20, 2024, at Oakland, California.


/s/ Anne P. Bellows
Anne P. Bellows

**Task Coding Definitions**

| Task Category | Definition and Examples in this Case |
|---|---|
| Case Administration (L100) | High level case management, including global staffing and case planning, initial case set up, and similar.<br><br>*Examples: high-level planning regarding the division of labor and staffing on the case, answering clients' questions regarding retainers, preparing notices of association and notices of appearance.* |
| Fact Investigation (L110) | All actions to investigate and understand the facts related to the litigation, outside of formal discovery tools, including all related communications and correspondence.<br><br>*Examples: interviews with Named Plaintiffs regarding their experiences and knowledge related to the case; reviewing and analyzing Named Plaintiffs' documents; dozens of interviews of Wasatch Section 8 tenants; factual research related to government agencies, including analysis of HUD and public housing authority statements and publications; conferences with the Assistant U.S. Attorney regarding case issues.* |
| Analysis, Strategy, and Legal Research (L120) | Work completed to support strategy decisions throughout the case, including legal research and memoranda on key issues, factual analyses and memoranda developed to guide decision-making, and strategy meetings.<br><br>*Examples: memoranda developing legal theories and exploring legal issues related to emerging strategy decisions; memoranda analyzing particular factual issues to support strategy decisions, including related analysis of factual record; meetings and communications addressing strategy decisions that transcend particular litigation tasks; strategy meetings that addressed multiple categories of litigation tasks (e.g., both discovery and settlement discussions).* |
| Experts & Consultants (L130) | Identifying, evaluating, and working with experts and consultants.<br><br>*Examples:  all work with the joint data expert hired to identify and extract data from Defendants' centralized databases; all work related to Plaintiffs' expert disclosures (forensic accountant David Breshears and subsidized housing expert MaryAnn Ross), including identifying issues for expert reports, providing relevant record materials, answering experts' questions,* |

| | |
|---|---|
| | *and reviewing draft reports, and all related correspondence and communications.* |
| Settlement (L160) | All work related to efforts to reach a settlement.<br><br>*Examples:  drafting briefs for settlement conferences and mediation, preparing for settlement efforts by assessing and drafting memoranda on issues that could arise in settlement, preparing clients for settlement, discussions and correspondence regarding settlement strategy issues, attending mediation, settlement communications with neutrals and Defendants, negotiating the terms of the MOU filed on July 27, 2024 and the long-form final Settlement Agreement, and all related communications.* |
| Pleadings (L210) | Work related to pleadings and motions concerning the pleadings.<br><br>*Examples:  drafting the complaint and amendments thereto; opposing Defendants' motions targeted to the pleadings (2016 motion to dismiss, April 2024 motion for judgment on the pleadings, June 2024 motion to dismiss state law claims); legal memoranda regarding pleading standards applied to particular issues; motions to amend the complaint; efforts to serve owner-entities named as Defendants in 2022, including motion to extend time for service* |
| Court Mandated Conferences (L230) | Work related to scheduling and status conferences.<br><br>*Examples: Attending scheduling and status conferences, including preparation and communications re: same; drafting and meeting and conferring with Defendants regarding joint status reports.* |
| Summary Judgment Motions (L240) | Work related to motions for summary judgment.<br><br>*Examples: legal research for Plaintiffs' respective motions for partial summary judgment on liability and remedies issues; analyzing and compiling the evidence to support undisputed facts; opposing Defendants' cross-motion for summary judgment, including legal research, analysis of the record, and drafting opposition papers; preparing for and attending the hearings; all correspondence and communications related to summary judgment.* |

| | |
|---|---|
| Other Written Motions or Submissions (L250) | Work related to all other substantive motions or filings (*i.e.*, other than those related to the pleadings, summary judgment, discovery, or trial).<br><br>*Examples: stipulations regarding the scheduling order; meet and confer, analysis, strategy, and drafting related to stipulation to bifurcate the case; work related to opposing Defendants' April 2024 motion to reconsider the bifurcation order; opposing ONO Defendants' ex parte application to extend the final pretrial conference date and associated deadlines; proposed fact stipulations (prior to trial preparation).* |
| Class Action Procedures (L260) | Work related to class action procedures under Federal Rule of Civil Procedure 23 and communications with class members about the case.<br><br>*Examples:  work related to the class certification motion, opposition to Defendants' Rule 23(f) petition; 2019 meet and confer with Defendants regarding class notice, including legal research, correspondence, and analysis; motion to amend or clarify the class definition and for notice; working with Defendants to obtain accurate and complete class list; management of initial class notice and class notice regarding settlement; work related to the preliminary approval motion, final approval motion, and motion for fees, costs, and expenses on the class claims; all related correspondence and communications.* |
| Other Discovery (L300) | Discovery-related tasks that encompassed multiple discovery tools<br><br>*Examples:  discovery planning; strategy meetings about discovery that addressed multiple discovery tools; meet and confer communications with opposing counsel.* |
| Written Discovery (L310) | Work related to interrogatories and requests for admission.<br><br>*Examples:  drafting interrogatories and requests for admission, including analysis and research re: same; reviewing Defendants' responses to written discovery; responding to written discovery propounded on Named Plaintiffs; related correspondence and communications.* |
| Requests for Production and Document Productions | Work related to requests for production and making Plaintiffs' productions. |

| (L320) | *Examples:  preparing Plaintiff productions; drafting requests for production; reviewing Defendants' responses; meet and confer and other correspondence and communications related to requests for production* |
|---|---|
| Document review (coded as L325) | Work related to reviewing documents produced by Defendants.<br><br>*Examples; Reviewing, analyzing, and working with the voluminous tenant files and electronic documents produced by Defendants, including developing and implementing document review procedures and summarizing information related to hot documents; factual memoranda based on the document review; all related communications and correspondence among Co-Counsel.* |
| Depositions (L330) | Work related to taking, defending, and analyzing depositions of fact witnesses.<br><br>*Examples:  drafting deposition notices and subpoenas; strategy and factual analysis related to deposition planning; developing deposition outlines and planning exhibits; preparing Named Plaintiffs for their depositions; taking, defending, and serving as second-chair at depositions; drafting deposition summaries; reviewing deposition transcripts for key issues; all related communications and correspondence.* |
| Expert Depositions (L340) | Work related to taking and analyzing depositions of expert witnesses.<br><br>*Examples:  preparing for, taking, and serving as second-chair at depositions of Defendants' disclosed experts Robert Griswold and James McCurley; drafting expert deposition summaries; analyzing expert deposition transcripts; all related communications and correspondence.* |
| Discovery Motions (L350) | Work related to discovery motions.<br><br>*Examples:  formal and informal discovery motions; meeting and conferring with Defendants; attending discovery conferences and hearings; all related communications and correspondence.* |
| Trial Preparation Re Fact Witnesses (L410) | Work related to preparing to present or cross fact witnesses at trial.<br><br>*Examples:  drafting witness strategy memoranda identifying key areas of testimony, relevant exhibits, and strategy issues; preparing examinations and cross examinations; contacting, subpoenaing, and communicating with fact* |

| | |
|---|---|
| | *witnesses; planning trial presentation related to fact witnesses; preparation sessions with witnesses; all related strategy, communications, and correspondence.* |
| Trial Preparation Re Expert Witnesses (L420) | Work related to preparing to present or cross expert witnesses at trial.<br><br>*Examples:  drafting witness strategy memoranda identifying key areas of testimony, relevant exhibits, and strategy issues; preparing examinations and cross examinations; communicating with fact witnesses; planning trial presentation related to fact witnesses; preparation sessions with witnesses; all related strategy, communications, and correspondence.* |
| Written Motions or Submissions for Trial (L430) | Work related to trial filings.<br><br>*Examples: all work related to joint pretrial statements and subsequent joint statements related to trial issues (including meet and confer regarding same); proposed fact stipulations; drafting and opposing motions in limine; opposing Defendants' motion to amend their exhibit list; objections to Defendants' exhibits; all related communications and correspondence.* |
| Other Trial Preparation and Support (L440) | All other trial preparation tasks.<br><br>*Examples:  developing and revising exhibit list; creating exhibits; deposition and discovery designations; developing demonstrative materials; higher-level trial strategy and discussions; drafting opening and closing arguments; all other trial preparation tasks not otherwise categorized; all related communications and correspondence.* |
| Trial and Hearing Attendance (L450) | Preparing for and attending the final pretrial conference and motion in limine hearing |
| Post-Trial Motions (L460) | Work related to the motion for fees, costs, and expenses on the Class Claims.<br><br>*Examples:  review of time records, including billing judgment and task categorization; drafting moving papers including detailed attorney declarations; legal research and factual analysis re: same; all related communications and correspondence.* |



**G B D H**

**Goldstein, Borgen,
Dardarian & Ho**

Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

February 9, 2023

<u>**Via E-Mail Only**</u>

Joseph Salazar                                         Joe.Salazar@lewisbrisbois.com
Ryan Matthews                                    Ryan.Matthews@lewisbrisbois.com
Lewis Brisbois
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833

Re:    There Is No Offset for Damages on the Class and FCA Claims

Dear Ryan,

In a meet and confer call, you suggested that Defendants would argue that damages should be reduced by the cost of providing the amenities and services listed on the Additional Services Agreements.  By email on December 1 and December 5, 2022, I asked you to provide authority for this position.  You have yet to do so, and, as described below, our own research confirms the contrary—that Defendants' costs do not affect the calculation of damages in this case.  With the enclosed discovery, Plaintiffs initiate the fact-finding on Defendants' costs that will be necessary if Defendants insist on proceeding with their unsupported theory.   However, before your clients incur the costs, inconvenience, and, ultimately, both sides' attorneys' fees for such discovery, we write in a final attempt to open the lines of communication and offer an alternative path.

In our review of the law, we do not see any basis for deducting Defendants' costs from the damages award.  Indeed, the Court has already stated that the damages to the class are measured by the total amount they paid in additional service charges.  *See* Summary Judgment Order, ECF No. 278 at 13-14 ("[D]efendants breached the tenancy addendum by requiring tenants to pay excess rent in the form of charges contained in the ASAs . . . .  *Plaintiffs were damaged in the amount of the excess rent they were required to pay*, which the court will determine in the second phase of this litigation." (emphasis added)).

The Court's ruling is consistent with both the terms of the relevant contract and contract principles. The Tenancy Addendum provides that "[t]he owner must immediately return any excess rent payment to the tenant."  HAP Contract Sec. C, ¶ 5f (incorporating 24 C.F.R. § 982.451(b)(4)(ii)).  Where, as here, "contractual language is clear and explicit, it governs," *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (citing Cal. Civ. Code § 1638).  Courts therefore enforce provisions that specify "particular remedies to be available in the event of a breach."  Witkin, Summary 11th Contracts § 880 (2022).

The same is true for restitution under the Unfair Competition Law.  The Court has already defined Plaintiffs' injury as the "lost money or property as a result of defendants' unlawful practice of requiring plaintiffs to pay additional charges beyond their share of rent set out in the HAP contracts."  ECF No. 278 at 14.  The UCL authorizes courts to make "such orders or judgments . . . as may be necessary to restore to any person in interest any money or property . . . which may have been acquired by means" of an unlawful business practice.  Cal. Bus. & Profs. Code § 17203.  Restitution under the UCL has a dual purpose: first, to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest," *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003), and second, to "penalize a defendant for past unlawful conduct and thereby deter future violations,"  *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 135 *as modified on denial of reh'g* (2003) (quotation marks and citation omitted).

These dual purposes are only served by the full return of the additional charges paid by class members.  Defendants' unlawful business practice was the collection of excess rent from Section 8 tenants, in violation of federal regulations that the owner "may not demand or accept any rent payment from the tenant" in excess of the maximum set by the HAP Contract.  *See* 24 C.F.R. § 982.451(b)(4)(ii).  The same regulation mandates that owners "must immediately return any excess rent payment to the tenant."  *See id.*  This language clearly establishes class members' ongoing ownership interest in the service charges, already found by the Court to be excess rent.  *See Beaumont*, *supra*, 111 Cal. App. 4th at 134-35 (affirming full restitution of unauthorized rent charged in violation of rent regulations, because doing so "accomplishe[d] the statutory objective of restoring to the victims sums acquired through defendants' unfair practices" and "[t]he trial court was not required to place defendants in the status quo ante").

Defendants' "windfall" argument will gain no traction here.  Defendants' position relies on their continued belief that the additional charges should be understood as consideration for the amenities and services listed on the ASAs.  The Court has twice "'rejected outright'" that argument.  Summary Judgment Order, ECF No. 278, at 10.  Defendants—not class members—implemented policies treating the additional charges as rent, and they did so for their own business advantage in eliciting payments from their tenants.  *See, e.g.*, Decl. of Jarom Johnson ¶ 8, ECF No. 78-4 ("Over the course of many years, it has been our experience that Section 8 tenants are motivated to stay in the Section 8 Program and, given the chance, will clear up shortfalls"[1]).  It would be a *windfall to Defendants* to allow them to keep any portion of the excess rent amounts that they charged and received in violation of the HAP Contract and federal law.[2]

Finally, Defendants' costs are also flatly irrelevant to the treble damages and penalties applicable to violations of the False Claims Act under 31 U.S.C. § 3729(a)(1).  The government's damages under the FCA are measured by the "'amount that it paid out by reason of

---

[1] In other words, Defendants' policies that placed Section 8 tenants at risk of eviction and loss of their vouchers were intended to, and effective at, obtaining payment of any past due amounts.

[2] Defendants have also acknowledged that separate additional service charges are a means of maximizing the *rents* they can receive under program rules, demonstrating that this distinction is also illusory in their own decision-making. Johnson Dep. Vol. 2 at 81:3-83:5.

the false statements over and above what it would have paid if the claims had been truthful.'"
*United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (quoting *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966)). Relying on the same language of the HAP Contract at issue here, the Ninth Circuit held that the damages in a Section 8 side payment case are "the entire amount [the landlord] received from the government." *Ellis v. Zheng*, 799 Fed. Appx. 551, 552 (9th Cir. 2020). As the Ninth Circuit explained, "[b]ecause the FCA is concerned with fraud on the *government*, damages are determined not by how much [the landlord] overcharged [the tenants], but rather by how much [the landlord] overcharged the government—that is, the amounts she received from the government without lawful entitlement." *Id.* The costs borne by Defendants play no role in this calculation.

Defendants also face government civil penalties for each monthly payment received from a housing authority for a relevant tenant—as each HAP charge is its own "'claim against the government fisc' and thus its own separate FCA violation." *Ellis*, 799 Fed. Appx. at 552 (citing *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1177 (9th Cir. 2006)) (affirming a penalty award of $121,000 for 22 months of housing assistance payments on behalf of a single tenant). The minimum penalty for a single FCA violation is $13,508, and the maximum penalty is $27,018.[3] 28 CFR § 85.5(d). These mandatory penalties are set by statute and non-negotiable, upon a finding of liability.

Because Defendants' costs in providing the services have no bearing on any damages calculation, they will not be admissible at trial. And the road to that ruling will be time-consuming and expensive. Thus, we propose that the Parties instead focus on the amounts that will actually determine damages in this case: (1) "the amount of excess rent," *i.e.*, the additional service charges paid by class members, and (2) the amount of the relevant housing assistance payments received by Defendants from the Section 8 program—both of which are readily determined in the Yardi data. Attached is a proposed Stipulation to that effect.

If Defendants do not agree to the Stipulation, they will not only incur their own attorneys' fees and expert costs to litigate this issue, but they will also cause Plaintiffs to expend significant attorney time and costs on the discovery, expert work, and briefing necessary to counter Defendants' position and any evidence Defendants intend to offer related to their costs. As Plaintiffs have already won a liability ruling on two of the class claims, we are prevailing parties and will be seeking an award of our attorneys' fees, costs, and expenses incurred on the class claims both under California Code of Civil Procedure § 1021.5 and pursuant to the leases. If we are forced to engage in extensive discovery and briefing on this issue, our fees will increase accordingly—and Defendants will foot the bill.

We request that you provide a response within two weeks—*i.e.*, no later than February 23, 2023—regarding whether Defendants will agree to the Stipulation. If you do not so agree, please provide your responses to the enclosed discovery requests no later than March 14, 2023.

---

[3] For violations prior to Nov. 2, 2015, the penalty range is from $5,500 to $11,000. 28 CFR § 89.3.

Plaintiffs believe that embarking on invasive and costly discovery related to Defendants' costs in providing amenities and services would be a waste of your time as well as ours. I hope we can agree to avoid such a needless and time-consuming exercise.

Sincerely,

Anne P. Bellows

cc:     Jahmy Graham
        Andrew Wolff
        Brenna Wood-Fitzpatrick
        Jesse Newmark
        Henrissa Bassey
        Laura Ho
        Stephanie Tilden
        Jocelyn Larkin
        Lindsay Nako



Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

**Goldstein, Borgen, Dardarian & Ho**

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

February 21, 2023

<u>**Via E-Mail Only**</u>

Joseph Salazar                                                    Joe.Salazar@lewisbrisbois.com
Ryan Matthews                                         Ryan.Matthews@lewisbrisbois.com
Lewis Brisbois
2020 West El Camino Avenue, Suite 700
Sacramento, CA 95833

   Re:  Changes Required for Defendants to Come into Compliance with the Court's
       Summary Judgment Order

Dear Ryan,

   Plaintiffs have reviewed the documents produced by Defendants regarding the policy
changes and communications with Section 8 tenants that have taken place since the Court's
November 23, 2022 summary judgment order.  As you are aware, the Court's summary
judgment order found that Wasatch's policies and practices related to the additional charges
listed on the Additional Service Agreements render those charges unlawful excess rent charges
under the HAP Contract and federal regulations. The Court identified the following practices that
convert the charges to unlawful excess rent[1]:

(1)  Language in Defendants' residential rental agreement, renewal notification letters and
   other forms that describe additional services "as a component of rent," and that combine
   rent and additional charges in several places, ECF No. 278 at 12;
(2)  Defendants' requirement that tenants pay for additional service charges "for the duration
   of the lease," id.;
(3)  Defendants' policies and practices treating failure to pay additional service charges as a
   default under the lease, including their service of pay or quit notices based on unpaid
   charges, id. at 12-13; and
(4)  Defendants' use of a payment priority sequence that converted unpaid amounts into
   unpaid rent, *id.*

---

   [1] As you are also aware, the Court independently held that it was unlawful for Wasatch
require Section 8 tenants to agree to certain additional service charges, such as renters'
insurance, as a mandatory condition of leasing their units.

868948.4

Bellows Decl. Ex. 3, page 1

Defendants' summary of their actions in response to the Court's order, set out in their response to Livingston Interrogatory No. 6, only addresses two of the four practices identified by the Court—Defendants' payment priority sequence, and tenants' obligation to pay the additional service charges for the duration of their lease.  *See* Defs.' Response to Livingston Interrogatory No. 6.   The letter Defendants sent Section 8 tenants, which you produced last week, continues to conflate tenants' rental payments with the additional service charges, and solely informs tenants that they may cancel additional service charges at any time, failing even to mention the other policy change (*i.e.*, changes to the payment sequence) implemented by Defendants.

Defendants must take further steps to fully come into compliance with the HAP Contract and federal law.  Namely, Defendants must:

(1)     *Remove from their form documents all language that describe the additional charges as part of the total monthly obligation or rental rate, or that combine additional charges and rent*. Specifically, Defendants must revise their rental agreements, monthly cost breakdown forms, renewal notification letters, move-in cost sheets, monthly statements of rental account, and any other relevant documents, to make clear that the additional charges are <u>not</u> a component of or combined with rent and are optional, separate charges that tenants may cancel at any time.

(2)     *Change Defendants' collections policies to ensure that tenants (and property personnel) know that non-payment of additional service charges will not have any effect on their tenancy.*  Defendants must inform personnel that (1) no pay or quit notices are to be served on Section 8 tenants as a result of unpaid additional service charges, that (2) nonpayment of an additional service charge by a Section 8 tenant is never grounds for refusing a rent payment, and that (3) personnel are strictly prohibited from suggesting to any tenant that failure to pay an additional service charge could have adverse consequences for their ability to remain in their unit or on their Section 8 vouchers.

(3)     *Fully inform Section 8 tenants of the changes to Defendants' policies and the tenants' rights with regard to additional service charges.*  Defendants must inform existing and future Section 8 tenants, in clear and accessible language, that all additional service charges are *not* rent, but instead charges for entirely separate and optional consumer services, such that non-payment of an additional service charge will have no impact on the tenant's rental housing or Section 8 voucher – *i.e.*, will not result in an eviction, an eviction notice, a refusal to accept rent, or any other adverse consequences for the tenant's ability to continue living in their homes – and that all tenant payments will be applied first towards the tenant's rent due.  This information must be clearly and concisely stated in a notice to current Section 8 tenants and on all future Additional Service Agreements.  Additionally, the notice to current Section 8 tenants should refer to and provide a summary of the Court's order in this case.

868948.4

Bellows Decl. Ex. 3, page 2

(4)   *Obtain fresh consent to the additional charges from existing Section 8 tenants.*  In order
       to ensure that tenants' consent to the additional service charges is both fully informed and
       voluntary, Defendants should ask Section 8 tenants to consent to the additional charges
       after fully disclosing the relevant policies.  That is, rather than putting the onus on
       Section 8 tenants to figure out opt-out of the service to end the charges, Wasatch should
       seek Section 8 tenants' affirmative consent to the charges with a revised Residential
       Rental Agreement and Additional Services Agreement that make clear that they charges
       are for an optional consumer service, that they are not a part of rent, and that non-
       payment of the charges will have no effect on the tenant's right to continue living in their
       home.

We would be happy to work with you to ensure that Defendants make adequate changes
to end the liability period for their violations of the HAP Contract and federal regulations.   At
this point, both Parties have an interest in seeing that the policies at issue in the Court's opinion
are fully ended as soon as practicable.

Sincerely,

Anne P. Bellows

cc:   Andrew Wolff
      Brenna Wood-Fitzpatrick
      Jesse Newmark
      Henrissa Bassey
      Laura Ho
      Stephanie Tilden
      Jocelyn Larkin
      Lindsay Nako

868948.4

Bellows Decl. Ex. 3, page 3

# RESIDENTIAL RENTAL AGREEMENT

**THIS IS A LEGALLY BINDING AGREEMENT**
**READ IT CAREFULLY**

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in*
*595 S Riverwoods Pkwy Suite 400, Logan, Utah 84321*

This agreement is made in Rancho Cordova, CA , on <u>8/30/11</u> between,  Chesapeake Commons Apartments hereinafter called Owner, by Wasatch Property Management, its authorized agent, and
<u>Lease Holder(s):</u>
**Denika Terry**

<u>Authorized Occupant(s):</u>

hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.   TERM**

This Agreement creates a <u>12</u> month and <u>0</u> day tenancy, commencing <u>09/20/2011</u>,  and Terminating <u>09/19/2012</u> .  Reference paragraph XVII of this Residential Rental Agreement.  The total rent for this <u>12</u>  month and <u>0</u> day tenancy is <u>$11,268.00</u>.

**II.   PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: <u>3600 Data Drive, #391, Rancho Cordova, CA  95670</u>

**III.   RENT**

The rental for the premises is <u>$939.00</u> per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at <u>3600 Data Drive , Rancho Cordova, CA, 95670-7403</u> . The Rental Office can be reached by phone at (916)-635-1970.  Unless otherwise posted, payment can be made in person at the Owner's office between 9:00 am and 5:00 pm Monday through Friday and between 10:00 am and 5:00 pm on the weekends.  In addition, a "night drop" is available for payment when the office is not open.  Resident agrees that there is a risk in depositing payments into the night drop and Resident agrees to hold Owner harmless for any loss or theft of payments made in the night drop.  All payments received for rent and additional charges shall first be applied to any past balance due and then to additional charges and then to current rent.  Rent shall be payable by check, cashier's check, certified check or money order (unless subject to paragraph IV. below), in installments as follows:


*Initials*

A.  The sum of <u>$344.30</u> upon execution of this Rental Agreement as rent for the period beginning  <u>09/20/2011</u> , through <u>09/30/2011</u>  (first month prorated) payable on <u>09/20/2011</u>.

B.  The sum of $939.00  is due on the first day of each calendar month commencing <u>October 2011</u>.

C.  A concession in the amount of $0.00  is to be given to Resident as part of this <u>11</u>month(s) lease and will be issued $0.00  off move in. The <u>$0.00</u> concession is due and payable back to Chesapeake Commons Apartments if the <u>11</u>  month lease is not fulfilled for any reason.

D.  The parties agree that the monthly rental for the premises set forth in Paragraph III of this Agreement may be less than the  standard monthly rental required by the Owner for this premises.  The Owner rents the premises to the Resident(s) at a reduced  market rate in accordance with a formula established by one ore more government financing programs.  The parties understand  that the monthly rent determined by formulas set forth in such financing programs may change from time to time to adjust the Residents monthly rental obligation as set forth in this Agreement, and in accordance with such formulas.  In such event,  Owner, or Owners agent, will provide Resident with written notification at least thirty (30) days prior to any monthly rental adjustment.  Such notice will set forth the

**IV.   PRORATIONS**

All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**V.   LATE CHARGES**


*Initials*

Landlord and Tenant understand and agree that Tenant 's failure to make rent payments promptly when called for by this Lease results in financial loss to Landlord in the form of, among other things, administrative and collections costs. Landlord and Tenant further understand and agree that because Landlord's fiscal management expenses are calculated and paid with respect to the whole of the rental complex, and not with respect to individual units.  Because of this, Landlord and Tenant understand and agree that the amount $<u>50.00</u> constitutes a reasonable estimate of the average damage resulting to Landlord from Tenant's failure to make a rent payment is not paid on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept a check after the 5th day of month. In the event any check tendered by Resident as payment of rent is returned by the bank for "Non Sufficient Funds" or "Account Closed", "Payment Stopped", or for any other reason, Resident shall be required to pay to owner immediately a charge of $<u>50.00</u>. In the event Resident fails to pay rent on or before 5:00 p.m. on the 3rd day of the month, or if any check tendered by resident is returned by the bank, Resident shall be required, at Owners option, to make any future payment on cashiers check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive the Owners right to demand future payment when due.

**VI.   SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**


*Initials*

Resident shall pay Owner, upon execution of this agreement, a security deposit of $325.00 . Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Residents defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, If necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to  Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents. Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners  which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of the Owner or agents of Owner.

WASATCH
GREATER COMMUNITIES

WAS000150

Bellows Decl. Ex. 4, page 1

**VII.   ACCEPTANCE AND SURRENDER OF PREMISES**

A.   Resident accepts said premises and furniture and appliances as listed on the Move-In, Move-Out Check List, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition. Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use 3 keys. Resident shall, upon vacating, deliver all keys

B.   Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Residents occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements.

**VIII.   USE OF THE PREMISES**


*Initials*

A.   The premises are rented for residential use only and shall be occupied by not more than 1 occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease.  Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks must be on the lease.
B.   Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Pets of any kind shall be kept or allowed on the premises, nor shall the Resident permit  any invited guest to have or keep any pets or other animals upon the premises for any period of time. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two pets per apartment.  Cats must be neutered. Reptiles or exotic pets are not allowed.  The maximum weight limit allowed for pets is 100.00 lbs.


*Initials*

C.   Resident shall not disturb, annoy, endanger or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.
D.   Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, California Code 308.3.1 and 308.3.1.1 or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane grills or any similar items which emit an open flame).
E.   Resident shall do absolutely no repair work on any vehicle on the premises, except for ordinary maintenance, nor shall any vehicle not in running order or without current registration be parked on the premises.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guests, for parking and to tow away and store at Residents expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner.  Resident agrees the Residents vehicle(s) will be parked only in the stall(s), if any, assigned to Resident.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.
F.   **Harassment or Threats:**  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager or any management personnel and/or interfere with the management and/or operation of the apartment community.
G.   **Nuisance and Waste:**  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**IX.   RESIDENTS DUTY TO MAINTAIN PREMISES**

Resident shall keep the dwelling unit in a clean and sanitary condition and shall otherwise comply with all state and local laws requiring Residents to maintain rented premises. If damage to the dwelling unit (other than normal wear, and tear) is caused by acts or neglect of Resident or others occupying or visiting the premises with permission, Resident may repair such damage at his or her own expense, and Owners written approval. Upon Residents failure to make such repairs, after reasonable notice by Owner, Owner may cause such repairs to be made, and Resident shall be liable to Owner for any reasonable expense thereby incurred by

**X.   UTILITIES**

Resident shall be responsible for the payment of utility services including gas, electricity and also including water, sewer and refuse collection as outlined in **Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges**.  Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  **Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of any prepayment.  Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.**
It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.


*Initials*

Resident shall pay for the following utility services.

| | | |
|---|---|---|
| X   gas, | Account # _____. | |
| X   electrcity, | Account # _____. | |

**XI.   INSPECTION BY OWNER**

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 8:00 a.m. to 7:00 p.m. daily (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of

**XII.   HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy.  Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

WAS000151

Bellows Decl. Ex. 4, page 2

 

**XIII.  DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Residents servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall

**XIV.  LIABILITY INSURANCE**


Initials

Effective December 1, 2003, Wasatch Property Management requires each resident(s) to maintain Renters Insurance with a minimum of $25,000 Personal Liability Coverage, with a company of the Resident's discretion. Resident(s) must provide proof of insurance from a 3rd party carrier and have Chesapeake Commons Apartments and its Ownership Entities & Management named as the additional insured, or, Resident(s) may participate in the "pay along with rent" program not affiliated with Wasatch Property Management or Chesapeake Commons Apartments. If at any time during the term of this lease, resident(s) is without coverage and in default of their lease, resident(s) agrees to automatically be enrolled in the "pay along with rent" program and being charged according.

**XV.  WAIVER OF LIABILITY**


Initials

Resident agrees to assume responsibility for the following:

A.  Resident understands that Managements insurance does not cover Residents belongings from losses or personal injury not caused by managements negligence and Management strongly encourages Resident to obtain an all-risk renter s insurance policy.  If you decline to obtain said insurance, you understand that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, it agents or employees.

B.  Loss of property due to theft

C.  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.

D.  The Actions or omissions of other Residents

E.  Interference with light, view or other intangible aspects of the premises.

F.  Operations in construction of any public or quasi-public work

G.  Any latent defect in the building(s)

H.  The use by resident or guest of any storeroom, laundry room, clubhouse, swimming pool, gates at all entrances and exits or any other ancillary facility furnished by Agent for Residents use.

I.  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.

J.  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.

K.  Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via

**XVI.  CANCELLATION FEE**

Upon execution of this lease, you may cancel your obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective thirty (30) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as rent becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $939.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, you are still subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVII.  NOTICE TO QUIT**


Initials

A.  MONTH-TO-MONTH TENANCY: If the tenancy under this agreement is on a month-to-month basis, then such tenancy may be terminated at any time by either party hereby by giving the other party not less than thirty(30) days notice in writing prior to the end of the monthly term. If no thirty day notice is received by Agent AND resident vacates the property, a fee equal to thirty days rent will be billed as liquidated damages for improper thirty day notice.  Upon the lease agreement expiration date of 09/19/2012 and if resident elects to not renew lease or submit a written thirty(30) day notice of intent to vacate, the monthly rent will be automatically adjusted by the Owner to reflect the current rental value of the premises, as well as, administrative costs associated with month to month tenancy.

Current month to month fee is $100.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

B.  TERM AGREEMENT: Resident agrees, at least thirty(30) days prior to the expiration of the term hereof, to give written notice to Agent of his intention to vacate the subject premises. Resident agrees that all keys, remotes and/or gate cards will be returned to the rental office by 10:00 am on move out date, at which time a final walk through inspection will be conducted.  If no thirty day notice is received by Agent AND resident vacates the property, a fee



**XVIII.  ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**


Initials

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorneys fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgment. Attorney's fees will not exceed $1000.00 unless otherwise provided by law.

**XIX.  AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.



WAS000152

Bellows Decl. Ex. 4, page 3




**XX.  SUBLETTING**

Resident shall not let or sublet all or any part of the premises nor assign this Agreement or any interest in it without the prior written consent of Owner. Any such assignment or subletting without written consent is void.

**XXI.  JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXII.  WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXIV.  RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement. <u>Termination on Breach and Notice to Quit</u>:  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a <u>non-curable default</u> under the provisions of State Civil Codes and shall forthwith <u>terminate this Lease Agreement</u>. In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor with-in THREE (3) DAYS after Lessee's actual or constructive receipt of said notice.  No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXV.  SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law and in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by stature, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and  all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorneys fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at time sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

Denika Terry (Lessee)                    8-30 2011
                                          Date

Owner/Authorized agent                   8-30 2011
                                          Date

WAS000153

Bellows Decl. Ex. 4, page 4

**CO-SIGNER ACKNOWLEDGEMENT**

The undersigned co-signer agrees to be responsible for any and all amounts due under this Residential Rental Agreement, and its addendums. This shall be deemed a continuing guarantee for so long as the resident shall have liability to Owner. The undersigned co-signer shall not have any rights to access or occupancy of the premises. Any and all notices given to resident shall be deemed to have been given to the undersigned co-signer. Owner shall have no obligations to co-signer for any notices or for any of the obligations under the Residential Rental Agreement. Co-signer agrees to a continuing agreement during Residential occupancy even if a new lease agreement is executed with Resident.

_Denika Jerry_
Co-Signer Signature

_DENIKA TERRY_
Print Name

_31000 DATA DRIVE # 391_
Address

_-1240._
Social Security Number

_8-30-2011_
Date

_(916) 807-2374_
Home Telephone number

_Rancho Cordova CA, 95670_
City, State Zip

_____
Employer

LD302 01 CA Revised 01/31/2011



WAS000154

Bellows Decl. Ex. 4, page 5

**UTILITY ADDENDUM:**
**DISCLOSURE OF RESIDENT'S FINANCIAL RESPONSIBILITY FOR**
**WATER, SEWER AND TRASH COLLECTION CHARGES**

This utility addendum is hereby incorporated into the Rental Agreement between, <u>Chesapeake Commons Apartments</u> hereinafter called Owner, by Wasatch Property Mangment, its authorized agent, and <u>Denika Terry</u> for premises located at <u>3600 Data Drive, #391, Rancho Cordova, CA 95670</u>.

1. Resident shall pay for water and sewer service based on the method selected below:

   a. ☑ Number of occupants in each apartment unit. Resident shall pay for water and sewer service base on an allocation formula, not actual submeter readings. Specifically, Resident's bill will be calculated in the following manner:  The property's water and sewer bills will be allocated to each apartment unit based on a percentage assigned to each apartment unit based on the number of Occupants in that apartment unit compared to the total number of occupants at the property.  If Resident's unit contains a washing machine, one additional occupant will be added to the occupant count for purposes of calculating the percentage, and Resident agrees that this is a fair practice to account for increased water usage in units containing washing machines. Resident's percentage for this factor is currently <u>80.00</u>% but could change based on the number of occupants at the property or in the apartment unit. Resident's bill will be equal to the calculated monthly percentage multiplied by the property's water and sewer charges. Prior to allocating the property's water and sewer bills using the method described above, Owner will deduct <u>20.00</u>% to account for common area usage. Owner and Resident agree that the exact amount of the water used in Resident's unit and the exact amount of water used in the common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates.  Resident acknowledges that under the billing method described above Resident may be paying for water and sewer usage in the common areas or in other residential units.

   b. ☑ Resident shall pay for water and sewer service based on water consumed in Resident's unit20.00. Specifically, Resident's bills will be calculated as follows: A water submeter is installed in the Resident's unit to measure the total amount of water used in the unit.  Water and sewer bills will be calculated by multiplying the submetered usage by a utility rate based on the utility rates of the local utility provider (which may include base or fixed charges).  Resident acknowledges that the rates paid for water and sewer service may not match the rate of the local water utility (as that rate may not be appropriate to charge to an individual unit), but that the rates used are designed in a manner to allocate Owner's actual water and sewer costs to the apartment units.  Resident acknowledges that Resident may be paying for some water and sewer charges attributable to common area usage.

2. All water and sewer related charges assessed to the property may be used to calculate the amount charged to each Resident under the selected formula described above, including, but not limited to, storm water charges, water or sewer related charges contained on tax bills, and all miscellaneous charges contained on the utility bills received from the local water and sewer providers.

3. Resident shall also be billed, and shall pay, for trash service by the third party billing provider.  Resident's trash bills shall be calculated in the following manner:  the property's trash bill will be allocated equally to each unit on a monthly basis.  The property contains 600 units, therefore resident will pay 1/600 of the trash bill monthly.  Prior to allocating the property's trash bills using the method described above, Owner will deduct %<u>20.00</u> to account for common area usage.  Owner and Resident agree that the exact amount of the trash costs attributable to common area cannot be determined precisely, but that the methods described above to calculate those amounts are reasonably accurate estimates.  Resident acknowledges that under the billing method described above Resident may be paying for trash charges attributable to common areas or other residential units.

4. The billing methods described above may be changed by Owner by providing Resident with 60 days prior written notice and Resident acknowledges that in certain situations it is necessary to make a change to the billing method.

5. The water and sewer bill will be sent to Resident by Conservice, a third party billing provider.  Resident acknowledges that Conservice is not a public utility.  Owner reserves the right to change the third party billing provider at any time.  Any disputes related to the computation of Resident's bills will be between the Resident and the Owner.

6. Resident must make payment in full to Owner or the third party billing provider of the utility charges prior to the due date listed on each bill. Owner and Resident agree that the actual cost to Owner and/or billing provider when Resident fails to pay the utility bill on time is difficult or impossible to ascertain, but the parties agree that Owner and/or billing provider does, in the event of a late payment, incur certain costs, such as additional bookkeeping and administrative charges, additional charges from the billing provider, costs in printing and mailing late notices, lost opportunity costs of the payment, etc.

7. Each monthly water, sewer and trash bill will include a monthly service fee not to exceed $4.32 in addition to the water, sewer and trash charges.  This monthly service fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for providing billing services and may be increased (with 60 days written notice provided to Resident) if Owner's expenses or charges increase.   Resident agrees to pay a one-time account processing fee in the amount of $1.95 when Resident vacates the apartment unit. This fee shall be included on Resident's final water and sewer bill. This fee is for administration, billing, overhead and similar expenses and charges incurred by Owner for processing the final bill.

8. Resident shall promptly contact the local gas and/or electric utility(ies) to establish an account in Resident's name for the provision of gas and electric service to Resident's unit. Resident shall ensure that the start date for each such account is the Resident's move-in date.



WAS000155

Bellows Decl. Ex. 4, page 6



If Resident fails to comply with the conditions of this paragraph and Owner is subsequently charged with utility charges attributable to Resident's occupancy of the unit, then Resident shall be issued (and shall pay) a bill for such services by Owner or the Billing Provider (which shall include a service charge in the amount of $25.00); such service charge is used to compensate Owner for Resident's failure to become the customer of record for such accounts, including, but not limited to charges assessed by the third party billing provider to Owner for processing of the bill for the delinquent time period, opportunity cost of the money not paid and other administrative costs.

9. Failure to pay any of said charges shall be considered a material breech of this Rental Agreement and Owner shall have the right to commence legal proceedings against Resident and all occupants including but not limited to an unlawful detainer action to recover possession of the premises. Upon termination or expiration of the Lease, unpaid water and sewer bills may be deducted from Resident's security deposit, and for such purpose Owner and Resident agree that the charges described in this addendum are considered additional rent.

_____
Denika Terry (Lessee)

_____
Date   8-30-2011

_____
Owner Authorized agent

_____
Date   8/30/11

LD317.01.CA--Revised 07/15/08

WAS000156
Bellows Decl. Ex. 4, page 7

## ADDITIONAL SERVICES AGREEMENT 

Apartment # 391

This Additional Services Agreement (hereinafter the "Agreement") is made by and between Wasatch Property Management, Inc. (hereinafter "Wasatch" or the "Lessor") as property manager for <u>Chesapeake Commons Apartments</u>  (hereinafter the "Community") and <u>Denika Terry</u> (hereinafter the "Resident(s)" under the terms of the Lease (defined below) or the "Lessee(s) under the terms of the Agreement).

This Agreement provides for the rental of certain personal property items (hereinafter the "Property") and/or provides for the additional services (hereinafter the "Services") listed below.  This Agreement is subject to and conditioned upon those certain terms and conditions detailed herein.  This Agreement is made a part of that certain Residential Rental Agreement, dated <u>09/20/2010</u> (hereinafter the "Lease") by and between the Resident(s) and the Community.  Wasatch Property Management will provide the Services and the Property as referenced and described by this Agreement.

**Property:**

| | | Monthly Charge |
|---|---|---|
| Washer and Dryer | Serial Number # _____ | <u>40.00</u> |
| Furniture Rental / Purchase (See Additional Agreement for purchase terms) | | <u>0.00</u> |
| Housewares | | $ _____ |
| Storage Space Rental | Space Number | <u>0.00</u> |
| Reserved Covered Parking | Space Number | <u>10.00</u> |
| Reserved Uncovered Parking | Space Number | <u>0.00</u> |
| Enclosed Private Garage | Space Number | <u>0.00</u> |
| Renter's Insurance | | <u>15.58</u>(This is available as a pay with rent option), or |
| Insurance Provider Name _____, Policy # _____ | | |

**Services:**

| | |
|---|---|
| Internet Service | $ _____ |
| Cable Television Service | <u>0.00</u> |
| Intrusion and Security Alarm Service | <u>0.00</u> |
| Utility Services (Electric, Gas, Water, Sewer, Trash)(See Separate Agreement for service terms) | $ <u>Estimated</u> _____ |
| Housekeeping Services | <u>0.00</u> |
| Pet Rent (0.00 x  1# of pets, limit 2 per household) | <u>$0.00</u> |
| Coporate Service | <u>0.00</u> |
| Month to Month Lease (For leases starting on MTM basis only) | <u>$0.00</u> |
| Total Charges for Property & Services | <u>$65.58</u> |
| Taxes (if applicable) | <u>$0.00</u> |
| Total Monthly Payment Due | <u>$65.58</u> |

**Fees:**

| | |
|---|---|
| Lease Initiation Fee    (if applicable) | |
| Pet Sanitizing and Cleaning Fee (if applicable) | <u>0.00</u> |
| Utility Service Setup Fee (See Separate Agreement for service terms) | <u>0.00</u> |
| Intrusion and Security Alarm Service Setup Fee | $ _____ |
| Total Fees Due at Initiation of this Agreement | <u>$0.00</u> |

**Payment:**  The scheduled Monthly Fees listed above are due and payable on or before the first day of the month following execution of this Agreement and every month thereafter, unless otherwise agreed.  I have read the foregoing and acknowledge the contents thereof, dated <u>09/20/2011</u>

_Denika Terry_
Denika Terry (Lessee)

8-30-2011
Date

_(signature)_
Owner Authorized agent

8/30/11
Date

LD303.01 Revised 07/15/2008

WASATCH
PREMIER COMMUNITIES

WAS000157

Bellows Decl. Ex. 4, page 8

 **ADDENDUM A** 

This document is incorporated into and shall become a part of that certain residency agreement by and between Property Owner <u>Chesapeake Commons Apartments</u>, and Resident(s), <u>Denika Terry</u>, dated <u>09/20/2010</u>.

## PAINTING CHARGES (MINIMUM):

Provided Resident occupies the apartment for AT LEAST thirty-six (36) months, management shall assess only labor charges for painting of walls (unless above normal wear and tear; including, but not limited to: painting patches necessary due to holes, rub lines from furniture, crayon, paint, adhesive hangers, grease splatters or other un-removable decoration of walls). Should resident occupy the apartment for LESS than thirty-six (36) months, resident shall be charged for th cost of painting, in the event it is necessary to repaint the premises. The following costs are typical of what is charged, however, they are only guidelines. Resid shall be charged actual costs of painting, if necessary, including labor and materials.

|  | STUDIO | 1 BEDROOM | 2 BED/1 BATH | 2 BED/2 BATH | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Comp;ete Paint Job | $175.00 | $200.00 | $225.00 | $260.00 | $295.00 | $330.00 |
| Partial Paint | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room | $45.00/room |

(0-12 months = cost, 13-18 months = 75%, 19-24 months = 50%, 25-30 months = 33% 31-36 months = 20%)

## REPLACEMENT CHARGES :

Should replacement of damaged or missing items be necessary due to damage beyond ordinary wear and tear, the following charges are typical of the actual replacement costs, including materials and labor. Only actual costs, including materials and labor if necessary will be charged to the resident.

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Alarm System | Cost | Int. Door | Cost | Range Knobs | Cost |
| Alarm Sensors | Cost | Int. Door Jam | Cost | Re-Key Locks | Cost |
| Appliance Rplc. | Cost | Int. Door Knob | Cost | Remotes/Key Cards | Cost |
| Cabinet Doors | Cost | Light Bulb | Cost | Shower Door | Cost |
| Carpet Red Stains | Cost | Light Globes (12") | Cost | Shower Rod | Cost |
| Carpet Patching | Cost | Light Globes (8") | Cost | Sink Stopper | Cost |
| Crisper Tray | Cost | Mail Box Locks | Cost | Smoke Detector | Cost |
| Dishwasher Rack | Cost | Mini-Blinds | Cost | Stove Burner Ring | Cost |
| Door Stops | Cost | Mirrors | Cost | Stove Drip Pans | Cost |
| Draperies | Cost | Mirrored Doors | Cost | Stove Elements | Cost |
| Entry Door | Cost | New Keys | Cost | Switch Plates | Cost |
| Entry Lock | Cost | Outlet Plates | Cost | Toilet Paper Roller | Cost |
| Fire Extinguisher | Cost | Oven Rack | Cost | Toilet Seat | Cost |
| Florescent Bulb (4) | Cost | Patio Door Blinds | Cost | Towel Bar | Cost |
| Furniture Damage | Cost | Patio Screen Door | Cost | Tub Stoppers | Cost |
| Garbage Disposal | Cost | Peep Holes | Cost | Vertical Blinds | Cost |
| Glass Rplc. | Cost |  |  | Wall Bumpers | Cost |
| Heat Lamp Bulb | Cost |  |  | Window Screens | Cost |

## CARPET

The Resident is responsible to leave the carpet in the same clean condition it was when the resident first took occupancy. The following charges are typical of the actual carpet cleaning expense. Only the actual costs of cleaning including labor and materials, if necessary, will be charged to the resident.

|  | STUDIO | 1 BEDROOM | 1 BED/LOFT | 2 BEDROOM | 3 BEDROOM | 4 BEDROOM |
|---|---|---|---|---|---|---|
| Carpet Shampoo | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Deodorizing | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Replacement | Cost | Cost | Cost | Cost | Cost | Cost |
| Carpet Pet Treatment | Cost | Cost | Cost | Cost | Cost | Cost |

## CLEANING :

It is your responsibility to leave the premises in the same clean condition as it was when you first occupied the property. If you choose not to, you will be billed for the actual costs, including labor and materials, if it becomes necessary to clean the premises. The following costs are typical of what is charged to clean the following items:

| ITEM | COST | ITEM | COST | ITEM | COST |
|---|---|---|---|---|---|
| Bath Cabinets | Cost | Kitchen Floor | Cost | Range Top | Cost |
| Bath Floor | Cost | Kitchen Sink | Cost | Refrig. Defrosting | Cost |
| Bath Sink | Cost | Light Fixtures | Cost | Refrigerator | Cost |
| Bath Tub | Cost | Medicine Cabinets | Cost | Shower Stall | Cost |
| Cabinets | Cost | Microwave | Cost | Storage Room | Cost |
| Ceiling Fan | Cost | Mini/Vertical Blinds | Cost | Vacuum Carpet | Cost |
| Commode | Cost | Mirrors | Cost | Vent Hood | Cost |
| Dishwasher | Cost | Oven | Cost | Vent Covers | Cost |
| Draperies | Cost | Patio/Balcony | Cost | Windows | Cost |
| Entry Way | Cost | Patio Window | Cost | Window Screens | Cost |

**LABOR:** General Maintenance, Painting and Cleaning Labor Charges and supplies will be assessed at the actual costs to the landlord, if necessary, for trash removal, washing of walls, doors, door frames, switch plates, shelving, heat registers, removing contact paper, cork, mirror tiles and wallpaper and any other miscellaneous repair, paint or cleaning. Resident should schedule a Move-Out Inspection with the Resident Manager prior to vacating the apartment and mutually assess any painting, cleaning or repairs required and review cost of same. Nothing herein shall be construed as a limitation upon Owners rights to pursue cause for damages not specifically listed hereon.

| Resident | Resident _Denika Terry_ |
|---|---|
| Owner's Authorized Agent | Date 8-30-2011 |

/LD304.01. Revised  7/15/08

*www.isyourhome.com*

WASATCH

WAS000158

Bellows Decl. Ex. 4, page 9



**Where can I get more information?**
Speak with the housing owner or manager directly to learn why you received a Proposition 65 warning. Property owners and managers were not required to notify OEHHA when they provide tenants with a warning.  However, to obtain general information on the Proposition 65 list of chemicals, you may contact OEHHA at (916) 445-6900, or visit http://www.oehha.ca.gov/prop65.  Following a list of contacts for more information on Proposition 65 as well as chemicals that may be found in your home.

| Type of Information | Contact |
|---|---|
| Proposition 65 Enforcement | California Attorney General<br>(510) 622-3170, prop65@doj.ca.gov |
| Toxics Directory:<br>Agency List | OEHHA<br>(510)622-3170<br>http://www.oehha.ca.gov/public_info/TDHOMSC1a.html |
| Asbestos<br>Indoor Air Quality | Indoor Exposure Assessment Unit, Air Resources Board<br>(916) 445-0753, http://www.arb.ca.gov/thml/fslist/htm |
| Lead | Lead Coordinator in your county government office<br>Childhood Lead Poisoning Prevention Program<br>(510) 622-5000, http://www.dca.ca.gov/childlead/ |
| Tenant Issues | Department of Consumer Affairs<br>(800) 952-5210, http://www.dca.ca.gov/<br>Department of Housing and Community Development<br>(916) 445-4782, http://www.hed.ca.gov/ |

I have read and acknowledge receipt of this fact sheet.


_Denika Terry_  (Lessee)    8-30-2011.
Denika Terry (Lessee)                Date

_(signature)_    8/30/11
Owner/Authorized agent              Date

LD316Revised 7/15/08



WAS000159

Bellows Decl. Ex. 4, page 10

# PREVENTION OF MOLD AND NOTICE OF DISCLOSURE

**Community:  Chesapeake Commons Apartments**
**Resident:**          Denika Terry                                                                                                t0030362

### What is Mold?

Molds are fungi. Molds grow throughout the natural and built environment. Tiny particles of mold are present in indoor and outdoor air. In nature, molds help break down dead materials and can be found growing on soil, foods, plant matter, and other items. Mold spores are very tiny and lightweight and spread very easily through air. Mold grows can often be seen as discolorations, ranging from white to orange and from green to brown and black.

When molds are present in large quantities, they can cause allergic symptoms similar to those caused by plant pollen.

### What does mold need to grow?

Mold only needs a few simple things to grow and multiply; moisture, nutrients, and a suitable place to grow. To prevent mold, moisture problems must be prevented and treated immediately. Proper ventilation is essential in preventing mold. The following are possible causes of indoor moisture problems:

| | | |
|---|---|---|
| Humidifiers | Leaky plumbing | Leaking roofs |
| Sewer back ups | Indoor clothes drying | Shower/bath steam |
| Cooking steam | House plants | Any flooding |

As a resident of your apartment you are responsible for the prevention of mold in your apartment. Please follow these simple guidelines:

1.  Remove Excess Moisture
    a. Dry out mops and cleaning utensils thoroughly before storing inside your apartment.
    b. Wipe down bathroom walls (shower doors if applicable) immediately after bathing, allow towels to air out. Wash and dry towels often.
    c. Wipe down any condensation from interior windows and windowsills, wash and dry towels immediately.
    d. Use of dehumidifying crystals is suggested for closed or other areas where ventilation is difficult to achieve.

2.  Keep Things Clean
    a. Keep closets, dresser drawers - any place where mildew is likely to grow - as clean as possible.
    b. Soil on dirty articles can supply enough *food* for mildew to start growing when moisture and temperature are right.
    c. Greasy films, such as those that form on kitchen walls, also contain many nutrients for mildew-causing molds.

3.  Circulate the Air
    a. When the outside is drier than that inside, ventilation allows the dry air to enter, take up excess moisture, and then be carried outside.
    b. When natural breezes are not sufficient, please use your central air conditioners (FAN ONLY) and bath/laundry room exhaust *fan(s)*.
    c. Poorly ventilated closets get damp and musty during continued wet weather, and articles stored in them are apt to mildew.
    d. Try to improve the air circulation by opening the closet doors. In addition, hang the clothes loosely so that air can circulate around them.
    e. Dry all wet clothing (including clothes wet from rain or perspirations) before putting in the closet.

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor *from* any liability for any personal injury or damages to property caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

The following have reviewed the information above and certify, to the best of their knowledge that they understand the information and will notify management of any water intrusion.

_Denika Terry_                     8-30-2011.
Denika Terry (Lessee)           Date

_(signature)_                          8/30/11
Owner Authorized agent            Date

EHS101.01--Revised 7/15/08

*www.isyourhome.com*

WAS000160
Bellows Decl. Ex. 4, page 11

 **PEST CONTROL ADDENDUM** 

Resident(s): <u>Denika Terry</u>

Address: <u>3600 Data Drive, #391, Rancho Cordova, CA 95670</u>

This Pest Control Addendum (this "Addendum") is made part of the Apartment Lease Contract (the "Lease") by Owner and Resident. To the extent the terms of this Addendum conflict with the Lease, the terms of this Addendum shall control.

1.  Resident acknowledges that the Apartment is free from infestation by rodents and vermin, including, but not limited to, beetles, spiders, ants, roaches, bed bugs, mice, and rats (collectively "Pest"). Resident shall keep the Apartment free from Pest infestation for the full term of the Lease.

2.  Resident shall keep the Apartment in a neat, clean, good and sanitary condition, including keeping the Apartment and all personal property in the Apartment free from Pest and their eggs.

3.  Resident shall immediately notify Owner in writing of any known or suspected Pest infestation in the Apartment.

4.  Owner or owner's contractor shall have the right to enter the Apartment at all times with or without prior notice for the purpose of inspecting for and treating Pest infestation. Resident acknowledges and agrees that treatment may include the application of pesticides.

5.  If given at least 24 hour notice of the date on which treatment shall be applied, Resident shall complete all pre-treatment instructions provided by Owner or Owner's contractor including, but not limited to the movement or removal of any or all personal property (examples: furniture and clothing), the bagging and/or laundering of all clothing, the removal of all items from cabinets, the removal or disposal of all clutter in the Apartment, and the thorough cleaning of the Apartment.

6.  Resident shall complete all post-treatment instructions provided by Owner or Owner's contractor including, but not limited to leaving traps and poison distribution systems unmolested.

7.  In the event the Owner reasonably determines that any of Resident's personal property is infested with any Pest, Owner may require that such personal property be permanently removed from the Apartment upon three day written demand and may require that such personal property be sealed prior to removal in order to keep Pest from spreading to common areas or other residences in the complex.

8.  Provided Resident fully complies with the terms of this Addendum, Owner shall provide appropriate extermination in response to the infestation of Pests. In the event the action or inaction of Resident, a member of Resident's household, a guest or invitee of Resident, or a person under Resident's direction or control contributes to or causes the infestation or Resident refuses to provide access of comply with pre and post treatment instructions, Resident shall be responsible for the cost of the extermination in addition to the other remedies provided by the Lease.

_Denika Terry_ _____   _8-30-2011_
Denika Terry (Lessee)       Date

OWNER
By: _____   _8/30/11_
Its authorized agent          Date

EHS101.02-Revised 9/7/10

WASATCH
PREMIER COMMUNITIES

WAS000161

Bellows Decl. Ex. 4, page 12

 **PET AGREEMENT** 

This Agreement entered into on 09/20/2011 by and between Wasatch Property Management (hereinafter referred to as "Management") acting pursuant to express written authority granted to Manager by Owner of the Chesapeake Commons Apartments and Denika Terry, Resident in consideration of their promises agree as follows:

1. Resident is renting from Management on the premises located at:

## 3600 Data Drive, #391 Apt. 391, Rancho Cordova, CA 95670

2. The lease agreement provides that without Management's prior written consent, no pet shall be allowed in or about said premises. If a pet is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.

3. Wasatch limits pets to domestic cats, dogs, birds, and fish only. Pets are allowed on the premises **ONLY** with an appointment by management to meet your pet, a signed Pet Agreement on file, additional deposits and fees may be required, plus per month pet rent, and the full **WRITTEN** consent and knowledge of the facts by management.

4. If a pet is acquired after you move in, it is necessary to make proper arrangements with the office immediately or you will be in violation of your lease.

5. All residents with pets are required to submit a statement from a licensed veterinarian establishing each of the following: (a) the breed of the animal, (b) the animal generally is in good health, and (c) which vaccinations the animal has received, when the animal received these vaccinations and that the animal has received all vaccinations required by law. (The only exceptions would be animals designated as service animals required to accompany a resident with a verified disability for the specific purpose of aiding that person).

6. Resident desires to keep the below described pet(s) hereinafter referred to as a "Pet" and will be responsible for the written Policies as follows:

1st Pet's Name:_____ Breed:_____ Color:_____ Sex:_____

2nd Pet's Name:_____ Breed:_____ Color:_____ Sex:_____

7. **Restrictions**. We will accept all breeds of dogs a minimum of one year old, except for pure breeds or mixed breeds of any of the following: Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner. The maximum weight limit allowed for pets is 100.00 lbs. **Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time. We allow a maximum of two pets per apartment. Cats must be neutered. Reptiles or exotic pets are not allowed. Renters Insurance is required for ALL Wasatch Property Management Residents as of December 1, 2006.**

8. Pet is required to be "house broken" and will not cause damage to property or apartment. Pets must not annoy other Residents, due to loud or disruptive behavior. Pets will not inconvenience, or cause complaints from any other Residents or you will be subject to fines or required to remove pet from premises for violation of terms of this agreement. After third offense or complaint resident will be subject to eviction proceedings.

9. The pet must be over one year old and have been SPAYED OR NEUTERED. Upon move in Management will photograph the pet and also copy licensing and vaccination records.

10. **Vaccination:** Updated vaccination information is required by management on a yearly basis.

11. **Non-Refundable Pet Fee:**

a. Resident agrees to pay Management the sum of $0.00. Management may use therefrom such amount as is reasonably necessary for any of the damages or excessive cleaning caused by or in connection with said Pet. At the termination of this agreement, any balance shall be billed to the LEASE AGREEMENT SECURITY DEPOSIT and disbursed by law. Resident agrees to pay Management for any excess damages or costs on demand.

*Denika Terry. 8-30-2011.*

WAS000162

Bellows Decl. Ex. 4, page 13

b. Resident agrees to pay Manager the sum of $0.00 as a Non-Refundable Fee for normal wear and tear in the apartment caused by or in connection with said Pet.

c. The total monthly rent stated in the Lease Agreement shall be increased by $0.00 per pet per month as pet rental cost. No additional pet or change in pet types is authorized without prior written consent from Management and the payment of another deposit and/or additional rent.

12. The pet must be kept inside the apartment, including private patio or balcony area, except when on a leash no longer than 6 feet and under the immediate control and presence of a responsible person.

13. **Liability for Cleaning:** Owner of pet shall be responsible for the immediate removal of pet defecation occurring anywhere on the apartment community.

14. A $75.00 fine will be charged in the event said pet is seen in landscaped, pool or other recreational areas. A $75.00 fine will be charged to any Resident who is not cleaning up after their pet. A $75.00 fine will also be charged if Resident is not keeping their pet on a leash at all times with the exception of the enclosed dog runs. If any pet rule is not followed, then, upon Management discretion, Resident will immediately remove the pet from the premises. Failure to do so will constitute a default to the Rental Agreement. AFTER A 3rd OFFENSE AN EVICTION WILL TAKE PLACE.

Resident Initials

15. If the pet is loose on the premises and the responsible party is not available or willing to retrieve Pet, Management may, but is not obligated to, retrieve and return it to Resident's apartment, or board it at Resident's expense, or cause appropriate officials to impound it. Resident agrees to indemnify Management for any damages or expense it may incur in carrying out any of the foregoing options.

16. No pet shall be fed on an unprotected carpet within the apartment. Resident shall prevent any fleas or other infestation of the apartment or other property of the owner. Upon move in and move out, front and backing of carpet will be inspected and photos taken and kept on file.

17. Resident agrees to comply with:
    a.   Health and safety code &
    b.   All other applicable laws and regulations.

18. Resident agrees to indemnify and hold Management and the owner of these apartments harmless from any and all liability, or claims of liability, arising in connection with the pet, including attorney fees.

19. This agreement is an addendum and part of the Lease Agreement between Manager and Resident. In the event of default by Resident of any listed items, Resident agrees after receiving written notice of default from Management to cure the default or vacate the premises.

20. Each Resident who signed the Lease Agreement shall sign this Pet Agreement.

_Denika Jerry_    8-30-2011.
Denika Terry (Lessee)      Date

   8/30/11
Owner Authorized agent      Date

LD310.02-Revised 7/15/08

WASATCH
PREMIER COMMUNITIES

WAS000163
Bellows Decl. Ex. 4, page 14

## CONCESSION APPROVAL REQUEST

Name of Resident: **Denika Terry**                                    Apartment: __391__

MI Date: __09/20/2010__          Lease From Date: __09/20/2011__          Lease To Date: __09/19/2012__

Phone #: __(916) 904-4534__                              **Amount of Concession $** ____0.00____

_____Reason for Concession: (Mark all that Apply)_____

|        |     |                                                                  |
|--------|-----|------------------------------------------------------------------|
| _____ | 1.  | **Move In Concession (MICONC)**                                  |
| _____ | 2.  | **Application Fee Waived (APLCONC)**                             |
| _____ | 3.  | **Lease Initiation Fee Waived (RDECONC)**                       |
| _____ | 4.  | **Special Promo  (PROMCONC) (Complete 4a)**                     |
|        |     | 4a.  Specify Promo _____          |
| _____ | 5.  | **Prompt Payment Discount (PPD) (Completed 5a-5b)**             |
|        |     | 5a.  Amount of Monthly Discount $(_____)             |
|        |     | 5b.  Number of months discount is applicable _____           |
| _____ | 6.  | **Renewal Concession (RENCONC)**                                |
| _____ | 7.  | **Resident Referral (REFCONC)  (Complete 7a-7c)**              |
|        |     | 7a.  Referred Who _____            |
|        |     | 7b.  Apartment # _____   Move In Date _____     |
|        |     | 7c.  Signature of New Resident: _____    |
| _____ | 8.  | **Early Bird (ERLYCONC) (Complete 8a)**                        |
|        |     | 8a.  Specify Month of Drawing: _____    |
| _____ | 9.  | **Contest Winner (CNTSTCON) (Complete 9a)**                    |
|        |     | 9a.  Specify Contest _____    |
| _____ | 10. | **Customer Service Concession (SRVCCONC) (Complete 10a)**      |
|        |     | 10a. Specify Issue/Reason for Concession                        |
|        |     | _____         |
| _____ | 11. | **Maintenance Concession (MNTCCONC) (Complete 11a)**           |
|        |     | 11a. Specify Issue/Reason for Concession                        |
|        |     | _____         |
| _____ | 12. | **Deployment Concession (DEPLOY)**                              |

**Additional Comments:**

_____
_____
_____

Resident Signature                                  __8-30-2011__
                                                    Date

Manager Approval                                    Regional/Area Leader Approval

**Copy to Resident File** : **t0030362**                    CM107.01-Revised 10/07/08

_www.isyourhome.com_                                        **Page 18 of 18**

WAS000164
Bellows Decl. Ex. 4, page 15

## QUALITY MOVE IN CHECKLIST

**Leasing Documents:**
Lease Agreement, explained and signed
Community Policies
Pet Policy/Rules
    -Size/Deposits
    -Areas to Walk Pets/Pet Waste Removal
Bond Program (if applicable)

Resident      Agent for Owner

**Additional Services Programs:**
*Property*    --Washer/Dryer
    --Furniture Rental
    --"Rent to Own" Furniture
    --Day Care Facility
    --Storage Space Rental
    --Reserved Parking Program (Garage, Covered or Uncovered)
    --Amenities (Common Areas, Clubhouse, Sport Courts, Car Wash, Vending)
    --Business Services (Copier and Fax Usage, Computer Centers, Meeting Facilities)
*Services*    --High Speed Internet
    --Cable Service
    --Housekeeping Services
    --Telephone Services (Smart Moves-Pacific Bell)
    --Renters Insurance
    --Intrusion and Security Alarm Service
    --Utility Service
    --Corporate Reservations
    --Pet Rent

Resident      Agent for Owner

**Rent Payment/Late Payment Policy/Fees:**
    How to Pay Rent
    When to Pay Rent
    Where to Pay Rent
    Late Payment Policy/Fees

Resident      Agent for Owner

**Quality and Reliable Service:**
    Service Request Procedures
    Pest Control Service Procedures
    Keys and Lock Change Procedures
        -Apartment, Mailbox, Commons Areas
        -Remotes for gates and/or garages
    UPS, Fedex and US Postal Package Services

Resident      Agent for Owner

**After Hours Service:**
    How to Contact Maintenance
    What is a Maintenance Emergency?
    Gated/Guarded Community Entry
    Guest Entry
    How to Contact Night Services

Resident      Agent for Owner

**Common Area Use/Hours:**
    Pools/Spa/Water Features
    Laundry Rooms
    Clubhouse/Recreation Rooms
    Weight Rooms/Sport Courts
    Play Grounds/Picnic Areas
    Pet Runs

Resident      Agent for Owner

**Surrounding Area Information:**

Resident      Agent for Owner

**New Home Orientation (This section to be completed with resident in the apartment home):**
    Move In Condition Inspections
    Review Addendum A
    Explain Operation of Home Features

LD301 01 Revised 07/15/2008

WAS000165

Bellows Decl. Ex. 4, page 16

DocuSign Envelope ID: A4919003-A659-493A-AF17-142537859F73

# RESIDENTIAL RENTAL AGREEMENT
### THIS IS A LEGALLY BINDING AGREEMENT
### READ IT CAREFULLY

**Wasatch Property Management, Inc. I Owners Agent**
*A Utah Corporation - registered in California*
595 S Riverwoods Pkwy Suite 400 Logan, Utah 84321

This agreement is made in Oceanside, CA , on 3/20/20 between , Canyon Club Apartments hereinafter called Owner, by **Wasatch Property Management**, its authorized agent, and

Lease Holder(s):

**Anthony Maiava**

Authorized Occupant(s):

▮▮ ▮▮ **(Dependant),** ▮▮▮ **(Dependant),** ▮▮▮ **(Dependant),**
,hereinafter called Resident(s). No other person(s) except these herein stated may occupy premises without written approval of Owner.

**I.  TERM**

This Agreement creates a 12 month and 0 day tenancy, commencing 06/28/2020 and Terminating 06/27/2021. The total rent for this 12 month and 0 day tenancy is $24,480.00.

**II.  PROPERTY**

Owner hereby rents to Resident for the term of this agreement the property located at: 520 Mesa Breeze Way #153, Oceanside, CA, 92058

**III.  RENT**

The rental for the premises is $2,040.00 per month, which Resident agrees to pay Owner, in advance, without deduction or offset, at Owners office at 420 Activity Way, Oceanside, CA, 92058 . The Rental Office can be reached by phone at (760)-721-2602. Unless otherwise posted, payment can be made in person at the Owner's office between  9:00 AM and  6:00 PM Monday through Friday, 10:00 AM through  5:00 PM on Saturday, and 10:00 AM through  3:00 PM on Sunday.   In addition, rent can be paid via ACH Transaction, Credit or Debit Card Transaction, Money Gram Transaction or online at www.IsYourHome.com in installments as follows:

**A.** The sum of $204.00 is due upon execution of this Rental Agreement as rent for the period beginning 06/28/2020 , through 06/30/2020  (first month prorated) payable on 06/01/2020.  All prorations made during the term of this tenancy shall be made on the basis of a calendar month.

**B.** The sum of $2,040.00, plus additional services of $25.00 (refer to Additional Services Agreement), is due, in advance, on the first day of each calendar month commencing July 2020 .

**C.** A concession in the amount of $0.00  is to be given to Resident as part of this 12 month(s) lease and will be issued as $0.00  off move in. The $0.00 concession is due and payable back to Canyon Club Apartments if the  12 month lease is not fulfilled for any reason.

**IV.  LATE CHARGES**

Tenant recognizes that late payments cause Owner damages in the form of, but not limited to, administrative and collection costs. Tenant further understands and agrees that the exact amount of such losses is difficult to ascertain, as Owner's fiscal management expenses are calculated with respect to the whole of the rental community and not to individual units. As such, Tenant agrees to pay to Owner an amount of $75.00, which constitutes a reasonable estimate of losses incurred due to Tenant's failure to make rental payments on or before 5:00 p.m. on the 3rd day of the month. This late charge shall be deemed to be additional rent due under the lease. Lessor will not accept personal checks after the 3rd day of the month.  In the event any check tendered by Tenant as payment of rent is returned by the bank for "Non-Sufficient Funds", "Account Closed", "Payment Stopped", or for any other reason, Tenant shall be required to immediately pay to Owner a charge of $25.00 for the first returned check, and $35.00 for each subsequent returned check, plus a $75.00 late fee. In the event Tenant rental payment is late , or if any check tendered by Tenant is returned by the bank, Tenant may be required, at Owners option, to make any future payment with cashier's check, certified check or money order.  Any acceptance of rent after the 3rd day of the month does not modify the terms of this agreement nor waive Owners right to demand future payment when due.

**V.  SECURITY, REPAIR, CLEANING AND KEY DEPOSIT**

Resident shall pay Owner, upon execution of this agreement, a security deposit of $750.00. Said deposits shall be held by Owner as security for the faithful performance by Resident of all terms of this agreement. Owner shall not be obligated to pay any interest on such amounts. Owner at its sole discretion, may at any time use part or all of said deposit to remedy Resident's defaults in the payment of rent, utilities, to repair damages caused by Resident (exclusive of ordinary wear and tear), and to clean the premises, if necessary, upon termination of tenancy including but not limited to painting, and general cleaning. Resident agrees that soilage is not ordinary wear and tear and agrees to restore the premises to original condition at commencement of tenancy as evidenced by the move-in inspection check list signed by the Resident prior to occupancy. If any part of the security deposit is so utilized by Owner during the term of tenancy, Resident agrees to reinstate said total security deposit upon (5) days written notice delivered to Resident in person or by mailing. No later than three (3) weeks after Resident has vacated the premises, the Owner shall furnish Resident with an itemized written statement of the disposition of such security deposit and shall return any remaining portion of said deposit to Resident. As applicable, any deposit or refund check will be made payable jointly in the name of each Resident who has executed this Residential Rental Agreement unless Owner receives written instruction to the contrary, executed by all such Residents.

Any violation or breach of this Agreement may cause Resident to forfeit all or a portion of security deposit. It is understood and agreed that any physical damage or destruction to rental premises or its contents, including theft, misuse or abuse, or any loss caused to Owners which exceeds the amount of the security deposit will be assessed to the Resident and the same agrees to assume full liability for any amount not covered by this security deposit. Except for any loss caused by the negligence or intentional misconduct of Owner.

**VI.  ACCEPTANCE AND SURRENDER OF PREMISES**

**A.** Resident accepts said premises and furniture and appliances as listed on the Move-In/Move-Out Checklist as is, and as being in good and sanitary condition and repair and agrees at the termination of this Rental Agreement to peaceably surrender same to Owner in a clean and satisfactory condition . Resident has inspected the premises, including, but not limited to the windows, doors, plumbing facilities hot and cold water supply, heating facilities, electrical lighting, building grounds and appurtenances and receptacles for trash, and accepts the same, as is. And acknowledges that the same are in good condition and/or repair, unless noted to the contrary in the Move-In, Move-Out Checklist. Resident hereby receives for their use two (2) keys. Resident shall, upon vacating, deliver all keys and access cards for the premises to Owner, or remain liable for the payment of rent until said delivery is made.  Be advised, $90.00 is the fee for after hours lockout service. Resident also understands that if for any reason resident loses a key or fails to return all keys at time of move out a $50.00 replacement fee will be charged to resident.

**B.** Resident acknowledges that all furniture, furnishings and equipment listed on the Apartment Furniture Inventory have been received in good condition and that Owners delivery of such item is without warranty, expressed or implied, by Owner as to their fitness. Such inventory shall be deemed conclusively correct in all particulars except as to those errors, defects or objections as to which Resident gives written notice to Owner with three (3) days after Resident's occupancy of the premises. Resident agrees not to remove any of the furniture, furnishings or equipment listed on said inventory without prior written consent of Owner, and to return each and all of the listed items upon termination, in the same condition as received, ordinary wear and tear, acts of God, sudden action of the elements, and other causes beyond Resident control excepted.

*www.isyourhome.com*          *AM*
INITIAL

**WASATCH** PROPERTY MANAGEMENT

*YB*

DocuSign Envelope ID: A4919003-A659-493A-AF17-142537859F73

## VII.  USE OF THE PREMISES

**A.** The premises are rented for residential use only and shall be occupied by not more than **4** occupants.  Resident agrees that no persons the age of 18 or older shall reside in the premises unless they have signed this lease. Resident further agrees that anyone over the age of 18, who stays in the apartment over two weeks, must be on the lease.

**B.** Without written approval of Owner, No Dogs, Cats, Birds, or Any Other Animals of any kind shall be kept or allowed on the premises, nor shall the Resident permit any invited guest to have or keep any animals upon the premises for any period of time.  If an animal is found in an apartment without written consent, a fee of $500.00 will be assessed plus current deposit and back rent.  We will accept all breeds of dogs a **minimum of 6 (six) months old**, except for pure breeds or mixed breeds of any of the following:  Afghan Hound, Akita, Australian Cattle Dog, Basenji, Basset Hound, Bedlington Terrier, Bernese, Bloodhound, Boxer, Bulldog, Chow, Dalmatian, Doberman, Dog de Bordeaux, Elkhound, Fila Brasilerio, Foxhound, German Shepherd, Great Dane, Greyhound, Husky, Keeshond, Malamute, Mastiff, Pit Bull, Presa Canario (Pit Bull Family) Pointer, Rottweiler, Saint Bernard, Saluki and Weimaraner.  Management reserves the right to add additional breeds or canine families to this list of prohibited breeds at any time.  We allow a maximum of two animals per apartment.  All Animals are required to be spayed or neutered.  Reptiles or exotic animals are not allowed.  The maximum weight limit allowed for animals is 100 lbs.

**C.** Resident shall not disturb, annoy, endanger, threaten or inconvenience other residents or neighbors, nor use the premises for any immoral or unlawful purpose, nor violate any law or ordinance, nor commit waste or nuisance upon or about the premises, nor shall the Resident allow any guest to do so.

**D.** Resident may not use the premises in any manner nor permit any use which would invalidate or be in conflict with applicable law, **California Code §308.3.1 and §308.3.1.1** or Owner's fire or liability insurance policies covering the premises.  As a result, Resident may not store or use within the Premises (including any balcony, patio or porch areas) any open flame cooking device (including but not limited to charcoal burner or liquid petroleum gas fueled fire pits, barbeque grills, hibachis, propane/electric grills or any similar items which emit an open flame).

**E.** Resident shall do absolutely no repair work on any vehicle on the premises, nor shall any vehicle not in running order or without current registration be parked on the premises.  No vehicle not in regular use may be stored on the property at any time or for any reason; this includes, but is not limited to motorcycles, boats, trailers and RV's.  Resident agrees that Owner has the right to control the method and manner of parking in the parking spaces in and around the premises, designate what portion of the premises may be used by Resident, his family or guest, for parking and to tow away and store at Resident's expense, any vehicle parked by Resident, his family or guests, in spaces not so authorized by Owner. Resident agrees the Resident's vehicles will be parked only in the stall(s), if any, assigned to Resident.  Resident agrees to "Front In" only parking and will not back into parking spaces at any time.  Resident acknowledges that Owner is not responsible for vehicles or other items kept or stored outside the premises, and Resident hereby waives any claim against Owner for damages or loss in connection therewith.

**F.** Harassment or Threats:  Lessee and such others for whom Lessee is responsible shall not harass or threaten the manager, any management personnel, or other residents and/or interfere with the management and/or operation of the apartment community.

**G.** Nuisance and Waste:  Lessee and such others for whom Lessee is responsible shall not maintain, commit, or permit the maintenance of commission of a nuisance, and shall not commit or permit the commission of waste, upon the Unit or property common area, or any part thereof.

**H.** Loitering:  Owner/Management prohibits loitering from Lessee, their guests and/or invitees and such others for whom Lessee is responsible in common areas, including but not limited to Laundry Rooms, Exercise Facilities, Parking Lots and/or Stairwells/Breezeways.

**I.** Resident shall not remove from the apartment, for any reason, any fixture or appliance.  This includes, but is not limited to the stove, refrigerator, washing machine and clothes dryer.  Resident's removal of any such items shall be deemed a lease violation subjecting Resident to all remedies available to Landlord in the lease.

## VIII.  RESIDENT'S DUTY TO MAINTAIN PREMISES

Resident is obligated to maintain the dwelling unit in a clean and sanitary condition. Resident shall fully comply with all state and local laws relating to the maintenance of the dwelling unit. If damage to the dwelling unit (other than normal wear and tear)is caused by acts, omissions, or neglect of Resident, occupants, guests or visitors, Resident shall be responsible for the costs of such repairs. Resident shall not perform repairs without express written permission of Owner and shall immediately report any and all damage. Owner is under no obligation to allow Resident to perform repairs.

Resident acknowledges that it has had an opportunity to inspect the dwelling unit and has found it to be free from any pest infestation, including but not limited to rodents, vermin, beetles, spiders, ants, roaches, bed bugs, mice, rats, and any other type of pest (collectively "pests"). Resident agrees to keep the dwelling unit and other areas of the community free from pests. Resident acknowledges that information on pests and pest policies is available in the rental office and agrees to abide by those policies and suggestions. Resident shall immediately report to Owner any problems or sighting of a pest problem within the dwelling unit. Resident further agrees to take no action that causes or exacerbates any pest problem or infestation, including but not limited to bringing onto the premises or in the dwelling unit any items that contain or are infested with pests.

Resident agrees to comply with any and all reasonable demands to assist in pest control. It is agreed that Resident shall hold harmless and indemnify Owner from any liability relating to any pest infestation or problem to the maximum extent allowed by law including but not limited to damages to personal items (including disposal and replacement), cleaning expenses, moving expenses, and expenses incurred during mitigation (hotel, food, transportation, etc.). Resident shall comply with and assist in all pest mitigation as instructed by Owner or a pest professional including but not limited to removal or movement of personal property, laundering of clothing, cleaning of personal items, movement and removal of items from areas for mitigation activities, disposal and removal of clutter, and thorough cleaning of the dwelling unit.

In the event, the any pest problem or infestation is determined to be the directly related to the actions or inactions of Resident, Resident agrees to be liable for the costs and expenses related to the remediation of the dwelling unit and such surrounding units. Such consequential damages may also be assessed to Resident that are determined to be a direct result of the pest problem or infestation.

## IX.  UTILITIES

Resident shall be responsible for the payment of utility services including gas, electricity and may also include water, sewer and refuse collection. Resident shall pay for such utilities consistent with requirements for continuous and uninterrupted service.  It shall be a material breach of this agreement for the Resident to knowingly allow for the interruption of such services or to fail to pay for utility services when due.  Resident must notify Owner in writing of Resident's intent to use any utility service prepayment program that will automatically terminate such service upon the expiration of a prepayment.  Resident further agrees that it shall be a material breach of this agreement to knowingly allow for the interruption of such prepayment services or to fail to pay for utility service prepayment programs when due.

It is further agreed that if resident allows said utilities to revert back into the Owner's name for any reason, Owner reserves the right to bill resident for said utilities in full, plus a utility reinstatement fee of $300 and said utilities could be subject to disconnection by the Owner.  Resident shall pay for the following utility services.

| | | |
|---|---|---|
| ____ gas, | Account # | |
| _X_ electricity, | Account # 78851 | |
| _X_ water/sewer/trash | **See attached Utility Addendum: Disclosure of Resident's Financial Responsibility for Water, Sewer and Trash Collections Charges** | |

## X.  INSPECTION BY OWNER

Resident shall make the premises available during normal business hours to Owner or his agent for: making necessary or agreed repairs; decorations; alterations or improvements; supplying necessary or agreed services. Twenty-Four (24) hour notice will be given by Owner prior to exhibiting the premises to prospective or actual purchasers, mortgagees, residents, workmen or contractors. Normal business hours are hereby agreed to be: 9:00 a.m. to 5:00 p.m. Monday through Friday (except holidays). In case of emergency, Owner or his agent may enter the premises at any time without notice to, or permission of, Resident for the purpose of making corrections or repairs to alleviate such emergency.

www.isyourhome.com

INITIAL  AM

WASATCH
PROPERTY MANAGEMENT

YB

Confidential

WEAU00008977

Bellows Decl. Ex. 4, page 18

DocuSign Envelope ID: A4919003-A659-493A-AF17-142537859F73

**XI.   HOLDOVERS**

If Resident holds over upon termination of this agreement, this agreement shall continue to be binding on the parties as a month-to month agreement.  The monthly rent may be adjusted by the Owner to reflect the current rental value of the premises as well as administrative costs associated with the month to month tenancy.  Current month to month fee is $150.00. Any and all rates and/or fees are subject to change upon expiration of lease term.

**XII.   DESTRUCTION OF PREMISES**

If the apartment shall be partially damaged by fire or other cause without the fault or neglect of Resident, Resident's servants, employees, visitors or agents, the damages shall be repaired by and at the expense of Owner, and the rent until such be made shall be apportioned according to the part of the apartment which is usable by Resident. No penalties shall accrue for reasonable delay that may arise beyond Owners control. The term of this Residency Agreement shall expire by lapse of time upon the third day after such notice is given, and Resident shall vacate the apartment and surrender the same to Owner.

**XIII.   LIABILITY INSURANCE**

Resident understands that any property or liability insurance coverage purchased by the property manager or owner will not protect against loss or damage (i.e., burglary, vandalism, fire, smoke, or any other perils) to Resident's personal property or belongings. Resident also understands that, he or she may be liable to third parties and to the property owner for certain losses and understand that Resident should not expect the property manager or Owner to be responsible for such losses.  Owner and property managment recommend that every resident maintain renter's insurance coverage, at all times.

☐   **RESIDENT HAS RENTER'S INSURANCE**

Resident has the following renter's insurance coverage through a third-party insurance carrier

| | |
|---|---|
| Insurance Company | Policy Number |
| Property Limit | Liability Limit |

☒   **RESIDENT DOES NOT HAVE RENTER'S INSURANCE**

Although Resident recognizes the need for renter's insurance, Resident does not, at this time, have such insurance coverage and may be personally responsible for any property or liability damage to the property's managers, Owner or third-party's property as a result of the actions of Resident, occupants, household members, and guests actions.

**XIV.  WAIVER OF LIABILITY**

Resident agrees to assume responsibility for the following:

**A.**  Resident understands that Managements insurance does not cover Resident's belongings from losses or personal injury not caused by management's negligence and Management strongly encourages Resident to obtain an all-risk renters insurance policy.  If Resident declines to obtain said insurance, Resident understands that Management is only liable for those claims for damages and injuries for which it is legally responsible.  Management shall not be liable for any damage or injury to the Resident(s) or any other person, or to any property, occurring on the premises, or any part thereof, or in the common areas thereof, unless such damage or injury is the result of negligence or unlawful acts of Management, its agents or employees.
**B.**  Loss of property due to theft
**C.**  Steam, gas, electricity, falling plaster, leakage of water from pipes, rain, snow, malfunction of appliances, leakage or dampness of any nature whatsoever to the extent said concerns are beyond the control of Owner.
**D.**  The Actions or omissions of other Residents
**E.**  Interference with light, view or other intangible aspects of the premises.
**F.**  Operations in construction of any public or quasi-public work
**G.**  Any latent defect in the building(s)
**H.**  The use by Resident or guest of any storeroom, laundry room, clubhouse, swimming pool or any other ancillary facility furnished by Agent for Resident's use.
**I.**  Resident shall give Agent immediate notice of fire, accidents, defects in any fixture or equipment, or any condition of the premises that may be unsafe or unhealthy.
**J.**  Resident agrees to indemnify, save and hold harmless Owner and Agent from any and all liability resulting from any and all actions of Resident, his family, servants, agents or guests.  Agent recommends that resident secure property insurance to protect himself against losses occasioned during the term of this agreement.
**K.**  Pursuant to Section  §290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an internet web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community if the residence and Zip Code in which her or she resides.

**XV.  CANCELLATION FEE**

Upon execution of this lease, Resident may cancel Resident's obligation under this Lease by delivering to Manager in writing a notice of intention to cancel Lease. Such notice will be effective sixty(60) days from the date it is given. The notice must be accompanied by payment of rent through the notice period plus, and one of the following options: 1) Pay the remaining balance of the Lease each month as it becomes due up to the date of the termination of the Residential Rental Agreement or until the apartment is reoccupied, whichever occurs first, or 2) Pay a Lease Cancellation Fee of $2,040.00. Such payment will release Resident only from any further rental obligation beyond the date the cancellation is effective. However, all other terms of the Residential Rental Agreement must be complied with, through the date of vacating the premises on or before the effective date of the cancellation. If lease is cancelled after execution, but prior to move in, Resident will be subject to above Lease Cancellation Fee and any other applicable charges. Owner shall retain all remedies for non-compliance with the Residential Rental Agreement, and Resident shall be liable for all costs and damages for non-compliance.

**XVI.  NOTICE TO QUIT**

**A.  MONTH-TO-MONTH TENANCY: If the tenancy under this Agreement is on a month-to-month basis, then such tenancy may be terminated by either party hereto by giving the other party not less than sixty(60) days notice in writing prior to the date upon which the occupancy is to be terminated and possession of the property returned to Owner. If no sixty(60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner win sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty(60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty(60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**
**B.  TERM AGREEMENT: If the tenancy under this Agreement is for a term longer than one month, then such tenancy may be terminated, on the initial expiration date of this Agreement, by either party hereto by giving the other party not less than sixty (60) days notice in writing prior to the initial expiration date of this Agreement. If such sixty (60) day notice is not timely given, then the tenancy will continue on a month-to-month basis subject to termination upon sixty (60) days written notice as provided by the preceding section of this Agreement, and the monthly rental will be automatically and periodically adjusted by Owner to reflect the current fair rental value of the property plus the additional administrative costs associated with month-to-month tenancies. If no sixty (60) day notice is received by Agent, and if Resident vacates the property, the parties hereto agree that Owner will sustain injury and losses that are extremely difficult or impossible to calculate and further agree that a sum equal to sixty (60) days rent is reasonable compensation to Owner for such injury and losses resulting from an improper or missing sixty (60) day notice and shall be paid by Resident to Owner in addition to any other amounts owed.**
**C.  MOVE-OUT INSPECTION: Resident agrees to return all keys, remotes and access cards to the rental office before 10:00 a.m. on the date Resident vacates the property, and at that time accompany Agent on a final walk-through inspection of the property..**



www.isyourhome.com        INITIAL        WASATCH PROPERTY MANAGEMENT

WEAU00008978

Bellows Decl. Ex. 4, page 19

DocuSign Envelope ID: A4919003-A659-493A-AF17-142537859F73

**XVII.   ATTORNEY FEES, COURT COSTS, ADMINISTRATION FEES AND ANY OTHER APPLICABLE FEES**

In the event that either Owner or Resident shall institute any action or proceeding against the other relating to the occupancy of the premises, construing the provisions of this Agreement or because of any default hereunder, then the prevailing party shall be entitled to the payment of reasonable costs, expenses and attorney's fees, which shall be deemed to have accrued on the commencement of such action or proceeding, and shall be enforceable whether or not such action is prosecuted to judgement. Attorney's fees will not exceed $1,000.00 unless otherwise provided by law.

**XVIII.      AMENDMENTS TO AGREEMENT**

This Agreement cannot be altered, amended or changed in any manner whatsoever unless in writing and properly signed by Owner and Resident.

**XIX.   SUBLETTING**

Resident shall not assign or sublet all or any part of the premises nor assign this Agreement or any interest in it. Owner may allow resident to engage in short-term vacation rentals in a limited fashion provided that Owner has approved Resident to opt into the Airbnb Friendly Buildings Program and delivered to Owner all required documentation as outlined in the Airbnb Friendly Buildings Program Addendum to Lease Agreement .

**XX.   JOINT AND SEVERAL RESPONSIBILITY**

Each Resident of the premises rented pursuant to this Agreement shall have joint and several liability for all terms and conditions herein including, but not limited to, the payment of rent.

**XXI. WAIVER OF BREACH**

The waiver by Owner of any breach shall not be construed to be a continuing waiver of any subsequent breach.

**XXII.   RULES AND REGULATIONS**

Resident agrees to comply with all reasonable Owner rules that are applicable to all residents and are in existence at the time of execution of this Agreement. Resident will also comply with any such regulations adopted from time to time by Owner. A copy of such rules and regulations, if any, is attached to, and made a part of this Agreement.  Owner may choose to modify community policies with thirty (30) days' notice to resident. Once change is effective and resident(s) have been notified, the new policy will be considered a formal part of the apartment rental agreement. Notice of any such changes in rules and regulations may be given by publishing the new rules in any monthly newsletter, by posting the new rule on all community bulletin boards, or by posting or delivering the new rule to each Resident at the premises. Thirty (30) days after such change is noticed, all residents will be required to comply with the new rule.

<u>Termination on Breach and Notice to Quit:</u>  Lessee acknowledges and agrees that any violation of the covenants of Lessee hereunder which cause either a nuisance or waste shall be deemed a <u>non-curable default</u> under the provisions of State Civil Codes and shall forthwith <u>terminate this Lease Agreement.</u>

In such event, Lessor shall provide Lessee with a non-alternative notice in writing requiring Lessee to quit and deliver possession of said Unit to Lessor within THREE (3) DAYS after Lessee's actual or constructive receipt of said notice. No reason needs to be stated by the Lessor in said notice, other than the statement that Lessee has violated the provisions of the Lease Agreement.

**XXIII. SECURITY**

Resident acknowledges and agrees that Owner and Owners agents have not promised to provide total security to Resident and are not responsible for any criminal act which results in damage or loss to Resident's property or in injury to any person whatsoever.

**XXIV. ENVIRONMENTAL INDEMNIFICATION**

To the fullest extent allowed by law, in accordance with California Proposition 65, Lessee acknowledges that certain materials containing potentially health-affecting substances, including second hand smoke, may exist in the Apartment Community.  Providing that Lessor complies with local law regarding notice of and/or removal and/or encapsulation requirements of these potential substances, Lessee, for themselves, their heirs, successors, assigns, guests, and all others claiming by, through or under them, or who may live in, occupy, use or reside in the Premises, hereby (a) expressly assumes and accepts any and all risks involved or related to the presence in the Apartment Community of any and all health affecting substances, any power lines in vicinity of the premises, any second hand smoke, any mold or mildew in the premises (b) waives all claims and causes of action of any kind or nature, at law or in equity, including, but not limited, to, claims or causes of action arising by statute, ordinance, rule, regulation or similar provision, against the Lessor and the Owner of the Apartment Community, their agents, principals, employees, legal representatives, affiliates, assignees, successors in title, partners, shareholders, officers and directors (herein collectively called the "Landlord Affiliates") with respect to any health hazard occurring in connection with the presence in the Apartment Community of materials containing potentially health affecting substances, and (c) agrees to defend, indemnify and hold harmless the Landlord Affiliates against and from any and all actions, causes of action, claims, demands, liabilities, losses, damages and expenses of whatsoever kind, including, but not limited to attorney's fees at both the trial and appellate levels, that any or all of the Landlord Affiliates may at times sustain or incur by reason of any and all claims asserted against them to the extent that such claims arise out of or are based upon any potentially health affecting substances brought, or allowed to be brought, into the Apartment Community by Lessee or any guest or other person living  in, occupying, using or residing in the Premises.

**XXV. PREVENTION OF MOLD AND NOTICE OF DISCLOSURE**

In signing this Lease, Lessee has first inspected the aforementioned premises and certifies that he/she has not observed mold, mildew or moisture within the premises. Lessee agrees to immediately notify Management if he/she observes mold/mildew (including the smell of musty odors) and/or moisture conditions (from any source, including leaks), and allow management to evaluate and make recommendations and/or take appropriate corrective action. Lessee relieves Lessor from any liability for any personal injury or damages to property or person caused by or associated with moisture or the growth of or occurrence of mold or mildew on the premises.

**XXVI. RENTPLUS ACKNOWLEDGEMENT**

Upon execution of this agreement, Resident shall be enrolled in RentPlus, a credit reporting and financial tool which is anticipated to help Resident build credit by reporting its rent and utility payments to a credit bureau or credit bureaus on a monthly basis. After the first month of RentPlus services, there will be a financial services fee of **$8.95 per month if only one Resident is enrolled to participate, or a fee of $14.95 per month for multiple Residents** enrolled in a single residence. Participating Residents must be lease signers.  The financial services fee will be charged by Conservice. Resident may opt out of the RentPlus at any time, for any or no reason, and receive additional information by logging in at **www.rentplus.com**. Fees paid will not be reimbursed or prorated. This program may be altered, changed, terminated or otherwise modified with thirty (30) days' notice to Resident. Resident acknowledges that they will be enrolled in RentPlus.

Anthony Maiava                         Initial  <u>_AM_</u>

**XXVII. ELECTRONIC COMMUNICATION**

**AGREEMENT TO RECEIVE NOTICES ELECTRONICALLY:**  You, the Resident agree that, if you have provided Owner or Wasatch Property Management an electronic or email address, any notices may be delivered to you electronically by them or their affiliates and assigns, to the extent permitted by law, including the Electronic Funds Transfer Act, Regulation E, The Equal Credit Opportunity Act, Regulation B, Title V of the Gramm-Leach-Bliley Act, Fair Debt Collection Practices Act (or its applicable regulatory equivalent), The Fair Credit Reporting Act, and/or any other provision of applicable federal or state law or regulation.



INITIAL



Confidential

WEAU00008979

Bellows Decl. Ex. 4, page 20

DocuSign Envelope ID: A4919003-A659-493A-AF17-142537859F73

**REMINDERS & PRE-RECORDED CALLS:** On occasion, customer service representatives of Owner, Wasatch Property Management or their affiliates and assigns and/or an automated telephone dialing system may call you to provide reminder messages about your Residential Rental Agreement and other important information. In the event of the use of the automatic telephone dialing system, these messages are played automatically when the telephone is answered, whether answered by you or someone else. They may be recorded by your answering machine or voice mail system. In the event that a customer service representative calls, instead of the automatic telephone dialing system, that customer service representative may also leave a message on your answering machine or voice mail. You give your consent for Owner, Wasatch Property Management or their affiliates and assigns to call any telephone number you have provided and to leave messages, whether pre-recorded or otherwise, with information about your Residential Rental Agreement. You agree that Owner, Wasatch Property Management and their affiliates and assigns will not be liable to you for any such calls.

**CONTACTING YOU:** In signing this lease, you as Resident are giving your express written consent to be contacted by Owner, Wasatch Property Management, their affiliates and assigns via telephone message or call, text message, through social media and/or email, including for purposes of the Amended Telemarketing Sales Rule (16 CFR §310 et seq.), and the Electronic Signatures in Global and National Commerce Act (15 USC §96), as amended from time to time. The telephone calls, emails and/or messages you are agreeing to receive relate to your Rental Agreement and other services provided by Owner, Wasatch Property Management or their affiliates or assigns. These calls and/or messages may be prerecorded. You are subscribing to receive calls and messages only from Owner, Wasatch Property Management and their affiliates or assigns, and only at the email or specific number(s) you have provided. Your consent will be effective if the email or number(s) you have provided are home, business, or cell phone line, or if the number is registered on any state or federal Do-Not-Call (DNC) list as of the date of this consent. Owner, Wasatch Property Management, their affiliates and assigns reserve the right to refrain from calling any number registered on a DNC list in connection with any promotions. This consent shall remain in effect until you revoke it by sending written notice to Wasatch Property Management at: Attn: Opt-Out, 595 S Riverwoods Parkway, Suite 400, Logan, Utah 84321. You further consent to the recording and monitoring, for quality assurance and collection purposes, of any call that you place to us (or our affiliates) or that we (or our affiliates) place to you. Your consent is not a condition of obtaining your Residential Rental Agreement.

### XXVIII. CREDIT DISCLAIMER and RELEASE

Resident acknowledges and agrees to allow or release to Owner or Owners agent to acquire information from resident's credit from any or all major credit reporting agencies at the landlord's discretion. Resident also releases Owner or Owners agent to report delinquencies, failure for perform, collections, evictions, damages to apartment community, etc. to all entities, individuals, agencies, or corporations at the Landlords discretion. Resident also agrees to hold landlord, its entities, and reporting agencies harmless from any claims or damages caused by the release or application of this information.

**The body of this lease agreement contains terms providing for the automatic renewal or extension of the lease for all or part of the full term of the lease if the lessee remains in possession after the expiration of the lease or fails to give notice of his intent not to renew or extend before the expiration of the lease.**

| | |
|---|---|
| *Anthony Maiava* | 3/30/2020 |
| Anthony Maiava(Lessee) | Date |
| *Yvonne Brown* | 3/30/2020 |
| Owner's Authorized Agent | Date |

LC502_01_CA Revised: 12/1/2019

WASATCH
PROPERTY MANAGEMENT

WEAU00008980

Bellows Decl. Ex. 4, page 21



**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

## Part A of the HAP Contract: Contract Information
(To prepare the contract, fill out all contract information in Part A.)

**1.   Contents of Contract**
    This HAP contract has three parts:
        Part A: Contract Information
        Part B: Body of Contract
        Part C: Tenancy Addendum

**2.   Tenant**

    ROY HUSKEY III

**3.   Contract Unit**

    4141 PALM AVE 191
    SACRAMENTO, CA  95842

**4.   Household**
    The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.

    ROY L HUSKEY III

**5.   Initial Lease Term**
    The initial lease term begins on (mm/dd/yyyy): **07/08/2011**
    The initial lease term ends on (mm/dd/yyyy): **06/30/2012**

**6.   Initial Rent to Owner**
    The initial rent to owner is: $840
    During the initial lease term, the owner may not raise the rent to owner.

**7.   Initial Housing Assistance Payment**
    The HAP contract term commences on the first day of the initial lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $554 per month.

    The amount of the monthly housing assistance payment by the PHA to the owner is  subject to change during the HAP contract term in accordance with HUD requirements.

WAS000377

Bellows Decl. Ex. 5, page 1

**8.   Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities or appliances indicated below by a "T".  Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Provided By | |
|---|---|---|
| | Owner | Tenant |
| Air Conditioning | | T |
| Cooking Oil/Electric | | T |
| Flat Fee Electric | | T |
| Heating - Oil/Electric | | T |
| Other Electric | | T |
| Refrigerator | O | |
| Sewer | O | |
| Trash Collection | O | |
| Water | O | |

**Signatures**
**Public Housing Agency: SHRA County of Sacramento Housing Authority**

Print or Type Name of PHA

Signature

SILVERIO RAMOS
Print or Type Name and Title of Signatory

07 · 18 · 11
Date (mm/dd/yyyy)

**Owner:  LOGAN PARK APARTMENTS**

Print or Type Name of Owner

Signature

Darlene Jeffery   Asst Manager
Print or Type Name and Title of Signatory

7/9/11
Date (mm/dd/yyyy)

**Mail Payments to:**

**LOGAN PARK APARTMENTS**

Name

4215 PALM AVE - OFFICE
C/O WASATCH PROPERTY MGMT
SACRAMENTO, CA  95842

Address (Street, City, State, Zip)

Previous editions are obsolete                    Page 3 of 12

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000378

Bellows Decl. Ex. 5, page 2

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

**Part B of HAP Contract: Body of Contract**

1. **Purpose**

   a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

   d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

   c. The lease for the contract unit must include word- for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

   d. The owner certifies that:

      (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
      (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
      (3) The lease is consistent with State and local law.

   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

   b. The owner must provide all utilities needed to comply with the HQS.

   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach

include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

   f. The PHA must notify the owner of any HQS defects shown by the inspection.

   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

   a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

   b. **When HAP contract terminates.**

      (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
      (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
      (3) If the family moves from the contract unit, the HAP contract terminates automatically.
      (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
      (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
      (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in-aide.

---

WAS000379

Bellows Decl. Ex. 5, page 3

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

**5. Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

**6. Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or re-determined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

   (1) The location, quality, size, unit type, and age of the contract unit; and

   (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must re-determine the reasonable rent when required in accordance with HUD requirements. The PHA may re-determine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

**7. PHA Payment to Owner**

a. **When paid**

   (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

   (2) The PHA must pay housing assistance payments promptly when due to the owner.

   (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge

such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

   (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

   (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

   (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

   (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility.**

   (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

   (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

**8. Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

WAS000380

Bellows Decl. Ex. 5, page 4

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

WAS000381

Bellows Decl. Ex. 5, page 5

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

c. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1) Has violated obligations under a housing assistance payments contract under Section 8;

   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any for any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

---

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000382

Bellows Decl. Ex. 5, page 6



16. **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

17. **Entire Agreement: Interpretation**

    a.    The HAP contract contains the entire agreement between the owner and the PHA.

    b.    The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

WAS000383

Bellows Decl. Ex. 5, page 7

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2012)

---

## Part C of HAP Contract: Tenancy Addendum

**1.  Section 8 Voucher Program**

   a.  The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

   b.  The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

**2.  Lease**

   a.  The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

   b.  The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

**3.  Use of Contract Unit**

   a.  During the lease term, the family will reside in the contract unit with assistance under the voucher program.

   b.  The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   c.  The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit-making activities incidental to primary use of the unit for residence by members of the family.

   d.  The tenant may not sublease or let the unit.

   e.  The tenant may not assign the lease or transfer the unit.

**4.  Rent to Owner**

   a.  The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

   b.  Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c.  During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

     (1)  The reasonable rent for the unit as most recently determined or re-determined by the PHA in accordance with HUD requirements, or

     (2)  Rent charged by the owner for comparable unassisted units in the premises.

**5.  Family Payment to Owner**

   a.  The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

   b.  Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

   c.  The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d.  The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

   e.  The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

   f.  The owner must immediately return any excess rent payment to the tenant.

**6.  Other Fees and Charges**

   a.  Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

   b.  The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

   c.  The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

**7.  Maintenance, Utilities, and Other Services**

   a.  **Maintenance**

     (1)  The owner must maintain the unit and premises in accordance with the HQS.

     (2)  Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

---

WAS000384

Bellows Decl. Ex. 5, page 8

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

   (a) Pay for any utilities that are to be paid by the tenant.
   (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**
   a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.
   b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

   (1) Serious or repeated violation of the lease;
   (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
   (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
   (4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**
   (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

   (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
   (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
   (c) Any violent criminal activity on or near the premises; or
   (d) Any drug-related criminal activity on or near the premises.

   (2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

   (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
   (b) Violating a condition of probation or parole under Federal or State law.

   (3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.
   (4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**
   (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
   (2) During the initial lease term or during any extension term, other good cause may include:

   (a) Disturbance of neighbors,
   (b) Destruction of property, or
   (c) Living or housekeeping habits that cause damage to the unit or premises.

   (3) After the initial lease term, such good cause may include:

   (a) The tenant's failure to accept the owner's offer of a new lease or revision;
   (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
   (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

   (4) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

   (5) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

e. **Protections for Victims of Abuse.**
   (1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.
   (2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

form HUD-52641 (8/2009)
ref Handbook 7420.8

WAS000385

Bellows Decl. Ex. 5, page 9

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, orotherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

**f. Eviction by court action.** The owner may only evict the tenant by a court action.

**g. Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**9. Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

**10. PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**11. Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

**12. Security Deposit**

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

**13. Prohibition of Discrimination**

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

WAS000386

Bellows Decl. Ex. 5, page 10

**14. Conflict with Other Provisions of Lease**

    a.  The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

    b.  In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

**15. Changes in Lease or Rent**

    a.  The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

    b.  In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

       (1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

       (2)  If there are any changes in lease provisions governing the term of the lease;

       (3)  If the family moves to a new unit, even if the unit is in the same building or complex.

    c.  PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

    d.  The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

**16. Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

**17. Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

WAS000387

Bellows Decl. Ex. 5, page 11

**Housing Assistance Payments Contract**

(HAP Contract)
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
exp. 7/31/2022

**Privacy Act Statement:** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied to the tenant. HUD may disclose this information to Federal, State, and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum
**Use of this form**
Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities

Section 5. **Initial Lease Term**

Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

- Such shorter term would improve housing opportunities for the tenant, **and**
- Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**

Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**

Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

Previous editions are obsolete

form **HUD-52641** (7/2019)

Bellows Decl. Ex. 5, page 12

**Housing Assistance Payments Contract**

**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

---

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract** This
   HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract Part
   C: Tenancy Addendum

2. **Tenant**

Kieone Kareem Finch-Colley

3. **Contract Unit**

2305 E Main St
Suite 132
Mesa, AZ  85205

4. **Household**

The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

Kieone Kareem Finch-Colley

5. **Initial Lease Term**

The initial lease term begins on (mm/dd/yyyy): 05/13/2021

The initial lease term ends on (mm/dd/yyyy): 04/30/2022

6. **Initial Rent to Owner**

The initial rent to owner is: $ 959.00
During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the monthly housing assistance payment by the PHA to the owner is $ 786.00 per month.
The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

CONFIDENTIAL

WCDS 1496404

Bellows Decl. Ex. 5, page 13

8. Utilities and Appliances

The owner shall provide or pay for the utilities/appliances indicated below by an "**O**". The tenant shall provide or pay for the utilities/appliances indicated below by a "**T**". Unless otherwise specified below, the owner shall pay for all utilities and provide the refrigerator and range/microwave.

| Item | Specify fuel type | Paid by |
|---|---|---|
| Heating | ☐ Natural gas  ☐ Bottle gas  ☑ Electric  ☐ Heat Pump  ☐ Oil  ☑ Other | T |
| Cooking | ☐ Natural gas  ☐ Bottle gas  ☐ Electric                            ☑ Other | T |
| Water Heating | ☐ Natural gas  ☐ Bottle gas  ☑ Electric                    ☐ Oil  ☑ Other | T |
| Other Electric | | T |
| Water | | T |
| Sewer | | T |
| Trash Collection | | T |
| Air Conditioning | | T |
| Other (specify) | Flat-Fee Electric: T | |
| | | Provided by |
| Refrigerator | | O |
| Range/Microwave | | O |

**Signatures**

**Public Housing Agency**

City of Mesa Housing Authority

Print or Type Name of PHA

_____

Signature

Rosario Beltran-Joshi, Housing Supervisor

Print or Type Name and Title of Signatory

_____

Date (mm/dd/yyyy)

**Owner**

Wasatch Premier Properties LLC DBA Sands A

Print or Type Name of Owner

_____

Signature

_____

Print or Type Name and Title of Signatory

_____

Date (mm/dd/yyyy)

Mail payments to:

Wasatch Premier Properties LLC DBA Sands A

Name

2305 E Main St
Mesa, AZ  85213

_____

Address (street, city, state, zip code)

CONFIDENTIAL

WCDS 1496405

Bellows Decl. Ex. 5, page 14

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

### 1. Purpose

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

### 2. Lease of Contract Unit

a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d. The owner certifies that:

   (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

   (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

   (3) The lease is consistent with State and local law.

e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

### 3. Maintenance, Utilities, and Other Services

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

### 4. Term of HAP Contract

a. Relation to lease term. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. When HAP contract terminates.

   (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

   (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

   (3) If the family moves from the contract unit, the HAP contract terminates automatically.

   (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

   (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

   (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

   (7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

   (8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing

CONFIDENTIAL                                                                      WCDS 1496406

Bellows Decl. Ex. 5, page 15

assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

## 5. Provision and Payment for Utilities and Appliances

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

## 6. Rent to Owner; Reasonable Rent

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

## 7. PHA Payment to Owner

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the

PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments; abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be prorated for a partial month.

d. **Application of payment** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. **Limit of PHA responsibility**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. **Overpayment to owner** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

## 8. Owner Certification

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP

---

CONFIDENTIAL                                                                      WCDS 1496407

Bellows Decl. Ex. 5, page 16

contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9.   Prohibition of Discrimination.** In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract. Eligibility for HUD's programs must be made without regard to actual or perceived sexual orientation, gender identity, or marital status.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

c. Violence Against Women Act. The owner must comply with the Violence Against Women Act, as amended, and HUD's implementing regulation at 24 CFR part 5, Subpart L, and program regulations.

**10.   Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1)   If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2)   If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3)   If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4)   For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or

criminal act in connection with the mortgage or loan.

(5)   If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11.   PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD, and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12.   Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used

CONFIDENTIAL                                                                                      WCDS 1496408

Bellows Decl. Ex. 5, page 17

by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:

   (1)  Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

   (2)  Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

   (3)  Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

   (4)  Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

   (1)  The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

   (2)  A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

   (1)  Has violated obligations under a housing assistance payments contract under Section 8;

   (2)  Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

   (3)  Has engaged in any drug-related criminal activity or any violent criminal activity;

   (4)  Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

   (5)  Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

      (a) Threatens the right to peaceful enjoyment of the premises by other residents;

      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

      (d) Is drug-related criminal activity or violent criminal activity;

   (6)  Has a history or practice of renting units that fail to meet State or local housing codes; or

   (7)  Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Reserved**

**16. Written Notices** Any notice by the PHA or the owner in connection with this contract must be in writing.

CONFIDENTIAL

Bellows Decl. Ex. 5, page 18

17. **Entire Agreement: Interpretation**

    a. The HAP contract contains the entire agreement between the owner and the PHA.

    b. The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

CONFIDENTIAL                                                                    WCDS 1496410

Bellows Decl. Ex. 5, page 19

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing**
**and Urban Development**
Office of Public and Indian Housing

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**

   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**

   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**

   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

   d. The tenant may not sublease or let the unit.

   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**

   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

      (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

      (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**

   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**

   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**

   a. **Maintenance**

      (1) The owner must maintain the unit and premises in accordance with the HQS.

      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

   b. **Utilities and appliances**

      (1) The owner must provide all utilities needed to comply with the HQS.

---

CONFIDENTIAL                                                                    WCDS 1496411

Bellows Decl. Ex. 5, page 20

(2)  The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

    (a)  Pay for any utilities that are to be paid by the tenant.

    (b)  Provide and maintain any appliances that are to be provided by the tenant.

c.  **Family damage**. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d.  **Housing services**. The owner must provide all housing services as agreed to in the lease.

## 8. Termination of Tenancy by Owner

a.  **Requirements**. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b.  **Grounds**. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1)  Serious or repeated violation of the lease;

(2)  Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3)  Criminal activity or alcohol abuse (as provided in paragraph c); or

(4)  Other good cause (as provided in paragraph d).

c.  **Criminal activity or alcohol abuse.**

(1)  The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

    (a)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

    (b)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

    (c)  Any violent criminal activity on or near the premises; or

    (d)  Any drug-related criminal activity on or near the premises.

(2)  The owner may terminate the tenancy during the term of the lease if any member of the household is:

    (a)  Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

    (b)  Violating a condition of probation or parole under Federal or State law.

(3)  The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4)  The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d.  **Other good cause for termination of tenancy\**

(1)  During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2)  During the initial lease term or during any extension term, other good cause may include:

    (a)  Disturbance of neighbors,

    (b)  Destruction of property, or

    (c)  Living or housekeeping habits that cause damage to the unit or premises.

(3)  After the initial lease term, such good cause may include:

    (a)  The tenant's failure to accept the owner's offer of a new lease or revision;

    (b)  The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

    (c)  A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

    (d)  The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

## 9. Protections for Victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking.

a.  **Purpose:** This section incorporates the protections for victims of domestic violence, dating violence, sexual assault, or stalking in accordance with subtitle N of the Violence Against Women Act of 1994, as amended (codified as amended at 42 U.S.C. 14043e et seq.) (VAWA) and implementing regulations at 24 CFR part 5, subpart L.

b.  **Conflict with other Provisions:** In the event of any conflict between this provision and any other provisions included in Part C of the HAP contract, this provision shall prevail.

CONFIDENTIAL

WCDS 1496412

Bellows Decl. Ex. 5, page 21

c. **Effect on Other Protections**: Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, sexual assault, or stalking.

d. **Definition**: As used in this Section, the terms "actual and imminent threat," "affiliated individual", "bifurcate", "dating violence," "domestic violence," "sexual assault," and "stalking" are defined in HUD's regulations at 24 CFR part 5, subpart L. The terms "Household" and "Other Person Under the Tenant's Control" are defined at 24 CFR part 5, subpart A.

e. **VAWA Notice and Certification Form**: The PHA shall provide the tenant with the "Notice of Occupancy Rights under VAWA and the certification form described under 24 CFR 5.2005(a)(1) and (2).

f. **Protection for victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking:**

   (1) The landlord or the PHA will not deny admission to, deny assistance under, terminate from participation in, or evict the Tenant on the basis of or as a direct result of the fact that the Tenant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the Tenant otherwise qualifies for admission, assistance, participation, or occupancy. 24 CFR 5.2005(b)(1).

   (2) The tenant shall not be denied tenancy or occupancy rights solely on the basis of criminal activity engaged in by a member of the Tenant's Household or any guest or Other Person Under the Tenant's Control, if the criminal activity is directly related to domestic violence, dating violence, sexual assault, or stalking, and the Tenant or an Affiliated Individual of the Tenant is the victim or the threatened victim of domestic violence, dating violence, sexual assault, or stalking. 24 CFR 5.2005(b)(2).

   (3) An incident or incidents of actual or threatened domestic violence, dating violence, sexual assault or stalking will not be construed as serious or repeated violations of the lease by the victim or threatened victim of the incident. Nor shall it not be construed as other "good cause" for termination of the lease, tenancy, or occupancy rights of such a victim or threatened victim. 24 CFR 5.2005(c)(1) and (c)(2).

g. **Compliance with Court Orders:** Nothing in this Addendum will limit the authority of the landlord, when notified by a court order, to comply with the court order with respect to the rights of access or control of property (including civil protection orders issued to protect a victim of domestic violence, dating violence, sexual assault, or stalking) or with respect to the distribution or possession of property among members of the Tenant's Household. 24 CFR 5.2005(d)(1).

h. **Violations Not Premised on Domestic Violence, Dating Violence, Sexual Assault, or Stalking:** Nothing in this section shall be construed to limit any otherwise available authority of the Landlord to evict or the public housing authority to terminate the assistance of a Tenant for any violation not premised on an act of domestic violence, dating violence, or stalking that is in question against the Tenant or an Affiliated Individual of the Tenant.

However, the Landlord or the PHA will not subject the tenant, who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, to a more demanding standard than other tenants in determining whether to evict or terminate assistance. 24 CFR 5.2005(d)(2).

i. **Actual and Imminent Threats:**

   (1) Nothing in this section will be construed to limit the authority of the Landlord to evict the Tenant if the Landlord can demonstrate that an "actual and imminent threat" to other tenants or those employed at or providing service to the property would be present if the Tenant or lawful occupant is not evicted. In this context, words, gestures, actions, or other indicators will be construed as an actual and imminent threat if they meet the following standards for an actual and imminent threat: "Actual and imminent threat" refers to a physical danger that is real, would occur within an immediate time frame, and could result in death or serious bodily harm. In determining whether an individual would pose an actual and imminent threat, the factors to be considered include: the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the length of time before the potential harm would occur. 24 CFR 5.2005(d)(3).

   (2) If an actual and imminent threat is demonstrated, eviction should be used only when there are no other actions that could be taken to reduce or eliminate the threat, including, but not limited to, transferring the victim to a different unit, barring the perpetrator from the property, contacting law enforcement to increase police presence, developing other plans to keep the property safe, or seeking other legal remedies to prevent the perpetrator from acting on a threat. Restrictions predicated on public safety cannot be based on stereotypes, but must be tailored to particularized concerns about individual residents. 24 CFR 5.2005(d)(4).

j. **Emergency Transfer:** A tenant who is a victim of domestic violence, dating violence, sexual assault, or stalking may request an emergency transfer in accordance with the PHA's emergency transfer plan. 24 CFR 5.2005(e). The PHA's emergency transfer plan must be made available upon request, and incorporate strict confidentiality measures to ensure that the PHA does not disclose a tenant's dwelling unit location to a person who committed or threatened to commit an act of domestic violence, dating violence, sexual assault, or stalking against the tenant;

For transfers in which the tenant would not be considered a new applicant, the PHA must ensure that a request for an emergency transfer receives, at a minimum, any applicable additional priority that is already provided to other types of emergency transfer requests. For transfers in which the tenant would be considered a new applicant, the plan must include policies for assisting a tenant with this transfer.

k. **Bifurcation**: Subject to any lease termination requirements or procedures prescribed by Federal, State, or local law, if any member of the Tenant's Household engages in criminal activity directly relating to domestic violence, dating violence, sexual assault, or stalking, the Landlord may "bifurcate" the Lease, or remove that Household member from the Lease, without regard to whether that Household member is a signatory to the Lease, in order to evict, remove, or terminate the occupancy rights of that Household member without evicting, removing, or otherwise

CONFIDENTIAL

WCDS 1496413

Bellows Decl. Ex. 5, page 22

penalizing the victim of the criminal activity who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program. 24 CFR 5.2009(a).

If the Landlord bifurcates the Lease to evict, remove, or terminate assistance to a household member, and that household member is the sole tenant eligible to receive assistance, the landlord shall provide any remaining tenants or residents a period of 30 calendar days from the date of bifurcation of the lease to:

(1) Establish eligibility for the same covered housing program under which the evicted or terminated tenant was the recipient of assistance at the time of bifurcation of the lease;

(2) Establish eligibility under another covered housing program; or

(3) Find alternative housing.

l. **Family Break-up:** If the family break-up results from an occurrence of domestic violence, dating violence, sexual assault, or stalking, the PHA must ensure that the victim retains assistance. 24 CFR 982.315.

m. **Move with Continued Assistance:** The public housing agency may not terminate assistance to a family or member of the family that moves out of a unit in violation of the lease, with or without prior notification to the public housing agency if such a move occurred to protect the health or safety of a family member who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking; and who reasonably believed they were imminently threatened by harm from further violence if they remained in the dwelling unit, or if any family member has been the victim of sexual assault that occurred on the premises during the 90-calendar-day period preceding the family's request to move.

(1) The move is needed to protect the health or safety of the family or family member who is or has been a victim of domestic violence dating violence, sexual assault or stalking; and

(2) The family or member of the family reasonably believes that he or she was threatened with imminent harm from further violence if he or she remained in the dwelling unit. However, any family member that has been the victim of a sexual assault that occurred on the premises during the 90-calendar day period preceding the family's move or request to move is not required to believe that he or she was threatened with imminent harm from further violence if he or she remained in the dwelling unit. 24 CFR 982.354.

n. **Confidentiality.**

(1) The Landlord shall maintain in strict confidence any information the Tenant (or someone acting on behalf of the Tenant) submits to the Landlord concerning incidents of domestic violence, dating violence, sexual assault or stalking, including the fact that the tenant is a victim of domestic violence, dating violence, sexual assault, or stalking.

(2) The Landlord shall not allow any individual administering assistance on its behalf, or any persons within its employ, to have access to confidential information unless explicitly authorized by the Landlord for reasons that specifically call for these individuals to have access to the information pursuant to applicable Federal, State, or local law.

(3) The Landlord shall not enter confidential information into any shared database or disclose such information to any other entity or individual, except to the extent that the disclosure is requested or consented to in writing by the individual in a time-limited release; required for use in an eviction proceeding; or is required by applicable law.

**10. Eviction by court action**

The owner may only evict the tenant by a court action.

**11. Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**12. Lease: Relation to HAP Contract**

If the HAP contract terminates for any reason, the lease terminates automatically.

**13. PHA Termination of Assistance**

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**14. Family Move Out**

The tenant must notify the PHA and the owner before the family moves out of the unit.

**15. Security Deposit**

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

**16. Prohibition of Discrimination**

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease. Eligibility for HUD's programs must be made without regard to actual or perceived sexual orientation, gender identity, or marital status.

**17. Conflict with Other Provisions of Lease**

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and

CONFIDENTIAL

WCDS 1496414

Bellows Decl. Ex. 5, page 23

regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b.  In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 18. Changes in Lease or Rent

a.  The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b.  In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

   (1)  If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

   (2)  If there are any changes in lease provisions governing the term of the lease;

   (3)  If the family moves to a new unit, even if the unit is in the same building or complex.

c.  PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d.  The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 19. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 20. Definitions

**Contract unit**. The housing unit rented by the tenant with assistance under the program.

**Family**. The persons who may reside in the unit with assistance under the program.

**HAP contract**. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household**. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS)**. The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD**. The U.S. Department of Housing and Urban Development.

**HUD requirements**. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease**. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA**. Public Housing Agency.

**Premises**. The building or complex in which the contract unit is located, including common areas and grounds.

**Program**. The Section 8 housing choice voucher program.

**Rent to owner**. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8**. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant**. The family member (or members) who leases the unit from the owner.

**Voucher program**. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

Previous editions are obsolete

form **HUD-52641** (7/2019)

CONFIDENTIAL

WCDS 1496415

Bellows Decl. Ex. 5, page 24